# EXHIBIT 2

17

1  A  It's a revolver.
2  Q  Okay.  And do you still have that gun?
3  A  Yes, ma'am.
4  Q  How long have you had the gun for,
5     approximately?
6  A  Do you mean when did I buy it?
7  Q  Yes, that works.
8  A  Oh, wow.  20 years ago.
9  Q  And do you have a permit for it, or does it just
10    stay inside your house?
11 A  It just stays inside my house.
12 Q  What's the primary purpose of the weapon?
13 A  Personal protection.
14 Q  Personal protection, okay.
15    And are you -- I don't know how to put
16    this -- a gun guy, a gun aficionado, do you
17    enjoy guns?
18 A  No, ma'am.
19 Q  Do you smoke?
20 A  Can you define "smoke"?
21 Q  Cigarettes.
22 A  Occasionally, yeah.  Rarely.
23 Q  Do you smoke any sort of recreational drugs?
24 A  I have, but I do not.
25 Q  How often would you say you've smoked a

18

1     recreational drug in the last year, if at all?
2  A  Once or twice.
3  Q  And are we talking about weed?
4  A  We are talking about weed.
5  Q  Okay.  Just wanted to make sure we're on the
6     same page.
7     Now I'm going to ask you a few questions
8     about your family.  Are you married?
9  A  No, ma'am.
10 Q  Were you married in November 2013?
11 A  Yes.
12 Q  And what was your wife's name?
13 A  Mari, M-A-R-I, Bilger, B-I-L-G-E-R.
14 Q  And do you know her date of birth?
15 A  ████████, 1971.
16 Q  And where did she live in November of 2013?
17 A  At her house in Plainfield, Indiana.
18 Q  And can you give me that address, if you recall?
19 A  221 South Vine Street in Plainfield.
20 Q  So you guys were married but each owned separate
21    houses?
22 A  Correct.
23 Q  How much time would you spend at her house,
24    would you estimate, maybe in a week?
25 A  One or two evenings a week, at most.

19

1  Q  At her house?  Would she come and stay with you?
2  A  Rarely.
3  Q  And what does she do for a living?
4  A  I'm sorry.
5  Q  You're fine.
6  A  She is -- she works in the computer field.
7  Q  Do you have any children?
8  A  No, ma'am.
9  Q  And do you have any siblings?
10 A  Yes, ma'am.
11 Q  And what are their names?
12 A  My sister's name is Rebecca, same last name.  My
13    brother's name is Robert.
14 Q  Is that all your siblings?
15 A  Yes, ma'am.
16 Q  And who's the oldest, or can you give me oldest
17    to youngest?
18 A  My sister is the oldest, I'm middle, my brother
19    is the youngest.
20 Q  I'm going to talk about Robert for just a
21    second, okay?
22 A  Uh-huh.
23 Q  Do you know Robert's date of birth?
24 A  ████████, 1962.
25 Q  Is Robert married?

20

1  A  No.
2  Q  Does he have a girlfriend or significant other,
3     that you know of?
4  A  I do not know.
5  Q  And I know in November of 2013, he was living
6     with you for a little bit; is that correct?
7  A  Correct.
8  Q  Is he still living with you?
9  A  No, ma'am.
10 Q  What's his current address?
11 A  7155 East 21st Street, Apartment 5.
12 Q  And that's in Indianapolis?
13 A  Yes, ma'am.
14 Q  Okay.  And what does Robert do for a living?
15 A  He's a house painter.
16 Q  And what's Robert's cell phone number?
17 A  (317)357-5791.
18 Q  How often do you see Robert?
19 A  Every few weeks.
20 Q  Every few weeks.
21    Would you characterize your relationship as
22    close?
23 A  Yes.
24 Q  And I know we touched on Robert was living with
25    you in November of 2013.  And why was he living



**21**

1   with you?
2   A  His house had been foreclosed on.  He was in a
3      financial muddle.
4   Q  Okay.
5   A  So...
6   Q  And when did he start living with you?
7   A  The summer of 2013, I think.
8   Q  Okay.  So he had been with you for three, four
9      months, something like that --
10  A  Yeah, I can't remember exactly.
11  Q  -- at the time of the -- and then Rebecca, do
12     you know her date of birth?
13  A  ~~~~~~~~, 1951.
14  Q  And is Rebecca married?
15  A  Yes.
16  Q  What's her husband's name?
17  A  Larry Ferguson.
18  Q  Do they have any kids?
19  A  You mean between them?
20  Q  Yes.
21  A  No.
22  Q  Do they have kids separately?
23  A  My sister has a daughter.
24  Q  A daughter?  And how old is her daughter?
25  A  Mid-40s.

**22**

1   Q  Mid-40s, okay.  So that's your niece; correct?
2   A  Correct.
3   Q  And what's her name?
4   A  Amber Hulse, H-U-L-S-E.
5   Q  And does she live in Indianapolis?
6   A  Amber lives in the county seat of Hendricks
7      County.  Danville.
8   Q  How often do you see Amber?
9   A  Once a month.
10  Q  Does Rebecca live with Larry?
11  A  Yes.
12  Q  And where do they live at?
13  A  They live in Greenville, South Carolina.
14  Q  Okay.  Now, she lived in Indianapolis in
15     November of 2013; correct?
16  A  Yes, ma'am.
17  Q  And what was her address?
18  A  In November of 2013?
19  Q  Correct.
20  A  12957 Tarkington Common, Carmel.
21  Q  What does Rebecca do for a living?
22  A  Rebecca is retired.
23  Q  Retired now.  What did she do before she
24     retired?
25  A  She was a CPA.

**23**

1   Q  How often do you see Rebecca?  I know she lives
2      far away.
3   A  Once a year.
4   Q  Once a year.  Did you see her more frequently
5      when she lived in Carmel?
6   A  Yes.
7   Q  How often did you see her?
8   A  Once -- once a month.
9   Q  Once a month.  Do you recall the last time you
10     saw her before the incident on the 19th,
11     November 19th?
12  A  No, not -- not with any accuracy.
13  Q  And what is your father's name?
14  A  His name was Ralph, R-A-L-P-H, Rainsberger.
15  Q  And he passed away?
16  A  Yes.
17  Q  I'm sorry about that.  When did he pass away?
18     Has it been a while?
19  A  '83?
20  Q  Were he and your mom married at that time --
21  A  No.
22  Q  -- when he passed away?
23  A  No.
24  Q  And did he live in Indianapolis at that time?
25  A  No.

**24**

1   Q  Did you have much of a relationship after he and
2      your mom got divorced?
3   A  No.
4   Q  And your mother's name was Ruth Rainsberger;
5      correct?
6   A  Yes, ma'am.
7   Q  And she was attacked and killed on
8      November 19, 2013?
9   A  She was attacked on November 19th.
10  Q  And she died the next day; is that correct?
11  A  Yes.
12  Q  I'm going to talk about your mom a little bit,
13     and I'm sorry for your loss.  I know this is --
14  A  That's okay.
15  Q  I'm sure it's tough to talk about; if you ever
16     need a break just let me know, okay?
17     Do you know your mom's date of birth?
18  A  ~~~~~~~~ 1925.
19  Q  And how old was she when she died?
20  A  8- -- 88.
21  Q  And where did she live?
22  A  801 North Shortridge, Apartment H-11,
23     Indianapolis.
24  Q  And that's an apartment complex?
25  A  Yes.  It's called Jeffersonian.

25

1  Q   And can you describe her apartment for me,
2      briefly?
3  A   She had a two-bedroom, one-bath apartment that
4      was in the -- like, half in the basement.  Very
5      generic apartment.
6  Q   And did she live there by herself?
7  A   Yes, ma'am.
8  Q   How long had she lived there for?
9  A   At the time she passed away, it had been almost
10     two years.
11 Q   Did she have a cell phone at that time?
12 A   Think of an answer that works correctly.  She
13     had a cell phone but never used it and did not
14     know how to operate it.
15 Q   I understand that.  Did she have a land line?
16 A   Yes, ma'am.
17 Q   And what was that number?
18 A   I don't remember.  It's in the --
19 Q   It's in the records?
20 A   Yeah.
21 Q   I'll find it real quick.
22 A   375-7841.
23 Q   7841?  375-7841?
24 A   Yes.
25 Q   What was your mom's physical condition like at

26

1      the time of her death?  Was she mobile, could
2      she walk?
3  A   Yes.
4  Q   Did she need any assistance from a walker or a
5      wheelchair or anything like that?
6  A   No.
7  Q   Was she able to care for herself?
8  A   No.
9  Q   No, okay.  Could she bathe herself?
10 A   I don't mean to be this -- this guy.
11 Q   You're fine.
12 A   She was -- she would have been physically strong
13     enough and adept enough to bathe herself, but
14     her dementia prevented her from performing
15     routine tasks.
16 Q   Describe her dementia for me a little bit.
17     Would you characterize it as severe or bad?
18 A   No.
19 Q   No, okay.  How often in a day would she forget
20     something, or what were -- let me back up.
21     What were her symptoms?
22 A   She -- there was a couple things.  One was
23     forgetfulness and the other is loss of executive
24     function.
25 Q   What do you mean by that?

27

1  A   She was not able to perform tasks that required
2      more than one or two steps.
3  Q   Okay.
4  A   So, for example, to make toast would be -- it's
5      kind of haphazard.
6  Q   Okay.
7  A   She had Lewy body dementia, the same thing Robin
8      Williams had.
9  Q   Oh, okay.
10 A   She was under treatment for that.
11 Q   Were you her primary caregiver at the time?
12 A   Yes.
13 Q   Who else helped with taking care of your mom?
14 A   My sister.
15 Q   What would you do for your mom, general tasks?
16 A   I went to the store, did her dishes, and put
17     things away.  The main thing I did was just to
18     be a companion.
19 Q   And what would Rebecca do for your mom?
20 A   Mainly laundry.
21 Q   How often --
22 A   She would -- she would also -- I'm sorry, I'm
23     not really here or there.  She would also bathe
24     her.
25 Q   And how often would you see her?

28

1  A   My mother?
2  Q   Yes, your mother, sorry.
3  A   Every day.
4  Q   How often would Rebecca see her?
5  A   Once a week.
6  Q   And did your mom have food delivered to her?
7  A   Yes, ma'am.
8  Q   And how often did those food deliveries come?
9  A   Monday through Friday.
10 Q   Did they come at the same time every day?
11 A   Approximately, yes.
12 Q   Approximately.  And what time was that?
13 A   10:30 or 11:00.
14 Q   Do you know if it was the same individual who
15     dropped the food off each day?
16 A   Yes.
17 Q   Did your mom understand that she was having food
18     delivered --
19 A   Yes.
20 Q   -- pretty much every day around 10:30?
21 A   Yes.
22 Q   So she would have been expecting a delivery?
23 A   Yes.
24 Q   How often would your mom get out of the house?
25 A   Rarely.



