# EXHIBIT 5

Page 5

1 on the department here also.
2 Q With the --
3 A I graduated in August of '89 from Kent State and
4 started here in October.
5 Q Did you start with the City or the sheriff's
6 department?
7 A The City.
8 Q So you worked for IPD --
9 A IPD.
10 Q -- and now IMPD your whole career?
11 A Yes.
12 Q And what different positions have you held with
13 the I -- with the City's police department?
14 A The only two positions I've had was working
15 south district on the street and homicide.
16 Q And -- and homicide as an investigator?
17 A Yes.
18 Q What -- and you've gone back and forth, haven't
19 you, a few times?
20 A Yes.
21 Q Why is that?
22 A Just -- I was there, like, four and a half years
23 the first time. My son was young, I wanted to
24 spend more time at home so that's why I left the
25 first time. The second time I was there -- I

Page 6

1 don't know -- two and a half years maybe, same
2 reason, I mean, coaching, wanting to be home
3 more, stress of the job, no sleep.
4 Q A little longer hours?
5 A It wears on you.
6 Q Less regular hours when you're a detective with
7 the homicide?
8 A Correct. It can go on for days without, you
9 know, I mean you can't make any plans, you know,
10 that sort of thing. My son's a teenager, a
11 junior in high school now, so he's more
12 understanding of me not being there when I can't
13 be. And I've over the years got used to the
14 job, learned to handle it better, you know,
15 learn to occupy your time better, ration your
16 time better.
17 Q It's always a struggle to juggle, isn't it?
18 A Yes.
19 Q What have you done to prepare for the
20 deposition?
21 A Basically just went over my file again, read my
22 notebook, read the probable cause, met with my
23 attorneys, Kathryn and Lynne.
24 Q And when you say your file, the documents that
25 comprise the homicide file in the case?

Page 7

1 A Yes, just basically who I spoke to and items of
2 evidence collected, looking at the crime scene
3 photos, that sort of thing.
4 Q Did you learn anything from going back over
5 those, that file, that you hadn't seen before or
6 hadn't thought about back at the time that you
7 were working the case?
8 A No, not really.
9 Q Okay. Is it an active case?
10 A It's not closed, so it's still open.
11 Q Is it assigned to you still or --
12 A Yes.
13 Q When was the last time you had done anything to
14 investigate the case?
15 A It's been probably since he was released and the
16 case was dismissed. I haven't really -- I've
17 had probably 15 cases since then so I don't have
18 time to go back to it right now. There hasn't
19 been any new information. The case hasn't led
20 me in any other direction.
21 Q So since that time you haven't done any further
22 investigation or --
23 A No.
24 Q -- uncovered any other evidence?
25 A No. There's no new evidence.

Page 8

1 Q Okay. Tell me when you first learned about the
2 case. What -- who called you and what did they
3 tell you and what did you do?
4 A I was contacted, I believe, Detective Feuquay
5 responded to the scene. It was initially an
6 aggravated assault because the victim, Ruth, was
7 still breathing and had some vital signs.
8 So Detective Feuquay is an aggravated
9 assault detective and he was the only one on the
10 scene. He contacted me when he found from the
11 medics that she was in critical condition at
12 that point, unresponsive. They were unable to
13 get her to speak or come to in any way.
14 So I came to the scene. The run came out
15 probably about 3:39 P.M. I got there probably
16 about 4:15 or so, made contact with
17 Detective Feuquay and he just let me know
18 basically what he had.
19 Q What did he tell you he had?
20 A The only information he had really was that the
21 son had called 911, that the victim was found
22 covered with a blanket, and she was transported
23 by medics in critical condition.
24 Q She was already gone by the time you got there?
25 A Yes.

**Page 9**

1  Q  Were there any photographs taken of the scene
2     before she was -- she left?
3  A  I don't believe so, no. She was still alive so
4     the medics won't leave her there. They'll take
5     her immediately.
6  Q  Okay. Tell me a little bit -- kind of back off
7     a little bit. What's your process when you do
8     an investigation like this? What do you try to
9     do in general?
10 A  Basically my job as a lead investigator is to be
11    the manager of the scene, get there, make sure
12    everything's been secured, made contact with the
13    reporting officer also, which was Officer Price,
14    see what information he might have. He let me
15    know that William was on scene and Robert, the
16    other brother, had showed up on scene in a
17    vehicle. They were separated and still at the
18    scene.
19       I basically do a quick walk-through of the
20    scene to see, just to get a general impression
21    of what's going on in there, what items I'm
22    going to need collected when I call the crime
23    lab.
24       Detective Tudor did an initial canvas of
25    the building there to talk to people that may

