# EXHIBIT 6

| STATE OF INDIANA | ) | | IN THE MARION SUPERIOR COURT |
|---|---|---|---|
| | ) SS: | | CRIMINAL DIVISION 1 |
| COUNTY OF MARION | ) | | CAUSE NO. 49G01-1405-MR-026747 |

|  |  |
|---|---|
| STATE OF INDIANA, | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| | ) |
| WILLIAM RAINSBERGER, | ) |
| Defendant. | ) |

## TAPED DEPOSITION OF JENNIFER LANE

Q    David R. Hennessy
A    Jennifer Lane
Pros  Marielle Vincent

1   Q   This is September 8, 2014 depositions on William Rainsberger. Marielle Vincent for the

2      State, I'm for the defense. First deponent is Jennifer Lane with the Marion County

3      Forensic Services Agency. If you would raise your right hand, do you solemnly swear to

4      tell the truth?

5   A   I do.

6   Q   A lot of people wait because they want me to say the whole truth and nothing but the

7      truth and I figure if I've got to say it then.

8   A   I wasn't awake then.

9   Q   State your name.

10  A   Jennifer Lane L-A-N-E

11  Q   And you're a crime scene specialist at the Marion County Forensic Services Agency?

12  A   I am.

13  Q   And uh you know what case we're here on?

14  A   I do.

15  Q   So when did you first get involved in this case?

1   A   On November the 19th.

2   Q   Of 2000

3   A   Of 2013.

4   Q   And you went to 801 Jefferson?

5   A   801 N. Shortridge.

6   Q   Jeffersonian Apartments?

7   A   Yes that's correct.

8   Q   Apartment H 11?

9   A   That's correct.

10  Q   And when you arrive uh tell me what you see in terms of what personnel are present.

11  A   There were multiple uniformed officers there uh Det. Tutor and Det. Benner were there

12      um the front of the apartment building had crime scene tape in front of it.  I immediately

13      met with uh Det. Benner and Det. Tutor and they took me to inside and basically that an

14      elderly female had been found on the floor there.  She had been transported to the

15      hospital and basically we started from there.

16  Q   Have you uh processed crime scenes indoors in somewhat confined area where um it was

17      a gunshot?

18  A   I have yes.

19  Q   And have you noticed the odor of uh gunpowder in those situations?

20  A   Um not a strong odor that I have ever smelled before uh generally by the time we get

21      there things have dissipated unless there's been a high number of rounds I would say that

22      have been shot but never a scene that I have processed have I ever noticed an odor of

23  Q   Oh never?

24  A   Never not at one of my scenes.

2

1  Q   And uh so what do you do what do they tell you other than an elderly female?

2  A   Basically they said that's all we know at this point.  We don't know what her injuries, how

3      her injuries occurred um she was laying right here in the doorway when EMS arrived.

4      She was found by um one of her sons and basically that is what we know at this point of

5      time.

6  Q   Is your first report dated December 11, 2014?

7  A   Yes see that would have been when it was finalized yes.

8  Q   And when I look at that um is where, the results and conclusions like the date and time

9      you have is November 19 at 15:55 which would be 3:55.

10 A   Uh huh.

11 Q   Is that when you arrive?

12 A   That would have been my dispatch time and then my arrival time was uh 16:21.

13 Q   Say what?

14 A   My oh uh my dispatch time was at 15:55 and my arrival time was at 16:21.

15 Q   So it would be 4:21?

16 A   That is correct.

17 Q   And uh what were you looking at to answer that question, you had something that had.

18 A   My uh run sheet right here is what we fill out as we go.

19 Q   Is that something that I've been given today I guess?

20 Pros You have everything that I've given you.

21 Q   Okay and uh when you arrive at the crime scene you uh attempted to obtain some

22     fingerprints on some objects and you also did swabbing for DNA analysis.

23 A   That is correct.

24 Q   And how do you do that?  Which comes first and second?

3

1    A    Um we'll typically do the DNA swabbing um at any crime scene first once we discuss

2        with the detective what we thinks is going to be the most appropriative areas to swab just

3        to reduce the chance of contamination of people just going in and out of the crime scene.

4        Detectives and also ourselves um latent print processing is generally the last thing that we

5        do at a crime scene after we've photographed, done our evidence searches um so that was,

6        that particular day is how that would have gone as well.

7    Q    When you first entered the apartment how many people are inside?

8    A    Uh it would have been myself, Det. Benner and Det. Tutor and then the I believe it's the

9        reporting officer also came in and spoke with all of us and gave us kind of a general

10       overview of what he knew when he first arrived on the scene.

11    Q    Did you see evidence of the medical personnel having been there?

12    A    No I did not.

13    Q    No gauze?

14    A    No.

15    Q    No gauze?

16    A    No.

17    Q    No nothing?

18    A    No I did not see anything.

19    Q    And uh with regard to the pen you indicated you attempted to obtain latent's with

20       negative results, what process did you use?

