# EXHIBIT 8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| WILLIAM RAINSBERGER, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No.: 1:16-cv-103-WTL-MJD |
| CHARLES BENNER, | ) ) ) |
| Defendant. | ) ) |

### AFFIDAVIT OF CHARLES BENNER

I, Charles Benner, am over the age of eighteen (18), am of sound mind, and am competent to testify that the below facts are true and correct based on my personal knowledge.

1. I am currently employed as a homicide Detective with the Indianapolis Metropolitan Police Department.

2. I have been employed by IMPD for _27_____ years. I have been a homicide Detective for __12_____ years.

3. On November 19, 2013, I was assigned to investigate the death of Ruth Rainsberger.

4. During my investigation, I uncovered facts that based on my training and experience led me to believe that William Rainsberger murdered his mother.

5. On May 22, 2014, I signed an Affidavit for Probable Cause that outlined the facts I uncovered during the course of my investigation. On or about May 27, 2014, the trial court found probable cause and issued a warrant for William's arrest.

6. My belief that William murdered his mother was based on the following facts:

    a. I focused my initial investigation on William and his brother, Robert Rainsberger because there were no signs of forced entry at Ruth's apartment. William, Robert, and their sister, Rebecca Rainsberger were the only individuals who had keys to her apartment. The apartment complex where

Ruth lived also had a key, but I confirmed that the key had not been moved and was in its normal location at all relevant times. Rebecca's phone records indicated that she was not near Ruth's apartment at the time of her death.

b. During my investigation, I learned that William was Ruth's primary caregiver. And, to the best of my knowledge, he was the last person to see her alive. William had last seen her the night before the incident around 6:00 p.m. This information indicated to me that William had the opportunity to murder Ruth.

c. Ruth was still breathing when William arrived at her apartment. William did not put pressure on her wound or attempt to render First Aid. He did not stay with his mother to comfort her. Instead, William called 911 and left the apartment. This behavior seemed suspicious to me. Based on my training and experience, an individual who finds a family member injured will typically try to render First Aid or provide comfort.

d. There was a blanket covering Ruth's head/face and injuries. William did not remove the blanket to determine the nature and extent of Ruth's injuries. This behavior again seemed suspicious. Based on my training and experience, an individual who finds a family member injured will typically want to know what happened and the severity of the injuries. I also know from my training that when an attacker covers his or her victim's head/face, it often indicates that the attacker had a personal relationship with the victim.

e. William told to the 911 operator that "someone had bashed her head in." He also told Wooldridge that someone had caved his mother's head in. However, William never removed the blanket to visualize Ruth's injuries. Medical personnel on scene and at the hospital believed that Ruth had suffered a gunshot wound. Dr. Tashjian who performed Ruth's autopsy determined that Ruth's cause of death was multiple blunt force trauma injuries to the head, possibly caused by a hammer-like object. The fact that William had specific knowledge of his mother's injuries, unknown to the medical personnel who treated Ruth, even though he did not remove the blanket, indicated to me that he was involved in her death.

f. Based on my training and experience, robbery did not appear to be the motive for Ruth's attack. There were no signs of forced entry. Ruth's cash, checks, and credit cards were found at the scene. The drawers in Ruth's bedroom were open, but appeared undisturbed. The back room of Ruth's apartment was cluttered with boxes and trash bags, but they also appeared undisturbed. There was a lockbox in the back room of Ruth's apartment that contained what appeared to me to be valuable documents.

g. When Officer Price transported William to IMPD Headquarters, William said that he did not know whether what happened to his mother was a good thing or a bad thing. In my opinion, this comment showed a lack of concern for

Ruth, which based on my training and experience was suspicious and uncommon.

h. Ruth did not answer the door when Pickens, a Meals-On-Wheels delivery driver, knocked around 10:30 a.m. Pickens called Ruth's landline when she did not answer the door. Pickens could hear the phone ringing inside Ruth's apartment, but Ruth did not pick up the phone. There was dried blood on the blanket covering Ruth's head. Based on this evidence and my training and experience, it is likely that Ruth was attacked prior to 10:30 a.m. Kroger surveillance video shows William throwing away a straight object, then pushing buttons on the Redbox, and turning to his side to look around at 3:29 p.m.

