UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

WILLIAM RAINSBERGER, )
  )
    Plaintiff, )
  )
v. )   Case No.: 1:16-cv-103-WTL-MJD
  )
CHARLES BENNER, )
  )
    Defendant. )

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

This case arises out of the death of eighty-eight-year-old Ruth Rainsberger. William Rainsberger testified that on November 19, 2013, he discovered his mother, Ruth, on the floor of her apartment breathing, but severely injured. Medics rushed Ruth to the hospital where she succumbed to her injuries the next day. The coroner determined that Ruth's cause of death was multiple blunt force trauma to the head and ruled it a homicide. Detective Charles Benner, a twenty-seven-year veteran of the Indianapolis Metropolitan Police Department, investigated Ruth's death. After a thorough investigation, Benner submitted an Affidavit for Probable Cause to the Marion Superior Court. The trial court found probable cause and issued a warrant for his arrest, although the charges against him were later dismissed.

William now sues Benner for false arrest, malicious prosecution, and for making false or misleading statements in a probable cause affidavit. These claims fail for four reasons. First, there was probable cause for William's arrest and prosecution. Second, Benner did not act with malicious intent, and even if he did, there is no constitutional right not to be prosecuted without probable cause. Third, there is no evidence that Benner knowingly made false or misleading statements, or withheld exculpatory evidence (and the allegedly false or misleading statements

1

were not material to the finding of probable cause in any event). And fourth, Benner has qualified immunity because he did not violate William's clearly established constitutional rights. Accordingly, Benner is entitled to summary judgment.

## I.     Statement of Material Facts Not in Dispute

### A.  William reports that he found his mother injured on the floor of her apartment.

According to William, on November 19, 2013 shortly after 3:30 p.m., he went to his mother's apartment at 801 North Shortridge Road in Indianapolis. Dkt. 1, ¶ 8; Exhibit 1 – Affidavit for Probable Cause, pp. 1-2. He says he went to unlock the door with his key, but it was already unlocked. Ex. 1, p. 2; Exhibit 2 – Deposition of William Rainsberger, 54:23-55:3. William entered the apartment and noticed his mother lying face down on the floor with "a blanket covering much of her shoulders and head." Ex. 2, 56:5-6. Ruth was still breathing when William testified that he discovered her, but her breathing was labored. Ex. 2, 56:8-10. He knelt down beside her, put his hand on her knee, and yelled, "Mom, Mom." Ex. 2, 56:21-22. Ruth was unable to communicate, but her breathing changed and she moved her head and arm slightly. Ex. 2, 56:23-57:7. William sensed that she was responding to his touch or voice. Ex. 2, 57:16-19.

William knelt down beside his mother and noticed that there was a large circle of dried blood on the blanket covering her head. Ex. 2, 57:22-58:9. There was also a large pool of what appeared to him to be congealed blood on the floor. Ex. 2, 58:9-12. Despite being curious about the nature and extent of her injuries, William did not remove the blanket. Ex. 2, 59:25-60:2; 61:15-18. He also did not attempt to put pressure on her wound or provide first aid. Exhibit 8 – Deposition of Charles Benner, ¶ 6c. Instead, around 3:38 p.m., he used his mom's landline phone to call 911. Ex. 2, 59:3; 66:7-10; Exhibit 3 – 911 Audio. William told the 911 operator that "someone bashed her head in." Ex. 3, Track 4, 00:49-00:51.

Indianapolis Fire Department Paramedic Carl Wooldridge responded to William's 911 call. Exhibit 4 – Affidavit of Carl Wooldridge, ¶ 4. William met Wooldridge outside the apartment and stated that someone had "caved his mother's head in." Ex. 4, ¶ 5. Inside the apartment, Wooldridge observed Ruth lying on the ground between a chair and the coffee table. Ex. 4, ¶ 6; Ex. 4, Attachment A, p. 1. She was still breathing. Ex. 4, Attachment A, p. 1. There was a greenish colored cloth with blood and a small hole covering Ruth's head. Ex. 4, ¶ 6; Ex. 4, Attachment A, p. 1. The cloth appeared stuck to her head. Ex. 4, ¶ 6. Wooldridge removed the cloth and saw an area on the back left side of Ruth's head, two to three inches in diameter, with brain matter protruding. Ex. 4, ¶ 7; Ex. 4, Attachment A, p. 1. There was also what Wooldridge believed to be a hole in the left side of her forehead. Ex. 4, ¶ 7; Ex. 4, Attachment A, p. 1.

Based on Ruth's injuries, Wooldridge's initial medical opinion was that Ruth sustained a gunshot wound. Ex. 4, ¶ 8. Based on Ruth's presenting injuries, the emergency room doctor also determined that she was shot. Exhibit 23 – Affidavit of Robert Rainsberger, 25:22-23. Wooldridge thought it was strange that William said his mother's head had been caved in because he did not remove the cloth to visualize her injuries and her injuries appeared consistent with a gunshot wound. Ex. 4, ¶ 9.  In addition to Wooldridge, five or six other individuals from Engine 43 and the ambulance crew arrived on scene to assist with Ruth's treatment. Ex. 4, ¶ 10; Ex. 4, Attachment A, p. 2. They padded the wound with a towel and log rolled her onto a back board. Ex. 4, Attachment A, p. 2. The ambulance transported Ruth to Wishard Hospital in critical condition. Ex. 4, Attachment A, p. 2; Exhibit 5 – Deposition of Charles Benner, 8:10-12.

### B.  Benner investigates Ruth's death.

IMPD Detective, Roger Feuquay, also responded to the 911 call. Ex. 5, 8:4-7. Feuquay, an aggravated assault detective, contacted homicide detective Benner when he learned that Ruth

was in critical condition. Ex. 5, 8:8-13. Benner arrived at the scene around 4:15 p.m. Ex. 5, 8:14-18. IMPD Homicide detective Tudor also arrived to assist Benner with the investigation. Ex. 5, 9:24-10:1.

### 1. *Benner performs an on-scene investigation.*

Benner began his investigation by speaking briefly with Feuquay and the reporting officer. Ex. 5, 8:14-23; 9:10-23. Feuquay relayed that William was the 911 caller, that Ruth was found covered with a blanket, and that she was transported to the hospital in critical condition. Ex. 5, 8:19-23. Benner learned from the reporting officer that William and his brother, Robert Rainsberger, were on scene and in separate vehicles. Ex. 5, 9:12-18. Tudor did an initial canvas of the building to identify potential witnesses. Ex. 5, 9:24-10:1. Benner gathered information about the medical personnel who treated Ruth then requested a crime scene specialist to collect evidence. Ex. 5, 10:2-6.

Around 4:21 p.m., Crime Scene Specialist, Jennifer Lane, arrived at 801 North Shortridge Road. Ex. 5, 10:5-6; Exhibit 6 – Deposition of Jennifer Lane, 3:14-16. Lane videotaped and photographed Ruth's apartment. Ex. 6, 16:7-10. She collected evidence, including fingerprints and DNA. Ex. 6, 3:21-32. Lane collected a skin cell sample from the outside back neck area and outside left sleeve of Ruth's jacket. Exhibit 7 – Laboratory Examination Report, p. 1. The Indianapolis-Marion County Forensic Services Agency analyzed the sample. Ex. 7. On April 23, 2014, the Forensics Services Agency issued a report indicating that "[t]he partial DNA profile of the minor contributor is from an unknown male individual A." Ex. 7, p. 2.

