# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| **WILLIAM RAINSBERGER,** | ) | |
| **PLAINTIFF,** | ) | **CAUSE NO. 1:16-cv-103-WTL-MJD** |
| **v.** | ) | |
| **CHARLES BENNER,** | ) | |
| **DEFENDANT.** | ) | |

[i]t is well-established that '[a]warrant request violates the Fourth Amendment if the requesting officer knowingly, intentionally, or with reckless disregard for the truth, makes false statements in requesting the warrant and the false statements were necessary to the determination that a warrant should issue.'"

> *Starks v. Moore*, Case 1:12-cv-01008-WTL-DML (SJ Entry at 14)
> (Doc. 163, 09/02/14)

## PLAINTIFF'S MEMORANDUM IN RESPONSE
## TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

William Rainsberger was falsely accused of killing his own mother, arrested, kept in jail for two months, and had criminal charges of murder lodged against him for over a year before they were dismissed for "evidentiary problems." He suffered loss of liberty, public embarrassment and humiliation, physical discomfort, emotional distress, damage to his good name and reputation, loss of economic opportunities, and over $60,000 in criminal defense attorney fees and costs.

Based upon the summary judgment record, a reasonable jury could conclude that Detective Charles Benner intentionally, knowingly or recklessly included false and misleading information in his probable cause affidavit, causing Mr. Rainsberger to be falsely arrested and maliciously prosecuted. Accordingly, defendant's motion for summary judgment should be denied.

### Plaintiff's Statement of Material Facts with Disputes Noted

1.   Ruth Rainsberger was 88 years old, suffering from dementia, and lived alone. W. Rainsberger Aff. ¶ 2. W. Rainsberger Depo. 24-25; Reb. Rainsberger Stmt, p. 2, Nov. 2013.

2.      Ruth had three adult children; Rebecca, William, and Robert. W. Rainsberger Aff. ¶ 3.

3.      William lived close by his mother and was her primary care giver. W. Rainsberger Depo. 27; Robt. Rainsberger Stmt, p. 3, Nov. 19, 2013; Reb. Rainsberger Stmt, p. 1-2, Nov. 20, 2013.

4.      William saw his mother most every day, did her grocery shopping, and kept her mentally engaged. W. Rainsberger Depo. 27-28;   Robt. Rainsberger Stmt, p. 3, Nov. 19, 2013; Rebecca Rainsberger Stmt, p. 1-2, Nov. 20, 2013.

5.      Rebecca lived further away, saw her mother once a week, and did her laundry. Rebecca Rainsberger Stmt, p. 1-3, Nov. 20, 2013; W. Rainsberger Depo. 27-28.

6.      Robert saw his mother less frequently, and had recently lost his job and his home had been foreclosed on. R. Rainsberger Stmt, p. 1, 3, Nov. 19, 2013; Benner Civil Depo. 88.

7.      On either the evening of Nov. 18 or the morning of Nov. 19, 2013 Ruth was attacked in her home and suffered blunt force trauma to her head. Benner Civ. Depo 89-90.

8.      William reported finding his injured mother at her home when he called 911 from her apartment at 3:37 p.m. on Nov. 19, 2013. W. Rainsberger Stmt, Nov. 19, 2013, p. 1-2.

9.      Ruth died the next day, Nov. 20, 2013. W. Rainsberger Depo. 24.

10.     William cooperated with the police, gave two statements–one the evening of Nov. 19, and the second the following day, Nov. 20, 2013.  W. Rainsberger Stmt, Nov. 19, 2013; W. Rainsberger Stmt, Nov. 20, 2013.

11.     Six months later, on May 27, 2014, William Rainsberger was arrested and charged with the murder of his mother, Ruth Rainsberger. W. Rainsberger Aff. ¶ 4.

12.     William's arrest and the murder charge were based upon a probable cause affidavit written and signed under oath on May 22, 2014, by Det. Charles Benner. Benner Civil Depo. 49-50

(Q: Okay. And without your probable cause affidavit, the prosecutor – and without you signing this information, the prosecutor wouldn't have filed charges against William Rainsberger? A: Correct"); Hennessy Aff. ¶6.

13. Det. Benner swore in the charging information that on November 19, 2013, William Rainsberger "did knowingly kill another human being, namely: Ruth Rainsberger, by inflicting blunt force injuries with a hammer or similar object, at or against the person of Ruth Rainsberger[.]" Information, 5/22/2014.

14. Based upon Det. Benner's PCA, Mr. Rainsberger was arrested (Benner Civil Depo. 49-50) and jailed for two months.  W. Rainsberger Aff. ¶ 6.

15. Detective Benner never had a murder weapon, confession, eyewitness, nor direct evidence that William killed his mother. Hennessy Aff, ¶ 8; Rossmo Report 11,-12, 28-30-33.

16. Detective Benner's evidence against William was all circumstantial. Benner Civil Depo. 22 ("I mean, it's a circumstantial case so, like I said, it's not my decision whether or not probable cause is established."); *id*. at 67 ("everything was circumstantial for the most part"); Hennessy Aff. ¶ 9; Rossmo Report 11,-12, 28-30-33.

17. The parties dispute whether many of the circumstances set forth in Det. Benner's probable cause affidavit meant to implicate William in his mother's murder were false or misleading. Plaintiff's evidence that these circumstances were false and misleading include:

    a.    The representation that cell phone tower records showed William in the area of the murder during the relevant time was false. *Infra* ¶ ¶ 18-19.

    b.    The inclusion of a 2:40 p.m. telephone call from William in his mother's apartment with her critically injured and an hour before he reported finding her and telephoning

911 was false. *Infra* ¶ ¶ 20-28.

c.  The representations that after this 2:40 p.m. telephone call, William went to a nearby Kroger grocery store, pulled what Det. Benner implied was a murder weapon from his person, looked around for cameras, and threw it away in the trash, was a mixture of misrepresented facts and falsehoods. *Infra* ¶ ¶ 29-35.

d.  The representations that there were no signs of forced entry and that nothing was stolen from Ruth Rainsberger's apartment was a mixture of misrepresented facts and falsehoods. *Infra* ¶ ¶ 36, 43-50.

e.  The representation that savings bonds were present in plain view in the apartment but left undisturbed was false. *Infra* ¶ ¶ 52-53.

f.  The representations that medics and hospital personnel thought Mrs. Rainsberger suffered a gunshot wound while William thought it was blunt force trauma was a mixture of misrepresented facts and falsehoods. *Infra* ¶ ¶ 54-69.

g.  The representations that William was uncaring and unconcerned about his mother's condition was a mixture of misrepresented facts and falsehoods. *Infra* ¶ ¶ 70-73.

**Cell Phone Tower Records do not Show William in the Area of the Murder**

18.  Detective Benner mislead the court in his affidavit by stating that cell phone tower location records "do not show William Rainsberger outside the area of Shortridge and 10th St. during the relevant time period." PCA, p. 5, ¶ 2.

19.  Cell phone records do not show William *in* this area anytime from 5:41 p.m. on Nov. 18, 2013 to 7:23 p.m. on Nov. 19, 2013, because there is no location information from cell phone

data for his telephone during that period. Cell Phone Tower Records; Hennessy Aff. ¶ 23; W. Rainsberger Aff. ¶ 13 (explaining Cell Tower Spreadsheets); Rossmo Report 13-14.

**There Was No Telephone Call From Ruth Rainsberger's Apartment at 2:40 p.m.**

20. Detective Benner included a key false time in his probable cause affidavit by stating that a telephone call was made from Ruth Rainsberger's landline telephone at 2:40 p.m. on Nov. 19, 2013 to Robert Rainsberger's cell phone. PCA, p. 3, ¶ 6.

21. Robert Rainsberger was William's brother, and both William and Robert had informed Det. Benner about this call, but said that it was made at 3:40 p.m., after William found their injured mother, rather than at 2:40 p.m. R. Rainsberger Stmt, p. 1, Nov. 19, 2013 ("My brother called me about, it was like twenty until 4:00. He said, 'Get over here, quick.'"); W. Rainsberger Stmt. p. 2-3, Nov. 20, 2013 (call made after he found mother after 3:30 p.m.); W. Rainsberger Aff. 11; Rossmo Report 16.

