1    STATE OF INDIANA      )
                           )    SS:
2    COUNTY OF MARION      )

3

4
                   IN THE MARION SUPERIOR COURT
5                     CRIMINAL DIVISION ONE
                  HONORABLE KURT EISGRUBER, JUDGE
6

7

8    STATE OF INDIANA          )
                               )
9                              )
     VS                        )    CAUSE NO. 49G01-1405-MR-026747
10                             )
                               )
11   WILLIAM RAINSBERGER       )

12

13        * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

14            TESTIMONY OF DET. CHARLES BENNER
                      July 17, 2014
15        * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

16
     A P P E A R A N C E S:
17

18   For the State of Indiana:        Marielle Vincent

19

20   For the Defendant:               David Hennessy

21

22

23

24            Carla Villalta, Court Reporter
                   Marion Superior Court
25                 Criminal Division One

                                                                      1

1          BE IT REMEMBERED, that on July 17, 2014 in the

2     Superior Court, Criminal Division One, Room 202,

3     City-County Building, Indianapolis, Marion County,

4     Indiana, before the Honorable Kurt Eisgruber, Judge,

5     the following proceedings were had:

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1          The State, in order to maintain the issues in its
2          behalf, offered and introduced the following into
3          evidence, to-wit:
4          D E T.   C H A R L E S    B E N N E R,
5          a witness, called on behalf of the State, who,
6          after first being sworn to testify the truth,
7          testified as follows, to-wit:
8
9     QUESTIONS BY THE COURT:
10    Q    And if you would, please, state your name.
11    A    Charles Benner, B-E-N-N-E-R.
12    Q    All right.   Thank you very much.
13         THE COURT:   And Ms. Vincent?
14         MS. VINCENT:   Thank you, Judge.
15    DIRECT EXAMINATION,
16    QUESTIONS BY MS. VINCENT:
17    Q    Detective, you're currently with IMPD; is that
18         correct?
19    A    Yes, ma'am.
20    Q    With the role of homicide detective; is that
21         correct?
22    A    Yes.
23    Q    How long have you been so employed?
24    A    Nine years in homicide and 25 years on the
25         department.
```

1   Q   All right.  Did you become involved with the case

2        involving the murder of Ruth Rainsberger on November

3        19, 2013?

4   A   Yes, I did.

5   Q   All right.  And when did you specifically become

6        involved with that case, please?

7   A   The case, the run came out about 3:38 PM that day, in

8        which Detective Feuquay originally responded as an

9        aggravated assault detective.

10       Based upon her condition later, homicide was

11        requested, and I got there about 4:15 PM.

12   Q   All right.  I'd like to briefly review some things

13        from the day of the murder, specifically, November

14        19th of 2013.  Where did Ruth Rainsberger live,

15        please?

16   A   801 North Shortridge, Apartment H-11.

17   Q   And who did she live there with, please?

18   A   She lived alone.

19   Q   Was there anyone who tried to make contact with her

20        earlier that morning, if you know?

21   A   Yes.  There was a food delivery person named Delbert

22        Pickens that said he was there around 10:30 that

23        morning.

24   Q   Okay.  And did he make attempts to contact her to

25        deliver that food?

```
 1   A   He said he knocked on the door, receive no answer, so

 2       he called her landline, listened to it ring outside

 3       and received no answer.

 4   Q   All right.  So he was able to hear her phone ringing

 5       inside but did not hear an answer?

 6   A   Yes.

 7   Q   And this was at approximately 10:30 AM, you said?

 8   A   Yes.

 9   Q   Did you, in fact, get the phone records of Ruth

10       Rainsberger, Detective?

11   A   Yes.

12   Q   And is her call log consistent with a call coming

13       into her landline at approximately 10:30 that day?

14   A   Yes.

15   Q   What's the next bit of information that you learned

16       about Ruth Rainsberger from that day, please?  Is it

17       a 911 call?

18   A   Yes.

19   Q   Okay.  And approximately what time was that call

20       made, please?

21   A   It was 3:38 or 3:39, somewhere --

22   Q   In the afternoon?

23   A   Yes.

24   Q   Thank you.  And who made that 911 call, please?

25   A   William Rainsberger.
```

1   Q   The Defendant?

2   A   Yes.

3   Q   And is he, in fact, one of Ruth Rainsberger's sons?

4   A   Yes.

5   Q   And the other two children are Rebecca Rainsberger

6       and Robert Rainsberger, correct?

7   A   Yes.

8   Q   And what of note does he say in the call, please?

9   A   He tells the 911 operator that his mother's head was

10      bashed in.

11  Q   Specifically, he says that the head has been "bashed

12      in"; is that correct?

13  A   Yes.

14  Q   All right.

15        MS. VINCENT:   Judge, I would move to admit State's

16      Exhibit 1, which I have provided to Mr. Hennessy, the

17      calls -- they are in two parts -- that the Defendant

18      makes that evening that reflect what the detective

19      has said.

20        MR. HENNESSY:   No objection for purposes of the

21      hearing.

22        THE COURT:   State's 1 admitted, no objection.

23  Q   Was this description that the Defendant made in the

24      911 call of note to you, sir?

25  A   Yes.

1        MR. HENNESSY:  I'm sorry, I couldn't understand the

2    question.

3  Q  Was the description that the Defendant gave regarding

4    his mother of note to you with this investigation,

5    Detective?

6  A  Yes.

7  Q  And we'll go into why a bit later, but to go on for a

8    bit here, who was the first police or medical

9    personnel to arrive, Detective?

10  A  I believe it was Officer Price, and Carl Wooldridge

11    was the fire personnel that arrived on the scene.

12  Q  Let's go into what -- Mr. Wooldridge for a moment.

13    What did he observe when he arrived, please?

14  A  He stated that Mr. Rainsberger was standing outside

15    smoking a cigarette when he arrived.

16  Q  Did Mr. Wooldridge have an opportunity to go inside

17    the apartment?

18  A  Yes.

19  Q  All right.  And did -- at the time that Mr.

20    Wooldridge arrived with the Defendant standing

21    outside smoking a cigarette, did the Defendant say

22    anything to Mr. Wooldridge about what happened?

23  A  Yes.  He told the fireman also that her head had been

24    caved in, bashed in.

25  Q  Okay.  What did the firefighter see when he went

```
 1              inside the apartment, please?

 2       A      He stated that the door to the apartment was slightly

 3              ajar.  He stepped inside the apartment.  He saw the

 4              victim, Ruth Rainsberger, lying on the floor between,

 5              like, a chair and a coffee table.  He noticed that

 6              she had a blanket completely covering her head on

 7              both sides.  She was laying down on the floor.

 8       Q      Did he notice anything about whether or not she was

 9              breathing at that time?

10       A      Yes.  He said it was evident as soon as he walked

11              into the apartment that she was breathing.

12       Q      And you mentioned that the blanket was covering her

13              head.  Was there -- was it entirely covering her head

14              or simply one side?

15       A      Completely --

16       Q      Okay.  Was there --

17       A      -- covering her head.

18       Q      I'm sorry, I didn't mean to interrupt.  Was there any

19              blood on that blanket?

20       A      Yes.

21       Q      Okay.  And, in fact, was the blanket soaked with

22              blood and stuck to the victim's head?

23       A      Yes.

24       Q      Was it evident by the amount of blood there and the

25              drying nature, dried nature of some of it that it had
```

1  been there for quite some time?

2 A Yes.

3 Q All right.  And why was all of this of note to you

4  considering, again, this investigation involving --

5  or ultimately this investigation involving the

6  Defendant?

7 A It became important because the knowledge, advising

8  911 callers and the firemen on the scene that the

9  victim's head was bashed in.  Without the blanket

10  being removed from the victim's head to actually see

11  her head, I mean, there was no way to tell that she

12  was bashed over the head or her head was caved in.

13   MR. HENNESSY:  I'm going to object to his opinion.

14  Preliminary question, please.

15   THE COURT:  You may.

16 PRELIMINARY QUESTIONS BY MR. HENNESSY:

17 Q Are there any photographs of Ms. Rainsberger with the

18  blanket on her head?

19 A No.  She was transported --

20 Q Did you see it yourself?

21 A No.

22 Q So you're just -- and Wooldridge did.

23   MR. HENNESSY:  So I object to his opinion as to

24  what you could or could not determine from looking,

25  because he didn't look and he's already testified as

1      to Wooldridge's hearsay.

2      MS. VINCENT:  And, Judge, hearsay is admissible in

3      these hearings.  I would -- I can ask the detective,

4      but I know the answer is that other people told him

5      that this was -- other.  And, obviously, hearsay is

6      admissible at these hearings.

7      THE COURT:  No, and I'm fine with hearsay.  I do

8      think Mr. Hennessy's objection as to how it occurred

9      concerning a towel is objectionable and I'll sustain

10     that.

11  Q  Detective, what did the fire and ambulance personnel

12     think the nature of the injury of Ms. Rainsberger was

13     that day when they arrived?

14  A  That she was shot.

15  Q  Other than -- excuse me.  Once the Defendant was seen

16     outside smoking the cigarette when the firefighter

17     arrived, was he allowed back in the home at all that

18     day that you know of?

19  A  I don't believe -- he was in a police car when I

20     arrived on the scene.

21  Q  Okay.  And, in fact, ambulance personnel transported

22     Ms. Rainsberger out of the home and to the hospital

23     that day; is that correct?

24  A  Yes.

25  Q  All right.  In addition to believing that Ms.

1       Rainsberger's injury was a gunshot, were there, in

2       fact, any actions taken based on that belief,

3       Detective?

4  A   Yes.  I, obviously, had crime lab check the apartment

5       to see if there was any blood spatter or anything

6       that would be indicative of a gunshot wound.  And we

7       even used the Bluestar, Luminol for the walls to see

8       if any had been cleaned up, and the ceiling.

9  Q   And that was while you were on the scene; is that

10      correct, Detective?

11  A   Yes.

12  Q   So everyone was -- all of the personnel present were

13      operating under the assumption from what they had

14      seen that it had been a gunshot wound, correct?

15  A   Yes.

16  Q   Okay.  Other than the blood on the body, blanket, and

17      floor around the body, did you find any other blood

18      in the apartment that day, sir?

19  A   No.

20  Q   Were there any statements made by the Defendant that

21      evening to someone other than you, other than the

22      generalities that we've been discussing here,

23      specifically, to Mr. Price?

24  A   Yes.  I was advised by Officer Price of a statement

25      that he made on his way downtown.

