```
 1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF INDIANA
 2                 INDIANAPOLIS DIVISION
 3         Civil Action No. 1:16-CV-103-WTL-MJD
 4
   WILLIAM RAINSBERGER,           )
 5                                )
                      Plaintiff,  )
 6                                )
           -vs-                   )
 7                                )
   CHARLES BENNER,                )
 8                                )
                      Defendant.  )
 9
10
                 DEPOSITION OF CHARLES BENNER
11
12
           The deposition upon oral examination of
13  CHARLES BENNER, a witness produced and sworn before
    me, Kelly S. Horsley, RPR, CSR 98-R-3004, a Notary
14  Public in and for the County of Hendricks, State of
    Indiana, taken on behalf of the Plaintiff at the
15  offices of Connor Reporting, 111 Monument Circle,
    Suite 4350, Indianapolis, Marion County, Indiana,
16  on the 27th day of September, 2016, commencing at
    the hour of 9:31 A.M., pursuant to the Federal
17  Rules of Civil Procedure with written notice as to
    the time and place thereof having been given.
18
19
20
21
22
23
24
25
 2
 1                     APPEARANCES
 2  FOR THE PLAINTIFF:
 3         Mr. Richard A. Waples
           WAPLES & HANGER
 4         410 N. Audobon Road
           Indianapolis, IN  46219
```

```
 5              317.357.0903
                rwaples@wapleshanger.com
 6
 7   FOR THE DEFENDANT:
 8              Ms. Kathryn Box
                Ms. Lynne D. Hammer
 9              OFFICE OF CORPORATION COUNSEL
                200 East Washington Street
10              Room 1601
                Indianapolis, IN  46204
11              317.327.4055
                kathryn.box@indy.gov
12              lynne.hammer@indy.gov
13
14   ALSO PRESENT:
15              Mr. William Rainsberger
16
17
                   INDEX OF EXAMINATION
18                                            PAGE
19   DIRECT EXAMINATION ............................4
     Questions by Mr. Richard A. Waples
20   CROSS-EXAMINATION ...........................127
     Questions by Ms. Kathryn Box
21   CROSS-EXAMINATION ...........................143
     Questions by Mr. Richard A. Waples
22
23
24
25
 3
 1                  INDEX OF EXHIBITS
                                              PAGE
 2   Plaintiff Exhibit:
 3   Exhibit 1 -  Affidavit for Probable Cause ......20
                  dated 12/6/13, Bates Nos. 549
 4                through 551
     Exhibit 2 -  Affidavit for Probable Cause ......20
 5                dated 5/22/14, Bates Nos. 241
                  through 244
 6   Exhibit 3 -  Landline usage spreadsheet ........41
                  dated 11/29/13, Bates No. 385
 7   Exhibit 4 -  Microsoft Excel spreadsheet .......42
     Exhibit 5 -  Charging information in State .....48
 8                of Indiana -v- William
```

```
                              Rainsberger, Bates Nos. 239 and
 9                            240
     Exhibit 6 -  Request for Analysis dated .......107
10                11/26/13, Bates Nos. 586 through
                  590
11   Exhibit 7 -  Request for Analysis ............110
     Exhibit 8 -  IMPD Property Room Voucher .......110
12                dated 12/4/13, Bates No. 585
     Exhibit 9 -  Laboratory Examination Report ....113
13                dated 4/23/14,Bates Nos. 593
                  through 595
14   Exhibit 10 - Laboratory Examination ..........115
                  Report dated 2/10/14, Bates
15                Nos. 556 through 555
     Exhibit 11 - Defendant's Preliminary .........116
16                Witness List
     Exhibit 12 - Physical Evidence List Lab .......120
17                Case No. LAB13-07692, Bates
                  Nos. 787 through 789
18
19
20
21
22
23
24
25
```

```
 4
 1                  CHARLES BENNER,
 2   having been first duly sworn to tell the truth, the
 3                  whole truth and nothing but the truth
 4                  relating to said matter, was examined
 5                  and testified as follows:
 6
 7   DIRECT EXAMINATION,
 8       QUESTIONS BY MR. RICHARD A. WAPLES:
 9   Q   Would you please state your name?
10   A   Charles Benner, B-e-n-n-e-r.
11   Q   And what do you do, Mr. Benner?
12   A   Detective for the Indianapolis Metropolitan
13       Police Department.
14   Q   How long have you been so employed?
15   A   I've been in the department for 27 years.
16   Q   Okay.  Give me a little background about
17       yourself, education, where you grew up and
```

```
18        different jobs you have had.
19   A    I grew up in Ohio, born in Cleveland, went to
20        Wooster High School.  I was a military policeman
21        in the Army for three years.  I have a
22        bachelor's degree in criminal justice from Kent
23        State University.
24   Q    What year was that?
25   A    I graduated in '89.  And that's when I started
5
 1        on the department here also.
 2   Q    With the --
 3   A    I graduated in August of '89 from Kent State and
 4        started here in October.
 5   Q    Did you start with the City or the sheriff's
 6        department?
 7   A    The City.
 8   Q    So you worked for IPD --
 9   A    IPD.
10   Q    -- and now IMPD your whole career?
11   A    Yes.
12   Q    And what different positions have you held with
13        the I -- with the City's police department?
14   A    The only two positions I've had was working
15        south district on the street and homicide.
16   Q    And -- and homicide as an investigator?
17   A    Yes.
18   Q    What -- and you've gone back and forth, haven't
19        you, a few times?
20   A    Yes.
21   Q    Why is that?
22   A    Just -- I was there, like, four and a half years
23        the first time.  My son was young, I wanted to
24        spend more time at home so that's why I left the
25        first time.  The second time I was there -- I
6
 1        don't know -- two and a half years maybe, same
 2        reason, I mean, coaching, wanting to be home
 3        more, stress of the job, no sleep.
 4   Q    A little longer hours?
 5   A    It wears on you.
 6   Q    Less regular hours when you're a detective with
 7        the homicide?
 8   A    Correct.  It can go on for days without, you
 9        know, I mean you can't make any plans, you know,
10        that sort of thing.  My son's a teenager, a
```

```
11          junior in high school now, so he's more
12          understanding of me not being there when I can't
13          be.  And I've over the years got used to the
14          job, learned to handle it better, you know,
15          learn to occupy your time better, ration your
16          time better.
17     Q    It's always a struggle to juggle, isn't it?
18     A    Yes.
19     Q    What have you done to prepare for the
20          deposition?
21     A    Basically just went over my file again, read my
22          notebook, read the probable cause, met with my
23          attorneys, Kathryn and Lynne.
24     Q    And when you say your file, the documents that
25          comprise the homicide file in the case?
 7
 1     A    Yes, just basically who I spoke to and items of
 2          evidence collected, looking at the crime scene
 3          photos, that sort of thing.
 4     Q    Did you learn anything from going back over
 5          those, that file, that you hadn't seen before or
 6          hadn't thought about back at the time that you
 7          were working the case?
 8     A    No, not really.
 9     Q    Okay.  Is it an active case?
10     A    It's not closed, so it's still open.
11     Q    Is it assigned to you still or --
12     A    Yes.
13     Q    When was the last time you had done anything to
14          investigate the case?
15     A    It's been probably since he was released and the
16          case was dismissed.  I haven't really -- I've
17          had probably 15 cases since then so I don't have
18          time to go back to it right now.  There hasn't
19          been any new information.  The case hasn't led
20          me in any other direction.
21     Q    So since that time you haven't done any further
22          investigation or --
23     A    No.
24     Q    -- uncovered any other evidence?
25     A    No.  There's no new evidence.
 8
 1     Q    Okay.  Tell me when you first learned about the
 2          case.  What -- who called you and what did they
 3          tell you and what did you do?
```

```
 4   A   I was contacted, I believe, Detective Feuquay
 5       responded to the scene.  It was initially an
 6       aggravated assault because the victim, Ruth, was
 7       still breathing and had some vital signs.
 8           So Detective Feuquay is an aggravated
 9       assault detective and he was the only one on the
10       scene.  He contacted me when he found from the
11       medics that she was in critical condition at
12       that point, unresponsive.  They were unable to
13       get her to speak or come to in any way.
14           So I came to the scene.  The run came out
15       probably about 3:39 P.M.  I got there probably
16       about 4:15 or so, made contact with
17       Detective Feuquay and he just let me know
18       basically what he had.
19   Q   What did he tell you he had?
20   A   The only information he had really was that the
21       son had called 911, that the victim was found
22       covered with a blanket, and she was transported
23       by medics in critical condition.
24   Q   She was already gone by the time you got there?
25   A   Yes.
 9
 1   Q   Were there any photographs taken of the scene
 2       before she was -- she left?
 3   A   I don't believe so, no.  She was still alive so
 4       the medics won't leave her there.  They'll take
 5       her immediately.
 6   Q   Okay.  Tell me a little bit -- kind of back off
 7       a little bit.  What's your process when you do
 8       an investigation like this?  What do you try to
 9       do in general?
10   A   Basically my job as a lead investigator is to be
11       the manager of the scene, get there, make sure
12       everything's been secured, made contact with the
13       reporting officer also, which was Officer Price,
14       see what information he might have.  He let me
15       know that William was on scene and Robert, the
16       other brother, had showed up on scene in a
17       vehicle.  They were separated and still at the
18       scene.
19           I basically do a quick walk-through of the
20       scene to see, just to get a general impression
21       of what's going on in there, what items I'm
22       going to need collected when I call the crime
```

```
23        lab.
24             Detective Tudor did an initial canvas of
25        the building there to talk to people that may
10
 1        have seen or heard anything.
 2             I receive all the information I can about
 3        the medics and people that transported the
 4        victim to the hospital.  And basically I called
 5        for crime scene.  At that point Jennifer Lane
 6        responded to the scene.
 7   Q    What is her position and what is her role?  What
 8        does she do?
 9   A    She was the crime scene CSS.  They call them
10        "crime scene specialist."  She is the one that
11        will videotape, take photographs, do a crime
12        scene sketch, collect any evidence, and then
13        testify later about the cases.  She'll also
14        process the items that are collected like prints
15        and DNA, take the swabs; but she doesn't
16        actually process them after that point.
17   Q    Somebody else does the DNA analysis?
18   A    Yes.
19   Q    But she collects the swabs?
20   A    Yes.
21   Q    Okay.  What did -- you said you separated the
22        brothers, William and Robert?
23   A    Yes.
24   Q    Where did you put them or where did you have
25        them?
11
 1   A    They were by police cars or in police cars there
 2        around the parking lot.
 3   Q    What did you tell them when -- or did you talk
 4        to them initially at the scene?
 5   A    I initially -- I didn't tell them anything
 6        per se.  In a case -- I knew that this was a
 7        mother/son -- the son reporting a mother that
 8        was found in this condition so protocol or
 9        whatever, in my opinion or what I've been
10        taught, was that I wanted to ask them if they
11        would, just to cover all my bases, if they would
12        submit to a consent to search of their vehicles
13        just to make sure that they weren't involved in
14        any way and see if there was anything that would
15        connect them to the apartment during the time of
```

```
16          the incident.
17               They both consented to that.  And I
18          basically told them I was going to have to take
19          them downtown and take statements from them,
20          which they said that was fine.  So they were
21          later transported.
22  Q    Did you transport either one of them?
23  A    I transported Robert.
24  Q    Okay.
25  A    Officer Price, I believe, transported William.
12
 1  Q    And then you went down to IMPD headquarters?
 2  A    Yes.
 3  Q    Did -- now, they were transported in marked
 4          police cars or unmarked or --
 5  A    Officer Price had a marked car, but I had an
 6          unmarked car.
 7  Q    The -- were they free to go at that point?
 8          Could they have just said, "No, we don't want to
 9          talk to you"?
10  A    Yes.
11  Q    But they voluntarily agreed to go downtown?
12  A    Yes.
13  Q    And they voluntarily agreed to have search of
14          the cars?
15  A    Yes.  They signed a consent to search.
16  Q    Did the search of the cars reveal any evidence?
17  A    No.
18  Q    They went downtown.  Where did you put them?
19  A    In interview rooms in the back.
20  Q    Separate interview rooms?
21  A    Yes.
22  Q    And what did you learn from -- did you interview
23          both of them?
24  A    Yes.
25  Q    Okay.  About how long did those interviews last?
13
 1  A    I'm not totally positive.  Probably about an
 2          hour for William and probably not quite as long
 3          for Robert.
 4  Q    Okay.  What did you learn from them, those
 5          interviews?
 6  A    From William I learned that he said that he
 7          spent the night in Plainfield playing poker the
 8          night before, that he had seen his mother
```

9        probably between 6:00 and 6:30 P.M. before he
10      went out there.  He returned back to the east
11      side around 9:00 in the morning, went to his
12      house, Robert was there.  They spent the day
13      there doing laundry, watching TV, that sort of
14      thing.
15          He said that around 3:00 or so he went over
16      and said -- told Robert he was going to go check
17      on his mother.  He said he went over to the
18      Kroger, bought an ice tea, went to her
19      apartment.  There was a bag on the door that
20      contained some items.  He took the bag off the
21      door, returned to his car.  He was going to go
22      home and look over those items, but decided
23      instead to go over them with her.  He said --
24      went back to the door, used his key to get in,
25      said he thought that maybe the door was

14
1  unlocked, wasn't sure, went inside, saw his
2  mother lying on the ground covered in a blanket.
3     He walked around the other side to the
4  coffee table, put down his ice tea, said he
5  could see some blood that seemed be to be
6  coagulating through the blanket.
7     He said he called 911.  He said at first he
8  wasn't sure if she had fallen and hit her head
9  or if she had been attacked.  He eventually made
10  reference to the fact that he thought that she
11  was hit with a lead pipe, could have been hit
12  with a lead pipe.  I asked him about items that
13  might have been -- if she had a purse or
14  anything like that.  And he described a black,
15  shiny purse that I believe we photographed in
16  the back bedroom that was still on the scene
17  along with a beige coin purse that was also in a
18  drawer in the bedroom, said that she never
19  really carried any money.  She hadn't been out
20  of the house but a couple times in a whole year.
21     Never mentioned -- oh, I asked him about
22  medication.  He said most of her medication was
23  over-the-counter.  Over-the-counter drugs were
24  still on the counter when we were there.  He
25  said she may have some type of dementia

15
1     medication.  I'm not sure what the name of that

```
 2         might be.
 3              As far as items missing --
 4    Q    Was that ever uncovered, was there ever any
 5         prescription medication recovered from the
 6         scene?
 7    A    No.  There was a little pill dispenser.  I'm not
 8         sure what was in there, but there was a lot
 9         of -- there's pictures.  I'm not sure if they
10         would show if there's any prescription
11         medication there; but there was a large number
12         of over-the-counter drugs that were still there.
13    Q    But you didn't find any prescription medication
14         in a bottle?
15    A    I didn't see any.
16    Q    Did you follow up with any pharmacy to determine
17         whether she had been prescribed any prescription
18         medication?
19    A    No.  No, Bill said that she was -- if she was
20         prescribed any, it was just for dementia so it
21         didn't seem like it had anything to do with the
22         case really.
23    Q    Did any of the children tell you that it had
24         come up missing, that she had a pill bottle
25         there?
16
 1    A    No.
 2    Q    Okay.  Anything else you learned from those
 3         interviews?
 4    A    Just from that interview, I believe that was
 5         most of what basically that lead pipe thing was
 6         significant to me that time.
 7    Q    Why was that?
 8    A    Because the medics and people at the hospital,
 9         we all thought that she suffered a gunshot
10         wound.  So we -- I wasn't even thinking that
11         there was blunt force trauma at that time.  It
12         didn't really mean anything at that point until
13         I found out that she actually was.
14    Q    Suffered blunt force trauma?
15    A    Right.  And then it kind of jumped out at me
16         that somebody would say in a 911 call, said
17         that -- or told the fireman that somebody bashed
18         his mom's head in.  So I don't know how he would
19         know that if she is covered with a blanket.
20              The other thing from that interview was
```

```
21        that she was covered with a blanket.  She was
22        breathing loudly.  He didn't attempt to pull the
23        blanket off, didn't, you know, try to pull it
24        off, ask her what happened, see if he could
25        render any first aid.
17
 1            The dispatcher actually directed him to put
 2        pressure on the wound, and he said he wasn't
 3        going to do that.  It just seemed unnatural to
 4        me that somebody would see their mother lying on
 5        the floor and not respond by pulling the blanket
 6        off and asking her, "What happened?  Did you
 7        fall?  Did somebody hit you?  Is there anything
 8        I can do?"
 9   Q    Did he tell you -- did you ask him if he had
10        called out his mother's name and tried to talk
11        to her?
12   A    Yeah.  He said, "Mom, mom."  He did say that.
13   Q    And did she respond?
14   A    No.  She was just breathing loudly.
15   Q    Okay.  So he couldn't get her to respond to him?
16   A    No.
17   Q    Did he tell you that it appeared that the
18        blanket was stuck to her head?
19   A    Yes.
20   Q    And that he was afraid if he pulled it off, that
21        it might break that --
22   A    Right, that's what --
23   Q    -- barrier, that --
24   A    Yes.
25   Q    -- connection of the blanket to the wound?
18
 1   A    That's what he told me, yes.
 2   Q    And that might cause further bleeding?
 3   A    Yes.
 4   Q    It seems like a reasonable thing to assume for
 5        somebody, doesn't it?
 6   A    I mean, everybody could have their own opinion
 7        on that.  My opinion, I probably wouldn't have
 8        walked around to the other side.  I would have
 9        immediately grabbed the blanket off to see what
10        was wrong with her.  I wouldn't survey the whole
11        situation, make the decision that the blood is
12        sticking to her, the blanket is sticking to her
13        head so I don't want to find out what happened
```

```
14          because I might make her start bleeding again.
15          I mean, it just -- that would be for somebody
16          beyond me to decide.
17               I mean, I had my own opinions.  I just
18          wrote down the facts as I saw them.
19     Q    But that's what he told you, that he was afraid
20          of opening up that wound and her bleeding out?
21     A    Yes, right.
22     Q    And the other things you said you thought
23          sounded not natural was the fact that he
24          reported that he thought that his mother had
25          suffered a blunt force trauma rather than a
19
 1          gunshot wound?
 2     A    Right.
 3     Q    Those were the two big things there that kind of
 4          stuck out from your initial investigation and
 5          the interviews with him?
 6     A    Yes, and the not -- there's no forced entry. I
 7          mean, nothing taken that I can tell.  Nothing
 8          rifled through.  The totality of the
 9          circumstances in the residence when I went in --
10          I've been in plenty of apartments that had been
11          burglarized.  Whether or not there's an actual
12          assault at the time or not, they rifle through
13          everything.
14               To kill somebody without forced entry and
15          then leave with nothing just didn't make any
16          sense to me.  It's been my experience that
17          little old ladies, so to speak, keep a lot of
18          cash in their house, usually in the closet,
19          under the bed.  None of that stuff was checked,
20          gone through.
21               Not to mention the fact that we basically
22          learn in homicides schools and training that
23          signs of personal attachment to the victim is
24          cover up their face so they can't see you during
25          the crime.  Her head was completely covered with
20
 1          the a blanket, so it looked like it was
 2          personal.
 3               All those things together, you could say,
 4          seemed suspicious to me at the time.
 5     Q    Seemed suspicious and warranted further
 6          investigation, you would say?
```

```
 7   A    Yes.
 8   Q    At this point, you're not ready to arrest him
 9        and charge him with murder, are you?
10   A    Well, I typed up what I had and sent it off to
11        the prosecutor and let them make -- I don't make
12        the decisions on whether or not he's going to
13        get charged.
14   Q    Right.  We've got a couple versions of your
15        probable cause affidavit and I want to mark
16        them.
17            (Plaintiff Exhibits 1 and 2 marked for
18        identification.)
19   Q    Can you identify what Exhibit 1 is?
20   A    It's an affidavit of probable cause that's dated
21        December 6th, 2013.
22   Q    Okay.  Is that kind of a work in progress?
23   A    Yes.
24   Q    Okay.  And then Exhibit 2 is what?
25   A    This is the one that was actually -- that she
21
 1        filed the warrant on.
 2   Q    So is No. 1 -- that's the extent of your
 3        investigation up to -- up to December 6th, 2013?
 4   A    Yes.
 5   Q    And did you actually send this to the
 6        prosecutor?
 7   A    I just emailed it to her just as an update type
 8        of thing, let her know where the case is at at
 9        that time.
10   Q    And who was the prosecutor?
11   A    Denise Robinson.
12   Q    Okay.  Did she communicate back to you at that
13        time?
14   A    Yes, probably.  She would have contacted me.
15   Q    And what did she say?
16   A    I don't recall what she said.  I mean, we didn't
17        make a meeting at that time.  The first time I
18        met with her was the end of December.
19   Q    And what did she tell you when you met with her?
20   A    She wanted to -- wanted me to get the financial
21        records for Ruth Rainsberger, so I got a warrant
22        for the financial records from Federal Credit
23        Union.
24   Q    Did she tell you at this time she wasn't ready
25        to file the case because she didn't believe that
```

