**Affidavit of William Rainsberger**

1.  I am 59 years old, of sound mind, and make this affidavit based upon my own personal knowledge.

2.  My mother was Ruth Rainsberger, who died on November 20, 2013 at the age of 88.

3.  My brother is Robert Rainsberger. My sister is Rebecca Rainsberger. At the time of my mother's death, I was married to Mari Bilger.

4.  On May 27, 2014, I was arrested and charged with Murder, for allegedly murdering my mother.

5.  I did not murder my mother.

6.  I spent 58 days in the Marion County Jail on this false charge. On July 22, 2014, the court ordered me released from jail on $100,000 bond.

7.  Over a year after my arrest, on July 7, 2015, the prosecutor, citing "evidentiary problems", moved to dismiss the murder charge against me. The court granted this motion the same day.

8.  My arrest and the murder charge were based upon a probable cause affidavit written by Detective Charles Benner of the Indianapolis Metropolitan Police Department (IMPD).

9.  Detective Benner swore in the charging information against me that on November 19, 2013, I "did knowingly kill another human being, namely: Ruth Rainsberger, by inflicting blunt force injuries with a hammer or similar object, at or against the person of Ruth Rainsberger[.]" (Information, 5/22/2014.)

10. Detective Benner lied in this Information and lied and misled the court in his Probable Cause Affidavit.

11.     Detective Benner lied in his probable cause affidavit by stating that a call was made to my brother's cell phone from my mom's landline telephone at 2:40 pm (PCA, p. 3, para. 6) which was well after my mother had been attacked, and an hour before I called 911 for help for my mother from that same phone. In the same paragraph of his PCA, Detective Benner then depicted me as the one who made a call at 2:40 pm, by noting my presence at a nearby grocery shortly after this time. But the 2:40 pm time was not the time that call was made; while the raw data from my brother's cell phone company shows an entry at 2:40 pm, it also shows a second entry for the same call at 3:40 pm The 2:40 pm entry was due to the call being routed through Chicago, which was one hour behind Indianapolis time.  Detective Benner also had in his possession, in 2013, my mother's AT&T landline telephone records which accurately showed this call was made at 3:40 pm, which matched what both my brother Robert and I had reported to him as when this call occurred. The AT&T records also show that no call whatsoever was made from my mother's landline at 2:40 pm. Detective Benner chose to completely ignore this information, and instead used the false call time of 2:40 pm in his PCA. This lie was particularly incriminating of me, especially in connection with the false portrayal of me throwing away trash at Kroger (see para. 12 below) between this false 2:40 time and the time I called 911 shortly after I found my mother a little after 3:30 pm. This lie was fabricated by Detective Benner in order to place me in my mother's apartment, with her critically injured, a full hour before I telephoned 911 and a full hour before I said I discovered her, thus misleading the court.

12.     Detective Benner lied in his probable cause affidavit by stating that at the Kroger store

across the street from my mother's apartment I pulled a "straight object" "from my person," and that I was "looking around for cameras" when I then threw it away in a trash bin at the front of the store. (PCA, p. 3, para. 5.) In the Kroger security video referenced by Detective Benner, I did not look around for cameras, nor did I pull any item from my person. I had a piece of trash in my hand, I threw it away, and I do not recall what it was. By making up these lies and including them in his PCA, Detective Benner sought to mislead the court into thinking I disposed of the murder weapon in a Kroger trash bin, at the front of a busy Kroger, during daytime hours.

13. Detective Benner lied in his Probable Cause Affidavit by stating that cell phone tower site location records "do not show William Rainsberger outside the area of Shortridge and 10th St. during the relevant time period." (PCA, p. 5, para. 2) This is an astounding lie. Cell phone tower records do not show me in this area anytime from 5:41 pm on Nov. 18, 2013 to 7:23 pm on Nov. 19, 2013, but that is because there is absolutely no location information from cell phone data for my phone during that period. Detective Benner may as well have said that cell phone records do not show me outside Mongolia during this time. Detective Benner absolutely knew this well in advance of filing his PCA because the IMPD phone records expert told him so in a report spreadsheet. Yet Detective Benner chose to ignore the IMPD expert, and insert into his PCA a well-crafted lie to give the court the impression that I was in the vicinity of my mother's apartment during what might have been the time of her attack.

a. The following explains the cell phone records submitted on summary judgment and how they do not show location data for my cell phone from 11/18/2013 at

5:41:14 p.m. to 11/19/2013 at 7:23:45 p.m.

