STATE OF INDIANA      )          IN THE MARION SUPERIOR COURT
                        ) SS:     CRIMINAL DIVISION 1
COUNTY OF MARION    )          CAUSE NO. 49G01-1405-MR-026747

STATE OF INDIANA,         )
         Plaintiff,       )     ORIGINAL
  v.                     )
                        )
                        )
WILLIAM RAINSBERGER,  )
        Defendant.     )

TELEPHONIC TAPED DEPOSITION OF
DR. STREIB
March, 27, 2015

Q     David R. Hennessy
A     Dr. Streib
Pros  Marielle Riedel

1   Q    I've started the recording and I just want to make sure of one thing.  I appreciate your

2          time but I regrettably I can't pay you for your time. It's my understanding that you are

3          waiving any fees for this telephonic statement.

4   A    Yes that's fine.

5   Q    Oh you're wonderful, thank you.  Uh if you would just do you swear to tell the truth?

6   A    Yes.

7   Q    Okay thank you.  Did you get my fax?

8   A    Yes I did.

9   Q    Okay. Um that's great.  Now um have you spoken with any police officers before today?

10  A    Um not since the time of the patient being in the hospital.

11  Q    And back at that time do you remember which officer you spoke with?

12  A    No.

13  Q    Do you have any idea, do you remember what the conversation was about?

1   A    Um at the time I had spoken with the officer that was at the hospital about uh in

2          describing in general because I don't remember specifically, but about the nature of her

3          injuries and then uh the officer also identified that they had a family member at the scene

4          and that uh I was able to speak to the person they had identified as a son, um on the

5          telephone um after discussing with law enforcement that this is the person they had

6          identified as her son, to describe the condition of the patient.

7   Q    And tell me about your conversation with the son.

8   A    Um at that point I uh described that she had a uh very uh severe traumatic brain injury

9          and that based on our evaluation that there was no treatment available to improve her

10         outcome and that we anticipated that this was a non survivable injury and we spoke about

11         um setting some limits on her treatment but we did not uh withdraw any care at that

12         point.   We made a decision to uh limit escalation of treatment until the family could

13         arrive as a group at the hospital and discuss it further.

14  Q    Is that what led to the do not resuscitate order?

15  A    Yes.

16  Q    In looking at the records it appears that that came pretty far in or pretty, sometime after

17         her arrival.  Do you recall any idea how long after her arrival?

18  A    Um, um I made a note that I had spoken to him and um I entered that note at 6:15 p.m. so

19         that decision was made uh sometime prior to that so probably a few minutes prior to that.

20  Q    Okay great and in talking to him did he seem um, how did he seem?

21  A    Um I, I don't recall the detail of the conversation um he seemed uh upset and concerned

22         about her condition.

23  Q    And did he seem to be reflective with that decision, whether to do the DNR or not?

| | | |
|---|---|---|
| 1 | A | Um I mean he seemed that uh he was able to uh consider what I had told him about her |
| 2 | | and that um issues with the need to not go any heroic treatments that did not have a |
| 3 | | reasonable chance of improving her outcome. |
| 4 | Q | In reviewing the records it looked to me almost like Dr. Guzman had done that but you |
| 5 | | personally had that conversation? |
| 6 | A | Yes. |
| 7 | Q | Um and then have you spoken with any prosecutors prior to today about your testimony |
| 8 | | as opposed as to just scheduling discussions? |
| 9 | A | Um I have um spoken with the with Miss um Riedle um and uh reviewed with her kind of |
| 10 | | the time course of the events in the hospital and uh answered some questions she had |
| 11 | | about uh the nature of the injures and what occurred at the hospital. |
| 12 | Q | And from those conversations uh do you have um some idea why you're being called as a |
| 13 | | witness what your expected testimony will be? |
| 14 | A | Um I expect to testify to uh the facts of the case um the medical facts as documented in |
| 15 | | our records and then the events that occurred at the hospital. |
| 16 | Q | And in what manner I mean what, what did you learn would be important for them? |
| 17 | A | My understanding is that uh it's important for me to describe to the court the nature of |
| 18 | | Mrs. Rainsberger's injuries and uh the um care that was provided and uh and ultimately |
| 19 | | uh that she had died as a result of this injury. |
| 20 | Q | Okay uh did you independently uh determine a suspected gunshot wound or is that just |
| 21 | | how she came in? |
| 22 | A | Um she uh was brought by uh the ambulance service and um they notify us um while |
| 23 | | they are enroute to the hospital and they had um notified us that she had a wound that |

3

1    might be a gunshot wound um in their interpretation um meaning that she had an open

2    wound that appeared to penetrate into the skull um upon our further evaluation we

3    determined in fact that this was not due to a gunshot wound but probably uh due to a

4    blunt force injury uh that created um a depressed skull fracture in a fairly focused area of

5    the back of her head that again has the appearance of a penetrating injury similar to a

6    gunshot wound or some other high energy mechanism.

