```
1                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF INDIANA
2                      INDIANAPOLIS DIVISION
3            CIVIL ACTION NO. 1:16-cv-103-WTL-MJD
4    WILLIAM RAINSBERGER,              )
                                       )
5             Plaintiff,               )
                                       )
6               -vs-                   )
                                       )
7    CHARLES BENNER,                   )
                                       )
8             Defendant.               )
9
10        DEPOSITION OF WILLIAM TERRY RAINSBERGER
11
12        The deposition upon oral examination of
     WILLIAM TERRY RAINSBERGER, a witness produced and
13   sworn before me, Susan Wollenweber Dezelan, RDR,
     CRR, CRC, Notary Public in and for the County of
14   Marion, State of Indiana, taken on behalf of the
     Defendant, at the offices of Connor Reporting, 111
15   Monument Circle, Suite 4350, Indianapolis, Marion
     County, Indiana, on the 27th day of September,
16   2016, at 1:58 p.m., pursuant to the Federal Rules
     of Civil Procedure with written notice as to time
17   and place thereof.
18
19
20
21
22
23
24
25
```

```
 1                    APPEARANCES
 2    FOR THE PLAINTIFF:
 3             Richard A. Waples
               WAPLES & HANGER
 4             410 North Audubon Road
               Indianapolis, IN  46219
 5             317.357.0903
               rwaples@wapleshanger.com
 6
 7
      FOR THE DEFENDANT:
 8
               Kathryn M. Box
 9             Lynne D. Hammer
               CITY OF INDIANAPOLIS
10             OFFICE OF CORPORATION COUNSEL
               200 East Washington Street, #1601
11             Indianapolis, IN  46204
               317.327.4055
12             kathryn.box@indy.gov
               lynne.hammer@indy.gov
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    INDEX OF EXAMINATION
 2                                            Page
 3   DIRECT EXAMINATION  . . . . . . . . . . . . .5
          Questions by Kathryn M. Box
 4
 5                    INDEX OF EXHIBITS
 6                                            Page
 7   Exhibit No.:
 8   Exhibit 13  - Robert Rainsberger's Cell . . . . 75
                   Phone Records
 9   Exhibit 14  - Gas Receipt from Kroger . . . . . 43
     Exhibit 15  - Kroger Receipt for Iced Tea . . . 49
10   Exhibit 16  - Kroger Plus Card Records  . . . . 50
     Exhibit 17  - Text Message Records from . . . . 80
11                 Rebecca Ferguson's Phone Number
     Exhibit 18  - Audio Records Request for 911 . . 82
12                 Call
     Exhibit 19  - Complaint . . . . . . . . . . . . 99
13   Exhibit 20  - Photograph Depicting Items on . .110
                   Counter
14   Exhibit 21  - Photograph Depicting a Box in . .110
                   a Drawer
15   Exhibit 22  - Photo Depicting a Black Purse . .114
                   in a Drawer
16   Exhibit 23  - Statement of William  . . . . . .115
                   Rainsberger
17   Exhibit 24  - Photo Depicting Small Purse in  .117
                   a Drawer
18   Exhibit 25  - Photograph Depicting Bedroom  . .119
     Exhibit 26  - Photograph Depicting Lockbox  . .122
19   Exhibit 27A - Photograph Depicting  . . . . . .128
                   Rainsberger at Kroger
20   Exhibit 27B - Photograph Depicting  . . . . . .128
                   Rainsberger at Kroger
21   Exhibit 27C - Photograph Depicting  . . . . . .128
                   Rainsberger at Kroger
22   Exhibit 27D - Photograph Depicting  . . . . . .128
                   Rainsberger at Kroger
23   Exhibit 28  - Selected W. Rainsberger Phone . .131
                   Records
24   Exhibit 29  - Storyboard for Video  . . . . . .135
     Exhibit 30  - 06-04-14 E-mail Exchange from . .137
25                 Vincent and Benner
```

1                    INDEX OF EXHIBITS

2                                                    Page

   Exhibit No.:

3   (Previously marked)

4   Exhibit 2   - Benner's Affidavit for Probable .100
                   Cause

5   Exhibit 3   - R. Rainsberger's Land Line  . . . 83
                   Telephone Records

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              WILLIAM TERRY RAINSBERGER,

 2   having been duly sworn to tell the truth, the whole

 3   truth, and nothing but the truth relating to said

 4   matter, was examined and testified as follows:

 5

 6   DIRECT EXAMINATION,

 7     QUESTIONS BY KATHRYN M. BOX:

 8   Q   Good morning, Mr. Rainsberger.

 9   A   Good afternoon.

10   Q   Good afternoon, sorry about that, it's been a

11       long day already.  My name is Kathryn Box, and I

12       represent Detective Benner in this case.  This

13       is my colleague, Lynne Hammer.  She also will

14       help me with representing Detective Benner here

15       today.

16              For ease of reference, do you mind if I

17       call you William or Bill?

18   A   Bill is fine.

19   Q   Bill.  Okay, thank you.  You can call me Kathryn

20       at any time.  Will you just start by stating

21       your full name for the record and spelling your

22       last name?

23   A   Yeah.  My name is William Terry Rainsberger,

24       R-A-I-N-S-B-E-R-G-E-R.

25   Q   Thank you.  Have you ever given a deposition
```

```
 1        before?

 2   A    No.

 3   Q    No?

 4   A    No.

 5   Q    So I'm going to go over a few rules real quick,

 6        they're pretty simple.  The first rule is you

 7        have to tell the truth to the best of your

 8        ability.  She swore you in today, it's similar

 9        as if you were in front of a Court or in front

10        of a jury.

11             Sometimes I will ask bad questions, it's

12        going to happen, you're not going to understand

13        what I say, you're not going to be able to hear

14        what I say, or when I get nervous sometimes I

15        start speaking fast.  So if for any reason you

16        don't understand my question or you don't hear

17        it, just let me know and I'll be happy to

18        restate it or rephrase it for you.

19   A    Okay.

20   Q    If you answer the question, I'm going to assume

21        that you heard it and that you understood it;

22        fair enough?

23   A    Yes.

24   Q    Great.  Our court reporter -- I know you kind of

25        already went through this this morning, but our
```

```
 1        court reporter is taking down everything that

 2        you and I say, and for her ease of typing, what

 3        we're going to try to make sure we do is not

 4        talk over each other; let me finish my question,

 5        and I'll let you finish your answer.  And make

 6        sure we answer out loud, so no nods of the heads

 7        or head shakes, yes and nos.  And I will try to

 8        remind you as we go throughout the deposition if

 9        you answer any by shaking your head or nodding,

10        okay?

11   A    Okay.

12   Q    Last, I don't know how long I'll take today, but

13        I don't anticipate it will be too long, but if

14        you need a break at any time, just like we did

15        this morning, just let me know.  We can take a

16        break, you can use the bathroom, get some food.

17        The only thing I ask is that you answer the

18        pending question before we break.

19   A    Yes.

20   Q    Great, thanks.

21             THE WITNESS:  Is this -- is there a

22        microphone, or are you just transcribing?

23             MS. BOX:  I don't know, I'm not sure how it

24        works, sorry.  I believe there is a microphone

25        as well.
```

```
 1                THE WITNESS:  Okay.
 2    BY MS. BOX:
 3    Q    Are you on any medication today?
 4    A    Yes.
 5    Q    What medication are you on?
 6    A    I take paroxetine, 10 milligram, once a day, and
 7         I take -- what's it called? -- generic Adderall.
 8         I can't remember the generic name.
 9    Q    And that's fine.  I don't --
10    A    And I take multiple hay fever over-the-counter
11         medications.
12    Q    Do any of those medications affect your ability
13         to understand questions?
14    A    No.
15    Q    Affect your ability to answer questions today?
16    A    No.
17    Q    Are you under the influence of any alcohol?
18    A    No.
19    Q    Sorry, I have to ask.
20    A    That's okay.
21    Q    Are you under the influence of any illegal
22         drugs?
23    A    No.
24    Q    And I see that you have eyeglasses.  Do you need
25         those to see any of the exhibits that I show you
```

```
 1        today?

 2    A   I just wear them to read --

 3    Q   Okay.

 4    A   -- so as that applies, I'll have to wear them.

 5    Q   The only thing I ask is if you need them to see

 6        something clearly, please do so.

 7    A   Right.

 8    Q   Thanks.  And do you wear hearing aids?

 9    A   No.

10    Q   Other than speaking with your attorney, what did

11        you do to prepare for your deposition today?

12    A   I just read through the affidavit and the

13        statements that I had -- or the -- my responses

14        to the questions that the police, the IMPD in

15        November of 2013.

16    Q   Was that your statement that you gave to

17        Detective Benner?

18    A   Yeah.  I read the question-and-answer with

19        Benner from the two instances in November 2013.

20    Q   Okay, right.  And there are two statements, just

21        so we're clear, right, one on the 19th?

22    A   The 19th.

23    Q   And then one on the next day, on the 20th; is

24        that correct?

25    A   Correct.
```

1    Q    Of November, 2013.

2              Did you talk to anyone else besides your

3         attorney about your deposition today?

4    A    No.

5    Q    And I mean about the substance.

6    A    No.

7    Q    And I'm just going to ask a few background

8         questions just to understand you, really.

9         What's your date of birth?

10   A    June 8, 1957.

11   Q    And how old are you?

12   A    59.

13   Q    How old were you on November 19th of 2013?

14        I'm not good at math, that's why I asked.

15   A    56.

16   Q    And where do you currently live?

17   A    You want the address?

18   Q    Please.

19   A    7345 East 13th Street.

20   Q    And that's the same address you lived at in

21        November of 2013; correct?

22   A    Correct.

23   Q    And what is your cell phone number?

24   A    (317)331-1059.

25   Q    Is that the same number as --

1   A   Yes, ma'am.

2   Q   -- November 2013?  And who is your carrier?

3   A   T-Mobile.

4   Q   T-Mobile.  All right.

5       Where were you born, the city?

6   A   Canton, Ohio.

7   Q   Canton, Ohio, okay.  And where did you go to

8       high school?

9   A   Arlington, here.

10  Q   Here in Indianapolis.  Did you go to college?

11  A   Yes.

12  Q   And where did you go to college?

13  A   For three years I went to IUPUI, and then I

14      finished, did two more years at Butler.

15  Q   And did you get a degree?

16  A   Yes.

17  Q   And what degree was that?

18  A   I have a bachelor of science.

19  Q   In what area of study?

20  A   I have a dual major in math and computer

21      science.

22  Q   That explains the Windows 10 stuff you were

23      explaining to us.  You know your computers.

24      Do you have any other post-high school

25      education?

```
 1   A   I'm not sure I understand the question.

 2   Q   Sorry.  Like any technical training or

 3       certificates.

 4   A   I have a limited amount of technical training

 5       that was done in relation to my work.

 6   Q   Okay.  Can you explain that a little bit

 7       further, please?

 8   A   I took several classes back in the '80s about

 9       IBM mainframes.

10   Q   Okay.

11   A   I took a class in the '90s about Novell, which

12       is a network operating system, and I took a

13       class in 1999 on firewalls.

14   Q   So all computer-related stuff?

15   A   Yes.

16   Q   And are you currently employed?

17   A   No, ma'am.

18   Q   Were you employed on November 19th of 2013?

19   A   No, ma'am.

20   Q   How long had you -- so you were retired?

21   A   Yes.

22   Q   And where were you retired from?

23   A   From Franciscan Alliance.

24   Q   How long did you work for Franciscan Alliance?

25   A   30 years, not all in a row.
```

1    Q   And what year did you retire?

2    A   January 2012 or early 2012.

3    Q   And what would a primary day, like, after

4        retirement be for you?  Did you -- what,

5        hobbies, activities, how did you stay busy?

6    A   Oh.  I read a lot.  I hang out with friends.

7        Work on the house.  I guess that's it.

8    Q   So you were retired in November of 2013.  Did

9        you have some sort of retirement pension, or

10       what was your source of income at that time?

11   A   A pension.

12   Q   A pension?  Okay.  Did you own any property in

13       November of 2013?

14   A   Yes.

15   Q   And is that the house --

16   A   Yes.

17   Q   -- that we're speaking about?  And that's at

18       7135 East 13th Street?

19   A   Yes.

20   Q   Can you describe the house for me?

21   A   It's a long ranch house, brick, on about

22       two-thirds of an acre.

23   Q   And is it -- that's in Indianapolis; correct?

24   A   Yes.

25   Q   What side of town is that on?

```
 1    A    It's on the east side, near 10th and

 2         Shadeland.

 3    Q    And did you own a vehicle at that time?

 4    A    Yes, ma'am.

 5    Q    Just one?

 6    A    Yes.

 7    Q    And what type of vehicle was that?

 8    A    It's a Honda Accord.

 9    Q    Did you have any other source of income at that

10         time besides your pension?

11    A    The answer doesn't fit the question.  I had

12         other assets.

13    Q    Okay.

14    A    So I don't know how to answer the question,

15         actually.

16    Q    No, no problem.  Can you describe your other

17         assets for me?

18    A    I have a IRA that I -- you know, IRA.  And

19         savings.

20    Q    And I just want to talk briefly about your

21         medical history.  Do you have a primary care

22         provider, doctor that you see regularly?

23    A    Yes, yes.

24    Q    What's his or her name?

25    A    William Kleckner.  K --
```

```
 1    Q   Can you spell --

 2    A   K-L-E-C-K-N-E-R.

 3    Q   And what hospital is he affiliated with?

 4    A   He's independent.

 5    Q   Independent, no hospital, okay.

 6            Do you have any chronic illnesses?

 7    A   No.

 8    Q   And we already talked briefly about your

 9        prescription medication.  Would the paroxetine,

10        the generic Adderall, and maybe some

11        over-the-counter allergy medicine be similar

12        medications that you were taking back in

13        November of 2013?

14    A   Paroxetine, yes.  Yes to all three, yes.

15    Q   Have you had any recent hospitalizations?

16    A   No.

17    Q   And I apologize, I'm not prying, I just have to

18        ask:  Have you ever been treated for a mental

19        health issue?

20    A   The paroxetine --

21    Q   Yeah.

22    A   -- if you want to categorize it that way, is for

23        low-level depression and anxiety.

24    Q   And how would you characterize it?  Is that how

25        you would characterize it as --
```

| | | |
|---|---|---|
| 1 | A | Low-level depression and anxiety. |
| 2 | Q | Okay, just wanted to make sure. |
| 3 | A | Yes. |
| 4 | Q | And is Dr. Kleckner your prescriber for the |
| 5 | | paroxetine? |
| 6 | A | Yes, ma'am. |
| 7 | Q | Have you ever had any inpatient treatment for a |
| 8 | | mental health issue? |
| 9 | A | No. |
| 10 | Q | Have you ever been treated for drug or alcohol |
| 11 | | addiction? |
| 12 | A | No. |
| 13 | Q | Prior to this incident, had you ever been |
| 14 | | arrested before? |
| 15 | A | No. |
| 16 | Q | Had you ever been a party to any sort of civil |
| 17 | | lawsuit prior to this incident? |
| 18 | A | Two divorces. |
| 19 | Q | That counts. |
| 20 | | Have you ever sued the City of Indianapolis |
| 21 | | before or one of its employees? |
| 22 | A | No, ma'am. |
| 23 | Q | In November of 2013, did you own a firearm? |
| 24 | A | Yes, ma'am. |
| 25 | Q | And what kind of gun was that? |

```
 1    A    It's a revolver.

 2    Q    Okay.  And do you still have that gun?

 3    A    Yes, ma'am.

 4    Q    How long have you had the gun for,

 5         approximately?

 6    A    Do you mean when did I buy it?

 7    Q    Yes, that works.

 8    A    Oh, wow.  20 years ago.

 9    Q    And do you have a permit for it, or does it just

10         stay inside your house?

11    A    It just stays inside my house.

12    Q    What's the primary purpose of the weapon?

13    A    Personal protection.

14    Q    Personal protection, okay.

15             And are you -- I don't know how to put

16         this -- a gun guy, a gun aficionado, do you

17         enjoy guns?

18    A    No, ma'am.

19    Q    Do you smoke?

20    A    Can you define "smoke"?

21    Q    Cigarettes.

22    A    Occasionally, yeah.  Rarely.

23    Q    Do you smoke any sort of recreational drugs?

24    A    I have, but I do not.

25    Q    How often would you say you've smoked a
```

1          recreational drug in the last year, if at all?

2   A  Once or twice.

3   Q  And are we talking about weed?

4   A  We are talking about weed.

5   Q  Okay.  Just wanted to make sure we're on the

6       same page.

7          Now I'm going to ask you a few questions

8       about your family.  Are you married?

9   A  No, ma'am.

10   Q  Were you married in November 2013?

11   A  Yes.

12   Q  And what was your wife's name?

13   A  Mari, M-A-R-I, Bilger, B-I-L-G-E-R.

14   Q  And do you know her date of birth?

15   A  February 12, 1971.

16   Q  And where did she live in November of 2013?

17   A  At her house in Plainfield, Indiana.

18   Q  And can you give me that address, if you recall?

19   A  221 South Vine Street in Plainfield.

20   Q  So you guys were married but each owned separate

21       houses?

22   A  Correct.

23   Q  How much time would you spend at her house,

24       would you estimate, maybe in a week?

25   A  One or two evenings a week, at most.

```
 1    Q   At her house?  Would she come and stay with you?

 2    A   Rarely.

 3    Q   And what does she do for a living?

 4    A   I'm sorry.

 5    Q   You're fine.

 6    A   She is -- she works in the computer field.

 7    Q   Do you have any children?

 8    A   No, ma'am.

 9    Q   And do you have any siblings?

10    A   Yes, ma'am.

11    Q   And what are their names?

12    A   My sister's name is Rebecca, same last name.  My

13        brother's name is Robert.

14    Q   Is that all your siblings?

15    A   Yes, ma'am.

16    Q   And who's the oldest, or can you give me oldest

17        to youngest?

18    A   My sister is the oldest, I'm middle, my brother

19        is the youngest.

20    Q   I'm going to talk about Robert for just a

21        second, okay?

