

**Tunnel Vision and Confirmation Bias in the Rainsberger Murder Investigation**

Prepared by

D. Kim Rossmo, PhD
Austin, Texas

January 2017

**Outline**

| | | |
|---|---|---|
| I. | Outline | 2 |
| II. | Statement of Opinion | 3 |
| | A.  Basis for opinion | 3 |
| | B.  Reasons | 3 |
| | 1.  Introduction | 4 |
| | 2.  Background | 5 |
| | a.  Evidence | 5 |
| | b.  Thinking Errors | 6 |
| | i.    Premature Judgment | 6 |
| | ii.   Tunnel Vision | 7 |
| | iii.  Confirmation Bias | 8 |
| | c.  Cognitive Biases and Subjectivity | 10 |
| | 3.  Probable Cause in the Rainsberger Murder Investigation | 11 |
| | a.  Meaning of Probable Cause | 11 |
| | b.  Detective Benner's Affidavit for Probable Cause | 11 |
| | c.  Analysis of the Probable Cause | 12 |
| | d.  Summary Evaluation | 28 |
| | 4.  Confirmation Bias in the Rainsberger Murder Investigation | 30 |
| | a.  Detective Benner rushed to judgment and quickly decided William Rainsberger had killed his mother | 30 |
| | b.  Detective Benner suffered from tunnel vision and failed to properly investigate other viable theories for the murder | 33 |
| | c.  Detectives exhibited confirmation bias in their search, interpretation, and recall of evidence | 38 |
| | i.    Biased search for evidence | 38 |
| | ii.   Biased interpretation of evidence | 39 |
| | iii.  Selective recall | 43 |
| | 5.  Conclusion | 44 |
| | 6.  References | 47 |
| III. | Facts Considered | 54 |
| IV. | Supporting Exhibits | 57 |
| V. | Qualifications | 58 |
| | A.  Summary | 58 |
| | B.  Recent Publications | 58 |
| VI. | Cases | 63 |
| VII. | Compensation | 64 |

**Statement of Opinion**

FRC Rule 26. (a) (2) (B) (i) a complete statement of all opinions the witness will express and the basis and reasons for them;

The police investigation of the Ruth Rainsberger murder suffered from tunnel vision and confirmation bias.  Specifically:

1. Detective Benner rushed to judgment and quickly decided William Rainsberger had killed his mother.

2. Detective Benner suffered from tunnel vision and failed to properly investigate other viable theories for the murder.

3. Detectives exhibited confirmation bias in their search, interpretation, and recall of evidence.

Detective Benner failed to perform a thorough investigation and his affidavit for probable cause contained a number of false and misleading statements.

1. Of the eight allegations in the probable cause, only five were actually items of evidence. One of these was false, and the remaining four contained a mix of facts and falsehoods. Some evidence was misinterpreted and taken out of context.

2. Detective Benner's rationale for concluding William Rainsberger murdered his mother is based on unreasonable and logically flawed conclusions.

When asserting that probable cause exists, police officers must be reasonable, cautious, and prudent, and must consider all the trustworthy facts and the overall circumstances.

1. Detective Benner was not cautious and prudent.  He was haphazard and careless.  He rushed to judgment and his investigation then suffered from tunnel vision and confirmation bias.

2. Several mistakes and omissions occurred in the police investigation.  Some of Detective Benner's facts were not trustworthy and he often failed to consider overall circumstances.

3. These mistakes were unreasonable because Detective Benner failed to verify his information, check assumptions, remain objective, and consider the probability of his investigative theory.

Basis for Opinion

My opinion is based on the information outlined in this report and the evidence and sources listed in the *Facts Considered* section.

Reasons

The specific rationale and reasons for my opinion are explained and discussed in detail in this report.

## Introduction

A rush to judgment in a criminal investigation can result in tunnel vision and confirmation bias, precluding an objective analysis of the evidence and a successful case resolution.  Detectives investigating the murder of Ruth Rainsberger decided in less than a day that her son, William Rainsberger, was guilty.  They came to this conclusion before they had collected, analyzed, and considered all the available evidence in the case.

This report begins with a background section that outlines the nature of evidence, relevant thinking errors, and the relationship between cognitive biases and subjectivity.  In the next section, the accuracy of the affidavit for probable cause sworn by Detective Benner for William Rainsberger's arrest is analyzed.  The allegations are found to be a mix of falsehoods, misleading innuendo, and immaterial information.  Finally, the report discusses various problems in the Ruth Rainsberger murder investigation resulting from the following occurrences:  (1) Detective Benner rushed to judgment and quickly decided William Rainsberger had killed his mother; (2) Detective Benner suffered from tunnel vision and failed to properly investigate other viable theories for the murder; and (3) detectives exhibited confirmation bias in their search, interpretation, and recall of evidence.

# Background

## Evidence

Criminal investigations are solved by evidence, the tangible and recorded facts relevant to a crime. Police must collect, analyze, and think about the evidence[1] to establish the information content of a case (Willmer, 1970). Detectives typically have a good understanding of the technical nature of evidence, however, they do not always fully appreciate the probative value of evidence (Robertson & Vignaux, 1995). Evidence has both significance and reliability. Significance is the strength or power of the evidence, and can be assessed by relating the probability of the evidence if the investigative theory (e.g., a given suspect) is true, to the probability of the evidence if the theory is false (Blair & Rossmo, 2010). Reliability[2] is the accuracy or "truthfulness" of the evidence. Research shows people tend to place more importance on significant evidence even if its reliability is low (Griffith & Tversky, 2004).

All evidence has an error rate – eyewitnesses make misidentifications, suspects give false confessions, and scientific tests produce false positives. As the possibility of mistakes and human error always exists, it is necessary to consider the reliability of an item of evidence in order to determine how much weight it should be given (Rossmo, 2016). Source reliability, forensic test error rates, research on evidentiary consistency/trustworthiness, and any other known issues should be considered. Evidence is not more reliable just because the investigator wants it to be, and it should not be deemed unreliable simply because it is inconsistent with the prevailing investigative theory.

Many people tend to believe the criminal justice system is fair and competent, with police, prosecutors, and jurors logically basing their decisions on reliable evidence. Unfortunately, as the Innocence Project and similar groups have shown, innocent people are sometimes arrested, prosecuted, and convicted. The reality is the system makes mistakes. It is difficult to determine how often such errors happen, but estimates of the frequency of wrongful convictions range from 0.5% (all felonies; Huff, Rattner, & Sagarin, 1996), to 4.1% (death row inmates; Gross, O'Brien, Hu, & Kennedy, 2014), to 5% and higher (murder and sexual assaults; Roman, Walsh, Lachman, & Yahner, 2012).

Eyewitness misidentifications, improper forensic science, and false confessions are the major causes of wrongful arrests and convictions (Innocence Project, 2016). However, investigative thinking errors often underlie these direct causes. Mistakes in decision making have been identified as the most common type of error in police investigations (Irvine & Dunningham, 1993). There is pressure to employ cognitive heuristics ("mental shortcuts") under the complexities of a major criminal investigation, even though these can lead to cognitive biases and then to errors. Human beliefs are the product of expectations, desires, and evidence; the more ambiguous the last, the stronger the influence of expectations and desires (Snook, 2000). "There can be little doubt that our beliefs influence the processes by which we seek out, store, and interpret relevant

---

[1] There are only three ways to solve a crime: a witness; a confession; or physical evidence (Klockars & Mastrofski, 1991). Theories, assumptions, and inferences are not evidence.

[2] Reliability is used here to refer to the accuracy or "truthfulness" of evidence, consistent with most of the legal literature. However, the correct scientific term is validity.

information" (Ross & Anderson, 1982, p. 149).  It is therefore important to process all investigative evidence before theorizing about the crime and suspects; if that happens prematurely, expectations and desires may influence interpretation and evaluation.  As Heuer (1999, p. 125) warns, "once information rings a bell, the bell cannot be unrung."

It can be helpful to consider the diagnosticity of an item of evidence.  Diagnosticity refers to the ability of a medical test to identify a patient's disease.  In the context of a criminal investigation, the diagnosticity of an item of evidence is a function of its ability to distinguish between different hypotheses, such as a suspect's guilt or innocence or the possible causes of an outcome.

**Thinking Errors**

"Man prefers to believe what he prefers to be true."

– Francis Bacon

In an ideal world, we would make the best possible decisions after a careful evaluation of all available evidence.  In reality, our thinking is frequently impaired by cognitive biases.  Within the context of a criminal investigation, such systematic errors in thinking can result in an unsolved crime or a wrongful conviction (Jones, Grieve, & Milne, 2008; Rossmo, 2009a).  Tunnel vision and confirmation bias are amongst the most problematic thinking errors that can be made by detectives.  Faulty assumptions and probability mistakes may play supporting roles.

The initiating problem is frequently a rush to judgment – reaching a conclusion before all the evidence has been collected and considered.  A premature judgment can lead to tunnel vision and confirmation bias, prevent subsequent evidence from being properly evaluated, and result in a criminal investigative failure:

premature judgment → tunnel vision → confirmation bias → investigative failure

These errors and their implications for police investigations generally are explained in the subsections below.  The presence and influence of these errors in Ruth Rainsberger's murder investigation specifically are then discussed in the remainder of the report.

Premature Judgment

Mistaken assumptions, tunnel vision, and cognitive biases in a criminal investigation are often the result of a rush to judgment.  For many reasons, detectives may jump to conclusions before the investigation is complete.  "Investigators need not be especially sure that they have the right person to sway their investigation toward an early suspect" (O'Brien, 2009, p. 328).[3]  When that happens, police prematurely move from an evidence-based to a suspect-based investigation (Rossmo, 2009a).[4]  In the former mode, detectives have not yet determined who the offender is; they are still

---

[3] The mere act of forming a hypothesis can create bias (Koehler, 1991).  A study on aggravating factors for confirmation bias in criminal investigations found participants who were asked early in the case to identify a suspect and reasons for his guilt showed a greater tendency to confirm that hypothesis (O'Brien, 2009).  They were also more likely to "remember" the case evidence as being consistent with their particular suspect's guilt.

[4] This is also known as moving from information generation to case building (Stelfox & Pease, 2005).

searching for and gathering information and evidence to determine what happened during the crime and who might be a suspect. In the latter mode, detectives have decided they know who the guilty person is, and their investigation shifts to gathering evidence for the prosecution.

The central problem therefore originates from a judgment based on only a subset of the evidence, rather than a totality. Evidence discovered post-judgment is then less likely to be evaluated in an unbiased manner, and relevant evidence that fails to support the investigative conclusion may not be collected or properly analyzed; in some instances, it may not even be recognized as evidence. This is confirmation bias.

Assumptions are often necessary in a criminal investigation, especially in the early stages when information is limited; however, they require constant assessment. As evidence is collected, it is necessary to reevaluate each assumption and discard those that are no longer valid. Unfortunately, this can fail to happen with a rush to judgment. If investigators then develop tunnel vision, they may fail to detect underlying errors. In such cases, unsubstantiated assumptions can crystalize into hard "facts."

Tunnel Vision

Tunnel vision (also called incrementalism) results from a narrow focus on a limited range of alternatives:

Tunnel vision is insidious…. It results in the [police] officer becoming so focussed upon an individual or incident than that no other person or incident registers in the officer's thoughts. Thus, tunnel vision can result in the elimination of other suspects who should be investigated. Equally, events that could lead to other suspects are eliminated from the officer's thinking. (Cory, 2001, p. 37)

Tunnel vision can be a product of satisficing, or the selection of the first identified alternative that appears "good enough" (Findley & Scott, 2006; Simon, 1956); arresting the first likely suspect, then closing the investigation off to alternative theories, is a recipe for disaster. Not surprisingly, tunnel vision has been identified as a major cause of wrongful convictions (FPT Heads of Prosecutions Committee Working Group, 2004).

In a recent study funded by the National Institute of Justice (NIJ), the research arm of the U.S. Department of Justice, Gould, Carrano, Leo, and Young (2013) report:

Tunnel vision is nearly impossible to quantify in terms of its prevalence among erroneous convictions. However, previous qualitative and case study research suggests that tunnel vision is common. Findley and Scott explain that when criminal justice professionals "focus on a suspect, select and filter the evidence that will 'build a case' for conviction, while ignoring the suppressing evidence that points away from guilt," they are at risk of "locking on" to the wrong suspect and inadvertently leading to his continued prosecution and conviction (2006: 292). (p. xii)

They also link tunnel vision to the broader issue of systemic failures in wrongful arrests and convictions:

7

tunnel vision helps explain how one error often leads to additional errors in an erroneous conviction. It contributes and facilitates system breakdown because it dismantles the rigorous testing of evidence that makes the investigative and adversarial processes function effectively. (p. xxi)

An officer may be so convinced of an eyewitness's identification that he ignores other case facts that point away from the suspect's guilt; a forensic scientist may conduct a hair comparison and see such a close match between that of the perpetrator and a suspect that he overlooks fingerprint analysis that isn't as compelling; a prosecutor may be so satisfied with a suspect's confession that he discounts forensic evidence that inculpates others; or a defense lawyer may consider the prosecution's case so airtight that he doesn't bother to look deeper into the government's files. (p. 15)

Gould and his colleagues connect the concept of tunnel vision to sunk costs. This tendency, also known as *escalation of commitment* (Brockner, 1992; Coleman, 2010; Staw, 1981), helps explain why entrenchment of beliefs occur even after strong contradictory evidence has emerged:

As more resources – money, time, and emotions – are placed into a narrative involving a suspect, the actors involved are less willing or able to process negative feedback that refutes their conclusions. Instead, actors want to devote additional resources in order to recoup their original investment. As a result, evidence that points away from a suspect is ignored or devalued, and latent errors are overlooked. At this point, the police are working to rule in rather than rule out the suspect, and prosecutors have moved from "inspection" mode to "selling" mode.[5] Escalation of commitment contributes and facilitates system breakdown because it dismantles the rigorous testing of evidence that makes the adversarial process function effectively. (pp. 86-87)

Confirmation Bias

Confirmation bias is a type of selective thinking. Once a hypothesis has been formed, our inclination is to confirm rather than refute – we tend to look for supporting information, interpret ambiguous information as consistent with our hypothesis, and minimize any inconsistent evidence (Koehler, 1991). Types of confirmation bias include:

1. the biased search for evidence

2. the biased interpretation of information

3. biased memory (selective recall).

Confirmation bias can cause a detective to focus on evidence confirming the investigative theory, while ignoring or refusing to look for contradicting evidence (Stelfox & Pease, 2005). Existing evidence is interpreted in a biased manner; evidence that supports the investigative theory

---

[5] This is similar to moving from an evidence-based to a suspect-based investigation, or from information generation to case building (see above).

is taken at face value, while contradicting evidence[6] is skeptically scrutinized (Ross & Anderson, 1982). Research has shown experienced police investigators consider witnesses less credible if they exonerate a preferred suspect than if they help confirm guilt (Ask & Granhag, 2007). Other manifestations of confirmation bias include the failure to search for evidence that might prove a suspect's alibi, not utilizing such evidence if found, and refusing to consider alternative hypotheses.

While the recording and documenting functions integral to a professional criminal investigation minimize the risk of biased memory, there have been instances of detectives "forgetting" to document important information or prosecutors failing to share "irrelevant" exculpatory evidence with defense counsel. It is difficult to say whether such actions are the result of rationalizations fed by confirmation bias or the product of unethical behavior.

The strength and perseverance of confirmation bias is well illustrated by the convoluted theories put forth by police who have difficulty admitting a mistake. In one of many such examples, DNA testing of sperm found on a victim's clothing matched a convicted rapist from her own neighborhood, not the man who spent 23 years in prison for her murder. Rather than acknowledging the failure, however, some police officers tried to explain away the DNA by suggesting the convicted man had actually killed her. Then, after he dumped her body in a back alley, the rapist came along and had sex with her frozen corpse prior to its discovery (Boyd & Rossmo, 1994).

Ross and Anderson (1982) observed, "it is clear that beliefs can survive potent logical or empirical challenges. They can survive and even be bolstered by evidence that most uncommitted observers would agree logically demands some weakening of such beliefs. They can even survive the total destruction of their original evidential bases" (p. 149). Stubborn and irrational belief perseverance by police and prosecutors in the face of significant conflicting new evidence is inconsistent with both justice and reality.

Confirmation bias can be detected in a criminal investigation by identifying:

- evidence "missed" post-judgment (e.g., ignored leads, unexplored lines of inquiry, lost evidence, unanalyzed evidence, etc.)

- biased treatment of post-judgment evidence (e.g., disregarded, downplayed, distorted, failure to consider logical implications, etc.).

In a case involving confirmation bias, the logic of the investigative conclusions can be tested by considering what would happen if the order of evidential discovery was changed. The conclusions reached by detectives should not depend upon the particular sequence in which the evidence was discovered. If altering the evidential order changes the case conclusions, then most likely there is a problem with the investigative logic.

---

[6] Police investigators rarely test their theories by searching for disconfirming evidence even though it is more probative than confirmative evidence (e.g., exclusionary DNA). Once a narrative of the crime has been adopted, police tend to focus only on gathering confirmatory evidence (Stubbins & Stubbins, 2009).

