UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| WILLIAM RAINSBERGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:  1:16-cv-103-WTL-MJD |
| | ) | |
| CHARLES BENNER, | ) | |
| | ) | |
| Defendant. | ) | |

## REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Rainsberger's oversized brief and hundreds of pages of exhibits appear designed to make the Court think the record is just too sprawling or complex to resolve this case on summary judgment. The Court should not be fooled.

Rainsberger's attempts to muddy and mischaracterize the record, his claim that he did not commit the crime, and his expert's Monday-morning quarterbacking are immaterial to the pending motion.[1] When focusing on the facts and arguments that actually are material, the resolution of that motion is straightforward. If Detective Benner had probable cause (or at least arguable probable cause) to seek a warrant for Rainsberger's arrest and prosecution, this litigation must end. The Court need not—and should not—go any further. But even if it does, nothing in the record negates probable cause or establishes malice.

---

[1] Rainsberger's response to Benner's summary-judgment motion is full of immaterial arguments, inadmissible evidence, and misrepresentations of the record. Responding to them is complicated by his failure to assign any exhibit numbers (which in turn is complicated by his designation of evidence's failure to list any of his thirty-four exhibits in the order in which he actually filed them). Nevertheless, Benner has attempted to address many of those issues in this reply. Addressing them all would far exceed the permitted page allotment only to divert the Court's attention to immaterial issues. For instance, Rainsberger claims the prosecutor's office "rejected" Benner's first probable-cause affidavit. He fails to mention that the prosecutor never said the initial affidavit did not establish probable cause and simply asked Benner to confirm the victim's financial information—information nobody disputes in this lawsuit. *See* Dkt. 50-3 at 46-47; Dkt. 50-9 at 13-14. Such claims are misleading but ultimately are immaterial to the issues the Court must decide. As the Court knows, misrepresentations of the record, inadmissible evidence, and disputes over *immaterial* facts cannot defeat a summary-judgment motion.

1

I.    **As long as Benner had arguable probable cause, Rainsberger's claims are legally barred (and this Court's analysis must end).**

Rainsberger's response goes to great lengths trying to explain away the undisputed evidence that provided Benner probable cause to believe he committed murder. But this is not a murder trial. Although Rainsberger's post-hoc rationalizations might create reasonable doubt, they do not negate the undisputed facts establishing that Benner had at least arguable probable cause to seek a warrant for Rainsberger's arrest and prosecution. Although Benner goes on to address various mischaracterizations and admissibility issues in later sections of this brief—so the Court is not left with a false view of the record—the issue addressed in this first section is dispositive. Because the undisputed facts easily meet the threshold for arguable probable cause, the Court need not proceed beyond Section I of this brief.

A.    **Binding precedent consistently cautions that probable cause is not a high bar, and the existence of at least arguable probable cause is an absolute defense to Rainsberger's claims.**

Probable cause is an "absolute defense" to false arrest and malicious prosecution claims under Section 1983. *Hart v. Mannina*, 798 F.3d 578, 587 (7th Cir. 2015). And for good reason. There is no constitutional right to be arrested and prosecuted only when the government has proof of guilt beyond a reasonable doubt. All that is required for either is probable cause. Our system leaves the determination of guilt or innocence to fellow citizens—not the government.

The Supreme Court has often cautioned that probable cause has a low threshold. *Kaley v. United States*, 134 S. Ct. 1090, 1103 (2014) ("Probable cause, we have often told litigants, is not a high bar. It requires only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." (quotation marks and alteration marks omitted)). Our own circuit echoes the Supreme Court's reminder. *E.g.*, *Fox v. Hayes*, 600 F.3d 819, 833 (7th Cir. 2010) ("it does not take much to establish probable cause"); *Hart*, 798 F.3d at 587 (calling probable cause a

2

"fluid concept" resting on "common-sense judgments" given the totality of circumstances). Accordingly, a police officer may have probable cause even if his evidence would not support a conviction. In fact, probable cause does not even require an officer to show that his belief is more likely correct than incorrect. *Fox*, 600 F.3d at 833. The officer need only have "more than a bare suspicion" that he has the right guy—even if he is more likely wrong than right. *Id.* ("The officers must have more than a bare suspicion that they have the right guy, but they need not have enough evidence to support a conviction or even to show that their belief is more likely true than false.").

