

# UNITED STATES DISTRICT COURT
## Southern District of Indiana

### Laura A. Briggs, Clerk of Court

Birch Bayh Federal Building
& U.S. Courthouse, Room 105
46 East Ohio Street
Indianapolis, IN  46204
(317) 229-3700

U.S. Courthouse, Room 104
921 Ohio Street
Terre Haute, IN 47807
(812) 231-1840

Winfield K. Denton Federal Building
& U. S. Courthouse, Room 304
101 NW Martin Luther King Blvd.
Evansville, IN 47708
(812) 434-6410

Lee H. Hamilton Federal Building
& U.S. Courthouse, Room 210
121 West Spring Street
New Albany, IN 47150
(812) 542-4510

July 26, 2017

Richard A. Waples
WAPLES & HANGER
410 N. Audubon Road
Indianapolis, IN 46219

Pamela G. Schneeman
OFFICE OF CORPORATION COUNSEL
200 E. Washington Street
Suite 1601
Indianapolis, IN 46204

RE:  WILLIAM RAINSBERGER v. CHARLES BENNER

CAUSE NO:  1:16-cv-00103-WTL-MJD

Dear Appellant and Appellee:

Please be advised that the Notice of Appeal filed in 1:16-cv-00103-WTL-MJD has been forwarded to the United States Court of Appeals for the Seventh Circuit. The Clerk of the Seventh Circuit will assign an appellate case number, docket the appeal, and notify case participants of the Seventh Circuit case number assigned to this matter.

Filing a "Designation of Record" in the U.S. District Court case helps ensure that the appropriate documents (*e.g.*, pleadings and attachments, briefs) are effectively transmitted to the Seventh Circuit. A copy of the docket sheet in this case has been included for your convenience. The docket sheet may be annotated (by circling docket numbers, or highlighting electronically) to identify the docket entries that are to be included in the appellate record, then attached as an exhibit to the Designation of Record. The designation may also simply list the docket entry numbers (all attachments to each entry will be included) along with a description of the designated documents.

Please review Southern District of Indiana Local Rule 76-1 and Seventh Circuit Rule 10 (enclosed) for guidance regarding the designation of a record, and comply with the provisions of Federal Rule of Civil Procedure 5 when filing the designation.

Please contact the Clerk's office with any questions or concerns.

Sincerely,
Laura A. Briggs,
Clerk of Court

By Maggie Twigg, Deputy Clerk
812-542-4510

# <u>Selected Rules for Reference</u>

Local Rule 76-1 - Designating Additional Items For Record on Appeal

> An appellant designating items for the record on appeal under Circuit Rule 10(a) must serve a proposed joint designation on the appellee with the notice of appeal. The parties must then confer and, if they agree, prepare a joint designation, highlighting those entries on the court's docket sheet if it is practical to do so. The joint designation must be filed with the clerk within 14 days after the notice of appeal is filed. If the parties cannot reach agreement on a joint designation, each party must submit a separate designation within 14 days after filing the notice of appeal.

> <u>NOTE</u>:   The complete Local Rules for the U.S. District Court, Southern District of Indiana, are available at: http://www.insd.uscourts.gov/local-rules

## CIRCUIT RULE 10. Preparation of Record in District Court Appeals

(a) *Record Preparation Duties.* The clerk of the district court shall prepare within 14 days of filing the notice of appeal the original papers, transcripts filed in the district court, and exhibits received or offered in evidence (with the exceptions listed below). The transcript of a deposition is "filed" within the meaning of this rule, and an exhibit is "received or offered," to the extent that it is tendered to the district court in support of a brief or motion, whether or not the rules of the district court treat deposition transcripts or exhibits as part of the record. These materials may be designated as part of the record on appeal without the need for a motion under Fed. R. App. P. 10(e). Counsel must ensure that exhibits and transcripts to be included in the record which are not in the possession of the district court clerk are furnished to the clerk within fourteen days after the filing of the notice of appeal. The following items will not be included in a record unless specifically requested by a party by item and date of filing within fourteen days after the notice of appeal is filed or unless specifically ordered by this court:

> briefs and memoranda,
>
> notices of filings,
>
> subpoenas,
>
> summonses,
>
> motions to extend time,
>
> affidavits and admissions of service and mailing,
>
> notices of settings,
>
> depositions and notices, and
>
> jury lists.

(b) *Correction or Modification of Record.* A motion to correct or modify the record pursuant to Rule 10(e), Fed. R. App. P., or a motion to strike matter from the record on the ground that it is not properly a part thereof shall be presented first to the district court. That court's order ruling on the motion will be transmitted to this court as part of the record.

(c) *Order or Certification with Regard to Transcript.* Counsel and court reporters are to utilize the form prescribed by this court when ordering transcripts or certifying that none will be ordered. For specific requirements, see Rules 10(b) and 11(b), Fed. R. App. P.

(d) *Ordering Transcripts in Criminal Cases.*

(1) *Transcripts in Criminal Justice Act Cases.* At the time of the return of a verdict of guilty or, in the case of a bench trial, an adjudication of guilt in a criminal case in which the defendant is represented by counsel appointed under the Criminal Justice Act (C.J.A.), counsel for the defendant shall request a transcript of testimony and other relevant proceedings by

completing a C.J.A. Form No. 24 and giving it to the district judge. If the district judge believes an appeal is probable, the judge shall order transcribed so much of the proceedings as the judge believes necessary for an appeal. The transcript shall be filed with the clerk of the district court within 40 days after the return of a verdict of guilty or, in the case of a bench trial, the adjudication of guilt or within seven days after sentencing, whichever occurs later. If the district judge decides not to order the transcript at that time, the judge shall retain the C.J.A. Form No. 24 without ruling. If a notice of appeal is filed later, appointed counsel or counsel for a defendant allowed after trial to proceed on appeal in forma pauperis shall immediately notify the district judge of the filing of a notice of appeal and file or renew the request made on C.J.A. Form No. 24 for a free transcript.

(2) *Transcripts in Other Criminal Cases.* Within 14 days after filing the notice of appeal in other criminal cases, the appellant or appellant's counsel shall deposit with the court reporter the estimated cost of the transcript ordered pursuant to Rule 10(b), Fed. R. App. P., unless the district court orders that the transcript be paid for by the United States. A non-indigent appellant must pay a pro rata share of the cost of a transcript prepared at the request of an indigent co-defendant under the Criminal Justice Act unless the district court determines that fairness requires a different division of the cost. Failure to comply with this paragraph will be cause for dismissal of the appeal.

(e) *Indexing of Transcript.* The transcript of proceedings to be transmitted to this court as part of the record on appeal (and any copies prepared for the use of the court or counsel in the case on appeal) shall be bound by the reporter in a volume or volumes, with the pages consecutively numbered throughout all volumes. The transcript of proceedings, or the first volume thereof, shall contain a suitable index, which shall refer to the number of the volume as well as the page, shall be cumulative for all volumes, and shall include the following information:

(1) An alphabetical list of witnesses, giving the pages on which the direct and each other examination of each witness begins.

(2) A list of exhibits by number, with a brief description of each exhibit indicating the nature of its contents, and with a reference to the pages of the transcript where each exhibit has been identified, offered, and received or rejected.

(3) A list of other significant portions of the trial such as opening statements, arguments to the jury, and instructions, with a reference to the page where each begins.

When the record includes transcripts of more than one trial or other distinct proceeding, and it would be cumbersome to apply this paragraph to all the transcripts taken together as one, the rule may be applied separately to each transcript of one trial or other distinct proceeding.

(f) *Presentence Reports*. The presentence report is part of the record on appeal in every criminal case. The district court should transmit this report under seal, unless it has already been placed in the public record in the district court. If the report is transmitted under seal, the report may not be included in the appendix to the brief or the separate appendix under Fed. R. App. P. 30 and Circuit Rule 30. Counsel of record may review the presentence report at the clerk's office but may not review the probation officer's written comments and any other portion submitted in camera to the trial judge.

(g) *Effect of Omissions from the Record on Appeal.* When a party's argument is countered by a contention of waiver for failure to raise the point in the trial court or before an agency, the party opposing the waiver contention must give the record cite where the point was asserted and also ensure that the record before the court of appeals contains the relevant document or transcript.

NOTE:   The complete Federal Rules of Appellate Procedure & Rules of the 7th Circuit Court of Appeals are available at: http://www.ca7.uscourts.gov/Rules/Rules/rules.pdf



# UNITED STATES DISTRICT COURT
## Southern District of Indiana

**Laura A. Briggs, Clerk of Court**

| | | | |
|---|---|---|---|
| Birch Bayh Federal Building<br>& U.S. Courthouse, Room 105<br>46 East Ohio Street<br>Indianapolis, IN 46204<br>(317) 229-3700 | U.S. Courthouse, Room 104<br>921 Ohio Street<br>Terre Haute, IN 47807<br>(812) 231-1840 | Winfield K. Denton Federal Building<br>& U. S. Courthouse, Room 304<br>101 NW Martin Luther King Blvd.<br>Evansville, IN 47708<br>(812) 434-6410 | Lee H. Hamilton Federal Building<br>& U.S. Courthouse, Room 210<br>121 West Spring Street<br>New Albany, IN 47150<br>(812) 542-4510 |

July 26, 2017

RE:  WILLIAM RAINSBERGER v. CHARLES BENNER

CAUSE NO:  1:16-cv-00103-WTL-MJD


Dear Appellant:

A Notice of Appeal was filed in the above case on July 26, 2017. However, a "Docketing Statement" was <u>not filed</u> along with the Notice of Appeal, as required by <u>Circuit Rule 3(c)</u> of the U.S. Court of Appeals for the Seventh Circuit. A copy of the rule is attached for reference.

Pursuant to the Seventh Circuit Rule 3(c), the appellant must serve on all parties a docketing statement and file said statement with the Clerk of the Seventh Circuit within seven (7) days of the filing of the Notice of Appeal.

<u>IMPORTANT</u>: Please do not submit the docketing statement to the U.S. District Court. The docketing statement must be filed electronically with the Seventh Circuit pursuant to Circuit Rule 25.  If the appellant is proceeding pro se, then the docketing statement should be filed on paper by mailing the same to the address below:

    Gino Agnello, Clerk
    United States Court of Appeals
    219 South Dearborn Street, Suite 2722
    Chicago, IL 60604

Please contact the Clerk's office with any questions or concerns.

    Sincerely,
    Laura A. Briggs,
    Clerk of Court

    By Maggie Twigg, Deputy Clerk
    812-542-4510

## **Selected Rules for Reference**

CIRCUIT RULE 3. Notice of Appeal, Docketing Fee, Docketing Statement, and Designation of Counsel of Record

(a) *Forwarding Copy of Notice of Appeal*. When the clerk of the district court sends to the clerk of this court a copy of the notice of appeal, the district court clerk shall include any docketing statement. In civil cases the clerk of the district court shall include the judgments or orders under review, any transcribed oral statement of reasons, opinion, memorandum of decision, findings of fact, and conclusions of law. The clerk of the district court shall also complete and include the Seventh Circuit Appeal Information Sheet in the form prescribed by this court.

(b) *Dismissal of Appeal for Failure to Pay Docketing Fee*. If a proceeding is docketed without prepayment of the docketing fee, the appellant shall pay the fee within 14 days after docketing. If the appellant fails to do so, the clerk is authorized to dismiss the appeal.

(c)(1) *Docketing Statement*. The appellant must serve on all parties a docketing statement and file it with the clerk of the district court at the time of the filing of the notice of appeal or with the clerk of this court within seven days of filing the notice of appeal. The docketing statement must comply with the requirements of Circuit Rule 28(a). If there have been prior or related appellate proceedings in the case, or if the party believes that the earlier appellate proceedings are sufficiently related to the new appeal, the statement must identify these proceedings by caption and number. The statement also must describe any prior litigation in the district court that, although not appealed, (a) arises out of the same criminal conviction, or (b) has been designated by the district court as satisfying the criteria of 28 U.S.C. §1915(g). If any of the parties to the litigation appears in an official capacity, the statement must identify the current occupant of the office. The docketing statement in a collateral attack on a criminal conviction must identify the prisoner's current place of confinement and its current warden; if the prisoner has been released, the statement must describe the nature of any ongoing custody (such as supervised release) and identify the custodian. If the docketing statement is not complete and correct, the appellee must provide a complete one to the court of appeals clerk within 14 days after the date of the filing of the appellant's docketing statement.

