UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

WILLIAM RAINSBERGER,    )
             )
   Plaintiff,     )
             )
   v.        )  Case No.:  1:16-cv-103-WTL-MJD
             )
CHARLES BENNER,     )
             )
   Defendant.    )

## DEFENDANT'S NOTICE OF APPEAL

Notice is hereby given that Defendant Charles Benner appeals to the United States Court of Appeals for the Seventh Circuit from the order denying him qualified immunity entered on July 18, 2017 at Docket Number 73.

Respectfully Submitted,

 /s/ *Pamela G. Schneeman*
Pamela G. Schneeman, (18142-53)
Deputy Chief Litigation Counsel
Office of Corporation Counsel
200 East Washington Street, Room 1601
Indianapolis, Indiana  46204
Telephone: (317) 327-4055
Fax: (317) 327-3968
E-Mail: Pamela.Schneeman@indy.gov

## CERTIFICATE OF SERVICE

I hereby certify that on July 26, 2017, a copy of the foregoing DEFENDANT'S NOTICE

OF APPEAL was filed electronically. Service of this filing will be made on all ECF-registered

counsel by operation of the Court's electronic filing system.  Parties may access this filing through

the Court's system.

Richard A. Waples
WAPLES & HANGER
410 N. Audubon Rd.
Indianapolis, IN  46219
rwaples@wapleshanger.com


　_/s/ *Pamela G. Schneeman*
Pamela G. Schneeman, (18142-53)
Deputy Chief Litigation Counsel


OFFICE OF CORPORATION COUNSEL
200 East Washington Street, Room 1601
Indianapolis, Indiana 46204
Telephone: (317) 327-4055
Fax: (317) 327-3968

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| **WILLIAM RAINSBERGER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Cause No. 1:16-cv-103-WTL-MJD** |
| | ) | |
| **CHARLES BENNER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ENTRY ON MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on the Defendant's motion for summary judgment (Dkt. No. 41).  The motion is fully briefed and the Court, being duly advised, **DENIES** the motion for the reasons set forth below.

## I.  SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed, and all reasonable inferences must be drawn in the non-movant's favor.  *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.").  However, a party who bears the burden of proof on a particular issue may not rest on its pleadings, but must show what evidence it has that there is a genuine issue of material fact that requires trial.  *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003).  Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in

search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II.  BACKGROUND

The facts set forth below consist of facts supported by evidence of record, viewed in the light most favorable to the Plaintiff, as the non-moving party.[1]  Additional facts are included in the Discussion section as relevant.

### A.  The Events of November 19, 2013

In November 2013, Ruth Rainsberger was 88 years old and suffering from dementia.  She lived alone in an apartment in Indianapolis.  Her son, Plaintiff William Rainsberger, lived close by and was her primary caregiver.  He saw Ruth almost every day, did her grocery shopping, and kept her mentally engaged.  Ruth had two other children: Rebecca, who lived farther away, saw her once a week, and did her laundry; and Robert, who saw his mother less frequently.  Robert had recently lost his job and his home to foreclosure and had moved in with William.

On November 19, 2013, shortly after 3:30 p.m., William went to Ruth's apartment and found the door unlocked.  He entered the apartment and noticed his mother lying face down on the floor with a blanket covering much of her shoulders and head.  She was still breathing, but her breathing was labored.  He knelt down beside her, put his hand on her knee, and yelled, "Mom, Mom."  There was a large circle of dried blood on the blanket covering her head.  There was also a large pool of what appeared to him to be congealed blood on the floor.  William did not remove the blanket because it was stuck to the wound and he believed it was acting as a bandage, so removing it would cause more bleeding to occur.

---

[1]Many of these facts are disputed by Benner.

Around 3:37 p.m., William used his mother's landline phone to call 911.  William told the 911 operator that someone had attacked his mother and, later in the call, that "someone bashed her head in."

Indianapolis Fire Department Paramedic Carl Wooldridge responded to William's 911 call.  William, who had gone outside to direct the ambulance to the correct apartment, met Wooldridge outside and told him that someone had "caved his mother's head in."

Inside the apartment, Wooldridge observed Ruth lying on the ground between a chair and the coffee table.  She was still breathing.  There was a cloth with blood covering Ruth's head that appeared to be stuck to a wound on her head.  The cloth had "somewhat of a hole in it right where the wound was," and when Wooldridge "peeled it off there was a mark at that time on her forehead that I believed to be an entrance wound."  Dkt. No. 50-7 at 8.  Based on these observations, Woolridge thought that Ruth had been shot and reported that belief to the paramedics who transported Ruth to the hospital.  Wooldridge later reported to Benner that he thought it was "odd" that William said his mother's head had been caved in because he had not removed the cloth to look at her injuries.

Defendant Charles Benner, a homicide detective with the Indianapolis Metropolitan Police Department ("IMPD"), arrived at the scene around 4:15 p.m. along with fellow homicide detective Tom Tudor.  Benner learned from the other officers on the scene that William and his brother Robert were both at the scene and had arrived in separate vehicles, that William had called 911, that Ruth had been found covered with a blanket, and that she had been transported to the hospital in critical condition.  Tudor did an initial canvas of the building to identify potential witnesses while Benner gathered information about the medical personnel who treated Ruth.

Benner then did a walkthrough of Ruth's apartment.  The walkthrough revealed no signs of forced entry.  Benner noticed some open dresser drawers in Ruth's bedroom, but the contents appeared undisturbed.  The back room was cluttered with boxes and trash bags that seemed untouched.  Benner found a lockbox on a closet shelf in the back room that contained what looked to him like financial documents.  He also found Ruth's checkbook, cash, and credit cards in the apartment.  Ruth's children reported that she used a black purse and took prescription medication for dementia.  Neither was found in the apartment.  Based on his observations, Benner determined that robbery did not appear to be the motive for the attack.

On November 20, 2013, Ruth died from her injuries.  An autopsy was performed and the cause of death was determined to be multiple blunt force trauma to the head, possibly caused by a hammer or similar object.  Not surprisingly, her death was ruled a homicide.

### B.  Statements by William, Robert, and Rebecca

On the evening of the attack, Benner asked William and Robert to give statements.  They both consented and were transported to IMPD Headquarters.

During his interview, William told Benner that he had been taking care of Ruth daily for the past few years.  He also handled all of her bills and finances.  Ruth had approximately $80,000 to $100,000 in savings that was to be distributed to her three children after her death.  In addition to Ruth, the only individuals with a key to her apartment were William, Robert, and their sister Rebecca.  The staff of the apartment complex where Ruth lived also had a key to her apartment; however, Benner confirmed that the key had not been moved and was in its normal location at all relevant times.

William reported to Benner that he had last seen his mother the previous night around 6:00 p.m.  After visiting with her, William drove to Plainfield to spend the evening with his wife.

4

Around 9:00 the next morning, he returned to his house at 7345 East 13th Street in Indianapolis.
He stayed home until about 3:30 p.m., then went to Kroger on 10th Street in Indianapolis and
bought a tea.  William then drove the short distance to Ruth's apartment.

When he arrived at Ruth's apartment, William noticed that the door was already
unlocked.  He went inside and saw Ruth lying on the floor with a blanket over her head.  Based
on Benner's training and experience, when an attacker covers his or her victim's head or face, it
often indicates that the attacker had a personal relationship with the victim.  William also noticed
a great deal of blood and that his mother was still breathing.  When asked why he did not remove
the blanket, William said that in his opinion removing the blanket would do more damage
because it was stuck to the wound and he believed it was acting as a bandage and preventing
more bleeding.  He checked the apartment to confirm that no one was there and then called 911.
After calling 911, William went outside to wait for the ambulance so he could direct it to the
correct apartment, as his mother's apartment can be difficult to locate.

During his interview, Robert stated that he had not seen Ruth for a few days.  In August
2013, Robert moved in with William after the bank foreclosed on his house.  Robert was at
William's house on November 19, 2013, when William called and told him to come to Ruth's
house immediately.  When he got to Ruth's apartment, Robert was stopped by police and put in a
police car.

The following day, Benner spoke with Rebecca Rainsberger, Ruth's other child.  Rebecca
stated that she typically checked on her mother once a week and had last been at Ruth's during
the day on the day before the attack.

At some point that day, Benner asked Rebecca, William, and Robert to come to IMPD
Headquarters, ostensibly to review the results of Ruth's autopsy.  Benner accused William and

Robert of murdering Ruth for money and asked them to take a polygraph test.  Upset at being

brought to the station under false pretenses and being accused of his mother's murder, and

because he considered polygraphs unreliable, William adamantly refused to take a polygraph.

### C.  The Investigation

Crime scene specialist Jennifer Lane collected potential evidence at the scene.  She

videotaped and photographed Ruth's apartment and collected fingerprints and DNA.  A report

dated April 23, 2014, stated that two DNA contributors were found on the outside back neck area

and outside left sleeve of Ruth's jacket.  The major contributor was Ruth; the "partial DNA

profile of the minor contributor [was] from an unknown male" (i.e., not William or Robert).

Dkt. No. 50-33 at 2.   In addition, the DNA of another unknown male was found on the blanket

that was covering Ruth's head and two stains on Ruth's sweatshirt.  Benner believed that the

unknown DNA was likely from the first responders who treated Ruth at the scene.