29

1  Q   Would she ever go out by herself?
2  A  No.
3  Q   And I believe you talked a little bit about, in
4      your statement, that she was either skeptical --
5      or I think "leery" was the word you used -- of
6      people at her door.  Is that correct?
7  A  Yes.  She was kind of skeptical of everyone, but
8      she would answer the door sometimes, against my
9      urging.
10 Q   And do you know specific times that she would
11     answer the door for people she didn't know?
12 A  The only time that I know that she did that she
13     told me about was when the two guys that lived
14     upstairs, who we referred to this morning --
15 Q   Right.
16 A  -- their names escape me --
17 Q   I don't know off the top of my head.
18 A  -- when they moved -- when they moved in, they
19     came down and introduced themselves, which my
20     mother thought was kind of funny or odd, but...
21 Q   But would you say it would be rare for her to
22     open the door for a stranger?
23 A  I don't have enough data points to know because
24     she didn't really tell me, and people didn't
25     generally knock on her door except the food guy.

31

1  Q   Did she have to take medication for her
2      scoliosis?
3  A  No.
4  Q   What, if any, side effects would she have from
5      her scoliosis?
6  A  It was difficult for her to walk and get around.
7  Q   And what medication or medications was your mom
8      on for her dementia?
9  A  Aricept, A-R-I-C-E-P-T.
10 Q   Do you know what dosage?
11 A  No.
12 Q   Okay.
13 A  And that's for hallucinations.
14 Q   It's for hallucinations?
15 A  Aricept is for hallucinations.
16 Q   And the hallucinations were a side effect of her
17     dementia, to your understanding?
18 A  Correct, correct.
19 Q   And did you fill her prescriptions for her?
20 A  Yes.
21 Q   Aricept, what was the packaging?  What did it
22     look like?
23 A  Just a pill bottle.
24 Q   Just a pill bottle?
25 A  Uh-huh.

30

1  Q   Do you remember making statements to Detective
2      Benner about how you thought it would be
3      unlikely that she would answer the door for a
4      stranger?
5  A  Yes.
6  Q   And with your mom's dementia issues, was she
7      able to handle her own finances?
8  A  No.
9  Q   Did you handle those for her?
10 A  Yes.
11 Q   What did you do, generally, for her financially?
12 A  The utilities were in my name and, of course, I
13     paid for groceries when I went to the grocery,
14     so I paid her bills, prepared checks for her to
15     sign.
16 Q   So she was able to still sign her checks,
17     though?
18 A  Yes.
19 Q   And did she reimburse you for the groceries that
20     you bought for her?
21 A  Yes.
22 Q   Did your mom have any other illnesses besides
23     her dementia?
24 A  I believe the only other medical condition she
25     had was scoliosis.

32

1  Q   Did your mom have any hospitalizations close to
2      the time of her death?
3  A  No.
4  Q   Would you also make sure that she took her
5      medication daily?
6  A  Yes.
7  Q   Did Robert help much with caring for your mom?
8  A  No.
9  Q   And why was that?
10 A  I took it on because he worked, and I was
11     retired, and I enjoyed doing it, so I didn't
12     think anything of it.
13 Q   Was Robert still pretty close with your mom?
14 A  Oh, yeah.
15 Q   How often would he see her?
16 A  Every few months.
17 Q   Every few months.
18     Do you know when the last time Robert saw
19     your mom before this incident was?
20 A  I do not.
21 Q   Did you have a key to your mom's apartment?
22 A  Yes, ma'am.
23 Q   Who else had keys to the apartment?
24 A  My brother and my sister.  And my mother, of
25     course.



33

1  Q   What was your mother's source of income in
2      November of 2013?
3  A   She had the savings that were mentioned in the
4      affidavit; she had a pension; and she had social
5      security.
6  Q   About how much did she have in savings?
7  A   Just under $100,000. That's savings and CDs and
8      a checking and money market, whatever.
9  Q   Gotcha. And do you know how much she got for
10     her pension?
11 A   1100 something, maybe 1200.
12 Q   Do you know how much she got for social
13     security?
14 A   Very little, probably 150 or 200 due to the
15     civil service offset.
16 Q   Is that the pension offset that you're referring
17     to?
18 A   Yes. If you have a civil service pension, they
19     subtract from your social security.
20 Q   And you managed all her finances; correct?
21 A   I did not do her taxes, but I did everything
22     else.
23 Q   And did you have a power of attorney for her?
24 A   Yes, ma'am.
25 Q   What did that power of attorney cover?

34

1  A   I don't recall offhand, it was just the routine.
2  Q   Did it encompass medical decisions?
3  A   There was a medical power of attorney.
4  Q   Okay. But that's something different than --
5  A   It was two different documents, yeah.
6  Q   And who had the medical power of attorney?
7  A   I think myself and my sister. I do not recall
8      clearly, so don't --
9  Q   Did your mom own any property in November of
10     2013?
11 A   No, ma'am.
12 Q   Did she own a vehicle?
13 A   No.
14 Q   Did she have any debt that you were aware of?
15 A   No.
16 Q   Any other assets that we haven't spoken about?
17 A   I'm trying to think. She had very little in the
18     way of earthly possessions that were of any
19     value. No.
20 Q   How much was the apartment complex a month,
21     where she was living?
22 A   650, 680?
23 Q   Did she have any other bills at that time?
24     Obviously groceries, but --
25 A   She had groceries, utilities, that's it.

35

1  Q   About, altogether, how much do you think she
2      spent a month?
3  A   Maybe 1100.
4  Q   1100. So her pension and social security pretty
5      much covered all her expenses for a month?
6  A   Uh-huh, correct.
7  Q   Given your mom's medical condition, was there
8      any discussion about putting her in a nursing
9      home?
10 A   Yes.
11 Q   And when did this discussion occur prior to
12     November of 2013, how long before?
13 A   I think it was the summer of 2013 that the kids
14     discussed it, and my sister was very much
15     wanting to find a place for her.
16 Q   And what was the reason that you ended up not
17     putting her in a nursing home at that time?
18 A   We were waiting for an opening so she would
19     have -- you didn't ask this, but she would have
20     been in a nursing home probably by February of
21     2014 -- I'm sorry, not nursing home, assisted
22     living.
23 Q   Assisted living, okay. So is there, like, a
24     long waiting list for assisted living places or
25     only certain places?

36

1  A   The -- I hate to elaborate too much, but the
2      place that -- we wanted to get her in a place
3      that had a continuum of care and that would take
4      Medicaid once her money ran out, and there is a
5      waiting list for such places, yes, especially
6      Medicaid assisted living, which is very rare.
7  Q   Would Medicaid pay the full cost of her nursing
8      home once her assets ran out?
9  A   Correct. It would make up the difference, I
10     should say.
11 Q   And about how much -- a nursing home that's not
12     one of these ones that would accept Medicaid,
13     about how much would that cost a month?
14 A   Nursing home or assisted living?
15 Q   Assisted living, excuse me.
16 A   We looked at Crestwood Village, and it was
17     between 2500 and 3,000.
18 Q   Wow. So quite a bit more expensive than her
19     current expenses --
20 A   Correct.
21 Q   -- in the apartment?
22 A   Correct.
23 Q   So you decided financially it made more sense
24     for you to just keep taking care of her and
25     Rebecca helping out until there was a spot open



**37**

1    at a Medicaid assisted living facility?
2  A  Correct, because there was a spot coming open,
3    so she would have slid in before too long.
4  **Q  So you guys were aware that there was a spot**
5    **opening up soon?**
6  A  Yes.  And there was a specific place by Fort
7    Harrison, the name of which I can't recall, that
8    she would have gone into.
9  **Q  GreenTree?**
10  A  No.  It was some real pompous-sounding name I
11    can't remember.  It's a brand-new place almost.
12  **Q  So 2500.  How much would the Medicaid facility**
13    **that she was on the waiting list for cost a**
14    **month?**
15  A  3,000.
16  **Q  3,000.**
17  A  Thereabouts.
18  **Q  So still expensive.**
19  A  Very.
20  **Q  So that would run through her savings pretty**
21    **quickly.**
22  A  Yes.  Within -- I can't remember how long, it's
23    a few years that it would burn through her
24    savings.  And then she would transfer to
25    Medicaid.

**38**

1  **Q  Did your mom have a will?**
2  A  Yes.
3  **Q  And who were the beneficiaries of that will?**
4  A  There were four beneficiaries: the three
5    siblings, and her sister, my Aunt Blanche, not
6    in equal parts.
7  **Q  And that was my next question, what are the --**
8    **what's the divide?**
9  A  Of the assets of my mother's estate that were
10    not awarded via beneficiaries, named
11    beneficiaries, my aunt would get 10 percent or
12    10,000, whichever was less, and the three
13    children would divide the rest per stirpes.
14  **Q  Stirpes?**
15  A  Stirpes.  Is that it?  I don't know, stripes?
16  **Q  It's been a while since my family law clinic,**
17    **trust -- trusts and estates class.**
18    **Okay, so a third, a third, a third for you**
19    **and your siblings?**
20  A  Correct, roughly.
21  **Q  Roughly.  After this incident, did you make a**
22    **claim on your mom's assets?**
23  A  I don't know what you mean by "claim."
24  **Q  Did you make a claim to have her assets**
25    **distributed per the will?**

**39**

1  A  I was the administrator.  I met with her
2    attorney and followed his instructions as far as
3    getting her assets identified and start, over
4    time, distributing what was supposed to be
5    distributed, et cetera.  I administered the will
6    in accordance with her wishes.
7  **Q  When was the last time you saw your mom prior to**
8    **this incident?**
9  A  November 18th, in the evening.
10  **Q  That was the day before; correct?**
11  A  Correct.
12  **Q  And about what time was that?**
13  A  Around 6:00.
14  **Q  And why did you go over there?**
15  A  I went over there every evening to fix her
16    something to eat and to spend time talking with
17    her.  Get her ma- -- get her her mail,
18    et cetera.
19  **Q  The general duties of taking care of her.**
20  A  Correct.
21  **Q  How long did you stay?**
22  A  I can't speak with any certainty.  Probably half
23    an hour.
24  **Q  And what was your mom doing when you left?**
25  A  Watching TV.

**40**

1  **Q  What was her condition?**
2  A  I'm not sure I understand.
3  **Q  How was she mentally?**
4    **Let me rephrase.  Anything out of the**
5    **ordinary?**
6  A  Nope.  Just watching TV.  That's what she did.
7  **Q  And when you left, did you lock the door?**
8  A  Yes.
9  **Q  So you didn't see her again in person until the**
10    **incident.**
11    **Did you speak to her at all later the**
12    **evening of the 18th or the morning of the**
13    **19th?**
14  A  I don't believe so.
15  **Q  Where did you go after you left your mom's**
16    **house?**
17  A  I went to Plainfield to see my wife.
18  **Q  Do you know what time you got to Plainfield?**
19  A  I want to say it was 7:15 or 7:30.  Poker starts
20    at 7:00; I was too late for poker.
21  **Q  Where do you play poker at?**
22  A  There's a bar in Plainfield that has a free
23    poker game.
24  **Q  Okay, cool.  Did you take your wife to poker**
25    **with you -- or you didn't get to play, but to**



41

1    the bar with you?
2  A   My -- my wife was already at poker.
3  Q   Okay.
4  A   So actually didn't -- I don't think I went over
5     there because I was too late, so I just stayed
6     at her house.
7  Q   So you don't think you actually went to the bar?
8  A   I don't believe so.
9  Q   Okay.  So you just went to your wife's house,
10    then?
11  A   Correct.
12  Q   And you think you got there about 7:15 or 7:30?
13  A   I believe so, yes.
14  Q   Did your wife come home soon after?
15  A   She came home after poker, which would have
16     been, I don't know, 9:30 or 10:00.
17  Q   Were you still awake?
18  A   Yes.
19  Q   What else did you do that evening?
20  A   Not a lot.  I mean -- do you mean at my wife's
21     house?
22  Q   Yes.
23  A   Watched TV.
24  Q   Anything stand out?
25  A   No.