**Page 10**

1     have seen or heard anything.
2        I receive all the information I can about
3     the medics and people that transported the
4     victim to the hospital. And basically I called
5     for crime scene. At that point Jennifer Lane
6     responded to the scene.
7  Q  What is her position and what is her role? What
8     does she do?
9  A  She was the crime scene CSS. They call them
10    "crime scene specialist." She is the one that
11    will videotape, take photographs, do a crime
12    scene sketch, collect any evidence, and then
13    testify later about the cases. She'll also
14    process the items that are collected like prints
15    and DNA, take the swabs; but she doesn't
16    actually process them after that point.
17 Q  Somebody else does the DNA analysis?
18 A  Yes.
19 Q  But she collects the swabs?
20 A  Yes.
21 Q  Okay. What did -- you said you separated the
22    brothers, William and Robert?
23 A  Yes.
24 Q  Where did you put them or where did you have
25    them?

**Page 11**

1  A  They were by police cars or in police cars there
2     around the parking lot.
3  Q  What did you tell them when -- or did you talk
4     to them initially at the scene?
5  A  I initially -- I didn't tell them anything
6     per se. In a case -- I knew that this was a
7     mother/son -- the son reporting a mother that
8     was found in this condition so protocol or
9     whatever, in my opinion or what I've been
10    taught, was that I wanted to ask them if they
11    would, just to cover all my bases, if they would
12    submit to a consent to search of their vehicles
13    just to make sure that they weren't involved in
14    any way and see if there was anything that would
15    connect them to the apartment during the time of
16    the incident.
17       They both consented to that. And I
18    basically told them I was going to have to take
19    them downtown and take statements from them,
20    which they said that was fine. So they were
21    later transported.
22 Q  Did you transport either one of them?
23 A  I transported Robert.
24 Q  Okay.
25 A  Officer Price, I believe, transported William.

**Page 12**

1  Q  And then you went down to IMPD headquarters?
2  A  Yes.
3  Q  Did -- now, they were transported in marked
4     police cars or unmarked or --
5  A  Officer Price had a marked car, but I had an
6     unmarked car.
7  Q  The -- were they free to go at that point?
8     Could they have just said, "No, we don't want to
9     talk to you"?
10 A  Yes.
11 Q  But they voluntarily agreed to go downtown?
12 A  Yes.
13 Q  And they voluntarily agreed to have search of
14    the cars?
15 A  Yes. They signed a consent to search.
16 Q  Did the search of the cars reveal any evidence?
17 A  No.
18 Q  They went downtown. Where did you put them?
19 A  In interview rooms in the back.
20 Q  Separate interview rooms?
21 A  Yes.
22 Q  And what did you learn from -- did you interview
23    both of them?
24 A  Yes.
25 Q  Okay. About how long did those interviews last?



**13**

1  A   I'm not totally positive. Probably about an
2      hour for William and probably not quite as long
3      for Robert.
4  Q   Okay. What did you learn from them, those
5      interviews?
6  A   From William I learned that he said that he
7      spent the night in Plainfield playing poker the
8      night before, that he had seen his mother
9      probably between 6:00 and 6:30 P.M. before he
10     went out there. He returned back to the east
11     side around 9:00 in the morning, went to his
12     house, Robert was there. They spent the day
13     there doing laundry, watching TV, that sort of
14     thing.
15         He said that around 3:00 or so he went over
16     and said -- told Robert he was going to go check
17     on his mother. He said he went over to the
18     Kroger, bought an ice tea, went to her
19     apartment. There was a bag on the door that
20     contained some items. He took the bag off the
21     door, returned to his car. He was going to go
22     home and look over those items, but decided
23     instead to go over them with her. He said --
24     went back to the door, used his key to get in,
25     said he thought that maybe the door was