21    A    Um we did that processing back at the lab so the first step in that is going to be the visual

22       um looking at that under white light magnification. The second step is going to be the

23       CA or cine acculate processing and then ray processing and then the powder processing.

24    Q    So that was all done at the lab?

1   A   That is correct.

2   Q   Had you already swabbed it at the scene?

3   A   Uh no and let me look. Typically on removable items of evidence we are going to do the

4       swabs back at the lab where we a have more controlled environment.

5   Q   So all you did was collect things?

6   A   Yes.

7   Q   Uh Det. Benner has talked about it being a plastic container that had cash.

8   A   That is correct.

9   Q   A checkbook and I don't see that anywhere in your report.

10  A   Uh it may not have been written out in my report. It was located in the dining room on

11      my uh page 3 of 5 here with uh this table. It wasn't anything that we collected um.

12  Q   Well he said you did.

13  A   I did not collect those items.

14  Q   Okay.

15  A   No.

16  Q   But that was not laying out or near at the scene where it was identified that she had been

17      found?

18  A   I'm not sure I understand your question.

19  Q   Well you said it was in the dining room and then you said on a table here and you know

20      where we don't have video but on your sketch from you got a couple of different sketches

21      uh how can we distinguish those?

22  A   What's the page number?

23  Q   Okay you've got 11/20 on the second one so on the one you sketched and dated it

5

1       November 19th, you said on this table here uh that you designated dining room would

2       that be um the square box with the T in it?

3  A    That is correct.

4  Q    And that's where you say the plastic container was?

5  A    Yes uh huh.

6  Q    And did you take an inventory of it?

7  A    We just looked through it um just to see what was in there.  We found some minimal

8       amount of cash, there's some credit cards, checkbook and didn't find anything that we felt

9       like we needed to collect at that time and.

10  Q    You're saying we can you tell me who?

11  A    Det. Benner and Det. Tutor that was in there with me.

12  Q    Okay, did you make notes or inventory of what was in there?

13  A    I did not.

14  Q    So you're just going on off memory?

15  A    Yes.

16  Q    Do you have any idea what happened to the credit cards or the checkbook?

17  A    No because we did not collect those items.

18  Q    Do you have any idea what happened to the plastic container?

19  A    No we didn't collect that.

20  Q    Do you know if it was processed for prints or DNA?

21  A    No it was not.

22  Q    By you anyway?

23  A    No it was not.

24  Q    And uh in your uh in your first report then you indicate that you did submit an envelope

6

1       containing a latent print lift card?

2   A    Yes sir.

3   Q    Where were those prints from?

4   A    It was from the light switch um in the living room right next to the front door is where I

5       obtained them.

6   Q    And do you know if those have been processed or

7   A    It was and it was not identifiable.

8   Q    And how do you know that, did you get a report?

9   A    Uh that we can look that up through IMPD to see if anything came back identifiable on it

10      or not.

11   Q    When did you do that?

12   A    We do it, most of us test them just regularly after.

13   Q    So that's memory you've looked at sometime and

14   A    Yes uh huh.

15   Q    Saw a report and uh what you had recovered

16   A    Right.

17   Q    Was then insufficient detail for it to be submitted for comparison?

18   A    Yes correct.

19   Q    Or was it not was it suitable for comparison but just not identifiable?

20   A    It said not identifiable basically is what their vague reports that comes back that say non

21      identifiable. So how detailed that is would be for them to say not really for.

22   Q    Did you take a photograph if you recall of that plastic container on the table in the dining

23      room?

1  A    I don't recall whether or not I did. It would have probably have been in my overall

2       photos but as far as in detail and the plastic container photograph I can't say whether or

3       not I did.

4  Q    And the eye glasses were still there when you got there.

5  A    That's correct.

6  Q    And then you indicate well let's, you collected the blanket yourself, correct?

7  A    That's correct.

8  Q    And when you identify or describe what you say as a one apparent defect can you give

9       me a better description of that or

10 A    It was uh like a hole or a tear of some variety um and I can't really determine how that

11      defect got there.

12 Q    Do you know uh do you remember was there some dried blood and moist blood or

13 A    There was.

14 Q    Both?

15 A    Uh huh the way um had to hang that up to dry in our drying closet. The thinner I guess

16      you would say areas of blood had dried by the time that we actually left the scene.

17 Q    And then in that same report you indicate that you recovered a bag for what you say a bag

18      you used to transport victims clothing from hospital and you got that from Breedlove?

19 A    That is correct.

20 Q    Do you have any idea how many different people had handled that before?

21 A    Um let me see possibly in the report. Well I just have a chain of custody directly from

22      Det. Breedlove which he brought it from the hospital so he did not provide me with a

23      separate chain of custody from nurses or.