i. William's phone records, including cell tower site locations, indicate that he was in the vicinity of Shortridge Road and 10th Street on November 19, 2013 during the relevant time. This information again indicated to me that William had the opportunity to murder Ruth.

j. I interviewed William on the evening of November 19, 2013. During that interview, William did not ask me how his mother was doing or if he could go to the hospital to be with her. Based on my training and experience, the family members of a victim are anxious to get to the hospital and want to know the condition of the victim.

k. Ruth had $98,762.70 in assets at the time of her death. William, Robert, and Rebecca were the beneficiaries of Ruth's assets. This information indicated to me that William, Robert, and Rebecca had a financial motive to murder Ruth.

l. I asked William to take a polygraph test. William adamantly refused. He became upset at my request and began yelling. In my experience, individuals who are not involved in a crime are willing to take a polygraph to prove their innocence and assist in the investigation.

7. During a search of the crime scene, I found a black handbag that seemed to match the description of Ruth's purse given to me by William and Robert. I also found a brown coin purse. I learned from William that Ruth's only prescription medication was Aricept, which she took for dementia. Based on my training and experience, Aricept is not a drug worth stealing because it has no value on the street. I do not recall whether William informed me that any of his mother's jewelry was missing. However, William did inform me that Ruth did not own any expensive jewelry.

Based on all the evidence at the scene, it did not appear that robbery was the motive for Ruth's death.

8. In my opinion, the lockbox was in plain view. It was located on the shelf of an open closet. I cannot recall whether the lockbox specifically contained "savings bonds." However, I do recall that the documents looked like financial documents. I included this information in my Affidavit for Probable Cause to support the conclusion that Ruth's apartment had not been burglarized because valuable documents were undisturbed. The documents appeared valuable to me because they were stored in a lockbox and were financial. Again, based on all the evidence at the scene, robbery did not appear to be the motive for Ruth's death.

9. IMPD Detective, Benjamin Bierce, subpoenaed phone records for William Rainsberger, Robert Rainsberger, Rebecca Rainsberger, and Ruth Rainsberger.

10. When I went to Kroger, I viewed footage that showed William driving onto the Kroger parking lot, exiting his vehicle, and walking toward the store entrance. The video did not show William carrying trash. The video also did not show anything relevant to the case. I asked the Kroger Loss Prevention Specialist, Pam Pulliam, to burn disks containing all the video depicting William on November 19, 2013. Pulliam provided me with four disks labeled "Camera 44 Lot," "Camera 29 Exit," "Camera 7 Uscan," and "Camera 30 Redbox."

11. The skin cell DNA evidence recovered from the collar and sleeve of Ruth's jacket was more than likely from one of the first responders. In my experience, it is common for first responders who treat an injured victim to leave touch DNA on the victim or victim's clothing. It is my understanding that the medical personnel on scene had to

log roll Ruth onto a back board and transport her to the ambulance. To perform these tasks, the first responders would have had to touch Ruth. Accordingly, based on my training and experience, I did not find this evidence relevant to my investigation. I was trained to handle this evidence by turning it over to the Prosecutor's Office, which I did, and not to include it in my Affidavit for Probable Cause.

12. Based on all the above evidence and my training and experience, it was my opinion that William murdered Ruth because 1) he had the opportunity; 2) he had a financial motive; 3) he knew specific details about her injuries indicating his involvement; and 4) his behavior following the incident was suspicious and uncommon.

13. I did not knowingly, intentionally, or recklessly make false or misleading statements, withhold exculpatory evidence in my Affidavit for Probable Cause.

FURTHER AFFIANT SAYETH NOT.

## **AFFIRMATION**

In accordance with 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing responses to interrogatories are true and correct.

Date: 1-12-17

*[signature]*
Charles Benner