The skin cell DNA evidence recovered from Ruth's jacket was more than likely from one of the first responders who treated Ruth at the scene. Exhibit 8 – Affidavit of Charles Benner, ¶ 11. In Benner's experience, it is common for first responders who treat an injured victim to leave

touch DNA on the victim or victim's clothing. Ex. 8, ¶ 11. Here, the medical personnel who responded to the scene had to "log roll" Ruth onto a back board and transport her to the ambulance. Ex. 8, ¶ 11; Ex. 4, Attachment A, p. 2. To perform these tasks, the first responders would have had to touch Ruth. Ex. 8, ¶ 11. Because the DNA could most likely be attributed to a first responder, Benner did not find this evidence helpful to his investigation. Ex. 8, ¶ 11. He did not include this evidence in his probable cause affidavit. Ex. 1. Instead, Benner complied with his training and made the Marion County Prosecutor's Office aware of the skin cell DNA recovered from the scene. Ex. 8, ¶ 11.

Benner did a walkthrough of Ruth's apartment. Ex. 1, p. 1. The walkthrough revealed no signs of forced entry. Ex. 1, p. 1; Exhibit 9 – Photos, #1-3. He noticed some open dresser drawers in Ruth's bedroom, but the contents appeared undisturbed. Ex. 1, p. 1; Ex. 9, #5-10. The back room was cluttered with boxes and trash bags that seemed untouched. Ex. 1, p. 1; Ex. 9, #11-15. Benner found a lockbox on the open closet shelf in the back room which contained what looked to him like valuable financial documents. Ex. 5, 60:1-5; Ex. 9, #12, 15. He also found Ruth's checkbook, cash, and credit cards in the apartment. Ex. 5, 141:25; Ex. 6, 3:7-11, 6:7-9; Ex. 9, #17.

Benner does not recall whether the lockbox specifically contained "savings bonds." Ex. 1. Ex. 8, ¶ 8. He does recall that the documents looked like financial documents. Ex. 8, ¶ 8. The documents appeared valuable to Benner because they were stored in a lockbox and contained financial information. Ex. 8, ¶ 8. The documents also seemed undisturbed, which would indicate that robbery was not the motive for her death. Ex. 8, ¶ 8. He included this information in his probable cause affidavit to support the conclusion that Ruth's apartment had not been burglarized. Ex. 8, ¶ 8.

During a search of the crime scene, Benner found a black handbag that seemed to match the description of Ruth's purse given to him by William and Robert. Ex. 8, ¶ 7; Ex. 9, #16. He also located a brown coin purse. Ex. 8, ¶ 7; Ex. 9, #6-7, 9. He noted several medications on the kitchen counter that appeared undisturbed. Ex. 9, #4. Based on all the evidence, Benner determined that robbery did not appear to be the motive for Ruth's death. Ex. 8, ¶ 7.

### 2. *Benner interviews William, Robert, and Rebecca.*

That same evening, Benner asked William and Robert to give a statement. Ex. 5, 11:17-21. They both consented and were transported to IMPD Headquarters. Ex. 5, 11:17-12:2. On the drive downtown, William told IMPD Officer Michael Price that he did not know whether what happened to his mother was a good thing or bad or a bad thing. Exhibit 10- Deposition of Michael Price, 14:3-9.

William told Benner during his interview that he had been taking care of Ruth daily for the past few years. Ex. 1, p. 2. He also handled all of her bills and finances. Ex. 1, p. 2. Ruth had approximately $80,000 to $100,000 in savings that was to be distributed to her three children after her death. Ex. 1, p. 2. In addition to Ruth, the only individuals with a key to her apartment were William, Robert, and their sister Rebecca. Ex. 8, ¶ 6a. The apartment complex where Ruth lived also had a key to her apartment; however, Benner confirmed that the key had not been moved and was in its normal location at all relevant times. Ex. 8, ¶ 6a.

William said he last saw his mother the previous night around 6:00 p.m. After visiting with her, William drove to Plainfield to spend the evening with his wife. Ex. 1, p. 2. Around 9:00 the next morning, he returned to his house at 7345 East 13th Street in Indianapolis. Ex. 1, p. 2. He stayed home until about 3:30 p.m. then went to Kroger on 10th Street in Indianapolis and bought a tea. Ex. 1, p. 2. William then drove the short distance to Ruth's apartment. Ex. 1, p. 2.

6

When he arrived at Ruth's apartment, he says he noticed that the door was already unlocked. Ex. 1, p. 2; Ex. 2, 54:23-55:3. He went inside and saw her lying on the floor with a blanket over her head. Ex. 1, p. 2. Based on Benner's training and experience, when an attacker covers his or her victim's head or face, it often indicates that the attacker had a personal relationship with the victim. Ex. 8, ¶ 6d. William also noticed some blood and that his mother was still breathing. Ex. 1, p. 2. When asked why he did not remove the blanket, William said that in his opinion removing the blanket would do more damage. Ex. 1, p. 2. He checked the apartment to confirm that no one was there and then called 911. Ex. 1, p. 2; Ex. 3. After calling 911, William went outside to wait for the ambulance. Ex. 1, p. 2.

William also informed Benner that the only prescription medication that Ruth took was Aricept to treat her dementia. Ex. 8, ¶ 7. Based on Benner's training and experience, Aricept is not a drug worth stealing because it has no value on the street. Ex. 8, ¶ 7. He does not recall whether William said that some of his mother's jewelry was missing. Ex. 8, ¶ 7. However, William did state that Ruth did not own any expensive jewelry. Ex. 8, ¶ 7. William admitted in his deposition that he cannot say with certainty that any jewelry was missing from the apartment. Ex. 2, 121:10-17.

William never asked Benner about his mother's condition or if he could go to the hospital to be with her. Ex. 2, 131:2-7.

During his interview, Robert stated that he had not seen Ruth for a few days. Ex. 1, p. 2. In August 2013, Robert moved in with William after the bank foreclosed on his house. Ex. 1, p. 2. Robert was at William's house on November 19, 2013 when William called and told him to come to Ruth's house immediately. Ex. 1, p. 2. When he got to Ruth's apartment, Robert was stopped

by police and put in a police car. Ex. 1, p. 2. He advised Benner that an ambulance took his mother away. Ex. 1, p. 2.

Robert, likewise, did not ask Benner about Ruth's condition or whether he could go to the hospital to be with her. Ex. 1, p. 2.

The next day, Benner spoke with Rebecca Rainsberger. Ex. 1, p. 2. Rebecca stated that she typically checks on her mother once a week. Ex. 1, p. 2. She was last at Ruth's during the day on Monday, November 18, 2013. Ex.1, p. 2. Rebecca was not at the apartment on the day of the incident. Ex. 1, p. 2.

### 3. *Ruth passes away.*

On November 20, 2013, Ruth died from her injuries. Ex. 2, 24:7-11. Benner attended Ruth's autopsy performed by Dr. Tashjian. Ex. 1, p. 2. He determined that Ruth's cause of death was multiple blunt force trauma to the head. Ex. 1, p. 2. According to Dr. Tashjian, Ruth's wounds were possibly caused by a hammer or similar object. Ex. 1, p. 3. He ruled her death a homicide. Ex. 1, p. 3.