22. Detective Benner's affidavit, stating this call occurred at 2:40 p.m. rather than 3:40 p.m., was particularly incriminating of William Rainsberger, as it placed William in his mother's apartment, with her critically injured, a full hour before he telephoned 911 and a full hour before he said he discovered her. Benner Civil Depo 24-25 (included this in affidavit because it was "significant" and "very inculpatory" towards William Rainsberger); Hennessy Aff. ¶ 14; Rossmo Report 14-16; W. Rainsberger Aff. ¶ 11.

23. The 2:40 p.m. time was not the time that call was made. Benner Bail Testimony 46, July 17, 2014 (Hennessy: "So its not true that there was a call from inside the apartment at 2:40." Benner: "Correct.").

24. While an entry from Robert Rainsberger's cell phone records showed a call at 2:40 p.m., it

also showed a second entry for the same call at 3:40 p.m. R. Rainsberger Cell Phone Records; W. Rainsberger Aff. ¶ 11; Rossmo Report 14-16; Hennessy Aff. ¶ 15.

25.  The 2:40 p.m. entry was due to the 3:40 p.m. call being routed through Chicago, which is one hour earlier than Indianapolis time. This was apparent from the records, which contained the Chicago area code 773 for the 2:40 p.m. call entry. Robt. Rainsberger Cell Phone Records; Hennessy Aff. ¶ 15; Rossmo Report 14-16; W. Rainsberger Aff. ¶ 11.

26.  Well before filing his PCA in court, Det. Benner had in his possession Ruth Rainsberger's AT&T landline telephone records, which accurately showed this call was made from her telephone at 3:40 p.m., and which showed no call made from that line at 2:40 p.m. Benner Civil Depo. 43-44:

> "Waples:      But yet you didn't write in your report – in your affidavit of the probable cause that the AT&T records from Ruth's landline showed in Exhibit 3 that there was a call made at 3:40, not 2:40 and that the results of Officer Bierce's analysis of Robert's cell phone records showed those two calls being both at 3:40?
> Benner:      I'm sorry. What was the question? Did I have this?
> Waples:      You had it and you didn't put that in your affidavit of probable cause.
> Benner:      That's correct."
> Waples:      Instead you reported it as 2:40?
> Benner:      Yes.

> Benner civil deposition, September 27, 2016, at 43-44.

27.  Also, well before filing his PCA in court, Det. Benner knew that both Robert and William had voluntarily told him about this call, and both reported the call as occurring after the 3:30 p.m. time that William reported finding his mother, which matched the AT&T landline records of a call from Ruth Rainsberger's landline to Robert Rainsberger's cell phone at 3:40 p.m. Robt. Rainsberger Stmt, p. 1, Nov. 19, 2013 ("My brother called me about, it was like

twenty until 4:00. He said, 'Get over here, quick.'"); Benner Civil Depo. 24-25; Ruth Rainsberger's AT&T Records; Hennessy Aff. ¶ 13; W. Rainsberger Aff. ¶ 11; W. Rainsberger Stmt, p. 2-3, Nov. 20, 2013; Rossmo Report 16.

28.    Detective Benner has also testified that he had the records from IMPD telephone expert Bierce, which showed that the correct time of the call  was 3:40 and not 2:40 p.m.,  before he signed his probable cause affidavit on May 22, 2014, but that he still included the 2:40 p.m. time. Benner Civil Depo. 42, line 3 to p. 44, line 16.

**The Kroger Video Does Not Depict William Pulling Anything from His Person, Looking Around for Cameras, or Throwing Away a Weapon**

29.    Detective Benner lied in his probable cause affidavit by stating that at approximately 3:32 p.m., while at the Kroger store nearby to his mother's apartment, video shows William pulling a "straight object from his person," and "looking around for cameras" when he threw this item away in a trash can at the front of the store. PCA, p. 3, ¶  5; Hennessy Aff. ¶ 20, 21; W. Rainsberger Aff. ¶ 12; Rossmo Report 16-19.

30.    Detective Benner included this allegation in his affidavit implying that it was circumstantial evidence of William disposing of the murder weapon. Benner Civil Depo. 79-80 ("it could have been the murder weapon, yes. That's why I put it in there.").

31.    Later, Det. Benner admitted that contrary to his PCA affirmation, the video <u>does not</u> depict William pulling anything "from his person." Benner Civil Depo. 146 ("that's correct.").

32.    Indeed, the Kroger video does not depict William pulling anything from his person nor looking around for cameras. It instead shows him throwing away a piece of trash and after doing so looking behind him to the parking lot at a woman who was walking up behind him.

Hennessy Aff. ¶ 21; W. Rainsberger Aff. ¶ 11-12 (piece of trash, can't remember what it was); Rossmo Report 16-19; Kroger video still frames replicated in Rossmo Report, 18, 19.

33.  While the piece of trash William was throwing away appears "straight" and thin in some still frames of the video, the object appears rectangular in other still frames of the video. Rossmo Report 17-19.

34.  The item "does not look thick enough to be a hammer, pipe or pry bar. There is no way to determine the object's composition, and certainly no indication that it is metal, as it is never in focus and can't be clearly seen." Rossmo Report 17; See also Benner Bail Testimony 18 (admitting that object "didn't look like a hammer to me").

35.  By falsely stating the time of the telephone call from Ruth Rainsberger's apartment at 2:40 p.m., and then implying that William left the apartment and went to the Kroger store to dispose of a weapon, and by misconstruing what the Kroger video depicted, Det. Benner misled the court into thinking that William was disposing of the murder weapon. Hennessy Aff. ¶ 21; Rossmo Report 16-19; W. Rainsberger Aff. ¶ 11-12.

**Mrs. Rainsberger Lived in a High Crime Area, There Was Evidence of Ongoing Drug Trafficking in Her Apartment Building, and Her Door Was Unlocked**

36.  Det. Benner stated that there was no sign of forced entry into Mrs. Rainsberger's apartment (PCA, p. 1, ¶ 3) and that nothing was stolen from the apartment, which he contends makes it more likely that the attack was not associated with a robbery or burglary but done by someone who knew her. Benner Civil Depo 19-20.

37.  Det. Benner did not mention in his affidavit that Mrs. Rainsberger lived in a high crime area and that there was evidence of an active drug trade in her apartment building. Benner Crim.

Depo. 71 (10.5 police runs per month at apartment complex);  Benner Bail Testimony 37-38

(high traffic in apartment building tenant associated with drugs); Benner Crim. Depo. 4

(same); M. Bilger Depo. 20-21 (Mrs. Rainsberger lived in high crime area, aware of one

woman attacked and another raped); W. Rainsberger Stmt. Nov. 19, 2013 ("the corner of 10th

and Shadeland is not a good place to be in the middle of the night. And I worry about that.").

38.     In fact, Det. Benner was aware that on Oct. 7, 2013, just the month before Mrs. Rainsberger

was attacked, another woman was attacked, hit in the head, and had her purse taken in the

parking lot right outside Mrs. Rainsberger's apartment. The unknown male assailant was

never found. Benner Bail Testimony 36-37; Benner Crim. Depo. 23.

39.     Det. Benner never interviewed the victim of the Oct. 7th attack. Benner Crim Depo. 23.

40.     Mrs. Rainsberger's door was unlocked when William arrived on Nov. 19, 2013. W.

Rainsberger Stmt, Nov. 19, 2013, p. 1.

41.     Mrs. Rainsberger was not physically able to look through the peephole to see who was at her

door and would sometimes open the door to strangers. W. Rainsberger Stmt, Nov. 19, p. 5;

Robt. Rainsberger Stmt, Nov. 19, p. 7; Mari Bilger Depo. 13.

42.     In fact, in the past, other tenants in the apartment building had reported seeing Mrs.

Rainsberger, who suffered from dementia, just sitting in her apartment watching tv seemingly

oblivious to the fact that her apartment door was wide open. Rossmo Report 31.

**A Purse and Prescription Medicine were Stolen from Ruth Rainsberger's Apartment**

43.     Detective Benner lied in his probable cause affidavit by representing that nothing was stolen

from Ruth Rainsberger's apartment. PCA, p. 1, ¶ 2; Hennessy Aff. ¶ 24; W. Rainsberger Aff.

¶ 14; Rossmo Report 20-21.

44.    Detective Benner knew that the Rainsberger children had described their mother's purse and prescription medication, both of which were missing and never recovered. Hennessy Aff. ¶ 25; W. Rainsberger Aff. ¶ 14; Rossmo Report 20-21; Lane Depo. 13.-14, 17-18; Rebecca Rainsberger Stmt, p. 2, Nov. 20, 2013.