```
1    Q    Okay.  And what was that statement, please?

2    A    He told Officer Price that he wasn't sure if it was a

3         good or bad thing if his mother died.

4    Q    Was there anything of note about the apartment

5         itself, Detective?  Any signs of forced entry?

6    A    There were no signs of forced entry.  The apartment

7         was clean.  I mean, the bedroom, the closet was still

8         closed.  The bed, the blanket on the bed was just

9         pulled back as if she had gotten out of bed that

10        morning.  Some of the drawers were pulled out

11        slightly, but it did not appear as if anybody had

12        rifled through any of the drawers.

13   Q    Was there a lockbox present in the home, Detective?

14   A    There was a lockbox in the spare room, along with a

15        lot of boxes filled with items.

16   Q    Would that have included items such as savings bonds

17        belonging to the victim?

18   A    Yes.

19   Q    Okay.  And was that in plain view from when you

20        walked into the home, the back room?

21   A    Yes.

22   Q    Were you able to locate the victim's checkbook and

23        credit cards that day?

24   A    Yes.

25   Q    And, in fact, you were able to collect the checkbook,
```

1    credit cards, and even cash present inside the

2    apartment, correct?

3  A  I collected the checkbook and the cards.  I had left

4    the cash there.  There was $70 there.  I left it in

5    the plastic container.

6  Q  And was --

7    MR. HENNESSY:  I'm sorry, I couldn't hear that

8    answer.  It was too softly spoken.

9  A  I collected the checkbook, Visa cards, and I did not

10   collect -- $70 in cash was photographed and left

11   there in the plastic container in the living room

12   where Ruth was found.

13 Q  So those items that we've just discussed were, in

14   fact, found in the same room where Ruth Rainsberger's

15   body was, correct?

16 A  Yes.

17 Q  Were there any electronics within the home?

18 A  There was a television just inside the front door

19   also.

20 Q  And that was still there that day, correct?

21 A  Yes.

22 Q  Did you conduct a statement with the Defendant on

23   that same day of November 19, 2013, sir?

24 A  Yes.

25 Q  And what did you learn, if anything, about the

1      mother's finances in relation to the Defendant?

2  A  I learned that William said that he has power of

3      attorney over his mother's finances and pays all her

4      bills and everything for her.

5  Q  And the Defendant actually lives approximately two to

6      three blocks from his mother's home; is that

7      correct?

8  A  Yes.

9  Q  All right.  Did he make any statements about whether

10     or not he had noticed that the mother had been

11     breathing?

12  A  Yes.  He stated that she was kind of snoring loudly,

13     breathing when he first entered the apartment.

14  Q  Did he also admit that he did not make any attempts

15     to take the blanket off to check on her?

16  A  Yes.

17  Q  All right.  Did you also learn of any possible

18     financial motivation regarding inheritance?

19  A  I learned that Ruth Rainsberger had approximately

20     $100,000 worth of savings and bonds, of which the

21     three children were beneficiaries of.

22  Q  Eventually, Ms. Rainsberger passed away and an

23     autopsy was done; is that correct?

24  A  Yes.

25  Q  From the autopsy -- do you know what day that was

```
 1        conducted, please?

 2   A    The next day, 11-20.

 3   Q    So this was after all of the statements that we've

 4        just discussed that the Defendant made, correct?

 5   A    The second statement, I talked to him after the

 6        autopsy, but the autopsy was not discussed.

 7   Q    Okay.  Did you learn what type of object likely

 8        inflicted the deadly injuries on Ms. Rainsberger from

 9        the doctor of the autopsy, the pathologist?

10   A    Yes.  It was Dr. Tashjian, and he stated that it was

11        a hammer-like object, steel, whatever.

12   Q    But again, prior to the conclusion at the autopsy,

13        all the police and first responding personnel thought

14        it had been a gunshot wound, correct?

15   A    Yes.

16   Q    And, in fact, what did the toe tag on Ruth

17        Rainsberger's body read?

18   A    Possible gunshot wound.

19   Q    In fact, "POSS GSW," is that correct?

20   A    Yes.

21   Q    During your statement with the Defendant, did he make

22        any indication as to what he thought his mother had

23        been attacked with?

24   A    When I talked to him the second time on 11-20, he

25        made reference to the fact that she may have been hit
```

```
 1        with a lead pipe.

 2   Q    And that would have been consistent with the

 3        conclusion by the doctor that none of the personnel

 4        present at the scene had been able to conclude; is

 5        that correct?

 6   A    Yes.

 7          MR. HENNESSY:  I'm sorry, hit with a what?

 8          DET. BENNER:  A lead pipe.

 9   Q    In that statement, including to the -- scratch that.

10        Sorry.

11          Okay, I'd like to now talk about the video

12        footage that was collected from the Kroger across the

13        street from Ms. Rainsberger's apartment.  Are you

14        aware of that?

15   A    Yes.

16   Q    All right.  Do we see the Defendant in that footage?

17   A    Yes.

18   Q    And that's on November 19th.  Approximately what time

19        is it?