22
```
 1        the -- your affidavit established probable cause
 2        yet?
 3   A    No, she didn't say that.
 4   Q    At this point on December 6th, at least your
 5        affidavit, did you believe that it established
 6        probable cause?
 7   A    I mean, it's a circumstantial case so, like I
 8        said, it's not my decision whether or not
 9        probable cause is established.  In my mind it
10        was a circumstantial case, so if you wanted to
11        give it to the jury and let them decide, I mean,
12        that is what the prosecutor's office decides. I
13        do not, so I --
14   Q    At this point she is not ready to do that?
15   A    At this point she did not do that.
16   Q    She said get the additional --
17   A    Yes, she requested that I get the financial
18        records.
19   Q    And looks like on Exhibit 2, the last page, you
20        have the financial records?
21   A    Yes.
22   Q    And you have a paragraph about that?
23   A    Yes.
24   Q    And then you also have a paragraph about the
25        phone records that is different -- it wasn't in
```
23
```
 1        the earlier --
 2   A    You mean on the first page?
 3   Q    No.  On the last page of Exhibit 2, which is the
 4        May 22nd affidavit, you've got a paragraph about
 5        the cell phone records; correct?
 6   A    Yes.
 7   Q    And also the -- on page 3 the bottom paragraph,
 8        there's a paragraph about the cell phone records
 9        as well that show this call from Ruth
10        Rainsberger's landline at 2:40 P.M.
11   A    Yes.
12   Q    Correct?
13   A    Yes.
14   Q    You think that that was a significant factor
15        that helped establish probable cause against
16        William Rainsberger?
17   A    Yes.  I mean, it's part of the whole
18        circumstance; but, yeah, it combined with the
```

```
19        other things was important.
20    Q   Well, until you had that, didn't you -- you had
21        suspicions that he had committed this crime but
22        there wasn't any directly contradictory
23        information he had provided or any really
24        incriminating information that you had uncovered
25        against him?
24
 1    A   It was -- it was a circumstantial case, but I
 2        mean, these phone records I had from the
 3        beginning.  It just wasn't in the first draft.
 4        That's all.  I already had.  Those records were
 5        already available to me.
 6    Q   But didn't you find it significant and very
 7        inculpatory towards Mr. Rainsberger that he said
 8        he didn't get to the apartment until 3:30 when
 9        he found his mother but then you find a phone
10        record where he had called from her landline to
11        his brother's number at 2:40?
12    A   Right.
13            MS. BOX:  I'm going to object just because
14        it mischaracterizes the PC.  It says that Robert
15        received a call from the landline.  It doesn't
16        say that William made that call.
17    Q   All right.  But William had admitted he made a
18        call to his brother right after he called 911?
19    A   Correct.
20    Q   And he called from his mother's landline?
21    A   And that call was there also, yes.
22    Q   Right.  And so I think you put it in there that
23        given the fact that he was there apparently an
24        hour before he made the 911 call and his mother
25        had apparently already been injured --
25
 1    A   Correct.
 2    Q   -- well before then, because she had dried blood
 3        on her head --
 4    A   Yes.
 5    Q   -- that that established that he was there when
 6        she was injured at least well before he had
 7        called 911?
 8    A   If he was the one that made the call, then, yes,
 9        he was there.
10    Q   And he is the only one that said he made a call
11        from his mother's landline to his brother's cell
```

12          phone; correct?
13     A    Correct.
14     Q    But later you determined that that was
15          inaccurate; correct?
16     A    No, I didn't think it was inaccurate.  And I
17          still don't.  Attorney Hennessy had some records
18          that seemed to show that one of the calls were
19          not on that -- on the records but
20          Robert Rainsberger's phone records do show that
21          there were two calls made from inside the
22          apartment on November 19th, one at 2:40 and one
23          at 3:40.
24               They lasted two different times.  One
25          lasted for 25 seconds.  One lasted for 15
26
 1          seconds, I believe.
 2               Right after the 2:40 phone call, William
 3          then texts Robert and then Robert and his sister
 4          start texting back and forth.  So it started a
 5          chain reaction an hour before 911 was called
 6          that the siblings were all talking to each other
 7          on their phones, either by text or by voice.
 8     Q    So do you still contend that that phone call was
 9          made at 2:40 rather than 3:40?
10     A    I have records that show from
11          Robert Rainsberger's phone that there were two
12          calls made on November 19th.  Now, there are
13          landline records that may not show that call.
14          And William's records may not show that call,
15          but Robert's do show that call.
16               Now, the discrepancy between the cell
17          companies, I don't know what it is.  I don't
18          know if AT&T with the landline keeps track of
19          every call, whether it's completed or not.
20          Maybe somebody didn't answer.  I don't know if
21          that's why it was excluded.  But I do know that
22          Robert Rainsberger's phone records show both
23          those calls were made.  One lasted 15 seconds
24          and the other one, I believe, 25 seconds.
25     Q    Did you consult with anybody about those calls
27
 1          and how to interpret them and the information
 2          regarding them?
 3     A    Detective Bierce at that time, back in 2013, his
 4          only job was to do phone records and warrants

```
 5        for phone records.  On all of our cases we would
 6        send information to him and he would do the
 7        search warrants on the phones and send us the
 8        information.
 9             He alerted me to those calls, and then I
10        looked at the phone records.  And I could see
11        those calls.  I mean, there was really no reason
12        to interpret.  The one thing he did interpret
13        for me, I do believe, is that when it said
14        "routed call," he believed that that was --
15        meant somebody didn't pick up, that voice
16        message may have been left.
17             And like I said, Defense Attorney Hennessy
18        had the other phone records that didn't show
19        that call and tried to tell me that the
20        discrepancy was because central time was used
21        and eastern time was used here and central time,
22        and it didn't make any sense to me.
23             By looking at the phone records that he was
24        showing me, I could see that that call wasn't
25        there, so I said, well, I guess maybe that's
28
 1        possible.  Maybe I did make a mistake, but I
 2        looked at Robert's phone records again.  I
 3        looked at them several times; and those calls
 4        are on there, two different lengths.  They lead
 5        to the texting between the siblings an hour
 6        before 911 was called, so it seems to me that
 7        they knew something was going on.
 8   Q    Did you -- did you consult with Bierce about the
 9        discrepancy and whether or not the call was --
10        the call was routed to central time to a Chicago
11        area code --
12   A    No.
13   Q    Let me finish my question -- to a Chicago area
14        phone in question and that's perhaps the reason
15        why it's listed at 2:40 rather than 3:40?
16   A    No, because they're listed at both times on
17        those phones records.  So I didn't have to ask
18        him.
19             On the other records, I mean, I didn't ask
20        them about that.  It wasn't -- well, I'm not
21        sure exactly whether he left but he retired and
22        went to private business so he's not even around
23        anymore.
```

```
24   Q   So you never consulted with him about this
25       discrepancy?
29
 1   A   On the other records, no, I did not.
 2   Q   Did you consult with Denise Robinson about the
 3       discrepancy?
 4   A   I don't know if we spoke about the other records
 5       because the only records that I made -- I mean,
 6       she has all the records, of course.  When I give
 7       her my file, she has everything that I have.
 8       But the only one that she would have actually
 9       taken notice of is what I put in the probable
10       cause, which is in here so ...
11           And that came out later during a deposition
12       with Hennessy that was long after the case was
13       already filed, so anybody that I would talk to
14       about that would have been Mariel Vincent who
15       was then assigned the case.  Detective -- or
16       Denise Robinson didn't have anything further to
17       do with it.
18   Q   Did you talk to Mariel about it?
19   A   We talked about -- yeah, we talked about
20       everything.
21   Q   What did she say about it?
22   A   She was unsure about it, why the discrepancy. I
23       don't know that she actually realized that
24       Robert Rainsberger's cell records actually did
25       show both calls because now she was focused upon
30
 1       what Hennessy brought to light, the smoke that
 2       he threw about --
 3   Q   The prosecutor's office ultimately moved to
 4       dismiss the charges against Robert?
 5   A   Yes.
 6   Q   Citing evidentiary problems; correct?
 7   A   That's what they said, yes.
 8   Q   What did -- was that -- did you talk to Mariel
 9       about that?
10   A   Just briefly.
11   Q   What did she tell you?
12   A   Well, we had a -- we had bail hearings and we
13       had a motion to suppress.  There was a cartoon
14       and stuff like that that ended up being
15       suppressed from a search warrant that she felt
16       was important to the case.  And we had two
```

```
17        witnesses that were starting to, after a visit
18        from certain -- from attorneys, they decided
19        that they might not want to prosecute any longer
20        and come to court.
21             So she felt at that time -- I don't know
22        that she was going to dismiss it with
23        evidentiary problems.  I didn't know how exactly
24        she was going to dismiss it, but we felt that
25        there may be more investigating that could be
31
 1        done.  Rather than try a case and take the
 2        chance of not winning it, we dismissed it or she
 3        dismissed it and wait and see if any more
 4        evidence came up and make the arrest again at a
 5        later date if we needed to.
 6    Q   What other investigation did she say she needed
 7        to have you to do?
 8    A   I mean, she didn't mention anything specific.  I
 9        mean, anything could come up.  Anybody could
10        call in.  These cases never go away.  I'm going
11        to be assigned this case until I'm not around
12        anymore, so it's my case.  Anybody calls,
13        they'll contact me.
14    Q   You say that the records -- well, the probable
15        cause affidavit you sent to Denise Robinson you
16        said you sent that in email to her?
17    A   Yes.
18             MS. BOX:  Which one are you referring to?
19             MR. WAPLES:  The Exhibit 1?
20    A   The first one, yes.
21    Q   And Exhibit 2?
22    A   I usually send it to her also ahead of our
23        meeting, but then we meet in person.
24    Q   And that's by email?
25    A   Yes.
32
 1    Q   And Denise Robinson is the one that's making the
 2        charging decision whether or not to go forward
 3        or not --
 4    A   Yes.
 5    Q   -- for the prosecutor's office?
 6    A   Well, I believe they met, Denise Hollingsworth
 7        and Jeremy Teipen, I think they all three met on
 8        this one and decided that they wouldn't file.
 9    Q   They are also deputy prosecutors?
```

```
10   A   Yes.
11   Q   The -- when you -- you say you emailed it to her
12       and then you met with her and then met with all
13       three of them?
14   A   I met with Denise.  Yeah, they are in and out,
15       you know, asking questions and taking part; but
16       she -- I met with her directly just meeting
17       between her and I.
18   Q   And where did you meet?
19   A   In her office, the prosecutor's office.
20   Q   And when you met with her, what did you have
21       with you --
22   A   My file.
23   Q   -- if anything?
24   A   I had my file, and I gave her a copy.  She had a
25       copy of the file also.  We make a prosecutor
33
 1       file and keep a copy of our own.
 2   Q   Did she look through your file or did you just
 3       talk to her about it?
 4   A   She did not -- I mean, she looks over it before
 5       she makes the decision.  She had this case for a
 6       long time, had this PC for a long time. I
 7       talked to her numerous times during -- during
 8       this period.  I was investigating probably five
 9       other homicides between November 19th and
10       May 22nd when the charges were filed, so
11       sometimes we could meet, sometimes I didn't have
12       time to meet.  Sometimes I was working on other
13       cases and would meet with her about those.
14           So eventually when things slowed down, she
15       got back to this case, said they were going to
16       meet about it, let me know.  They didn't make a
17       decision to charge and I went over and met with
18       her.  I'm sure they all went through my file.
19   Q   But you don't have personal knowledge of that,
20       though.  You weren't there.
21   A   I mean, I didn't see them, no; but I would
22       imagine the charging prosecutor would look
23       through the file and read the -- I mean, they
24       read the probable cause obviously; but I don't
25       know if they simply just go on that.  I imagine
34
 1       they look at the file, look at the statements,
 2       read the statements I provided them.
```

```
 3   Q   The witness statements?
 4   A   Yes, sir.
 5   Q   Now, there was -- you said there was this
         discrepancy that came up later that Attorney
 7       Hennessy found with the cell phone records and
 8       suggested that they showed that Robert's cell
 9       phone records suggested that they routed through
10       a central time area code.
11   A   He wasn't talking about Robert's.  He was
12       talking about William's and the landline.  I
13       don't think he specifically spoke about Robert's
14       because they show both phone calls.  He didn't
15       show me the one that showed both phone calls.
16       He showed me the ones that did not.
17   Q   But this phone call came from Ruth's landline?
18   A   Yes.
19   Q   That's how you knew that it was -- that it
20       placed William in Ruth's apartment at 2:40?
21           MS. BOX:  He didn't testify to that and
22       that's not what the probable cause says.
23   A   That's what can be implied probably.  That's
24       circumstantial also.
25   Q   But that was your conclusion given that --
35
 1   A   Correct.  I mean --
 2   Q   -- William said he made the call and the records
 3       show that there was a call from Ruth's landline?
 4   A   There was two calls, yes.  He said he made the
 5       one at 3:40.  He didn't say anything about the
 6       one at 2:40, 2:41.
 7   Q   Was there -- did Ruth's landline records
 8       indicate a call at 2:40 or 3:40?
 9   A   No.  They showed the one at 3:40 but not the
10       other one.
11   Q   So Ruth's landline records that you had back in
12       December of 2013 showed one call coming from
13       Ruth's landline at 3:40?
14   A   Yes.
15   Q   And no call coming from Ruth's landline at 2:40?
16   A   Correct.
17   Q   But you didn't put that in your affidavit?
18   A   No.
19   Q   Okay.  The -- did -- and Mariel, what's her last
20       name?
21   A   Reidle I think now.  She got married.
```

```
22  Q    What was it before?
23  A    Vincent.
24  Q    Vincent.  Did she tell you that this issue of
25       this phone call was at least part of the reason
36
 1       why they were deciding to dismiss the case?
 2  A    She didn't come right out and say that, but I'm
 3       sure it probably played a part.
 4  Q    It was a big issue, wasn't it, the discrepancy?
 5  A    You would really have to ask her.  I don't know
 6       if it was a big issue for her.  It wasn't for
 7       me, but it may have been for her.  I don't know.
 8  Q    It wasn't a big issue for you even though Ruth's
 9       landline records only showed a call at 3:40,
10       which was consistent with William's testimony
11       that he made that call after he came in a little
12       after 3:30 and called his brother to tell him to
13       come over there?
14  A    I mean, like I said, again, the only -- Robert's
15       phone showed that both calls were made so, I
16       mean, that's not my job to give him the benefit
17       of the doubt.  I had information from his call
18       from his phone records that two calls were made
19       at two different lengths.  So, I mean, they're
20       not the same call.
21            If they were both 25 seconds and they were
22       exact same time like one's at 2:40 and one's at
23       3:41 and couple seconds, if they were the exact
24       same time, exact seconds, and the exact duration
25       then I might have said, well, maybe there's
37
 1       something wrong here.  But to me, it looked like
 2       there was two calls made.
 3            And whether or not -- like I said, AT&T, I
 4       don't know how accurate they are.  I mean, who
 5       has a landline anymore?  Who knows how important
 6       they take their records of calls made or whether
 7       or not they acknowledge the ones that aren't
 8       actually connected.  There's just a voice mail,
 9       which is the routing thing that sends it to the
10       voice mail.  Maybe when that happens they don't
11       pop up.  I did not check that.
12  Q    Seems like an important question if you want to
13       charge somebody with murder and you want to use
14       circumstantial evidence that they're in
```

15      somebody's apartment who has been murdered at a
16      time an hour before they said they're there.
17      And --
18   A  Well, I mean --
19   Q  -- you've got a landline record that shows a
20      call at 3:40, which is consistent with the
21      person's story that they got there at 3:30 and
22      found the mother, called 911, and then used the
23      landline to call the brother.  And yet you're
24      saying, well, we got these cell phone records
25      from Robert that say that there is two calls an
38
1       hour before but not at 3:40; correct?
2    A  Correct.
3    Q  Seems like you would want to do a little more
4       investigation to determine whether or not
5       which -- especially when there's a question
6       raised about maybe there's a routing issue and
7       it went to central time and that's why it's
8       listed at 2:40 or 2:41 rather than go forward
9       without mentioning that Ruth's AT&T records only
10      show one call at the 3:40 and 3:41, not at 2:40
11      and without checking with AT&T whether that
12      record accurately depicts whether there was a
13      call made at 2:40 or not?
14         MS. BOX:  What's your question?
15   Q  That's my question.  Wouldn't you want to check
16      because you just said you hadn't checked that
17      out and you didn't know.
18   A  The fact that I looked at Robert Rainsberger's
19      phone records.  I could tell that they weren't
20      in central time because it would have been an
21      hour earlier or an hour later.  And for it to be
22      an hour later, it would have been made at 4:40
23      which I had control of the residence at that
24      point.  There was nobody using the phone at that
25      point, so it told me that those records were
39
1       accurate at 2:40 and 3:40.
2          If you push the times forward and it's just
3       3:40, there's still the next one that would be
4       4:40 when there's nobody in the apartment but me
5       and the crime lab and nobody would be using that
6       phone.
7          Now --