The PDF "William Rainsberger Processed Cell Phone Records.pdf"
represents the "Results" worksheet from the Microsoft Excel spreadsheet of the
police analysis of my cell phone data for the period October 22 - November 22,
2013. That spreadsheet was created by Detective Bierce of IMPD on November
25 2013, and produced in discovery.  The PDF shows a combination of my cell
phone activity and my phone provider's (T-Mobile) cell tower information. It is
Detective Bierce's summary and cross-reference of all my available phone
information into one useful view.

In the PDF a row may represent a text message or a voice call. Columns
A-F contain descriptive data for voice calls and text messages, with  Column D
indicating whether the entry is for a text ("SMS", "MMS") or a voice call
("Voice"). For reasons unknown, T-Mobile reports voice call timestamps (Column
F) accurately, but reports text message timestamps as occurring three hours early.
The remaining columns (G - U) represent cell tower information, which T-Mobile
only provides for voice calls. Note that for text messages, there is nothing (N/A)
in columns G - U.

To narrow down the time range to that in question, please note there is a
voice call on row 1041 (11/18/2013  5:41:14 p.m.), then not another voice call
until row 1159 (11/19/2013  7:23:45 p.m.). Because both those rows represent
voice calls, they have cell tower information in columns G - U. Row 1041 shows
that my mother called me at 11/18/2013 at 5:41:14 p.m. and my phone was

4

connected to a tower at 7701 East 21st Street in Indianapolis. Row 1159 shows that I called my sister at 7:23 p.m., and my phone was connected to a tower at 225 N. New Jersey in Indianapolis.

In between those two calls, the only events are texts, so there is no cell tower data recorded. In other words, the rows between 1041 and 1159 are all text messages, therefore they have no cell tower location information. This means that the location of my phone could not possibly be determined from T-Mobile records between 11/18/2013 at 5:41:14 p.m. and 11/19/2013 at 7:23:45 p.m.

Thus Detective Benner's statement that my phone records show my phone was not outside a specific area during that timeframe is not true at all. Those phone records do not show anything about location, period.

14.   Detective Benner lied in his probable cause affidavit by stating that nothing was stolen from my mother's apartment. I described my mother's purse and my mother's one prescription medication to Detective Benner shortly after his arrival at the crime scene on November 19, 2013, and he wrote that in his notes. My siblings told Detective Benner of my mother's purse, a small coin purse where she kept credit and debit cards, and her prescription medication, all of which were missing and never recovered. IMPD Forensic Services which inventoried the scene also noted in one of their reports which Det. Benner had, that "no prescriptions found, purse is missing." Detective Benner simply ignored all this information to make it look like robbery could not have been a motive in the attack on my mother, so as to make it look to the court that my mother's attack was an inside job. Detectives did find my mom's checkbook and a small amount of cash and a couple of

5

credit cards in her apartment, but these items would not have been readily apparent to an intruder as she kept them inside a translucent plastic Tupperware container which was underneath a stack of papers on one of her tables. Also, Det. Benner falsely stated in the probable cause affidavit that: "There was a lockbox in the back room in plain view that contained savings bonds belonging to the victim." The lock box was in a closet, not in plain view. Not only were there no savings bonds inside, there were no documents remotely resembling savings bonds, nor anything else of monetary value.