7  Q   Right so all the references to the gunshot wound came from either a medic or fire

8    personnel on the scene?

9  A   Yeah there's a few references to it because uh I mean any penetrating injury um know um

10    it's basically a small penetration could be um um due to something like a gunshot wound

11    which we unfortunately see commonly or could be due to a direct blow on a very small

12    area.

13  Q   And then uh you said the back of the head from the autopsy schematics and photographs

14    it appears to be more to the left and more to the top would you agree?

15  A   Yes.

16  Q   And uh do you are you an emergency room physician?

17  A   I am a surgeon uh so I am what most people would refer to as a trauma surgeon so my

18    scope of practice involves trauma care, intensive care, uh and general surgery.

19  Q   Okay based on your experience, training and education, anything do you ever get in the

20    area of the mechanics of an injury?

21  A   Um I am not a forensic expert uh we leave the determinations of uh the forensics aspects

22    of the mechanism of an injury to the coroner's office uh because they have expertise in

23    this area however, I do have experience uh taking care of a lot of patients with traumatic

4

| | | |
|---|---|---|
| 1 | | brain injuries and uh so I have a practicing familiarity with uh a variety of types of |
| 2 | | injuries. |
| 3 | Q | I suspected as much.  The uh it is clearly a blow to the head, anything beyond that that |
| 4 | | you picked up? |
| 5 | A | Um I mean my impression of this is that there was a high energy fairly focused uh blow |
| 6 | | to the skull uh was capable of creating a fracture that uh penetrated deeply into the brain |
| 7 | | um there's actually a secondary of, of fracture uh a little bit more to the right uh that does |
| 8 | | not uh penetrate through the skull and the scalp uh but the um um clearly the area on the |
| 9 | | left side of the back of the head is what caused your damage to the brain. |
| 10 | Q | Um and then do you have an opinion or can you anything about uh if the blow, handiness |
| 11 | | left hand, right handed if she was struck by someone? |
| 12 | A | No I did not know um anything about uh what occurred at the scene uh as the cause of |
| 13 | | this injury so I, I don't think I could speculate as to that. |
| 14 | Q | Okay and then um you um how about whether it was from the front or from behind? |
| 15 | A | Um this is a uh this would have been a blow from uh uh behind uh in the location that we |
| 16 | | previously discussed um and uh it appears that uh again that the energy of this blow uh |
| 17 | | was sufficient to penetrate towards the center of her uh her head.  Um about 6 centimeters |
| 18 | | or so it was pretty significant force. |
| 19 | Q | And then um I asked about handiness and whether this blow came from the right or the |
| 20 | | left or directly behind? |
| 21 | A | Um again I think that would uh depend on a lot of factors that I don't know the position |
| 22 | | of the patient at the time of the injury and uh uh uh what she was struck with uh I, I think |

5

1 it would be hard to describe that without information that law enforcement or the coroner

2 may be able to provide.

3 Q Sure, um some of this I kind of suspect but I just need to pin it down um the um with the

4 injuries that you observed on Ruth Rainsberger if um there's a perpetrator and they leave

5 her, how long, do you know how long she could be breathing laying unattended?

6 A Um that um is something that we don't know for certain um we were informed that she

7 was found uh at home by her son and um it's unclear uh how much time there was uh

8 between the time of her injury and she was discovered or uh the 911 call that was made.

9 Uh with an injury like this a person may be able to maintain uh their vital functions uh for

10 a period of time in fact it could be a period of minutes or hours depending on uh their a

11 number of factors of mostly having to do with is there any obstruction of the airway due

12 to the unconscious or um the progression of the injury itself.

13 Q When you say hours could it be as many as four or five?

14 A Uh it could be.

15 Q And has anyone provided you information to help you provide testimony as to that time

16 frame in this case?

17 A No but I would base that assessment on the fact that at the time that care was withdrawn

18 uh several hours did go by until she ultimately died from this injury um so clearly there

19 was, she did have the ability as vital functions of breathing for a period of time after that

20 care was withdrawn and uh essentially the natural course of the injury was allowed to

21 happen.

22 Q Uh was she intubated by ambulance personnel or hospital personnel?

1   A    Uh let me just review the notes for a second.  Um she was intubated shortly after arrival

2          to the emergency room.

3   Q    And so then she would have had assistance in breathing either by a hand pump or other

4          machine?