22    A   Uh-huh.

23    Q   Do you know Robert's date of birth?

24    A   January 12, 1962.

25    Q   Is Robert married?
```

1    A    No.

2    Q    Does he have a girlfriend or significant other,

3         that you know of?

4    A    I do not know.

5    Q    And I know in November of 2013, he was living

6         with you for a little bit; is that correct?

7    A    Correct.

8    Q    Is he still living with you?

9    A    No, ma'am.

10   Q    What's his current address?

11   A    7155 East 21st Street, Apartment 5.

12   Q    And that's in Indianapolis?

13   A    Yes, ma'am.

14   Q    Okay.  And what does Robert do for a living?

15   A    He's a house painter.

16   Q    And what's Robert's cell phone number?

17   A    (317)357-5791.

18   Q    How often do you see Robert?

19   A    Every few weeks.

20   Q    Every few weeks.

21        Would you characterize your relationship as

22        close?

23   A    Yes.

24   Q    And I know we touched on Robert was living with

25        you in November of 2013.  And why was he living

```
 1        with you?
 2    A   His house had been foreclosed on.  He was in a
 3        financial muddle.
 4    Q   Okay.
 5    A   So...
 6    Q   And when did he start living with you?
 7    A   The summer of 2013, I think.
 8    Q   Okay.  So he had been with you for three, four
 9        months, something like that --
10    A   Yeah, I can't remember exactly.
11    Q   -- at the time of the -- and then Rebecca, do
12        you know her date of birth?
13    A   September 21, 1951.
14    Q   And is Rebecca married?
15    A   Yes.
16    Q   What's her husband's name?
17    A   Larry Ferguson.
18    Q   Do they have any kids?
19    A   You mean between them?
20    Q   Yes.
21    A   No.
22    Q   Do they have kids separately?
23    A   My sister has a daughter.
24    Q   A daughter?  And how old is her daughter?
25    A   Mid-40s.
```

1    Q    Mid-40s, okay.  So that's your niece; correct?

2    A    Correct.

3    Q    And what's her name?

4    A    Amber Hulse, H-U-L-S-E.

5    Q    And does she live in Indianapolis?

6    A    Amber lives in the county seat of Hendricks

7         County.  Danville.

8    Q    How often do you see Amber?

9    A    Once a month.

10   Q    Does Rebecca live with Larry?

11   A    Yes.

12   Q    And where do they live at?

13   A    They live in Greenville, South Carolina.

14   Q    Okay.  Now, she lived in Indianapolis in

15        November of 2013; correct?

16   A    Yes, ma'am.

17   Q    And what was her address?

18   A    In November of 2013?

19   Q    Correct.

20   A    12957 Tarkington Common, Carmel.

21   Q    What does Rebecca do for a living?

22   A    Rebecca is retired.

23   Q    Retired now.  What did she do before she

24        retired?

25   A    She was a CPA.

```
 1    Q   How often do you see Rebecca?  I know she lives

 2        far away.

 3    A   Once a year.

 4    Q   Once a year.  Did you see her more frequently

 5        when she lived in Carmel?

 6    A   Yes.

 7    Q   How often did you see her?

 8    A   Once -- once a month.

 9    Q   Once a month.  Do you recall the last time you

10        saw her before the incident on the 19th,

11        November 19th?

12    A   No, not -- not with any accuracy.

13    Q   And what is your father's name?

14    A   His name was Ralph, R-A-L-P-H, Rainsberger.

15    Q   And he passed away?

16    A   Yes.

17    Q   I'm sorry about that.  When did he pass away?

18        Has it been a while?

19    A   '83?

20    Q   Were he and your mom married at that time --

21    A   No.

22    Q   -- when he passed away?

23    A   No.

24    Q   And did he live in Indianapolis at that time?

25    A   No.
```

```
1    Q   Did you have much of a relationship after he and

2        your mom got divorced?

3    A   No.

4    Q   And your mother's name was Ruth Rainsberger;

5        correct?

6    A   Yes, ma'am.

7    Q   And she was attacked and killed on

8        November 19, 2013?

9    A   She was attacked on November 19th.

10   Q   And she died the next day; is that correct?

11   A   Yes.

12   Q   I'm going to talk about your mom a little bit,

13       and I'm sorry for your loss.  I know this is --

14   A   That's okay.

15   Q   I'm sure it's tough to talk about; if you ever

16       need a break just let me know, okay?

17           Do you know your mom's date of birth?

18   A   June 10, 1925.

19   Q   And how old was she when she died?

20   A   8- -- 88.

21   Q   And where did she live?

22   A   801 North Shortridge, Apartment H-11,

23       Indianapolis.

24   Q   And that's an apartment complex?

25   A   Yes.  It's called Jeffersonian.
```

```
 1    Q   And can you describe her apartment for me,

 2        briefly?

 3    A   She had a two-bedroom, one-bath apartment that

 4        was in the -- like, half in the basement.  Very

 5        generic apartment.

 6    Q   And did she live there by herself?

 7    A   Yes, ma'am.

 8    Q   How long had she lived there for?

 9    A   At the time she passed away, it had been almost

10        two years.

11    Q   Did she have a cell phone at that time?

12    A   Think of an answer that works correctly.  She

13        had a cell phone but never used it and did not

14        know how to operate it.

15    Q   I understand that.  Did she have a land line?

16    A   Yes, ma'am.

17    Q   And what was that number?

18    A   I don't remember.  It's in the --

19    Q   It's in the records?

20    A   Yeah.

21    Q   I'll find it real quick.

22    A   375-7841.

23    Q   7841?  375-7841?

24    A   Yes.

25    Q   What was your mom's physical condition like at
```

```
 1          the time of her death?  Was she mobile, could

 2          she walk?

 3    A     Yes.

 4    Q     Did she need any assistance from a walker or a

 5          wheelchair or anything like that?

 6    A     No.

 7    Q     Was she able to care for herself?

 8    A     No.

 9    Q     No, okay.  Could she bathe herself?

10    A     I don't mean to be this -- this guy.

11    Q     You're fine.

12    A     She was -- she would have been physically strong

13          enough and adept enough to bathe herself, but

14          her dementia prevented her from performing

15          routine tasks.

16    Q     Describe her dementia for me a little bit.

17          Would you characterize it as severe or bad?

18    A     No.

19    Q     No, okay.  How often in a day would she forget

20          something, or what were -- let me back up.

21              What were her symptoms?

22    A     She -- there was a couple things.  One was

23          forgetfulness and the other is loss of executive

24          function.

25    Q     What do you mean by that?
```

```
 1    A   She was not able to perform tasks that required
 2        more than one or two steps.
 3    Q   Okay.
 4    A   So, for example, to make toast would be -- it's
 5        kind of haphazard.
 6    Q   Okay.
 7    A   She had Lewy body dementia, the same thing Robin
 8        Williams had.
 9    Q   Oh, okay.
10    A   She was under treatment for that.
11    Q   Were you her primary caregiver at the time?
12    A   Yes.
13    Q   Who else helped with taking care of your mom?
14    A   My sister.
15    Q   What would you do for your mom, general tasks?
16    A   I went to the store, did her dishes, and put
17        things away.  The main thing I did was just to
18        be a companion.
19    Q   And what would Rebecca do for your mom?
20    A   Mainly laundry.
21    Q   How often --
22    A   She would -- she would also -- I'm sorry, I'm
23        not really here or there.  She would also bathe
24        her.
25    Q   And how often would you see her?
```

```
 1    A    My mother?

 2    Q    Yes, your mother, sorry.

 3    A    Every day.

 4    Q    How often would Rebecca see her?

 5    A    Once a week.

 6    Q    And did your mom have food delivered to her?

 7    A    Yes, ma'am.

 8    Q    And how often did those food deliveries come?

 9    A    Monday through Friday.

10    Q    Did they come at the same time every day?

11    A    Approximately, yes.

12    Q    Approximately.  And what time was that?

13    A    10:30 or 11:00.

14    Q    Do you know if it was the same individual who

15         dropped the food off each day?

16    A    Yes.

17    Q    Did your mom understand that she was having food

18         delivered --

19    A    Yes.

20    Q    -- pretty much every day around 10:30?

21    A    Yes.

22    Q    So she would have been expecting a delivery?

23    A    Yes.

24    Q    How often would your mom get out of the house?

25    A    Rarely.
```

```
 1    Q    Would she ever go out by herself?

 2    A    No.

 3    Q    And I believe you talked a little bit about, in

 4         your statement, that she was either skeptical --

 5         or I think "leery" was the word you used -- of

 6         people at her door.  Is that correct?

 7    A    Yes.  She was kind of skeptical of everyone, but

 8         she would answer the door sometimes, against my

 9         urging.

10    Q    And do you know specific times that she would

11         answer the door for people she didn't know?

12    A    The only time that I know that she did that she

13         told me about was when the two guys that lived

14         upstairs, who we referred to this morning --

15    Q    Right.

16    A    -- their names escape me --

17    Q    I don't know off the top of my head.

18    A    -- when they moved -- when they moved in, they

19         came down and introduced themselves, which my

20         mother thought was kind of funny or odd, but...

21    Q    But would you say it would be rare for her to

22         open the door for a stranger?

23    A    I don't have enough data points to know because

24         she didn't really tell me, and people didn't

25         generally knock on her door except the food guy.
```

```
 1    Q    Do you remember making statements to Detective

 2         Benner about how you thought it would be

 3         unlikely that she would answer the door for a

 4         stranger?

 5    A    Yes.

 6    Q    And with your mom's dementia issues, was she

 7         able to handle her own finances?

 8    A    No.

 9    Q    Did you handle those for her?

10    A    Yes.

11    Q    What did you do, generally, for her financially?

12    A    The utilities were in my name and, of course, I

13         paid for groceries when I went to the grocery,

14         so I paid her bills, prepared checks for her to

15         sign.

16    Q    So she was able to still sign her checks,

17         though?

18    A    Yes.

19    Q    And did she reimburse you for the groceries that

20         you bought for her?

21    A    Yes.

22    Q    Did your mom have any other illnesses besides

23         her dementia?

24    A    I believe the only other medical condition she

25         had was scoliosis.
```

1    Q    Did she have to take medication for her

2         scoliosis?

3    A    No.

4    Q    What, if any, side effects would she have from

5         her scoliosis?

6    A    It was difficult for her to walk and get around.

7    Q    And what medication or medications was your mom

8         on for her dementia?

9    A    Aricept, A-R-I-C-E-P-T.

10   Q    Do you know what dosage?

11   A    No.

12   Q    Okay.

13   A    And that's for hallucinations.

14   Q    It's for hallucinations?

15   A    Aricept is for hallucinations.

16   Q    And the hallucinations were a side effect of her

17        dementia, to your understanding?

18   A    Correct, correct.

19   Q    And did you fill her prescriptions for her?

20   A    Yes.

21   Q    Aricept, what was the packaging?  What did it

22        look like?

23   A    Just a pill bottle.

24   Q    Just a pill bottle?

25   A    Uh-huh.

1    Q    Did your mom have any hospitalizations close to

2         the time of her death?

3    A    No.

4    Q    Would you also make sure that she took her

5         medication daily?

6    A    Yes.

7    Q    Did Robert help much with caring for your mom?

8    A    No.

9    Q    And why was that?

10   A    I took it on because he worked, and I was

11        retired, and I enjoyed doing it, so I didn't

12        think anything of it.

13   Q    Was Robert still pretty close with your mom?

14   A    Oh, yeah.

15   Q    How often would he see her?

16   A    Every few months.

17   Q    Every few months.

18             Do you know when the last time Robert saw

19        your mom before this incident was?

20   A    I do not.

21   Q    Did you have a key to your mom's apartment?

22   A    Yes, ma'am.

23   Q    Who else had keys to the apartment?

24   A    My brother and my sister.  And my mother, of

25        course.

1    Q    What was your mother's source of income in

2         November of 2013?

3    A    She had the savings that were mentioned in the

4         affidavit; she had a pension; and she had social

5         security.

6    Q    About how much did she have in savings?

7    A    Just under $100,000.  That's savings and CDs and

8         a checking and money market, whatever.

9    Q    Gotcha.  And do you know how much she got for

10        her pension?

11   A    1100 something, maybe 1200.

12   Q    Do you know how much she got for social

13        security?

14   A    Very little, probably 150 or 200 due to the

15        civil service offset.

16   Q    Is that the pension offset that you're referring

17        to?

18   A    Yes.  If you have a civil service pension, they

19        subtract from your social security.

20   Q    And you managed all her finances; correct?

21   A    I did not do her taxes, but I did everything

22        else.

23   Q    And did you have a power of attorney for her?

24   A    Yes, ma'am.

25   Q    What did that power of attorney cover?

```
 1   A   I don't recall offhand, it was just the routine.

 2   Q   Did it encompass medical decisions?

 3   A   There was a medical power of attorney.

 4   Q   Okay.  But that's something different than --

 5   A   It was two different documents, yeah.

 6   Q   And who had the medical power of attorney?

 7   A   I think myself and my sister.  I do not recall

 8       clearly, so don't --

 9   Q   Did your mom own any property in November of

10       2013?

11   A   No, ma'am.

12   Q   Did she own a vehicle?

13   A   No.

14   Q   Did she have any debt that you were aware of?

15   A   No.

16   Q   Any other assets that we haven't spoken about?

17   A   I'm trying to think.  She had very little in the

18       way of earthly possessions that were of any

19       value.  No.

20   Q   How much was the apartment complex a month,

21       where she was living?

22   A   650, 680?

23   Q   Did she have any other bills at that time?

24       Obviously groceries, but --

25   A   She had groceries, utilities, that's it.
```

1    Q    About, altogether, how much do you think she

2         spent a month?

3    A    Maybe 1100.

4    Q    1100.  So her pension and social security pretty

5         much covered all her expenses for a month?

6    A    Uh-huh, correct.

7    Q    Given your mom's medical condition, was there

8         any discussion about putting her in a nursing

9         home?

10   A    Yes.

11   Q    And when did this discussion occur prior to

12        November of 2013, how long before?

13   A    I think it was the summer of 2013 that the kids

14        discussed it, and my sister was very much

15        wanting to find a place for her.

16   Q    And what was the reason that you ended up not

17        putting her in a nursing home at that time?

18   A    We were waiting for an opening so she would

19        have -- you didn't ask this, but she would have

20        been in a nursing home probably by February of

21        2014 -- I'm sorry, not nursing home, assisted

22        living.

23   Q    Assisted living, okay.  So is there, like, a

24        long waiting list for assisted living places or

25        only certain places?

```
 1    A    The -- I hate to elaborate too much, but the
 2         place that -- we wanted to get her in a place
 3         that had a continuum of care and that would take
 4         Medicaid once her money ran out, and there is a
 5         waiting list for such places, yes, especially
 6         Medicaid assisted living, which is very rare.
 7    Q    Would Medicaid pay the full cost of her nursing
 8         home once her assets ran out?
 9    A    Correct.  It would make up the difference, I
10         should say.
11    Q    And about how much -- a nursing home that's not
12         one of these ones that would accept Medicaid,
13         about how much would that cost a month?
14    A    Nursing home or assisted living?
15    Q    Assisted living, excuse me.
16    A    We looked at Crestwood Village, and it was
17         between 2500 and 3,000.
18    Q    Wow.  So quite a bit more expensive than her
19         current expenses --
20    A    Correct.
21    Q    -- in the apartment?
22    A    Correct.
23    Q    So you decided financially it made more sense
24         for you to just keep taking care of her and
25         Rebecca helping out until there was a spot open
```

```
 1        at a Medicaid assisted living facility?

 2   A    Correct, because there was a spot coming open,

 3        so she would have slid in before too long.

 4   Q    So you guys were aware that there was a spot

 5        opening up soon?

 6   A    Yes.  And there was a specific place by Fort

 7        Harrison, the name of which I can't recall, that

 8        she would have gone into.

 9   Q    GreenTree?

10   A    No.  It was some real pompous-sounding name I

11        can't remember.  It's a brand-new place almost.

12   Q    So 2500.  How much would the Medicaid facility

13        that she was on the waiting list for cost a

14        month?

15   A    3,000.

16   Q    3,000.

17   A    Thereabouts.

18   Q    So still expensive.

19   A    Very.

20   Q    So that would run through her savings pretty

21        quickly.

22   A    Yes.  Within -- I can't remember how long, it's

23        a few years that it would burn through her

24        savings.  And then she would transfer to

25        Medicaid.
```

1   Q   Did your mom have a will?

2   A   Yes.

3   Q   And who were the beneficiaries of that will?

4   A   There were four beneficiaries: the three

5       siblings, and her sister, my Aunt Blanche, not

6       in equal parts.

7   Q   And that was my next question, what are the --

8       what's the divide?

9   A   Of the assets of my mother's estate that were

10      not awarded via beneficiaries, named

11      beneficiaries, my aunt would get 10 percent or

12      10,000, whichever was less, and the three

13      children would divide the rest per stirpes.

14  Q   Stirpes?

15  A   Stirpes.  Is that it?  I don't know, stripes?

16  Q   It's been a while since my family law clinic,

17      trust -- trusts and estates class.

18          Okay, so a third, a third, a third for you

19      and your siblings?

20  A   Correct, roughly.

21  Q   Roughly.  After this incident, did you make a

22      claim on your mom's assets?

23  A   I don't know what you mean by "claim."

24  Q   Did you make a claim to have her assets

25      distributed per the will?