**Cognitive Biases and Subjectivity**

Like all humans, police investigators, prosecutors, and forensic scientists can fall prey to cognitive biases. Their influence affects human decision making at both conscious and subconscious levels; the more subjective a judgment, the greater their effect. As shown in Figure 1, what we think we see is a function of what we expect to see, what we want to see, and what we actually see (Heuer, 1999; Snook, 2000). The more ambiguous what we actually see, the stronger the influence of our expectations and desires (Dror & Fraser-Mackenzie, 2009).



Figure 1. What We Think We See.

Research has shown that even the more "objective" forensic sciences have an element of subjectivity as their practitioners can be influenced by extraneous contextual information (Dror & Rosenthal, 2008). "Subjectivity arises when we no longer examine data purely by itself, evaluating it by its own merit without cognitive influences. When we examine information in light of such influences, we unavoidably and unconsciously perceive and judge it differently" (Dror & Fraser-Mackenzie, 2009, p. 56). In other words, we see what we expect to see. Studies in which experienced fingerprint examiners were told the suspect was under arrest or confessed were more likely to find matches during their print comparisons (Dror & Charlton, 2006). Even DNA mixture interpretations have been shown to be subjective and susceptible to influence by outside information under certain circumstances (Dror & Hampikian, 2011).

## Probable Cause in the Rainsberger Murder Investigation

### Meaning of Probable Cause

The United States Supreme Court has provided guidance to police officers on the meaning of probable cause:

> This court repeatedly has explained that "probable cause" to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.[7]  Michigan v. DeFillippo, 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979).

Because the situations confronting police officers in the course of executing their duties are often ambiguous, room must be allowed for some mistakes on their part.  But the mistakes need to be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. Brinegar v. United States, 338 U.S. 160, 175-176 (1949).

A police officer must have "reasonably trustworthy information."  Carroll v. United States, 267 U.S. 132, 162, 288, 39 A.L.R. 790. 15.  Probable cause is objective and "based on the totality of the circumstances."  United States v. Reed, 443 F.3d 600, 603 (7th Cir. 2006).

To summarize, when asserting that probable cause exists, police officers must be reasonable, cautious, and prudent.  They must consider all the trustworthy facts and the overall circumstances. They can be mistaken, but the mistake needs to be that of a reasonable person who would reach the same sensible and probable conclusion acting on the same known facts.

### Detective Benner's Affidavit for Probable Cause

Detective Charles Benner's affidavit for probable cause of May 22, 2014, lists several facts and circumstances supporting his belief that William Rainsberger murdered his mother, Ruth Rainsberger.  The affidavit is four pages long and contains extraneous information, but Benner's core allegations, in chronological order, can be summarized as follows:

1. The victim's assets totaled almost $100,000, and William Rainsberger was, along with his brother and sister, a beneficiary of her will.

2. Cell phone records show William Rainsberger was in the area of the murder (Shortridge and 10th Street) during the relevant time period when the murder likely occurred.

3. Cell phone records show a call was made from the victim's landline to Robert, William Rainsberger's brother, an hour before William claimed to find his mother's body.

---

[7] A fact is something that has actual existence, a piece of information with objective reality; circumstance is a condition accompanying, conditioning, or determining another, a piece of evidence that indicates the probability or improbability of an event (Merriam-Webster Dictionary, 2016).

4.  In the intervening hour, William Rainsberger threw a "straight object" into a garbage can in front of a Kroger store located across the street from his mother's apartment.  He looked around for cameras both before and after doing this.

5.  There were no indications of a burglary to the victim's apartment – no signs of forced entry (William Rainsberger had a key), no evidence of ransacking, and nothing stolen.

6.  William Rainsberger told people his mother's head had been bashed in even though he had not seen the actual injury.  This suggests he had knowledge of how she sustained her injury.

7.  After calling 9-1-1, William Rainsberger left his mother unattended in the apartment and went outside until police arrived.  He did not ask detectives how she was doing or if he could go to the hospital to see her.  He failed to exhibit grief over her murder or show interest in the progress of the investigation.

8.  William Rainsberger refused to take a polygraph test and got angry when asked to do so by police detectives.

The theory outlined in the probable cause is that William Rainsberger murdered his mother during the morning of November 19, 2013, by hitting her on the head with a hammer or similar object.  This occurred after he returned to Indianapolis from Plainfield[8] (9:20 am), but before Delbert Pickens tried to deliver lunch to Ruth Rainsberger (10:30 am).  William then went home, saw his brother Robert, and returned to the murder scene by 2:40 pm.  He next went to Kroger's, dumped the murder weapon in the garbage can at the main entrance of the store (checking to make sure he wasn't being filmed by a security camera – which he was), purchased an Arizona iced tea at 3:31 pm, and returned to his mother's apartment.  Once there, he telephoned 9-1-1 at 3:37 pm.

A key question in this matter is whether the allegations in Detective Benner's probable cause affidavit were accurate, whether the facts were trustworthy and the overall circumstances taken into account, and if a reasonable person would have reached the same probable conclusions.


**Analysis of the Probable Cause**

1.  The victim's assets totaled almost $100,000, and William Rainsberger was, along with his brother and sister, a beneficiary of her will.

Being the beneficiary of someone's estate is not evidence of murder; it is not even a motive absent the establishment of some financial need.  Ruth Rainsberger's will specified that her three children, William, Robert, and Rebecca, were to all equally share in her estate.  Detective Benner, however, concentrated on William even though it was Robert who suffered from money problems; he had lost his job and the bank foreclosed on his house.  By contrast, William's financial situation

---

[8] William Rainsberger said he left his wife's house at 221 South Vine Street in Plainfield sometime between 8:00 and 9:00 am, and then stopped at two Kmarts on the way home looking for television rabbit ears.  The only two Kmarts in Indianapolis (6780 West Washington Street and 5101 East Thompson Road; there are no Kmarts in Plainfield) are on a logical route home for William.  The drive (29.4 miles) would take 38 to 60 minutes during the early morning (Google Maps).  Assuming he spent 10 minutes at each Kmart, this translates into 58 to 80 minutes.  We know he purchased gas at 9:20 am at the Kroger store located at 7101 East 10th Street.  Working backwards, this suggests William left his wife's home sometime between 8:00 am and 8:20 am, consistent with his statement.

was reasonably comfortable.  This investigative focus made little sense.  Detective Benner later tried to explain why, given this fact, William and not Robert was his main suspect:

> William was the main suspect because he is the primary caregiver.  He goes there every day ... I had no reason to believe that Robert was over there.  He said he hardly went over there. (civil deposition, September 27, 2016, p. 74)

2.   Cell phone records show William Rainsberger was in the area of the murder (Shortridge and 10th Street) during the relevant time period when the murder likely occurred.

This statement is not true.  T-Mobile, William Rainsberger's carrier, was only able to provide police cell tower information for voice calls (Exhibit 28).  The call records and cell tower data for William's telephone (317-331-1059) show that he did not make or receive any voice calls from 5:41 pm on November 18, to 7:23 pm on November 19, 2013.  In other words, during the so-called "relevant time period" for the murder, there was no phone data available that could be used to establish William's location.

The very claim that William Rainsberger was in the area of the murder when it occurred is misleading on two counts.  First, police never established an accurate "relevant time period" for Ruth's murder.  The standard method of doing so is to bracket the murder time by when the victim was last confirmed to be alive (by someone other than a suspect), and when she was found dead. This time range may then be narrowed down by other factors (e.g., Ruth Rainsberger's failure to answer the door when her lunch was delivered).  A homicide investigator will normally obtain a time of death estimation from a pathologist or medical examiner.  In this case, as the victim did not die until after she was in a hospital, the next best approach would be to seek expert medical and forensic opinions for the estimated time of her wounds to help establish the most "likely" time of the attack.

Detective Benner engaged in circular reasoning – he believed William Rainsberger was a suspect because he was in the area of the murder during the "relevant time period," which he defines as the morning of November 19th.  However, the reason he defined the morning as "the relevant time period" was because Rainsberger was not in Indianapolis the prior night (see highlighted section below).

> Richard Waples:  "I have looked at those records, and I want to know what you determined was the relevant time period."
>
> Detective Benner:  "Between the morning and when he called 911, his Kroger card showed that he was across the street at the Kroger gas station around 9:00 in the morning too.  So, I mean, the relevant time period is the morning hours leading up to when she was found.  I mean, we've got the 10:30 time that the Meals on Wheels person was there, so sometime before that up until the time she was found."
>
> Waples:  "All through the night before?"
>
> Benner:  "Well, we didn't – yeah, I suppose you can say through the night before."
>
> Waples:  "Well, I think you said that right.  You didn't know when the attack occurred on the mother."

Benner:  "I don't have a definite time, no, but –"

Waples:  "Your best guess is it happened before 10:30 because what's when Delbert Pickens tried to contact her?"

Benner:  "Yes."

Waples:  "But don't know whether it happened an hour before 10:30 or at midnight or the night before; correct?"

Benner:  "We don't – we didn't pinpoint the time, no."

Waples:  "Right.  So a relevant period for the attack on the mother includes the night before; right?"

Benner:  "Well, my relevant time period was in the morning because I – it appears to me that he was there [Plainfield] over night.  She wouldn't have survived that long."

Waples:  "You didn't see her.  You weren't there."

Benner:  "No, but I know the wounds that she sustained were pretty serious.  And they totally immobilized her and put her out.  She was barely hanging on at 3:00."

Waples:  "Do you have any medical training?"

Benner:  "No."  (civil deposition, September 27, 2016, pp. 88-90).

Detective Benner stated he did not believe the victim would have been able to survive for long, though he did not obtain an expert opinion.  In fact, Ruth Rainsberger survived for 11 hours after her discovery, from 3:37 pm until 2:42 am the next day.  At another point, Benner admits, "We can't specify what time it [the attack] happened" (p. 59).

Second, the statement that "William Rainsberger was in the area of the murder (Shortridge and 10th Street)" misrepresents the reality.  All that can be determined from cell phone records is that a phone was in the catchment area[9] of the closest cell tower (and sometimes the second closest tower if the closest is busy).  Detective Benner fails to mention in the probable cause that William lived in that same catchment area; his house was only half a mile from his mother's apartment.

3.  Cell phone records show a call was made from the victim's landline to Robert, William Rainsberger's brother, an hour before William claimed to find his mother's body.

It has been established that there was no call from William to Robert Rainsberger at this time (Benner bail hearing testimony, July 17, 2014, pp. 25-26, 44-46; Benner civil deposition, September 27, 2016, pp. 42-44).  Police investigators were careless and misinterpreted telephone records, failing to recognize that the call to Robert Rainsberger's cell phone had been routed to a Chicago area code.  Chicago is on Central Standard Time, an hour earlier than Indianapolis which is on Eastern Standard Time.

---

[9] A cell tower catchment area varies from hundreds of square miles in rural areas to several square miles in a congested urban area.  Indianapolis has a population density of 2,264 people per square mile; therefore, thousands of individuals lived within a five-minute drive of North Shortridge Road and 10th Street (United States Census, 2010).

Detective Benner became aware of this mistake sometime before William Rainsberger's bail hearing in July 2014.  He later admitted he had a record of the telephone call time error in December 2013:

Richard Waples:  "And on lines 486 and 487, there are two calls there to Ruth Rainsberger – or from Ruth Rainsberger's landline to Robert's cell phone?"

Detective Benner:  "Yes."

Waples:  "And do the results of Officer Bierce's analysis of these show that both of those calls were made at 3:40, one at 3:40:38, one at 3:40:51 P.M.?"

Benner:  "That's what it says here, yes."

Waples:  "All right. And you had this record back in December of 2013 and in May of 2013 [should be 2014] when you prepared your affidavit of probable cause; correct?"

Benner:  "Yes."

Waples:  "But yet you didn't write in your report – in your affidavit of the probable cause that the AT&T records from Ruth's landline showed in Exhibit 3 that there was a call made at 3:40, not 2:40 and that the results of Officer Bierce's analysis of Robert's cell phone records showed those two calls being both at 3:40?"

Benner:  "I'm sorry.  What was the question?  Did I have this?"

Waples:  "You had it and you didn't put that in your affidavit of probable cause."

Benner:  "That's correct."

Waples:  "Instead you reported it as 2:40?"

Benner:  "Yes."  (civil deposition, September 27, 2016, pp. 43-44)

In early December 2013, Detective Benjamin Bierce, a homicide investigator who worked on telephone records for the Indianapolis Metropolitan Police Department, sent Ruth Rainsberger's AT&T landline call records to Detective Benner (email from Benjamin Bierce to Charles Benner, December 3, 2013).  These records showed only two calls on Ruth's landline for November 19, 2013:  the first, an incoming call (from Delbert Pickens) at 10:30 am; and the second, an outgoing call (from William to Robert) at 3:41 pm.  There was no call at 2:40 pm.

Richard Waples:  "What's it show a call to?"

Detective Benner:  "Oh, which call?  3:41?"

Waples:  "Yes."

Benner:  "Yeah, it shows a call to Robert."

Waples:  "Okay.  From Ruth's landline?"

Benner:  "Yes."

Waples:  "And it doesn't show another call from – to Robert at that time or at 2:40?"

Benner:  "Not on these records, no.  I already told you they didn't."  (civil deposition, September 27, 2016, p. 41)

Despite having this information, and despite the fact that both William and Robert Rainsberger told him there was only the one (3:40 pm) telephone call between them, Detective Benner failed to investigate this discrepancy in timing.  He used the non-existent 2:40 pm call as an integral part of his probable cause affidavit, noting that it occurred "hours after it is presumed that Ruth Rainsberger received her injuries" (May 22, 2014, p. 3).  This was a damning allegation; William's presence in his mother's apartment an hour before he called for help pointed towards his guilt.[10] But this never happened, and Benner knew or should have known it never happened.  He didn't find it necessary to understand the telephone records or resolve the time discrepancy before he used the (incorrect) information against William.  He took no responsibility for fixing the error and later tried to shift responsibility to Detective Bierce:

> David Hennessy:  "And if you look at those documents [Robert Rainsberger's cellular phone records], in about ten minutes you can see that the 2:40 call was routed through the 773 area code and that the landline did not have a 2:40 call, correct?"

> Detective Benner:  "Ben Bierce gave me that information, so you're going to have to ask him that question.  He does the phone records."

> Hennessy:  "Well, I'm just – you had the documents."

> Benner:  "The information I had was that the call was made at 2:40 and that's what I put in the probable cause."

> Hennessy:  "What information?  Where did you get that information?"

> Benner:  "From Bierce."

> Hennessy:  "Okay.  I'm asking if you had the documents, because see, I looked at the same documents and it took me ten minutes to figure out that the call got routed through area code 773.  I Google'd 773 and found out it was Chicago."

> Benner:  "Good job."

> Hennessy:  "So I want to know what work you did as a detective before you put a false – fact in the probable cause affidavit."  (bail testimony, July 17, 2014, pp. 44-45)


4.   In the intervening hour, William Rainsberger threw a "straight object" into a garbage can in front of a Kroger store located across the street from his mother's apartment.  He looked around for cameras both before and after doing this.

Detective Benner's use of innuendo is more obvious here than anywhere else.  He testified to his perceptions and beliefs about this mysterious object two months later:

> Detective Benner:  "Mr. Rainsberger exits his vehicle and walks towards the store.  He looks around.  He walks up to – he pulls something out – I don't know if it's from his waistband or his pocket.  It looks like some type of object, metal object.  He walks straight forward to the trash can, places it in the trash can –"  (bail testimony, July 17, 2014, p. 17)

---

[10] It also pointed towards Robert's guilt, something Detective Benner conveniently ignored.  Moreover, it left unexplained the fact that Ruth Rainsberger was still alive when emergency medical assistance arrived at her apartment.

David Hennessy:  "And, I'm sorry, he takes an object – did you say a long, narrow object?"

Benner:  "Yes."

Hennessy:  "All right.  And in your opinion, Detective, is it consistent with something like the shape of a metal pipe or a hammer handle?"

Benner:  "It could be a pipe or a pry bar of some kind.  It didn't look like a hammer to me, but ..."  (bail testimony, July 17, 2014, p. 18)

When he is later asked why he thought the object was metal, he answered:

David Hennessy:  "Well you said metal object."

Detective Benner:  "Well I said it just appeared to it just appeared to me to be a metal object."

Hennessy:  "Now I'm wondering what about it made you think metal."

Benner:  "It didn't look like a straw or anything like that so I just figured it was metal.  I said it appeared so I meant just what it appears to be to me."  (criminal deposition, November 25, 2014, p. 69)

The Kroger surveillance video retrieved by police contains 14 frames from the point when something can first be seen in William Rainsberger's hands to the point when he deposits the object in the trash bin next to the Redbox outside the main entry.  In the first four frames, William appears to be holding an object in his right hand (see Figure 2).  He makes no effort to hide the object, even though the man on the left in this frame could well have observed him (as can be seen in earlier frames).  The object appears to be straight and thin, though it may be that only the object's side or edge can be seen from this camera angle.  It does not look thick enough to be a hammer, pipe, or pry bar.  There is no way to determine the object's composition, and certainly no indication it is metal, as it is never in focus and cannot be clearly seen.  In the next eight frames, its shape is vague though it appears William passes the object from his right hand to his left.  In the last two frames, the object no longer appears straight and thin, but rather looks more rectangular in shape[11] (see Figure 3).