Courts evaluating whether probable cause existed must consider the defendant officer's perspective, not that of an omniscient observer. *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1245 (7th Cir. 1994). And because police officers are entitled to rely on their experience, their probable-cause judgments "deserve deference." *United States v. Breit*, 429 F.3d 725, 728 (7th Cir. 2005). Here, where Benner has asserted a qualified-immunity defense, he must establish only that he had arguable probable cause. In other words, even if he was mistaken that probable cause existed, he is immune as long as that mistake was reasonable. *See* Dkt. 44 at 29 (citing *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 714-15 (7th Cir. 2013)).

### B.   Even if the Court were to credit Rainsberger's inadmissible evidence and mischaracterizations, the remaining undisputed facts still satisfy the threshold for probable cause.

Notwithstanding Rainsberger's attempts to muddy the record, the resolution of this case is not complicated. As explained in Sections II and V of this reply, the Court should not credit Rainsberger's inadmissible evidence and mischaracterizations of the record. But even if it does, the undisputed facts still easily meet the threshold for probable cause (and the lower threshold for arguable probable cause), entitling Benner to summary judgment:

- Rainsberger was the last known person to see his mother alive. *See* Dkt. 50-24 at 2. He is also the one who reported her injuries in the 911 call. Dkt. 50-18 at 56. No evidence

confirms that anyone else was in his mother's apartment between the time Rainsberger acknowledges last being there and the time he called 911 to report her injuries.

- Although his mother was still breathing, Rainsberger did not attempt to provide any aid even after dispatchers instructed him to put pressure on her wound. Dkt. 50-10 at 6; *see also* Dkt. 50-18 at 65 (calling it "moronic" that dispatchers kept asking him if she was breathing normally). Rainsberger now offers various post-hoc explanations for why he refused to follow the dispatcher's instructions. But it is undisputed that he provided no aid and that Benner found that fact to be suspicious. *See* Dkt. 50-9 at 11.

- A bloodied blanket covered his mother's head. *Id.* at 58. Detective Benner's training and experience taught him that an attacker who covers his victim's head often has a personal relationship with the victim.[2] Dkt. 43-8 at 3.

- Rainsberger never looked under the blanket to see what had happened to his mother or to assess her injuries. *See* Dkt. 50-18 at 64 (testifying that removing the blanket to see what had happened was "the most idiotic suggestion anyone could have made"). But despite never looking under the blanket to see what happened, Rainsberger appeared to know right away how his mother had been attacked. He told the 911 operator that someone "bashed" her head in. *Id.* at 71. Likewise, he told a medic that someone had "caved" her head in. Dkt. 50-7 at 5.

- That medic, Carl Wooldridge, reported to Benner that he thought it strange when Rainsberger reported that someone had caved his mother's head in given that Rainsberger

---

[2] Rainsberger's expert report—which is largely inadmissible or immaterial as noted below in Section V—questions whether empirical research supports that training (despite acknowledging a manual from the FBI's National Center for the Analysis of Violent Crime that does). But whatever the literature surveyed in an expert report prepared in 2017 may show, it is undisputed that Benner's training and experience taught him that covering a victim's face suggests a personal relationship between the victim and her attacker. *Cf. Sheik-Abdi*, 37 F.3d at 1245 (noting the officer's perspective at the time is what matters).

had not removed the blanket to see what happened. Dkt. 43-4 at 3, 10. Indeed, Wooldridge initially thought she had been shot. *Id.* at 7. And Rainsberger's own evidence shows that at least one other medic, a female, and an ER doctor also reported an initial belief that she had been shot. *See* Dkt. 50-2 at 2-3; Dkt. 50-11 at 8; Dkt. 50-13 at 7. Yet Rainsberger somehow appeared to know right away how the attack had actually happened. Although he now says he was actually unsure and offers various post-hoc explanations for his statements to the dispatcher and the medic, those statements are undisputed and were unequivocal. It is also undisputed that both Benner and Wooldridge found it suspicious that Rainsberger appeared to know how the attack happened well before medical personnel were able to figure it out.[3] Dkt. 43-1 at 2; Dkt. 43-4 at 3, 10.

- Wooldridge also reported to Benner that he thought William's lack of emotion on the scene "didn't seem right." Dkt. 43-4 at 10. No evidence anywhere in the record suggests Benner had any reason to doubt Wooldridge's credibility.

- It appeared to Benner that there had been no forced entry to the mother's apartment (something Rainsberger agreed with). Dkt. 43-1 at 2; Dkt. 50-24 at 20. Rainsberger also told Benner his mother would have been unlikely to open the door for a stranger. Dkt. 50-18 at 30; Dkt. 50-24 at 24. Rainsberger was one of a very small universe of people with a key to his mother's apartment. Dkt. 50-18 at 32.