(2) Failure to file the docketing statement within 14 days of the filing of the notice of appeal will lead to the imposition of a $100 fine on counsel. Failure to file the statement within 28 days of the filing of the notice of appeal will be treated as abandonment of the appeal, and the appeal will be dismissed. When the appeal is docketed, the court will remind the litigants of these provisions.

(d) *Counsel of Record*. The attorney whose name appears on the docketing statement or other document first filed by that party in this court will be deemed counsel of record, and a separate notice of appearance need not be filed. If the name of more than one attorney is shown, the attorney who is counsel of record must be clearly identified. (There can be only one counsel of record.) If no attorney is so identified, the court will treat the first listed as counsel of record. The court will send documents only to the counsel of record for each party, who is responsible for transmitting them to other lawyers for the same party. The docketing statement or other document must provide the post office address and telephone number of counsel of record. The names of other members of the Bar of this Court and, if desired, their post office addresses, may be added but counsel of record must be clearly identified. An attorney representing a party who will not be filing a document shall enter a separate notice of appearance as counsel of record indicating the name of the party represented. Counsel of record may not withdraw, without consent of the court, unless another counsel of record is simultaneously substituted.

NOTE:   The complete Federal Rules of Appellate Procedure & Rules of the 7th Circuit Court of Appeals are available at: http://www.ca7.uscourts.gov/Rules/Rules/rules.pdf

# THE SETTLEMENT CONFERENCE PROGRAM
# U.S. COURT OF APPEALS FOR THE SEVENTH CIRCUIT

Pursuant to Rule 33 of the Federal Rules of Appellate Procedure[1] and Circuit Rule 33, the Court conducts conferences with counsel and clients to encourage and facilitate the settlement of civil appeals. Rule 33 conferences are conducted in all types of fully-counseled civil appeals except immigration, social security, habeas corpus, prisoners' civil rights, sentencing, and mandamus cases. The Court spontaneously notices most eligible appeals for Rule 33 conferences. Attorneys for one or more parties may also request that a conference be conducted in any eligible case.

Counsel and clients are well-advised to explore opportunities for settlement at the appellate level.Regardless of how unlikely it may seem, the fact is that many cases can be settled at this stage, substituting a certain and acceptable outcome for the risk and expense of further litigation. The Court's Settlement Conference Office has assisted counsel in settling many appeals without unduly delaying the progress of those appeals which do not yield to settlement efforts.      The following information is intended to assist practitioners and their clients in understanding how the Seventh Circuit's settlement conference program works and how they can make the best use of it to achieve favorable results.

- **How do counsel learn that a Rule 33 conference will be conducted in their appeal?**
  A Notice of Rule 33 Settlement Conference is posted on the docket. The Notice is an order of the Court advising counsel of the date and time of the conference, whether it is to be in person or by telephone, and how they and their clients are expected to prepare.

- **How can a Rule 33 conference be requested?**
  Counsel are invited to request a Rule 33 conference by contacting the Settlement Conference Office, U.S. Court of Appeals for the Seventh Circuit, 219 S. Dearborn, Room 1120, Chicago, Illinois 60604-1705 (Tel. (312) 435-6883/Fax (312) 435-6888/E-mail:  settlement@ca7.uscourts.gov ). At the request of any party or parties in an eligible appeal, the Settlement Conference Office will schedule a Rule 33 conference if its calendar permits. Counsel are then advised by notice that a conference will be held.

- **Do other parties have to be informed that a conference was requested?**
  No. If a party prefers to keep its request confidential, the Settlement Conference Office will not disclose to other parties or to the Court that the conference was requested.

- **Is participation in Rule 33 conferences optional?**
  No. When a Rule 33 conference is scheduled, participation is mandatory.

- **Are clients required to attend?**
  Clients and insurance representatives are required to attend Rule 33 conferences whenever the Settlement Conference Office so directs. When clients or insurance representatives have not been directed to attend the initial conference, they must be available by phone – with full settlement authority – for the duration of the conference.

- **Is it mandatory to settle?**
  No. Whether to settle is ultimately for the parties and their counsel to decide. However, counsel and parties are required to participate with the utmost diligence and good faith. Experience shows that settlements can often be achieved when neither side thought it possible.

---

[1] FRAP Rule 33 provides: "Appeal Conferences. The Court may direct the attorneys, and in appropriate cases the parties, to participate in one or more conferences to address any matter that may aid in the disposition of the proceedings, including the simplification of the issues and the possibility of settlement. A conference may be conducted in person or by telephone and be presided over by a judge or other person designated by the court for that purpose. Before a settlement conference, attorneys must consult with their clients and obtain as much authority as feasible to settle the case. As a result of a conference, the court may enter an order controlling the course of the proceedings or implementing any settlement agreement."

- **Who conducts Rule 33 conferences?**
  The Court has delegated the responsibility for conducting Rule 33 conferences to three full-time conference attorneys: Joel N. Shapiro, Rocco J. Spagna, and Jillisa Brittan. All were civil litigators in private practice prior to their appointment by the Court.

- **Is there a fee for the services of the conference attorney?**
  No. The assistance of the Settlement Conference Office is available to appellate litigants at no charge.

- **Must each party's lead attorney attend the Rule 33 conference?**
  Yes. It is essential that each party be represented at the Rule 33 conference by an attorney who not only is conversant with the case but is the attorney on whose advice the party relies. If more than one attorney meets these criteria, either of them may represent the client in the Rule 33 conference.

- **How is it decided whether a Rule 33 conference will be conducted by telephone or in person?**
  When all participants reside in the Chicago metropolitan area, Rule 33 conferences are usually held in the Settlement Conference Office at the United States Courthouse. Otherwise, conferences are generally conducted by telephone. The telephone equipment used in these conferences can accommodate more than a dozen separate lines and enables the conference attorney to speak privately with any combination of participants. Experience indicates that telephone conferences are generally as effective as in-person conferences in fostering settlements.

- **Are in-person conferences ever held outside Chicago?**
  Because the resources of the settlement conference program are limited, in-person conferences cannot routinely be held throughout the Circuit. However, from time to time in-person conferences are conducted at locations other than Chicago. If the participants believe that an in-person conference outside Chicago would be more productive than a conference by telephone, they are welcome to suggest it.

- **Are Rule 33 conferences confidential?**
  Yes. The Court requires all participants to keep what is said in these conferences strictly confidential. Communications, oral and written, which take place in the course of Rule 33 proceedings may not be disclosed to anyone other than the litigants, their counsel, and the conference attorney.

- **Do judges of the Court of Appeals learn what has happened at a Rule 33 conference?**
  No. Participants in Rule 33 conferences, including the conference attorney, are forbidden to impart to any judge or other court personnel, in the Court of Appeals or elsewhere, what has been communicated in these conferences.

- **What occurs at a Rule 33 conference?**
  Rule 33 conferences are official proceedings of the Court but are off-the-record and relatively informal. Discussion is conversational rather than argumentative. The focus is on realistically assessing the prospects of the appeal, the risks and costs of further litigation, the interests of the parties, and the benefits each side can gain through settlement. The conference attorney ordinarily meets with counsel both together and separately. Settlement proposals are discussed. A resolution may or may not be reached during the initial conference. Often, follow-up conferences or shuttle negotiations are conducted. Letters or draft proposals may be exchanged. By the conclusion of the Rule 33 process, the parties will have either reached an agreement to settle or learned how far apart they are and what are the remaining obstacles to settlement.

- **Is discussion of settlement limited to the appeal itself?**
  Not necessarily. If settlement of the appeal will not dispose of the entire case, or if related litigation is pending in other forums, the parties are invited and encouraged to explore the possibility of a global settlement.

- **Is briefing deferred when a Notice of Rule 33 Conference is issued?**
  Briefing is usually postponed until after the initial conference. If further modification of the briefing schedule would be conducive to settlement, an order to that effect may later be entered. What preparation is required of

counsel? In preparation for the initial Rule 33 conference, attorneys are required to consult rigorously with their clients and obtain as much authority as feasible to settle the case. Counsel must also review their legal and factual contentions with a view to being able to discuss candidly the prospects of the appeal and the case as a whole. If the conference attorney requests copies of pleadings, hearing transcripts, or other material in anticipation of the conference, counsel are expected to provide it promptly.

- **What is the role of the conference attorney?**
  Because the format of Rule 33 conferences is flexible and each appeal is dealt with on its own terms, the conference attorney plays a variety of roles. He or she acts as moderator, facilitator, and intermediary. The conference attorney serves as a neutral evaluator and a reality check. He or she may suggest terms of settlement. Without being coercive, the conference attorney acts as a determined advocate for settlement.

- **What can counsel expect of the conference attorney**?
  Before the initial conference, the conference attorney will have familiarized him or herself with the history of the litigation, the posture of the case, and the issues on appeal. During the conference, the conference attorney will seek additional information about the background of the dispute and the parties' interests, claims and defenses in order to explore all possibilities for a voluntary resolution. The conference attorney is strictly impartial. He or she does not advocate for any party and avoids making comments that could advantage one side or another in arguing the issues on appeal. The conference attorney will disclose any affiliation or prior representation of which he or she is aware that could call his or her neutrality into question. The conference attorney does not force any party to settle or to accept terms it is not willing to accept. While he or she urges parties to take advantage of opportunities to settle favorably, the conference attorney recognizes that settlement is not always possible.

- **How can counsel make best use of the Rule 33 conference to benefit their clients?**
  Recognize that the Rule 33 conference is an opportunity to achieve a favorable outcome for your client. Without laying aside the advocate's responsibility, approach the conference as essentially cooperative rather than adversarial. Help your client make settlement decisions based not on overconfidence or wishful thinking, but on a realistic assessment of the case; not on emotion, however justified it may be, but on rational self-interest. Suggest terms of settlement that maximize the benefits of settlement for all parties. Take advantage of the opportunity to talk confidentially and constructively with counsel for the other parties and, if clients are present, to address them respectfully but convincingly. Let the conference attorney know how he or she can help you obtain a satisfactory resolution. Be candid. Don't posture. Listen closely to what other participants have to say. Give the process a chance to work.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

WILLIAM RAINSBERGER,               )
                                   )
    Plaintiff,                     )
                                   )
    v.                             )      Case No.:  1:16-cv-103-WTL-MJD
                                   )
CHARLES BENNER,                    )
                                   )
    Defendant.                     )

## DEFENDANT'S NOTICE OF APPEAL

Notice is hereby given that Defendant Charles Benner appeals to the United States Court of Appeals for the Seventh Circuit from the order denying him qualified immunity entered on July 18, 2017 at Docket Number 73.


Respectfully Submitted,


  /s/ *Pamela G. Schneeman*
Pamela G. Schneeman, (18142-53)
Deputy Chief Litigation Counsel
Office of Corporation Counsel
200 East Washington Street, Room 1601
Indianapolis, Indiana  46204
Telephone: (317) 327-4055
Fax: (317) 327-3968
E-Mail: Pamela.Schneeman@indy.gov

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 26, 2017, a copy of the foregoing DEFENDANT'S NOTICE

OF APPEAL was filed electronically. Service of this filing will be made on all ECF-registered

counsel by operation of the Court's electronic filing system.  Parties may access this filing through

the Court's system.

Richard A. Waples
WAPLES & HANGER
410 N. Audubon Rd.
Indianapolis, IN  46219
rwaples@wapleshanger.com


    _/s/ *Pamela G. Schneeman*
    Pamela G. Schneeman, (18142-53)
    Deputy Chief Litigation Counsel



OFFICE OF CORPORATION COUNSEL
200 East Washington Street, Room 1601
Indianapolis, Indiana 46204
Telephone: (317) 327-4055
Fax: (317) 327-3968

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| WILLIAM RAINSBERGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cause No. 1:16-cv-103-WTL-MJD |
| | ) | |
| CHARLES BENNER, | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on the Defendant's motion for summary judgment

(Dkt. No. 41).  The motion is fully briefed and the Court, being duly advised, **DENIES**

the motion for the reasons set forth below.