On December 6, 2013, Benner collected video from the Kroger grocery store located on

10th Street.  The store had eighty-one working cameras that day, four of which showed William.

Camera 30, located in the front entry way, shows William dispose of an item in the trash.  After

dropping the object in the trashcan, William then pushes some buttons on the Redbox video-

rental box next to the trashcan.  At one point while looking at the Redbox machine, he turns to

look behind him.  He then enters the store.

Camera 7, located in the self-checkout area, shows William purchasing a tea.  He appears

to let a customer at the adjacent checkout kiosk use his Kroger Plus Card, but he does not use the

card for his own purchase.  He then exits the store, locates his car, and drives away.

Benner obtained Ruth's financial records from her bank, which showed that at the time of

her death she had a checking account balance of $15,098.90, a savings account balance of

$4,605.65, and certificate balances totaling $79,058.15.  Benner obtained a beneficiary form from Ruth's apartment showing that William, Robert, and Rebecca were the beneficiaries for all of her assets.

### D.  Phone Records

IMPD detective Benjamin Bierce obtained phone records for William, Robert, Rebecca, and Ruth.  Rebecca's cell phone records confirmed that she was not in the vicinity of Ruth's apartment on the day her mother was attacked.  Ruth's landline phone records show a phone call to Robert's cell phone number at 3:40 p.m.  Robert's cell phone records show that he received two phone calls from Ruth's landline number, one at 2:40 p.m. and the other at 3:40 p.m.  Bierce provided the phone records to Benner during the winter of 2013-2014.

During the summer of 2014, while collecting phone records for another case, Bierce learned that due to cell tower construction, some calls made in Indianapolis were being routed through cell towers in Chicago, Illinois.  Calls that were routed through Chicago were recorded in Central standard time.  After learning this new information, Bierce reviewed the cell phone records he had obtained for several open investigations, including Robert's records.  Bierce found that some of the calls on Robert's records had been routed through Chicago.  Accordingly, he created a spreadsheet titled "Results" that converted the calls on Robert's phone records that had been routed through Chicago to Eastern standard time (Indianapolis time).  The Results spreadsheet shows that the two calls to Robert's cell phone from Ruth's landline were made on November 19, 2013 at 3:40:38 p.m. and 3:40:51 p.m. Bierce created the Results spreadsheet in July 2014 and provided it to Benner.

### E.  The Probable Cause Affidavit

On May 22, 2014, Benner executed a probable cause affidavit that contained the
following statements:

- On November 19, 2013 at approximately 3:38 pm IMPD 911 dispatch received a call
  from the address of 801 N. Shortridge Rd, Apartment H 11. The caller said that someone
  had "bashed" his mother's head in.  Officer Lewis arrived on scene along with IFD.
  Officer Lewis said that the victim's head was covered with a blanket when they arrived
  on scene. The victim, identified as Ruth Rainsberger, was transported to Wishard hospital
  in critical condition. The caller, identified as William Rainsberger, and his brother,
  Robert Rainsberger, were transported to Police Headquarters to give a statement. It
  should be noted that during the initial investigation, both medic and hospital personnel
  believed that the victim may have sustained a gunshot wound. The fact that the 911 caller
  said his mother's head was bashed in without actually seeing her head is indicative to the
  affiant that he may have knowledge of how she sustained the injury.

- On December 4, 2013 I took a statement from Firefighter Carl Wooldridge. Wooldridge
  said he was the first to have contact with the caller who was standing outside of the
  apartment building when fire arrived on scene. The white male on scene told Wooldridge
  that someone had "caved his mother's head in."  Wooldridge went to the apartment door
  and noticed it was slightly ajar.  The victim was lying on the floor between a chair and a
  coffee table.  Wooldridge said it was immediately apparent to him that the victim was
  breathing even though she had a blanket covering her head.  He said the blanket appeared
  to cover the entire head and not just one side.  The blanket was soaked in blood and was
  stuck to the victim's head.  Wooldridge thought it was strange that the caller said her

head was caved in when it was obvious that he had not removed the blanket to check on

his mother. Fire and ambulance personnel thought the victim may have been shot and

thought it was not normal that there was not any blood spatter on the walls or ceiling.

Wooldridge said the apartment seemed to be in orderly condition. The caller was

identified as William Rainsberger.

- I requested crime lab to the scene and 4439 CSS Lane responded to the scene. A

  walkthrough of the apartment revealed that there were no signs of forced entry.  There

  were a few drawers in the victim's bedroom that were pulled out halfway with no sign of

  anyone rifling through the contents.  There were a large amount of boxes in a back room

  that were untouched.  There was a lockbox in the back room in plain view that contained

  savings bonds belonging to the victim.  The victim's checkbook, some cash and credit

  cards were still present inside the apartment.  The only blood found on the scene was on

  the blanket and on the floor where the victim was found.

- On November 19, 2013 I conducted an interview of William Rainsberger at Police

  Headquarters.  William said he has been taking care of his mother on a daily basis for the

  past few years.  He pays all of her bills and has power of attorney responsibility over her

  finances.  He said he last saw his mother on Monday night around 6:00 pm. He left her

  apartment and went to Plainfield to spend the night with his wife.  He returned home to

  13th Street around 9:00 am on Tuesday morning and just hung out at home all day.  He

  said that around 3:30 pm he went to the Kroger on 10th St and bought an iced tea.  He

  then drove across the street to check on his mother.  He said he checked her mailbox and

  went out to his car before going to her door. He said when he used his key to open the

  door if appeared that the door was already unlocked.  He opened the door and saw his

mom lying on the floor with a blanket over her head.  He walked around a coffee table and put his tea down on the table.  He saw some blood on the floor and on the blanket so he called 911.  He said his mom was breathing loudly as if she was snoring.  I asked why he didn't take the blanket off to check his mom and he said he thought he would do more damage by touching her.  He called 911, left the apartment after closing the door, and went outside to wait for the ambulance.  He also said he had walked through the residence to check for anyone inside before he called 911.  I asked William about his mother's finances and learned that she has approximately eighty to one hundred thousand dollars in savings and bonds that will be distributed to her three children if she were to die.

- On November 19, 2013 I spoke to Robert Rainsberger who said he had not seen his mother for a few days.  He recently had his home foreclosed upon and moved in with William this past August.  He said he was hanging out at home on Tuesday when William called and told him to get over to his mom's apartment immediately.  Robert drove his vehicle to Shortridge and was stopped by police when he arrived.  He said his mother was taken away in an ambulance and he waited in a police car until I transported him downtown to give a statement.  I drove Robert to headquarters and he did not say one word on the way unless I asked him a question.  At no time did Robert or his brother, William, ever ask me how their mom was doing or if they could get to the hospital to see her.

- On November 20, 2013 I spoke to Rebecca Rainsberger.  She said she usually checks on her mother once a week and had last been to her apartment on Monday, November 8th.  I asked her if she was at the apartment at all on Tuesday and she said no.  Phone records

confirmed that her cell phone was not near Ruth Rainsberger's apartment when the incident occurred.

- On 1-13-14 I spoke to Delbert Pickens who delivers meals on a daily basis to Ruth's apartment.  Mr. Pickens said he delivers a meal to Ruth Monday through Friday and almost always arrives around 10:30 am.  On 11-19-13 Delbert said he arrived at Ruth's address around 10:30 am. He knocked on the door and she did not answer.  He called her phone and could hear it ringing inside the apartment.  He did not hear any signs that anyone may be inside the apartment so he left.

- On November 20, 2013 I attended the autopsy of Ruth Rainsberger which was performed by Dr. Tashjian.  He determined that the cause of death was due to multiple blunt force trauma injuries to the head and the manner was ruled a Homicide.  The wounds were possibly inflicted with a hammer or similar type weapon.

- On November 20, 2013 I spoke to William and Robert Rainsberger once again at Police Headquarters.  I asked them if they would submit to a polygraph so that I could eliminate them as suspects and they adamantly said no, they would not take a polygraph.  All three siblings stormed out and I have not heard from them since.

- I have not at any time during this investigation, been asked by any of the victim's children if I have any suspects or any other information in reference to this case.

- On November 27, 2013 I received a call from Attorney Brad Keffer, who said he is now representing William Rainsberger.  I advised him I would be requesting a limited search warrant for William to obtain a buccal swab and major case prints.  I also received a call from Attorney John Christ, who said he is now representing Robert Rainsberger.  I made arrangements for William and Robert to come to Police Headquarters on December 4,

11

2013 so that I could serve the limited search warrants for prints and a DNA buccal swab. Both subjects did show up on December 4, 2013 with their attorneys and I obtained prints and buccal swabs from both.

- On November 22, 2013 Detective Tudor and I recovered a video from the Kroger store located at 7101 E 10th St.  The video showed William Rainsberger drive onto the Kroger lot on November 19, 2013 at approximately 3:32 pm. Mr. Rainsberger got out of the car and approached a garbage can located near the Red Box video dispenser.  Rainsberger appeared to pull out a straight object from his person which he placed in the garbage can. As he placed the item in the trash he appeared to look around for cameras.  He then stepped over to the Red Box and punched some buttons.  He looked around again before he entered the store.  He entered the store and bought an iced tea which he paid for with cash.  He appeared to let someone in line use his Kroger plus card but did not use the card for his purchase. William exited the store and looked around several times before returning to his vehicle.  He left the lot and drove to his mother's apartment where he found her down and called 911.