42

1  Q   What time did you go to bed?
2  A   11:00, maybe.  I don't know.  I'm going to say I
3     don't know.
4  Q   Do you know what time you woke up the next
5     morning?
6  A   No.
7  Q   No?  Do you have a typical time you wake up at?
8  A   Not really, no.
9  Q   It just varies?
10  A   Yeah.
11  Q   And what time did you leave Plainfield that
12     morning?  The morning of the 19th, excuse me.
13  A   I think it was 8:00-something.
14  Q   Was your wife with you in the morning?
15  A   Briefly.
16  Q   Briefly.  Okay.  What time did she leave?
17  A   Earlier than I did.
18  Q   Okay.
19  A   7:15.
20  Q   And where did you go when you left Plainfield?
21  A   I headed back home, but I stopped at, I think,
22     two Kmarts on the way.
23  Q   Just running errands?
24  A   I was looking for rabbit ears.
25  Q   Like for a TV?

43

1  A   Yes.
2  Q   Did you make any other stops on the way home?
3  A   I don't know if I did or not.  I know I got -- I
4     got gas, whenever I got gas, I don't know if I
5     went home first or not, I can't remember.
6  Q   Do you recall what time you got gas at?
7  A   Not off the top of my head.
8  Q   What time do you think you got home at?
9  A   9:30, 10:00.
10  Q   Was Robert there when you got home?
11  A   Yes, ma'am.
12  Q   And what was he doing?
13  A   Goofing around on the Internet, I believe.
14  Q   Okay.
15     (Exhibit 14 was marked for identification.)
16  Q   Bill, I'm going to show you what's been marked
17     as Exhibit 14.  I'm going to represent to you
18     that that's a receipt from when you got gas at
19     Kroger.
20  A   Okay.
21  Q   Does that look to be an accurate copy of the
22     receipt?
23  A   I guess so.
24  Q   Any reason to dispute that it would be the
25     receipt from when you got gas that morning?

44

1  A   No.
2  Q   Up in the right-hand corner, not the very top
3     but the basically third line down, there's a
4     date and a time.  Can you please read that for
5     me?
6  A   11/19/13 09:20.  9:20.
7  Q   Do you think that means that you got gas on the
8     19th at 9:20 a.m.?
9  A   I don't know if I did or not, but it sure looks
10     like I did, yes.
11  Q   And then it looks like, down in the left-hand
12     column, that the total amount for the gas was
13     $48.16.  Do you see that?
14  A   Yes.
15  Q   And then one more thing I wanted to look at, on
16     the right-hand column where it says "Summary
17     Journal," about the third line down, it says
18     "Kroger Plus Customer."  Did you have a Kroger
19     Plus card at this time?
20  A   Yes, ma'am.
21  Q   And do you know your Kroger Plus number off the
22     top of your head?
23  A   No, I don't.
24  Q   Any reason to dispute that those are the last
25     four numbers of your Kroger Plus card, the 9558?



---

**49**

1  Q   And did you go straight to your mom's house?
2  A   No, I went to Kroger.
3  Q   The same Kroger we've already talked about?
4  A   Of course.
5  Q   And what did you do at Kroger?
6  A   I bought an iced tea because it was on sale and
7      I wanted one.
8  Q   Seems like a good reason.
9          Do you remember about how much that iced
10     tea cost?
11 A   About a dollar.
12 Q   A dollar, okay.
13         (Exhibit 15 was marked for identification.)
14 Q   I'm showing you Exhibit 15, which I'm going to
15     represent to you is a receipt for the iced tea
16     you purchased --
17 A   Oh.
18 Q   -- on 11-19-2013.
19 A   Okay.
20 Q   And do you see under "Total Number of Items
21     Sold," there's a date and a time there?
22 A   Yes.
23 Q   And can you read that off for me, please?
24 A   11-19-13 at 3:31 p.m.
25 Q   Okay.

---

**50**

1          (Exhibit 16 was marked for identification.)
2  Q   Now I'm showing you what has been marked as
3      Exhibit 16, and I'm going to represent to you
4      that these are your Kroger Plus card records,
5      the records for the Kroger Plus card ending in
6      9558.  Do you have any reason to dispute that?
7          MR. WAPLES:  Do you have a copy?
8          MS. BOX:  Yes.  Sorry, gave it to Lynne
9      instead.
10         MR. WAPLES:  And this is 15?
11         MS. BOX:  This is 16.
12         MR. WAPLES:  This is 16?
13         MS. BOX:  Yes.
14 A   Not without analyzing it for some weirdness,
15     but, no, I don't see anything unusual about it.
16 BY MS. BOX:
17 Q   The fifth line down, there's a record that says
18     "Spirit Terminal 11-19-2013" at 9:20 a.m., it
19     looks like, for 48.16.
20 A   Yes.
21 Q   And would that match up with the receipt for the
22     gas that we talked about earlier in Exhibit 13?
23 A   It sure looks like it.
24 Q   Now, I also see a record for 11-19, it's just
25     one up from that, four down, and it looks like

---

**51**

1      it's at 3:32, but it's for $14.10.  Do you see
2      that?
3  A   Uh-huh, yes, I do.
4  Q   But that would not be the Kroger Plus card for
5      your tea, correct, because your tea only cost
6      $0.99?
7  A   Correct.
8  Q   Did you use your Kroger Plus card when you
9      purchased your tea?
10 A   No.
11 Q   So did you make this $14.10 purchase?
12 A   No.
13 Q   Did you let someone else use your Kroger Plus
14     card?
15 A   Yes, to get their points.
16 Q   Why would you let someone else use your Kroger
17     Plus card but then not use it for your own
18     transaction?
19 A   I don't think it works unless your pretax total
20     is a dollar or more, so I didn't even bother.
21 Q   And that's something you know for sure?
22 A   No.  It's something I believe, but I don't know
23     for sure.  That was my experience, so I thought,
24     well, whatever.
25 Q   And you told me earlier that the iced tea was on

---

**52**

1      sale; is that correct?
2  A   I think it was.
3  Q   Would you have had to use your Kroger Plus card
4      to get that discounted price?
5  A   I don't remember.  I don't believe so.
6  Q   Okay.
7  A   And that may not actually -- I hate to ramble --
8      that may not be the sale price, it may have gone
9      off sale, because 99 cents is the normal price,
10     I believe, for Arizona tea, so I may have
11     thought I was going to save a dime that day and
12     I didn't.
13 Q   Didn't break the bank, though, did it?
14 A   Close.
15 Q   You bought a tea at Kroger, and did you go to
16     your mom's house after that?
17 A   Yes, ma'am.
18 Q   Did you have any reason for going over to your
19     mom's house that day other than just to cook her
20     dinner, your daily general tasks that you do
21     with her?
22 A   The general checking in to make sure she had
23     something that she wanted to eat, that she would
24     eat.
25 Q   Do you recall what time you got to your mom's

---

**53**

1   house?
2   A   Well, it was right after that, so 3:30, 3:35,
3       somewhere in there.
4   Q   Because, again, the Kroger is very close to your
5       mom's house; right?
6   A   Correct.  It's one minute, two minutes.
7   Q   What was the first thing you did when you got to
8       your mom's apartment?
9   A   I got out of the car, and I went up to the door,
10      and she had something, there was something
11      hanging on her door, and I can't remember if it
12      was a sales flyer or something about her lease
13      renewal.  It was something -- it might have been
14      the lease renewal, I honestly can't remember,
15      but there was a -- some kind of paper.
16  Q   Okay.  So did you collect that or take it off
17      the door handle?
18  A   I took it off the door handle.
19  Q   Okay.  And then what did you do?
20  A   I went -- I believe I went back to my car and I
21      was going to put it in my car.
22  Q   Did you put it in your car?
23  A   No.  I believe I decided to show it to my mother
24      to try to engage her mentally, which was kind of
25      an ongoing thing.

**54**

1   Q   After you went back to your car, what did you
2       do?
3   A   Oh, I went back to my mother's apartment.
4   Q   Okay.
5   A   Well, I went back in the building.
6   Q   Went back in the building.
7   A   So I parked right outside the building, went
8       back in the building.
9   Q   And did you enter your mother's apartment at
10      that time?
11  A   Yes.
12  Q   When you went to open the door, did you use your
13      key?
14  A   I used my key on -- you can use the key on
15      deadbolt and doorknob.  I used my key, yes,
16      sorry.
17  Q   Is it the same key for the deadbolt and the
18      doorknob?
19  A   I don't remember.
20  Q   Is there an outside door to the apartment
21      complex that needed a key?
22  A   No.
23  Q   And when you went to unlock the door, did it
24      feel like the door had been locked?
25  A   The door was unlocked.

**55**

1   Q   Okay.
2   A   There was no resistance when I turned the key on
3       the deadbolt.
4   Q   Did you notice any damage to either the door
5       frame or the door right around where the lock
6       would be?
7   A   No.
8   Q   What was the first thing you saw when you got
9       inside?
10  A   I saw my mother laying on the living room floor.
11  Q   I know this is kind of tough, but can you
12      describe the scene for me, please?
13  A   As you walk into my mother's apartment, you step
14      into the living room.  There is a chair, a TV,
15      coffee table, and she was laying sort of next to
16      the chair, on her stomach.
17  Q   On her stomach.  What part of her body was
18      facing you?  Was it her legs, her head, her
19      side?
20  A   Oh, her -- she -- her feet were towards the
21      door.
22  Q   Her feet were towards the door, okay.
23      And what else did you notice?
24  A   Do you mean right then?
25  Q   Yes.