**14**

1   unlocked, wasn't sure, went inside, saw his
2   mother lying on the ground covered in a blanket.
3       He walked around the other side to the
4   coffee table, put down his ice tea, said he
5   could see some blood that seemed be to be
6   coagulating through the blanket.
7       He said he called 911. He said at first he
8   wasn't sure if she had fallen and hit her head
9   or if she had been attacked. He eventually made
10  reference to the fact that he thought that she
11  was hit with a lead pipe, could have been hit
12  with a lead pipe. I asked him about items that
13  might have been -- if she had a purse or
14  anything like that. And he described a black,
15  shiny purse that I believe we photographed in
16  the back bedroom that was still on the scene
17  along with a beige coin purse that was also in a
18  drawer in the bedroom, said that she never
19  really carried any money. She hadn't been out
20  of the house but a couple times in a whole year.
21      Never mentioned -- oh, I asked him about
22  medication. He said most of her medication was
23  over-the-counter. Over-the-counter drugs were
24  still on the counter when we were there. He
25  said she may have some type of dementia

**15**

1      medication. I'm not sure what the name of that
2      might be.
3          As far as items missing --
4  Q   Was that ever uncovered, was there ever any
5      prescription medication recovered from the
6      scene?
7  A   No. There was a little pill dispenser. I'm not
8      sure what was in there, but there was a lot
9      of -- there's pictures. I'm not sure if they
10     would show if there's any prescription
11     medication there; but there was a large number
12     of over-the-counter drugs that were still there.
13 Q   But you didn't find any prescription medication
14     in a bottle?
15 A   I didn't see any.
16 Q   Did you follow up with any pharmacy to determine
17     whether she had been prescribed any prescription
18     medication?
19 A   No. No, Bill said that she was -- if she was
20     prescribed any, it was just for dementia so it
21     didn't seem like it had anything to do with the
22     case really.
23 Q   Did any of the children tell you that it had
24     come up missing, that she had a pill bottle
25     there?

**16**

1  A   No.
2  Q   Okay. Anything else you learned from those
3      interviews?
4  A   Just from that interview, I believe that was
5      most of what basically that lead pipe thing was
6      significant to me that time.
7  Q   Why was that?
8  A   Because the medics and people at the hospital,
9      we all thought that she suffered a gunshot
10     wound. So we -- I wasn't even thinking that
11     there was blunt force trauma at that time. It
12     didn't really mean anything at that point until
13     I found out that she actually was.
14 Q   Suffered blunt force trauma?
15 A   Right. And then it kind of jumped out at me
16     that somebody would say in a 911 call, said
17     that -- or told the fireman that somebody bashed
18     his mom's head in. So I don't know how he would
19     know that if she is covered with a blanket.
20         The other thing from that interview was
21     that she was covered with a blanket. She was
22     breathing loudly. He didn't attempt to pull the
23     blanket off, didn't, you know, try to pull it
24     off, ask her what happened, see if he could
25     render any first aid.



**57**

1 been at the beginning and they flee without
2 causing any disturbance; correct?
3 A  Maybe.
4 Q  You don't know any of the circumstances exactly
5 whether -- which one of those circumstances may
6 have happened in this case, do you?
7 A  No.
8 Q  Do you even know what time it was that Ruth
9 sustained her injuries?
10 A  I don't have an exact time, no.
11 Q  You believed it was before 10:30 in the morning;
12 correct?
13 A  Yes.
14 Q  Because Delbert Pickens and Meals on Wheels both
15 knocked on her door and called her phone?
16 A  Yes.
17 Q  And Ruth's cell phone records that we saw show a
18 call from Delbert Pickens at about 10:29 A.M.
19 that morning; right?
20 A  They show a call at that time, yes.
21 Q  To Ruth's landline?
22 A  Yes.
23 Q  I guess that tells us a couple of things.  I
24 mean, one, you took it that that means that she
25 was probably injured because she didn't respond

**58**

1 to the door before 10:30 in the morning?
2 A  Yes.
3 Q  It also tells us that AT&T reports on their
4 landline records that calls that are even made
5 to that landline that aren't -- aren't picked up
6 on; correct?
7 A  Possibly, yes.
8 Q  Well --
9 A  Doesn't mean they record all of them.
10 Q  Yeah.  And you don't know whether they do or
11 not?
12 A  I don't know what they did.
13 Q  And you didn't check with them to see if they
14 did or not?
15 A  No.
16 Q  Correct?
17 A  Correct.
18 Q  Okay.  The -- and you know William had said he
19 had been over there maybe 5:30, 6:00 the night
20 before?
21 A  Yes.
22 Q  You didn't have anybody's -- information from
23 anybody that showed that the injury occurred
24 sometime after that time the night before of the
25 18th or early in the morning of the 19th?