24 Q    Other officers?

1   A   Yeah.

2   Q   Um do you normally get a chain of custody with the objects that you recover at homicide

3       office?

4   A   It depends on the hospitals generally whether or not they provide the detectives with

5       them.

6   Q   Um do you normally get a chain of custody if you take an object to be processed and

7       submitted to the lab that you recover at homicide?

8   A   Yes.

9   Q   I mean the police, they

10  A   Yes, yeah, yes the third

11  Q   Which officer at the scene got it and he gave it to.

12  A   Right.

13  Q   But you did not get it in this case?

14  A   I got it from Det. Breedlove so I have chain of custody from Det. Breedlove and he was

15      at the hospital.

16  Q   Oh so what he gave you indicates that he was at the hospital?

17  A   Yes.

18  Q   And he got the sack?

19  A   That's correct.

20  Q   And Breedlove gave you that?

21  A   That's correct

22  Q   And uh said you itemized uh you get that at homicide office, you take it back to the lab

23      and then you itemized it.

24  A   Uh huh.

1   A    That's correct.

2   Q    Uh what do you recall the appearance of the drawers being in?

3   A    Um the four I believe there were six in the center um I guess you would call that a

4         credenza um type, the longer shorter one, um there was six drawers total. The top four

5         were slightly opened um and after I photographed those and then opened down further it

6         didn't appear they had actually been gone through at all. The smaller night stand um that

7         was to the left of that, the top drawer was more fully opened um and there wasn't really

8         enough items in that drawer to be able to determine whether they had really been gone

9         through or not there was just a few miscellaneous items in that drawer.

10  Q    So you can't tell if anything is missing from the drawer?

11  A    No.

12  Q    And then uh did you go through the apartment fairly thoroughly?

13  A    Yes I did.

14  Q    And did you go through the kitchen then fairly thoroughly?

15  A    I did.

16  Q    Your notes indicate that no prescriptions were found. Do you mean prescription bottles?

17  A    I do.

18  Q    And uh none were found anywhere?

19  A    No, there was um some vitamins um I believe. I could not recall what types um were on

20         the kitchen counter and just my experience taking care of my own grandparents at the

21         similar age I thought that might be odd that there would not be more prescriptions. I

22         would expect somebody at that age to have a lot of prescriptions um then we later learned

23         I believe that Det. Benner had spoken with the children and they said she was not on I

24         believe a lot of prescriptions so.

13

1    Q    Did Benner tell you that?

2    A    I believe so yeah.

3    Q    How old is yours, old person?

4    A    Well they are both deceased now but they were both in their 80s.

5    Q    I've got my 88 up here out at Westminster.

6    A    Um

7    Q    Uh in your notes you indicate purse is missing. Where did you get that information?

8    A    Um also from the family members we've been told that she carried a black purse um and
9        we had searched, both myself and Det. Tutor had searched um all the drawers, the
10       closets, under the beds um in both bedrooms, closets and the other bedroom as well um
11       pantry, kitchen cabinets and we did not locate a black purse.

12    Q    And uh so Benner and Tutor had the same information about the missing purse?

13    A    That is correct.

14    Q    And you indicate that the bathroom was flooded?

15    A    Yeah there was small amount of water um just about to the mid sink area on that
16       bathroom floor um which we later found old she had been having maintenance issues in
17       that bathroom.

18    Q    And uh by flooding, it hadn't run out into the outer area, it was just a pool of water on the
19       floor?

20    A    That's correct.

21    Q    It was not normal.

22    A    No.

14

1   Q   Now we'll get in a debate because me and Benner have difference of opinions of what is

2       normal. I'll try not to use that word anymore. Uh your note kitchen counter around area

3       where over the counter medicines were located.

4   A   Uh huh.

5   Q   Is that in reference to you did latent print processing in that area?

6   A   That's correct.

7   Q   Okay, in uh on the desk is the uh apparent debris do you remember did you photograph

8       that separately?

9   A   I don't recall.

10  Q   To depict the

11  A   If I did I don't remember.

12  Q   Okay.

13  A   Actually if I would have there would have been a separate media card done um and it

14      doesn't look like there was so no.

15  Q   Did you attend the autopsy?

16  A   I did not.

17  Q   Oh um anything else you did on the 19th?

18  A   Um no I don't believe so.

19  Q   You didn't do the alumina that day?

20  A   No we did not um that is a two person operation to do the Blue Star and I believe I was

21      the only one working um that day and at that point also we really didn't know if she was

22      still alive um for one thing at the point at that point we were still there. Um we didn't

23      know what the uh how she had been injured for another thing um that's how we that was

24      actually I believe two or three days later when we came back and did the Blue Star.