### 4. *Benner asks William and Robert to take a polygraph test.*

Following Ruth's autopsy, Benner again spoke with William and Robert at IMPD Headquarters. Ex. 1, p. 3. Benner asked William and Robert to take a polygraph test to eliminate them as suspects. Ex. 1, p. 3. William got upset and began yelling. Ex. 2, 95:16-96:3. He adamantly refused to take a polygraph. Ex. 1, p. 3; Ex. 2, 94:14-15.

### 5. *Benner obtains William's and Robert's fingerprints and DNA.*

Benner obtained a limited search warrant for William and Robert's fingerprints and DNA. Ex. 1, p. 3. On December 4, 2013, Benner collected fingerprints and DNA buccal swabs from William and Robert. Ex. 1, p. 3.

### 6.  *Benner recovers video of William from the Kroger on 10th Street.*

Two days later, Benner collected video from the Kroger store located on 10th Street. Ex. 1, p. 3. Phil Thompson, an off-duty IMPD officer, had previously asked Pam Pulliam, a Loss Prevention Specialist for Kroger, if there was any video of William from November 19, 2013. Exhibit 11 – Deposition of Pam Pulliam, 2:22-3:5. Pulliam identified video of William making a purchase from the self-checkout lane. Ex. 11, 3:7-13. Kroger had eighty-one working cameras that day. Ex. 11, 3:18-21.

Four of them showed William. Ex. 11, 5:21-6:9. Camera 30, located in the front entry way, shows William at about 3:29 p.m. pull a "straight object" from his right side or right pocket and dispose of it in the trash. Exhibit 12- Camera 30 Footage, 3:28:55-3:28:59; Exhibit 13 – Still Photos of Camera 30 Footage. After dropping the object in the trashcan, William then pushes some buttons on the Redbox video-rental box next to the trashcan. Ex. 12, 3:28:59-3:29:26. As he pushes buttons, he turns to his side and looks around. Ex. 12, 3:29:03-3:29:04. He then enters the store. Ex. 12, 3:29:30. Camera 7, located in the self-checkout area, shows William purchasing a tea. Exhibit 14 - Camera 7, 3:31:14-3:32:01; Exhibit 15 - Receipt. He appears to let a female at the adjacent checkout kiosk use his Kroger Plus Card, but he does not use the card for his purchase. Ex. 14, 3:31:18-3:31:25; Exhibit 16 - Kroger Plus Card Records. Camera 29, located near the exit, shows William leaving the store. Exhibit 17 - Camera 29 Footage, 3:32:26-3:32:34. Camera 44, located in the parking lot, shows William walking towards a row of parked vehicles. Exhibit 18 - Camera 44 Footage, 3:32:50-3:32:55. He stops in the middle of the road, does a complete turn, throws up his hand, and then walks to a vehicle that is directly in front of him. Ex. 18, 3:32:55-3:33:14. William then gets in a vehicle and drives away. Ex. 18, 3:33:14-3:33:49.

Pulliam contacted Benner and invited him to the store to view the video footage. Ex. 11, 7:11-17. In addition to the video described above, Benner recalls seeing footage of William driving onto the Kroger parking lot, exiting his vehicle, and walking toward the entrance. Ex. 8, ¶ 10; Ex. 11, 7:7-8, 16-24. This video did not show William carrying trash or anything relevant to Benner's investigation. Ex. 8, ¶ 10. Benner asked Pulliam to provide him with all of the video depicting William. Ex. 8, ¶ 10. Pulliam gave Benner four disks labeled: "Camera 44 Lot," "Camera 29 Exit," "Camera 7 Uscan," and "Camera 30 Redbox." Ex. 8, ¶ 10; Ex. 11, 5:21-6:5.

### 7.  Benner subpoenas Kroger's records.

Benner subpoenaed the Kroger Plus Card records for card number XXXXXXXX9558, which belongs to William. Ex. 16. The records show that on November 19, 2013, he made a $48.16 purchase at the Fuel Center at 9:20 a.m. and a $14.10 purchase at the Uscan self-checkout at 3:32 p.m. Ex. 16. Benner also obtained a receipt for William's purchase at the Uscan kiosk shown on Camera 7. Ex. 15. The receipt indicates that he paid $1.06 for an Arizona Green Tea at 3:34 p.m. Ex. 15. After purchasing the tea, William goes to Ruth's apartment and finds her injured on the floor. Ex. 1, p. 2.

### 8.  IMPD Detective Bierce provides Benner with phone records.

IMPD Detective Benjamin Bierce subpoenaed phone records for William, Robert, Rebecca, and Ruth. Ex. 8, ¶ 9. Rebecca's cell phone records confirmed that she was not in the vicinity of Ruth's apartment on November 19, 2013. Ex. 1, p. 2. William's phone records, including cell tower site locations for November 19, 2013, show that he was in the vicinity of Shortridge Road and 10th Street during the relevant time period. Ex. 1, p. 4. Ruth's phone records show a phone call to Robert's cell phone number, 317-357-5791, at 3:40 p.m. on November 19, 2013. Ex. 2, 20:16-17; Exhibit 19 – Affidavit of Benjamin Bierce, ¶ 7; Exhibit 20 – Phone Records

for Ruth Rainsberger. Bierce determined that Robert's phone records show that he received two phone calls from Ruth's landline number, 317-375-7841. Ex. 19, ¶¶ 8, 9; Ex. 19, Attachment A. The first phone call was at 2:40 p.m. and the second phone call was at 3:40 p.m. Ex. 19, ¶ 8; Ex. 19, Attachment A. Bierce provided these records to Benner during the winter of 2013-2014. Ex. 19, ¶ 10; Ex. 19, Attachment A; Exhibit 21 – December 9, 2013 Email.

During the summer of 2014, while collecting phone records for another case, Bierce learned that Sprint was doing construction on some of their cell phone towers in Indianapolis. Ex. 19, ¶ 11. Due to the construction, some calls were being routed through cell towers in Chicago, Illinois. Ex. 19, ¶ 11. Calls that were routed through Chicago were recorded in Central standard time. Ex. 19, ¶ 12. On Sprint phone records, calls routed through Chicago are indicated with a Network Element ID of 420. Ex. 19, ¶ 13. After learning this new information, Bierce reviewed the cell phone records he had obtained for several open investigations, including Robert's records. Ex. 19, ¶¶ 14, 15. Bierce noticed that some of the calls on Robert's records had been routed through Chicago. Ex. 19, ¶ 15. Accordingly, he created a spreadsheet titled "Results" that converted the calls on Robert's phone records that had been routed through Chicago to Eastern standard time. Ex. 19, ¶ 16; Ex. 19, Attachment B. The Results spreadsheet shows that the two calls to Robert's cell phone from Ruth's landline were made on November 19, 2013 at 3:40:38 p.m. and 3:40:51 p.m. Ex. 19, ¶ 18; Ex. 19, Attachment B. Bierce created the Results spreadsheet in July 2014 and provided it to Benner. Ex. 19, ¶ 19; Ex. 19, Attachment B; Exhibit 22 – July 23, 2014 Email.

### 9. *Benner interviews Pickens.*

On January 13, 2014, Benner spoke with Delbert Pickens. Ex. 1, p. 2. Pickens is a delivery driver for Meals on Wheels. Ex. 1, p. 2. He delivers meals to Ruth Monday through Friday around 10:30 a.m. Ex. 1, p. 2. On November 19, 2013, Pickens arrived at Ruth's apartment around the

usual time. Ex. 1, p. 2. He knocked on Ruth's door, but she did not answer. Ex. 1, p. 2. He called her phone, but Ruth did not pick up. Ex. 1, p. 2. Pickens could hear Ruth's phone ringing inside her apartment. Ex. 1, p. 2. There were no signs that Ruth was in her apartment, so Pickens left without delivering the meal. Ex. 1, p. 2.