45.    IMPD Forensic Services, which inventoried the scene, noted in a report, which Det. Benner had prior to the submission of his affidavit, that "no prescriptions found, purse is missing." Forensic Services Agency Note, Nov. 19, 2013; Lane Depo. 13-14; Hennessy Aff. ¶ 25; W. Rainsberger Aff. ¶ 14; Rossmo Report 20-21.

46.    IMPD Forensic Services Crime Scene Specialist Jennifer Lane had searched for prescription medications, found none, and told this to Det. Benner. Lane Depo. 13.

47.    Detective Benner also had this information about the missing purse, but did not include it in his probable cause affidavit:

> Hennessy:    Uh in your notes you indicate purse is missing. Where did you get that information?
> Lane:    Uh also from the family members we've been told that she carried a black purse um and we had searched, both myself and Det. Tudor had searched um all the drawers, the closets, under the beds um in both bedrooms, closets and the other bedroom as well um pantry, kitchen cabinets and we did not locate a black purse.
> Hennessy:    And so Benner and Tudor had the same information about the missing purse?
> Lane:    That is correct.
>
> Lane Depo. 14 (Sept. 8, 2014).

48.    Forensic Services Crime Scene Specialist Lane did find a new purse in Mrs. Rainsberger's bedroom dresser drawer which was empty, unused and which still had the store tag on it. It was apparent to Lane that this was not the purse described by the family. Det. Benner was with Lane during this search. Lane Depo. 17-18.

49.   Det. Benner knew the family described their mother's purse as black and shiny and patten leather, and this new unused purse did not fit this description. Benner Crim. Depo. 6.

50.   The new purse with the store tag on it still had the paper stuffing in it, and was not the one described by the Rainsberger children as the one their mother used every day. W. Rainsberger Aff. ¶ 14; Rebecca Rainsberger Stmt. p. 5, Nov. 20, 2013; Lane Depo. 17-18; Benner Crim Depo. 6.

51.   A checkbook, a small amount of cash, and credit cards were located inside a translucent plastic Tupperware container which was underneath a stack of papers on one of Mrs. Rainsberger's tables, items which would not have been readily apparent to a stranger. Benner Bail Testimony 59; W. Rainsberger Aff. ¶ 14.

**There were no Savings Bonds in Plain View or Otherwise**

52.   Det. Benner falsely stated in his probable cause affidavit that: "There was a lockbox in the back room in plain view that contained savings bonds belonging to the victim." PCA, p. 2, ¶ 3; Hennessy Aff. ¶ ¶ 24, 25; W. Rainsberger Aff. ¶ 14.

53.   In truth, the lock box was in a back bedroom closet, and never contained savings bonds. Benner Civil Depo. 59-60 (admitting lockbox was in a cluttered bedroom closet and contained no savings bonds; contesting whether box was in plain view and asserting that documents "were something like savings bonds" "I'm not sure what they were"); Hennessy Aff. ¶ ¶ 24, 25; W. Rainsberger Aff. ¶ 14 (never any savings bonds or anything "remotely resembling savings bonds, nor anything else of monetary value"in lockbox); Rossmo Report 20-21.

**William Rationally Thought the Wound on Top of His Mother's Head Was from a Blow; the One Firefighter Who Thought it Was a Gunshot Wound Based His Conclusion on What He Thought Were Bullet Entrance and Exit Wounds Not Visible to William**

54.    Detective Benner stated in his probable cause affidavit that because William reported that his mother had been hit in the head though "fire and ambulance personnel thought" that Ruth Rainsberger had been shot, this indicated that William knew "how she sustained the injury," thus implicating him in the attack. PCA, p. 1, ¶ 1.

55.    William did not know how his mother had been attacked, and told Det. Benner that at first he thought she had fallen and hit her head, but when he got closer and saw all the blood that had congealed on the blanket wrapped around the top of her head, he "didn't know what had happened," but thought that maybe she had been struck on the top of the head. Rainsberger Stmt, p. 6-7, Nov. 20, 2013; W. Rainsberger Aff. ¶ 15; W. Rainsberger Depo. 57-59.

56.    As William explains:

> While it definitely appeared to me that my mother was struck on the head, I was not certain how my mother was injured.  What I saw was a blanket soaked with partially-dried blood stuck to the top of my mother's head as she lay on the floor, and on the same blanket but on the floor right next to my mother's head, a pool of congealed blood, approximately one cup. This indicated to me an extremely serious injury that produced substantial blood loss, which had occurred long enough before my arrival that the blood was not fresh but partially dried and solidified. I did not remove the bloody blanket stuck to the top of her head because I believed it was acting as a bandage, and I did not want to pull it away from the wound and cause it to start bleeding again.

W. Rainsberger Aff. ¶ 15a.

57.    William did not see any hole in the blanket surrounding his mother's head, and, having not removed it, could not see her forehead. W. Rainsberger Aff. ¶ 15 f; W. Rainsberger Stmt, Nov. 20, 2013, p. 3.

58. William does not normally associate wounds to the top of the head as gunshot wounds, which is probably typical of most people's reactions. W. Rainsberger Depo. 72 ("I have no idea except I don't know how many people get shot on top of the head."); W. Rainsberger Aff. ¶ 15 d; Rossmo Report 21-22.

59. There was no blood splatter, no odor of gun powder, nor any spent gun cartridges in Ruth Rainsberger's apartment, all of which would be associated with a gunshot.  Benner Civil Depo. 51-52; Hennessy Aff. ¶ 29; W. Rainsberger Aff. ¶ 15 e; Rossmo Report 21.

60. The incorrect "gunshot wound" conclusion was started by Firefighter Carl Wooldridge, one of the first responders, who removed the blood soaked blanket which had dried upon Mrs. Rainsberger's head and observed a hole in the blanket covered with wet and dried blood where the wound was, which he thought was perhaps made by a bullet, and a mark on Ruth's now exposed forehead, which he mistakenly thought was a bullet entrance wound. Wooldridge Depo. 8 (cloth had "somewhat of a hole in it right where the wound was" and there "was a mark ... on her forehead [visible only after peeling cloth off] that I believed to be an entrance wound."); Hennessy Aff. ¶ 30; Rossmo Report 21-23.

61. Detective Benner wrote in his probable cause affidavit that "it should be noted that during the initial investigation, both medic and hospital personnel believed that the victim may have sustained a gunshot wound."PCA, p. 2, ¶ 1.

62. However, this was not true, as only Firefighter Wooldridge expressed this opinion, and Det. Benner never spoke to any of the medics or hospital personnel to get their opinions. Benner Civil Depo. 52-53, 55.

63. Firefighter Wooldridge had only responded to three previous incidents where there was a

13

gunshot victim. Wooldridge Depo. 9; Rossmo Report 21.

64.   While medical personnel at Eskenazi Hospital were initially told the victim may have suffered a gunshot wound, upon examining Mrs. Rainsberger, they determined the wound was from blunt force trauma. Dr. Streib Depo. 3-4 (ambulance notified them on route that Mrs. Rainsberger "had a wound that might be a gunshot wound ... upon our further evaluation we determined in fact that this was not due to a gunshot wound but probably due to a blunt force injury").

65.   William told Det. Benner that he did not remove the blanket from his mother's head because there was a mixture of congealed and dried blood sticking it to his mother's wound and he did not want to pull it off and risk causing more bleeding. Benner Civil Depo. 12-18 ("That's what he told me, yes."); W. Rainsberger Stmt, Nov. 20, 2013, p. 4-5.

66.   Having not disturbed the blanket, William was unable to see any hole in it or any mark on his mother's forehead underneath the blanket.  W. Rainsberger Stmt, Nov. 20, 2013, p. 3 ("I couldn't see much of her face or shoulders because there was that blanket thing over her."); W. Rainsberger Aff. ¶ 15 f.

67.   Detective Benner ignored the fact that Mr. Wooldridge based his assumption on an incorrect diagnosis of gunshot entrance and exit wounds, which were not even visible to William, and used William's speculation about how his mother had been injured as evidence that he had killed her. PCA, p. 1, ¶ 1; Hennessy Aff. ¶ 31; Rossmo Report 21-23.