20   A    About 3:38 --

21   Q    2:28?

22   A    -- (inaudible.)  Yes.

23   Q    So a little bit before the 911 call; is that correct?

24   A    Yes, ten minutes or so.

25   Q    And can you describe for the Judge what you see in
```

```
1        the video of him outside of the Kroger front door?
2    A   Mr. Rainsberger exits his vehicle and walks towards
3        the store.  He looks around.  He walks up to -- he
4        pulls something out -- I don't know if it's from his
5        waistband or his pocket.  It looks like some type of
6        object, metal object.  He walks straight forward to
7        the trash can, places it in the trash can --
8            MR. HENNESSY:  Judge, I would ask the Court to
9        review the video himself because Detective Benner --
10       I've watched it three or four times, and quite
11       frankly, Detective Benner's description in his
12       probable cause is just simply false and misleading,
13       especially when he wants to describe it as looking
14       around for cameras.
15           At the Redbox he's pushing buttons, and then he
16       looks off to his right one time.  There's no --
17       there's no audio.  I think that you need to see it
18       and make your own determination, because Detective
19       Benner is not looking at it objectively.
20           MS. VINCENT:  And, Judge, we will be submitting it
21       after the detective gives his description, yes.
22           THE COURT:  Okay.
23           MS. VINCENT:  Along with photo stills.
24           THE COURT:  Considering that I will review it, I'll
25       allow the State to continue --
```

1    MS. VINCENT:  Thank you, Judge.

2    THE COURT:  -- with this question.

3  Q  And, I'm sorry, he takes an object -- did you say a

4   long, narrow object?

5  A  Yes.

6  Q  Okay.  And he puts it in the trash can, correct?

7  A  Yes.

8  Q  All right.  And in your opinion, Detective, is it

9   consistent with something like the shape of a metal

10   pipe or a hammer handle?

11  A  It could be a pipe or a pry bar of some kind.  It

12   didn't look like a hammer to me, but...

13  Q  What day did you collect the video, Detective?

14  A  The 22nd.

15  Q  Is that November 22nd?

16  A  Yes.

17  Q  All right.  So this is three days after the murder;

18   is that correct?

19  A  Yes.

20  Q  All right.  So by that time would it be fair to say

21   that the Kroger trash can that that object had been

22   thrown into, you weren't able to check the trash can,

23   correct?

24  A  I asked them, and they said they empty them daily.

25  Q  Okay.  And again, looking at that long, thin object,

1       which I'm about to submit to the Court, what was the

2       Defendant's speculation again about how the crime

3       occurred during your interview of him that everyone

4       else thought was a gunshot wound?

5   A   He had mentioned a lead pipe.

6           MS. VINCENT:  All right.  I'd move to admit State's

7       Exhibit 2, which is the camera at the Kroger Redbox,

8       and also corresponding to that, State's 3 through 10

9       of those photo cells, all of which again I have

10      provided to Mr. Hennessy previously.

11          MR. HENNESSY:  No objection for purposes of this

12      hearing.  And is it -- there was two --

13          MS. VINCENT:  This is the one in front of the

14      store.  It's the first one --

15          MR. HENNESSY:  Yeah, there's -- there was two,

16      camera -- 

17          MS. VINCENT:  The one that you showed --

18          MR. HENNESSY:  Cameras 29 and 30.

19          MS. VINCENT:  There are other videos, Judge -- if I

20      may, Mr. Hennessy?

21          MR. HENNESSY:  Right.

22          MS. VINCENT:  There are other videos that includes

23      the inside of the store of him buying his iced tea,

24      the parking lot.  This is the only video of the

25      outside when he's putting an object in the trash can

1      looking at the Redbox, so that's why I'm submitting

2      this.

3          MR. HENNESSY:  Right.  I'm just -- camera 29 and

4      camera 30 both show the same thing, and to me it

5      would be better -- I don't have a copy.  This is --

6      she's offering the 30, and I don't have a duplicate

7      of 29 but would like it to be admitted as well.

8          MS. VINCENT:  I have no objection if he wants to

9      supplement the Court with that after the hearing.

10         THE COURT:  Okay.

11         MS. VINCENT:  So no objection to 2 through 10?

12         MR. HENNESSY:  Not for purposes of this hearing.

13         MS. VINCENT:  Thank you.

14         THE COURT:  Two through 10 are admitted.

15         MS. VINCENT:  Yes, Judge, thank you.

16         THE COURT:  No objection for purposes of this

17     hearing.

18         MR. HENNESSY:  You don't happen to have a spare

19     copy of --

20         MS. VINCENT:  I don't, not on me, no.

21         MR. HENNESSY:  -- 29?  How about Benner?  You got

22     one?

23         DET. BENNER:  I might.

24         MS. VINCENT:  Is it your only copy though?

25         DET. BENNER:  Yeah.

1        MS. VINCENT:  It would be his only copy, Mr.

2   Hennessy, so he -- Mr. Hennessy, that's his only copy

3   so --

4        MR. HENNESSY:  Okay.

5        MS. VINCENT:  -- if you can just make a copy, we'd

6   prefer that.  Thank you.

7        MR. HENNESSY:  Well, I'll have to find someone that

8   knows how to do that.

9        MS. VINCENT:  Thank you.

10       THE COURT:  All right.  So should we expect 29 or

11   no?  Angle 29?

12       MR. HENNESSY:  Yes, please, we'd like to -- we'll

13   submit camera 29 and ask the Court to view camera 29

14   in conjunction with camera 30.

15       THE COURT:  Okay.  Will I get that -- when do you

16   think I'll get that?

17       MR. HENNESSY:  Well, you can have it now if there

18   would be no objection to me withdrawing it to make a

19   copy later next week or something.

20       THE COURT:  Okay.  So if I -- well, you have

21   copies.  If I screw this one up, they still have

22   copies.

23       MS. VINCENT:  Correct.

24       THE COURT:  All right.

25       MR. HENNESSY:  Do you want me to mark that?  We

1    probably should.

2        THE COURT:  Yeah, Defense A.  We'll get it marked

3        here.

4        MR. HENNESSY:  Defense C.  I've got an A and a B.

5        THE COURT:  Oh, Defense C, and it's camera angle

6        29.  All right, State's 2 through 10, they're

7        admitted.

8        MS. VINCENT:  Thank you, Judge.

9    DIRECT EXAMINATION RESUMED,

10   QUESTIONS BY MS. VINCENT:

11   Q   Detective, we talked previously about that you

12       learned that Ruth Rainsberger had nearly $100,000 in

13       accounts and other policies.  Did you also learn that

14       there's a life insurance policy for her?

15   A   Yes.

16   Q   And was that in the amount of approximately $60,000

17       payable to her three children?

18   A   I believe so.

19   Q   Okay.  Detective, have you also had an opportunity to

20       listen to some jail calls relating to this case?

21   A   Yes.

22   Q   Were there any of note made specifically on

23       5-31-2014, all of which have been discovered to the

24       defense attorney?

25   A   Yes.  I listened to probably three calls that day,

1      one of which William's speaking about the finances of

2      his mother, whether or not -- go ahead.

3  Q  Specifically, is he trying to get the life insurance

4      policy distributed to himself and his two siblings?

5  A  Yes.

6  Q  Okay.  I'd like to make -- refer your attention to

7      another call where he's speaking to someone by the

8      name of Brad.  Can you tell the Court what he

9      discusses in that call, please?

10  A  He speaks about some celebratory thing or something

11      that he needs to get to his brother, Robert, that he

12      has in a drawer somewhere.

13  Q  Does he, in fact, refer to it as a house warming

14      gift?

15  A  Yes.

16  Q  And he refers to it as a bottle; is that correct?

17  A  Yes.

18  Q  Does he make any indication as to anyone that his

19      brother, William, should -- or excuse me, his

20      brother, Robert, should share it with?

21  A  His sister.

22  Q  Okay.  And does he indicate to his brother, Robert,

23      where that item is in the home?

24  A  I think it's in his drawer.

25  Q  Okay.  Does he also discuss anything else

```
 1        specifically about this case in that phone call?

 2   A    He kind of speaks in a coded -- I don't know what

 3        he's doing, but he gives, like, a list of 11 or 12

 4        things and says that it's mnemonics for the case

 5        that's going on.

 6   Q    He specifically tells the gentleman he's talking to

 7        it's a mnemonic device for him and about the case; is

 8        that correct?

 9   A    Yes, and to email it to somebody.

10   Q    Okay.  That same day, does the Defendant follow up

11        with a call to his brother, Robert, as well?

12   A    Yes.

13   Q    Does he confirm that Robert has picked up the item in

14        his drawer?

15   A    Yes.

16   Q    All right.  Does he also give any other instructions

17        to his brother?

18   A    He says that there's a file on his computer that he

19        wants to be deleted.

20   Q    In fact, does he say permanently deleted from his

21        file?

22   A    Yes, immediately and permanently deleted.

23   Q    All right.

24           MS. VINCENT:  I'm going to move to admit, again

25        it's already been discovered to defense counsel,
```

```
 1        those three jail calls that we just referenced,

 2        State's 11, into evidence (inaudible).

 3           MR. HENNESSY:  No objection.

 4           MS. VINCENT:  Thank you.

 5           THE COURT:  State's 11 entered, no objection.

 6           MS. VINCENT:  Thank you.

 7    Q   And, Detective, have you, in fact, executed a search

 8        warrant on the Defendant's home since those calls

 9        were made in order to obtain his computer and other

10        papers in their house for the case?

11    A   Yes.

12    Q   And are we still waiting on -- back from cyber crimes

13        for a search of that computer?

14    A   Yes, we are.

15    Q   Okay.  And, Detective, were there, in fact, other

16        jail calls where the Defendant discusses trying to

17        get his life insurance policy money?

18    A   Yes.

19    Q   And again, these were discovered to the defense

20        counsel.  Can you give us a brief description as to

21        the gist of these conversations about the life

22        insurance policy?

23    A   I know he just speaks about how it's going to be

24        distributed, I believe, and --

25    Q   Do they -- I'm sorry.  Do people indicate to him that
```

```
 1        there's any trouble in the distribution of the life
 2        insurance policy?
 3   A    Yes.  They are -- I think they're requesting police
 4        reports and stuff pertaining to this case before they
 5        decide whether or not that money will be distributed.
 6   Q    And what is the Defendant's response to that?
 7   A    He said that he didn't think they really needed those
 8        reports.  They shouldn't distribute it anyway.
 9   Q    Okay.  And, Detective, we are also still waiting back
10        on account information from both the victim and the
11        Defendant's on this case via a third party request;
12        is that correct?
13   A    Yes.
14   Q    I'd like to take a moment and also -- in the probable
15        cause, I'm sure Mr. Hennessy will be discussing this
16        with you, there was a note that you believed that at
17        approximately 2:40 PM there was a call made from Ruth
18        Rainsberger's landline to the Defendant's brother,
19        Robert Rainsberger; is that correct?
20   A    Yes.
21   Q    And, in fact, in discussions with both myself via
22        Detective Bierce, did you learn anything about that
23        phone call?
24   A    I learned that the 2:40 phone call was a different
25        time zone, so it would have kicked it up to savings
```

```
 1        -- daylight savings time, which would have made it
 2        3:40 --
 3   Q    All right.  So --
 4   A    -- instead of 2:40.
 5   Q    At this time your understanding, and you have no
 6        reason to dispute it at this time, that when put in
 7        Indiana's time zone, that that call was likely made
 8        at approximately 3:40 PM; is that correct?
 9   A    Yes.
10   Q    Okay.  Did you attempt to obtain a polygraph from the
11        Defendant in this case?
12   A    Yes.
13          MR. HENNESSY:  Objection.  That's not relevant, not
14        even at this.
15          THE COURT:  Uh...
16          MR. HENNESSY:  It's just not.
17          THE COURT:  Well, it is not, and I cannot consider
18        that, so I don't know what relevance it would have.
19          MS. VINCENT:  I can move on.
20          THE COURT:  I mean, I can view it that way or I can
21        view it I'm not going to give it any weight, but you
22        --
23          MR. VINCENT:  I can move on.
24          THE COURT:  -- might as well skip it, yeah.
25   Q    Detective, this case was not filed immediately after
```

```
 1        the death of Ms. Rainsberger; is that correct?

 2   A    Yes.

 3   Q    In fact, there were a few months that lapsed before

 4        it was filed?

 5   A    Yes.

 6   Q    And a lot of that had to do with other investigations

 7        that were ongoing; is that correct?

 8   A    Yes.

 9   Q    During those several months, other than the

10        conversations, the two conversations that you had

11        with the Defendant that you've discussed with us, did

12        the Defendant make any inquiries as to the

13        investigation with you?

14   A    The only call I received from him was, I believe, on

15        May 22nd, the day that I went and got the warrant.

16        He was asking me if he could get his handgun back.

17        That's the only time I spoke with him.

18   Q    And that's -- you're talking about the initial

19        warrant in this case, not the search warrant

20        subsequent?

21   A    Right, I was talking about the arrest warrant.

22   Q    Okay.

23          MS. VINCENT:  One moment, please, Judge.  No

24        further questions at this time.  Thank you.