8   Q   How does that follow?  I'm sorry.  I'm lost at
9       this 4:40 call.  There's a 4:40 call?
10  A   No.  I'm saying if you're saying that those
11      calls were central time and they were an hour
12      off and there's two calls, then it would push
13      the other one forward to 4:40 instead of 3:40
14      he's talking about, which wouldn't make sense.
15  Q   "Push the other one"?  What's "the other one"?
16  A   There's a call made at 2:40 and 3:40 from the
17      landline.
18  Q   Ruth's AT&T records show two calls, one at 2:40
19      and one as --
20  A   I'm talking about Robert's cell phone records.
21  Q   Okay.
22  A   So they show -- you're saying that those
23      couldn't possibly be within central time.  But
24      if they were, then both of those calls would
25      have been possible.
40
1           Central time is an hour behind eastern time
2       or we just changed time so it'd probably be
3       about the same time.  We change our clocks back
4       around the end of the October, so I don't know
5       whether central or eastern time would make any
6       difference.  It would be the exact -- the right
7       time.  Wouldn't it?
8   Q   So you're saying in November, November 27th
9       eastern and standard time would be the same
10      time?
11  A   Eastern and central?
12  Q   Eastern and central, yeah.
13  A   I'm not sure.
14  Q   You don't know?
15  A   Either way, I mean, there's two calls.  You want
16      to take it back?  You want to take it forward?
17      It doesn't matter.  It's a discrepancy.  There's
18      two calls made.
19          If I'm not mistaken central time is an hour
20      behind eastern time, so when we turn our time
21      back, we should be the same time during the
22      winter time because we used to be central time.
23      We fall back.
24  Q   In 2013 were we central time or eastern time or
25      do you know?
41

```
 1              MS. BOX:  I think he's testified that he
 2       doesn't know central time and eastern time and
 3       when we fall back and spring forward.
 4              (Plaintiff Exhibit 3 marked for
 5       identification.)
 6    Q  Here's Exhibit 3, which is Bates stamped
 7       production 385.  Are those -- is that a page of
 8       Ruth's landline --
 9    A  Yes.
10    Q  -- calls?  Does that just show one call at 3:41?
11    A  Yes.
12    Q  Does that show a call to Robert's landline or
13       Robert's cell phone?
14    A  No.
15    Q  What's it show a call to?
16    A  Oh, which call?  3:41?
17    Q  Yes.
18    A  Yeah, it shows a call to Robert.
19    Q  Okay.  From Ruth's landline?
20    A  Yes.
21    Q  And it doesn't show another call from -- to
22       Robert at that time or at 2:40?
23    A  Not on these records, no.  I already told you
24       they didn't.
25    Q  Okay.  And then you received some records from
42
 1       Bierce, did you say?
 2    A  Yes.
 3    Q  With respect to Robert's cell phone records?
 4    A  Yes.
 5              (Plaintiff Exhibit 4 marked for
 6       identification.)
 7    Q  Okay.  I hand you Exhibit 4.  Now, there's two
 8       pages here taken from an Excel spreadsheet of
 9       Robert's cell phone records that were produced
10       to us in a disk.  The second page circled down
11       at the bottom "original CDR."  The first page
12       says "results."  So those are different pages of
13       the Excel spreadsheet.  Do you recognize this as
14       part of your homicide investigation file?
15    A  Yes.
16    Q  Okay.  And the second page on the original CD,
17       does it show two calls basically line 486 and
18       line 493?
19    A  Yes.
```

```
20   Q   And are those the calls to -- from Ruth's
21       landline to Robert's cell phone?
22   A   Yes.
23   Q   And those are the ones that are at time is, at
24       least on there, is 11:19 and 14:40 and 15:40?
25   A   Yes.
43
 1   Q   Which would be 2:40 and/or 3:40?
 2   A   Yes.
 3   Q   And on page 1, which shows results -- and are
 4       these the results of Officer Bierce's
 5       investigation of what Robert's cell phone
 6       records show?
 7   A   These are the results.  He's showing contact
 8       between William, Ruth, and Robert, yes, and
 9       Rebecca.
10   Q   All right.  Well, this is showing, isn't it,
11       Robert Rainsberger's Sprint records?
12   A   That's what it says on here, yes.
13   Q   And on lines 486 and 487, there are two calls
14       there to Ruth Rainsberger -- or from
15       Ruth Rainsberger's landline to Robert's cell
16       phone?
17   A   Yes.
18   Q   And do the results of Officer Bierce's analysis
19       of these show that both of those calls were made
20       at 3:40, one at 3:40:38, one at 3:40:51 P.M.?
21   A   That's what it says here, yes.
22   Q   All right.  And you had this record back in
23       December of 2013 and in May of 2013 [sic] when
24       you prepared your affidavit of probable cause;
25       correct?
44
 1   A   Yes.
 2   Q   But yet you didn't write in your report -- in
 3       your affidavit of the probable cause that the
 4       AT&T records from Ruth's landline showed in
 5       Exhibit 3 that there was a call made at 3:40,
 6       not 2:40 and that the results of
 7       Officer Bierce's analysis of Robert's cell phone
 8       records showed those two calls being both at
 9       3:40?
10   A   I'm sorry.  What was the question?  Did I have
11       this?
12   Q   You had it and you didn't put that in your
```

```
13        affidavit of probable cause.
14   A    That's correct.
15   Q    Instead you reported it as 2:40?
16   A    Yes.
17   Q    Okay.  You said there were a couple of witnesses
18        that made -- that you had interviewed that later
19        the prosecutor or you had determined were --
20        didn't want to become involved or changed their
21        stories or something like that?
22   A    They didn't change their stories.  They were
23        just more reluctant to come to court,
24        Damon Thomas and Kevin Walker.
25   Q    And are those the two individuals that lived
45
1         upstairs?
2    A    Yes.
3    Q    And you didn't put anything in your affidavit of
4         probable cause about anything they reported to
5         you, did you?
6    A    No.
7    Q    And why is that?
8    A    Because I hadn't spoken to them yet.  They
9         hadn't given those statements yet.
10   Q    They hadn't given any statements by
11        December 6th, which is your first version of
12        your affidavit of probable cause?
13   A    No.  They -- they gave those statements in March
14        of 2015.
15   Q    Much later after the --
16   A    Yes.
17   Q    But they had been interviewed the day of --
18   A    Yes.
19   Q    -- the homicide; correct?
20   A    Yes.
21   Q    And they both reported that they didn't hear or
22        see anything unusual at that time?
23   A    Yes.
24   Q    It was only a year and a half later after
25        William had been arrested that they said that
46
1         they had heard something unusual or strange?
2    A    What they said was they didn't think that it was
3         weird or strange that the son was there because
4         he came there every day.  So when they said that
5         they saw him there that day, it was nothing out
```

```
 6        of the ordinary.  That's what they said.
 7    Q   But they had been asked whether they had seen
 8        him there that day and they didn't report that
 9        they had.
10    A   I don't know if they were asked if they saw
11        William there.  They were just asked if they saw
12        anything suspicious.  I mean, at that point he
13        wasn't a suspect.  We wouldn't know to ask him,
14        "Hey, was William here this morning?"  At the
15        initial scene, he was not a suspect.
16    Q   Well, wouldn't they ask, "Did you see in the
17        apartment?"
18    A   See anything suspicious or -- I mean ...
19    Q   You're a homicide investigator.  You're not just
20        going to say, "Did you see anything suspicious."
21        Aren't you going to say, "Did you see anybody at
22        Ruth's house?"
23    A   I don't remember the exact wording that we used;
24        but at that point when we talked to them, they
25        didn't say anything about the son being there.
47
 1    Q   Right.  Later they did?
 2    A   Yes.
 3    Q   After he had been arrested a year and a half
 4        later?
 5    A   Yes.
 6    Q   And then later they didn't want to come to court
 7        and say that?
 8    A   Well, they were just reluctant.  They said they
 9        were going to, but they were getting harder to
10        get in touch with.  But as time goes by, we lose
11        witnesses, lose, you know, the motivation.  They
12        don't want to be part of a court case.  It
13        happens in all of our cases, most of our cases.
14    Q   You didn't consider them very reliable, did you?
15    A   It's not for me to decide.  I wrote down what
16        they told me in their statements and passed it
17        on to the prosecutor.
18    Q   Yeah.  But you had an opinion, didn't you?
19            MS. BOX:  Object.  Asked and answered.
20    Q   You had an opinion?
21            MS. BOX:  You can answer.
22    A   Oh, okay.  I had an opinion?  My opinion at that
23        point, because they had no reason to lie, I
24        mean, I don't know what their motivation would
```

```
25        be to come forward and tell me that they saw the
48
 1        son there that day.  They had nothing to gain
 2        from that.  I don't understand why they would
 3        make something like that up.  It doesn't make
 4        any sense.
 5    Q   Did you check into their background, their
 6        reliability, whether they had any criminal
 7        records, whether they seemed reliable?
 8    A   As far as I know, they both had jobs.  They're
 9        an alternative lifestyle couple.  I know that.
10        I don't think they had any criminal history.
11        One of them might have something like driving
12        while suspended or theft or something like that.
13        I'm not sure, but it was nothing that would give
14        you reason to believe that they're going to make
15        something up in a homicide investigation.
16    Q   But they didn't want to become involved?
17    A   I said they were becoming more reluctant.  They
18        still said that they would show up to court if
19        it went to trial.
20            It kept getting harder.  I had to keep
21        going out to their house.  They wouldn't answer
22        phone calls anymore.  It just seemed like they
23        were getting tired of the whole process.  That's
24        all.
25            (Plaintiff Exhibit 5 marked for
49
 1        identification.)
 2    Q   Here's Exhibit 5.  Can you tell me what that is?
 3    A   This is a charging affidavit that was created by
 4        Denise Robinson.
 5    Q   Is this the information for murder --
 6    A   Yes.
 7    Q   -- charging William Rainsberger with knowingly
 8        killing Ruth Rainsberger by inflicting blunt
 9        force injuries with a hammer or similar object?
10    A   Yes.
11    Q   Is this an affidavit that you signed?
12    A   Yes.
13    Q   Under penalties of perjury?
14    A   Yes.
15    Q   And you swore that that statement was true?
16    A   Yes.
17    Q   Okay.  And you signed that on what date?
```

18  A   May 22, 2014.
19  Q   Is that the same date as your probable cause
20      affidavit, the second version was signed --
21  A   Yes.
22  Q   -- which is Exhibit 2?
23  A   Yes.
24  Q   Okay.  And without your probable cause
25      affidavit, the prosecutor -- and without you

50

 1      signing this information, the prosecutor
 2      wouldn't have filed charges against
 3      William Rainsberger?
 4  A   Correct.
 5  Q   I'm going to go over the affidavit, the May 22nd
 6      one, if you can pull that out, Exhibit 2.
 7  A   (Witness complies.)
 8  Q   Okay.  This contained, at the time, May 22nd,
 9      2014, the information you believed constituted
10      probable cause for the charges that you signed
11      the homicide against William Rainsberger, which
12      is Exhibit 5; correct?
13  A   That's what the prosecutor believed I had
14      probable cause, yes.  This is what I submitted
15      to her.
16  Q   Okay.  And the first paragraph you say that on
17      November 19, 2013, William Rainsberger reported
18      that someone had bashed his mother's head in,
19      but "both medic and hospital personnel believe
20      that the victim may have sustained a gunshot
21      wound."
22  A   Yes.
23  Q   All right.  The -- was the -- in a gunshot
24      wound, is there usually blood splatter?
25  A   There can be.