15.     Detective Benner was misleading in his probable cause affidavit by stating that because I reported that my mother had been hit in the head though "fire and ambulance personnel thought" that my mother had been shot,  this indicated that I knew "how she sustained the injury." (PCA, p. 1, para. 1)

    a.     While it definitely appeared to me that my mother was struck on the head, I was not certain how my mother was injured.  What I saw was a blanket soaked with partially-dried blood stuck to the top of my mother's head as she lay on the floor, and on the same blanket but on the floor right next to my mother's head, a pool of congealed blood, approximately one cup. This indicated to me an extremely serious injury that produced substantial blood loss, which had occurred long enough before my arrival because the blood was not fresh but partially dried and solidified. I did not remove the bloody blanket stuck to the top of her head because I believed it was acting as a bandage, and I did not want to pull it away from the wound and cause it to start bleeding again.

    b.     Detective Benner knew that when my brother arrived at the scene and asked me

6

what had happened to our mother I told him I did not know.

c.    When Det. Benner interrogated me on Nov. 19, I told him I initially thought my mother had fallen and hit her head, but upon seeing the blanket wrapped her head and the amount of blood loss apparently coming from on top of her head, I thought she must have been hit on top of the head.

d.    I do not associate gunshot wounds to an injury on the top of a head.

e.    Also, I did not see any blood splatter, sense an odor of gun powder, or see any spent gun cartridges in my mother's apartment, any of which might indicate that my mom was shot.

f.    I did not see any hole in the blanket surrounding my mother's head, and, having not removed it, could not see her forehead.

g.    Based upon the witness statements provided to my criminal defense lawyers and my civil lawyers, which I have reviewed, it was Firefighter Carl Wooldridge, one of the first responders and the first among fire and ambulance personnel to see my mother, who determined that my mother had been shot, and he simply passed this incorrect conclusion on to the other medical personnel.

h.    Mr. Wooldridge based his assessment on more information than I had: he removed the blanket from my mother's head, noticed a hole in the blanket which I had not seen, observed a mark on my mother's now exposed forehead, which I had not seen, and mistakenly concluded that it was a gunshot entrance wound. Mr. Wooldridge did not have the medical or forensic training to make a determination on the nature of the attack on my mother. Mr. Wooldridge's act of removing the

7

bloody blanket stuck to my mother's head was in my opinion irresponsible and

unnecessary because once EMS arrived, they re-bandaged my mother's head,

which I saw as they took her to the ambulance.

    i.    It should have been apparent to Detective that Mr. Wooldridge and myself simply

saw different things and arrived at different conclusions based upon this differing

information. As documented in my mother's autopsy, Mr. Wooldridge was

absolutely mistaken in his description of a gunshot entrance wound on my

mother's forehead

    j.    Detective Benner did not include in his probable cause affidavit that I told him I

initially thought my mother had fallen and struck her head but rather unfairly used

my speculation about how my mother was injured to suggest that I had killed her.

16.    Detective Benner misleadingly suggested to the court in his PCA that I was uncaring and

unconcerned for my mother's health, making it appear more likely that I would have

carried out the attack on her. He did this in a number of ways, including:

    a.    After I discovered my injured mother I called 911, quickly checked the apartment

for intruders, and ran out the front door of the apartment building to flag down the

ambulance. I went outside because I knew the fire department was close and the

apartment complex is complicated and the buildings poorly marked. I wanted to

get emergency medical help for my mother as soon as possible, so I wanted to

direct the ambulance people to my mother's apartment. I told this to Detective

Benner during his interview of me on Nov. 19. However, in his PCA, Detective

Benner omitted all the reasons I told him I went outside, and simply put in his

PCA that after calling 911 I "went outside to wait for the ambulance" (PCA, p. 2, para. 1) and that "William left his mother unattended until the police arrived" (PCA, p. 4, para. 1) in order to make me seem uncaring to the court.

b.    Detective Benner put in his Probable Cause Affidavit that while I was detained for questioning downtown at police headquarters during the evening of Nov. 19, 2013, that I did not ask him how my mother was doing and that I never asked him to take me to the hospital to see her. (PCA p. 2, para. 3) This was false and misleading, as Detective Benner knew I was in constant contact with my sister who was at the hospital with our mother during my detention and interrogation, and that she was keeping me informed of my mother's condition. I actually read one of my sister's many texts to me to Detective Benner during his interrogation of me (Nov. 19, 2013 Transcript at 13) which was advising me of my mother's condition, and instructing me which entrance I should enter at Eskenazi Hospital. Detective Benner said "we'll get you there" which he never did. Thus there was no need for me to ask Detective Benner how my mother was doing or for a ride to the hospital. Detective Benner's portrayal of this exchange was simply dishonest and misleading and obviously meant to prejudice me.