5   A    Um yes.

6   Q    And that would have continued until the withdrawal of care?

7   A    That's correct.

8   Q    So I'm sure that people talked to you to try uh because what they really want to do is to

9          try to get this blow to the head within minutes of the son discovering her so where are

10         you with that?

11   A    Um I do not have an opinion on that.  I don't have information to make a judgment on

12          that.

13   Q    So it would be equally reasonable to say she'd been struck four hours before the son

14          discovered her as to saying she was struck ten minutes before the son discovered her,

15          correct?

16   A    Um all I can say is I do not know the time that occurred between the time of her injury

17          and the time she was discovered.

18   Q    Right but I need, could it have been four hours as well as 10 minutes?

19   A    Um that is possible.

20   Q    Is one more likely than another?

21   A    I don't know.

22   Q    Okay and then just very quickly I want to go through the records and you have them

23          they're numbered in the upper right hand corner.

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Okay on page 1 what's a code 77? |
| 3 | A | That is a term we use uh at the hospital for our highest level of trauma activation so when |
| 4 | | the emergency medical services uh notify the hospital that they are bringing a patient that |
| 5 | | meets certain criteria uh certain types of injuries uh we have different levels of activation |
| 6 | | that code 77 is our highest level of activation which results in an immediate response of |
| 7 | | our entire trauma team and emergency medical staff to the uh receiving area of the |
| 8 | | emergency department commonly referred to as the shock room and the patient is |
| 9 | | evaluated there by um a trauma surgeon, emergency medical physician um a variety of |
| 10 | | other resident doctors and uh hospital staff. |
| 11 | Q | And then down at the bottom of that page there's typewriting that says comment 11/23 |
| 12 | | 2013 do you see that? |
| 13 | A | Yeah |
| 14 | Q | I can't read the rest of that, any idea what that is? |
| 15 | A | Um |
| 16 | Q | Could that be… |
| 17 | A | I believe that is sort of a time stamp from our um it says coding complete which I believe |
| 18 | | would refer to a review of the chart for um chart entry and so forth. |
| 19 | Q | Was Wishard on Epic or any other health data system at that time? |
| 20 | A | Um we have a medical records system uh which is an order entry and uh documentation |
| 21 | | system we refer to it as a G3 which is uh a system that was developed here locally um the |
| 22 | | medical record itself consists of some um handwritten or paper documentation that's |

1    generated in the emergency department and then also some electronic medical records

2    that are generated after the um patient is admitted to the hospital.  So

3  Q    Yeah.

4  A    So it's a combination of handwritten and electronic documents.

5  Q    So certainly care would have been completed on November 23rd, I'm thinking that

6    coding complete means all of that process had been done I guess the.

7  A    Yeah, so the, you know the charts get reviewed from an administrative stand point and

8    then they get scanned into a medical records archive which is what generates the images

9    that you have here.  Um so I believe that uh that statement has something to do with

10    either that the chart has been scanned or that the administrative functions that are based

11    on this record were completed at that time.

12  Q    Okay page 2, resident was Noland so he's a doctor right?

13  A    Yes.

14  Q    Says staff is LeFlore, would that be a nurse?

15  A    Uh that is uh one of the emergency medicine uh so Dr. LeFlore is an emergency medicine

16    attending physician and Dr. Noland would be the emergency medicine resident on duty at

17    that time.

18  Q    And it's signed by a Jill Glasser, what's her function?

19  A    Um

20  Q    Down at the very bottom left.

21  A    Um that's on page 2 um that would be um the emergency department nurse.

22  Q    Okay. Would any of those people have had contact with family members outside of your

23    presence to your knowledge?

9

1   A   Um possible, I don't know.

2   Q   And then on page 3 the historical notations "found slumped over in apartment by friend"

3       do you know where that, the source of that?

4   A   Um that would be based on the um the paramedics report um so they give us a verbal

5       report on arrival and since she was unconscious that would have been the only history

6       that we had available is what the paramedics told us.

7   Q   Do you know who would have made that entry?

8   A   Um that is by Dr. Noland.

9   Q   And then on page 3 I have a hard time reading some of this.  Um eyes open, something

10      spontaneous what?

11  A   Um it says LUE which is left upper extremity spontaneous movement um protruding

12      tissue and depressed skull fracture, sonorous respiration.

13  Q   And uh it says something at bedside.

14  A   Um

15  Q   Oh I'm sorry in the 3rd paragraph 3rd line.

16  A   Okay.

17  Q   MDM elderly lady with head trauma.

18  A   Okay um elderly lady with head trauma seems to be only injury, intubated on arrival, To

19      CT emergently.  NUS which is the abbreviation for neurosurgery.

20  Q   Okay.

21  A   Uh trauma is our trauma team um surgery team at the bedside um critically ill, tube

22      placement confirmed on chest x-ray CXR.