```
 1    A   I was the administrator.  I met with her
 2        attorney and followed his instructions as far as
 3        getting her assets identified and start, over
 4        time, distributing what was supposed to be
 5        distributed, et cetera.  I administered the will
 6        in accordance with her wishes.
 7    Q   When was the last time you saw your mom prior to
 8        this incident?
 9    A   November 18th, in the evening.
10    Q   That was the day before; correct?
11    A   Correct.
12    Q   And about what time was that?
13    A   Around 6:00.
14    Q   And why did you go over there?
15    A   I went over there every evening to fix her
16        something to eat and to spend time talking with
17        her.  Get her ma- -- get her her mail,
18        et cetera.
19    Q   The general duties of taking care of her.
20    A   Correct.
21    Q   How long did you stay?
22    A   I can't speak with any certainty.  Probably half
23        an hour.
24    Q   And what was your mom doing when you left?
25    A   Watching TV.
```

1    Q    What was her condition?

2    A    I'm not sure I understand.

3    Q    How was she mentally?

4              Let me rephrase.  Anything out of the

5         ordinary?

6    A    Nope.  Just watching TV.  That's what she did.

7    Q    And when you left, did you lock the door?

8    A    Yes.

9    Q    So you didn't see her again in person until the

10        incident.

11             Did you speak to her at all later the

12        evening of the 18th or the morning of the

13        19th?

14   A    I don't believe so.

15   Q    Where did you go after you left your mom's

16        house?

17   A    I went to Plainfield to see my wife.

18   Q    Do you know what time you got to Plainfield?

19   A    I want to say it was 7:15 or 7:30.  Poker starts

20        at 7:00; I was too late for poker.

21   Q    Where do you play poker at?

22   A    There's a bar in Plainfield that has a free

23        poker game.

24   Q    Okay, cool.  Did you take your wife to poker

25        with you -- or you didn't get to play, but to

```
 1         the bar with you?

 2    A    My -- my wife was already at poker.

 3    Q    Okay.

 4    A    So actually didn't -- I don't think I went over

 5         there because I was too late, so I just stayed

 6         at her house.

 7    Q    So you don't think you actually went to the bar?

 8    A    I don't believe so.

 9    Q    Okay.  So you just went to your wife's house,

10         then?

11    A    Correct.

12    Q    And you think you got there about 7:15 or 7:30?

13    A    I believe so, yes.

14    Q    Did your wife come home soon after?

15    A    She came home after poker, which would have

16         been, I don't know, 9:30 or 10:00.

17    Q    Were you still awake?

18    A    Yes.

19    Q    What else did you do that evening?

20    A    Not a lot.  I mean -- do you mean at my wife's

21         house?

22    Q    Yes.

23    A    Watched TV.

24    Q    Anything stand out?

25    A    No.
```

1    Q    What time did you go to bed?

2    A    11:00, maybe.  I don't know.  I'm going to say I

3         don't know.

4    Q    Do you know what time you woke up the next

5         morning?

6    A    No.

7    Q    No?  Do you have a typical time you wake up at?

8    A    Not really, no.

9    Q    It just varies?

10   A    Yeah.

11   Q    And what time did you leave Plainfield that

12        morning?  The morning of the 19th, excuse me.

13   A    I think it was 8:00-something.

14   Q    Was your wife with you in the morning?

15   A    Briefly.

16   Q    Briefly?  Okay.  What time did she leave?

17   A    Earlier than I did.

18   Q    Okay.

19   A    7:15.

20   Q    And where did you go when you left Plainfield?

21   A    I headed back home, but I stopped at, I think,

22        two Kmarts on the way.

23   Q    Just running errands?

24   A    I was looking for rabbit ears.

25   Q    Like for a TV?

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Did you make any other stops on the way home? |
| 3 | A | I don't know if I did or not.  I know I got -- I |
| 4 | | got gas, whenever I got gas, I don't know if I |
| 5 | | went home first or not, I can't remember. |
| 6 | Q | Do you recall what time you got gas at? |
| 7 | A | Not off the top of my head. |
| 8 | Q | What time do you think you got home at? |
| 9 | A | 9:30, 10:00. |
| 10 | Q | Was Robert there when you got home? |
| 11 | A | Yes, ma'am. |
| 12 | Q | And what was he doing? |
| 13 | A | Goofing around on the Internet, I believe. |
| 14 | Q | Okay. |
| 15 | | (Exhibit 14 was marked for identification.) |
| 16 | Q | Bill, I'm going to show you what's been marked |
| 17 | | as Exhibit 14.  I'm going to represent to you |
| 18 | | that that's a receipt from when you got gas at |
| 19 | | Kroger. |
| 20 | A | Okay. |
| 21 | Q | Does that look to be an accurate copy of the |
| 22 | | receipt? |
| 23 | A | I guess so. |
| 24 | Q | Any reason to dispute that it would be the |
| 25 | | receipt from when you got gas that morning? |

```
 1    A    No.

 2    Q    Up in the right-hand corner, not the very top

 3         but the basically third line down, there's a

 4         date and a time.  Can you please read that for

 5         me?

 6    A    11/19/13 09:20.  9:20.

 7    Q    Do you think that means that you got gas on the

 8         19th at 9:20 a.m.?

 9    A    I don't know if I did or not, but it sure looks

10         like I did, yes.

11    Q    And then it looks like, down in the left-hand

12         column, that the total amount for the gas was

13         $48.16.  Do you see that?

14    A    Yes.

15    Q    And then one more thing I wanted to look at, on

16         the right-hand column where it says "Summary

17         Journal," about the third line down, it says

18         "Kroger Plus Customer."  Did you have a Kroger

19         Plus card at this time?

20    A    Yes, ma'am.

21    Q    And do you know your Kroger Plus number off the

22         top of your head?

23    A    No, I don't.

24    Q    Any reason to dispute that those are the last

25         four numbers of your Kroger Plus card, the 9558?
```

```
 1    A    Knowing where you got this, I have no reason to

 2         dispute it.

 3    Q    Okay.  That's why I was asking.

 4              And can you describe to me what a Kroger

 5         Plus card is?

 6    A    Well, it's a discount card.  If you swipe it or

 7         whatever when you purchase something at Kroger,

 8         you accumulate points which eventually give you

 9         a discount on gasoline.

10    Q    And, actually, I was going to -- one more thing

11         on Exhibit 14, in the top left corner, there's

12         "Store:  100."

13    A    Uh-huh.

14    Q    Do you know what location is Store 100 for

15         Kroger?

16    A    7101 East 10th Street.

17    Q    East 10th Street.  And is this the same -- I

18         know I'm jumping ahead a little bit -- but the

19         same Kroger you go to later in the afternoon --

20    A    Yes, ma'am.

21    Q    -- on the 19th?

22              And that Kroger, Store 100, how far is that

23         from your house, driving minutes, approximately?

24    A    Two minutes.

25    Q    Two minutes, okay.
```

```
 1                  And how far from your mom's house?

 2    A    It's directly west across Shortridge Road, so

 3         2-, 300 yards if you go building to building, I

 4         guess.  Extremely close.

 5    Q    And why didn't you go check on your mom, visit

 6         your mom at that time, do your daily --

 7    A    Did you say why did I or why didn't --

 8    Q    Why didn't you?

 9    A    The setup that we had was that I would go in the

10         evening and that the Meals on Wheels guy would

11         act as her, kind of, like, mental stimulus or --

12         or universal reminder of where she is in the

13         morning.

14    Q    Would she interact much with the Meals on Wheels

15         guy?

16    A    Not really.

17    Q    Okay.

18    A    Not -- not -- excuse me.  Pleasantries, that's

19         all.

20    Q    Did you ever go to your mom's house in the

21         morning?

22    A    If -- if needed.

23    Q    Okay.

24    A    If, like, her TV was messed up or -- which it

25         often was, yes.  It wasn't normal, but it wasn't
```

```
 1          unusual to go twice in one day.

 2     Q    So no reason you couldn't have gone and checked

 3          on your mom at that time; right?

 4     A    No.  I could've, but I was -- I did dinner.

 5     Q    You did dinner?

 6     A    The Meals on Wheels guy took -- brought her

 7          lunch, I did her dinner, or made sure she had

 8          something hot or nourishing to eat at -- in late

 9          evening, early evening.

10     Q    So that just wasn't the schedule.

11     A    Correct.

12     Q    And we don't know if you got gas before or after

13          you went home the first time, but what did you

14          do after you got gas?

15     A    Do you mean after I went back home?

16     Q    Well, you testified that you couldn't remember

17          if you went home first and then went back out to

18          get gas or if you got gas on your way home from

19          Plainfield and then went home.

20     A    I have no idea.

21     Q    But what did you do after you got gas?

22     A    I believe I went home.

23     Q    Went home, okay.

24               And how long were you at home for?

25     A    Well, from when I got gas until 3:15 or 3:30,
```

```
 1         when I went to my mom's, so that -- I -- I

 2         believe that after I went home, I stayed there

 3         until that afternoon.

 4    Q    So until you went to check on your mom --

 5    A    Correct.

 6    Q    -- at 3:00 or 3:15.

 7    A    Correct.

 8    Q    And was Robert with you the whole time?

 9    A    I can't say for sure.  I don't know if he ran

10         out or not.

11    Q    Do you remember telling Detective Benner in your

12         statement that Robert was with you the whole

13         day?

14    A    I don't remember.  I believe he was with me all

15         day, but I guess that's that.  I don't know

16         absolutely for sure if he was there the whole

17         time, but I believe he was.

18    Q    And you recall telling Detective Benner that he

19         was there with you that day?

20    A    Uh-huh, yes.

21    Q    You left for your mom's at 3:00 or 3:15,

22         correct, in the afternoon, on the 19th?

23    A    Yeah.  It might -- I'm not sure of the exact

24         time.  It was around 3:15, 3:20, I -- I'm not

25         sure.
```

1    Q    And did you go straight to your mom's house?

2    A    No, I went to Kroger.

3    Q    The same Kroger we've already talked about?

4    A    Of course.

5    Q    And what did you do at Kroger?

6    A    I bought an iced tea because it was on sale and

7         I wanted one.

8    Q    Seems like a good reason.

9              Do you remember about how much that iced

10        tea cost?

11   A    About a dollar.

12   Q    A dollar, okay.

13             (Exhibit 15 was marked for identification.)

14   Q    I'm showing you Exhibit 15, which I'm going to

15        represent to you is a receipt for the iced tea

16        you purchased --

17   A    Oh.

18   Q    -- on 11-19-2013.

19   A    Okay.

20   Q    And do you see under "Total Number of Items

21        Sold," there's a date and a time there?

22   A    Yes.

23   Q    And can you read that off for me, please?

24   A    11-19-13 at 3:31 p.m.

25   Q    Okay.

```
 1                  (Exhibit 16 was marked for identification.)

 2    Q   Now I'm showing you what has been marked as

 3        Exhibit 16, and I'm going to represent to you

 4        that these are your Kroger Plus card records,

 5        the records for the Kroger Plus card ending in

 6        9558.  Do you have any reason to dispute that?

 7                  MR. WAPLES:  Do you have a copy?

 8                  MS. BOX:  Yes.  Sorry, gave it to Lynne

 9        instead.

10                  MR. WAPLES:  And this is 15?

11                  MS. BOX:  This is 16.

12                  MR. WAPLES:  This is 16?

13                  MS. BOX:  Yes.

14    A   Not without analyzing it for some weirdness,

15        but, no, I don't see anything unusual about it.

16    BY MS. BOX:

17    Q   The fifth line down, there's a record that says

18        "Spirit Terminal 11-19-2013" at 9:20 a.m., it

19        looks like, for 48.16.

20    A   Yes.

21    Q   And would that match up with the receipt for the

22        gas that we talked about earlier in Exhibit 13?

23    A   It sure looks like it.

24    Q   Now, I also see a record for 11-19, it's just

25        one up from that, four down, and it looks like
```

1        it's at 3:32, but it's for $14.10.  Do you see

2        that?

3    A   Uh-huh, yes, I do.

4    Q   But that would not be the Kroger Plus card for

5        your tea, correct, because your tea only cost

6        $0.99?

7    A   Correct.

8    Q   Did you use your Kroger Plus card when you

9        purchased your tea?

10   A   No.

11   Q   So did you make this $14.10 purchase?

12   A   No.

13   Q   Did you let someone else use your Kroger Plus

14       card?

15   A   Yes, to get their points.

16   Q   Why would you let someone else use your Kroger

17       Plus card but then not use it for your own

18       transaction?

19   A   I don't think it works unless your pretax total

20       is a dollar or more, so I didn't even bother.

21   Q   And that's something you know for sure?

22   A   No.  It's something I believe, but I don't know

23       for sure.  That was my experience, so I thought,

24       well, whatever.

25   Q   And you told me earlier that the iced tea was on

1       sale; is that correct?

2   A  I think it was.

3   Q  Would you have had to use your Kroger Plus card

4       to get that discounted price?

5   A  I don't remember.  I don't believe so.

6   Q  Okay.

7   A  And that may not actually -- I hate to ramble --

8       that may not be the sale price, it may have gone

9       off sale, because 99 cents is the normal price,

10      I believe, for Arizona tea, so I may have

11      thought I was going to save a dime that day and

12      I didn't.

13   Q  Didn't break the bank, though, did it?

14   A  Close.

15   Q  You bought a tea at Kroger, and did you go to

16      your mom's house after that?

17   A  Yes, ma'am.

18   Q  Did you have any reason for going over to your

19      mom's house that day other than just to cook her

20      dinner, your daily general tasks that you do

21      with her?

22   A  The general checking in to make sure she had

23      something that she wanted to eat, that she would

24      eat.

25   Q  Do you recall what time you got to your mom's

| | | |
|---|---|---|
| 1 | | house? |
| 2 | A | Well, it was right after that, so 3:30, 3:35, |
| 3 | | somewhere in there. |
| 4 | Q | Because, again, the Kroger is very close to your |
| 5 | | mom's house; right? |
| 6 | A | Correct.  It's one minute, two minutes. |
| 7 | Q | What was the first thing you did when you got to |
| 8 | | your mom's apartment? |
| 9 | A | I got out of the car, and I went up to the door, |
| 10 | | and she had something, there was something |
| 11 | | hanging on her door, and I can't remember if it |
| 12 | | was a sales flyer or something about her lease |
| 13 | | renewal.  It was something -- it might have been |
| 14 | | the lease renewal, I honestly can't remember, |
| 15 | | but there was a -- some kind of paper. |
| 16 | Q | Okay.  So did you collect that or take it off |
| 17 | | the door handle? |
| 18 | A | I took it off the door handle. |
| 19 | Q | Okay.  And then what did you do? |
| 20 | A | I went -- I believe I went back to my car and I |
| 21 | | was going to put it in my car. |
| 22 | Q | Did you put it in your car? |
| 23 | A | No.  I believe I decided to show it to my mother |
| 24 | | to try to engage her mentally, which was kind of |
| 25 | | an ongoing thing. |

```
1    Q   After you went back to your car, what did you

2        do?

3    A   Oh, I went back to my mother's apartment.

4    Q   Okay.

5    A   Well, I went back in the building.

6    Q   Went back in the building.

7    A   So I parked right outside the building, went

8        back in the building.

9    Q   And did you enter your mother's apartment at

10       that time?

11   A   Yes.

12   Q   When you went to open the door, did you use your

13       key?

14   A   I used my key on -- you can use the key on

15       deadbolt and doorknob.  I used my key, yes,

16       sorry.

17   Q   Is it the same key for the deadbolt and the

18       doorknob?

19   A   I don't remember.

20   Q   Is there an outside door to the apartment

21       complex that needed a key?

22   A   No.

23   Q   And when you went to unlock the door, did it

24       feel like the door had been locked?

25   A   The door was unlocked.
```

```
 1    Q    Okay.

 2    A    There was no resistance when I turned the key on

 3         the deadbolt.

 4    Q    Did you notice any damage to either the door

 5         frame or the door right around where the lock

 6         would be?

 7    A    No.

 8    Q    What was the first thing you saw when you got

 9         inside?

10    A    I saw my mother laying on the living room floor.

11    Q    I know this is kind of tough, but can you

12         describe the scene for me, please?

13    A    As you walk into my mother's apartment, you step

14         into the living room.  There is a chair, a TV,

15         coffee table, and she was laying sort of next to

16         the chair, on her stomach.

17    Q    On her stomach.  What part of her body was

18         facing you?  Was it her legs, her head, her

19         side?

20    A    Oh, her -- she -- her feet were towards the

21         door.

22    Q    Her feet were towards the door, okay.

23              And what else did you notice?

24    A    Do you mean right then?

25    Q    Yes.
```

```
 1    A    Nothing else.  I didn't notice anything else

 2         except my mother laying there.

 3    Q    And how did your mother appear?

 4    A    She -- well, I mean, she simply appeared like

 5         she was laying on the floor with a blanket

 6         covering much of her shoulders and head, the

 7         blanket she always had with her and always had

 8         over her.  And you said "appear," but her -- her

 9         breathing was very forced, so that's more of a

10         sound than an appear thing.

11    Q    Did you hear anything else?

12    A    No.

13    Q    Smell anything?

14    A    No.

15    Q    What were your initial thoughts right then, when

16         you saw your mom on the floor with the blanket

17         covering her head?

18    A    I thought she'd had a heart attack or a stroke.

19    Q    What did you do?

20    A    This is a little hazy because I was in shock,

21         but I -- I reached out and kneeled down and

22         grabbed her leg and yelled, "Mom, Mom."

23    Q    And did she respond to you in any way?

24    A    Her breathing changed a little, and she moved

25         her head a little, but she did not -- well, of
```

```
 1          course, in hindsight, she was not able to
 2          communicate, did not say anything.  She moved --
 3          she was laying -- well, it doesn't translate.
 4          She was laying on her stomach but with her head
 5          on -- somewhat on its left side, and she moved
 6          slightly and moved her arm slightly, and then
 7          stopped moving after that.
 8     Q    Okay.  You said her breathing changed, and she
 9          moved a little bit.  Do you think that she
10          recognized that someone was there?
11     A    I don't know.
12     Q    Okay.
13     A    I -- I -- I don't know.
14     Q    Do you think she could have been responding to
15          your touch?
16     A    My sense was, without knowing for sure, is that
17          she responded either to my voice or to my touch,
18          because mine is the voice she's most familiar
19          with.  It could have been unrelated.
20     Q    Right.  Okay.  When she didn't really respond to
21          you, what did you do next?
22     A    Well, I was kind of freaking out, and I went
23          around to see what -- to look at her condition,
24          and I got down on my knees and was trying to
25          understand this scene of having all this blood.
```

1       She had these -- this blanket thing, it's about

2       four-by-four, kind of a shawl or a small

3       blanket, I guess, over her head, so I reached

4       down, and I was trying -- I examined the --

5       the -- there was a -- a circle of -- a large

6       circle of blood stuck to her head, and I reached

7       down, and I looked very closely to examine that,

8       and there was -- because that was on the top of

9       her head.  And then on the floor, as it -- as it

10      had oozed out, I guess, there was a -- not huge,

11      but shockingly large pool of blood that had

12      congealed.

13   Q  Okay.

14   A  And I examined -- I did not try to remove the

15      blanket.  I did kind of barely touch where it

16      had scabbed on.  And I touched the congealed

17      blood just barely to see what -- at that time I

18      didn't know if she had -- I was still operating

19      under the assumption that she had fallen and hit

20      her head on the coffee table corner or

21      something, but it was -- in looking at it and

22      getting down and looking closely, it was such a

23      enormous amount of dried blood on the top of her

24      head that I thought, Well, this, you know,

25      there's no blood on the coffee table.  So I

```
 1        just -- I froze, I think, for a few seconds and

 2        then called out again, and it was, like, just in

 3        shock, and then I called 911.