After placing the object in the trash bin, William Rainsberger checks out the movie selections on the Redbox.  As a woman walks up to the doors, he briefly turns to his right to look behind him (towards the parking lot).  This is not the direction one would look for surveillance cameras, only occurs after the item has been placed in the trash bin, and happens so quickly (about a second) as to preclude any reasonable conclusion he was looking for something.  Moreover, while Rainsberger was wearing a "hoodie," he did not have the hood pulled up to cover his head, which would be a logical precaution for someone worried about surveillance cameras or witnesses.  **The objective reality is that William's movements were perfectly normal and not at all suspicious.**

---

[11] The object's shape, while never clear, can be better seen on the Kroger video than in the still frames.  Police investigators did not request a forensic video analysis, which would have provided a more scientific determination of the object's shape and dimensions.



Figure 2.  Kroger Main Entry Video Frame (Thin Object).



Figure 3. Kroger Main Entry Video Frame (Rectangular Object).

5.   There were no indications of a burglary to the victim's apartment – no signs of forced entry (William Rainsberger had a key), no evidence of ransacking, and nothing stolen.

Detective Benner ignored William Rainsberger's statement that he had found the door to his mother's apartment unlocked.  An intruder might have gained entry by simply knocking on the door and then pushing inside when the victim answered (breaking down a door is noisy and risky inside an apartment building).  William also told police about certain items that turned up missing, including his mother's purse, credit and debit cards, a small coin purse, jewelry, and prescription medicine.  However, Benner was reluctant to accept that anything had been stolen from Ruth Rainsberger's apartment.

David Hennessy:  "So the purse was missing?"

Detective Benner:  "I never – I don't know if she had a purse."  (bail hearing testimony, July 17, 2014, pp. 58-59)


David Hennessy:  "And uh you still have not identified anything that was stolen from her apartment?"

Detective Benner:  "No."  (criminal deposition, November 25, 2014, p. 69)

However, Detective Benner recovered a black purse in a dresser drawer in the back bedroom of the apartment.  He assumed this was the missing purse reported by William Rainsberger, even though this purse was new, empty, and still had its price tag attached.

Box:  "Did you indicate to Detective Benner that there were two purses, that our mom had two purses?"

Rainsberger:  "Yeah."

Box:  "I'm handing you what's been marked as Exhibit 22.  Do you recognize that?"

Rainsberger:  "That is my mother's new purse that she does not use and keeps in a drawer."  (civil deposition, September 27, 2016, p. 113)

Crime Scene Specialist Lane testified the purse recovered by detectives from the victim's apartment was empty, still had its store tags attached, and did not appear to be the missing purse; moreover, she confirmed that Detectives Benner and Tudor knew all this (deposition, September 8, 2014, pp. 14, 17-18).  She also noticed that some of the drawers in the credenza and the night stand in the bedroom had been opened:

David Hennessy:  "Uh what do you recall the appearance of the drawers being in?"

Jennifer Lane:  "Um the four I believe there were six in the center um I guess you would call that a credenza um type, the longer shorter one, um there was six drawers total.  The top four were slightly opened um and after I photographed those and then opened down further it didn't appear they had actually been gone through at all.  The smaller night stand um that was to the left of that, the top drawer was more fully opened un and there wasn't really enough items in that drawer to be able to determine whether they had really been gone through or not there was just a few miscellaneous items in that drawer."

20

Hennessy:  "So you can't tell if anything is missing from the drawer?"

Lane:  "No."  (criminal deposition, September 8, 2014, p. 13)

Detective Benner's antipathy towards the burglary/robbery theory manifested itself in several ways.  When questioned as to whether he'd asked Rebecca Rainsberger about items missing from her mother's apartment, he answered, "How would she know if anything was taken if she wasn't in the place when it happened?" (Benner bail hearing testimony, July 17, 2014, pp. 60).  This response was nonsensical as Benner knew Rebecca visited her mother weekly and had been inside her apartment many times.

Detective Benner went so far as to alter the facts in his affidavit for probable cause in an effort to downplay the possibility of a burglary.  He claimed, "There was a lockbox in the back room in plain view that contained savings bonds belonging to the victim.  The victim's checkbook, some cash and credit cards were still present inside the apartment" (May 22, 2014, p. 1).  But there were no savings bonds, the lockbox was in a closet, and the cash and other items were in a plastic food container.  The victim's credit and debit cards have never been recovered.  When asked about the discrepancy, he responded:  "I didn't pay a whole lot of attention to them.  It didn't really make that much difference at the time" (bail testimony hearing, July 17, 2014, p. 47).

6.   William Rainsberger told people his mother's head had been bashed in even though he had not seen the actual injury.  This suggests he had knowledge of how she sustained her injury.

This issue is important because it is the only allegation in Detective Benner's probable cause that distinguished William Rainsberger from his siblings.  When William arrived at his mother's apartment, he saw her lying in a pool of blood on the floor, her head covered by a bloody blanket.  Unfortunately, there are no photographs of the blanket *in situ*.  The autopsy report describes multiple blunt force traumatic injuries to the victim's head, some longitudinal or "Y" shaped, involving depressed skull fractures (p. 6).  The blanket had been placed over her head before she was hit and was "stuck right to the wound area" (Fireman Wooldridge criminal deposition, September 8, 2014, p. 6).  Thus, it may have shown the underlying pattern of wounds.  There were no firearms, bullets, or shell casings at the crime scene, no smell of gunpowder, no blood splatter on the wall, no entry or exit holes in the body of the victim, no reports of shots fired, and no gunpowder (stippling or soot) on the blanket.  It does not seem unreasonable that William thought somebody had "bashed her head in."[12]

Fireman Wooldridge assumed the wound was a bullet hole (police statement, December 4, 2012, p. 6).  However, it was later established that he had very little experience with gunshot wounds.[13]  He also admitted there was no other evidence at the crime scene to support this conclusion (pp. 8-9).  When the EMS paramedics arrived at the apartment, he told them he thought the victim had been shot.  There was apparently no discussion between them on this issue and

---

[12]   While William Rainsberger was correct about what had happened to his mother, he was not accurate regarding the type of weapon used.  He told Detective Benner it looked like she had been hit with a lead pipe or something similar (W. Rainsberger police statement, November 20, 2013, p. 7).  The autopsy concluded the weapon was a hammer-like object.

[13]   The appearance of a gunshot wound varies by the type and caliber of firearm used, trajectory distance, impact point, whether the wound is an entrance or exit hole, and other factors (Di Maio, 2016).

Wooldridge did not explain the reasons for his conclusion to the paramedics.  EMS personnel passed on this information to Officer Price and to medical staff at Wishard Memorial Hospital (now Eskenazi Hospital).  The blanket was removed by Wooldridge when he first arrived at the apartment, so none of the EMS responders, police, or hospital personnel ever saw the victim with the blanket over her head.

Detective Benner did not get to the crime scene until after EMS had transported Ruth Rainsberger.  He did not have any crime scene photographs of her body in the apartment.  However, he somehow still thought it reasonable to conclude, "Without the blanket being removed from the victim's head to actually see her head, I mean, there was no way to tell that she was bashed over the head or her head was caved in" (bail hearing testimony, July 17, 2014, p. 9).  He further believed, "all of the personnel present were operating under the assumption from what they had seen that it had been a gunshot wound" (p. 11), and "all the police and first responding personnel thought it had been a gunshot wound" (p. 15).  But Benner did not talk to anyone other than Fireman Wooldridge (civil deposition, September 27, 2016).  This is one of several assumptions that Benner failed to verify.

For this issue to have evidentiary significance, Ruth Rainsberger's injuries, when viewed with the blanket over her head, would have to have been so obviously the product of a gunshot wound that no reasonable person could misinterpret them for blunt force trauma.  However, no one other than fire department personnel saw Ruth with the blanket on her head, and there is no record that anyone other than Fireman Wooldridge thought her wound was from a firearm.  And Wooldridge, admittedly inexperienced in gunshots,[14] was wrong.

Detective Benner did not investigate or attempt to understand why there was this discrepancy in the interpretation of the cause of the victim's injuries.  He twice interviewed William Rainsberger, but never asked what he observed or why he thought his mother's head had been bashed in.  He also failed to ask Fireman Wooldridge what he saw or why he thought Ruth had been shot in the head.  Later, Wooldridge explained to David Hennessy:

> Just by the way the cloth was and the cloth had somewhat of a hole in it right where the wound was and then when I pealed it off there was a mark at that time on her forehead that I believed to be an entrance wound.  (criminal deposition, September 8, 2014, p. 8)

However, William Rainsberger did not notice the hole in the blanket because of all the blood.  He could not see the mark on his mother's forehead because it was covered by the blanket he left in place (according to the autopsy report, this mark was only a superficial laceration).  What William saw was different from what Fireman Wooldridge saw.  When he was finally asked about his rationale, three years later, he simply explained, "I have no idea except I don't know how many people get shot on the top of the head" (W. Rainsberger civil deposition, September 27, 2016, p. 72).

Benner interpreted William's comments about his mother's head being bashed in to the 9-1-1 operator and Fireman Wooldridge as knowledge.  However, guessing isn't the same as knowledge.  When his brother, Robert, asked him what had happened to their mother, William told him he didn't know (Robert Rainsberger police statement, November 19, 2013, pp. 7-8).  When viewed

---

[14] Fireman Wooldridge's mistaken conclusion is later elevated to a "medical opinion" by Detective Benner's counsel (defendant's memorandum of law in support of motion for summary judgment, January 13, 2017, p. 3).

in the context of all the information, particularly the failure by detectives to investigate the cause of the discrepancy, Benner's unverified assumption about William's guilty "knowledge" is far from reasonable.

7.    After calling 9-1-1, William Rainsberger left his mother unattended in the apartment and went outside until police arrived.  He did not ask detectives how she was doing or if he could go to the hospital to see her.  He failed to exhibit grief over her murder or show interest in the progress of the investigation.

Interpreting the demeanor of the victim of a crime is problematic because people respond to tragic events in a number of different and individual ways.  In the past, for example, reports by sexual assault victims who did not display "expected" responses to their attacks were sometimes not believed by police officers.  We now know that psychological trauma such as rape trauma syndrome can disrupt normal physical, emotional, and cognitive behavior.  Reduced affect display ("emotional blunting"), in which an individual fails to express "normal feelings," can result from post-traumatic stress originating from, amongst other causes, violent crime victimization.  Robert Rainsberger described William as being "in shock" after he found their mother covered in blood on the floor of the apartment (civil deposition, December 20, 2016, p. 22).

Detective Benner characterized William Rainsberger's actions after discovering his mother to be callous and suspicious.  In fact, William did exactly what he should have done in such a situation – he checked for responsiveness, determined his mother was still breathing, and established her bleeding had **stopped** (American Red Cross, 2011; Mayo Clinic, 2017; U.S. Department of Health and Human Services, 2016).  He decided not to remove the blanket stuck to the top of her head for fear of causing further damage and concluded prompt emergency medical help was immediately needed.  He then called 9-1-1, checked for an intruder in the apartment, and tried not to touch anything he did not have to.  He went outside when he heard sirens and made sure the first responders quickly found the apartment (W. Rainsberger police statement, November 19, 2013).  Even Benner admitted that the buildings in the Jeffersonian apartment complex looked similar and have multiple entrances and exits (bail hearing testimony, July 17, 2014, pp. 35-36).  Another man may have acted differently under such circumstances, but that does not mean his actions would have been better ones.  As even Benner admitted during his civil deposition, "I mean, everybody could have their own opinion on that" (September 27, 2016, p. 18).

In his probable cause affidavit, Detective Benner claimed, "At no time did Robert or his brother, William, ever ask me how their mom was doing[15] or if they could get to the hospital to see her" (May 22, 2014, p. 2).  This is completely misleading as Benner omitted important facts here.  Telephone records in Benner's possession showed William was in constant communication with his sister, Rebecca, who was at the hospital with their mother.  From 4:20 pm to 6:44 pm, they exchanged a total of 27 text messages (SMS or MMS), 16 of which were incoming to William from his sister, and 11 of which were outgoing (Exhibit 28).  Two of those texts were actually received by William at 6:44 pm while Benner was interviewing him at police headquarters; his

---

[15]    Detective Benner was at police headquarters with William and Robert Rainsberger, not at the hospital with Ruth.  It is therefore unclear why Benner thought William would think to ask him about his mother's condition.

interview began at 6:12 pm and ended at 7:18 pm (W. Rainsberger police statement, November 19, 2013, pp. 1, 28):

> William Rainsberger:  "No, he's never been married.  Uh... oh, for Christ's sake.  Pardon me.  'Cause it's just... I'm, I'm really out of it, 'cause I don't know whether my mom is alive or not."

> Detective Benner:  "I understand."

> Rainsberger:  "And then this is from my sister.  I talked to the doctor and saw mom.  She's not good, has breathing assistance fluid and pain, fluids and pain meds.  They're moving her to IC.  Are you coming here?  Ask for a Chaplain House at emergency department intake.  So and I, I (Inaudible) from... I don't know how to grade her from here."

> Benner:  "Uh; we'll get you there."

> Rainsberger:  "Okay.  Uh; you had asked..."  (police statement, November 19, 2013, pp. 13-14).

Detective Benner characterized William Rainsberger's subsequent absence of direct communication with him as lack of interest in the investigation.  However, at this point he had made it clear to the family that William was a suspect.  Benner seemed not to consider the likelihood that his suspicions and actions were the cause of this communication breakdown.  Moreover, when Rebecca Rainsberger did try to contact him, he refused to return her calls.

> Detective Benner:  "I spoke to Becky the day after the autopsy, and I think I made it pretty clear at that point that William was a suspect in the case.... But it was very clear to the family that William was a suspect in the case, so I saw no need to call her and tell her that at that point."

> David Hennessy:  "So you never returned her calls."

> Benner:  "I did not, no."  (bail hearing testimony, July 17, 2014, p. 30)

When William, Robert, and Rebecca Rainsberger attended the hospital the evening of November 19, 2013, Dr. Streib testified that he did not think their demeanor was unusual or their actions inappropriate (criminal deposition, March 27, 2015, p. 14).

8.   William Rainsberger refused to take a polygraph test and got angry when asked to do so by police detectives.

Detective Benner made much of the fact that William Rainsberger elected not to take a polygraph examination:

> Still up to this point everything was circumstantial for the most part; but, I mean,  we used that polygraph as a tool to gauge where people are coming from.  A lot of family members, not all, would say 'Yes, hurry up.  Give me a polygraph.  Clear me.  I want you to find out who killed my mother."  They wouldn't be yelling and screaming and say, 'No way.'  His reaction was out of control, so it made Detective Tudor and I both believe that, yes, we are on the right track.  (civil deposition, September 27, 2016, p. 67)

In my experience, individuals who are not involved in a crime are willing to take a polygraph to prove their innocence and assist in the investigation.  (affidavit of Charles Benner, January 12, 2017, p. 4)

However, Detective Benner knew that many people do not respond positively to a polygraph test request (see highlighted section below).  He also acknowledged that he had not been honest with the Rainsberger family and had used a pretext[16] to get them to attend police headquarters:

If I told them I them wanted to come down for them to give a polygraph, they probably wouldn't have showed up, so I can say what I want to have them come down there.  (bail hearing testimony, July 17, 2014, p. 33)

The refusal of a polygraph examination is not evidence of guilt.  At this point, William Rainsberger stated he felt they had "already been through enough."  From the beginning of the case – the argumentative 9-1-1 call takers, the patrol officer who locked William in his car, the polygraph deception by Detective Benner – he had been treated poorly by the police.  It was hardly a surprise he no longer trusted them.  Benner was apparently oblivious to how such treatment might have influenced the cooperation of the Rainsberger family.

Kathryn Box:  "And why didn't you go to the hospital at that time?"

William Rainsberger:  "Because my sister was going to the hospital and I was being held by the police."

Box:  "Can you explain 'being held'?"

Rainsberger:  "I was put in the back of a squad car and not allowed to leave."

Box:  "Did you ask to leave?"

Rainsberger:  "Nope."

Box:  "How do you know you weren't allowed to leave?"

Rainsberger:  "Because I couldn't get out of the squad car."

"Was the door locked?"

Rainsberger:  "Uh-huh."

...

Box:  "How long did you stay in the back of the squad car, do you believe?"

Rainsberger:  "May have been as long as an hour.  It was quite awhile."

Box:  "Okay."

Rainsberger:  "I had to go to the bathroom at one point.  I was allowed to do that."

Box:  "So you asked someone if you could go to the bathroom?"

---

[16]   Detective Benner tricked William, Robert, and Rebecca Rainsberger into coming to police headquarters on November 20, 2013, for a polygraph test by telling them he had Ruth's autopsy report which he wanted to discuss with them (Robert Rainsberger civil deposition, December 20, 2016, p. 29).

Rainsberger:  "And they let me, but they had to watch me."

Box:  "Where did you use the restroom at?"

Rainsberger:  "I went outside, on the wall in between my mother's apartment and the church next door."  (civil deposition, September 27, 2016, pp. 86-88)


Box:  "And did you consent to do a polygraph?"