- Credit cards, cash, and a checkbook were found in a container sitting on the dining room table. Dkt. 43-1 at 2; Dkt. 50-28 at 5-6. A lockbox was left undisturbed on a shelf in the spare bedroom's open closet. Dkt. 43-1 at 2; Dkt. 43-9 (photo 12); Dkt. 50-18 at 123.

---

[3] Rainsberger now criticizes first responders for thinking his mother had been shot, pointing to things like the absence of any gunpowder odor in the apartment. His response omits the forensic specialist's testimony that she has never *in her entire career* been able to smell gunpowder at a shooting scene. Dkt. 43-6 at 3.

5

- Rainsberger told the police officer transporting him from the scene either (a) that he did not know if it was a good thing or a bad thing that happened to his mother or (b) that he did not know if it was a good thing or a bad thing if his mother died. Dkt. 50-2 at 14. Rainsberger has since attempted to explain what he meant. *See* Dkt. 50-18 at 89 (calling one possible explanation "just a comment on the fragility of life and the senselessness of the crime" and another that "if she was going to die anyway, she might as well die"). But regardless of any post-hoc rationalizations for it, it is undisputed that Benner found that statement to be suspicious. Dkt. 43-8 at 3-4.

- Rainsberger's mother had approximately $100,000 in assets, and Rainsberger was one of her beneficiaries. Dkt. 43-1 at 5; Dkt. 50-18 at 38. Had she lived longer, those assets would have been spent down quickly on the cost of assisted living. Dkt. 50-24 at 7.

- Rainsberger became angry when Benner asked him to take a polygraph, refused to take it, and shouted down to the waiting room to tell his brother Robert that he was not taking a polygraph either. Dkt. 50-18 at 93-97. Although he has since attempted to explain why he refused, it is undisputed that polygraphs are a tool Benner often use to eliminate family members as suspects early in an investigation, that in Benner's experience family members typically are eager to cooperate and take a polygraph so police can move on to other potential suspects, and that Rainsberger's angry refusal aroused both Benner's suspicions and Detective Tom Tudor's suspicions. Dkt. 50-9 at 39-40, 80-81.

Even if the Court credits everything in Rainsberger's response, these facts remain undisputed. They provided Benner with "more than a bare suspicion" that Rainsberger had committed murder. He appeared to have the most opportunity to commit the crime. He appeared to know how the attack had happened long before anyone else had figured it out. His behavior

after the crime seemed suspicious both to a first responder and to two experienced homicide detectives. And he stood to gain financially from his mother's death. Under binding Seventh Circuit precedent, Benner is therefore entitled to summary judgment *even if he was more likely wrong than right*. *Supra* at 2. And even if those facts did not justify more than a bare suspicion—and they do—Benner would still be entitled to qualified immunity because they at least provided him with arguable probable cause.

That is the end of the inquiry. Probable cause, or at least arguable probable cause, is an absolute bar to both of Rainsberger's claims. *See Hart*, 798 F.3d at 587; *Abbott*, 705 F.3d at 714. The Court need not—and should not—go any further to resolve this case.

## II. Although the Court need not reach them, Rainsberger's scattershot arguments repeatedly misstate the record and are immaterial in any event.

Rainsberger tries to defeat summary judgment by arguing that Benner should have pursued other leads, drawn different inferences from the facts, or included different facts in his probable-cause affidavit. Those arguments are immaterial. As noted in Section I, the existence of probable cause is an absolute bar to Rainsberger's claims (so the Court need not address anything else). And notwithstanding the response's second-guessing of Benner's decision to focus on Rainsberger as a suspect, the Seventh Circuit has "consistently" held that officers with probable cause "have no constitutional obligation to conduct any further investigation in the hopes of uncovering potentially exculpatory evidence." *E.g.*, *Forman v. Richmond Police Dep't*, 104 F.3d 950, 962 (7th Cir. 1997).

And even if Rainsberger's arguments were material, the record does not support them. His response constructs a fictional probable-cause affidavit and then argues that the fictional affidavit was false or misleading. Those mischaracterizations should not distract the Court from the straightforward inquiry before it—whether Benner had probable cause to believe Rainsberger had killed his mother. And to the extent Benner made any mistakes in the actual probable-cause

affidavit at issue here, they are immaterial to the outcome because they do not negate the probable cause (or, at a minimum, arguable probable cause) established in Section I.

Lest those mischaracterizations go unanswered—however immaterial they may be—this reply addresses them briefly in turn.