## I.  SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if

the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  In ruling on a motion for summary judgment, the

admissible evidence presented by the non-moving party must be believed, and all reasonable

inferences must be drawn in the non-movant's favor.  *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th

Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all

reasonable inferences in that party's favor.").  However, a party who bears the burden of proof

on a particular issue may not rest on its pleadings, but must show what evidence it has that there

is a genuine issue of material fact that requires trial.  *Johnson v. Cambridge Indus., Inc.*, 325

F.3d 892, 901 (7th Cir. 2003).  Finally, the non-moving party bears the burden of specifically

identifying the relevant evidence of record, and "the court is not required to scour the record in

search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II.  BACKGROUND

The facts set forth below consist of facts supported by evidence of record, viewed in the light most favorable to the Plaintiff, as the non-moving party.[1]  Additional facts are included in the Discussion section as relevant.

### A.  The Events of November 19, 2013

In November 2013, Ruth Rainsberger was 88 years old and suffering from dementia.  She lived alone in an apartment in Indianapolis.  Her son, Plaintiff William Rainsberger, lived close by and was her primary caregiver.  He saw Ruth almost every day, did her grocery shopping, and kept her mentally engaged.  Ruth had two other children:  Rebecca, who lived farther away, saw her once a week, and did her laundry; and Robert, who saw his mother less frequently.  Robert had recently lost his job and his home to foreclosure and had moved in with William.

On November 19, 2013, shortly after 3:30 p.m., William went to Ruth's apartment and found the door unlocked.  He entered the apartment and noticed his mother lying face down on the floor with a blanket covering much of her shoulders and head.  She was still breathing, but her breathing was labored.  He knelt down beside her, put his hand on her knee, and yelled, "Mom, Mom."  There was a large circle of dried blood on the blanket covering her head.  There was also a large pool of what appeared to him to be congealed blood on the floor.  William did not remove the blanket because it was stuck to the wound and he believed it was acting as a bandage, so removing it would cause more bleeding to occur.

---

[1]Many of these facts are disputed by Benner.

Around 3:37 p.m., William used his mother's landline phone to call 911.  William told the 911 operator that someone had attacked his mother and, later in the call, that "someone bashed her head in."

Indianapolis Fire Department Paramedic Carl Wooldridge responded to William's 911 call.  William, who had gone outside to direct the ambulance to the correct apartment, met Wooldridge outside and told him that someone had "caved his mother's head in."

Inside the apartment, Wooldridge observed Ruth lying on the ground between a chair and the coffee table.  She was still breathing.  There was a cloth with blood covering Ruth's head that appeared to be stuck to a wound on her head.  The cloth had "somewhat of a hole in it right where the wound was," and when Wooldridge "peeled it off there was a mark at that time on her forehead that I believed to be an entrance wound."  Dkt. No. 50-7 at 8.  Based on these observations, Woolridge thought that Ruth had been shot and reported that belief to the paramedics who transported Ruth to the hospital.  Wooldridge later reported to Benner that he thought it was "odd" that William said his mother's head had been caved in because he had not removed the cloth to look at her injuries.

Defendant Charles Benner, a homicide detective with the Indianapolis Metropolitan Police Department ("IMPD"), arrived at the scene around 4:15 p.m. along with fellow homicide detective Tom Tudor.  Benner learned from the other officers on the scene that William and his brother Robert were both at the scene and had arrived in separate vehicles, that William had called 911, that Ruth had been found covered with a blanket, and that she had been transported to the hospital in critical condition.  Tudor did an initial canvas of the building to identify potential witnesses while Benner gathered information about the medical personnel who treated Ruth.

Benner then did a walkthrough of Ruth's apartment.  The walkthrough revealed no signs of forced entry.  Benner noticed some open dresser drawers in Ruth's bedroom, but the contents appeared undisturbed.  The back room was cluttered with boxes and trash bags that seemed untouched.  Benner found a lockbox on a closet shelf in the back room that contained what looked to him like financial documents.  He also found Ruth's checkbook, cash, and credit cards in the apartment.  Ruth's children reported that she used a black purse and took prescription medication for dementia.  Neither was found in the apartment.  Based on his observations, Benner determined that robbery did not appear to be the motive for the attack.

On November 20, 2013, Ruth died from her injuries.  An autopsy was performed and the cause of death was determined to be multiple blunt force trauma to the head, possibly caused by a hammer or similar object.  Not surprisingly, her death was ruled a homicide.

### B.  Statements by William, Robert, and Rebecca

On the evening of the attack, Benner asked William and Robert to give statements.  They both consented and were transported to IMPD Headquarters.

During his interview, William told Benner that he had been taking care of Ruth daily for the past few years.  He also handled all of her bills and finances.  Ruth had approximately $80,000 to $100,000 in savings that was to be distributed to her three children after her death.  In addition to Ruth, the only individuals with a key to her apartment were William, Robert, and their sister Rebecca.  The staff of the apartment complex where Ruth lived also had a key to her apartment; however, Benner confirmed that the key had not been moved and was in its normal location at all relevant times.

William reported to Benner that he had last seen his mother the previous night around 6:00 p.m.  After visiting with her, William drove to Plainfield to spend the evening with his wife.

Around 9:00 the next morning, he returned to his house at 7345 East 13th Street in Indianapolis.

He stayed home until about 3:30 p.m., then went to Kroger on 10th Street in Indianapolis and

bought a tea.  William then drove the short distance to Ruth's apartment.

When he arrived at Ruth's apartment, William noticed that the door was already

unlocked.  He went inside and saw Ruth lying on the floor with a blanket over her head.  Based

on Benner's training and experience, when an attacker covers his or her victim's head or face, it

often indicates that the attacker had a personal relationship with the victim.  William also noticed

a great deal of blood and that his mother was still breathing.  When asked why he did not remove

the blanket, William said that in his opinion removing the blanket would do more damage

because it was stuck to the wound and he believed it was acting as a bandage and preventing

more bleeding.  He checked the apartment to confirm that no one was there and then called 911.

After calling 911, William went outside to wait for the ambulance so he could direct it to the

correct apartment, as his mother's apartment can be difficult to locate.

During his interview, Robert stated that he had not seen Ruth for a few days.  In August

2013, Robert moved in with William after the bank foreclosed on his house.  Robert was at

William's house on November 19, 2013, when William called and told him to come to Ruth's

house immediately.  When he got to Ruth's apartment, Robert was stopped by police and put in a

police car.

The following day, Benner spoke with Rebecca Rainsberger, Ruth's other child.  Rebecca

stated that she typically checked on her mother once a week and had last been at Ruth's during

the day on the day before the attack.

At some point that day, Benner asked Rebecca, William, and Robert to come to IMPD

Headquarters, ostensibly to review the results of Ruth's autopsy.  Benner accused William and

Robert of murdering Ruth for money and asked them to take a polygraph test.  Upset at being

brought to the station under false pretenses and being accused of his mother's murder, and

because he considered polygraphs unreliable, William adamantly refused to take a polygraph.

### C.  The Investigation

Crime scene specialist Jennifer Lane collected potential evidence at the scene.  She

videotaped and photographed Ruth's apartment and collected fingerprints and DNA.  A report

dated April 23, 2014, stated that two DNA contributors were found on the outside back neck area

and outside left sleeve of Ruth's jacket.  The major contributor was Ruth; the "partial DNA

profile of the minor contributor [was] from an unknown male" (i.e., not William or Robert).

Dkt. No. 50-33 at 2.  In addition, the DNA of another unknown male was found on the blanket

that was covering Ruth's head and two stains on Ruth's sweatshirt.  Benner believed that the

unknown DNA was likely from the first responders who treated Ruth at the scene.

On December 6, 2013, Benner collected video from the Kroger grocery store located on

10th Street.  The store had eighty-one working cameras that day, four of which showed William.

Camera 30, located in the front entry way, shows William dispose of an item in the trash.  After

dropping the object in the trashcan, William then pushes some buttons on the Redbox video-

rental box next to the trashcan.  At one point while looking at the Redbox machine, he turns to

look behind him.  He then enters the store.

Camera 7, located in the self-checkout area, shows William purchasing a tea.  He appears

to let a customer at the adjacent checkout kiosk use his Kroger Plus Card, but he does not use the

card for his own purchase.  He then exits the store, locates his car, and drives away.

Benner obtained Ruth's financial records from her bank, which showed that at the time of

her death she had a checking account balance of $15,098.90, a savings account balance of

$4,605.65, and certificate balances totaling $79,058.15.  Benner obtained a beneficiary form

from Ruth's apartment showing that William, Robert, and Rebecca were the beneficiaries for all

of her assets.

### D.  Phone Records

IMPD detective Benjamin Bierce obtained phone records for William, Robert, Rebecca,

and Ruth.  Rebecca's cell phone records confirmed that she was not in the vicinity of Ruth's

apartment on the day her mother was attacked.  Ruth's landline phone records show a phone call

to Robert's cell phone number at 3:40 p.m.  Robert's cell phone records show that he received

two phone calls from Ruth's landline number, one at 2:40 p.m. and the other at 3:40 p.m.  Bierce

provided the phone records to Benner during the winter of 2013-2014.

During the summer of 2014, while collecting phone records for another case, Bierce

learned that due to cell tower construction, some calls made in Indianapolis were being routed

through cell towers in Chicago, Illinois.  Calls that were routed through Chicago were recorded

in Central standard time.  After learning this new information, Bierce reviewed the cell phone

records he had obtained for several open investigations, including Robert's records.  Bierce

found that some of the calls on Robert's records had been routed through Chicago.  Accordingly,

he created a spreadsheet titled "Results" that converted the calls on Robert's phone records that

had been routed through Chicago to Eastern standard time (Indianapolis time).  The Results

spreadsheet shows that the two calls to Robert's cell phone from Ruth's landline were made on

November 19, 2013 at 3:40:38 p.m. and 3:40:51 p.m. Bierce created the Results spreadsheet in

July 2014 and provided it to Benner.

### E.  The Probable Cause Affidavit

On May 22, 2014, Benner executed a probable cause affidavit that contained the

following statements:

- On November 19, 2013 at approximately 3:38 pm IMPD 911 dispatch received a call
  from the address of 801 N. Shortridge Rd, Apartment H 11. The caller said that someone
  had "bashed" his mother's head in.  Officer Lewis arrived on scene along with IFD.
  Officer Lewis said that the victim's head was covered with a blanket when they arrived
  on scene. The victim, identified as Ruth Rainsberger, was transported to Wishard hospital
  in critical condition. The caller, identified as William Rainsberger, and his brother,
  Robert Rainsberger, were transported to Police Headquarters to give a statement. It
  should be noted that during the initial investigation, both medic and hospital personnel
  believed that the victim may have sustained a gunshot wound. The fact that the 911 caller
  said his mother's head was bashed in without actually seeing her head is indicative to the
  affiant that he may have knowledge of how she sustained the injury.

- On December 4, 2013 I took a statement from Firefighter Carl Wooldridge. Wooldridge
  said he was the first to have contact with the caller who was standing outside of the
  apartment building when fire arrived on scene. The white male on scene told Wooldridge
  that someone had "caved his mother's head in."  Wooldridge went to the apartment door
  and noticed it was slightly ajar.  The victim was lying on the floor between a chair and a
  coffee table.  Wooldridge said it was immediately apparent to him that the victim was
  breathing even though she had a blanket covering her head.  He said the blanket appeared
  to cover the entire head and not just one side.  The blanket was soaked in blood and was
  stuck to the victim's head.  Wooldridge thought it was strange that the caller said her

head was caved in when it was obvious that he had not removed the blanket to check on his mother. Fire and ambulance personnel thought the victim may have been shot and thought it was not normal that there was not any blood spatter on the walls or ceiling. Wooldridge said the apartment seemed to be in orderly condition. The caller was identified as William Rainsberger.