- I received cell phone records for the Rainsberger family and obtained the following information.  On November 19, 2013 at 2:40 pm, Robert Rainsberger received a call from Ruth Rainsberger's landline to his cell -----. This is hours after it is presumed that Ruth Rainsberger received her injuries.  This presumption is based upon the fact that a delivery person knocked on her door at 10:30 am and attempted to call her but did not get an answer and also based upon the fact that the blanket contained dried blood which caused the blanket to stick to the victim's head which, in the affiant's experience, would indicate the victim was not recently attacked (prior to the 911 call).  Within an hour of this phone

12

call, William Rainsberger is on video across the street at the Kroger. He throws an object away in the trash before entering the store to buy an ice tea. He then goes to his mother's apartment and calls the police. William then stood outside and left his mother unattended until the police arrived.

- Cell phone records were obtained for William Rainsberger, including cell tower site locations for the day of November 19, 2013. Those records do not show William Rainsberger outside of the area of Shortridge and 10th St. during the relevant time period.

- On 1-13-14 I received the financial records for Ruth Rainsberger, from the Financial Federal Credit Union located at 701 E 56th St. The records show the following balances existed at the time of Ruth's death. There was a checking account balance of $15,098.90, savings account balance of $4,605.65 and certificate balances of $79,058.15. I recovered a beneficiary form from Ruth's apartment shortly after she was discovered which revealed that William, Robert and Rebecca Rainsberger are the beneficiaries for all of her assets.

Dkt. No. 50-6. Benner and a deputy prosecutor also executed an Information charging William with Ruth's murder.

Based on Benner's probable cause affidavit, a court found probable cause to arrest William for murder. A few days later, William was arrested for the murder of his mother. He was held in jail for two months after his arrest before being released on bail. On July 7, 2015, the Prosecutor's Office dismissed the case against William.

## III. DISCUSSION

The Court notes as an initial matter that Benner raises several evidentiary issues in his reply brief. He argues that many statements in affidavits relied upon by William (his own and

that of David Hennessy) are inadmissible and that the expert report submitted by William is largely inadmissible and/or immaterial.  The Court has not relied on either affidavit or the expert report in making this ruling and, therefore, need not address Benner's arguments.  Because the issue may arise again at trial, however, the Court notes that many of Benner's arguments regarding the opinions in the expert report appear to be well-taken, and William should carefully review the applicable law when deciding whether to offer the expert's testimony at trial.

Turning to the merits, William asserts claims against Benner pursuant to 42 U.S.C. § 1983 for violation of the fourth amendment.  Specifically, William alleges that Benner intentionally, knowingly, or recklessly made false and misleading statements in his probable cause affidavit that led to William being wrongfully arrested and maliciously prosecuted.

The applicable law is not in dispute.  "[P]robable cause is an absolute defense to false arrest claims in . . . the § 1983 context." *Jones v. City of Elkhart, Ind.*, 737 F.3d 1107, 1114 (7th Cir. 2013).  Thus,

> [a] warrant request violates the Fourth Amendment if the requesting officer knowingly, intentionally, or with reckless disregard for the truth, makes false statements in requesting the warrant and the false statements were necessary to the determination that a warrant should issue. A reckless disregard for the truth can be shown by demonstrating that the officer entertained serious doubts as to the truth of the statements, had obvious reasons to doubt their accuracy, or failed to disclose facts that he or she knew would negate probable cause.

*Hart v. Mannina*, 798 F.3d 578, 591 (7th Cir. 2015) (internal citations and quotation marks omitted).

### A.  Allegedly False or Misleading Statements

William argues that a reasonable jury could find that Benner knowingly or with reckless disregard for the truth made false or misleading statements in the probable cause affidavit.  Each of the statements William objects to is examined, in turn, below.

14

### 1. Cell phone tower records

Benner stated in the probable cause affidavit that cell phone tower location records "do not show William Rainsberger outside the area of Shortridge and 10th St. during the relevant time period." William argues that this statement was misleading because the records "do not show William *in* this area anytime from 5:41 p.m. on Nov. 18, 2013 to 7:23 p.m. on Nov. 19, 2013, because there is no location information from cell phone data for his telephone during that period." Dkt. No. 49 at 4-5. The Court disagrees that a reasonable jury could find that this statement was misleading. The statement is true, and can reasonably be read only to indicate that there is no exculpatory cell phone evidence. No reasonable judicial officer would read that statement as implying that there were cell phone records that affirmatively suggested that William (or at least his cell phone) was present in the relevant area at the relevant time; if such evidence existed, Benner certainly would have included it.[2]

### 2. The 2:40 p.m. telephone call

Benner stated in the probable cause affidavit that a call was made from Ruth's landline to Robert at 2:40 p.m., which is hours after the time the evidence indicates Ruth was attacked. This information was intended to suggest that William could have been in Ruth's apartment an hour before he called 911. The Court agrees with William that a reasonable jury could find from the evidence of record that that call was actually made by William at 3:40 p.m., after he discovered his mother and called 911, and that the 2:40 p.m. time on the phone records occurred because the

---

[2]Unfortunately, in his brief in support of the instant motion, Benner—or, more accurately, his counsel—mischaracterizes the statement in the probable cause affidavit as showing that "William's phone records, including cell tower site locations for November 19, 2013, show that he was in the vicinity of Shortridge Road and 10th Street during the relevant time period." Dkt. No. 44 at 17. Counsel is admonished to be more careful in characterizing the evidence of record.

call was routed through a tower in Chicago, where the time is one hour earlier than the time in

Indianapolis.  Further, Benner himself testified in his deposition that he had the report from

IMPD phone records expert Bierce that showed the time discrepancy before he executed his

probable cause affidavit.[3]  Given this testimony, and viewing the evidence in the light most

favorable to William, the Court finds that a reasonable jury could determine from the evidence of

record that Benner included the statement about the 2:40 p.m. call with reckless disregard for

whether it was accurate because, given the totality of the information about the telephone records

that he testified that he had, a reasonable jury could find that he had obvious reasons to doubt its

accuracy.

### 3. The Kroger video

In the probable cause affidavit, Benner stated that the video from the Kroger store shows

that William "appeared to pull out a straight object from his person which he placed in the

garbage can."  William argues that the video "does not depict William pulling anything from his

person," but rather shows him throwing away a piece of trash, and that Benner admitted in his

deposition that "the video does not depict William pulling anything 'from his person.'"  Dkt. No.

49 at 7 (emphasis in original) (citing Benner Civil Depo. at 146).  The deposition testimony in

question reads as follows:

> Q:  You're not able to really see if he – when he gets the object in his hands or
>      not, are you?
>
> A:  I don't think so, no, just that it's there.

---

[3]That testimony is belied by Bierce's own affidavit in which he states that he created the
report on or about July 2014, well after William's arrest, and by Benner's own testimony that he
learned of the theory when it was raised by William's criminal defense lawyer.  However, the
Court must view the evidence in the light most favorable to William.

Q:      So you don't know whether he pulled it out of his pocket or a waistband or—

A:      Doesn't matter, but, no, I don't know.

Q:      Or whether it was in his hand before and you just didn't see it?

A:      That's correct.

Dkt. No. 50-9 at 85-86.

This testimony does not, in fact, elucidate what Benner meant by "pull[ed] . . . from his person" or whether he in fact agrees with William's assessment that the camera does not show him "pull[ing the object] from his person." He was not asked that question. That said, the Court has watched the video, and agrees with William that a reasonable juror could find the statement's wording to be intentionally misleading.[4] There is simply nothing on the video that shows William "pulling" the object from anywhere. Given what is shown on the video, it is equally possible that he walked from his vehicle to the trash can carrying the object in plain view.

Next, William argues that the statement is misleading because it is meant to imply that the object in question was the murder weapon. It does not state that it was the murder weapon, however, and the statement, as worded, makes it clear that one cannot tell from the video what the object was, only that it was a "straight object." That statement is not false or misleading. Any judicial officer reviewing the affidavit would understand that if Benner believed anything else about the object could be identified on the video, he would have included that information.

---

[4]While the standard quoted above speaks of "false statements," the Seventh Circuit also has recognized that misleading statements in a probable cause affidavit can lead to a Fourth Amendment violation. *See, e.g.*, *Betker v. Gomez*, 692 F.3d 854, 861-62 (7th Cir. 2012) ("A reasonable jury could find that Officer Gomez knowingly or with reckless disregard for the truth made false or misleading statements. So we must decide whether probable cause would have existed for the no-knock search warrant absent those disputed statements.").

17

The affidavit essentially says that William threw away something that could have been the murder weapon, and that is, in fact, true.

Finally, the affidavit also states that "[a]s he placed the item in the trash he appeared to look around for cameras." The Court agrees with William that a reasonable jury watching the video could find that that statement was false and that Benner knew it to be so.

### 4. No signs of a burglary

The probable cause affidavit states the following:

> A walkthrough of the apartment revealed that there were no signs of forced entry. There were a few drawers in the victim's bedroom that were pulled out halfway with no sign of anyone rifling through the contents. There were a large amount of boxes in a back room that were untouched. There was a lockbox in the back room in plain view that contained savings bonds belonging to the victim. The victim's checkbook, some cash and credit cards were still present inside the apartment.