**56**

1   A   Nothing else.  I didn't notice anything else
2       except my mother laying there.
3   Q   And how did your mother appear?
4   A   She -- well, I mean, she simply appeared like
5       she was laying on the floor with a blanket
6       covering much of her shoulders and head, the
7       blanket she always had with her and always had
8       over her.  And you said "appear," but her -- her
9       breathing was very forced, so that's more of a
10      sound than an appear thing.
11  Q   Did you hear anything else?
12  A   No.
13  Q   Smell anything?
14  A   No.
15  Q   What were your initial thoughts right then, when
16      you saw your mom on the floor with the blanket
17      covering her head?
18  A   I thought she'd had a heart attack or a stroke.
19  Q   What did you do?
20  A   This is a little hazy because I was in shock,
21      but I -- I reached out and kneeled down and
22      grabbed her leg and yelled, "Mom, Mom."
23  Q   And did she respond to you in any way?
24  A   Her breathing changed a little, and she moved
25      her head a little, but she did not -- well, of



57

1    course, in hindsight, she was not able to
2    communicate, did not say anything. She moved --
3    she was laying -- well, it doesn't translate.
4        She was laying on her stomach but with her head
5    on -- somewhat on its left side, and she moved
6    slightly and moved her arm slightly, and then
7    stopped moving after that.
8  Q  Okay. You said her breathing changed, and she
9     moved a little bit. Do you think that she
10    recognized that someone was there?
11 A  I don't know.
12 Q  Okay.
13 A  I -- I -- I don't know.
14 Q  Do you think she could have been responding to
15    your touch?
16 A  My sense was, without knowing for sure, is that
17    she responded either to my voice or to my touch,
18    because mine is the voice she's most familiar
19    with. It could have been unrelated.
20 Q  Right. Okay. When she didn't really respond to
21    you, what did you do next?
22 A  Well, I was kind of freaking out, and I went
23    around to see what -- to look at her condition,
24    and I got down on my knees and was trying to
25    understand this scene of having all this blood.

58

1    She had these -- this blanket thing, it's about
2    four-by-four, kind of a shawl or a small
3    blanket, I guess, over her head, so I reached
4    down, and I was trying -- I examined the --
5    the -- there was a -- a circle of -- a large
6    circle of blood stuck to her head, and I reached
7    down, and I looked very closely to examine that,
8    and there was -- because that was on the top of
9    her head. And then on the floor, as it -- as it
10    had oozed out, I guess, there was a -- not huge,
11    but shockingly large pool of blood that had
12    congealed.
13 Q  Okay.
14 A  And I examined -- I did not try to remove the
15    blanket. I did kind of barely touch where it
16    had scabbed on. And I touched the congealed
17    blood just barely to see what -- at that time I
18    didn't know if she had -- I was still operating
19    under the assumption that she had fallen and hit
20    her head on the coffee table corner or
21    something, but it was -- in looking at it and
22    getting down and looking closely, it was such a
23    enormous amount of dried blood on the top of her
24    head that I thought, Well, this, you know,
25    there's no blood on the coffee table. So I

59

1    just -- I froze, I think, for a few seconds and
2    then called out again, and it was, like, just in
3    shock, and then I called 911.
4  Q  And so when you -- you said you were on your
5     knees; is that correct?
6  A  Yeah. When I was trying to -- I was trying to
7    figure out what was going on with all the blood.
8  Q  You got down --
9  A  Yeah.
10 Q  You got down on your knees, okay.
11    And where are you with respect to her body?
12    Are you up by her head, on either one of her
13    sides?
14 A  I'm up -- I'm up -- it's hard to explain without
15    a diagram, but I'm up by her head. Up -- as
16    you're walking in the apartment, you come to my
17    mother, and her feet are by the door, her head
18    is angled away from the door, about a 45-degree
19    angle, I am at her head, so I could see the top
20    of her head and see the blood. Not -- I wasn't
21    beside her, I was at the top of her head,
22    because that's where -- I was just in shock and
23    trying to figure out what on earth was
24    happening.
25 Q  And you didn't remove the blanket; that's

60

1    correct?
2  A  Correct.
3  Q  And why didn't you remove the blanket?
4  A  It had -- there was a circle of blood the size
5    of a softball at least which had congealed on
6    the outer ring of it. The outer inch or so
7    was -- was almost completely dry, and the blood
8    on the floor had congealed, it was the
9    consistency of pudding, more or less, it
10    wasn't -- you know, and there was probably half
11    a cup or a cup of blood in this pool on the
12    floor, but there was no fresh blood. There was
13    just this darker colored blood.
14    And my sense was that it was stuck to her
15    head and that it made more sense to leave it
16    stuck to her head than to pry it off, because
17    whatever made that much blood come out must be
18    pretty serious, and it appeared she had stopped
19    bleeding, so I just left well enough alone.
20 Q  So you were under the understanding that -- or
21    you thought that it had stopped bleeding at that
22    point?
23 A  It may -- it -- it appeared that the blood that
24    was there, the blood that was -- made up the
25    round part stuck to the top of her head, and the



61

1   blood that had formed a small pool on the floor,
2   on the blanket on the floor, it all appeared
3   like that bleeding had taken place, I don't
4   know, well before I had gotten there, and that
5   it was -- the blood on the top of her head had
6   started drying and did not appear to be "wet"
7   wet, so I didn't think she was bleeding.
8       I thought it was -- it's a banal
9   comparison, but when you -- if I nick myself
10  shaving and put a piece of toilet paper on there
11  and wet it and then it dries, that's what it
12  looked like to me, and I was not going to pull
13  that off. I thought it would be stupid to pull
14  it off, so that's why I didn't.
15  **Q   You weren't curious to know what actually**
16  **happened to your mom or to figure out the extent**
17  **of her injuries?**
18  A   My -- I was curious, of course, but I was more
19  interested that my mom receive proper medical
20  care, and knowing that there was a fire station
21  half a mile away, I didn't think that it would
22  take that long, that I could potentially do more
23  damage. There's nothing I could have done for
24  her because she was not bleeding anymore.
25  **Q   Do you know for sure she wasn't bleeding**

62

1   **anymore?**
2   A   I do not know for sure. It did not appear that
3   there was bright red blood on the blanket, on
4   the floor, on my mother, anywhere.
5   **Q   And if she had been bleeding, you could have put**
6   **pressure on the wound to help with that?**
7   A   Yes. If the -- if it had appeared that the --
8   if the blood on the blanket was wet and red,
9   that would, to me, indicate that she was
10  bleeding, and at that point I would get -- use
11  the blanket or get a towel and put pressure on
12  it.
13      But I was afraid that by putting pressure
14  on it, I might break the bond between the
15  blanket and her head and start the bleeding
16  again, so I chose to defer to the ambulance or
17  fire for their help.
18  **Q   Didn't the 911 operator instruct you to put a**
19  **cloth on your mom's head, hold a cloth to her**
20  **head?**
21  A   There were -- I don't remember precisely what
22  they said, but when they said put a cloth to her
23  head, I thought that was absolutely idiotic
24  because she wasn't breathing. I know what a
25  pressure bandage is, but she wasn't bleeding, or

63

1   did not appear to be bleeding, and I didn't want
2   to screw up what was already there. Idea behind
3   a pressure bandage is you put it on there till
4   the bleeding stops through the force of
5   compression, and it didn't look like there was
6   any -- it looked like she had stopped bleeding
7   quite awhile before that, so I thought that was
8   among various unhelpful things 911 said.
9   **Q   And you don't have any medical training?**
10  A   I took a first aid course at some point, but,
11  no, I do not.
12  **Q   Any, like, first-responder EMT-type training?**
13  A   Nope, nothing.
14  **Q   And you testified that it was your opinion that**
15  **you should defer to the fire department.**
16  A   When I saw my mother in the condition she was
17  in, with the loss of blood but nonactive
18  bleeding, getting fire or medical or somebody
19  there as quickly as possible seemed like the
20  most logical thing to do, so that's what I did.
21  **Q   Well, if you're deferring to medical, and people**
22  **with medical training and experience are telling**
23  **you to put a cloth on your mom's head, why**
24  **wouldn't you follow their instructions?**
25      MR. WAPLES: Objection. States facts not

64

1   in evidence, and it's been asked and answered.
2   **Q   You can answer.**
3   A   They -- they did not understand the scene at all
4   and that putting a cloth on a scab is kind of
5   silly.
6   **Q   Okay.**
7   A   They did not even understand the scene. They
8   didn't ask me if she was actively bleeding, they
9   didn't know anything, really, what was going on.
10  So their advice is just a stock advice, which
11  didn't make any sense given the circumstances.
12  **Q   Do you believe that you fully understood the**
13  **scene?**
14  A   As well as -- as well as a layperson can. I
15  don't know what you mean by the question.
16  **Q   Couldn't you have understood the scene more by**
17  **removing the blanket, being able to give the 911**
18  **responder a description of her injuries?**
19  A   Based on the amount of blood, I felt that the
20  injuries must be quite severe and that removing
21  the blanket would be -- it's been brought up a
22  number of times. I still think that is the most
23  idiotic suggestion anyone could have made.
24  **Q   Do you think it would be important for the EMT**
25  **or first responders to have as much information**



**65**

1   about your mom's condition as possible?
2  A   Not having the ability to assess the situation
3     beyond the fact that my mother had some sort of
4     head wound would not have helped them in any way
5     versus them just showing up and doing it
6     themselves.
7  Q   Did the 911 operator ask anything else about
8     your mom's condition when you were speaking to
9     her on the phone?
10  A   I can't remember which one it was, but one of
11     them asked if she was breathing regularly and
12     kept asking me that, and I thought that was also
13     moronic.
14  Q   Okay.
15  A   'Cause I said she was breathing, I said she was
16     breathing, she was breathing, like (making
17     breathing noise) like really loud and raspy.  So
18     I don't know what -- I mean, if somebody's not
19     breathing, you can do CPR; if they are
20     breathing, there's not a lot you can do.
21         So I don't even understand what the
22     question was, but I think that puts the 911
23     operator not even understanding what the
24     situation was, blood around the head, the scab
25     on the head, or whatever you want to call that,

**66**

1     and her labored breathing.
2  Q   We're going to back up a little bit.  We talked
3     a lot about your thought process and why you
4     chose to call 911, take the path that you did.
5         So walk me through, you are now on your
6     knees, kind of up by your mom's head examining
7     the scene, and you decide the best course of
8     action is to call 911.  Did you use the land
9     line or did you use your cell phone?
10  A   I used the land line.
11  Q   And is it a cordless phone?
12  A   No.  It's an old-fashioned cord phone.
13  Q   So did you have to go get up and go to another
14     room in the house to use the phone?
15  A   No.  The phone was on the coffee table, right
16     there where my mother was laying.
17  Q   And so you stood by your mom while you made the
18     call to 911?
19  A   I either sat on the floor or sat on the other
20     chair, I can't remember.
21  Q   And I think --
22  A   The phone was a few feet from my mother's head,
23     so...
24  Q   I think there's been some reference to a couple
25     of 911 calls.  How many 911 calls did you make?

**67**

1  A   Two.
2  Q   Two, okay.  And briefly explain to me the
3     first -- summarize the first 911 call for me.
4  A   I have them straight because I'm not that
5     familiar, but I called 911, and I said, "My
6     mother's been attacked."  And what I wanted to
7     do is give them the address and get an ambulance
8     en route, and I think that was the 911 operator
9     who kept asking me about her breathing.  "Is she
10     breathing?  Is she breathing regularly," or
11     normally or something.  And I'm, like, it seemed
12     beyond nonhelpful, so I hung up and I called 911
13     back.
14  Q   Did you call up immediately right after you hung
15     up?
16  A   Yep.
17  Q   Okay.
18  A   Called 911 back, and I said, "My mother's been
19     attacked."  And I don't know if that was the one
20     that said put something on her head or not, but
21     I finally understood that somebody was on the
22     way anyway.  That's the advantage -- that's why
23     I used the land line.  Land lines have
24     geographical references so they can -- as soon
25     as you say "ambulance," they know your address,

**68**

1     they know to dispatch an ambulance; my cell
2     doesn't have that.
3  Q   Oh, like a caller ID or something like that?  I
4     get what you're saying --
5  A   Yes, kind of, yeah.
6  Q   I get what you're saying.  They know exactly
7     where the --
8  A   They know where you're coming from --
9  Q   -- where you're calling from --
10  A   -- unlike the cell.  Yeah.
11  Q   Even without giving them the address, okay.
12         And did you stay on the phone with 911 or
13     did you hang up?
14  A   No.  I hung up.
15  Q   And then what did you do after you hung up?
16  A   I looked at my mom for a little bit more, and I
17     think I started crying.  And then I realized I
18     should run out and flag down the ambulance
19     because the -- so I ran out, left her apartment,
20     I don't know if I closed it or left it ajar,
21     went outside, went into the parking lot where
22     you drive, not just the parking area, and
23     started looking towards the main entrance for an
24     ambulance.
25  Q   Why didn't you stay with your mom at that time?