**59**

1 A  We can't specify what time it happened.
2 Q  Okay.  You say in that third paragraph there in
3 the bottom that "There was a lockbox in the back
4 room in plain view that contained savings bonds
5 belonging to the victim."  Did -- where exactly
6 was the lockbox?
7 A  It was in the closet in the room right there
8 with the clutter, the boxes and the bags.
9 Q  So that's not -- and it's in a lockbox itself?
10 A  Yes.
11 Q  In a closet in a cluttered room?
12 A  Yes.
13 Q  And that's what you're stating is in plain view?
14 A  If you walk into the room, it's in -- I mean,
15 you could see it just by looking in the closet.
16 The closet door was open.
17 Q  You can see a lot of things, though, because
18 it's cluttered, a lot of boxes, a lot of the
19 different things in that room; correct?
20 A  Yes.  I pointed that out just because that's an
21 area that I believed if somebody was looking for
22 valuables they would check a lockbox that's
23 sitting there in plain view is probably what
24 somebody would be looking for if they were going
25 to burglarize an apartment.

**60**

1 Q  And you said that the lockbox contained savings
2 bonds?
3 A  That's what it says here, but I heard they might
4 be certificates of deposit or whatever, some
5 kind of financial documents.
6 Q  They weren't savings bonds?
7 A  I'm not sure what they were, but that's what I
8 put in here.  They were something like savings
9 bonds, certificates of deposit.  The point was I
10 was just showing there was something with
11 possible value in that box that wasn't looked
12 through.
13 Q  On the second page of this, you report what you
14 found -- what William had told you.
15 A  Yes.
16 Q  Second paragraph, that's on the evening of
17 November 19th when they voluntarily cooperated
18 with you and went to the police headquarters and
19 gave a recorded statement?
20 A  Yes.
21 Q  Without even a lawyer present; correct?
22 A  Yes.
23 Q  Same thing on the second paragraph.  You report
24 what Robert told you in that interview on
25 November 19th at police headquarters?

**61**

1  A  Yes.
2  Q  And that last sentence in that paragraph you say
3     "At no time did Robert or brother, William, ever
4     ask me how mom was doing or if they could get to
5     the hospital to see her."
6  A  Right.
7  Q  Was that true?
8  A  Yes.
9  Q  That seems to indicate that they were uncaring
10     or unconcerned about their mother, doesn't it?
11  A  Seemed to be, yes.
12  Q  Okay. Why would they ask you how their mom was
13     doing?
14  A  Why would they ask me?
15  Q  Yeah. You were at police headquarters with
16     them. Why would they ask you?
17  A  Well, because I could check for them. I mean,
18     everybody asks -- not everybody but a lot of
19     people ask after their loves ones. They want to
20     get out of there as quick as they can to get to
21     the hospital.
22  Q  Well, did they indicate they wanted to be there
23     at police headquarters or were they there
24     because you told them you needed them to go
25     downtown and give a statement?

**62**

1  A  They came down because I asked them to. I mean,
2     this -- this statement is basically not even
3     about just that night. It's just following
4     that. I mean, nobody ever called later in the
5     evening. They never called about the suspects,
6     never called to check in on the case.
7  Q  You have another statement about that and we'll
8     get to that. But with respect to that night you
9     say at no time did they ask you about their
10     mom's condition when they're there under
11     interrogation by you. But you weren't at the
12     hospital so you didn't know what their mom's
13     condition was.
14  A  No, but I can call the hospital and find out.
15  Q  Well, wasn't --
16  A  I mean, the main reason why I came up with that
17     was because on the way downtown William told the
18     officer, "I don't know if it's a good thing or a
19     bad thing if my mom dies."
20        From that point, there was really no sign
21     of emotion. He talked to me like nothing was
22     even happening during his statement. So that --
23     when you make a statement like that, it makes me
24     think that you're not really concerned whether
25     she dies or not if you don't know if it's a good

**63**

1     thing a bad thing.
2  Q  You reported that but you also reported that he
3     didn't ask you how his mom's condition is when
4     he's there being interrogated by you at the
5     police headquarters.
6  A  Right. He didn't ask if he could leave to go
7     see her. That's correct.
8  Q  Wasn't his sister at the hospital with his
9     mother?
10  A  Probably.
11  Q  And didn't William have his cell phone with him?
12  A  If he was making communications -- I didn't say
13     in here that maybe he was talking to his sister
14     about it. But the truth of the matter is I put
15     in there he didn't ask me about it. That's all
16     it says. He didn't ask me about it. Maybe he
17     asked his sister. He didn't say anything to me
18     about it.
19  Q  Well, didn't he receive a call from his sister?
20  A  I don't know.
21  Q  Didn't he talk to his sister while you were
22     interviewing him asking him about his mother?
23  A  Not that I remember.
24  Q  But if he did, you didn't put that in the
25     report?