15

1   Q   And then you did a list and it's all in your report where you collected on the 19th?

2   A   Uh huh.

3   Q   Is that a yes?

4   A   That's correct.

5   Q   I just had to ask.

6   A   Sorry.

7   Q   Uh you did your video that day?

8   A   That's correct.

9   Q   Alright, and you took photographs that day?

10   A   That's correct.

11   Q   And then um they had you go back the next day?

12   A   That's correct.

13   Q   About what time?

14   A   On the um 20th, I was requested at uh 5:09 and arrived at 5:20.

15   Q   And in your report on that on your first thing on your activity is detective interview.

16   A   Yes.

17   Q   What's that?

18   A   Um it's just basically when we get to the scene we talk to the detective about whether it's

19       uh   a original scene or the follow up about what information they have, what new

20       information they might have, what were they looking for and kind of go in together and

21       see what we have at that time.

22   Q   So what did he tell you that day?

23   A   He said um he had the autopsy results done at that point in time, what type of weapon we

24       would be looking for (sneeze-excuse me, sorry I'm losing my voice) and um so we knew

16

1      that at that point we might be looking some type of a blunt object. I believe that the um

2      doctor or pathologist had told him that a hammer might be what we were looking for um

3      so we were searching for a hammer um there were some um items that were on the coffee

4      table as well that I believe he had got information from the uh apartment complex there

5      was a plastic bag that had um lease papers and them that they torn up I believe they had

6      told Det. Benner or Det. Tutor that those had been taped to her front door that day the day

7      of the um incident or the day prior and so um we had decided to go ahead and collect

8      those items as well.

9   Q   So when you went in the next day did uh you notice anything different from the first day

10      as someone had been in there to kind of clean up or anything?

11   A   Um we did notice um when they went back in and looked um we found a black purse in

12      the bottom drawer of the night stand in her bedroom that didn't, did not appear to have

13      didn't have anything in it and it had a store tag still on the purse um we photographed the

14      purse, photographed the tags and um then we continued our search for um.

15   Q.   Do you have any notes or anything in this documentation talking about the purse?

16   A   Um we do, (going through papers) we have in there that we have in my previous report

17      that there was a black purse missing in the narrative photographs of it on this media card.

18   Q   I'm, I'm wondering if you made the notation purse missing, I'm looking for any

19      documentation in covering that?

20   A   Just the photograph of it.

21   Q   Okay she didn't make a new notation about the purse?

22   A   No just the photographs.

23   Q   And there's no notation where it was?

24   A   Just the photograph.

1   Q   And where do you recall it being?

2   A   It was in the bottom drawer um of a nightstand in her bedroom.

3   Q   And do you know if anybody ever showed that to any family member to see if that is the

4       purse they were talking about?

5   A   No I do not.

6   Q   And it had store tags on it?

7   A   It does.

8   Q   So if they just got the purse she had been using but did not seem to be that purse?

9   A   It would not.

10  Q   Um and on this date who's with you?

11  A   Um also Det. Benner and Det. Tutor again.

12  Q   And do you have another crime lab person?

13  A   Not on this day.

14  Q   Just the day you did the

15  A   No.

16  Q   So what you go back the 20th, oh just to look for hammers?

17  A   Yes.

18  Q   Okay and then you decide to go ahead and take the um bag with the apartment stuff in it.

19  A   Right uh huh.

20  Q   Did you uh had you do you remember seeing that the day before?

21  A   We did see it before um but there was quite a bit of mail, paperwork laying around and

22      we didn't know how long those papers had been there. anything like that but once we

23      learned that uh it had been on her door possibly that day of the incident we decided we

24      would go ahead and recover those items.

18

1  Q  Uh there was a notation that you were present when either Tutor or Benner were going

2     through an envelope do you recall that?

3  A  Um can you be more specific?

4  Q  Well I wish I could, do you recall them going through, what do you remember them

5     going through? Did they go through the plastic bag that you recovered?

6  A  There was not anything in the plastic bag um at the time. All of the items were laying

7     around it that had been in it. There was like a um a black can cozie that had been given

8     to the residents um like a lease renewal agreement um I don't know what all there was.

9  Q  You indicate a lease renewal offer that was said to be inside of item 22.

10 A  Uh huh.

11 Q  Is that a yes?

12 A  Yes that's correct.

13 Q  By whom?

14 A  By the apartment leasing people.

15 Q  According to?

16 A  Uh Det. Benner and Det. Tutor.

17 Q  Oh they both said it?

18    TURNED TAPE OVER

19 Q  I'm hoping that one's good. Uh what was the last question.

20 A  You asked what time I left that day um on the 20th and I left at 6:35 p.m.

21 Q  Um so then you go back. Do you do anything else on this case then before you go back

22    the 22nd?

23 A  Uh no just the processing that I would have started. The latent print processing which

24    have been happening back in the lab um and then that's when on the 22nd is when we