### 10. Benner subpoenas Ruth's financial records.

Benner subpoenaed Ruth's financial records from Financial Federal Credit Union located at 7101 East 56th Street in Indianapolis. Ex. 1, p. 4. The records show that at the time of her death Ruth had a checking account balance of $15,098.90, a savings account balance of $4,605.65, and certificate balances totaling $79,058.15. Ex. 1, p. 4. Benner obtained a beneficiary form from Ruth's apartment showing that William, Robert, and Rebecca were the beneficiaries for all of her assets. Ex. 1, p. 4.

### C. The Prosecutor's Office charges William with the murder of Ruth.

Based on all the evidence that Benner obtained during his investigation, he concluded that William likely murdered Ruth because he: 1) had the opportunity; 2) had the financial motive; 3) knew specific details about Ruth's injuries unknown to medical personnel, despite testifying that he did not remove the blanket covering her head; and 4) acted suspiciously following the incident. Ex. 8, ¶ 8. On May 22, 2014, Benner and the Deputy Prosecuting Attorney signed a probable cause affidavit outlining the results of Benner's investigation. Ex. 1. They also signed a Charging Information that states that on or about November 19, 2013 William knowingly or intentionally caused Ruth's death in violation of Indiana law. Dkt. 1, ¶ 14. The Marion Superior Court determined that the murder charge against William was supported by probable cause and issued a warrant for his arrest. Ex. 8, ¶ 5. William was arrested and charged with murder on May 27, 2014.

Dkt. 1, ¶ 28. On July 7, 2015, the Prosecutor's Office dismissed the case against William. Dkt. 1, ¶ 32.

## II.    Standard of Review

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Springer v. Durflinger*, 518 F.3d 479, 483 (7th Cir. 2008). The party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## III.    Argument

Benner is entitled to summary judgment because there is no genuine issue of material fact, and William's claims fail as a matter of law. The designated evidence shows that there was probable cause to arrest and prosecute William for Ruth's murder. There is no evidence that Benner acted with malicious intent, and even if he did, there is no constitutional right not to be prosecuted without probable cause. Nor is there any evidence that Benner made knowingly false or misleading statements or withheld exculpatory evidence in his probable cause affidavit. Lastly, Benner is immune from suit under the doctrine of qualified immunity because he did not violate Rainsberger's clearly established constitutional rights.

### A. William's false arrest claim fails as a matter of law because there was probable cause for his arrest.

If probable cause existed for an arrest, no Fourth Amendment violation occurred. *See Fleming v. Livingston Cnty., Ill.*, 674 F.3d 874, 878 (7th Cir. 2012) ("Indeed, if [the Sheriff Deputy] actually did have probable cause to arrest [the plaintiff], 'then a Fourth Amendment claim for false arrest is foreclosed.'") (quoting *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 679-80 (7th Cir. 2007)). "Probable cause exists if 'at the time of the arrest, the facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Williams v. City of Chicago*, 733 F.3d 749, 756 (7th Cir. 2013) (quoting *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009)). According to the Seventh Circuit, "it does not take much to establish probable cause." *Fox v. Hayes*, 600 F.3d 819, 833 (7th Cir. 2010) (citing *Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000)). While "[t]he officers must have more than a bare suspicion that they have the right guy, [] they need not have enough evidence to support a conviction or even to show that their belief is more likely true than false." *Id*.

In determining whether probable cause exists, courts must look at the facts from the perspective of the arresting officer, and not as an omniscient observer. *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1245 (7th Cir. 1994); *Kelley v. Miller*, 149 F.3d 641, 646 (7th Cir. 1998); *see also Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."). Probable cause may be determined as a matter of law when the material facts are undisputed. *Penn v. Harris*, 296 F.3d 573, 577 (7th Cir. 2002). Further, when determining whether a police officer had probable cause, the court must view each situation in light of the totality of the

circumstances. *Simkunas v. Tardi*, 720 F.Supp. 687, 692 (N.D. Ill. 1989). ". . . [T]he relevant inquiry is not whether the particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." *Id*. (quoting *Illinois v. Gates*, 462 U.S. 213, 243-44 (1983)).

At the time Benner filed his probable cause affidavit, the evidence against William could be summarized as follows:

- There were no signs of forced entry at Ruth's apartment. Ex. 8, ¶ 6a; Ex. 9, #1-3. William, Robert, and Rebecca were the only individuals who had keys to Ruth's apartment. Ex. 2, 32:21-25; Ex. 8, ¶ 6a. The apartment complex also had a key, but that key had not been moved and was found in its normal location. Ex. 8, ¶ 6a. Phone records indicated that Rebecca was not near Ruth's apartment at the time of her death. Ex. 1, p. 2; Ex. 8, ¶ 6a.

- William was Ruth's primary caregiver. Ex. 2, 27:11-12; Ex. 8, ¶ 6b.  To the best of Benner's knowledge, William was the last person to see her prior to the incident. Ex. 8, ¶ 6b. He admits that he was in her house the night before and he was the one who reported her condition to police. Ex. 2, 39:7-13; Ex. 8, ¶ 6b.

- Ruth was still breathing when William arrived at her apartment. Ex. 2, 56:8-10; Ex. 8, ¶ 6c. Although it was possible that his mother was still bleeding, he did not put pressure on her wound or attempt to render first aid. Ex. 2, 61:25-62:17; Ex. 8, ¶ 6c. And even though William sensed that his mother had responded to his voice or touch, he did not stay with her to comfort her. Ex. 2, 57:14-19, 68:15-24; Ex. 8, ¶ 6c. Instead, William called 911 and left the apartment. Ex. 2, 57:14-19, 68:15-24; Ex. 3; Ex. 8, ¶ 6c.

- There was a blanket covering Ruth's head/face and injuries. Ex. 2, 56:5-6; Ex. 4, ¶ 6; Ex. 8, ¶ 6d. William did not remove the blanket to determine the nature and extent of Ruth's

injuries. Ex. 2, 59:25-60:2, 61:15-18; Ex. 4, ¶ 6; Ex. 8, ¶ 6d. Based on Benner's training and experience, when an attacker covers his or her victim's head/face, it often indicates that the attacker had a personal relationship with the victim. Ex. 8, ¶ 6d.

- William told the 911 operator that "someone had bashed her head in." Ex. 3, Track 4, 00:49-00:51; Ex. 8, ¶ 6e. He also told Wooldridge that someone had caved his mother's head in. Ex. 4, ¶ 5; Ex. 8, ¶ 6e. However, William never removed the blanket to visualize Ruth's injuries. Ex. 2, 59:25-60:2, 61:15-18; Ex. 4, ¶ 6; Ex. 8, ¶ 6e. And, even had he looked under the blanket, her wounds were such that medical personnel on scene and at the hospital believed that she had been shot. Ex. 4, ¶ 8; Ex. 8, ¶ 6e; Ex. 23, 25:22-23. The autopsy determined that Ruth's cause of death was multiple blunt force trauma injuries to the head, possibly caused by a hammer-like object. Ex. 1, pp. 2-3; Ex. 8, ¶ 6e.