68.   William's  speculation about the nature of his mother's injures was rational based on his observation of a wound on top of her head, the fact that there were no shells, bullets, blood splatter, or odor of gunpowder, and he was not able to see any supposed bullet exit hole in

the blanket and no supposed bullet entrance wound on his mother's forehead. W. Rainsberger Aff. ¶ 15 a, c, d, e, f; Hennessy Aff. ¶ ¶ 28-31; Rossmo Report 21-23.

69.   William's decision not to remove the blanket stuck to his mother's wound because it appeared to act as a bandage but rather to call for immediate emergency medical assistance was rational and not indicative of having caused the injury. W. Rainsberger Depo. 60-62 ("I was more interested that my mom receive proper medical care, and knowing that there was a fire station half a mile away, I didn't think that it would take that long, that I could potentially do more damage. There's nothing I could have done for her because she was not bleeding anymore."); Hennessy Aff. ¶ 30 ("Benner made it seem incriminating that William had not removed the blanket but William had told him he did not for fear of making the bleeding worse."); Rossmo Report 23 ("Detective Benner characterized William Rainsberger's actions after discovering his mother to be callous and suspicious. In fact, William did exactly what he should have done in such a situation-he checked for responsiveness, determined his mother was still breathing, and established her bleeding had stopped (American Red Cross, 2011; Mayo Clinic, 2017; U.S. Department of Health and Human Services, 2016). He decided not to remove the blanket stuck to the top of her head for fear of further damage and concluded that prompt emergency medical help was immediately needed.").

**Det. Benner Misrepresented William's Reactions and Concerns for his Mother**

70.   After discovering his injured mother, William telephoned 911, quickly checked the apartment to see if any intruders were still present, and then ran out the front door of the apartment building to flag down the ambulance. William told Det. Benner he did this because

the apartment complex is complicated and the buildings poorly marked, and he wanted to get emergency medical help for his mother as soon as possible. Detective Benner omitted all the reasons William told him he went outside, and simply put in his affidavit that after calling 911 William "went outside to wait for the ambulance" (PCA, p. 2, ¶ 1) and that "William left his mother unattended until the police arrived" (PCA, p. 4, ¶ 1). W. Rainsberger Aff. ¶ 16 a; Rossmo Report 23; Hennessy Aff. ¶ 32 a;  Rainsberger Stmt, p. 2-3, Nov. 20, 2013 ("H 11 [mother's apartment number] doesn't really tell you much. So I jumped up and down and waved at them. And then they came ..."); see also W. Rainsberger Depo. 68 (Q: And then what did you do after you hung up [from 911]? A: I looked at my mom for a little bit more, and I think I started crying. And then I realized I should run out and flag down the ambulance[.]"); Benner Bail Test. 35-36 (admitting apartment layout confusing).

71.   Defendant asserts that "On the drive downtown, William told IMPD Officer Michael Price that he did not know whether what happened to his mother was a good thing or bad or a bad thing." Def's SJ Memo 6 (citing Exhibit 10- Price Depo 14:3-9). William did not say he didn't know if what happened to his mother was good or bad, but, rather, given what happened, and that she appeared to be dying, that he didn't know if it was good or bad for her to survive in a severely damaged state or in a coma, or to pass away. W. Rainsberger Aff. ¶ 18. In his deposition, Officer Price did not directly quote William, and acknowledged that William was referencing whether Mrs. Rainsberger was going to live or die, not whether it was good or bad that she had been attacked. Price Depo. 14-15.

72.   Detective Benner swore in his Probable Cause Affidavit that while William was detained for questioning downtown at police headquarters during the evening of Nov. 19, 2013, that he

16

did not ask the detective how his mother was doing and never asked to be taken to the hospital. PCA p. 2, ¶ 3.

73.    While this was technically true, as William did not used these words, it was extremely misleading, as Det. Benner knew that while William was detained he was in frequent contact with his sister Rebecca, who was at the hospital with their mother, and that she was keeping William informed of their mother's condition. William actually read one of Rebecca's texts to him to Detective Benner during his interrogation (W. Rainsberger Stmt, Nov. 19, 2013 Transcript at 13) in which Rebecca advised William of their mother's condition and instructed him which entrance he should enter at Eskenazi Hospital. Detective Benner said "we'll get you there" which he never did. W. Rainsberger Aff. ¶ 16 b; Hennessy Aff. ¶ 32 b.

**Detective Benner's Account of William's Refusal to Take a Polygraph Was Not Evidence of a Crime and Contained a Mixture of Misrepresented Facts and Falsehoods**

74.    On November 20, 2013, the day his mother died, Detective Benner called William and told him he wanted him, his sister, and his brother, to come downtown so that the detective could share with them the results of their mother's autopsy. Benner Bail Hearing Testimony, July 17, 2014, p. 33; Robt. Rainsberger Depo. 29.

75.    The real reason Detective Benner asked them to come downtown was not to share the autopsy results with them, but to get them to submit to additional questioning and polygraph examinations. Benner Bail Hearing Testimony, July 17, 2014, p. 33 ("If I told them I wanted to come down for them to give a polygraph, they probably wouldn't have showed up, so I can say what I want to have them come down there.").

76.    Instead of sharing the autopsy results with the family, Det. Benner and his partner Tom

Tudor, took statements from Rebecca and William, confronted William and Robert with requests to take polygraphs, and accused William and Robert of killing their mother for money. W. Rainsberger Depo. 94-96; Hennessy Aff. ¶ 33.

77. The police in general and Det. Benner in particular were overbearing and treated the Rainsbergers callously and with disrespect. The night before, William had been detained at the scene for over an hour in the back of a locked police car, and had to relieve himself under guard on the side of the apartment building. W. Rainsberger Depo 86-88. At police headquarters the next day, Det. Benner continued this abusive treatment:

> Q    Okay. And what did Benner do? Or how could you tell that he was pissed?
> A    They spoke to Bill first, then me, and he just had -- well, when we first got there, he talked to my sister like she was a petulant little seven-year-old, and he wanted to talk to her first since he didn't talk to her the night before. And he was just angry. He was angry as soon as we got there. Becky didn't stand up as soon as he told her to come with him, so he yelled at her. Then he talked to Bill. Apparently he didn't like what Bill had to say, because by the time got to me, he was fit to be tied.
>
> Robt. Rainsberger Depo 30-31.

78. Detective Benner omitted from his probable cause affidavit that he had lied to the family to get them to come downtown, instead writing that on November 20, 2013, "I asked them [William and Robert] if they would submit to a polygraph so that I could eliminate them as suspects and they adamantly said no, they would not take a polygraph. All three siblings stormed out and I have not heard from them since." PCA, p. 3, ¶ 2.

79. William refused the polygraph because he was upset and suspicious of the police, as they had detained him the night before, both at the scene and downtown where he gave his statement, keeping him from the hospital and his dying mother; lied to about the reason for him to come to police headquarters; subjected to interrogation again on Nov. 20, 2013, the day their

mother died; not provided with the autopsy results, the ostensive reason they were given as the purpose of the meeting, and treated like suspects rather than the grieving family of the victim of a violent homicide. William also did not believe that polygraphs were reliable, and he believed the police, especially Det. Benner, were already prejudiced against him. W. Rainsberger Aff. ¶ 17;  W. Rainsberger Depo. 94-96; Rossmo Report 24-27; Hennessy Aff. ¶ 33; Benner Civil Depo. 68 (William accused Benner of lying to him "[b]ecause, like I said, he probably thought he was just coming down to get results of what happened to his mother and he didn't know he was going to be confronted to see if he would take a polygraph.").

80.   The refusal to take a polygraph exam is not evidence of guilt. Rossmo Report 25.

81.   As Professor Rossmo states: " William Rainsberger had a right to refuse a polygraph test and such a refusal should never have been used as an element in a probable cause affidavit. He also had other reasons to be concerned about a polygraph. First, his treatment by police generally, and Detective Benner's polygraph deception specifically, raised legitimate concerns over investigative bias." Rossmo Report 26.

**Detective Benner's PCA Assertion that the Rainsberger Family "Stormed Out" of Police Headquarters on Nov. 20, 2013, was False**

82.   Detective Benner lied to the court in his affidavit when he stated that William and his siblings "stormed out" of police headquarters on Nov. 20, 2013, after refusing to take a polygraph . PCA, p. 3, ¶ 2.