25   CROSS-EXAMINATION,
```

1    QUESTIONS BY MR. HENNESSY:

2    Q    The May 22nd (inaudible) he tried to get his handgun

3         back, was that before you went to get the warrant?

4    A    No, it was -- well, I don't know what time he left

5         the message, but I didn't get the message until I got

6         back after the warrant.

7    Q    And can you explain why you never returned the

8         voicemails from Becky Rainsberger through January and

9         February, trying to ask you questions about the case?

10        MS. VINCENT:  Judge, I would object as to relevance

11        for this defendant's culpability.

12        MR. HENNESSY:  Well, they brought it out that, gee,

13        no one's bothered to ask him about the case, does he

14        have any suspects, highly suspicious.  They have

15        Becky Rainsberger's phone records.

16        THE COURT:  I'll allow it.

17        MR. HENNESSY:  She called him repeatedly.  She left

18        messages.  He never called her back.  And he and

19        Tudor both yelled at the three of them.  So it's

20        relevant.

21        THE COURT:  Well, I don't know that I needed that

22        dialogue.  I'll consider them relevant because it is

23        in the window in which there were no files charged,

24        so I think it is an appropriate question.

25   Q    Did you get voicemail --

29

1   A   I spoke to Becky the day after the autopsy, and I

2       think I made it pretty clear at that point that

3       William was a suspect in the case.  She did not --

4       she left two voicemails, I believe, one in February

5       or March and one late -- I don't know when they were,

6       but there were two voicemails asking me basically,

7       just called to check in or whatever.

8           But it was very clear to the family that William

9       was a suspect in the case, so I saw no need to call

10      her and tell her that at that point.

11  Q   So you never returned her calls?

12  A   I did not, no.

13  Q   Tell me the date then you made it accurately clear

14      that William was your suspect, and rather than do an

15      independent investigation, you were simply building a

16      case against him?

17  A   Well, basically I started out, you know, it's kind of

18      a touchy situation when a family member may be

19      involved in a case, so I did not treat him like a

20      suspect --

21  Q   No, sir, you just said --

22  A   -- initially.

23  Q   -- that you made it clear to the family --

24  A   I'm answering your question.

25  Q   No, you're not.  My question is, what day -- you said

```
 1        --
 2   A    I'm getting to that.
 3   Q    Well, just give me the day.  It's my question so --
 4   A    It's the day when --
 5   Q    -- answer my question.  She can ask you more
 6        questions.
 7   A    I'm answering your question.
 8   Q    The day?
 9        MS. VINCENT:  If I can just have a moment, Judge.
10   A    When I decided that he was a true suspect in the case
11        was when he came in the day after the autopsy and he
12        gave me a statement, and I was asking him about his
13        brother.  I told him that in these kind of cases,
14        it's important for me to eliminate family members as
15        suspects before I move on to the outside world.
16        I asked him if he would take a polygraph and he
17        exploded and went crazy.  They ran out and they
18        contacted their lawyers and I never talked to him
19        again.  At that point he became my main suspect.
20        From there --
21   Q    What day?
22   A    -- I started to --
23   Q    What day was that?
24   A    I just told you, the day of -- the day of the
25        autopsy, the day after the case --
```

1   Q   Well, no, you haven't given me a date.  I'd like to

2       know the --

3         MS. VINCENT:   Judge --

4   A   11-20 --

5   Q   I'm sorry?

6   A   -- 2013.

7   Q   What?  And then, in fact, did you ask all three of

8       them to give a polygraph?

9   A   I asked Robert and William and they said no.

10   Q   Did they both decline?

11   A   Yes.

12   Q   And who left the room first, you and Tudor or the

13       family?

14   A   Who left what room first?

15   Q   The last room you were in with the three children?

16   A   I think we pretty much went our separate ways at the

17       same time.

18   Q   Well, I thought you said they just stormed out, they

19       got upset and stormed out?

20   A   They stormed out of the interview room, but we came

21       up by the conference room where Becky was still

22       sitting.  He came in and yelled at Robert, "They want

23       us to take a polygraph.  Let's get out of here."

24         So Robert came back for a second and then he

25       refused his, so we came back to where they were

```
 1        sitting and then they --

 2   Q    How did you get them down there that day?

 3   A    They showed up.

 4   Q    Yeah, but didn't you schedule it?  Didn't you tell

 5        them to come down to discuss the autopsy report?

 6   A    Maybe.  Yes.

 7   Q    So you tell them, "We want you all to come down and

 8        talk about and review the autopsy report," right?

 9   A    If I told them I them wanted to come down for them to

10        give a polygraph, they probably wouldn't have showed

11        up, so I can say what I want to have them come down

12        there.

13   Q    Okay.  So you lied to them to get them down there,

14        and then they're upset when they find out you lied to

15        them.

16        MS. VINCENT:  Judge, objection.  At this point --

17   Q    Is that what happened?

18        MS. VINCENT:  -- he's just making argument. I would

19        ask that he just ask questions of the detective.

20        THE COURT:  That is your theory of the case.  And

21        you can conclude that and that can be your argument,

22        but I don't know that's it's appropriate.  You can

23        ask him the questions --

24        THE COURT:  -- and he'll answer them to the best of

25        his ability.
```

1   Q   You didn't tell them the truth to get them to come

2       down, correct?

3   A   If they would have said, "Yeah, I'll take a polygraph

4       --

5   Q   Did you tell them what --

6   A   -- everything's fine," I would have given him -- I

7       would have given them the autopsy results, but at

8       that point I had to hold it back because they became

9       suspects.

10  Q   Detective Benner, if you could please focus on my

11      questions and answer only my questions.  You've had

12      your opportunity to show your case to the Judge.

13  A   Ask the question.

14  Q   My question was, did you lie to them to get them down

15      there?  That's a "yes" or a "no."

16  A   Not necessarily, no, because I had every intent of

17      telling them about the autopsy results until that

18      happened.  I'm not going to give them the gist of my

19      case.

20  Q   Well, why didn't you do that first then?

21  A   I'm sorry?

22  Q   Why didn't you do that first then?

23      MS. VINCENT:  Judge --

24  A   What do you mean?

25      MS. VINCENT:  -- at this point, I mean, I think

```
 1        we're --
 2   Q    Well, if you scheduled a meeting --
 3           MS. VINCENT:  He's made his point as to how --
 4           THE COURT:  And I think -- I think you're arguing
 5        with the witness and I don't know that that's
 6        productive.  You can ask the question --
 7           MR. HENNESSY:  Well, but I'm only having to argue
 8        with him because he won't answer the questions.
 9           THE COURT:  No, he's answering the questions and
10        let's move forward.  I get the gist of how this
11        meeting took place.
12   Q    Okay.  So they left upset and then you made it clear
13        to the sister that William's your suspect and then
14        they don't bother to call you to find out if you're
15        actually developing any other suspects?
16   A    Correct.
17   Q    Okay.  In terms of other suspects, did you have
18        information from witnesses -- first of all, these
19        apartments at 801 Shortridge are the Jeffersonian,
20        correct?
21   A    Yes.
22   Q    And they have buildings that look alike, correct?
23   A    Yes.
24   Q    And there's multiple entrances and exits to the
25        apartment complex, right?
```

1   A   Yes.

2   Q   And you found it suspicious that he waits outside for

3       the ambulance after he called 911, correct?

4   A   Yes.

5   Q   You can't see Building H until you drive past it.

6       The only markings are on the front of the buildings.

7       You have to actually drive through to find Building H

8       or Building J or Building I, correct?

9   A   Yes.

10  Q   All right.  And now, Building H, you had information

11      when you filed your probable cause affidavit that

12      there had been a mugging and a physical attack of a

13      woman under the carport right outside Building H,

14      correct?

15  A   Yes.

16  Q   And then to the east of Building H is Holy Spirit

17      Church, correct?

18  A   Yeah, I guess.  I don't know.

19  Q   Do you know where the dumpster is for the

20      Jeffersonian?

21  A   Oh, yes, through the fence there.  Yes, I know what

22      you're talking about now.

23  Q   Well, no, do you know where the --

24  A   The church to the east, right?

25  Q   There's a gate to Holy Spirit to the east --

```
 1   A   Yes, I know what you're talking about, yeah.

 2   Q   And do you know where the dumpster is for the

 3       Jeffersonian?

 4   A   I didn't pay any attention to the dumpster, but I'd

 5       imagine there's one out there.

 6   Q   And then there's foliage and brush and ivy along that

 7       fenceline to the east, correct?

 8   A   Yes.

 9   Q   Did anybody ever search for a weapon through there?

10   A   Yes.

11   Q   And who did that and when?

12   A   I did.

13   Q   When?

14   A   Every day.

15   Q   You went and searched --

16   A   Those three days.  Yes, I walked that fenceline many

17       times.