51

 1  Q   Is it -- is that usual?
 2  A   I don't know.
 3          MS. BOX:  He said there can be, Rich.
 4  A   There can or can't be.  If somebody's covered
 5      with a blanket, there may not be because it
 6      would hold it in.
 7  Q   There was no blood splatter here, though;
 8      correct?
 9  A   No, I didn't see any.
10  Q   Okay.  And if there's a firearm used, are there

```
11       usually shell casings that may be ejected?
12   A   There may or may not be.  Sometimes they use a
13       revolver.
14   Q   Were there shell casings here?
15   A   No.
16   Q   In a gunshot wound are there usually -- usually
17       bullets are found?
18   A   There may or may not be bullets found.  If you
19       shoot somebody in the head, they may be inside
20       the head.
21   Q   Were there any bullets found here?
22   A   No.
23   Q   And if there's a gunshot in an enclosed space
24       like an apartment is there usually the smell of
25       gun powder that lingers for a while?
52
 1   A   There could be when it first happens.
 2   Q   And it could linger for quite awhile, can't it?
 3   A   I'm not sure how long it would linger.  I have
 4       no idea.
 5   Q   Was there any gunshot residue smelled or any
 6       gunshot smell?
 7   A   Not that I recall, no.
 8   Q   So objectively those things would point less
 9       towards a firearm being used and more towards a
10       blunt force trauma, wouldn't it?
11   A   It wasn't for me to decide what caused the
12       wounds.  She was gone when I got there so the
13       medics believed that she was shot.  The doctors
14       believed that she was probably shot.  That's all
15       I had to go on at that time.
16   Q   Well --
17   A   When I got there I didn't see any --
18   Q   Well, when you said the medics believe that she
19       was shot, was there more medics than this
20       Wooldridge, Carl Wooldridge, that actually
21       believed that or reported that?
22   A   Yes.  I mean, they were all there together.  He
23       is from the fire department so he was with the
24       medics.
25   Q   But he's the one that reported that he thought
53
 1       it was a gunshot?
 2   A   He's the one that gave the statement, yes.
 3   Q   But none of the other medics reported to you
```

```
 4        that they believed that there was a gunshot?
 5    A   I didn't talk to them.  I didn't reach out to
 6        the others.  This is the only one I made contact
 7        with.
 8    Q   Right.  And the hospital personnel would have
 9        been going off of what was reported to them by
10        the fire department and medics; correct?
11    A   Possibly.  And the doctor could make his own
12        decision.
13    Q   Well, and they made their own decision that it
14        was blunt force trauma?
15    A   I don't believe they ever made that decision.
16        The autopsy showed it was blunt force trauma.  I
17        never heard anybody at the hospital say it was
18        blunt force trauma.
19    Q   Did you interview any of the medical personnel
20        at the hospital --
21    A   No.
22    Q   -- that said that they believed that it was a
23        gunshot wound rather than blunt force trauma?
24    A   No.  The coroner spoke to them and Heather Tait,
25        and she said that that's what they believed.
54
 1        And I'm pretty sure she didn't put on the toe
 2        tag that it was a possible gunshot wound.
 3    Q   But you didn't talk to any hospital personnel
 4        that believed it was a --
 5    A   I did not know.
 6    Q   And you don't know whether any hospital
 7        personnel actually believed that or it was just
 8        passing on what Wooldridge had reported?
 9    A   The coroner talked to the medical personnel.
10        They're not going to give somebody else's
11        opinion.  They'll give their own opinion.
12    Q   Did the coroner say that some medical doctor
13        said that it was a gunshot wound?
14    A   She said personnel.  She didn't -- she didn't
15        specifically say "doctor."  But she called me,
16        like, 4:15 in the morning so I don't remember
17        the call, everything she said.
18    Q   So.  Can you swear here today that she told you
19        that medical personnel at the hospital told her
20        that they thought it was a gunshot wound?
21    A   I believe so, yes.
22    Q   Okay.  And what was her name?
```

```
23   A   Heather Tait, T-a-i-t.  I don't know if she
24       works there anymore either.  I haven't seen her
25       since then.
55
 1   Q   And was she a deputy coroner?
 2   A   Yes.
 3   Q   Okay.  Second paragraph, you say that this
 4       Carl Wooldridge reported that the blanket was
 5       stuck to the victim's head.
 6   A   Yes.
 7   Q   Again, you repeat that fire and ambulance
 8       personnel felt the victim may have been shot.
 9   A   Yes.
10   Q   Is that what Wooldridge had told you or did you
11       have any ambulance personnel that told you that
12       they believed that the victim was shot?
13   A   Wooldridge is the only one I had direct
14       communication with.
15   Q   But even they thought it was not normal that
16       there wasn't any blood splatter on the walls if
17       it was a gunshot wound?
18   A   That's what he said, yes.
19   Q   You report that Wooldridge said the apartment
20       seemed to be in orderly condition.  Did
21       Wooldridge go through the apartment?
22   A   He was in the main room.  You can see everything
23       but Ruth's bedroom pretty much from just inside
24       the door.
25   Q   Was the back room in an orderly condition, the
56
 1       second bedroom?
 2   A   Are you asking my opinion of the bedroom?
 3   Q   I'm asking you objectively was it in orderly
 4       condition or was it in a fairly chaotic
 5       condition?
 6           MS. BOX:  Objection.  That calls for
 7       speculation.  You can answer as to your opinion.
 8   A   It did not appear as if anything was gone
 9       through.  There were bags and boxes all stacked
10       in there, so that's the basically the way it
11       looked to me.
12   Q   It looked to you to be in orderly condition, the
13       back room?
14   A   I mean, it was cluttered.  It was cluttered. I
15       mean, it wasn't -- by "orderly," to me means
```

```
16        that things weren't rifled through and thrown
17        all over the place like somebody was looking for
18        something.
19   Q    Sometimes when an intruder goes through a
20        residence and they start rifling through things,
21        they tear everything apart and make a mess of
22        everything; correct?
23   A    Yes.
24   Q    Sometimes an intruder gets spooked for whatever
25        reason, interrupted in what they do, may have
57
1         been at the beginning and they flee without
2         causing any disturbance; correct?
3    A    Maybe.
4    Q    You don't know any of the circumstances exactly
5         whether -- which one of those circumstances may
6         have happened in this case, do you?
7    A    No.
8    Q    Do you even know what time it was that Ruth
9         sustained her injuries?
10   A    I don't have an exact time, no.
11   Q    You believed it was before 10:30 in the morning;
12        correct?
13   A    Yes.
14   Q    Because Delbert Pickens and Meals on Wheels both
15        knocked on her door and called her phone?
16   A    Yes.
17   Q    And Ruth's cell phone records that we saw show a
18        call from Delbert Pickens at about 10:29 A.M.
19        that morning; right?
20   A    They show a call at that time, yes.
21   Q    To Ruth's landline?
22   A    Yes.
23   Q    I guess that tells us a couple of things. I
24        mean, one, you took it that that means that she
25        was probably injured because she didn't respond
58
1         to the door before 10:30 in the morning?
2    A    Yes.
3    Q    It also tells us that AT&T reports on their
4         landline records that calls that are even made
5         to that landline that aren't -- aren't picked up
6         on; correct?
7    A    Possibly, yes.
8    Q    Well --
```

```
 9   A   Doesn't mean they record all of them.
10   Q   Yeah.  And you don't know whether they do or
11       not?
12   A   I don't know what they did.
13   Q   And you didn't check with them to see if they
14       did or not?
15   A   No.
16   Q   Correct?
17   A   Correct.
18   Q   Okay.  The -- and you know William had said he
19       had been over there maybe 5:30, 6:00 the night
20       before?
21   A   Yes.
22   Q   You didn't have anybody's -- information from
23       anybody that showed that the injury occurred
24       sometime after that time the night before of the
25       18th or early in the morning of the 19th?
59
 1   A   We can't specify what time it happened.
 2   Q   Okay.  You say in that third paragraph there in
 3       the bottom that "There was a lockbox in the back
 4       room in plain view that contained savings bonds
 5       belonging to the victim."  Did -- where exactly
 6       was the lockbox?
 7   A   It was in the closet in the room right there
 8       with the clutter, the boxes and the bags.
 9   Q   So that's not -- and it's in a lockbox itself?
10   A   Yes.
11   Q   In a closet in a cluttered room?
12   A   Yes.
13   Q   And that's what you're stating is in plain view?
14   A   If you walk into the room, it's in -- I mean,
15       you could see it just by looking in the closet.
16       The closet door was open.
17   Q   You can see a lot of things, though, because
18       it's cluttered, a lot of boxes, a lot of the
19       different things in that room; correct?
20   A   Yes.  I pointed that out just because that's an
21       area that I believed if somebody was looking for
22       valuables they would check a lockbox that's
23       sitting there in plain view is probably what
24       somebody would be looking for if they were going
25       to burglarize an apartment.
60
 1   Q   And you said that the lockbox contained savings
```

```
 2         bonds?
 3    A    That's what it says here, but I heard they might
 4         be certificates of deposit or whatever, some
 5         kind of financial documents.
 6    Q    They weren't savings bonds?
 7    A    I'm not sure what they were, but that's what I
 8         put in here.  They were something like savings
 9         bonds, certificates of deposit.  The point was I
10         was just showing there was something with
11         possible value in that box that wasn't looked
12         through.
13    Q    On the second page of this, you report what you
14         found -- what William had told you.
15    A    Yes.
16    Q    Second paragraph, that's on the evening of
17         November 19th when they voluntarily cooperated
18         with you and went to the police headquarters and
19         gave a recorded statement?
20    A    Yes.
21    Q    Without even a lawyer present; correct?
22    A    Yes.
23    Q    Same thing on the second paragraph.  You report
24         what Robert told you in that interview on
25         November 19th at police headquarters?
61
 1    A    Yes.
 2    Q    And that last sentence in that paragraph you say
 3         "At no time did Robert or brother, William, ever
 4         ask me how mom was doing or if they could get to
 5         the hospital to see her."
 6    A    Right.
 7    Q    Was that true?
 8    A    Yes.
 9    Q    That seems to indicate that they were uncaring
10         or unconcerned about their mother, doesn't it?
11    A    Seemed to be, yes.
12    Q    Okay.  Why would they ask you how their mom was
13         doing?
14    A    Why would they ask me?
15    Q    Yeah.  You were at police headquarters with
16         them.  Why would they ask you?
17    A    Well, because I could check for them.  I mean,
18         everybody asks -- not everybody but a lot of
19         people ask after their loves ones.  They want to
20         get out of there as quick as they can to get to
```

```
21              the hospital.
22    Q    Well, did they indicate they wanted to be there
23         at police headquarters or were they there
24         because you told them you needed them to go
25         downtown and give a statement?
62
 1    A    They came down because I asked them to.  I mean,
 2         this -- this statement is basically not even
 3         about just that night.  It's just following
 4         that.  I mean, nobody ever called later in the
 5         evening.  They never called about the suspects,
 6         never called to check in on the case.
 7    Q    You have another statement about that and we'll
 8         get to that.  But with respect to that night you
 9         say at no time did they ask you about their
10         mom's condition when they're there under
11         interrogation by you.  But you weren't at the
12         hospital so you didn't know what their mom's
13         condition was.
14    A    No, but I can call the hospital and find out.
15    Q    Well, wasn't --
16    A    I mean, the main reason why I came up with that
17         was because on the way downtown William told the
18         officer, "I don't know if it's a good thing or a
19         bad thing if my mom dies."
20              From that point, there was really no sign
21         of emotion.  He talked to me like nothing was
22         even happening during his statement.  So that --
23         when you make a statement like that, it makes me
24         think that you're not really concerned whether
25         she dies or not if you don't know if it's a good
63
 1         thing a bad thing.
 2    Q    You reported that but you also reported that he
 3         didn't ask you how his mom's condition is when
 4         he's there being interrogated by you at the
 5         police headquarters.
 6    A    Right.  He didn't ask if he could leave to go
 7         see her.  That's correct.
 8    Q    Wasn't his sister at the hospital with his
 9         mother?
10    A    Probably.
11    Q    And didn't William have his cell phone with him?
12    A    If he was making communications -- I didn't say
13         in here that maybe he was talking to his sister
```

```
14        about it.  But the truth of the matter is I put
15        in there he didn't ask me about it.  That's all
16        it says.  He didn't ask me about it.  Maybe he
17        asked his sister.  He didn't say anything to me
18        about it.
19   Q    Well, didn't he receive a call from his sister?
20   A    I don't know.
21   Q    Didn't he talk to his sister while you were
22        interviewing him asking him about his mother?
23   A    Not that I remember.
24   Q    But if he did, you didn't put that in the
25        report?
64
 1   A    I don't remember him talking -- he wasn't
 2        talking on the phone when I'm interviewing him.
 3        He was back there with the cell phone by himself
 4        for a while, so he may have had contact with her
 5        at that point.
 6   Q    Right.  But if you knew he had been talking to
 7        his sister about his mother and how she's doing,
 8        that would create a very contradictory inference
 9        from the one you're trying to draw here that he
10        is uncaring and unconcerned because he's not
11        asking you about his mother?
12   A    He didn't ask.  I just said he didn't ask to go
13        to the hospital to see her.
14   Q    You told him you needed him there; right?
15   A    And I already covered that.  Most people will
16        say, "I need to hurry up.  Can we hurry this up.
17        I need to go see my mother."  That's what I'm
18        getting at.  And that's why I put that in there.
19   Q    Were you dragging it out?  I mean, how long did
20        this take?
21   A    I don't remember how long it took.  Probably
22        about an hour or so.
23   Q    Do you know what they did when they left, Robert
24        and William?
25   A    They probably went to the hospital.
65
 1   Q    Okay.  You didn't put that in the report that
 2        they went to the hospital as soon as they got
 3        out of the interview.
 4   A    No.
 5   Q    That last paragraph on page 2 of your report
 6        what the doctor that had done the autopsy
```

```
 7        reported to you?
 8   A    Yes.
 9   Q    Multiple blunt force trauma to Ruth's head and
10        that the wounds were possibly inflicted with a
11        hammer or similar-type weapon?
12   A    Yes.
13   Q    The next paragraph on page 3 first full
14        paragraph "On November 20th" -- now this is
15        after Ruth had died; correct?
16   A    Yes.
17   Q    And you said you spoke to William and Robert
18        once again at police headquarters.  Was their
19        sister there too?
20   A    Yes, yes.
21   Q    And did you call them and ask them to come down?
22   A    Yes.
23   Q    And did you tell them why you wanted them to
24        come down?
25   A    To talk about the case.
66
 1   Q    Did you tell them you wanted to report to them
 2        the results of the autopsy?
 3   A    I may have.  I'm not sure if I said anything
 4        about the autopsy or not.
 5   Q    When they got there, did you tell them about the
 6        results of the autopsy?
 7   A    I'm not sure if they asked me when they came
 8        down or not.  I don't remember talking about the
 9        autopsy.  Once we got to the polygraph part,
10        everything blew up at that point and it was
11        over.  We never got that far.
12   Q    You say "All three siblings stormed out and I
13        have not heard from them since."
14   A    Yes.
15   Q    When you asked them to take -- is a polygraph
16        reliable?
17             MS. BOX:  Objection.  Calls for
18        speculation.  You can answer to your experience.
19   A    I mean, it's -- it's a tool that we use.  It's
20        not reliable in court.  It's not accepted in
21        court.  But in a case -- when there's a case,
22        like I said, between family members, it's
23        customary that we have to eliminate family
24        members first before we move on to somebody
25        else.
```