c.    Detective Benner lied to the court in his probable cause affidavit when he said that after Nov. 20, 2013, that "I have not heard from them [my brother, sister, and myself] since." (PCA, p. 3, para. 2.) My sister telephoned Detective Benner twice after this time and left messages for him to return her call, and he chose to not return either call. Again, this lie was designed to make it appear that we were

uncaring and culpable in our mother's death.

17.    Detective Benner lied to the court in his PCA when he stated that I "stormed out" of

police headquarters on Nov. 20, 2013, after refusing to take a polygraph (PCA, p. 3, para.

2.). Detective Benner and his partner Tom Tudor left the room before my brother, sister

and I did. Additionally, Detective Benner did not reveal in his PCA that he lied to us to

get us to come downtown on the day our mother died, by telling us he had the results of

the autopsy that he wanted to discuss with us. Nor did Detective Benner notify anyone in

my family about the time and date of the autopsy. Instead of sharing autopsy results with

our family, he treated us as guilty parties, falsely accused me and my brother of killing

our mother for money, and confronted us out of the blue with his polygraph request. I did

not consent to the polygraph because I consider them unreliable and I considered

Detective Benner to already be prejudiced against me because of his uncaring attitude the

night before, his deception and aggressive and hostile attitude on Nov. 20, 2013.

18.    Detective Benner also has unfairly portrayed what I said on the way to police

headquarters on Nov. 19, 2013, in an apparent attempt to unfairly prejudice me and make

me seem callous and uncaring. He asserts in his summary judgment memo at p. 6 that

"On the drive downtown, William told IMPD Officer Michael Price that he did not know

whether what happened to his mother was a good thing or bad thing." (citing Exhibit 10-

Price Depo 14:3-9). I did not say I did not know if what happened to his mother was good

or bad, but, rather, given what happened, and that my mother appeared to be dying, that I

didn't know if it was good or bad for her to survive in a severely damaged state or in a

coma, or to pass away. Officer Price was not quoting me, and confirmed in his deposition

10

that I was speaking about whether my mother survived.

19.    Detective Benner in his PCA noted that my mother's assets totaled approximately

$99,000. He intentionally omitted my financial status so as to mislead the court into

believing I had a financial motive for murdering my own mother. I did not. I told Det.

Benner that I was retired and "fairly well set" financially. County records showed I owed

my house free and clear. Additionally, I was my mother's power of attorney and handled

all of her financial affairs in her best interests. I resent Det. Benner suggesting that I

would kill my mother and that I had a financial motive to do so. If I was dishonest, which

I am not, and if I had wanted my mother's money, which I did not, I could have simply

taken it without harming her.

20.    As a direct result of Detective Benner's intentionally false and misleading statements I

was: falsely accused of  murdering my own mother; kept in the Marion County jail for

almost two months, with 23 hours per day of that time confined in an 8x5 cell; was

threatened twice with murder and once with rape while in jail; was physically attacked in

jail by having cleaning fluid sprayed in my eyes and items thrown at me; threatened with

bodily harm multiple times by strangers on Facebook; tethered to an ankle bracelet for

nearly three months; was not allowed to leave Indiana for almost a year; was not allowed

to communicate with my beloved aunt, Blanche Miller, my mother's sister, for over nine

months; had criminal charges of murder lodged against me for over a year; suffered

substantial physical discomfort, emotional distress, public humiliation and

embarrassment, damage to my good name and reputation; and, spent over $60,000 in

criminal defense attorney fees and associated expenses.

I affirm under the penalties for perjury that the above statements are true.


February 13, 2017                    */s/ William T. Rainsberger*
                                     William T. Rainsberger