23  Q   Do you know who made those entries in that hand writing?

10

| | | |
|---|---|---|
| 1 | A | Um that appears to be Dr. Noland's handwriting and then there is a uh cursive |
| 2 | | handwriting note that says the teaching staff MD that would be Dr. LeFlore. |
| 3 | Q | And can you read that? |
| 4 | A | Um says uh patient seen and examined um.  (long pause) |
| 5 | Q | I'm glad to know you have some difficulty yourself. |
| 6 | A | Yeah this is unfortunately the problem with the hand written documentation and why we |
| 7 | | then subsequently dictate a full _history and physical_ because we are aware that our handwritten notes uh |
| 8 | | we do them immediately to have some documentation at the time. |
| 9 | Q | Well and it's not your primary focus at the time I mean you're giving care so. |
| 10 | A | Yeah so it says that he's discussed with the resident uh I mean generally that appears to |
| 11 | | be a statement that, he saw and examined the patient with the resident, discussed the care |
| 12 | | and agreed. |
| 13 | Q | Yeah it's under teaching staff MD so it may be just |
| 14 | A | Yeah. |
| 15 | Q | Kind of a memorialize it for those purposes. |
| 16 | A | It's a bit of a formality that says he agrees with what Dr. Noland had documented. |
| 17 | Q | Anything from those entries that affects your belief or opinion about the timing of the |
| 18 | | trauma? |
| 19 | A | No. |
| 20 | Q | And then page 5 uh notified 15:58 I'm not, I have separate notes that's up at the top. |
| 21 | | Notified 15:58 arrived 16:04 and notification would have been by radio from the EMS |
| 22 | | saying we're on our way or what? |

| | | |
|---|---|---|
| 1 | A | So that would be the time that we received the page uh that says code 77 you know, |
| 2 | | patient has arrived with a brief description of the problem at the time of arrival. So that's |
| 3 | | when we received that page uh and then when we were present uh I mean our team uh at |
| 4 | | 16:01 then the patient arrived at 16:04. |
| 5 | Q | Um so it would be internal of the hospital so someone at the hospital gets something from |
| 6 | | the EMS ambulance personnel and then they that is when they notify the who they need |
| 7 | | for their code 77? |
| 8 | A | Yes so that's the time the code 77 page was received by our team. |
| 9 | Q | And then on page 6 on the secondary survey something bilateral non reactive. |
| 10 | A | Um the pupil size 2 mm, bilateral, nonreactive. |
| 11 | Q | Okay, anything on those notes that helps you try to figure out the timing of the trauma? |
| 12 | A | Um no I mean these notes and then again our subsequent dictated version of it basically |
| 13 | | describe the findings at the time of arrival. |
| 14 | Q | Page 8 we have a Dr. Simons. |
| 15 | A | Yes. |
| 16 | Q | Who's that? |
| 17 | A | Um he is one of my partners um so he was on duty at the time of her arrival to the |
| 18 | | emergency department um and then the uh then the uh then have an on call staff that |
| 19 | | takes over at 5:00 p.m. so I was next on call so um I took over the care from Dr. Simons |
| 20 | | shortly after the patient arrives. |
| 21 | Q | And then on page 10 um we've got references to Dr. Guzman and Dr. Gayed. Can you |
| 22 | | tell me who they are and their participation? |

1    A    They are two of our surgical residents that are part of the um trauma surgery team at uh

2         that evaluated her and cared for her.

3    Q    And then the narrative that appears on that page do you know its source.

4    A    Are you on page 10?

5    Q    Yes sir uh where briefly brought in, an unidentified

6    A    Yes.

7    Q    Is that just

8    A    That's a note by Dr. Guzman who uh would have been our senior resident on duty um and

9         uh so he's uh summarizing the uh the nature of uh what happened and the uh plan.

10   Q    So that could have been different sources some EMS, some nurses, some personal

11        observations?

12   A    Yes.

13   Q    Thank you. Um page 11 were you present for the discussions no wait, page 11 is the

14        DNR uh and it says after discussions with the family that was just the son, correct?

15   A    Um that is page 11 is actually somewhat out of time sequence but it's uh a note um that

16        was entered after the time of her death sort of summarizing the hospital course uh that

17        evening.

18   Q    Did Dr. Guzman make that entry or?

19   A    Yes.

20   Q    And then um do you see the part after the discussions with the family she was made

21        DNR?

22   A    Yes.

23   Q    Um to your knowledge that was just the son?

1    A    Um the um the additional conversation was with the son by telephone and um it

2         sometime thereafter a her daughter arrived at the hospital and uh discussions were um

3         held throughout the evening with her family members uh about her condition and there

4         was an agreement amongst the family uh to make that decision.