 4    Q   And so when you -- you said you were on your

 5        knees; is that correct?

 6    A   Yeah.  When I was trying to -- I was trying to

 7        figure out what was going on with all the blood.

 8    Q   You got down --

 9    A   Yeah.

10    Q   You got down on your knees, okay.

11            And where are you with respect to her body?

12        Are you up by her head, on either one of her

13        sides?

14    A   I'm up -- I'm up -- it's hard to explain without

15        a diagram, but I'm up by her head.  Up -- as

16        you're walking in the apartment, you come to my

17        mother, and her feet are by the door, her head

18        is angled away from the door, about a 45-degree

19        angle, I am at her head, so I could see the top

20        of her head and see the blood.  Not -- I wasn't

21        beside her, I was at the top of her head,

22        because that's where -- I was just in shock and

23        trying to figure out what on earth was

24        happening.

25    Q   And you didn't remove the blanket; that's
```

1      correct?

2   A   Correct.

3   Q   And why didn't you remove the blanket?

4   A   It had -- there was a circle of blood the size

5      of a softball at least which had congealed on

6      the outer ring of it.  The outer inch or so

7      was -- was almost completely dry, and the blood

8      on the floor had congealed, it was the

9      consistency of pudding, more or less, it

10     wasn't -- you know, and there was probably half

11     a cup or a cup of blood in this pool on the

12     floor, but there was no fresh blood.  There was

13     just this darker colored blood.

14        And my sense was that it was stuck to her

15     head and that it made more sense to leave it

16     stuck to her head than to pry it off, because

17     whatever made that much blood come out must be

18     pretty serious, and it appeared she had stopped

19     bleeding, so I just left well enough alone.

20   Q   So you were under the understanding that -- or

21     you thought that it had stopped bleeding at that

22     point?

23   A   It may -- it -- it appeared that the blood that

24     was there, the blood that was -- made up the

25     round part stuck to the top of her head, and the

```
1          blood that had formed a small pool on the floor,

2          on the blanket on the floor, it all appeared

3          like that bleeding had taken place, I don't

4          know, well before I had gotten there, and that

5          it was -- the blood on the top of her head had

6          started drying and did not appear to be "wet"

7          wet, so I didn't think she was bleeding.

8               I thought it was -- it's a banal

9          comparison, but when you -- if I nick myself

10         shaving and put a piece of toilet paper on there

11         and wet it and then it dries, that's what it

12         looked like to me, and I was not going to pull

13         that off.  I thought it would be stupid to pull

14         it off, so that's why I didn't.

15    Q    You weren't curious to know what actually

16         happened to your mom or to figure out the extent

17         of her injuries?

18    A    My -- I was curious, of course, but I was more

19         interested that my mom receive proper medical

20         care, and knowing that there was a fire station

21         half a mile away, I didn't think that it would

22         take that long, that I could potentially do more

23         damage.  There's nothing I could have done for

24         her because she was not bleeding anymore.

25    Q    Do you know for sure she wasn't bleeding
```

```
1        anymore?

2    A   I do not know for sure.  It did not appear that

3        there was bright red blood on the blanket, on

4        the floor, on my mother, anywhere.

5    Q   And if she had been bleeding, you could have put

6        pressure on the wound to help with that?

7    A   Yes.  If the -- if it had appeared that the --

8        if the blood on the blanket was wet and red,

9        that would, to me, indicate that she was

10       bleeding, and at that point I would get -- use

11       the blanket or get a towel and put pressure on

12       it.

13            But I was afraid that by putting pressure

14       on it, I might break the bond between the

15       blanket and her head and start the bleeding

16       again, so I chose to defer to the ambulance or

17       fire for their help.

18   Q   Didn't the 911 operator instruct you to put a

19       cloth on your mom's head, hold a cloth to her

20       head?

21   A   There were -- I don't remember precisely what

22       they said, but when they said put a cloth to her

23       head, I thought that was absolutely idiotic

24       because she wasn't breathing.  I know what a

25       pressure bandage is, but she wasn't bleeding, or
```

```
 1          did not appear to be bleeding, and I didn't want

 2          to screw up what was already there.  Idea behind

 3          a pressure bandage is you put it on there till

 4          the bleeding stops through the force of

 5          compression, and it didn't look like there was

 6          any -- it looked like she had stopped bleeding

 7          quite awhile before that, so I thought that was

 8          among various unhelpful things 911 said.

 9    Q     And you don't have any medical training?

10    A     I took a first aid course at some point, but,

11          no, I do not.

12    Q     Any, like, first-responder EMT-type training?

13    A     Nope, nothing.

14    Q     And you testified that it was your opinion that

15          you should defer to the fire department.

16    A     When I saw my mother in the condition she was

17          in, with the loss of blood but nonactive

18          bleeding, getting fire or medical or somebody

19          there as quickly as possible seemed like the

20          most logical thing to do, so that's what I did.

21    Q     Well, if you're deferring to medical, and people

22          with medical training and experience are telling

23          you to put a cloth on your mom's head, why

24          wouldn't you follow their instructions?

25              MR. WAPLES:  Objection.  States facts not
```

1       in evidence, and it's been asked and answered.

2    Q  You can answer.

3    A  They -- they did not understand the scene at all

4       and that putting a cloth on a scab is kind of

5       silly.

6    Q  Okay.

7    A  They did not even understand the scene.  They

8       didn't ask me if she was actively bleeding, they

9       didn't know anything, really, what was going on.

10      So their advice is just a stock advice, which

11      didn't make any sense given the circumstances.

12   Q  Do you believe that you fully understood the

13      scene?

14   A  As well as -- as well as a layperson can.  I

15      don't know what you mean by the question.

16   Q  Couldn't you have understood the scene more by

17      removing the blanket, being able to give the 911

18      responder a description of her injuries?

19   A  Based on the amount of blood, I felt that the

20      injuries must be quite severe and that removing

21      the blanket would be -- it's been brought up a

22      number of times.  I still think that is the most

23      idiotic suggestion anyone could have made.

24   Q  Do you think it would be important for the EMT

25      or first responders to have as much information

```
 1        about your mom's condition as possible?

 2    A   Not having the ability to assess the situation

 3        beyond the fact that my mother had some sort of

 4        head wound would not have helped them in any way

 5        versus them just showing up and doing it

 6        themselves.

 7    Q   Did the 911 operator ask anything else about

 8        your mom's condition when you were speaking to

 9        her on the phone?

10    A   I can't remember which one it was, but one of

11        them asked if she was breathing regularly and

12        kept asking me that, and I thought that was also

13        moronic.

14    Q   Okay.

15    A   'Cause I said she was breathing, I said she was

16        breathing, she was breathing, like (making

17        breathing noise) like really loud and raspy.  So

18        I don't know what -- I mean, if somebody's not

19        breathing, you can do CPR; if they are

20        breathing, there's not a lot you can do.

21            So I don't even understand what the

22        question was, but I think that puts the 911

23        operator not even understanding what the

24        situation was, blood around the head, the scab

25        on the head, or whatever you want to call that,
```

```
 1            and her labored breathing.

 2    Q     We're going to back up a little bit.  We talked

 3            a lot about your thought process and why you

 4            chose to call 911, take the path that you did.

 5               So walk me through, you are now on your

 6            knees, kind of up by your mom's head examining

 7            the scene, and you decide the best course of

 8            action is to call 911.  Did you use the land

 9            line or did you use your cell phone?

10    A     I used the land line.

11    Q     And is it a cordless phone?

12    A     No.  It's an old-fashioned cord phone.

13    Q     So did you have to go get up and go to another

14            room in the house to use the phone?

15    A     No.  The phone was on the coffee table, right

16            there where my mother was laying.

17    Q     And so you stood by your mom while you made the

18            call to 911?

19    A     I either sat on the floor or sat on the other

20            chair, I can't remember.

21    Q     And I think --

22    A     The phone was a few feet from my mother's head,

23            so...

24    Q     I think there's been some reference to a couple

25            of 911 calls.  How many 911 calls did you make?
```

```
 1   A   Two.

 2   Q   Two, okay.  And briefly explain to me the

 3       first -- summarize the first 911 call for me.

 4   A   I have them straight because I'm not that

 5       familiar, but I called 911, and I said, "My

 6       mother's been attacked."  And what I wanted to

 7       do is give them the address and get an ambulance

 8       en route, and I think that was the 911 operator

 9       who kept asking me about her breathing.  "Is she

10       breathing?  Is she breathing regularly," or

11       normally or something.  And I'm, like, it seemed

12       beyond nonhelpful, so I hung up and I called 911

13       back.

14   Q   Did you call up immediately right after you hung

15       up?

16   A   Yep.

17   Q   Okay.

18   A   Called 911 back, and I said, "My mother's been

19       attacked."  And I don't know if that was the one

20       that said put something on her head or not, but

21       I finally understood that somebody was on the

22       way anyway.  That's the advantage -- that's why

23       I used the land line.  Land lines have

24       geographical references so they can -- as soon

25       as you say "ambulance," they know your address,
```

```
 1          they know to dispatch an ambulance; my cell

 2          doesn't have that.

 3   Q    Oh, like a caller ID or something like that?  I

 4          get what you're saying --

 5   A    Yes, kind of, yeah.

 6   Q    I get what you're saying.  They know exactly

 7          where the --

 8   A    They know where you're coming from --

 9   Q    -- where you're calling from --

10   A    -- unlike the cell.  Yeah.

11   Q    Even without giving them the address, okay.

12              And did you stay on the phone with 911 or

13          did you hang up?

14   A    No.  I hung up.

15   Q    And then what did you do after you hung up?

16   A    I looked at my mom for a little bit more, and I

17          think I started crying.  And then I realized I

18          should run out and flag down the ambulance

19          because the -- so I ran out, left her apartment,

20          I don't know if I closed it or left it ajar,

21          went outside, went into the parking lot where

22          you drive, not just the parking area, and

23          started looking towards the main entrance for an

24          ambulance.

25   Q    Why didn't you stay with your mom at that time?
```

```
 1   A   Because the most logical thing to do was to get

 2       medical care to her as quickly as possible.

 3       There was nothing I felt that I could do for

 4       somebody with an enormous head wound that has

 5       already stopped bleeding, in my opinion, and the

 6       apartment complex is kind of confusing, it's not

 7       well marked or anything, so in order to

 8       facilitate them getting to my mother as quickly

 9       as possible, I went out to flag them down.

10   Q   Could you have comforted your mother with either

11       your voice or your touch?

12   A   I don't know if she would have responded or

13       understood any of that, and I don't know if that

14       would have helped heal her wounds.

15   Q   Well, you testified earlier that you believe she

16       responded to your voice or your touch.

17   A   I said she may have; it may have been an

18       involuntary thing that's a coincidence.  But

19       that would not heal -- whatever.

20   Q   I understand.  I'm not talking about healing her

21       wounds.

22   A   Okay.

23   Q   I'm talking about being with her during a

24       traumatic incident.

25   A   If there was nothing else to do, I would have
```

```
 1          been with her.  But there was something to do:

 2          Make sure the ambulance finds my mother's

 3          apartment as fast as possible.

 4     Q    You don't think the ambulance had been to this

 5          apartment complex before?

 6     A    I have no idea.

 7     Q    You said it was close by.  Correct?

 8     A    The fire's close by.  I don't know where

 9          ambulance came from.  The fire showed up first.

10     Q    And you don't believe the ambulances are usually

11          at the fire department?

12     A    I don't believe at that one they are.

13     Q    How quickly did the fire department show up?

14     A    Two or three minutes.

15     Q    What did you do after you waved them down?

16     A    I just -- I pointed -- one of them got out of

17          the truck, and I motioned and pointed where to

18          go.

19     Q    Did you follow them inside?

20     A    I think I did 'cause I showed -- I -- led them

21          to the apartment and opened the door, said, you

22          know, "Here's my mom," and said, "She's got a

23          bleeding head wound and she's nonresponding."

24          Her head wound had been bleeding; I guess it

25          wasn't bleeding, really.  She had a massive
```

1    freaking head wound and blood on the blanket,

2    blood on the blanket on the floor.  So I -- I

3    was kind of in shock at that point, so -- and

4    then they told me to go back out and wait, so I

5    went back out and waited.

6  Q Did you tell them anything else about her wound?

7  A No.  I just said she had -- I just -- I mean, it

8    was painfully obvious.  I pointed it out and

9    said she -- somebody hit her over the head, it

10    looks like, and I don't really know anything

11    else I could contribute, and they wanted me out

12    of there so they could work with her, so they

13    sent me back out.

14  Q So you recall telling one of the firefighters

15    that you think someone smashed your mom's head

16    in?

17  A I believe I told 911 and the firefighter that

18    somebody had bashed my mother over the head.

19  Q And why did you feel at that time that she had

20    been bashed over the head?

21  A She had -- she had a bloody piece of cloth stuck

22    to the top of her head, right here (indicating),

23    and it looked like that's what had happened.  I

24    don't -- I didn't really think through it or

25    think gunshot or not.  It looked like somebody

```
 1        had taken a pickax or something and just bashed

 2        her head in.

 3   Q    But there were other -- other ways that someone

 4        could sustain that type of injury; correct?

 5   A    I have no idea.

 6   Q    Would you assume that a gunshot wound would

 7        cause that type of bleeding to the head?

 8   A    I have no idea except I don't how many people

 9        get shot on the top of their head.

10   Q    What about -- you already stated that you

11        thought she may have fallen and hit her head.

12   A    Yeah.  But she was -- she was like a foot away

13        from the edge of the coffee table still, her

14        head was, and there was no blood on the coffee

15        table.  And I've fallen and hit my head on the

16        coffee table, I -- it doesn't produce massive

17        amounts of blood, so I kind of just dismissed

18        that out of hand.

19   Q    So you pretty much knew right away that it was

20        some sort of blunt force trauma?

21            MR. WAPLES:  Objection, misstates his

22        testimony.

23   A    I believed that it was.

24   Q    Okay.  As opposed to some sort of other injury?

25   A    As opposed to what?
```

1   Q   Some sort of other injury, cause of injury.

2   A   Yeah, correct.

3   Q   Did you consider any other causes of injury?

4   A   Not having seen her, no.  Having seen her, I

5       would argue that any rational person would say

6       she got hit over the head.

7   Q   Did you know that the medical responders on

8       scene and the police officers and the hospital

9       staff were under the impression that she

10      suffered a gunshot wound?

11  A   I'm not entirely clear who thought what, so I

12      understand that theory is out there, but I don't

13      know factually who actually said what.

14  Q   Okay.  But you know that someone was under the

15      impression that your mom suffered a gunshot

16      wound?

17  A   I think the -- I think someone did.  I believe

18      Wooldridge, the fireman, did, but I don't know

19      if anybody from the ambulance or the other three

20      people on the fire truck or anybody at the

21      hospital ever stated one way or the other.  So

22      I -- I technically don't know.

23  Q   Okay.  You went back outside after instructed to

24      do so by the firefighters.

25  A   Yes, ma'am.

```
 1    Q   What did you do when you were outside?

 2    A   I sat on the bricks on the edge of the porch and

 3        cried and was freaking out.  At some point I

 4        contacted my brother.

 5    Q   So you contacted Robert.  Did you use your cell

 6        phone?

 7    A   No.  I think I had -- oh, God, it's such a blur.

 8        I may have called him from her phone after I

 9        called 911.

10    Q   From the land line, maybe?

11    A   I-- I -- I do not remember which phone, but I

12        contacted him.  Once I stopped freaking out for

13        a second, I realized I needed to notify people,

14        and so, my brother being so close, I called him.

15    Q   So did you go back inside the house to call him,

16        then?

17    A   I honestly don't remember.

18    Q   Do you know if you made your call to Robert

19        before or after they moved your mom or

20        transported her to the hospital?

21    A   Way before.  It took them quite awhile --

22    Q   To transport her?

23    A   -- to get her on the board, or what seemed like

24        quite awhile.

25    Q   Any idea how long that took?
```

```
 1   A   10 minutes.  I mean, it seemed like forever, but

 2       I -- honestly, I would guess that it was 10

 3       minutes or something perfectly reasonable.

 4   Q   What did you tell Robert when you called him?

 5   A   Told him to come over here now.  I did not tell

 6       him anything else.

 7   Q   No other details?

 8   A   Well, I think he surmised something was

 9       seriously wrong by the, "Come over here to Mom's

10       now," or something like that.

11   Q   Do you think -- did he head over there?

12   A   He was there almost instantaneously.

13           (A discussion was held off the record.)

14           (Exhibit 13 was marked for identification.)

15   Q   I'm going to hand you what's been marked as

16       Exhibit 13, and we went a little bit out of

17       order here.

18           I'm going to represent to you that these

19       are phone records for your brother Robert's cell

20       phone number.

21   A   Right.

22   Q   That number at the top, (317)357-5791, is that

23       your brother's cell phone number?