Rainsberger:  "I did not."

Box:  "And why not?"

Rainsberger:  "Because, one, I think we'd already been through enough, and, two, I think polygraphs are BS."

Box:  "Why do you think a polygraph's BS?"

Rainsberger:  "They're not even admissible in court, and after having been lied to about the reason to come down and having been questioned like some kind of fiend, I didn't have any faith in the process anymore and didn't want to partake in what I considered to be a – a silly exercise that – that I would not have considered to be unbiased."

...

Box:  "Did you get upset when Detective Benner asked you to consent to a polygraph?"

Rainsberger:  "Yes."

Box:  "What did you do?"

Rainsberger:  "We were yelling back and forth about the efficacy of such a test and might – their need for me to do it and my anger at them for leading me on and lying about why we were there.  And I said something about it not being admissible in court, and I'm not taking it.  And that did not sit well."

Box:  "Did you yell?"

Rainsberger:  "No more than they did."

Box:  "Did you storm out?"

Rainsberger:  "No.  In fact, it's impossible to storm out of an investigation room with a detective sitting on either side of the table.  They're in the way."

...

Box:  "Do you think there was any usefulness that could have been gained from a polygraph test of you, Robert, or Rebecca?"

Rainsberger:  "No."  (civil deposition, September 27, 2016, pp. 94-96)

William Rainsberger had a right to refuse a polygraph test and such a refusal should never have been used as an element in a probable cause affidavit.  He also had other reasons to be concerned about taking a polygraph.  First, his treatment by the police generally, and Detective Benner's polygraph deception specifically, raised legitimate concerns over investigative bias.  A

proper polygraph examination requires a trained and qualified examiner who conducts the examination and interprets the results in a professional and impartial manner.

There was also another problem. The police wanted polygraph tests administered to all the Rainsberger siblings. A polygraph test, however, has a significantly high false positive rate, so with three different tests there was roughly a 50/50 chance one of them would have failed even if they were all truthful (National Research Council, 2003). The indiscriminate use of the polygraph at such an early stage of the case, when much still needed to be determined, was premature and smacks of an investigative "quick fix". Moreover, asking the victim's family members to take such a test the very day their mother died was both insensitive and a poor tactical approach. William Rainsberger cooperated in other aspects of the police investigation, and a professional straightforward request at a timelier point might have resulted in better cooperation.

In his probable cause affidavit, Detective Benner claimed that, following his effort to get the Rainsbergers to take a polygraph, "All three siblings stormed out and I have not heard from them since" (p. 3). This was an exaggeration of their behavior and mispresented the circumstances; Benner made no note of his trickery or that the detectives had yelled at William and accused him of murdering his mother.

Robert Rainsberger had a very different impression from Detective Benner of how this meeting at police headquarters went.

Kathryn Box: "So after you were asked to do a polygraph and you refused, what happened?"

Robert Rainsberger: "Benner was pissed."

Box: "Okay."

Rainsberger: "He was – he was angry the whole time we were there, but that pissed him off more than anything."

Box: "Okay. And what did Benner do? Or how could you tell that he was pissed?"

Rainsberger: "They spoke to Bill first, then me, and he just had – well, when we first got there, he talked to my sister like she was a petulant little seven-year-old, and he wanted to talk to her first since he didn't talk to her the night before. And he was just angry. He was angry as soon as we got there. Becky didn't stand up as soon as he told her to come with him, so he yelled at her. Then he talked to Bill. Apparently he didn't like what Bill had to say, because by the time got to me, he was fit to be tied. He asked me – he asked me, "So I suppose you don't want to take a polygraph either." I said, "No." And then he started yelling and he started bringing out statistics about whatever and there was a whole lot of cussing between he and I, a whole lot of yelling, and I – to Tudor's credit, he broke it up, so." (civil deposition, December 20, 2016, pp. 30-31)

Contrary to the probable cause affidavit, Rebecca Rainsberger did try to contact Detective Benner; however, he refused to return any of her calls (Benner bail hearing testimony, July 17, 2014, p. 30; Benner civil deposition, September 27, 2016, pp. 71-75; W. Rainsberger civil deposition, September 27, 2016, pp. 95-96).

**Summary Evaluation**

Of the eight allegations in Detective Benner's affidavit for probable cause, only five were actually items of evidence; being a beneficiary of a will, living near a sick mother, and refusing to take a polygraph test from suspicious detectives are not evidence of murder. One of these items, the alleged telephone call from the victim's landline at 2:40 pm, was completely false. The remaining four allegations contained a mix of misinterpreted facts and falsehoods:

1. William Rainsberger threw something away in a trash bin at Kroger's, but it is unclear what it was or what shape it was. There was absolutely no evidence it was metallic and no logical reason to believe it was a murder weapon. There was nothing captured on any of the videos that showed him looking around for surveillance cameras.

2. William found Ruth's apartment door unlocked, and her purse, credit and debit cards, jewelry, and prescription medication were missing. This was all evidence of either a burglary or a robbery.

3. William (correctly) thought his mother's head had been bashed in. In his probable cause affidavit, Detective Benner suggested it was not possible for someone to conclude this without having seen the wound, an assumption he made without actually seeing the victim at the crime scene himself. Moreover, he never bothered to ask either William or Fireman Wooldridge about the basis for their different conclusions.

4. Benner alleged William failed to show grief over his mother's murder and was uninterested in the investigation. This was simply not true, and Benner mischaracterized William's behavior and misrepresented his actions. The probable cause was misleading and omitted important facts (e.g., William was in constant communication with his sister who was at the hospital) and relevant circumstances (e.g., William knew he was a suspect from the day his mother died; Benner would not return telephone calls from the Rainsberger family).

Dissecting Detective Benner's probable clause affidavit and evaluating its various statements by their accuracy provides a useful perspective on the evidence in the case. In the following summary of key alleged facts, gray highlighted sections are untrue; blue highlighted sections are misleading; and yellow highlighted sections are facts or events that are not evidence of murder. A review of what is left over (the sections that are not highlighted) reveals the weakness of the probable cause used by Benner to justify the arrest of William Rainsberger:

William, his brother, and his sister are equal beneficiaries of Ruth Rainsberger's will.

Cell phone records with tower site locations do not show William outside of the area of his mother's apartment during the relevant time period of the crime.

At 2:40 pm, Robert receives a call from his mother's landline, hours after it was presumed she was attacked.

At 3:30 pm, video shows William across the street at a Kroger's placing a straight object into a trash bin. He looks around for cameras as he did this, before he entered the store, and when he returns to the parking lot.

At 3:40 pm, William went to his mother's apartment where he called 9-1-1 and told the operator someone had bashed her head in.  William then went outside, leaving his mother unattended until police arrived.

A paramedic thought it strange William did not check on his mother's condition by removing the blanket covering her head.

Fire department, ambulance, and hospital personnel all thought Ruth may have been shot.

The fact that William said his mother's head had been bashed in without having seen her head indicated he knew how she was attacked.

There were no signs of forced entry into the victim's apartment.  A few drawers in her bedroom were pulled out partway but there was no indication they had been rifled through.  A large number of boxes in a back room were untouched.  There was a lockbox that contained savings bonds in plain view in the back room.  The victim's checkbook, some cash, and credit cards were still there.

At no time did William ask Detective Benner how his mother was doing or if he could go to the hospital to see her.

William refused to take a polygraph test when asked by detectives.  He then stormed out of the police station with his brother and sister.

Detective Benner has not heard from them since; they have never asked him if he has any suspects or other information on the case.

Detective Benner's probable cause affidavit contained falsehoods, misleading statements, irrelevant information, and unreasonable conclusions.  However, his rationale for believing William Rainsberger murdered his mother has apparently now changed (defendant's memorandum of law in support of motion for summary judgment, January 13, 2017, p. 12; see also affidavit of Charles Benner, January 12, 2017 p. 6).  Based on "all the evidence," Benner currently asserts he thought William was guilty because:

1.  He had the opportunity.

2.  He had a financial motive.

3.  He knew specific details about the victim's injuries.

4.  His behavior following the incident was suspicious and uncommon.

But, as discussed above, William Rainsberger had no more opportunity than thousands of other people.  He had little need for money, and did not benefit to any greater extent than his siblings did from his mother's death.  Based on what he saw at the crime scene, he thought someone had hit his mother in the head, perhaps with a lead pipe (of the two "specific details" William provided, only one was accurate).  Detective Benner did not see the victim at the crime scene and had no idea what William saw; he only knew that a fire department paramedic with little experience with gunshot wounds incorrectly concluded Ruth had been shot.  He did not bother to ask William exactly what he observed or why he reached the conclusion he did.  Similarly, he failed to ask Fireman Wooldridge those same critical questions.  Finally, Benner mischaracterized William's behavior and mispresented his actions following the discovery of his mother's body.  William behaved reasonably, normally, and logically given the totality of the circumstances.

**Confirmation Bias in the Rainsberger Murder Investigation**

The police investigation of the Ruth Rainsberger murder suffered from tunnel vision and confirmation bias:

1. Detective Benner rushed to judgment and quickly decided William Rainsberger had killed his mother.

2. Detective Benner suffered from tunnel vision and failed to properly investigate other viable theories for the murder.

3. Detectives exhibited confirmation bias in their search, interpretation, and recall of evidence.

These points are discussed in detail below.

**Detective Benner rushed to judgment and quickly decided William Rainsberger had killed his mother**

Police immediately treated William Rainsberger as a suspect, not as the son of a murder victim. He had just discovered his mother, bludgeoned and unconscious. But rather than letting him to go the hospital or providing any sort of counselling, he was locked in the back of a police car and later taken to police headquarters. Even though detectives did not formally place him under arrest – and have to read him a *Miranda* warning – he was not told he was free to leave (Benner criminal deposition, November 25, 2014, p. 70). His vehicle was searched and the handgun he owned seized by investigators from his home. When the police were finished with him, he had to walk back to the Jeffersonian Apartments for his vehicle.

Detective Benner's suspicions emerged shortly after he arrived at the victim's apartment. He soon came to the conclusion that the crime scene did not look like it involved a burglary or a home invasion robbery:

Yes, and the not – there's no forced entry. I mean, nothing taken that I can tell. Nothing rifled through. The totality of the circumstances in the residence when I went in – I've been in plenty of apartments that had been burglarized. Whether or not there's an actual assault at the time or not, they rifle through everything.

To kill somebody without forced entry and then leave with nothing just didn't make any sense to me. It's been my experience that little old ladies, so to speak, keep a lot of cash in their house, usually in the closet, under the bed. None of that stuff was checked, gone through.

Not to mention the fact that we basically learn in homicides schools and training that signs of personal attachment to the victim is cover up their face so they can't see you during the crime. Her head was completely covered with the a blanket, so it looked like it was personal.

All those things together, you could say, seemed suspicious to me at the time. (civil deposition, September 27, 2016, pp. 19-20)

Offenders differ in their actions and behaviors and there may be considerable variation in crime scene characteristics. Experienced investigators know things are not always what they first appear, so it is important to question assumptions and keep all reasonable options open. Detective Benner, however, failed to consider the very real possibility that the murder was a burglary or robbery gone bad. If this is what happened, the offender likely panicked after striking Ruth Rainsberger, quickly grabbed whatever was available, and then fled the scene.

Detective Benner apparently dismissed the idea that someone might have tricked Ruth Rainsberger, who suffered from dementia, into opening her apartment door.[17] Yet he had questioned all three siblings on this point. William said that while he didn't think his mother would let a stranger into the apartment, she would open the door if someone knocked on it to see who was there because she couldn't reach the peep hole (police statement, November 19, 2013, pp. 5, 24-25). Robert wasn't sure if she'd answer the door, but could see her doing so (police statement, November 19, 2013, p. 7). Rebecca didn't know if she would unlock her door for a stranger (police statement, November 20, 2013, p. 3). Mari Bilger, William's wife at the time, thought Ruth would open the door for someone she didn't know (civil deposition, December 20, 2016, p. 13). Ruth may have been more likely to open the door if she thought the person was someone from her building or Delbert Pickens with her lunch (the small possibility exists that the offender was inside the apartment when Pickens called). She had also left her door open before (Kevin Walker criminal deposition, June 23, 2015, pp. 15, 34-35).

The association between the covered face of a murder victim and a personal relationship with the offender is based only on anecdotal experience; there have been no empirical research studies on the subject and no establishment of the error or false positive rate (i.e., how often any such relationship does occur in relation to how often it does not occur). The connection is mentioned in the *Crime Classification Manual* (Douglas, Burgess, Burgess, & Ressler, 2013), the product of a project originally conducted by the FBI's National Center for the Analysis of Violent Crime (NCAVC). However, the CCM-III describes this behavior, along with washing the victim's body, as an act of remorse or undoing (pp. 30-31), not as an attempt to stop a dead victim from "watching" the offender. Covering the victim's face or body *may* express a degree of remorse and therefore *may* be an indicator of a personal association.[18] However, the fact that the blanket was placed over the victim *before* the attack undermines this conclusion; it may have been used for no other purpose than to prevent blood from splattering on the killer.

On November 20, 2013, the same day Ruth Rainsberger died, Detective Benner contacted her family and asked them to come to police headquarters to discuss the autopsy report. But, in fact, he deceived the family as to the real reason for the meeting – he wanted to give them all polygraph tests. William's refusal solidified the detective's suspicions. "Now, reliable or not, it's still – the reaction I got was very negative, screaming and yelling that they were not taking polygraphs, which at that point was basically when I started treating them like a suspect at that point" (Benner civil deposition, September 27, 2016, p. 67). Detective Tudor accused the family of killing their

---

[17] Ruth Rainsberger's apartment was partly in the basement of her apartment building. However, there appears to be no mention by police of the possibility of an intruder gaining entry though the sliding glass doors or by a window.

[18] The claim that such an association "often" occurs is completely unsupported by any scientific studies (defendant's memorandum of law in support of motion for summary judgment, January 13, 2017, p. 7).

mother for money (p. 69), and Detective Benner told them their mother's assets were going to be frozen (p. 21).

In less than 24 hours from the time of the initial 9-1-1 call, police investigators concluded Ruth Rainsberger was murdered by one of her children; William became their main focus for the simple reason that he was the primary caregiver and visited his mother every day.  This *non sequitur* was reached by detectives at the very start of their investigation – the neighborhood canvas had not been completed, first responders at the crime scene were yet to be interviewed, potential witnesses were not located, and DNA, fingerprint, and other physical evidence analyses would not be completed for several weeks.  They rushed to judgment before having a complete understanding of all the evidence in the case.

The premature judgment of Detective Benner and Detective Tudor was most likely the result of the police investigators being overworked, rushed, and with little time to devote to yet another homicide case:

Detective Benner:  "I was working on probably other cases between six cases between November 19th and when he was arrested so I was – I didn't have the time to keep going back to this case like that."  (civil deposition, September 27, 2016, p. 147)

Detective Tudor:  "At that time I had already had five um homicides."  (criminal deposition, March 30, 2015, p. 3)

The lack of substantive police work on the case, the delays in the investigation, and the rush to judgement by detectives was noticed by the Rainsberger family:

Kathryn Box:  "And why were you most upset with Benner?"

Robert Rainsberger:  "He was the lead detective.  He was the angry one.  He was the one that targeted us with really nothing to go on.  He's the one that – from my understanding, he's the one that sat around for months before bothering to do anything, so, yeah."

Box:  "Okay."

Rainsberger:  "He put in no effort, had us pinned from the beginning, so."  (civil deposition, December 20, 2016, p. 33)

Detective Benner admitted he did nothing on the Ruth Rainsberger murder investigation for almost 10 weeks, from February 23 to May 1, 2014 (criminal deposition, November 25, 2014, p. 53).  This inattention produced a number of gaps in the case.  For example, even though police initially believed Ruth had been shot, they did not administer any form of gunshot residue (GSR) test on William or Robert when they were at police headquarters, and they failed to examine their clothing for blood.  Drink and food containers at the crime scene were not tested for DNA (email from Charles Benner to Marielle Vincent, July 11, 2014).  The murder weapon had not been found, but William's house and computer were not searched for almost seven months; his wife's house was never searched.  Rebecca's DNA and fingerprints were not taken despite police having a warrant for them.  Statements of two prosecution witnesses were not taken and recorded until 16 months after the crime.  These are all indicators of overworked detectives juggling too many cases and failing to give the Rainsberger murder investigation the attention it required.

**Detective Benner suffered from tunnel vision and failed to properly investigate other viable theories for the murder**

Detective Benner quickly focused on William Rainsberger and failed to develop or properly investigate other possible suspects. He told Rebecca his strategy was, "every homicide investigation starts with family" (Rebecca Rainsberger police statement, November 20, 2013, p. 9). His focus here, however, was misplaced. The Federal Bureau of Investigation Uniform Crime Reporting (FBI UCR) data provide information on murder circumstances in the United States by offender-victim relationship (2016). Of the 7,012 murder victims in 2015 where this relationship was known,[19] only 125 (1.8%) were killed by their sons. However, 2,801 (39.9%) were killed by an acquaintance and 1,375 (19.6%) by a stranger; 1,721 (24.5%) victims were murdered by a family member, though a large proportion of these involved spousal offenders.