1.      Rainsberger claims the probable-cause affidavit was misleading because cellphone records to not show him in the area of his mother's apartment during the relevant time period. There are two problems with that claim. First, Benner's probable-cause affidavit never says records show him inside the area. It simply says no records are able to confirm he was *outside* the area during the relevant time.[4] Dkt. 43-1 at 5. That statement is indisputably true. Second, Rainsberger's claim that this true statement somehow misled the criminal-court judge into thinking Rainsberger was in the area is preposterous. His own testimony places him either at his house two or three blocks away from his mother's apartment or at the Kroger across the street from her apartment for virtually the entire day leading up to his 911 call. Dkt. 50-4 at 14; Dkt. 50-18 at 43-48. And even though no cellphone location data confirmed it, Benner included in his affidavit Rainsberger's version of events—that he went to Plainfield the evening before and stayed there through the early morning hours before returning home. Dkt. 43-1 at 3. So Benner's actual statement about cellphone location records was indisputably accurate, and it could not possibly have misled a judge into believing that which Rainsberger himself has testified to.

2.      Rainsberger claims Benner falsely stated that cellphone records showed a call from the mother's landline phone to Rainsberger's brother at 2:40 p.m. *See* Dkt. 43-1 at 4. It is undisputed that Rainsberger's brother's cellphone records do, in fact, show that 2:40 p.m. call. At

---

[4] Benner testified in the criminal matter that he considered the relevant time to be from the morning of November 19, 2013 until the time when Rainsberger called 911 that afternoon. Dkt. 50-4 at 66.

some point, Benner received a spreadsheet prepared by another officer comparing various phone records and suggesting that the 2:40 p.m. call was actually a 3:40 p.m. call routed through a Chicago network. Even assuming Benner had that spreadsheet when he completed his affidavit, there is no evidence that he had any understanding that the two calls were the same call until months later.[5] To the contrary, more than two years later Benner still was not convinced they were the same call because—even accepting the time zone discrepancy for a call routed through Chicago—the two calls show up on the brother's cellphone records as having two different durations. Dkt. 50-9 at 16, 22.

Even Rainsberger testified that he has no evidence proving that there was only one call. Dkt. 50-18 at 105 ("Q: But you have no evidence to prove that. A: No, but I'm confident."). He simply argues that Benner should have known to treat the mother's landline phone records—which show a 3:41 p.m. call but not a 2:40 p.m. call—as the inviolably accurate ones. But those records do not even show the 3:38 p.m. 911 call that everyone agrees was made from the mother's landline phone. Dkt. 50-18 at 8; Dkt. 50-25. Although police may not ignore "conclusively established evidence" that defeats probable cause, the phone call discrepancy is not even conclusively established today. *Cf. McBride v. Grice*, 576 F.3d 703, 707-08 (7th Cir. 2009). And even if it were, that fact would not negate probable cause. *See* Section I, *supra*.

3.      Rainsberger calls Benner a liar and criticizes him for purportedly saying that surveillance video from a Kroger shows Rainsberger throwing away a weapon and looking around for cameras. The most fundamental problem with that farce is that Benner's probable-cause

---

[5] Two-and-a-half years after the fact, Benner testified that he believed he had the comparison spreadsheet in his file when he prepared the probable-cause affidavit but was not aware of the discrepancy at that time. Dkt. 50-9 at 50. The evidence actually confirms that Officer Bierce did not even create the comparison spreadsheet until well *after* Benner submitted his probable-cause affidavit in May 2014. Dkt. 43-19 at 3-4 (Bierce testifying that he did not create the comparison spreadsheet until July 2014); Dkt. 43-22 at 2 (Bierce emailing Benner the comparison spreadsheet in late July 2014).

affidavit says nothing about Rainsberger throwing away a weapon, a hammer, or a pry bar. *Cf.* Dkt. 49 at 8. It says that Rainsberger appeared to take a "straight object" from his person and place in a garbage can. Dkt. 43-1 at 4. That statement is indisputably true. *See* Dkt. 50-18 at 130 (Rainsberger testifying that he took the object from his pocket and threw it away); Dkt. 50-31 at 18 (showing that it was some sort of straight object). Rainsberger also takes issue with Benner stating that he "appeared to look around for cameras," saying he was just turning to look at a woman. Dkt. 49 at 7. Regardless of what Rainsberger now claims he was looking at back in November 2013, there is no evidence suggesting Benner knowingly made a false statement when he said it looked to him like Rainsberger was looking around for cameras. Nor could that discrepancy negate probable cause.