- I requested crime lab to the scene and 4439 CSS Lane responded to the scene. A walkthrough of the apartment revealed that there were no signs of forced entry.  There were a few drawers in the victim's bedroom that were pulled out halfway with no sign of anyone rifling through the contents.  There were a large amount of boxes in a back room that were untouched.  There was a lockbox in the back room in plain view that contained savings bonds belonging to the victim.  The victim's checkbook, some cash and credit cards were still present inside the apartment.  The only blood found on the scene was on the blanket and on the floor where the victim was found.

- On November 19, 2013 I conducted an interview of William Rainsberger at Police Headquarters.  William said he has been taking care of his mother on a daily basis for the past few years.  He pays all of her bills and has power of attorney responsibility over her finances.  He said he last saw his mother on Monday night around 6:00 pm. He left her apartment and went to Plainfield to spend the night with his wife.  He returned home to 13th Street around 9:00 am on Tuesday morning and just hung out at home all day.  He said that around 3:30 pm he went to the Kroger on 10th St and bought an iced tea.  He then drove across the street to check on his mother.  He said he checked her mailbox and went out to his car before going to her door. He said when he used his key to open the door if appeared that the door was already unlocked.  He opened the door and saw his

mom lying on the floor with a blanket over her head.  He walked around a coffee table and put his tea down on the table.  He saw some blood on the floor and on the blanket so he called 911.  He said his mom was breathing loudly as if she was snoring.  I asked why he didn't take the blanket off to check his mom and he said he thought he would do more damage by touching her.  He called 911, left the apartment after closing the door, and went outside to wait for the ambulance.  He also said he had walked through the residence to check for anyone inside before he called 911.  I asked William about his mother's finances and learned that she has approximately eighty to one hundred thousand dollars in savings and bonds that will be distributed to her three children if she were to die.

- On November 19, 2013 I spoke to Robert Rainsberger who said he had not seen his mother for a few days.  He recently had his home foreclosed upon and moved in with William this past August.  He said he was hanging out at home on Tuesday when William called and told him to get over to his mom's apartment immediately.  Robert drove his vehicle to Shortridge and was stopped by police when he arrived.  He said his mother was taken away in an ambulance and he waited in a police car until I transported him downtown to give a statement.  I drove Robert to headquarters and he did not say one word on the way unless I asked him a question.  At no time did Robert or his brother, William, ever ask me how their mom was doing or if they could get to the hospital to see her.

- On November 20, 2013 I spoke to Rebecca Rainsberger.  She said she usually checks on her mother once a week and had last been to her apartment on Monday, November 8th.  I asked her if she was at the apartment at all on Tuesday and she said no.  Phone records

10

confirmed that her cell phone was not near Ruth Rainsberger's apartment when the incident occurred.

- On 1-13-14 I spoke to Delbert Pickens who delivers meals on a daily basis to Ruth's apartment.  Mr. Pickens said he delivers a meal to Ruth Monday through Friday and almost always arrives around 10:30 am.  On 11-19-13 Delbert said he arrived at Ruth's address around 10:30 am. He knocked on the door and she did not answer.  He called her phone and could hear it ringing inside the apartment.  He did not hear any signs that anyone may be inside the apartment so he left.

- On November 20, 2013 I attended the autopsy of Ruth Rainsberger which was performed by Dr. Tashjian.  He determined that the cause of death was due to multiple blunt force trauma injuries to the head and the manner was ruled a Homicide.  The wounds were possibly inflicted with a hammer or similar type weapon.

- On November 20, 2013 I spoke to William and Robert Rainsberger once again at Police Headquarters.  I asked them if they would submit to a polygraph so that I could eliminate them as suspects and they adamantly said no, they would not take a polygraph.  All three siblings stormed out and I have not heard from them since.

- I have not at any time during this investigation, been asked by any of the victim's children if I have any suspects or any other information in reference to this case.

- On November 27, 2013 I received a call from Attorney Brad Keffer, who said he is now representing William Rainsberger.  I advised him I would be requesting a limited search warrant for William to obtain a buccal swab and major case prints.  I also received a call from Attorney John Christ, who said he is now representing Robert Rainsberger.  I made arrangements for William and Robert to come to Police Headquarters on December 4,

11

2013 so that I could serve the limited search warrants for prints and a DNA buccal swab. Both subjects did show up on December 4, 2013 with their attorneys and I obtained prints and buccal swabs from both.

- On November 22, 2013 Detective Tudor and I recovered a video from the Kroger store located at 7101 E 10th St.  The video showed William Rainsberger drive onto the Kroger lot on November 19, 2013 at approximately 3:32 pm. Mr. Rainsberger got out of the car and approached a garbage can located near the Red Box video dispenser.  Rainsberger appeared to pull out a straight object from his person which he placed in the garbage can. As he placed the item in the trash he appeared to look around for cameras.  He then stepped over to the Red Box and punched some buttons.  He looked around again before he entered the store.  He entered the store and bought an iced tea which he paid for with cash.  He appeared to let someone in line use his Kroger plus card but did not use the card for his purchase. William exited the store and looked around several times before returning to his vehicle.  He left the lot and drove to his mother's apartment where he found her down and called 911.

- I received cell phone records for the Rainsberger family and obtained the following information.  On November 19, 2013 at 2:40 pm, Robert Rainsberger received a call from Ruth Rainsberger's landline to his cell -----. This is hours after it is presumed that Ruth Rainsberger received her injuries.  This presumption is based upon the fact that a delivery person knocked on her door at 10:30 am and attempted to call her but did not get an answer and also based upon the fact that the blanket contained dried blood which caused the blanket to stick to the victim's head which, in the affiant's experience, would indicate the victim was not recently attacked (prior to the 911 call).  Within an hour of this phone

call, William Rainsberger is on video across the street at the Kroger.  He throws an object

away in the trash before entering the store to buy an ice tea.  He then goes to his mother's

apartment and calls the police.  William then stood outside and left his mother unattended

until the police arrived.

- Cell phone records were obtained for William Rainsberger, including cell tower site

  locations for the day of November 19, 2013.  Those records do not show William

  Rainsberger outside of the area of Shortridge and 10th St. during the relevant time period.

- On 1-13-14 I received the financial records for Ruth Rainsberger, from the Financial

  Federal Credit Union located at 701 E 56th St.  The records show the following balances

  existed at the time of Ruth's death.  There was a checking account balance of $15,098.90,

  savings account balance of $4,605.65 and certificate balances of $79,058.15.  I recovered

  a beneficiary form from Ruth's apartment shortly after she was discovered which

  revealed that William, Robert and Rebecca Rainsberger are the beneficiaries for all of her

  assets.

Dkt. No. 50-6.  Benner and a deputy prosecutor also executed an Information charging William

with Ruth's murder.

    Based on Benner's probable cause affidavit, a court found probable cause to arrest

William for murder.  A few days later, William was arrested for the murder of his mother.  He

was held in jail for two months after his arrest before being released on bail.  On July 7, 2015,

the Prosecutor's Office dismissed the case against William.

### III. <u>DISCUSSION</u>

    The Court notes as an initial matter that Benner raises several evidentiary issues in his

reply brief.  He argues that many statements in affidavits relied upon by William (his own and

13

that of David Hennessy) are inadmissible and that the expert report submitted by William is largely inadmissible and/or immaterial.  The Court has not relied on either affidavit or the expert report in making this ruling and, therefore, need not address Benner's arguments.  Because the issue may arise again at trial, however, the Court notes that many of Benner's arguments regarding the opinions in the expert report appear to be well-taken, and William should carefully review the applicable law when deciding whether to offer the expert's testimony at trial.

Turning to the merits, William asserts claims against Benner pursuant to 42 U.S.C. § 1983 for violation of the fourth amendment.  Specifically, William alleges that Benner intentionally, knowingly, or recklessly made false and misleading statements in his probable cause affidavit that led to William being wrongfully arrested and maliciously prosecuted.

The applicable law is not in dispute.  "[P]robable cause is an absolute defense to false arrest claims in . . . the § 1983 context." *Jones v. City of Elkhart, Ind.*, 737 F.3d 1107, 1114 (7th Cir. 2013).  Thus,

> [a] warrant request violates the Fourth Amendment if the requesting officer knowingly, intentionally, or with reckless disregard for the truth, makes false statements in requesting the warrant and the false statements were necessary to the determination that a warrant should issue. A reckless disregard for the truth can be shown by demonstrating that the officer entertained serious doubts as to the truth of the statements, had obvious reasons to doubt their accuracy, or failed to disclose facts that he or she knew would negate probable cause.

*Hart v. Mannina*, 798 F.3d 578, 591 (7th Cir. 2015) (internal citations and quotation marks omitted).

### A.  Allegedly False or Misleading Statements

William argues that a reasonable jury could find that Benner knowingly or with reckless disregard for the truth made false or misleading statements in the probable cause affidavit.  Each of the statements William objects to is examined, in turn, below.

## 1.  Cell phone tower records

Benner stated in the probable cause affidavit that cell phone tower location records "do not show William Rainsberger outside the area of Shortridge and 10th St. during the relevant time period."  William argues that this statement was misleading because the records "do not show William *in* this area anytime from 5:41 p.m. on Nov. 18, 2013 to 7:23 p.m. on Nov. 19, 2013, because there is no location information from cell phone data for his telephone during that period."  Dkt. No. 49 at 4-5.  The Court disagrees that a reasonable jury could find that this statement was misleading.  The statement is true, and can reasonably be read only to indicate that there is no exculpatory cell phone evidence.  No reasonable judicial officer would read that statement as implying that there were cell phone records that affirmatively suggested that William (or at least his cell phone) was present in the relevant area at the relevant time; if such evidence existed, Benner certainly would have included it.[2]

## 2.  The 2:40 p.m. telephone call

Benner stated in the probable cause affidavit that a call was made from Ruth's landline to Robert at 2:40 p.m., which is hours after the time the evidence indicates Ruth was attacked.  This information was intended to suggest that William could have been in Ruth's apartment an hour before he called 911.  The Court agrees with William that a reasonable jury could find from the evidence of record that that call was actually made by William at 3:40 p.m., after he discovered his mother and called 911, and that the 2:40 p.m. time on the phone records occurred because the

---

[2]Unfortunately, in his brief in support of the instant motion, Benner—or, more accurately, his counsel—mischaracterizes the statement in the probable cause affidavit as showing that "William's phone records, including cell tower site locations for November 19, 2013, show that he was in the vicinity of Shortridge Road and 10th Street during the relevant time period."  Dkt. No. 44 at 17.  Counsel is admonished to be more careful in characterizing the evidence of record.

call was routed through a tower in Chicago, where the time is one hour earlier than the time in Indianapolis.  Further, Benner himself testified in his deposition that he had the report from IMPD phone records expert Bierce that showed the time discrepancy before he executed his probable cause affidavit.[3]  Given this testimony, and viewing the evidence in the light most favorable to William, the Court finds that a reasonable jury could determine from the evidence of record that Benner included the statement about the 2:40 p.m. call with reckless disregard for whether it was accurate because, given the totality of the information about the telephone records that he testified that he had, a reasonable jury could find that he had obvious reasons to doubt its accuracy.

### 3. The Kroger video

In the probable cause affidavit, Benner stated that the video from the Kroger store shows that William "appeared to pull out a straight object from his person which he placed in the garbage can."  William argues that the video "does not depict William pulling anything from his person," but rather shows him throwing away a piece of trash, and that Benner admitted in his deposition that "the video does not depict William pulling anything 'from his person.'"  Dkt. No. 49 at 7 (emphasis in original) (citing Benner Civil Depo. at 146).  The deposition testimony in question reads as follows:

Q:     You're not able to really see if he – when he gets the object in his hands or not, are you?

A:     I don't think so, no, just that it's there.

---

[3]That testimony is belied by Bierce's own affidavit in which he states that he created the report on or about July 2014, well after William's arrest, and by Benner's own testimony that he learned of the theory when it was raised by William's criminal defense lawyer.  However, the Court must view the evidence in the light most favorable to William.