William suggests that this paragraph—which implies that it is more likely that Ruth's attacker was not someone seeking to steal from her, but rather someone she knew—is misleading because Benner omitted the fact that Ruth's purse and her prescription medication were missing from the apartment. Viewing the evidence of record in the light most favorable to William, the Court agrees. While the affidavit does not state that nothing appeared to be taken from the apartment, that is clearly the message that paragraph is intended to convey. A reasonable jury could determine that Benner knew a purse and prescription medication were missing and that the failure to include that information was intentionally misleading.

In addition, the evidence viewed in the light most favorable to William indicates that the lockbox found in Ruth's apartment was not reasonably described as "in plain view," and that it did not contain savings bonds. Again, a reasonably jury could find that Benner included those statements with knowledge of, or reckless disregard for, their falsity.

18

*5. William knew the nature of Ruth's injuries*

The probable cause affidavit makes it clear that Benner believed it to be suspicious that William told the 911 operator that his mother's head had been "bashed in," and also told Wooldridge that her head had been "caved in," even though Ruth's head was covered by a blanket.  The Court finds nothing false or misleading about Benner's statements that "[t]he fact that the 911 caller said his mother's head was bashed in without actually seeing her head is indicative to the affiant that he may have knowledge of how she sustained the injury" and "Wooldridge thought it was strange that the caller said her head was caved in when it was obvious that he had not removed the blanket to check on his mother."  William provides wholly reasonable explanations for how he surmised that his mother had been hit in the head without looking under the blanket, but those explanations do not change the fact that Benner's statements in the affidavit were true and not misleading.

What William really takes issue with are Benner's representations that others who saw Ruth initially believed that she may have been shot; in other words, they did not immediately conclude that she had suffered blunt force trauma to the head like William did.  Dkt. No. 50-6 at 2 ("It should be noted that during the initial investigation, both medic and hospital personnel believed that the victim may have sustained a gunshot wound."; "Fire and ambulance personnel thought the victim may have been shot and thought it was not normal that there was not any blood spatter on the walls or ceiling.").  William has pointed to no evidence of record that shows that Benner knew these statements were not true or had reason to doubt that they were.  There is no dispute that Woolridge, who as an EMT would fall under the category of "medic personnel," believed that she may have been shot and that ambulance personnel reported to the hospital that Ruth's wound might be a gunshot wound.  Benner also testified that a deputy coroner told him

19

that hospital personnel believed she had been shot and, in fact, wrote "possible gunshot wound" on the tag that was placed on Ruth's body.  While William makes a convincing argument as to why it was not suspicious that his initial belief was that his mother had been hit in the head, there was nothing false or misleading about Benner's statements that others believed otherwise.

### 6.  William's lack of concern for his mother

William argues that several statements in the probable cause affidavit that were meant to convey his lack of concern for his mother are false or misleading.  The Court agrees.

First, Benner notes in the affidavit that after calling 911 William "went outside to wait for the ambulance" and "left his mother unattended until the police arrived."  Benner fails to note William's explanation for doing so—that he wanted to direct the ambulance because his mother's apartment was hard to find based solely on the address.  In addition, Benner states that while William was being questioned on November 19, 2013, "[a]t no time did Robert or his brother, William, ever ask me how their mom was doing or if they could get to the hospital to see her."  This statement is misleading, because Benner knew that William was receiving texts from his sister, who was at the hospital, about Ruth's condition, and also knew that he expressed concern about how he would get to the hospital.  These omissions were misleading, and a reasonable jury could find them to be intentionally so.

### 7.  Refusal to take a polygraph

William takes issue with the inclusion in the probable cause affidavit of the fact that he and his brother adamantly refused to take a polygraph, then they and their sister "stormed out" and Benner did not hear from them again.  William does not deny that he adamantly refused to take a polygraph, but rather offers reasons for his refusal and suggests that Benner should have included the fact that he lied to the Rainsbergers in order to get them to come to the police

station, at which time he asked the brothers to submit to polygraphs.  William does not suggest that his reaction would have been any different if Benner had simply asked him to come in to take a polygraph, nor does he provide any evidence that Benner knew William's reasons for refusing.  However, William has presented evidence from which a reasonable jury could find that Benner's statements that the siblings "stormed out," and that he did not hear from them again after that, were false and that Benner knew them to be so.

### 8. *Suggestion of financial motive*

William next argues that "Detective Benner also mislead the court in his probable cause affidavit by suggesting that William had a financial motive for killing his mother because he along with his siblings was a beneficiary of his mother's estate."  Dkt. No. 49 at 20.  There was nothing false or misleading about the financial information Benner included in the affidavit.  Benner did not in any way suggest that William was having financial problems himself, and therefore did not mislead the court reviewing the affidavit into believing that to be the case.

### B. Was There Probable Cause Without the False or Misleading Statements?

William argues that "[t]here is just too much wrong in this probable cause affidavit to say that a rational jury could not find intentional, knowing, or reckless conduct in its compilation."  Dkt. No. 49 at 27.  As explained above, viewing the evidence in the light most favorable to William, the Court agrees.  However, as both parties acknowledge, such a finding would not be sufficient to support a jury verdict in William's favor.  Rather, despite the presence of false and misleading statements in the probable cause affidavit, William's Fourth Amendment rights were not violated unless the false and misleading statements were "necessary to the determination that a warrant should issue."  *Hart*, 798 F.3d at 591.  Accordingly, the Court must examine the remaining statements in the probable cause affidavit, along with the omitted information that

made some of the statements misleading, in order to determine whether the resulting probable

cause affidavit, free from false and misleading statements, would have been sufficient to

establish probable cause to arrest William for murder.  *See Betker v. Gomez*, 692 F.3d 854, 862

(7th Cir. 2012) ("Our analysis is fairly straightforward.  We eliminate the alleged false

statements, incorporate any allegedly omitted facts, and then evaluate whether the resulting

'hypothetical' affidavit would establish probable cause.") (citations omitted) (applying analysis

to search warrant).

The "hypothetical affidavit" that eliminates those statements that a reasonable jury,

viewing the facts of record in the light most favorable to William, could find to be false, and

adds information necessary to rectify what a reasonable jury could find to be misleading

statements,[5] includes the following statements:

- On November 19, 2013 at approximately 3:38 pm IMPD 911 dispatch received a call

  from the address of 801 N. Shortridge Rd, Apartment H 11. The caller said that someone

  had "bashed" his mother's head in.  Officer Lewis arrived on scene along with IFD.

  Officer Lewis said that the victim's head was covered with a blanket when they arrived

  on scene. The victim, identified as Ruth Rainsberger, was transported to Wishard hospital

  in critical condition. The caller, identified as William Rainsberger, and his brother,

  Robert Rainsberger, were transported to Police Headquarters to give a statement. It

  should be noted that during the initial investigation, both medic and hospital personnel

  believed that the victim may have sustained a gunshot wound. The fact that the 911 caller

---

[5]The information that has been added by the Court is in bold type.

said his mother's head was bashed in without actually seeing her head is indicative to the affiant that he may have knowledge of how she sustained the injury.

- On December 4, 2013 I took a statement from Firefighter Carl Wooldridge. Wooldridge said he was the first to have contact with the caller who was standing outside of the apartment building when fire arrived on scene. The white male on scene told Wooldridge that someone had "caved his mother's head in."  Wooldridge went to the apartment door and noticed it was slightly ajar.  The victim was lying on the floor between a chair and a coffee table.  Wooldridge said it was immediately apparent to him that the victim was breathing even though she had a blanket covering her head.  He said the blanket appeared to cover the entire head and not just one side.  The blanket was soaked in blood and was stuck to the victim's head.  Wooldridge thought it was strange that the caller said her head was caved in when it was obvious that he had not removed the blanket to check on his mother. Fire and ambulance personnel thought the victim may have been shot and thought it was not normal that there was not any blood spatter on the walls or ceiling. Wooldridge said the apartment seemed to be in orderly condition. The caller was identified as William Rainsberger.

- I requested crime lab to the scene and 4439 CSS Lane responded to the scene. A walkthrough of the apartment revealed that there were no signs of forced entry.  There were a few drawers in the victim's bedroom that were pulled out halfway with no sign of anyone rifling through the contents.  There were a large amount of boxes in a back room that were untouched.  The victim's checkbook, some cash and credit cards were still present inside the apartment.  **The victim's purse and a bottle of prescription**

23

**medication were not found in the apartment.**  The only blood found on the scene was on the blanket and on the floor where the victim was found.

- On November 19, 2013 I conducted an interview of William Rainsberger at Police Headquarters.  William said he has been taking care of his mother on a daily basis for the past few years.  He pays all of her bills and has power of attorney responsibility over her finances.  He said he last saw his mother on Monday night around 6:00 pm. He left her apartment and went to Plainfield to spend the night with his wife.  He returned home to 13th Street around 9:00 am on Tuesday morning and just hung out at home all day.  He said that around 3:30 pm he went to the Kroger on 10th St and bought an iced tea.  He then drove across the street to check on his mother.  He said he checked her mailbox and went out to his car before going to her door. He said when he used his key to open the door if appeared that the door was already unlocked.  He opened the door and saw his mom lying on the floor with a blanket over her head.  He walked around a coffee table and put his tea down on the table.  He saw some blood on the floor and on the blanket so he called 911.  He said his mom was breathing loudly as if she was snoring.  I asked why he didn't take the blanket off to check his mom and he said he thought he would do more damage by touching her.  He called 911, left the apartment after closing the door, and went outside **so that he could direct the ambulance to his mother's apartment, as it can be difficult to locate**.  He also said he had walked through the residence to check for anyone inside before he called 911.  I asked William about his mother's finances and learned that she has approximately eighty to one hundred thousand dollars in savings and bonds that will be distributed to her three children if she were to die.