**69**

1  A  Because the most logical thing to do was to get
2     medical care to her as quickly as possible.
3     There was nothing I felt that I could do for
4     somebody with an enormous head wound that has
5     already stopped bleeding, in my opinion, and the
6     apartment complex is kind of confusing, it's not
7     well marked or anything, so in order to
8     facilitate them getting to my mother as quickly
9     as possible, I went out to flag them down.
10 Q  Could you have comforted your mother with either
11    your voice or your touch?
12 A  I don't know if she would have responded or
13    understood any of that, and I don't know if that
14    would have helped heal her wounds.
15 Q  Well, you testified earlier that you believe she
16    responded to your voice or your touch.
17 A  I said she may have; it may have been an
18    involuntary thing that's a coincidence.  But
19    that would not heal -- whatever.
20 Q  I understand.  I'm not talking about healing her
21    wounds.
22 A  Okay.
23 Q  I'm talking about being with her during a
24    traumatic incident.
25 A  If there was nothing else to do, I would have

**70**

1     been with her.  But there was something to do:
2     Make sure the ambulance finds my mother's
3     apartment as fast as possible.
4  Q  You don't think the ambulance had been to this
5     apartment complex before?
6  A  I have no idea.
7  Q  You said it was close by.  Correct?
8  A  The fire's close by.  I don't know where
9     ambulance came from.  The fire showed up first.
10 Q  And you don't believe the ambulances are usually
11    at the fire department?
12 A  I don't believe at that one they are.
13 Q  How quickly did the fire department show up?
14 A  Two or three minutes.
15 Q  What did you do after you waved them down?
16 A  I just -- pointed -- one of them got out of
17    the truck, and I motioned and pointed where to
18    go.
19 Q  Did you follow them inside?
20 A  I think I did 'cause I showed -- I -- led them
21    to the apartment and opened the door, said, you
22    know, "Here's my mom," and said, "She's got a
23    bleeding head wound and she's nonresponding."
24    Her head wound had been bleeding; I guess it
25    wasn't bleeding, really.  She had a massive

**71**

1     freaking head wound and blood on the blanket,
2     blood on the blanket on the floor.  So I -- I
3     was kind of in shock at that point, so -- and
4     then they told me to go back out and wait, so I
5     went back out and waited.
6  Q  Did you tell them anything else about her wound?
7  A  No.  I just said she had -- I just -- I mean, it
8     was painfully obvious.  I pointed it out and
9     said she -- somebody hit her over the head, it
10    looks like, and I don't really know anything
11    else I could contribute, and they wanted me out
12    of there so they could work with her, so they
13    sent me back out.
14 Q  So you recall telling one of the firefighters
15    that you think someone smashed your mom's head
16    in?
17 A  I believe I told 911 and the firefighter that
18    somebody had bashed my mother over the head.
19 Q  And why did you feel at that time that she had
20    been bashed over the head?
21 A  She had -- she had a bloody piece of cloth stuck
22    to the top of her head, right here (indicating),
23    and it looked like that's what had happened.  I
24    don't -- I didn't really think through it or
25    think gunshot or not.  It looked like somebody

**72**

1     had taken a pickax or something and just bashed
2     her head in.
3  Q  But there were other -- other ways that someone
4     could sustain that type of injury; correct?
5  A  I have no idea.
6  Q  Would you assume that a gunshot wound would
7     cause that type of bleeding to the head?
8  A  I have no idea except I don't how many people
9     get shot on the top of their head.
10 Q  What about -- you already stated that you
11    thought she may have fallen and hit her head.
12 A  Yeah.  But she was -- she was like a foot away
13    from the edge of the coffee table still, her
14    head was, and there was no blood on the coffee
15    table.  And I've fallen and hit my head on the
16    coffee table, I -- it doesn't produce massive
17    amounts of blood, so I kind of just dismissed
18    that out of hand.
19 Q  So you pretty much knew right away that it was
20    some sort of blunt force trauma?
21    MR. WAPLES:  Objection, misstates his
22    testimony.
23 A  I believed that it was.
24 Q  Okay.  As opposed to some sort of other injury?
25 A  As opposed to what?



89

1  A  Yes.
2  Q  Was he wearing a uniform?
3  A  Uniformed --
4  Q  Did you guys --
5  A  -- in a squad car.
6  Q  I'm sorry.  Did you guys talk about anything?
7  A  Very little.
8  Q  Did you say something to the effect of, "I don't
9     know if it would be better or worse if my mom
10    died"?
11  A  I said something around that, although I'm not
12    sure -- I cannot remember what I said clearly.
13  Q  Do you know what you meant by that?
14  A  I was referring to the -- well, I didn't --
15    it -- it could have been a couple things.  One
16    was just a comment on the fragility of life and
17    the senselessness of the crime, and the other
18    was if my mom was going to be -- if she was
19    going to die anyway, she might as well die,
20    as -- as harsh as that sounds, I didn't want --
21    it was paramount for me that having my mother
22    having gone through this, that she not suffer.
23  Q  And you're downtown in an interview room.  Did
24    you give a statement at that time to the police?
25  A  I don't know if -- I was questioned and I

90

1     answered questions.
2  Q  And who was in the room with you when you
3     answered questions?
4  A  I'm not sure, but I think it was just Benner.
5  Q  Okay.  Do you recall about how long that lasted?
6  A  In between 30 minutes and an hour.
7  Q  Okay.
8  A  It's hard to remember because it seemed like a
9     long time.
10  Q  Did Robert answer questions at that point, too?
11  A  Yes, ma'am.
12  Q  So what happened after you and Robert were done
13    giving --
14  A  I'm sorry, you said at that time?  He -- one of
15    us was questioned first, one of us was
16    questioned second.  I don't know who went -- I
17    can't remember who went first and second.
18  Q  While Robert was being questioned, whether it
19    was before or after you, were you still in
20    the interview room?
21  A  Yes, ma'am.
22  Q  So were you both basically let out of the
23    interview room at the same time?
24  A  I don't know that I know exactly when he got
25    out.  We were in different rooms, and the door

91

1     was kept shut.
2  Q  Did you guys leave together?
3  A  No, ma'am.
4  Q  Where did you go after you left downtown?
5  A  If I'm remembering correctly, Detective Tudor,
6     he had me sign a thing consenting to a search
7     and obtainment, or whatever you want to call it,
8     for my gun, which was at my house.  And I didn't
9     see my brother, but I -- I left with Detective
10    Tudor when he drove me to my house and took my
11    gun.
12  Q  After you got to your house, did you go to the
13    hospital?
14  A  Yes.
15  Q  Okay.  Did you go with Robert?
16  A  Yes.  I picked him up.
17  Q  Did you pick him up from downtown?
18  A  I picked him up from the City-County Building.
19  Q  Where you guys were being interviewed?
20  A  Correct.
21  Q  And you met up with your sister at the hospital;
22    is that correct?
23  A  Yes, ma'am.
24  Q  Did you talk to any medical personnel, a doctor,
25    a nurse, when you got to the hospital?

92

1  A  The nurse there, coincidentally, was my
2     brother's best friend's wife, so we talked to
3     her, and we talked to another nurse, and we
4     talked to -- took him a while to get there, but
5     we talked to the doctor on charge of that area
6     or whatever.
7  Q  And what were you basically told about your
8     mom's condition?
9  A  That it was irreversible, she would not recover,
10    she wasn't in any pain, but the prognosis was
11    zero.
12  Q  Did you guys make a decision at that time to
13    remove her from life support?
14  A  Yes.  We talked about it briefly, and it was my
15    mother's wish that, when the time came, that she
16    be removed from life support, and there was
17    no -- we would have made that decision anyway
18    because there was no hope.
19  Q  Did she have a DNR, a do not resuscitate order?
20  A  No.  I don't think she had a DNR.  She had a
21    medical power of attorney, but I -- I -- I'm
22    going to say I don't recall ever seeing a DNR.
23  Q  And you know that that was her wish from
24    previous conversations you had with her?
25  A  Correct.



93

1 Q   But she never memorialized anything in writing?
2 A   It may be in the medical power of attorney, but
3     I cannot remember because that document wasn't
4     invoked.
5 Q   And when did your mother pass away?
6 A   2:30 to 3:00 the following morning.
7 Q   On November 20th?
8 A   November 20th.
9 Q   Were you, again, asked some questions by
10    Detective Benner on the 20th?
11 A  Yes, ma'am.
12 Q  About how long did that question-and-answer
13    session last?
14 A  I think it was half an hour, I'm not quite
15    clear.
16 Q  And was that at the City-County Building again?
17 A  Yes, ma'am.  It was up in homicide or whatever
18    area, interrogation room.
19 Q  And do you recall about what time of the day
20    that was at on the 20th?
21 A  Early afternoon.
22 Q  At some point did Detective Benner ask you to do
23    a polygraph exam?
24 A  Yes.  They both were -- yes.
25 Q  "They both"; are you referring to Detective

94

1    Tudor as well?
2 A   Yes, Tudor was there with Benner.
3 Q   Okay.  And do you recall what month this was in
4    or how close it was, what day it was --
5 A   I don't understand the question.
6 Q   -- that you had this conversation?  How soon
7    after your mom's death did you have this
8    conversation?
9 A   Regarding the polygraph?
10 Q  Yes.
11 A  Well, that was on the day of my mother's death.
12 Q  The same day?
13 A  Yes.
14 Q  And did you consent to do a polygraph?
15 A  I did not.
16 Q  And why not?
17 A  Because, one, I think we'd already been through
18    enough, and, two, I think polygraphs are BS.
19 Q  Why do you think a polygraph's BS?
20 A  They're not even admissible in court, and after
21    having lied to about the reason to come
22    down and having been questioned like some kind
23    of fiend, I didn't have any faith in the process
24    anymore and didn't want to partake in what I
25    considered to be a -- silly exercise that --

95

1    that I would not have considered to be unbiased.
2 Q   So you consented to a search of your gun;
3    correct?
4 A   Yes.  The retrieval --
5 Q   The retrieval of your gun --
6 A   -- of my gun.
7 Q   Yes.  I don't know what all they do to test it,
8    but --
9 A   Technically, it's a search warrant, you're
10    right.
11 Q  And to a search of your car, is that correct, as
12    well?
13 A  Correct.
14 Q  But you wouldn't consent to the polygraph?
15 A  No.
16 Q  Did you get upset when Detective Benner asked
17    you to consent to a polygraph?
18 A  Yes.
19 Q  What did you do?
20 A  We were yelling back and forth about the
21    efficacy of such a test and might -- their need
22    for me to do it and my anger at them for leading
23    me on and lying about why we were there.  And I
24    said something about it not being admissible in
25    court, and I'm not taking it.  And that did not

96

1    sit well.
2 Q   Did you yell?
3 A   No more than they did.
4 Q   Did you storm out?
5 A   No.  In fact, it's impossible to storm out of an
6    investigation room with a detective sitting on
7    either side of the table.  They're in the way.
8 Q   You couldn't get around them?
9 A   No.  The room's not big enough.  And I certainly
10    would not storm past a detective, you know, I
11    have more respect for the law than that.
12 Q  So you know that a polygraph test is not
13    admissible in court, but you still didn't want
14    to consent to it?
15 A  Correct.
16 Q  Do you think there was any usefulness that could
17    have been gained from a polygraph test of you,
18    Robert, or Rebecca?
19 A  No.
20 Q  You're absolutely sure neither Robert or Rebecca
21    had anything to do with your mom's death?
22 A  As sure as I can be of anything, yes; they're
23    not involved, I'm not involved.
24 Q  If they had been, would you have wanted them to
25    consent to a polygraph to find out?