**64**

1  A  I don't remember him talking -- he wasn't
2     talking on the phone when I'm interviewing him.
3     He was back there with the cell phone by himself
4     for a while, so he may have had contact with her
5     at that point.
6  Q  Right. But if you knew he had been talking to
7     his sister about his mother and how she's doing,
8     that would create a very contradictory inference
9     from the one you're trying to draw here that he
10     is uncaring and unconcerned because he's not
11     asking you about his mother?
12  A  He didn't ask. I just said he didn't ask to go
13     to the hospital to see her.
14  Q  You told him you needed him there; right?
15  A  And I already covered that. Most people will
16     say, "I need to hurry up. Can we hurry this up.
17     I need to go see my mother." That's what I'm
18     getting at. And that's why I put that in there.
19  Q  Were you dragging it out? I mean, how long did
20     this take?
21  A  I don't remember how long it took. Probably
22     about an hour or so.
23  Q  Do you know what they did when they left, Robert
24     and William?
25  A  They probably went to the hospital.



### 137

1  Q  So you've done a fair number of investigations?
2  A  I've been lead detective on 69 homicide cases.
3  Q  Okay. And you've interviewed a number of
4     witnesses and potential suspects?
5  A  Yes.
6  Q  Okay. Was William Rainsberger's behavior with
7     regards to the polygraph, how he got upset,
8     "stormed out" were your words, typical of
9     someone who had nothing to hide; right?
10        MR. WAPLES: Objection. Calls for
11    speculation.
12        MS. BOX: I'm just asking upon his
13    experience.
14        MR. WAPLES: It's speculation. You can
15    answer if you can.
16 A  Based on my personal opinion that it was
17    overboard the way he reacted to the polygraph.
18    I've had people that acted softer than that when
19    they're really being interrogated as a suspect,
20    you know, they acted calmer than he did when I
21    wasn't even treating him as a suspect at that
22    point, so I was caught off guard by it.
23        And so was Tudor and that's why our
24    emotions get elevated there when we all came
25    back together because we were really shocked by

### 138

1     it. We thought he was going to say, "Yeah, you
2     need to find who killed my mother, do it now,
3     right now and get it over with, so I'm not a
4     suspect and move on to who did this." That was
5     my opinion at the time.
6  Q  Okay. And what is your opinion on
7     William Rainsberger's demeanor and actions
8     following his mother's death attack and death?
9     Was it typical of someone who had lost his mom?
10 A  I'm trying -- I mean, a loved one in general,
11    normally people are crazy crying falling down
12    screaming, yelling, wanting to know what
13    happened, rushing -- I mean, it would be
14    pandemonium in a lot of cases where, not
15    necessarily mother/son, but that doesn't happen
16    very often in my -- I haven't had many cases
17    like that, just a few. But my opinion was
18    formulated based upon everything at the time.
19        When I investigate a case, I remember
20    everything, how people act, how they talk, how
21    they give statements. And then once information
22    starts coming in, I kind of backtrack. Was he
23    acting normal? And I -- the way -- the thing
24    that really bothered me the most, if I haven't
25    talked about it already -- I think I have -- was

### 139

1     that he couldn't he didn't check her, didn't
2     grab her and check her and grab that blanket
3     off, which I think a normal human being seeing
4     their mother in that condition would do.
5         So it was kind of weird to me right from
6     the start; but like I said, I did not treat him
7     like a suspect. I treated him with respect
8     until the polygraph; and that's when he became
9     an actual suspect in my mind.
10 Q  Okay. And just in general, you don't make the
11    determination of whether there's probable cause
12    to charge someone for an arrest; correct?
13 A  No, I don't.
14 Q  Who makes that call?
15 A  The deputy prosecutor.
16 Q  Okay. And your job with respect to the probable
17    cause is just to lay out the facts as you have
18    investigated them?
19 A  Yes.
20 Q  In your probable cause -- or in your experience
21    as an investigator, is it possible to chase down
22    every single lead --
23 A  No.
24 Q  -- in a case?
25 A  No.