- Robbery did not appear to be the motive for Ruth's attack. Ex. 8, ¶ 6f. There were no signs of forced entry. Ex. 8, ¶ 6f; Ex. 9, #1-3. Ruth's cash, checks, and credit cards were found at the scene. Ex. 5, 60:1-5; Ex. 6, 3:7-11; Ex. 8, ¶ 6f; Ex. 9, #17. The drawers in Ruth's bedroom were open, but appeared undisturbed. Ex. 8, ¶ 6f; Ex. 9, #5-10. The back room of Ruth's apartment was cluttered with boxes and trash bags, but they also appeared undisturbed. Ex. 8, ¶ 6f; Ex. 9, #11-15. There was a lockbox in the back room of Ruth's apartment that contained what appeared to Benner to be financial documents. Ex. 5, 60:1-5; Ex. 8, ¶ 6f; Ex. 9, #12, 15. There were several pill bottles that appeared undisturbed on Ruth's kitchen counter. Ex. 8, ¶ 7; Ex. 9, #4. And Benner found a coin purse and black handbag in Ruth's bedroom. Ex. 8, ¶ 7; Ex. 9, #6-7, 9, 16.

- When Officer Price transported William to IMPD Headquarters, William said that he did not know whether what happened to his mother was a good thing or a bad thing. Ex. 8, ¶ 6g; Ex. 10, 14:3-9.

- Ruth did not answer the door when Pickens, a Meals-On-Wheels delivery driver, knocked around 10:30 a.m. Ex. 1, p. 2; Ex. 8, ¶ 6h. Pickens called Ruth's landline when she did not respond. Ex. 1, p. 2; Ex. 8, ¶ 6h; Ex. 20. Pickens could hear the phone ringing inside Ruth's apartment, but Ruth did not pick up the phone. Ex. 1, p. 2; Ex. 8, ¶ 6h. There was dried blood on the blanket covering Ruth's head. Ex. 2, 57:22-58:9; Ex. 4, ¶ 6; Ex. 8, ¶ 6h. Based on this evidence and Benner's training and experience, it is likely that Ruth was attacked prior to 10:30 a.m. Ex. 8, ¶ 6h. Kroger surveillance video shows William throwing away a straight object around 3:29 p.m. while looking around and seeming to fiddle with a Redbox. Ex. 8, ¶ 6h; Ex. 12, 3:28:55-3:39:30; Ex. 13.

- William's phone records, including cell tower site locations, indicate that he was in the vicinity of Shortridge Road and 10th Street on November 19, 2013 during the relevant time. Ex. 1, p. 4; Ex. 8, ¶ 6i.

- Benner interviewed William on the evening of November 19, 2013. Ex. 1, p. 2; Ex. 8, ¶ 6j. During that interview, William did not ask Benner how his mother was doing or if he could go to the hospital to be with her. Ex. 2, 131:2-7; Ex. 8, ¶ 6j.

- Ruth had $98,762.70 in assets at the time of her death. Ex. 1, p. 4; Ex. 2, 33:6-8; Ex. 8, ¶ 6k. William, Robert, and Rebecca were the beneficiaries of Ruth's assets. Ex. 1, p. 4; Ex. 8, ¶ 6k.

- Benner asked William to take a polygraph test. Ex. 2, 95:16-96:3; Ex. 8, ¶ 6l. William adamantly refused to take a polygraph test. Ex. 2, 94:14-15; Ex. 8, ¶ 6l. He became upset at Benner's request and began yelling. Ex. 2, 95:16-96:3; Ex. 8, ¶ 6l.

In light of the totality of the circumstances, Benner had probable cause to arrest William. The information available to Benner on May 22, 2014 indicated that: 1) William had the opportunity to murder Ruth; 2) William had the financial motive to murder Ruth; 3) William knew specific details about Ruth's injuries, which were unknown to medical personnel, despite testifying that he never looked under the blanket covering her head; and 4) William's behavior following Ruth's attack was highly suspicious. Ex. 8, ¶ 12. Because the above evidence is sufficient to establish probable cause, William's claim of false arrest fails as a matter of law.

### B. William's malicious prosecution claim fails as a matter of law.

The Seventh Circuit held in *Julian v. Hanna*, 732 F.3d 842 (7th Cir. 2013), that individuals may bring federal malicious prosecution claims against Indiana law enforcement officers and agencies under § 1983, because Indiana had failed to provide an adequate remedy for these claims. Accordingly, "[t]o state a claim for malicious prosecution under § 1983, a plaintiff must demonstrate that: (1) he has satisfied the requirements of a state law cause of action for malicious prosecution; (2) the malicious prosecution was committed by state actors; and (3) he was deprived of liberty." *Washington v. Summerville*, 127 F.3d 552, 558-59 (7th Cir. 1997) (citations omitted). In Indiana, "[t]he elements of a malicious prosecution are: (1) the defendant instituted or caused to be instituted an action against the plaintiff; (2) the defendant acted maliciously in so doing; (3) the defendant had no probable cause to institute the action; and (4) the original action was terminated in the plaintiff's favor." *Crosson v. Berry*, 829 N.E.2d 184, 189 (Ind. App. 2005) (citations omitted).

### 1. *Benner had probable cause to institute an action against William.*

Probable cause to commence criminal proceedings in the context of malicious prosecution exists when a reasonable inquiry would induce a reasonably intelligent and prudent person to believe that the accused committed the crime charged. *Owens v. Downey*, 150 F.Supp.3d. 1008, 1018 (S.D. Ind. 2015). Indiana courts have held that a judicial determination of probable cause in a criminal proceeding constitutes prima facie evidence of probable cause in a subsequent civil lawsuit alleging malicious prosecution. *Id*. The plaintiff may rebut such a prima facie case of probable cause by introducing evidence that shows the finding of probable cause was induced by false testimony, fraud, or other improper means such as the defendant withholding material facts at the hearing. *Id*.

Here, the trial court found probable cause and issued a warrant for William's arrest. Ex. 8, ¶ 5. Accordingly, William bears the burden of rebutting this prima facie evidence of probable cause. Although William alleges that Benner made false or misleading statements in his probable cause affidavit, there is no evidence to support this allegation. *See infra*, Section III(C)(1). And, there was probable cause for William's arrest and prosecution even without the allegedly false or misleading statements. *See infra*, Section III(C)(2). Based on all the evidence outlined above, Benner had probable cause to institute an action against William for his mother's murder. *See supra*, Section III(A). Accordingly, William's malicious prosecution claim fails as a matter of law.

### 2. *There is no evidence that Benner acted with malicious intent.*

Malice may be shown "by evidence of personal animosity or inferred from a complete lack of probable cause or a failure to conduct an adequate investigation under the circumstances." *Welton v. Anderson*, 770 F.3d 670, 674 (7th Cir. 2014).

There is no evidence that Benner had any personal animosity toward William. Further, as outlined above, Benner performed a thorough investigation. Ex. 1; Ex. 8, ¶ 5. Benner did not knowingly make false or misleading statements or withhold exculpatory evidence in his probable cause affidavit that was material to the finding of probable cause. *See infra*, Section III(C). Lastly, there was adequate probable cause to support William's arrest and prosecution. *See supra*, Section III(A).