83.   Instead, Detective Benner and his partner Tom Tudor left the room before the three Rainsberger children. W. Rainsberger Depo. 94-96; W. Rainsberger Aff. ¶ 17; Hennessy Aff. ¶ 33.

19

As Detective Benner explained it:

Q     You and Tudor accused -- Tudor accuses them of killing their mother for money and you and Tudor walk off from where you're all together and you guys --
A     We went back to our office.
Q     You go back to your office and the three children were there together still?
A     Yes.
Q     And then they leave?
A     Yes.

Benner Civil Depo. 70.

84. The three Rainsberger siblings did not storm out of police headquarters, but rather left after detectives Benner and Tudor left, ending their meeting. W. Rainsberger Depo. 70, 96; W. Rainsberger Aff. ¶ 17.

**Detective Benner's PCA Assertion that the Rainsberger Family Did not Contact Him after Nov. 20, 2013, was False**

85. Detective Benner lied to the court in his affidavit when he said that after this confrontation on Nov. 20, 2013, that "I have not heard from them [the three Rainsberger children] since." PCA, p. 3, ¶ 2.

86. Detective Benner admits that Rebecca Rainsberger telephoned him twice after this time and left messages wanting to check in on the case and asking him to return her calls, and he refused to return either call. Benner Bail Testimony 30; Benner Civil Depo 73-74; Hennessy Aff. ¶ 32 c; Rossmo Report, p. 27; W. Rainsberger Aff. ¶ 16 c.

**William Had No Financial Motive to Murder His Mother**

87. Detective Benner also mislead the court in his probable cause affidavit by suggesting that William had a financial motive for killing his mother because he along with his siblings was a beneficiary of his mother's estate. PCA, p. 4, ¶ 3.

20

88. While Det. Benner noted that William's inheritance of his mother's estate was approximately $33,000 (PCA, p. 4, ¶ 3), he omitted the fact that William was comfortably retired and owned his house free and clear of any mortgage. W. Rainsberger Nov. 19, 2013 Stmt. 15; W. Rainsberger Aff. ¶ 19.

89. "Being the beneficiary of someone's estate is not evidence of murder, it is not even a motive absent the establishment of some financial need" of which there was none here, Rossmo Report at 12.

90. Detective Benner understood that William Rainsberger had access to all of his mother's finances before her death. Benner Bail Testimony 63.

91. William handled all his mother's finances, and had a power of attorney which enabled him to conduct all her financial affairs. W. Rainsberger Depo. 30, 33-34.

92. If William was dishonest and had wanted his mother's money, he could have just taken it without harming her. W. Rainsberger Aff. ¶ 19.

**Detective Benner Failed to Include Exculpatory DNA Evidence in his PCA**

93. DNA is often important evidence which can be either compelling evidence of guilt or exculpatory evidence of innocence. Hennessy Aff. ¶ 36.

94. Detective Benner had the Marion County Forensic Services Agency collect DNA samples from Ruth Rainsberger's clothing. Benner Civil Depo. 37, 108-109.

95. The purpose of testing for DNA is twofold: one, to identify a perpetrator; two, to possibly eliminate an innocent suspect. Benner Civil Depo. 109-110.

96. Detective Benner obtained a search warrant to collect DNA samples from William and Robert Rainsberger. Hennessy Aff. ¶ 38; Benner Civil Depo. 110; Rossmo Report 37.

97.   Illustrating the importance of DNA evidence to this wholly circumstantial case, on March 20, 2014, Det. Benner wrote an email to the Indiana Criminal Justice Institute, which was considering a victim's compensation request filed by Rebecca Rainsberger, informing the Institute that he could not make any arrests in the Ruth Rainsberger murder investigation until after he received DNA test results. Email from Benner to Amelia Basham, March 20, 2014 ("The victim's sons are the suspects in the case and I am waiting for DNA results before any arrest can be made. I just do not want to compensate anyone who may have killed the victim.") (under-lineation supplied).

98.   A month later, on April 23, 2014, the Marion County Forensic Services Agency reported to Detective Benner (a month before he signed the probable cause affidavit) that Ruth Rainsberger's clothing tested positive for DNA from two unknown male subjects. DNA Report, p. 2; Rossmo Report 37-38; Hennessy Aff. ¶ 39.

99.   In that same report, the Marion County Forensic Services Agency reported to Detective Benner that William Rainsberger was excluded as having contributed the male DNA evidence found on Ruth Rainsberger's clothing. DNA Report, p. 2; Benner Civil Depo. 111; Rossmo Report 37-38; Hennessy Aff. ¶ 40.

100.   Detective Benner omitted this exculpatory evidence from his May 22, 2014, probable cause affidavit he filed against William Rainsberger. Hennessy Aff. ¶ 42; Benner Depo. 112; Rossmo Report 37-38.

101.   Detective Benner now contends he did not include the DNA positive test results for two unknown males and the exclusion of William Rainsberger because, he speculates, the DNA may have come from one of the first responders. Benner SJ Aff. ¶ 10-11.

102.     However, there was blood on the scene and on Mrs. Rainsberger, and first responders normally take precautions against becoming infected by such bodily fluids by wearing latex gloves, and thus it is unlikely they would have been the source of the DNA from two unknown males discovered on Mrs. Rainsberger. Rossmo Report 37-38.

**Det. Benner First Probable Cause Affidavit was Rejected**

103.     Detective Benner prepared and signed two probable cause affidavits in this case, one on December 6, 2013, just weeks after Ruth Rainsberger's murder; the other on May 22, 2014, leading to William's arrest. PCA, Dec. 6, 2013; PCA, May 22, 2014; Benner Civil Depo 31.

104.     The two affidavits are virtually identical, with the addition of two substantive allegations to the second affidavit, (1) the false information about the 2:40 p.m. phone call; and, (2) the false allegation of cell tower data placing William in the area of Shadeland and 10th Street during the time of the murder. Compare PCA Dec. 6, 2013 with PCA, May 22, 2014.[1]

105.     Detective Benner initially presented the Dec. 6, 2013, version of the PCA to the Marion County Prosecutor's Office, which declined to file charges against William Rainsberger. Benner Civil Depo. 31-32.

106.     Rather than include the DNA test results in the second affidavit, Det. Benner included the two additional allegations about the cell phone tower location data and the 2:40 p.m. telephone call, presented it again to the prosecutor's office, which then filed charges against William Rainsberger. Benner Civil Depo. 49-50.

---

[1] The only other substantive difference between the two documents is the concluding paragraph of the latter May 22, 2014 affidavit, concerning Ruth's financial records showing that she had approximately $99,000 in assets. This information simply confirmed what William had told Det. Benner on Nov. 19, 2013, which Det. Benner had included as the last sentence on the first paragraph of page 2 of the earlier affidavit.

23

**Summary of Argument**

Jurors could reasonably conclude that in his probable cause affidavit Detective Benner intentionally, knowingly, or recklessly included false and misleading statements, and omitted important exculpatory information, which caused William Rainsberger to be falsely arrested and prosecuted. The rights violated here were clearly established, thus qualified immunity is not available. Detective Benner's motion for summary judgment should be denied.

**ARGUMENT**

**Reasonable Jurors Could Conclude
Detective Benner Intentionally, Knowingly or Recklessly
Made False and Misleading Statements in his Probable Cause Affidavit
and that William Rainsberger was Wrongly Arrested and Maliciously Prosecuted**

**A.      Reasonable Jurors Could Conclude That Detective Benner Made False and Misleading Statements in His Probable Cause Affidavit**

It is axiomatic that police officers cannot lie and mislead courts in their probable cause affidavits and that if they do they can be liable for the resulting damages.

As this Court recently recognized in a similar case against one of Det. Benner's colleagues, "[i]t is well-established that '[a] warrant request violates the Fourth Amendment if the requesting officer knowingly, intentionally, or with reckless disregard for the truth, makes false statements in requesting the warrant and the false statements were necessary to the determination that a warrant should issue.'" *Starks v. Moore*, Case 1:12-cv-01008-WTL-DML, SJ Entry at 14 (Doc. 163, 09/02/14) (quoting *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012) (quoting *Knox v. Smith*, 342 F.3d 651, 658 (7th Cir. 2003)).