18   Q   Every day?  Did you ever make notes --

19   A   For the first three days or so.

20   Q   Did you ever put it in your notes?

21   A   No.  It didn't produce anything.

22   Q   Well, did you ever -- well, you put a lot of stuff in

23       your notes that didn't produce anything.  Did you put

24       in your notes the witness that told you about all the

25       high traffic in and out of Building H?
```

1   A   I believe so.

2   Q   So you had that information?

3   A   Yes.

4   Q   And she suspected it was drug dealers or --

5   A   I don't know about all that.

6   Q   -- drug buyers?  What?

7   A   I don't know about all that.

8   Q   Well, did you ask her?

9   A   She can't say whether or not it was drug dealers or

10      not.

11  Q   But she could certainly form an opinion based upon

12      it.

13      MS. VINCENT:  Judge, may I ask a preliminary --

14  Q   Police do it all the time.

15      MS. VINCENT:  -- question?

16      THE COURT:  You may.

17  PRELIMINARY QUESTIONS BY MS. VINCENT:

18  Q   Did this woman give any indication that she had

19      observed anything about this crime or any statement

20      that she had observed people coming to or from the

21      area prior to Ruth Rainsberger's murder?

22  A   No.

23      MS. VINCENT:  No further questions.

24  CROSS-EXAMINATION RESUMED,

25  QUESTIONS BY MR. HENNESSY:

```
 1   Q   And then sometime afterwards you found a bloody
 2       sweatshirt behind the dryer in the laundry room,
 3       which is right outside Ruth Rainsberger's apartment?
 4   A   It's down at the total other end of the complex.
 5       That was on February 5th, and I had that tested and
 6       it had nothing to do at all with this case.
 7   Q   That sweatshirt didn't come out of the laundry room
 8       in Building H?
 9   A   No.
10   Q   Are you sure?
11   A   Positive.
12   Q   But it is a sign and evidence of other violent acts
13       within the Jeffersonian Apartments?
14       MS. VINCENT:  Judge, objection.  It's calling for a
15       conclusion.
16       THE COURT:  Well --
17       MS. VINCENT:  It's irrelevant to this cause.
18       THE COURT:  It does.  I think the evidence speaks
19       for itself.  I don't know that -- so it is calling
20       for speculation, so I'll sustain it.
21       MS. VINCENT:  Thank you.
22   Q   Did any witness give you information about a
23       potential suspect or suspects?
24   A   No.
25   Q   And your belief then was that Delbert Pickens was the
```

1    last person to have contact with the Ruth Rainsberger

2    apartment before William made the 911 call?

3  A  Yes.

4  Q  Do you remember talking to the groundskeeper?

5  A  Yes.

6  Q  Did he tell you that Becky Rainsberger's Mini Cooper

7    was there around 11:30 to noon?

8  A  He was mistaken.  That was the day before.

9  Q  Did he tell you that?

10  A  Yeah, he did, and I investigated and decided that it

11    was not true.

12  Q  Based on what?  Becky?  Becky told you it was the day

13    before so you believed her?

14  A  Well, Robert and William both said that she goes

15    there every Monday, and this happened on a Tuesday,

16    so they also confirmed that she was there on Monday.

17    And plus the phone records and everything did not put

18    her in that location.

19  Q  Well, it didn't put her phone there, right?

20  A  Correct.

21  Q  But William's phone does put him there in the area,

22    correct?

23  A  He lives in the area, so that would be --

24  Q  Okay.  So you have an independent witness not tied to

25    the family that puts Becky's car there between 11:30

```
 1        and noon the day Ruth Rainsberger --

 2   A    Well, he said he thought.

 3   Q    -- was attacked --

 4   A    He wasn't sure.

 5   Q    I'm sorry, could I finish my questions and then you

 6        could answer?  Did you have that information?

 7   A    Yes.

 8   Q    Had you investigated or do you know William

 9        Rainsberger's financial situation?

10           MS. VINCENT:  Do you mean Robert?

11           MR. HENNESSY:  Excuse me?

12           MS. VINCENT:  Did you mean William Rainsberger?

13           MR. HENNESSY:  I meant exactly what I said.

14   A    I believe there's orders in to get his financial

15        information.

16   Q    So you haven't reviewed it yet?

17   A    No.

18   Q    So do you have any -- well, you seem to think that

19        this one-third of 150,000 or 120,00 is motive.  Is

20        that where you're going with that?

21   A    Well, I mean, it's a possible motive.  I'm not sure

22        what was --

23   Q    Okay.

24   A    -- going through everybody's head when they do things

25        like this.  He might have just been mad at her.
```

1   Q   Do you even -- do you know Robert's financial

2       situation as it compared to William's?

3   A   I don't know about William's, so I can't compare the

4       two, but Robert said that he had lost his house and

5       moved in with William.

6   Q   Okay.  But he needed money?

7   A   I don't know if he needed money or not.  He just

8       moved in with William.  William was taking care of

9       him.

10  Q   Well, you seem to make a lot of conclusions and

11      suspicions --

12          MS. VINCENT:  Judge, I think --

13  Q   -- but you cannot figure out that if someone lost

14      their house and moved in with someone, you can't

15      envision that they need money?

16          MS. VINCENT:  Judge, that's argumentative.  He's

17      made -- he's asked his question and the detective has

18      answered it.

19          MR. HENNESSY:  Well, I'm pointing out this

20      detective's bias.  He makes all these leaping

21      conclusions --

22          THE COURT:  I understand that.

23          MR. HENNESSY:  -- and it's important that you see

24      it.  I mean, he just -- it --

25          THE COURT:  Well --

1       MR. HENNESSY:  He has had one suspect from November

2       20th --

3       THE COURT:  I understand --

4       MR. HENNESSY:  -- and he's never investigated the

5       case.

6       THE COURT:  -- but you can argue it, Mr. Hennessy.

7       MR. HENNESSY:  What?

8       THE COURT:  You can argue it.

9       MR. HENNESSY:  Okay.

10      THE COURT:  But I don't know that it helps --

11      MR. HENNESSY:  Well, I think it's important that

12      you see it --

13      THE COURT:  -- to argue with him on the question.

14      MR. HENNESSY:  -- from his demeanor and the fact

15      that he -- something that is reasonable and

16      objective, he acts like he can't make that

17      conclusion.

18      THE COURT:  I understand.

19      MR. HENNESSY:  And I think it's important for you

20      to see it.

21  Q  Now, the day that you did -- I'm sorry, did you want

22     to say something?

23  A  I was talking to my prosecutor here.  Go ahead.

24  Q  The day that you prepared the affidavit, did you have

25     the landline records from AT&T from Ruth Rainsberger?

```
 1   A   Yes.

 2   Q   And did you have William -- I mean, Robert

 3       Rainsberger's cellular phone records?

 4   A   Yes.

 5   Q   And if you look at those documents, in about ten

 6       minutes you can see that the 2:40 call was routed

 7       through the 773 area code and that the landline did

 8       not have a 2:40 call, correct?

 9   A   Ben Bierce gave me that information, so you're going

10       to have to ask him that question.  He does the phone

11       records.

12   Q   Well, I'm just -- you had the documents.

13   A   The information I had was that the call was made at

14       2:40 and that's what I put in the probable cause.

15   Q   What information?  Where did you get that

16       information?

17   A   From Bierce.

18   Q   Okay.  I'm asking if you had the documents, because

19       see, I looked at the same documents and it took me

20       ten minutes to figure out that the call got routed

21       through area code 773.  I Google'd 773 and found out

22       it was Chicago.

23   A   Good job.

24   Q   So I want to know what work you did as a detective

25       before you put a false --
```

```
 1          MS. VINCENT:  Judge --

 2     Q    -- fact in the probable cause affidavit?

 3          MS. VINCENT:  Judge, again at this point, I mean,

 4     what we're here for is a let to bail.  He can ask the

 5     questions that he's asking about the -- that go

 6     towards the presumption and evidence in this case,

 7     and I think that -- I mean, a lot of it has become

 8     argumentative, Judge, and I would just ask that --

 9          THE COURT:  Well, I think he is entitled to probe

10     this area, a routing through 773.

11          MS. VINCENT:  Which has already --

12          THE COURT:  Just curious.

13          MS. VINCENT:  Which we have addressed in direct,

14     that it, in fact, was 3:40.  We're not suggesting

15     otherwise, but --

16          THE COURT:  No, I don't --

17          MR. HENNESSY:  No, he swore to it, and he had

18     documents.  If you look at them, it takes you ten

19     minutes to figure out it's not true.

20          THE COURT:  All right.  I'm not exactly sure what's

21     not true other than a routing through a different

22     area code.

23          MR. HENNESSY:  With the time.

24          THE COURT:  Oh, the time.  Okay, just merely the

25     time.  All right.
```

```
 1        MR. HENNESSY:  In the affidavit he puts in 2:40 --

 2        THE COURT:  Right.

 3        MR. HENNESSY:  -- because the 911 call is at 3:38,

 4    3:39.  He thinks that's important because it puts, by

 5    his speculation, William in the apartment at 2:40

 6    calling Robert.  That was a big fact for him in the

 7    probable cause.  It's false.

 8        THE COURT:  Okay.

 9        MR. HENNESSY:  And I would ask you to review the

10    probable cause, now knowing that part of the

11    affidavit was false.

12        THE COURT:  And I think it's appropriate for you to

13    attack.

14     MR. HENNESSY:  And what I'm trying to do is point

15    out for the Court that if you had been objective and

16    simply look at the documents that he now admits that

17    he had before he wrote that false statement, it goes

18    beyond negligent.  I mean, it just was clear.  I saw

19    it within ten minutes and it turned out to be

20    correct.

21        THE COURT:  Okay.

22        MR. HENNESSY:  So it's not true that there was a

23    call from inside the apartment at 2:40.

24  A  Correct.

25  Q  And then you mentioned savings bonds.  Do you have
```

46

1      any savings bonds that came out of a lockbox?

2   A  I don't recall if they were in the -- they're in the

3      property room, whatever was in the box.

4   Q  Okay.  Well, where do you get the idea there were

5      savings bonds?

6   A  That's what the crime lab person said that was in

7      there when she checked the box.

8   Q  Okay.  So that just came from the crime scene

9      specialist that --

10  A  I was there with her, yes.

11  Q  Okay.  Well, did you see them?

12  A  I didn't pay a whole lot of attention to them.  It

13     didn't really make that much difference at the time.

14  Q  Well, you want to go with money for motive.  I just

15     want to know how sure you are that there were savings

16     bonds in that apartment.

17  A  There was at least -- there was paperwork showing

18     that they were beneficiaries to savings bonds and all

19     that stuff.  I do know that.  I don't know if the

20     actual bonds were there.  I don't know.

21  Q  Well, you swore to it but now you don't know?

22  A  There was evidence that they had bonds that they were

23     beneficiaries for.

24  Q  Now, the inside, right inside the door was a pen on

25     the floor.  Do you remember that?

1   A   Yes.

2   Q   Has that been processed --

3   A   Yes.

4   Q   -- for fingerprints or DNA?

5   A   Both.

6   Q   Do you know what the results were on the pen?

7       Because I have not seen that.

8   A   You'd have to ask the DNA people.  I don't have the

9       results on that either.

10  Q   But what are you saying, that you put in a request

11      for the pen?

12  A   Yes, yes.

13  Q   Okay.  And then how about the bag -- tell us about

14      the bag that was a door hanger or something.

15  A   That was left on the door by the maintenance person

16      and William took it inside.

17  Q   And how do you know it was left by the maintenance

18      person?

19  A   By talking to the maintenance person.

20  Q   Which one?

21  A   Sean.

22  Q   Did you also talk to Mr. Loney?

23  A   Mr. Loney?

24  Q   Yeah, the other maintenance man.

25  A   Not that I recall.