67
```
 1          So myself and Detective Tudor spoke to
 2     William.  Since it's not admissible, we turned
 3     off the recorder.  I told him I'm not accusing
 4     you of anything; but in cases like this, we need
 5     to eliminate the family members.  And I asked --
 6     requested that they take a polygraph.
 7          Now, reliable or not, it's still -- the
 8     reaction I got was very negative, screaming and
 9     yelling that they were not taking polygraphs,
10     which at that point was basically when I started
11     treating them like a suspect at that point.
12          Still up to this point everything was
13     circumstantial for the most part; but, I mean,
14     we used that polygraph as a tool to gauge where
15     people are coming from.  A lot of family
16     members, not all, would say "Yes, hurry up.
17     Give me a polygraph.  Clear me.  I want you to
18     find out who killed my mother."  They wouldn't
19     be yelling and screaming and say, "No way."
20          His reaction was out of control, so it made
21     Detective Tudor and I both believe that, yes, we
22     are on the right track.
23  Q  You say he yelled and screamed?
24  A  Yes.
25  Q  What did he yell and what did he scream?
```
68
```
 1  A  That he's not taking a polygraph, that we're a
 2     bunch of liars and we're just trying to jam him
 3     up in the case and get him for something he
 4     didn't do and we lied to get him down there.
 5  Q  Why did he accuse you of lying to get him down
 6     there?
 7  A  Because, like I said, he probably thought he was
 8     just coming down to get results of what happened
 9     to his mother and he didn't know he was going to
10     be confronted to see if he would take a
11     polygraph.
12  Q  His mother just died that day; right?
13  A  Yes.
14  Q  And you call him and tell him you want him to
15     come down to tell him about the results of the
16     autopsy.  They do and you don't tell them about
17     the results of the autopsy.  Instead you treat
18     them like suspects and say, "We want you to take
```

```
19        a polygraph"?
20   A    We never got that far.  And I wasn't treating
21        him like a suspect until after his reaction to
22        the polygraph.  I did not once treat him like a
23        suspect.  I never yelled at him, never got out
24        of line with him, asked him simple questions
25        about the events of the night before.
69
 1            That was just our gauge to ask him, "Will
 2        you take a polygraph?" to see how he would
 3        react.  And he reacted very negatively.
 4   Q    What about William?
 5   A    He came running down the hall and started
 6        yelling and screaming that "We're not taking any
 7        polygraph.  Robert, you're not taking any
 8        polygraph."  So Robert refused us also.
 9   Q    Did you or Tudor accuse William or Robert of
10        killing the mother at that time?
11   A    There were some words exchanged between
12        Detective Tudor I believe about the fact that
13        the money that she had.
14   Q    What did he say?
15   A    And that if you killed your mom for money,
16        that's ridiculous or something like that.
17   Q    He accused them?
18   A    There was a lot of emotions going back and forth
19        because they were yelling at us calling us
20        liars.  I mean, he didn't accuse.  He said, "If
21        you kill your mother for money, that's
22        sickening" or "ridiculous," something like that.
23   Q    Did he use the word "if" or did he actually say,
24        "You killed your mother for money"?
25   A    I don't know if he actually said it like that or
70
 1        not.  It wasn't recorded so I'm not sure.  I
 2        know it was heated back and forth.
 3   Q    But you had turned off the recorder?
 4   A    We were already out in the lobby of our office
 5        at that point when that was going on right
 6        before they left.
 7   Q    And you two had left, right, and gone into
 8        another room before the three sibling left?
 9   A    I don't understand the question, who had gone
10        into another room.
11   Q    You and Tudor accused -- Tudor accuses them of
```

```
12        killing their mother for money and you and Tudor
13        walk off from where you're all together and you
14        guys --
15   A    We went back to our office.
16   Q    You go back to your office and the three
17        children were there together still?
18   A    Yes.
19   Q    And then they leave?
20   A    Yes.
21   Q    But you put in here that they stormed out.  "All
22        three siblings stormed out."  That's really not
23        true, is it?
24   A    Yes.
25   Q    They left after you left.
71
 1   A    Well, they left at the same time.  We're all in
 2        this little room together smaller than this
 3        room, about a quarter of the size from me to you
 4        to the wall.  They went that way; we went this
 5        way.
 6   Q    So --
 7   A    So they did storm out.  I mean, you can use any
 8        words that you want.  I don't know if they
 9        stormed or left angrily, left yelling and
10        screaming; but they left upset, stormed out.
11        That's just the word that I chose to put in
12        there.
13   Q    And you said "and I have not heard from them
14        since."  Was that true?
15   A    I tried to contact William.  Yes.  I had talked
16        to William or Robert until the lawyers came with
17        the -- to do the limited search warrants. I
18        talked to the lawyers.
19   Q    Did you try to talk to William again?
20   A    I tried to call William a couple times, yes.
21   Q    What about?
22   A    To see if he would come in and do the limited
23        search warrant so I could get prints and DNA.
24   Q    Well, and he did that; right?
25   A    He contacted a lawyer and the lawyer contacted
72
 1        me to do it.
 2   Q    And he came in and gave prints and --
 3   A    Yes.
 4   Q    -- a DNA swab?
```

```
 5   A   Yes.
 6   Q   Okay.  You said "All three siblings stormed out
 7       and I have not heard from them since."  Did you
 8       expect William to call you or Robert to call you
 9       after Tudor had told them -- told them that they
10       accused him of killing his mother?
11           MS. BOX:  Again, you're mischaracterizing
12       his testimony.  He didn't testify that Tudor
13       accused them.  He said "if."
14           MR. WAPLES:  He said he can't remember
15       which one it was, whether he used "if" or
16       whether he just accused them.
17   Q   But regardless, after Tudor had said either "If
18       you killed your mother for money that's
19       ridiculous," or "that's sickening" or "You
20       killed your mother for money.  That's sickening"
21       or "that's ridiculous," and then they leave and
22       you thought it was strange that William or
23       Robert didn't call you after that time?
24   A   If they wanted find out who killed their mother,
25       they'd call somebody.  If they didn't want to
73
 1       talk to me, the could have called the
 2       supervisor.  Whether I expected them to or not,
 3       they didn't.  And that's what I put in here.
 4   Q   But didn't their sister Rebecca call you several
 5       times afterwards?
 6   A   She called me once in February just to see what
 7       was going on.  And I said, "The same suspects
 8       are being investigated."
 9   Q   And who were those?
10   A   William at that point.  He was the only one that
11       was a suspect.
12   Q   So you talked to Rebecca in -- in February?
13   A   I think it was February.  I can't be positive,
14       February or March, sometime she called the
15       office.
16   Q   Did you make a notation of that call?
17   A   I'm not sure if I did or not.  I do remember it,
18       though.
19   Q   I didn't see anything in your file.  I didn't
20       see any record of it in your file.
21   A   Maybe I just remember it, but I do remember her
22       calling.  And I think it was February.
23   Q   Of her calling you?
```

```
24  A   Yes.
25  Q   So the statement's not true that you have not
74
 1      heard from them since.  You say "All three
 2      siblings stormed out and I have not heard from
 3      them since."  So you had heard -- and you signed
 4      this on May 22nd of 2014.  So you had heard from
 5      Rebecca since.
 6  A   From Rebecca; right.  So that's -- yeah, that
 7      doesn't mean much to the probable cause.  But I
 8      mean, William is the suspect.  And Robert was
 9      with him.  They didn't contact me.
10          I didn't go back through and take that out.
11      I didn't catch that part of it, so I could have
12      added "except Rebecca called me and asked me
13      what was going on."  I don't know whether that
14      would have changed in the probable cause but ...
15  Q   Now, wasn't Robert a suspect at this point?
16  A   We asked him to take a polygraph also.  I mean,
17      William was the main suspect because he is the
18      primary caregiver.  He goes there every day.
19          It seemed like everything -- his comments
20      he made.  It was all circumstantial in the
21      beginning.  Mostly circumstantial probably when
22      she filed the case, but that's the decision that
23      the prosecutor made.
24          I had no reason to believe that Robert was
25      over there.  He said he hardly went over there.
75
 1      William was the main caregiver, went there every
 2      day, paid for her groceries, paid her bills,
 3      took care of her.
 4          The comments that he made about her head
 5      being bashed in and possibly using a lead pipe,
 6      I mean, all that stuff was contradictory with
 7      what we believed at first.  So ...
 8  Q   "What we believed at first"?
 9  A   If I said "we," maybe me and Detective Tudor.  I
10      don't know.  It's my probable causes, so that's
11      what I believed, that we had circumstantial
12      evidence.
13          What I do is I type everything up that I
14      put in here and I send it to the prosecutor's
15      office and they decide whether or not the
16      evidence warrants a charge.  That's what
```

```
17        happened.
18    Q   But as of December 6th of 2013, there wasn't
19        that in this Exhibit 1, that version of the
20        affidavit.  There's not yet sufficient evidence
21        at least for the prosecutor to go forward?
22    A   Well, she just -- I don't know if she would have
23        filed at that point or not if there was nothing
24        else, but I kept working on the case at that
25        point.  I don't know if she felt there was
76
 1        circumstantial evidence at that point or not.
 2        You would have to ask her.
 3    Q   On page 3 of that probable cause you've got the
 4        fourth full paragraph begins "On November 22,
 5        2013," about the videos at Kroger.
 6    A   Yes.
 7    Q   You said "The video showed the William
 8        Rainsberger drove onto the Kroger lot on
 9        November 19 ... at approximately 3:32 P.M.
10        Mr. Rainsberger got out of the car and
11        approached a garbage can located near the Red
12        Box.  I have -- as you know, you produced your
13        file to me, including any videos you got from
14        Kroger.  And I've looked through those videos,
15        and there's not a video that shows
16        William Rainsberger driving onto the Kroger lot
17        and getting out of his car.  Do you know why
18        that is, why there isn't a video that you
19        recovered from Kroger that would show what you
20        put in your probable cause affidavit?
21    A   It shows him walking across the lot with the
22        item in his hand, walking from his car towards
23        the --
24    Q   Do you believe that your homicide file that
25        contain videos from Kroger has a video of Robert
77
 1        [sic] that you say you recovered from Kroger --
 2        means you obtained it; right?  When you say you
 3        recovered?
 4    A   Yes.
 5    Q   A video that you recovered you obtained from
 6        Kroger that says that shows William drive onto
 7        the Kroger lot at approximately 3:32?
 8    A   Yes.  I believe I saw a video to that effect.
 9        Whether or not they actually gave me that part
```

```
10        of it or not, I do not know.  I don't remember
11        if I saw that part on video or not.  I know that
12        they transcribed the video and still photos of
13        him walking across the lot with the item in his
14        hand, so they got that from the video.
15   Q    Well, there's a video showing him approaching
16        the trashcan and the Red Box close to the Kroger
17        entrance where he's either on a sidewalk or a
18        step or two off the sidewalk walking up to that
19        area; right?
20   A    I'm not sure how far it is; but, yeah, there's
21        some photographs of him walking across the lot,
22        walking towards the Red Box and the trashcan.
23   Q    Are there photographs of him pulling onto the
24        Kroger lot and getting out of his car?
25   A    I thought there were.  I mean, if you're saying
78
 1        that there's not, maybe there's not.  I know
 2        that he had to pull in the lot because he pulled
 3        off the lot.  His car is on the lot.  And I'm
 4        pretty sure that when we went to the end, we
 5        backed it up and got to the point where he
 6        pulled out of the lot also.
 7   Q    All right.  Well, you put this in your probable
 8        cause affidavit so -- and you say you recovered
 9        the video, so there should be a video in your
10        file that shows what you put in your probable
11        cause affidavit; correct?
12   A    I got a search warrant, and I watched the video,
13        and I recovered the video.  So hopefully
14        everything is in there that I saw.
15   Q    And you say you saw Mr. Rainsberger getting out
16        of his car and approaching a garbage can.  You
17        say that's what the video shows?
18   A    Yes.  That's what I saw on the video.
19   Q    And you say Rainsberger appeared to pull out a
20        straight object from his person which he placed
21        in the garbage can?
22   A    Yes.
23   Q    And this is at 3:32 P.M.?
24   A    Yes.
25   Q    What did that straight object look like?
79
 1   A    Straight object.  I couldn't tell you what it
 2        was.
```

```
 3   Q   How big was it?
 4   A   I couldn't tell.  It was kind of hidden next to
 5       his body.  Looked like maybe 4 inches or so was
 6       sticking out.  There is still photos of it.  You
 7       can look at them and see.
 8   Q   You couldn't tell how long it was or what it was
 9       made out of?
10   A   It was next to his body.  No, I couldn't.
11   Q   And you say "As he placed the item in the trash
12       he appeared to look around for cameras."  So the
13       video should show that as well; correct?
14   A   Yes.
15   Q   If it doesn't show that, then you've
16       misrepresented what he -- what happened;
17       correct?
18            MS. BOX:  Objection.  Calls for
19       speculation.
20   A   That's my opinion.  I'm sorry.  That's my
21       opinion of what I saw when I watched the video.
22   Q   Are you speculating that was a murder weapon?
23   A   Am I speculating?  I just wrote in there that he
24       threw away a straight object.  Once again,
25       that's part of the circumstantial case, so I'm
80
 1       sure the prosecutor's office and I both believed
 2       that it could have been a weapon, yes.  That's
 3       why I put it in there.
 4   Q   Could have been, but it's just speculation
 5       because you don't know how big it was, what it
 6       was made out of, whether it was metal, or
 7       whether it was just a piece of trash?
 8   A   It was a straight object so, I mean, I put it in
 9       there as part of the entire case, as another
10       piece of circumstantial evidence, yes.
11   Q   Okay.  Would your theory of the case be that he
12       used that object to strike his mother in the
13       head at some point before 10:30 when
14       Delbert Pickens got there?
15   A   It's possible.
16   Q   And then keep that on his person --
17   A   It's possible.
18   Q   -- the rest of the day, not dispose of it, and
19       then go to his mom's house at 2:40 or sometime
20       before that and be there with his mother again
21       and then take that object and instead of
```

```
22        throwing it away in a secretive place, go to a
23        public place where there's a lot of people
24        around and throw that out in front of a lot of
25        people in a trashcan where most people would
81
 1        understand that there's security cameras?  You
 2        think that sounds like a reasonable thing that
 3        happened?
 4   A    It's possible.  Every case is different, and
 5        people that commit these crimes aren't acting
 6        reasonably.  So I can't say where somebody would
 7        throw away something that they hit their mother
 8        with.  It's -- stranger things have happened.
 9        Could have been put -- could have still had it
10        in the trunk when we got there.  We just don't
11        know.  Every case is different.
12            Some people stand outside of a crime scene
13        with the murder weapon in their hand.  Maybe he
14        forgot about it.
15   Q    But you don't know whether that was a murder
16        weapon or not?
17   A    I don't.  And I never said in my PC that it was
18        a murder weapon.  It's just open for
19        speculation, something for a jury to decide at
20        that point.
21   Q    Did you attempt to recover the trash from
22        Kroger?
23   A    It had already been dumped.  I checked.  They
24        don't keep it for more -- it was, like, four
25        days later when the video was watched.
82
 1   Q    Was the -- who did you speak to about the trash
 2        dumping from Kroger?
 3   A    The security, the Pam Pulliam, individual that
 4        got me the video.
 5   Q    Did you ask her when the trashcan from the front
 6        of the Kroger store where you saw
 7        Mr. Rainsberger throw away that trash or object
 8        was, where that would be dumped?
 9   A    No.  I mean, it's hard to tell which landfill
10        they would go to.
11   Q    No, no.  I'm not asking about a landfill.
12   A    You mean a dumpster?
13   Q    What do they do with that trashcan's contents?
14        What does Kroger do with that trashcan's
```

```
15        contents?
16   A    They put them in a dumpster to be picked up.
17   Q    And did you determine when the dumpster got
18        dumped?
19   A    I'm not sure what day it was, but she said that
20        the dumpster was already cleared.  They were
21        empty from that day.  And this was, like, four
22        days later after the 19th.
23   Q    Did she tell you that they were -- that the
24        dumpster got dumped on a routine basis on a
25        particular day?
83
 1   A    I don't remember all that.  I don't know if I
 2        got that specific about it or not, just to know
 3        that it was no longer there.
 4   Q    Did you ask her what company would pick up the
 5        dumpster?
 6   A    I believe it's Ray's that covers that
 7        neighborhood.
 8   Q    Well, did you ask her?
 9   A    I don't recall if I asked her or not.
10   Q    Did you attempt to contact Ray's and determine
11        what they might have done with the contents of
12        the dumpster?
13   A    No.
14   Q    Why not?
15   A    Because it would be like looking for a needle in
16        a haystack.  It was gone at that point.  There
17        was no way I was going to recover  -- I can't go
18        through a landfill looking for a lead pipe or
19        anything else that matches that type of blunt
20        object.
21   Q    Well, you don't know whether it was in a
22        landfill or not, do you?
23   A    That's usually where they dump the dumpsters.
24   Q    So the answer to my question is correct.  You
25        don't know what they did with the dumpster and
84
 1        its contents?
 2   A    I don't have any idea what happened to that
 3        dumpster.
 4   Q    The last full paragraph there on page 3, we've
 5        already covered that, haven't we, when we talked
 6        about the cell phone records?
 7   A    Yes.
```

```
 8   Q    And the landline records?
 9   A    Yes.
10   Q    And, again, you didn't report in there what
11        Ruth's landline showed calls or what the results
12        were from Biers analysis of Robert's cell phone
13        records; correct?
14   A    I did not.  I wasn't aware.
15   Q    Well, you had those documents.
16   A    I believe I had them, yes.  I didn't realize
17        they were a bit different.
18   Q    That paragraph continues in page 4.  It ends
19        with the sentence that says "William then stood
20        outside" -- this is after he had gone back to
21        his mother's after your scenario of him being
22        there at 2:40 making a call but then going to
23        Kroger at 3:30 and then coming back to his
24        mother's some time right after 3:30 and
25        discovering her, calling 911.  Then you said
85
 1        "William then stood outside and left his mother
 2        unattended until the police arrived."  That's
 3        after he calls the police; correct?
 4   A    Yes.
 5   Q    And that is consistent with your statements
 6        earlier that made the children -- or at least
 7        William -- look uncaring or unconcerned about
 8        his mother; right?  Callous?
 9   A    Yes.
10   Q    It created the impression that he didn't care
11        about his mother or what was happening to her?
12   A    Yes.
13   Q    But didn't William tell you that he had -- he
14        was afraid to pull the blanket off because it
15        would open up the dried up scabby wound on her
16        head, that he called 911 and he knew the fire
17        department was very close by -- there's a fire
18        station close by -- and that he ran outside to
19        flag down the fire department and the ambulance,
20        whichever got there first because it was
21        difficult to see which building was Building L
22        in that apartment complex?
23   A    That's what he said, yes.
24   Q    Okay.  And did you -- but that seems much
25        different than just William making a call and
86
```

```
 1        then William standing outside and left his
 2        mother unattended until the police arrived,
 3        doesn't it?
 4   A    It was -- I mean, it follows the line of
 5        thinking that he didn't check on her and that he
 6        pulls the door shut and goes outside.
 7   Q    Well, he did check on her, didn't he?
 8   A    We covered that earlier.
 9   Q    We did.
10   A    But he didn't pull the blanket off and ask his
11        mother, "What's wrong?"
12   Q    Well, he couldn't get his mother to respond at
13        all.  He was calling her name right?  "Mom?
14        Mom?  Mom?"
15   A    We already covered all that, yes; but, I mean,
16        my line of thinking at that point looking at the
17        totality of this case was that it wasn't
18        reasonable to me that you would leave your mom
19        laying there as soon as you walk through the
20        door, pulling that blanket off, and asking her
21        what's going on, what happened.
22             You wouldn't calmly walk around, place your
23        ice tea on the coffee table and think, well,
24        maybe I better not pull the blanket off because
25        it's like a bandaid or a scab on her head, so it
87
 1        just didn't make any sense to me.
 2             So when he left her unattended it just
 3        didn't -- I don't know that I would -- I would
 4        still be trying to find out what was wrong with
 5        my mom.  But, I mean, I'm not part of this case.
 6        That's just my own opinion.
 7   Q    Well, wouldn't it be more reasonable to want to
 8        make sure you get prompt expert medical
 9        attention to her as fast --
10   A    I mean --
11   Q    Let me finish my question -- to get prompt
12        expert medical attention to her as fast as you
13        can?
14   A    The police were probably there.  I mean,
15        somebody will guide the ambulance and they know.
16        They've probably been to that complex numerous
17        times.  They knew their way around.
18   Q    You're just speculating about that, aren't you?
19   A    And you are too.
```

```
20  Q   I'm not.  I'm not at all.
21  A   You're saying that he cared about her.  And I'm
22      just saying in my opinion, with the totality of
23      the circumstances, it seemed that he didn't.
24  Q   Wasn't it --
25  A   And that was circumstantial evidence for the
88
 1      prosecutor to file the charges.  That's all I'm
 2      saying.
 3  Q   Right.  The picture that you painted in the
 4      probable cause affidavit were the reason why the
 5      prosecutor filed the charges; correct?
 6          MS. BOX:  Objection.  Calls for
 7      speculation.
 8  A   I don't understand.
 9  Q   Well, we've already covered this.  The
10      prosecutor relied upon your affidavit of
11      probable cause in order to say "go forward" and
12      then draft up the charges that you signed, which
13      are the information for murder accusing William
14      of killing his mother.
15  A   Yes.
16  Q   All right.  This next paragraph on page 4 of
17      Exhibit 2, your affidavit of probable cause, you
18      say you obtained William's cell phone records
19      "including cell tower site locations for the day
20      of November 19, 2013.  Those records do not show
21      William Rainsberger outside of the area of
22      Shortridge and 10th Street during the relevant
23      time period."  Correct?  Is that what you put?
24  A   That's what it says, yes.
25  Q   I have looked at those records, and I want to
89
 1      know what you determined was the relevant time
 2      period.
 3  A   Between the morning and when he called 911, his
 4      Kroger card showed that he was across the street
 5      at the Kroger gas station around 9:00 in the
 6      morning too.  So, I mean, the relevant time
 7      period is the morning hours leading up to when
 8      she was found.  I mean, we've got the 10:30 time
 9      that the Meals on Wheels person was there, so
10      sometime before that up until the time she was
11      found.
12  Q   All through the night before?
```

```
13   A   Well, we didn't -- yeah, I suppose you can say
14       through the night before.
15   Q   Well, I think you said that right.  You didn't
16       know when the attack occurred on the mother.
17   A   I don't have a definite time, no, but --
18   Q   Your best guess is it happened before 10:30
19       because what's when Delbert Pickens tried to
20       contact her?
21   A   Yes.
22   Q   But don't know whether it happened an hour
23       before 10:30 or at midnight or the night before;
24       correct?
25   A   We don't -- we didn't pinpoint the time, no.
90
 1   Q   Right.  So a relevant period for the attack on
 2       the mother includes the night before; right?
 3   A   Well, my relevant time period was in the morning
 4       because I -- it appears to me that he was there
 5       over night.  She wouldn't have survived that
 6       long.
 7   Q   You didn't see her.  You weren't there.
 8   A   No, but I know the wounds that she sustained
 9       were pretty serious.  And they totally
10       immobilized her and put her out.  She was barely
11       hanging on at 3:00.
12   Q   Do you have any medical training?
13   A   No.
14   Q   Are you --
15   A   I talked to the pathologist, though.
16   Q   Are you making a medical judgment, though, when
17       the attack would have occurred because based on
18       how long she would survive with that wound?
19   A   That was just going by the seriousness that the
20       pathologist said the wounds were.
21   Q   Serious and it caused her death?
22   A   Yes.
23   Q   And she was -- we know at least that she was
24       unconscious or unresponsive when -- when William
25       found her and called 911 and the ambulance and
91
 1       fire people came at 3:30 that afternoon;
 2       correct?
 3   A   Yes.
 4   Q   And we assume she was in a similar sort of
 5       condition, unresponsive, unable to make any
```

```
 6        noise, or come to the door or answer the phone
 7        when Dilbert Pickens was there at 10:30 that
 8        morning; correct?
 9   A    Yes.
10   Q    And how long she had been in that condition? I
11        think we established that you don't know.  It
12        could have been any time that morning or the
13        night before; correct?
14   A    I suppose it could have been the night before;
15        but, I mean, there was still blood that wasn't
16        coagulated.  There was still blood that was wet.
17        I mean, it surely would have been dried if she
18        was there all night.
19             So the relevant time period, to me, was --
20        I mean, you can say it was all night; but when I
21        wrote this, the relevant time period is leading
22        up to the time when he called 911.  He was there
23        in that area, like he said he was.  I know that
24        he was there from at least 9:00 A.M. until he
25        called the 911.
92
 1   Q    Well you know he was there from 9:00 A.M.
 2        because he bought gas at Kroger?
 3   A    Yes.
 4   Q    My specific question in this record, this
 5        affidavit of probable cause, you said that the
 6        cell phone tower location data showed that he
 7        was in the relevant -- in the area during the
 8        relevant time period.  I'm trying to figure
 9        out -- I'm asking you, one, what's the relevant
10        time period?  You're telling me it's at least
11        that morning is your thought.
12   A    My relevant time period was --
13   Q    And my question is:  Do your records in your
14        file contain cell phone tower site locations for
15        that day that show where William's phone was on
16        that day morning to that afternoon.
17   A    Yes.  The tower locations will show that he was
18        in the area and his house is in this area also.
19        So it's not out of the ordinary that he's still
20        there all day.  He lives on 13th street, so I
21        said that they showed him not outside the area
22        so he was in the area.
23   Q    Okay.  So you're including when he's at his
24        house?
```

```
25   A   Yes, the area -- yeah, that's what I'm saying.
93
 1        I'm not saying right at the apartment.  That's
 2        not what that means.  It just means outside the
 3        area.
 4   Q    Well, when the --
 5   A    Which is the cell tower.  In that area, so he's
 6        close to that cell tower and his house is in
 7        that area.  So that's all that means, that he
 8        wasn't in Plainfield at that time.  He wasn't in
 9        Morgan County at that time.  He was in that area
10        around Shortridge and 10th Street.  That's all
11        that means, which his house is in that area.
12   Q    Well, but you put Shortridge and 10th because
13        that was close to the mother's house rather than
14        his house.
15   A    Because it's in the area.  It's in the same area
16        as 13th Street.  It's just right across the
17        street, really, a couple blocks away.
18   Q    But you didn't put the records show that he was
19        at his house or by his house the relevant time
20        period.  You put he was at Shortridge and 10th
21        which was closer to his mom's apartment where
22        the attack occurred; correct?
23   A    Yes.  That's the way I put it in there.
24   Q    Okay.  The next full paragraph, the last full
25        paragraph you say you obtained financial records
94
 1        in January for Ruth Rainsberger that showed
 2        William, Robert, and Rebecca were the
 3        beneficiary of her assets; correct?
 4   A    Yes.
 5   Q    Did you -- and so you think that -- well, tell
 6        me.  Are you saying that you think William
 7        killed his mother for one-third of her assets?
 8   A    I'm not saying that.  It's just part of the
 9        case.  That's how much money she had in case
10        there's a motive.  That could be a motive.
11        People kill each other for $20 anymore but --
12   Q    Did you check William's assets, his own assets?
13   A    No.
14   Q    So you didn't know how much money he had?
15   A    No.
16   Q    You didn't know he owned his house free and
17        clear?
```

```
18   A   It didn't have anything to do with my case.
19   Q   Did you check Robert's financial situation?
20   A   I knew that he had been recently foreclosed
21       upon.  I got that from William and Robert, so he
22       was staying with William because he was locked
23       out on his lot.
24   Q   So he was more in financial straits than William
25       was?
95
 1   A   Yes.
 2   Q   But you really didn't look into William's
 3       financial situation?
 4   A   No.
 5           MR. WAPLES:  Okay.  Let's take a break.
 6           (A recess was taken between 11:17 A.M. and
 7       11:32 A.M.)
 8           MR. WAPLES:  Back on the record.
 9   Q   Detective, you said that there was no sign of
10       forced entry; correct?
11   A   Yes.
12   Q   Did you ask Robert or William about their
13       mother's normal behavior if somebody came to the
14       door, how she would respond if somebody came to
15       the door and knocked?
16   A   I talked to William about that.
17   Q   What did he tell you about that?
18   A   He said that she would look through -- try to
19       look through the peephole, and she wouldn't let
20       anybody in that she didn't know basically.
21   Q   Okay.  He didn't tell you that she couldn't
22       reach the peephole and that she would open the
23       door without being able to see through the
24       peephole?
25   A   I don't think he told me she would open the door
96
 1       to anybody to see if anybody was out there.
 2   Q   Well, did he tell you that she couldn't see
 3       through the peephole?
 4   A   I just remember him saying she tried to look
 5       through the peephole.  I don't know if she
 6       couldn't reach it or not.
 7   Q   Okay.
 8   A   She could probably yell through the door.
 9   Q   Did he tell you that he thought that the door
10       was unlocked even though he used his key to open
```

```
11          it, it moved like it had not been locked or it
12          didn't make that unlocking noise or mechanism
13          that --
14    A     Yes, that's what he said.
15    Q     And that would be strange to him, that he would
16          have thought it would have been locked; correct?
17    A     Would it be strange that he thought it was
18          locked?
19    Q     Well, didn't he tell you his mother normally
20          would keep her door locked?
21    A     That she would keep it locked, yes.
22    Q     She would keep it locked.  So being unlocked, to
23          him, would be unusual?
24    A     If it was unlocked, yes.
25    Q     Yeah.  You said that it didn't appear that
97
 1          anybody had gone through anything, but weren't
 2          there drawers pulled out in his mother's
 3          bedroom?
 4    A     They were pulled out a little bit.
 5    Q     And were the contents all jumbled up?
 6    A     No, not at all.
 7    Q     Did any of the children tell you that she was on
 8          a prescription medication that was missing?
 9    A     No.
10    Q     Okay.  Did any of the children tell you that she
11          had a purse similar to the black purse that was
12          found but different and that it contained --
13          that she would keep money in there or a credit
14          card or whatever?
15    A     No.  William told me that she didn't carry any
16          money and that he only described the purse,
17          which is the one we found.  Never said there was
18          a --
19    Q     Did any of the children tell you that there was
20          a second purse that --
21    A     I didn't talk to any of them about it.
22    Q     Any of the children tell you that there was
23          jewelry missing?
24    A     Not that either, no.
25    Q     If they did, you wouldn't -- you didn't put that
98
 1          in your probable cause affidavit?
 2    A     I don't recall any jewelry being mentioned.
 3    Q     If they had told you that jewelry was missing or
```

```
 4        a black purse was missing or a prescription was
 5        missing, you would have put that in your
 6        probable cause affidavit?
 7   A    Yes.
 8   Q    Because that would indicate that --
 9   A    Well, I would have let the prosecutor know.
10        That they said it was missing doesn't
11        necessarily mean -- I would have let the
12        prosecutor know.
13   Q    But you didn't put that in your probable cause
14        affidavit and you didn't let the prosecutor know
15        that?
16   A    I didn't believe anything was taken, no.
17   Q    So you didn't report to the prosecutor any of
18        those things; correct?
19   A    I let -- I mean, they obviously knew that he
20        said that she had a purse that was described
21        that we found in the house and that she didn't
22        carry any money.  I let them know that there was
23        money and her credit cards and checks were in
24        the apartment, so those weren't taken.
25             I didn't know about any prescription
99
 1        medication that was gone.  He said that she used
 2        mostly over-the-counter medication that was
 3        still on the counter.  I'm not sure what the
 4        mentioned medication is, but I don't think it's
 5        popular in the street that anybody would want to
 6        take it.
 7             And that's about it.  I mean, the
 8        prosecutor knew everything that he said. I
 9        mean, she had the statements so he mentioned
10        that stuff in the statements.
11   Q    But you never reported to the prosecutor
12        yourself that the children were telling you that
13        there was a purse missing, prescription
14        medication missing, or this -- or jewelry?
15             MS. BOX:  Objection.  Asked and answered.
16        You can answer.
17   A    They never told me that those things were
18        missing.
19   Q    And so you never reported that to the
20        prosecutor?
21   A    Only what William said, that she had a purse
22        that could be missing; but we found, like, that
```

```
23        with the change purse and the credit cards and
24        the check and the money were there, so it
25        obviously wasn't missing.  But she knew that
100
 1        William brought up the purse.
 2            I asked William about it.  He didn't bring
 3        it up.  I asked him if she had a purse or
 4        anything, and that's what he described.
 5    Q   If the facts were that it was -- the drawers
 6        were pulled out, the contents were jumbled, that
 7        there was a purse that was missing, that there
 8        was prescription medication that was missing,
 9        that there was jewelry that was taken and
10        missing, that would be more indicative that
11        there was some kind of intruder and robbery
12        motive; correct?
13    A   It could be possible or could be staged, either
14        one.
15    Q   You never did find the murder weapon; correct?
16    A   No, no.
17    Q   Whatever William appeared to be throwing away at
18        Kroger didn't appear to be a hammer?
19    A   It didn't really look like a hammer to me, like
20        a hammer-like object.
21    Q   When the prosecutor dismissed the charges for
22        evidentiary reasons, you said you had a
23        conversation, not with Denise but with the other
24        deputy prosecutor.
25    A   Yes, sir.
101
 1    Q   Was that the only conversation you had with the
 2        prosecutor's office about that?
 3    A   Yes.
 4    Q   And was that an in-person conversation?
 5    A   We talked on the phone and in person probably.
 6    Q   Were there any emails exchanged between you and
 7        the deputy prosecutor about that decision?
 8    A   There was lots of emails between us, but I don't
 9        know that she mentioned that in an email.  I'm
10        not sure if she mentioned that.
11    Q   In your emails, the lot of them -- who was the
12        deputy prosecutor again?
13    A   Mariel Reidle, R-e-i-d-l-e.
14    Q   And if I was to look for those emails, where
15        would I find them, between you and Mariel?  Are
```

```
16          they in Outlook?  Are they --
17   A      Yeah, they're in Outlook.  Yeah, that's what we
18          use.  I don't think I deleted any of them.
19   Q      Can you go back and --
20              MR. WAPLES:  Can I ask you, Kathryn, to
21          produce the emails between -- any emails from
22          the detective on these regarding
23          William Rainsberger and this case to the
24          prosecutor's or anybody else?
25              MS. BOX:  We --
102
1               MR. WAPLES:  Between Officer Benner,
2           Officer Tudor, Denise Robinson, and
3           Mariel Reidle?
4               MS. BOX:  Those four.  And what time period
5           are you looking at?
6               MR. WAPLES:  Really from the date of the
7           incident, November 19th of 2013, ongoing.
8               MS. BOX:  Tudor, Reidle, Robinson, and
9           Detective Benner?
10              MR. WAPLES:  Yeah.  They don't all have to
11          be in there, but any of them with respect to the
12          Rainsberger death investigation.
13              MS. BOX:  We can do a search.  ISA can do a
14          search, but I'm guessing there's going to be a
15          lot that comes back so it will take a while to
16          go through the privilege review, but we can get
17          them.
18   Q      How many emails do you think there might be that
19          comprise that universe of emails between you and
20          the deputy prosecutor and --
21   A      Probably not a lot between me and
22          Denise Robinson but Mariel sent and her
23          paralegal -- they sent stuff like what I needed
24          to do.
25   Q      What was her paralegal's name?
103
1    A      Angie Mahone.  She's not there anymore.  She
2           works for Voyles.  She works in Voyles' office
3           now.
4    Q      M-a-h-o-n-e?
5    A      Yes.
6    Q      Mahone?
7    A      Yes, sir.
8    Q      Anybody else in the prosecutor's office?
```

```
 9   A   That should be it.
10   Q   Anybody else in the police department or --
11   A   Shouldn't be, no.
12   Q   What about anybody else you might have
13       communicated with in email regarding the
14       Rainsberger case?
15   A   I get the crime lab Jenny Lane probably sent me
16       a list of stuff she recovered and stuff like
17       that.
18   Q   Jenny Lane --
19   A   She works for.
20   Q   -- and Angie Mahone?  She works where?
21   A   She works for the Carmel Police Department.
22   Q   But back then she was with the crime lab with
23       the City?
24   A   Yes.
25   Q   When was the last time you talked to Jenny?
104
 1   A   It's been a while.  She left probably six months
 2       ago or so at least.
 3   Q   When was the last time you talked to Mariel?
 4   A   About this case?
 5   Q   No, about anything.
 6   A   I don't really talk to her anymore unless I just
 7       pass her in the hall or something, just say
 8       "Hi."  That's all.
 9   Q   She's with the prosecutor's office?
10   A   Yes.
11   Q   When was the last time you talked to her about
12       the case?
13   A   Probably when it got dismissed.  I haven't
14       really talked to her since.
15   Q   Have you -- did you take any report to your
16       superior, Captain Converse, about the dismissal
17       of the case?
18   A   Yes, they all know about it.
19   Q   Did you make those in writing or orally or both?
20   A   I don't know that I -- probably just orally.
21       They all know what's going on with the case,
22       though.  I don't know that I'm -- I didn't give
23       them an inter-department or anything about it.
24   Q   Would there be any emails between you and
25       Captain Converse about the case?
105
 1   A   I don't think so.
```

```
 2   Q   And tell me again to the best of your
 3       recollection the prosecutor decision to dismiss
 4       the charges, what did they communicate to you,
 5       Mariel communicate to you?
 6   A   I -- I already answered that a little while ago;
 7       but I'll do it again, I guess.  What did she
 8       communicate to me?  After the bail hearing and
 9       after the suppression when the cartoon that
10       William drew got thrown out and the two
11       witnesses were acting a little reluctant about
12       wanting to continue on with the investigation,
13       she wasn't sure that we would be able to win the
14       court -- win the trial or not.
15           So rather than try it and lose it and not
16       be able to try it again, we figured we'll wait
17       and see.  Dismiss it and see if any new evidence
18       would come up that could strengthen the case
19       more.  Basically that's the reason that I'm
20       aware of.
21   Q   In your interviews with William and -- and
22       Robert, his brother, you asked him about a
23       person named Michael a couple of times.  Who is
24       Michael?
25   A   That name came up when I spoke to Damon Thomas
106
 1       and Kevin Walker.  They said that they thought
 2       they had heard Ruth about a week earlier or so
 3       talking to somebody on the phone named Michael,
 4       and it turns out that there was a piece of
 5       paper -- William said that his mom had troubles
 6       with the TV all the time.  There was a piece of
 7       paper up by the television that had Comcast
 8       contact on there, and it had questions that she
 9       was supposed to ask, and it had Michael in
10       parentheses at the beginning of each one.
11           So Michael appears to be the Comcast person
12       she would call when she had problems with her
13       television set.  She'd often call William to
14       come over and help her with the television also.
15   Q   Did you try to contact Comcast and find out who
16       this Michael is?
17   A   I called them, but they said -- I mean, they
18       have got a lot of Michaels that worked there.
19       And they don't know that they track the phone
20       calls that well to see who it was that would
```

```
21        answer questions like that, so I didn't pursue
22        it any further.
23   Q    Did the two witnesses, Damon Walker -- or
24        Kevin Walker and Damon Thomas, did they say that
25        they had seen a Mike, this person named Michael
107
 1        there?
 2   A    No, they said it seemed like she was talking on
 3        the phone.
 4   Q    To a Michael?
 5   A    Yes.  She said his name.
 6   Q    On the day of the incident?
 7   A    No, about a week before they said.
 8   Q    About a week before.  And then that name was
 9        written -- she had written it somewhere in
10        her --
11   A    It was typed and it said "Michael."  I don't
12        know if William typed it for her or something,
13        but it was a sheet on here that had Michael in
14        parentheses by every question, like "Do I have
15        it on the right channel?" or whatever questions
16        that she had on there.  But she had "Michael"
17        written down there at least ten times.  And
18        there was a landline call on November 12th, I
19        think it was, where she did call Comcast.
20   Q    Okay.
21            (Plaintiff Exhibit 6 marked for
22        identification.)
23   Q    You said you collected a bunch of evidence in
24        the case to have the crime lab look at, examine;
25        right?
108
 1   A    Yes.
 2   Q    Handing you Exhibit 6, which is a multiple-page
 3        document starting with Bates stamp 586, can you
 4        tell me what that is, please.
 5   A    This is a crime lab card that I submitted to
 6        Jennifer Lane in reference to the green blanket
 7        that was recovered from the victim's body, check
 8        for touch DNA, check for hair foreign to the
 9        victim, check for prints, touch DNA off the
10        eyeglasses recovered near her body.
11   Q    And it's a multiple-page document that goes on
12        to the next page.
13   A    Yes.
```