5    Q    Were you present when it talks about the immediate family, were you present for that the

6         discussions about withdrawing care?

7    A    Yes.

8    Q    And so how many was it if you recall?

9    A    Um there were three children that had arrived at the bedside and we spoke with them in

10        the intensive care unit.

11   Q    Anything about the demeanor of any of them that you found odd?

12   A    Um no, not given the circumstances.

13   Q    Were they, so they all seemed to be reacting appropriately given the circumstances?

14   A    Yes.

15   Q    Anything about the discussions that I don't know is out of sync with your experience?

16   A    Um no I discussed um the nature of her injuries and the devastating traumatic brain injury

17        and uh her condition at the time and that it was the opinion of the neurosurgeons and of

18        our team caring for her that there was no treatment that would repair her injuries that

19        would lead to a good recovery and then they agreed that she would not want prolonged

20        life support in that situation and uh at that point the decision was made to withdraw care

21        except for uh pain medication and comfort measures.  Uh and I made a note to that effect

22        in the record which is not included in the um documents that you have but um was a note

23        that I entered in the medical record at 22:11.

| | | |
|---|---|---|
| 1 | Q | I'm sorry just the note that they had decided to withdraw care? |
| 2 | A | Yes. |
| 3 | Q | Okay in um given those communications can you remember any specific statements or |
| 4 | | concerns expressed by any particular one of the three children? |
| 5 | A | No. |
| 6 | Q | Uh page 12 it's simply the radiology report. |
| 7 | A | Yes. |
| 8 | Q | Anything about that that would help someone determine the timing of the trauma? |
| 9 | A | Um, um it demonstrates that this is an acute or a recent injury but the uh the exact timing |
| 10 | | would not be uh uh determined to the point of whether it was minutes or hours. |
| 11 | Q | Yeah recent in medical terminology could be up to 20 hours, right? |
| 12 | A | Um, um it was definitely evidence of an acute injury with a recent hemorrhage uh I can't |
| 13 | | speculate on the duration of time. |
| 14 | Q | Okay well but when you use the word recent how, what, what amount of time could that |
| 15 | | involve? |
| 16 | A | Um minutes or hours. |
| 17 | Q | And how many hours? |
| 18 | A | I don't know. |
| 19 | Q | And if you reference recent to the hemorrhaging, hemorrhaging would be ongoing, |
| 20 | | correct? |
| 21 | A | Uh yes. |
| 22 | Q | Um |

1   A    So, so blood has a certain appearance on a CT scan and uh over time that appearance

2         changes um um I am not a radiologist so I could not quote you a specific time frame but

3         in my experience this is indicative of an acute injury um as I mentioned uh within

4         minutes or a few hours.

5   Q    Okay well now a few hours could that be four or five?

6   A    It could be.

7   Q    Okay is there anyway, we keep going minutes or a few hours, is there any way to uh to

8         elevate or give more credence to one or the other?

9   A    Um, not in my experience.

10  Q    On page

11  A    I don't think that the test is able to be that precise in terms of timing.

12  Q    So I suspect that's why they want you to come in is to say that the kid, the kid had to have

13        done it because it was so recent.  Are you going to say anything like that?

14  A    Uh I can't speculate about who caused this injury.  I can just describe the injury uh.

15  Q    Right but I'm saying I'm not talking about describing who did it.  It's going to be their

16        theory and I think they want you to help them I mean are you going to come in and say

17        whoever found this person probably did it because it's so recent, anything like that?

18  A    Um I can say that it was a recent injury I can't speculate as to whether or not the person

19        who found her was involved or just happened to find her I don't know.