24   A   Yes.

25   Q   And I would like you to look at the blue
```

1   highlighted number -- or record, excuse me.

2 A Okay.

3 Q And can you tell me what number was being called

4   from?  I believe it's the first column.

5 A It's my mother's phone number, 375-7841.

6 Q And then the third column over, the number that

7   is being called?

8 A 357-5791.

9 Q And that's your brother's number; correct?

10 A Correct.

11 Q And then over to the fifth column, "Start Date,"

12   it looks like there's a time and a date.  Can

13   you read that for me, please?

14 A November 19, 2013, at 15:40 and 38 seconds.

15 Q And 15:40 is 3:40 --

16 A 3:40 -- 3:40 p.m.

17 Q -- 3:40 p.m.; correct.

18   Do you think that this is the phone call

19   you made to Robert telling him to come over to

20   your mom's house?

21 A Yes.

22 Q We'll come back to that exhibit.

23   How long did it take for Robert to arrive?

24 A I don't know exactly.  If I had to guess, I

25   would say it was no more than five minutes.

1   Q   No more than five minutes?  Okay.

2           When did the police arrive?

3   A   Wow.  I'm not sure who arrived in what order.

4       The police -- I believe the police squad car was

5       the first emergency responder to arrive.

6   Q   Even before the firefighters?

7   A   I'm not sure.  I'm going to say I don't know.

8   Q   Do you think the police --

9   A   Sorry.

10  Q   -- arrived before Robert got there?

11  A   I don't know.

12  Q   So the first police vehicle to arrive, was it a

13      marked police car?

14  A   Yes.

15  Q   And what did that officer do when he arrived on

16      scene?

17  A   Not much, really.  Asked what had happened and

18      just looked at what was going on.

19  Q   Okay.

20  A   I don't think he really did anything.

21  Q   Did you speak with him for very long?

22  A   No.  I don't think so.

23  Q   Did you tell them what had happened to your mom?

24  A   Yes.  But we didn't talk about anything about --

25      other than the most immediate -- or the most

```
 1          high-level aspect of what was occurring.

 2    Q     Did Robert arrive before or after they

 3          transported your mom to the hospital?

 4    A     I believe it was before.

 5    Q     Okay.  So Robert arrives on scene.  And what do

 6          you and Robert do?

 7    A     I talked to him and explained what had happened

 8          to Mom, and he was -- we were both just in

 9          shock.  We didn't really talk that much.  I

10          asked him for a cigarette.  And we were both

11          stand -- all we could do is stand around outside

12          and wait for the gurney to come out.

13    Q     What did you tell him happened to your mom?

14    A     I told him it looked like somebody bashed her

15          over the head, and that she was -- I described

16          the -- the nature of her condition.

17    Q     What happened next?

18    A     I'm not sure where we are exactly or who's

19          there, who gets there, so by "next," you mean --

20          my mother was taken, in ambulance, to the

21          hospital.

22    Q     Is that the next event that you remember

23          chronologically?

24    A     Yes.

25    Q     Okay.  Did you follow the ambulance to the
```

```
 1        hospital?

 2   A    No.

 3   Q    And why not?

 4   A    I think at that point either myself or my

 5        brother were already talking to my sister.

 6        However that worked out, whether we were or

 7        whether that came just after my sister -- I sent

 8        a text, my sister voted to go to the hospital.

 9        And that may or may not have been during the

10        time that we were, quote, unquote, held by the

11        police.

12   Q    And when you say "held by the police," are you

13        referring to the patrol officer that arrived?

14   A    No.  The -- the patrol officer didn't really do

15        anything except just keep an eye on things.

16        And, again, my -- my timing and my understanding

17        of who arrived when and whatnot is kind of

18        vague, but other patrol cars showed up, and I

19        don't know which detective showed up or when

20        they showed up.

21   Q    Okay.

22            MS. BOX:  So did we decide we were on 16 or

23        17?

24            THE WITNESS:  We've used 16.

25            MR. WAPLES:  We used 16.
```

```
 1              MS. BOX:  17.  Okay.

 2              (Exhibit 17 was marked for identification.)

 3    BY MS. BOX:

 4    Q   I'm going to show you what's been marked as

 5        Exhibit 17, and I'm going to represent to you

 6        that these are text messages from your sister,

 7        Rebecca Rainsberger's, phone number.  Let me

 8        draw your attention to the third kind of full

 9        box down.

10    A   Uh-huh.

11    Q   You see in the middle, on the left-hand side,

12        there's a record that reads "Originating DN."

13        And then across from that, there looks like to

14        be a phone number.

15    A   Yes.

16    Q   Can you read that phone number for me, please?

17    A   "(317)331-1059."

18    Q   And do you recognize that phone number?

19    A   That's mine.

20    Q   And that's your cell phone; correct?

21    A   Correct.

22    Q   And then there's a terminating DN?

23    A   Yes.

24    Q   And a number following that.  Can you read that

25        number for me?
```

1    A    "(317)679-4411."

2    Q    Do you recognize that number?

3    A    That's my sister.

4    Q    And then at the bottom of that box, it shows the

5         message text?

6    A    Yes.

7    Q    Can you read that for me, please?

8    A    "Come down to Mom's now."

9    Q    Do you think that's the text message you sent to

10        your sister notifying her of your mom's

11        incident?

12   A    Yeah.

13   Q    And then back up at the top, it looks like

14        there's a message over on the left-hand side,

15        "Message Arrival," and then there's a date and a

16        time.  Can you read that for me, please?

17   A    November 19, 2013, at 15:20:18, or at 3:20 p.m.

18        and 18 seconds.

19   Q    So 3:20 p.m., you texted your sister and told

20        her to come down to your mom's?

21   A    No.  The information here says 3:20, but that is

22        not when I texted her.  I would guess that this

23        is off by an hour.

24   Q    Why do you believe that it's off by an hour?

25   A    Well, at 3:20 p.m., I'm not sure I'd gotten to

```
 1        my mother's.

 2    Q   Okay.

 3    A   Had I?  No, I was on my way to Kroger.

 4    Q   Okay.  What evidence do you have that this

 5        record is incorrect?

 6    A   The fact that it refers to an event or an

 7        emergency of which I am not yet aware.

 8    Q   So just your testimony?

 9    A   Yeah.  I'm not a phone expert.  But there was no

10        reason for me to text my sister at 3:20 and tell

11        her to come to Mom's.

12    Q   Unless you had gone to your mom's house before

13        you went to Kroger.

14    A   I guess we can deal in hypotheticals, but I

15        didn't.

16    Q   And if that time was actually correct, that text

17        would have occurred before your 911 call; is

18        that correct?

19    A   Again, if you want to deal with hypotheticals,

20        yeah, it would've.  But I didn't make that text

21        at that time.

22    Q   Well, I'm not dealing with hypotheticals, I'm

23        dealing with the records.

24            (Exhibit 18 was marked for identification.)

25    Q   I'm going to hand you what's been marked as
```

```
 1          Exhibit 18.  It says "Plaintiff's Exhibit,"

 2          but -- it's a copy of the audio records request

 3          for when you made the 911 call.  Right under the

 4          boxes, though, it looks like sort of Excel

 5          boxes.  There's a "Date of Incident" and a "Time

 6          of Incident."  Can you read that for me, please?

 7    A     November 19, 2013.  Time is 1538 hours.

 8    Q     Okay.  So this is the record of your 911 call.

 9          It looks like you made the 911 call at 3:38 p.m.

10    A     According to this, yes.

11    Q     And you said you called 911 from your mom's

12          phone.  Is that correct?

13    A     Yes.

14    Q     Okay.

15    A     Twice.

16    Q     I'm going to show you -- I'm going to go back to

17          what was Exhibit 3 that we entered this morning.

18    A     Oh.

19    Q     I think it might be in here, the official one.

20          Here you go.  This was previously admitted.

21          This was your mom's land line records.

22    A     Right.

23    Q     Do you see -- okay.  The call -- the very last

24          call, line number 150, what time was that call

25          made at?
```

1   A   November 19, 2013, at 3:41:09.

2   Q   And the call right -- that call, the terminating

3       number, 357-5791, that's your brother, Robert's,

4       phone number; correct?

5   A   Correct.

6   Q   And you think that's the phone call you made to

7       your brother telling him to come to Mom's?

8   A   Correct.

9   Q   The phone call made right before that, the last

10      phone call to your mom's land line, can you tell

11      me what time that was made at?

12  A   Line 149?

13  Q   149, yes.

14  A   November 19, 2013, at 10:29:50 a.m.

15  Q   So there's no phone call from your mom's land

16      line at 3:38; is that correct?

17  A   There is no --

18  Q   On this record.

19  A   There is no entry on this record for a 911 call

20      at 3:38, correct.

21  Q   But you believe you used your mom's land line to

22      call 911?

23  A   Correct.

24  Q   Where was Rebecca when you texted her, do you

25      know?

```
 1   A   I don't know.

 2   Q   And did you guys continue to text back and

 3       forth?

 4   A   Yes.

 5   Q   About your mother?

 6   A   Yes.

 7   Q   And at some point, the decision was made that

 8       she would go to the hospital?

 9   A   Yes.  And I don't know when that decision was

10       made, but it was -- she did not come to the

11       apartment.

12   Q   And then, at some point in time, some IMPD

13       detectives showed up at the scene; is that

14       correct?

15   A   Yes, ma'am.

16   Q   And what did those detectives say to you when

17       they got on the scene?  Or was -- was there one

18       detective, two detectives?

19   A   I'm not clear.

20   Q   Okay.

21   A   There was at least one, and I don't remember who

22       got there first.

23   Q   Okay.  You know Detective Benner --

24   A   Yes, ma'am.

25   Q   -- you just met him this morning.  Do you recall
```

1       seeing him at the scene?

2   A   Yes.

3   Q   And did you speak with him at the scene?

4   A   I don't remember.

5   Q   Okay.  Did you speak with another detective at

6       the scene?

7   A   I believe I spoke to either him or Tudor, but I

8       cannot say for sure.  I should say I think I

9       spoke to him or Tudor, but I cannot say for

10      sure.  I don't believe.

11  Q   And why didn't you go to the hospital at that

12      time?

13  A   Because my sister was going to the hospital and

14      I was being held by the police.

15  Q   Can you explain "being held"?

16  A   I was put in the back of a squad car and not

17      allowed to leave.

18  Q   Did you ask to leave?

19  A   Nope.

20  Q   How do you know you weren't allowed to leave?

21  A   Because I couldn't get out of the squad car.

22  Q   Was the door locked?

23  A   Uh-huh.

24  Q   Did you try it?

25  A   Uh-huh.

1    Q    How many times?

2    A    I would say once.

3    Q    But you didn't ask anyone to leave?

4    A    I'm sorry?

5    Q    You didn't ask anyone to leave?

6    A    No, ma'am, I did not.

7    Q    Didn't ask anyone to go with your mom to the

8         hospital?

9    A    No, I did not.

10   Q    All right.  What happened after you were placed

11        in the squad car?

12   A    I think crime scene showed up, and there was a

13        lot of people coming and going.

14   Q    How do you know they were crime scene?

15   A    Different jackets or markings, and they had what

16        appeared to be equipment.

17   Q    How long did you stay in the back of the squad

18        car, do you believe?

19   A    May have been as long as an hour.  It was quite

20        awhile.

21   Q    Okay.

22   A    I had to go to the bathroom at one point.  I was

23        allowed to do that.

24   Q    So you asked someone if you could go to the

25        bathroom?

1    A    And they let me, but they had to watch me.

2    Q    Where did you use the restroom at?

3    A    I went outside, on the wall in between my

4         mother's apartment and the church next door.

5    Q    So where did you go next?

6    A    You mean after the squad car --

7    Q    Yes.

8    A    -- time?

9    Q    Yes.

10   A    I believe that squad car took me downtown to

11        IMPD.

12   Q    Okay.  And once you got downtown, where did you

13        go?

14   A    I was brought up to -- I don't know where it is,

15        somewhere in IMPD, in the City-County Building.

16   Q    Okay.

17   A    And placed in a -- like a conference room.

18   Q    Okay.  Did Robert go downtown with you as well?

19   A    Robert went downtown separately.

20   Q    Okay.  So he was in another vehicle?

21   A    Yes.

22   Q    Do you recall who drove you downtown?

23   A    I cannot -- I cannot remember the guy's name.

24        It was a patrolman.

25   Q    Okay.  Was he an IMPD officer?

```
 1    A    Yes.

 2    Q    Was he wearing a uniform?

 3    A    Uniformed --

 4    Q    Did you guys --

 5    A    -- in a squad car.

 6    Q    I'm sorry.  Did you guys talk about anything?

 7    A    Very little.

 8    Q    Did you say something to the effect of, "I don't

 9         know if it would be better or worse if my mom

10         died"?

11    A    I said something around that, although I'm not

12         sure -- I cannot remember what I said clearly.

13    Q    Do you know what you meant by that?

14    A    I was referring to the -- well, I didn't --

15         it -- it could have been a couple things.  One

16         was just a comment on the fragility of life and

17         the senselessness of the crime, and the other

18         was if my mom was going to be -- if she was

19         going to die anyway, she might as well die,

20         as -- as harsh as that sounds, I didn't want --

21         it was paramount for me that having my mother

22         having gone through this, that she not suffer.

23    Q    And you're downtown in an interview room.  Did

24         you give a statement at that time to the police?

25    A    I don't know if -- I was questioned and I
```

1       answered questions.

2   Q  And who was in the room with you when you

3       answered questions?

4   A  I'm not sure, but I think it was just Benner.

5   Q  Okay.  Do you recall about how long that lasted?

6   A  In between 30 minutes and an hour.

7   Q  Okay.

8   A  It's hard to remember because it seemed like a

9       long time.

10   Q  Did Robert answer questions at that point, too?

11   A  Yes, ma'am.

12   Q  So what happened after you and Robert were done

13       giving --

14   A  I'm sorry, you said at that time?  He -- one of

15       us was questioned first, one of us was

16       questioned second.  I don't know who went -- I

17       can't remember who went first and second.

18   Q  While Robert was being questioned, whether it

19       was before you or after you, were you still in

20       the interview room?

21   A  Yes, ma'am.

22   Q  So were you both basically let out of the

23       interview room at the same time?

24   A  I don't know that I know exactly when he got

25       out.  We were in different rooms, and the door

1           was kept shut.

2      Q    Did you guys leave together?

3      A    No, ma'am.

4      Q    Where did you go after you left downtown?

5      A    If I'm remembering correctly, Detective Tudor,

6           he had me sign a thing consenting to a search

7           and obtainment, or whatever you want to call it,

8           for my gun, which was at my house.  And I didn't

9           see my brother, but I -- I left with Detective

10          Tudor when he drove me to my house and took my

11          gun.

12     Q    After you got to your house, did you go to the

13          hospital?

14     A    Yes.

15     Q    Okay.  Did you go with Robert?

16     A    Yes.  I picked him up.

17     Q    Did you pick him up from downtown?

18     A    I picked him up from the City-County Building.

19     Q    Where you guys were being interviewed?

20     A    Correct.

21     Q    And you met up with your sister at the hospital;

22          is that correct?

23     A    Yes, ma'am.

24     Q    Did you talk to any medical personnel, a doctor,

25          a nurse, when you got to the hospital?

```
 1    A    The nurse there, coincidentally, was my

 2         brother's best friend's wife, so we talked to

 3         her, and we talked to another nurse, and we

 4         talked to -- took him a while to get there, but

 5         we talked to the doctor on charge of that area

 6         or whatever.

 7    Q    And what were you basically told about your

 8         mom's condition?

 9    A    That it was irreversible, she would not recover,

10         she wasn't in any pain, but the prognosis was

11         zero.

12    Q    Did you guys make a decision at that time to

13         remove her from life support?

14    A    Yes.  We talked about it briefly, and it was my

15         mother's wish that, when the time came, that she

16         be removed from life support, and there was

17         no -- we would have made that decision anyway

18         because there was no hope.

19    Q    Did she have a DNR, a do not resuscitate order?

20    A    No.  I don't think she had a DNR.  She had a

21         medical power of attorney, but I -- I -- I'm

22         going to say I don't recall ever seeing a DNR.

23    Q    And you know that that was her wish from

24         previous conversations you had with her?

25    A    Correct.
```

```
 1    Q   But she never memorialized anything in writing?

 2    A   It may be in the medical power of attorney, but

 3        I cannot remember because that document wasn't

 4        invoked.

 5    Q   And when did your mother pass away?

 6    A   2:30 to 3:00 the following morning.

 7    Q   On November 20th?

 8    A   November 20th.

 9    Q   Were you, again, asked some questions by

10        Detective Benner on the 20th?

11    A   Yes, ma'am.

12    Q   About how long did that question-and-answer

13        session last?

14    A   I think it was half an hour, I'm not quite

15        clear.

16    Q   And was that at the City-County Building again?

17    A   Yes, ma'am.  It was up in homicide or whatever

18        area, interrogation room.

19    Q   And do you recall about what time of the day

20        that was at on the 20th?

21    A   Early afternoon.

22    Q   At some point did Detective Benner ask you to do

23        a polygraph exam?