Even given the investigative viability of a family focus, most of the elements in the probable cause also applied to Robert and Rebecca Rainsberger. However, Detective Benner concentrated on William to the exclusion of his brother and sister. For example, all three siblings were equal beneficiaries of Ruth's will; Robert, in fact, was in much greater financial need than William. And when Sean Hornsby, the maintenance man/groundkeeper of the Jeffersonian, told police he saw Rebecca's vehicle there late Tuesday morning, the day of the murder, Benner decided he was mistaken; he concluded this for no other reason than Mondays were the day Rebecca visited her mother and there was no record of her cell phone being used in that area[20] (bail hearing testimony, July 17, 2014, pp. 40-41). Benner dismissed Hornsby's account, but then more than a year after the crime had happened he uncritically accepted a similar report about William's car from Damon Thomas (Thomas police statement, March 18, 2015, pp. 2-4).

Ruth Rainsberger's apartment building was apparently not located in a good neighborhood of Indianapolis and there were several reported crimes in the immediate area (Law Enforcement Police Reports CAD/Dispatch Search Results, July 23, 2014). Right from the beginning, William warned Detective Benner, "The corner of 10th and Shadeland is not a good place to be in the middle of the night. And I worry about that" (police statement, November 19, 2013, p. 14). Mari Bilger, William's wife at the time, was also aware of these problems:

Mari Bilger: "I knew the apartment to be in a bad area because co-worker had a niece attacked there."

Kathryn Box: "So when you say bad area, do you mean crime, lots of crime?"

Bilger: "Yes."

---

[19] In 2015, there was a total of 13,455 murder victims in the United States. However, in almost half the cases (6,432, or 47.8%), the offender-victim relationship was not known; it is likely that a disproportionate number of these cases involved stranger offenders. UCR statistics do not provide the data necessary to estimate conditional probabilities (e.g., based on victim gender, age, family conditions, etc.).

[20] Counsel for Detective Benner goes so far to state, "Phone records indicated that Rebecca was not near Ruth's apartment at the time of her death" (defendant's memorandum of law in support of motion for summary judgment, January 13, 2017, p. 15; see also p. 10). This conclusion is flawed on two counts. First, the time of "death" (she is actually referring to the time of the attack) is unknown and covers a period of many hours. Second, while phone records can indicate a person was probably in a cell tower catchment area, they cannot prove that someone was *not* in that area; all that can be concluded is that the person likely did not use their phone there.

Box:  "Do you know what types of crime?"

Bilger:  "Somebody was hit on the head and their purse was taken and somebody was raped." (civil deposition, December 20, 2016, pp. 20-21)

As an experienced police officer, Detective Benner should have known about the surrounding crime problems (or at least he could have easily found out).  However, Benner still failed to thoroughly investigate the possibility that Ruth may have been the victim of a home invasion robbery or burglary gone bad.  He claimed:

Well I mean from that point on where I considered him a suspect at that point I also continued to uh to investigate the area around the ports and see if there were any other things going on um that would fit this type of crime I mean this type of crime just didn't make sense to me so nothing I found could compare to it to make me think that somebody else might have been involved.  (criminal deposition, November 25, 2014, p. 27)

But there are clear indications he did not pursue this line of inquiry with any thoroughness. He had written "Apt. H7 – Traffic" in his notes, which reflected information he had received from two tenants in the building regarding a lot of people coming and going from apartment H7, directly above Ruth Rainsberger's semi-basement apartment H11 (criminal deposition, November 25, 2014, pp. 3-4; bail hearing testimony, July 17, 2014, pp. 37-38).  Their suspicion was that this activity related to drug trafficking (there was no lock on the outside door of the apartment building to hinder such traffic).  These reports were not followed up and detectives failed to identify the occupants of H7, let alone interview them – a serious omission given Ruth's missing purse and prescription medicine.

Kathryn Box:  "Did you ever tell Detective Benner that Aricept was taken?"

William Rainsberger:  "I told Benner about a purse and prescription that were later shown by the crime scene records to be missing."

Box:  "So when did this conversation take place?"

Rainsberger:  "November 19th and 20th, 2013."  (civil deposition, September 27, 2016, p. 112)


David Hennessy:  "Did you find any medication in the apartment?"

Detective Benner:  "I don't – there may have been some pill bottles in the kitchen.  I didn't pay any attention to them."

Hennessy:  "Do you have pictures of that [pill bottles]?"

Benner:  "We'd have to check.  I'm not sure."

Hennessy:  "What did you do with the pill bottles that were in the kitchen"

Benner:  "Nothing."

...

Hennessy:  "Did you investigate?  Did you try to find out?"

Benner:  "I had no reason to believe there were any pills taken.  William told me that one medication she was taking for dementia.  I don't think people are going to steal dementia pills."

Hennessy:  "So you just assumed it [pills] wouldn't be stolen?

Benner: "I had no evidence to suggest that there were any pills stolen.  There was nothing –" (bail hearing testimony, July 17, 2014, pp. 58, 59)


Richard Waples:  "But you didn't find any prescription medication in a bottle."

Detective Benner:  "I didn't see any."

Waples: "Did you follow up with any pharmacy to determine whether she had been prescribed any prescription medicine?"

Benner:  "No.  No, Bill said that she was – if she was prescribed any, it was just for dementia so it didn't seem like it had anything to do with the case really."  (civil deposition, September 27, 2016, p. 15)

Detective Benner downplayed this angle from the beginning of the investigation.  He failed to make a record of the victim's medications, assumed without checking that she did not have a prescription with any street value, and claimed he knew nothing about any missing pills.  He dismissed the possibility Ruth Rainsberger's jewelry had been stolen because it was not valuable.  However, Benner, who has apparently been to many burglaries, should have known that the important issue here is the offender's perception.  A drug-addict, particular one who is under the influence of a substance or hurting for his next fix, will steal almost anything with the hope that it will get them high or that they will be able to sell it to someone else and make some money.

It is standard procedure in a homicide investigation to canvas the area in an effort to identify witnesses, suspicious happenings, and routine neighborhood activities (Geberth, 2015).  To do this properly requires some effort, including multiple visits to the site in order to interview people who were not home during previous visits, who are on shiftwork, who might be temporarily out of town, or who were only visiting a resident.  Investigators should have obtained a complete list of all tenants in the victim's building (H), along with their telephone numbers.  But they did not do this.

David Hennessy:  "Did Tracy [the apartment manager] ever tell you how you could get an entire complete list of people that lived there and when and where through like corporate headquarters?"

Detective Benner:  "No I never really needed the list."

Hennessy:  "Did you, why not?"

Benner:  "Cause I was knocking on their doors.  If they don't answer I mean."

Hennessy:  "Well you're getting."

Benner:  "What information do I need from them?  (criminal deposition, November 25, 2014, p. 65)

The cluster of buildings in the Jeffersonian Apartments meant this effort should have been extended to the entire complex, along with nearby houses, businesses, and institutions (e.g., Holy Spirit Catholic School). The area of the crime, along with possible entrance and exit routes should also have been thoroughly searched.[21]   Detective Benner was provided specific information in this regard that was apparently not followed up.

There are a lot of people through, because people cut through going to, uh; they go, there, there's a gate to the Catholic church there. There's people that come through that way. There's people that go to, uh; down towards Eastgate and Eastgate used to be before what's her name took it over. It used to be, uh; kind of a homeless camp. Uh; I have seen people that, you know, it's like, uh; it kind of look a little rough, but I don't want to, I don't know. (William Rainsberger police statement, November 19, 2013, p. 19)

Yeah cause you got like a Catholic school right next door to it and they had the gate right there so yeah I mean it was a lot of it now you you correct on that a lot of people did take the shortcut that's what they call the shortcut you know what I'm saying so yeah I did see people going in and out of the gate so.  (Damon Thomas criminal deposition, July 23, 2015, p. 28)

As part of the canvassing effort, any relevant surveillance cameras should have been identified and footage seized. These actions are all important parts of evidence retrieval in a major crime investigation. Unfortunately, police canvass and search efforts in this case fell short of the mark:

Richard Waples:  "Detective Benner, were there – did you talk to everybody that lived in that apartment building, H?"

Detective Benner:  "We made brief contact with the people that lived upstairs. I don't know that I talked to everybody. A lot of people weren't home and ended up moving away or whatever; but the upstairs is where I made contact."  (civil deposition, September 27, 2016, pp. 126-127)

David Hennessy:  "And do you know where the dumpster is for the Jeffersonian?"

Detective Benner:  "I didn't pay any attention to the dumpster, but I'd imagine there's one out there."  (bail hearing testimony, July 17, 2014, p. 37)

Canvass and search efforts must be done promptly as evidence is exposed to weather, items get picked up or lost, and memories of witnesses fade. Detective Benner's statement that some people moved away before he could talk to them makes it clear that the investigative response to the Rainsberger murder was not timely. And his failure to search the apartment dumpster for the murder weapon was a careless and baffling mistake.

---

[21]  Ruth Rainsberger's apartment was on a semi-basement level of her building so passersby could see into her place through the sliding glass doors or windows when her blinds were open (Damon Thomas criminal deposition, July 23, 2015, pp. 13, 37). From the forensic diagrams and crime scene photographs, it appears her medication may have been visible through the kitchen window. Her apartment was also right next to the laundry room. These environmental factors should have been considered in both evidence recovery and witness canvassing efforts.

A proper exploration of the intruder possibility would have entailed a search for similar incidents that might be connected to a robbery or murder.  This is known as linkage analysis. Investigators should have searched for incidents[22] that occurred nearby, in the same general time period, with comparable victimology, and/or with a similar *modus operandi* (Rossmo, 2000).  It is not clear how thorough police efforts were in regards to this, or if detectives engaged in more than a cursory effort to find and exam other crimes.  For example, Detective Benner failed to consider the possibility that other incidents could be connected even if they were not identical:  "parts of those crimes did not match up to this one.  Some of those had forced entry" (bail testimony, July 17, 2014, p. 73).  Benner also ruled out some incidents because he could not place the offender in the area of the Rainsberger murder even though those cases were unsolved and the offender remained unknown (bail testimony, July 17, 2014, pp. 69, 72).  David Hennessy, William Rainsberger's criminal attorney, did a more thorough job on this than the police did (Law Enforcement Police Reports CAD/Dispatch Search Results, July 23, 2014; Benner criminal deposition, November 2, 2014).

Finally, Detective Benner's interest in DNA testing of crime scene items seized from Ruth Rainsberger's apartment seemed to wax and wane depending upon whether or not the evidence pointed towards William Rainsberger.  Initially, he was in a hurry to obtain the laboratory results:

> Sir, In reference to case number DP13153344, Denise Robinson asked that I request a rush on DNA to see if any foreign DNA was present at the scene.  Possible charges are pending against William Rainsberger, whose DNA is on file.  (email from Charles Benner to Crag Converse, January 13, 2014; see also February 5, 2014)

> The victim's sons are the suspects in this case and I am waiting for DNA results before any arrest may be made.  (email from Charles Benner to Amelia Basham, March 20, 2014)

DNA from two unknown males (A and B) was found on the victim's clothing; analysis eliminated William Rainsberger as a contributor (Laboratory Examination Report LAB13-07692, April 23, 2014).  As the DNA evidence did not support his suspicions about William, Detective Benner minimized its importance.  "Because the DNA could most likely be attributed to a first responder, Benner did not find this evidence helpful to his investigation ... [and] did not include this evidence in his probable cause affidavit" (highlighting added; defendant's memorandum of law in support of motion for summary judgment, January 13, 2017, p. 3).

The key phrase in this statement is "*his* investigation," meaning Detective Benner's efforts to implicate William Rainsberger.  A professional and unbiased investigation would have considered the implications of *all* the evidence.  Even if Benner's conclusion is correct (and it probably isn't if first responders followed standard procedure with a body covered in blood and wore gloves), "most likely" is not the same as "certainly."  In a thorough investigation, DNA samples would have been obtained from everyone who handled Ruth Rainsberger so they could be eliminated as sources of the unknown DNA.  A match would have resolved this matter; a failure to match would have given more support to the intruder theory.

---

[22]   The murder of Ruth Rainsberger may have been a break in, home invasion robbery, or sexual assault gone bad.  Incidents of interest for linkage purposes therefore would have included homicides, sex crimes, robberies, burglaries, reports of prowling or peeping, and assaults and thefts by drug addicts.  The relevant similarities are of offender behavior, not in official police descriptions or legal categories.  Attempted crimes also need to be considered.

Detective Benner's enthusiasm for the DNA results seems to have dissipated by the summer of 2014. When asked for the findings of the forensic examination of a pen found eight months earlier on the floor of Ruth Rainsberger's apartment by the door, he replied, "You have to ask the DNA people. I don't have the results on that either" (Benner bail hearing testimony (July 17, 2014, p. 48).

The case proceeded haphazardly and intermittently. In yet another example of tunnel vision, detectives failed to look for problems in their investigative theory. They did not critically assess their logic or try to falsify their initial suspicions. Detective Benner considered William Rainsberger's behavior unusual for an innocent man; however, he did not consider the complementary question – did William's actions make sense if he was guilty? There were some riddles police investigators should have carefully thought about:

- If William had attacked his mother, why would he have left her alive and breathing, with the possibility of recovery?[23]

- If William had bludgeoned his mother on the morning of November 19th, why would he wait several hours to get rid of the weapon? Why, in broad daylight, would he throw it into a trash bin outside a large and busy grocery store with multiple surveillance cameras?[24] Why would he dump it across the street from the crime scene rather than tossing it into a back-alley dumpster on the other side of the city?

- If William wanted to stage the crime to look like a home invasion robbery, why didn't he leave clear signs of a break in, such as a damaged door, ransacking, or stolen money?

- Why would William tell police detectives how his mother was assaulted?


**Detectives exhibited confirmation bias in their search, interpretation, and recall of evidence**

Confirmation bias involves the biased search for evidence, the biased interpretation of information, and biased memory (selective recall). All three of these occurred during the police investigation of Ruth Rainsberger's murder.


Biased search for evidence

Investigators quickly decided William Rainsberger had killed his mother, focused their efforts on him to the exclusion of his siblings or other possible suspects, and failed to look for evidence of other viable theories for Ruth's murder. Detective Benner did not obtain a list of residents for her apartment building and only interviewed a few of them. He did not follow up on reports of drug trafficking in the apartment above Ruth's or do a thorough job of looking for similar crimes. He failed to search the dumpster of the victim's apartment building. He forgot or ignored what

---

[23] Fireman Wooldridge stated Ruth Rainsberger "opened her eyes and grasped the medic's hand (Fireman Wooldridge police statement, December 4, 2013, pp. 2, 3; see also Dr. Streib criminal deposition, March 27, 2015, p. 22). William reported that "she moved her head and arm slightly," and responded to his touch or voice (defendant's memorandum of law in support of motion for summary judgment, January 13, 2017, p. 2).

[24] Kroger apparently had 81 surveillance cameras operating the day of the murder (defendant's memorandum of law in support of motion for summary judgment, January 13, 2017, p. 9).

William and others told him regarding items missing from the victim's apartment, did not follow up with the family, and dismissed the possibility of a burglary or robbery.

As part of this bias, Detective Benner uncritically accepted any evidence that appeared to point towards William Rainsberger's guilt.  The error in the "2:40 pm" time of the telephone call from Ruth's landline to Robert's cell phone is the most egregious example.  The time discrepancy between Robert's cell phone records and Ruth's landline records (and William and Robert's statements) was simply ignored and the inconsistency not disclosed in the probable cause affidavit.

Detective Benner accepted Fireman Wooldridge's perceptions of Ruth's injuries at face value.  He never asked William Rainsberger what he saw or why he thought his mother had been hit with a lead pipe.  He had two opportunities to do so, on November 19th and 20th, while he was interviewing William at police headquarters.  Similarly, he never asked Wooldridge to explain how he reached his conclusion regarding a gunshot wound.  This discrepancy became one of the most important rationales for Benner's suspicions even though Wooldridge had little experience with gunshot wounds (something else Benner failed to ask him about).  Benner also did not follow up with the other firemen on Engine 43 or the EMS crew who transported Ruth to the hospital regarding their opinions on what they thought the wound looked like.

Detective Benner's treatment of William Rainsberger and his siblings, and his refusal to respond to their calls, ended an important avenue of communication that might have assisted him in his investigation.  After his rush to judgment in concluding William was the suspect, Benner failed to search for other potentially relevant evidence.  Consequently, his sunk costs increased over time.  A failure to explore alternate theories of the murder, and the lengthy delays in the investigation, foreclosed options; arresting William became the only possible way to clear Ruth's homicide.  Each stage led to a deeper entrenchment as more time, effort, reputation, and money was invested in this theory of who the killer was.  This "escalation of commitment" could explain Benner's rather creative interpretation of the storyboard panel drawing discussed below.