4.     Rainsberger criticizes Benner for stating that a lockbox in plain view in the back room contained "savings bonds." It is undisputed that the lockbox was visible on a shelf in an open closet in that back room. Dkt. 43-9 (photo 12); Dkt. 50-9 at 35. And, though everyone now agrees the financial documents in the lockbox were certificates of deposit instead of savings bonds, it is hard to fathom how that fact could possibly be material. *See* Dkt. 50-18 at 123. They were financial documents that someone thought important enough to keep in a lockbox, and they were undisturbed. Moreover, even though Benner's statement later proved to be mistaken, Rainsberger's own designated evidence shows that Benner relied on a representation from crime lab personnel who indicated they were savings bonds. Dkt. 50-4 at 47.

5.     Rainsberger says Benner lied in his probable-cause affidavit by saying nothing had been stolen from the mother's apartment. Dkt. 49 at 9-11. Rainsberger is yet again attacking a fictional probable-cause affidavit. Dkt. 43-1. The one at issue here never says that nothing was stolen. It says there were no visible signs of forced entry, something Rainsberger himself agrees

with. *Id.*; Dkt. 50-18 at 123. It recounts that some drawers were pulled out but did not appear to have been rifled through. Dkt. 43-1 at 2. And it notes various seemingly valuable items that were left undisturbed, including cash, checks, and credit cards. *Id.* Those facts are undisputed.

Rainsberger argues that Benner should have known some items were stolen because Rainsberger had reported that his mother owned certain items that purportedly were not recovered—a purse, jewelry, and a dementia medication. But the evidence does not support that argument. It shows that Rainsberger's mother had a shiny black purse that she rarely if ever used. Dkt. 50-11 at 6; Dkt. 50-18 at 113. Benner recovered a purse matching that description. Dkt. 43-8 at 4; Dkt. 43-9 (photo 16); Dkt. 50-9 at 9. And while Rainsberger now argues that Benner should have known the recovered purse did not fit the description of his mother's purse, that argument squarely contradicts his own sworn testimony that it was "extremely similar" to the one he remembers his mother having.[6] *Compare* Dkt. 49 at 11, *with* Dkt. 50-18 at 113; *see also* Dkt. 43-9 (showing in photo 16 the shiny black purse police recovered from the apartment). Regarding Rainsberger's claim that Benner should have known his mother's jewelry was stolen, that too contradicts his own testimony. Rainsberger testified under oath that he cannot say for sure whether any jewelry was stolen and that, in fact, her jewelry was sufficiently valueless that "we didn't really track it." Dkt. 50-18 at 121. In fact, he explicitly told Benner that his mother had no valuable jewelry in the apartment (or any other valuable possessions for that matter). Dkt. 50-24 at 9 ("[B]ut she doesn't own a car or real estate or stocks or valuable jewelry or, or anything."). And with respect to the allegedly missing dementia prescription, Benner testified that he noticed some pill bottles on the kitchen counter but did not pay attention to whether they were over-the-counter or the dementia prescription. Dkt. 50-4 at 58-59. In any event, it is undisputed that Benner's training

---

[6] Rainsberger appears to make up out of thin air a claim that the recovered purse still had paper stuffing in it from the store. *See* Dkt. 49 at 11. He cites four possible sources for that claim, none of which support it.

11

and experience taught him that Aricept is not commonly stolen and has no street value. Dkt. 43-8 at 4.

In sum, Benner never said in his probable-cause affidavit that nothing was stolen. And while Rainsberger now suggests the evidence does not conclusively establish that all of his mother's belongings were recovered and inventoried by police, there is no evidence that Benner knowingly ignored conclusively established evidence that anything was missing—much less evidence sufficient to negate probable cause. *Cf. McBride*, 576 F.3d at 707-08.

6.      Rainsberger accuses Benner of misrepresenting Rainsberger's degree of concern for his mother. Here, yet again, the actual probable-cause affidavit never says Rainsberger was not concerned. And the statements it does make—that he left the apartment to wait for the ambulance after calling 911, that he did not remove the blanket from her head to see what happened to her, and that he never asked Benner about his mom's condition or asked to go see her during his interview—are undisputed. *See* 43-1 at 2-3; *see also* Dkt. 50-18 at 131 ("Q: My question is: Did you ever ask Detective Benner if you could go to the hospital? A: I did not. Q: Did you ever ask Detective Benner what your mother's condition was? A: No.").

7.      Rainsberger accuses Benner of misrepresenting his refusal to take a polygraph and lying about whether the family stormed out afterward. Dkt. 49 at 17-20. But all the probable-cause affidavit says about the exchange is that Rainsberger and his brother "adamantly said no" and that afterward the family stormed out. Dkt. 43-1 at 4. Rainsberger's own testimony confirms this account. He says he refused to take it and then started "yelling back and forth" with Benner and Tudor about it. Dkt. 50-18 at 94-96. He also says that, while he is "not sure exactly how it played out," he then left the interview room yelling at his brother down in the waiting room that "we are not taking a polygraph test." Dkt. 50-18 at 97. His brother, Robert, testified that yelling and cussing

continued in the lobby and that the detectives and the Rainsbergers then parted ways from the lobby. Dkt. 50-13 at 9. Nit picking whether "stormed out" or some other phrase best describes that heated exchange cannot possibly be material to this motion.