> Q:   So you don't know whether he pulled it out of his pocket or a waistband or—
>
> A:   Doesn't matter, but, no, I don't know.
>
> Q:   Or whether it was in his hand before and you just didn't see it?
>
> A:   That's correct.

Dkt. No. 50-9 at 85-86.

This testimony does not, in fact, elucidate what Benner meant by "pull[ed] . . . from his person" or whether he in fact agrees with William's assessment that the camera does not show him "pull[ing the object] from his person."  He was not asked that question.  That said, the Court has watched the video, and agrees with William that a reasonable juror could find the statement's wording to be intentionally misleading.[4]  There is simply nothing on the video that shows William "pulling" the object from anywhere.  Given what is shown on the video, it is equally possible that he walked from his vehicle to the trash can carrying the object in plain view.

Next, William argues that the statement is misleading because it is meant to imply that the object in question was the murder weapon.  It does not state that it was the murder weapon, however, and the statement, as worded, makes it clear that one cannot tell from the video what the object was, only that it was a "straight object."  That statement is not false or misleading.  Any judicial officer reviewing the affidavit would understand that if Benner believed anything else about the object could be identified on the video, he would have included that information.

---

[4]While the standard quoted above speaks of "false statements," the Seventh Circuit also has recognized that misleading statements in a probable cause affidavit can lead to a Fourth Amendment violation.  *See, e.g.*, *Betker v. Gomez*, 692 F.3d 854, 861-62 (7th Cir. 2012) ("A reasonable jury could find that Officer Gomez knowingly or with reckless disregard for the truth made false or misleading statements. So we must decide whether probable cause would have existed for the no-knock search warrant absent those disputed statements.").

The affidavit essentially says that William threw away something that could have been the murder weapon, and that is, in fact, true.

Finally, the affidavit also states that "[a]s he placed the item in the trash he appeared to look around for cameras." The Court agrees with William that a reasonable jury watching the video could find that that statement was false and that Benner knew it to be so.

### 4. No signs of a burglary

The probable cause affidavit states the following:

> A walkthrough of the apartment revealed that there were no signs of forced entry. There were a few drawers in the victim's bedroom that were pulled out halfway with no sign of anyone rifling through the contents. There were a large amount of boxes in a back room that were untouched. There was a lockbox in the back room in plain view that contained savings bonds belonging to the victim. The victim's checkbook, some cash and credit cards were still present inside the apartment.

William suggests that this paragraph—which implies that it is more likely that Ruth's attacker was not someone seeking to steal from her, but rather someone she knew—is misleading because Benner omitted the fact that Ruth's purse and her prescription medication were missing from the apartment. Viewing the evidence of record in the light most favorable to William, the Court agrees. While the affidavit does not state that nothing appeared to be taken from the apartment, that is clearly the message that paragraph is intended to convey. A reasonable jury could determine that Benner knew a purse and prescription medication were missing and that the failure to include that information was intentionally misleading.

In addition, the evidence viewed in the light most favorable to William indicates that the lockbox found in Ruth's apartment was not reasonably described as "in plain view," and that it did not contain savings bonds. Again, a reasonably jury could find that Benner included those statements with knowledge of, or reckless disregard for, their falsity.

*5. William knew the nature of Ruth's injuries*

The probable cause affidavit makes it clear that Benner believed it to be suspicious that William told the 911 operator that his mother's head had been "bashed in," and also told Wooldridge that her head had been "caved in," even though Ruth's head was covered by a blanket.  The Court finds nothing false or misleading about Benner's statements that "[t]he fact that the 911 caller said his mother's head was bashed in without actually seeing her head is indicative to the affiant that he may have knowledge of how she sustained the injury" and "Wooldridge thought it was strange that the caller said her head was caved in when it was obvious that he had not removed the blanket to check on his mother."  William provides wholly reasonable explanations for how he surmised that his mother had been hit in the head without looking under the blanket, but those explanations do not change the fact that Benner's statements in the affidavit were true and not misleading.

What William really takes issue with are Benner's representations that others who saw Ruth initially believed that she may have been shot; in other words, they did not immediately conclude that she had suffered blunt force trauma to the head like William did.  Dkt. No. 50-6 at 2 ("It should be noted that during the initial investigation, both medic and hospital personnel believed that the victim may have sustained a gunshot wound."; "Fire and ambulance personnel thought the victim may have been shot and thought it was not normal that there was not any blood spatter on the walls or ceiling.").  William has pointed to no evidence of record that shows that Benner knew these statements were not true or had reason to doubt that they were.  There is no dispute that Woolridge, who as an EMT would fall under the category of "medic personnel," believed that she may have been shot and that ambulance personnel reported to the hospital that Ruth's wound might be a gunshot wound.  Benner also testified that a deputy coroner told him

19

that hospital personnel believed she had been shot and, in fact, wrote "possible gunshot wound" on the tag that was placed on Ruth's body.  While William makes a convincing argument as to why it was not suspicious that his initial belief was that his mother had been hit in the head, there was nothing false or misleading about Benner's statements that others believed otherwise.

### 6.  *William's lack of concern for his mother*

William argues that several statements in the probable cause affidavit that were meant to convey his lack of concern for his mother are false or misleading.  The Court agrees.

First, Benner notes in the affidavit that after calling 911William "went outside to wait for the ambulance" and "left his mother unattended until the police arrived."  Benner fails to note William's explanation for doing so—that he wanted to direct the ambulance because his mother's apartment was hard to find based solely on the address.  In addition, Benner states that while William was being questioned on November 19, 2013, "[a]t no time did Robert or his brother, William, ever ask me how their mom was doing or if they could get to the hospital to see her."  This statement is misleading, because Benner knew that William was receiving texts from his sister, who was at the hospital, about Ruth's condition, and also knew that he expressed concern about how he would get to the hospital.  These omissions were misleading, and a reasonable jury could find them to be intentionally so.

### 7.  *Refusal to take a polygraph*

William takes issue with the inclusion in the probable cause affidavit of the fact that he and his brother adamantly refused to take a polygraph, then they and their sister "stormed out" and Benner did not hear from them again.  William does not deny that he adamantly refused to take a polygraph, but rather offers reasons for his refusal and suggests that Benner should have included the fact that he lied to the Rainsbergers in order to get them to come to the police

station, at which time he asked the brothers to submit to polygraphs.  William does not suggest that his reaction would have been any different if Benner had simply asked him to come in to take a polygraph, nor does he provide any evidence that Benner knew William's reasons for refusing.  However, William has presented evidence from which a reasonable jury could find that Benner's statements that the siblings "stormed out," and that he did not hear from them again after that, were false and that Benner knew them to be so.

### 8.  Suggestion of financial motive

William next argues that "Detective Benner also mislead the court in his probable cause affidavit by suggesting that William had a financial motive for killing his mother because he along with his siblings was a beneficiary of his mother's estate."  Dkt. No. 49 at 20.  There was nothing false or misleading about the financial information Benner included in the affidavit.  Benner did not in any way suggest that William was having financial problems himself, and therefore did not mislead the court reviewing the affidavit into believing that to be the case.

### B.  Was There Probable Cause Without the False or Misleading Statements?

William argues that "[t]here is just too much wrong in this probable cause affidavit to say that a rational jury could not find intentional, knowing, or reckless conduct in its compilation."  Dkt. No. 49 at 27.  As explained above, viewing the evidence in the light most favorable to William, the Court agrees.  However, as both parties acknowledge, such a finding would not be sufficient to support a jury verdict in William's favor.  Rather, despite the presence of false and misleading statements in the probable cause affidavit, William's Fourth Amendment rights were not violated unless the false and misleading statements were "necessary to the determination that a warrant should issue."  *Hart*, 798 F.3d at 591.  Accordingly, the Court must examine the remaining statements in the probable cause affidavit, along with the omitted information that

made some of the statements misleading, in order to determine whether the resulting probable

cause affidavit, free from false and misleading statements, would have been sufficient to

establish probable cause to arrest William for murder.  *See Betker v. Gomez*, 692 F.3d 854, 862

(7th Cir. 2012) ("Our analysis is fairly straightforward.  We eliminate the alleged false

statements, incorporate any allegedly omitted facts, and then evaluate whether the resulting

'hypothetical' affidavit would establish probable cause.") (citations omitted) (applying analysis

to search warrant).

The "hypothetical affidavit" that eliminates those statements that a reasonable jury,

viewing the facts of record in the light most favorable to William, could find to be false, and

adds information necessary to rectify what a reasonable jury could find to be misleading

statements,[5] includes the following statements:

- On November 19, 2013 at approximately 3:38 pm IMPD 911 dispatch received a call

  from the address of 801 N. Shortridge Rd, Apartment H 11. The caller said that someone

  had "bashed" his mother's head in.  Officer Lewis arrived on scene along with IFD.

  Officer Lewis said that the victim's head was covered with a blanket when they arrived

  on scene. The victim, identified as Ruth Rainsberger, was transported to Wishard hospital

  in critical condition. The caller, identified as William Rainsberger, and his brother,

  Robert Rainsberger, were transported to Police Headquarters to give a statement. It

  should be noted that during the initial investigation, both medic and hospital personnel

  believed that the victim may have sustained a gunshot wound. The fact that the 911 caller

---

[5]The information that has been added by the Court is in bold type.

said his mother's head was bashed in without actually seeing her head is indicative to the affiant that he may have knowledge of how she sustained the injury.

- On December 4, 2013 I took a statement from Firefighter Carl Wooldridge. Wooldridge said he was the first to have contact with the caller who was standing outside of the apartment building when fire arrived on scene. The white male on scene told Wooldridge that someone had "caved his mother's head in." Wooldridge went to the apartment door and noticed it was slightly ajar. The victim was lying on the floor between a chair and a coffee table. Wooldridge said it was immediately apparent to him that the victim was breathing even though she had a blanket covering her head. He said the blanket appeared to cover the entire head and not just one side. The blanket was soaked in blood and was stuck to the victim's head. Wooldridge thought it was strange that the caller said her head was caved in when it was obvious that he had not removed the blanket to check on his mother. Fire and ambulance personnel thought the victim may have been shot and thought it was not normal that there was not any blood spatter on the walls or ceiling. Wooldridge said the apartment seemed to be in orderly condition. The caller was identified as William Rainsberger.

- I requested crime lab to the scene and 4439 CSS Lane responded to the scene. A walkthrough of the apartment revealed that there were no signs of forced entry. There were a few drawers in the victim's bedroom that were pulled out halfway with no sign of anyone rifling through the contents. There were a large amount of boxes in a back room that were untouched. The victim's checkbook, some cash and credit cards were still present inside the apartment. **The victim's purse and a bottle of prescription**

23

**medication were not found in the apartment.**  The only blood found on the scene was on the blanket and on the floor where the victim was found.

- On November 19, 2013 I conducted an interview of William Rainsberger at Police Headquarters.  William said he has been taking care of his mother on a daily basis for the past few years.  He pays all of her bills and has power of attorney responsibility over her finances.  He said he last saw his mother on Monday night around 6:00 pm. He left her apartment and went to Plainfield to spend the night with his wife.  He returned home to 13th Street around 9:00 am on Tuesday morning and just hung out at home all day.  He said that around 3:30 pm he went to the Kroger on 10th St and bought an iced tea.  He then drove across the street to check on his mother.  He said he checked her mailbox and went out to his car before going to her door. He said when he used his key to open the door if appeared that the door was already unlocked.  He opened the door and saw his mom lying on the floor with a blanket over her head.  He walked around a coffee table and put his tea down on the table.  He saw some blood on the floor and on the blanket so he called 911.  He said his mom was breathing loudly as if she was snoring.  I asked why he didn't take the blanket off to check his mom and he said he thought he would do more damage by touching her.  He called 911, left the apartment after closing the door, and went outside **so that he could direct the ambulance to his mother's apartment, as it can be difficult to locate**.  He also said he had walked through the residence to check for anyone inside before he called 911.  I asked William about his mother's finances and learned that she has approximately eighty to one hundred thousand dollars in savings and bonds that will be distributed to her three children if she were to die.