24

- On November 19, 2013 I spoke to Robert Rainsberger who said he had not seen his mother for a few days. He recently had his home foreclosed upon and moved in with William this past August. He said he was hanging out at home on Tuesday when William called and told him to get over to his mom's apartment immediately. Robert drove his vehicle to Shortridge and was stopped by police when he arrived. He said his mother was taken away in an ambulance and he waited in a police car until I transported him downtown to give a statement. I drove Robert to headquarters and he did not say one word on the way unless I asked him a question.

- On November 20, 2013 I spoke to Rebecca Rainsberger. She said she usually checks on her mother once a week and had last been to her apartment on Monday, November 8th.  I asked her if she was at the apartment at all on Tuesday and she said no. Phone records confirmed that her cell phone was not near Ruth Rainsberger's apartment when the incident occurred.

- On 1-13-14 I spoke to Delbert Pickens who delivers meals on a daily basis to Ruth's apartment. Mr. Pickens said he delivers a meal to Ruth Monday through Friday and almost always arrives around 10:30 am.  On 11-19-13 Delbert said he arrived at Ruth's address around 10:30 am. He knocked on the door and she did not answer. He called her phone and could hear it ringing inside the apartment. He did not hear any signs that anyone may be inside the apartment so he left.

- On November 20, 2013 I attended the autopsy of Ruth Rainsberger which was performed by Dr. Tashjian. He determined that the cause of death was due to multiple blunt force trauma injuries to the head and the manner was ruled a Homicide. The wounds were possibly inflicted with a hammer or similar type weapon.

- On November 20, 2013 I spoke to William and Robert Rainsberger once again at Police Headquarters. I asked them if they would submit to a polygraph so that I could eliminate them as suspects and they adamantly said no, they would not take a polygraph.

- On November 27, 2013 I received a call from Attorney Brad Keffer, who said he is now representing William Rainsberger. I advised him I would be requesting a limited search warrant for William to obtain a buccal swab and major case prints. I also received a call from Attorney John Christ, who said he is now representing Robert Rainsberger. I made arrangements for William and Robert to come to Police Headquarters on December 4, 2013 so that I could serve the limited search warrants for prints and a DNA buccal swab. Both subjects did show up on December 4, 2013 with their attorneys and I obtained prints and buccal swabs from both.

- On November 22, 2013 Detective Tudor and I recovered a video from the Kroger store located at 7101 E 10th St. The video showed William Rainsberger drive onto the Kroger lot on November 19, 2013 at approximately 3:32 pm. Mr. Rainsberger got out of the car and approached a garbage can located near the Red Box video dispenser. Rainsberger placed what appeared to be a straight object in the garbage can.  He then stepped over to the Red Box and punched some buttons. He entered the store and bought an iced tea which he paid for with cash. He appeared to let someone in line use his Kroger plus card but did not use the card for his purchase. William exited the store and drove to his mother's apartment where he found her down and called 911.

- Cell phone records were obtained for William Rainsberger, including cell tower site locations for the day of November 19, 2013. Those records do not show William Rainsberger outside of the area of Shortridge and 10th St. during the relevant time period.

26

- On 1-13-14 I received the financial records for Ruth Rainsberger, from the Financial Federal Credit Union located at 701 E 56th St.  The records show the following balances existed at the time of Ruth's death. There was a checking account balance of $15,098.90, savings account balance of $4,605.65 and certificate balances of $79,058.15. I recovered a beneficiary form from Ruth's apartment shortly after she was discovered which revealed that William, Robert and Rebecca Rainsberger are the beneficiaries for all of her assets.

Dkt. No. 50-6.

The Court finds that this hypothetical affidavit does not establish probable cause to arrest William for the murder of his mother.  Probable cause "is a common-sense inquiry requiring only a probability of criminal activity; it exists whenever an officer or a court has enough information to warrant a prudent person to believe criminal conduct has occurred." *Leaver v. Shortess*, 844 F.3d 665, 669 (7th Cir. 2016), *cert. denied,* 137 S. Ct. 2127 (2017).  "[I]t does not take much to establish probable cause. The officers must have more than a bare suspicion that they have the right guy, but they need not have enough evidence to support a conviction or even to show that their belief is more likely true than false." *Fox v. Hayes,* 600 F.3d 819, 833 (7th Cir. 2010).  Even given this fairly low bar, the Court finds that there are

simply not enough facts in the hypothetical affidavit[6] to support a finding of probable cause. Accordingly, Benner is not entitled to summary judgment on William's claim for false arrest.[7]

### C. Qualified Immunity

Benner argues that even if probable cause was lacking, he is entitled to qualified immunity if there was "arguable probable cause" for William's arrest. This argument is off base. Benner cites cases that discuss qualified immunity in cases in which an officer decides that he has probable cause to arrest someone on the spot. Those cases and the "arguable probable cause" standard applied therein are irrelevant to the instant case. Rather, the applicable law is clear: "A police officer is not entitled to qualified immunity for submitting an affidavit that contained statements he knew to be false or would have known were false had he not recklessly disregarded the truth and no accurate information sufficient to constitute probable cause attended the false statements." *Olson v. Champaign County, Ill.*, 784 F.3d 1093, 1100 (7th Cir. 2015)

---

[6]In his reply brief, Benner points to additional facts that he argues help to establish probable cause; for example, the fact that William did not attempt any first aid while waiting for the ambulance, and the fact that his training indicated that an attacker who covers his victim's head often has a personal relationship with the victim. These facts were not included in the probable cause affidavit, however, and therefore are irrelevant to the question of whether the probable cause affidavit, as written, but omitting any statements a reasonable jury could find to be false and misleading, would have been sufficient to constitute probable cause to arrest William.

[7]William also argues that the probable cause affidavit improperly omits the fact that Ruth's apartment complex was a high crime area and another woman had been hit in the head and robbed about a month earlier in the parking lot outside of Ruth's apartment, as well as omitting what he deems to be exculpatory DNA evidence. An officer does not have to include every fact, only those facts that are material. "'The materiality of an omitted . . . fact depends on its relative importance to the evaluation of probable cause; an omitted fact is material if its inclusion would have negated probable cause.' If the omitted fact would not have negated probable cause, its omission was immaterial and there was no Fourth Amendment violation.'" *Hart*, 798 F.3d at 593 (quoting *Whitlock v. Brown,* 596 F.3d 406, 411 (7th Cir. 2010)). Because the Court finds probable cause lacking even without consider this omitted information, the Court need not determine whether it was material.

(citations omitted); *see also Betker v. Gomez*, 692 F.3d 854 (7th Cir. 2012) (finding law clearly

established). If Benner ultimately is liable to William in this case, he will not be liable for

determining that probable cause existed to arrest William. As he stated in his deposition, that

was not his call to make under the circumstances of this case; a judicial officer made that

determination. Rather, any liability in this case will be based upon the jury determining that

Benner intentionally or recklessly included false and/or misleading statements in his probable

cause affidavit that caused the judicial officer to find probable cause when, in the absence of

those statements, it would not have been appropriate to do so. Because, considering the facts of

record in the light most favorable to William, a reasonable jury could so find, Benner is not

entitled to qualified immunity.

### D.  Malicious Prosecution

In addition to his false arrest claim, William also asserts a claim for malicious

prosecution under the Fourth Amendment. Benner in essence argues that this claim fails for the

same reasons as he argues the false arrest claim fails.[8]  Accordingly, the Court finds summary

judgment is not appropriate on that claim as well. However, it is unclear to the Court how, under

the facts of this case, a malicious prosecution claim adds anything to the false arrest claim. It

appears to the Court that if William cannot be successful on the former and not also be

successful on the latter, and any damages he could receive for malicious prosecution would also

be available for false arrest. Accordingly, William should carefully consider whether it is

---

[8]In addition, consistent with the law in this circuit at the time, Benner argued in his
summary judgment briefing that William's malicious prosecution claim could not be brought
under the Fourth Amendment. William wisely conceded the point, but noted that the Supreme
Court had before it a case that could change the law. That case has since been decided, and
William's claim for malicious prosecution under the Fourth Amendment is, indeed, now viable.
*See Manuel v. City of Joliet*, 137 S. Ct. 911 (2017).

advisable to proceed with both claims at trial, or whether doing so will only unnecessarily complicate the jury instructions in this case.

## IV.  CONCLUSION

For the reasons set forth below, Benner's motion for summary judgment is **DENIED**. This cause remains set for trial on September 11, 2017.  The final pretrial conference will be held on August 10, 2017.  The parties are reminded of their pretrial filing obligations set forth in section VIII of the case management plan (Dkt. No. 12).  In addition, the parties shall confer and file a joint issue instruction at least one week prior to the final pretrial conference.  The issue instruction serves as the Court's brief introduction of the case to the jury; it is read to the jury during *voir dire* and is included in the Court's preliminary instructions.  It needs to inform the jury who the parties are and what the case is about.  It is the Court's practice to require the parties to agree to a joint issue instruction; it is not acceptable for each side to propose one.