97

1  A  I had -- no, because I have -- I don't have any
2     faith in the process.
3  **Q  So I know you couldn't go around the detectives,**
4     **but the detectives leave the room; did you then**
5     **leave quickly thereafter?**
6  A  They made room for me to go out and go get my
7     brother and said, "Go get your brother." And
8     I'm not sure exactly how it played out, but I
9     was supposed to go get him, and then he would be
10    questioned, and I yelled at my brother, "We are
11    not taking a polygraph test," or something like
12    that.
13       MS. HAMMER:  Note for the record that
14    Mr. Rainsberger raised his voice to show the
15    inflection.
16       THE WITNESS:  Right.
17 A  I was distant from my brother, too, because he
18    was in the waiting room, and he was probably
19    25 feet away, so the only way to communicate
20    with him -- there was probably a better way to
21    communicate that, but I wanted him to know what
22    was going on.
23 BY MS. BOX:
24 **Q  So did you demand to leave?**
25 A  No.

98

1  **Q  You didn't demand the officers move so you could**
2     **get out of the room?**
3  A  Oh, I'm sorry, this is before that. They --
4     it's like they stood up and said -- one of them
5     stood up, Tudor, I think, and said, "Go get your
6     brother and have him come back here."
7  **Q  You were under the impression that you were**
8     **there that day to go over the autopsy results;**
9     **right?**
10 A  Yes. But Benner contacted my sister, she
11    contacted us, that autopsy results, be there at
12    1:00, so that's what my -- that's what we were
13    told.
14 **Q  Did you go over the autopsy results with**
15    **Detective Benner?**
16 A  No.
17 **Q  So you left before he could go over the autopsy**
18    **results with you?**
19    MR. WAPLES:  Objection, misstates facts in
20    evidence and it's argumentative.
21    You can answer.
22 A  They left us waiting in the entryway without
23    talking about the autopsy, so I don't know how
24    to answer that exactly.
25    MS. BOX:  Do you want to take a break or do

99

1     you want to keep going?
2        THE WITNESS:  I'm okay. I don't --
3        MR. WAPLES:  I'm okay. It's up to you.
4        MS. HAMMER:  I'm okay.
5        (Exhibit 19 was marked for identification.)
6  BY MS. BOX:
7  **Q  I'm going to show you what's been marked as**
8     **Exhibit 19. And this is the Complaint that was**
9     **filed in this case against Charles Benner,**
10    **Detective Benner. The document reference number**
11    **is Document 1, it was filed on January 12th of**
12    **2016, and the Case No. is 1:16-cv-00103-WTL-MJD.**
13       **Do you recognize this document,**
14    **Mr. Rainsberger?**
15 A  Yes, ma'am.
16 **Q  When was the last time you saw this document?**
17 A  I've read it recently. I don't know exactly
18    when.
19 **Q  Did you help in the preparation of this**
20    **document?**
21 A  Yes, ma'am.
22 **Q  Now, I know you're not a lawyer, but what is**
23    **your understanding, just in general terms, of**
24    **the claims that you're bringing against**
25    **Detective Benner?**

100

1        MR. WAPLES:  Objection, calls for a legal
2     conclusion, but he can answer to the extent that
3     he knows.
4  A  I know that it's a Section 1983 lawsuit against
5     a police person acting under the color of
6     authority violating my constitutional rights.
7  **Q  And what rights do you feel were violated?**
8  A  The right not to be arrested and charged with
9     something out of thin air. I don't know.
10 **Q  I'd like you to turn to page 3, it's**
11    **Paragraph 18, it reads, "In his probable cause**
12    **affidavit, Detective Benner misrepresented that**
13    **Mr. Rainsberger was in his mother's apartment**
14    **during the time period she was attacked and well**
15    **before he telephoned 911 to report her**
16    **injuries."**
17       **Do you see that?**
18 A  Yes, ma'am.
19 **Q  Okay. And then Exhibit 2, which is Detective**
20    **Benner's affidavit for probable cause. Here you**
21    **go. It's on page 3.**
22 A  Okay.
23 **Q  The very last paragraph, Detective Benner**
24    **writes, "I received cell phone records for the**
25    **Rainsberger family and obtained the following**

105

1  A   The duration, as listed, the first one at 14- --
2      with the time stamp of 14:40 is 15 seconds.
3  Q   And the second one?
4  A   25 seconds.
5  Q   So they're not even the same length of phone
6      calls.  How could it be the same phone call?
7  A   The 15-second phone call is encapsulated into
8      the 25-second phone call.  The 25 seconds is the
9      phone call, the actual time on the phone plus
10     the switching plus the front and back end
11     handoffs and everything.
12  Q   But you have no evidence to prove that.
13  A   No, but I'm confident.
14  Q   But your own speculation?
15  A   I've never been more confident in anything.
16  Q   Do you recognize that Chicago number, 773
17      number?
18  A   Only because I looked it up after the fact and
19      found it was some weird number that appears in
20      other things.  It's not a person.  It is part of
21      the network switching for the phone companies.
22  Q   But your testimony today is you were not at your
23      mom's house at 2:40 p.m.; is that correct?
24  A   Absolutely not.
25  Q   And Robert was at home with you at that time;

106

1      correct?
2  A   Correct.  I had not yet left.
3  Q   And where was Rebecca, do you know?
4  A   I have no idea.
5  Q   You three were the only individuals with keys
6      besides your mom; correct?
7  A   To be accurate, maintenance would have had keys.
8  Q   So who could have made this call?
9  A   I don't know what call you're referring to.
10  Q   The call at 2:40 p.m.
11  A   There is no call at 2:40 p.m.  Those are --
12     those are two lines that represent one call, and
13     it's shown in the rest of the records it kind of
14     works that way, but not being a phone expert, I
15     can't really explain it adequately, I guess,
16     so...
17  Q   Since you're not a phone expert, let's assume
18      there was a call at 2:41, because we have no
19      evidence --
20      MR. WAPLES:  Objection, assumes facts not
21     in evidence, it's contrary to the record.
22  A   The AT&T records show --
23      (Simultaneous colloquy interrupted by the
24      court reporter.)
25      MR. WAPLES:  And I object to that.  It

107

1      assumes facts not in evidence and is contrary to
2      the records.
3  Q   So who could have made that call?
4      MR. WAPLES:  And it calls for speculation.
5      Somebody made a call that didn't exist at that
6      time, it didn't happen.
7      MS. BOX:  We have Exhibit 13 that says that
8      there's a call.  We have no evidence to prove
9      otherwise.
10     MR. WAPLES:  We don't even know --
11     (Simultaneous colloquy.)
12     MS. BOX:  I even made it clear on the
13     record that I would assume -- make an assumption
14     that a call occurred.  I just want to know who
15     could have made the call if it did occur.
16     MR. WAPLES:  You're asking him to testify
17     about a call that occurred at a time he said it
18     didn't occur.  It occurred at 3:40, not --
19     MS. BOX:  He also told me he wasn't at his
20     mom's house at 2:40, so how would he have known
21     if the call occurred not?  He's not Robert, he's
22     not the person on the other line making a call.
23  A   Because the AT&T phone records don't show a call
24     at 2:40.
25

108

1  BY MS. BOX:
2  Q   The AT&T records also don't show your 911 call
3      at 3:38.  How do you explain that?  Or your two
4      911 calls at 3:38.  There are multiple issues
5      with your mom's land line records.
6      MR. WAPLES:  Objection, argumentative.
7  Q   So who could have made a call at 2:40 p.m. from
8      your mom's land line?
9  A   I can't answer that.  That's a nonsensical
10     question.
11  Q   Well, it could have been Robert, you said it
12      wasn't you, and you don't know where Rebecca
13      was.  I guess the maintenance man could have
14      made the call, but the maintenance man wouldn't
15      have Robert's cell phone number; correct?
16  A   I can't speculate.
17     MR. WAPLES:  Objection.  Kathryn, you're
18     speculating and you're arguing with the witness
19     who's already told you what his answer is about
20     any call at 2:40 --
21     MS. BOX:  He didn't answer the question,
22     Rich.  And I'm not --
23     MR. WAPLES:  He's not going to answer that
24     somebody made a call when he doesn't believe a
25     call was made.



**109**

1    MS. BOX:  I'm not asking him to answer that
2  someone made a call.  I'm asking him:  If the
3  call was made, who could have done it?
4    THE WITNESS:  I have no idea.
5  BY MS. BOX:
6  **Q  Going back to Exhibit 19, this is the Complaint.**
7  **Page 3, Paragraph 19 states, "In his probable**
8  **cause affidavit, Detective Benner misrepresents**
9  **that nothing of value was stolen from the**
10 **apartment, in an apparent attempt to eliminate a**
11 **robbery as a motive for the attack, when in**
12 **truth prescription drugs, a purse and jewelry**
13 **were stolen."**
14 **Do you see that paragraph that I'm**
15 **referring to?**
16 A  Yes, ma'am.
17 **Q  What drugs were stolen from the apartment?**
18 A  Aricept.  I don't know if any over-the-counter
19   drugs were taken or not, but the Aricept was
20   missing.
21 **Q  What did you do to find out that the Aricept was**
22 **missing?**
23 A  I looked at the place that it was always sitting
24   on the counter and saw that there was no Aricept
25   there.