### 140

1  Q  Okay. And is it possible to put everything that
2     you develop from an investigation into a
3     probable cause affidavit?
4  A  No.
5  Q  Okay. How do you decide what facts are
6     important or warrant putting in the probable
7     cause?
8  A  Basically what you have at the time that points
9     to -- I mean, we're looking for probable cause
10    for an arrest at this point so we don't
11    necessarily have to put everything in there,
12    even if it's negative towards the defendant, we
13    don't have to put everything in there.
14        The way we handle our probable causes is we
15    email them to deputy prosecutor and they look at
16    them and they give input. If they want
17    something changed, they'll tell us you need to
18    add something. Is there any more? This doesn't
19    look right. You know what I'm saying?
20 Q  Right.
21 A  So there's a give and take at that point; but,
22    everything to do with an investigation, then
23    there's always stuff that comes up after you
24    file the probable cause that adds to it or, I
25    mean, it's possible that something could come up



**141**

1   that would clear the person also, you know, so
2   but as far as the probable cause, this is a
3   probable cause for arrest; so the prosecutor
4   makes the decision whether or not what she reads
5   there gives her probable cause to request a
6   warrant with the judge.
7 Q  All right. And the judge granted a warrant in
8   this case; correct?
9 A  Yes.
10 Q  With respect to some of the stolen items from
11   the apartment, from Ruth's apartment, were you
12   ever told by either Rebecca, William, or Robert
13   that anything was missing from the apartment?
14 A  The only one I really talked to about that was
15   William because he was the only one that was in
16   the apartment. The other two hadn't entered
17   during the investigation.
18     For the next two or three days I went back
19   to the apartment and they hadn't been in there
20   because the crime scene tape was left up to keep
21   people out. So he was the only one that gave me
22   an indication of what could have been, like I
23   said, the descriptions of the items that he, we
24   found them, I believe, inside the residence.
25   And there was money, credit cards, checkbooks.

**142**

1     Nothing rifled through, closets unchecked,
2   lockboxes not rifled through either. So in my
3   opinion, it didn't appear as if anything had
4   been taken.
5     The over-the-counter drugs that he said
6   were on the counter were all still there. So,
7   yeah, but he would be the only one that would
8   have been able to tell me. He was the only one
9   in the apartment at the time when this was
10   happening.
11 Q  Okay. And you've never -- prior this incident,
12   you never met Ruth Rainsberger before; correct?
13 A  No.
14 Q  Never been inside her apartment?
15 A  No, I never been there.
16 Q  So is it safe to say you wouldn't know if
17   anything was missing unless you were told that
18   something was missing?
19 A  Correct.
20 Q  Do you recall in his statement
21   Mr. Rainsberger -- William, excuse me -- telling
22   you that his mom didn't have anything of value
23   in the apartment?
24 A  Yes.
25 Q  Okay. Okay. Just finishing up here, did you

**143**

1   knowingly or intentionally lie in your probable
2   cause affidavit?
3 A  No, I did not.
4 Q  Did you knowingly or intentionally try to
5   mislead the court in the probable cause
6   affidavit or the prosecutor?
7 A  No, I did not.
8 Q  How about did you knowingly or intentionally
9   include what you thought was incorrect
10   information in your probable cause affidavit?
11 A  No.
12     MS. BOX: No further questions.
13 CROSS-EXAMINATION,
14     QUESTIONS BY MR. RICHARD A. WAPLES:
15 Q  The prosecutor relies upon your characterization
16   of the evidence in the probable cause affidavit,
17   don't they?
18 A  They read the probable causes, yes, and make
19   their decision based upon that.
20 Q  Yeah. The prosecutor in this case didn't ask
21   you to change anything in the affidavit, did
22   they?
23 A  No.
24 Q  Didn't suggest you put anything else in the
25   affidavit that wasn't already there?

**144**

1 A  The only thing, like we covered earlier, from
2   December to May was she asked to get the
3   financial records, she asked to include that
4   when I got them.
5 Q  Okay. But she relied upon your characterization
6   of the financial records as well; correct?
7 A  Yes.
8 Q  And you know that's how it works and your
9   interaction with the prosecutor is that they
10   rely upon you as the homicide investigator to
11   present to them all of the facts in the case;
12   correct?
13 A  Yes.
14 Q  And relies upon you to objectively put forth
15   those facts in a probable cause affidavit that
16   would tend to show whether the person did it or
17   not?
18 A  Yes.
19 Q  Okay. You said the Kroger video that you saw at
20   the scene of William getting out of the car,
21   didn't contain any incriminating evidence or any
22   exculpatory evidence; is that what you said?
23 A  Yes.
24 Q  Okay. Did it show anything in his hands getting
25   out of the car?