### 3.   *There is no constitutional right not to be prosecuted without probable cause.*

Even if probable cause did not exist for William's arrest and prosecution, and it did, Benner is still entitled to summary judgment because William does not have a constitutional right not to be prosecuted without probable cause. *Tully v. Barada*, 599 F.3d 591, 594-95 (7th Cir. 2010).  An individual asserting a § 1983 malicious prosecution claim must allege that he or she was deprived of a specific constitutional right. *Id*.

The Seventh Circuit has made clear that "[f]ederal courts are rarely the appropriate forum for malicious prosecution claims." *Ray v. City of Chicago*, 629 F.3d 660, 664 (7th Cir. 2011). This is because individuals do not have a "federal right not to be summoned into court and prosecuted without probable cause, under either the Fourth Amendment or the Fourteenth Amendment's Procedural Due Process Clause." *Tully*, 599 F.3d at 594; *see Penn v. Harris*, 296 F.3d 573, 576 (7th Cir. 2002) ("[T]here is no constitutional right not to be prosecuted without probable cause") (internal citations and quotation marks omitted). Moreover, the Seventh Circuit has held that "a plaintiff could not state a [§]1983 claim simply by showing that he was wrongly prosecuted but rather must establish that he was deprived of a specific constitutional right, such as the right to a fair trial." *Holmes,* 511 F.3d at 683.

In the present case, William's malicious prosecution claim is entirely based on Benner's alleged violation of the Fourth and Fourteenth Amendments due to a lack of probable cause for his arrest. Dkt. 1. He does not allege that some other constitutional violation occurred in relation to his malicious prosecution claim. Dkt. 1. Because the Fourth and Fourteenth Amendments do not protect these interests, William's § 1983 claim fails as a matter of law. Accordingly, Benner is entitled to summary judgment on William's malicious prosecution claim.

### C. There is no evidence that Benner knowingly made false statements that were material to the finding of probable cause.

"It is well-established that '[a] warrant request violates the Fourth Amendment if the requesting officer knowingly, intentionally, or with reckless disregard for the truth, makes false statements in requesting the warrant and the false statements were necessary to the determination that a warrant should issue.'" *Starks v. Moore*, 51 F.Supp.3d 782, 792 (S.D. Ind. 2014) (quoting *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012). "[A] reckless disregard for the truth can be shown by demonstrating that the officer entertained serious doubts as to the truth of the statements, had obvious reasons to doubt their accuracy, or failed to disclose facts that he or she knew would negate probable cause." *Id.* (internal quotation marks omitted).

### 1. Benner did not make knowingly false or misleading statements, or withhold exculpatory evidence in his probable cause affidavit.

William claims that several statements in Benner's probable cause affidavit were knowingly false or misleading. However, several of his allegations misstate Benner's probable cause affidavit. Regardless of William's misstatements, there is no evidence that Benner had any doubts about the facts in his affidavit. And, the designated evidence shows, that Benner did not recklessly omit facts.

First, William alleges that "[i]n his probable cause affidavit, [] Benner misrepresented that [] William was in his mother's apartment during the time period she was attacked and well before he telephoned 911 to report her injuries." Dkt. 1, ¶ 18. This allegation refers to the following statement in Benner's probable cause affidavit: "[o]n November 19, 2013 at 2:40 p.m., Robert [] received a call from Ruth's [] landline to his cell of 317-357-5791." Ex. 1, p. 3. Benner goes on to explain that this phone call presumably occurred after Ruth was attacked based on his evidentiary-based assumption that Ruth was attacked prior to 10:30 a.m. Ex. 1, p. 3. Benner does not say that William made this call. Ex. 1, p. 3. And, based on Benner's information at the time, this statement was accurate. Ex. 19, ¶ 8; Ex. 21. As of May 22, 2014, Bierce had determined that there was a phone call from Ruth's landline to Robert's cellphone at 2:40 p.m. Ex. 19, Attachment A; Ex. 21. It was not until July 2014, several weeks after Benner filed his probable cause affidavit, that Bierce discovered that this phone call actually occurred at 3:40 p.m. Ex. 1; Ex. 19, ¶¶ 18, 19; Ex. 22.

Second, William alleges that "… Benner misrepresents that nothing of value was stolen from the apartment, in an apparent attempt to eliminate robbery as a motive for the attack, when in truth prescription drugs, a purse and jewelry were stolen." Dkt. 1, ¶ 19. In his affidavit, Benner does not make this statement. Ex. 1. Instead, Benner lays out several facts that, in his opinion, support the conclusion that Ruth's attack was not the result of a robbery. Ex. 1, p. 1; Ex. 8, ¶ 6f.

William claims that prescription drugs, a purse, and jewelry were stolen from Ruth's apartment; however, the evidence at the scene supported the opposite conclusion. Benner found a black handbag in the apartment that appeared to match the description of Ruth's purse given to him by William and Robert. Ex. 8, ¶ 7; Ex. 9, #16. Benner also found a brown coin purse in Ruth's bedroom. Ex. 8, ¶ 7; Ex. 9, #6-7, 9. He also noted that there were several pill bottles on the kitchen counter that appeared untouched. Ex. 9, #4. And, the only prescription medication that Ruth took

22

was Aricept for her dementia, which is not a drug worth stealing. Ex. 2: 109:17-20; Ex. 8, ¶ 7.
During his interview on November 19, 2013, William told Benner that his mother did not own any
expensive jewelry. Ex. 8, ¶ 7. Even William himself admitted in his deposition that he cannot say
with certainty that any jewelry was stolen from the apartment. Ex. 2, 121:10-17. In short, there
was no evidence that would definitively indicate to Benner that Ruth's apartment was burglarized,
and there is no evidence that Benner's statements were false.

Third, William alleges that "[] Benner falsely stated in his probable cause affidavit that
there were savings bonds in [Ruth's] open lockbox in plain view in the apartment…" Dkt. 1, ¶ 20.
According to William, the lockbox was not in plain view and did not contain savings bonds. Dkt.
1, ¶ 21. Whether the lockbox was in plain view is a matter of interpretation. The photos of the
scene indicate that the lockbox was located on the shelf of an open closet. Ex. 5, 60:1-5; Ex. 8, ¶
8; Ex. 9, #12, 15. In Benner's opinion, the lockbox was in plain view. Ex. 8, ¶ 8. Benner cannot
recall whether the lockbox specifically contained "savings bonds," as he indicated in the probable
cause affidavit. Ex. 1, p. 1; Ex. 8, ¶ 8. He does remember that the documents looked like financial
documents. Ex. 8, ¶8. William confirmed that the lockbox contained financial documents during
his deposition. Ex. 2, 123:5-7. Regardless of whether the documents were specifically "savings
bonds," Benner's reason for including this information was to show that Ruth's apartment had not
been burglarized because valuable documents had not been disturbed. Ex. 8, ¶ 8. It is reasonable
to assume that documents stored in a lockbox that appear financial are just as valuable as "savings
bonds." So, William's allegation is a distinction without meaning. Based on the evidence, robbery
did not appear to be the motive for Ruth's death, which is what Benner indicated truthfully in his
probable cause affidavit. Ex. 1; Ex. 8, ¶ 8.