Officers who lie or mislead in order to obtain a warrant will be liable under § 1983 for a subsequent false arrest. *Olson v. Tyler*, 771 F.2d 277 (7th Cir. 1985); *see also Hampton v. Hanrahan*,

24

600 F.2d 600, 635-38 (7th Cir. 1979).

As this Court stated, in *Starks*, the Seventh Circuit recognizes that "a reckless disregard for the truth can be shown by demonstrating that the officer entertained serious doubts as to the truth of the statements, had obvious reasons to doubt their accuracy, or failed to disclose facts that he or she knew would negate probable cause."*Starks*, Doc. 163 SJ Entry at 14.

As set forth in detail in the fact section above, Detective Benner's repeated decisions to ignore correct information and instead use false and misleading statements in his probable cause affidavit provides a sufficient basis for a reasonable trier of fact to determine that he intentionally, knowingly, or recklessly ignored the truth in his pursuit of having William Rainsberger arrested and prosecuted.

This was a circumstantial case, as admitted to by Det. Benner. Detective Benner did not have a murder weapon, an eyewitness, a confession, or any direct evidence that William Rainsberger killed his mother. He did not have DNA evidence, which he previously acknowledged was necessary in order to make an arrest. When that evidence did not pan out, but rather pointed towards others, Det. Benner failed to mention it in his affidavit and instead inserted the false cell tower location and 2:40 p.m. phone call. Without the false and misleading statements in Det. Benner's probable cause affidavit, he didn't have anything approaching probable cause for William's arrest. Rossmo Report 28-29; Hennessy Aff. ¶ 11, 42.

Detective Benner suspected William Rainsberger right away, and focused his investigation solely upon him. As Attorney Hennessy states:

Detective Benner rushed to judgment, declaring William his prime suspect within 24 hours of the attack. Det. Benner admitted that William became his only suspect after William declined to take a polygraph test because he knew they were considered unreliable. All further investigation was limited to attempts to confirm Det. Benner's unfounded belief. When the evidence did not support his suspicions, Det. Benner misconstrued facts against William, distorted other evidence, and ignored exculpatory evidence in William's favor.

25

Hennessy Aff. ¶ 12.

Plaintiff has employed Kim Rossmo to review Det. Benner's investigation and probable cause affidavit. Dr. Rossmo is a former law enforcement detective and currently the University Endowed Chair in Criminology and the Director of the Center for Geospatial Intelligence and Investigation in the Department of Criminal Justice at Texas State University. Dr. Rossmo has prepared an extensive expert disclosure report. Rossmo Report. In his 46 page report, Dr. Rossmo reviews Det. Benner's investigation and affidavit of probable cause in detail; he summarizes the failings in Det. Benner's probable cause affidavit as follows:

Detective Benner failed to perform a thorough investigation and his affidavit for probable cause contained a number of false and misleading statements.

1. Of the eight allegations in the probable cause, only five were actually items of evidence. One of these was false, and the remaining four contained a mix of facts and falsehoods. Some evidence was misinterpreted and taken out of context.

2. Detective Benner's rationale for concluding William Rainsberger murdered his mother is based on unreasonable and logically flawed conclusions.

When asserting that probable cause exists, police officers must be reasonable, cautious, and prudent, and must consider all the trustworthy facts and the overall circumstances.

1. Detective Benner was not cautious and prudent. He was haphazard and careless. He rushed to judgment and his investigation then suffered from tunnel vision and confirmation bias.

2. Several mistakes and omissions occurred in the police investigation. Some of Detective Benner's facts were not trustworthy and he often failed to consider overall circumstances.

3. These mistakes were unreasonable because Detective Benner failed to verify his information, check assumptions, remain objective, and consider the probability of his investigative theory.

Rossmo Report 3.

There is just too much wrong in this probable cause affidavit to say that a rational jury could

not find intentional, knowing, or reckless conduct in its compilation. There is no excuse for Det. Benner falsely stating that cell phone tower records show William in the area of the murder during the relevant time when those records do not show this at all. Det. Benner had the information on the correct time of the 3:40 p.m. call William made to his brother from his mother's apartment; he simply chose to ignore it and include the obviously incorrect time, which was highly incriminating to William. These two incriminating "facts," the cell phone tower location records and the non-existent 2:40 p.m. call, were critical to the probable cause determination, as the prosecutor's office had declined to file charges previously on the same affidavit sans these two canards.

Similarly, Det. Benner did not have a basis to say that all the medics and hospital personnel thought Mrs. Rainsberger's injuries were due to a gunshot, when he only received this information from a single firefighter who observed a suspected bullet hole in the blanket and an "entrance" wound on Mrs. Rainsberger's forehead, neither of which were visible to William. Det. Benner was wrong to exclude burglary or a robbery as a possible motive when he knew that Mrs. Rainsberger's door was unlocked, she would open the door because she could not see through the peephole, and there was evidence of an active drug trade in her apartment building in this high crime area. Detective Benner also knew the family reported and forensic services confirmed that prescription medication and a purse were missing and never recovered. Along this same line, Detective Benner was simply wrong to state in the affidavit that there were savings bonds in plain sight that were not taken when there were never any savings bonds and the papers he was referencing were in a lock box in a cluttered back bedroom closet. Detective Benner was wrong to characterize the Kroger video as depicting William pulling a straight object from his person and looking around for cameras prior to throwing it away, when the video neither shows him pulling any object from his person nor him

27

looking around for cameras and only throwing away a small, unidentifiable piece of trash. It was simply false for Det. Benner to say that the Rainsberger siblings stormed out of his office on Nov. 20, 2013, and never tried to contact him afterwards.

In his memorandum in support of summary judgment at 12, Det. Benner makes four arguments for finding probable cause against William Rainsberger:

1. He had the opportunity.
2. He had a financial motive.
3. He knew specific details about the victim's injuries.
4. His behavior following the incident was suspicious and uncommon.

But, as set forth in the fact section above and in Professor Rossmo's report at 28-29, William had no more opportunity to commit this crime than thousands of other people. He had little need for money as he was comfortably retired and his home was paid for; moreover, if he wanted his mother's money, as her power of attorney with complete access to her finances, he could have simply taken it without killing her. Moreover, he did not benefit financially to any greater extent than his siblings from his mother's death. His brother was the one who was in serious financial straits, not William.

Based on what William saw at the crime scene, especially a wound on the top of his mother's head, he reasonably concluded that someone had hit his mother in the head.

Finally, Det. Benner mischaracterized William's behavior and misrepresented his actions following the discovery of his mother's body. William behaved reasonably, normally, and logically given the totality of the circumstances. See Rossmo Report 29.

Dr. Rossmo extensively discussed the failings of the eight specific assertions in Det. Benner's probable cause affidavit. Rossmo Report 12-30. He explains how "being the beneficiary of someone's estate is not evidence of murder, it is not even a motive absent the establishment of some financial need" of which there was none here, *id.* at 12; how Det. Benner's assertion was false that

cell phone tower records place William in the area at the time of his mother's attack, *id*. at 13-14; how Detective Benner's ignored overwhelming evidence that his assertion was false that there was a call made from Ruth Rainsberger's landline phone an hour before William claimed to have discovered his mother; *id*. at 14-15; how Det. Benner's depiction of the Kroger video was false in that it did not show William pulling anything from his person or looking around for cameras, or throwing anything that could be a murder weapon in the trash, *id*. at 16-19; how Det. Benner's assertion was false that there was no evidence of a burglary at Ruth Rainsberger's apartment, *id*. at 20-21; how William's assumption of how his mother sustained her injury was reasonable and not indicative of guilt, especially in light of the  diagnosis of a gunshot entrance and exit wounds that firefighter Wooldridge incorrectly relied upon for his contrary conclusion were not visible to William *id*. at 21-23; how Det. Benner unfairly lied, omitted facts, and misconstrued other facts, in depicting William as unconcerned and uncaring for his mother's well-being, *id*. at 23-24; and, how William's refusal to take a polygraph was not evidence of guilt but rather a rational reaction to the abusive and biased treatment he had already been subjected to by Det. Benner. *Id*. at 24-27.

Based on the number and centrality of these falsehoods and misrepresentations, reasonable jurors could easily reach the conclusion that Det. Benner intentionally, knowingly or recklessly included false and misleading statements in his probable cause affidavit. Accordingly, Defendant's motion for summary judgment on the Fourth Amendment warrant claim should be denied.

## B.   Reasonable Jurors Could Conclude That William Rainsberger Was Arrested Without Probable Cause

As this Court recognized in *Starks*, if false or misleading statements or omitted exculpatory information leads to the probable cause finding, the offending officer will be liable for the subsequent false arrest on the ensuing warrant. *Starks,* Doc. 162, SJ Entry at 14.