```
1   Q   And then in terms of -- well, Ruth Rainsberger went

2       to the hospital and then you got her clothing from

3       the hospital through Detective Breedlove; is that

4       correct?

5   A   Feuquay.

6   Q   Well, does that say from Breedlove?

7   A   Does what say from Breedlove?  Oh, yes.  Feuquay gave

8       it to me and I gave it to Breedlove because I was

9       interviewing, so I gave it to Breedlove to give to

10      crime lab.

11  Q   Okay.  But that was Ruth Rainsberger's jacket?

12  A   Yes.

13  Q   And then have you seen the DNA report from the

14      jacket?

15  A   Yes.

16  Q   So do you know that there was a mixture, a major and

17      minor contributor, and the minor contributor was

18      again a profile of an unknown male?

19  A   Yes.

20  Q   And that would exclude William Rainsberger because

21      they had his buccal swab, correct?

22  A   That -- on the sweatshirt, yes.

23  Q   On Ruth Rainsberger's jacket, not the sweatshirt.

24  A   Yes, jacket, sweatshirt, whatever.

25          MR. HENNESSY:  I'd move to admit A and B.
```

1          MS. VINCENT:  For purposes of this hearing, Judge,

2     no objection.

3          THE COURT:  Defendant's A and B are admitted.

4     Q    Now, do you have any idea what -- Wooldridge's

5          expertise with regard to spatter or identifying

6          gunshot wounds?

7     A    No.

8     Q    Do you suspect it's based on experience from being a

9          fire fellow?

10         MS. VINCENT:  Judge, objection.  He just said he

11    didn't know.

12         THE COURT:  I didn't hear the follow up, to be

13    honest with you.

14         MS. VINCENT:  He said, "Do you suspect that it's

15    based on being a firefighter?"  He just said he

16    doesn't know.

17         THE COURT:  Okay.  He can answer that.  If he

18    knows, he knows; if he doesn't, he doesn't.

19    A    What was the question?

20    Q    Wooldridge, why do you find it important that he

21         thought it was a gunshot wound?  What's his

22         expertise?

23    A    Even the doctor at the hospital thought it was a

24         gunshot wound, so Wooldridge, that's just their first

25         impression at the scene.

1   Q   Right.  And I'm wondering what expertise he has?  Had

2       he been to more scenes like that?

3   A   You'd have to ask him, but I would imagine a fireman

4       has been to many scenes like that.

5   Q   Okay.  Well, I'm asking you why you put it in here

6       and thought it was important.  Because you thought he

7       had more experience than William?

8       MS. VINCENT:  Again, he's answered his limited

9       knowledge as to what Mr. Wooldridge's experience is

10      and that he doesn't have any.  He's already answered

11      it.

12      THE COURT:  Well, I think he's just exploring --

13      MS. VINCENT:  And he's answered why he --

14      THE COURT:  -- the answer and I think he's fine, so

15      he can answer it to the extent he can.

16  A   I think what -- if I have to say, what I think

17      Wooldridge was saying is that there's no -- I mean,

18      anybody could see blood spatter on the wall or on the

19      ceiling.  You don't have to be an expert to know if

20      there was blood sprayed on the walls.  He said that

21      it didn't look like there was any blood anywhere

22      else.  I mean, that's not being --

23  Q   Are you saying there was?

24  A   -- that's not being a blood spatter expert where you

25      actually decide the angles and how it happened and

```
 1        where the person was standing.  He was just saying

 2        that there was -- didn't appear to be any more blood

 3        except for what was right there underneath the body,

 4        and that's what everybody saw.

 5    Q   Right.  And the way this reads if it would have been

 6        a gun -- that they thought it was a gunshot but it

 7        was not normal that there wasn't any blood spatter.

 8             That tells me that Wooldridge would have

 9        expected blood spatter if it had been a gunshot.

10    A   That's probably -- yes.

11    Q   But there wasn't blood spatter?

12    A   Right.  And they thought it was strange --

13    Q   So that contradicts --

14    A   -- but that did not say that they didn't think it was

15        a gunshot.  They said it was weird that there wasn't.

16    Q   So it contradicts his belief of a gunshot, correct?

17    A   No.  You'd have to ask him that question.  I don't

18        know.

19    Q   Do you have any pictures of Ruth Rainsberger as she

20        appeared on the floor with a blanket around her head?

21          MS. VINCENT:  Judge, that's been asked and

22        answered.

23          THE COURT:  I think he asked that at his

24        preliminary questions.  He can ask.  That's fine.

25    A   The medical personnel treated her, so they took it
```

```
 1        off and transported her.  There were no pictures

 2        taken.  There was nobody there yet but them.

 3    Q   And then you fault William for not moving the blanket

 4        but the blanket was crusted, and at one point in your

 5        affidavit you describe the blanket as being somewhat

 6        crusted and stuck to the wound?

 7    A   Yes.

 8    Q   So if someone pulls that off, would it be reasonable

 9        to think that the bleeding might begin again?

10        MS. VINCENT:  Judge, objection.  That goes towards

11        speculation about what someone may or may not have

12        been thinking.

13        MR. HENNESSY:  He's willing to speculate one way.

14        I'm just trying to get him to be objective and

15        reasonable.  Look, if you have a wound --

16        THE COURT:  He can answer the question.

17        MR. HENNESSY:  -- and a bandage on it and you rip

18        it off, it's going to start bleeding again.

19        THE COURT:  I don't know.  Maybe it will, maybe it

20        won't.

21        MR. HENNESSY:  Your Scouting experience would tell

22        you all that.

23        THE COURT:  Well, it may.  It depends on how long

24        it's been there and --

25        MR. HENNESSY:  That's right.  It's reasonable to
```

```
 1        think --
 2            MS. VINCENT:  Judge, I would just ask --
 3            THE COURT:  It is reasonable but it's not
 4        unreasonable to think it won't, but you may answer
 5        the question.
 6   A    I think it's unreasonable that he wouldn't check on
 7        his mother's condition when she's laying there
 8        breathing and bloody with a blanket over her head.
 9        Any normal person would have pulled the blanket off
10        of her head to check and ask her what's going on.
11        They wouldn't have went outside and waited for
12        somebody.
13   Q    That's your belief of what a normal person would do.
14   A    You asked me what my belief was, and that's my
15        belief.
16   Q    What's your definition of a "normal person"?
17            MS. VINCENT:  Judge, objection.  He's answering the
18        questions.
19            MR. HENNESSY:  No, he introduced it.
20   Q    What's a "normal person" to you?
21            MS. VINCENT:  Judge, at this point we're getting
22        argumentative.  He's answered the question.
23            THE COURT:  You can answer the question.
24   A    In this case a normal person would have checked on
25        his mother.  She's laying there half dead and he
```

```
 1        didn't even do anything to attempt to help her.

 2   Q    Well, that's not true.  He told you exactly what he

 3        did.

 4   A    He called 911 and went outside.

 5   Q    And he looked.  I wonder what you think a normal

 6        person is, because in the same -- do you think I'm a

 7        normal person?

 8        MS. VINCENT:  Judge, objection.  I'm going to move

 9        to strike that from the record.  Can you please stick

10        to this case?

11        MR. HENNESSY:  I'm trying to.  He introduced

12        "normal person."  And I'm telling you, I got an

13        88-year-old father that I care for.  I know exactly

14        what I would do if go in and I see the exact same

15        thing.  I'm not going to move the blanket, because

16        you pull it off -- if it sealed the wound and you

17        pull it off, that wound is going to start bleeding

18        again.

19        MS. VINCENT:  Judge, I appreciate Mr. Hennessy's

20        continuous arguments throughout these questions, but

21        if we can just stick to questions --

22        MR. HENNESSY:  Well, if you appreciate them, don't

23        object to them.