14  Q   You also checked the victim's gray jacket and
15      sleeves for touch DNA?
16  A   Yes.  And then the underwear from the victim,
17      check for any signs of semen, gray pants
18      recovered from the victim, check pant legs for
19      touch DNA.
20          And then the third card was from the
21      autopsy, victim fingernail scraping.  I had them
22      check for foreign DNA.  And I also did a rape
23      kit on her for oral, anal, and vaginal swabs to
24      check for any semen.
25  Q   And the fourth page?
109
1  A   Want me to continue to read them?
2  Q   Yeah.  The fourth page you had a Stanley hammer
3      and a helping hand hammer checked for DNA, touch
4      DNA?  It's on Bates stamp 589.
5  A   Oh, yes.
6  Q   Items 24 and 25?
7  A   Yes.  Stanley brand hammer, check for human
8      blood, touch DNA, and another helping hand
9      hammer check for human blood and touch DNA.  And
10     the last one is a pink pen that was by the front
11     door or by the coffee table, glass dish
12     recovered from the scene.  That's the end of
13     that.
14  Q   All right.  And you submitted this to the crime
15      lab on November 26 of '13?
16  A   Yes.
17  Q   Okay.  Why would it be important to look for
18      that kind of DNA and that kind of evidence?
19  A   Checking to see if there was anybody foreign
20      inside the apartment that might have had contact
21      with any of her property or her person.
22  Q   Might help identify who would have done this to
23      Ruth; correct?
24  A   Possibly, yes.
25  Q   Or it might eliminate people who might have done
110
1      this to Ruth?
2  A   Possibly.  Not necessarily.
3          (Plaintiff Exhibit 7 marked for
4      identification.)
5  Q   Exhibit 7 is Bates stamped 582 from your file.
6      Is this the -- well, tell me what this is.

```
 7   A   This is the buccal swab I took from
 8       William Rainsberger to compare to any DNA
 9       recovered from the seen.
10   Q   So this is the swab you -- was it from his
11       mouth?
12   A   Yes.
13   Q   And that's how you collect DNA for the lab to
14       then compare that to the DNA that might be found
15       on the items that you were listed in the Exhibit
16       6; correct?
17   A   Yes.
18   Q   Okay.
19           (Plaintiff Exhibit 8 marked for
20       identification.)
21   Q   What is 8, Exhibit 8?
22   A   This is the property room voucher showing that I
23       took the swab down to the property room and
24       submitted it as evidence.
25   Q   The swab from William?
111
 1   A   Yes.
 2   Q   Okay.  Put those over here.
 3   A   (Witness complies.)
 4   Q   Now, did those -- you had the -- was it both on
 5       the blanket that was around her head, did -- and
 6       you had that checked for DNA?
 7   A   Yes.
 8   Q   And her jacket she had on?
 9   A   Yes.
10   Q   And compared to see whether there was any DNA on
11       there from William?
12   A   Yes, from anybody.
13   Q   Did it show that William -- was there any DNA
14       from any male on either one of those items?
15   A   There was a DNA swab from the sweatshirt that
16       was -- didn't come back to anybody.
17   Q   Did it come back as DNA from an unidentified
18       male?
19   A   Yes.
20   Q   And did it exclude William as being the --
21   A   Yes.
22   Q   -- contributor of that DNA?
23   A   Yes.
24   Q   And did you attempt to match that DNA with --
25       through any kind of databank of DNA?
```