20  Q    Okay and again recent could have been four or five hours?

21  A    Um it, it could have been but I think it was probably relatively soon after the injury.

22  Q    Okay why do you say that?  Why did it take me so long to get that answer?

| | | |
|---|---|---|
| 1 | A | Um well, I mean I'm saying, I'm saying it would be uh more likely, more likely a matter |
| 2 | | of minutes than hours. |
| 3 | Q | I think I'm pretty sure I asked that directly about 20 minutes ago but why are you saying |
| 4 | | that now? |
| 5 | A | Because you continue to ask me could it have been this and could have it been that and I |
| 6 | | cannot say with absolute certainty so I would say in my opinion this was more likely uh a |
| 7 | | matter of minutes rather than several hours because I don't think she would have survived |
| 8 | | without life support for a long period of time. |
| 9 | Q | Okay well how long? |
| 10 | A | Uh I'd give it the same answer I gave you before. A matter of minutes or hours. |
| 11 | Q | Okay so but now you're saying more likely minutes because she wouldn't have survived. |
| 12 | | So how do you get there?  I mean you know three times I've asked the question, you go |
| 13 | | minutes or hours.  I even said is one more likely than the other early on and you said no |
| 14 | | and now it's your opinion it's more likely minutes than hours and I'd like you to explain |
| 15 | | that to me please. |
| 16 | A | Because when a person has a severe traumatic brain injury and they are unconscious um |
| 17 | | there are effects on the patency of the airway, the patient's ability to breath and there's |
| 18 | | ongoing bleeding and these injuries evolve over time as a patient's condition tends to get |
| 19 | | worse um over a relatively short period of time an that period of time in the absence of |
| 20 | | medical treatment in my opinion, would be more likely to be measured in minutes than |
| 21 | | multiple hours. |

1   Q   And um I'm sorry so, great now I'm really have to, you just extended this a few, quite a

2       bit. Uh have you reviewed any documentation, photographs or videos of the scene to see

3       what kind of blood loss was there?

4   A   No.

5   Q   Would that affect your opinion?

6   A   No.

7   Q   Well if blood loss is something that goes over time if there's a little of it that would mean

8       it was a shorter time versus if there's a lot of it, correct?

9   A   Um I base my assessment on our evaluation of the patient uh the amount of bleeding she

10      had that we observed and the laboratory and other tests that we obtained at the hospital.

11  Q   Okay well tell me what laboratory results affect that opinion?

12  A   Um she had a blood cell count um a hemoglobin level that it was an impression of uh the

13      amount of blood loss uh and I would use that as, you know my assessment as to how

14      much bleeding there has been.  Uh it is very difficult to estimate the quantity of blood

15      loss based on observation of a patient of the scene or the patient's clothing uh that is

16      something that's fairly well known. You just pour a quantity of liquid on the floor it's

17      very difficult to estimate the exact volume of that.

18  Q   Well you could certainly tell the difference between a 50 cent drop and a 1 foot puddle

19      couldn't you?

20  A   Um yes.

21  Q   Wouldn't you say a 50 cent drop would be less liquid than a 1 foot puddle?

22  A   Yes.

1    Q    So then on the lab reports tell me what uh you've told me how the hemoglobin count so

2         what does that tell you then about how long she'd been bleeding?

3    A    Uh she had a hemoglobin level of 9.9 normal range is 12 to 15 so she had lost you would

4         estimate approximately uh what we would describe as 2 units of blood or the amount of

5         transfusion that would be required to replace that blood loss to get her back to a normal

6         value would be about 2 units of stored blood.  So that's how I make that estimation.

7    Q    So how long would it take to lose 2 units of blood?

8    A    That depends on how fast someone's bleeding.

9    Q    So how does that help you decide minutes rather than hours?

10   A    It doesn't. It just helps me decide how much blood was lost.

11   Q    Well did she get any blood?

12   A    No, I don't think so.

13   Q    So what else uh supports your preference for minutes versus hours?

14   A    Uh that's my judgment and professional experience.

15   Q    No, no, I want to know what you're basing it on.  You said the blood count and you said

16        something else and then we started talking about the blood count so.

17   A    I would use the blood count to estimate how much blood she had lost not the time period

18        over which she lost it.

19   Q    Okay.

20   A    Uh I would use my experience based on her condition when she arrived, the nature of her

21        injuries, uh is that this was an acute injury, that um that without medical treatment she

22        would not survive um more than some number of minutes or a few hours.

23   Q    Alright.

1  A    I am not going to be more specific than that because I cannot be.

2  Q    Well you've gone back and forth on it.  You'll be able to read this.

3  A    No I have consistently said a period of time between minutes or several hours.

4  Q    I won't argue with you, I'll wait and let you read it.

5  A    On that question.

6  Q    I'll wait and let you read it and then you can make changes if you wish.

7  A    So.

8  Q    Are you a neurologist or a neurosurgeon?

9  A    I am a general surgeon with ___*added*___ qualifications in surgical critical care.

10 Q    Any board certifications?

11 A    Yes.

12 Q    What are they?

13 A    Surgery and surgical critical care.

14 Q    And uh any board certifications in neurology or brain functions?

15 A    No.

16 Q    Uh back to the record page 13 who is Dr. Tarver?

17 A    He is a radiologist.

18 Q    And then page 14 uh do you know who um made the entry for the history of present

19     illness?

20 A    Um that was entered by Benjamin Gayed who I, I mentioned as one of our surgery

21     residents, trauma team.

22 Q    Do you know where he got that information?

20

1   A   Um based on the history provided by the paramedics and of his assessment of the patient

2   on arrival.