24    A   Yes.  They both were -- yes.

25    Q   "They both"; are you referring to Detective
```

1        Tudor as well?

2    A   Yes, Tudor was there with Benner.

3    Q   Okay.  And do you recall what month this was in

4        or how close it was, what day it was --

5    A   I don't understand the question.

6    Q   -- that you had this conversation?  How soon

7        after your mom's death did you have this

8        conversation?

9    A   Regarding the polygraph?

10   Q   Yes.

11   A   Well, that was on the day of my mother's death.

12   Q   The same day?

13   A   Yes.

14   Q   And did you consent to do a polygraph?

15   A   I did not.

16   Q   And why not?

17   A   Because, one, I think we'd already been through

18       enough, and, two, I think polygraphs are BS.

19   Q   Why do you think a polygraph's BS?

20   A   They're not even admissible in court, and after

21       having been lied to about the reason to come

22       down and having been questioned like some kind

23       of fiend, I didn't have any faith in the process

24       anymore and didn't want to partake in what I

25       considered to be a -- a silly exercise that --

1   that I would not have considered to be unbiased.

2 Q So you consented to a search of your gun;

3   correct?

4 A Yes.  The retrieval --

5 Q The retrieval of your gun --

6 A -- of my gun.

7 Q Yes.  I don't know what all they do to test it,

8   but --

9 A Technically, it's a search warrant, you're

10   right.

11 Q And to a search of your car, is that correct, as

12   well?

13 A Correct.

14 Q But you wouldn't consent to the polygraph?

15 A No.

16 Q Did you get upset when Detective Benner asked

17   you to consent to a polygraph?

18 A Yes.

19 Q What did you do?

20 A We were yelling back and forth about the

21   efficacy of such a test and might -- their need

22   for me to do it and my anger at them for leading

23   me on and lying about why we were there.  And I

24   said something about it not being admissible in

25   court, and I'm not taking it.  And that did not

1           sit well.

2      Q    Did you yell?

3      A    No more than they did.

4      Q    Did you storm out?

5      A    No.  In fact, it's impossible to storm out of an

6           investigation room with a detective sitting on

7           either side of the table.  They're in the way.

8      Q    You couldn't get around them?

9      A    No.  The room's not big enough.  And I certainly

10          would not storm past a detective, you know, I

11          have more respect for the law than that.

12     Q    So you know that a polygraph test is not

13          admissible in court, but you still didn't want

14          to consent to it?

15     A    Correct.

16     Q    Do you think there was any usefulness that could

17          have been gained from a polygraph test of you,

18          Robert, or Rebecca?

19     A    No.

20     Q    You're absolutely sure neither Robert or Rebecca

21          had anything to do with your mom's death?

22     A    As sure as I can be of anything, yes; they're

23          not involved, I'm not involved.

24     Q    If they had been, would you have wanted them to

25          consent to a polygraph to find out?

1   A   I had -- no, because I have -- I don't have any

2       faith in the process.

3   Q   So I know you couldn't go around the detectives,

4       but the detectives leave the room; did you then

5       leave quickly thereafter?

6   A   They made room for me to go out and go get my

7       brother and said, "Go get your brother."  And

8       I'm not sure exactly how it played out, but I

9       was supposed to go get him, and then he would be

10      questioned, and I yelled at my brother, "We are

11      not taking a polygraph test," or something like

12      that.

13          MS. HAMMER:  Note for the record that

14      Mr. Rainsberger raised his voice to show the

15      inflection.

16          THE WITNESS:  Right.

17  A   I was distant from my brother, too, because he

18      was in the waiting room, and he was probably

19      25 feet away, so the only way to communicate

20      with him -- there was probably a better way to

21      communicate that, but I wanted him to know what

22      was going on.

23  BY MS. BOX:

24  Q   So did you demand to leave?

25  A   No.

1    Q    You didn't demand the officers move so you could

2         get out of the room?

3    A    Oh, I'm sorry, this is before that.  They --

4         it's like they stood up and said -- one of them

5         stood up, Tudor, I think, and said, "Go get your

6         brother and have him come back here."

7    Q    You were under the impression that you were

8         there that day to go over the autopsy results;

9         right?

10   A    Yes.  But Benner contacted my sister, she

11        contacted us, that autopsy results, be there at

12        1:00, so that's what my -- that's what we were

13        told.

14   Q    Did you go over the autopsy results with

15        Detective Benner?

16   A    No.

17   Q    So you left before he could go over the autopsy

18        results with you?

19        MR. WAPLES:  Objection, misstates facts in

20        evidence and it's argumentative.

21        You can answer.

22   A    They left us waiting in the entryway without

23        talking about the autopsy, so I don't know how

24        to answer that exactly.

25        MS. BOX:  Do you want to take a break or do

```
 1          you want to keep going?

 2                 THE WITNESS:  I'm okay.  I don't --

 3                 MR. WAPLES:  I'm okay.  It's up to you.

 4                 MS. HAMMER:  I'm okay.

 5                 (Exhibit 19 was marked for identification.)

 6     BY MS. BOX:

 7     Q   I'm going to show you what's been marked as

 8         Exhibit 19.  And this is the Complaint that was

 9         filed in this case against Charles Benner,

10         Detective Benner.  The document reference number

11         is Document 1, it was filed on January 12th of

12         2016, and the Case No. is 1:16-cv-00103-WTL-MJD.

13                 Do you recognize this document,

14         Mr. Rainsberger?

15     A   Yes, ma'am.

16     Q   When was the last time you saw this document?

17     A   I've read it recently.  I don't know exactly

18         when.

19     Q   Did you help in the preparation of this

20         document?

21     A   Yes, ma'am.

22     Q   Now, I know you're not a lawyer, but what is

23         your understanding, just in general terms, of

24         the claims that you're bringing against

25         Detective Benner?
```

```
 1              MR. WAPLES:  Objection, calls for a legal
 2         conclusion, but he can answer to the extent that
 3         he knows.
 4    A    I know that it's a Section 1983 lawsuit against
 5         a police person acting under the color of
 6         authority violating my constitutional rights.
 7    Q    And what rights do you feel were violated?
 8    A    The right not to be arrested and charged with
 9         something out of thin air.  I don't know.
10    Q    I'd like you to turn to page 3, it's
11         Paragraph 18, it reads, "In his probable cause
12         affidavit, Detective Benner misrepresented that
13         Mr. Rainsberger was in his mother's apartment
14         during the time period she was attacked and well
15         before he telephoned 911 to report her
16         injuries."
17              Do you see that?
18    A    Yes, ma'am.
19    Q    Okay.  And then Exhibit 2, which is Detective
20         Benner's affidavit for probable cause.  Here you
21         go.  It's on page 3.
22    A    Okay.
23    Q    The very last paragraph, Detective Benner
24         writes, "I received cell phone records for the
25         Rainsberger family and obtained the following
```

```
 1          information:  On November 19, 2013, at
 2          2:40 p.m., Robert Rainsberger received a call
 3          from Ruth Rainsberger's land line to his cell
 4          of," and it's blacked out.
 5     A    Uh-huh.
 6     Q    Is that the statement you're referring to in
 7          Paragraph 18, the misrepresentation?
 8     A    Yes.
 9     Q    So but in the probable cause affidavit,
10          Detective Benner doesn't actually say that you
11          made the call at 2:40; correct?
12     A    No, he does not.
13     Q    I'd like to go back to Exhibit 13.  It looks
14          like this.
15     A    Okay.
16     Q    And now let's talk about the yellow highlighted
17          record.
18     A    Okay.
19     Q    Again, Exhibit 13 is Robert Rainsberger's phone
20          records.  The yellow highlighted line, which is
21          the -- 1, 2, 3, 4 -- fifth line down from the
22          top.
23     A    Yes.
24     Q    Can you please read for me the number that was
25          called?
```

1   A   357-5791.

2   Q   And that's your brother, Robert's, phone number;

3       correct?

4   A   Correct.

5   Q   And the number that was being called from?

6   A   375-7841, my mother.

7   Q   Your mother's phone number, okay.

8           And then over to "Start Date," the time and

9       date, please?

10  A   Start date is November 19, 2013, 14:40:51.

11  Q   So according to this record, it appears that

12      Detective Benner's statement in the probable

13      cause affidavit is correct?

14  A   No, it does not.  It does not appear that way.

15  Q   How does it not appear that way?

16  A   According to Exhibit 13, at 15:40:38, somebody

17      called from my mother's land line to a 773

18      number, and that is nonsensical.  The same 773

19      number on the 14th put a call under "Dialed

20      Digits."

21  Q   Looks like the called number, though, is

22      317-357-5791?

23  A   No, that's dialed digits.  The called number in

24      blue is (773)960-9972.

25  Q   We're referring to the yellow highlighted one.

1    A    Blue.

2    Q    No.  We're referring to yellow, though, the

3         phone call at 2:41.

4    A    I'm sorry.  Let me -- let me recap what I just

5         probably said badly.  There is a record with a

6         start date -- a start time of 14:40:51 showing

7         my mother's land line number called my brother's

8         cell number, that's the first two columns.  At

9         15:40:38, there is another line that shows my

10        mother's land line phone calling a 773 number,

11        that's the blue line.

12   Q    But so, again, there's a phone call from your

13        mom's land line to Robert Rainsberger at 2:40,

14        at least it appears from these records.

15   A    If -- if you don't understand this record, there

16        is a line there that does say something occurred

17        at a time stamp of 2:40:51, yes.

18   Q    What do you mean if I don't understand this

19        record?  How am I misunderstanding it?

20   A    These two lines are the same thing, they're two

21        halves of the phone call.  The 773 number is a

22        bridging number in Chicago for AT&T to connect

23        its network to Sprint.

24   Q    And how do you know that?

25   A    I don't, but it's the only thing that makes any

1        sense.

2    Q   You stated earlier you're not a phone record

3        expert; correct?

4    A   Well, the alternative is that at 15:41:03,

5        somebody from my mother's land line called a 773

6        number, which did not happen.

7    Q   Has an expert in phone records told you that

8        that's what's happening here?

9    A   No, but I'm very confident.

10   Q   How so?

11   A   I'm very confident that an expert that would

12       look at this would go, Oh, that's the same call.

13   Q   Have you spoken to any expert?

14   A   No.  But at least Beers (phonetic) corrected the

15       time on this, on the 1440 call.

16   Q   Well, there's multiple issues with Beers's

17       records.

18   A   Only if you don't understand the phone records,

19       and I'm very confident that what I've stated and

20       testified to will be borne out.

21   Q   The --

22   A   That I made a phone call at 15:40 to my brother

23       from my mother's land line.

24   Q   Tell me the times of both those phone calls, the

25       duration.

```
 1   A   The duration, as listed, the first one at 14- --
 2       with the time stamp of 14:40 is 15 seconds.
 3   Q   And the second one?
 4   A   25 seconds.
 5   Q   So they're not even the same length of phone
 6       calls.  How could it be the same phone call?
 7   A   The 15-second phone call is encapsulated into
 8       the 25-second phone call.  The 25 seconds is the
 9       phone call, the actual time on the phone plus
10       the switching plus the front and back end
11       handoffs and everything.
12   Q   But you have no evidence to prove that.
13   A   No, but I'm confident.
14   Q   But your own speculation?
15   A   I've never been more confident in anything.
16   Q   Do you recognize that Chicago number, 773
17       number?
18   A   Only because I looked it up after the fact and
19       found it was some weird number that appears in
20       other things.  It's not a person.  It is part of
21       the network switching for the phone companies.
22   Q   But your testimony today is you were not at your
23       mom's house at 2:40 p.m.; is that correct?
24   A   Absolutely not.
25   Q   And Robert was at home with you at that time;
```

1       correct?

2    A  Correct.  I had not yet left.

3    Q  And where was Rebecca, do you know?

4    A  I have no idea.

5    Q  You three were the only individuals with keys

6       besides your mom; correct?

7    A  To be accurate, maintenance would have had keys.

8    Q  So who could have made this call?

9    A  I don't know what call you're referring to.

10   Q  The call at 2:40 p.m.

11   A  There is no call at 2:40 p.m.  Those are --

12      those are two lines that represent one call, and

13      it's shown in the rest of the records it kind of

14      works that way, but not being a phone expert, I

15      can't really explain it adequately, I guess,

16      so...

17   Q  Since you're not a phone expert, let's assume

18      there was a call at 2:41, because we have no

19      evidence --

20          MR. WAPLES:  Objection, assumes facts not

21      in evidence, it's contrary to the record.

22   A  The AT&T records show --

23          (Simultaneous colloquy interrupted by the

24      court reporter.)

25          MR. WAPLES:  And I object to that.  It

```
 1              assumes facts not in evidence and is contrary to

 2              the records.

 3    Q    So who could have made that call?

 4              MR. WAPLES:  And it calls for speculation.

 5              Somebody made a call that didn't exist at that

 6              time, it didn't happen.

 7              MS. BOX:  We have Exhibit 13 that says that

 8              there's a call.  We have no evidence to prove

 9              otherwise.

10              MR. WAPLES:  We don't even know --

11              (Simultaneous colloquy.)

12              MS. BOX:  I even made it clear on the

13              record that I would assume -- make an assumption

14              that a call occurred.  I just want to know who

15              could have made the call if it did occur.

16              MR. WAPLES:  You're asking him to testify

17              about a call that occurred at a time he said it

18              didn't occur.  It occurred at 3:40, not --

19              MS. BOX:  He also told me he wasn't at his

20              mom's house at 2:40, so how would he have known

21              if the call occurred not?  He's not Robert, he's

22              not the person on the other line making a call.

23    A    Because the AT&T phone records don't show a call

24              at 2:40.

25
```

```
1    BY MS. BOX:

2    Q   The AT&T records also don't show your 911 call

3        at 3:38.  How do you explain that?  Or your two

4        911 calls at 3:38.  There are multiple issues

5        with your mom's land line records.

6            MR. WAPLES:  Objection, argumentative.

7    Q   So who could have made a call at 2:40 p.m. from

8        your mom's land line?

9    A   I can't answer that.  That's a nonsensical

10       question.

11   Q   Well, it could have been Robert, you said it

12       wasn't you, and you don't know where Rebecca

13       was.  I guess the maintenance man could have

14       made the call, but the maintenance man wouldn't

15       have Robert's cell phone number; correct?

16   A   I can't speculate.

17           MR. WAPLES:  Objection.  Kathryn, you're

18       speculating and you're arguing with the witness

19       who's already told you what his answer is about

20       any call at 2:40 --

21           MS. BOX:  He didn't answer the question,

22       Rich.  And I'm not --

23           MR. WAPLES:  He's not going to answer that

24       somebody made a call when he doesn't believe a

25       call was made.
```

```
 1              MS. BOX:  I'm not asking him to answer that
 2         someone made a call.  I'm asking him:  If the
 3         call was made, who could have done it?
 4              THE WITNESS:  I have no idea.
 5    BY MS. BOX:
 6    Q   Going back to Exhibit 19, this is the Complaint.
 7         Page 3, Paragraph 19 states, "In his probable
 8         cause affidavit, Detective Benner misrepresents
 9         that nothing of value was stolen from the
10         apartment, in an apparent attempt to eliminate a
11         robbery as a motive for the attack, when in
12         truth prescription drugs, a purse and jewelry
13         were stolen."
14              Do you see that paragraph that I'm
15         referring to?
16    A   Yes, ma'am.
17    Q   What drugs were stolen from the apartment?
18    A   Aricept.  I don't know if any over-the-counter
19         drugs were taken or not, but the Aricept was
20         missing.
21    Q   What did you do to find out that the Aricept was
22         missing?
23    A   I looked at the place that it was always sitting
24         on the counter and saw that there was no Aricept
25         there.
```

1    Q   At what time?

2    A   Oh, what time?

3    Q   Yes.

4    A   I'm not even sure what day.  I don't know if I

5         looked that closely on the 19th.  I did look

6         around the apartment, but I don't know if I

7         noticed it for sure that day or not, I can't

8         remember.

9    Q   Okay.  Where did your mom usually keep her

10        Aricept medication?

11    A   It's sitting on the kitchen across from the

12        refrigerator, to the right of the sink, where

13        all that stuff is.

14        (Exhibit 20 was marked for identification.)

15    Q   Here's Exhibit 20.  Do you recognize what that

16        photo is depicting?

17    A   I believe this is the kitchen counter to the

18        right of the sink.

19    Q   And is that where she would usually keep her

20        Aricept?

21    A   Yes, ma'am.

22        (Exhibit 21 was marked for identification.)

23    Q   All right.  Now I'm handing you Exhibit 21.  Do

24        you recognize what's in that box in the drawer

25        or do you know what that is?

```
 1   A   It's some other medication.  That could be --

 2       oh, she'd been on something for something else

 3       in the past and I -- I do not remember what that

 4       is.

 5   Q   Okay.  But that's not Aricept; is that your

 6       testimony today?

 7   A   Aricept -- correct.  Aricept comes in a bottle.

 8   Q   Well, do you see the bottle up to the right-hand

 9       side of the box?

10   A   Yes, ma'am.

11   Q   And could that have been her Aricept?

12   A   No, ma'am, that -- that bottle appears to be too

13       big.

14   Q   Can you think of any reason that someone would

15       want to take Aricept?

16   A   To be succinct, I -- I believe someone who would

17       do such a thing would just grab whatever

18       prescription drugs existed without thinking

19       about it.

20   Q   Why wouldn't they take any of the other drugs

21       depicted in these two exhibits?

22   A   Well, the -- the items on the counter are

23       over-the-counter medications that are not

24       particularly valuable to a drug addict, and the

25       4-milligram card I didn't even realize was a
```

 1        drug at first, I thought that was a pamphlet, so

 2        they may not have recognized that.

 3     Q  What about that bottle?

 4     A  Oh, I don't know.  I have no idea.

 5     Q  Do you think if someone was going to rob the

 6        place, they would pick and choose between

 7        different medications or just grab everything

 8        that they could see?

 9            MR. WAPLES:  Objection, calls for

10        speculation.

11     A  I believe the easiest and quickest and surest

12        they could take would be the bottle of

13        medication sitting out on the kitchen counter,

14        so not something that doesn't look like

15        medication, and I have no explanation for the

16        other bottle except maybe they didn't see it.

17     Q  Did you ever tell Detective Benner that Aricept

18        was taken?

19     A  I don't know if I told Benner or Tudor or who,

20        but I told them that stuff was taken, and it

21        didn't seem to register.

22     Q  So when did this conversation take place?

23     A  I don't remember.

24     Q  Do you know who you were speaking to?

25     A  I believe it was Benner, but I don't remember.

```
 1    Q    So you heard Detective Benner testify this

 2         morning that you never told him that anything

 3         was taken.

 4    A    I believe I told Benner; if not, I told one of

 5         the other police officers or I told Tudor that a

 6         purse, jewelry, and my mom's Aricept were

 7         missing.

 8    Q    Okay.  You told them about all three at the same

 9         time?

10    A    I don't remember.

11    Q    But you only brought this lawsuit against

12         Detective Benner; correct?

13    A    That's the way it works.

14    Q    I'm just asking.

15    A    Correct.

16    Q    Can you please describe the purse that was

17         stolen?

18    A    It was a black leather purse, approximately the

19         size of a loaf of bread, with handles.

20         Extremely similar to the other purse that was

21         left on the scene.