Biased interpretation of evidence

The level of investigative bias and the amount of subjectivity in the interpretation of evidence in this case was significant.  An undistinguishable item in a Kroger video becomes a long narrow object that could be a pipe or pry bar, a weapon.  Something that isn't straw becomes metal.  A quick glance over a shoulder becomes the action of checking for surveillance cameras.  Being the beneficiary of a mother's will becomes a motive for murder.  Financial records become valuable financial documents and even savings bonds.  A blanket over a body becomes a strong indicator of a victim-offender relationship.  Efforts by William Rainsberger to make sure first responders quickly found his mother's apartment building becomes disinterest.  A fire department paramedic's conclusion become a medical opinion.  William napping at home becomes William in the area of the murder.  The time of the attack becomes whenever William had the opportunity.  No phone calls by Rebecca near her mother's house becomes her not being there.  Refusing to take a polygraph after being deceived by detectives becomes the defining indicator of guilt.

The strongest example of biased evidence interpretation in this case involves a five-page storyboard (Exhibit 29) Detective Benner found in a nightstand drawer following the execution of a police search warrant on Williams Rainsberger's house on June 9, 2014.  Benner took extreme interest in the drawing in panel 12 on page 4 of the storyboard (see Figure 4):



Figure 4.  Storyboard Panel.

The panel consists of a simple line drawing, beneath which are the film directions:

                              <position camera
                                <eat pudding
already open, cover w/cloth)
       <count quarters
     cloth is hidden
Well, that's all the
time we have.
 <shake & still>

The first panel on the first page of the storyboard shows that William Rainsberger wrote it for his 40th birthday in June 1997.  He explained that the panel depicted a magic trick involving two open containers of canned pudding, with spoons in them, sitting on a table (W. Rainsberger civil deposition, September 27, 2016, pp. 136-137).

However, police and prosecutors somehow interpreted this panel as an incriminating simulation of Ruth Rainsberger's murder:

> Towards the end of the storyboard, one frame of particular interest to the State includes what appears to be two feet sticking out from a diamond shaped object like a cloth, with a table nearby similarly situated to our murder scene.  Next to that image, the directions includes the words "cover with cloth."  That frame became immediately apparent to the Detective present (who had also been at the crime scene) to be of an incriminating character of the crime.  (State's Motion to Certify Order for Interlocutory Appeal, July 2, 2015, p. 2)

> In the lower right frame is a picture with words including "cover with cloth" and a cartoon depicting what the State describes as two stick legs coming out from the bottom of a cloth covering the body of the stick figure.  State maintains that the cartoon frame is probative of the technique utilized by the Defendant at the crime scene.  As noted by the State, when first responders arrived at the scene of the crime in response to Defendant's 911 call, they found the victim's head covered with a cloth.... According to the State, the Storyboard "sheds light on any planning or motive related to this case."  (Order Granting Defendant's Motion to Suppress Non-Financial Evidence From 7345 East 13th Street, June 23, 2015, pp. 3-4)

This interpretation is a Rorschach test of Detective Benner's biased perceptions.  They ignore the context of the entire storyboard, the fact that it was created in 1997, 16 years before Ruth Rainsberger's murder and 14 years before she moved into the Jeffersonian Apartments, the explanatory film directions, and the references to pudding and quarters.  A "cloth" becomes a "blanket," spoons become legs, and the square table in the picture becomes the round table of the crime scene.  The "immediately apparent ... incriminating character" of this picture to Detective Benner illustrates more than anything else in this case the degree to which his judgment was impaired by confirmation bias.

The strength of an item of evidence for a particular investigative theory or suspect depends on how likely the evidence is given that the theory is true compared to how likely it is given that the theory is false.  Benner seems to have completely ignored the second part of this equation.  His opinions,[25] experience, and suspicions dominated.  What he believed to be unusual took precedence over common sense.  There was no need to research or investigate.  In several instances, something that could have been checked out and verified was not; the assumption was considered good enough and Benner's theory became a "fact."  Possibilities became probabilities.  Probabilities became certainties.

---

[25] The strength of Detective Benner's often unjustified beliefs suggests another form of bias.  False-consensus effect occurs when an individual believes their opinions are much more common than they actually are.  This tendency to forgo consideration of other perspectives results from egocentric bias.

Detective Benner made several comments during his civil deposition (September 27, 2016) that revealed both the subjectivity of his investigation and his efforts to shift responsibility for the probable cause to others:

"I mean, I had my own opinions.  I just wrote down the facts as I saw them" (p. 18).

"I mean, it's a circumstantial case so, like I said, it's not my decision whether or not probable cause is established.  In my mind it was a circumstantial case, so if you wanted to give it to the jury and let them decide, I mean, that is what the prosecutor's office decides.  I do not, so I –" (p. 22).

"It's not for me to decide.  I wrote down what they told me in their statements and passed it on to the prosecutor" (p. 47).

"It wasn't for me to decide what caused the wounds.  She was gone when I got there so the medics believed that she was shot.  The doctors believed that she was probably shot.  That's all I had to go on at that time" (p. 52).

"I'm not sure what they were, but that's what I put in here.  They were something like savings bonds, certificates of deposit.  The point was I was just showing there was something with possible value[26] in that box that wasn't looked through" (p. 60).

"If he was making communications – I didn't say in there that maybe he was talking to his sister about it.  But the truth of the matter is I put in there he didn't ask me about it.  That's all it says.  He didn't ask me about it.  Maybe he asked his sister.  He didn't say anything to me about it" (p. 63).

"So they did storm out.  I mean, you can use any words that you want.  I don't know if they stormed or left angrily, left yelling and screaming, but they left upset, stormed out.  That's just the word that I chose to put in there" (p. 71).

"From Rebecca; right.  So that's – yeah, that doesn't mean much to the probable cause.  But I mean, William is the suspect.  And Robert was with him.  They didn't contact me" (p. 74).

"I didn't go back through and take that out.  I didn't catch that part of it, so I could have added 'except Rebecca called me and asked me what was going on.'  I don't know whether that would have changed in the probable cause but ..." (p. 74).

"It seemed like everything – his comments he made.  It was all circumstantial in the beginning.  Mostly circumstantial probably when she filed the case, but that's the decision that the prosecutor made" (p. 74).

"What I do is I type everything up that I put in here and I send it to the prosecutor's office and they decide whether or not the evidence warrants a charge.  That's what happened" (p. 75).

"Am I speculating?  I just wrote in there that he threw away a straight object.  Once again, that's part of the circumstantial case, so I'm sure the prosecutor's office and I both believed that it could have been a weapon, yes.  That's why I put it in there" (pp. 79-80).

---

[26] Detective Benner fails to mention that savings bonds are not readily negotiable and consequently have little street value.

"I don't.  And I never said in my PC that it was a murder weapon.  It's just open for speculation, something for a jury to decide at that point" (p. 81).

"I mean, like once again, it wasn't up to me to decide if it was incriminating or not" (p. 123).


<u>Selective Recall</u>

Some of the detectives and police officers involved in the investigation of Ruth Rainsberger's murder suffered from evidence recall problems.  Officer Price reported he observed events he actually did not see, and was confused on other specifics (criminal deposition, September 8, 2014).  He apparently did not prepare the detailed notes expected in a murder case.  Detective Benner, as noted above, often had difficulties recalling who he had spoken to and what they had told him, particularly regarding items missing from Ruth Rainsberger's apartment, and remembering exactly what he did – and did not do – in the investigation.

The worst was Detective Tudor.  When this experienced homicide investigator was questioned by David Hennessy (criminal deposition, March 30, 2015), he continually answered that he could not remember events from the case:  "I don't recall two brothers being there;" "I could have been but I just don't recall it;" "I don't think so.  I don't recall;" "uh I don't recall;" "If you got it on tape that I was involved then I was obviously there I don't recall it;" "I just can't recall if I was or not;" "I don't recall if I did;" "I do not, I do not;" "I really don't [remember anything] on this case um;" "I can't remember either."  When specifically asked if he had any notes from the case, he replied, "I do not." (p. 3).  When Detective Benner asked Tudor for his notes, he was told he didn't have any (Benner criminal deposition, November 25, 2014, pp. 54, 72).

## Conclusion

On July 7, 2015, the Marion County Prosecutor's Office asked the court to dismiss all counts against William Rainsberger in this matter.  What was a wrongful arrest fortunately did not become a wrongful murder conviction.  Unfortunately, it does not appear the Indianapolis police homicide detectives learned much from their mistakes in this case.

The investigation of the Ruth Rainsberger murder suffered from several problems and biases, including:

1. Detective Benner rushed to judgment and quickly decided William Rainsberger had killed his mother.

   - Within 24 hours of the initial report of Ruth's attack, William Rainsberger had become his main suspect.

   - Benner shifted from an evidence-based to a suspect-based investigation long before all the evidence had been collected and analyzed.

   - His premature judgment was likely the result of being overworked, rushed, and with little time to devote to yet another homicide case.

2. Detective Benner suffered from tunnel vision and failed to properly investigate other viable theories for the murder.

   - He focused on William Rainsberger and failed to develop or diligently investigate other possible suspects.

   - Robert and Rebecca were quickly dismissed as suspects in the murder even though most of the elements in the probable cause affidavit also applied to them.

   - Benner did not properly investigate the possibility that Ruth may have been the victim of a home invasion robbery or burglary gone bad.  The theft of items from her apartment was ignored and reports by tenants of possible drug trafficking in the apartment building were dismissed.

   - A proper canvass of the apartment complex for witnesses was not performed.  Benner failed to obtain a list of all the tenants in the victim's building.  The dumpster for the apartment building was not searched.

   - Unknown male DNA that did not match William was found on the victim's clothing.  Benner failed to follow this up by testing to try to eliminate first responders.  This forensic clue was not disclosed in the probable cause affidavit.

   - Benner did not consider the logic and reasonableness of his investigative theory given all the facts and circumstances of the case.

3. Detectives exhibited confirmation bias in their search, interpretation, and recall of evidence.

- Detective Benner concentrated his search for evidence against William Rainsberger, but not for other possible suspects. He uncritically endorsed evidence that was demonstrably wrong if it supported his investigative theory, and failed to properly investigate information from unreliable sources.

- The extent of investigative bias and the degree of subjectivity in the interpretation of evidence in this case was significant. This was clearly demonstrated by a number of examples, including Benner's inclusion in the probable cause affidavit of an object he believed was the murder weapon tossed into a trash bin, and his sinister interpretation of the storyboard panel drawing.

- Some of the police officers involved in this investigation suffered from selective recall problems and either could not remember much or made mistakes in what they thought they did remember.

- Cognitive biases influenced Benner's subjectivity. Assumptions were not checked. Possibilities became probabilities. Probabilities became certainties.

Detective Benner failed to perform a thorough investigation and his affidavit for probable cause contained a number of false and misleading statements.

1. Of the eight allegations in the probable cause, only five were actually items of evidence.

- Of these five, one item was false.

- The remaining four contained a mix of facts and falsehoods. Some evidence was misrepresented and taken out of context.

2. Detective Benner's rationale for believing William Rainsberger murdered his mother has changed, and is now based on four factors: (1) William had the opportunity; (2) he had a financial motive; (3) he knew specific details about the victim's injuries; and (4) his behavior following the incident was suspicious and unusual. This new rationale is based on unreasonable and logically flawed conclusions.

- William Rainsberger had no more opportunity to murder his mother than thousands of other people, including his brother and sister.

- He benefited from his mother's will to the same degree as his two siblings. And unlike his brother, he did not need the money.

- Based on what he observed of his mother's injuries, William thought someone had bashed her head in. Benner did not see the victim at the crime scene, did not know exactly what William observed, and, despite interviewing him twice, failed to ask him why he came to that particular conclusion.

- William's actions and behavior following the discovery of his mother's body were normal and rational given the totality of the circumstances.

When asserting that probable cause exists, police officers must be reasonable, cautious, and prudent, and they must consider all the trustworthy facts and the overall circumstances.

1. Detective Benner was not cautious and prudent. He was careless and rushed to judgment before recovering and analyzing all the available evidence in the case. His investigation then suffered from tunnel vision, confirmation bias, and subjectivity.

2. Several mistakes and omissions occurred in the police investigation. Some of Benner's facts were not trustworthy because he failed to make the effort to validate them. He conveniently ignored the circumstances surrounding certain actions or evidence if they undermined his theory of who committed the murder.

3. These mistakes were unreasonable because Benner failed to verify information, question assumptions, remain objective, and rationally evaluate the logic and probability of his investigative theory.

Tunnel vision, confirmation bias, and other thinking errors undermine the integrity of evidence collection and detective cognition during a criminal investigation. Assumptions are left unchallenged. Evidence is misinterpreted, ignored, or forgotten. Logic and rationality become impaired. When this happens, judges and juries are not given an unbiased set of facts and interpretations. Instead, they receive filtered or even distorted information. The contamination of evidence can lead to an unjustified arrest of an innocent person and the risk of a wrongful conviction.

The purpose of an affidavit for probable cause is to outline for a judge the factual justification for an arrest or search. However, Detective Benner's probable cause in the William Rainsberger case contained false claims, innuendo, and misleading statements. It contained untrustworthy facts and its conclusions were unreasonable. It fell far short of the ideal of "the truth, the whole truth, and nothing but the truth."

# References

ACPO. (2006). *Murder investigation manual*. Wyboston, Bedfordshire: National Centre for Policing Excellence (Association of Chief Police Officers).

Adcock, J. M., & Stein, S. L. (2013). Cold case models for evaluating unresolved homicides. *Investigative Sciences Journal, 5*(2), 19-28.

American Red Cross. (2011). *Adult first aid/CPR/AED: Ready reference*. Washington, DC: American National Red Cross.

Anderson, B., & Anderson, D. (1998). *Manufacturing guilt: Wrongful convictions in Canada*. Black Point, NS: Fernwood Publishing.

Ariely, D. (2009). *Predictably irrational* (rev. ed.). New York: HarperCollins.

Ask, K., & Granhag, P. A. (2005). Motivational sources of confirmation bias in criminal investigations: The need for cognitive closure. *Journal of Investigative Psychology and Offender Profiling, 2*, 43-63.

Ask, K., & Granhag, P. A. (2007). Motivational bias in criminal investigators' judgments of witness reliability. *Journal of Applied Social Psychology, 37*, 561-591.

Ask, K., Rebelius, A., & Granhag, P. A. (2008). The 'elasticity' of criminal evidence: A moderator of investigator bias. *Applied Cognitive Psychology, 22*, 1245-1259.

Blair, J. P., & Rossmo, D. K. (2010). Evidence in context: Bayes' Theorem and investigations. *Police Quarterly, 13*, 123-135.

Boyd, N., & Rossmo, D. K. (1994, February). David Milgaard, the Supreme Court and Section 690: A wrongful conviction revisited. *Canadian Lawyer*, pp. 28-29, 32.

Brockner, J. (1992). The escalation of commitment to a failing course of action: Toward theoretical progress. *The Academy of Management Review, 17*, 39-63.

Burton, R. A. (2008). *On being certain: Believing you are right even when you're not*. New York: St. Martin's Griffin.

Campbell, E., & LePard, D. (2007, June). *How police departments can reduce the risk of wrongful convictions*. Proceedings of the International Society for the Reform of Criminal Law, Vancouver, BC.

Coleman, M. D. (2010). Sunk costs and the commitment to medical treatment. *Current Psychology, 29*, 121-134.

*Commission of Inquiry Into the Wrongful Conviction of David Milgaard*. (2005, March 7). Public documents. Retrieved December 10, 2013, from http://www.justice.gov.sk.ca/milgaard/pubdocs/march7/Nichol%20John/018589.pdf.

Connors, E., Lundregan, T., Miller, N., & McEwen, J. T. (1996). *Convicted by juries, exonerated by science: Case studies in the use of DNA evidence to establish innocence after trial* (National Institute of Justice Research Report No. NCJ-161258). Washington, DC: U.S. Government Printing Office.

Cory, P. de C. (2001). *The Inquiry Regarding Thomas Sophonow*. Winnipeg, MB: Queen's Printer.

Di Maio, V. J. M. (2016). *Gunshot wounds: Practical aspects of firearms, ballistics, and forensic techniques* (3rd ed.). Boca Raton, FL: CRC Press.

Douglas, J. E., Burgess, A. W., Burgess, A. G., & Ressler, R. K. (2013). *Crime classification manual: A standard system for investigating and classifying violent crime* (3rd ed.). Hoboken, NJ: John Wiley & Sons.

Dror, I. E. (2008, June). Biased brains. *Police Review*, pp. 20-21, 23.

Dror, I. E., & Charlton, D. (2006). Why experts make errors. *Journal of Forensic Identification*, *56*, 600-616.

Dror, I. E., & Cole, S. A. (2010). The vision in "blind" justice: Expert perception, judgment, and visual cognition in forensic pattern recognition. *Psychometric Bulletin & Review*, *17*, 161-167.

Dror, I. E., & Fraser-Mackenzie, P. A. F. (2009). Cognitive biases in human perception, judgment, and decision making: Bridging theory and the real world. In D. K. Rossmo, *Criminal investigative failures* (pp. 55-69). Boca Raton, FL: Taylor & Francis.

Dror, I. E., & Hampikian, G. (2011). Subjectivity and bias in forensic DNA mixture interpretation. *Science and Justice*, *51*, 204-208.

Dror, I. E., & Rosenthal, R. (2008). Meta-analytically quantifying the reliability and biasability of forensic experts. *Journal of Forensic Sciences*, *53*, 900-903.

Einhorn, H. J., & Hogarth, R. M. (1978). Confidence in judgment: Persistence in the illusion of validity. *Psychological Review*, *85*, 395-416.