8.     Rainsberger claims that Benner lied in his probable-cause affidavit when he said he had not heard from the Rainsbergers after the polygraph confrontation. Dkt. 49 at 20. Benner later acknowledged in testimony during the criminal proceeding that, while he had not spoken with her, he had received two voicemails from Rainsberger's sister, Rebecca. Dkt. 50-4 at 30. He has also testified that the sentence noting that he had not heard from any of the siblings was in his initial draft probable-cause affidavit prepared months earlier and that he did not catch it and remove it when finalizing the May 2014 affidavit. Dkt. 50-9 at 44. He noted that whether Rebecca left him any voicemails was irrelevant to probable cause, though. Neither of the brothers—and particularly his suspect, William Rainsberger—ever contacted him. *Id.* That is indisputably right. Whether Rebecca left Benner a voicemail does not negate probable cause.

9.     Rainsberger faults Benner for not including in his probable-cause affidavit that a touch DNA sample from the shoulder of his mother's sweater showed DNA from an unidentified male. Dkt. 49 at 21-23. Undisputed evidence shows that Benner told prosecutors about the sample but did not include it in his affidavit just as he was trained to do. Dkt. 43-8 at 6. Based on his training and experience, he understood that sample likely was attributable to medical personnel who treated Ruth Rainsberger at the scene and transported her to the hospital. *Id.* at 5-6; Dkt. 50-9 at 79. Prosecutors told Benner they agreed and also noted that doctors and nurses at the hospital could be responsible for the sample. *See* Dkt. 50-9 at 66. In short, Benner followed his training and his experience. And while the DNA evidence might be important to a reasonable-doubt

13

defense in a murder trial, it does not change the fact that Benner had "more than a bare suspicion" that Rainsberger committed murder.

10.     Rainsberger says Benner misled the criminal court by "suggesting" in his probable-cause affidavit that he had a financial motive to kill his mother. There are several problems with that argument. First, again, he is attacking a fictitious affidavit. The one Benner prepared never says Rainsberger had a financial motive. It simply reports what the mother's assets were and that Rainsberger was one of her beneficiaries. Dkt. 43-1 at 5. Those facts indisputably are true. What Rainsberger and his purported expert evidence complain about are the inferences someone might draw from those accurate factual statements. But that complaint is not with Benner. He simply provided accurate facts about the mother's assets.

Moreover, the bald claim in Rainsberger's expert report that a suspect cannot have a financial motive unless he is in dire financial straits is wholly unsupported. Rossmo's unsourced assertion that only poor folks could ever have a motive to kill for money is facially absurd. It defies both common sense and long-established law in this circuit recognizing "[p]ersonal advancement and financial gain" as "two well recognized motives for much of human conduct." *United States v. Snow*, 670 F.2d 749, 7545 n.9 (7th Cir. 1982). In short, the actual probable-cause affidavit in this case does not say Rainsberger had a financial motive. But even if it did, he indisputably stood to (and did) gain financially from his mother's death. Dkt. 50-18 at 38-39; *see also* Dkt. 50-24 at 7 (Rainsberger noting that, although his mother was "fairly well off" before her death, he was looking at moving her into assisted living "but it costs so much that it was going to eat through everything" before Medicaid kicked in).

*     *     *     *     *

14

Although Rainsberger's response might be relevant to the beyond-a-reasonable-doubt inquiry in a murder trial, this is not a murder trial. The relevant question here is whether Benner had probable cause to seek the arrest warrant. Because the undisputed facts confirm that he did, everything else is immaterial. *See* Section I, *supra*.

### III.     Rainsberger failed to point to a single analogous case and has therefore failed to meet his burden of overcoming qualified immunity.

Rainsberger points to general principles that police officers are not entitled to qualified immunity if their probable-cause affidavits include false or misleading statements. Dkt. 49 at 33. As an initial matter, he misstates the law. If probable cause or arguable probable cause existed, Benner has an absolute defense to his claims regardless of what the probable-cause affidavit may or may not have included. Moreover, Rainsberger points to no analogous case suggesting that probable cause could be negated by, for instance, mixing up whether documents in a murder victim's lockbox were certificates of deposit or savings bonds or by characterizing a shouting match in a police station's lobby as someone storming out. Harping on those sorts of immaterial disputes may be a useful strategy for defending a murder charge under the beyond-a-reasonable-doubt standard, but Rainsberger points to no analogous case clearly establishing that such peripheral issues could negate probable cause. It was his burden to overcome qualified immunity, and he failed to meet it.