24

- On November 19, 2013 I spoke to Robert Rainsberger who said he had not seen his mother for a few days. He recently had his home foreclosed upon and moved in with William this past August. He said he was hanging out at home on Tuesday when William called and told him to get over to his mom's apartment immediately. Robert drove his vehicle to Shortridge and was stopped by police when he arrived. He said his mother was taken away in an ambulance and he waited in a police car until I transported him downtown to give a statement. I drove Robert to headquarters and he did not say one word on the way unless I asked him a question.

- On November 20, 2013 I spoke to Rebecca Rainsberger. She said she usually checks on her mother once a week and had last been to her apartment on Monday, November 8th.  I asked her if she was at the apartment at all on Tuesday and she said no. Phone records confirmed that her cell phone was not near Ruth Rainsberger's apartment when the incident occurred.

- On 1-13-14 I spoke to Delbert Pickens who delivers meals on a daily basis to Ruth's apartment. Mr. Pickens said he delivers a meal to Ruth Monday through Friday and almost always arrives around 10:30 am.  On 11-19-13 Delbert said he arrived at Ruth's address around 10:30 am. He knocked on the door and she did not answer. He called her phone and could hear it ringing inside the apartment. He did not hear any signs that anyone may be inside the apartment so he left.

- On November 20, 2013 I attended the autopsy of Ruth Rainsberger which was performed by Dr. Tashjian. He determined that the cause of death was due to multiple blunt force trauma injuries to the head and the manner was ruled a Homicide. The wounds were possibly inflicted with a hammer or similar type weapon.

- On November 20, 2013 I spoke to William and Robert Rainsberger once again at Police Headquarters. I asked them if they would submit to a polygraph so that I could eliminate them as suspects and they adamantly said no, they would not take a polygraph.

- On November 27, 2013 I received a call from Attorney Brad Keffer, who said he is now representing William Rainsberger. I advised him I would be requesting a limited search warrant for William to obtain a buccal swab and major case prints. I also received a call from Attorney John Christ, who said he is now representing Robert Rainsberger. I made arrangements for William and Robert to come to Police Headquarters on December 4, 2013 so that I could serve the limited search warrants for prints and a DNA buccal swab. Both subjects did show up on December 4, 2013 with their attorneys and I obtained prints and buccal swabs from both.

- On November 22, 2013 Detective Tudor and I recovered a video from the Kroger store located at 7101 E 10th St. The video showed William Rainsberger drive onto the Kroger lot on November 19, 2013 at approximately 3:32 pm. Mr. Rainsberger got out of the car and approached a garbage can located near the Red Box video dispenser. Rainsberger placed what appeared to be a straight object in the garbage can.  He then stepped over to the Red Box and punched some buttons. He entered the store and bought an iced tea which he paid for with cash. He appeared to let someone in line use his Kroger plus card but did not use the card for his purchase. William exited the store and drove to his mother's apartment where he found her down and called 911.

- Cell phone records were obtained for William Rainsberger, including cell tower site locations for the day of November 19, 2013. Those records do not show William Rainsberger outside of the area of Shortridge and 10th St. during the relevant time period.

26

- On 1-13-14 I received the financial records for Ruth Rainsberger, from the Financial Federal Credit Union located at 701 E 56th St.  The records show the following balances existed at the time of Ruth's death. There was a checking account balance of $15,098.90, savings account balance of $4,605.65 and certificate balances of $79,058.15. I recovered a beneficiary form from Ruth's apartment shortly after she was discovered which revealed that William, Robert and Rebecca Rainsberger are the beneficiaries for all of her assets.

Dkt. No. 50-6.

The Court finds that this hypothetical affidavit does not establish probable cause to arrest William for the murder of his mother.  Probable cause "is a common-sense inquiry requiring only a probability of criminal activity; it exists whenever an officer or a court has enough information to warrant a prudent person to believe criminal conduct has occurred." *Leaver v. Shortess*, 844 F.3d 665, 669 (7th Cir. 2016), *cert. denied,* 137 S. Ct. 2127 (2017).  "[I]t does not take much to establish probable cause. The officers must have more than a bare suspicion that they have the right guy, but they need not have enough evidence to support a conviction or even to show that their belief is more likely true than false." *Fox v. Hayes,* 600 F.3d 819, 833 (7th Cir. 2010).  Even given this fairly low bar, the Court finds that there are

simply not enough facts in the hypothetical affidavit[6] to support a finding of probable cause. Accordingly, Benner is not entitled to summary judgment on William's claim for false arrest.[7]

## C. Qualified Immunity

Benner argues that even if probable cause was lacking, he is entitled to qualified immunity if there was "arguable probable cause" for William's arrest. This argument is off base. Benner cites cases that discuss qualified immunity in cases in which an officer decides that he has probable cause to arrest someone on the spot. Those cases and the "arguable probable cause" standard applied therein are irrelevant to the instant case. Rather, the applicable law is clear: "A police officer is not entitled to qualified immunity for submitting an affidavit that contained statements he knew to be false or would have known were false had he not recklessly disregarded the truth and no accurate information sufficient to constitute probable cause attended the false statements." *Olson v. Champaign County, Ill.*, 784 F.3d 1093, 1100 (7th Cir. 2015)

---

[6]In his reply brief, Benner points to additional facts that he argues help to establish probable cause; for example, the fact that William did not attempt any first aid while waiting for the ambulance, and the fact that his training indicated that an attacker who covers his victim's head often has a personal relationship with the victim. These facts were not included in the probable cause affidavit, however, and therefore are irrelevant to the question of whether the probable cause affidavit, as written, but omitting any statements a reasonable jury could find to be false and misleading, would have been sufficient to constitute probable cause to arrest William.

[7]William also argues that the probable cause affidavit improperly omits the fact that Ruth's apartment complex was a high crime area and another woman had been hit in the head and robbed about a month earlier in the parking lot outside of Ruth's apartment, as well as omitting what he deems to be exculpatory DNA evidence. An officer does not have to include every fact, only those facts that are material. "'The materiality of an omitted . . . fact depends on its relative importance to the evaluation of probable cause; an omitted fact is material if its inclusion would have negated probable cause.' If the omitted fact would not have negated probable cause, its omission was immaterial and there was no Fourth Amendment violation.'" *Hart*, 798 F.3d at 593 (quoting *Whitlock v. Brown,* 596 F.3d 406, 411 (7th Cir. 2010)). Because the Court finds probable cause lacking even without consider this omitted information, the Court need not determine whether it was material.

(citations omitted); *see also Betker v. Gomez*, 692 F.3d 854 (7th Cir. 2012) (finding law clearly established).  If Benner ultimately is liable to William in this case, he will not be liable for determining that probable cause existed to arrest William.  As he stated in his deposition, that was not his call to make under the circumstances of this case; a judicial officer made that determination.  Rather, any liability in this case will be based upon the jury determining that Benner intentionally or recklessly included false and/or misleading statements in his probable cause affidavit that caused the judicial officer to find probable cause when, in the absence of those statements, it would not have been appropriate to do so.  Because, considering the facts of record in the light most favorable to William, a reasonable jury could so find, Benner is not entitled to qualified immunity.

### D.  Malicious Prosecution

In addition to his false arrest claim, William also asserts a claim for malicious prosecution under the Fourth Amendment.  Benner in essence argues that this claim fails for the same reasons as he argues the false arrest claim fails.[8]  Accordingly, the Court finds summary judgment is not appropriate on that claim as well.  However, it is unclear to the Court how, under the facts of this case, a malicious prosecution claim adds anything to the false arrest claim.  It appears to the Court that if William cannot be successful on the former and not also be successful on the latter, and any damages he could receive for malicious prosecution would also be available for false arrest.  Accordingly, William should carefully consider whether it is

---

[8]In addition, consistent with the law in this circuit at the time, Benner argued in his summary judgment briefing that William's malicious prosecution claim could not be brought under the Fourth Amendment.  William wisely conceded the point, but noted that the Supreme Court had before it a case that could change the law.  That case has since been decided, and William's claim for malicious prosecution under the Fourth Amendment is, indeed, now viable. *See Manuel v. City of Joliet*, 137 S. Ct. 911 (2017).

advisable to proceed with both claims at trial, or whether doing so will only unnecessarily complicate the jury instructions in this case.

## IV.  CONCLUSION

For the reasons set forth below, Benner's motion for summary judgment is **DENIED**. This cause remains set for trial on September 11, 2017.  The final pretrial conference will be held on August 10, 2017.  The parties are reminded of their pretrial filing obligations set forth in section VIII of the case management plan (Dkt. No. 12).  In addition, the parties shall confer and file a joint issue instruction at least one week prior to the final pretrial conference.  The issue instruction serves as the Court's brief introduction of the case to the jury; it is read to the jury during *voir dire* and is included in the Court's preliminary instructions.  It needs to inform the jury who the parties are and what the case is about.  It is the Court's practice to require the parties to agree to a joint issue instruction; it is not acceptable for each side to propose one.

SO ORDERED:  7/18/2017

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification

# *** PUBLIC DOCKET ***

APPEAL,CMP

**U.S. District Court**
**Southern District of Indiana (Indianapolis)**
**CIVIL DOCKET FOR CASE #: 1:16-cv-00103-WTL-MJD**

| | |
|---|---|
| RAINSBERGER v. BENNER | Date Filed: 01/12/2016 |
| Assigned to: Judge William T. Lawrence | Jury Demand: Plaintiff |
| Referred to: Magistrate Judge Mark J. Dinsmore | Nature of Suit: 440 Civil Rights: Other |
| Cause: 28:1331 Federal Question: Other Civil Rights | Jurisdiction: Federal Question |

**Plaintiff**

**WILLIAM RAINSBERGER**                    represented by    **Richard A. Waples**
                                                             WAPLES & HANGER
                                                             410 N. Audubon Road
                                                             Indianapolis, IN 46219
                                                             (317)357-0903
                                                             Fax: (317)357-0275
                                                             Email: rwaples@wapleshanger.com
                                                             *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**CHARLES BENNER**                         represented by    **Donald Eugene Morgan**
                                                             OFFICE OF CORPORATION
                                                             COUNSEL
                                                             CITY OF INDIANAPOLIS
                                                             200 E. Washington Street
                                                             Suite 1601
                                                             Indianapolis, IN 46204
                                                             317-327-4081
                                                             Fax: 317-237-3968
                                                             Email: donald.morgan@indy.gov
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Pamela G. Schneeman**
                                                             OFFICE OF CORPORATION
                                                             COUNSEL
                                                             CITY OF INDIANAPOLIS
                                                             200 E. Washington Street
                                                             Suite 1601
                                                             Indianapolis, IN 46204