SO ORDERED:  7/18/2017

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification

# *** PUBLIC DOCKET ***

APPEAL,CMP

**U.S. District Court**
**Southern District of Indiana (Indianapolis)**
**CIVIL DOCKET FOR CASE #: 1:16-cv-00103-WTL-MJD**

RAINSBERGER v. BENNER                          Date Filed: 01/12/2016
Assigned to: Judge William T. Lawrence          Jury Demand: Plaintiff
Referred to: Magistrate Judge Mark J. Dinsmore   Nature of Suit: 440 Civil Rights: Other
Cause: 28:1331 Federal Question: Other Civil Rights   Jurisdiction: Federal Question

**Plaintiff**

**WILLIAM RAINSBERGER**          represented by   **Richard A. Waples**
                                                 WAPLES & HANGER
                                                 410 N. Audubon Road
                                                 Indianapolis, IN 46219
                                                 (317)357-0903
                                                 Fax: (317)357-0275
                                                 Email: rwaples@wapleshanger.com
                                                 *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**CHARLES BENNER**               represented by   **Donald Eugene Morgan**
                                                 OFFICE OF CORPORATION
                                                 COUNSEL
                                                 CITY OF INDIANAPOLIS
                                                 200 E. Washington Street
                                                 Suite 1601
                                                 Indianapolis, IN 46204
                                                 317-327-4081
                                                 Fax: 317-237-3968
                                                 Email: donald.morgan@indy.gov
                                                 *ATTORNEY TO BE NOTICED*

                                                 **Pamela G. Schneeman**
                                                 OFFICE OF CORPORATION
                                                 COUNSEL
                                                 CITY OF INDIANAPOLIS
                                                 200 E. Washington Street
                                                 Suite 1601
                                                 Indianapolis, IN 46204

(317) 327-4055
Fax: (317) 327-3968
Email: pamela.schneeman@indy.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 01/12/2016 | 1 | COMPLAINT *against CHARLES BENNER* against WILLIAM RAINSBERGER, filed by WILLIAM RAINSBERGER. (Filing fee $400, receipt number 0756-3736498) (Attachments: # 1 Civil Cover Sheet, # 2 appearance, # 3 Proposed Summons)(Waples, Richard) (Entered: 01/12/2016) |
| 01/13/2016 | 2 | Summons Issued as to CHARLES BENNER. (MEH) (Entered: 01/13/2016) |
| 01/13/2016 | 3 | MAGISTRATE JUDGE's NOTICE of Availability to Exercise Jurisdiction issued. (MEH) (Entered: 01/13/2016) |
| 01/23/2016 | 4 | RETURN of Service by CMRRR, filed by WILLIAM RAINSBERGER. CHARLES BENNER served on 1/19/2016. (Attachments: # 1 Receipt Cert Mail Card, Return Receipt)(Waples, Richard) (Entered: 01/23/2016) |
| 02/04/2016 | 5 | NOTICE of Appearance by Benjamin J. Church on behalf of Defendant CHARLES BENNER. (Church, Benjamin) (Entered: 02/04/2016) |
| 02/04/2016 | 6 | NOTICE of Parties' First Extension of Time, filed by Defendant CHARLES BENNER. (Church, Benjamin) (Entered: 02/04/2016) |
| 02/05/2016 | 7 | SCHEDULING ORDER: Initial Pretrial Conference set for 3/15/2016 01:50 PM in room #257, United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana before Magistrate Judge Mark J. Dinsmore. The parties shall file a proposed Case Management Plan ("CMP") no fewer than seven days before the pretrial conference (see Order for additional information). Signed by Magistrate Judge Mark J. Dinsmore on 2/5/2016.(SWM) (Entered: 02/08/2016) |
| 02/08/2016 | 8 | NOTICE of Appearance by Lynne Denise Hammer on behalf of Defendant CHARLES BENNER. (Hammer, Lynne) (Entered: 02/08/2016) |
| 03/07/2016 | 9 | CASE MANAGEMENT PLAN TENDERED, filed by Plaintiff WILLIAM RAINSBERGER . (Waples, Richard) (Entered: 03/07/2016) |
| 03/08/2016 | 10 | ANSWER to 1 Complaint *AND AFFIRMATIVE DEFENSES*, filed by CHARLES BENNER.(Hammer, Lynne) (Entered: 03/08/2016) |
| 03/15/2016 | 11 | MINUTE ORDER for proceedings held before Magistrate Judge Mark J. Dinsmore: Initial Pretrial Conference held on 3/15/2016. The Court will approve the Case Management Plan, by separate order, with the changes to which the parties have agreed. Settlement Conference set for 9/27/2016 at 09:00 AM in room #257, United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana before Magistrate Judge Mark J. Dinsmore. Status |

| | | |
|---|---|---|
| | | Conference set for 5/13/2016 at 10:30 AM in Telephonic before Magistrate Judge Mark J. Dinsmore. *see order for additional information* Signed by Magistrate Judge Mark J. Dinsmore. (NLR) (Entered: 03/15/2016) |
| 03/15/2016 | 12 | ORDER: CASE MANAGEMENT PLAN APPROVED AS AMENDED. Dispositive Motions due by 12/23/2016. Discovery due by 11/23/2016. Signed by Magistrate Judge Mark J. Dinsmore on 3/15/2016.(SWM) (Entered: 03/15/2016) |
| 03/21/2016 | 13 | SCHEDULING ORDER: Jury Trial set for 9/11/2017 at 9:00 AM in room #202, United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana before Judge William T. Lawrence. Final Pretrial Conference set for 8/10/2017 at 10:00 AM in room #202, United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana before Judge William T. Lawrence. (DW) (Entered: 03/21/2016) |
| 03/21/2016 | 14 | TRIAL PROCEDURES AND PRACTICES before Judge William T. Lawrence. (DW) (Entered: 03/21/2016) |
| 04/12/2016 | 15 | NOTICE of Service of Initial Disclosures , filed by Defendant CHARLES BENNER. (Hammer, Lynne) (Entered: 04/12/2016) |
| 04/12/2016 | 16 | NOTICE of Service of Initial Disclosures , filed by Plaintiff WILLIAM RAINSBERGER. (Waples, Richard) (Entered: 04/12/2016) |
| 04/12/2016 | 17 | Witness List *Preliminary*, filed by Plaintiff WILLIAM RAINSBERGER. (Waples, Richard) (Entered: 04/12/2016) |
| 04/12/2016 | 18 | Exhibit List *Preliminary*, filed by Plaintiff WILLIAM RAINSBERGER. (Waples, Richard) (Entered: 04/12/2016) |
| 04/22/2016 | 19 | Witness List *Preliminary*, filed by Defendant CHARLES BENNER, Exhibit List *Preliminary*, filed by Defendant CHARLES BENNER. (Hammer, Lynne) (Entered: 04/22/2016) |
| 04/22/2016 | 20 | Witness List *Preliminary*, filed by Defendant CHARLES BENNER. (Hammer, Lynne) (Entered: 04/22/2016) |
| 05/13/2016 | 22 | MINUTE ORDER for proceedings held before Magistrate Judge Mark J. Dinsmore: Telephonic Status Conference held on 5/13/2016. The parties discussed the status of and future plans for discovery. Telephonic Status Conference set for 7/7/2016 at 1:00 PM (Eastern Time) before Magistrate Judge Mark J. Dinsmore. *See order for additional information.* Signed by Magistrate Judge Mark J. Dinsmore. (GD) (Entered: 05/13/2016) |
| 07/06/2016 | 24 | NOTICE of Appearance by Kathryn M. Box on behalf of Defendant CHARLES BENNER. (Box, Kathryn) (Entered: 07/06/2016) |
| 07/12/2016 | 25 | MINUTE ORDER for proceedings held before Magistrate Judge Mark J. Dinsmore: Telephonic Status Conference held on 7/7/2016. The parties discussed the status of and future plans for discovery. Telephonic Status Conference set for 8/26/2016 at 3:40 PM (Eastern Time) before Magistrate Judge Mark J. Dinsmore. In addition, the September 27, 2016 Settlement |