**110**

1  **Q  At what time?**
2  A  Oh, what time?
3  **Q  Yes.**
4  A  I'm not even sure what day.  I don't know if I
5    looked at that closely on the 19th.  I did look
6    around the apartment, but I don't know if I
7    noticed it for sure that day or not, I can't
8    remember.
9  **Q  Okay.  Where did your mom usually keep her**
10 **Aricept medication?**
11 A  It's sitting on the kitchen across from the
12   refrigerator, to the right of the sink, where
13   all that stuff is.
14   (Exhibit 20 was marked for identification.)
15 **Q  Here's Exhibit 20.  Do you recognize what that**
16 **photo is depicting?**
17 A  I believe this is the kitchen counter to the
18   right of the sink.
19 **Q  And is that where she would usually keep her**
20 **Aricept?**
21 A  Yes, ma'am.
22   (Exhibit 21 was marked for identification.)
23 **Q  All right.  Now I'm handing you Exhibit 21.  Do**
24 **you recognize what's in that box in the drawer**
25 **or do you know what that is?**

**111**

1  A  It's some other medication.  That could be --
2    oh, she'd been on something for something else
3    in the past and I -- I do not remember what that
4    is.
5  **Q  Okay.  But that's not Aricept; is that your**
6  **testimony today?**
7  A  Aricept -- correct.  Aricept comes in a bottle.
8  **Q  Well, do you see the bottle up to the right-hand**
9  **side of the box?**
10 A  Yes, ma'am.
11 **Q  And could that have been her Aricept?**
12 A  No, ma'am, that -- that bottle appears to be too
13   big.
14 **Q  Can you think of any reason that someone would**
15 **want to take Aricept?**
16 A  To be succinct, I -- I believe someone who would
17   do such a thing would just grab whatever
18   prescription drugs existed without thinking
19   about it.
20 **Q  Why wouldn't they take any of the other drugs**
21 **depicted in these two exhibits?**
22 A  Well, the -- the items on the counter are
23   over-the-counter medications that are not
24   particularly valuable to a drug addict, and the
25   4-milligram card I didn't even realize was a

**112**

1    drug at first, I thought that was a pamphlet, so
2    they may not have recognized that.
3  **Q  What about that bottle?**
4  A  Oh, I don't know.  I have no idea.
5  **Q  Do you think if someone was going to rob the**
6  **place, they would pick and choose between**
7  **different medications or just grab everything**
8  **that they could see?**
9    MR. WAPLES:  Objection, calls for
10   speculation.
11 A  I believe the easiest and quickest and surest
12   they could take would be the bottle of
13   medication sitting out on the kitchen counter,
14   so not something that doesn't look like
15   medication, and I have no explanation for the
16   other bottle except maybe they didn't see it.
17 **Q  Did you ever tell Detective Benner that Aricept**
18 **was taken?**
19 A  I don't know if I told Benner or Tudor or who,
20   but I told them that stuff was taken, and it
21   didn't seem to register.
22 **Q  So when did this conversation take place?**
23 A  I don't remember.
24 **Q  Do you know who you were speaking to?**
25 A  I believe it was Benner, but I don't remember.



117

1  A  Right.
2  Q  He asked about purses.  This is the only answer
3     you give, except for a few more lines down you
4     talk about a beige coin purse.
5  A  Right.
6  Q  You don't reference any other black purse in
7     this statement.
8  A  Correct.
9  Q  So you didn't tell Detective Benner, at least at
10    this time (indicating), that there were two
11    purses, that your mom had two purses?
12 A  Not at this time, no.
13 Q  And then do you see where I'm talking about a
14    few more paragraphs down, the next big paragraph
15    that talks about a beige coin purse?
16 A  Correct.
17    (Exhibit 24 was marked for identification.)
18 Q  I'm showing you Exhibit 24.  Is that the beige
19    coin purse that you're referring to?
20 A  No.
21 Q  Okay.  What is that?
22 A  What is this?
23 Q  Yes.
24 A  In the picture?
25 Q  Yes.  Do you know?

118

1  A  That is a little make-up pouch or purse or
2     whatever you want to call it.  It's about the
3     size of a small burrito.
4  Q  So do you believe that the beige coin purse was
5     stolen as well?
6  A  I don't know.  It was -- that one was smaller
7     than this one.  That one -- the beige coin purse
8     was smaller than this.
9     MR. WAPLES:  Is this the statement,
10    Exhibit 23?
11    MS. BOX:  Yes, uh-huh.  And then did you
12    get 24?
13    MR. WAPLES:  Yes.
14 BY MS. BOX:
15 Q  You also state that -- in the Complaint, excuse
16    me, that jewelry was stolen from the house.
17    What jewelry was stolen from your mom's house?
18    Can you describe it for me, please?
19 A  It was just costume jewelry, necklaces and
20    bracelets and such, but it was all -- the -- the
21    only thing -- part of the problem is I don't
22    know what the police have and what was taken and
23    whatnot, but the -- in the same chest of drawers
24    in Exhibit 24 on the right side not photographed
25    an array of costume jewelry, and it had been

119

1     disturbed.
2  Q  Disturbed or taken?
3  A  It looks like taken and disturbed, like somebody
4     was grabbing stuff or something.
5  Q  When did you see that?
6  A  When we went back to the apartment.
7  Q  Okay.
8  A  Which wasn't for, I don't know, like, a week
9     before they took the police tape down.
10 Q  Is this the chest that you're referring to where
11    the costume jewelry was?
12 A  Yes, ma'am.
13    MS. BOX:  This is 25.
14    MS. HAMMER:  What is 23?
15    MS. BOX:  It's the statement.
16    MS. HAMMER:  I'm sorry.
17    MS. BOX:  You're good.
18    (Exhibit 25 was marked for identification.)
19 BY MS. BOX:
20 Q  Here's Exhibit 25, and can you just point out
21    for me on the picture where her jewelry was
22    stored?
23 A  It was in this drawer, and I think the bottom
24    drawer, and it was laid out in kind of an array,
25    so it was clear that it was there, for her

120

1     memory's sake.
2  Q  And what do you mean, "it was laid out in an
3     array"?
4  A  I took every item and put it, like, in a grid,
5     so it was, like, here's -- you know, in rows and
6     columns in the drawer.  She had all this jewelry
7     she never wore, never used, hardly ever looked
8     at, but I wanted, when she opened her drawer, to
9     be able to say, oh, here's my jewelry.  So it
10    was all laid out kind of in a grid.
11 Q  Okay.
12 A  It was a very -- it was a nonconventional way of
13    storing it just to aid her memory, I guess, or
14    that was the thought.
15 Q  How many pieces of jewelry do you believe she
16    had, if you could estimate?
17 A  Oh, God, like 100; 50 to 100.  She had some --
18    so many bracelets and necklaces and stuff.
19    Quite a bit -- dozens of things.
20 Q  Did you have any documentation that listed each
21    piece of jewelry --
22 A  No.  It was all costume jewelry.
23 Q  -- was there a description -- so is it possible
24    that the jewelry was just disturbed and nothing
25    was taken?



---

**121**

1  A  It seemed to me that it was missing.
2  Q  And why do you think that?
3  A  Because there was more empty space in the drawer
4     than it seemed like there should have been, I
5     don't know.
6  Q  And the jewelry couldn't have been, you know,
7     just pushed to sides or in clumps?
8  A  It's hard to argue one way or the other, I don't
9     know.
10  Q  But you can't today say for sure what pieces of
11     jewelry were stolen?
12  A  No.  No, there was nothing of value, really of
13     value, so we didn't really track it, except for
14     the wedding ring.
15  Q  Can you even say for sure that jewelry was
16     stolen?
17  A  100 percent, no.  But 99.
18  Q  And I think you already touched on this:  After
19     your mom's house, was it kind of closed off as a
20     crime scene, or were people allowed in after
21     you -- after this incident, was your mom's house
22     taped off?
23  A  There was crime scene tape on my mother's front
24     door from -- well, I assume it was put up the
25     day the police came, probably for a week after

**122**

1     that, seven or eight days.
2  Q  So you think that when you went back in her
3     apartment, maybe a week later, you noticed that
4     things were missing?
5  A  I looked around to see if anything was missing
6     and also to look at the condition of the
7     apartment.
8  Q  And you specifically recall telling Detective
9     Benner that these things were missing from the
10     house?
11  A  Yeah.
12  Q  But you don't recall when that conversation was?
13  A  I do not.
14  Q  So back to the Complaint, which is
15     Exhibit No. 19, Paragraph 20, it says,
16     "Detective Benner falsely stated in his probable
17     cause affidavit that there were savings bonds in
18     Mrs. Rainsberger's open lockbox in plain view in
19     the apartment, implying that robbery could not
20     have been the motive for the attack."
21     Is this a photo of the lockbox?
22  A  Yes.
23     MS. BOX:  Okay.  I'm going to mark this as
24     Exhibit 26.
25     (Exhibit 26 was marked for identification.)

**123**

1  Q  And for the record, the lockbox is the gray box
2     sort of in a little -- what looks like was a
3     drawer without a front cover on it.
4  A  Correct.
5  Q  And what was in the lockbox?
6  A  Some old financial records.  Printouts of
7     certificates of deposit.
8  Q  Did they have any value?
9  A  No.
10  Q  Why were they in the lockbox?
11  A  Made my mother feel better.
12  Q  Okay.  Other than the Aricept, potentially a
13     purse, and maybe some jewelry that was allegedly
14     stolen from the apartment, did you see any other
15     signs that would indicate to you that this was a
16     robbery?
17  A  No.
18  Q  There's no forced entry; correct?
19  A  Not that I'm aware of, no, it didn't look like
20     it to me.
21  Q  Did your mom have any electronics?
22  A  No -- what --
23  Q  Electronics.  Did she have a TV?
24  A  She had a -- yeah, she had a big old tube TV.
25  Q  And I'm assuming that was in the apartment a

**124**

1     week later; correct?
2  A  Right.  I don't believe she had even a radio or
3     anything else.
4  Q  Back to Exhibit 19, the Complaint, Paragraph 22
5     says that, "In his probable cause affidavit,
6     Detective Benner misrepresents that after the
7     attack on his mother, a video from a
8     surveillance camera in the Kroger grocery store
9     located near his mother's apartment showed
10     Mr. Rainsberger disposing of a 'straight object'
11     pulled from his person 'while he looked around
12     for cameras.'"
13     Then going back to the affidavit for
14     probable cause, which is Exhibit No. 2, it's the
15     very last full sentence of page 3.  Detective
16     Benner writes, "Within an hour of this phone
17     call, William Rainsberger's on video across the
18     street at the Kroger."  And the phone call he's
19     referring to -- do you see where I'm talking
20     about?
21  A  Yes.
22  Q  The phone call he's referring to is this --
23     we're not going to argue about the phone call
24     but --
25  A  Yeah.