Fourth, William alleges that "… Benner misrepresents that after the attack on his mother, a video from a surveillance camera in a Kroger grocery store located near his mother's apartment, showed [William] disposing of a 'straight object' 'pulled from his person' while he 'looked around for cameras.'" Dkt. 1, ¶ 22. William claims that the Kroger video is *before* he went to Ruth's apartment and shows him throwing away trash and not looking for cameras. Dkt. 1, ¶ 23. With respect to William's allegation regarding the timeline, Benner affirmatively states in his probable cause affidavit that William disposes of an object in the Kroger trash "[] then goes to his mother's apartment and calls the police." Ex. 1, p. 4. Benner does not represent that William was at Ruth's apartment prior to going to Kroger. Ex. 1, p. 3. Instead, Benner states that Robert received a phone call from Ruth's landline before William is on the Kroger video. Ex. 1, p. 3. Again, he does not state that William made this phone call. Ex. 1, p. 3.

Benner was operating on the presumption that Ruth was attacked sometime prior to 10:30 a.m. because she did not respond to Pickens at that time and because dried blood was found at the scene. Ex. 1, p. 3; Ex. 8, ¶ 6h. The facts, as known to Benner, support this reasonable presumption. Ex. 1, p. 2; Ex. 2, 57:22-58:9; Ex. 4, ¶ 6; Ex. 8; ¶ 6h. And, based on this reasonable presumption, Benner accurately states that the phone call at 2:40 p.m. occurred after Ruth was attacked. Ex. 1, p. 3. Further, the Kroger video shows William pull a "straight object" from his side or pocket and dispose of it in the Kroger trash. Ex. 12, 3:28:55-3:28:59; Ex. 13. William then pushes some buttons on the Redbox and turns to his side and looks around. Ex. 12, 3:28:59-3:29:26. It is possible that the straight object was trash, but it is not clear from the video. Ex. 12, 3:28:55-3:28:59; Ex. 13. And, most importantly, Benner does not state in his affidavit that the object was not trash. Ex. 1, p. 3. Instead, Benner accurately described the object as it appeared on the video. Ex. 1, p. 3; Ex. 12, 3:28:55-3:28:59; Ex. 13.

Fifth, William alleges that "[] Benner viewed but failed to secure additional video surveillance from the Kroger parking lot camera which demonstrated that [William] was carrying trash, not a weapon." Dkt. 1, ¶ 24. Presumably what William is referring to is Benner's statement that "[t]he video showed William [] *drive onto the Kroger lot on November 19, 2013 at approximately 3:32 p.m. [William] got out of the car* and approached a garbage can located near the Red Box video dispenser." Ex. 1, p. 3. Benner recalls seeing video of William driving onto the Kroger parking lot and exiting his vehicle. Ex. 8, ¶ 10. Benner asked Pulliam to burn all of the video depicting William, including the referenced video. Ex. 8, ¶ 10.

The Kroger parking lot camera is Camera 44. Ex. 18. Pulliam provided Benner with a disk containing video footage from Camera 44. Ex. 8, ¶ 10; Ex. 11, 5:21-6:5; Ex. 18. However, this disk only contains footage of William walking to his vehicle and driving out of the parking lot. Ex. 18. Accordingly, it appears that Pulliam inadvertently failed to rewind the video far enough before burning the disk to capture William driving onto the lot and exiting his vehicle. Ex. 18. Kroger only maintains video for six weeks, so the video is no longer available. Ex. 11, 12:1-2. Benner recalls that the footage in question did not show William carrying trash or anything relevant to the case. Ex. 8, ¶ 10. Based on the location and distance of Camera 44, it is highly unlikely that it would show anything on William's right side or enough detail to identify the object as trash, as William alleges. Ex. 18.

"A police officer's duty to preserve evidence applies when the officer either knows the evidence is exculpatory or destroys the evidence in bad faith." *Hart v. Mannina*, 798 F.3d 578, 589 (7th Cir. 2015). Here, there is no evidence that the video in question was exculpatory. In fact, the undisputed evidence indicates that the video was irrelevant to the investigation. Ex. 8, ¶ 10.

Further, there is no evidence that Benner destroyed this video or acted in bad faith. Instead, the evidence shows that Benner attempted to preserve the video. Ex. 8, ¶ 10.

Sixth, William alleges that "… Benner failed to disclose that DNA evidence taken from [Ruth's] jacket was from an unidentified male []" and "... excluded the DNA as coming from [William]." Dkt. 1, ¶¶ 25-26. The DNA evidence that William is referring to is touch DNA from the neck and sleeve of Ruth's jacket. Ex. 7, p. 1. The Forensic Services Agency concluded that the DNA profile was made up of major and minor contributors. Ex. 7, p. 2. The major contributor was Ruth and the minor contributor was "an unknown male individual A." Ex. 7, p. 2. Benner did not include this information in his affidavit because it is touch DNA collected from areas where Ruth was likely touched by the medical personnel who treated her. Ex. 8, ¶ 11. In addition to Wooldridge, there were five or six other individuals on scene who assisted with treating Ruth. Ex. 4, ¶ 10. While treating Ruth, he medical personnel had to "log role" her onto a backboard and transport her to the ambulance, both of which would have required touching. Ex. 4, Attachment 1, p. 2; Ex. 8, ¶ 10. Accordingly, it is highly likely that the DNA evidence at issue is from one of the first responders. Ex. 8, ¶ 10. Benner was trained to turn this kind of DNA evidence over to the Prosecutor's Office, which he did, but not to include it in his probable cause affidavit. Ex. 8, ¶ 10.

The touch DNA evidence that Benner omitted from his probable cause affidavit was not material to the finding of probable cause. "The materiality of an omitted . . . fact depends on its relative importance to the evaluation of probable cause; an omitted fact is material if its inclusion would have negated probable cause. *Hart*, 798 F.3d at 592. "If the omitted fact would not have negated probable cause, its omission was immaterial and there was no Fourth Amendment violation." *Id*. To assess materiality a court must determine "whether a hypothetical affidavit that included the omitted material would still establish probable cause." *Id*. at 593. Here, a

"hypothetical affidavit" that contained the DNA evidence would still establish probable cause based on William's knowledge of his mother's injuries, his suspicious behavior, his access to Ruth, and his financial motive to commit the crime. Ex. 1; Ex. 8.

Lastly, William claims that "… Benner falsely stated that [William] showed no signs of concern for [his] mother's health while she was at the hospital before she died." Dkt. 1, ¶ 27. Again, this allegation misstates Benner's affidavit. Ex. 1, p. 2. Benner actually stated that "[a]t no time did Robert or his brother, William, ever ask me how their mom was doing or if they could get to the hospital to see her." Ex. 1, p. 2. William admitted in his deposition that he never asked Benner if he could go to the hospital. Ex. 2, 131:2-4; Ex. 8, ¶ 6j. Likewise, William admitted that he never asked Benner about his mother's condition. Ex. 2, 131:5-7; Ex. 8, ¶ 6j. Accordingly, Benner's statement was entirely accurate. Ex. 1, p. 2.

In sum, there is no evidence that Benner knowingly, intentionally, or recklessly made false or misleading statements, or withheld exculpatory evidence in his probable cause affidavit, and William cannot carry his burden to prove otherwise.

### 2. Benner's alleged false or misleading statements, or allegedly withheld exculpatory evidence was not material to the finding of probable cause.

William must prove that Benner "knowingly and deliberately, or with reckless disregard for the truth, made false statements or omissions in [his] affidavit of probable cause; and the false statements or omissions were material, or necessary, to the finding of probable cause." *Franks*, 438 U.S. at 155-56. Even if Benner made false or misleading statements in his probable cause affidavit, the allegedly false statements were not material to the finding of probable cause.