While Det. Benner suspected William of the murder, and there is no problem with him investigating William, a reasonable jury could easily conclude that the evidence supporting such a suspicion was thin and nothing more than conjecture, and that without the false and misleading statements made by Det. Benner that probable cause did not exist for the issuance of the warrant.

Detective Benner rushed to judgment, suspecting William as his prime suspect within 24 hours of the attack. When the evidence did not support his suspicions, Det. Benner made up evidence against William, distorted other evidence, and ignored exculpatory evidence in William's favor.

The case against William was weak even if all the things alleged in Detective Benner's probable cause affidavit were true. When those false and misleading statements are stripped away from Detective Benner's probable cause affidavit, and the omitted evidence is included, it is apparent that William Rainsberger should never have been arrested or charged with Ruth Rainsberger's murder.

Detective Benner prepared a probable cause affidavit on December 6, 2013,  just a few weeks after Ruth's murder and presented it to the prosecutor's officer, which rejected filing any charges against William Rainsberger.

Indeed, four months after the murder, Det. Benner admitted to others that without hard evidence such as DNA, there was no basis to make an arrest. When that DNA evidence came back and excluded William and pointed towards others, Det. Benner failed to mention it in his affidavit. Instead, he included the two false facts of the cell phone tower location of William Rainsberger and the 2:40 p.m. phone call. Not only were these two new "facts" incorrect, much of the remainder of the affidavit was also comprised of false and misleading statements. The prosecutor then filed charges, which ultimately were dismissed because of evidentiary problems.

Dr. Rossmo prepared a detailed analysis of what is left of Det. Benner's probable cause affidavit

30

stripped of its false and misleading statements. On pages 28-29 of his report, he replicates the affidavit, color-coding the false and misleading information. This presentation illustrates the scant and non-incriminating nature of the information remaining. *Id*.

As defense attorney David Hennessy observes, "When those inaccurate and misleading statements are stripped away from Detective Benner's probable cause affidavit, and the omitted evidence is included, it is apparent that William Rainsberger should never have been arrested or charged with Ruth Rainsberger's murder." Hennessy Aff. ¶ 11.

The only factually true circumstantial information regarding William Rainsberger  in Det. Benner's affidavit is that William said someone had struck his mother in the head, he did not remove the blanket from his mother's head, a firefighter thought Ruth may had been shot, a few dresser drawers in Ruth's bedroom were pulled out partway, boxes in the backroom bedroom appeared untouched, and William threw some type of object in a trash can in front of a Kroger store. It is apparent that these circumstances would not lead a reasonable and prudent person to believe that William Rainsberger murdered his mother.

While William correctly speculated that someone had struck his mother in the head rather than shot her, his speculation was based upon objective facts he observed at the scene, including a wound on top of her head, no blood splatter, no shell casings, and no odor of gunpowder. Mr. Wooldridge's contrary gunshot conclusion was based upon his observation of hole under the blood on the cloth covering Ruth's wound which he mistook for a bullet hole, and a mark on Ruth's forehead, which Wooldridge mistook for a bullet entrance wound, neither of which were visible to William.

William's decision not to pull the blanket off his mother's head was rationally based on his concern that doing so would disturb the dried blood and thus reopen the wound, causing further

31

bleeding. He took the most appropriate actions by quickly calling for close-by emergency medical services, checking for intruders, and going outside to direct the medical personnel to his mother.

A reasonable jury could credit William for correctly assessing the situation and taking the most appropriate actions to assist his mother, rather than find in those actions some nefarious knowledge of how she was injured or lack of concern for her health and welfare.

The fact that dresser drawers were pulled out but appeared untouched indicates a possible burglary, in which the thieves either were interrupted or thought the contents not worth taking. It does not point to William as the assailant.

William's throwing away a piece of trash at a Kroger store which even Det. Benner admits does not appear to be a hammer or similar type instrument the autopsy identified as the murder weapon, does nothing to implicate William in his mother's murder. The whole theory is preposterous, that William struck his mother with a weapon in the morning, left her apartment, did not dispose of the murder weapon, returns to his mother's apartment where she is injured but not dead, calls his brother, goes to Kroger, then disposes of the alleged murder weapon in front of the busy store, then goes back to the apartment where his injured mother is still not dead, and, instead of finishing her off, he calls emergency medical assistance for her, despite the fact that she could identify him as her attacker if she is revived. This "theory" makes absolutely no sense, is riddled with falsehoods and misconstrued facts, is not supported by the objective true facts of what happened, and is rank speculation rather than probable cause for William's arrest for the murder of his mother. See *United States v. Cellitti*, 387 F.3d 618, 624 (7th Cir. 2004) (noting that officer speculation is insufficient to establish probable cause); *Sherouse v. Ratchner*, 573 F.3d 1055, 1062 (10th Cir. 2009) ("Where an officer observes inherently innocuous behavior that has plausible innocent explanations, it takes

32

more than speculation or mere possibility to give rise to probable cause to arrest.").

Detective Benner realized he did not have probable cause in March of 2014 when he wrote the Criminal Justice Institute. He was hoping DNA evidence would provide that probable cause. The April DNA tests excluded William and pointed towards others. Detective Benner excluded these results from his affidavit and instead added the two false allegations of cell tower location data and the 2:40 p.m. phone call. Hence, by his own representation, Det. Benner admitted his earlier affidavit was insufficient to establish probable cause. Reasonable jurors could reach the same conclusion.

A reasonable jury could conclude that absent the false and misleading statements contained in Det. Benner's probable cause affidavit, there was no probable cause for William Rainsberger's arrest. Accordingly, defendant's motion for summary judgment on the Fourth Amendment unreasonable seizure *i.e.* false arrest claim, should be denied.

**C. Detective Benner is not Entitled to Qualified Immunity for Making False and Misleading Statements in his Probable Cause Affidavit and Causing William Rainsberger to be Arrested without Probable Cause**

The parties agree the law is clearly established that an officer who intentionally, knowingly or recklessly submits an affidavit containing false or misleading statements is not entitled to qualified immunity unless "accurate information sufficient to constitute probable cause attended the false statements." See *Malley v. Briggs*, 475 U.S. 335, 344 (1986); *Lawson v. Veruchi*, 637 F.3d 699, 705 (7th Cir. 2011); *Juriss v. McGowan*, 957 F.2d 345, 349-50 (7th Cir. 1992) (officer not entitled to qualified immunity where only his false and misleading statements provided probable cause); *Starks*, Doc, 163, SJ Entry at 16-17 (denying qualified immunity).

The parties disagree about whether Det. Benner included false and misleading statements in his probable cause affidavit, and, if he did, whether the remainder of his affidavit established probable

cause for William Rainsberger's arrest. The parties' disagreements on both of these questions are the same as in the preceding two sections. Without repeating but incorporating those same arguments, plaintiff submits that when the summary judgment evidence is viewed in the light most favorably to William Rainsberger, the resolution of those questions is clear and precludes a defense of qualified immunity at this stage.

A reasonable jury could conclude based upon this evidence that Det. Benner's affidavit of probable cause was riddled with false and misleading statements, and that without those statements that there was no probable cause for William Rainsberger's arrest. Accordingly, Defendant Benner is not entitled to qualified immunity.

### D. Reasonable Jurors Could Conclude that William Rainsberger was Maliciously Prosecuted

Defendant acknowledges that the Seventh Circuit has held that Indiana plaintiffs may bring malicious prosecution claims under 42 U.S.C. §1983 because Indiana does not provide an adequate remedy for such claims. Def's SJ Memo at 18 (citing *Julian v. Hanna*, 732 F.3d 842 (7th Cir. 2013). Defendant argues that the evidence here does not support such a claim, and that such claims cannot be based solely upon the Fourth Amendment. *Id*. at 18, 20-21.

The first argument is incorrect; the second argument is presently valid under existing Seventh Circuit precedent, which as explained below, is likely to change before the trial in this case.

Defendant's first evidentiary argument is that there was probable cause to institute the action. This inquiry is the same as in above sections, which plaintiff incorporates rather than repeats here. A reasonable jury could conclude an absence of probable cause.