24        MS. VINCENT:  Judge, Judge --

25        THE COURT:  No.  The question was asked --
```

1        MS. VINCENT:  In all seriousness.  Thank you.

2        THE COURT:  -- what do you consider a normal

3    person? and Detective Benner can answer that

4    question.

5        MS. VINCENT:  Thank you.

6    A   I already did answer it.

7        MR. HENNESSY:  Well, I want to know what he thinks

8    a normal person is.

9        THE COURT:  If you have an opinion?

10   A   And I said a normal person to me in that situation

11   would have checked on his mother and try to find if

12   she was --

13       MR. HENNESSY:  He keeps telling me what he thinks a

14   normal person would do.  I want to know what he

15   thinks a normal person is, because I go over it with

16   five people that I consider extremely normal, and

17   they all -- their perception is exactly like mine.

18       MS. VINCENT:  Judge, Mr. Hennessy --

19       MR. HENNESSY:  I'm not trained to treat the woman.

20   If it's crusted and sealed to the wound, don't pull

21   it off.  And that's normal people, so I want to know,

22   you know...

23       THE COURT:  Well, I understand that what Detective

24   Benner represents is what he feels a normal person

25   would have done.  I understand that that doesn't

1    necessarily qualify in every instance.

2    MR. HENNESSY:  Well, that's why I'm trying to find

3    out what his definition of a "normal person" is.

4    MS. VINCENT:  Judge, he's made his point five-fold.

5    If we can please move forward.  He's answered the

6    question.  The detective has answered Mr. Hennessy's

7    question about what he believes a normal person is.

8    He's answered it three times.

9    Just because Mr. Hennessy is not getting the

10    answer that he's desiring -- it has no relevance to

11    what we're here for, which is the let to bail.  He's

12    made his point about that five times.

13    THE COURT:  I think he has made his point.  I don't

14    think the question has been answered, but I don't

15    know that it plays much relevance as far as how I

16    view the case, so let's do move on, Mr. Hennessy.

17    MS. VINCENT:  Thank you.

18  Q  Did crime lab look for blood on the walls and the

19    ceiling?

20  A  Yes.

21  Q  Did they find some?

22  A  No.

23  Q  You've not seen a report about a positive reaction on

24    the ceiling?

25  A  No.  I mean, they took a test of the ceiling, but

```
 1      there was no positive reaction.  It was not blood.
 2   Q  Do you know what medication Ruth Rainsberger was on?
 3   A  No.
 4   Q  Did you find any medication in the apartment?
 5   A  I don't -- there may have been some pill bottles in
 6      the kitchen.  I didn't pay any attention to them.
 7   Q  Or they could have been stolen by the person that
 8      attacked her, since you don't have any?  Can you tell
 9      us if you found any?
10   A  Can I tell what?
11   Q  Can you tell us if you found any of her medicine in
12      her apartment?
13   A  There were pill bottles in the kitchen.
14   Q  Do you have pictures of that?
15   A  We'd have to check.  I'm not sure.
16   Q  What did you do with the pill bottles that were in
17      the kitchen?
18   A  Nothing.
19   Q  So you're just going off raw memory?
20   A  Yes.
21   Q  How about her purse?
22   A  There was a change purse described by William that
23      was in a drawer in the bedroom, and I don't know --
24      there was no purse.
25   Q  So the purse was missing?
```

```
 1   A   I never -- I don't know if she had a purse.

 2   Q   Well, did you ever ask the three family members, or

 3       since you made William a suspect --

 4   A   William said she may have had a purse.

 5   Q   Okay.

 6   A   But her checkbook and her Visa cards and her cash

 7       were there, so I don't know what she would be keeping

 8       in a purse.

 9   Q   Where was the checkbook?

10   A   Right in the plastic container, right ten feet from

11       her body.

12   Q   Right.  Purse is gone.  Pills are gone.

13   A   There's no purse and pills gone that I know of.

14   Q   Did you investigate?  Did you try to find out?

15   A   I had no reason to believe there were any pills

16       taken.  William told me that one medication she was

17       taking for dementia.  I don't think people are going

18       to steal dementia pills.

19   Q   So you just assumed it wouldn't be stolen?

20   A   I had no evidence to suggest that there were any

21       pills stolen.  There was nothing --

22   Q   Did ask --

23   A   The house was not ransacked.  There was nothing taken

24       that I know of from that apartment.

25   Q   Did you ever ask Becky Rainsberger what was
```

1     missing?

2  A  I don't know how she would know.

3  Q  Well, you just said that you had information she was

4     there every Monday.

5  A  So she wasn't there Tuesday.

6  Q  Right.  And so sometime --

7  A  How would she know if anything was taken if she

8     wasn't in the place when it happened?

9  Q  Well, you can ask.  That's how you might find those

10     things out, if you were to ask and do an

11     investigation rather --

12  A  I took a statement from her.  I don't know if --

13  Q  -- than just focus on --

14  A  -- I asked her --

15  Q  I'm not finished.

16  A  -- if anything was taken or not.

17  Q  Rather than just focus on William Rainsberger, if you

18     do an objective investigation.  So did you ask Becky

19     Rainsberger what, if anything, was missing from Ruth

20     Rainsberger's apartment?

21  A  I don't recall if I did or not --

22  Q  Did you ask --

23  A  -- but she wouldn't have --

24  Q  -- Robert Rainsberger what, if anything, was missing

25     from Ruth Rainsberger's apartment?

```
 1   A   They did not have access to the apartment --

 2   Q   Did you ask --

 3   A   -- so they wouldn't know.

 4   Q   -- Robert Rainsberger --

 5   A   I don't know if --

 6   Q   -- what, if anything --

 7   A   I don't think I did because --

 8   Q   -- was missing from the apartment?

 9   A   -- he wasn't -- he wasn't there.

10   Q   You don't know if he was there after?

11   A   After my investigation was complete.

12   Q   Did you ask him?

13   A   I don't recall if I asked him if anything was --

14   Q   You think Robert might know what --

15   A   -- missing or not.

16       MS. VINCENT:  Judge, I believe -- if he --

17   Q   -- belongings his mother had?

18       MS. VINCENT:  If Mr. Hennessy can just wait for Mr.

19       Benner to also answer his statements --

20       THE COURT:  Yeah, and --

21       MS. VINCENT:  -- so people aren't talking over.

22       THE COURT:  -- Detective Benner has answered he

23       does not recall asking that question.