112
```
 1  A   Yes, the unknown samples get put in CODIS and
 2      then checked every week against known samples in
 3      their database.
 4  Q   And at least up to that time it hadn't come back
 5      with anybody else that might have --
 6  A   Right, up to this time.
 7  Q   But at least it was an unidentified male had
 8      some kind of touch DNA on her jacket?
 9  A   Yes.
10  Q   And you had it recovered from the back of her
11      neck of her jack and the sleeve?  Is that where
12      you did?
13  A   Probably the shoulder, yes.  I mean, they do the
14      swabs.  I mean, they get an area that they deem
15      necessary.
16  Q   Well, why would they -- would those be places
17      where maybe an attacker might grab her?  Is that
18      why you're looking for touch DNA at those places
19      more likely that somebody would grab her there?
20  A   It's possible, yes.
21  Q   Okay.  Did you include the results of that DNA
22      in your probable cause affidavit that showed
23      that there had been some unidentified male that
24      had touched her jacket?
25  A   No.
```
113
```
 1  Q   And had excluded William as that person?
 2  A   No.
 3  Q   Okay.  Why not?
 4  A   I let the prosecutor know that there was a
 5      sample and based upon the fact that she was
 6      covered up with the blanket and that she was
 7      transported by the medics and everybody, she
 8      felt -- and the other prosecutors felt that it
 9      could be explained by possible medics, doctors,
10      nurses, somebody that took -- touched her shirt
11      during her care at the hospital or at the scene.
12          So it's not something that I put in the
13      probable cause.  It's something I let the
14      prosecutor know and if there are any charges
15      filed, that they then forward it on to any
16      defense attorney that might take the case.
17  Q   But you knew at that time that when the results
18      came back that it had excluded William as the
```

```
19        contributor to that DNA?
20   A    I'm not sure exactly when the results came back;
21        but, yes, I was aware of it and the prosecutor
22        was aware of it.
23            (Plaintiff Exhibit 9 marked for
24        identification.)
25   Q    Exhibit 9, is this one of the -- is this a
114
 1        laboratory report from the crime lab on that
 2        DNA?
 3   A    Yes, yes.
 4   Q    But that showed what they -- the items that she
 5        examined and what they found?
 6   A    And there's another case number on here also
 7        from a different case of the DP14012605 doesn't
 8        have anything to do with this case.  This was a
 9        sweatshirt that was recovered on February 5th of
10        2014 from a couple buildings over that was
11        hidden behind a washer.  It had possible human
12        blood on it so it was collected and sent in and
13        did not come back connected to this case in any
14        way.
15   Q    Okay.  But the rest of them above that --
16   A    All the ones that have the DP13153344 are
17        related to this case.
18   Q    Gotcha.  And item -- the one, two, three, four,
19        five -- the sixth item down is the
20        Item 006.001.01 is a possible skin cell sample
21        from the outside back neck and outside left
22        sleeve of jacket?
23   A    Yes, sir.
24   Q    And does that show that there were, on the
25        second page under Conclusions, down at the --
115
 1   A    It's in the second paragraph at the top.
 2   Q    Second paragraph at the top?
 3   A    Yes.
 4   Q    Okay.  Show that that was from --
 5   A    Yes.
 6   Q    It was an unknown male individual on that?
 7   A    Yes.
 8   Q    But it not William Rainsberger?
 9   A    Correct.
10   Q    Okay.
11            (Plaintiff Exhibit 10 marked for
```

```
12        identification.)
13   Q    Exhibit 10, is that another laboratory result?
14   A    Yes.
15   Q    A little earlier than the other one; right?
16   A    February 10th, 2014.
17   Q    And that is submitting the blanket and the
18        jacket and the underwear and those other items?
19   A    Yes.
20   Q    And you're going to do basically the same thing
21        you were talking about us doing blood and DNA
22        exams on these items?
23   A    Yes.
24   Q    And actually there's the same report looks like
25        you maybe looked at before that shows the
116
 1        results, last three pages; is that correct?
 2   A    Yes.
 3   Q    All right.
 4            (Plaintiff Exhibit 11 marked for
 5        identification.)
 6   Q    Here is defendant's preliminary witness list.
 7        And I want to ask you about those people.  What
 8        is Detective Tudor have to -- what will he
 9        testify to other than what you've already stated
10        his involvement was?
11   A    The only -- he was at the initial scene, helped
12        with the initial canvas.  He was there when I
13        spoke to Kevin Walker and Damon Thomas.
14   Q    On the day of?
15   A    Yes.  And then he was with me when I spoke to
16        William.
17   Q    So you both were talking to Damon Thomas and
18        Kevin Walker?
19   A    Yes.  He talked to them initially.  Then I went
20        up there later and talked with them also.
21   Q    Okay.  So you talked to them at separate times
22        and then he together with you?
23   A    Yes.
24   Q    And then he was -- took one of the statements of
25        the brothers at headquarters?
117
 1   A    I took all the statements, but he was with me.
 2   Q    He was with you for both of those?
 3   A    He was with me for William.  I'm not sure.  He
 4        may have been there with Robert also.
```

```
 5   Q   Okay.  What else did he do in the case?
 6   A   He went -- when I went back the next day and
 7       recovered some of the other stuff, he was there
 8       also.  I think the only other thing he probably
 9       did was recovered a note from Tracy, the
10       apartment manager there, that William had
11       brought to her; and we just recovered it.  Gave
12       it to Jenny Lane.  And that was the last
13       participation I think Tudor had in the case.
14   Q   From then on it was pretty much you?
15   A   Yes.
16   Q   What about Officer Jordan Lewis?  What did he
17       do?
18   A   I'm not sure if I remember -- I don't remember
19       what he did.  I'm not sure why he's on here.
20   Q   And Carl Wooldridge?
21   A   He's the fireman at the scene.  And then he gave
22       a statement about William's comments at the
23       scene.
24   Q   And that's contained in your file.  We have
25       that; right?
118
 1   A   Yes.
 2   Q   Did he do anything else with respect to the
 3       case?
 4   A   No.
 5   Q   And Jennifer Lane was the crime scene analysis
 6       person?
 7   A   Yes, sir.
 8   Q   Did you say she's now up -- she is still with
 9       IMPD or --
10   A   Carmel.
11   Q   She went to Carmel?
12   A   Yes.
13   Q   And Delbert Pickens, we pretty much covered what
14       he said and he gave a statement?
15   A   Yes.
16   Q   Pam Pulliam, what does she have to say?
17   A   She was the security at the Kroger that got the
18       video and I spoke to.
19   Q   Did you just speak to her the one time?
20   A   No, I saw her a few different times.  I went and
21       spoke to her about the video.  Then I got a
22       search warrant for the video.  Then I watched
23       the video.  Then she recorded or put the video
```

```
24        on CDs and gave them to me, so I talked to her
25        quite a few times.
119
 1   Q    Did she tell you anything other than what's on
 2        the video?
 3   A    No, she didn't have any knowledge of anything,
 4        personal knowledge, of what happened.
 5   Q    Did she tell you any impressions she had from
 6        looking at the video?
 7   A    No.
 8   Q    Do you know of any other witnesses in this case
 9        that would have anything to say with respect to
10        your defense?
11   A    No.  That's pretty much the only other people
12        that I talked to outside of this would have been
13        Robert's -- or William's relatives that live in
14        Ohio.
15   Q    Did they --
16   A    I say Aunt Blanche, I think.  And they didn't --
17        I mean, she just had basic knowledge of what
18        William told them.  That's all.  They don't have
19        anything to do with the case really.  Those are
20        the only other people I believe I spoke with.
21   Q    They weren't really going to be witnesses in the
22        criminal case?
23   A    No.
24   Q    Wouldn't be witnesses in this case?
25   A    No.
120
 1   Q    Okay.
 2            (Plaintiff Exhibit 12 marked for
 3        identification.)
 4   Q    Exhibit 12, can you tell me what this is?
 5   A    This is a physical evidence list typed up by the
 6        crime lab.
 7   Q    And does it show the items of evidence in the
 8        case and who submitted it to them and the date
 9        that they submitted them?
10   A    Yes.
11   Q    Is there any other evidence that you were aware
12        of, physical evidence, that existed in the case?
13   A    I don't believe so, no.
14   Q    Okay.  Okay.  Did you ever try to confiscate the
15        clothing Bill had on him that day?
16   A    No.
```

```
17  Q  Did you learn that Bill had full access to his
18     mother's accounts?
19  A  Yes.
20  Q  He could have taken the money without killing
21     his mother if he wanted to, couldn't he?
22  A  I suppose so.
23  Q  Did you look up Bill's criminal background?
24  A  He did not have one.
25  Q  Did you put either one of those items in the
121
 1     affidavit of probable cause, that he had no
 2     criminal background and that he could have taken
 3     the money without killing his mother?
 4  A  No.
 5  Q  So you interviewed his Aunt Blanche?
 6  A  Yes.
 7  Q  Did she tell you about Bill telling her about
 8     her sister's death -- his mother's death?
 9  A  I spoke to Marcia, her caregiver, I spoke to her
10     first.  And then she did mention that she
11     eventually found out that she had been -- that
12     she had been killed.  But they initially thought
13     that she had just fallen and hit her head or
14     something is what Marcia and those guys thought
15     at first.  They found out a couple month later.
16  Q  Did Aunt Blanche tell you that when Bill was
17     telling her about his mother's death, that she
18     could barely understand him because he was
19     crying so much?
20  A  No, I don't remember that.
21  Q  What evidence do you have other than what we've
22     gone over today that would be incriminatory
23     towards Bill Rainsberger, if there is any?
24  A  Stuff on the probable cause is what the case was
25     based upon, what the arrest was made upon.
122
 1         From the search warrant there was a cartoon
 2     that he drew that seemed it depicted the crime
 3     scene and the actual act of his mom being
 4     killed.  And that was thrown out during the
 5     motion to suppress.  That would have been
 6     entered into evidence.
 7  Q  Why did the court throw that out?
 8  A  Because it wasn't listed.  The search warrant
 9     was basically to recover -- based upon jail
```

|     |   |                                                              |
|-----|---|--------------------------------------------------------------|
| 10  |   | calls William was making, he was requesting that             |
| 11  |   | some files be deleted from a computer.                       |
| 12  |   | So the warrant was to recover any hard                       |
| 13  |   | drives or -- he said they were in a fire box of              |
| 14  |   | some type that we were looking for, recovering               |
| 15  |   | any thumb drives, anything that could contain                |
| 16  |   | possible files that could be deleted because we              |
| 17  |   | didn't know what they were.                                  |
| 18  |   | During that search, in a drawer I found                      |
| 19  |   | notebook paper that was folded.  And it was                  |
| 20  |   | about three or four pages of a cartoon with                  |
| 21  |   | square -- just like you'd see a regular cartoon              |
| 22  |   | in the newspaper.  And the last screen of it was             |
| 23  |   | somebody laying down with a blanket covering                 |
| 24  |   | them and it just seemed apparent to me that was              |
| 25  |   | a depiction of the crime scene, so I recovered               |

123

|     |   |                                                              |
|-----|---|--------------------------------------------------------------|
| 1   |   | it.  It's not something that we go into a crime              |
| 2   |   | scene looking for, so it wasn't covered in the               |
| 3   |   | search warrant, so the judge felt that it would              |
| 4   |   | not be admissible.  So he suppressed it.                     |
| 5   | Q | Didn't really tend to incriminate Bill.  He was              |
| 6   |   | there at the crime scene.  He saw his mother                 |
| 7   |   | right?  And he didn't have a blanket wrapped                 |
| 8   |   | around her head did it?                                       |
| 9   | A | What didn't?  The cartoon?                                    |
| 10  | Q | Yeah.                                                         |
| 11  | A | It had it laying over her.  I don't remember                 |
| 12  |   | exactly what it looked like, but there was a                 |
| 13  |   | blanket.  I mean, like once again, it wasn't up              |
| 14  |   | to me to decide if it was incriminating or not.             |
| 15  |   | Just something that the prosecutor was made                  |
| 16  |   | aware of that would have been used as evidence               |
| 17  |   | to see what the jury thought about it.  It was               |
| 18  |   | their decision, not mine.                                    |
| 19  | Q | What is -- is there any other evidence that you              |
| 20  |   | have that would help defend yourself in this                 |
| 21  |   | civil case that you're aware of?                             |
| 22  | A | I don't know what you mean by evidence to defend             |
| 23  |   | myself.  I mean, all I have --                                |
| 24  | Q | Facts or any physical evidence or anything you               |
| 25  |   | think would assist in a jury determining that                |

124

|     |   |                                                              |
|-----|---|--------------------------------------------------------------|
| 1   |   | you're not responsible for any kind of arrest               |
| 2   |   | without probable cause or misleading the court              |

```
 3        or not fully putting all the facts in the
 4        affidavit that would inform the court about the
 5        results of your investigation of
 6        William Rainsberger in this case?
 7   A    Everything I've done in the case is either in my
 8        file or in the probable cause or the prosecutor
 9        is aware of, so I don't have anything to hide
10        anywhere.  No, I don't have anything to add.
11   Q    You agree with these rules.  I mean, I'm going
12        to throw out three or four or five:  That police
13        officers have to have probable cause for arrest?
14             MS. BOX:  Objection.  He's not here as a
15        30(B)(6) witness.  He's just a fact witness so
16        he cannot testify for all police officers.  He
17        can only testify for himself.
18   Q    I'm asking you for yourself.  I mean, is that a
19        rule that you normally would think that applies
20        that there has to be probable causes for arrest?
21   A    Yes.
22   Q    Okay.  Do you agree with the rule that the facts
23        stated in a probable cause affidavit have to be
24        true?
25             MS. BOX:  Same objection.
125
 1   A    Yes.
 2   Q    Okay.  Do you agree with the rule that police
 3        officers cannot misrepresent facts in probable
 4        cause affidavits?
 5             MS. BOX:  Same objection.
 6   A    Yes.
 7   Q    Okay.  Do you agree with the rule that police
 8        officers can't mislead the court or the
 9        prosecutor in a probable case affidavit?
10             MS. BOX:  Same objection.
11   A    Yes.
12   Q    Do you agree that police officers cannot leave
13        out important facts in a probable cause
14        affidavit that would tend to show that the
15        defendant or the person that's identified in the
16        probable cause affidavit didn't commit the
17        crime?
18             MS. BOX:  Same objection.
19   A    That's usually a determination made between the
20        officer and the prosecutor.  I mean, there are
21        times when stuff is left out but made aware in
```

```
22        discovery.
23    Q   In this case --
24    A   Everything doesn't have to be in the probable
25        cause.
126
 1    Q   In this case you're the one that created the
 2        probable cause affidavit; correct?
 3    A   Yes.
 4    Q   The prosecutor didn't write this probable cause
 5        affidavit?
 6    A   No.
 7    Q   Correct?
 8    A   Yes.
 9    Q   Okay.  Do you agree that any reasonably trained
10        officer would know these rules that we just
11        covered?
12    A   Yes.
13    Q   And that they were well established at the time
14        of the events in this case?
15    A   Yes.
16    Q   Okay.  Okay let's take a short break.
17            (A recess was taken between 12:15 P.M. and
18        12:26 P.M.)
19    BY MR. WAPLES:
20    Q   Detective Benner, were there -- did you talk to
21        everybody that lived in that apartment building,
22        H?
23    A   We made brief contact with the people that lived
24        upstairs.  I don't know that I talked to
25        everybody.  A lot of people weren't home and
127
 1        ended up moving away or whatever; but the 7, 8,
 2        9, 10 upstairs is where I made contact.
 3    Q   Nobody reported anything like a shot being heard
 4        or anything; correct?
 5    A   No.
 6    Q   Did you come across any information from anybody
 7        that indicated that there was an active drug
 8        trade going on out of that building from any of
 9        the apartments?
10    A   No.
11    Q   If there had been an active drug trade going
12        from and out of those apartments, that building,
13        would that give you cause for concern that maybe
14        there was people in that building that shouldn't
```

```
15        be there and are up to no good and might be
16        possible suspects in this case?
17   A    Possibly.  I mean, anything is possible.
18             MR. WAPLES:  I don't have any further
19        questions.
20             MS. BOX:  Okay.  Just gather my thoughts
21        here real quick.
22   CROSS-EXAMINATION,
23        QUESTIONS BY MS. KATHRYN BOX:
24   Q    Okay.  Detective Benner, I have just a few
25        questions for you.  We've been going for a while
128
 1        here, so I'm going to do my best to make it
 2        quick.
 3             I'm going to go back to Exhibit 4. I
 4        believe that this was -- it's in two pages,
 5        first page is the results page of Robert's --
 6        Robert Rainsberger's phone records.  The second
 7        page is the original CDR for Robert Rainsberger
 8        phone records; is that correct?
 9   A    Yes.
10   Q    To the best of your understanding?
11   A    Yes.
12   Q    Okay.  Now, we have already established that on
13        the first page, which is the results page, shows
14        a phone call at I believe 4:38 P.M. and then
15        another one at 4:51 P.M.  Where were those phone
16        calls from and to?
17             MR. WAPLES:  I'm sorry.  What line?
18             MS. BOX:  Sorry.  Okay.  3:40:38, it's line
19        486 and line 487, 3:40:51.  Okay?
20             MR. WAPLES:  You just misspoke and said
21        4:30 instead of 3:40.
22             MS. BOX:  Sorry.  Thank you.
23             MR. WAPLES:  That's okay.
24   A    The calls are involved between Ruth Rainsberger
25        and Robert, I believe.
129
 1   Q    And can you tell who's initiating the call?
 2   A    The landline.
 3   Q    Okay.  Which is Ruth Rainsberger?
 4   A    Yes.
 5   Q    To Robert.  Is that his cell phone do you know?
 6   A    Yes.
 7   Q    Okay.  Now, the first phone call at 3:40:38 says
```

```
 8        it lasts for how many seconds?
 9   A    Twenty-five.
10   Q    Okay.  And if that phone call which lasts for
11        25 seconds, with have -- wouldn't it conflict
12        with the second phone call?
13   A    It appears as if it would, yes.
14   Q    So the amount of time between the two phone
15        calls -- 3:40:37 and 3:40:51 -- is roughly
16        13 seconds; correct?
17   A    Yes.
18   Q    So there couldn't have been a 25 second phone
19        call placed at 3:40:48 then a second phone all
20        placed at 3:40:51; is that correct?
21   A    I would think not, yes.
22   Q    Okay.  And do you know who created this
23        document?
24   A    Detective Bierce.
25   Q    Detective Bierce.  And was it typed in or was it
130
 1        compiled, like, copy and pasted or --
 2   A    He does everything on the computer.  Back then
 3        he did warrants for everybody, and we don't do
 4        that anymore.  Now we all do our own warrants,
 5        so we can be more familiar with what's going on
 6        and get all the records back and take care of
 7        everything.  So he did everything on the
 8        computer.
 9            He must have compiled certain numbers and
10        put them all together to come up with results
11        like that.
12   Q    Okay.
13   A    And then printed it off the computer.
14   Q    So it's possible that could be a typo?
15   A    Yes.
16   Q    Now, the second page of that Exhibit 4, which
17        is, again, Robert Rainsberger's phone records,
18        but the original CDR page of the Excel
19        spreadsheet does show two phone calls; correct?
20   A    Yes.
21   Q    One, it's line 486 at 14:40:51, which is roughly
22        2:40:51; correct?
23   A    Yes.
24   Q    And then another one, line 493 at 3:40:38 or
25        15:40:38; correct.
131
```

```
 1   A   Yes.
 2   Q   Okay.  And when you reviewed Robert
 3       Rainsberger's phone records in preparing your
 4       probable cause affidavit, were those the two
 5       records that you saw?
 6   A   Yes.
 7   Q   Okay.  I don't think we have Ruth Rainsberger's
 8       landline records as an exhibit.  But if we take
 9       the first page --
10          MR. WAPLES:  I thought we did?
11          MS. BOX:  Do we?  I didn't see it.
12          MR. WAPLES:  It's Exhibit 3.
13   Q   All right.  Now, on Exhibit 3, this is
14       Ruth Rainsberger's landline.  We're comparing
15       that to page 1 of Exhibit 4.  Do both of the
16       phone calls that we're referencing, the one at
17       3:40:38 and 3:40:51 show up on her landline?
18   A   No, just the one.
19   Q   And what is the one phone call that shows up on
20       her landline records?
21   A   It says 3:41:09.
22   Q   So the phone call that shows up on her landline
23       really doesn't match either of the phone calls
24       on the first page of Exhibit 4; is that correct?
25   A   Correct.
132
 1   Q   Okay.  I'll give you that back, then I wanted to
 2       talk a little bit about the Kroger video.  As
 3       you sit here today do you recall seeing or can
 4       you say for sure that you saw video of William
 5       parking his vehicle and then walking into the
 6       store?
 7   A   I believe that when I was there in person with
 8       Pam Pulliam, I had her back up the video to the
 9       point where he pulled in.  I did see him get
10       out.
11   Q   And can you explain that?  You said "in person."
12       Did you go to Kroger?
13   A   Yes, I was sitting next to her.  And we were
14       looking at it on her monitors.  She pulled up
15       the video for me.
16   Q   And then based on what you looked at with her,
17       do you then determine that you want her to burn
18       to a disk?
19   A   Yes.
```

20  Q  Okay.  And did the video of him parking his
21      vehicle and then walking to the store that
22      wasn't covered by the entryway camera, did it
23      have any relevance to your probable -- creating
24      your probable cause affidavit?
25  A  No.