3   Q   The only new entry on that narrative is that no weapon was found any idea where he got

4   that information?

5   A   It would have been what came from the same paramedics.

6   Q   And then page 15 assessment and plan would that still be Dr. Gayed or Dr. Simons?

7   A   It would be Dr. Gayed and then um again Dr. Simons is the attending so he was uh uh

8   still sign as the attending physician of record.

9   Q   When he said a neurosurgeon was consulted who was that?

10   A   Um that was uh Dr. Todd Vogel, he was one of the neurosurgery residents at the time and

11   his attending was Dr. Shapiro.

12   Q   I'm sorry could you spell Dr. Todd's last name?

13   A   It's Todd Vogel V as in Victor-O-G-E-L.

14   Q   And his uh he was a resident?

15   A   Yes.

16   Q   And so who was the supervising doctor?

17   A   Scott Shaprio S-H-A-P-I-R-O.

18   Q   Have they prepared any reports to your knowledge?

19   A   Uh yes.

20   Q   And do you have any idea where those are?

21   A   Um

22   Q   I'm sorry hold on a minute (turned tape over)  Okay where would those reports be?

| | | |
|---|---|---|
| 1 | A | Um there is um a note in our electronic medical records um that um that was entered |
| 2 | | November 19, 2013 at 16:56. |
| 3 | Q | Do you have access to that? |
| 4 | A | Yes. |
| 5 | Q | Is it lengthy? |
| 6 | A | No. |
| 7 | Q | Can you read it? |
| 8 | A | Um it says neurosurgery consult note.  Unidentified female uh reported born in 1925 uh |
| 9 | | 88 years old found down at home with GSW to left parietal occipital region unknown |
| 10 | | circumstances.  No family available for questioning.  Patient had eyes open, squeezing |
| 11 | | left hand intermittently, non verbal during transportation for a GSC of 9 E4 G1 M4 on |
| 12 | | arrival.  Intubated with rapid intubation sequence on arrival.  Large left occipital lesions. |
| 13 | | Uh that's how I read past medical history, past surgical history, medication, socialistic |
| 14 | | family history, review systems are unable to be  obtained.  Uh there's a listing of the vital |
| 15 | | signs on arrival.  Uh says GCS 3T at time of my exam but patient recently paralyzed, |
| 16 | | pupils 2 non reactive, no gag, large left occipital lesion palpated. Head CT demonstrates |
| 17 | | left parietal occipital comminuted bone fracture driven deep into the brain with |
| 18 | | intraventrical hemorrhage. 5 millimeter midline shift left to right.  Assessment plan |
| 19 | | gunshot wound to head.  Non operative based on imaging.  Patient will likely die from |
| 20 | | her injury we're happy to counsel family but no neurosurgical intervention given severity |
| 21 | | of her injury.  It says staff is Shapiro and then there's an addendum by Dr. Shapiro that |
| 22 | | says patient seen and examined and resident supervisor agree with plan. |
| 23 | Q | So that entry would have been made by Dr. Vogel? |

1   A    Yes.

2   Q    And uh any idea why I don't have that?  Do you know if it was given to the prosecutor?

3   A    Um I don't know, it is uh in our electronic medical records and should be available upon

4        request.

5   Q    Well so I'm identifying now that you have one note that you identified not in the packet

6        that I sent you which is all that I was given and now we have this.  Do you know of any

7        other missing documents or documents that I don't have?  I don't mean to say missing

8        documents.

9   A    Um I mean what you have is a, are excerpts from the medical records um medical records

10       now a days are sort of a complex data base that I think are sometimes difficult to depict

11       completely in a printed form however, uh it should certainly be possible to retrieve all of

12       the progress notes and have those available to you.  Uh upon request from our medical

13       records department.

14  Q    Yeah I don't know how they requested it but I can do a non party.

15  A    So what, I mean what is in this packet is incomplete version of the medical record.

16  Q    Gotcha.

17  Pros So I may just, how many additional pages does it look because this is all that the State

18       was provided upon request.  About how many other documents are we talking about Dr.