22    Q    Did you indicate to Detective Benner that there

23         were two purses, that your mom had two purses?

24    A    Yeah.

25    Q    And when did you do that?
```

1    A    I don't remember.

2    Q    I'm handing you what's been marked as

3         Exhibit 22.  Do you recognize that?

4    A    That is my mother's new purse that she does not

5         use and keeps in a drawer.

6              (Exhibit 22 was marked for identification.)

7              THE WITNESS:  Can we take a break?

8              MS. BOX:  Sure.

9              (A recess was taken between 4:19 p.m. and

10        4:29 p.m.)

11   BY MS. BOX:

12   Q    We were talking about the purse that was

13        allegedly stolen from your mom's house.  Do you

14        recall -- we already talked about you gave a

15        statement to Detective Benner on the 19th, the

16        evening of the 19th, and he asked you about

17        some things that could have been stolen from the

18        house.  Do you recall giving him a description

19        of your mom's purse?

20   A    Not off the top of my head, no.  I could

21        describe the purse, but I don't recall that

22        instance.

23   Q    Then I'm going to show you what's been marked as

24        Plaintiff's Exhibit 23, and I have it open to

25        page 21 just for ease.

```
 1                    (Exhibit 23 was marked for identification.)

 2     Q    And it's the very top paragraph.  Can you read

 3          that paragraph for me?

 4     A    Let's see.  "Yeah, she had a, uh; purses, black,

 5          patent leather, oh, not patent leather, shiny

 6          black leather with like, uh; stitching in it,

 7          like, I don't know how to, anyway it was about

 8          that big, about that big, and, uh; it's got,

 9          like, stitching in it to make it look kind of

10          alligator-y.  It's black, shiny leather.  It's

11          crammed full most of the time.  And as far as I

12          know, it should be in her ... she kept it in

13          her, uh; clothes closet on the floor..."

14     Q    Okay, thank you.  And the purse in Exhibit

15          No. 22, the one right before this, you would

16          agree that that matches the description that you

17          gave Detective Benner; correct?

18     A    No.  This purse does not have stitching in order

19          to emulate alligator appearance.

20     Q    What is the white stitching pattern?

21     A    That's stitching, but that does not emulate an

22          alligator-type appearance.

23     Q    That looks like a black patent leather purse to

24          me, though.  Correct?

25     A    She had two of them.
```

```
 1    Q   Do you --
 2    A   This one, if you look closely, has a price tag
 3        or nylon twirly thing on it, this is a brand-new
 4        purse that her sister got her some time ago.
 5    Q   Did you, anywhere in this statement, tell
 6        Detective Benner about another purse or describe
 7        another purse to Detective Benner?
 8    A   I answered his question as to what my mom's
 9        purse was and where she kept it.  I don't know
10        what you mean.
11    Q   Are you telling me that she has two purses and
12        that this isn't the purse that was stolen?
13    A   Correct, she had two purses.
14    Q   And then Detective Benner asked you -- you know
15        he was asking you to see if anything had been
16        stolen from the house.  If he asked you about
17        purses, and this is the only one that you told
18        him about, why wouldn't you reference the other
19        one?
20    A   I -- I'm sorry, you lost me.
21    Q   Okay.
22    A   If I -- if what?
23    Q   Detective Benner's asking you about things that
24        could have possibly been stolen from your mom's
25        house.
```

```
 1    A    Right.

 2    Q    He asked about purses.  This is the only answer

 3         you give, except for a few more lines down you

 4         talk about a beige coin purse.

 5    A    Right.

 6    Q    You don't reference any other black purse in

 7         this statement.

 8    A    Correct.

 9    Q    So you didn't tell Detective Benner, at least at

10         this time (indicating), that there were two

11         purses, that your mom had two purses?

12    A    Not at this time, no.

13    Q    And then do you see where I'm talking about a

14         few more paragraphs down, the next big paragraph

15         that talks about a beige coin purse?

16    A    Correct.

17              (Exhibit 24 was marked for identification.)

18    Q    I'm showing you Exhibit 24.  Is that the beige

19         coin purse that you're referring to?

20    A    No.

21    Q    Okay.  What is that?

22    A    What is this?

23    Q    Yes.

24    A    In the picture?

25    Q    Yes.  Do you know?
```

```
 1    A    That is a little make-up pouch or purse or

 2         whatever you want to call it.  It's about the

 3         size of a small burrito.

 4    Q    So do you believe that the beige coin purse was

 5         stolen as well?

 6    A    I don't know.  It was -- that one was smaller

 7         than this one.  That one -- the beige coin purse

 8         was smaller than this.

 9              MR. WAPLES:  Is this the statement,

10         Exhibit 23?

11              MS. BOX:  Yes, uh-huh.  And then did you

12         get 24?

13              MR. WAPLES:  Yes.

14    BY MS. BOX:

15    Q    You also state that -- in the Complaint, excuse

16         me, that jewelry was stolen from the house.

17         What jewelry was stolen from your mom's house?

18         Can you describe it for me, please?

19    A    It was just costume jewelry, necklaces and

20         bracelets and such, but it was all -- the -- the

21         only thing -- part of the problem is I don't

22         know what the police have and what was taken and

23         whatnot, but the -- in the same chest of drawers

24         in Exhibit 24 on the right side not photographed

25         was an array of costume jewelry, and it had been
```

```
1          disturbed.

2     Q    Disturbed or taken?

3     A    It looks like taken and disturbed, like somebody

4          was grabbing stuff or something.

5     Q    When did you see that?

6     A    When we went back to the apartment.

7     Q    Okay.

8     A    Which wasn't for, I don't know, like, a week

9          before they took the police tape down.

10    Q    Is this the chest that you're referring to where

11         the costume jewelry was?

12    A    Yes, ma'am.

13              MS. BOX:  This is 25.

14              MS. HAMMER:  What is 23?

15              MS. BOX:  It's the statement.

16              MS. HAMMER:  I'm sorry.

17              MS. BOX:  You're good.

18              (Exhibit 25 was marked for identification.)

19    BY MS. BOX:

20    Q    Here's Exhibit 25, and can you just point out

21         for me on the picture where her jewelry was

22         stored?

23    A    It was in this drawer, and I think the bottom

24         drawer, and it was laid out in kind of an array,

25         so it was clear that it was there, for her
```

```
 1          memory's sake.

 2    Q     And what do you mean, "it was laid out in an

 3          array"?

 4    A     I took every item and put it, like, in a grid,

 5          so it was, like, here's -- you know, in rows and

 6          columns in the drawer.  She had all this jewelry

 7          she never wore, never used, hardly ever looked

 8          at, but I wanted, when she opened her drawer, to

 9          be able to say, oh, here's my jewelry.  So it

10          was all laid out kind of in a grid.

11    Q     Okay.

12    A     It was a very -- it was a nonconventional way of

13          storing it just to aid her memory, I guess, or

14          that was the thought.

15    Q     How many pieces of jewelry do you believe she

16          had, if you could estimate?

17    A     Oh, God, like 100; 50 to 100.  She had some --

18          so many bracelets and necklaces and stuff.

19          Quite a bit -- dozens of things.

20    Q     Did you have any documentation that listed each

21          piece of jewelry --

22    A     No.  It was all costume jewelry.

23    Q     -- was there a description -- so is it possible

24          that the jewelry was just disturbed and nothing

25          was taken?
```

1   A   It seemed to me that it was missing.

2   Q   And why do you think that?

3   A   Because there was more empty space in the drawer

4       than it seemed like there should have been, I

5       don't know.

6   Q   And the jewelry couldn't have been, you know,

7       just pushed to sides or in clumps?

8   A   It's hard to argue one way or the other, I don't

9       know.

10  Q   But you can't today say for sure what pieces of

11      jewelry were stolen?

12  A   No.  No, there was nothing of value, really of

13      value, so we didn't really track it, except for

14      the wedding ring.

15  Q   Can you even say for sure that jewelry was

16      stolen?

17  A   100 percent, no.  But 99.

18  Q   And I think you already touched on this:  After

19      your mom's house, was it kind of closed off as a

20      crime scene, or were people allowed in after

21      you -- after this incident, was your mom's house

22      taped off?

23  A   There was crime scene tape on my mother's front

24      door from -- well, I assume it was put up the

25      day the police came, probably for a week after

1       that, seven or eight days.

2   Q   So you think that when you went back in her

3       apartment, maybe a week later, you noticed that

4       things were missing?

5   A   I looked around to see if anything was missing

6       and also to look at the condition of the

7       apartment.

8   Q   And you specifically recall telling Detective

9       Benner that these things were missing from the

10      house?

11  A   Yeah.

12  Q   But you don't recall when that conversation was?

13  A   I do not.

14  Q   So back to the Complaint, which is

15      Exhibit No. 19, Paragraph 20, it says,

16      "Detective Benner falsely stated in his probable

17      cause affidavit that there were savings bonds in

18      Mrs. Rainsberger's open lockbox in plain view in

19      the apartment, implying that robbery could not

20      have been the motive for the attack."

21          Is this a photo of the lockbox?

22  A   Yes.

23          MS. BOX:  Okay.  I'm going to mark this as

24      Exhibit 26.

25          (Exhibit 26 was marked for identification.)

1    Q    And for the record, the lockbox is the gray box

2         sort of in a little -- what looks like was a

3         drawer without a front cover on it.

4    A    Correct.

5    Q    And what was in the lockbox?

6    A    Some old financial records.  Printouts of

7         certificates of deposit.

8    Q    Did they have any value?

9    A    No.

10   Q    Why were they in the lockbox?

11   A    Made my mother feel better.

12   Q    Okay.  Other than the Aricept, potentially a

13        purse, and maybe some jewelry that was allegedly

14        stolen from the apartment, did you see any other

15        signs that would indicate to you that this was a

16        robbery?

17   A    No.

18   Q    There's no forced entry; correct?

19   A    Not that I'm aware of, no, it didn't look like

20        it to me.

21   Q    Did your mom have any electronics?

22   A    No -- what --

23   Q    Electronics.  Did she have a TV?

24   A    She had a -- yeah, she had a big old tube TV.

25   Q    And I'm assuming that was in the apartment a

1       week later; correct?

2    A  Right.  I don't believe she had even a radio or

3       anything else.

4    Q  Back to Exhibit 19, the Complaint, Paragraph 22

5       says that, "In his probable cause affidavit,

6       Detective Benner misrepresents that after the

7       attack on his mother, a video from a

8       surveillance camera in the Kroger grocery store

9       located near his mother's apartment showed

10      Mr. Rainsberger disposing of a 'straight object'

11      pulled from his person 'while he looked around

12      for cameras.'"

13         Then going back to the affidavit for

14      probable cause, which is Exhibit No. 2, it's the

15      very last full sentence of page 3.  Detective

16      Benner writes, "Within an hour of this phone

17      call, William Rainsberger's on video across the

18      street at the Kroger."  And the phone call he's

19      referring to -- do you see where I'm talking

20      about?

21   A  Yes.

22   Q  The phone call he's referring to is this --

23      we're not going to argue about the phone call

24      but --

25   A  Yeah.

```
 1   Q   -- he wrote in there, "a phone call that

 2       occurred at 2:40 p.m."  Okay?

 3   A   Yes.

 4   Q   So Detective Benner doesn't actually indicate

 5       that you deposited of this straight object -- or

 6       disposed of this straight object after going to

 7       your mother's in his probable cause affidavit,

 8       he just says "within an hour of this phone

 9       call."

10   A   Can you phrase the question again?

11   Q   Sure, sure.  So maybe it will help if you read

12       Paragraph 23 of the Complaint.

13   A   23?

14   Q   Yes, it's the very first paragraph.  It says,

15       "In truth, the video shows Mr. Rainsberger at

16       the Kroger store prior to going to his mother's

17       house and only throwing away trash, not a

18       'straight object' weapon, and not looking around

19       for cameras."

20   A   Okay.

21   Q   What I'm saying is that this sentence that

22       you're referring to in the probable cause

23       affidavit that references these paragraphs of

24       the Complaint actually indicates that you were

25       at the Kroger within an hour of a phone call,
```

```
 1          not prior to or after going to your mother's

 2          house.

 3     A    It says, "Within an hour of this phone call,

 4          William Rainsberger's on video" -- I'm not sure

 5          what the debate is.  Is it about the "within an

 6          hour" or --

 7     Q    No.  And I'm not -- the debate is in the

 8          Complaint.  It makes a distinction between prior

 9          to going to your mother's house and after going

10          to your mother's house, and the Complaint seems

11          to indicate that Detective Benner got the

12          timeline wrong.  And all I'm trying to point out

13          is that Detective Benner was referring to within

14          an hour of a phone call, not prior to going to

15          your mother's house or after going to your

16          mother's house.

17               MR. WAPLES:  Well, I'm going to object to

18          this.  It's confusing, it kind of misstates

19          facts in evidence because Benner certainly, in

20          his probable cause affidavit, is saying the

21          phone call came from his mother's house prior to

22          Bill going to Kroger, and then he states that

23          Bill made a phone call from his mother's house

24          to his brother's cell phone at 2:40 is what he's

25          placing it at.  I mean, that's the obvious
```

```
 1            intent of that probable cause affidavit.

 2            MS. BOX:  I don't think it's as obvious,

 3       especially after Detective Benner's testimony

 4       this morning, so we'll disagree on that, but I'm

 5       simply looking at Detective Benner's language.

 6            MR. WAPLES:  Perhaps this -- maybe this

 7       will straighten it out.  Are you asking if

 8       Paragraphs 22 and 23 of the Complaint are

 9       referring to the probable cause affidavit,

10       page 3, Paragraph-- fourth full paragraph?

11            MS. BOX:  Yes.

12            MR. WAPLES:  Okay.

13            MS. BOX:  Or fifth paragraph.

14            MR. WAPLES:  Okay, thank you.  We should

15       learn how to count better when we go to law

16       school.

17  A    Is there a question on the table?  I'm sorry.

18  BY MS. BOX:

19  Q    Let's try it this way:  Does Detective Benner

20       say that you went to throw away -- does he

21       specifically use the words that you went to

22       throw away this object after going to your

23       mother's house anywhere in that paragraph?

24  A    In here?

25  Q    Yes.  The fifth paragraph on page 3.
```

```
 1   A   I think it does, because I think he's of the

 2       opinion I made a phone call at 2:40, and he's

 3       implying that I made a phone call, went to

 4       Kroger to throw something away, and then came

 5       back.  So, yes, in my opinion --

 6   Q   Does it use that language --

 7   A   -- I know it's not crystal clear.

 8   Q   Does it use that language?

 9   A   I think what he states here is that I made a

10       phone call at 2:40, and then I went to Kroger to

11       throw something away.

12   Q   But he says Robert Rainsberger received a phone

13       call from Ruth's land line; correct?

14   A   True.

15           (Exhibit 27A-D was marked for

16       identification.)

17           MS. BOX:  I have some still photos that I'm

18       going to mark as -- there are three of them --

19       oh, there are four altogether, excuse me, I'm

20       going to mark them as 27A-D.

21           MR. WAPLES:  These are in order, 27A-D?

22           MS. BOX:  Yes, correct.

23   BY MS. BOX:

24   Q   I'll represent to you that these are still

25       photos taken from the Kroger camera entryway.
```

1       Do you have any reason to dispute that?

2    A  No.

3    Q  Can you please read the time and date?

4    A  On the photos?

5    Q  Correct, on the bottom of the photos.  I believe

6       it's the same for all four of them.

7    A  All four of them say November 19, 2013, at

8       3:28:56 p.m.

9    Q  This is about the same time you went to Kroger

10      to buy tea; correct?

11   A  Yes.  This is just before that, in fact.

12   Q  Are you in this picture?  Are you in these

13      photos?

14   A  Yes.

15   Q  Can you please describe where you're located at?

16   A  I am -- I don't know how you put it.  Where you

17      see the door open, the figure in the blue jeans

18      and blue sweatshirt is me.

19   Q  So you're not the person -- there are two people

20      in this photo; correct?

21   A  Correct.  I am not the person approaching the

22      sliding glass door, I'm the person behind him.

23   Q  Okay, great.  Do you see a small object that

24      appears to be, in these photos, maybe in your

25      right hand, down by your side?

```
1    A    I see something that you're referring to.  I

2         don't know which hand it's in.

3    Q    Okay.  Fair enough.  Do you know what that is?

4    A    Nope.

5    Q    What did you do with it?

6    A    I threw it away.

7    Q    But you don't recall what you threw away?

8    A    It was trash of some kind.  It was either just

9         some -- some thing I had in my pocket, I'm,

10        like, well, I'll throw this away, I don't

11        know -- I cannot be confident enough about what

12        it was.

13   Q    Okay.  But you're sure it's trash?

14   A    Yeah.

15   Q    But you'd agree that it's not clear from these

16        photos that it's trash?

17            MR. WAPLES:  Objection, argumentative.

18   A    I would say from the photos it's hard to tell

19        what it is.

20   Q    Going back to -- I should know the exhibit by

21        now -- Exhibit 19, the Complaint.  It's

22        Paragraph No. 27, "In his probable cause

23        affidavit, Detective Benner falsely stated that

24        Mr. Rainsberger showed no signs of concern for

25        their mother's health while she was at the
```

```
 1          hospital before she died."
 2              My question is:  Did you ever ask Detective
 3          Benner if you could go to the hospital?
 4    A     I did not.
 5    Q     Did you ever ask Detective Benner what your
 6          mother's condition was?
 7    A     No.
 8              (Exhibit 28 was marked for identification.)
 9    Q     I'm showing you what's been marked as
10          Exhibit 28, and I'm going to represent to you
11          that these are selected records of your phone
12          records.  They were pretty extensive, so I only
13          printed off the pages that I felt were relevant.
14          So I printed off the very first page so we would
15          have the headings, and I printed off the pages
16          that reference November 18th through
17          November 20th.
18    A     Okay.
19    Q     And, obviously, it included a little bit of the
20          21st on that full page.  I'd like to draw your
21          attention to what is page 3 of this exhibit.
22          You previously testified in the deposition that
23          you stayed in Plainfield the night of
24          November 18th; correct?
25    A     Yes, ma'am.
```

```
 1   Q   And that you believe you left your wife's house

 2       maybe some -- sometime prior to 8:00.