Epp, J. A. (1997). Penetrating police investigative practice post-Morin. *U.B.C. Law Review*, *31*, 95-126.

Faigman, D. L. (1999). *Legal alchemy: The use and misuse of science in the law*. New York: W. H. Freeman.

Fauci, A. S., Braunwald, E., Kasper, D. L., Hauser, S. L., Longo, D. L., Jameson, J. L., & Loscalzo, J. (2008). *Harrison's principles of internal medicine* (17th ed.). New York: McGraw-Hill.

Federal Bureau of Investigation Uniform Crime Reporting. (2016). 2015 crime in the United States: Murder circumstances by relationship. Retrieved January 14, 2017, from https://ucr.fbi.gov/crime-in-the-u.s/2015/crime-in-the-u.s.-2015/tables/expanded_homicide_data_table_10_murder_circumstances_by_relationship_2015.xls.

Fenton, N., & Neil, M. (2009). *Avoiding probabilistic reasoning fallacies in legal practice using Bayesian networks*. Unpublished manuscript, School of Electronic Engineering and Computer Science, Queen Mary, University of London, London, UK.

Findley, K. A., & Scott, M. S. (2006). The multiple dimensions of tunnel vision in criminal cases. *Wisconsin Law Review*, *2*, 291-397.

Forst, B. (2004). *Errors of justice: Nature, sources and remedies*. Cambridge: Cambridge University Press.

FPT Heads of Prosecutions Committee Working Group. (2004). *Report on the prevention of miscarriages of justice*. Ottawa: Department of Justice.

Garland, N. M., & Stuckey, G. B. (2000). *Criminal evidence for the law enforcement officer* (4th ed.). New York: McGraw-Hill.

Garrett, B. L. (2008). Judging innocence. *Columbia Law Review, 108*, 55-141.

Garrett, B. L. (2011). *Convicting the innocent: Where criminal prosecutions go wrong*. Cambridge, MA: Harvard University Press.

Geberth, V. J. (2015). *Practical homicide investigation: Tactics, procedures, and forensic techniques* (5th ed.). Boca Raton, FL: CRC Press.

Gigerenzer, G. (2000). *Adaptive thinking: Rationality in the real world*. Oxford: Oxford University Press.

Gigerenzer, G. (2002). *Calculated risks: How to know when numbers deceive you*. New York: Simon & Schuster.

Gigerenzer, G. (2007). *Gut feelings: The intelligence of the unconscious*. New York: Viking.

Gigerenzer, G., Hoffrage, U., & Kleinbolting, H. (1991). Probabilistic mental models: A Brunswikian theory of confidence. *Psychological Review, 98*, 506-528.

Gould, J. B. (2007). *The Innocence Commission: Preventing wrongful convictions and restoring the criminal justice system*. New York: New York University Press.

Gould, J. B., Carrano, J., Leo, R., & Young, J. (2013). *Predicting erroneous convictions: A social science approach to miscarriages of justice*. Final report submitted to the U.S. Department of Justice (Document No. 241389).

Gould, J. B., & Leo, R. A. (2010). One hundred years later: Wrongful convictions after a century of research. *Journal of Criminal Law and Criminology, 100*, 825-868.

Griffith, D. & Tversky, A. (2004). The weighing of evidence and the determinants of confidence. In A. Tversky (Ed.), *Preference, belief, and similarity: Selected writings* (pp. 275-299). Cambridge, MA: MIT Press.

Gross, S. R., O'Brien, B., Hu, C., & Kennedy, E. H. (2014). Rate of false conviction of criminal defendants who are sentenced to death. *Proceedings of the National Academy of Sciences, 111*, 7230-7235.

Hamilton, D. L. (1979). A cognitive attributional analysis of stereotyping. In L. Berkowitz (Ed.), *Advances in experimental social psychology, Vol. 12* (pp. 53-84). New York: Academic Press.

Hasel, L. E., & Kassin, S. M. (2009). On the presumption of evidentiary independence: Can confessions corrupt eyewitness identifications? *Psychological Science, 20*, 122-126.

Hastie, R., & Kumar, P. A. (1979). Person memory: Personality traits as organizing principles in memory for behavior. *Journal of Personality and Social Psychology, 37*, 25-38.

Heuer, Jr., R. J. (1999). *Psychology of intelligence analysis*. Washington, DC: Center for the Study of Intelligence, Central Intelligence Agency.

Hill, C., Memon, A., & McGeorge, P. (2008). The role of confirmation bias in suspect interviews: A systematic evaluation. *Legal and Criminological Psychology, 13*, 357–371.

Hirt, E. R. (1990). Do I see only what I expect? Evidence for an expectancy-guided retrieval model. *Journal of Personality and Social Psychology, 58*, 937-951.

Hirt, E. R., Kardes, F. R., & Markman, K. D. (2004). Activating a mental simulation mind-set through generation of alternatives: Implications for debiasing in related and unrelated domains. *Journal of Experimental Social Psychology*, *40*, 374-383.

Hirt, E. R., & Markman, K. D. (1995). Multiple explanation: A consider-an-alternative strategy for debiasing judgments. *Journal of Personality and Social Psychology*, *69*, 1069-1086.

Huber, P. W. (1991). *Galileo's revenge: Junk science in the courtroom*. New York: Basic Books.

Huff, C. R., Rattner, A., & Sagarin, E. (1996). *Convicted but innocent: Wrongful conviction and public policy*. Thousand Oaks, CA: Sage.

Innocence Project. (2016). *The causes*. Retrieved January 14, 2017, from http://www.innocenceproject.org/#causes.

Irvine, B., & Dunningham, C. (1993). *Human factors in the quality control of CID investigations*. Royal Commission on Criminal Justice Research, Study No. 21. London: HMSO.

James, S. H., & Eckert, W. G. (1998). *Interpretation of bloodstain evidence at crime scenes* (2nd ed.). Boca Raton: CRC Press.

Jones, D., Grieve, J., & Milne, B. (2008). The case to review murder investigations. *Policing: A Journal of Policy and Practice*, *2*, 470-480.

Kahneman, D. (2003). A perspective on judgment and choice: Mapping bounded rationality. *American Psychologist*, *58*, 697-720.

Kahneman, D. (2011). *Thinking, fast and slow*. New York: Farrar, Straus and Giroux.

Kahneman, D., & Klein, G. (2009). Conditions of intuitive expertise: A failure to disagree. *American Psychologist*, *64*, 515-526.

Kahneman, D., Slovic, P., & Tversky, A. (Eds.). (1982). *Judgment under uncertainty: Heuristics and biases*. Cambridge: Cambridge University Press.

Kahneman, D., & Tversky, A. (1972). On prediction and judgment. *ORI Research Monograph*, *12*(4), 12.

Kassin, S. M. (2012). Why confessions trump innocence. *American Psychologist*, *67*, 431-445.

Kassin, S. M., Goldstein, C. C., & Savitsky, K. (2003). Behavioral confirmation in the interrogation room: On the dangers of presuming guilt. *Law and Human Behavior*, *27*, 187-203.

Kaufman, F. (1998). *The Commission on Proceedings Involving Guy Paul Morin: Report*. Toronto: Ontario Ministry of the Attorney General.

Kertstholt, J. H., & Eikelbloom, A. R. (2007). Effects of prior interpretation on situation assessment in crime analysis. *Journal of Behavioral Decision Making*, *20*, 455-465.

Kida, T. E. (2006). *Don't believe everything you think: The 6 basic mistakes we make in thinking*. Amherst, NY: Prometheus Books.

Kish, P. E., & MacDonell, H. L. (1996). "Absence of evidence is not evidence of absence." *Journal of Forensic Identification*, *46*(2), 160-164.

Klein, G. (1999). *Sources of power: How people make decisions*. Cambridge, MA: MIT Press.

Klockars, C. B., & Mastrofski, S. D. (Eds.). (1991). *Thinking about police: Contemporary readings* (2nd ed.). New York: McGraw-Hill.

Koehler, D. J. (1991). Explanation, imagination, and confidence in judgment. *Psychological Bulletin*, *110*, 499-519.

Koriat, A., Lichtenstein, S., & Fischhoff, B. (1980). Reasons for confidence. *Journal of Experimental Psychology: Human Learning and Memory*, *6*, 107-118.

Kunda, Z. (1999). *Social cognition: Making sense of people*. Cambridge, MA: MIT Press.

LeGault, M. R. (2006). *Think!: Why crucial decisions can't be made in the blink of an eye*. New York: Simon & Schuster.

Lord, C., Lepper, M. R., &Ross, L. (1979). Biased assimilation and attitude polarization: The effects of prior theories on subsequently considered evidence. *Journal of Personality and Social Psychology*, *37*, 2098-2110.

Lunenburg, F. C. (2010). Escalation of commitment: Patterns of retrospective rationality. *International journal of Management, Business, and Administration*, *13*, 1-5.

Makin, K. (1992). *Redrum the innocent*. Toronto: Viking.

Martin, D. (2002). Lessons about justice from the "laboratory" of wrongful convictions: Tunnel vision, the construction of guilt and informer evidence. *University of Missouri-Kansas City School of Law Review*, *70*, 847-864.

Masters, T., & Lehto, S. (2012). *Drawn to injustice: The wrongful conviction of Timothy Masters*. New York: Berkley Books.

Mayo Clinic. (2017). *First aid*. Retrieved January 10, 2017, from http://www.mayoclinic.org/first-aid.

Myers, D. (2002). *Intuition: Its powers and perils*. New Haven, CT: Yale University Press.

Narchet, F. M., Meissner, C. A., & Russano, M. B. (2011). Modeling the influence of investigator bias on the elicitation of true and false confessions. *Law and Human Behavior*, *35*, 452–465.

National Research Council. (2003). *The polygraph and lie detection*. Committee to Review the Scientific Evidence on the Polygraph. Division of Behavioral and Social Sciences and Education. Washington, DC: The National Academies Press.

National Research Council. (2009). *Strengthening forensic science in the United States: A path forward*. Washington, DC: The National Academies Press.

Nickerson, R. S. (1998). Confirmation bias: A ubiquitous phenomenon in many guises. *Review of General Psychology*, *2*, 175–220.

O'Brien, B. (2009). Prime suspect: An examination of factors that aggravate and counteract confirmation bias in criminal investigations. *Psychology, Public Policy, and Law*, *15*, 315-334.

Oskamp, S. (1965). Overconfidence in case-study judgments. *Journal of Consulting Psychology*, *29*, 261-265.

Pearl, J. (2000). *Causality: Models, reasoning, and inference*. Cambridge: Cambridge University Press.

Perrow, C. (1999). *Normal accidents: Living with high-risk technologies*. Princeton, NJ: Princeton University Press.

Piattelli-Palmarini, M. (1994). *Inevitable illusions. How mistakes of reason rule our minds* (M. Piattelli-Palmarini & K. Botsford, Trans.). New York: John Wiley & Sons.

Plous, S. (1993). *The psychology of judgment and decision making*. New York: McGraw-Hill.

Reason, J. (1990). *Human error*. Cambridge: Cambridge University Press.

Risen, J., & Gilovich, T. (2007). Informal logical fallacies. In R. J. Sternberg, H. L. Roediger III, & D. F. Halpern (Eds.), *Critical thinking in psychology* (pp. 110-130). Cambridge: Cambridge University Press.

Robertson, B., & Vignaux, G. A. (1995). *Interpreting evidence: Evaluating forensic evidence in the courtroom*. Chichester: John Wiley & Sons.

Roman, J., Walsh, K., Lachman, P., & Yahner, J. (2012). Post-conviction DNA testing and wrongful conviction. Washington, DC: Urban Institute.

Ross, L., & Anderson, C. A. (1982). Shortcomings in the attribution process: On the origins and maintenance of erroneous social assessments. In D. Kahneman, P. Slovic, & A. Tversky (Eds.), *Judgment under uncertainty: Heuristics and biases* (pp. 129-152). Cambridge: Cambridge University Press.

Rossmo, D. K. (2000). *Geographic profiling*. Boca Raton, FL: CRC Press.

Rossmo, D. K. (2006a). Criminal investigative failures: Avoiding the pitfalls. *FBI Law Enforcement Bulletin*, *75*(9), 1-8.

Rossmo, D. K. (2006b). Criminal investigative failures: Avoiding the pitfalls (Part two). *FBI Law Enforcement Bulletin*, *75*(10), 12-19.

Rossmo, D. K. (2009a). *Criminal investigative failures*. Boca Raton, FL: Taylor & Francis.

Rossmo, D. K. (2009b, October). Failures in criminal investigation. *The Police Chief*, pp. 54-66.

Rossmo, D. K. (2010). Criminal investigative failures. *RCMP Gazette*, *72*(1), 30-31.

Rossmo, D. K. (2016). Case rethinking: A protocol for reviewing criminal investigations. *Police Practice and Research*, *17*, 212-228.

Scheck, B., Neufeld, P., & Dwyer, J. (2000). *Actual innocence: Five days to execution and other dispatches from the wrongly convicted*. New York: Doubleday.

Schum, D. A. (1994). *The evidential foundations of probabilistic reasoning*. Evanston, IL: Northwestern University Press.

Simon, H. A. (1956). Rational choice and the structure of the environment. *Psychological Review*, *63*, 129-138.

Snook, S. A. (2000). *Friendly fire: The accidental shootdown of U.S. Black Hawks over Northern Iraq*. Princeton, NJ: Princeton University Press.

Stacey, R. B. (2004). Report on the erroneous fingerprint individualization in the Madrid train bombing case. *Journal of Forensic Identification*, *54*, 706-718.

Staw, B. M. (1981). The escalation of commitment to a course of action. *Academy of Management Review*, *6*, 577-587.

Stelfox, P., & Pease, K. (2005). Cognition and detection: Reluctant bedfellows? In M. J. Smith & N. Tilley (Eds.), *Crime science: New approaches to preventing and detecting crime* (pp. 191-207). Cullompton, Devon: Willan Publishing.

Stubbins, D., & Stubbins, N. (2009). On the horns of a narrative: Judgment, heuristics, and biases in criminal investigation. In D. K. Rossmo, *Criminal investigative failures* (pp. 99-140). Boca Raton, FL: Taylor & Francis.

Tversky, A. (Ed.). (2004). *Preference, belief, and similarity: Selected writings*. Cambridge, MA: MIT Press.

Tversky, A., & Kahneman, D. (1973). Availability: A heuristic for judging frequency and probability. *Cognitive Psychology*, *5*, 207-232.

Tversky, A., & Kahneman, D. (1981). The framing of decisions and the psychology of choice. *Science*, *211*, 453-458.

United States Census. (2010). *American FactFinder: Community facts (Indianapolis, Indiana)*. Retrieved January 22, 2017, from: https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=CF.

U.S. Department of Health and Human Services, Office of Disease Prevention and Health Promotion. (2016). *Basic first aid: Script*. Retrieved January 10, 2017, from http://nasdonline.org/301/d000105/basic-first-aid-script.html.

Vick, S. G. (2002). *Degrees of belief: Subjective probability and engineering judgment*. Reston, VA: American Society of Civil Engineers.

Wason, P. C., & Johnson-Laird, P. N. (1972). *Psychology of reasoning: Structure and content*. Cambridge, MA: Harvard University Press.

Whitman, G., & Koppl, R. (2010). Rational bias in forensic science. *Law, Probability and Risk*, *9*, 69-90.

Willmer, M. A. P. (1970). *Crime and information theory*. Edinburgh: Edinburgh University Press.

Wilson, P. J. (2003). Wrongful conviction: Lessons learned from the Sophonow Public Inquiry. *Canadian Police College*.

Woffinden, B. (1988). *Miscarriages of justice*. London: Hodder & Stoughton.

Wright, M. (2013). Homicide detectives' intuition. *Journal of Investigative Psychology and Offender Profiling*, *10*, 182-199.

Zalman, M., Smith, B., & Kiger, A. (2008). Officials' estimates of the incidence of "actual innocence" convictions. *Justice Quarterly*, *25*, 72-100.