### IV.     Even if probable cause were not an absolute bar to both of Rainsberger's claims, his malicious prosecution claim would still fail.

Rainsberger notes that he cannot prevail on a malicious prosecution claim without establishing that Benner committed a "wrongful act done willfully and purposely and without just cause or excuse." Dkt. 49 at 35 (citing *Peoples Bank & Trust Co. v. Stock*, 403 N.E.2d 1077, 1084 (Ind. 1980)). Here, Rainsberger cannot point to any evidence that any purported mistakes or omissions were purposeful or without excuse. The argument he emphasizes most is Benner's

failure to include DNA results in his probable-cause affidavit. But that argument cannot support a malicious prosecution claim because it is undisputed that Benner made the authority that eventually initiated the prosecution aware of those results—meaning any omission from the affidavit could not possibly be responsible for the prosecutor filing a criminal information against Rainsberger. Dkt. 43-8 at 6; Dkt. 50-9 at 66; *see also Alexander v. United States*, 721 F.3d 418, 422 (7th Cir. 2013) (noting that one of the elements of malicious prosecution in Indiana is causing an action to be instituted against the plaintiff). Moreover, it is undisputed that he was following his training by turning those results over to prosecutors but not including them in his affidavit. *Id.*

Likewise, Rainsberger concedes that current Seventh Circuit law bars his malicious prosecution claim because it is premised solely on the Fourth Amendment. Dkt. 49 at 36.

## V.     Much of the sprawling evidence filed with Rainsberger's response is inadmissible and immaterial (although probable cause exists even if it is considered).

As noted in Section I, summary judgment is proper even if the Court considers all of Rainsberger's evidence. But much that that evidence is inadmissible in any event.

### A.     Most of the Rainsberger and Hennessy affidavits are inadmissible.

A plaintiff's self-serving affidavit may be considered only if it is supported by record evidence and if it satisfies relevant evidentiary requirements—including requirements that affidavits be based on personal knowledge and set out facts that would be admissible. *See Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 504 (7th Cir. 2004). After a few unobjectionable introductory paragraphs, Rainsberger's sprawling and argumentative affidavit is inadmissible. It is replete with assumptions and arguments for which he has established no foundation of personal knowledge. *See* Dkt. 50-15. It is also full of speculation, legal arguments, hearsay, and violations of the best evidence rule. *See id.* Under the guise of stating "facts," it also repeatedly misstates what the evidence in the record actually shows in much the same way the arguments in his brief did.

16

*Compare* Dkt. 50-15, *with* Section II, *supra*. The facts in the record are the facts in the record. Rainsberger's arguments about those facts—whether in his response or in his purported affidavit—are not evidence.

Rainsberger also submits an affidavit from his criminal defense lawyer. *See* Dkt. 50-29. Like Rainsberger's own affidavit, his lawyer's affidavit provides a few unobjectionable introductory facts and then launches into dozens more paragraphs of what amounts to legal argument. It is replete with assumptions and argumentative conclusions for which there is no foundation of personal knowledge, speculation, legal arguments, hearsay, and violations of the best evidence rule. *See* Dkt. 50-29. And like Rainsberger's affidavit, it repeatedly mischaracterizes the record. *Compare* Dkt. 50-29, *with* Section II, *supra*. It is not evidence.

For those reasons, the Court should strike each paragraph following paragraph nine in Rainsberger's affidavit and each paragraph following paragraph seven in his Hennessy's affidavit. Arguments regarding how the Court should characterize the evidence are not evidence.

## B. Much of Dr. Rossmo's report is inadmissible, and the admissible portions are immaterial.

Qualified expert witnesses may provide opinion testimony if their specialized knowledge will help determine a fact in issue, but only if that testimony is based on sufficient facts or data. Fed. R. Evid. 702. It is well-settled that expert witnesses may not opine whether undisputed facts are sufficient to establish probable cause. That is a question of law for the Court. *Mason v. City of Indianapolis*, No. 1:06-cv-258-RLY-TAB, 2007 WL 2700193, at *1 (S.D. Ind. Sept. 11, 2007) (citing *Smith v. Lamz*, 321 F.3d 680, 684 (7th Cir. 2003)). Hence, experts may not testify about whether a given police investigation was sufficient to justify probable cause, as an expert is no better suited than a jury to make that determination. *United States v. Diekhoff*, 535 F.3d 611, 619 (7th Cir. 2008) (noting that so-called "fact-law conclusions" in which experts purport to apply the

facts of a case to the governing legal standard are inadmissible); *Wells v. City of Chicago*, No. 09 C 1198, 2012 WL 116040, at *14 (N.D. Ill. Jan. 16, 2102) (excluding expert testimony purporting to claim that plaintiff's detention was not justified by the investigation police performed because an expert is "no more qualified than a jury to determine whether probable cause existed").