(317) 327-4055
Fax: (317) 327-3968
Email: pamela.schneeman@indy.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/12/2016 | 1 | COMPLAINT *against CHARLES BENNER* against WILLIAM RAINSBERGER, filed by WILLIAM RAINSBERGER. (Filing fee $400, receipt number 0756-3736498) (Attachments: # 1 Civil Cover Sheet, # 2 appearance, # 3 Proposed Summons)(Waples, Richard) (Entered: 01/12/2016) |
| 01/13/2016 | 2 | Summons Issued as to CHARLES BENNER. (MEH) (Entered: 01/13/2016) |
| 01/13/2016 | 3 | MAGISTRATE JUDGE's NOTICE of Availability to Exercise Jurisdiction issued. (MEH) (Entered: 01/13/2016) |
| 01/23/2016 | 4 | RETURN of Service by CMRRR, filed by WILLIAM RAINSBERGER. CHARLES BENNER served on 1/19/2016. (Attachments: # 1 Receipt Cert Mail Card, Return Receipt)(Waples, Richard) (Entered: 01/23/2016) |
| 02/04/2016 | 5 | NOTICE of Appearance by Benjamin J. Church on behalf of Defendant CHARLES BENNER. (Church, Benjamin) (Entered: 02/04/2016) |
| 02/04/2016 | 6 | NOTICE of Parties' First Extension of Time, filed by Defendant CHARLES BENNER. (Church, Benjamin) (Entered: 02/04/2016) |
| 02/05/2016 | 7 | SCHEDULING ORDER: Initial Pretrial Conference set for 3/15/2016 01:50 PM in room #257, United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana before Magistrate Judge Mark J. Dinsmore. The parties shall file a proposed Case Management Plan ("CMP") no fewer than seven days before the pretrial conference (see Order for additional information). Signed by Magistrate Judge Mark J. Dinsmore on 2/5/2016.(SWM) (Entered: 02/08/2016) |
| 02/08/2016 | 8 | NOTICE of Appearance by Lynne Denise Hammer on behalf of Defendant CHARLES BENNER. (Hammer, Lynne) (Entered: 02/08/2016) |
| 03/07/2016 | 9 | CASE MANAGEMENT PLAN TENDERED, filed by Plaintiff WILLIAM RAINSBERGER . (Waples, Richard) (Entered: 03/07/2016) |
| 03/08/2016 | 10 | ANSWER to 1 Complaint *AND AFFIRMATIVE DEFENSES*, filed by CHARLES BENNER.(Hammer, Lynne) (Entered: 03/08/2016) |
| 03/15/2016 | 11 | MINUTE ORDER for proceedings held before Magistrate Judge Mark J. Dinsmore: Initial Pretrial Conference held on 3/15/2016. The Court will approve the Case Management Plan, by separate order, with the changes to which the parties have agreed. Settlement Conference set for 9/27/2016 at 09:00 AM in room #257, United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana before Magistrate Judge Mark J. Dinsmore. Status |

|  |  | Conference set for 5/13/2016 at 10:30 AM in Telephonic before Magistrate Judge Mark J. Dinsmore. *see order for additional information* Signed by Magistrate Judge Mark J. Dinsmore. (NLR) (Entered: 03/15/2016) |
|---|---|---|
| 03/15/2016 | 12 | ORDER: CASE MANAGEMENT PLAN APPROVED AS AMENDED. Dispositive Motions due by 12/23/2016. Discovery due by 11/23/2016. Signed by Magistrate Judge Mark J. Dinsmore on 3/15/2016.(SWM) (Entered: 03/15/2016) |
| 03/21/2016 | 13 | SCHEDULING ORDER: Jury Trial set for 9/11/2017 at 9:00 AM in room #202, United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana before Judge William T. Lawrence. Final Pretrial Conference set for 8/10/2017 at 10:00 AM in room #202, United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana before Judge William T. Lawrence. (DW) (Entered: 03/21/2016) |
| 03/21/2016 | 14 | TRIAL PROCEDURES AND PRACTICES before Judge William T. Lawrence. (DW) (Entered: 03/21/2016) |
| 04/12/2016 | 15 | NOTICE of Service of Initial Disclosures , filed by Defendant CHARLES BENNER. (Hammer, Lynne) (Entered: 04/12/2016) |
| 04/12/2016 | 16 | NOTICE of Service of Initial Disclosures , filed by Plaintiff WILLIAM RAINSBERGER. (Waples, Richard) (Entered: 04/12/2016) |
| 04/12/2016 | 17 | Witness List *Preliminary*, filed by Plaintiff WILLIAM RAINSBERGER. (Waples, Richard) (Entered: 04/12/2016) |
| 04/12/2016 | 18 | Exhibit List *Preliminary*, filed by Plaintiff WILLIAM RAINSBERGER. (Waples, Richard) (Entered: 04/12/2016) |
| 04/22/2016 | 19 | Witness List *Preliminary*, filed by Defendant CHARLES BENNER, Exhibit List *Preliminary*, filed by Defendant CHARLES BENNER. (Hammer, Lynne) (Entered: 04/22/2016) |
| 04/22/2016 | 20 | Witness List *Preliminary*, filed by Defendant CHARLES BENNER. (Hammer, Lynne) (Entered: 04/22/2016) |
| 05/13/2016 | 22 | MINUTE ORDER for proceedings held before Magistrate Judge Mark J. Dinsmore: Telephonic Status Conference held on 5/13/2016. The parties discussed the status of and future plans for discovery. Telephonic Status Conference set for 7/7/2016 at 1:00 PM (Eastern Time) before Magistrate Judge Mark J. Dinsmore. *See order for additional information.* Signed by Magistrate Judge Mark J. Dinsmore. (GD) (Entered: 05/13/2016) |
| 07/06/2016 | 24 | NOTICE of Appearance by Kathryn M. Box on behalf of Defendant CHARLES BENNER. (Box, Kathryn) (Entered: 07/06/2016) |
| 07/12/2016 | 25 | MINUTE ORDER for proceedings held before Magistrate Judge Mark J. Dinsmore: Telephonic Status Conference held on 7/7/2016. The parties discussed the status of and future plans for discovery. Telephonic Status Conference set for 8/26/2016 at 3:40 PM (Eastern Time) before Magistrate Judge Mark J. Dinsmore. In addition, the September 27, 2016 Settlement |

| | | |
|---|---|---|
| | | Conference is hereby CONTINUED 10/7/2016 at 1:00 PM (Eastern Time). All other requirements of the Court's March 15, 2016 order scheduling the settlement conference [Dkt. 11 at 1-5] remain in effect. *See order for additional information.* Signed by Magistrate Judge Mark J. Dinsmore. (GD) (Entered: 07/13/2016) |
| 08/26/2016 | 27 | MINUTE ORDER for proceedings held before Magistrate Judge Mark J. Dinsmore: Telephonic Status Conference held on 8/26/2016. The parties discussed the status of and future plans for discovery. The parties confirmed they will be ready for the upcoming settlement conference. The conference was concluded without further order. Signed by Magistrate Judge Mark J. Dinsmore. (GD) (Entered: 08/29/2016) |
| 09/01/2016 | 28 | Unopposed MOTION *to Excuse Defendant Charles Benner from Attending the Settlement Conference*, filed by Defendant CHARLES BENNER. (Attachments: # 1 Text of Proposed Order)(Box, Kathryn) (Entered: 09/01/2016) |
| 09/02/2016 | 29 | ORDER granting 28 Motion to excuse Defendant Benner from attending the settlement conference. Signed by Magistrate Judge Mark J. Dinsmore on 9/2/2016. (CBU) (Entered: 09/06/2016) |
| 10/07/2016 | 30 | NOTICE of Appearance by Daniel Bowman on behalf of Defendant CHARLES BENNER. (Bowman, Daniel) (Entered: 10/07/2016) |
| 10/07/2016 | 31 | MINUTE ORDER for proceedings held before Magistrate Judge Mark J. Dinsmore: Settlement Conference held on 10/7/2016. Settlement was not achieved. Telephonic Status Conference set for 3/10/2017 at 1:30 PM (Eastern Time) before Magistrate Judge Mark J. Dinsmore. *See order for additional information.* Signed by Magistrate Judge Mark J. Dinsmore. (GD) (Entered: 10/07/2016) |
| 11/18/2016 | 32 | Unopposed MOTION for Extension of Time to , filed by Defendant CHARLES BENNER. (Attachments: # 1 Text of Proposed Order)(Box, Kathryn) (Entered: 11/18/2016) |
| 11/22/2016 | 33 | SCHEDULING ORDER: Telephonic Status Conference set for 11/23/2016 at 9:30 AM (Eastern Time) to discuss Defendant's Unopposed Motion seeking a 30-day extension of the dispositive motion, liability discovery, and expert disclosure deadlines. [Dkt. 32 .] Counsel shall attend the conference by calling the designated telephone number, to be provided by the Court via email generated by the Court's ECF system. Signed by Magistrate Judge Mark J. Dinsmore on 11/22/2016.(GD) (Entered: 11/22/2016) |
| 11/22/2016 | 35 | NOTICE of Withdrawal of Appearance by *Daniel Bowman* on behalf of CHARLES BENNER (Bowman, Daniel) (Entered: 11/22/2016) |
| 11/23/2016 | 36 | MINUTE ORDER for proceedings held before Magistrate Judge Mark J. Dinsmore: Telephonic Status Conference held on 11/23/2016. Defendant's motion 32 to enlarge certain deadlines GRANTED IN PART and DENIED IN PART. The approved Case Management Plan 12 amended as follows: II. |

| | | |
|---|---|---|
| | | Jurisdiction and Statement of Claims C. On or before 12/23/2016, and consistent with the certification provisions of Fed. R. Civ. P. 11(b), the party with the burden of proof shall file a statement of the claims or defenses it intends to prove at trial, stating specifically the legal theories upon which the claims or defenses are based. IV. Discovery and Dispositive Motions B. Dispositive Motions due by 1/6/2017. Discovery due by 12/21/2016. All other requirements of the approved Case Management Plan 12 remain in effect. Telephonic Status Conference on 3/10/2017 31 remains on calendar as scheduled. *See order for additional deadlines and information.* Signed by Magistrate Judge Mark J. Dinsmore. (GD) (Entered: 11/28/2016) |
| 12/22/2016 | 37 | Statement *of Defenses* by CHARLES BENNER. (Box, Kathryn) (Entered: 12/22/2016) |
| 12/23/2016 | 38 | Statement *of Claims for Trial* by WILLIAM RAINSBERGER. (Waples, Richard) (Entered: 12/23/2016) |
| 01/03/2017 | 39 | MOTION for Extension of Time to January 13, 2017 *to File a Dispositive Motion*, filed by Defendant CHARLES BENNER. (Attachments: # 1 Text of Proposed Order)(Box, Kathryn) (Entered: 01/03/2017) |
| 01/04/2017 | 40 | ORDER granting Defendant's 39 Motion to enlarge dispositive motion deadline. Dispositive motions due by 1/13/2017. Signed by Magistrate Judge Mark J. Dinsmore on 1/4/2017.(SWM) (Entered: 01/04/2017) |
| 01/13/2017 | 41 | MOTION for Summary Judgment , filed by Defendant CHARLES BENNER. (Box, Kathryn) (Entered: 01/13/2017) |
| 01/13/2017 | 42 | NOTICE *of Manual Filing*, filed by Defendant CHARLES BENNER (Box, Kathryn) (Entered: 01/13/2017) |
| 01/13/2017 | 43 | Designation of Evidence re 41 MOTION for Summary Judgment , filed by Defendant CHARLES BENNER. (Attachments: # 1 Exhibit 1- Affidavit for Probable Cause, # 2 Exhibit 2- William Rainsberger Deposition Excerpts, # 3 Exhibit 3- Manually filed, # 4 Exhibit 4- Affidavit of Carl Wooldridge, # 5 Exhibit 5- Deposition of Charles Benner, # 6 Exhibit 6- Tape Deposition of Jennifer Lane, # 7 Exhibit 7- Laboratory Examination Report, # 8 Exhibit 8- Affidavit of Charles Benner, # 9 Exhibit 9- Manually Filed, # 10 Exhibit 10- Interview, # 11 Exhibit 11- Taped Deposition of Pamela Pullium, # 12 Exhibit 12- Manually Filed, # 13 Exhibit 13- Photographs, # 14 Exhibit 14- Manually Filed, # 15 Exhibit 15- Electronic Journal File, # 16 Exhibit 16- Transaction Journal, # 17 Exhibit 17- Manually Filed, # 18 Exhibit 18- Manually Filed, # 19 Exhibit 19- Affidavit of Benjamin Bierce, # 20 Exhibit 20- Landline Usage, # 21 Exhibit 21-Email, # 22 Exhibit 22- Email, # 23 Exhibit 23- Robert Rainsberger Deposition excerpt)(Box, Kathryn) (Entered: 01/13/2017) |
| 01/13/2017 | 44 | BRIEF/MEMORANDUM in Support re 41 MOTION for Summary Judgment , filed by Defendant CHARLES BENNER. (Box, Kathryn) (Entered: 01/13/2017) |
| | | |