| | | |
|---|---|---|
| | | Conference is hereby CONTINUED 10/7/2016 at 1:00 PM (Eastern Time). All other requirements of the Court's March 15, 2016 order scheduling the settlement conference [Dkt. 11 at 1-5] remain in effect. *See order for additional information.* Signed by Magistrate Judge Mark J. Dinsmore. (GD) (Entered: 07/13/2016) |
| 08/26/2016 | 27 | MINUTE ORDER for proceedings held before Magistrate Judge Mark J. Dinsmore: Telephonic Status Conference held on 8/26/2016. The parties discussed the status of and future plans for discovery. The parties confirmed they will be ready for the upcoming settlement conference. The conference was concluded without further order. Signed by Magistrate Judge Mark J. Dinsmore. (GD) (Entered: 08/29/2016) |
| 09/01/2016 | 28 | Unopposed MOTION *to Excuse Defendant Charles Benner from Attending the Settlement Conference,* filed by Defendant CHARLES BENNER. (Attachments: # 1 Text of Proposed Order)(Box, Kathryn) (Entered: 09/01/2016) |
| 09/02/2016 | 29 | ORDER granting 28 Motion to excuse Defendant Benner from attending the settlement conference. Signed by Magistrate Judge Mark J. Dinsmore on 9/2/2016. (CBU) (Entered: 09/06/2016) |
| 10/07/2016 | 30 | NOTICE of Appearance by Daniel Bowman on behalf of Defendant CHARLES BENNER. (Bowman, Daniel) (Entered: 10/07/2016) |
| 10/07/2016 | 31 | MINUTE ORDER for proceedings held before Magistrate Judge Mark J. Dinsmore: Settlement Conference held on 10/7/2016. Settlement was not achieved. Telephonic Status Conference set for 3/10/2017 at 1:30 PM (Eastern Time) before Magistrate Judge Mark J. Dinsmore. *See order for additional information.* Signed by Magistrate Judge Mark J. Dinsmore. (GD) (Entered: 10/07/2016) |
| 11/18/2016 | 32 | Unopposed MOTION for Extension of Time to , filed by Defendant CHARLES BENNER. (Attachments: # 1 Text of Proposed Order)(Box, Kathryn) (Entered: 11/18/2016) |
| 11/22/2016 | 33 | SCHEDULING ORDER: Telephonic Status Conference set for 11/23/2016 at 9:30 AM (Eastern Time) to discuss Defendant's Unopposed Motion seeking a 30-day extension of the dispositive motion, liability discovery, and expert disclosure deadlines. [Dkt. 32 .] Counsel shall attend the conference by calling the designated telephone number, to be provided by the Court via email generated by the Court's ECF system. Signed by Magistrate Judge Mark J. Dinsmore on 11/22/2016.(GD) (Entered: 11/22/2016) |
| 11/22/2016 | 35 | NOTICE of Withdrawal of Appearance by *Daniel Bowman* on behalf of CHARLES BENNER (Bowman, Daniel) (Entered: 11/22/2016) |
| 11/23/2016 | 36 | MINUTE ORDER for proceedings held before Magistrate Judge Mark J. Dinsmore: Telephonic Status Conference held on 11/23/2016. Defendant's motion 32 to enlarge certain deadlines GRANTED IN PART and DENIED IN PART. The approved Case Management Plan 12 amended as follows: II. |

| | | |
|---|---|---|
| | | Jurisdiction and Statement of Claims C. On or before 12/23/2016, and consistent with the certification provisions of Fed. R. Civ. P. 11(b), the party with the burden of proof shall file a statement of the claims or defenses it intends to prove at trial, stating specifically the legal theories upon which the claims or defenses are based. IV. Discovery and Dispositive Motions B. Dispositive Motions due by 1/6/2017. Discovery due by 12/21/2016. All other requirements of the approved Case Management Plan 12 remain in effect. Telephonic Status Conference on 3/10/2017 31 remains on calendar as scheduled. *See order for additional deadlines and information.* Signed by Magistrate Judge Mark J. Dinsmore. (GD) (Entered: 11/28/2016) |
| 12/22/2016 | 37 | Statement *of Defenses* by CHARLES BENNER. (Box, Kathryn) (Entered: 12/22/2016) |
| 12/23/2016 | 38 | Statement *of Claims for Trial* by WILLIAM RAINSBERGER. (Waples, Richard) (Entered: 12/23/2016) |
| 01/03/2017 | 39 | MOTION for Extension of Time to January 13, 2017 *to File a Dispositive Motion*, filed by Defendant CHARLES BENNER. (Attachments: # 1 Text of Proposed Order)(Box, Kathryn) (Entered: 01/03/2017) |
| 01/04/2017 | 40 | ORDER granting Defendant's 39 Motion to enlarge dispositive motion deadline. Dispositive motions due by 1/13/2017. Signed by Magistrate Judge Mark J. Dinsmore on 1/4/2017.(SWM) (Entered: 01/04/2017) |
| 01/13/2017 | 41 | MOTION for Summary Judgment , filed by Defendant CHARLES BENNER. (Box, Kathryn) (Entered: 01/13/2017) |
| 01/13/2017 | 42 | NOTICE *of Manual Filing*, filed by Defendant CHARLES BENNER (Box, Kathryn) (Entered: 01/13/2017) |
| 01/13/2017 | 43 | Designation of Evidence re 41 MOTION for Summary Judgment , filed by Defendant CHARLES BENNER. (Attachments: # 1 Exhibit 1- Affidavit for Probable Cause, # 2 Exhibit 2- William Rainsberger Deposition Excerpts, # 3 Exhibit 3- Manually filed, # 4 Exhibit 4- Affidavit of Carl Wooldridge, # 5 Exhibit 5- Deposition of Charles Benner, # 6 Exhibit 6- Tape Deposition of Jennifer Lane, # 7 Exhibit 7- Laboratory Examination Report, # 8 Exhibit 8- Affidavit of Charles Benner, # 9 Exhibit 9- Manually Filed, # 10 Exhibit 10- Interview, # 11 Exhibit 11- Taped Deposition of Pamela Pullium, # 12 Exhibit 12- Manually Filed, # 13 Exhibit 13- Photographs, # 14 Exhibit 14- Manually Filed, # 15 Exhibit 15- Electronic Journal File, # 16 Exhibit 16- Transaction Journal, # 17 Exhibit 17- Manually Filed, # 18 Exhibit 18- Manually Filed, # 19 Exhibit 19- Affidavit of Benjamin Bierce, # 20 Exhibit 20- Landline Usage, # 21 Exhibit 21-Email, # 22 Exhibit 22- Email, # 23 Exhibit 23- Robert Rainsberger Deposition excerpt)(Box, Kathryn) (Entered: 01/13/2017) |
| 01/13/2017 | 44 | BRIEF/MEMORANDUM in Support re 41 MOTION for Summary Judgment , filed by Defendant CHARLES BENNER. (Box, Kathryn) (Entered: 01/13/2017) |
| | | |

| 01/17/2017 | 45 | Receipt of Six CDs re 42 NOTICE *of Manual Filing*, filed by Defendant CHARLES BENNER (Box, Kathryn) (BRR) (Entered: 01/17/2017) |
| 02/07/2017 | 46 | MOTION for Extension of Time to File Response to February 13, 2017 re 41 MOTION for Summary Judgment , filed by Plaintiff WILLIAM RAINSBERGER. (Attachments: # 1 Text of Proposed Order)(Waples, Richard) (Entered: 02/07/2017) |
| 02/09/2017 | 47 | ORDER granting Plaintiff's 46 Motion for Extension of Time to File Response to 2/13/2017 re 41 MOTION for Summary Judgment . Signed by Magistrate Judge Mark J. Dinsmore on 2/9/2017. (SWM) (Entered: 02/10/2017) |
| 02/13/2017 | 48 | MOTION for Leave to File *over-sized summary judgment response brief*, filed by Plaintiff WILLIAM RAINSBERGER. (Attachments: # 1 Text of Proposed Order)(Waples, Richard) (Entered: 02/13/2017) |
| 02/13/2017 | 49 | RESPONSE in Opposition re 41 MOTION for Summary Judgment *Memorandum*, filed by Plaintiff WILLIAM RAINSBERGER. (Waples, Richard) (Entered: 02/13/2017) |
| 02/13/2017 | 50 | Designation of Evidence re 44 Brief/Memorandum in Support *of Plaintiff's Response to Defendant's Motion for Summary Judgment*, filed by Plaintiff WILLIAM RAINSBERGER. (Attachments: # 1 Exhibit Email from Charles Benner to Amelia Basham, March 20, 2014, # 2 Exhibit Deposition of Michael Price, Sept. 8, 2014, # 3 Exhibit Criminal Deposition of Charles Benner, Nov. 25, 2014, # 4 Exhibit Bail Testimony of Charles Benner, July 17, 2014, # 5 Exhibit Information for Murder Charge, May 22, 2014, # 6 Exhibit Affidavit of Probable Cause, May 22, 2014, # 7 Exhibit Deposition of Carl Wooldridge, Sept. 8, 2014, # 8 Exhibit Affidavit of Probable Cause, Dec. 6, 2013, # 9 Exhibit Civil Deposition of Charles Benner, September 27, 2016, # 10 Exhibit William Rainsberger Statement, Nov. 20, 2013, # 11 Exhibit Robert Rainsberger Statement, Nov. 19, 2013, # 12 Exhibit Mari Bilger Deposition, Dec. 20, 2016, # 13 Exhibit Robert Rainsberger Deposition, Dec. 20, 2016, # 14 Exhibit Criminal Case Dismissal Motion and Order, July 7, 2015, # 15 Exhibit William Rainsberger Affidavit, # 16 Exhibit Deposition of Dr. Eric Streib, March 27, 2015, # 17 Exhibit William Rainsberger Deposition Errata, # 18 Exhibit William Rainsberger Deposition, # 19 Exhibit Robert Rainsbergers Processed Cell Phone Records Map, # 20 Exhibit Robert Rainsbergers Processed Cell Phone Records, # 21 Exhibit William Rainsbergers Processed Cell Phone Records Map, # 22 Exhibit William Rainsbergers Processed Cell Phone Records, # 23 Exhibit Manuel v. City of Joliet, Transcript of Oral Arg., # 24 Exhibit William Rainsberger Statement, Nov. 19, 2013, # 25 Exhibit Ruth Rainsbergers AT&T Land line Records, # 26 Exhibit Forensic Services Agency Note, 11-19-2013, # 27 Exhibit Rebecca Rainsberger Statement, Nov. 20, 2013., # 28 Exhibit Deposition of Jennifer Lane, Sept. 8, 2014, # 29 Exhibit Affidavit of David Hennessy, # 30 Exhibit Affirmation of Kim Rossmo, # 31 Exhibit Expert Disclosure of Kim Rossmo (Rossmo Report), # 32 Exhibit CV of Kim Rossmo, # 33 Exhibit Lab Exam Report, DNA Report (highlighted) |