125

1   Q   -- he wrote in there, "a phone call that
2       occurred at 2:40 p.m." Okay?
3   A   Yes.
4   Q   So Detective Benner doesn't actually indicate
5       that you deposited of this straight object -- or
6       disposed of this straight object after going to
7       your mother's in his probable cause affidavit,
8       he just says "within an hour of this phone
9       call."
10  A   Can you phrase the question again?
11  Q   Sure, sure. So maybe it will help if you read
12      Paragraph 23 of the Complaint.
13  A   23?
14  Q   Yes, it's the very first paragraph. It says,
15      "In truth, the video shows Mr. Rainsberger at
16      the Kroger store prior to going to his mother's
17      house and only throwing away trash, not a
18      'straight object' weapon, and not looking around
19      for cameras."
20  A   Okay.
21  Q   What I'm saying is that this sentence that
22      you're referring to in the probable cause
23      affidavit that references these paragraphs of
24      the Complaint actually indicates that you were
25      at the Kroger within an hour of a phone call,

126

1       not prior to or after going to your mother's
2       house.
3   A   It says, "Within an hour of this phone call,
4       William Rainsberger's on video" -- I'm not sure
5       what the debate is. Is it about the "within an
6       hour" or --
7   Q   No. And I'm not -- the debate is in the
8       Complaint. It makes a distinction between prior
9       to going to your mother's house and after going
10      to your mother's house, and the Complaint seems
11      to indicate that Detective Benner got the
12      timeline wrong. And all I'm trying to point out
13      is that Detective Benner was referring to within
14      an hour of a phone call, not prior to going to
15      your mother's house or after going to your
16      mother's house.
17      MR. WAPLES: Well, I'm going to object to
18      this. It's confusing, it kind of misstates
19      facts in evidence because Benner certainly, in
20      his probable cause affidavit, is saying the
21      phone call came from his mother's house prior to
22      Bill going to Kroger, and then he states that
23      Bill made a phone call from his mother's house
24      to his brother's cell phone at 2:40 is what he's
25      placing it at. I mean, that's the obvious

127

1       intent of that probable cause affidavit.
2       MS. BOX: I don't think it's as obvious,
3       especially after Detective Benner's testimony
4       this morning, so we'll disagree on that, but I'm
5       simply looking at Detective Benner's language.
6       MR. WAPLES: Perhaps this -- maybe this
7       will straighten it out. Are you asking if
8       Paragraphs 22 and 23 of the Complaint are
9       referring to the probable cause affidavit,
10      page 3, Paragraph-- fourth full paragraph?
11      MS. BOX: Yes.
12      MR. WAPLES: Okay.
13      MS. BOX: Or fifth paragraph.
14      MR. WAPLES: Okay, thank you. We should
15      learn how to count better when we go to law
16      school.
17  A   Is there a question on the table? I'm sorry.
18  BY MS. BOX:
19  Q   Let's try it this way: Does Detective Benner
20      say that you went to throw away -- does he
21      specifically use the words that you went to
22      throw away this object after going to your
23      mother's house anywhere in that paragraph?
24  A   In here?
25  Q   Yes. The fifth paragraph on page 3.

128

1   A   I think it does, because I think he's of the
2       opinion I made a phone call at 2:40, and he's
3       implying that I made a phone call, went to
4       Kroger to throw something away, and then came
5       back. So, yes, in my opinion --
6   Q   Does it use that language --
7   A   I know it's not crystal clear.
8   Q   Does it use that language?
9   A   I think what he states here is that I made a
10      phone call at 2:40, and then I went to Kroger to
11      throw something away.
12  Q   But he says Robert Rainsberger received a phone
13      call from Ruth's land line; correct?
14  A   True.
15      (Exhibit 27A-D was marked for
16      identification.)
17      MS. BOX: I have some still photos that I'm
18      going to mark as -- there are three of them --
19      oh, there are four altogether, excuse me, I'm
20      going to mark them as 27A-D.
21      MR. WAPLES: These are in order, 27A-D?
22      MS. BOX: Yes, correct.
23  BY MS. BOX:
24  Q   I'll represent to you that these are still
25      photos taken from the Kroger camera entryway.



129

1   Do you have any reason to dispute that?
2 A  No.
3 Q  Can you please read the time and date?
4 A  On the photos?
5 Q  Correct, on the bottom of the photos. I believe
6   it's the same for all four of them.
7 A  All four of them say November 19, 2013, at
8   3:28:56 p.m.
9 Q  This is about the same time you went to Kroger
10   to buy tea; correct?
11 A  Yes. This is just before that, in fact.
12 Q  Are you in this picture? Are you in these
13   photos?
14 A  Yes.
15 Q  Can you please describe where you're located at?
16 A  I am -- I don't know how you put it. Where you
17   see the door open, the figure in the blue jeans
18   and blue sweatshirt is me.
19 Q  So you're not the person -- there are two people
20   in this photo; correct?
21 A  Correct. I am not the person approaching the
22   sliding glass door, I'm the person behind him.
23 Q  Okay, great. Do you see a small object that
24   appears to be, in these photos, maybe in your
25   right hand, down by your side?

130

1 A  I see something that you're referring to. I
2   don't know which hand it's in.
3 Q  Okay. Fair enough. Do you know what that is?
4 A  Nope.
5 Q  What did you do with it?
6 A  I threw it away.
7 Q  But you don't recall what you threw away?
8 A  It was trash of some kind. It was either just
9   some -- some thing I had in my pocket, I'm,
10   like, well, I'll throw this away, I don't
11   know -- I cannot be confident enough about what
12   it was.
13 Q  Okay. But you're sure it's trash?
14 A  Yeah.
15 Q  But you'd agree that it's not clear from these
16   photos that it's trash?
17   MR. WAPLES: Objection, argumentative.
18 A  I would say from the photos it's hard to tell
19   what it is.
20 Q  Going back to -- I should know the exhibit by
21   now -- Exhibit 19, the Complaint. It's
22   Paragraph No. 27, "In his probable cause
23   affidavit, Detective Benner falsely stated that
24   Mr. Rainsberger showed no signs of concern for
25   their mother's health while she was at the

131

1   hospital before she died."
2   My question is: Did you ever ask Detective
3   Benner if you could go to the hospital?
4 A  I did not.
5 Q  Did you ever ask Detective Benner what your
6   mother's condition was?
7 A  No.
8   (Exhibit 28 was marked for identification.)
9 Q  I'm showing you what's been marked as
10   Exhibit 28, and I'm going to represent to you
11   that these are selected records of your phone
12   records. They were pretty extensive, so I only
13   printed off the pages that I felt were relevant.
14   So I printed off the very first page so we would
15   have the headings, and I printed off the pages
16   that reference November 18th through
17   November 20th.
18 A  Okay.
19 Q  And, obviously, it included a little bit of the
20   21st on that full page. I'd like to draw your
21   attention to what is page 3 of this exhibit.
22   You previously testified in the deposition that
23   you stayed in Plainfield the night of
24   November 18th; correct?
25 A  Yes, ma'am.

132

1 Q  And that you believe you left your wife's house
2   maybe some -- sometime prior to 8:00.
3 A  I don't know about prior to 8:00; 8:00-something
4   would be --
5 Q  Fair enough. And I believe you testified that
6   your wife left before you, maybe around 7:15.
7 A  Yeah. And I -- I apologize, I can't remember
8   what time she goes to work. She -- it would
9   have either been 6:30 or 7:30 that she would
10   normally leave for work downtown.
11 Q  But she was with you in the house until she left
12   for work; correct?
13 A  We were both in the house, yes.
14 Q  So the second record down looks like an SMS,
15   which do you know what SMS means?
16 A  Short message service.
17 Q  Which is a text message; correct?
18 A  Correct.
19 Q  And can you read the time and date stamp on that
20   for me as well?
21 A  November 19th, 2013, at 5:00 a.m. plus 41
22   seconds.
23 Q  So it looks like this is a text message in the
24   far left column from number 331-1059, which is
25   your number; correct?

---

**133**

1  A   Correct.
2  Q   To 771-07604; correct?
3  A   (317)710-7604, correct.
4  Q   And that's your wife's number; correct?
5  A   Correct.
6  Q   So were you guys texting each other while you
7       were in the same house?
8  A   Yes.
9  Q   Why would you do that?
10 A   Because we don't sleep together.  I sleep on the
11      couch in the living room because I snore and she
12      works, so I sleep in the living room.  So we
13      text back and forth.
14 Q   So you couldn't have gone into her room to talk
15      to her?
16      MR. WAPLES:  Objection, argumentative.
17 A   I didn't.
18 Q   Is it common for you to text in the house with
19      her?
20 A   Yeah, quite.
21 Q   So it looks like you have -- there's another
22      record at 5:08, 7:08, 7:09, 7:10, 7:11, 7:13,
23      7:16, and 7:16.  Again, they all look like text
24      messages between you and your wife; correct?
25 A   Correct.

**134**

1  Q   While you were in the same house?
2  A   I cannot be certain that the ones after
3       7:00 a.m. are while we are in the same house,
4       that could have been while she was driving in to
5       work, but certainly the ones at 5 -- 5:00 a.m.
6       or thereabouts are while we were in the same
7       house; myself in the living room, her in her
8       bedroom.
9  Q   And turning to the next page, the very top
10      record looks like another text message.  Can you
11      read the time and date stamp on that for me?
12 A   November 19, 2013, at 12:44:10 p.m.
13 Q   And that's a text message from your number, the
14      (317)331-1059; correct?
15 A   Correct.
16 Q   To the (317)357-5791 number; correct?
17 A   Correct.
18 Q   And that's your brother, Robert's, phone number?
19 A   Correct.
20 Q   And you previously testified that your brother,
21      Robert, was home with you all day?
22 A   Yes, I think so.
23 Q   So would this, again, be you guys texting each
24      other from the same house?
25 A   Yes.

**135**

1  Q   Even though you were in the same house?
2  A   Yes.
3  Q   So it looks like there are some more records at
4       1:59, two of them, and then a little bit farther
5       down, 2:40, 2:41, 2:42, another one at 2:42, a
6       2:51 and a 2:52, all text messages between you
7       and Robert?
8  A   Uh-huh.  Yes, I'm sorry.
9  Q   While you guys were at the house together?
10 A   Yes.
11 Q   Is it common for you and Robert to text together
12      while you're in the same house?
13 A   I have a very large house, so yes.
14 Q   How big is your house?
15 A   It's a 2,000-square-foot ranch house, and
16      it's -- God, it must be 75 feet long, so if he's
17      in the garage and I'm inside, I just text him.
18 Q   I'm showing you what's been marked as
19      Exhibit No. 29.  Do you recognize this?
20 A   Yeah.
21      (Exhibit 29 was marked for identification.)
22 Q   What is it?
23 A   This is a storyboard for a video I was going to
24      make.
25 Q   Okay.  Do you often draw storyboards for videos

**136**

1       you're going to make?
2  A   On the rare occasion I make a video, I draw a
3       storyboard.
4  Q   And my question is concerning page 4 of that, I
5       know it's not numbered, but the very bottom
6       right box, can you read for me what that says?
7  A   This?
8  Q   Do you see where I'm -- yes, correct.
9       MR. WAPLES:  Is it the last page?
10      MS. BOX:  Page four, the second-to-last
11      page.
12      MR. WAPLES:  Second-to-last page?
13      MS. BOX:  Yes.
14 A   There's a technical note, it says "position."
15      It doesn't say "camera," but I think that's
16      camera.  And then it says, "Eat pudding already
17      open, cover with cloth, count quarters, cloth is
18      hidden.  Well, that's all the time we have.
19      Shake and still."
20 Q   And you made the storyboard; correct?
21 A   Correct.
22 Q   And do you know when you made the storyboard,
23      rough estimate?
24 A   On page 1, it refers to my 40th birthday, so
25      it would have been 19 years ago.