Leaving out the portions that William challenges, the probable cause affidavit cites evidence indicating that William had the opportunity and financial motive to murder Ruth, knew specific details about her injuries unknown to medical personnel until her autopsy, and acted

suspiciously following her attack. Ex. 8, ¶ 12. A reasonable person in Benner's position would find this evidence sufficient to establish probable cause for William's arrest and prosecution. Accordingly, Benner's alleged false or misleading statements were not material to the finding of probable cause.

### D. Benner is entitled to qualified immunity.

The doctrine of qualified immunity shields a public official from civil liability when an official is performing a discretionary function that the reasonable official would have believed was within the bounds of the law at the time he acted. *Belcher v. Norton*, 497 F.3d 742, 749 (7th Cir. 2007). The doctrine provides an immunity from suit rather than a mere defense to liability, and the defense is lost if a case is erroneously permitted to go to trial. *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985). Here, William cannot show that Benner violated a clearly established constitutional right or acted so outside the bounds of the law that he should have known his conduct violated the constitution. Accordingly, Benner is entitled to qualified immunity.

The question of whether the doctrine provides immunity from suit is a question of law for a court to decide. *Hughes v. Meyer*, 880 F.2d 967, 969 (7th Cir. 1989). The doctrine provides immunity to those public officers who reasonably act in a way they believe to be lawful. *Anderson v. Creighton,* 483 U.S. 635, 641 (1987). The doctrine provides "ample room for mistaken judgments" and protects "all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991). Although qualified immunity is an affirmative defense, once raised, the immunity becomes the plaintiff's burden to defeat. *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008).

The Supreme Court has established a two-part analysis to determine when the doctrine applies. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). A court should determine: (1) whether the facts,

taken in a light most favorable to the plaintiff, show that the defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation. *Saucier*, 533 U.S. at 201. This Court need not follow the two-part *Saucier* test. *Pearson v. Callahan*, 129 S. Ct. 808, 811-12 (2009).

Benner has invoked qualified immunity, so William bears the burden of defeating it by showing that Benner violated his constitutional rights and that his rights were clearly established at the time of the violation. *Jewett*, 521 F.3d at 823. He cannot.

### 1. Benner complied with the U.S. Constitution.

As set forth above, Benner did not violate William's Fourth or Fourteenth Amendment rights. There is no evidence that Benner knowingly made false or misleading statements or omit exculpatory evidence in his probable cause affidavit that were material to the finding of probable cause. *See supra*, Section III(C). And, the designated evidence establishes that there was probable cause for William's arrest and prosecution. *See supra*, Section III(A).

Even if the Court finds that Benner lacked probable cause, there was at least "arguable probable cause" for William's arrest and prosecution. This Circuit has recognized that "[t]he probable-cause standard inherently allows room for reasonable mistakes, but qualified immunity affords an added layer of protection by shielding officers from 'suit for damages if a reasonable officer could have believed [the arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed.'" *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 714 (7th Cir. 2013). "Often termed 'arguable probable cause,' qualified immunity in this context protects officers who reasonably but mistakenly believe that probable cause exists." *Id*. at 714-15. In other words, Benner is entitled to qualified immunity if he reasonably believed that probable cause existed for William's arrest. William's post-incident behavior, access to Ruth, financial motive,

and inexplicable knowledge of Ruth's injuries support the reasonable that probable cause existed for William's arrest and prosecution.

### 2. *Benner did not violate William's clearly established rights.*

In addition to the above, William also cannot identify a closely analogous case establishing a right to be free from the alleged conduct, nor can he establish that Benner's conduct was so egregious that a reasonable person would know that his actions violated the constitution without guidance from the courts. *Chelios v. Heavener*, 520 F.3d 678, 691 (7th Cir. 2008). Because William cannot prove a clearly established right to defeat immunity, summary judgment is appropriate.

A plaintiff bears the burden to prove a clearly established constitutional right. *Rakovich v. Wade*, 850 F.2d 1180, 1209 (7th Cir. 1988). When defining a right in a claim of qualified immunity, courts should be wary of defining the right at issue too broadly, as the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. To defeat a claim of immunity, plaintiff must prove that a constitutional right is clearly established either by showing (1) "a clearly analogous case establishing a right to be free from the specific conduct at issue" or that (2) the "conduct is so egregious that no reasonable person could have believed that it would not violate clearly established rights." *See Chelios*, 520 F.3d at 691 (citing *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001)).

William cannot provide a clearly analogous case to the facts of this matter. A clearly analogous case is one decided before an officer acted. *Rice v. Burks*, 999 F.2d 1172, 1174 (7th Cir. 1993). A clearly analogous case must also establish a right sufficiently particularized to put the officer on notice that his or her conduct is unlawful. *Id*. The words "clearly established" should

not be used to read the defense of immunity out of federal law by stating the right in its most general terms. *Id*.

William must provide a case that establishes that Benner did not have probable cause to arrest him, even though he had the opportunity and motive to kill Ruth, inexplicably knew specific details about her injuries, and acted suspiciously following her death. Ex. 8, ¶ 12. William cannot provide a closely analogous case sufficient to establish a clearly established constitutional right on the facts of this case. Moreover, Rainsberger cannot prove that Benner's conduct was so plainly egregious that an officer would be on notice that his conduct violated the Fourth Amendment. *See Estate of Bryant v. Buchanan*, 883 F.Supp. 1222, 1227 (S.D. Ind. 1995).

Benner maintains that he did not knowingly make false or misleading statements or omit exculpatory evidence in his probable cause affidavit, but if the Court disagrees, Benner is still entitled to qualified immunity. "An officer who knowingly or recklessly submitted an affidavit containing false statements may still get qualified immunity if he can establish that he had an objectively reasonable basis for believing the facts in the affidavit were sufficient to establish probable cause." *Betker*, 692 F.3d at 860. Qualified immunity does not apply "where an officer knowingly or recklessly made false statements and 'no accurate information sufficient to constitute probable cause attended the false statements.'" *Id*. (quoting *Lawson v. Veruchi*, 637, F.3d 699, 705 (7th Cir. 2011). Benner's probable cause affidavit contained accurate information that William's behavior was suspicious following Ruth's death, he had knowledge of specific details of her death, and he had the opportunity and motive to commit the crime. Based on this evidence, it was objectively reasonably for Benner to conclude that there was probable cause for William's arrest and prosecution.

Benner is therefore entitled to qualified immunity.

**IV.     Conclusion**

William cannot point to any evidence suggesting that Benner violated his rights. Benner

therefore respectfully requests that the Court grant him summary judgment on William's claims.


Respectfully submitted,


 _/s/ Kathryn M. Box_____
Kathryn M. Box (31233-49)
Assistant Corporation Counsel
Office of Corporation Counsel
200 East Washington Street, Room 1601
Indianapolis, Indiana 46204
Telephone: (317) 327-4055
Fax: (317) 327-3968
E-Mail: kathryn.box@indy.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 13, 2017, a copy of the foregoing was served by electronic filing. Notice of this filing will be sent to all ECF-registered parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Kathryn M. Box*
Kathryn M. Box (31233-49)
Assistant Corporation Counsel

OFFICE OF CORPORATION COUNSEL
200 East Washington Street, Room 1601
Indianapolis, Indiana 46204
Telephone: (317) 327-4055
Fax: (317) 327-3968