Defendant's second evidentiary argument is that there is no evidence that Det. Benner acted with malicious intent. Defendant fails to examine the relevant law on malice, which as applied to

34

the evidence in this case, would permit a reasonable jury to infer malice here.

Plaintiff's evidence that Detective Benner falsified his affidavit is sufficient for a jury to determine malice. See *Kalina v. Fletcher*, 522 U.S. 118, 133 (1997) (Scalia, J., concurring) ("false statements" may serve as "evidence of malice or initiation in the malicious prosecution suit"); *Peoples Bank & Trust Co. v. Stock*, 403 N.E.2d 1077, 1084 (Ind. 1980) ("any wrongful act done willfully and purposely and without just cause or excuse, to the injury of another is as against that person malicious.").

In Indiana, only "legal malice," as opposed to "actual malice," is needed to prove malicious prosecution. *Pontius v. Kimble*, 104 N.E. 981, 982 (Ind. App. 1914) (rejecting the argument that actual, or express, malice is necessary to prove malicious prosecution. Legal malice, "'malice in law,' or 'implied malice' means wrongful act done intentionally, without just cause or excuse." *United States Fire Ins. Co. v. Beltmann Northern American Co.*, 883 F.2d 564, 566 (7th Cir. 1989) (citing Black's Law Dictionary (5th ed. 1979)).

"Legal malice" is distinguished from "actual malice," the latter of which requires proof of "spite, hatred, ill will, or vindictive motives." See *Boyd v. Tornier, Inc.*, 656 F.3d 487, 497 (7th Cir. 2011) (discussing the difference between actual and legal malice under federal law). Actual malice has a substantially higher proof threshold. For example, proof of actual malice is required to establish liability for libel against public officials. See *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-280 (1964).

Because the Indiana Supreme Court has held that "any wrongful act done willfully and purposely and without just cause or excuse, to the injury of another is as against that person malicious" (*Peoples Bank & Trust Co.*, 403 N.E.2d at 1084), evidence of Detective Benner' false

35

and misleading presentation of evidence is sufficient to support an inference of legal malice.

Malicious intent can also be inferred from the complete lack of probable cause, *Welton v. Anderson*, 770 F.3d 670, 674 (7th Cir. 2014). As explained above, absent the false and misleading material there was no probable cause here, and hence malice can be inferred.

Finally, malicious intent can be inferred from an officer's failure to conduct an adequate investigation. *Welton*, 770 F.3d at 674. Here, Det. Benner latched onto Mr. Rainsberger as his only suspect within 24 hours and failed to conduct an adequate investigation.

Professor Rossmo extensively examined Det. Benner's investigation and found it biased and woefully lacking in thoroughness and objectivity. Rossmo Report 30-46. Without repeating his extensive findings set forth in those 17 pages of his report, suffice it to say that his critique would provide an adequate basis for a reasonable jury to conclude that the investigation was inadequate and to infer legal malice.

Defendant's legal argument against Mr. Rainsberger's malicious prosecution claims based solely upon a Fourth Amendment lack of probable cause are not permitted in the Seventh Circuit. Def's SJ Memo 20 (citing *Ray v. City of Chicago*, 629 F.3d 660, 664 (7th Cir. 2011) and *Tully v. Barada*, 599 F.3d 591, 594-95 (7th Cir. 2010)).

Defendant correctly relies upon this Seventh Circuit precedent for this proposition. However, the Seventh Circuit is out of step with the other circuits on this issue, and the issue is presently under consideration by the U.S. Supreme Court, which likely will soon align our circuit with the others.

On January 15, 2016, the Court granted certiorari on the following question presented in *Manuel v. City of Joliet,* 590 F. App'x 641 (7th Cir. 2015), cert. granted 136 S. Ct. 890 (Jan. 15, 2016):

> The question presented is whether an individual's Fourth Amendment right to be free from unreasonable seizure continues beyond legal process so as to allow a malicious prosecution

claim based upon the Fourth Amendment. This question was raised, but left unanswered, by this Court in *Albright v. Oliver*, 510 U.S. 266 (1994). Since then, the First, Second, Third, Fourth, Fifth, Sixth, Ninth, Tenth, Eleventh, and D.C. Circuits have all held that a Fourth Amendment malicious prosecution claim is cognizable through 42 U.S.C. § 1983 ("Section 1983"). Only the Seventh Circuit holds that a Fourth Amendment Section 1983 malicious prosecution claim is not cognizable.

http://www.supremecourt.gov/qp/14-09496qp.pdf (Last accessed 2-10-17).

The Supreme Court heard oral argument on this issue at the beginning of this term, on Oct. 5, 2016. A transcript of that argument is submitted by plaintiff. Manuel Oral Arg Transcript.

While it is always risky to forecast what the Supreme Court will do, it is not unreasonable to expect it to bring the Seventh Circuit in line with the other circuits on this issue, especially in light of the Court's previous assumption that such claims are viable under the Fourth Amendment.

In *Wallace v. Kato*, 594 U.S. 384 (2007), the Supreme Court, citing *Albright*, explained that it: has "never explored the contours of a Fourth Amendment malicious-prosecution suit under Section 1983;" recognized a "range of approaches" on such a claim in the lower courts; and, did not foreclose such claims, but rather "assumed, without deciding," that such claims were cognizable under §1983. *Wallace*, 594 U.S. at 390 n.2. *See also Albright v. Oliver*, 510 U.S. at 271 ("Most of the lower courts recognize some form of malicious prosecution action under § 1983.").

As the First Circuit has observed: "there is now broad consensus among the circuits that the Fourth Amendment right to be free from seizure but upon probable cause extends through the pretrial period." *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 98-99 (1st Cir. 2013).

To this point, in the *Manuel* oral argument, the respondents concede a Fourth Amendment claim which extends beyond arrest for false statements by officers which lead to continued pretrial seizures. Manuel Oral Arg. Transcript at 51 ("You would have a Fourth Amendment claim for misstatements at a Gerstein hearing that then led to ongoing pretrial seizure. And the damages from

37

that claim would run throughout the period of pretrial seizure.").

One would assume a decision in *Manuel* would be handed down prior to the conclusion of the Court's current term in late June or early July and prior to the September 11, 2017 trial in this case.

Plaintiff submits that the most judicious manner to address the issue is to take defendant's motion on this claim under advisement and address the issue after the Supreme Court hands down *Manuel* and prior to the September 11, 2017 trial.

Accordingly, for the above reasons, Defendant's motion for summary judgment on Mr. Rainsberger's malicious prosecution claim should be denied on all arguments asserted by defendant with the exception of the issue to be decided by *Manuel*, and, with respect to that issue, taken under consideration pending the outcome in *Manuel*.

## Conclusion

Detective Benner has failed to show that the material facts are undisputed and that he is entitled to judgment as a matter of law. Based upon the summary judgment record, reasonable jurors could conclude that Det. Benner intentionally, knowingly, or recklessly made false and misleading statements and omitted relevant exculpatory information from his probable cause affidavit, and that without that unfair presentation, probable cause did not exist for William Rainsberger's arrest or prosecution. The rights here were clearly established at the time of the events, and qualified immunity does not apply. Accordingly, the motion for summary judgment should be denied as to the first two claims, and taken under advisement on plaintiff's malicious prosecution claim on the issue pending before the Supreme Court in *Manuel*.

Dated: February 13, 2017

Respectfully submitted,

*/s/ Richard A. Waples*
Richard A. Waples
Attorney for Plaintiff

**WAPLES & HANGER**
410 N. Audubon Road
Indianapolis, Indiana 46219
TEL: (317) 357-0903
FAX: (317) 357-0275
EMAIL: rwaples@wapleshanger.com

## CERTIFICATE OF SERVICE

The undersigned certifies that on February 13, 2017, a copy of this document was filed

electronically. Notice of this filing will be sent to counsel of record by operation of the Court's

electronic filing system. Parties may access this filing through the Court's system:

Kathryn Box at Kathryn.Box@indy.gov
Lynne D. Hammer at Lynne.Hammer@indy.gov
Benjamin J. Church at Benjamin.Church@indy.gov

Office of Corporation Counsel
200 East Washington Street, Room 1601
Indianapolis, Indiana 46204


*/s/ Richard A. Waples*
Richard A. Waples

**WAPLES & HANGER**
410 N. Audubon Road
Indianapolis, IN 46219
TEL: (317) 357-0903
FAX: (317) 357-0275
EMAIL: rwaples@wapleshanger.com