24   Q   Do you think the three children might know what

25       belongings she had, just from being there
```

1     periodically?

2  A  There was nothing moved.  There was nothing taken.

3     The only reference to --

4  Q  You don't know it --

5  A  -- anything being taken -- they would have told me.

6  Q  What?  What did you just say?

7  A  Why wouldn't they tell me?

8  Q  Because you didn't ask.

9  A  Oh, I'm sure.  Your mom gets killed and you're not

10    going to offer anything?

11 Q  Because on November 20th you told them we're going

12    after William Rainsberger; isn't that right?  You

13    just swore here today on November 20, 2013, the day

14    after Ruth Rainsberger was discovered and the day she

15    died, you made it clear to the family that William

16    Rainsberger was your suspect, right?

17    MS. VINCENT:  I believe he stated the day after,

18    after they stormed out of the office.

19    MR. HENNESSY:  I asked him the date, and I finally

20    got November 20th out of him.

21    MS. VINCENT:  Which is the day after.

22 A  That's the day after then.

23 Q  She died 11 hours after she went to the hospital.

24    It's the day she died.  She was discovered on the

25    19th.  Am I right about that?  Can you add 11 hours

1     to three o'clock?

2     MS. VINCENT:  Judge --

3     MR. HENNESSY:  Well, it's just what he -- it's what

4     he's done throughout this case, Judge.

5     THE COURT:  No, I understand --

6     MR. HENNESSY:  And you need to see it.

7     THE COURT:  -- your theory of the case, but we both

8     need to have clear cut questions but clear cut

9     answers as well.  Respond to the questions and let's

10    keep moving forward here.

11  Q  Did William Rainsberger have sole access to all of

12    Ruth Rainsberger's finances?

13  A  As far as I know, yes.

14  Q  Have you obtained copies of text messages from the

15    cellular phones of William, Robert, and Becky

16    Rainsberger?

17  A  I think I -- we received some from Becky's, but a lot

18    of phones you can't get text messages.

19  Q  You put in your probable cause affidavit that you

20    found it suspicious that Robert and William weren't

21    asking about their mother's status while at the

22    hospital.  Did you put that in there?

23  A  Yes.

24  Q  Why?

25  A  Because it thought it was suspicious that they

1        weren't asking about her condition.   Is that what it

2        says?

3    Q   Have you seen the communications between them and

4        their sister who was at the hospital?

5    A   Rebecca?

6    Q   Yeah.  Do you know if they were learning the status

7        of their mother without having to ask you?

8    A   Not while I was speaking with them, they weren't.

9        Maybe after.

10   Q   Or before -- and before and after?  But they just

11       didn't ask you, right?

12   A   I am the detective, yes.  They didn't ask me.

13   Q   The Redbox that William approached after throwing

14       some trash away, have you looked at that Redbox?

15   A   Yes.

16   Q   Do you know if it's a touch screen or has buttons?

17   A   I don't know.

18   Q   In the video you see that he's punching the Redbox

19       with his finger --

20   A   Yeah, aimlessly.

21   Q   -- several times?

22   A   Aimlessly, yes, in my opinion.

23   Q   Well, yeah, that's what I -- I knew you would say

24       that because you're such a suspicious fellow, which

25       is why I want to know, did you go to that Redbox and

1     see how it works?

2  A   I know how Redbox's work, yes.

3  Q   Well, how do they work?

4     MS. VINCENT:  Can you be more specific with your

5     question, please, Mr. Hennessy?

6  A   I've never used one myself.  But, I mean, you look

7     for what movie you want, you order it, and you get

8     it.  Correct?

9  Q   And on that Redbox, did you go and see what you punch

10    and how it works so you could somehow understand more

11    objectively the video when Robert -- I mean, William

12    is standing at the Redbox?

13  A   I looked at it, but I don't -- I don't understand the

14    question.

15  Q   See, I've never used a Redbox either myself and so I

16    went and did that and it made a lot of sense to me

17    then, the video did.  I just wonder if you bothered

18    to do the same thing.

19  A   Yes, I looked at it.

20  Q   Is that a "no"?

21     MS. VINCENT:  He just said yes, he looked at it,

22    Judge.

23  Q   Now you're saying you did look at the Redbox?

24  A   I told you earlier I looked at the Redbox.  I just

25    didn't touch buttons and do all that stuff.

1   Q   In your probable cause affidavit you swore that

2       records didn't show William Rainsberger outside the

3       area of Shortridge and 10th Street during the

4       relevant time period?

5       MS. VINCENT:  I'm sorry, did not show?

6       MR. HENNESSY:  Yeah.

7       MS. VINCENT:  Thank you.

8   Q   William Rainsberger's records did not show him

9       outside of the area of 10th and Shortridge --

10  A   Correct.

11  Q   -- during the relevant time period.  I'm wondering,

12      in your mind, what was the relevant time period?

13  A   The morning of the 19th and up until she was found.

14  Q   So from when to when?

15      MS. VINCENT:  Do you remember an approximate time,

16      Detective?

17      MR. HENNESSY:  I'm sorry --

18      MS. VINCENT:  I asked if he remembers an

19      approximate time.

20  A   Well, I know that William used his Kroger plus card

21      about 9:20 AM across the street at the Kroger, so we

22      can say between 9:00 and 3:30 then, if you want.

23  Q   Kroger plus card at 9:20 AM on the 19th?

24  A   Yes.

25  Q   And then we know that he called 911 at 3:38,

1          correct?

2     A    Yes.

3     Q    And he lived in that same area?

4     A    Yes.

5     Q    What records do you rely on for that statement?

6          MS. VINCENT:  For which statement?

7          MR. HENNESSY:  That -- the one I read to him,

8          quoted from the probable cause:  "Those records do

9          not show William Rainsberger outside of the area of

10         Shortridge and 10th Street during the relevant time

11         period."  I'm wondering what records you're

12         referencing.

13    A    I just told you I referenced the Kroger plus card at

14         9:20.

15    Q    No, no, cell phone records and cell tower locations,

16         because I don't have any cell tower location

17         information.

18         MS. VINCENT:  They were discovered to you, sir.

19         MR. HENNESSY:  Well --

20         MS. VINCENT:  Just for the record, they were

21         discovered to you.

22         MR. HENNESSY:  I don't have cell tower locations.

23         MS. VINCENT:  They were discovered.

24         MR. HENNESSY:  Can I just ask the --

25         MS. VINCENT:  Yes.

1        MR. HENNESSY:   -- witness questions or -- I mean, I

2        know you want to --

3        MS. VINCENT:   Mr. Hennessy, I was simply saying

4        that -- you said that you don't have them and I was

5        clarifying that, in fact, that was discovered to you.

6            That was all I was doing, Judge.

7        THE COURT:   All right.   But he's quizzing the

8        detective.

9        MS. VINCENT:   Sure.

10    Q    So what cell phone records, including cell tower, how

11       did you do this?   Did you have someone do it for you?

12    A    Benjamin Bierce does that, a detective.   He handles

13       the cell phone information.

14    Q    So he reviewed William Rainsberger's cellular

15       telephone records and told you that the phone was not

16       outside the area of 10th and Shortridge between --

17    A    It did not show that it was.

18    Q    That came from Bierce?

19    A    Yes.

20        MR. HENNESSY:   That's all I have.

21        THE COURT:   Okay.   State?

22    REDIRECT EXAMINATION,

23    QUESTIONS BY MS. VINCENT:

24    Q    Detective, just very briefly, we did discuss, through

25       Mr. Hennessy and you, some other investigations of

68

1   other possible suspects.  Did you eliminate any other

2   possible suspects in your investigation?  Can you

3   tell us a little bit about that, please?

4  A  I ran police reports, starting probably on the 21st

5   of November and on through for the next couple months

6   in between cases, and I found there was a rape at 801

7   North Shortridge.

8   I investigated that person and found that in

9   March of 2013, he was sentenced for 100 years for

10  that rape, so he was in jail when this occurred.

11  There were some other batteries and stuff in the

12  area, and I could not place any of those individuals

13  in the area.

14  I do have probably five or six reports from 801

15  North Shortridge, so I did run that area to see if

16  any other -- you know, I was working on as possible

17  suspects just to see if my direction would go

18  elsewhere.

19  Q  And you are in the process of getting me copies of

20  that so that I can discover that to Mr. Hennessy,

21  correct?

22  A  Yes.

23  Q  Additionally, we spoke briefly, I just wanted to make

24  clear that the woman who said that she may or may not

25  have seen -- that made this speculation that Mr.

1      Hennessy spoke about, she did not give any indication

2      about seeing anything related to the crime.  It was

3      simply a speculation that she made on her own based

4      on nothing to your knowledge, correct?

5   A  Yes.

6   Q  You mentioned that you made some efforts to verify

7      that led you to reach your conclusion that Rebecca

8      Rainsberger's vehicle was, in fact, present the day

9      before, on Monday.  You were cut off a little bit.

10     Can you please describe to the Court what efforts you

11     made?

12  A  I spoke to Sean again to see if it was possible it

13     could have been the day before, and based upon -- I

14     believe the phone records even showed that she always

15     called on Monday, so it seemed to me like she always

16     appeared on Monday, which was the day before, which

17     was a likely possible mistake that the maintenance

18     man could have made.

19         I mean, it's a Mini Cooper vehicle.  He said he

20     thought he saw it that day, but the fact that it was

21     probably there the day before wasn't that big of a

22     jump.

23  Q  You also talked about a sweatshirt that was found.

24     What day was that incident?

25  A  That was found on, I believe, like, February 5th.

1    There was somebody doing laundry on the other end of

2    the complex.  She dropped something behind the

3    dryer/washer.  She went back there and picked up the

4    hose and there was a bloody sweatshirt underneath, or

5    what appeared to be blood.

6    Q   And you did test and that sweatshirt was in no way

7        connected with Ruth Rainsberger, correct?

8    A   Correct.

9    Q   Okay.  No further questions at this time, but he may

10       have some more for you.

11   CROSS-EXAMINATION,

12   QUESTIONS BY MR. HENNESSY:

13   Q   The police report regarding the mugging and the

14       carport right outside Building H, did they ever make

15       an arrest?

16   A   I don't believe so, no.

17   Q   So that would be an unknown suspect out there that

18       had attacked someone in the exact same area where

19       Ruth Rainsberger was attacked?

20   A   Yes.

21   Q   And you said you had five or six batteries at the

22       Jeffersonian?

23   A   Well, five or six reports.  Not all necessarily

24       batteries.  One of them was a rape and maybe a

25       robbery -- it was a purse grab.  The one you're

1        talking about, I believe, was a purse grab.

2    Q   Did all of those reports result in arrests?

3    A   On some -- a couple of them.  One of them was

4        exceptionally cleared, which means that there was not

5        an actual arrest made but a suspect was identified.

6    Q   Who was that suspect and how were you able to clear

7        him on this one?

8    A   He lives on the south side of Indianapolis.  His name

9        was Thomas -- I can supply the reports to you.  I

10       can't recall his last name right now, but he was not

11       connected really to that area.  He was placed on

12       Community Corrections, I believe, in March of 2013

13       until February '14, so he was under the watchful eye

14       of somebody.

15   Q   On some of those reports, were arrests not made?

16   A   I already answered that question.  Yes.

17   Q   Well, you answered about the mugging.  When I asked

18       you about the other five or six, you went straight

19       around one was somehow cleared with a suspect without

20       an arrest and you didn't ever really answer about the

21       others.

22   A   I did say yes, there were some that were not arrests.

23       I did say that.

24   Q   What did you say?

25   A   There are cases out there that did not result in

1      arrests.  I did make that --

2   Q  So those are suspects of violent acts at the

3      Jeffersonian that you could not rule out because you

4      don't know who they are?

5   A  Well, I mean, I've ruled them out of this case,

6      yes.

7   Q  Well, because you liked William the day after, right?

8      You --

9   A  Is that a question?

10  Q  -- couldn't exclude them because you didn't know who

11     they were, right?  You can't exclude an unknown

12     suspect, can you?

13  A  Do you -- parts of those crimes did not match up to

14     this one.  Some of those had forced entry.

15  Q  I understand.  You just brought it up, you know,

16     because you want to say, hey, you've ruled all these

17     people out, and I'm trying --

18  A  Well, I didn't.  I ruled them --

19  Q  -- again show the whole truth, because you guys just

20     don't want to share, and so I have to do this.  So I

21     want it to be clear that you had some reports, had

22     suspects in a violent crime that was not arrested so

23     you could not rule that person out.  Is that true or

24     not?

25  A  The ones that arrests were not made, I don't know if

1     those are violent acts or not.  You'll have to look

2     at the reports yourself.  But the two that I know

3     that were violent I've already discussed with you.

4     One was in prison and the other one's on Community

5     Corrections.  Those are the two violent ones that I

6     know of.

7  Q  How about the mugging where they punched the woman in

8     the head --

9  A  We already covered that too --

10  Q  -- and took her property?

11  A  -- and I told you --

12  Q  That's no -- there's no arrests?

13  A  I already said that.  I already answered that

14     question.

15     MS. VINCENT:  I believe that has --

16  Q  That's just now when you wanted to make it look more

17     favorable to yourself.

18     MR. HENNESSY:  Judge, I have no further questions,

19     but I'd like an order from this court that those

20     reports be given to me unredacted... (hearing

21     continues and concludes.)

22

23     END OF TESTIMONY OF DET. CHARLES BENNER

24

25

1   STATE OF INDIANA          )

2                             )   SS:

3   COUNTY OF MARION          )

4

5

6           I, Carla Villalta, a duly appointed and sworn

7   Official Reporter for the Marion Superior Court,

8   Criminal Division One, State of Indiana, do hereby

9   certify that the foregoing is a true, full and

10  complete transcript of the Testimony of Det. Charles

11  Benner, held on July 17, 2014, in Cause Number

12  49G01-1405-MR-026747, wherein the State of Indiana

13  was the Plaintiff and William Rainsberger was the

14  Defendant.

15          IN WITNESS WHEREOF, I hereunto set my hand and

16  seal this ____ day of August, 2014.

17

18

19                          _____
                            Carla Villalta
20                          Official Reporter
                            Marion Superior Court
21                          Criminal Division One

22

23

24

25