133

1  Q  Did it show anything inculpatory or exculpatory
2      about William?
3  A  No.
4  Q  So it's possible that you saw that video and it
5      didn't get burned to a disk?
6  A  Correct.
7  Q  But, again, it wouldn't have relevance to your
8      probable cause?
9  A  No.
10  Q  And you recall seeing him walk to a trash can
11      and throw what looked like a straight object
12      away?
13  A  You can see that he walks to the trash can, yes.
14      It's right next to the box.  And he comes back
15      to the box without the item in his hands.  So I
16      don't know if I actually see it go into the
17      trash can, but it was inferred that he went to
18      the trash can and doesn't have the item anymore
19      that he was putting in the trash can.
20  Q  Okay.  And you saw a video of him leaving
21      Kroger; right?
22  A  Yes.
23  Q  Was he in the parking lot walking to his car?
24  A  Yes.
25  Q  So if he was walking to a vehicle, pretty safe

134

1      to assume that he drove to Kroger?
2  A  Yes.
3  Q  And than walked from his vehicle into the store?
4  A  Yes.
5  Q  Okay.  And then with respect to the DNA and then
6      we talked about that there was some DNA on I
7      believe it was Ruth's jacket maybe in the upper
8      shoulder area from an unidentified male; is that
9      correct?
10  A  Yes.
11  Q  Okay.  And it's your understanding -- well, let
12      me back up.  Sorry.  Was Ruth already gone by

```
13        the time you arrived on scene?
14   A    Yes.
15   Q    Okay.  But it's your understanding that EMTs
16        from either the fire department or EMS arrived
17        on scene to care for her?
18   A    Yes.
19   Q    Okay.  And then they transported her to the
20        hospital?
21   A    Yes.
22   Q    So presumably they had to pick her up, put her
23        on a backboard?
24   A    Yes.
25   Q    Carry her to the ambulance?
135
 1   A    Yes.
 2   Q    And then once at the hospital, she would have,
 3        based on your experience, would have undergone
 4        some sort of examination?
 5   A    Yes.  They would have transferred her to a
 6        hospital bed, taken her clothes off and placed
 7        them in a paper bag for us to collect later.
 8   Q    Okay.  And presumably that would involve some
 9        touching --
10   A    Yes.
11   Q    -- as well?  So it's possible that the
12        unidentified DNA could be from any one of these
13        individuals that touched her?
14   A    Yes.
15   Q    Okay.  And then the shoulder location where the
16        DNA was found is a typical place where someone
17        would touch if you were transporting them or
18        lifting them?
19   A    Yes, it's consistent with somebody picking them
20        up putting them on a backboard.
21   Q    Okay.  And have you come across this type of DNA
22        evidence before --
23   A    Yes.
24   Q    -- in your experience?  Would this be something
25        you'd typically put in your probable cause
136
 1        affidavit given all the other factors?
 2   A    No.  It was just something that I would give the
 3        results to the prosecutor so they were aware of
 4        it.
 5   Q    Okay.
```

```
 6   A   Just part of the investigation that would be
 7       passed on in discovery.
 8   Q   Okay.  And you made the prosecutor aware in this
 9       case; correct?
10   A   Yes.
11   Q   So with respect to Ruth Rainsberger's injuries,
12       it was your understanding until the autopsy that
13       she had suffered a gunshot wound; is that
14       correct?
15   A   Yes.
16   Q   And you didn't have any reason to believe
17       otherwise?
18   A   No.  I'd wait until William collected the .357
19       in his house that he signed a consent form.
20   Q   And how long have you been a detective for?
21   A   Probably 12 years.
22   Q   Twelve years?
23   A   Out of 27.
24   Q   I know it was split up some there.
25   A   Yes.
137
 1   Q   So you've done a fair number of investigations?
 2   A   I've been lead detective on 69 homicide cases.
 3   Q   Okay.  And you've interviewed a number of
 4       witnesses and potential suspects?
 5   A   Yes.
 6   Q   Okay.  Was William Rainsberger's behavior with
 7       regards to the polygraph, how he got upset,
 8       "stormed out" were your words, typical of
 9       someone who had nothing to hide; right?
10           MR. WAPLES:  Objection.  Calls for
11       speculation.
12           MS. BOX:  I'm just asking upon his
13       experience.
14           MR. WAPLES:  It's speculation.  You can
15       answer if you can.
16   A   Based on my personal opinion that it was
17       overboard the way he reacted to the polygraph.
18       I've had people that acted softer than that when
19       they're really being interrogated as a suspect,
20       you know, they acted calmer than he did when I
21       wasn't even treating him as a suspect at that
22       point, so I was caught off guard by it.
23           And so was Tudor and that's why our
24       emotions get elevated there when we all came
```

```
25        back together because we were really shocked by
138
 1        it.  We thought he was going to say, "Yeah, you
 2        need to find who killed my mother, do it now,
 3        right now and get it over with, so I'm not a
 4        suspect and move on to who did this."  That was
 5        my opinion at the time.
 6    Q   Okay.  And what is your opinion on
 7        William Rainsberger's demeanor and actions
 8        following his mother's death attack and death?
 9        Was it typical of someone who had lost his mom?
10    A   I'm trying -- I mean, a loved one in general,
11        normally people are crazy crying falling down
12        screaming, yelling, wanting to know what
13        happened, rushing -- I mean, it would be
14        pandemonium in a lot of cases where, not
15        necessarily mother/son, but that doesn't happen
16        very often in my -- I haven't had many cases
17        like that, just a few.  But my opinion was
18        formulated based upon everything at the time.
19            When I investigate a case, I remember
20        everything, how people act, how they talk, how
21        they give statements.  And then once information
22        starts coming in, I kind of backtrack.  Was he
23        acting normal?  And I -- the way -- the thing
24        that really bothered me the most, if I haven't
25        talked about it already -- I think I have -- was
139
 1        that he couldn't he didn't check her, didn't
 2        grab her and check her and grab that blanket
 3        off, which I think a normal human being seeing
 4        their mother in that condition would do.
 5            So it was kind of weird to me right from
 6        the start; but like I said, I did not treat him
 7        like a suspect.  I treated him with respect
 8        until the polygraph; and that's when he became
 9        an actual suspect in my mind.
10    Q   Okay.  And just in general, you don't make the
11        determination of whether there's probable cause
12        to charge someone for an arrest; correct?
13    A   No, I don't.
14    Q   Who makes that call?
15    A   The deputy prosecutor.
16    Q   Okay.  And your job with respect to the probable
17        cause is just to lay out the facts as you have
```

```
18        investigated them?
19   A    Yes.
20   Q    In your probable cause -- or in your experience
21        as an investigator, is it possible to chase down
22        every single lead --
23   A    No.
24   Q    -- in a case?
25   A    No.
140
 1   Q    Okay.  And is it possible to put everything that
 2        you develop from an investigation into a
 3        probable cause affidavit?
 4   A    No.
 5   Q    Okay.  How do you decide what facts are
 6        important or warrant putting in the probable
 7        cause?
 8   A    Basically what you have at the time that points
 9        to -- I mean, we're looking for probable cause
10        for an arrest at this point so we don't
11        necessarily have to put everything in there,
12        even if it's negative towards the defendant, we
13        don't have to put everything in there.
14            The way we handle our probable causes is we
15        email them to deputy prosecutor and they look at
16        them and they give input.  If they want
17        something changed, they'll tell us you need to
18        add something.  Is there any more?  This doesn't
19        look right.  You know what I'm saying?
20   Q    Right.
21   A    So there's a give and take at that point; but,
22        everything to do with an investigation, then
23        there's always stuff that comes up after you
24        file the probable cause that adds to it or, I
25        mean, it's possible that something could come up
141
 1        that would clear the person also, you know, so
 2        but as far as the probable cause, this is a
 3        probable cause for arrest; so the prosecutor
 4        makes the decision whether or not what she reads
 5        there gives her probable cause to request a
 6        warrant with the judge.
 7   Q    All right.  And the judge granted a warrant in
 8        this case; correct?
 9   A    Yes.
10   Q    With respect to some of the stolen items from
```

11   the apartment, from Ruth's apartment, were you
12   ever told by either Rebecca, William, or Robert
13   that anything was missing from the apartment?
14 A The only one I really talked to about that was
15   William because he was the only one that was in
16   the apartment.  The other two hadn't entered
17   during the investigation.
18       For the next two or three days I went back
19   to the apartment and they hadn't been in there
20   because the crime scene tape was left up to keep
21   people out.  So he was the only one that gave me
22   an indication of what could have been, like I
23   said, the descriptions of the items that he, we
24   found them, I believe, inside the residence.
25   And there was money, credit cards, checkbooks.
142
1        Nothing rifled through, closets unchecked,
2    lockboxes not rifled through either.  So in my
3    opinion, it didn't appear as if anything had
4    been taken.
5        The over-the-counter drugs that he said
6    were on the counter were all still there.  So,
7    yeah, but he would be the only one that would
8    have been able to tell me.  He was the only one
9    in the apartment at the time when this was
10   happening.
11 Q Okay.  And you've never -- prior this incident,
12   you never met Ruth Rainsberger before; correct?
13 A No.
14 Q Never been inside her apartment?
15 A No, I never been there.
16 Q So is it safe to say you wouldn't know if
17   anything was missing unless you were told that
18   something was missing?
19 A Correct.
20 Q Do you recall in his statement
21   Mr. Rainsberger -- William, excuse me -- telling
22   you that his mom didn't have anything of value
23   in the apartment?
24 A Yes.
25 Q Okay.  Okay.  Just finishing up here, did you
143
1    knowingly or intentionally lie in your probable
2    cause affidavit?
3  A No, I did not.

```
 4   Q   Did you knowingly or intentionally try to
 5       mislead the court in the probable cause
 6       affidavit or the prosecutor?
 7   A   No, I did not.
 8   Q   How about did you knowingly or intentionally
 9       include what you thought was incorrect
10       information in your probable cause affidavit?
11   A   No.
12           MS. BOX:  No further questions.
13   CROSS-EXAMINATION,
14       QUESTIONS BY MR. RICHARD A. WAPLES:
15   Q   The prosecutor relies upon your characterization
16       of the evidence in the probable cause affidavit,
17       don't they?
18   A   They read the probable causes, yes, and make
19       their decision based upon that.
20   Q   Yeah.  The prosecutor in this case didn't ask
21       you to change anything in the affidavit, did
22       they?
23   A   No.
24   Q   Didn't suggest you put anything else in the
25       affidavit that wasn't already there?
144
 1   A   The only thing, like we covered earlier, from
 2       December to May was she asked to get the
 3       financial records, she asked to include that
 4       when I got them.
 5   Q   Okay.  But she relied upon your characterization
 6       of the financial records as well; correct?
 7   A   Yes.
 8   Q   And you know that's how it works and your
 9       interaction with the prosecutor is that they
10       rely upon you as the homicide investigator to
11       present to them all of the facts in the case;
12       correct?
13   A   Yes.
14   Q   And relies upon you to objectively put forth
15       those facts in a probable cause affidavit that
16       would tend to show whether the person did it or
17       not?
18   A   Yes.
19   Q   Okay.  You said the Kroger video that you saw at
20       the scene of William getting out of the car,
21       didn't contain any incriminating evidence or any
22       exculpatory evidence; is that what you said?
```

```
23   A    Yes.
24   Q    Okay.  Did it show anything in his hands getting
25        out of the car?
145
 1   A    The only time I could see -- it looked like he
 2        pulled out from somewhere.  I think that's what
 3        I said when I saw the video, so it was on his --
 4        kind of hidden by his body, so I don't know if
 5        it was in his pocket, waistband.  I'm not sure.
 6        I didn't see it when he first got out of the
 7        car.
 8   Q    Well, that would be important evidence to see
 9        for a defense lawyer, wouldn't it, to see what
10        that video that shows him getting out of his
11        car, whether it shows anything in his hand or
12        not?
13   A    I requested all the video be recovered.  If it's
14        not in there, then it's not part of the video
15        that she downloaded for me.
16   Q    Well, you said you recovered it.
17   A    Well ...
18   Q    You wrote that in the probable cause affidavit.
19        You wrote that you recovered the video that
20        showed him getting out -- pulling into the lot
21        and getting out of his car.
22            MS. BOX:  Objection.  He did not write in
23        his probable call affidavit that he recovered
24        that video.
25            MR. WAPLES:  We don't need to quibble,
146
 1        because the language you used was "recovered."
 2   Q    So it would be important, would it not, to view
 3        it to see whether Robert [sic] had anything in
 4        his hand and what that might look like when he's
 5        getting out of the car in the parking lot.
 6   A    And it was requested.  If everything didn't make
 7        it to the video, then Pam Pullium didn't get it
 8        all on there; but when I was in there in person,
 9        she backed all the way up to where I could see
10        him pulling in.
11            I mean, when you get out, the left side is
12        exposed to the camera.  And you don't see it
13        until he starts walking towards where the camera
14        picks up.  That's why they have the still photos
15        from that point on.
```

```
16   Q   You're not able to really see if he -- when he
17       gets the object in his hands or not, are you?
18   A   I don't think so, no, just that it's there.
19   Q   So you don't know whether he pulled it out of
20       his pocket or a waistband or --
21   A   Doesn't matter, but, no, I don't know.
22   Q   Or whether it was in his hand before and you
23       just didn't see it?
24   A   That's correct.
25   Q   And you say you requested that video and in your
147
 1       probable cause affidavit you said you recovered
 2       the video and if the video is not in your file,
 3       that means you didn't recover the video?
 4   A   I recovered video of the incident which covers
 5       all the videos I recovered.  There's probably
 6       five or six CD, DVDs.
 7   Q   Did you look at the videos after you got them
 8       from Pam?
 9   A   The best I could.  I mean, I didn't -- the
10       prosecutor looked at all of them.  I was working
11       on probably other cases between six cases
12       between November 19th and when he was arrested
13       so I was -- I didn't have the time to keep going
14       back to this case like that.
15   Q   So did you look at the videos after you got them
16       from Pam and see a video of him getting out of
17       his car?
18   A   I don't recall if I saw him getting out of the
19       car, no.  I'd have to look at them again.  I
20       know that I saw it initially.
21   Q   With respect to the DNA of the unidentified male
22       on Ruth's jacket, it's not in your probable
23       cause affidavit anything about what the DNA
24       showed or didn't show?
25   A   No.
148
 1   Q   And you didn't include that it eliminated
 2       William as the contributor of that DNA that was
 3       found; correct?
 4   A   The prosecutor's made aware; but, no, I did not
 5       put that in the probable cause.
 6   Q   When you say the prosecutor was made aware of
 7       it, did you actually tell the prosecutor orally
 8       or did you write it in the memo?
```

```
 9   A   No.  I mean, she gets all the results.  When I
10       get them, I give them to them, so they were
11       aware.  Something we discuss.
12   Q   With respect to Exhibits 3 and 4, you obtained
13       these from Bierce, you said; right?
14   A   Yes.
15   Q   Did you ever ask Bierce about the discrepancy
16       between one call at 3:41 on Ruth's landline and
17       these entries for what appears to be two calls
18       on page 2 of Exhibit 4 of Robert's cell phone
19       records?
20   A   I don't believe I did, no.
21   Q   Did you ask him what it meant to have the
22       773 number in between his call on line 486,
23       page 2 of Exhibit 4?
24   A   Yeah.  I thought he told me that it was a routed
25       call meant that it was going to voice mail.
149
 1   Q   Did he tell you that because it was routed
 2       there's actually two entries for that call and
 3       it's only one call?
 4   A   No, he didn't tell me that.
 5   Q   Didn't tell you that.  Did you ask him about the
 6       discrepancy between the calls listed on
 7       line 1 -- or Exhibit 4, lines 486 and 487, the
 8       overlapping times?
 9   A   No.
10   Q   And whether that indicated there was really only
11       one call rather than two?
12   A   I don't believe I did, no.
13   Q   In the results page of that spreadsheet which
14       Bierce gave you, do show both calls, if there
15       were two calls, both at the 3:41 time and
16       3:40 time, not 2:40; correct?
17   A   Yes.
18   Q   And you didn't ask him about that?
19   A   No.
20   Q   Instead you put in the affidavit that the call
21       occurred at 2:40?
22   A   I put that in there based upon the records that
23       I saw from William Rainsberger's phone.
24   Q   And you never altered that probable cause
25       affidavit or withdrew it or changed it with
150
 1       respect to the calls?
```

```
 2  A   No.
 3           MR. WAPLES:  Okay.  I don't have any
 4      further questions.
 5           MS. BOX:  No questions.
 6
 7           (Time noted:  12:53 P.M.)
 8           AND FURTHER THE DEPONENT SAITH NOT.
 9
10           _____
11                     CHARLES BENNER
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

151
```
 1  STATE OF INDIANA          )
                              )  SS:
 2  COUNTY OF MARION          )
 3       I, Kelly S. Horsley, RPR, CSR No. 98-R-3004, a
 4  Notary Public in and for the County of Hendricks,
 5  State of Indiana at large, do hereby certify that
 6  the deponent herein, CHARLES BENNER, was by me
 7  first duly sworn to tell the truth, the whole
 8  truth, and nothing but the truth in the
 9  aforementioned matter;
10       That the foregoing deposition was taken on
11  behalf of the Plaintiff at the offices of Connor
12  Reporting, 111 Monument Circle, Suite 4350,
13  Indianapolis, Marion County, Indiana, on the 27th
14  day of September, 2016, commencing at the hour of
15  9:31 A.M., pursuant to the Federal Rules of Civil
16  Procedure;
17       That said deposition was taken down in
18  stenograph notes and afterwards reduced to English
19  under my direction, and that transcript is a true
```

```
20   record of the testimony given by the said deponent;
21   and that the signature of said deponent to his
22   deposition was requested;
23        That the parties were represented by their
24   counsel as aforementioned.
25        I do further certify that I am a disinterested
152
 1   person in this cause of action; that I am not a
 2   relative or attorney of either party, or otherwise
 3   interested in the event of this action, and am not
 4   in the employ of the attorneys for either party.
 5        IN WITNESS WHEREOF, I have hereunto set my
 6   hand and affixed my notarial seal this _____ day
 7   of _____, 2016.
 8
 9               _____
10                    N O T A R Y    P U B L I C
11
12   My Commission Expires:
     October 11, 2023
13
14   County of Residence:
     Hendricks
15
16
17
18
19
20
21
22
23
24
25
```