19       Streib if you had to guess?

20  A    Um if I pull up the list of available documents um

21  Pros Or maybe a better way if we re-request it how should we word it to ensure we get all the

22       documents?

| | | |
|---|---|---|
| 1 | A | Um you would want to make sure that you have all of documents including the history |
| 2 | | and physical, progress notes, um radiology reports and discharge summary that would |
| 3 | | give you all of the physician documentation. |
| 4 | Pros | Okay and I'm sorry I only got um the radiology report and discharge summary what did |
| 5 | | you say prior to that please? |
| 6 | A | I would say the admitting history and physical. |
| 7 | Pros | Okay thank you. |
| 8 | A | And progress notes. |
| 9 | Pros | Okay thank you, sorry go ahead. |
| 10 | Q | You might include consultation and referral notes.  Um |
| 11 | Pros | Would that also be necessary to include, doctor? |
| 12 | A | Um you could certainly, yeah you could list that. |
| 13 | Pros | Okay. |
| 14 | Q | Uh from your discussion with uh the prosecutor and all and expectation of testimony |
| 15 | | have I missed anything? |
| 16 | A | Um |
| 17 | Q | See here's the thing, I hate surprises when I'm in court and hear stuff for the first time so I |
| 18 | | like to try to make sure I've heard everything from a prospective witness that they know |
| 19 | | or expect will be covered in their testimony. |
| 20 | A | Uh huh.  Um I uh like I said if called to testify I would be able to uh testify to the facts of |
| 21 | | the documented medical records, uh my opinion based upon those which I think I have |
| 22 | | described to you uh and I could uh describe the discussion I had with the patient's family |
| 23 | | and the decisions that were made based upon those discussions um I would not be able to |

1    provide any detailed forensic testimony about the mechanism of injury or the timing of

2    injury any more specifically than we've discussed because I just that's not in my area of

3    expertise. It is possible that the coroner or medical examiner may have more specific

4    information or uh details regarding those questions.

5    Q   And then uh anything about your interactions with the family that we haven't covered?

6    A   No, I don't think so.

7    Q   When you referenced minutes versus hours like minutes was that are you talking 10, 15

8    or up to 59?

9    A   Um I mean just based on the nature of pre-hospital care um and um I don't have the EMS

10   record um but there would be information regarding the timing of the call, usually uh the

11   pre-hospital time would be at least 20 to 30 minutes um so I would say that you're

12   probably from the you know the time of an injury is found and the time the patient gets to

13   the hospital it could be in the 30 to 60 minutes time frame.

14   Q   Oh no I'm talking about when you uh uh your opinion as to when the trauma was suffered

15   A   Yeah.

16   Q   You know you said it could be minutes it could be hours and you're saying in your

17   opinion it was more likely minutes.

18   A   Yeah.

19   Q   Can you give me your parameters of that word.  When you say minutes are you talking 5-

20   10.

21   A   I think clearly it happened before the 911 call.  Uh so uh um whatever that time period is

22   a minimum number uh and then uh I think that uh in um um you know if it was probably

23   somewhere between half an hour uh upwards but again I can't I don't have any really way

25

1        of being any more specific on that.  Like I said I think that just on the nature of the pre-

2        hospital timing uh that it happened obviously before that.

3  Q    Right but when you're saying minutes I mean could it be up to 50-59 before you switch

4        over to saying hours, I mean just in general?

5  A    Yes.

6  Q    Okay well thank you very much.  I'm going to turn the tape.  I'm sorry do you have any

7        questions?

8  Pros  No

9  Q    I'm going to turn the tape off.

10       End of taped deposition of Dr. Streib.


AND FURTHER AFFIANT SAYETH NAUGHT.


_____        04/03/2015
Dr. Streib                         Date

| STATE OF INDIANA | ) | IN THE MARION SUPERIOR COURT |
| | )SS: | CRIMINAL DIVISION 1 |
| COUNTY OF MARION | ) | CAUSE NO. 49G01-1405-MR-026747 |

| STATE OF INDIANA, | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| WILLIAM RAINSBERGER, | ) |
| Defendant. | ) |

"I hereby certify that the foregoing is a true and accurate transcript of the taped deposition testimony given by Dr. Erik Streib. The transcript was prepared and completed by me on the 30th day of March, 2015".


*Patricia A. Cardinal*
Patricia A. Cardinal


PATRICIA A CARDINAL
Notary Public- Seal
State of Indiana
My Commission Expires Aug 28, 2019

STATE OF INDIANA vs. WILLIAM HAMSBERGER  JUDGE: KURT EISGRUBER

CAUSE NUMBER: 49G01-1405-MR-026747

I make the following corrections

- Page 5 Section Line 7 _____ reads,

... there's actually a secondary of, offracture...

Should read,

there's actually a seconda area of, of fracture...

- Page 11 Section line 7 _____ reads,

then subsequently dictate a full ── because we are aware that our handwritten notes

Should read,

then subsequently dictate a full history and physical because...

- Page 20 Section Line 9 _____ reads,

I am a general surgeon with _____ qualifications in Surgical critical care

Should read,

I am a general surgeon with added qualifications in Surgical critical care.

- Page _____ Section _____ reads,

_____

Should read,

_____

DATE: 04/03/2015          AFFIANT: Erik Streib