 3   A   I don't know about prior to 8:00; 8:00-something

 4       would be --

 5   Q   Fair enough.  And I believe you testified that

 6       your wife left before you, maybe around 7:15.

 7   A   Yeah.  And I -- I apologize, I can't remember

 8       what time she goes to work.  She -- it would

 9       have either been 6:30 or 7:30 that she would

10       normally leave for work downtown.

11   Q   But she was with you in the house until she left

12       for work; correct?

13   A   We were both in the house, yes.

14   Q   So the second record down looks like an SMS,

15       which do you know what SMS means?

16   A   Short message service.

17   Q   Which is a text message; correct?

18   A   Correct.

19   Q   And can you read the time and date stamp on that

20       for me as well?

21   A   November 19th, 2013, at 5:00 a.m. plus 41

22       seconds.

23   Q   So it looks like this is a text message in the

24       far left column from number 331-1059, which is

25       your number; correct?
```

```
 1    A    Correct.

 2    Q    To 771-07604; correct?

 3    A    (317)710-7604, correct.

 4    Q    And that's your wife's number; correct?

 5    A    Correct.

 6    Q    So were you guys texting each other while you

 7         were in the same house?

 8    A    Yes.

 9    Q    Why would you do that?

10    A    Because we don't sleep together.  I sleep on the

11         couch in the living room because I snore and she

12         works, so I sleep in the living room.  So we

13         text back and forth.

14    Q    So you couldn't have gone into her room to talk

15         to her?

16              MR. WAPLES:  Objection, argumentative.

17    A    I didn't.

18    Q    Is it common for you to text in the house with

19         her?

20    A    Yeah, quite.

21    Q    So it looks like you have -- there's another

22         record at 5:08, 7:08, 7:09, 7:10, 7:11, 7:13,

23         7:16, and 7:16.  Again, they all look like text

24         messages between you and your wife; correct?

25    A    Correct.
```

```
 1    Q    While you were in the same house?

 2    A    I cannot be certain that the ones after

 3         7:00 a.m. are while we are in the same house,

 4         that could have been while she was driving in to

 5         work, but certainly the ones at 5 -- 5:00 a.m.

 6         or thereabouts are while we were in the same

 7         house; myself in the living room, her in her

 8         bedroom.

 9    Q    And turning to the next page, the very top

10         record looks like another text message.  Can you

11         read the time and date stamp on that for me?

12    A    November 19, 2013, at 12:44:10 p.m.

13    Q    And that's a text message from your number, the

14         (317)331-1059; correct?

15    A    Correct.

16    Q    To the (317)357-5791 number; correct?

17    A    Correct.

18    Q    And that's your brother, Robert's, phone number?

19    A    Correct.

20    Q    And you previously testified that your brother,

21         Robert, was home with you all day?

22    A    Yes, I think so.

23    Q    So would this, again, be you guys texting each

24         other from the same house?

25    A    Yes.
```

```
 1   Q   Even though you were in the same house?

 2   A   Yes.

 3   Q   So it looks like there are some more records at

 4       1:59, two of them, and then a little bit farther

 5       down, 2:40, 2:41, 2:42, another one at 2:42, a

 6       2:51 and a 2:52, all text messages between you

 7       and Robert?

 8   A   Uh-huh.  Yes, I'm sorry.

 9   Q   While you guys were at the house together?

10   A   Yes.

11   Q   Is it common for you and Robert to text together

12       while you're in the same house?

13   A   I have a very large house, so yes.

14   Q   How big is your house?

15   A   It's a 2,000-square-foot ranch house, and

16       it's -- God, it must be 75 feet long, so if he's

17       in the garage and I'm inside, I just text him.

18   Q   I'm showing you what's been marked as

19       Exhibit No. 29.  Do you recognize this?

20   A   Yeah.

21           (Exhibit 29 was marked for identification.)

22   Q   What is it?

23   A   This is a storyboard for a video I was going to

24       make.

25   Q   Okay.  Do you often draw storyboards for videos
```

```
 1        you're going to make?

 2    A   On the rare occasion I make a video, I draw a

 3        storyboard.

 4    Q   And my question is concerning page 4 of that, I

 5        know it's not numbered, but the very bottom

 6        right box, can you read for me what that says?

 7    A   This?

 8    Q   Do you see where I'm -- yes, correct.

 9            MR. WAPLES:  Is it the last page?

10            MS. BOX:  Page four, the second-to-last

11        page.

12            MR. WAPLES:  Second-to-last page?

13            MS. BOX:  Yes.

14    A   There's a technical note, it says "position."

15        It doesn't say "camera," but I think that's

16        camera.  And then it says, "Eat pudding already

17        open, cover with cloth, count quarters, cloth is

18        hidden.  Well, that's all the time we have.

19        Shake and still."

20    Q   And you made the storyboard; correct?

21    A   Correct.

22    Q   And do you know when you made the storyboard,

23        rough estimate?

24    A   On page 1, it refers to my 40th birthday, so

25        it would have been 19 years ago.
```

1    Q    19 years ago?

2    A    Uh-huh.

3    Q    You think you made this right around the time of

4         your 40th birthday?

5    A    Yeah.  It says "Turning 40."

6    Q    Okay.

7    A    It also depicts a house in which I lived when I

8         turned 40.

9    Q    I'm getting close to being done, I promise.

10   A    That's okay.

11             THE WITNESS:  I think that was 29.

12             (Exhibit 30 was marked for identification.)

13   Q    I'm handing you Exhibit 30.  This is an e-mail

14        from a Marielle Vincent, who I'm not sure who

15        that is, but it's to --

16   A    That's Marielle Riedle, that was the prosecutor.

17   Q    Oh, okay.

18   A    She got married.

19   Q    Got married, that makes sense.

20             To Detective Benner.  And I'm only

21        concerned, really, about the top part.  The kind

22        of bulleted point.  It's referencing a jail

23        phone call that you made.

24   A    Right.

25   Q    And in this paragraph, she refers to a file on

```
 1        your computer that you asked your brother,

 2        Robert, to permanently delete.

 3   A    Correct.

 4   Q    And that file is named "M-WTF."  What does that

 5        stand for?

 6   A    The M stands for Mari and the WTF stands for the

 7        commonly...

 8   Q    I gotcha, okay.  And what was in that file?

 9   A    There was information that I was saving that

10        demonstrated that my wife had been having an

11        affair.

12   Q    And why did you want that deleted?

13   A    My wife was going to come to my house and get

14        that computer so she could sign onto my banking,

15        and if she was going to go to all that

16        trouble -- she was going to go to all that

17        trouble because that computer already had the

18        Internet cookies, and so she wouldn't be asked

19        my challenge questions when logging in from

20        another computer and we wouldn't have to go

21        through the rigmarole of her saying what was

22        your first pet's name.  She could just use my

23        computer.

24   Q    And then the very next line, it goes on to

25        reference the My Documents folder, and I think
```

1          you asked Robert to -- or according to this,

2          asked Robert to burn that to your external hard

3          drive or move it to your external hard drive.

4     A    Correct.

5     Q    Do you recall asking him to do that?

6     A    Not vividly, but yes.

7     Q    And what was in your My Documents folder that

8          you wanted to save or preserve?

9     A    Oh, that's just -- jeez, all my taxes, banking,

10         health records; every document I personally had

11         created was under My Documents folder.

12    Q    And why did you want that moved to the external

13         hard drive rather than staying on your computer?

14    A    It's to copy it to the external hard drive.

15    Q    Sorry, yes.

16    A    And that's in case my wife did something to it,

17         so I would have a backup.

18    Q    And I believe there was one more phone call

19         where you asked Robert to move what was ever in

20         your nightstand or to pick up what was in your

21         nightstand.

22    A    Yes.

23    Q    Do you recall that?

24    A    I do.

25    Q    What was in your nightstand?

```
 1              THE WITNESS:  I have to talk to him

 2      briefly.

 3  Q   I ask that you answer the pending question

 4      first.

 5              MR. WAPLES:  Well, let me form a -- let me

 6      ask a voir dire question in order to form an

 7      objection.

 8              Do you need to ask me a question about this

 9      question that's pending?

10              THE WITNESS:  Yes.

11              MR. WAPLES:  And is it because you're

12      worried about some rights that you might have

13      with respect to answering the question or --

14              THE WITNESS:  Yes.

15              MR. WAPLES:  Would the results of any

16      conversation with me change what you would have

17      to say, or do --

18              THE WITNESS:  I don't know.

19              MR. WAPLES:  -- you need to know whether

20      you should not say something?

21              THE WITNESS:  That.

22  BY MS. BOX:

23  Q   I think you need to answer the question, please.

24  A   Marijuana.

25  Q   I'm not a criminal prosecutor.
```

1    A    Okay.

2    Q    You're not going to get in trouble for this.

3         Don't worry if that's your concern.

4              MR. WAPLES:  Sorry, but --

5              THE WITNESS:  That's okay.

6              MR. WAPLES:  It's okay.

7    BY MS. BOX:

8    Q    I just want to touch briefly on the damages that

9         you're seeking from this lawsuit.  What day were

10        you arrested, do you recall?

11   A    Jeez.  May 27, 2014.

12   Q    5-27?

13   A    Pretty sure.

14   Q    And when were you released from jail, or do you

15        know how many days you were in jail for?

16   A    I think it was just under two months.  It was,

17        like, July 24th?

18   Q    And what are you looking to get out of this

19        lawsuit?

20   A    Compensatory damages for the violation of my

21        rights.

22   Q    Can you be a little bit more specific about what

23        compensatory damages you're seeking?

24   A    Do you mean about the nature of them or the

25        amount of them or what they're from --

1    Q    Both.

2    A    -- or --

3    Q    Both, please.

4    A    Well, the damages or -- I can describe the

5         damage I have.

6    Q    Please, please.  I just -- trying to hear it in

7         your own words.

8    A    Two months in jail, another year, almost,

9         charged.  Prior to that, prior to arrest for --

10        from February to May, I knew I was a suspect, so

11        I was living under that sword.  And then

12        reputational damage, the inability to do

13        anything, go anywhere, to seek work for that

14        year.  And then the -- the -- the pain or

15        difficulty from being in jail, the expense of

16        dealing with the thing, reputational loss, the

17        fact that my name being unique is very well

18        known now for being a very bad way, and

19        wondering, given the nature of ongoing stuff,

20        like mugshots.com, if I'm going to be able to

21        put this behind me or anytime in the near

22        future, plus the threat of spending the rest of

23        my life in jail for something I would never do

24        and which was just a very strange avenue for

25        Detective Benner to take.

1          MS. BOX:  Is it okay if Lynne asks

2     questions?

3          MR. WAPLES:  It's not --

4          MS. HAMMER:  Thank you.

5          MR. WAPLES:  I actually said no.  Usually

6     rule is only one lawyer gets to ask the

7     questions.

8          MS. HAMMER:  Oh, really?

9          MR. WAPLES:  Yes.

10         MS. HAMMER:  I wasn't aware of that.

11         MR. WAPLES:  It's never permitted that two

12    lawyers get to ask questions at a deposition,

13    just like at trial, you don't get different

14    lawyers to ask the questions.

15         MS. HAMMER:  Understood.

16         MR. WAPLES:  But you guys can consult --

17         MS. HAMMER:  Would you object to taking a

18    break so we can go over and consult --

19         MR. WAPLES:  No, you guys can consult and

20    that would do -- but that's just the way --

21    because, otherwise, if you don't have that rule,

22    I mean, we could have so many lawyers all asking

23    questions, and it's going to be --

24         MS. HAMMER:  I understand.  So I'm going to

25    say that at my next one.

```
 1              MR. WAPLES:  Well, you can.

 2              MS. HAMMER:  Thanks very much.

 3              MR. WAPLES:  Yes, certainly.  I'm sorry.

 4              THE WITNESS:  We're taking a quick break?

 5              MS. BOX:  Quick break.

 6              MS. HAMMER:  Yes, we are.

 7              (A recess was taken between 5:10 p.m. and

 8         5:14 p.m.)

 9    BY MS. BOX:

10    Q    I just have a couple more questions for you.

11         They may seem a little disjointed because we're

12         going back over stuff.

13    A    That's okay.

14    Q    You mentioned to me that you take generic

15         Adderall; is that correct?

16    A    Yeah.

17    Q    Have you ever had what's call a neurocognitive

18         exam?

19    A    I don't even know what that is.

20    Q    Okay.  I'm just curious if you know if you've

21         had one.

22    A    I have -- I don't recall anything like that.

23    Q    Have you ever been diagnosed with autism or

24         anything on the spectrum of autism?  I'm not

25         implying anything, just asking.
```

```
 1   A   Oh, no.

 2   Q   And your mom was diagnosed with dementia;

 3       correct?

 4   A   Correct.

 5   Q   And do you have a family history of dementia or

 6       Alzheimer's?

 7   A   Yes, very much so.

 8   Q   Can you describe the family history to me a

 9       little bit?

10   A   My mom had Lewy body disorder or Lewy body

11       dementia; her sister Roxy, Roxanne, has -- I

12       think it's just straight-up Alzheimer's.  Her

13       sister Blanche has Parkinson's, and those three

14       things are -- they're in the same family.

15   Q   Associated?

16   A   Yeah.  They're very much associated.  It just

17       depends on which part of the brain really goes,

18       I guess, I don't know.  My -- their mother, my

19       grandma, had Alzheimer's and died from it.  My

20       father's sister had Alzheimer's.  And that's all

21       I know.

22   Q   And you stated that your mother had a will;

23       correct?

24   A   Yes, ma'am.

25   Q   Do you know when that will was drafted?
```

```
 1    A    No.  But it was -- it was, like, years before

 2         she passed away.

 3    Q    Did you take part in the drafting of that will,

 4         by chance?

 5    A    No.

 6    Q    And just out of curiosity, what's the poker bar

 7         that you go play poker at?

 8    A    Firehouse in Plainfield.

 9    Q    Firehouse in Plainfield.

10    A    It's a dump.

11    Q    My kind of place.

12    A    Yes.

13    Q    On the night of the 18th, did you drink any

14         alcohol?

15    A    Night of the 18th.  I think I had a glass of

16         wine while I was waiting for my wife to come

17         home, but --

18    Q    At her house?

19    A    At her house, yeah.

20    Q    Do you have any previous military experience?

21    A    No, ma'am.

22    Q    And I know this was probably, I'm assuming, a

23         pretty traumatic incident for you.  Did you have

24         any type of counseling or grief counseling

25         afterwards?  I don't want to go into any
```

```
 1         specifics.
 2    A    I -- I talked to a counselor -- wow, when was
 3         it? -- once regarding this because I wasn't able
 4         to get beyond it, so -- and then I've -- I've
 5         spoken at length with a couple of friends that
 6         are as good as counselors, trying to make sense
 7         of this and -- make sense of it and at least not
 8         forget it but not let it occupy my mind so much.
 9    Q    And do you recall when your mom was diagnosed
10         with dementia?
11    A    Not exactly.  It was two or three years before
12         she passed away, and I can't remember the
13         doctor's name.
14    Q    You don't recall her treating physician?
15    A    It was ordered by the PCP, and he read the
16         diagnosis.  It's actually a Fort Harrison
17         property.
18    Q    Okay.  Did your mom have renter's insurance at
19         the time of this incident?
20    A    Really bad renter's insurance, yes, yes, $500
21         deductible.
22    Q    And when you went to the hospital after the
23         incident to check on your mom, do you recall the
24         name of the doctor who spoke to you?
25    A    No.  I can picture him, but I can't remember his
```

1      name.

2   Q   Do you know what specialty he was, by chance?

3   A   I think we spoke to the neuro guy.

4   Q   Neuro guy, okay.

5          MS. BOX:  I don't have any further

6   questions.

7          THE WITNESS:  Oh, okay.

8          MR. WAPLES:  Let's take a short break.

9          (A recess was taken between 5:19 p.m. and

10   5:23 p.m.)

11          MR. WAPLES:  We don't have any questions.

12   We'll read and sign.

13          THE REPORTER:  Copies?

14          MR. WAPLES:  E-tran.

15          MS. BOX:  E-tran condensed, please.

16          (Time noted:  5:23 p.m.)

17        AND FURTHER THE DEPONENT SAITH NOT.

18

19

20

                    _____

21                    WILLIAM TERRY RAINSBERGER

22

23

24

25

1    STATE OF INDIANA             )

                                  )  SS:

2    COUNTY OF MARION             )

3

4         I, Susan Wollenweber Dezelan, RDR, CRR, CRC, a

5    Notary Public in and for the County of Marion,

6    State of Indiana, at large, do hereby certify that

7    WILLIAM TERRY RAINSBERGER, the deponent herein, was

8    by me first duly sworn to tell the truth, the whole

9    truth, and nothing but the truth in the

10   aforementioned matter;

11        That the foregoing deposition was taken on

12   behalf of the Defendant  at the offices of Connor

13   Reporting, 111 Monument Circle, Suite 4350,

14   Indianapolis, Marion County, Indiana, on the 27th

15   day of September, 2016, at 1:58 p.m., pursuant to

16   the Federal Rules of Civil Procedure;

17        That said deposition was taken down in

18   stenograph notes and afterwards reduced to

19   typewriting under my direction, and that the

20   typewritten transcript is a true record of the

21   testimony given by the said deponent; and that

22   signature was requested by the deponent and all

23   parties present;

24        That the parties were represented by their

25   counsel as aforementioned.

1       I do further certify that I am a disinterested

2   person in this cause of action, that I am not a

3   relative or attorney of either party or otherwise

4   interested in the event of this action, and that I

5   am not in the employ of the attorneys for any

6   party.

7       IN WITNESS WHEREOF, I have hereunto set my

8   hand and affixed my notarial seal on this 5th day

9   of October  , 2016.

10

11                  _____

12                 N O T A R Y   P U B L I C

13

My Commission Expires:

14   March 24, 2024

15   County of Residence:

Marion County

16

17

18

19

20

21

22

23

24

25