**Facts Considered**

FRC Rule 26. (a) (2) (B) (ii) the facts or data considered by the witness in forming them;

The facts and data considered in the rendering of my opinion were obtained from a review of the following materials:

- Detective Charles Benner notes

- Detective Charles Benner affidavit for probable cause; December 6, 2013 (Exhibit 1)

- Detective Charles Benner affidavit for probable cause; May 22, 2014 (Exhibit 2)

- Detective Charles Benner sworn information; May 22, 2014 (Exhibit 5)

- Detective Charles Benner bail hearing testimony; July 17, 2014

- Detective Charles Benner criminal deposition; November 25, 2014

- Detective Charles Benner civil deposition and errata; September 27, 2016

- Detective Tom Tudor criminal deposition; March 30, 2015

- Office Michael Price police case report; November 19, 2013

- Officer Michael Price criminal deposition; September 8, 2014

- Jennifer Lane criminal deposition; September 8, 2014

- Melissa Wilson criminal deposition; September 8, 2014

- Fireman Carl Wooldridge police statement; December 4, 2013

- Fireman Carl Wooldridge criminal deposition; September 8, 2014

- Delbert Pickens police statement; January 13, 2014

- Delbert Pickens criminal deposition; May 22, 2015

- Damon Thomas police statement; March 18, 2015

- Damon Thomas criminal deposition; June 23, 2015

- Kevin Walker police statement; March 18, 2015

- Kevin Walker criminal deposition; June 23, 2015

- William Rainsberger police statement; November 19, 2013

- William Rainsberger police statement; November 20, 2013

- William Rainsberger civil deposition and errata; September 27, 2016

- Rebecca Rainsberger police statement; November 20, 2013

- Robert Rainsberger police statement; November 19, 2013

- Robert Rainsberger civil deposition; December 20, 2016

- Mari Bilger civil deposition; December 20, 2016

- Dr. Streib's criminal deposition; March 27, 2015

- coroner's autopsy and field deputy's report

- autopsy photograph

- crime scene photographs from victim's apartment; November 19, 20, 22, 2013

- photographs of victim's apartment (Exhibits 20, 21, 22, 24, 25, and 26)

- crime scene diagrams of victim's apartment, with measurements

- photographs of William Rainsberger at the Kroger main entrance; November 19, 2013 (Exhibits 27a, 27b, 27c, and 27d)

- Kroger receipts; November 19, 2013 (Exhibits 14, 15, and 16)

- Kroger videos:  2013 – cameras 30 (main entry), 7 (checkout Uscan 1-3), 29 (exit doors), 44 (NE parking lot); 2015 – camera 30 (main entry); November 19, 2013

- audio recordings of 9-1-1 calls from William Rainsberger (x2); November 19, 2013

- Marion County Sheriff's Office Audio records request (Exhibit 18)

- Ruth Rainsberger AT&T landline usage telephone records (Exhibit 3)

- William Rainsberger T-Mobile cellular telephone records (Exhibits 17 and 28), and cell tower data map

- Robert Rainsberger Sprint cellular telephone records (Exhibits 4 and 13)

- Indianapolis Metropolitan Police Department property room voucher (Exhibit 8)

- Indianapolis-Marion County Forensic Services Agency reports (Exhibits 6, 7, 9, 10, and 12)

- email from Marielle Vincent to Charles Benner re "Jail calls and possible search warrant...William Rainsberger murder;" June 4, 2014 (Exhibit 30)

- various emails sent by, sent to, and copied to Charles Benner; December 3, 2013, to September 15, 2015

- William Rainsberger 40th birthday storyboard (Exhibit 29)

- "Son accused of killing elderly mother sits down with FOX59" news article; May 28, 2014

- defendant's petition for review of probable cause determination

- order granting defendant's petition to let bail; order denying defendant's petition to review probable cause determination

- defense discovery compliance

- list of residents in Jeffersonian Apartments

- law enforcement police reports CAD/dispatch search results for 801 N. Shortridge Rd.; January 1, 2013, to July 23, 2014

- police reports for various incidents at 801 N. Shortridge Rd.

- discovery compliance

- State's motion to exclude

- defense memorandum of law in support of admission of evidence

- order re State's motion to exclude

- State's petition for a body attachment

- court order granting defendant's motion to suppress nonfinancial evidence from 7345 East 13th Street

- State's motion to certify order for interlocutory appeal

- State's motion to dismiss

- plaintiff's timeline

- Detective Benner cross reference

- plaintiff's federal complaint (Exhibit 19)

- plaintiff's statement of claims for trial

- defendant's answer and affirmative defenses

- defendant's preliminary witness list (Exhibit 11)

- affidavit of Charles Benner; January 12, 2017 (Exhibit 8)

- affidavit of Carl Wooldridge; December 5, 2017? (Exhibit 4)

- Ruth Rainsberger emergency room medical records; November 19-20, 2013

- defendant's memorandum of law in support of motion for summary judgment

- defendant's designation of evidence in support of motion for summary judgment

- *Starks v. Moore et al.*, United States District Court Southern District of Indiana Indianapolis Division, decision on defendants' motion for summary judgment (2014)

- *Hart v. Mannina, et al.*, United States Court of Appeals for the Seventh Circuit appeal decision (2015)

- various news articles from the Internet

- works listed in the References.

**Supporting Exhibits**

FRC Rule 26. (a) (2) (B) (iii) any exhibits that will be used to summarize or support them;

I may use:

- any of the exhibits listed in this report;
- any of the exhibits identified or introduced at trial; and
- a *PowerPoint* slide presentation of the points I have made in this report.

## Qualifications

(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

<u>Summary</u>

I am a research professor and the University Chair in Criminology in the School of Criminal Justice, and the director of the Center for Geospatial Intelligence and Investigation, at Texas State University.  I have a PhD and an MA in criminology and a BA in sociology.  Before joining the academy, I was a management consultant for the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), the director of research for the Police Foundation, a national think tank based in Washington, DC, and a sworn member of the Vancouver Police Department (British Columbia, Canada) for 21 years.  For the last five years of my service with the VPD, I was the detective inspector in charge of the Geographic Profiling Section, which provided investigative support for the international law enforcement community.  I was awarded the Governor General of Canada Police Exemplary Service Medal in 2000.

I am also a member of the Police Investigative Operations Committee of the International Association of Chiefs of Police (IACP), a commissioner and former chair of the Austin Public Safety Commission (a policy and budget advisory board for city council), and a full fellow of the International Criminal Investigative Analysis Fellowship (ICIAF).  I have sat on the editorial boards of five scholarly journals, including *Homicide Studies*.

I have authored 105 publications, including three books, which have been cited in the literature over 2,300 times.  I have also given 147 scholarly papers and invited presentations in over 20 different countries.  I have been the principal investigator on 11 federal research grants, totaling $3,760,000 in funding, from a wide range of government agencies, including the Department of Justice, the Department of Defense, the intelligence community, and the British Home Office.

Specific to this action, I have studied, researched, and taught on the subject of criminal investigative failures and wrongful convictions for many years, publishing a book and eight related articles.  I have consulted on criminal cases for commissions of inquiry, city, state, and provincial governments, local, state, and national police agencies, prosecutors and Crown counsel, and defense and civil lawyers.  One of my current National Institute of Justice (NIJ) grants involves the examination of systemic causes of wrongful convictions and criminal investigative failures.

My complete curriculum vitae is attached to this report.

<u>Recent Publications</u>

*Refereed Journal Articles*

Rossmo, D. K. (2016). Bernoulli, Darwin, and Sagan: The probability of life on other planets. *International Journal of Astrobiology*. doi: 10.1017/S1473550416000148.

Hauge, M. V., Stevenson, M. D., Rossmo, D. K., & Le Comber, S. C. (2016). Tagging Banksy: Using geographic profiling to investigate a modern art mystery. *Journal of Spatial Science*. doi: 10.1080/14498596.2016.1138246.

Schmitz, P., Cooper, A., de Jong, T., & Rossmo, D. K. (2015). Mapping criminal activity space. *Journal of Intelligence & Analysis*, *22*(3), 67-94.

Ackerman, J. M., & Rossmo, D. K. (2015). How far to travel? A multilevel analysis of the residence-to-crime distance. *Journal of Quantitative Criminology*, *31*, 237-262.

Demers, S., & Rossmo, D. K. (2015). Simpson's paradox in Canadian police clearance rates. *Canadian Journal of Criminology and Criminal Justice*, *57*, 424-434.

LePard, D., Demers, S., Langan, C., & Rossmo, D. K. (2015). Challenges in serial murder investigations involving missing persons. *Police Practice and Research*, *16*, 328-340.

Rossmo, D. K., & Summers, L. (2015). El perfil geográfico en la investigación criminal. *International E-journal of Criminal Sciences*, *9*, art. 3.

Rossmo, D. K. (2016). Case rethinking: A protocol for reviewing criminal investigations. *Police Practice and Research*, *17*, 212-228.

Rossmo, D. K. (2014). Commentary on: DeLisi M. An empirical study of rape in the context of multiple murder. *Journal of Forensic Science*, *59*, 571.

Rossmo, D. K., Lutermann, H., Stevenson, M. D., & Le Comber, S. C. (2014). Geographic profiling in Nazi Berlin: Fact and fiction. *Geospatial Intelligence Review*, *12*(2), 44-57.

Verity, R., Stevenson, M. D., Rossmo, D. K., Nichols, R. A., & Le Comber, S. C. (2014). Spatial targeting of infectious disease control: identifying multiple, unknown sources. *Methods in Ecology and Evolution*, *5*, 647-655.

Rossmo, D. K. (2012). Recent developments in geographic profiling. *Policing: A Journal of Policy and Practice*, *6*, 144-150.

Stevenson, M. D., Rossmo, D. K., Knell, R. J., & Le Comber, S. C. (2012). Geographic profiling as a novel spatial tool for targeting the control of invasive species. *Ecography*, *35*, 704-715.

Le Comber, S. C., Rossmo, D. K., Hassan, A. N., Fuller, D. O., & Beier, J. C. (2011). Geographic profiling as a novel spatial tool for targeting infectious disease control. *International Journal of Health Geographics*, *10*, 35-42.

Rossmo, D. K. (2011). Evaluating geographic profiling. *Crime Mapping: A Journal of Research and Practice*, *3*, 42-65.

Rossmo, D. K. (2011). A reality response to Bridges' "A structured geospatial analytic method and pedagogy for the intelligence community." *IALEIA Journal*, *20*(1), 91-106.

Rossmo, D. K., & Harries, K. D. (2011). The geospatial structure of terrorist cells. *Justice Quarterly*, *28*, 221-248.

Beauregard, E., Rebocho, M. F., & Rossmo, D. K. (2010). Target selection patterns in rape. *Journal of Investigative Psychology and Offender Profiling*, *7*, 137-152.

Blair, J. P., & Rossmo, D. K. (2010). Evidence in context: Bayes' theorem and investigations. *Police Quarterly*, *13*, 123-135.

Martin, R. A., Rossmo, D. K., & Hammerschlag, N. (2009). Hunting patterns and geographic profiling of white shark predation. *Journal of Zoology*, *279*, 111-118.

Raine, N. E., Rossmo, D. K., & Le Comber, S. C. (2009). Geographic profiling applied to testing models of bumble-bee foraging. *Journal of the Royal Society Interface*, *6*, 307-319.

Rossmo, D. K., Thurman, Q. C., Jamieson, J. D., & Egan, K. (2008). Geographic patterns and profiling of illegal crossings of the southern U.S. border. *Security Journal*, *21*, 29-57.

Beauregard, E., Proulx, J., Rossmo, D. K., Leclerc, B., & Allaire, J.-F. (2007). Script analysis of the hunting process of serial sex offenders. *Criminal Justice and Behavior*, *34*, 1069-1084.

Beauregard, E., Rossmo, D. K., & Proulx, J. (2007). A descriptive model of the hunting process of serial sex offenders: A rational choice approach. *Journal of Family Violence*, *22*, 449-463.


*Other Articles*

Rossmo, D. K. (2017). The fine print of journal reviewing. *The Criminologist*, *42*(1), 8. Reprinted with additions in *The Western Criminologist* (2017, Spring).

Rossmo, D. K. (2015). Science and advocacy: Mixing oil and water. *The Criminologist*, *40*(6), 7-8.

Rossmo, D. K. (2015). Short and sweet: A call for concise journal articles. *The Criminologist*, *40*(2), 8-10.

Rossmo, D. K. (2014, Winter). Finding patterns in spatial data. *Up front* (pp. 44-45). Toronto: PwC Canada.

Rossmo, D. K. (2010). Criminal investigative failures. *RCMP Gazette*, *72*(1), 30-31.

Rossmo, D. K. (2009, October). Failures in criminal investigation. *The Police Chief*, pp. 54-66.


*Books*

Estaville, L. E., Egan, K., & Rossmo, D. K. (2013). *Texas crime atlas*. San Marcos, TX: Texas State Center for the Study of the Southwest.

Rossmo, D. K. (2009). *Criminal investigative failures*. Boca Raton, FL: Taylor & Francis.

Rossmo, D. K. (2007). *Geographic profiling* (M. Lee, Trans.). Beijing: Chinese Public Security University Press. (Original work published 2000).


*Book Chapters*

Rossmo, D. K. (2017). Geoprofiling serial sex murder. In J. Proulx & E. Beauregard (Eds.), *International handbook on sexual homicide*. Abingdon, Oxfordshire: Routledge.

Rossmo, D. K. (2017). Geoprofiling terrorism. In G. Bruinsma & S. Johnson (Eds.), *The Oxford handbook of environmental criminology* (chap. 34). Oxford: Oxford University Press.

Rossmo, D. K. (2017). Geographic profiling in cold cases. In R. H. Walton (Ed.), *Cold case homicides: Practical investigative techniques* (2nd ed.) (pp. 557-580). Boca Raton, FL: CRC Press.

Rossmo, D. K., & Rombouts, S. (2017). Geographic profiling. In R. Wortley & M. Townsley (Eds.), *Environmental criminology and crime analysis* (2nd ed.) (pp. 162-179). Abingdon, Oxfordshire: Routledge.

Rossmo, D. K. (2017). Sexual homicide: An exemplar horror crime. In E. Beauregard & M. Martineau, *The sexual murderer: Offender behaviour and implications for practice* (pp. xvii-xviii). Abingdon, Oxfordshire: Routledge.

Rossmo, D. K. (2015). "Rounding up twice the usual number of suspects." In M. Maltz & S. K. Rice (Eds.), *Envisioning criminology: Researchers on research as a process of discovery* (pp. 253-260). New York: Springer.

Rossmo, D. K., & Summers, L. (2015). Routine activity theory in crime investigation. In M. A. Andresen & G. Farrell (Eds.), *The criminal act: The role and influence of routine activity theory* (pp. 19-32). Basingstoke, Hampshire: Palgrave Macmillan.

Summers, L., & Rossmo, D. K. (2015). Aplicaciones prácticas de la teoría de las actividades rutinarias a la investigación criminal. In F. Miró Llinares & J. R. Agustina Sanllehi (Eds.), *Crimen, sociedad, vida: Un homenaje a Marcus Felson* (pp. 173-188). Madrid: Dykinson.

Rossmo, D. K. (2014). Geographic profiling in cold case investigations. In R. Walton (Ed.), *Practical cold case homicide investigations procedure manual* (pp. 303-304). Boca Raton, FL: CRC Press.

Rossmo, D. K. (2013). Geographic profiling. In G. Bruinsma & D. L. Weisburd (Eds.), *Encyclopedia of criminology and criminal justice* (pp. 1934-1942). New York: Springer.

Beauregard, E., Rossmo, D. K., & Proulx, J. (2011). A descriptive model of the hunting process of serial sex offenders: A rational choice approach. In M. Natarajan (Ed.), *Crime opportunity theories: Routine activity, rational choice and their variants*. Surrey, UK: Ashgate.

Rossmo, D. K., Lu, Y., & Fang, T. (2011). Spatial-temporal crime paths. In M. A. Andresen & J. B. Kinney (Eds.), *Patterns, prevention, and geometry of crime* (pp. 16-42). London: Routledge.

Rossmo, D. K. (2009). Geographic profiling in serial rape investigations. In R. R. Hazelwood & A. W. Burgess (Eds.), *Practical aspects of rape investigation: A multidisciplinary approach* (4th ed.). Boca Raton, FL: CRC Press.

Beauregard, E., & Rossmo, D. K. (2008). Geographic profiling and analysis of the hunting process used by serial sex offenders. In M. St-Yves & M. Tanguay (Eds.), *The psychology of criminal investigations: The search for the truth* (pp. 529-554) (J. Miller, Trans.). Toronto: Carswell. (Original work published 2007).

Rossmo, D. K. (2008). Geographic profiling. In M. Strano (Ed.), Manuale di investigazione criminale (pp. 407-417). Rome: International Crime Analysis Association.

Rossmo, D. K. (2008). Place, space, and police investigations: Hunting serial violent criminals. In D. V. Canter & D. Youngs (Eds.), *Principles of geographical offender profiling* (pp. 149-163). Aldershot, Hampshire: Ashgate Publishing.

Rossmo, D. K., & Rombouts, S. (2008). Geographic profiling. In R. Wortley & L. Mazerolle, *Environmental criminology and crime analysis* (pp. 136-149). Cullompton, Devon: Willan Publishing.

Rossmo, D. K., & Velarde, L. (2008). Geographic profiling analysis: Principles, methods, and applications. In S. Chainey & L. Tompson (Eds.), *Crime mapping case studies: Practice and research* (pp. 35-43). Chichester: John Wiley & Sons.

Beauregard, E., & Rossmo, D. K. (2007). Profilage géographique et analyse des tactiques de chasse chez les agresseurs sexuels sériels. In M. St-Yves & M. Tanguay (Eds.), *Psychologie de l'enquête criminelle: La recherche de la vérité* (pp. 577-605). Cowansville, Québec: Les Éditions Yvon Blais.

**Cases**

(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition;

- *State of Indiana v. David Camm* (2013).

**Compensation**

(vi) a statement of the compensation to be paid for the study and testimony in the case.


     I have agreed to assist Richard A. Waples of Waples & Hanger on William Rainsberger's civil case as an expert consultant and witness, at the rate of $400 US per hour plus expenses.  This rate applies to all tasks, including document and record review, research, analysis, report writing, meetings, trial preparation, depositions, testifying, travel, and telephone and email communication.