Rainsberger offers an expert report from Dr. Kim Rossmo, an apparent expert on the use of geographic profiling in criminal investigations (something nobody contends to be relevant to this case). His conclusions are either inadmissible, irrelevant, or squarely contradicted by binding Seventh Circuit law.

First, Rossmo opines that Rainsberger was wrongfully arrested. Dkt. 50-31 at 44. That opinion is inadmissible under well-established Seventh Circuit law. *Diekhoff*, 535 F.3d at 619.

Second, Rossmo concludes that Benner rushed to judgment, suffered from common cognitive errors like tunnel vision and confirmation bias, and failed to investigate alternate theories. Dkt. 50-31 at 44. Even if credited, that conclusion is immaterial. Seventh Circuit precedent is clear. Once Benner had probable cause to believe Rainsberger committed the crime, he had no constitutional obligation to investigate alternate theories or search for exculpatory evidence. *Forman*, 104 F.3d at 962. Moreover, that Rossmo in hindsight thinks Benner's investigation could have been influenced by what he himself calls "common" cognitive or thinking errors that "frequently" impact real-world decision-making is immaterial. If anything, the report shows that these sorts of cognitive errors are as inevitable and unintentional for police officers as they are for any other humans. *See id.* at 5-10 (noting that "the possibility of mistakes and human error always exists," "[t]he reality is the system makes mistakes," and that "[l]ike all humans, police investigators, prosecutors, and forensic scientists can fall prey to cognitive biases"). That Rossmo thinks inevitable cognitive errors affected an investigation might be relevant if this were

a murder trial tasked with determining whether Rainsberger committed murder under the beyond-a-reasonable-doubt standard. But it provides no support for the allegations in this case that Benner lacked probable cause or knowingly made false or misleading statements. If anything, it suggests just the opposite.

Third, Rossmo claims that Benner's probable-cause affidavit contained false or misleading statements and attempts to explain away some of the facts that helped establish probable cause. Dkt. 50-31 at 45. As described in Sections I and II, those conclusions largely derive from Rossmo's mischaracterizations of the record. Regardless, they do not negate probable cause. *See* Section I, *supra*.

Finally, Rossmo offers his opinion as to the standard of care an officer must follow to establish probable cause. That opinion is inconsistent with the law, and it is inadmissible. The standard for evaluating whether probable cause existed is an issue of law decided in binding cases like *Kaley*, *Hart*, *Fox*, and *Forman*—not something for an expert witness to decree.

### Conclusion

Rainsberger goes to great lengths to make a straightforward case seem complicated. But the Court need not untangle his web of misstated facts and immaterial or inadmissible evidence. Even if the Court credits those arguments, it is left with undisputed facts that still easily clear the threshold for establishing probable cause (and the even lower bar for arguable probable cause). Because probable cause is an absolute defense to both claims in this lawsuit, the Court should go no further. Benner is entitled to summary judgment.

And even if probable cause did not exist, Benner would be entitled to qualified immunity on both claims. Rainsberger failed to come forward with a single analogous case establishing that the sorts of alleged mistakes at issue here would be sufficient to negate probable cause. The

malicious prosecution claim fails other reasons too—both because Seventh Circuit law precludes it and because Benner has failed to show malice.

For all those reasons, Detective Benner is entitled to summary judgment.

Respectfully submitted,

*/s/ Donald E. Morgan*
Donald E. Morgan, No. 30776-49
OFFICE OF CORPORATION COUNSEL
200 East Washington Street, Suite 1601
Indianapolis, IN 46204
Telephone: (317) 327-4055
Fax: (317) 327-3968
E-mail: donald.morgan@indy.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing reply was filed electronically on this 27th day

of February, 2017. This filing will be served on the following by operation of the Court's electronic

case filing system, and parties may access this filing through the Court's system.

> Richard A. Waples
> WAPLES & HANER
> 410 N. Audubon Road
> Indianapolis, IN  46219
> rwaples@wapleshanger.com

> _/s/ Donald E. Morgan_____
> Donald E. Morgan
> Chief Litigation Counsel