| 01/17/2017 | 45 | Receipt of Six CDs re 42 NOTICE *of Manual Filing*, filed by Defendant CHARLES BENNER (Box, Kathryn) (BRR) (Entered: 01/17/2017) |
| 02/07/2017 | 46 | MOTION for Extension of Time to File Response to February 13, 2017 re 41 MOTION for Summary Judgment , filed by Plaintiff WILLIAM RAINSBERGER. (Attachments: # 1 Text of Proposed Order)(Waples, Richard) (Entered: 02/07/2017) |
| 02/09/2017 | 47 | ORDER granting Plaintiff's 46 Motion for Extension of Time to File Response to 2/13/2017 re 41 MOTION for Summary Judgment . Signed by Magistrate Judge Mark J. Dinsmore on 2/9/2017. (SWM) (Entered: 02/10/2017) |
| 02/13/2017 | 48 | MOTION for Leave to File *over-sized summary judgment response brief*, filed by Plaintiff WILLIAM RAINSBERGER. (Attachments: # 1 Text of Proposed Order)(Waples, Richard) (Entered: 02/13/2017) |
| 02/13/2017 | 49 | RESPONSE in Opposition re 41 MOTION for Summary Judgment *Memorandum*, filed by Plaintiff WILLIAM RAINSBERGER. (Waples, Richard) (Entered: 02/13/2017) |
| 02/13/2017 | 50 | Designation of Evidence re 44 Brief/Memorandum in Support *of Plaintiff's Response to Defendant's Motion for Summary Judgment*, filed by Plaintiff WILLIAM RAINSBERGER. (Attachments: # 1 Exhibit Email from Charles Benner to Amelia Basham, March 20, 2014, # 2 Exhibit Deposition of Michael Price, Sept. 8, 2014, # 3 Exhibit Criminal Deposition of Charles Benner, Nov. 25, 2014, # 4 Exhibit Bail Testimony of Charles Benner, July 17, 2014, # 5 Exhibit Information for Murder Charge, May 22, 2014, # 6 Exhibit Affidavit of Probable Cause, May 22, 2014, # 7 Exhibit Deposition of Carl Wooldridge, Sept. 8, 2014, # 8 Exhibit Affidavit of Probable Cause, Dec. 6, 2013, # 9 Exhibit Civil Deposition of Charles Benner, September 27, 2016, # 10 Exhibit William Rainsberger Statement, Nov. 20, 2013, # 11 Exhibit Robert Rainsberger Statement, Nov. 19, 2013, # 12 Exhibit Mari Bilger Deposition, Dec. 20, 2016, # 13 Exhibit Robert Rainsberger Deposition, Dec. 20, 2016, # 14 Exhibit Criminal Case Dismissal Motion and Order, July 7, 2015, # 15 Exhibit William Rainsberger Affidavit, # 16 Exhibit Deposition of Dr. Eric Streib, March 27, 2015, # 17 Exhibit William Rainsberger Deposition Errata, # 18 Exhibit William Rainsberger Deposition, # 19 Exhibit Robert Rainsbergers Processed Cell Phone Records Map, # 20 Exhibit Robert Rainsbergers Processed Cell Phone Records, # 21 Exhibit William Rainsbergers Processed Cell Phone Records Map, # 22 Exhibit William Rainsbergers Processed Cell Phone Records, # 23 Exhibit Manuel v. City of Joliet, Transcript of Oral Arg., # 24 Exhibit William Rainsberger Statement, Nov. 19, 2013, # 25 Exhibit Ruth Rainsbergers AT&T Land line Records, # 26 Exhibit Forensic Services Agency Note, 11-19-2013, # 27 Exhibit Rebecca Rainsberger Statement, Nov. 20, 2013., # 28 Exhibit Deposition of Jennifer Lane, Sept. 8, 2014, # 29 Exhibit Affidavit of David Hennessy, # 30 Exhibit Affirmation of Kim Rossmo, # 31 Exhibit Expert Disclosure of Kim Rossmo (Rossmo Report), # 32 Exhibit CV of Kim Rossmo, # 33 Exhibit Lab Exam Report, DNA Report (highlighted) |

|            |    | (Indianapolis-Marion County Forensic Services Agency Laboratory Examination Report), # 34 Exhibit Lab Exam Report, DNA Report (Indianapolis-Marion County Forensic Services Agency Laboratory Examination Report))(Waples, Richard) (Entered: 02/13/2017) |
|------------|----|----|
| 02/14/2017 | 51 | ORDER - granting 48 Motion for Leave to File. Plaintiff may file an oversized summary judgment response brief up to 39 pages. Signed by Judge William T. Lawrence on 2/14/2017. (BRR) (Entered: 02/14/2017) |
| 02/17/2017 | 52 | Unopposed MOTION for Extension of Time to April 3, 2017 *to Serve Expert Disclosures*, filed by Defendant CHARLES BENNER. (Attachments: # 1 Text of Proposed Order)(Box, Kathryn) (Entered: 02/17/2017) |
| 02/17/2017 | 53 | MOTION to Withdraw Attorney Appearance *of Kathryn M. Box*, filed by Defendant CHARLES BENNER. (Box, Kathryn) (Entered: 02/17/2017) |
| 02/21/2017 | 54 | NOTICE of Appearance by Pamela G. Schneeman on behalf of Defendant CHARLES BENNER. (Schneeman, Pamela) (Entered: 02/21/2017) |
| 02/21/2017 | 55 | MOTION to Withdraw Attorney Appearance *of Lynne D. Hammer and Benjamin J. Church*, filed by Defendant CHARLES BENNER. (Attachments: # 1 Text of Proposed Order)(Schneeman, Pamela) (Entered: 02/21/2017) |
| 02/21/2017 | 56 | Submission of Proposed Order , re 53 MOTION to Withdraw Attorney Appearance *of Kathryn M. Box*, filed by Defendant CHARLES BENNER. (Box, Kathryn) (Entered: 02/21/2017) |
| 02/21/2017 | 57 | Joint MOTION for Extension of Time to February 27, 2017 *to File Final Witness and Exhibit List*, filed by Defendant CHARLES BENNER. (Attachments: # 1 Text of Proposed Order)(Schneeman, Pamela) (Entered: 02/21/2017) |
| 02/22/2017 | 58 | ORDER granting 53 Motion to Withdraw Attorney Appearance. Attorney Kathryn M. Box withdrawn. Signed by Magistrate Judge Mark J. Dinsmore on 2/22/2017. (SWM) (Entered: 02/22/2017) |
| 02/22/2017 | 59 | ORDER granting 55 Motion to Withdraw Attorney Appearance. Attorney Benjamin J. Church and Lynne Denise Hammer withdrawn. Signed by Magistrate Judge Mark J. Dinsmore on 2/22/2017. (SWM) (Entered: 02/22/2017) |
| 02/22/2017 | 60 | SCHEDULING ORDER: This matter comes before the Court on Defendant's Unopposed Motion to Extend the Expert Disclosure Deadline [Dkt. 52] and the parties' Joint Motion for Extension of Time to File Final Witness and Exhibit Lists [Dkt. 57]. Those motions are set for a telephonic hearing before the Magistrate Judge at 8:30 a.m. (Eastern) on Friday, February 24, 2017. Counsel shall attend the hearing by calling the designated telephone number, to be provided by the Court via email generated by the Court's ECF system. Signed by Magistrate Judge Mark J. Dinsmore on 2/22/2017.(SWM) (Entered: 02/22/2017) |

| 02/23/2017 | 62 | NOTICE of Appearance by Donald Eugene Morgan on behalf of Defendant CHARLES BENNER. (Morgan, Donald) (Entered: 02/23/2017) |
| 02/24/2017 | 63 | MINUTE ORDER for proceedings held before Magistrate Judge Mark J. Dinsmore: This matter came before the Court for a hearing on Defendant's motion to enlarge the Defendant's expert disclosure deadline [Dkt. 52 ] and the parties' joint motion to enlarge the deadline to file their final witness and exhibit lists [Dkt. 57 ]. The Court heard argument from the parties with regard to the motions and hereby orders as follows: Defendant's motion to enlarge the Defendant's expert disclosure deadline [Dkt. 52 ] is hereby GRANTED IN PART and DENIED IN PART. The parties' joint motion to enlarge the deadline to file their final witness and exhibit lists [Dkt. 57 ] is hereby GRANTED. All parties shall file and serve their final witness and exhibit lists on or before February 27, 2017. (See Entry.) Signed by Magistrate Judge Mark J. Dinsmore. (BRR) (Entered: 02/24/2017) |
| 02/27/2017 | 64 | Witness List *Final*, filed by Plaintiff WILLIAM RAINSBERGER. (Waples, Richard) (Entered: 02/27/2017) |
| 02/27/2017 | 65 | Exhibit List *Final*, filed by Plaintiff WILLIAM RAINSBERGER. (Waples, Richard) (Entered: 02/27/2017) |
| 02/27/2017 | 66 | REPLY in Support of Motion re 41 MOTION for Summary Judgment , filed by Defendant CHARLES BENNER. (Morgan, Donald) (Entered: 02/27/2017) |
| 02/27/2017 | 67 | Exhibit List *Final*, filed by Defendant CHARLES BENNER, Witness List *Final*, filed by Defendant CHARLES BENNER. (Morgan, Donald) (Entered: 02/27/2017) |
| 03/10/2017 | 69 | MINUTE ORDER for proceedings held before Magistrate Judge Mark J. Dinsmore: Telephonic Status Conference held on 3/10/2017. The parties discussed the status of and future plans for discovery. The conference was concluded without further order. Signed by Magistrate Judge Mark J. Dinsmore. (GD) (Entered: 03/10/2017) |
| 03/24/2017 | 70 | Exhibit List *Final*, filed by Defendant CHARLES BENNER, Witness List *Amended Final*, filed by Defendant CHARLES BENNER. (Schneeman, Pamela) (Entered: 03/24/2017) |
| 03/24/2017 | 71 | NOTICE *of Service of Expert Disclosure*, filed by Defendant CHARLES BENNER (Schneeman, Pamela) (Entered: 03/24/2017) |
| 03/27/2017 | 72 | Submission *of Supplemental Authority on Summary Judgment Motion*, filed by Plaintiff WILLIAM RAINSBERGER. (Attachments: # 1 Exhibit Manuel v. City of Joliet)(Waples, Richard) (Entered: 03/27/2017) |
| 07/18/2017 | 73 | ORDER denying 41 Motion for Summary Judgment. This cause remains set for trial on September 11, 2017. The final pretrial conference will be held on August 10, 2017. The parties are reminded of their pretrial filing obligations set forth in section VIII of the case management plan Dkt. No. 12 . In addition, the parties shall confer and file a joint issue instruction at least one |

| | | |
|---|---|---|
| | | week prior to the final pretrial conference. The issue instruction serves as the Court's brief introduction of the case to the jury; it is read to the jury during voir dire and is included in the Court's preliminary instructions. It needs to inform the jury who the parties are and what the case is about. It is the Court's practice to require the parties to agree to a joint issue instruction; it is not acceptable for each side to propose one. Signed by Judge William T. Lawrence on 7/18/2017. (JDC) (Entered: 07/18/2017) |
| 07/21/2017 | 74 | SCHEDULING ORDER: Settlement Conference set for 7/28/2017 01:00 PM (Eastern Time) in room #257, United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana before Magistrate Judge Mark J. Dinsmore. On or before July 26, 2017, the parties may, but need not, submit (not file) supplemental confidential settlement statements if they wish to do so; any such statements should be submitted via email to MJDinsmore@insd.uscourts.gov. See Order for additional information. Signed by Magistrate Judge Mark J. Dinsmore on 7/21/2017.(SWM) (Entered: 07/21/2017) |
| 07/24/2017 | 75 | MOTION to Vacate *July 28 Settlement Conference*, filed by Defendant CHARLES BENNER. (Attachments: # 1 Text of Proposed Order) (Schneeman, Pamela) (Entered: 07/24/2017) |
| 07/26/2017 | 76 | NOTICE OF APPEAL as to 73 Order on Motion for Summary Judgment, filed by Defendant CHARLES BENNER. (Filing fee $505, receipt number 0756-4462073) (Schneeman, Pamela) (Entered: 07/26/2017) |
| 07/26/2017 | 77 | MOTION to Stay *Case Pending Appeal*, filed by Defendant CHARLES BENNER. (Attachments: # 1 Text of Proposed Order)(Schneeman, Pamela) (Entered: 07/26/2017) |

**Case #: 1:16-cv-00103-WTL-MJD**