|            |     | (Indianapolis-Marion County Forensic Services Agency Laboratory Examination Report), # 34 Exhibit Lab Exam Report, DNA Report (Indianapolis-Marion County Forensic Services Agency Laboratory Examination Report))(Waples, Richard) (Entered: 02/13/2017) |
|------------|-----|---|
| 02/14/2017 | 51  | ORDER - granting 48 Motion for Leave to File. Plaintiff may file an oversized summary judgment response brief up to 39 pages. Signed by Judge William T. Lawrence on 2/14/2017. (BRR) (Entered: 02/14/2017) |
| 02/17/2017 | 52  | Unopposed MOTION for Extension of Time to April 3, 2017 *to Serve Expert Disclosures*, filed by Defendant CHARLES BENNER. (Attachments: # 1 Text of Proposed Order)(Box, Kathryn) (Entered: 02/17/2017) |
| 02/17/2017 | 53  | MOTION to Withdraw Attorney Appearance *of Kathryn M. Box*, filed by Defendant CHARLES BENNER. (Box, Kathryn) (Entered: 02/17/2017) |
| 02/21/2017 | 54  | NOTICE of Appearance by Pamela G. Schneeman on behalf of Defendant CHARLES BENNER. (Schneeman, Pamela) (Entered: 02/21/2017) |
| 02/21/2017 | 55  | MOTION to Withdraw Attorney Appearance *of Lynne D. Hammer and Benjamin J. Church*, filed by Defendant CHARLES BENNER. (Attachments: # 1 Text of Proposed Order)(Schneeman, Pamela) (Entered: 02/21/2017) |
| 02/21/2017 | 56  | Submission of Proposed Order , re 53 MOTION to Withdraw Attorney Appearance *of Kathryn M. Box*, filed by Defendant CHARLES BENNER. (Box, Kathryn) (Entered: 02/21/2017) |
| 02/21/2017 | 57  | Joint MOTION for Extension of Time to February 27, 2017 *to File Final Witness and Exhibit List*, filed by Defendant CHARLES BENNER. (Attachments: # 1 Text of Proposed Order)(Schneeman, Pamela) (Entered: 02/21/2017) |
| 02/22/2017 | 58  | ORDER granting 53 Motion to Withdraw Attorney Appearance. Attorney Kathryn M. Box withdrawn. Signed by Magistrate Judge Mark J. Dinsmore on 2/22/2017. (SWM) (Entered: 02/22/2017) |
| 02/22/2017 | 59  | ORDER granting 55 Motion to Withdraw Attorney Appearance. Attorney Benjamin J. Church and Lynne Denise Hammer withdrawn. Signed by Magistrate Judge Mark J. Dinsmore on 2/22/2017. (SWM) (Entered: 02/22/2017) |
| 02/22/2017 | 60  | SCHEDULING ORDER: This matter comes before the Court on Defendant's Unopposed Motion to Extend the Expert Disclosure Deadline [Dkt. 52] and the parties' Joint Motion for Extension of Time to File Final Witness and Exhibit Lists [Dkt. 57]. Those motions are set for a telephonic hearing before the Magistrate Judge at 8:30 a.m. (Eastern) on Friday, February 24, 2017. Counsel shall attend the hearing by calling the designated telephone number, to be provided by the Court via email generated by the Court's ECF system. Signed by Magistrate Judge Mark J. Dinsmore on 2/22/2017.(SWM) (Entered: 02/22/2017) |

| 02/23/2017 | 62 | NOTICE of Appearance by Donald Eugene Morgan on behalf of Defendant CHARLES BENNER. (Morgan, Donald) (Entered: 02/23/2017) |
| 02/24/2017 | 63 | MINUTE ORDER for proceedings held before Magistrate Judge Mark J. Dinsmore: This matter came before the Court for a hearing on Defendant's motion to enlarge the Defendant's expert disclosure deadline [Dkt. 52 ] and the parties' joint motion to enlarge the deadline to file their final witness and exhibit lists [Dkt. 57 ]. The Court heard argument from the parties with regard to the motions and hereby orders as follows: Defendant's motion to enlarge the Defendant's expert disclosure deadline [Dkt. 52 ] is hereby GRANTED IN PART and DENIED IN PART. The parties' joint motion to enlarge the deadline to file their final witness and exhibit lists [Dkt. 57 ] is hereby GRANTED. All parties shall file and serve their final witness and exhibit lists on or before February 27, 2017. (See Entry.) Signed by Magistrate Judge Mark J. Dinsmore. (BRR) (Entered: 02/24/2017) |
| 02/27/2017 | 64 | Witness List *Final*, filed by Plaintiff WILLIAM RAINSBERGER. (Waples, Richard) (Entered: 02/27/2017) |
| 02/27/2017 | 65 | Exhibit List *Final*, filed by Plaintiff WILLIAM RAINSBERGER. (Waples, Richard) (Entered: 02/27/2017) |
| 02/27/2017 | 66 | REPLY in Support of Motion re 41 MOTION for Summary Judgment , filed by Defendant CHARLES BENNER. (Morgan, Donald) (Entered: 02/27/2017) |
| 02/27/2017 | 67 | Exhibit List *Final*, filed by Defendant CHARLES BENNER, Witness List *Final*, filed by Defendant CHARLES BENNER. (Morgan, Donald) (Entered: 02/27/2017) |
| 03/10/2017 | 69 | MINUTE ORDER for proceedings held before Magistrate Judge Mark J. Dinsmore: Telephonic Status Conference held on 3/10/2017. The parties discussed the status of and future plans for discovery. The conference was concluded without further order. Signed by Magistrate Judge Mark J. Dinsmore. (GD) (Entered: 03/10/2017) |
| 03/24/2017 | 70 | Exhibit List *Final*, filed by Defendant CHARLES BENNER, Witness List *Amended Final*, filed by Defendant CHARLES BENNER. (Schneeman, Pamela) (Entered: 03/24/2017) |
| 03/24/2017 | 71 | NOTICE *of Service of Expert Disclosure*, filed by Defendant CHARLES BENNER (Schneeman, Pamela) (Entered: 03/24/2017) |
| 03/27/2017 | 72 | Submission *of Supplemental Authority on Summary Judgment Motion*, filed by Plaintiff WILLIAM RAINSBERGER. (Attachments: # 1 Exhibit Manuel v. City of Joliet)(Waples, Richard) (Entered: 03/27/2017) |
| 07/18/2017 | 73 | ORDER denying 41 Motion for Summary Judgment. This cause remains set for trial on September 11, 2017. The final pretrial conference will be held on August 10, 2017. The parties are reminded of their pretrial filing obligations set forth in section VIII of the case management plan Dkt. No. 12 . In addition, the parties shall confer and file a joint issue instruction at least one |

| | | |
|---|---|---|
| | | week prior to the final pretrial conference. The issue instruction serves as the Court's brief introduction of the case to the jury; it is read to the jury during voir dire and is included in the Court's preliminary instructions. It needs to inform the jury who the parties are and what the case is about. It is the Court's practice to require the parties to agree to a joint issue instruction; it is not acceptable for each side to propose one. Signed by Judge William T. Lawrence on 7/18/2017. (JDC) (Entered: 07/18/2017) |
| 07/21/2017 | 74 | SCHEDULING ORDER: Settlement Conference set for 7/28/2017 01:00 PM (Eastern Time) in room #257, United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana before Magistrate Judge Mark J. Dinsmore. On or before July 26, 2017, the parties may, but need not, submit (not file) supplemental confidential settlement statements if they wish to do so; any such statements should be submitted via email to MJDinsmore@insd.uscourts.gov. See Order for additional information. Signed by Magistrate Judge Mark J. Dinsmore on 7/21/2017.(SWM) (Entered: 07/21/2017) |
| 07/24/2017 | 75 | MOTION to Vacate *July 28 Settlement Conference*, filed by Defendant CHARLES BENNER. (Attachments: # 1 Text of Proposed Order) (Schneeman, Pamela) (Entered: 07/24/2017) |
| 07/26/2017 | 76 | NOTICE OF APPEAL as to 73 Order on Motion for Summary Judgment, filed by Defendant CHARLES BENNER. (Filing fee $505, receipt number 0756-4462073) (Schneeman, Pamela) (Entered: 07/26/2017) |
| 07/26/2017 | 77 | MOTION to Stay *Case Pending Appeal*, filed by Defendant CHARLES BENNER. (Attachments: # 1 Text of Proposed Order)(Schneeman, Pamela) (Entered: 07/26/2017) |
| 07/26/2017 | 78 | PARTIES' SHORT RECORD re 76 Notice of Appeal - **Instructions for Attorneys and Designation of Record information attached.** (MAT) (Entered: 07/26/2017) |

**Case #: 1:16-cv-00103-WTL-MJD**