APPEAL,CMP,STAYED,FILE

# U.S. District Court
# Southern District of Indiana (Indianapolis)
# CIVIL DOCKET FOR CASE #: 1:16–cv–00103–WTL–MJD

RAINSBERGER v. BENNER
Assigned to: Judge William T. Lawrence
Referred to: Magistrate Judge Mark J. Dinsmore
 Case in other court:  7th Circuit, 17–02521
Cause: 28:1331 Federal Question: Other Civil Rights

Date Filed: 01/12/2016
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

Discovery Deadline: 12/21/2016
Dispositive Motion Deadline: 01/13/2017

Settlement Conference:
Final Pretrial Conference:
Trial Date:

**Plaintiff**

**WILLIAM RAINSBERGER**                    represented by    **Richard A. Waples**
                                                              WAPLES & HANGER
                                                              410 N. Audubon Road
                                                              Indianapolis, IN 46219
                                                              (317)357–0903
                                                              Fax: (317)357–0275
                                                              Email: rwaples@wapleshanger.com
                                                              *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**CHARLES BENNER**                          represented by    **Donald Eugene Morgan**
                                                              OFFICE OF CORPORATION COUNSEL
                                                              CITY OF INDIANAPOLIS
                                                              200 E. Washington Street
                                                              Suite 1601
                                                              Indianapolis, IN 46204
                                                              317–327–4081
                                                              Fax: 317–237–3968
                                                              Email: donald.morgan@indy.gov
                                                              *ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 01/12/2016 | 1 | 10 | COMPLAINT *against CHARLES BENNER* against WILLIAM RAINSBERGER, filed by WILLIAM RAINSBERGER. (Filing fee $400, receipt number 0756–3736498) (Attachments: # 1 Civil Cover Sheet, # 2 appearance, # 3 Proposed Summons)(Waples, Richard) (Entered: 01/12/2016) |
| 01/13/2016 | 2 | | Summons Issued as to CHARLES BENNER. (MEH) (Entered: 01/13/2016) |
| 01/13/2016 | 3 | | |

1

| | | | |
|---|---|---|---|
| | | | MAGISTRATE JUDGE's NOTICE of Availability to Exercise Jurisdiction issued. (MEH) (Entered: 01/13/2016) |
| 01/23/2016 | 4 | | RETURN of Service by CMRRR, filed by WILLIAM RAINSBERGER. CHARLES BENNER served on 1/19/2016. (Attachments: # 1 Receipt Cert Mail Card, Return Receipt)(Waples, Richard) (Entered: 01/23/2016) |
| 02/04/2016 | 5 | | NOTICE of Appearance by Benjamin J. Church on behalf of Defendant CHARLES BENNER. (Church, Benjamin) (Entered: 02/04/2016) |
| 02/04/2016 | 6 | | NOTICE of Parties' First Extension of Time, filed by Defendant CHARLES BENNER. (Church, Benjamin) (Entered: 02/04/2016) |
| 02/05/2016 | 7 | | SCHEDULING ORDER: Initial Pretrial Conference set for 3/15/2016 01:50 PM in room #257, United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana before Magistrate Judge Mark J. Dinsmore. The parties shall file a proposed Case Management Plan ("CMP") no fewer than seven days before the pretrial conference (see Order for additional information). Signed by Magistrate Judge Mark J. Dinsmore on 2/5/2016.(SWM) (Entered: 02/08/2016) |
| 02/08/2016 | 8 | | NOTICE of Appearance by Lynne Denise Hammer on behalf of Defendant CHARLES BENNER. (Hammer, Lynne) (Entered: 02/08/2016) |
| 03/07/2016 | 9 | | CASE MANAGEMENT PLAN TENDERED, filed by Plaintiff WILLIAM RAINSBERGER . (Waples, Richard) (Entered: 03/07/2016) |
| 03/08/2016 | 10 | 21 | ANSWER to 1 Complaint *AND AFFIRMATIVE DEFENSES*, filed by CHARLES BENNER.(Hammer, Lynne) (Entered: 03/08/2016) |
| 03/15/2016 | 11 | | MINUTE ORDER for proceedings held before Magistrate Judge Mark J. Dinsmore: Initial Pretrial Conference held on 3/15/2016. The Court will approve the Case Management Plan, by separate order, with the changes to which the parties have agreed. Settlement Conference set for 9/27/2016 at 09:00 AM in room #257, United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana before Magistrate Judge Mark J. Dinsmore. Status Conference set for 5/13/2016 at 10:30 AM in Telephonic before Magistrate Judge Mark J. Dinsmore. *see order for additional information* Signed by Magistrate Judge Mark J. Dinsmore. (NLR) (Entered: 03/15/2016) |
| 03/15/2016 | 12 | | ORDER: CASE MANAGEMENT PLAN APPROVED AS AMENDED. Dispositive Motions due by 12/23/2016. Discovery due by 11/23/2016. Signed by Magistrate Judge Mark J. Dinsmore on 3/15/2016.(SWM) (Entered: 03/15/2016) |
| 03/21/2016 | 13 | | SCHEDULING ORDER: Jury Trial set for 9/11/2017 at 9:00 AM in room #202, United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana before Judge William T. Lawrence. Final Pretrial Conference set for 8/10/2017 at 10:00 AM in room #202, United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana before Judge William T. Lawrence. (DW) (Entered: 03/21/2016) |
| 03/21/2016 | 14 | | TRIAL PROCEDURES AND PRACTICES before Judge William T. Lawrence. (DW) (Entered: 03/21/2016) |
| 04/12/2016 | 15 | | NOTICE of Service of Initial Disclosures , filed by Defendant CHARLES BENNER. (Hammer, Lynne) (Entered: 04/12/2016) |

| 04/12/2016 | 16 | | NOTICE of Service of Initial Disclosures , filed by Plaintiff WILLIAM RAINSBERGER. (Waples, Richard) (Entered: 04/12/2016) |
|---|---|---|---|
| 04/12/2016 | 17 | | Witness List *Preliminary*, filed by Plaintiff WILLIAM RAINSBERGER. (Waples, Richard) (Entered: 04/12/2016) |
| 04/12/2016 | 18 | | Exhibit List *Preliminary*, filed by Plaintiff WILLIAM RAINSBERGER. (Waples, Richard) (Entered: 04/12/2016) |
| 04/22/2016 | 19 | | Witness List *Preliminary*, filed by Defendant CHARLES BENNER, Exhibit List *Preliminary*, filed by Defendant CHARLES BENNER. (Hammer, Lynne) (Entered: 04/22/2016) |
| 04/22/2016 | 20 | | Witness List *Preliminary*, filed by Defendant CHARLES BENNER. (Hammer, Lynne) (Entered: 04/22/2016) |
| 05/13/2016 | 22 | | MINUTE ORDER for proceedings held before Magistrate Judge Mark J. Dinsmore: Telephonic Status Conference held on 5/13/2016. The parties discussed the status of and future plans for discovery. Telephonic Status Conference set for 7/7/2016 at 1:00 PM (Eastern Time) before Magistrate Judge Mark J. Dinsmore. *See order for additional information.* Signed by Magistrate Judge Mark J. Dinsmore. (GD) (Entered: 05/13/2016) |
| 07/06/2016 | 24 | | NOTICE of Appearance by Kathryn M. Box on behalf of Defendant CHARLES BENNER. (Box, Kathryn) (Entered: 07/06/2016) |
| 07/12/2016 | 25 | | MINUTE ORDER for proceedings held before Magistrate Judge Mark J. Dinsmore: Telephonic Status Conference held on 7/7/2016. The parties discussed the status of and future plans for discovery. Telephonic Status Conference set for 8/26/2016 at 3:40 PM (Eastern Time) before Magistrate Judge Mark J. Dinsmore. In addition, the September 27, 2016 Settlement Conference is hereby CONTINUED 10/7/2016 at 1:00 PM (Eastern Time). All other requirements of the Court's March 15, 2016 order scheduling the settlement conference [Dkt. 11 at 1–5] remain in effect. *See order for additional information.* Signed by Magistrate Judge Mark J. Dinsmore. (GD) (Entered: 07/13/2016) |
| 08/26/2016 | 27 | | MINUTE ORDER for proceedings held before Magistrate Judge Mark J. Dinsmore: Telephonic Status Conference held on 8/26/2016. The parties discussed the status of and future plans for discovery. The parties confirmed they will be ready for the upcoming settlement conference. The conference was concluded without further order. Signed by Magistrate Judge Mark J. Dinsmore. (GD) (Entered: 08/29/2016) |
| 09/01/2016 | 28 | | Unopposed MOTION *to Excuse Defendant Charles Benner from Attending the Settlement Conference*, filed by Defendant CHARLES BENNER. (Attachments: # 1 Text of Proposed Order)(Box, Kathryn) (Entered: 09/01/2016) |
| 09/02/2016 | 29 | | ORDER granting 28 Motion to excuse Defendant Benner from attending the settlement conference. Signed by Magistrate Judge Mark J. Dinsmore on 9/2/2016. (CBU) (Entered: 09/06/2016) |
| 10/07/2016 | 30 | | NOTICE of Appearance by Daniel Bowman on behalf of Defendant CHARLES BENNER. (Bowman, Daniel) (Entered: 10/07/2016) |
| 10/07/2016 | 31 | | |

| | | | MINUTE ORDER for proceedings held before Magistrate Judge Mark J. Dinsmore: Settlement Conference held on 10/7/2016. Settlement was not achieved. Telephonic Status Conference set for 3/10/2017 at 1:30 PM (Eastern Time) before Magistrate Judge Mark J. Dinsmore. *See order for additional information.* Signed by Magistrate Judge Mark J. Dinsmore. (GD) (Entered: 10/07/2016) |
|---|---|---|---|
| 11/18/2016 | 32 | | Unopposed MOTION for Extension of Time to , filed by Defendant CHARLES BENNER. (Attachments: # 1 Text of Proposed Order)(Box, Kathryn) (Entered: 11/18/2016) |
| 11/22/2016 | 33 | | SCHEDULING ORDER: Telephonic Status Conference set for 11/23/2016 at 9:30 AM (Eastern Time) to discuss Defendant's Unopposed Motion seeking a 30–day extension of the dispositive motion, liability discovery, and expert disclosure deadlines. [Dkt. 32 .] Counsel shall attend the conference by calling the designated telephone number, to be provided by the Court via email generated by the Court's ECF system. Signed by Magistrate Judge Mark J. Dinsmore on 11/22/2016.(GD) (Entered: 11/22/2016) |
| 11/22/2016 | 35 | | NOTICE of Withdrawal of Appearance by *Daniel Bowman* on behalf of CHARLES BENNER (Bowman, Daniel) (Entered: 11/22/2016) |
| 11/23/2016 | 36 | | MINUTE ORDER for proceedings held before Magistrate Judge Mark J. Dinsmore: Telephonic Status Conference held on 11/23/2016. Defendant's motion 32 to enlarge certain deadlines GRANTED IN PART and DENIED IN PART. The approved Case Management Plan 12 amended as follows: II. Jurisdiction and Statement of Claims C. On or before 12/23/2016, and consistent with the certification provisions of Fed. R. Civ. P. 11(b), the party with the burden of proof shall file a statement of the claims or defenses it intends to prove at trial, stating specifically the legal theories upon which the claims or defenses are based. IV. Discovery and Dispositive Motions B. Dispositive Motions due by 1/6/2017. Discovery due by 12/21/2016. All other requirements of the approved Case Management Plan 12 remain in effect. Telephonic Status Conference on 3/10/2017 31 remains on calendar as scheduled. *See order for additional deadlines and information.* Signed by Magistrate Judge Mark J. Dinsmore. (GD) (Entered: 11/28/2016) |
| 12/22/2016 | 37 | | Statement *of Defenses* by CHARLES BENNER. (Box, Kathryn) (Entered: 12/22/2016) |
| 12/23/2016 | 38 | | Statement *of Claims for Trial* by WILLIAM RAINSBERGER. (Waples, Richard) (Entered: 12/23/2016) |
| 01/03/2017 | 39 | | MOTION for Extension of Time to January 13, 2017 *to File a Dispositive Motion*, filed by Defendant CHARLES BENNER. (Attachments: # 1 Text of Proposed Order)(Box, Kathryn) (Entered: 01/03/2017) |
| 01/04/2017 | 40 | | ORDER granting Defendant's 39 Motion to enlarge dispositive motion deadline. Dispositive motions due by 1/13/2017. Signed by Magistrate Judge Mark J. Dinsmore on 1/4/2017.(SWM) (Entered: 01/04/2017) |
| 01/13/2017 | 41 | 34 | MOTION for Summary Judgment , filed by Defendant CHARLES BENNER. (Box, Kathryn) (Entered: 01/13/2017) |
| 01/13/2017 | 42 | 37 | |

| | | | |
|---|---|---|---|
| | | | NOTICE *of Manual Filing*, filed by Defendant CHARLES BENNER (Box, Kathryn) (Entered: 01/13/2017) |
| 01/13/2017 | 43 | 39 | Designation of Evidence re 41 MOTION for Summary Judgment , filed by Defendant CHARLES BENNER. (Attachments: # 1 Exhibit 1– Affidavit for Probable Cause, # 2 Exhibit 2– William Rainsberger Deposition Excerpts, # 3 Exhibit 3– Manually filed, # 4 Exhibit 4– Affidavit of Carl Wooldridge, # 5 Exhibit 5– Deposition of Charles Benner, # 6 Exhibit 6– Tape Deposition of Jennifer Lane, # 7 Exhibit 7– Laboratory Examination Report, # 8 Exhibit 8–Affidavit of Charles Benner, # 9 Exhibit 9– Manually Filed, # 10 Exhibit 10–Interview, # 11 Exhibit 11– Taped Deposition of Pamela Pullium, # 12 Exhibit 12– Manually Filed, # 13 Exhibit 13– Photographs, # 14 Exhibit 14– Manually Filed, # 15 Exhibit 15– Electronic Journal File, # 16 Exhibit 16– Transaction Journal, # 17 Exhibit 17– Manually Filed, # 18 Exhibit 18– Manually Filed, # 19 Exhibit 19– Affidavit of Benjamin Bierce, # 20 Exhibit 20– Landline Usage, # 21 Exhibit 21–Email, # 22 Exhibit 22– Email, # 23 Exhibit 23– Robert Rainsberger Deposition excerpt)(Box, Kathryn) (Entered: 01/13/2017) |
| 01/13/2017 | 44 | 185 | BRIEF/MEMORANDUM in Support re 41 MOTION for Summary Judgment , filed by Defendant CHARLES BENNER. (Box, Kathryn) (Entered: 01/13/2017) |
| 01/17/2017 | 45 | 218 | Receipt of Six CDs re 42 NOTICE *of Manual Filing*, filed by Defendant CHARLES BENNER (Box, Kathryn) (BRR) (Entered: 01/17/2017) |
| 02/07/2017 | 46 | | MOTION for Extension of Time to File Response to February 13, 2017 re 41 MOTION for Summary Judgment , filed by Plaintiff WILLIAM RAINSBERGER. (Attachments: # 1 Text of Proposed Order)(Waples, Richard) (Entered: 02/07/2017) |
| 02/09/2017 | 47 | | ORDER granting Plaintiff's 46 Motion for Extension of Time to File Response to 2/13/2017 re 41 MOTION for Summary Judgment . Signed by Magistrate Judge Mark J. Dinsmore on 2/9/2017. (SWM) (Entered: 02/10/2017) |
| 02/13/2017 | 48 | | MOTION for Leave to File *over−sized summary judgment response brief*, filed by Plaintiff WILLIAM RAINSBERGER. (Attachments: # 1 Text of Proposed Order)(Waples, Richard) (Entered: 02/13/2017) |
| 02/13/2017 | 49 | 221 | RESPONSE in Opposition re 41 MOTION for Summary Judgment *Memorandum*, filed by Plaintiff WILLIAM RAINSBERGER. (Waples, Richard) (Entered: 02/13/2017) |
| 02/13/2017 | 50 | | Designation of Evidence re 44 Brief/Memorandum in Support *of Plaintiff's Response to Defendant's Motion for Summary Judgment*, filed by Plaintiff WILLIAM RAINSBERGER. (Attachments: # 1 Exhibit Email from Charles Benner to Amelia Basham, March 20, 2014, # 2 Exhibit Deposition of Michael Price, Sept. 8, 2014, # 3 Exhibit Criminal Deposition of Charles Benner, Nov. 25, 2014, # 4 Exhibit Bail Testimony of Charles Benner, July 17, 2014, # 5 Exhibit Information for Murder Charge, May 22, 2014, # 6 Exhibit Affidavit of Probable Cause, May 22, 2014, # 7 Exhibit Deposition of Carl Wooldridge, Sept. 8, 2014, # 8 Exhibit Affidavit of Probable Cause, Dec. 6, 2013, # 9 Exhibit Civil Deposition of Charles Benner, September 27, 2016, # 10 Exhibit William Rainsberger Statement, Nov. 20, 2013, # 11 Exhibit Robert Rainsberger Statement, Nov. 19, 2013, # 12 Exhibit Mari Bilger Deposition, Dec. 20, 2016, # 13 Exhibit Robert Rainsberger Deposition, Dec. 20, 2016, # 14 Exhibit Criminal |

5

| | | |
|---|---|---|
| | | Case Dismissal Motion and Order, July 7, 2015, # 15 Exhibit William Rainsberger Affidavit, # 16 Exhibit Deposition of Dr. Eric Streib, March 27, 2015, # 17 Exhibit William Rainsberger Deposition Errata, # 18 Exhibit William Rainsberger Deposition, # 19 Exhibit Robert Rainsbergers Processed Cell Phone Records Map, # 20 Exhibit Robert Rainsbergers Processed Cell Phone Records, # 21 Exhibit William Rainsbergers Processed Cell Phone Records Map, # 22 Exhibit William Rainsbergers Processed Cell Phone Records, # 23 Exhibit Manuel v. City of Joliet, Transcript of Oral Arg., # 24 Exhibit William Rainsberger Statement, Nov. 19, 2013, # 25 Exhibit Ruth Rainsbergers AT&T Land line Records, # 26 Exhibit Forensic Services Agency Note, 11–19–2013, # 27 Exhibit Rebecca Rainsberger Statement, Nov. 20, 2013., # 28 Exhibit Deposition of Jennifer Lane, Sept. 8, 2014, # 29 Exhibit Affidavit of David Hennessy, # 30 Exhibit Affirmation of Kim Rossmo, # 31 Exhibit Expert Disclosure of Kim Rossmo (Rossmo Report), # 32 Exhibit CV of Kim Rossmo, # 33 Exhibit Lab Exam Report, DNA Report (highlighted) (Indianapolis–Marion County Forensic Services Agency Laboratory Examination Report), # 34 Exhibit Lab Exam Report, DNA Report (Indianapolis–Marion County Forensic Services Agency Laboratory Examination Report))(Waples, Richard) (Entered: 02/13/2017) |
| 02/14/2017 | 51 | ORDER – granting 48 Motion for Leave to File. Plaintiff may file an oversized summary judgment response brief up to 39 pages. Signed by Judge William T. Lawrence on 2/14/2017. (BRR) (Entered: 02/14/2017) |
| 02/17/2017 | 52 | Unopposed MOTION for Extension of Time to April 3, 2017 *to Serve Expert Disclosures*, filed by Defendant CHARLES BENNER. (Attachments: # 1 Text of Proposed Order)(Box, Kathryn) (Entered: 02/17/2017) |
| 02/17/2017 | 53 | MOTION to Withdraw Attorney Appearance *of Kathryn M. Box*, filed by Defendant CHARLES BENNER. (Box, Kathryn) (Entered: 02/17/2017) |
| 02/21/2017 | 54 | NOTICE of Appearance by Pamela G. Schneeman on behalf of Defendant CHARLES BENNER. (Schneeman, Pamela) (Entered: 02/21/2017) |
| 02/21/2017 | 55 | MOTION to Withdraw Attorney Appearance *of Lynne D. Hammer and Benjamin J. Church*, filed by Defendant CHARLES BENNER. (Attachments: # 1 Text of Proposed Order)(Schneeman, Pamela) (Entered: 02/21/2017) |
| 02/21/2017 | 56 | Submission of Proposed Order , re 53 MOTION to Withdraw Attorney Appearance *of Kathryn M. Box*, filed by Defendant CHARLES BENNER. (Box, Kathryn) (Entered: 02/21/2017) |
| 02/21/2017 | 57 | Joint MOTION for Extension of Time to February 27, 2017 *to File Final Witness and Exhibit List*, filed by Defendant CHARLES BENNER. (Attachments: # 1 Text of Proposed Order)(Schneeman, Pamela) (Entered: 02/21/2017) |
| 02/22/2017 | 58 | ORDER granting 53 Motion to Withdraw Attorney Appearance. Attorney Kathryn M. Box withdrawn. Signed by Magistrate Judge Mark J. Dinsmore on 2/22/2017. (SWM) (Entered: 02/22/2017) |
| 02/22/2017 | 59 | ORDER granting 55 Motion to Withdraw Attorney Appearance. Attorney Benjamin J. Church and Lynne Denise Hammer withdrawn. Signed by Magistrate Judge Mark J. Dinsmore on 2/22/2017. (SWM) (Entered: 02/22/2017) |

| 02/22/2017 | 60 | | SCHEDULING ORDER: This matter comes before the Court on Defendant's Unopposed Motion to Extend the Expert Disclosure Deadline [Dkt. 52] and the parties' Joint Motion for Extension of Time to File Final Witness and Exhibit Lists [Dkt. 57]. Those motions are set for a telephonic hearing before the Magistrate Judge at 8:30 a.m. (Eastern) on Friday, February 24, 2017. Counsel shall attend the hearing by calling the designated telephone number, to be provided by the Court via email generated by the Court's ECF system. Signed by Magistrate Judge Mark J. Dinsmore on 2/22/2017.(SWM) (Entered: 02/22/2017) |
|---|---|---|---|
| 02/23/2017 | 62 | | NOTICE of Appearance by Donald Eugene Morgan on behalf of Defendant CHARLES BENNER. (Morgan, Donald) (Entered: 02/23/2017) |
| 02/24/2017 | 63 | | MINUTE ORDER for proceedings held before Magistrate Judge Mark J. Dinsmore: This matter came before the Court for a hearing on Defendant's motion to enlarge the Defendant's expert disclosure deadline [Dkt. 52] and the parties' joint motion to enlarge the deadline to file their final witness and exhibit lists [Dkt. 57]. The Court heard argument from the parties with regard to the motions and hereby orders as follows: Defendant's motion to enlarge the Defendant's expert disclosure deadline [Dkt. 52] is hereby GRANTED IN PART and DENIED IN PART. The parties' joint motion to enlarge the deadline to file their final witness and exhibit lists [Dkt. 57] is hereby GRANTED. All parties shall file and serve their final witness and exhibit lists on or before February 27, 2017. (See Entry.) Signed by Magistrate Judge Mark J. Dinsmore. (BRR) (Entered: 02/24/2017) |
| 02/27/2017 | 64 | | Witness List *Final*, filed by Plaintiff WILLIAM RAINSBERGER. (Waples, Richard) (Entered: 02/27/2017) |
| 02/27/2017 | 65 | | Exhibit List *Final*, filed by Plaintiff WILLIAM RAINSBERGER. (Waples, Richard) (Entered: 02/27/2017) |
| 02/27/2017 | 66 | 260 | REPLY in Support of Motion re 41 MOTION for Summary Judgment , filed by Defendant CHARLES BENNER. (Morgan, Donald) (Entered: 02/27/2017) |
| 02/27/2017 | 67 | | Exhibit List *Final*, filed by Defendant CHARLES BENNER, Witness List *Final*, filed by Defendant CHARLES BENNER. (Morgan, Donald) (Entered: 02/27/2017) |
| 03/10/2017 | 69 | | MINUTE ORDER for proceedings held before Magistrate Judge Mark J. Dinsmore: Telephonic Status Conference held on 3/10/2017. The parties discussed the status of and future plans for discovery. The conference was concluded without further order. Signed by Magistrate Judge Mark J. Dinsmore. (GD) (Entered: 03/10/2017) |
| 03/24/2017 | 70 | | Exhibit List *Final*, filed by Defendant CHARLES BENNER, Witness List *Amended Final*, filed by Defendant CHARLES BENNER. (Schneeman, Pamela) (Entered: 03/24/2017) |
| 03/24/2017 | 71 | | NOTICE *of Service of Expert Disclosure*, filed by Defendant CHARLES BENNER (Schneeman, Pamela) (Entered: 03/24/2017) |
| 03/27/2017 | 72 | 281 | Submission *of Supplemental Authority on Summary Judgment Motion*, filed by Plaintiff WILLIAM RAINSBERGER. (Attachments: # 1 Exhibit Manuel v. City of Joliet)(Waples, Richard) (Entered: 03/27/2017) |
| 07/18/2017 | 73 | 296 | |

| | | | |
|---|---|---|---|
| | | | ORDER denying 41 Motion for Summary Judgment. This cause remains set for trial on September 11, 2017. The final pretrial conference will be held on August 10, 2017. The parties are reminded of their pretrial filing obligations set forth in section VIII of the case management plan Dkt. No. 12 . In addition, the parties shall confer and file a joint issue instruction at least one week prior to the final pretrial conference. The issue instruction serves as the Court's brief introduction of the case to the jury; it is read to the jury during voir dire and is included in the Court's preliminary instructions. It needs to inform the jury who the parties are and what the case is about. It is the Court's practice to require the parties to agree to a joint issue instruction; it is not acceptable for each side to propose one. Signed by Judge William T. Lawrence on 7/18/2017. (JDC) (Entered: 07/18/2017) |
| 07/21/2017 | 74 | | SCHEDULING ORDER: Settlement Conference set for 7/28/2017 01:00 PM (Eastern Time) in room #257, United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana before Magistrate Judge Mark J. Dinsmore. On or before July 26, 2017, the parties may, but need not, submit (not file) supplemental confidential settlement statements if they wish to do so; any such statements should be submitted via email to MJDinsmore@insd.uscourts.gov. See Order for additional information. Signed by Magistrate Judge Mark J. Dinsmore on 7/21/2017.(SWM) (Entered: 07/21/2017) |
| 07/24/2017 | 75 | | MOTION to Vacate *July 28 Settlement Conference*, filed by Defendant CHARLES BENNER. (Attachments: # 1 Text of Proposed Order)(Schneeman, Pamela) (Entered: 07/24/2017) |
| 07/26/2017 | 76 | 326 | NOTICE OF APPEAL as to 73 Order on Motion for Summary Judgment, filed by Defendant CHARLES BENNER. (Filing fee $505, receipt number 0756–4462073) (Schneeman, Pamela) (Entered: 07/26/2017) |
| 07/26/2017 | 77 | | MOTION to Stay *Case Pending Appeal*, filed by Defendant CHARLES BENNER. (Attachments: # 1 Text of Proposed Order)(Schneeman, Pamela) (Entered: 07/26/2017) |
| 07/26/2017 | 78 | | PARTIES' SHORT RECORD re 76 Notice of Appeal **– Instructions for Attorneys and Designation of Record information attached.** (MAT) (Entered: 07/26/2017) |
| 07/26/2017 | 79 | | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 76 Notice of Appeal. **– for Court of Appeals Use Only.** (MAT) (Entered: 07/26/2017) |
| 07/26/2017 | 80 | 328 | DOCKETING STATEMENT by CHARLES BENNER re 76 Notice of Appeal (Morgan, Donald) (Entered: 07/26/2017) |
| 07/26/2017 | 81 | | USCA Case Number 17–2521 for 76 Notice of Appeal filed by CHARLES BENNER. (MAT) (Entered: 07/26/2017) |
| 07/27/2017 | 82 | | ORDER granting Defendant's 75 Motion to Vacate Settlement Conference currently scheduled for 7/28/2017. Signed by Magistrate Judge Mark J. Dinsmore on 7/27/2017.(SWM) (Entered: 07/27/2017) |
| 08/03/2017 | 83 | | ORDER granting Defendant's 77 Motion to Stay Case Pending Appeal. All pending dates and deadlines are VACATED, including: (a) the July 28, 2017 settlement conference; (b) the August 10, 2017 final pretrial conference; and (c) |

| | | | |
|---|---|---|---|
| | | | the September 11, 2017 trial setting. New dates will be established, if necessary, after the appeal is resolved. Signed by Judge William T. Lawrence on 8/3/2017. (JDC) (Entered: 08/03/2017) |
| 08/08/2017 | 84 | 331 | DESIGNATION of Record on Appeal by CHARLES BENNER re 76 Notice of Appeal (Morgan, Donald) (Entered: 08/08/2017) |
| 08/21/2017 | 85 | 343 | SEVENTH CIRCUIT TRANSCRIPT INFORMATION SHEET by CHARLES BENNER re 76 Notice of Appeal (Morgan, Donald) (Entered: 08/21/2017) |
| 10/31/2017 | 86 | | MOTION to Withdraw Attorney Appearance *of Pamela G. Schneeman*, filed by Defendant CHARLES BENNER. (Attachments: # 1 Text of Proposed Order)(Schneeman, Pamela) (Entered: 10/31/2017) |
| 11/02/2017 | 87 | | ORDER granting 86 Motion to Withdraw Attorney Appearance. Attorney Pamela G. Schneeman withdrawn. Signed by Magistrate Judge Mark J. Dinsmore on 11/2/2017. (SWM) (Entered: 11/02/2017) |

**Case #: 1:16–cv–00103–WTL–MJD**

Case 1:16-cv-00103-TWP-MJD   Document 88-1   Filed 01/28/17   Page 10 of 344 PageID #:
1602
Case 1:16-cv-00103-TWP-MJD   Document 1   Filed 01/22/16   Page 1 of 6 PageID #: 10

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| **WILLIAM RAINSBERGER,** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | **Cause No. 1:16-cv-103** |
| | ) | |
| **v.** | ) | **JURY TRIAL REQUESTED** |
| | ) | |
| **CHARLES BENNER,** | ) | |
| | ) | |
| **DEFENDANT.** | ) | |

**COMPLAINT**

**I. Nature of Case**

1.   This lawsuit seeks money damages against a City of Indianapolis police officer for the false
     arrest and malicious prosecution of William Rainsberger.

**II. Jurisdiction and Venue**

2.   This action is brought pursuant to 42 U.S.C. §1983 and is premised on the fourth and
     fourteenth amendments to the United States Constitution.  This Court has original subject
     matter jurisdiction of the federal questions presented pursuant to 28 U.S.C. §§1331 and 1343.

3.   Venue is proper in this Court and Division, pursuant to 28 U.S.C. §1391, because the events
     giving rise to this action occurred in, and the defendant is a resident of, Indianapolis, Indiana,
     which is located in the Indianapolis Division of the Southern District of Indiana.

**III.  Parties**

4.   Plaintiff William Rainsberger is an adult resident of Indiana.

5.  Defendant Charles Benner is an adult resident of Indiana and is a police officer employed by Defendant City of Indianapolis.  He is sued in his individual capacity.

## IV. Facts

6.  In 2013 William Rainsberger was 56 years old and took care of his elderly mother, who lived a few blocks away from where he and his brother lived.

7.  Mr. Rainsberger had no criminal record and no motive to harm his mother.

8.  On November 19, 2013 shortly afer 3:30 p.m., Mr. Rainsberger arrived at his mother's apartment and found her seriously injured by an unknown assailant.

9.  Mr. Rainsberger telephoned 911 and reported that his mother had apparently been hit in the head and injured.

10.  Mrs. Rainsberger eventually died from her injuries.

11.  IMPD Detective Charles Benner was assigned to investigate the case.

12.  Detective Benner failed to conduct a thorough investigation and instead incorrectly targeted Mr. Rainsberger.

13.  Detective Benner misconstrued the evidence, and in his probable cause affidavit supporting Mr. Rainsberger's arrest and criminal charges, made false statements and concealed key evidence implicating an unidentified male in the attack and exonerating Mr. Rainsberger.

14.  On May 22, 2014 Detective Benner swore under oath in an Information charging Mr. Rainsberger with Murder that Mr. Rainsberger "did knowingly kill another human being, namely Ruth Rainsberger, by inflicting blunt force injuries with a hammer or similar object, at and against the person of Ruth Rainsberger, thereby inflicting mortal injuries upon Ruth

-2-

Case 1:16-cv-00103-TWP-MJD   Document 88-1   Filed 01/28/17   Page 12 of 34   PageID #:
1604
Case 1:16-cv-00103-WR-MJD   Document 1   Filed 01/22/16   Page 3 of 6   PageID

Rainsberger, causing Ruth Rainsberger to die."

15.    Detective Benner's allegation was false.

16.    Detective Benner procured Mr. Rainsberger's arrest and prosecution by misleading the prosecutor and the court.

17.    Detective Benner's Probable Cause Affidavit contained omissions of exculpatory evidence and fabrication of inculpatory evidence.

18.    In his probable cause affidavit, Detective Benner misrepresented that Mr. Rainsberger was in his mother's apartment during the time period she was attacked and well before he telephoned 911 to report her injuries.

19.    In his probable cause affidavit, Detective Benner misrepresents that nothing of value was stolen from the apartment, in an apparent attempt to eliminate a robbery as a motive for the attack, when in truth prescription drugs, a purse and jewelry were stolen.

20.    Detective Benner falsely stated in his probable cause affidavit that there were savings bonds in Mrs. Rainsberger's open lockbox in plain view in the apartment, implying that robbery could not have been the motive for the attack.

21.    In truth, the lockbox was not in plain view in the apartment, and there were never any savings bonds.

22.    In his probable cause affidavit Detective Benner misrepresents that after the attack on his mother, a video from a surveillance camera in a Kroger grocery store located near his mother's apartment, showed Mr. Rainsberger disposing of a "straight object" "pulled from his person" while he "look[ed] around for cameras."

23.    In truth the video shows Mr. Rainsberger at the Kroger store *prior* to going to his mother's

house, and only throwing away trash, not a "straight object" weapon, and not looking around for cameras.

24. Detective Benner viewed but failed to secure additional video surveillance from the Kroger parking lot camera which demonstrated that Mr. Rainsberger was carrying trash, not a weapon. The video was subsequently destroyed.

25. In his probable cause affidavit Detective Benner failed to disclose that DNA evidence taken from Mrs. Rainsberger's jacket was from an unidentified male.

26. In his probable cause affidavit Detective Benner failed to disclose that tests upon the DNA evidence taken from Mrs. Rainsberger's jacket excluded the DNA as coming from Mr. Rainsberger.

27. In his probable cause affidavit, Detective Benner falsely stated that Mr. Rainsberger showed no signs of concern for their mother's health while she was at the hospital before she died.

28. Based upon Detective Benner's false and misleading allegations, Mr. Rainsberger was arrested on May 27, 2014 and charged with murder.

29. The prosecutor's charge of murder against Mr. Rainsberger were based upon Detective Benner's affidavit of probable cause.

30. Mr. Rainsberger was confined in jail on pretrial detention from May 27, 2014 to July 22, 2014.

31. Mr. Rainsberger hired criminal defense counsel who investigated the evidence and exposed Detective Benner's falsehoods.

32. On July 7, 2015 the Marion County Prosecutor, citing "evidentiary problems," moved to dismiss the charges against Mr. Rainsberger, a motion which the Marion Superior Court

-4-

13

granted the same day.

33.    Mr. Rainsberger suffered damages as a result of these events in the form of physical discomfort, loss of liberty, public embarrassment and humiliation, emotional distress, damage to his good name and reputation, loss of economic opportunities, and attorney fees and costs.

34.    At all times relevant, Detective Benner was acting under color of state law.

35.    At all times relevant, Detective Benner was employed by the City of Indianapolis and acted within the scope of his employment.

## V. Claims

36.    Defendant Benner's actions constitute an unlawful seizure, in terms of the lack of probable cause for the arrest of Mr. Rainsberger, in contravention of the fourth amendment, actionable pursuant to 42 U.S. C. § 1983.

37.    Defendant Benner's actions constitute an unreasonable and/or a malicious prosecution, in violation of the fourth and/or fourteenth amendments, actionable pursuant to 42 U.S.C. § 1983.

38.    Plaintiff reserves the right to proceed with any and all claims which the facts averred in this Complaint support, pursuant to the notice pleading requirement of Federal Rule of Civil Procedure 8.

## VI.  Jury Trial Requested

39.    William Rainsberger requests a jury trial on his claims.

Case 1:16-cv-00103-TWP-MJD   Document 88-1   Filed 11/28/17   Page 15 of 344 PageID #:
Case 1:16-cv-00103-WTL-MJD   Document 1   Filed 01/12/16   Page 6 of 6 PageID #:
1607

## VII.  Relief Requested

40.     William Rainsberger seeks all relief available under the law, including compensatory and

punitive damages, attorney fees and costs, and all other appropriate relief.


Respectfully submitted,


Dated: January 12,  2016                    /s/ Richard A. Waples____
                                            Richard A. Waples
                                            Attorney for Plaintiff


**WAPLES & HANGER**
410 N. Audubon Road
Indianapolis, Indiana 46219
TEL: (317) 357-0903
FAX: (317) 357-0275
EMAIL: rwaples@wapleshanger.com


-6-

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Rainsberger, William

**(b)** County of Residence of First Listed Plaintiff    Marion
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Richard A. Waples, WAPLES & HANGER, 410 N. Audubon Road, Indianapolis, IN 46219; 317-357-0903

## DEFENDANTS

Benner, Charles

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

Attorneys (If Known)
Office of Corporation Counsel, City of Indianapolis

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ❑ 1  U.S. Government Plaintiff
- ❑ 2  U.S. Government Defendant
- x  3  Federal Question (U.S. Government Not a Party)
- ❑ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❑ 1 | ❑ 1 | Incorporated or Principal Place of Business In This State | ❑ 4 | ❑ 4 |
| Citizen of Another State | ❑ 2 | ❑ 2 | Incorporated and Principal Place of Business In Another State | ❑ 5 | ❑ 5 |
| Citizen or Subject of a Foreign Country | ❑ 3 | ❑ 3 | Foreign Nation | ❑ 6 | ❑ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ❑ 110 Insurance | **PERSONAL INJURY** | ❑ 610 Agriculture | ❑ 422 Appeal 28 USC 158 | ❑ 400 State Reapportionment |
| ❑ 120 Marine | ❑ 310 Airplane | ❑ 620 Other Food & Drug | ❑ 423 Withdrawal | ❑ 410 Antitrust |
| ❑ 130 Miller Act | ❑ 315 Airplane Product Liability | ❑ 625 Drug Related Seizure of Property 21 USC 881 | 28 USC 157 | ❑ 430 Banks and Banking |
| ❑ 140 Negotiable Instrument | ❑ 320 Assault, Libel & Slander | ❑ 630 Liquor Laws | **PROPERTY RIGHTS** | ❑ 450 Commerce |
| ❑ 150 Recovery of Overpayment & Enforcement of Judgment | ❑ 330 Federal Employers' Liability | ❑ 640 R.R. & Truck | ❑ 820 Copyrights | ❑ 460 Deportation |
| ❑ 151 Medicare Act | ❑ 340 Marine | ❑ 650 Airline Regs. | ❑ 830 Patent | ❑ 470 Racketeer Influenced and Corrupt Organizations |
| ❑ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ❑ 345 Marine Product Liability | ❑ 660 Occupational Safety/Health | ❑ 840 Trademark | ❑ 480 Consumer Credit |
| ❑ 153 Recovery of Overpayment of Veteran's Benefits | ❑ 350 Motor Vehicle | ❑ 690 Other | **LABOR** | ❑ 490 Cable/Sat TV |
| ❑ 160 Stockholders' Suits | ❑ 355 Motor Vehicle Product Liability | ❑ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ❑ 810 Selective Service |
| ❑ 190 Other Contract | ❑ 360 Other Personal Injury | ❑ 720 Labor/Mgmt. Relations | ❑ 861 HIA (1395ff) | ❑ 850 Securities/Commodities/ Exchange |
| ❑ 195 Contract Product Liability | **PERSONAL INJURY** | ❑ 730 Labor/Mgmt.Reporting & Disclosure Act | ❑ 862 Black Lung (923) | ❑ 875 Customer Challenge 12 USC 3410 |
| ❑ 196 Franchise | ❑ 362 Personal Injury - Med. Malpractice | ❑ 740 Railway Labor Act | ❑ 863 DIWC/DIWW (405(g)) | ❑ 890 Other Statutory Actions |
| **REAL PROPERTY** | ❑ 365 Personal Injury - Product Liability | ❑ 790 Other Labor Litigation | ❑ 864 SSID Title XVI | ❑ 891 Agricultural Acts |
| ❑ 210 Land Condemnation | ❑ 368 Asbestos Personal Injury Product Liability | ❑ 791 Empl. Ret. Inc. Security Act | ❑ 865 RSI (405(g)) | ❑ 892 Economic Stabilization Act |
| ❑ 220 Foreclosure | **PERSONAL PROPERTY** | | **FEDERAL TAX SUITS** | ❑ 893 Environmental Matters |
| ❑ 230 Rent Lease & Ejectment | ❑ 370 Other Fraud | | ❑ 870 Taxes (U.S. Plaintiff or Defendant) | ❑ 894 Energy Allocation Act |
| ❑ 240 Torts to Land | ❑ 371 Truth in Lending | | ❑ 871 IRS—Third Party 26 USC 7609 | ❑ 895 Freedom of Information Act |
| ❑ 245 Tort Product Liability | ❑ 380 Other Personal Property Damage | | | ❑ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ❑ 290 All Other Real Property | ❑ 385 Property Damage Product Liability | | | ❑ 950 Constitutionality of State Statutes |
| **CIVIL RIGHTS** | **PRISONER PETITIONS** | | | |
| ❑ 441 Voting | ❑ 510 Motions to Vacate Sentence | | | |
| ❑ 442 Employment | **Habeas Corpus:** | | | |
| ❑ 443 Housing/ Accommodations | ❑ 530 General | | | |
| ❑ 444 Welfare | ❑ 535 Death Penalty | | **IMMIGRATION** | |
| ❑ 445 Amer. w/Disabilities - Employment | ❑ 540 Mandamus & Other | | ❑ 462 Naturalization Application | |
| ❑ 446 Amer. w/Disabilities - Other | ❑ 550 Civil Rights | | ❑ 463 Habeas Corpus - Alien Detainee | |
| x 440 Other Civil Rights | ❑ 555 Prison Condition | | ❑ 465 Other Immigration Actions | |

## V. ORIGIN (Place an "X" in One Box Only)

- x 1  Original Proceeding
- ❑ 2  Removed from State Court
- ❑ 3  Remanded from Appellate Court
- ❑ 4  Reinstated or Reopened
- ❑ 5  Transferred from another district (specify)
- ❑ 6  Multidistrict Litigation
- ❑ 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
42 U.S.C. Sec. 1983

Brief description of cause:
constitutional false arrest and malicious prosecution against a police officer

## VII. REQUESTED IN COMPLAINT:

❑ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   x Yes   ❑ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):
JUDGE

DOCKET NUMBER

## DATE
January 12, 2016

## SIGNATURE OF ATTORNEY OF RECORD
/s/ Richard A. Waples

**FOR OFFICE USE ONLY**

RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE

JS 44 Reverse  (Rev. 12/07)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

I.      **(a) Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

    (b) County of Residence.  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

    (c) Attorneys.  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

 II.     **Jurisdiction**.  The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.

United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked.  (See Section III below; federal question actions take precedence over diversity cases.)

III.     **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

IV.     **Nature of Suit**.  Place an "X" in the appropriate box.  If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit.  If the cause fits more than one nature of suit, select the most definitive.

V.      **Origin**.  Place an "X" in one of the seven boxes.

Original Proceedings.  (1) Cases which originate in the United States district courts.

Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.  When the petition for removal is granted, check this box.

Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.

Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.

Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.  When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment.  (7) Check this box for an appeal from a magistrate judge's decision.

VI.     **Cause of Action**.  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity**.          Example:     U.S. Civil Statute: 47 USC 553
                                    Brief Description: Unauthorized reception of cable service

VII.     **Requested in Complaint**.  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand.  In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.    **Related Cases**.  This section of the JS 44 is used to reference related pending cases if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature**.  Date and sign the civil cover sheet.

Case 1:16-cv-00103-TWP-MJD Document 88-1 Filed 11/28/17 Page 18 of 344 PageID #:
1610
Case 1:16-cv-00103-WTL-MJD Document 12 Filed 01/12/16 Page 1 of 1 PageID 9

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| **WILLIAM RAINSBERGER,** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | **Cause No. 1:16-cv-103** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CHARLES BENNER,** | ) | |
| | ) | |
| **DEFENDANT.** | ) | |

## NOTICE OF APPEARANCE

Richard A. Waples, of the law firm Waples & Hanger, gives Notice of his Appearance on behalf of the plaintiff in the above cause of action.

Respectfully submitted,

Dated: January 12, 2016

*/s/ Richard A. Waples*
Richard A. Waples
Attorney for Plaintiff

**WAPLES & HANGER**
410 N. Audubon Road
Indianapolis, Indiana 46219
TEL: (317) 357-0903
FAX: (317) 357-0275
EMAIL: rwaples@wapleshanger.com

Case 1:16-cv-00103-TWP-MJD Document 88-1 Filed 01/13/17 Page 19 of 344 PageID #:
Case 1:16-cv-00103-WTL-MJD Document 3-3 Filed 01/18/16 Page 19 of 24 PageID #:
1611

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA, INDIANAPOLIS DIVISON

| | | |
|---|---|---|
| **WILLIAM RAINSBERGER,** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | **Cause No. 1:16-cv-103** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CHARLES BENNER,** | ) | |
| | ) | |
| | ) | |
| **DEFENDANT.** | ) | |

## SUMMONS IN A CIVIL ACTION

TO:

Detective Charles Benner
Indianapolis Metropolitan Police Department
50 N. Alabama Street
Indianapolis, IN 46204

A lawsuit has been filed against you. Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:]

**Richard A. Waples**
**WAPLES & HANGER**
**410 N. Audubon Road**
**Indianapolis, Indiana 46219**

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____

*Signature of Clerk or Deputy Clerk*

Civil Summons (Page 2)

Civil Action Number: **1:16-cv-103**

## PROOF OF SERVICE
*(this section should not be filed with the court unless required by Fed. R. Civ. P. 4(l))*

This summons for *(name of individual and title, if any)* _ was received by me on

*(date)*_____.

☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)*_____

_____, a person of suitable age and discretion who resides there,

on *(date)* _____,  and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____, who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____on *(date)* _____; or

☐ I returned the summons unexecuted because _____; or

☒ Other *(specify)*: **The summons was served by U.S. Certified Mail, return receipt requested, article #**

**_____and signed by agent on _____, 2016.**

My fees are $ ___0.00___ for travel and $_____0.00_____ for services, for a total of $___0.00_____.

I declare under penalty of perjury that this information is true.

Date: ____January 12, 2016____          */s/ Richard A. Waples_____*
                                        *Server's Signature*

                                         _Richard A. Waples, Attorney_____
                                        *Printed name and title*

                                        Waples & Hanger
                                        410 N. Audubon Road, Indianapolis, IN 46219
                                        *Server's address*

Additional information regarding attempted service, etc.

Case 1:16-cv-00103-TWP-MJD Document 88-1 Filed 01/29/17 Page 21 of 344 PageID #:
Case 1:16-cv-00103-WTL-MJD Document 50 Filed 03/08/16 Page 1 of 13 PageID #: 95
1613

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| WILLIAM RAINSBERGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 1:16-cv-103-WTL-MJD |
| | ) | |
| CHARLES BENNER, | ) | JURY TRIAL REQUESTED |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S ANSWER TO PLAINTIFF'S COMPLAINT
## AND AFFIRMATIVE DEFENSES

Defendant Charles Benner, by counsel, hereby answers Plaintiff William Rainsberger's Complaint. Defendant notes that for ease of reference, the allegations of Plaintiff's Complaint are set forth verbatim with Defendant's responses following each allegation.

## ANSWER

### I.    Nature of Case

1. This lawsuit seeks money damages against a City of Indianapolis police officer for the false arrest and malicious prosecution of William Rainsberger.

> **ANSWER:** Defendant admits that Plaintiff seeks money damages against a City of Indianapolis police officer but deny that Plaintiff is entitled to any relief. Defendant denies the remaining material allegations in paragraph 1 of Plaintiff's Complaint.

## II.      Jurisdiction and Venue

2.      This action is brought pursuant to 42 U.S.C. §1983 and is premised on the fourth and

fourteenth amendments to the United States Constitution. This Court has original subject

matter jurisdiction of the federal questions presented pursuant to 28 U.S.C. §§1331 and 1343.

> **ANSWER:** Defendant admits that Plaintiff purports to bring this action
> pursuant to 42 U.S.C. § 1983 with the federal statutory claim premised on
> a violation of the fourth and fourteenth amendments to the United States
> Constitution. To the extent there are allegations that require a response in
> paragraph 2 of Plaintiff's Complaint; Defendant denies the allegations.

3.      Venue is proper in this Court and Division, pursuant to 28 U.S.C. §1391, because the events

giving rise to this action occurred in, and the defendant is a resident of, Indianapolis, Indiana,

which is located in the Indianapolis Division of the Southern District of Indiana.

> **ANSWER:** Defendant admits that venue is proper. To the extent Plaintiff
> seeks any relief in his Complaint; Defendant denies Plaintiff is entitled to
> any relief. To the extent there are allegations that require a response in
> paragraph 3 of Plaintiff's Complaint; Defendant denies the allegations.

## III.      Parties

4.      Plaintiff William Rainsberger is an adult resident of Indiana.

> **ANSWER:** Defendant is without sufficient knowledge or information to
> form a belief as to the truth of the material allegations in paragraph 4 of
> Plaintiff's Complaint and, therefore deny said allegations.

5.      Defendant Charles Benner is an adult resident of Indiana and is a police officer employed by

Defendant City of Indianapolis.  He is sued in his individual capacity.

> **ANSWER:** Defendant admits that Defendant Charles Benner is an adult
> resident of Indiana and is a police officer employed by the City of
> Indianapolis in its Indianapolis Metropolitan Police Department. To the
> extent there are remaining allegations that require a response in paragraph
> 5 of Plaintiff's Complaint; Defendant denies the allegations.

2

## IV. Facts

6.      In 2013 William Rainsberger was 56 years old and took care of his elderly mother, who lived a few blocks away from where he and his brother lived.

> **ANSWER:** Defendant admits that an interview of Plaintiff revealed that Plaintiff was 56 years old in 2013, that Plaintiff stated that he had been taking care of his mother for the past few years and that Plaintiff's mother lived approximately one-half mile from where Plaintiff and his brother lived.

7.      Mr. Rainsberger had no criminal record and no motive to harm his mother.

> **ANSWER:** Defendant admits that prior to November 19, 2013, Plaintiff had no criminal record. Defendant denies the remaining material allegations in paragraph 7 of Plaintiff's Complaint.

8.      On November 19, 2013 shortly after 3:30 p.m., Mr. Rainsberger arrived at his mother's apartment and found her seriously injured by an unknown assailant.

> **ANSWER:** Defendant admits that on November 19, 2013, IMPD 911 dispatch received a call from the address of 801 N. Shortridge Road, Apartment H11, that the caller said that his mother had been "attacked" and that someone had "bashed" his mother's head in, and that the caller was identified as William Rainsberger.

9.      Mr. Rainsberger telephoned 911 and reported that his mother had apparently been hit in the head and injured.

> **ANSWER:** Defendant admits that IMPD 911 dispatch received a call from the address of 801 N. Shortridge Road, Apartment H11, that the caller said that his mother had been "attacked" and that someone had "bashed" his mother's head in, and that the caller was identified as William Rainsberger.

10.     Mrs. Rainsberger eventually died from her injuries.

     **ANSWER:** Defendant admits that an autopsy of Mrs. Rainsberger, Plaintiff's mother, determined that the cause of death was due to multiple blunt force trauma injuries to the head and that the manner was ruled a Homicide.

11.     IMPD Detective Charles Benner was assigned to investigate the case.

     **ANSWER:** Defendant admits that he was assigned to investigate the case.

12.     Detective Benner failed to conduct a thorough investigation and instead incorrectly targeted Mr. Rainsberger.

     **ANSWER:** Defendant denies the material allegations in paragraph 12 of Plaintiff's Complaint.

13.     Detective Benner misconstrued the evidence, and in his probable cause affidavit supporting Mr. Rainsberger's arrest and criminal charges, made false statements and concealed key evidence implicating an unidentified male in the attack and exonerating Mr. Rainsberger.

     **ANSWER:** Defendant denies the material allegations in paragraph 13 of Plaintiff's Complaint.

14.     On May 22, 2014 Detective Benner swore under oath in an Information charging Mr. Rainsberger with Murder that Mr. Rainsberger "did knowingly kill another human being, namely Ruth Rainsberger, by inflicting blunt force injuries with a hammer or similar object, at and against the person of Ruth Rainsberger, thereby inflicting mortal injuries upon Ruth Rainsberger, causing Ruth Rainsberger to die."

     **ANSWER:** Defendant admits that the Information referenced in paragraph 14 of Plaintiff's Complaint speaks for itself.

Case 1:16-cv-00103-TWP-MJD Document 88-1 Filed 11/29/17 Page 25 of 344 PageID #:
Case 1:16-cv-00103-WTL-MJD Document 30 Filed 03/08/16 Page 5 of 13 PageID #:
1617

15.     Detective Benner's allegation was false.

      **ANSWER:** Defendant denies the material allegations in paragraph 15 of
Plaintiff's Complaint.

16.     Detective Benner procured Mr. Rainsberger's arrest and prosecution by misleading
the prosecutor and the court.

      **ANSWER:** Defendant denies the material allegations in paragraph 16 of
Plaintiff's Complaint.

17.     Detective Benner's Probable Cause Affidavit contained omissions of exculpatory
evidence and fabrication of inculpatory evidence.

      **ANSWER:** Defendant denies the material allegations in paragraph 17 of
Plaintiff's Complaint.

18.     In his probable cause affidavit, Detective Benner misrepresented that Mr. Rainsberger
was in his mother's apartment during the time period she was attacked and well before he
telephoned 911 to report her injuries.

      **ANSWER:** Defendant denies the material allegations in paragraph 18 of
Plaintiff's Complaint.

19.     In his probable cause affidavit, Detective Benner misrepresents that nothing of value
was stolen from the apartment, in an apparent attempt to eliminate a robbery as a motive
for the attack, when in truth prescription drugs, a purse and jewelry were stolen.

      **ANSWER:** Defendant denies the material allegations in paragraph 19 of
Plaintiff's Complaint.

20.    Detective Benner falsely stated in his probable cause affidavit that there were savings

bonds in Mrs. Rainsberger's open lockbox in plain view in the apartment, implying that

robbery could not have been the motive for the attack.

>    **ANSWER:** Defendant denies the material allegations in paragraph 20 of
>    Plaintiff's Complaint.

21.    In truth, the lockbox was not in plain view in the apartment, and there were never

any savings bonds.

>    **ANSWER:** Defendant denies the material allegations in paragraph 21 of
>    Plaintiff's Complaint.

22.    In his probable cause affidavit Detective Benner misrepresents that after the attack on

his mother, a video from a surveillance camera in a Kroger grocery store located

near his mother's apartment, showed Mr. Rainsberger disposing of a "straight object"

"pulled from his person" while he "look[ed] around for cameras."

>    **ANSWER:** Defendant denies the material allegations in paragraph 22 of
>    Plaintiff's Complaint.

23.    In truth the video shows Mr. Rainsberger at the Kroger store *prior* to going to his mother's

house, and only throwing away trash, not a "straight object" weapon, and not looking around

for cameras.

>    **ANSWER:** Defendant denies the material allegations in paragraph 23 of
>    Plaintiff's Complaint.

24.     Detective Benner viewed but failed to secure additional video surveillance from the Kroger parking lot camera which demonstrated that Mr. Rainsberger was carrying trash, not a weapon. The video was subsequently destroyed.

        **ANSWER:** Defendant denies the material allegations in paragraph 24 of Plaintiff's Complaint.

25.     In his probable cause affidavit Detective Benner failed to disclose that DNA evidence taken from Mrs. Rainsberger's jacket was from an unidentified male.

        **ANSWER:** Defendant denies the material allegations in paragraph 25 of Plaintiff's Complaint.

26.     In his probable cause affidavit Detective Benner failed to disclose that tests upon the DNA evidence taken from Mrs. Rainsberger's jacket excluded the DNA as coming from Mr. Rainsberger.

        **ANSWER:** Defendant denies the material allegations in paragraph 26 of Plaintiff's Complaint.

27.     In his probable cause affidavit, Detective Benner falsely stated that Mr. Rainsberger showed no signs of concern for their mother's health while she was at the hospital before she died.

        **ANSWER:** Defendant denies the material allegations in paragraph 27 of Plaintiff's Complaint.

28.     Based upon Detective Benner's false and misleading allegations, Mr. Rainsberger was arrested on May 27, 2014 and charged with murder.

        **ANSWER:** Defendant admits that Plaintiff was arrested on May 27, 2014, and that the charge for Plaintiff's arrest was homicide.

29.     The prosecutor's charge of murder against Mr. Rainsberger were based upon
Detective Benner's affidavit of probable cause.

    **ANSWER:** Defendant admits that the affidavit of probable cause referenced in paragraph 29 of Plaintiff's Complaint speaks for itself.

30.     Mr. Rainsberger was confined in jail on pretrial detention from May 27, 2014 to July 22, 2014.

    **ANSWER:** Defendant admits that Plaintiff was confined in jail on pretrial detention. Defendant is without sufficient knowledge or information to form a belief as to the truth of the remaining material allegations in paragraph 30 of Plaintiff's Complaint.

31.     Mr. Rainsberger hired criminal defense counsel who investigated the evidence and exposed Detective Benner's falsehoods.

    **ANSWER:** Defendant admits that Plaintiff was represented by criminal defense counsel. Defendant is without sufficient knowledge or information to form a belief as to the truth of the material allegation regarding whether Plaintiff's criminal defense counsel conducted an investigation and, therefore deny said allegation. Defendant denies the remaining material allegations in paragraph 31 of Plaintiff's Complaint.

32.     On July 7, 2015 the Marion County Prosecutor, citing "evidentiary problems," moved to dismiss the charges against Mr. Rainsberger, a motion which the Marion Superior Court granted the same day.

    **ANSWER:** Defendant is without sufficient knowledge or information to form a belief as to the truth of the material allegations in paragraph 32 of Plaintiff's Complaint and, therefore deny said allegations.

Case 1:16-cv-00103-TWP-MJD   Document 88-1   Filed 11/29/17   Page 29 of 344 PageID #:
1621
Case 1:16-cv-00103-WTL-MJD   Document 30   Filed 03/08/16   Page 9 of 13   PageID 43

33. Mr. Rainsberger suffered damages as a result of these events in the form of physical discomfort, loss of liberty, public embarrassment and humiliation, emotional distress, damage to his good name and reputation, loss of economic opportunities, and attorney fees and costs.

> **ANSWER:** Defendant denies the material allegations in paragraph 33 of Plaintiff's Complaint.

34. At all times relevant, Detective Benner was acting under color of state law.

> **ANSWER**: Defendant admits that at all times relevant he acted under color of state law; however, Defendant denies that he committed any violations.

35. At all times relevant, Detective Benner was employed by the City of Indianapolis and acted within the scope of his employment.

> **ANSWER**: Defendant admits that at all times relevant to this suit he was employed by the City of Indianapolis and acted within the scope of his employment as an officer of the Indianapolis Metropolitan Police Department; however, Defendant denies that he committed any violations.

## V.  Claims

36. Defendant Benner's actions constitute an unlawful seizure, in terms of the lack of probable cause for the arrest of Mr. Rainsberger, in contravention of the fourth amendment, actionable pursuant to 42 U.S.C. § 1983.

> **ANSWER:** Defendant denies the material allegations in paragraph 36 of Plaintiff's Complaint.

37.   Defendant Benner's actions constitute an unreasonable and/or a malicious prosecution, in violation of the fourth and/or fourteenth amendments, actionable pursuant to 42 U.S.C. § 1983.

> **ANSWER:** Defendant denies the material allegations in paragraph 37 of Plaintiff's Complaint.

38.   Plaintiff reserves the right to proceed with any and all claims which the facts averred in this Complaint support, pursuant to the notice pleading requirement of Federal Rule of Civil Procedure 8.

> **ANSWER:** Defendant denies that Plaintiff is entitled to any relief pursuant to the Indiana Trial Rules. To the extent Plaintiff seeks any relief in his Complaint; Defendant denies Plaintiff is entitled to any relief. Defendant respectfully requests that judgment be entered for the Defendant and that Plaintiff takes nothing by way of the Complaint, as well as for all other just and proper relief in the premises.

## VI.   Jury Trial Requested

39.   William Rainsberger requests a jury trial on his claims.

> **ANSWER:** Defendant also requests a jury trial

## VII.   Relief Requested

40.   William Rainsberger seeks all relief available under the law, including compensatory and punitive damages, attorney fees and costs, and all other appropriate relief.

> **ANSWER:** To the extent Plaintiff seeks any relief in his Complaint; Defendant denies Plaintiff is entitled to any relief. Defendant respectfully requests that judgment be entered for the Defendant and that Plaintiff takes nothing by way of the Complaint, as well as for all other just and proper relief in the premises.

10

30

Case 1:16-cv-00103-TWP-MJD   Document 90-1   Filed 03/08/16   Page 31 of 344 PageID #:
1623
Case 1:16-cv-00103-TWP-MJD   Document 80-1   Filed 11/29/17   Page 31 of 344 PageID #:

## AFFIRMATIVE DEFENSES

1.      Plaintiff has failed to state a claim upon which relief may be granted.

2.      Probable cause for arrest existed.

3.      Probable cause for prosecution existed.

4.      Plaintiff's claims under *Monell*, if any, are barred to the extent he has failed to properly
state a claim.

5.      Defendant is immune from liability for Plaintiff's claims to the extent the doctrine of
qualified immunity applies.

6.      Plaintiff is not entitled to punitive damages on any claims against Defendant in his
individual capacity.

7.      Plaintiff's claims are limited to the extent he failed to mitigate his damages, but to the
extent some mitigation has occurred, Defendant is entitled to a set-off.

8.      Plaintiff's lawsuit and any recovery is barred to the extent that the claims are subject to
any federal statute limiting the cause of action or the recovery of damages, including,
but not limited to, a cap on compensatory damages and a limitation on interest.

9.      Plaintiff's claims are barred to the extent that he has waived claims by actions or
inactions.

10.     Plaintiff's claims are barred to the extent they are untimely.

11.     Defendant acted in good faith at all times, and had reasonable grounds for believing that
any act(s) he took did not violate any applicable federal or state laws.

12.     Defendant acted in accordance with his authority pursuant to a State law.

13.     Plaintiff's claims are barred to the extent the Defendant would have taken the same action
against the Plaintiff even if there was no constitutional violation.

14.     Defendant did not act with malice or reckless indifference.

15.     Any claim on the part of Plaintiff for prejudgment interest is barred by Indiana law.

16.     Further, Defendant hereby reserves any and all rights to raise additional affirmative

defenses that may be developed through the course of discovery in this litigation.

Respectfully submitted,

*/s/ Lynne D. Hammer_____*
Lynne D. Hammer (28252-49)
Assistant Corporation Counsel
OFFICE OF CORPORATION COUNSEL
200 East Washington Street, Room 1601
Indianapolis, Indiana  46204
Telephone: (317) 327-4055
Fax:  (317) 327-3968
E-Mail: lynne.hammer@indy.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 8, 2016, a copy of the foregoing served by electronic filing. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Richard A. Waples
WAPLES & HANER
410 N. Audubon Road
Indianapolis, IN  46219

/s/ Lynne D. Hammer_____
Lynne D. Hammer (28252-49)
Assistant Corporation Counsel

OFFICE OF CORPORATION COUNSEL
200 East Washington Street, Room 1601
Indianapolis, Indiana  46204
Telephone: (317) 327-4055
Fax:  (317) 327-3968

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| WILLIAM RAINSBERGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 1:16-cv-103-WTL-MJD |
| | ) | |
| CHARLES BENNER, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant Charles Benner, by counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure, respectfully moves for summary judgment on Plaintiff's claim against him in this cause of action. In support of this motion, Defendant states the following:

1. Plaintiff filed his complaint on January 12, 2016. Dkt. 1.

2. Plaintiff claims that Defendant violated his constitutional rights under ¶ 1983. Dkt. 1.

3. Specifically, Plaintiff asserts three claims: 1) False arrest; 2) Malicious prosecution; and 3) Knowingly making false or misleading statements and omitting exculpatory evidence in a probable cause affidavit. Dkt. 1.

4. There is no genuine issue of material fact and Plaintiff's claims fail as a matter of law.

5. Defendant had probable cause to arrest Plaintiff.

6. Defendant did not act with malicious intent and there is no constitutional right not to be prosecuted without probable cause.

7. There is no evidence that Defendant knowingly made false or misleading statements or omitted exculpatory evidence. And, the alleged false or misleading statements and omitted evidence were not material to the finding of probable cause.

8. Defendant is entitled to qualified immunity because he did not violate Plaintiff's clearly established constitutional rights.

9. Accordingly, Defendant is entitled to summary judgment.

10. Defendant files his Memorandum of Law in Support of Motion for Summary Judgment and Designation of Evidence in Support of Motion for Summary Judgment contemporaneously herewith.

Defendant respectfully moved for summary judgment on Plaintiff's claims against him in this action, and for all other appropriate relief.

Respectfully submitted,


*/s/ Kathryn M. Box*
Kathryn M. Box (31233-49)
Assistant Corporation Counsel
Office of Corporation Counsel
200 East Washington Street, Room 1601
Indianapolis, Indiana 46204
Telephone: (317) 327-4055
Fax: (317) 327-3968
E-Mail: kathryn.box@indy.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 13, 2017, a copy of the foregoing was served by electronic filing. Notice of this filing will be sent to all ECF-registered parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

<u>/s/ Kathryn M. Box</u>
Kathryn M. Box (31233-49)
Assistant Corporation Counsel

OFFICE OF CORPORATION COUNSEL
200 East Washington Street, Room 1601
Indianapolis, Indiana 46204
Telephone: (317) 327-4055
Fax: (317) 327-3968

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

WILLIAM RAINSBERGER,          )
                                    )
       Plaintiff,               )
                                    )
       v.                      )   Case No.: 1:16-cv-103-WTL-MJD
                                    )
CHARLES BENNER,             )
                                    )
       Defendant.          )

**<u>DEFENDANTS' NOTICE OF MANUAL FILING</u>**

Please take notice that Defendant has manually filed the following Exhibits on January 13, 2017:

Exhibit 3:  911 Audio (manually filed)

Exhibit 9:  Photos (manually filed)

Exhibit 12:  Kroger Video Surveillance – Camera 30 (manually filed)

Exhibit 14:  Kroger Video Surveillance – Camera 7 (manually filed)

Exhibit 17:  Kroger Video Surveillance – Camera 29 (manually filed)

Exhibit 18:  Kroger Video Surveillance – Camera 44 (manually filed)

These exhibits have not been filed electronically because they are objects that cannot be converted into an electronic format that can be filed in ECF.

These exhibits have been manually served on Plaintiff.

Respectfully submitted,

_/s/ Kathryn M. Box_____
Kathryn M. Box (31233-49)
Assistant Corporation Counsel
Office of Corporation Counsel
200 East Washington Street, Room 1601
Indianapolis, Indiana 46204
Telephone: (317) 327-4055
Fax: (317) 327-3968
E-Mail: kathryn.box@indy.gov

## CERTIFICATE OF SERVICE

I hereby certify that on January 13, 2017, a copy of the foregoing was served by electronic filing. Notice of this filing will be sent to all ECF-registered parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

_/s/ Kathryn M. Box_____
Kathryn M. Box (31233-49)
Assistant Corporation Counsel

OFFICE OF CORPORATION COUNSEL
200 East Washington Street, Room 1601
Indianapolis, Indiana 46204
Telephone: (317) 327-4055
Fax: (317) 327-3968

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| WILLIAM RAINSBERGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 1:16-cv-103-WTL-MJD |
| | ) | |
| CHARLES BENNER, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S DESIGNATION OF EVIDENCE IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Defendant Charles Benner, by counsel, respectfully designates the following evidence in support of his Motion for Summary Judgment:

Exhibit 1:  Affidavit for Probable Cause

Exhibit 2:  Deposition of William Rainsberger

Exhibit 3:  911 Audio (manually filed)

Exhibit 4:  Affidavit of Carl Wooldridge

    Attachment A – Statement of Carl Wooldridge

Exhibit 5:  Deposition of Charles Benner

Exhibit 6:  Deposition of Jennifer Lane

Exhibit 7:  Indianapolis-Marion County Forensic Services Agency Laboratory Examination Report

Exhibit 8:  Affidavit of Charles Benner

Exhibit 9:  Photos (manually filed)

Exhibit 10:  Deposition of Michael Price

Exhibit 11:  Deposition of Pam Pulliam

Exhibit 12:  Kroger Video Surveillance – Camera 30 (manually filed)

Exhibit 13:  Kroger Video Surveillance – Camera 30 – Still Photos

Exhibit 14:  Kroger Video Surveillance – Camera 7 (manually filed)

Exhibit 15: Kroger Receipt – November 19, 2013

Exhibit 16:  Kroger Plus Card Records

Exhibit 17:  Kroger Video Surveillance – Camera 29 (manually filed)

Exhibit 18:  Kroger Video Surveillance – Camera 44 (manually filed)

Exhibit 19: Affidavit of Benjamin Bierce

    Attachment A – Robert Rainsberger's Phone Records – Original CDR

    Attachment B – Robert Rainsberger's Phone Records - Results

Exhibit 20:  Ruth Rainsberger's Phone Records

Exhibit 21:  Email – December 9, 2013

Exhibit 22:  Email – July 23, 2014

Exhibit 23: Deposition of Robert Rainsberger

 

                           Respectfully submitted,

                           */s/ Kathryn M. Box*
                           Kathryn M. Box (31233-49)
                           Assistant Corporation Counsel
                           Office of Corporation Counsel
                           200 East Washington Street, Room 1601
                           Indianapolis, Indiana 46204
                           Telephone: (317) 327-4055
                           Fax: (317) 327-3968
                           E-Mail: kathryn.box@indy.gov

## CERTIFICATE OF SERVICE

I hereby certify that on January 13, 2017, a copy of the foregoing was served by electronic filing. Notice of this filing will be sent to all ECF-registered parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Kathryn M. Box*
Kathryn M. Box (31233-49)
Assistant Corporation Counsel

OFFICE OF CORPORATION COUNSEL
200 East Washington Street, Room 1601
Indianapolis, Indiana 46204
Telephone: (317) 327-4055
Fax: (317) 327-3968

# EXHIBIT 1

# AFFIDAVIT
## FOR PROBABLE CAUSE

**STATE OF INDIANA, COUNTY OF MARION, SS:**

Detective Charles Benner swears (affirms) that:

On November 19, 2013 at approximately 3:38 pm IMPD 911 dispatch received a call from the address of 801 N. Shortridge Rd, Apartment H11. The caller said that someone had "bashed" his mother's head in. Officer Lewis arrived on scene along with IFD. Officer Lewis said that the victim's head was covered with a blanket when they arrived on scene. The victim, identified as Ruth Rainsberger, was transported to Wishard hospital in critical condition. The caller, identified as William Rainsberger, and his brother, Robert Rainsberger, were transported to Police Headquarters to give a statement. It should be noted that during the initial investigation, both medic and hospital personnel believed that the victim may have sustained a gunshot wound. The fact that the 911 caller said his mother's head was bashed in without actually seeing her head is indicative to the affiant that he may have knowledge of how she sustained the injury.

On December 4, 2013 I took a statement from Firefighter Carl Wooldridge. Wooldridge said he was the first to have contact with the caller who was standing outside of the apartment building when fire arrived on scene. The white male on scene told Wooldridge that someone had "caved his mother's head in." Wooldridge went to the apartment door and noticed it was slightly ajar. The victim was lying on the floor between a chair and a coffee table. Wooldridge said it was immediately apparent to him that the victim was breathing even though she had a blanket covering her head. He said the blanket appeared to cover the entire head and not just one side. The blanket was soaked in blood and was stuck to the victim's head. Wooldridge thought it was strange that the caller said her head was caved in when it was obvious that he had not removed the blanket to check on his mother. Fire and ambulance personnel thought the victim may have been shot and thought it was not normal that there was not any blood spatter on the walls or ceiling. Wooldridge said the apartment seemed to be in orderly condition. The caller was identified as William Rainsberger.

I requested crime lab to the scene and 4439 CSS Lane responded to the scene. A walkthrough of the apartment revealed that there were no signs of forced entry. There were a few drawers in the victim's bedroom that were pulled out halfway with no sign of anyone rifling through the contents. There were a large amount of boxes in a back room that were untouched. There was a lockbox in the back room in plain view that contained savings bonds belonging to the victim. The victim's checkbook, some cash and credit cards were still present inside the apartment. The only blood found on the scene was on the blanket and on the floor where the victim was found.

I swear (affirm), under penalty of perjury as specified by IC 35-44-2-1, that the foregoing representations are true.

_____
AFFIANT

DATED: May 22, 2014

_____
DEPUTY PROSECUTING ATTORNEY
NINETEENTH JUDICIAL CIRCUIT

_____
JUDGE

43

## Affidavit for Probable Cause

**From:** Detective Charles Benner

On November 19, 2013 I conducted an interview of William Rainsberger at Police Headquarters. William said he has been taking care of his mother on a daily basis for the past few years. He pays all of her bills and has power of attorney responsibility over her finances. He said he last saw his mother on Monday night around 6:00 pm. He left her apartment and went to Plainfield to spend the night with his wife. He returned home to 13th Street around 9:00 am on Tuesday morning and just hung out at home all day. He said that around 3:30 pm he went to the Kroger on 10th St and bought an iced tea. He then drove across the street to check on his mother. He said he checked her mailbox and went out to his car before going to her door. He said when he used his key to open the door it appeared that the door was already unlocked. He opened the door and saw his mom lying on the floor with a blanket over her head. He walked around a coffee table and put his tea down on the table. He saw some blood on the floor and on the blanket so he called 911. He said his mom was breathing loudly as if she was snoring. I asked why he didn't take the blanket off to check his mom and he said he thought he would do more damage by touching her. He called 911, left the apartment after closing the door, and went outside to wait for the ambulance. He also said he had walked through the residence to check for anyone inside before he called 911. I asked William about his mother's finances and learned that she has approximately eighty to one hundred thousand dollars in savings and bonds that will be distributed to her three children if she were to die.

On November 19, 2013 I spoke to Robert Rainsberger who said he had not seen his mother for a few days. He recently had his home foreclosed upon and moved in with William this past August. He said he was hanging out at home on Tuesday when William called and told him to get over to his mom's apartment immediately. Robert drove his vehicle to Shortridge and was stopped by police when he arrived. He said his mother was taken away in an ambulance and he waited in a police car until I transported him downtown to give a statement. I drove Robert to headquarters and he did not say one word on the way unless I asked him a question. At no time did Robert or his brother, William, ever ask me how their mom was doing or if they could get to the hospital to see her.

On November 20, 2013 I spoke to Rebecca Rainsberger. She said she usually checks on her mother once a week and had last been to her apartment on Monday, November 18th. I asked her if she was at the apartment at all on Tuesday and she said no. Phone records confirmed that her cell phone was not near Ruth Rainsberger's apartment when the incident occurred.

On 1-13-14 I spoke to Delbert Pickens who delivers meals on a daily basis to Ruth's apartment. Mr. Pickens said he delivers a meal to Ruth Monday through Friday and almost always arrives around 10:30 am. On 11-19-13 Delbert said he arrived at Ruth's address around 10:30 am. He knocked on the door and she did not answer. He called her phone and could hear it ringing inside the apartment. He did not hear any signs that anyone may be inside the apartment so he left.

On November 20, 2013 I attended the autopsy of Ruth Rainsberger which was performed by Dr. Tashjian. He determined that the cause of death was due to multiple blunt force trauma injuries to the head and the

I swear (affirm), under penalty of perjury as specified by IC 35-44-2-1, that the foregoing representations are true.

_____
AFFIANT

DATED: May 22, 2014

_____
DEPUTY PROSECUTING ATTORNEY
NINETEENTH JUDICIAL CIRCUIT

_____
JUDGE

## Affidavit for Probable Cause

**From:** Detective Charles Benner

manner was ruled a Homicide. The wounds were possibly inflicted with a hammer or similar type weapon.

On November 20, 2013 I spoke to William and Robert Rainsberger once again at Police Headquarters. I asked them if they would submit to a polygraph so that I could eliminate them as suspects and they adamantly said no, they would not take a polygraph. All three siblings stormed out and I have not heard from them since.

I have not at any time during this investigation, been asked by any of the victim's children if I have any suspects or any other information in reference to this case.

On November 27, 2013 I received a call from Attorney Brad Keffer, who said he is now representing William Rainsberger. I advised him I would be requesting a limited search warrant for William to obtain a buccal swab and major case prints. I also received a call from Attorney John Christ, who said he is now representing Robert Rainsberger. I made arrangements for William and Robert to come to Police Headquarters on December 4, 2013 so that I could serve the limited search warrants for prints and a DNA buccal swab. Both subjects did show up on December 4, 2013 with their attorneys and I obtained prints and buccal swabs from both.

On November 22, 2013 Detective Tudor and I recovered a video from the Kroger store located at 7101 E 10th St. The video showed William Rainsberger drive onto the Kroger lot on November 19, 2013 at approximately 3:32 pm. Mr. Rainsberger got out of the car and approached a garbage can located near the Red Box video dispenser. Rainsberger appeared to pull out a straight object from his person which he placed in the garbage can. As he placed the item in the trash he appeared to look around for cameras. He then stepped over to the Red Box and punched some buttons. He looked around again before he entered the store. He entered the store and bought an iced tea which he paid for with cash. He appeared to let someone in line use his Kroger plus card but did not use the card for his purchase. William exited the store and looked around several times before returning to his vehicle. He left the lot and drove to his mother's apartment where he found her down and called 911.

I received cell phone records for the Rainsberger family and obtained the following information. On November 19, 2013 at 2:40 pm, Robert Rainsberger received a call from Ruth Rainsberger's landline to his cell of 317-357-5791. This is hours after it is presumed that Ruth Rainsberger received her injuries. This presumption is based upon the fact that a delivery person knocked on her door at 10:30 am and attempted to call her but did not get an answer and also based upon the fact that the blanket contained dried blood which caused the blanket to stick to the victim's head which, in the affiant's experience, would indicate the victim was not recently attacked (prior to the 911 call). Within an hour of this phone call, William Rainsberger is on video across the street at the Kroger. He throws an object away in the

I swear (affirm), under penalty of perjury as specified by IC 35-44-2-1, that the foregoing representations are true.

AFFIANT

DATED: May 22, 2014

DEPUTY PROSECUTING ATTORNEY
NINETEENTH JUDICIAL CIRCUIT

JUDGE

(Page 3)

## Affidavit for Probable Cause

**From:** Detective Charles Benner

trash before entering the store to buy an ice tea. He then goes to his mother's apartment and calls the police. William then stood outside and left his mother unattended until the police arrived.

Cell phone records were obtained for William Rainsberger, including cell tower site locations for the day of November 19, 2013. Those records do not show William Rainsberger outside of the area of Shortridge and 10th St. during the relevant time period.

On 1-13-14 I received the financial records for Ruth Rainsberger, from the Financial Federal Credit Union located at 7101 E 56th St. The records show the following balances existed at the time of Ruth's death. There was a checking account balance of $15,098.90, savings account balance of $4,605.65 and certificate balances of $79,058.15. I recovered a beneficiary form from Ruth's apartment shortly after she was discovered which revealed that William, Robert and Rebecca Rainsberger are the beneficiaries for all of her assets.

All of these events occurred in Marion County, Indiana.

I swear (affirm), under penalty of perjury as specified by IC 35-44-2-1, that the foregoing representations are true.

_____
AFFIANT

DATED: May 22, 2014
_____

_____
DEPUTY PROSECUTING ATTORNEY
NINETEENTH JUDICIAL CIRCUIT

_____
JUDGE

(Page 4)

Case 1:16-cv-00103-TWP-MJD   Document 88-1   Filed 11/28/17   Page 47 of 344 PageID #:
1639
Case 1:16-cv-00103-WTL-MJD   Document 43-2   Filed 01/23/17   Page 1 of 244   PageID 137

# EXHIBIT 2

---

**17**

1   A   It's a revolver.
2   Q   Okay.  And do you still have that gun?
3   A   Yes, ma'am.
4   Q   How long have you had the gun for,
5       approximately?
6   A   Do you mean when did I buy it?
7   Q   Yes, that works.
8   A   Oh, wow.  20 years ago.
9   Q   And do you have a permit for it, or does it just
10      stay inside your house?
11  A   It just stays inside my house.
12  Q   What's the primary purpose of the weapon?
13  A   Personal protection.
14  Q   Personal protection, okay.
15          And are you -- I don't know how to put
16      this -- a gun guy, a gun aficionado, do you
17      enjoy guns?
18  A   No, ma'am.
19  Q   Do you smoke?
20  A   Can you define "smoke"?
21  Q   Cigarettes.
22  A   Occasionally, yeah.  Rarely.
23  Q   Do you smoke any sort of recreational drugs?
24  A   I have, but I do not.
25  Q   How often would you say you've smoked a

**18**

1       recreational drug in the last year, if at all?
2   A   Once or twice.
3   Q   And are we talking about weed?
4   A   We are talking about weed.
5   Q   Okay.  Just wanted to make sure we're on the
6       same page.
7           Now I'm going to ask you a few questions
8       about your family.  Are you married?
9   A   No, ma'am.
10  Q   Were you married in November 2013?
11  A   Yes.
12  Q   And what was your wife's name?
13  A   Mari, M-A-R-I, Bilger, B-I-L-G-E-R.
14  Q   And do you know her date of birth?
15  A   ████████, 1971.
16  Q   And where did she live in November of 2013?
17  A   At her house in Plainfield, Indiana.
18  Q   And can you give me that address, if you recall?
19  A   221 South Vine Street in Plainfield.
20  Q   So you guys were married but each owned separate
21      houses?
22  A   Correct.
23  Q   How much time would you spend at her house,
24      would you estimate, maybe in a week?
25  A   One or two evenings a week, at most.

**19**

1   Q   At her house?  Would she come and stay with you?
2   A   Rarely.
3   Q   And what does she do for a living?
4   A   I'm sorry.
5   Q   You're fine.
6   A   She is -- she works in the computer field.
7   Q   Do you have any children?
8   A   No, ma'am.
9   Q   And do you have any siblings?
10  A   Yes, ma'am.
11  Q   And what are their names?
12  A   My sister's name is Rebecca, same last name.  My
13      brother's name is Robert.
14  Q   Is that all your siblings?
15  A   Yes, ma'am.
16  Q   And who's the oldest, or can you give me oldest
17      to youngest?
18  A   My sister is the oldest, I'm middle, my brother
19      is the youngest.
20  Q   I'm going to talk about Robert for just a
21      second, okay?
22  A   Uh-huh.
23  Q   Do you know Robert's date of birth?
24  A   ████████, 1962.
25  Q   Is Robert married?

**20**

1   A   No.
2   Q   Does he have a girlfriend or significant other,
3       that you know of?
4   A   I do not know.
5   Q   And I know in November of 2013, he was living
6       with you for a little bit; is that correct?
7   A   Correct.
8   Q   Is he still living with you?
9   A   No, ma'am.
10  Q   What's his current address?
11  A   7155 East 21st Street, Apartment 5.
12  Q   And that's in Indianapolis?
13  A   Yes, ma'am.
14  Q   Okay.  And what does Robert do for a living?
15  A   He's a house painter.
16  Q   And what's Robert's cell phone number?
17  A   (317)357-5791.
18  Q   How often do you see Robert?
19  A   Every few weeks.
20  Q   Every few weeks.
21          Would you characterize your relationship as
22      close?
23  A   Yes.
24  Q   And I know we touched on Robert was living with
25      you in November of 2013.  And why was he living



---

**21**

1    with you?
2  A  His house had been foreclosed on.  He was in a
3    financial muddle.
4  Q  Okay.
5  A  So...
6  Q  And when did he start living with you?
7  A  The summer of 2013, I think.
8  Q  Okay.  So he had been with you for three, four
9    months, something like that --
10  A  Yeah, I can't remember exactly.
11  Q  -- at the time of the -- and then Rebecca, do
12    you know her date of birth?
13  A  ~~████████~~, 1951.
14  Q  And is Rebecca married?
15  A  Yes.
16  Q  What's her husband's name?
17  A  Larry Ferguson.
18  Q  Do they have any kids?
19  A  You mean between them?
20  Q  Yes.
21  A  No.
22  Q  Do they have kids separately?
23  A  My sister has a daughter.
24  Q  A daughter?  And how old is her daughter?
25  A  Mid-40s.

**22**

1  Q  Mid-40s, okay.  So that's your niece; correct?
2  A  Correct.
3  Q  And what's her name?
4  A  Amber Hulse, H-U-L-S-E.
5  Q  And does she live in Indianapolis?
6  A  Amber lives in the county seat of Hendricks
7    County.  Danville.
8  Q  How often do you see Amber?
9  A  Once a month.
10  Q  Does Rebecca live with Larry?
11  A  Yes.
12  Q  And where do they live at?
13  A  They live in Greenville, South Carolina.
14  Q  Okay.  Now, she lived in Indianapolis in
15    November of 2013; correct?
16  A  Yes, ma'am.
17  Q  And what was her address?
18  A  In November of 2013?
19  Q  Correct.
20  A  12957 Tarkington Common, Carmel.
21  Q  What does Rebecca do for a living?
22  A  Rebecca is retired.
23  Q  Retired now.  What did she do before she
24    retired?
25  A  She was a CPA.

**23**

1  Q  How often do you see Rebecca?  I know she lives
2    far away.
3  A  Once a year.
4  Q  Once a year.  Did you see her more frequently
5    when she lived in Carmel?
6  A  Yes.
7  Q  How often did you see her?
8  A  Once -- once a month.
9  Q  Once a month.  Do you recall the last time you
10    saw her before the incident on the 19th,
11    November 19th?
12  A  No, not -- not with any accuracy.
13  Q  And what is your father's name?
14  A  His name was Ralph, R-A-L-P-H, Rainsberger.
15  Q  And he passed away?
16  A  Yes.
17  Q  I'm sorry about that.  When did he pass away?
18    Has it been a while?
19  A  '83?
20  Q  Were he and your mom married at that time --
21  A  No.
22  Q  -- when he passed away?
23  A  No.
24  Q  And did he live in Indianapolis at that time?
25  A  No.

**24**

1  Q  Did you have much of a relationship after he and
2    your mom got divorced?
3  A  No.
4  Q  And your mother's name was Ruth Rainsberger;
5    correct?
6  A  Yes, ma'am.
7  Q  And she was attacked and killed on
8    November 19, 2013?
9  A  She was attacked on November 19th.
10  Q  And she died the next day; is that correct?
11  A  Yes.
12  Q  I'm going to talk about your mom a little bit,
13    and I'm sorry for your loss.  I know this is --
14  A  That's okay.
15  Q  I'm sure it's tough to talk about; if you ever
16    need a break just let me know, okay?
17      Do you know your mom's date of birth?
18  A  ~~████████~~ 1925.
19  Q  And how old was she when she died?
20  A  8- -- 88.
21  Q  And where did she live?
22  A  801 North Shortridge, Apartment H-11,
23    Indianapolis.
24  Q  And that's an apartment complex?
25  A  Yes.  It's called Jeffersonian.



25

1  Q  And can you describe her apartment for me,
2     briefly?
3  A  She had a two-bedroom, one-bath apartment that
4     was in the -- like, half in the basement.  Very
5     generic apartment.
6  Q  And did she live there by herself?
7  A  Yes, ma'am.
8  Q  How long had she lived there for?
9  A  At the time she passed away, it had been almost
10    two years.
11 Q  Did she have a cell phone at that time?
12 A  Think of an answer that works correctly.  She
13    had a cell phone but never used it and did not
14    know how to operate it.
15 Q  I understand that.  Did she have a land line?
16 A  Yes, ma'am.
17 Q  And what was that number?
18 A  I don't remember.  It's in the --
19 Q  It's in the records?
20 A  Yeah.
21 Q  I'll find it real quick.
22 A  375-7841.
23 Q  7841?  375-7841?
24 A  Yes.
25 Q  What was your mom's physical condition like at

26

1     the time of her death?  Was she mobile, could
2     she walk?
3  A  Yes.
4  Q  Did she need any assistance from a walker or a
5     wheelchair or anything like that?
6  A  No.
7  Q  Was she able to care for herself?
8  A  No.
9  Q  No, okay.  Could she bathe herself?
10 A  I don't mean to be this -- this guy.
11 Q  You're fine.
12 A  She was -- she would have been physically strong
13    enough and adept enough to bathe herself, but
14    her dementia prevented her from performing
15    routine tasks.
16 Q  Describe her dementia for me a little bit.
17    Would you characterize it as severe or bad?
18 A  No.
19 Q  No, okay.  How often in a day would she forget
20    something, or what were -- let me back up.
21    What were her symptoms?
22 A  She -- there was a couple things.  One was
23    forgetfulness and the other is loss of executive
24    function.
25 Q  What do you mean by that?

27

1  A  She was not able to perform tasks that required
2     more than one or two steps.
3  Q  Okay.
4  A  So, for example, to make toast would be -- it's
5     kind of haphazard.
6  Q  Okay.
7  A  She had Lewy body dementia, the same thing Robin
8     Williams had.
9  Q  Oh, okay.
10 A  She was under treatment for that.
11 Q  Were you her primary caregiver at the time?
12 A  Yes.
13 Q  Who else helped with taking care of your mom?
14 A  My sister.
15 Q  What would you do for your mom, general tasks?
16 A  I went to the store, did her dishes, and put
17    things away.  The main thing I did was just to
18    be a companion.
19 Q  And what would Rebecca do for your mom?
20 A  Mainly laundry.
21 Q  How often --
22 A  She would -- she would also -- I'm sorry, I'm
23    not really here or there.  She would also bathe
24    her.
25 Q  And how often would you see her?

28

1  A  My mother?
2  Q  Yes, your mother, sorry.
3  A  Every day.
4  Q  How often would Rebecca see her?
5  A  Once a week.
6  Q  And did your mom have food delivered to her?
7  A  Yes, ma'am.
8  Q  And how often did those food deliveries come?
9  A  Monday through Friday.
10 Q  Did they come at the same time every day?
11 A  Approximately, yes.
12 Q  Approximately.  And what time was that?
13 A  10:30 or 11:00.
14 Q  Do you know if it was the same individual who
15    dropped the food off each day?
16 A  Yes.
17 Q  Did your mom understand that she was having food
18    delivered --
19 A  Yes.
20 Q  -- pretty much every day around 10:30?
21 A  Yes.
22 Q  So she would have been expecting a delivery?
23 A  Yes.
24 Q  How often would your mom get out of the house?
25 A  Rarely.



Case 1:16-cv-00103-TWP-MJD   Document 88-1   Filed 01/23/17   Page 51 of 344 PageID #:
1643
William Rainsberger
September 27, 2016

29 to 32

**29**

1  Q   Would she ever go out by herself?
2  A   No.
3  Q   And I believe you talked a little bit about, in
4       your statement, that she was either skeptical --
5       or I think "leery" was the word you used -- of
6       people at her door.  Is that correct?
7  A   Yes.  She was kind of skeptical of everyone, but
8       she would answer the door sometimes, against my
9       urging.
10 Q   And do you know specific times that she would
11      answer the door for people she didn't know?
12 A   The only time that I know that she did that she
13      told me about was when the two guys that lived
14      upstairs, who we referred to this morning --
15 Q   Right.
16 A   -- their names escape me --
17 Q   I don't know off the top of my head.
18 A   -- when they moved -- when they moved in, they
19      came down and introduced themselves, which my
20      mother thought was kind of funny or odd, but...
21 Q   But would you say it would be rare for her to
22      open the door for a stranger?
23 A   I don't have enough data points to know because
24      she didn't really tell me, and people didn't
25      generally knock on her door except the food guy.

**30**

1  Q   Do you remember making statements to Detective
2       Benner about how you thought it would be
3       unlikely that she would answer the door for a
4       stranger?
5  A   Yes.
6  Q   And with your mom's dementia issues, was she
7       able to handle her own finances?
8  A   No.
9  Q   Did you handle those for her?
10 A   Yes.
11 Q   What did you do, generally, for her financially?
12 A   The utilities were in my name and, of course, I
13      paid for groceries when I went to the grocery,
14      so I paid her bills, prepared checks for her to
15      sign.
16 Q   So she was able to still sign her checks,
17      though?
18 A   Yes.
19 Q   And did she reimburse you for the groceries that
20      you bought for her?
21 A   Yes.
22 Q   Did your mom have any other illnesses besides
23      her dementia?
24 A   I believe the only other medical condition she
25      had was scoliosis.

**31**

1  Q   Did she have to take medication for her
2       scoliosis?
3  A   No.
4  Q   What, if any, side effects would she have from
5       her scoliosis?
6  A   It was difficult for her to walk and get around.
7  Q   And what medication or medications was your mom
8       on for her dementia?
9  A   Aricept, A-R-I-C-E-P-T.
10 Q   Do you know what dosage?
11 A   No.
12 Q   Okay.
13 A   And that's for hallucinations.
14 Q   It's for hallucinations?
15 A   Aricept is for hallucinations.
16 Q   And the hallucinations were a side effect of her
17      dementia, to your understanding?
18 A   Correct, correct.
19 Q   And did you fill her prescriptions for her?
20 A   Yes.
21 Q   Aricept, what was the packaging?  What did it
22      look like?
23 A   Just a pill bottle.
24 Q   Just a pill bottle?
25 A   Uh-huh.

**32**

1  Q   Did your mom have any hospitalizations close to
2       the time of her death?
3  A   No.
4  Q   Would you also make sure that she took her
5       medication daily?
6  A   Yes.
7  Q   Did Robert help much with caring for your mom?
8  A   No.
9  Q   And why was that?
10 A   I took it on because he worked, and I was
11      retired, and I enjoyed doing it, so I didn't
12      think anything of it.
13 Q   Was Robert still pretty close with your mom?
14 A   Oh, yeah.
15 Q   How often would he see her?
16 A   Every few months.
17 Q   Every few months.
18      Do you know when the last time Robert saw
19      your mom before this incident was?
20 A   I do not.
21 Q   Did you have a key to your mom's apartment?
22 A   Yes, ma'am.
23 Q   Who else had keys to the apartment?
24 A   My brother and my sister.  And my mother, of
25      course.



---

33

1  Q   What was your mother's source of income in
2      November of 2013?
3  A   She had the savings that were mentioned in the
4      affidavit; she had a pension; and she had social
5      security.
6  Q   About how much did she have in savings?
7  A   Just under $100,000.  That's savings and CDs and
8      a checking and money market, whatever.
9  Q   Gotcha.  And do you know how much she got for
10     her pension?
11 A   1100 something, maybe 1200.
12 Q   Do you know how much she got for social
13     security?
14 A   Very little, probably 150 or 200 due to the
15     civil service offset.
16 Q   Is that the pension offset that you're referring
17     to?
18 A   Yes.  If you have a civil service pension, they
19     subtract from your social security.
20 Q   And you managed all her finances; correct?
21 A   I did not do her taxes, but I did everything
22     else.
23 Q   And did you have a power of attorney for her?
24 A   Yes, ma'am.
25 Q   What did that power of attorney cover?

---

34

1  A   I don't recall offhand, it was just the routine.
2  Q   Did it encompass medical decisions?
3  A   There was a medical power of attorney.
4  Q   Okay.  But that's something different than --
5  A   It was two different documents, yeah.
6  Q   And who had the medical power of attorney?
7  A   I think myself and my sister.  I do not recall
8      clearly, so don't --
9  Q   Did your mom own any property in November of
10     2013?
11 A   No, ma'am.
12 Q   Did she own a vehicle?
13 A   No.
14 Q   Did she have any debt that you were aware of?
15 A   No.
16 Q   Any other assets that we haven't spoken about?
17 A   I'm trying to think.  She had very little in the
18     way of earthly possessions that were of any
19     value.  No.
20 Q   How much was the apartment complex a month,
21     where she was living?
22 A   650, 680?
23 Q   Did she have any other bills at that time?
24     Obviously groceries, but --
25 A   She had groceries, utilities, that's it.

---

35

1  Q   About, altogether, how much do you think she
2      spent a month?
3  A   Maybe 1100.
4  Q   1100.  So her pension and social security pretty
5      much covered all her expenses for a month?
6  A   Uh-huh, correct.
7  Q   Given your mom's medical condition, was there
8      any discussion about putting her in a nursing
9      home?
10 A   Yes.
11 Q   And when did this discussion occur prior to
12     November of 2013, how long before?
13 A   I think it was the summer of 2013 that the kids
14     discussed it, and my sister was very much
15     wanting to find a place for her.
16 Q   And what was the reason that you ended up not
17     putting her in a nursing home at that time?
18 A   We were waiting for an opening so she would
19     have -- you didn't ask this, but she would have
20     been in a nursing home probably by February of
21     2014 -- I'm sorry, not nursing home, assisted
22     living.
23 Q   Assisted living, okay.  So is there, like, a
24     long waiting list for assisted living places or
25     only certain places?

---

36

1  A   The -- I hate to elaborate too much, but the
2      place that -- we wanted to get her in a place
3      that had a continuum of care and that would take
4      Medicaid once her money ran out, and there is a
5      waiting list for such places, yes, especially
6      Medicaid assisted living, which is very rare.
7  Q   Would Medicaid pay the full cost of her nursing
8      home once her assets ran out?
9  A   Correct.  It would make up the difference, I
10     should say.
11 Q   And about how much -- a nursing home that's not
12     one of these ones that would accept Medicaid,
13     about how much would that cost a month?
14 A   Nursing home or assisted living?
15 Q   Assisted living, excuse me.
16 A   We looked at Crestwood Village, and it was
17     between 2500 and 3,000.
18 Q   Wow.  So quite a bit more expensive than her
19     current expenses --
20 A   Correct.
21 Q   -- in the apartment?
22 A   Correct.
23 Q   So you decided financially it made more sense
24     for you to just keep taking care of her and
25     Rebecca helping out until there was a spot open

---

---

37

1    at a Medicaid assisted living facility?
2  A  Correct, because there was a spot coming open,
3    so she would have slid in before too long.
4  Q  **So you guys were aware that there was a spot**
5    **opening up soon?**
6  A  Yes.  And there was a specific place by Fort
7    Harrison, the name of which I can't recall, that
8    she would have gone into.
9  Q  **GreenTree?**
10 A  No.  It was some real pompous-sounding name I
11   can't remember.  It's a brand-new place almost.
12 Q  **So 2500.  How much would the Medicaid facility**
13   **that she was on the waiting list for cost a**
14   **month?**
15 A  3,000.
16 Q  **3,000.**
17 A  Thereabouts.
18 Q  **So still expensive.**
19 A  Very.
20 Q  **So that would run through her savings pretty**
21   **quickly.**
22 A  Yes.  Within -- I can't remember how long, it's
23   a few years that it would burn through her
24   savings.  And then she would transfer to
25   Medicaid.

---

38

1  Q  **Did your mom have a will?**
2  A  Yes.
3  Q  **And who were the beneficiaries of that will?**
4  A  There were four beneficiaries: the three
5    siblings, and her sister, my Aunt Blanche, not
6    in equal parts.
7  Q  **And that was my next question, what are the --**
8    **what's the divide?**
9  A  Of the assets of my mother's estate that were
10   not awarded via beneficiaries, named
11   beneficiaries, my aunt would get 10 percent or
12   10,000, whichever was less, and the three
13   children would divide the rest per stirpes.
14 Q  **Stirpes?**
15 A  Stirpes.  Is that it?  I don't know, stripes?
16 Q  **It's been a while since my family law clinic,**
17   **trust -- trusts and estates class.**
18   **Okay, so a third, a third, a third for you**
19   **and your siblings?**
20 A  Correct, roughly.
21 Q  **Roughly.  After this incident, did you make a**
22   **claim on your mom's assets?**
23 A  I don't know what you mean by "claim."
24 Q  **Did you make a claim to have her assets**
25   **distributed per the will?**

---

39

1  A  I was the administrator.  I met with her
2    attorney and followed his instructions as far as
3    getting her assets identified and start, over
4    time, distributing what was supposed to be
5    distributed, et cetera.  I administered the will
6    in accordance with her wishes.
7  Q  **When was the last time you saw your mom prior to**
8    **this incident?**
9  A  November 18th, in the evening.
10 Q  **That was the day before; correct?**
11 A  Correct.
12 Q  **And about what time was that?**
13 A  Around 6:00.
14 Q  **And why did you go over there?**
15 A  I went over there every evening to fix her
16   something to eat and to spend time talking with
17   her.  Get her ma-- get her her mail,
18   et cetera.
19 Q  **The general duties of taking care of her.**
20 A  Correct.
21 Q  **How long did you stay?**
22 A  I can't speak with any certainty.  Probably half
23   an hour.
24 Q  **And what was your mom doing when you left?**
25 A  Watching TV.

---

40

1  Q  **What was her condition?**
2  A  I'm not sure I understand.
3  Q  **How was she mentally?**
4    **Let me rephrase.  Anything out of the**
5    **ordinary?**
6  A  Nope.  Just watching TV.  That's what she did.
7  Q  **And when you left, did you lock the door?**
8  A  Yes.
9  Q  **So you didn't see her again in person until the**
10   **incident.**
11   **Did you speak to her at all later the**
12   **evening of the 18th or the morning of the**
13   **19th?**
14 A  I don't believe so.
15 Q  **Where did you go after you left your mom's**
16   **house?**
17 A  I went to Plainfield to see my wife.
18 Q  **Do you know what time you got to Plainfield?**
19 A  I want to say it was 7:15 or 7:30.  Poker starts
20   at 7:00; I was too late for poker.
21 Q  **Where do you play poker at?**
22 A  There's a bar in Plainfield that has a free
23   poker game.
24 Q  **Okay, cool.  Did you take your wife to poker**
25   **with you -- or you didn't get to play, but to**

---



41

1    the bar with you?
2  A   My -- my wife was already at poker.
3  Q   Okay.
4  A   So actually didn't -- I don't think I went over
5      there because I was too late, so I just stayed
6      at her house.
7  Q   So you don't think you actually went to the bar?
8  A   I don't believe so.
9  Q   Okay.  So you just went to your wife's house,
10     then?
11 A   Correct.
12 Q   And you think you got there about 7:15 or 7:30?
13 A   I believe so, yes.
14 Q   Did your wife come home soon after?
15 A   She came home after poker, which would have
16     been, I don't know, 9:30 or 10:00.
17 Q   Were you still awake?
18 A   Yes.
19 Q   What else did you do that evening?
20 A   Not a lot.  I mean -- do you mean at my wife's
21     house?
22 Q   Yes.
23 A   Watched TV.
24 Q   Anything stand out?
25 A   No.

42

1  Q   What time did you go to bed?
2  A   11:00, maybe.  I don't know.  I'm going to say I
3      don't know.
4  Q   Do you know what time you woke up the next
5      morning?
6  A   No.
7  Q   No?  Do you have a typical time you wake up at?
8  A   Not really, no.
9  Q   It just varies?
10 A   Yeah.
11 Q   And what time did you leave Plainfield that
12     morning?  The morning of the 19th, excuse me.
13 A   I think it was 8:00-something.
14 Q   Was your wife with you in the morning?
15 A   Briefly.
16 Q   Briefly.  Okay.  What time did she leave?
17 A   Earlier than I did.
18 Q   Okay.
19 A   7:15.
20 Q   And where did you go when you left Plainfield?
21 A   I headed back home, but I stopped at, I think,
22     two Kmarts on the way.
23 Q   Just running errands?
24 A   I was looking for rabbit ears.
25 Q   Like for a TV?

43

1  A   Yes.
2  Q   Did you make any other stops on the way home?
3  A   I don't know if I did or not.  I know I got -- I
4      got gas, whenever I got gas, I don't know if I
5      went home first or not, I can't remember.
6  Q   Do you recall what time you got gas at?
7  A   Not off the top of my head.
8  Q   What time do you think you got home at?
9  A   9:30, 10:00.
10 Q   Was Robert there when you got home?
11 A   Yes, ma'am.
12 Q   And what was he doing?
13 A   Goofing around on the Internet, I believe.
14 Q   Okay.
15     (Exhibit 14 was marked for identification.)
16 Q   Bill, I'm going to show you what's been marked
17     as Exhibit 14.  I'm going to represent to you
18     that that's a receipt from when you got gas at
19     Kroger.
20 A   Okay.
21 Q   Does that look to be an accurate copy of the
22     receipt?
23 A   I guess so.
24 Q   Any reason to dispute that it would be the
25     receipt from when you got gas that morning?

44

1  A   No.
2  Q   Up in the right-hand corner, not the very top
3      but the basically third line down, there's a
4      date and a time.  Can you please read that for
5      me?
6  A   11/19/13 09:20.  9:20.
7  Q   Do you think that means that you got gas on the
8      19th at 9:20 a.m.?
9  A   I don't know if I did or not, but it sure looks
10     like I did, yes.
11 Q   And then it looks like, down in the left-hand
12     column, that the total amount for the gas was
13     $48.16.  Do you see that?
14 A   Yes.
15 Q   And then one more thing I wanted to look at, on
16     the right-hand column where it says "Summary
17     Journal," about the third line down, it says
18     "Kroger Plus Customer."  Did you have a Kroger
19     Plus card at this time?
20 A   Yes, ma'am.
21 Q   And do you know your Kroger Plus number off the
22     top of your head?
23 A   No, I don't.
24 Q   Any reason to dispute that those are the last
25     four numbers of your Kroger Plus card, the 9558?



49

1  Q   And did you go straight to your mom's house?
2  A   No, I went to Kroger.
3  Q   The same Kroger we've already talked about?
4  A   Of course.
5  Q   And what did you do at Kroger?
6  A   I bought an iced tea because it was on sale and
7      I wanted one.
8  Q   Seems like a good reason.
9          Do you remember about how much that iced
10     tea cost?
11 A   About a dollar.
12 Q   A dollar, okay.
13         (Exhibit 15 was marked for identification.)
14 Q   I'm showing you Exhibit 15, which I'm going to
15     represent to you is a receipt for the iced tea
16     you purchased --
17 A   Oh.
18 Q   -- on 11-19-2013.
19 A   Okay.
20 Q   And do you see under "Total Number of Items
21     Sold," there's a date and a time there?
22 A   Yes.
23 Q   And can you read that off for me, please?
24 A   11-19-13 at 3:31 p.m.
25 Q   Okay.

50

1          (Exhibit 16 was marked for identification.)
2  Q   Now I'm showing you what has been marked as
3      Exhibit 16, and I'm going to represent to you
4      that these are your Kroger Plus card records,
5      the records for the Kroger Plus card ending in
6      9558.  Do you have any reason to dispute that?
7          MR. WAPLES:  Do you have a copy?
8          MS. BOX:  Yes.  Sorry, gave it to Lynne
9      instead.
10         MR. WAPLES:  And this is 15?
11         MS. BOX:  This is 16.
12         MR. WAPLES:  This is 16?
13         MS. BOX:  Yes.
14 A   Not without analyzing it for some weirdness,
15     but, no, I don't see anything unusual about it.
16 BY MS. BOX:
17 Q   The fifth line down, there's a record that says
18     "Spirit Terminal 11-19-2013" at 9:20 a.m., it
19     looks like, for 48.16.
20 A   Yes.
21 Q   And would that match up with the receipt for the
22     gas that we talked about earlier in Exhibit 13?
23 A   It sure looks like it.
24 Q   Now, I also see a record for 11-19, it's just
25     one up from that, four down, and it looks like

51

1      it's at 3:32, but it's for $14.10.  Do you see
2      that?
3  A   Uh-huh, yes, I do.
4  Q   But that would not be the Kroger Plus card for
5      your tea, correct, because your tea only cost
6      $0.99?
7  A   Correct.
8  Q   Did you use your Kroger Plus card when you
9      purchased your tea?
10 A   No.
11 Q   So did you make this $14.10 purchase?
12 A   No.
13 Q   Did you let someone else use your Kroger Plus
14     card?
15 A   Yes, to get their points.
16 Q   Why would you let someone else use your Kroger
17     Plus card but then not use it for your own
18     transaction?
19 A   I don't think it works unless your pretax total
20     is a dollar or more, so I didn't even bother.
21 Q   And that's something you know for sure?
22 A   No.  It's something I believe, but I don't know
23     for sure.  That was my experience, so I thought,
24     well, whatever.
25 Q   And you told me earlier that the iced tea was on

52

1      sale; is that correct?
2  A   I think it was.
3  Q   Would you have had to use your Kroger Plus card
4      to get that discounted price?
5  A   I don't remember.  I don't believe so.
6  Q   Okay.
7  A   And that may not actually -- I hate to ramble --
8      that may not be the sale price, it may have gone
9      off sale, because 99 cents is the normal price,
10     I believe, for Arizona tea, so I may have
11     thought I was going to save a dime that day and
12     I didn't.
13 Q   Didn't break the bank, though, did it?
14 A   Close.
15 Q   You bought a tea at Kroger, and did you go to
16     your mom's house after that?
17 A   Yes, ma'am.
18 Q   Did you have any reason for going over to your
19     mom's house that day other than just to cook her
20     dinner, your daily general tasks that you do
21     with her?
22 A   The general checking in to make sure she had
23     something that she wanted to eat, that she would
24     eat.
25 Q   Do you recall what time you got to your mom's

---

53

1 house?
2 A Well, it was right after that, so 3:30, 3:35,
3 somewhere in there.
4 Q Because, again, the Kroger is very close to your
5 mom's house; right?
6 A Correct. It's one minute, two minutes.
7 Q What was the first thing you did when you got to
8 your mom's apartment?
9 A I got out of the car, and I went up to the door,
10 and she had something, there was something
11 hanging on her door, and I can't remember if it
12 was a sales flyer or something about her lease
13 renewal. It was something -- it might have been
14 the lease renewal, I honestly can't remember,
15 but there was a -- some kind of paper.
16 Q Okay. So did you collect that or take it off
17 the door handle?
18 A I took it off the door handle.
19 Q Okay. And then what did you do?
20 A I went -- I believe I went back to my car and I
21 was going to put it in my car.
22 Q Did you put it in your car?
23 A No. I believe I decided to show it to my mother
24 to try to engage her mentally, which was kind of
25 an ongoing thing.

---

54

1 Q After you went back to your car, what did you
2 do?
3 A Oh, I went back to my mother's apartment.
4 Q Okay.
5 A Well, I went back in the building.
6 Q Went back in the building.
7 A So I parked right outside the building, went
8 back in the building.
9 Q And did you enter your mother's apartment at
10 that time?
11 A Yes.
12 Q When you went to open the door, did you use your
13 key?
14 A I used my key on -- you can use the key on
15 deadbolt and doorknob. I used my key, yes,
16 sorry.
17 Q Is it the same key for the deadbolt and the
18 doorknob?
19 A I don't remember.
20 Q Is there an outside door to the apartment
21 complex that needed a key?
22 A No.
23 Q And when you went to unlock the door, did it
24 feel like the door had been locked?
25 A The door was unlocked.

---

55

1 Q Okay.
2 A There was no resistance when I turned the key on
3 the deadbolt.
4 Q Did you notice any damage to either the door
5 frame or the door right around where the lock
6 would be?
7 A No.
8 Q What was the first thing you saw when you got
9 inside?
10 A I saw my mother laying on the living room floor.
11 Q I know this is kind of tough, but can you
12 describe the scene for me, please?
13 A As you walk into my mother's apartment, you step
14 into the living room. There is a chair, a TV,
15 coffee table, and she was laying sort of next to
16 the chair, on her stomach.
17 Q On her stomach. What part of her body was
18 facing you? Was it her legs, her head, her
19 side?
20 A Oh, her -- she -- her feet were towards the
21 door.
22 Q Her feet were towards the door, okay.
23 And what else did you notice?
24 A Do you mean right then?
25 Q Yes.

---

56

1 A Nothing else. I didn't notice anything else
2 except my mother laying there.
3 Q And how did your mother appear?
4 A She -- well, I mean, she simply appeared like
5 she was laying on the floor with a blanket
6 covering much of her shoulders and head, the
7 blanket she always had with her and always had
8 over her. And you said "appear," but her -- her
9 breathing was very forced, so that's more of a
10 sound than an appear thing.
11 Q Did you hear anything else?
12 A No.
13 Q Smell anything?
14 A No.
15 Q What were your initial thoughts right then, when
16 you saw your mom on the floor with the blanket
17 covering her head?
18 A I thought she'd had a heart attack or a stroke.
19 Q What did you do?
20 A This is a little hazy because I was in shock,
21 but I -- I reached out and kneeled down and
22 grabbed her leg and yelled, "Mom, Mom."
23 Q And did she respond to you in any way?
24 A Her breathing changed a little, and she moved
25 her head a little, but she did not -- well, of

---



**57**

1course, in hindsight, she was not able to
2communicate, did not say anything. She moved --
3she was laying -- well, it doesn't translate.
4She was laying on her stomach but with her head
5on -- somewhat on its left side, and she moved
6slightly and moved her arm slightly, and then
7stopped moving after that.
8 **Q Okay. You said her breathing changed, and she**
9 **moved a little bit. Do you think that she**
10 **recognized that someone was there?**
11 A I don't know.
12 **Q Okay.**
13 A I -- I -- I don't know.
14 **Q Do you think she could have been responding to**
15 **your touch?**
16 A My sense was, without knowing for sure, is that
17she responded either to my voice or to my touch,
18because mine is the voice she's most familiar
19with. It could have been unrelated.
20 **Q Right. Okay. When she didn't really respond to**
21 **you, what did you do next?**
22 A Well, I was kind of freaking out, and I went
23around to see what -- to look at her condition,
24and I got down on my knees and was trying to
25understand this scene of having all this blood.

**58**

1She had these -- this blanket thing, it's about
2four-by-four, kind of a shawl or a small
3blanket, I guess, over her head, so I reached
4down, and I was trying -- I examined the --
5the -- there was a -- a circle of -- a large
6circle of blood stuck to her head, and I reached
7down, and I looked very closely to examine that,
8and there was -- because that was on the top of
9her head. And then on the floor, as it -- as it
10had oozed out, I guess, there was a -- not huge,
11but shockingly large pool of blood that had
12congealed.
13 **Q Okay.**
14 A And I examined -- I did not try to remove the
15blanket. I did kind of barely touch where it
16had scabbed on. And I touched the congealed
17blood just barely to see what -- at that time I
18didn't know if she had -- I was still operating
19under the assumption that she had fallen and hit
20her head on the coffee table corner or
21something, but it was -- in looking at it and
22getting down and looking closely, it was such a
23enormous amount of dried blood on the top of her
24head that I thought, Well, this, you know,
25there's no blood on the coffee table. So I

**59**

1just -- I froze, I think, for a few seconds and
2then called out again, and it was, like, just in
3shock, and then I called 911.
4 **Q And so when you -- you said you were on your**
5 **knees; is that correct?**
6 A Yeah. When I was trying to -- I was trying to
7figure out what was going on with all the blood.
8 **Q You got down --**
9 A Yeah.
10 **Q You got down on your knees, okay.**
11 **And where are you with respect to her body?**
12 **Are you up by her head, on either one of her**
13 **sides?**
14 A I'm up -- I'm up -- it's hard to explain without
15a diagram, but I'm up by her head. Up -- as
16you're walking in the apartment, you come to my
17mother, and her feet are by the door, her head
18is angled away from the door, about a 45-degree
19angle, I am at her head, so I could see the top
20of her head and see the blood. Not -- I wasn't
21beside her, I was at the top of her head,
22because that's where -- I was just in shock and
23trying to figure out what on earth was
24happening.
25 **Q And you didn't remove the blanket; that's**

**60**

1**correct?**
2 A Correct.
3 **Q And why didn't you remove the blanket?**
4 A It had -- there was a circle of blood the size
5of a softball at least which had congealed on
6the outer ring of it. The outer inch or so
7was -- was almost completely dry, and the blood
8on the floor had congealed, it was the
9consistency of pudding, more or less, it
10wasn't -- you know, and there was probably half
11a cup or a cup of blood in this pool on the
12floor, but there was no fresh blood. There was
13just this darker colored blood.
14And my sense was that it was stuck to her
15head and that it made more sense to leave it
16stuck to her head than to pry it off, because
17whatever made that much blood come out must be
18pretty serious, and it appeared she had stopped
19bleeding, so I just left well enough alone.
20 **Q So you were under the understanding that -- or**
21 **you thought that it had stopped bleeding at that**
22 **point?**
23 A It may -- it -- it appeared that the blood that
24was there, the blood that was -- made up the
25round part stuck to the top of her head, and the

Case 1:16-cv-00103-TWP-MJD    Document 48-1    Filed 11/28/17    Page 58 of 344 PageID #: 1650
Case 1:16-cv-00103-WTL-MJD    Document 49-1    Filed 11/13/17    Page 158 of 244 PageID #: 148

William Rainsberger
September 27, 2016

61 to 64

61

1  blood that had formed a small pool on the floor,
2  on the blanket on the floor, it all appeared
3  like that bleeding had taken place, I don't
4  know, well before I had gotten there, and that
5  it was -- the blood on the top of her head had
6  started drying and did not appear to be "wet"
7  wet, so I didn't think she was bleeding.
8      I thought it was -- it's a banal
9  comparison, but when you -- if I nick myself
10 shaving and put a piece of toilet paper on there
11 and wet it and then it dries, that's what it
12 looked like to me, and I was not going to pull
13 that off. I thought it would be stupid to pull
14 it off, so that's why I didn't.
15 **Q  You weren't curious to know what actually**
16 **happened to your mom or to figure out the extent**
17 **of her injuries?**
18 A  My -- I was curious, of course, but I was more
19 interested that my mom receive proper medical
20 care, and knowing that there was a fire station
21 half a mile away, I didn't think that it would
22 take that long, that I could potentially do more
23 damage. There's nothing I could have done for
24 her because she was not bleeding anymore.
25 **Q  Do you know for sure she wasn't bleeding**

62

1  anymore?
2  A  I do not know for sure. It did not appear that
3  there was bright red blood on the blanket, on
4  the floor, on my mother, anywhere.
5  **Q  And if she had been bleeding, you could have put**
6  **pressure on the wound to help with that?**
7  A  Yes. If the -- if it had appeared that the --
8  if the blood on the blanket was wet and red,
9  that would, to me, indicate that she was
10 bleeding, and at that point I would get -- use
11 the blanket or get a towel and put pressure on
12 it.
13     But I was afraid that by putting pressure
14 on it, I might break the bond between the
15 blanket and her head and start the bleeding
16 again, so I chose to defer to the ambulance or
17 fire for their help.
18 **Q  Didn't the 911 operator instruct you to put a**
19 **cloth on your mom's head, hold a cloth to her**
20 **head?**
21 A  There were -- I don't remember precisely what
22 they said, but when they said put a cloth to her
23 head, I thought that was absolutely idiotic
24 because she wasn't breathing. I know what a
25 pressure bandage is, but she wasn't bleeding, or

63

1  did not appear to be bleeding, and I didn't want
2  to screw up what was already there. Idea behind
3  a pressure bandage is you put it on there till
4  the bleeding stops through the force of
5  compression, and it didn't look like there was
6  any -- it looked like she had stopped bleeding
7  quite awhile before that, so I thought that was
8  among various unhelpful things 911 said.
9  **Q  And you don't have any medical training?**
10 A  I took a first aid course at some point, but,
11 no, I do not.
12 **Q  Any, like, first-responder EMT-type training?**
13 A  Nope, nothing.
14 **Q  And you testified that it was your opinion that**
15 **you should defer to the fire department.**
16 A  When I saw my mother in the condition she was
17 in, with the loss of blood but nonactive
18 bleeding, getting fire or medical or somebody
19 there as quickly as possible seemed like the
20 most logical thing to do, so that's what I did.
21 **Q  Well, if you're deferring to medical, and people**
22 **with medical training and experience are telling**
23 **you to put a cloth on your mom's head, why**
24 **wouldn't you follow their instructions?**
25     MR. WAPLES: Objection. States facts not

64

1  in evidence, and it's been asked and answered.
2  **Q  You can answer.**
3  A  They -- they did not understand the scene at all
4  and that putting a cloth on a scab is kind of
5  silly.
6  **Q  Okay.**
7  A  They did not even understand the scene. They
8  didn't ask me if she was actively bleeding, they
9  didn't know anything, really, what was going on.
10 So their advice is just a stock advice, which
11 didn't make any sense given the circumstances.
12 **Q  Do you believe that you fully understood the**
13 **scene?**
14 A  As well as -- as well as a layperson can. I
15 don't know what you mean by the question.
16 **Q  Couldn't you have understood the scene more by**
17 **removing the blanket, being able to give the 911**
18 **responder a description of her injuries?**
19 A  Based on the amount of blood, I felt that the
20 injuries must be quite severe and that removing
21 the blanket would be -- it's been brought up a
22 number of times. I still think that is the most
23 idiotic suggestion anyone could have made.
24 **Q  Do you think it would be important for the EMT**
25 **or first responders to have as much information**



**65**

1    about your mom's condition as possible?
2  A   Not having the ability to assess the situation
3     beyond the fact that my mother had some sort of
4     head wound would not have helped them in any way
5     versus them just showing up and doing it
6     themselves.
7  Q   Did the 911 operator ask anything else about
8     your mom's condition when you were speaking to
9     her on the phone?
10  A   I can't remember which one it was, but one of
11     them asked if she was breathing regularly and
12     kept asking me that, and I thought that was also
13     moronic.
14  Q   Okay.
15  A   'Cause I said she was breathing, I said she was
16     breathing, she was breathing, like (making
17     breathing noise) like really loud and raspy.  So
18     I don't know what -- I mean, if somebody's not
19     breathing, you can do CPR; if they are
20     breathing, there's not a lot you can do.
21        So I don't even understand what the
22     question was, but I think that puts the 911
23     operator not even understanding what the
24     situation was, blood around the head, the scab
25     on the head, or whatever you want to call that,

**66**

1    and her labored breathing.
2  Q   We're going to back up a little bit.  We talked
3     a lot about your thought process and why you
4     chose to call 911, take the path that you did.
5        So walk me through, you are now on your
6     knees, kind of up by your mom's head examining
7     the scene, and you decide the best course of
8     action is to call 911.  Did you use the land
9     line or did you use your cell phone?
10  A   I used the land line.
11  Q   And is it a cordless phone?
12  A   No.  It's an old-fashioned cord phone.
13  Q   So did you have to go get up and go to another
14     room in the house to use the phone?
15  A   No.  The phone was on the coffee table, right
16     there where my mother was laying.
17  Q   And so you stood by your mom while you made the
18     call to 911?
19  A   I either sat on the floor or sat on the other
20     chair, I can't remember.
21  Q   And I think --
22  A   The phone was a few feet from my mother's head,
23     so...
24  Q   I think there's been some reference to a couple
25     of 911 calls.  How many 911 calls did you make?

**67**

1  A   Two.
2  Q   Two, okay.  And briefly explain to me the
3     first -- summarize the first 911 call for me.
4  A   I have them straight because I'm not that
5     familiar, but I called 911, and I said, "My
6     mother's been attacked."  And what I wanted to
7     do is give them the address and get an ambulance
8     en route, and I think that was the 911 operator
9     who kept asking me about her breathing.  "Is she
10     breathing?  Is she breathing regularly," or
11     normally or something.  And I'm, like, it seemed
12     beyond nonhelpful, so I hung up and I called 911
13     back.
14  Q   Did you call up immediately right after you hung
15     up?
16  A   Yep.
17  Q   Okay.
18  A   Called 911 back, and I said, "My mother's been
19     attacked."  And I don't know if that was the one
20     that said put something on her head or not, but
21     I finally understood that somebody was on the
22     way anyway.  That's the advantage -- that's why
23     I used the land line.  Land lines have
24     geographical references so they can -- as soon
25     as you say "ambulance," they know your address,

**68**

1    they know to dispatch an ambulance; my cell
2     doesn't have that.
3  Q   Oh, like a caller ID or something like that?  I
4     get what you're saying --
5  A   Yes, kind of, yeah.
6  Q   I get what you're saying.  They know exactly
7     where the --
8  A   They know where you're coming from --
9  Q   -- where you're calling from --
10  A   -- unlike the cell.  Yeah.
11  Q   Even without giving them the address, okay.
12        And did you stay on the phone with 911 or
13     did you hang up?
14  A   No.  I hung up.
15  Q   And then what did you do after you hung up?
16  A   I looked at my mom for a little bit more, and I
17     think I started crying.  And then I realized I
18     should run out and flag down the ambulance
19     because the -- so I ran out, left her apartment,
20     I don't know if I closed it or left it ajar,
21     went outside, went into the parking lot where
22     you drive, not just the parking area, and
23     started looking towards the main entrance for an
24     ambulance.
25  Q   Why didn't you stay with your mom at that time?



69

1  A  Because the most logical thing to do was to get
2     medical care to her as quickly as possible.
3     There was nothing I felt that I could do for
4     somebody with an enormous head wound that has
5     already stopped bleeding, in my opinion, and the
6     apartment complex is kind of confusing, it's not
7     well marked or anything, so in order to
8     facilitate them getting to my mother as quickly
9     as possible, I went out to flag them down.
10 Q  Could you have comforted your mother with either
11    your voice or your touch?
12 A  I don't know if she would have responded or
13    understood any of that, and I don't know if that
14    would have helped heal her wounds.
15 Q  Well, you testified earlier that you believe she
16    responded to your voice or your touch.
17 A  I said she may have; it may have been an
18    involuntary that's a coincidence.  But
19    that would not heal -- whatever.
20 Q  I understand.  I'm not talking about healing her
21    wounds.
22 A  Okay.
23 Q  I'm talking about being with her during a
24    traumatic incident.
25 A  If there was nothing else to do, I would have

70

1     been with her.  But there was something to do:
2     Make sure the ambulance finds my mother's
3     apartment as fast as possible.
4  Q  You don't think the ambulance had been to this
5     apartment complex before?
6  A  I have no idea.
7  Q  You said it was close by.  Correct?
8  A  The fire's close by.  I don't know where
9     ambulance came from.  The fire showed up first.
10 Q  And you don't believe the ambulances are usually
11    at the fire department?
12 A  I don't believe at that one they are.
13 Q  How quickly did the fire department show up?
14 A  Two or three minutes.
15 Q  What did you do after you waved them down?
16 A  I just -- pointed -- one of them got out of
17    the truck, and I motioned and pointed where to
18    go.
19 Q  Did you follow them inside?
20 A  I think I did 'cause I showed -- I -- led them
21    to the apartment and opened the door, said, you
22    know, "Here's my mom," and said, "She's got a
23    bleeding head wound and she's nonresponding."
24    Her head wound had been bleeding; I guess it
25    wasn't bleeding, really.  She had a massive

71

1     freaking head wound and blood on the blanket,
2     blood on the blanket on the floor.  So I -- I
3     was kind of in shock at that point, so -- and
4     then they told me to go back out and wait, so I
5     went back out and waited.
6  Q  Did you tell them anything else about her wound?
7  A  No.  I just said she had -- I just -- I mean, it
8     was painfully obvious.  I pointed it out and
9     said she -- somebody hit her over the head, it
10    looks like, and I don't really know anything
11    else I could contribute, and they wanted me out
12    of there so they could work with her, so they
13    sent me back out.
14 Q  So you recall telling one of the firefighters
15    that you think someone smashed your mom's head
16    in?
17 A  I believe I told 911 and the firefighter that
18    somebody had bashed my mother over the head.
19 Q  And why did you feel at that time that she had
20    been bashed over the head?
21 A  She had -- she had a bloody piece of cloth stuck
22    to the top of her head, right here (indicating),
23    and it looked like that's what had happened.  I
24    don't -- I didn't really think through it or
25    think gunshot or not.  It looked like somebody

72

1     had taken a pickax or something and just bashed
2     her head in.
3  Q  But there were other -- other ways that someone
4     could sustain that type of injury; correct?
5  A  I have no idea.
6  Q  Would you assume that a gunshot wound would
7     cause that type of bleeding to the head?
8  A  I have no idea except I don't how many people
9     get shot on the top of their head.
10 Q  What about -- you already stated that you
11    thought she may have fallen and hit her head.
12 A  Yeah.  But she was -- she was like a foot away
13    from the edge of the coffee table still, her
14    head was, and there was no blood on the coffee
15    table.  And I've fallen and hit my head on the
16    coffee table, I -- it doesn't produce massive
17    amounts of blood, so I kind of just dismissed
18    that out of hand.
19 Q  So you pretty much knew right away that it was
20    some sort of blunt force trauma?
21    MR. WAPLES:  Objection, misstates his
22    testimony.
23 A  I believed that it was.
24 Q  Okay.  As opposed to some sort of other injury?
25 A  As opposed to what?



Case 1:16-cv-00103-TWP-MJD Document 48-1 Filed 11/28/17 Page 61 of 244 PageID #: 1653
Case 1:16-cv-00103-TWP-MJD Document 48-2 Filed 01/13/17 Page 16 of 244 PageID 151
William Rainsberger
September 27, 2016
89 to 92

**89**

1  A  Yes.
2  Q  Was he wearing a uniform?
3  A  Uniformed --
4  Q  Did you guys --
5  A  -- in a squad car.
6  Q  I'm sorry.  Did you guys talk about anything?
7  A  Very little.
8  Q  Did you say something to the effect of, "I don't
9     know if it would be better or worse if my mom
10    died"?
11 A  I said something around that, although I'm not
12    sure -- I cannot remember what I said clearly.
13 Q  Do you know what you meant by that?
14 A  I was referring to the -- well, I didn't --
15    it -- it could have been a couple things.  One
16    was just a comment on the fragility of life and
17    the senselessness of the crime, and the other
18    was if my mom was going to be -- if she was
19    going to die anyway, she might as well die,
20    as -- as harsh as that sounds, I didn't want --
21    it was paramount for me that having my mother
22    having gone through this, that she not suffer.
23 Q  And you're downtown in an interview room.  Did
24    you give a statement at that time to the police?
25 A  I don't know if -- I was questioned and I

**90**

1     answered questions.
2  Q  And who was in the room with you when you
3     answered questions?
4  A  I'm not sure, but I think it was just Benner.
5  Q  Okay.  Do you recall about how long that lasted?
6  A  In between 30 minutes and an hour.
7  Q  Okay.
8  A  It's hard to remember because it seemed like a
9     long time.
10 Q  Did Robert answer questions at that point, too?
11 A  Yes, ma'am.
12 Q  So what happened after you and Robert were done
13    giving --
14 A  I'm sorry, you said at that time?  He -- one of
15    us was questioned first, one of us was
16    questioned second.  I don't know who went -- I
17    can't remember who went first and second.
18 Q  While Robert was being questioned, whether it
19    was before or after you, were you still in
20    the interview room?
21 A  Yes, ma'am.
22 Q  So were you both basically let out of the
23    interview room at the same time?
24 A  I don't know that I know exactly when he got
25    out.  We were in different rooms, and the door

**91**

1     was kept shut.
2  Q  Did you guys leave together?
3  A  No, ma'am.
4  Q  Where did you go after you left downtown?
5  A  If I'm remembering correctly, Detective Tudor,
6     he had me sign a thing consenting to a search
7     and obtainment, or whatever you want to call it,
8     for my gun, which was at my house.  And I didn't
9     see my brother, but I -- I left with Detective
10    Tudor when he drove me to my house and took my
11    gun.
12 Q  After you got to your house, did you go to the
13    hospital?
14 A  Yes.
15 Q  Okay.  Did you go with Robert?
16 A  Yes.  I picked him up.
17 Q  Did you pick him up from downtown?
18 A  I picked him up from the City-County Building.
19 Q  Where you guys were being interviewed?
20 A  Correct.
21 Q  And you met up with your sister at the hospital;
22    is that correct?
23 A  Yes, ma'am.
24 Q  Did you talk to any medical personnel, a doctor,
25    a nurse, when you got to the hospital?

**92**

1  A  The nurse there, coincidentally, was my
2     brother's best friend's wife, so we talked to
3     her, and we talked to another nurse, and we
4     talked to -- took him a while to get there, but
5     we talked to the doctor on charge of that area
6     or whatever.
7  Q  And what were you basically told about your
8     mom's condition?
9  A  That it was irreversible, she would not recover,
10    she wasn't in any pain, but the prognosis was
11    zero.
12 Q  Did you guys make a decision at that time to
13    remove her from life support?
14 A  Yes.  We talked about it briefly, and it was my
15    mother's wish that, when the time came, that she
16    be removed from life support, and there was
17    no -- we would have made that decision anyway
18    because there was no hope.
19 Q  Did she have a DNR, a do not resuscitate order?
20 A  No.  I don't think she had a DNR.  She had a
21    medical power of attorney, but I -- I -- I'm
22    going to say I don't recall ever seeing a DNR.
23 Q  And you know that that was her wish from
24    previous conversations you had with her?
25 A  Correct.



Case 1:16-cv-00103-TWP-MJD   Document 48-1   Filed 11/28/17   Page 62 of 344 PageID #: 1654
Case 1:16-cv-00103-TWP-MJD   Document 49-1   Filed 01/13/17   Page 162 of 244 PageID: 152
William Rainsberger
September 27, 2016
93 to 96

**93**

1  Q  But she never memorialized anything in writing?
2  A  It may be in the medical power of attorney, but
3     I cannot remember because that document wasn't
4     invoked.
5  Q  And when did your mother pass away?
6  A  2:30 to 3:00 the following morning.
7  Q  On November 20th?
8  A  November 20th.
9  Q  Were you, again, asked some questions by
10    Detective Benner on the 20th?
11 A  Yes, ma'am.
12 Q  About how long did that question-and-answer
13    session last?
14 A  I think it was half an hour, I'm not quite
15    clear.
16 Q  And was that at the City-County Building again?
17 A  Yes, ma'am.  It was up in homicide or whatever
18    area, interrogation room.
19 Q  And do you recall about what time of the day
20    that was at on the 20th?
21 A  Early afternoon.
22 Q  At some point did Detective Benner ask you to do
23    a polygraph exam?
24 A  Yes.  They both were -- yes.
25 Q  "They both"; are you referring to Detective

**94**

1     Tudor as well?
2  A  Yes, Tudor was there with Benner.
3  Q  Okay.  And do you recall what month this was in
4     or how close it was, what day it was --
5  A  I don't understand the question.
6  Q  -- that you had this conversation?  How soon
7     after your mom's death did you have this
8     conversation?
9  A  Regarding the polygraph?
10 Q  Yes.
11 A  Well, that was on the day of my mother's death.
12 Q  The same day?
13 A  Yes.
14 Q  And did you consent to do a polygraph?
15 A  I did not.
16 Q  And why not?
17 A  Because, one, I think we'd already been through
18    enough, and, two, I think polygraphs are BS.
19 Q  Why do you think a polygraph's BS?
20 A  They're not even admissible in court, and after
21    having been lied to about the reason to come
22    down and having been questioned like some kind
23    of fiend, I didn't have any faith in the process
24    anymore and didn't want to partake in what I
25    consider to be a -- silly exercise that --

**95**

1     that I would not have considered to be unbiased.
2  Q  So you consented to a search of your gun;
3     correct?
4  A  Yes.  The retrieval --
5  Q  The retrieval of your gun --
6  A  -- of my gun.
7  Q  Yes.  I don't know what all they do to test it,
8     but --
9  A  Technically, it's a search warrant, you're
10    right.
11 Q  And to a search of your car, is that correct, as
12    well?
13 A  Correct.
14 Q  But you wouldn't consent to the polygraph?
15 A  No.
16 Q  Did you get upset when Detective Benner asked
17    you to consent to a polygraph?
18 A  Yes.
19 Q  What did you do?
20 A  We were yelling back and forth about the
21    efficacy of such a test and might -- their need
22    for me to do it and my anger at them for leading
23    me on and lying about why we were there.  And I
24    said something about it not being admissible in
25    court, and I'm not taking it.  And that did not

**96**

1     sit well.
2  Q  Did you yell?
3  A  No more than they did.
4  Q  Did you storm out?
5  A  No.  In fact, it's impossible to storm out of an
6     investigation room with a detective sitting on
7     either side of the table.  They're in the way.
8  Q  You couldn't get around them?
9  A  No.  The room's not big enough.  And I certainly
10    would not storm past a detective, you know, I
11    have more respect for the law than that.
12 Q  So you know that a polygraph test is not
13    admissible in court, but you still didn't want
14    to consent to it?
15 A  Correct.
16 Q  Do you think there was any usefulness that could
17    have been gained from a polygraph test of you,
18    Robert, or Rebecca?
19 A  No.
20 Q  You're absolutely sure neither Robert or Rebecca
21    had anything to do with your mom's death?
22 A  As sure as I can be of anything, yes; they're
23    not involved, I'm not involved.
24 Q  If they had been, would you have wanted them to
25    consent to a polygraph to find out?



Case 1:16-cv-00103-TWP-MJD  Document 48-1  Filed 11/28/17  Page 63 of 344 PageID #: 1655
Case 1:16-cv-00103-WTL-MJD  Document 48-1  Filed 01/13/17  Page 17 of 244 PageID 153

William Rainsberger
September 27, 2016
97 to 100

97

1 A  I had -- no, because I have -- I don't have any
2    faith in the process.
3 Q  So I know you couldn't go around the detectives,
4    but the detectives leave the room; did you then
5    leave quickly thereafter?
6 A  They made room for me to go out and go get my
7    brother and said, "Go get your brother."  And
8    I'm not sure exactly how it played out, but I
9    was supposed to go get him, and then he would be
10    questioned, and I yelled at my brother, "We are
11    not taking a polygraph test," or something like
12    that.
13    MS. HAMMER:  Note for the record that
14    Mr. Rainsberger raised his voice to show the
15    inflection.
16    THE WITNESS:  Right.
17 A  I was distant from my brother, too, because he
18    was in the waiting room, and he was probably
19    25 feet away, so the only way to communicate
20    with him -- there was probably a better way to
21    communicate that, but I wanted him to know what
22    was going on.
23 BY MS. BOX:
24 Q  So did you demand to leave?
25 A  No.

98

1 Q  You didn't demand the officers move so you could
2    get out of the room?
3 A  Oh, I'm sorry, this is before that.  They --
4    it's like they stood up and said -- one of them
5    stood up, Tudor, I think, and said, "Go get your
6    brother and have him come back here."
7 Q  You were under the impression that you were
8    there that day to go over the autopsy results;
9    right?
10 A  Yes.  But Benner contacted my sister, she
11    contacted us, that autopsy results, be there at
12    1:00, so that's what my -- that's what we were
13    told.
14 Q  Did you go over the autopsy results with
15    Detective Benner?
16 A  No.
17 Q  So you left before he could go over the autopsy
18    results with you?
19    MR. WAPLES:  Objection, misstates facts in
20    evidence and it's argumentative.
21    You can answer.
22 A  They left us waiting in the entryway without
23    talking about the autopsy, so I don't know how
24    to answer that exactly.
25    MS. BOX:  Do you want to take a break or do

99

1    you want to keep going?
2    THE WITNESS:  I'm okay.  I don't --
3    MR. WAPLES:  I'm okay.  It's up to you.
4    MS. HAMMER:  I'm okay.
5    (Exhibit 19 was marked for identification.)
6 BY MS. BOX:
7 Q  I'm going to show you what's been marked as
8    Exhibit 19.  And this is the Complaint that was
9    filed in this case against Charles Benner,
10    Detective Benner.  The document reference number
11    is Document 1, it was filed on January 12th of
12    2016, and the Case No. is 1:16-cv-00103-WTL-MJD.
13    Do you recognize this document,
14    Mr. Rainsberger?
15 A  Yes, ma'am.
16 Q  When was the last time you saw this document?
17 A  I've read it recently.  I don't know exactly
18    when.
19 Q  Did you help in the preparation of this
20    document?
21 A  Yes, ma'am.
22 Q  Now, I know you're not a lawyer, but what is
23    your understanding, just in general terms, of
24    the claims that you're bringing against
25    Detective Benner?

100

1    MR. WAPLES:  Objection, calls for a legal
2    conclusion, but he can answer to the extent that
3    he knows.
4 A  I know that it's a Section 1983 lawsuit against
5    a police person acting under the color of
6    authority violating my constitutional rights.
7 Q  And what rights do you feel were violated?
8 A  The right not to be arrested and charged with
9    something out of thin air.  I don't know.
10 Q  I'd like you to turn to page 3, it's
11    Paragraph 18, it reads, "In his probable cause
12    affidavit, Detective Benner misrepresented that
13    Mr. Rainsberger was in his mother's apartment
14    during the time period she was attacked and well
15    before he telephoned 911 to report her
16    injuries."
17    Do you see that?
18 A  Yes, ma'am.
19 Q  Okay.  And then Exhibit 2, which is Detective
20    Benner's affidavit for probable cause.  Here you
21    go.  It's on page 3.
22 A  Okay.
23 Q  The very last paragraph, Detective Benner
24    writes, "I received cell phone records for the
25    Rainsberger family and obtained the following



Case 1:16-cv-00103-TWP-MJD   Document 48-21   Filed 11/28/17   Page 64 of 344 PageID #: 1656
Case 1:16-cv-00103-WTL-MJD   Document 48-21   Filed 11/28/17   Page 164 of 244 PageID 154
William Rainsberger
September 27, 2016
105 to 108

---

**105**

1    A   The duration, as listed, the first one at 14- --
2      with the time stamp of 14:40 is 15 seconds.
3    **Q   And the second one?**
4    A   25 seconds.
5    **Q   So they're not even the same length of phone**
6      **calls. How could it be the same phone call?**
7    A   The 15-second phone call is encapsulated into
8      the 25-second phone call. The 25 seconds is the
9      phone call, the actual time on the phone plus
10     the switching plus the front and back end
11     handoffs and everything.
12    **Q   But you have no evidence to prove that.**
13    A   No, but I'm confident.
14    **Q   But your own speculation?**
15    A   I've never been more confident in anything.
16    **Q   Do you recognize that Chicago number, 773**
17      **number?**
18    A   Only because I looked it up after the fact and
19     found it was some weird number that appears in
20     other things. It's not a person. It is part of
21     the network switching for the phone companies.
22    **Q   But your testimony today is you were not at your**
23      **mom's house at 2:40 p.m.; is that correct?**
24    A   Absolutely not.
25    **Q   And Robert was at home with you at that time;**

---

**106**

1      **correct?**
2    A   Correct. I had not yet left.
3    **Q   And where was Rebecca, do you know?**
4    A   I have no idea.
5    **Q   You three were the only individuals with keys**
6      **besides your mom; correct?**
7    A   To be accurate, maintenance would have had keys.
8    **Q   So who could have made this call?**
9    A   I don't know what call you're referring to.
10    **Q   The call at 2:40 p.m.**
11    A   There is no call at 2:40 p.m. Those are --
12     those are two lines that represent one call, and
13     it's shown in the rest of the records it kind of
14     works that way, but not being a phone expert, I
15     can't really explain it adequately, I guess,
16     so...
17    **Q   Since you're not a phone expert, let's assume**
18      **there was a call at 2:41, because we have no**
19      **evidence --**
20      MR. WAPLES: Objection, assumes facts not
21     in evidence, it's contrary to the record.
22    A   The AT&T records show --
23      (Simultaneous colloquy interrupted by the
24      court reporter.)
25      MR. WAPLES: And I object to that. It

---

**107**

1      assumes facts not in evidence and is contrary to
2      the records.
3    **Q   So who could have made that call?**
4      MR. WAPLES: And it calls for speculation.
5      Somebody made a call that didn't exist at that
6      time, it didn't happen.
7      MS. BOX: We have Exhibit 13 that says that
8      there's a call. We have no evidence to prove
9      otherwise.
10      MR. WAPLES: We don't even know --
11      (Simultaneous colloquy.)
12      MS. BOX: I even made it clear on the
13      record that I would assume -- make an assumption
14      that a call occurred. I just want to know who
15      could have made the call if it did occur.
16      MR. WAPLES: You're asking him to testify
17      about a call that occurred at a time he said it
18      didn't occur. It occurred at 3:40, not --
19      MS. BOX: He also told me he wasn't at his
20      mom's house at 2:40, so how would he have known
21      if the call occurred not? He's not Robert, he's
22      not the person on the other line making a call.
23    A   Because the AT&T phone records don't show a call
24      at 2:40.
25

---

**108**

1    BY MS. BOX:
2    **Q   The AT&T records also don't show your 911 call**
3      **at 3:38. How do you explain that? Or your two**
4      **911 calls at 3:38. There are multiple issues**
5      **with your mom's land line records.**
6      MR. WAPLES: Objection, argumentative.
7    **Q   So who could have made a call at 2:40 p.m. from**
8      **your mom's land line?**
9    A   I can't answer that. That's a nonsensical
10     question.
11    **Q   Well, it could have been Robert, you said it**
12      **wasn't you, and you don't know where Rebecca**
13      **was. I guess the maintenance man could have**
14      **made the call, but the maintenance man wouldn't**
15      **have Robert's cell phone number; correct?**
16    A   I can't speculate.
17      MR. WAPLES: Objection. Kathryn, you're
18      speculating and you're arguing with the witness
19      who's already told you what his answer is about
20      any call at 2:40 --
21      MS. BOX: He didn't answer the question,
22      Rich. And I'm not --
23      MR. WAPLES: He's not going to answer that
24      somebody made a call when he doesn't believe a
25      call was made.

---



Case 1:16-cv-00103-WTL-MJD Document 48-1 Filed 11/28/17 Page 65 of 344 PageID #: 1657
Case 1:16-cv-00103-WTL-MJD Document 48-1 Filed 11/28/17 Page 195 of 244 PageID 155

William Rainsberger
September 27, 2016
109 to 112

---

**109**

1   MS. BOX: I'm not asking him to answer that
2   someone made a call. I'm asking him: If the
3   call was made, who could have done it?
4       THE WITNESS: I have no idea.
5   BY MS. BOX:
6   Q   Going back to Exhibit 19, this is the Complaint.
7       Page 3, Paragraph 19 states, "In his probable
8       cause affidavit, Detective Benner misrepresents
9       that nothing of value was stolen from the
10      apartment, in an apparent attempt to eliminate a
11      robbery as a motive for the attack, when in
12      truth prescription drugs, a purse and jewelry
13      were stolen."
14      Do you see that paragraph that I'm
15      referring to?
16  A   Yes, ma'am.
17  Q   What drugs were stolen from the apartment?
18  A   Aricept. I don't know if any over-the-counter
19      drugs were taken or not, but the Aricept was
20      missing.
21  Q   What did you do to find out that the Aricept was
22      missing?
23  A   I looked at the place that it was always sitting
24      on the counter and saw that there was no Aricept
25      there.

**110**

1   Q   At what time?
2   A   Oh, what time?
3   Q   Yes.
4   A   I'm not even sure what day. I don't know if I
5       looked at that closely on the 19th. I did look
6       around the apartment, but I don't know if I
7       noticed it for sure that day or not, I can't
8       remember.
9   Q   Okay. Where did your mom usually keep her
10      Aricept medication?
11  A   It's sitting on the kitchen across from the
12      refrigerator, to the right of the sink, where
13      all that stuff is.
14      (Exhibit 20 was marked for identification.)
15  Q   Here's Exhibit 20. Do you recognize what that
16      photo is depicting?
17  A   I believe this is the kitchen counter to the
18      right of the sink.
19  Q   And is that where she would usually keep her
20      Aricept?
21  A   Yes, ma'am.
22      (Exhibit 21 was marked for identification.)
23  Q   All right. Now I'm handing you Exhibit 21. Do
24      you recognize what's in that box in the drawer
25      or do you know what that is?

**111**

1   A   It's some other medication. That could be --
2       oh, she'd been on something for something else
3       in the past and I -- I do not remember what that
4       is.
5   Q   Okay. But that's not Aricept; is that your
6       testimony today?
7   A   Aricept -- correct. Aricept comes in a bottle.
8   Q   Well, do you see the bottle up to the right-hand
9       side of the box?
10  A   Yes, ma'am.
11  Q   And could that have been her Aricept?
12  A   No, ma'am, that -- that bottle appears to be too
13      big.
14  Q   Can you think of any reason that someone would
15      want to take Aricept?
16  A   To be succinct, I -- I believe someone who would
17      do such a thing would just grab whatever
18      prescription drugs existed without thinking
19      about it.
20  Q   Why wouldn't they take any of the other drugs
21      depicted in these two exhibits?
22  A   Well, the -- the items on the counter are
23      over-the-counter medications that are not
24      particularly valuable to a drug addict, and the
25      4-milligram card I didn't even realize was a

**112**

1       drug at first, I thought that was a pamphlet, so
2       they may not have recognized that.
3   Q   What about that bottle?
4   A   Oh, I don't know. I have no idea.
5   Q   Do you think if someone was going to rob the
6       place, they would pick and choose between
7       different medications or just grab everything
8       that they could see?
9       MR. WAPLES: Objection, calls for
10      speculation.
11  A   I believe the easiest and quickest and surest
12      they could take would be the bottle of
13      medication sitting out on the kitchen counter,
14      so not something that doesn't look like
15      medication, and I have no explanation for the
16      other bottle except maybe they didn't see it.
17  Q   Did you ever tell Detective Benner that Aricept
18      was taken?
19  A   I don't know if I told Benner or Tudor or who,
20      but I told them that stuff was taken, and it
21      didn't seem to register.
22  Q   So when did this conversation take place?
23  A   I don't remember.
24  Q   Do you know who you were speaking to?
25  A   I believe it was Benner, but I don't remember.

---



117

1  A  Right.
2  Q  He asked about purses. This is the only answer
3     you give, except for a few more lines down you
4     talk about a beige coin purse.
5  A  Right.
6  Q  You don't reference any other black purse in
7     this statement.
8  A  Correct.
9  Q  So you didn't tell Detective Benner, at least at
10    this time (indicating), that there were two
11    purses, that your mom had two purses?
12 A  Not at this time, no.
13 Q  And then do you see where I'm talking about a
14    few more paragraphs down, the next big paragraph
15    that talks about a beige coin purse?
16 A  Correct.
17    (Exhibit 24 was marked for identification.)
18 Q  I'm showing you Exhibit 24. Is that the beige
19    coin purse that you're referring to?
20 A  No.
21 Q  Okay. What is that?
22 A  What is this?
23 Q  Yes.
24 A  In the picture?
25 Q  Yes. Do you know?

118

1  A  That is a little make-up pouch or purse or
2     whatever you want to call it. It's about the
3     size of a small burrito.
4  Q  So do you believe that the beige coin purse was
5     stolen as well?
6  A  I don't know. It was -- that one was smaller
7     than this one. That one -- the beige coin purse
8     was smaller than this.
9     MR. WAPLES: Is this the statement,
10    Exhibit 23?
11    MS. BOX: Yes, uh-huh. And then did you
12    get 24?
13    MR. WAPLES: Yes.
14 BY MS. BOX:
15 Q  You also state that -- in the Complaint, excuse
16    me, that jewelry was stolen from the house.
17    What jewelry was stolen from your mom's house?
18    Can you describe it for me, please?
19 A  It was just costume jewelry, necklaces and
20    bracelets and such, but it was all -- the -- the
21    only thing -- part of the problem is I don't
22    know what the police have and what was taken and
23    whatnot, but the -- in the same chest of drawers
24    in Exhibit 24 on the right side not photographed
25    an array of costume jewelry, and it had been

119

1     disturbed.
2  Q  Disturbed or taken?
3  A  It looks like taken and disturbed, like somebody
4     was grabbing stuff or something.
5  Q  When did you see that?
6  A  When we went back to the apartment.
7  Q  Okay.
8  A  Which wasn't for, I don't know, like, a week
9     before they took the police tape down.
10 Q  Is this the chest that you're referring to where
11    the costume jewelry was?
12 A  Yes, ma'am.
13    MS. BOX: This is 25.
14    MS. HAMMER: What is 23?
15    MS. BOX: It's the statement.
16    MS. HAMMER: I'm sorry.
17    MS. BOX: You're good.
18    (Exhibit 25 was marked for identification.)
19 BY MS. BOX:
20 Q  Here's Exhibit 25, and can you just point out
21    for me on the picture where her jewelry was
22    stored?
23 A  It was in this drawer, and I think the bottom
24    drawer, and it was laid out in kind of an array,
25    so it was clear that it was there, for her

120

1     memory's sake.
2  Q  And what do you mean, "it was laid out in an
3     array"?
4  A  I took every item and put it, like, in a grid,
5     so it was, like, here's -- you know, in rows and
6     columns in the drawer. She had all this jewelry
7     she never wore, never used, hardly ever looked
8     at, but I wanted, when she opened her drawer, to
9     be able to say, oh, here's my jewelry. So it
10    was all laid out kind of in a grid.
11 Q  Okay.
12 A  It was a very -- it was a nonconventional way of
13    storing it just to aid her memory, I guess, or
14    that was the thought.
15 Q  How many pieces of jewelry do you believe she
16    had, if you could estimate?
17 A  Oh, God, like 100; 50 to 100. She had some --
18    so many bracelets and necklaces and stuff.
19    Quite a bit -- dozens of things.
20 Q  Did you have any documentation that listed each
21    piece of jewelry --
22 A  No. It was all costume jewelry.
23 Q  -- was there a description -- so is it possible
24    that the jewelry was just disturbed and nothing
25    was taken?



William Rainsberger
September 27, 2016

121 to 124

---

**121**

1  A  It seemed to me that it was missing.
2  Q  And why do you think that?
3  A  Because there was more empty space in the drawer
4     than it seemed like there should have been, I
5     don't know.
6  Q  And the jewelry couldn't have been, you know,
7     just pushed to sides or in clumps?
8  A  It's hard to argue one way or the other, I don't
9     know.
10 Q  But you can't today say for sure what pieces of
11    jewelry were stolen?
12 A  No.  No, there was nothing of value, really of
13    value, so we didn't really track it, except for
14    the wedding ring.
15 Q  Can you even say for sure that jewelry was
16    stolen?
17 A  100 percent, no.  But 99.
18 Q  And I think you already touched on this:  After
19    your mom's house, was it kind of closed off as a
20    crime scene, or were people allowed in after
21    you -- after this incident, was your mom's house
22    taped off?
23 A  There was crime scene tape on my mother's front
24    door from -- well, I assume it was put up the
25    day the police came, probably for a week after

---

**122**

1     that, seven or eight days.
2  Q  So you think that when you went back in her
3     apartment, maybe a week later, you noticed that
4     things were missing?
5  A  I looked around to see if anything was missing
6     and also to look at the condition of the
7     apartment.
8  Q  And you specifically recall telling Detective
9     Benner that these things were missing from the
10    house?
11 A  Yeah.
12 Q  But you don't recall when that conversation was?
13 A  I do not.
14 Q  So back to the Complaint, which is
15    Exhibit No. 19, Paragraph 20, it says,
16    "Detective Benner falsely stated in his probable
17    cause affidavit that there were savings bonds in
18    Mrs. Rainsberger's open lockbox in plain view in
19    the apartment, implying robbery could not
20    have been the motive for the attack."
21    Is this a photo of the lockbox?
22 A  Yes.
23    MS. BOX:  Okay.  I'm going to mark this as
24    Exhibit 26.
25    (Exhibit 26 was marked for identification.)

---

**123**

1  Q  And for the record, the lockbox is the gray box
2     sort of in a little -- what looks like was a
3     drawer without a front cover on it.
4  A  Correct.
5  Q  And what was in the lockbox?
6  A  Some old financial records.  Printouts of
7     certificates of deposit.
8  Q  Did they have any value?
9  A  No.
10 Q  Why were they in the lockbox?
11 A  Made my mother feel better.
12 Q  Okay.  Other than the Aricept, potentially a
13    purse, and maybe some jewelry that was allegedly
14    stolen from the apartment, did you see any other
15    signs that would indicate to you that this was a
16    robbery?
17 A  No.
18 Q  There's no forced entry; correct?
19 A  Not that I'm aware of, no, it didn't look like
20    it to me.
21 Q  Did your mom have any electronics?
22 A  No -- what --
23 Q  Electronics.  Did she have a TV?
24 A  She had a -- yeah, she had a big old tube TV.
25 Q  And I'm assuming that was in the apartment a

---

**124**

1     week later; correct?
2  A  Right.  I don't believe she had even a radio or
3     anything else.
4  Q  Back to Exhibit 19, the Complaint, Paragraph 22
5     says that, "In his probable cause affidavit,
6     Detective Benner misrepresents that after the
7     attack on his mother, a video from a
8     surveillance camera in the Kroger grocery store
9     located near his mother's apartment showed
10    Mr. Rainsberger disposing of a 'straight object'
11    pulled from his person 'while he looked around
12    for cameras.'"
13    Then going back to the affidavit for
14    probable cause, which is Exhibit No. 2, it's the
15    very last full sentence of page 3.  Detective
16    Benner writes, "Within an hour of this phone
17    call, William Rainsberger's on video across the
18    street at the Kroger."  And the phone call he's
19    referring to -- do you see where I'm talking
20    about?
21 A  Yes.
22 Q  The phone call he's referring to is this --
23    we're not going to argue about the phone call
24    but --
25 A  Yeah.

---



125

1  Q  -- he wrote in there, "a phone call that
2     occurred at 2:40 p.m." Okay?
3  A  Yes.
4  Q  So Detective Benner doesn't actually indicate
5     that you deposited of this straight object -- or
6     disposed of this straight object after going to
7     your mother's in his probable cause affidavit,
8     he just says "within an hour of this phone
9     call."
10 A  Can you phrase the question again?
11 Q  Sure, sure. So maybe it will help if you read
12    Paragraph 23 of the Complaint.
13 A  23?
14 Q  Yes, it's the very first paragraph. It says,
15    "In truth, the video shows Mr. Rainsberger at
16    the Kroger store prior to going to his mother's
17    house and only throwing away trash, not a
18    'straight object' weapon, and not looking around
19    for cameras."
20 A  Okay.
21 Q  What I'm saying is that this sentence that
22    you're referring to in the probable cause
23    affidavit that references these paragraphs of
24    the Complaint actually indicates that you were
25    at the Kroger within an hour of a phone call,

126

1     not prior to or after going to your mother's
2     house.
3  A  It says, "Within an hour of this phone call,
4     William Rainsberger's on video" -- I'm not sure
5     what the debate is. Is it about the "within an
6     hour" or --
7  Q  No. And I'm not -- the debate is in the
8     Complaint. It makes a distinction between prior
9     to going to your mother's house and after going
10    to your mother's house, and the Complaint seems
11    to indicate that Detective Benner got the
12    timeline wrong. And all I'm trying to point out
13    is that Detective Benner was referring to within
14    an hour of a phone call, not prior to going to
15    your mother's house or after going to your
16    mother's house.
17    MR. WAPLES: Well, I'm going to object to
18    this. It's confusing, it kind of misstates
19    facts in evidence because Benner certainly, in
20    his probable cause affidavit, is saying the
21    phone call came from his mother's house prior to
22    Bill going to Kroger, and then he states that
23    Bill made a phone call from his mother's house
24    to his brother's cell phone at 2:40 is what he's
25    placing it at. I mean, that's the obvious

127

1     intent of that probable cause affidavit.
2     MS. BOX: I don't think it's as obvious,
3     especially after Detective Benner's testimony
4     this morning, so we'll disagree on that, but I'm
5     simply looking at Detective Benner's language.
6     MR. WAPLES: Perhaps this -- maybe this
7     will straighten it out. Are you asking if
8     Paragraphs 22 and 23 of the Complaint are
9     referring to the probable cause affidavit,
10    page 3, Paragraph-- fourth full paragraph?
11    MS. BOX: Yes.
12    MR. WAPLES: Okay.
13    MS. BOX: Or fifth paragraph.
14    MR. WAPLES: Okay, thank you. We should
15    learn how to count better when we go to law
16    school.
17 A  Is there a question on the table? I'm sorry.
18 BY MS. BOX:
19 Q  Let's try it this way: Does Detective Benner
20    say that you went to throw away -- does he
21    specifically use the words that you went to
22    throw away this object after going to your
23    mother's house anywhere in that paragraph?
24 A  In here?
25 Q  Yes. The fifth paragraph on page 3.

128

1  A  I think it does, because I think he's of the
2     opinion I made a phone call at 2:40, and he's
3     implying that I made a phone call, went to
4     Kroger to throw something away, and then came
5     back. So, yes, in my opinion it does.
6  Q  Does it use that language --
7  A  -- I know it's not crystal clear.
8  Q  Does it use that language?
9  A  I think what he states here is that I made a
10    phone call at 2:40, and then I went to Kroger to
11    throw something away.
12 Q  But he says Robert Rainsberger received a phone
13    call from Ruth's land line; correct?
14 A  True.
15    (Exhibit 27A-D was marked for
16    identification.)
17    MS. BOX: I have some still photos that I'm
18    going to mark as -- there are three of them --
19    oh, there are four altogether, excuse me, I'm
20    going to mark them as 27A-D.
21    MR. WAPLES: These are in order, 27A-D?
22    MS. BOX: Yes, correct.
23 BY MS. BOX:
24 Q  I'll represent to you that these are still
25    photos taken from the Kroger camera entryway.



Case 1:16-cv-00103-TWP-MJD Document 48-21 Filed 11/28/17 Page 69 of 344 PageID #: 1661
Case 1:16-cv-00103-TWP-MJD Document 48-21 Filed 11/28/17 Page 29 of 244 PageID 159

William Rainsberger
September 27, 2016

129 to 132

---

**129**

1    Q    Do you have any reason to dispute that?
2    A    No.
3    Q    Can you please read the time and date?
4    A    On the photos?
5    Q    Correct, on the bottom of the photos. I believe
6         it's the same for all four of them.
7    A    All four of them say November 19, 2013, at
8         3:28:56 p.m.
9    Q    This is about the same time you went to Kroger
10        to buy tea; correct?
11   A    Yes. This is just before that, in fact.
12   Q    Are you in this picture? Are you in these
13        photos?
14   A    Yes.
15   Q    Can you please describe where you're located at?
16   A    I am -- I don't know how you put it. Where you
17        see the door open, the figure in the blue jeans
18        and blue sweatshirt is me.
19   Q    So you're not the person -- there are two people
20        in this photo; correct?
21   A    Correct. I am not the person approaching the
22        sliding glass door, I'm the person behind him.
23   Q    Okay, great. Do you see a small object that
24        appears to be, in these photos, maybe in your
25        right hand, down by your side?

**130**

1    A    I see something that you're referring to. I
2         don't know which hand it's in.
3    Q    Okay. Fair enough. Do you know what that is?
4    A    Nope.
5    Q    What did you do with it?
6    A    I threw it away.
7    Q    But you don't recall what you threw away?
8    A    It was trash of some kind. It was either just
9         some -- some thing I had in my pocket, I'm,
10        like, well, I'll throw this away, I don't
11        know -- I cannot be confident enough about what
12        it was.
13   Q    Okay. But you're sure it's trash?
14   A    Yeah.
15   Q    But you'd agree that it's not clear from these
16        photos that it's trash?
17        MR. WAPLES: Objection, argumentative.
18   A    I would say from the photos it's hard to tell
19        what it is.
20   Q    Going back to -- I should know the exhibit by
21        now -- Exhibit 19, the Complaint. It's
22        Paragraph No. 27, "In his probable cause
23        affidavit, Detective Benner falsely stated that
24        Mr. Rainsberger showed no signs of concern for
25        their mother's health while she was at the

**131**

1         hospital before she died."
2         My question is: Did you ever ask Detective
3         Benner if you could go to the hospital?
4    A    I did not.
5    Q    Did you ever ask Detective Benner what your
6         mother's condition was?
7    A    No.
8         (Exhibit 28 was marked for identification.)
9    Q    I'm showing you what's been marked as
10        Exhibit 28, and I'm going to represent to you
11        that these are selected records of your phone
12        records. They were pretty extensive, so I only
13        printed off the pages that I felt were relevant.
14        So I printed off the very first page so we would
15        have the headings, and I printed off the pages
16        that reference November 18th through
17        November 20th.
18   A    Okay.
19   Q    And, obviously, it included a little bit of the
20        21st on that full page. I'd like to draw your
21        attention to what is page 3 of this exhibit.
22        You previously testified in the deposition that
23        you stayed in Plainfield the night of
24        November 18th; correct?
25   A    Yes, ma'am.

**132**

1    Q    And that you believe you left your wife's house
2         maybe some -- sometime prior to 8:00.
3    A    I don't know about prior to 8:00; 8:00-something
4         would be --
5    Q    Fair enough. And I believe you testified that
6         your wife left before you, maybe around 7:15.
7    A    Yeah. And I -- I apologize, I can't remember
8         what time she goes to work. She -- it would
9         have either been 6:30 or 7:30 that she would
10        normally leave for work downtown.
11   Q    But she was with you in the house until she left
12        for work; correct?
13   A    We were both in the house, yes.
14   Q    So the second record down looks like an SMS,
15        which do you know what SMS means?
16   A    Short message service.
17   Q    Which is a text message; correct?
18   A    Correct.
19   Q    And can you read the time and date stamp on that
20        for me as well?
21   A    November 19th, 2013, at 5:00 a.m. plus 41
22        seconds.
23   Q    So it looks like this is a text message in the
24        far left column from number 331-1059, which is
25        your number; correct?

---



---

133

1  A   Correct.
2  Q   To 771-07604; correct?
3  A   (317)710-7604, correct.
4  Q   And that's your wife's number; correct?
5  A   Correct.
6  Q   So were you guys texting each other while you
7      were in the same house?
8  A   Yes.
9  Q   Why would you do that?
10 A   Because we don't sleep together.  I sleep on the
11     couch in the living room because I snore and she
12     works, so I sleep in the living room.  So we
13     text back and forth.
14 Q   So you couldn't have gone into her room to talk
15     to her?
16     MR. WAPLES:  Objection, argumentative.
17 A   I didn't.
18 Q   Is it common for you to text in the house with
19     her?
20 A   Yeah, quite.
21 Q   So it looks like you have -- there's another
22     record at 5:08, 7:08, 7:09, 7:10, 7:11, 7:13,
23     7:16, and 7:16.  Again, they all look like text
24     messages between you and your wife; correct?
25 A   Correct.

---

134

1  Q   While you were in the same house?
2  A   I cannot be certain that the ones after
3      7:00 a.m. are while we are in the same house,
4      that could have been while she was driving in to
5      work, but certainly the ones at 5 -- 5:00 a.m.
6      or thereabouts are while we were in the same
7      house; myself in the living room, her in her
8      bedroom.
9  Q   And turning to the next page, the very top
10     record looks like another text message.  Can you
11     read the time and date stamp on that for me?
12 A   November 19, 2013, at 12:44:10 p.m.
13 Q   And that's a text message from your number, the
14     (317)331-1059; correct?
15 A   Correct.
16 Q   To the (317)357-5791 number; correct?
17 A   Correct.
18 Q   And that's your brother, Robert's, phone number?
19 A   Correct.
20 Q   And you previously testified that your brother,
21     Robert, was home with you all day?
22 A   Yes, I think so.
23 Q   So would this, again, be you guys texting each
24     other from the same house?
25 A   Yes.

---

135

1  Q   Even though you were in the same house?
2  A   Yes.
3  Q   So it looks like there are some more records at
4      1:59, two of them, and then a little bit farther
5      down, 2:40, 2:41, 2:42, another one at 2:42, a
6      2:51 and a 2:52, all text messages between you
7      and Robert?
8  A   Uh-huh.  Yes, I'm sorry.
9  Q   While you guys were at the house together?
10 A   Yes.
11 Q   Is it common for you and Robert to text together
12     while you're in the same house?
13 A   I have a very large house, so yes.
14 Q   How big is your house?
15 A   It's a 2,000-square-foot ranch house, and
16     it's -- God, it must be 75 feet long, so if he's
17     in the garage and I'm inside, I just text him.
18 Q   I'm showing you what's been marked as
19     Exhibit No. 29.  Do you recognize this?
20 A   Yeah.
21     (Exhibit 29 was marked for identification.)
22 Q   What is it?
23 A   This is a storyboard for a video I was going to
24     make.
25 Q   Okay.  Do you often draw storyboards for videos

---

136

1      you're going to make?
2  A   On the rare occasion I make a video, I draw a
3      storyboard.
4  Q   And my question is concerning page 4 of that, I
5      know it's not numbered, but the very bottom
6      right box, can you read for me what that says?
7  A   This?
8  Q   Do you see where I'm -- yes, correct.
9      MR. WAPLES:  Is it the last page?
10     MS. BOX:  Page four, the second-to-last
11 page.
12     MR. WAPLES:  Second-to-last page?
13     MS. BOX:  Yes.
14 A   There's a technical note, it says "position."
15     It doesn't say "camera," but I think that's
16     camera.  And then it says, "Eat pudding already
17     open, cover with cloth, count quarters, cloth is
18     hidden.  Well, that's all the time we have.
19     Shake and still."
20 Q   And you made the storyboard; correct?
21 A   Correct.
22 Q   And do you know when you made the storyboard,
23     rough estimate?
24 A   On page 1, it refers to my 40th birthday, so
25     it would have been 19 years ago.

---



# EXHIBIT 3

**(manually filed)**

Case 1:16-cv-00103-TWP-MJD   Document 88-1   Filed 11/28/17   Page 72 of 344 PageID #:
1664
Case 1:16-cv-00103-WTL-MJD   Document 43-4   Filed 01/23/17   Page 1 of 11   PageID 162

# EXHIBIT 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

WILLIAM RAINSBERGER,       )
                           )
    Plaintiff,             )
                           )
v.                         )   Case No.: 1:16-cv-103-WTL-MJD
                           )
CHARLES BENNER,            )
                           )
    Defendant.             )

## AFFIDAVIT OF CARL WOOLDRIDGE

    I, Carl Wooldridge, am over the age of eighteen (18), am of sound mind, and am competent to testify that the below facts are true and correct based on my personal knowledge.

1. I am currently employed as a Firefighter/Paramedic with the Indianapolis Fire Department.

2. I have been employed by IFD for five years. I was employed by the Lawrence Township Fire Department for fourteen years prior to the merger with IFD.

3. On November 19, 2013, I was working as a Paramedic for IFD at Station 43 located at 7604 East 10th Street, Indianapolis, IN 46219.

4. On November 19, 2013, we were dispatched on an assault trauma run to 801 North Shortridge Road, Indianapolis, IN 46219.

5. Once I arrived on scene, I was met by the patient's son who stated that "someone had caved his mom's head in."

6. When I entered the residence, I noticed that the patient was laying on the ground with a piece of cloth covering her head. The cloth was stuck to her head and appeared to have not been removed.

7. I had to remove the cloth to visualize the patient's injuries.

8. Based on the patient's injuries, it was my initial medical opinion that the she was suffering from a gun shot wound.

9. I thought it was strange that the patient's son said his mother's head had been caved in because he did not remove the cloth to visualize her injuries and her injuries appeared consistent with a gun shot wound.

10. In addition to myself, there were three other individuals on Engine 43 and two or three other individuals in the ambulance crew on scene who assisted with treating the patient.

11. On December 4, 2013, I gave a recorded statement to Detective Charles Benner regarding my recollection of events on November 19, 2013.

12. I have reviewed Attachment A and it is a true and accurate transcript of the statement I gave to Detective Benner on December 4, 2013.

13. Additionally, to the best of my knowledge and recollection Attachment A is a true and accurate depiction of the events that occurred on November 19, 2013.


FURTHER AFFIANT SAYETH NOT.

**AFFIRMATION**

In accordance with 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing responses to interrogatories are true and correct.

Date: 12/5/2017

Carl Wooldridge

Case 1:16-cv-00103-TWP-MJD   Document 88-1   Filed 11/28/17   Page 76 of 344 PageID #:
Case 1:16-cv-00103-WTL-MJD   Document 43-1   Filed 01/23/17   Page 5 of 11   PageID 166
1668

# ATTACHMENT A

This is a statement being given by Fireman Carl Wooldridge, the date is now 12-04-2013, the time is 1430 hours.  This statement is being given to Detective Charles Benner.  We're presently at 555 North New Jersey Street.  This statement is being given in reference to case number DP 13153344 which occurred on 11-19-2013 at approximately 3:39 p.m., at 801 North Shortridge.

Q.      Sir, can you state your name please?

A.      Carl Wooldridge.

Q.      Can you spell your last name for me?

A.      W O O L D R I D G E.

Q.      And what's your birthday sir?

A.      ██████1962.

Q.      And can you tell me where your home station is?

A.      Station 43, A-Shift.

Q.      Okay and where is that located?  You know the address?

A.      7600 something, East 10th Street.

Q.      Okay, so you're not too far from where this happened?

A.      Yeah we're just down the road from it.

Q.      Okay, so you were working on November 19, 2013 then?

A.      Yes.

Q.      And you received a run to 801 North Shortridge?

A.      Yes.

Q.      Okay can you tell me in your own words what you remember about that incident?

A.      We were dispatched on an assault trauma.  We normally wait on law enforcement on the MDT it said it had something to do with an autistic child, we read it as to go ahead and go in and start the search or treat the child that was injured.  We were met by a man outside the residence stating that someone had caved his mom's head in.  We went ahead and entered the apartment to find an elderly white female lying on her right side between a chair and a coffee table.  I could hear the patient breathing, moved the chair and was able to make access to the patient.  The patient had a greenish colored piece of cloth over her head with blood on it and a hole.  Pulled the cloth back to reveal an area on the left back side of her head, two to three inches in diameter with brain matter protruding.  The patient also had what I believed to be a hole in the left side of her forehead.  Come to find out later from the medic that actually took it in she cleaned her head and that was not a hole in her forehead, it was a mark from blood, vomit, or something, but she cleaned it and said it was not a hole there.  The patient was clutching her glasses in her left hand.  The patient's robe, shirt sleeve cut to make access to get the vitals.

Statement of Carl Wooldridge                DP130153344                          Page **1** of 6

Unable to palpate a radial pulse, monitor wouldn't pick up patient's BP at this time.  Medic 20 arrived, we patted patient's head with a towel and log rolled her onto a back board.  The patient's eyes then opened, she moved her left arm, patient secured to back board and moved to cot for transport to Wishard.  IFD Collup was driving the ambulance and the regular ambulance crew were (INAUDIBLE) in the back.

Q.   Okay.  So were you guys the first ones to arrive before the ambulance?

A.   Yes, yes we were.

Q.   Okay and you remember where the guy was that...

A.   ...he was standing right outside the door to the left of the door, in between a couple of cars I believe that was sitting there and he seemed a little bit distraught and made that statement that somebody had caved his mom's head in, which kind of struck me as odd, especially when I got in there and her head was still covered up with that piece of cloth and as I went to remove the cloth the cloth was actually stuck to her head so if he knew her head was caved in that cloth would have already been removed and not have been stuck because that blood had already dried, so.

Q.   Right.  Could you tell if the cloth was laid over her while she was laying on the ground or was it completely, was she like laying on part of the cloth too so it was completely overhead before she hit the ground or were you able to determine that?

A.   To the best, because I laid the cloth back, I would say it was on both sides of her head, because as we rolled her up it stayed laying down in the blood so I believe it was over...

Q.   ...completely...

A.   ...other than just over the one side.

Q.   Okay, gotcha.  Alright, and he was actually outside then, he wasn't in the apartment building anymore?

A.   He was outside and the guy (INAUDIBLE) I told him to keep him outside, I didn't need him back inside after seeing what we thought was damage from a bullet, we hollered out to make sure he had law enforcement on the way.

Q.   Okay.  Do you remember at all what he looked like?

A.   Tall guy, late 50s, blackish gray hair, kind of ear length.  Just kind of common...

Q.   ...did he say if he was the one that called the police?  Or called for fire.

A.   He directed us to his mom, where she was at.  I can't, I wouldn't swear that he said that he's the one that actually called.  There was another man standing there that he said was his brother I believe.

Q.   Okay.  So he was already on the scene too?

Statement of Carl Wooldridge                 DP130153344                          Page **2** of 6

A.  Yes.  When we got ready to leave, now I only seen the one man when we showed up.  Before we left the second man was there.  I heard him refer to him, to another one of the officers that that was his brother.

Q.  Okay.  So when you first got there was there anybody else around him then?

A.  Not that I seen.

Q.  Do you know, was he talking on the phone or was he smoking a cigarette or do you remember what he was doing?

A.  He wasn't doing either one of them.  He was kind of...

Q.  ...messing with his hands?

A.  Messing with his hands.

Q.  Okay.  When you got to the apartment door was it open?

A.  The door was opened probably about a foot, foot and a half.

Q.  Okay.  And as soon as you stepped inside she was laying right there?

A.  Yeah.

Q.  Okay.  You said she opened her eyes.  Was she ever able to say anything?

A.  She never spoke in my presence and from my understanding the medic took it in.  When I talked to her some time later she never spoke to her.  She did grasp that lady's hand but, the medic's hand but she never spoke to them.

Q.  Okay.  Do you remember when you made, when you went into the apartment did it look like anything was out of order or anything, besides her laying on the floor?

A.  It looked like a reasonably clean, neat apartment.  Before we moved anything I looked behind and up after we seen it was a hole in the thing thinking it would be blood splatter on the ceiling or wall, never seen no blood splatter anywhere and made sure and told the officers there that we slid, how we slid the chair and the table back so we didn't disrupt anymore than we absolutely had to.

Q.  Okay.  So when you're talking about the chair you're talking about that cloth covered chair that she may have been sitting on?  You moved that just straight back?

A.  Just kind of at an angle to peel it away from her, the table and the chair both, just kind of pushed them at an angle to make access to her.

Q.  Okay.  So was she touching either one of those two when you got there do you think?

A.  Her back would have been to the foot of the chair and her head was towards the coffee table.  And she was really kind of wedged in between the two, not that they was real tight, but she was in between the two of them.

Q.  Okay.  But she wasn't under the coffee table?

Statement of Carl Wooldridge                    DP130153344                    Page **3** of 6

A.    No.

Q.    Okay.  So it looked like she could have just came right down from the chair and just off to her right hand side?

A.    Yeah.

Q.    Okay, alright.  And you didn't see any blood splattered on any of that stuff either, correct?

A.    No.

Q.    Okay.

A.    That was, I mean I've been on a shooting before and I remember the blood splatter being on the ceiling and the wall as soon as you looked.  It wasn't a lot but there was, and I didn't see anything on this wall, so.

Q.    Okay.  And the first thing that he said to you was, did he say my mom?

A.    His statement was someone had caved his mom's head in.

Q.    Okay.  And that's the only thing he said about her?

A.    Yeah.  And I didn't wait to hear anything more, I just went to treat her, or see if she was treatable.

Q.    And based upon what you saw in there with the blanket and everything, you said you thought that was kind of strange for him to say that?

A.    Yes, because, I had to peel that off, it was stuck.  If he'd have peeled that off so he could have seen what was there, I wouldn't have had too.

Q.    Right.

A.    And it just, I mean it kind of stuck in my head that yeah it was easy because you know, I was assuming it was a bullet hole and didn't want to pull anything more off than I had to, but it was stuck and I had to peel it back.  If he'd have already done that...

Q.    ...and she was breathing still?

A.    She was, I could hear her breathing.  When I got up to her I could still hear her breathing.

Q.    Okay.

A.    That's the reason I knew she was still alive.

Q.    Okay.  Alright did you have any more contact with him then before you left?

A.    No, when we walked out the door I asked, there was two officers with him at the time, I asked them if they needed us to stay around, they said no and we went up, took our crew up to Wishard.

Q.    Okay.  Was the ambulance already taking her out then?

A.     The ambulance had already left at the point, before we left.

Q.     Okay, alright.  Was there anybody else that might have heard what you heard about him saying that his mom's head was caved in?  Was there an EMS person there?

A.     I don't know whether anybody else from our engine got up to him as fast as I did because I, I mean I come off the driver's seat too, I'm the medic and I was right there at him.

Q.     Okay.

A.     I don't know whether the officer got around or one of the EMT's got around in time to actually hear that or not, but after he said that I had the, Tony Landez was the officer that day, I had him stay with him, because I didn't want him back inside the apartment.

Q.     Okay.  And you thought that that comment was strange enough that you actually made note of that in your report?

A.     Yep.

Q.     Okay, alright.  Mr. Wooldridge is there anything else you might remember about this incident or anything you want to add?

A.     No, not really, I mean.

Q.     Okay.  You didn't notice any injuries on him or anything that jumped out at you?  Any blood on him or anything?

A.     No, but him or the other guy that I believe was his brother, neither one acted terribly, I mean if it had been my mom I'd have been either upset because you know she was hurt or I'd have been t-totally ticked because she was hurt, one of the two.  And they really didn't show…

Q.     …any emotion?

A.     Well that type of emotion anyway.

Q.     Right, right.

A.     The one that I believed to be the brother that never actually said nothing, he was smoking a cigarette like it was just another day in the park.  Just didn't seem quite right.

Q.     Right, okay.

A.     People handle things in different ways, I know, but that didn't seem right.

Q.     Okay.  And you don't remember them asking you anything before you left, about how she was, nobody asked her condition?

A.     Somebody said is she still alive but I can't say whether it was one of the officers or one of them.

Q.     Right, okay.  And is it safe to say that everything that they did was kind of strange at the scene, the two brothers?

A.     I thought it was.

Statement of Carl Wooldridge                    DP130153344                              Page **5** of **6**

Q.    Okay, alright.  Is there anything else you can think of at this time?

A.    Not right now.

Q.    Okay, alright.  This will be the end of the statement being given by Fire Fighter Carl Wooldridge,
      the time is now 1441 hours.

END OF STATEMENT

KLM

IMPD

02-06-2014

# EXHIBIT 5

---

**5**

1     on the department here also.
2   Q   With the --
3   A   I graduated in August of '89 from Kent State and
4     started here in October.
5   Q   Did you start with the City or the sheriff's
6     department?
7   A   The City.
8   Q   So you worked for IPD --
9   A   IPD.
10   Q   -- and now IMPD your whole career?
11   A   Yes.
12   Q   And what different positions have you held with
13     the I -- with the City's police department?
14   A   The only two positions I've had was working
15     south district on the street and homicide.
16   Q   And -- and homicide as an investigator?
17   A   Yes.
18   Q   What -- and you've gone back and forth, haven't
19     you, a few times?
20   A   Yes.
21   Q   Why is that?
22   A   Just -- I was there, like, four and a half years
23     the first time.  My son was young, I wanted to
24     spend more time at home so that's why I left the
25     first time.  The second time I was there -- I

**6**

1     don't know -- two and a half years maybe, same
2     reason, I mean, coaching, wanting to be home
3     more, stress of the job, no sleep.
4   Q   A little longer hours?
5   A   It wears on you.
6   Q   Less regular hours when you're a detective with
7     the homicide?
8   A   Correct.  It can go on for days without, you
9     know, I mean you can't make any plans, you know,
10     that sort of thing.  My son's a teenager, a
11     junior in high school now, so he's more
12     understanding of me not being there when I can't
13     be.  And I've over the years got used to the
14     job, learned to handle it better, you know,
15     learn to occupy your time better, ration your
16     time better.
17   Q   It's always a struggle to juggle, isn't it?
18   A   Yes.
19   Q   What have you done to prepare for the
20     deposition?
21   A   Basically just went over my file again, read my
22     notebook, read the probable cause, met with my
23     attorneys, Kathryn and Lynne.
24   Q   And when you say your file, the documents that
25     comprise the homicide file in the case?

**7**

1   A   Yes, just basically who I spoke to and items of
2     evidence collected, looking at the crime scene
3     photos, that sort of thing.
4   Q   Did you learn anything from going back over
5     those, that file, that you hadn't seen before or
6     hadn't thought about back at the time that you
7     were working the case?
8   A   No, not really.
9   Q   Okay.  Is it an active case?
10   A   It's not closed, so it's still open.
11   Q   Is it assigned to you still or --
12   A   Yes.
13   Q   When was the last time you had done anything to
14     investigate the case?
15   A   It's been probably since he was released and the
16     case was dismissed.  I haven't really -- I've
17     had probably 15 cases since then so I don't have
18     time to go back to it right now.  There hasn't
19     been any new information.  The case hasn't led
20     me in any other direction.
21   Q   So since that time you haven't done any further
22     investigation or --
23   A   No.
24   Q   -- uncovered any other evidence?
25   A   No.  There's no new evidence.

**8**

1   Q   Okay.  Tell me when you first learned about the
2     case.  What -- who called you and what did they
3     tell you and what did you do?
4   A   I was contacted, I believe, Detective Feuquay
5     responded to the scene.  It was initially an
6     aggravated assault because the victim, Ruth, was
7     still breathing and had some vital signs.
8         So Detective Feuquay is an aggravated
9     assault detective and he was the only one on the
10     scene.  He contacted me when he found from the
11     medics that she was in critical condition at
12     that point, unresponsive.  They were unable to
13     get her to speak or come to in any way.
14         So I came to the scene.  The run came out
15     probably about 3:39 P.M.  I got there probably
16     about 4:15 or so, made contact with
17     Detective Feuquay and he just let me know
18     basically what he had.
19   Q   What did he tell you he had?
20   A   The only information he had really was that the
21     son had called 911, that the victim was found
22     covered with a blanket, and she was transported
23     by medics in critical condition.
24   Q   She was already gone by the time you got there?
25   A   Yes.

<table>
<tr><td>

**9**

1  **Q   Were there any photographs taken of the scene**
2  **before she was -- she left?**
3  A   I don't believe so, no.  She was still alive so
4  the medics won't leave her there.  They'll take
5  her immediately.
6  **Q   Okay.  Tell me a little bit -- kind of back off**
7  **a little bit.  What's your process when you do**
8  **an investigation like this?  What do you try to**
9  **do in general?**
10  A   Basically my job as a lead investigator is to be
11  the manager of the scene, get there, make sure
12  everything's been secured, made contact with the
13  reporting officer also, which was Officer Price,
14  see what information he might have.  He let me
15  know that William was on scene and Robert, the
16  other brother, had showed up on scene in a
17  vehicle.  They were separated and still at the
18  scene.
19  I basically do a quick walk-through of the
20  scene to see, just to get a general impression
21  of what's going on in there, what items I'm
22  going to need collected when I call the crime
23  lab.
24  Detective Tudor did an initial canvas of
25  the building there to talk to people that may

</td><td>

**11**

1  A   They were by police cars or in police cars there
2  around the parking lot.
3  **Q   What did you tell them when -- or did you talk**
4  **to them initially at the scene?**
5  A   I initially -- I didn't tell them anything
6  per se.  In a case -- I knew that this was a
7  mother/son -- the son reporting a mother that
8  was found in this condition so protocol or
9  whatever, in my opinion or what I've been
10  taught, was that I wanted to ask them if they
11  would, just to cover all my bases, if they would
12  submit to a consent to search of their vehicles
13  just to make sure that they weren't involved in
14  any way and see if there was anything that would
15  connect them to the apartment during the time of
16  the incident.
17  They both consented to that.  And I
18  basically told them I was going to have to take
19  them downtown and take statements from them,
20  which they said that was fine.  So they were
21  later transported.
22  **Q   Did you transport either one of them?**
23  A   I transported Robert.
24  **Q   Okay.**
25  A   Officer Price, I believe, transported William.

</td></tr>
<tr><td>

**10**

1  have seen or heard anything.
2  I receive all the information I can about
3  the medics and people that transported the
4  victim to the hospital.  And basically I called
5  for crime scene.  At that point Jennifer Lane
6  responded to the scene.
7  **Q   What is her position and what is her role?  What**
8  **does she do?**
9  A   She was the crime scene CSS.  They call them
10  "crime scene specialist."  She is the one that
11  will videotape, take photographs, do a crime
12  scene sketch, collect any evidence, and then
13  testify later about the cases.  She'll also
14  process the items that are collected like prints
15  and DNA, take the swabs; but she doesn't
16  actually process them after that point.
17  **Q   Somebody else does the DNA analysis?**
18  A   Yes.
19  **Q   But she collects the swabs?**
20  A   Yes.
21  **Q   Okay.  What did -- you said you separated the**
22  **brothers, William and Robert?**
23  A   Yes.
24  **Q   Where did you put them or where did you have**
25  **them?**

</td><td>

**12**

1  **Q   And then you went down to IMPD headquarters?**
2  A   Yes.
3  **Q   Did -- now, they were transported in marked**
4  **police cars or unmarked or --**
5  A   Officer Price had a marked car, but I had an
6  unmarked car.
7  **Q   The -- were they free to go at that point?**
8  **Could they have just said, "No, we don't want to**
9  **talk to you"?**
10  A   Yes.
11  **Q   But they voluntarily agreed to go downtown?**
12  A   Yes.
13  **Q   And they voluntarily agreed to have search of**
14  **the cars?**
15  A   Yes.  They signed a consent to search.
16  **Q   Did the search of the cars reveal any evidence?**
17  A   No.
18  **Q   They went downtown.  Where did you put them?**
19  A   In interview rooms in the back.
20  **Q   Separate interview rooms?**
21  A   Yes.
22  **Q   And what did you learn from -- did you interview**
23  **both of them?**
24  A   Yes.
25  **Q   Okay.  About how long did those interviews last?**

</td></tr>
</table>



**13**

1  A  I'm not totally positive.  Probably about an
2    hour for William and probably not quite as long
3    for Robert.
4  Q  Okay.  What did you learn from them, those
5    interviews?
6  A  From William I learned that he said that he
7    spent the night in Plainfield playing poker the
8    night before, that he had seen his mother
9    probably between 6:00 and 6:30 P.M. before he
10   went out there.  He returned back to the east
11   side around 9:00 in the morning, went to his
12   house, Robert was there.  They spent the day
13   there doing laundry, watching TV, that sort of
14   thing.
15     He said that around 3:00 or so he went over
16   and said -- told Robert he was going to go check
17   on his mother.  He said he went over to the
18   Kroger, bought an ice tea, went to her
19   apartment.  There was a bag on the door that
20   contained some items.  He took the bag off the
21   door, returned to his car.  He was going to go
22   home and look over those items, but decided
23   instead to go over them with her.  He said --
24   went back to the door, used his key to get in,
25   said he thought that maybe the door was

**14**

1    unlocked, wasn't sure, went inside, saw his
2    mother lying on the ground covered in a blanket.
3      He walked around the other side to the
4    coffee table, put down his ice tea, said he
5    could see some blood that seemed to be to be
6    coagulating through the blanket.
7      He said he called 911.  He said at first he
8    wasn't sure if she had fallen and hit her head
9    or if she had been attacked.  He eventually made
10   reference to the fact that he thought that she
11   was hit with a lead pipe, could have been hit
12   with a lead pipe.  I asked him about items that
13   might have been -- if she had a purse or
14   anything like that.  And he described a black,
15   shiny purse that I believe we photographed in
16   the back bedroom that was still on the scene
17   along with a beige coin purse that was also in a
18   drawer in the bedroom, said that she never
19   really carried any money.  She hadn't been out
20   of the house but a couple times in a whole year.
21     Never mentioned -- oh, I asked him about
22   medication.  He said most of her medication was
23   over-the-counter.  Over-the-counter drugs were
24   still on the counter when we were there.  He
25   said she may have some type of dementia

**15**

1    medication.  I'm not sure what the name of that
2    might be.
3      As far as items missing --
4  Q  Was that ever uncovered, was there ever any
5    prescription medication recovered from the
6    scene?
7  A  No.  There was a little pill dispenser.  I'm not
8    sure what was in there, but there was a lot
9    of -- there's pictures.  I'm not sure if they
10   would show if there's any prescription
11   medication there; but there was a large number
12   of over-the-counter drugs there were still there.
13 Q  But you didn't find any prescription medication
14   in a bottle?
15 A  I didn't see any.
16 Q  Did you follow up with any pharmacy to determine
17   whether she had been prescribed any prescription
18   medication?
19 A  No.  No, Bill said that she was -- if she was
20   prescribed any, it was just for dementia so it
21   didn't seem like it had anything to do with the
22   case really.
23 Q  Did any of the children tell you that it had
24   come up missing, that she had a pill bottle
25   there?

**16**

1  A  No.
2  Q  Okay.  Anything else you learned from those
3    interviews?
4  A  Just from that interview, I believe that was
5    most of what basically that lead pipe thing was
6    significant to me that time.
7  Q  Why was that?
8  A  Because the medics and people at the hospital,
9    we all thought that she suffered a gunshot
10   wound.  So we -- I wasn't even thinking that
11   there was blunt force trauma at that time.  It
12   didn't really mean anything at that point until
13   I found out that she actually was.
14 Q  Suffered blunt force trauma?
15 A  Right.  And then it kind of jumped out at me
16   that somebody would say in a 911 call, said
17   that -- or told the fireman that somebody bashed
18   his mom's head in.  So I don't know how he would
19   know that if she is covered with a blanket.
20     The other thing from that interview was
21   that she was covered with a blanket.  She was
22   breathing loudly.  He didn't attempt to pull the
23   blanket off, didn't, you know, try to pull it
24   off, ask her what happened, see if he could
25   render any first aid.



**57**

1  been at the beginning and they flee without
2  causing any disturbance; correct?
3  A  Maybe.
4  Q  You don't know any of the circumstances exactly
5  whether -- which one of those circumstances may
6  have happened in this case, do you?
7  A  No.
8  Q  Do you even know what time it was that Ruth
9  sustained her injuries?
10  A  I don't have an exact time, no.
11  Q  You believed it was before 10:30 in the morning;
12  correct?
13  A  Yes.
14  Q  Because Delbert Pickens and Meals on Wheels both
15  knocked on her door and called her phone?
16  A  Yes.
17  Q  And Ruth's cell phone records that we saw show a
18  call from Delbert Pickens at about 10:29 A.M.
19  that morning; right?
20  A  They show a call at that time, yes.
21  Q  To Ruth's landline?
22  A  Yes.
23  Q  I guess that tells us a couple of things.  I
24  mean, one, you took it that that means that she
25  was probably injured because she didn't respond

**58**

1  to the door before 10:30 in the morning?
2  A  Yes.
3  Q  It also tells us that AT&T reports on their
4  landline records that calls that are even made
5  to that landline that aren't -- aren't picked up
6  on; correct?
7  A  Possibly, yes.
8  Q  Well --
9  A  Doesn't mean they record all of them.
10  Q  Yeah.  And you don't know whether they do or
11  not?
12  A  I don't know what they did.
13  Q  And you didn't check with them to see if they
14  did or not?
15  A  No.
16  Q  Correct?
17  A  Correct.
18  Q  Okay.  The -- and you know William had said he
19  had been over there maybe 5:30, 6:00 the night
20  before?
21  A  Yes.
22  Q  You didn't have anybody's -- information from
23  anybody that showed that the injury occurred
24  sometime after that time the night before of the
25  18th or early in the morning of the 19th?

**59**

1  A  We can't specify what time it happened.
2  Q  Okay.  You say in that third paragraph there in
3  the bottom that "There was a lockbox in the back
4  room in plain view that contained savings bonds
5  belonging to the victim."  Did -- where exactly
6  was the lockbox?
7  A  It was in the closet in the room right there
8  with the clutter, the boxes and the bags.
9  Q  So that's not -- and it's in a lockbox itself?
10  A  Yes.
11  Q  In a closet in a cluttered room?
12  A  Yes.
13  Q  And that's what you're stating is in plain view?
14  A  If you walk into the room, it's in -- I mean,
15  you could see it just by looking in the closet.
16  The closet door was open.
17  Q  You can see a lot of things, though, because
18  it's cluttered, a lot of boxes, a lot of the
19  different things in that room; correct?
20  A  Yes.  I pointed that out just because that's an
21  area that I believed if somebody was looking for
22  valuables they would check a lockbox that's
23  sitting there in plain view is probably what
24  somebody would be looking for if they were going
25  to burglarize an apartment.

**60**

1  Q  And you said that the lockbox contained savings
2  bonds?
3  A  That's what it says here, but I heard they might
4  be certificates of deposit or whatever, some
5  kind of financial documents.
6  Q  They weren't savings bonds?
7  A  I'm not sure what they were, but that's what I
8  put in here.  They were something like savings
9  bonds, certificates of deposit.  The point was I
10  was just showing there was something with
11  possible value in that box that wasn't looked
12  through.
13  Q  On the second page of this, you report what you
14  found -- what William had told you.
15  A  Yes.
16  Q  Second paragraph, that's on the evening of
17  November 19th when they voluntarily cooperated
18  with you and went to the police headquarters and
19  gave a recorded statement?
20  A  Yes.
21  Q  Without even a lawyer present; correct?
22  A  Yes.
23  Q  Same thing on the second paragraph.  You report
24  what Robert told you in that interview on
25  November 19th at police headquarters?



61 to 64

---

**61**

1  A  Yes.
2  Q  And that last sentence in that paragraph you say
3      "At no time did Robert or brother, William, ever
4      ask me how mom was doing or if they could get to
5      the hospital to see her."
6  A  Right.
7  Q  Was that true?
8  A  Yes.
9  Q  That seems to indicate that they were uncaring
10      or unconcerned about their mother, doesn't it?
11  A  Seemed to be, yes.
12  Q  Okay.  Why would they ask you how their mom was
13      doing?
14  A  Why would they ask me?
15  Q  Yeah.  You were at police headquarters with
16      them.  Why would they ask you?
17  A  Well, because I could check for them.  I mean,
18      everybody asks -- not everybody but a lot of
19      people ask after their loves ones.  They want to
20      get out of there as quick as they can to get to
21      the hospital.
22  Q  Well, did they indicate they wanted to be there
23      at police headquarters or were they there
24      because you told them you needed them to go
25      downtown and give a statement?

**62**

1  A  They came down because I asked them to.  I mean,
2      this -- this statement is basically not even
3      about just that night.  It's just following
4      that.  I mean, nobody ever called later in the
5      evening.  They never called about the suspects,
6      never called to check in on the case.
7  Q  You have another statement about that and we'll
8      get to that.  But with respect to that night you
9      say at no time did they ask you about their
10      mom's condition when they're there under
11      interrogation by you.  But you weren't at the
12      hospital so you didn't know what their mom's
13      condition was.
14  A  No, but I can call the hospital and find out.
15  Q  Well, wasn't --
16  A  I mean, the main reason why I came up with that
17      was because on the way downtown William told the
18      officer, "I don't know if it's a good thing or a
19      bad thing if my mom dies."
20          From that point, there was really no sign
21      of emotion.  He talked to me like nothing was
22      even happening during his statement.  So that --
23      when you make a statement like that, it makes me
24      think that you're not really concerned whether
25      she dies or not if you don't know if it's a good

**63**

1      thing a bad thing.
2  Q  You reported that but you also reported that he
3      didn't ask you how his mom's condition is when
4      he's there being interrogated by you at the
5      police headquarters.
6  A  Right.  He didn't ask if he could leave to go
7      see her.  That's correct.
8  Q  Wasn't his sister at the hospital with his
9      mother?
10  A  Probably.
11  Q  And didn't William have his cell phone with him?
12  A  If he was making communications -- I didn't say
13      in here that maybe he was talking to his sister
14      about it.  But the truth of the matter is I put
15      in there he didn't ask me about it.  That's all
16      it says.  He didn't ask me about it.  Maybe he
17      asked his sister.  He didn't say anything to me
18      about it.
19  Q  Well, didn't he receive a call from his sister?
20  A  I don't know.
21  Q  Didn't he talk to his sister while you were
22      interviewing him asking him about his mother?
23  A  Not that I remember.
24  Q  But if he did, you didn't put that in the
25      report?

**64**

1  A  I don't remember him talking -- he wasn't
2      talking on the phone when I'm interviewing him.
3      He was back there with the cell phone by himself
4      for a while, so he may have had contact with her
5      at that point.
6  Q  Right.  But if you knew he had been talking to
7      his sister about his mother and how she's doing,
8      that would create a very contradictory inference
9      from the one you're trying to draw here that he
10      is uncaring and unconcerned because he's not
11      asking you about his mother?
12  A  He didn't ask.  I just said he didn't ask to go
13      to the hospital to see her.
14  Q  You told him you needed him there; right?
15  A  And I already covered that.  Most people will
16      say, "I need to hurry up.  Can we hurry this up.
17      I need to go see my mother."  That's what I'm
18      getting at.  And that's why I put that in there.
19  Q  Were you dragging it out?  I mean, how long did
20      this take?
21  A  I don't remember how long it took.  Probably
22      about an hour or so.
23  Q  Do you know what they did when they left, Robert
24      and William?
25  A  They probably went to the hospital.

---



---

137

1  Q  So you've done a fair number of investigations?
2  A  I've been lead detective on 69 homicide cases.
3  Q  Okay.  And you've interviewed a number of
4     witnesses and potential suspects?
5  A  Yes.
6  Q  Okay.  Was William Rainsberger's behavior with
7     regards to the polygraph, how he got upset,
8     "stormed out" were your words, typical of
9     someone who had nothing to hide; right?
10     MR. WAPLES:  Objection.  Calls for
11  speculation.
12     MS. BOX:  I'm just asking upon his
13  experience.
14     MR. WAPLES:  It's speculation.  You can
15  answer if you can.
16  A  Based on my personal opinion that it was
17     overboard the way he reacted to the polygraph.
18     I've had people that acted softer than that when
19     they're really being interrogated as a suspect,
20     you know, they acted calmer than he did when I
21     wasn't even treating him as a suspect at that
22     point, so I was caught off guard by it.
23     And so was Tudor and that's why our
24     emotions get elevated there when we all came
25     back together because we were really shocked by

138

1     it.  We thought he was going to say, "Yeah, you
2     need to find who killed my mother, do it now,
3     right now and get it over with, so I'm not a
4     suspect and move on to who did this."  That was
5     my opinion at the time.
6  Q  Okay.  And what is your opinion on
7     William Rainsberger's demeanor and actions
8     following his mother's death attack and death?
9     Was it typical of someone who had lost his mom?
10  A  I'm trying -- I mean, a loved one in general,
11     normally people are crazy crying falling down
12     screaming, yelling, wanting to know what
13     happened, rushing -- I mean, it would be
14     pandemonium in a lot of cases where, not
15     necessarily mother/son, but that doesn't happen
16     very often in my -- I haven't had many cases
17     like that, just a few.  But my opinion was
18     formulated based upon everything at the time.
19     When I investigate a case, I remember
20     everything, how people act, how they talk, how
21     they give statements.  And then once information
22     starts coming in, I kind of backtrack.  Was he
23     acting normal?  And I -- the way -- the thing
24     that really bothered me the most, if I haven't
25     talked about it already -- I think I have -- was

139

1     that he couldn't he didn't check her, didn't
2     grab her and check her and grab that blanket
3     off, which I think a normal human being seeing
4     their mother in that condition would do.
5     So it was kind of weird to me right from
6     the start; but like I said, I did not treat him
7     like a suspect.  I treated him with respect
8     until the polygraph; and that's when he became
9     an actual suspect in my mind.
10  Q  Okay.  And just in general, you don't make the
11     determination of whether there's probable cause
12     to charge someone for an arrest; correct?
13  A  No, I don't.
14  Q  Who makes that call?
15  A  The deputy prosecutor.
16  Q  Okay.  And your job with respect to the probable
17     cause is just to lay out the facts as you have
18     investigated them?
19  A  Yes.
20  Q  In your probable cause -- or in your experience
21     as an investigator, is it possible to chase down
22     every single lead --
23  A  No.
24  Q  -- in a case?
25  A  No.

140

1  Q  Okay.  And is it possible to put everything that
2     you develop from an investigation into a
3     probable cause affidavit?
4  A  No.
5  Q  Okay.  How do you decide what facts are
6     important or warrant putting in the probable
7     cause?
8  A  Basically what you have at the time that points
9     to -- I mean, we're looking for probable cause
10     for an arrest at this point so we don't
11     necessarily have to put everything in there,
12     even if it's negative towards the defendant, we
13     don't have to put everything in there.
14     The way we handle our probable causes is we
15     email them to deputy prosecutor and they look at
16     them and they give input.  If they want
17     something changed, they'll tell us you need to
18     add something.  Is there any more?  This doesn't
19     look right.  You know what I'm saying?
20  Q  Right.
21  A  So there's a give and take at that point; but,
22     everything to do with an investigation, then
23     there's always stuff that comes up after you
24     file the probable cause that adds to it or, I
25     mean, it's possible that something could come up

141

1    that would clear the person also, you know, so
2    but as far as the probable cause, this is a
3    probable cause for arrest; so the prosecutor
4    makes the decision whether or not what she reads
5    there gives her probable cause to request a
6    warrant with the judge.
7  Q  All right.  And the judge granted a warrant in
8    this case; correct?
9  A  Yes.
10 Q  With respect to some of the stolen items from
11    the apartment, from Ruth's apartment, were you
12    ever told by either Rebecca, William, or Robert
13    that anything was missing from the apartment?
14 A  The only one I really talked to about that was
15    William because he was the only one that was in
16    the apartment.  The other two hadn't entered
17    during the investigation.
18      For the next two or three days I went back
19    to the apartment and they hadn't been in there
20    because the crime scene tape was left up to keep
21    people out.  So he was the only one that gave me
22    an indication of what could have been, like I
23    said, the descriptions of the items that he, we
24    found them, I believe, inside the residence.
25    And there was money, credit cards, checkbooks.

142

1      Nothing rifled through, closets unchecked,
2    lockboxes not rifled through either.  So in my
3    opinion, it didn't appear as if anything had
4    been taken.
5      The over-the-counter drugs that he said
6    were on the counter were all still there.  So,
7    yeah, but he would be the only one that would
8    have been able to tell me.  He was the only one
9    in the apartment at the time when this was
10    happening.
11 Q  Okay.  And you've never -- prior this incident,
12    you never met Ruth Rainsberger before; correct?
13 A  No.
14 Q  Never been inside her apartment?
15 A  No, I never been there.
16 Q  So is it safe to say you wouldn't know if
17    anything was missing unless you were told that
18    something was missing?
19 A  Correct.
20 Q  Do you recall in his statement
21    Mr. Rainsberger -- William, excuse me -- telling
22    you that his mom didn't have anything of value
23    in the apartment?
24 A  Yes.
25 Q  Okay.  Okay.  Just finishing up here, did you

143

1    knowingly or intentionally lie in your probable
2    cause affidavit?
3  A  No, I did not.
4  Q  Did you knowingly or intentionally try to
5    mislead the court in the probable cause
6    affidavit or the prosecutor?
7  A  No, I did not.
8  Q  How about did you knowingly or intentionally
9    include what you thought was incorrect
10    information in your probable cause affidavit?
11 A  No.
12      MS. BOX:  No further questions.
13 CROSS-EXAMINATION,
14    QUESTIONS BY MR. RICHARD A. WAPLES:
15 Q  The prosecutor relies upon your characterization
16    of the evidence in the probable cause affidavit,
17    don't they?
18 A  They read the probable causes, yes, and make
19    their decision based upon that.
20 Q  Yeah.  The prosecutor in this case didn't ask
21    you to change anything in the affidavit, did
22    they?
23 A  No.
24 Q  Didn't suggest you put anything else in the
25    affidavit that wasn't already there?

144

1  A  The only thing, like we covered earlier, from
2    December to May was she asked to get the
3    financial records, she asked to include that
4    when I got them.
5  Q  Okay.  But she relied upon your characterization
6    of the financial records as well; correct?
7  A  Yes.
8  Q  And you know that's how it works and your
9    interaction with the prosecutor is that they
10    rely upon you as the homicide investigator to
11    present to them all of the facts in the case;
12    correct?
13 A  Yes.
14 Q  And relies upon you to objectively put forth
15    those facts in a probable cause affidavit that
16    would tend to show whether the person did it or
17    not?
18 A  Yes.
19 Q  Okay.  You said the Kroger video that you saw at
20    the scene of William getting out of the car,
21    didn't contain any incriminating evidence or any
22    exculpatory evidence; is that what you said?
23 A  Yes.
24 Q  Okay.  Did it show anything in his hands getting
25    out of the car?



# EXHIBIT 6

STATE OF INDIANA )                IN THE MARION SUPERIOR COURT
                  ) SS:           CRIMINAL DIVISION 1
COUNTY OF MARION  )               CAUSE NO. 49G01-1405-MR-026747

STATE OF INDIANA,           )
          Plaintiff,        )
     v.                     )
                            )
                            )
WILLIAM RAINSBERGER,        )
          Defendant.        )

## TAPED DEPOSITION OF JENNIFER LANE

Q     David R. Hennessy
A     Jennifer Lane
Pros  Marielle Vincent

1  Q    This is September 8, 2014 depositions on William Rainsberger.  Marielle Vincent for the

2       State, I'm for the defense.   First deponent is Jennifer Lane with the Marion County

3       Forensic Services Agency.  If you would raise your right hand, do you solemnly swear to

4       tell the truth?

5  A    I do.

6  Q    A lot of people wait because they want me to say the whole truth and nothing but the

7       truth and I figure if I've got to say it then.

8  A    I wasn't awake then.

9  Q    State your name.

10 A    Jennifer Lane  L-A-N-E

11 Q    And you're a crime scene specialist at the Marion County Forensic Services Agency?

12 A    I am.

13 Q    And uh you know what case we're here on?

14 A    I do.

15 Q    So when did you first get involved in this case?

1

| | | |
|---|---|---|
| 1 | A | On November the 19th. |
| 2 | Q | Of 2000 |
| 3 | A | Of 2013. |
| 4 | Q | And you went to 801 Jefferson? |
| 5 | A | 801 N. Shortridge. |
| 6 | Q | Jeffersonian Apartments? |
| 7 | A | Yes that's correct. |
| 8 | Q | Apartment H 11? |
| 9 | A | That's correct. |
| 10 | Q | And when you arrive uh tell me what you see in terms of what personnel are present. |
| 11 | A | There were multiple uniformed officers there uh Det. Tutor and Det. Benner were there |
| 12 | | um the front of the apartment building had crime scene tape in front of it.  I immediately |
| 13 | | met with uh Det. Benner and Det. Tutor and they took me to inside and basically that an |
| 14 | | elderly female had been found on the floor there.  She had been transported to the |
| 15 | | hospital and basically we started from there. |
| 16 | Q | Have you uh processed crime scenes indoors in somewhat confined area where um it was |
| 17 | | a gunshot? |
| 18 | A | I have yes. |
| 19 | Q | And have you noticed the odor of uh gunpowder in those situations? |
| 20 | A | Um not a strong odor that I have ever smelled before uh generally by the time we get |
| 21 | | there things have dissipated unless there's been a high number of rounds I would say that |
| 22 | | have been shot but never a scene that I have processed have I ever noticed an odor of |
| 23 | Q | Oh never? |
| 24 | A | Never not at one of my scenes. |

2

| | | |
|---|---|---|
| 1 | Q | And uh so what do you do what do they tell you other than an elderly female? |
| 2 | A | Basically they said that's all we know at this point.  We don't know what her injuries, how |
| 3 | | her injuries occurred um she was laying right here in the doorway when EMS arrived. |
| 4 | | She was found by um one of her sons and basically that is what we know at this point of |
| 5 | | time. |
| 6 | Q | Is your first report dated December 11, 2014? |
| 7 | A | Yes see that would have been when it was finalized yes. |
| 8 | Q | And when I look at that um is where, the results and conclusions like the date and time |
| 9 | | you have is November 19 at 15:55 which would be 3:55. |
| 10 | A | Uh huh. |
| 11 | Q | Is that when you arrive? |
| 12 | A | That would have been my dispatch time and then my arrival time was uh 16:21. |
| 13 | Q | Say what? |
| 14 | A | My oh uh my dispatch time was at 15:55 and my arrival time was at 16:21. |
| 15 | Q | So it would be 4:21? |
| 16 | A | That is correct. |
| 17 | Q | And uh what were you looking at to answer that question, you had something that had. |
| 18 | A | My uh run sheet right here is what we fill out as we go. |
| 19 | Q | Is that something that I've been given today I guess? |
| 20 | Pros | You have everything that I've given you. |
| 21 | Q | Okay and uh when you arrive at the crime scene you uh attempted to obtain some |
| 22 | | fingerprints on some objects and you also did swabbing for DNA analysis. |
| 23 | A | That is correct. |
| 24 | Q | And how do you do that?  Which comes first and second? |

3

1    A    Um we'll typically do the DNA swabbing um at any crime scene first once we discuss

2         with the detective what we thinks is going to be the most appropriative areas to swab just

3         to reduce the chance of contamination of people just going in and out of the crime scene.

4         Detectives and also ourselves um latent print processing is generally the last thing that we

5         do at a crime scene after we've photographed, done our evidence searches um so that was,

6         that particular day is how that would have gone as well.

7    Q    When you first entered the apartment how many people are inside?

8    A    Uh it would have been myself, Det. Benner and Det. Tutor and then the I believe it's the

9         reporting officer also came in and spoke with all of us and gave us kind of a general

10        overview of what he knew when he first arrived on the scene.

11   Q    Did you see evidence of the medical personnel having been there?

12   A    No I did not.

13   Q    No gauze?

14   A    No.

15   Q    No gauze?

16   A    No.

17   Q    No nothing?

18   A    No I did not see anything.

19   Q    And uh with regard to the pen you indicated you attempted to obtain latent's with

20        negative results, what process did you use?

21   A    Um we did that processing back at the lab so the first step in that is going to be the visual

22        um looking at that under white light magnification.  The second step is going to be the

23        CA or cine acculate processing and then ray processing and then the powder processing.

24   Q    So that was all done at the lab?

4

| 1 | A | That is correct. |
|---|---|---|
| 2 | Q | Had you already swabbed it at the scene? |
| 3 | A | Uh no and let me look. Typically on removable items of evidence we are going to do the |
| 4 | | swabs back at the lab where we a have more controlled environment. |
| 5 | Q | So all you did was collect things? |
| 6 | A | Yes. |
| 7 | Q | Uh Det. Benner has talked about it being a plastic container that had cash. |
| 8 | A | That is correct. |
| 9 | Q | A checkbook and I don't see that anywhere in your report. |
| 10 | A | Uh it may not have been written out in my report. It was located in the dining room on |
| 11 | | my uh page 3 of 5 here with uh this table. It wasn't anything that we collected um. |
| 12 | Q | Well he said you did. |
| 13 | A | I did not collect those items. |
| 14 | Q | Okay. |
| 15 | A | No. |
| 16 | Q | But that was not laying out or near at the scene where it was identified that she had been |
| 17 | | found? |
| 18 | A | I'm not sure I understand your question. |
| 19 | Q | Well you said it was in the dining room and then you said on a table here and you know |
| 20 | | where we don't have video but on your sketch from you got a couple of different sketches |
| 21 | | uh how can we distinguish those? |
| 22 | A | What's the page number? |
| 23 | Q | Okay you've got 11/20 on the second one so on the one you sketched and dated it |

5

| | | |
|---|---|---|
| 1 | | November 19th, you said on this table here uh that you designated dining room would |
| 2 | | that be um the square box with the T in it? |
| 3 | A | That is correct. |
| 4 | Q | And that's where you say the plastic container was? |
| 5 | A | Yes uh huh. |
| 6 | Q | And did you take an inventory of it? |
| 7 | A | We just looked through it um just to see what was in there.  We found some minimal |
| 8 | | amount of cash, there's some credit cards, checkbook and didn't find anything that we felt |
| 9 | | like we needed to collect at that time and. |
| 10 | Q | You're saying we can you tell me who? |
| 11 | A | Det. Benner and Det. Tutor that was in there with me. |
| 12 | Q | Okay, did you make notes or inventory of what was in there? |
| 13 | A | I did not. |
| 14 | Q | So you're just going on off memory? |
| 15 | A | Yes. |
| 16 | Q | Do you have any idea what happened to the credit cards or the checkbook? |
| 17 | A | No because we did not collect those items. |
| 18 | Q | Do you have any idea what happened to the plastic container? |
| 19 | A | No we didn't collect that. |
| 20 | Q | Do you know if it was processed for prints or DNA? |
| 21 | A | No it was not. |
| 22 | Q | By you anyway? |
| 23 | A | No it was not. |
| 24 | Q | And uh in your uh in your first report then you indicate that you did submit an envelope |

6

| 1 |   | containing a latent print lift card? |
|---|---|---|
| 2 | A | Yes sir. |
| 3 | Q | Where were those prints from? |
| 4 | A | It was from the light switch um in the living room right next to the front door is where I |
| 5 |   | obtained them. |
| 6 | Q | And do you know if those have been processed or |
| 7 | A | It was and it was not identifiable. |
| 8 | Q | And how do you know that, did you get a report? |
| 9 | A | Uh that we can look that up through IMPD to see if anything came back identifiable on it |
| 10 |   | or not. |
| 11 | Q | When did you do that? |
| 12 | A | We do it, most of us test them just regularly after. |
| 13 | Q | So that's memory you've looked at sometime and |
| 14 | A | Yes uh huh. |
| 15 | Q | Saw a report and uh what you had recovered |
| 16 | A | Right. |
| 17 | Q | Was then insufficient detail for it to be submitted for comparison? |
| 18 | A | Yes correct. |
| 19 | Q | Or was it not was it suitable for comparison but just not identifiable? |
| 20 | A | It said not identifiable basically is what their vague reports that comes back that say non |
| 21 |   | identifiable. So how detailed that is would be for them to say not really for. |
| 22 | Q | Did you take a photograph if you recall of that plastic container on the table in the dining |
| 23 |   | room? |

7

1    A    I don't recall whether or not I did.  It would have probably have been in my overall

2         photos but as far as in detail and the plastic container photograph I can't say whether or

3         not I did.

4    Q    And the eye glasses were still there when you got there.

5    A    That's correct.

6    Q    And then you indicate well let's, you collected the blanket yourself, correct?

7    A    That's correct.

8    Q    And when you identify or describe what you say as a one apparent defect can you give

9         me a better description of that or

10   A    It was uh like a hole or a tear of some variety um and I can't really determine how that

11        defect got there.

12   Q    Do you know uh do you remember was there some dried blood and moist blood or

13   A    There was.

14   Q    Both?

15   A    Uh huh the way um had to hang that up to dry in our drying closet.  The thinner I guess

16        you would say areas of blood had dried by the time that we actually left the scene.

17   Q    And then in that same report you indicate that you recovered a bag for what you say a bag

18        you used to transport victims clothing from hospital and you got that from Breedlove?

19   A    That is correct.

20   Q    Do you have any idea how many different people had handled that before?

21   A    Um let me see possibly in the report.  Well I just have a chain of custody directly from

22        Det. Breedlove which he brought it from the hospital so he did not provide me with a

23        separate chain of custody from nurses or.

24   Q    Other officers?

8

| | | |
|---|---|---|
| 1 | A | Yeah. |
| 2 | Q | Um do you normally get a chain of custody with the objects that you recover at homicide |
| 3 | | office? |
| 4 | A | It depends on the hospitals generally whether or not they provide the detectives with |
| 5 | | them. |
| 6 | Q | Um do you normally get a chain of custody if you take an object to be processed and |
| 7 | | submitted to the lab that you recover at homicide? |
| 8 | A | Yes. |
| 9 | Q | I mean the police, they |
| 10 | A | Yes, yeah, yes the third |
| 11 | Q | Which officer at the scene got it and he gave it to. |
| 12 | A | Right. |
| 13 | Q | But you did not get it in this case? |
| 14 | A | I got it from Det. Breedlove so I have chain of custody from Det. Breedlove and he was |
| 15 | | at the hospital. |
| 16 | Q | Oh so what he gave you indicates that he was at the hospital? |
| 17 | A | Yes. |
| 18 | Q | And he got the sack? |
| 19 | A | That's correct. |
| 20 | Q | And Breedlove gave you that? |
| 21 | A | That's correct |
| 22 | Q | And uh said you itemized uh you get that at homicide office, you take it back to the lab |
| 23 | | and then you itemized it. |
| 24 | A | Uh huh. |

9

1    A    That's correct.

2    Q    Uh what do you recall the appearance of the drawers being in?

3    A    Um the four I believe there were six in the center um I guess you would call that a

4         credenza um type, the longer shorter one, um there was six drawers total.  The top four

5         were slightly opened um and after I photographed those and then opened down further it

6         didn't appear they had actually been gone through at all.  The smaller night stand um that

7         was to the left of that, the top drawer was more fully opened um and there wasn't really

8         enough items in that drawer to be able to determine whether they had really been gone

9         through or not there was just a few miscellaneous items in that drawer.

10   Q    So you can't tell if anything is missing from the drawer?

11   A    No.

12   Q    And then uh did you go through the apartment fairly thoroughly?

13   A    Yes I did.

14   Q    And did you go through the kitchen then fairly thoroughly?

15   A    I did.

16   Q    Your notes indicate that no prescriptions were found.  Do you mean prescription bottles?

17   A    I do.

18   Q    And uh none were found anywhere?

19   A    No, there was um some vitamins um I believe.  I could not recall what types um were on

20        the kitchen counter and just my experience taking care of my own grandparents at the

21        similar age I thought that might be odd that there would not be more prescriptions.  I

22        would expect somebody at that age to have a lot of prescriptions um then we later learned

23        I believe that Det. Benner had spoken with the children and they said she was not on I

24        believe a lot of prescriptions so.

13

1   Q    Did Benner tell you that?

2   A    I believe so yeah.

3   Q    How old is yours, old person?

4   A    Well they are both deceased now but they were both in their 80s.

5   Q    I've got my 88 up here out at Westminster.

6   A    Um

7   Q    Uh in your notes you indicate purse is missing.  Where did you get that information?

8   A    Um also from the family members we've been told that she carried a black purse um and

9         we had searched, both myself and Det. Tutor had searched um all the drawers, the

10       closets, under the beds um in both bedrooms, closets and the other bedroom as well um

11       pantry, kitchen cabinets and we did not locate a black purse.

12  Q    And uh so Benner and Tutor had the same information about the missing purse?

13  A    That is correct.

14  Q    And you indicate that the bathroom was flooded?

15  A    Yeah there was small amount of water um just about to the mid sink area on that

16       bathroom floor um which we later found old she had been having maintenance issues in

17       that bathroom.

18  Q    And uh by flooding, it hadn't run out into the outer area, it was just a pool of water on the

19       floor?

20  A    That's correct.

21  Q    It was not normal.

22  A    No.

14

1   Q   Now we'll get in a debate because me and Benner have difference of opinions of what is

2       normal. I'll try not to use that word anymore. Uh your note kitchen counter around area

3       where over the counter medicines were located.

4   A   Uh huh.

5   Q   Is that in reference to you did latent print processing in that area?

6   A   That's correct.

7   Q   Okay, in uh on the desk is the uh apparent debris do you remember did you photograph

8       that separately?

9   A   I don't recall.

10  Q   To depict the

11  A   If I did I don't remember.

12  Q   Okay.

13  A   Actually if I would have there would have been a separate media card done um and it

14      doesn't look like there was so no.

15  Q   Did you attend the autopsy?

16  A   I did not.

17  Q   Oh um anything else you did on the 19th?

18  A   Um no I don't believe so.

19  Q   You didn't do the alumina that day?

20  A   No we did not um that is a two person operation to do the Blue Star and I believe I was

21      the only one working um that day and at that point also we really didn't know if she was

22      still alive um for one thing at the point at that point we were still there. Um we didn't

23      know what the uh how she had been injured for another thing um that's how we that was

24      actually I believe two or three days later when we came back and did the Blue Star.

15

| | | |
|---|---|---|
| 1 | Q | And then you did a list and it's all in your report where you collected on the 19th? |
| 2 | A | Uh huh. |
| 3 | Q | Is that a yes? |
| 4 | A | That's correct. |
| 5 | Q | I just had to ask. |
| 6 | A | Sorry. |
| 7 | Q | Uh you did your video that day? |
| 8 | A | That's correct. |
| 9 | Q | Alright, and you took photographs that day? |
| 10 | A | That's correct. |
| 11 | Q | And then um they had you go back the next day? |
| 12 | A | That's correct. |
| 13 | Q | About what time? |
| 14 | A | On the um 20th, I was requested at uh 5:09 and arrived at 5:20. |
| 15 | Q | And in your report on that on your first thing on your activity is detective interview. |
| 16 | A | Yes. |
| 17 | Q | What's that? |
| 18 | A | Um it's just basically when we get to the scene we talk to the detective about whether it's |
| 19 | | uh  a original scene or the follow up about what information they have, what new |
| 20 | | information they might have, what were they looking for and kind of go in together and |
| 21 | | see what we have at that time. |
| 22 | Q | So what did he tell you that day? |
| 23 | A | He said um he had the autopsy results done at that point in time, what type of weapon we |
| 24 | | would be looking for (sneeze-excuse me, sorry I'm losing my voice) and um so we knew |

16

1    that at that point we might be looking some type of a blunt object. I believe that the um

2    doctor or pathologist had told him that a hammer might be what we were looking for um

3    so we were searching for a hammer um there were some um items that were on the coffee

4    table as well that I believe he had got information from the uh apartment complex there

5    was a plastic bag that had um lease papers and them that they torn up I believe they had

6    told Det. Benner or Det. Tutor that those had been taped to her front door that day the day

7    of the um incident or the day prior and so um we had decided to go ahead and collect

8    those items as well.

9    Q    So when you went in the next day did uh you notice anything different from the first day

10        as someone had been in there to kind of clean up or anything?

11   A    Um we did notice um when they went back in and looked um we found a black purse in

12        the bottom drawer of the night stand in her bedroom that didn't, did not appear to have

13        didn't have anything in it and it had a store tag still on the purse um we photographed the

14        purse, photographed the tags and um then we continued our search for um.

15   Q    Do you have any notes or anything in this documentation talking about the purse?

16   A    Um we do, (going through papers) we have in there that we have in my previous report

17        that there was a black purse missing in the narrative photographs of it on this media card.

18   Q    I'm, I'm wondering if you made the notation purse missing, I'm looking for any

19        documentation in covering that?

20   A    Just the photograph of it.

21   Q    Okay she didn't make a new notation about the purse?

22   A    No just the photographs.

23   Q    And there's no notation where it was?

24   A    Just the photograph.

| 1 | Q | And where do you recall it being? |
|---|---|---|
| 2 | A | It was in the bottom drawer um of a nightstand in her bedroom. |
| 3 | Q | And do you know if anybody ever showed that to any family member to see if that is the |
| 4 | | purse they were talking about? |
| 5 | A | No I do not. |
| 6 | Q | And it had store tags on it? |
| 7 | A | It does. |
| 8 | Q | So if they just got the purse she had been using but did not seem to be that purse? |
| 9 | A | It would not. |
| 10 | Q | Um and on this date who's with you? |
| 11 | A | Um also Det. Benner and Det. Tutor again. |
| 12 | Q | And do you have another crime lab person? |
| 13 | A | Not on this day. |
| 14 | Q | Just the day you did the |
| 15 | A | No. |
| 16 | Q | So what you go back the 20th, oh just to look for hammers? |
| 17 | A | Yes. |
| 18 | Q | Okay and then you decide to go ahead and take the um bag with the apartment stuff in it. |
| 19 | A | Right uh huh. |
| 20 | Q | Did you uh had you do you remember seeing that the day before? |
| 21 | A | We did see it before um but there was quite a bit of mail, paperwork laying around and |
| 22 | | we didn't know how long those papers had been there. anything like that but once we |
| 23 | | learned that uh it had been on her door possibly that day of the incident we decided we |
| 24 | | would go ahead and recover those items. |

18

| | | |
|---|---|---|
| 1 | Q | Uh there was a notation that you were present when either Tutor or Benner were going |
| 2 | | through an envelope do you recall that? |
| 3 | A | Um can you be more specific? |
| 4 | Q | Well I wish I could, do you recall them going through, what do you remember them |
| 5 | | going through? Did they go through the plastic bag that you recovered? |
| 6 | A | There was not anything in the plastic bag um at the time.  All of the items were laying |
| 7 | | around it that had been in it.  There was like a um a black can cozie that had been given |
| 8 | | to the residents um like a lease renewal agreement um I don't know what all there was. |
| 9 | Q | You indicate a lease renewal offer that was said to be inside of item 22. |
| 10 | A | Uh huh. |
| 11 | Q | Is that a yes? |
| 12 | A | Yes that's correct. |
| 13 | Q | By whom? |
| 14 | A | By the apartment leasing people. |
| 15 | Q | According to? |
| 16 | A | Uh Det. Benner and Det. Tutor. |
| 17 | Q | Oh they both said it? |
| 18 | | TURNED TAPE OVER |
| 19 | Q | I'm hoping that one's good.  Uh what was the last question. |
| 20 | A | You asked what time I left that day um on the 20th and I left at 6:35 p.m. |
| 21 | Q | Um so then you go back.  Do you do anything else on this case then before you go back |
| 22 | | the 22nd? |
| 23 | A | Uh no just the processing that I would have started.  The latent print processing which |
| 24 | | have been happening back in the lab um and then that's when on the 22nd is when we |

19

# EXHIBIT 7

Indianapolis-Marion County Forensic Services Agency
40 S. Alabama Street
Indianapolis, IN 46204
(317)327-3670     FAX (317)327-3607

# Laboratory Examination Report     LAB13-07692     Page 1 of 3

**DATE:** 04/23/2014                    **Agency Case #:**   DP13153344

**TO: Indianapolis Metropolitan Police Department**

**FROM: Shannin Guy, Forensic Scientist**

**EXAMINATION REQUESTED: DNA**

**MATERIAL SUBMITTED:**

| | | |
|---|---|---|
| Item 001.001 | DP13153344 | Possible skin cell sample from the side of the blanket with Panda |
| Item 001.002 | DP13153344 | Possible skin cell sample from the side of the blanket with no Panda |
| Item 002.001 | DP13153344 | Swab for possible DNA taken from the edges of item 002 (glasses) |
| Item 003.001 | DP13153344 | Swab for possible DNA taken from grip area of item 003 (pen) |
| Item 004.001 | DP13153344 | Swab for possible DNA taken from edges of item 004 (glass dish) |
| Item 006.001.01 | DP13153344 | Possible skin cell sample collected from the outside back neck area and outside left sleeve of jacket |
| Item 006.004.01 | DP13153344 | Possible skin cell sample from the outside front legs of the gray pants |
| Item 006.004.02 | DP13153344 | Possible skin cell sample from the outside back legs of the gray pants |
| Item 011.001 | DP13153344 | Blood standard from Ruth Rainsberger |
| Item 013.001 | DP13153344 | Swab of the right hand fingernails |
| Item 014.001 | DP13153344 | Swab of the left hand fingernails *Blood detected* |
| Item 024.001 | DP13153344 | Swab for possible DNA taken from head of item 024 (hammer) |
| Item 024.002 | DP13153344 | Swab for possible DNA taken from handle of item 024 (hammer) |
| Item 025.001 | DP13153344 | Swab for possible DNA taken from head of item 025 (hammer) |
| Item 025.002 | DP13153344 | Swab for possible DNA taken from handle of item 025 (hammer) |
| Item 030.001 | DP13153344 | Buccal cell standard labeled as from William Rainsberger |
| Item 031.001 | DP13153344 | Buccal cell standard labeled as from Robert Rainsberger |
| Item 001.002 | DP14012605 | Possible skin cell sample from cuffs of sweatshirt |
| Item 001.003 | DP14012605 | Possible skin cell sample from inside back neck area of sweatshirt |
| Item 001.004 | DP14012605 | Stain from outside front of sweatshirt |
| Item 001.005 | DP14012605 | Stain from outside front left sleeve of sweatshirt |
| Item 001.006 | DP14012605 | Stain from outside back right of sweatshirt |
| Item 004.001 | DP14012605 | Buccal cell standard from Jacquelyn Goldstein |

LAB13-07692-0008

**RESULTS:**

DNA (Deoxyribonucleic Acid) was characterized using the Polymerase Chain Reaction (PCR) and the AmpFISTR Identifiler Plus amplification kit. Amplification was performed at genetic loci D8S1179, D21S11, D7S820, CSF1PO, D3S1358, TH01, D13S317, D16S539, D2S1338, D19S433, vWA, TPOX, D18S51, D5S818, FGA and Amelogenin.

**CONCLUSIONS:**

The DNA profile obtained from items 001.001, 001.002, 006.004.01, 006.004.02, 014.001 and the partial DNA profiles obtained from items 002.001 and 004.001 match the DNA profile of Ruth Rainsberger (011.001).

The DNA profile obtained from item 006.001.01 is a mixture with major and minor contributors. The DNA profile of the major contributor matches the DNA profile of Ruth Rainsberger (011.001). The partial DNA profile of the minor contributor is from an unknown male individual A. An additional allele at genetic locus D8S1179 is inconclusive. The partial minor DNA profile from item 006.001.01 was entered in the Indiana DNA database and is being maintained on file for future searches.

The DNA profile obtained from item 013.001 is a mixture with major and minor contributors. The DNA profile of the major contributor matches the DNA profile of Ruth Rainsberger (011.001). The partial DNA profile of the minor contributor is inconclusive.

The partial DNA profile obtained from item 003.001 is an inconclusive mixture of at least two individuals.

The partial DNA profiles obtained from items 024.002 and 025.002 are inconclusive.

No DNA profile was obtained from items 024.001 or 025.001.

The DNA profiles obtained from items 001.002 (DP14012605) and 001.006 (DP14012605) are mixtures with major and minor contributors. The DNA profile of the major contributor is from unknown male B. The partial DNA profile of the minor contributor(s) is inconclusive. Ruth Rainsberger (011.001), William Rainsberger (030.001), Robert Rainsberger (031.001) and Jacquelyn Goldstein (004.001, DP14012605) are excluded as contributors to the mixed samples.

The DNA profile obtained from item 001.003 (DP14012605) is a mixture of two unknown individuals. Ruth Rainsberger (011.001), William Rainsberger (030.001), Robert Rainsberger (031.001) and Jacquelyn Goldstein (004.001, DP14012605) are excluded as contributors to the mixed sample.

The DNA profile obtained from items 001.004 (DP14012605) and 001.005 (DP14012605) is from unknown male B.

Portions of pertinent evidence items are being stored frozen.

Case 1:16-cv-06103-TWR-MJD   Document 88-17   Filed 11/28/17   Page 111 of 344 PageID #:
1703

G5025

Signature:



**Shannin Guy**
**Forensic Scientist**

# EXHIBIT 8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

WILLIAM RAINSBERGER,                    )
                                        )
        Plaintiff,                      )
                                        )
        v.                              )    Case No.: 1:16-cv-103-WTL-MJD
                                        )
CHARLES BENNER,                         )
                                        )
        Defendant.                      )

## AFFIDAVIT OF CHARLES BENNER

I, Charles Benner, am over the age of eighteen (18), am of sound mind, and am competent to testify that the below facts are true and correct based on my personal knowledge.

1. I am currently employed as a homicide Detective with the Indianapolis Metropolitan Police Department.

2. I have been employed by IMPD for _27_____ years. I have been a homicide Detective for __12_____ years.

3. On November 19, 2013, I was assigned to investigate the death of Ruth Rainsberger.

4. During my investigation, I uncovered facts that based on my training and experience led me to believe that William Rainsberger murdered his mother.

5. On May 22, 2014, I signed an Affidavit for Probable Cause that outlined the facts I uncovered during the course of my investigation. On or about May 27, 2014, the trial court found probable cause and issued a warrant for William's arrest.

6. My belief that William murdered his mother was based on the following facts:

   a. I focused my initial investigation on William and his brother, Robert Rainsberger because there were no signs of forced entry at Ruth's apartment. William, Robert, and their sister, Rebecca Rainsberger were the only individuals who had keys to her apartment. The apartment complex where

Ruth lived also had a key, but I confirmed that the key had not been moved and was in its normal location at all relevant times. Rebecca's phone records indicated that she was not near Ruth's apartment at the time of her death.

b.  During my investigation, I learned that William was Ruth's primary caregiver. And, to the best of my knowledge, he was the last person to see her alive. William had last seen her the night before the incident around 6:00 p.m. This information indicated to me that William had the opportunity to murder Ruth.

c.  Ruth was still breathing when William arrived at her apartment. William did not put pressure on her wound or attempt to render First Aid. He did not stay with his mother to comfort her. Instead, William called 911 and left the apartment. This behavior seemed suspicious to me. Based on my training and experience, an individual who finds a family member injured will typically try to render First Aid or provide comfort.

d.  There was a blanket covering Ruth's head/face and injuries. William did not remove the blanket to determine the nature and extent of Ruth's injuries. This behavior again seemed suspicious. Based on my training and experience, an individual who finds a family member injured will typically want to know what happened and the severity of the injuries. I also know from my training that when an attacker covers his or her victim's head/face, it often indicates that the attacker had a personal relationship with the victim.

e.  William told to the 911 operator that "someone had bashed her head in." He also told Wooldridge that someone had caved his mother's head in. However, William never removed the blanket to visualize Ruth's injuries. Medical personnel on scene and at the hospital believed that Ruth had suffered a gunshot wound. Dr. Tashjian who performed Ruth's autopsy determined that Ruth's cause of death was multiple blunt force trauma injuries to the head, possibly caused by a hammer-like object. The fact that William had specific knowledge of his mother's injuries, unknown to the medical personnel who treated Ruth, even though he did not remove the blanket, indicated to me that he was involved in her death.

f.  Based on my training and experience, robbery did not appear to be the motive for Ruth's attack. There were no signs of forced entry. Ruth's cash, checks, and credit cards were found at the scene. The drawers in Ruth's bedroom were open, but appeared undisturbed. The back room of Ruth's apartment was cluttered with boxes and trash bags, but they also appeared undisturbed. There was a lockbox in the back room of Ruth's apartment that contained what appeared to me to be valuable documents.

g.  When Officer Price transported William to IMPD Headquarters, William said that he did not know whether what happened to his mother was a good thing or a bad thing. In my opinion, this comment showed a lack of concern for

Ruth, which based on my training and experience was suspicious and uncommon.

h. Ruth did not answer the door when Pickens, a Meals-On-Wheels delivery driver, knocked around 10:30 a.m. Pickens called Ruth's landline when she did not answer the door. Pickens could hear the phone ringing inside Ruth's apartment, but Ruth did not pick up the phone. There was dried blood on the blanket covering Ruth's head. Based on this evidence and my training and experience, it is likely that Ruth was attacked prior to 10:30 a.m. Kroger surveillance video shows William throwing away a straight object, then pushing buttons on the Redbox, and turning to his side to look around at 3:29 p.m.

i. William's phone records, including cell tower site locations, indicate that he was in the vicinity of Shortridge Road and 10th Street on November 19, 2013 during the relevant time. This information again indicated to me that William had the opportunity to murder Ruth.

j. I interviewed William on the evening of November 19, 2013. During that interview, William did not ask me how his mother was doing or if he could go to the hospital to be with her. Based on my training and experience, the family members of a victim are anxious to get to the hospital and want to know the condition of the victim.

k. Ruth had $98,762.70 in assets at the time of her death. William, Robert, and Rebecca were the beneficiaries of Ruth's assets. This information indicated to me that William, Robert, and Rebecca had a financial motive to murder Ruth.

l. I asked William to take a polygraph test. William adamantly refused. He became upset at my request and began yelling. In my experience, individuals who are not involved in a crime are willing to take a polygraph to prove their innocence and assist in the investigation.

7. During a search of the crime scene, I found a black handbag that seemed to match the description of Ruth's purse given to me by William and Robert. I also found a brown coin purse. I learned from William that Ruth's only prescription medication was Aricept, which she took for dementia. Based on my training and experience, Aricept is not a drug worth stealing because it has no value on the street. I do not recall whether William informed me that any of his mother's jewelry was missing. However, William did inform me that Ruth did not own any expensive jewelry.

Based on all the evidence at the scene, it did not appear that robbery was the motive for Ruth's death.

8. In my opinion, the lockbox was in plain view. It was located on the shelf of an open closet. I cannot recall whether the lockbox specifically contained "savings bonds." However, I do recall that the documents looked like financial documents. I included this information in my Affidavit for Probable Cause to support the conclusion that Ruth's apartment had not been burglarized because valuable documents were undisturbed. The documents appeared valuable to me because they were stored in a lockbox and were financial. Again, based on all the evidence at the scene, robbery did not appear to be the motive for Ruth's death.

9. IMPD Detective, Benjamin Bierce, subpoenaed phone records for William Rainsberger, Robert Rainsberger, Rebecca Rainsberger, and Ruth Rainsberger.

10. When I went to Kroger, I viewed footage that showed William driving onto the Kroger parking lot, exiting his vehicle, and walking toward the store entrance. The video did not show William carrying trash. The video also did not show anything relevant to the case. I asked the Kroger Loss Prevention Specialist, Pam Pulliam, to burn disks containing all the video depicting William on November 19, 2013. Pulliam provided me with four disks labeled "Camera 44 Lot," "Camera 29 Exit," "Camera 7 Uscan," and "Camera 30 Redbox."

11. The skin cell DNA evidence recovered from the collar and sleeve of Ruth's jacket was more than likely from one of the first responders. In my experience, it is common for first responders who treat an injured victim to leave touch DNA on the victim or victim's clothing. It is my understanding that the medical personnel on scene had to

log roll Ruth onto a back board and transport her to the ambulance. To perform these tasks, the first responders would have had to touch Ruth. Accordingly, based on my training and experience, I did not find this evidence relevant to my investigation. I was trained to handle this evidence by turning it over to the Prosecutor's Office, which I did, and not to include it in my Affidavit for Probable Cause.

12. Based on all the above evidence and my training and experience, it was my opinion that William murdered Ruth because 1) he had the opportunity; 2) he had a financial motive; 3) he knew specific details about her injuries indicating his involvement; and 4) his behavior following the incident was suspicious and uncommon.

13. I did not knowingly, intentionally, or recklessly make false or misleading statements, withhold exculpatory evidence in my Affidavit for Probable Cause.


FURTHER AFFIANT SAYETH NOT.

## AFFIRMATION

In accordance with 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing responses to interrogatories are true and correct.

Date: 1-12-17

Charles Benner

# EXHIBIT 9

**(manually filed)**

# EXHIBIT 10

| | | |
|---|---|---|
| 1 | A | I mean it's your mother, usually that's your close, you know what I mean that's your |
| 2 | | family.  You know what I mean I'd do it for any family or any. |
| 3 | Q | Have you cared for an elderly person with dementia like 88 or so? |
| 4 | A | Like 88? |
| 5 | Q | Yeah. |
| 6 | A | Any care for them? |
| 7 | Q | Yeah have you had any contact with close family relationship with dementia Alzheimer's |
| 8 | | people. |
| 9 | A | Alzheimer's we've had some Alzheimer's in our family yeah. |
| 10 | Q | Were you the primary care giver |
| 11 | A | No. |
| 12 | Q | Or and um how long have you been a police officer? |
| 13 | A | 5 years. |
| 14 | Q | And have you received, do you get any medical training or? |
| 15 | A | We get limited, yeah, |
| 16 | Q | Just the |
| 17 | A | But I'd also been a certified EMT before so. |
| 18 | Q | Oh where was that? |
| 19 | A | Um through Warren Township Buck Creek. |
| 20 | Q | And so you're saying  defensive mode because you're thinking, you're thinking evidence |
| 21 | | and he's adamant that he didn't touch anything? |
| 22 | A | I wasn't thinking of evidence I was just asking the normal question. |
| 23 | Q | Well you're thinking that he's thinking evidence. |

11

| 1 | A | Well I mean the way I wasn't even thinking anything until he jumped the way he did at |
| 2 | | the question.  I mean it was straight no way in heck you know type of thing I didn't touch |
| 3 | | anything on the scene was the reaction.  I mean of uh other than yeah up until that point I |
| 4 | | really wasn't feeling any uh you know wasn't feeling anything toward him as far as |
| 5 | Q | Suspicious? |
| 6 | A | Yeah really until that moment. |
| 7 | Q | So how did that conversation keep going then? |
| 8 | A | Um really I don't know if I got, I don't know if we talked a whole lot more because |
| 9 | | obviously I want uh to call a detective and get them involved and kind of go down the |
| 10 | | right, you know, set the way or however they wanted to handle everything. |
| 11 | Q | Did you call for homicide then? |
| 12 | A | I did at some point I believe. |
| 13 | Q | Can you testify to anything else that he said there at the scene? |
| 14 | A | Are you talking, William? |
| 15 | Q | Yes. |
| 16 | A | Um not that I recall while we were still on scene no. |
| 17 | Q | Did you get the other fellows identification? |
| 18 | A | I did not by then I had a partner. |
| 19 | Q | And did he? |
| 20 | A | Yeah I'm sure I know he sat in his car.  We ended up separating them each in each car. |
| 21 | Q | Which officer was that? |
| 22 | A | I want to say that was officer I want to say it was Officer Staton that pulled up. |
| 23 | Q | Did anybody go around and get the identification of all civilians at the scene? |
| 24 | A | Are you talking paramedics and everything or just |

12

| | | |
|---|---|---|
| 1 | Q | Yeah. |
| 2 | A | No, no. |
| 3 | Q | How about all civilians that were not related to the emergency response? |
| 4 | A | Well I spoke to the two guys that were standing right there and I even spoke to a neighbor |
| 5 | | and was kind of seeing if they, I got his ID and everything. |
| 6 | Q | Who was that? |
| 7 | A | I think it was the neighbor that lived I think he lived right upstairs but I put him in the run |
| 8 | | he was the guy I just ran and to see you know just anybody that I spoke to. |
| 9 | Q | You don't remember the name at all? |
| 10 | A | Uh not off hand. |
| 11 | Q | And uh |
| 12 | A | I put him in the report. |
| 13 | Q | Uh anybody else that you remember that you talked to or got the identity of? |
| 14 | A | No just them the two brothers and him. |
| 15 | Q | And the neighbor can you remember anything he said? |
| 16 | A | Yeah he just said he worked uh late shift I believe gets home around 3:00 a.m. and that |
| 17 | | basically he hadn't heard anything. |
| 18 | Q | Uh so what happens next? |
| 19 | A | Well detective comes to the scene, Det. Benner, and basically he takes over I kind of just |
| 20 | | let him know what I've found so far and he takes over and I know we have the brothers |
| 21 | | separated and at some point he wants us to transport them downtown to talk with him. |
| 22 | Q | So you take uh William? |
| 23 | A | Right. |
| 24 | Q | And you have some conversation? |

13

| | | |
|---|---|---|
| 1 | A | Well he was talking. I wasn't asking him any questions or anything. |
| 2 | Q | What did he say? |
| 3 | A | He just kind of randomly um well out of the blue he was just he said um out of the blue |
| 4 | | he had said he didn't know if it was a good thing or a bad thing that this had happened. |
| 5 | Q | Do you remember how he says that? |
| 6 | A | Um something to the effect like you know as he's contemplating it I'm not sure if this is |
| 7 | | good or bad. I asked him what he was talking about. He said his mother dying and |
| 8 | | because of the dementia she was already had set in and everything. She was already, |
| 9 | | basically she was already getting toward later stage in life basically. |
| 10 | Q | So yeah (inaudible) well earlier you said you know I don't know if it's a good thing or a |
| 11 | | bad thing this had happened and I'm thinking in the reports I don't know if it's a good |
| 12 | | thing or a bad thing if my mother dies but it was in reflecting that's the jest of it is that |
| 13 | | whether she survived, right? |
| 14 | A | Yes |
| 15 | Q | He wasn't acting like she was dead or anything, was he? |
| 16 | A | Yeah he uh actually he was because he was, he just, you know he just kept saying I can't |
| 17 | | believe it, can't believe it and he was saying that you know that's pretty understandable |
| 18 | | hearing somebody say that so I didn't you know I just let him talk, you know I'm driving |
| 19 | | so. |
| 20 | Q | Sure. |
| 21 | A | And then he kind of went into that don't know if it's a good thing or not. |
| 22 | Q | He was just in disbelief, mostly. |
| 23 | A | Yeah I mean that was his demeanor. |

14

| | | |
|---|---|---|
| 1 | Q | And then he said I can't I'm not sure if that would be a good thing or a bad thing if she |
| 2 | | dies? That's the version I've got. |
| 3 | A | I can't testify that he said yeah if she dies or that she's going to die or anything but it was |
| 4 | | to that, that's what he was talking about. |
| 5 | Q | Well did he say or do anything that made you think he thought she was already dead? |
| 6 | A | Just other than that I mean not really other than he kept saying he can't believe it, he can't |
| 7 | | believe it but that could have been just over anything I'm not positive. |
| 8 | Q | Anything else he said that you recall? |
| 9 | A | Right now I can't remember. |
| 10 | Q | Well do you have any notes or anything you could look at to refresh your recollection? |
| 11 | A | Not really I mean other than what I wrote in the narrative and I reread that but. |
| 12 | Q | So you had prepared for today? |
| 13 | A | Yeah I read it. |
| 14 | Q | You read your report? |
| 15 | A | Yes. |
| 16 | Q | And the part that was in the report? |
| 17 | A | Yeah I read that. |
| 18 | Q | Here's the thing, I get a lot of guys that will say not that I can remember right now and |
| 19 | | then you know then I got to bring them back once a week before trial. |
| 20 | A | Uh huh. |
| 21 | Q | Have you remembered anything yet? I like to try to avoid that. |
| 22 | A | Right. |
| 23 | Q | By trying to find out (a) they are fully prepared and you feel that you are? |
| 24 | A | Yes. |

15

| 1 | Q | And that they've looked at everything that's available to them to refresh their recollection |
| 2 | | you have, right? |
| 3 | A | I looked at my stuff, yes. |
| 4 | Q | Uh well how about this, if you come up with something new or you recall something |
| 5 | | different will you let me know? |
| 6 | A | Yes. |
| 7 | Q | Alright. Now I want to interrupt for just one minute because I want to try to find the |
| 8 | | CAD or the report to get this identification. --- Okay we're back on. The good Officer |
| 9 | | Price is gonna actually going to look on his laptop and then come back and tell me the |
| 10 | | name. We're not going to turn this back on for that. Uh you put it in your report, do you |
| 11 | | remember if you've given it to Benner there at the scene? |
| 12 | A | Uh not positive of it. |
| 13 | Q | It would be available to him because it's in your reports. |
| 14 | A | Yes, yes. |
| 15 | Q | And you don't recall, did you do any other canvassing, knocking on doors, talking to |
| 16 | | people? |
| 17 | A | Not talking or anything no. |
| 18 | Q | And you didn't have enough sufficient contact with any other people in the area that you |
| 19 | | got their identification but for the one person you put in your report? |
| 20 | A | Other than the two brothers. |
| 21 | Q | And the two brothers. Uh do you have any conversation with Robert, the other brother? |
| 22 | A | If I did it was very limited because he, he didn't he was very angry. |
| 23 | Q | Did you ever see him smoking a cigarette? |
| 24 | A | I can't recall the cigarette. |

16

1    Q      Okay.

2    A      I know he was pacing you know when I first walked up and.

3    Q      So he was like uh okay thank you that's all that I have.

4    Pros   No questions asked

         END OF TAPED DEPOSITION OF OFFICER MICHAEL PRICE.


AND FURTHER AFFIANT SAYETH NAUGHT.


_____        _____
Officer Michael Price            Date
IMPD  (31326)


17

Case 1:16-cv-00103-TWP-MJD   Document 88-11   Filed 11/28/17   Page 128 of 344 PageID #:
1720
Case 1:16-cv-00103-WTL-MJD   Document 43-11   Filed 01/18/17   Page 1 of 16   PageID 213

# EXHIBIT 11

STATE OF INDIANA      )         IN THE MARION SUPERIOR COURT
                      ) SS:     CRIMINAL DIVISION 1
COUNTY OF MARION      )         CAUSE NO. 49G01-1405-MR-026747

STATE OF INDIANA,              )
          Plaintiff,           )
     v.                        )
                               )
                               )
WILLIAM RAINSBERGER,           )
          Defendant.           )

## TAPED DEPOSITION OF PAMELA PULLIUM

Q      David R. Hennessy
A      Pamela Pullium
Pros   Marielle Vincent

This is September 8, 2014 depositions on William Rainsberger. Marielle Vincent for the State and David Hennessy for the defense.

1  Q    The next deponent is Pam Pullium. If you would raise your right hand please. Do you

2       solemnly swear to tell the truth so help you God?

3  A    I do.

4  Q    And do you have a hard copy of, did you bring the report or anything?

5  A    Report sir?

6  Q    Yeah they have me a report that you had done.

7  Pros  The one page think that you had

8  A    Oh the narrative, no I didn't.

9  Q    Oh, darn cause I don't have a paper copy. Uh well state your name.

10 A    Pamela Pullium  P-U-L-L-I-U-M.

11 Q    And where do you work?

12 A    Kroger loss prevention district 3.

13 Q    How long have you worked there?

1

| | | |
|---|---|---|
| 1 | A | Uh I've been in this business since 1990. I've been in that district since April of I'm sorry |
| 2 | | I stand corrected 8 years. |
| 3 | Q | And uh the store we're talking about it uh what is it 10th and Shortridge? |
| 4 | A | 7101 E. 10th Street. |
| 5 | Q | And how do you identify it? J100? |
| 6 | A | J-100 sir. |
| 7 | Q | And uh how did you get involved in the, this case with regard to that Kroger's? |
| 8 | A | That is district 3 of the central region of the Kroger Company. Um I am the district loss |
| 9 | | prevention specialist. One of the specialists for that area and I do most of the video |
| 10 | | reconstruction also by virtue of the fact that that's my home store. So I start and end |
| 11 | | every day there. |
| 12 | Q | Um why's that? |
| 13 | A | Excuse me sir? |
| 14 | Q | Why is it? I mean why do you have a home store and why do you start and end your |
| 15 | | everyday at that store? |
| 16 | A | By virtue of the fact that you have to have subpoenas, your mail and everything come to |
| 17 | | one location. |
| 18 | Q | Ah oh so you have an office there? |
| 19 | A | Um I share. |
| 20 | Q | But you're very familiar with that store? |
| 21 | A | Very familiar with that store. |
| 22 | Q | And how did the first request regarding video come, did that? |
| 23 | A | There's an IMPD, IMPD Officer, Phil Thompson, who was working off duty on site was |
| 24 | | contacted by a detective. |

2

| | | |
|---|---|---|
| 1 | Q | Do you remember which detective? |
| 2 | A | I believe Benner B-E-N-N-E-R. |
| 3 | Q | Okay, so Thompson comes to you say hey they want video basically? |
| 4 | A | All he told me was there was an incident detective was investigating and needed to look |
| 5 | | at some video. |
| 6 | Q | So then what happens next? |
| 7 | A | They gave me a time frame and a date.  They do not give me a physical description of the |
| 8 | | individual clothing or anything in nature.  But they told me about a transaction and a |
| 9 | | purchase and by virtue of that information I went in and first searched the u-scan the self |
| 10 | | service checkout and subsequent to that I identified an individual that was making that |
| 11 | | purchase at that time and no one else matched that, those particular perimeters. |
| 12 | Q | So then what did you do? |
| 13 | A | Searched to see what else I had on the individual coming into the store out of the store |
| 14 | | and notified the detective that I had someone for him to look at and see if that was the |
| 15 | | individual they were looking for. |
| 16 | Q | So you screened it first, correct? |
| 17 | A | Sir, yes sir. |
| 18 | Q | How many cameras are on that store? |
| 19 | A | 84. |
| 20 | Q | And uh |
| 21 | A | I stand corrected there's 81 operable at the time. |
| 22 | Q | How many outside? |
| 23 | A | Oh my, outside in the parking lot, outside with the fuel center? |
| 24 | Q | Uh the main store parking lot? |

3

| | | |
|---|---|---|
| 1 | A | Sorry, I've got 18 stores I have to count. I believe there are 5. |
| 2 | Q | And then they are above the canopy, right? |
| 3 | A | Sir they are. |
| 4 | Q | And uh so they're not going to see stuff under the canopy, right? |
| 5 | A | The canopy meaning the edifice of the sidewalk? |
| 6 | Q | Yes Ma'am |
| 7 | A | Correct. |
| 8 | Q | So then like where the Red Box is the stuff we're interested on this case those cameras |
| 9 | | were immediately inside the exit and entrance doors? |
| 10 | A | The camera that covers the what they call the seasonal area where they put Christmas |
| 11 | | trees, pumpkins, items of that nature, the Red Box and the occasional beverage uh |
| 12 | | distribution center those are covered by camera number 30 which is the main camera |
| 13 | | inside the foyer. |
| 14 | Q | Correct. There's no other cameras under the uh |
| 15 | A | The edifice. |
| 16 | Q | The edifice, okay and then uh do you remember uh do you remember any video of him |
| 17 | | getting out of a car or in a car? |
| 18 | A | I cannot say sir it has been so long. |
| 19 | Q | Okay, there's some video where he's walking up to the store and uh before he throws |
| 20 | | something away and goes to the Red Box |
| 21 | A | Uh huh. |
| 22 | Q | Do you remember that? |
| 23 | A | Oh sure. I found that. |
| 24 | Q | And that view is from his looking at his left side walking up, do you remember? |

4

| | | |
|---|---|---|
| 1 | A | I do. |
| 2 | Q | A picture of that? |
| 3 | A | I do. |
| 4 | Q | Well I know there's a camera on the outside, that has to be an outside camera above the |
| 5 | | edifice, right? |
| 6 | A | Over it yes? |
| 7 | Q | Yeah and there's another one then on the other side that would have shown the right side |
| 8 | | of him walking up. |
| 9 | A | No sir. |
| 10 | Q | Well |
| 11 | A | Any camera that would have shown the right side sir would have been the camera that, if |
| 12 | | I understand where you're coming from it is a camera that protects the pharmacy sir |
| 13 | | because the pharmacy has a drive up area.  His left side is visible through camera 30 the |
| 14 | | right side something that would be facing east sir on that sidewalk there is nothing facing |
| 15 | | east. |
| 16 | Q | I'm not talking under the edifice I'm talking out in the parking lot as he approaches.  It |
| 17 | | cannot be camera 30. |
| 18 | A | No sir it is inside sir. |
| 19 | Q | Right I don't know what camera it is but do you remember what I'm talking about? |
| 20 | A | Truthfully sir I do not recall. |
| 21 | Q | Okay, did you make all video available to Benner or did you, he ended up with only 4 |
| 22 | | cameras, 7 |
| 23 | A | 7 issue stamped checkout |
| 24 | Q | 30? |

5

| 1 | A | Foyer. |
| 2 | Q | 44? |
| 3 | A | Parking lot. |
| 4 | Q | And 29? |
| 5 | A | Exit door. |
| 6 | Q | Very good.  Did you pick these and just give them to him or did he get to see everything |
| 7 |  | and pick what he wanted? |
| 8 | A | Oh no sir it was the only places the individual was visible that I was able to discover and |
| 9 |  | is such I showed him those were the ones he needed, sir. |
| 10 | Q | Okay so you went through everything, identified what you thought he might want and |
| 11 |  | then said hey you can come look at it. |
| 12 | A | Sir, no sir, I did not make any determination, predetermination for him as far as I didn't |
| 13 |  | anticipate what he would need.  I just found all the views of the individual. |
| 14 | Q | Oh you're saying he looked at all 81 cameras and these 4 are the only ones that you could |
| 15 |  | ever see him in? |
| 16 | A | No sir I didn't look at all 81 I just looked at, I tracked him when I could see the individual |
| 17 |  | come in when  I could see the individual leave. |
| 18 | Q | Right, okay so do you know the number of the cameras, the other cameras on the outside |
| 19 |  | of the building above the edifice? |
| 20 | A | It runs 41 through 46. |
| 21 | Q | Did you look at 41 through 46? |
| 22 | A | Sir I did. |
| 23 | Q | Where's camera 7? |
| 24 | A | Camera 7 sir is just dated as uscan. |

6

1    Q    Okay, 44

2    A    Yes sir

3    Q    Is the only one we have of the lot, right, and you're telling me you?

4    A    I don't recall.

5    Q    Oh okay but you're telling me that you looked at 41 through 46?

6    A    Absolutely.

7    Q    Did Det. Benner ever look at 41 through 46?

8    A    To the best of my knowledge yes sir.

9    Q    And tell me how that occurred.

10    A    When he was upstairs sir.

11    Q    Well you told me that he went to uscan and then you watched everything and you

12        matched up this guy to the guy you saw at the uscan and then you called Benner.

13    A    Uh huh.

14    Q    Right?

15    A    Yes sir.

16    Q    So then what happens?

17    A    When he came I showed him what was available.

18    Q    Which is what you had already selected?

19    A    Yes except for the fact that in the parking lot we make a determined effort to view all the

20        cameras you can put as many as 16 cameras up at a time, sir, for the parking lot you can

21        put those up there in conjunction with that so you can watch others at a time to see if you

22        can for lack of a better description may I refer to a situation I had yesterday sir I can track

23        someone. I was not tracking him. I was looking for anything that was of interest to him

24        at that point sir.

7

| 1 | Q | Benner? |
|---|---|---|
| 2 | A | Yes sir. |
| 3 | Q | Okay now if 41 through 46 is the outside does it start and go left to right if you're facing |
| 4 | | the building? |
| 5 | A | If you are facing the building sir it goes right to left.  If you are standing not facing 10th |
| 6 | | Street but you are facing the building the lowest numbers are over by the fuel center the |
| 7 | | highest numbers are by Shortridge. |
| 8 | Q | Gotca. |
| 9 | A | And if I may, I mean I'm sorry. |
| 10 | Q | No go ahead. |
| 11 | A | They do not intercept there are a number of blind spots quite unfortunately. |
| 12 | Q | Well not that do you go around the building like with 41 be the right rear corner? |
| 13 | A | No 41 as I said is the access way there's a Irish Bar and a Dollar Store and there's a lot by |
| 14 | | the fuel center, 41 is in that area.  46 is the lot that is over just north of the post office and |
| 15 | | just west of Shortridge. |
| 16 | Q | Are there cameras on the western face of the building? |
| 17 | A | On the western face of the building? |
| 18 | Q | Yes. |
| 19 | A | That you can see the western face of the building, no sir. |
| 20 | Q | No the cameras are placed on the western face of the building so you can see that area. |
| 21 | A | Well as I just said sir on the western side of the building it's the lot with the access way |
| 22 | | by Dollar General and the Irish Pub. |
| 23 | Q | Okay and then there's some around where the pharmacy pick up is? |
| 24 | A | There is one yes sir. |

8

1   Q    And then there's one further down to your left if you're facing the building from that,

2         right?

3   A    I would say a good 85% of the parking lot is covered.

4   Q    Uh there was something about uh you did, you ran the Kroger Plus cards?

5   A    I asked my supervisor, Jonathan Nagle, to run the cards.

6   Q    Has anybody kept what you gave them, do you have like a file somewhere with copies of

7         what you gave the police?

8   A    Everything that I gave the police I turned over to them.

9   Q    No I got that.  I want to know like if I was you okay and the police wanted something

10   A    Uh huh.

11   Q    Like a Kroger Plus cards.

12   A    Yes sir.

13   Q    I'd keep them in a file so I would have proof of what I gave them.

14   A    I have a copy of the initial email and the response as due to whose card was whose.  I

15         have a copy of emails but anything else this was a video request, this was not something

16         from Kroger's so we do not keep the supporting documentation.

17   Q    I'm talking about the Kroger Plus card print outs.

18   A    There, I never had a copy the Plus cards I was just received an email that said what card

19         belonged to who.  I don't get a copy of the printout and if there was one and if the police

20         did receive one with a subpoena that was from my supervisor, Jonathan Nagel.

21   Q    Okay so do you know if he would have a, is there a file somewhere?

22   A    There is and I pulled the file and there's no copy in there, no sir.  I thought it was

23         imperative that I had anything that I was not aware of prior to coming today sir and there

24         is no copy sir.

| | | |
|---|---|---|
| 1 | Q | What's in that file then? |
| 2 | A | My report, my narrative. |
| 3 | Q | The one page thing I got? |
| 4 | A | There's uh I don't know what page you have sir. There is a cover sheet. The report that |
| 5 | | we use covers areas, a number of areas primarily done in theft. There's like one sheet that |
| 6 | | is going to be blank by virtue of the fact that you list product unrecovered it's not related |
| 7 | | to this. Because this category is video request the amount of information was extremely |
| 8 | | limited. |
| 9 | Q | Did you give them the gas station video they asked for? |
| 10 | A | I do not recall. I remembered that they were looking for a gas station video. I believe |
| 11 | | that he had asked for one but I do not recall. |
| 12 | Q | In that report as I recall there was something about identifying a, after the Kroger Plus |
| 13 | | request a gas purchase at 9:20 in the morning. |
| 14 | A | I do not recall sir. |
| 15 | Q | You don't okay, do you happen to have a hard copy of her report? |
| 16 | A | I might. |
| 17 | Q | I'm going off record for a minute. Okay right now I'm distracting myself so my first |
| 18 | | question is regarding the Kroger Plus cards it has Ruth Rainsberger's Plus card and has a |
| 19 | | whole long digits and then it just has William's last four why is that? |
| 20 | A | Elate to the best of my knowledge sir Ruth's card had been recovered and they had Ruth's |
| 21 | | card. They had receipts with, when you make a purchase it only shows the last 4 just like |
| 22 | | a credit card sir, it only shows the last 4. They said that his card ended in 9558 the |
| 23 | | receipts of recent transactions used that card were attached to assist so that if you have |

10

1    the exact time, date, amount and location of a purchase then they can go back through the

2    system and find the entire number for the card.

3    Q    If I requested all purchases over a 3 day period on 9558 can I get that?

4    A    9558?

5    Q    Yeah.

6    A    Of his card?

7    Q    Yeah.

8    A    As long as we have the whole number, yes sir.

9    Q    Oh do you know if anybody has gotten the whole number yet?

10   A    But of course sir.

11   Q    I'm sorry, what?

12   A    Yes sir.

13   Q    Yes what?

14   A    The whole number was retrieved.

15   Q    Okay, can I know what that is?

16   A    I do not have it with me. It was turned over to the police.

17   Q    I want to get under both cards all purchases over a 3 day period, can you tell me how I

18        can do that? I mean I'll give you a subpoena but.

19   A    Of course with a subpoena sir.

20   Q    Where do you want it to go?

21   A    Uh if it comes to Kroger Loss Prevention I will give you the address sir and on the

22        subpoena put reference the case and the dates and the transactions and then request it.

23   Q    And how long is video kept?

11

| | | |
|---|---|---|
| 1 | A | Video is kept it depends on the particular store, that location video is retained for up to 6 |
| 2 | | weeks. |
| 3 | Q | And then uh you'll give me just loss prevention is where I can get the other information |
| 4 | | right? Is that right? |
| 5 | A | Yes sir. |
| 6 | Q | And then uh here at the fuel center see that, pump 8, did you give anybody any video if |
| 7 | | you recall? |
| 8 | A | No sir as I told you I don't recall and it does not say that I did. |
| 9 | Q | It says they requested video. |
| 10 | A | Yes sir. |
| 11 | Q | So what happened with that request? |
| 12 | A | To the best of my knowledge sir I do not recall. |
| 13 | Q | Well did he look and it wasn't there, I mean you might have given it to them huh? |
| 14 | A | No sir. |
| 15 | Q | You're sure you didn't? |
| 16 | A | No sir I do not know sir. |
| 17 | Q | Well that's what I'm trying to figure out between what if you don't know that leaves open |
| 18 | | a number of possibilities, right? If you don't remember if you gave it to him you could |
| 19 | | have given it to him. |
| 20 | A | I truthfully do not know and it is not indicated that I gave it to him. |
| 21 | Q | Okay, so if you don't know you could have, but you don't know, right? |
| 22 | A | Historically when I give someone something the information is in here. |
| 23 | Q | Okay, if you had given it to him you would expect this to say that? |
| 24 | A | Sir, yes, sir. |

12

| | | |
|---|---|---|
| 1 | Q | Well where in here does it say uh okay you say you record the four, four things correct? |
| 2 | | Well okay, do you know if he looked at it, the video of the fuel center? |
| 3 | A | No. |
| 4 | Q | And I want to go back to before you went through 46 does Benner come in and you just |
| 5 | | put up the parts that you've identified? |
| 6 | A | In store yes. |
| 7 | Q | Now does he look at all the other cameras or to see for himself what else might be there? |
| 8 | A | We watched I had no idea what we were looking for by virtue of that instance is the |
| 9 | | reason we looked through the parking lot and I cannot recall if that is when I was told that |
| 10 | | was the vehicle on number 44. I do not remember. I found the gentlemen inside based |
| 11 | | on the purchase and I followed it as I said, his actions in and out of the store to the best of |
| 12 | | my ability. In the parking lot I had no description, no heads up on the vehicle or anything |
| 13 | | of the nature that I was looking for and we reviewed the cameras together, said that we |
| 14 | | put up a multi-screen we could see vehicles moving during that time sir. |
| 15 | Q | Do you believe that Benner left with everything he wanted? |
| 16 | A | To the best of my knowledge sir, yes. |
| 17 | Q | Okay, how many times have you met with Det. Benner? |
| 18 | A | To the best of my knowledge I believe it was twice. |
| 19 | Q | And is this the only thing of substances in that file? |
| 20 | A | Sir yes sir. |
| 21 | | Turned tape over. |
| 22 | Q | Um I'm trying to figure out, I really need to find out, if possible, if Kroger has copies of |
| 23 | | what they gave the police because I've got some photocopies of receipts and they are not |

13

| | | |
|---|---|---|
| 1 | | making sense to me and they seem to contradict then stuff other people say. Do you |
| 2 | | know if that's in existence? |
| 3 | A | Are these the receipts you sent me the other day? |
| 4 | Pros | I'm not sure what he's referring to. |
| 5 | A | Okay. |
| 6 | Q | Is there anything at Kroger like somebody ask me for something, you know I'm going to |
| 7 | | give them like a written response and I'm going to attach copies of what I gave them so if |
| 8 | | they say hey I didn't get this I can say I gave you this, right. I'm wondering is there any at |
| 9 | | Kroger where I can go look independently to confirm what Kroger gave the police? |
| 10 | A | Because it was a video request that is, that is the summary of what I provided to them. |
| 11 | | The receipts if I may, the receipts that you, may I just |
| 12 | Q | Yeah, yeah. |
| 13 | A | There were three or four receipts ending in the number 9558 that were pulled by a co- |
| 14 | | manager that no longer works for the company. Um the individual pulled those in an |
| 15 | | attempt to get transaction and amount (inaudible) specifically for a transaction so that |
| 16 | | they could pull Mr. Rainsberger's entire Plus card number and to the best of my |
| 17 | | knowledge because I had not seen them since until the prosecutor was good enough, the |
| 18 | | deputy prosecutor emailed them to me the other day and |
| 19 | Q | So it's digital again? |
| 20 | A | I understand. |
| 21 | Q | She emailed to you and then? |
| 22 | A | As I told her those, I hadn't even seen those before to the best of my knowledge and from |
| 23 | | what I could gather those were the ones that the co-management had pulled so that they |
| 24 | | could recover Mr. Rainsberger's number. |

14

| | | |
|---|---|---|
| 1 | Q | And just gave copies directly to the police? |
| 2 | A | To the best of my knowledge. |
| 3 | Q | And then have you or anybody at Kroger that you know of responded to the request for |
| 4 | | the whole history of both Plus cards? |
| 5 | A | I can tell you in no uncertain terms that I have not seen anything about the history of both |
| 6 | | cards. |
| 7 | Q | Do you, would that request go, end up with you if made? |
| 8 | A | If it comes through me I can assure you that I will hand carry it to my supervisor and |
| 9 | | ensure that it is compelled. |
| 10 | Q | No, no I mean like we know they got some receipts, okay? |
| 11 | A | Uh huh. |
| 12 | Q | That came through a manger in kind of an unofficial way but I'm trying to find out under |
| 13 | | these two, they now have all of those, so I'm trying to find out was there ever a request |
| 14 | | for the whole history over three days like the 18th, 19th 20th maybe. |
| 15 | A | As you referred to earlier sir and it's like a subpoena, sir no sir. |
| 16 | Q | Okay. |
| 17 | A | To the best of my knowledge and I can tell you in no uncertain terms I have no subpoena |
| 18 | | for that. |
| 19 | Q | So if it were requested you believe it would have come to your attention? |
| 20 | A | Oh absolutely. There was one subpoena for information on the Rainsberger card there |
| 21 | | was nothing about both individuals. |
| 22 | Q | There was a subpoena for the 9558 card? |
| 23 | A | Sir yes sir. |
| 24 | Q | Okay and has that been responded to? |

15

Case 1:16-cv-00103-TWP-MJD   Document 88-1   Filed 11/28/17   Page 144 of 344 PageID #:
1736
Case 1:16-cv-00103-WTL-MJD   Document 43-12   Filed 02/15/17   Page 1 of 1   PageID 234

# EXHIBIT 12

**(manually filed)**

# EXHIBIT 13

Device name : 100 UNIT 2     Time & Date : 11/19/2013 3:28:56 PM (GMT -05:00)
MAC address : 00:04:63:10:1D:36 Events     : None





Device name : 100 UNIT 2          Time & Date : 11/19/2013 3:28:56 PM (GMT -05:00)

MAC address : 00:04:63:10:1D:36 Events          : None

147



Device name : 100 UNIT 2    Time & Date : 11/19/2013 3:28:56 PM (GMT -05:00)
MAC address : 00:04:63:10:1D:36 Events : None



Case 1:16-cv-00103-TWP-MJD   Document 83-14   Filed 02/13/17   Page 1 of 1   PageID #: 240

# EXHIBIT 14

**(manually filed)**

Case 1:16-cv-00103-TWP-MJD   Document 88-1   Filed 11/28/17   Page 151 of 344 PageID #:
Case 1:16-cv-00103-TWP-MJD   Document 43-15   Filed 02/13/17   Page 1 of 2   PageID #:
1743

# EXHIBIT 15

File
■ ■
Search     Help
      1.00    Electronic Journal File For Terminal 084 Date 11/19/13

ARIZ GRN TEA      0.99 B
**** TAX         0.07
BALANCE       1.06
CASH         1.00
CASH         1.00
CHANGE        0.94

TOTAL NUMBER OF ITEMS SOLD =   1
11/19/13 03:31pm 100 84 68 999

THANK YOU FOR SHOPPING KROGER
CUSTOMER SERVICE IS EVERYONE'S JOB.
LET ME KNOW HOW WE ARE DOING.
TERRY EMMONS, MANAGER

          1,179.77

Print

F1 Help F3 Quit
Time=08:16

SYSTEM MESSAGE AVAILABLE

Cancel

◄ ■ ▦▦▦▦▦▦▦▦▦▦ ►

Case 1:16-cv-00103-TWP-MJD   Document 88-1   Filed 11/28/17   Page 153 of 344 PageID #:
Case 1:16-cv-00103-WTL-MJD   Document 43-16   Filed 02/13/17   Page 1 of 2   PageID 245:
1745

# EXHIBIT 16

| Division | District Zone | Store | Cashier | Cashier Name | Reg# | Tran Date | Tran Time | Tran# | Net Tender Amount | Net Quantity | Tran Type | |
|----------|---------------|-------|---------|--------------|------|-----------|-----------|-------|-------------------|--------------|-----------|---|
| Central | 03 | 100 | 145 | JOSH F | 15 | 11/27/2013 | 190400 | 421 | $ 91.78 | 7 | SALE | ( |
| | | | 102 | ALIA THOMAS | 9 | 11/26/2013 | 171300 | 215 | $ 28.37 | 3 | SALE | ( |
| | | | 104 | NANCY WEST | 14 | 11/23/2013 | 173100 | 177 | $ 8.49 | 2 | SALE | ( |
| | | | 999 | S ELF CHECKOUT | 83 | 11/19/2013 | 153200 | 405 | $ 14.10 | 8 | SALE | ( |
| | | | 88888109 | S PIRIT TERMINAL | 109 | 11/19/2013 | 092000 | 39 | $ 48.16 | 1 | SALE | ( |
| | | | 999 | S ELF CHECKOUT | 83 | 11/18/2013 | 175700 | 194 | $ 2.80 | 7 | SALE | ( |
| | | | | | 82 | 11/17/2013 | 092000 | 56 | $ 5.34 | 1 | SALE | ( |
| | | | 103 | NILA RICHMOND | 8 | 11/15/2013 | 184200 | 316 | $ 5.27 | 12 | SALE | ( |
| | | | 999 | S ELF CHECKOUT | 84 | 11/12/2013 | 173900 | 123 | $ 4.49 | 2 | SALE | ( |
| | | | 172 | RACHEL JOHNSON | 80 | 11/07/2013 | 144800 | 166 | $ 23.94 | 21 | SALE | ( |
| | | | 855 | ERIC HATCKETT | 11 | 11/06/2013 | 163300 | 40 | $ 17.43 | 17 | SALE | ( |
| | | | 88888108 | S PIRIT TERMINAL | 108 | 11/05/2013 | 162500 | 114 | $ 38.38 | 1 | SALE | ( |
| | | | 506 | MATT GAMBLE | 65 | 11/05/2013 | 161700 | 101 | $ 10.00 | 1 | SALE | ( |
| | | | 107 | VANESSA HAMANN | 15 | 11/04/2013 | 180100 | 147 | $ 4.92 | 6 | SALE | ( |
| | | | 500 | DARCY | 65 | 11/04/2013 | 175600 | 140 | $ 20.00 | 1 | SALE | ( |
| | | | 999 | S ELF CHECKOUT | 85 | 11/02/2013 | 172900 | 142 | $ 53.96 | 9 | SALE | ( |
| | | | 516 | MARCELA | 65 | 11/02/2013 | 172600 | 125 | $ 5.28 | 1 | SALE | ( |

Case 1:16-cv-00103-WTL-MJD   Document 88-17   Filed 11/28/17   Page 155 of 344 PageID #:
1747
Case 1:16-cv-00103-WTL-MJD   Document 43-17   Filed 02/13/17   Page 1 of 1   PageID 245

# EXHIBIT 17

**(manually filed)**

Case 1:16-cv-00103-WFL-MJD   Document 88-18   Filed 11/28/17   Page 156 of 344 PageID #:
Case 1:16-cv-00103-WFL-MJD   Document 43-18   Filed 02/13/17   Page 1 of 1   PageID #:
1748

# EXHIBIT 18

**(manually filed)**

# EXHIBIT 19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

WILLIAM RAINSBERGER,    )
           )
  Plaintiff,     )
           )
  v.        )  Case No.:  1:16-cv-103-WTL-MJD
           )
CHARLES BENNER,     )
           )
  Defendant.     )

## **AFFIDAVIT OF BENJAMIN BIERCE**

I, Benjamin Bierce, am over the age of eighteen (18), am of sound mind, and am competent to testify that the below facts are true and correct based on my personal knowledge.

1. I am currently employed as the owner of Bierce Associates, LLC.

2. At the time of Ruth Rainsberger's death and during the investigation of William Rainsberger, I was employed as a Detective with the Indianapolis Metropolitan Police Department.

3. I was employed with IMPD for 15 years.

4. As a Detective with IMPD, I assisted with investigations by subpoenaing, collecting, and interpreting phone records.

5. I assisted Detective Charles Benner with the investigation of Ruth Rainsberger's death by obtaining the cell phone records of Robert Rainsberger.

6. Attachment A is the original cell phone records I received from Sprint for phone number 317-357-5791.

7. At all relevant times, the Sprit records stated the subscriber for the phone number 317-357-5791 was Robert Rainsberger.

8. Based on my understanding at the time, Attachment A shows that Robert Rainsberger received two calls on November 19, 2013 at 14:40:51 (2:40:51 p.m.) and 15:40:38 (3:40:38 p.m.) from phone number 317-375-7841.

9. Detective Benner advised me that, at all relevant times, phone number 317-375-7841 was Ruth Rainsberger's landline number.

10. I provided the phone records in Attachment A to Detective Benner during the winter of 2013-2014.

11. During the summer of 2014 while collecting phone records for another investigation, I learned that Sprint was doing construction on their cell towers in Indianapolis. Due to the construction, some calls were being routed through cell towers in Chicago.

12. Calls that were routed through Chicago were recorded in Central standard time (CST) rather than Eastern standard time (EST) on phone records.

13. Calls that were routed through Chicago are indicated on phone records with a Network Element ID (NEID) of 420.

14. After obtaining this new information, I went back and reviewed the phone records I had obtained for other active investigations.

15. I reviewed the cell phone records for Robert Rainsberger and noticed that some of the calls had been routed through Chicago.

16. For this reason, I created an excel spreadsheet titled "Results" that contained Robert Rainsberger's phone records with the call times converted to EST.

17. Attachment B is the Results spreadsheet that I created.

18. Attachment B shows that the two calls to Robert Rainsberger's cell phone from Ruth Rainsberger's landline were made on November 19, 2013 at 3:40:38 p.m. and 3:40:51 p.m.

19. I created Attachment B on or about July 2014 and provided it to Detective Benner.

FURTHER AFFIANT SAYETH NOT.

## AFFIRMATION

In accordance with 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing responses to interrogatories are true and correct.

Date: _1/4/17_

_Benjamin Bierce_
Benjamin Bierce

Case 1:16-cv-00103-TWP-MJD   Document 88-19   Filed 11/28/17   Page 162 of 344 PageID #:
1754
Case 1:16-cv-00103-WTL-MJD   Document 48-19   Filed 01/23/17   Page 6 of 13   PageID 252

# ATTACHMENT A

# Combined Detail LE

| MSISDN | IMSI | Event Type | Start Time | Direction | Connected To | First Tower LAC / ENodeB_ID | First Tower Cell ID / ECGI_Cell | First Tower Latitude |
|---|---|---|---|---|---|---|---|---|
| 13173311059 | 310260541837267 | SMS | 10/22/2013 05:42:01 AM | Incoming | 13177107604 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 10/22/2013 05:43:55 AM | Outgoing | 13177107604 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 10/22/2013 05:44:57 AM | Incoming | 13177107604 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 10/22/2013 05:45:25 AM | Outgoing | 13177107604 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 10/22/2013 05:56:45 AM | Incoming | 13177107604 | NA | NA | NA |
| 13173311059 | 310260541837267 | Voice | 10/22/2013 08:11:03 AM | Incoming | 13173575841 | 20498 | 40303 | 39.794444 |
| 13173311059 | 310260541837267 | SMS | 10/22/2013 09:10:16 AM | Outgoing | 13173575791 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 10/22/2013 09:10:51 AM | Incoming | 13173575791 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 10/22/2013 10:36:53 AM | Incoming | 13173575791 | NA | NA | NA |
| 13173311059 | 310260541837267 | Voice | 10/22/2013 01:26:31 PM | Outgoing | 13173575841 | 20498 | 40303 | 39.794444 |
| 13173311059 | 310260541837267 | SMS | 10/22/2013 01:33:33 PM | Outgoing | 13177107604 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 10/22/2013 01:41:59 PM | Incoming | 13177107604 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 10/22/2013 01:43:04 PM | Outgoing | 13177107604 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 10/22/2013 02:04:05 PM | Incoming | 13177107604 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 10/22/2013 02:04:26 PM | Incoming | 13177107604 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 10/22/2013 07:55:36 PM | Incoming | 13177107604 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 10/22/2013 07:56:17 PM | Outgoing | 13177107604 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 10/22/2013 09:00:51 PM | Incoming | 129 | NA | NA | NA |
| 13173311059 | 310260541837267 | Voice | 10/23/2013 12:00:37 AM | Outgoing | 1805637249 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 10/23/2013 05:14:52 AM | Incoming | 129 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 10/23/2013 05:15:34 AM | Outgoing | 13176582166 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 10/23/2013 05:47:52 AM | Incoming | 13173575791 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 10/23/2013 05:48:31 AM | Outgoing | 13173575791 | NA | NA | NA |

| 13173311059 | 31026054837267 | SMS | 11/18/2013 | 06:49:00 PM | Outgoing | 13177107604 | NA | NA | NA |
|---|---|---|---|---|---|---|---|---|---|
| 13173311059 | 31026054837267 | SMS | 11/18/2013 | 06:49:49 PM | Incoming | 13177107604 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 | 05:00:41 AM | Outgoing | 13177107604 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 | 05:01:58 AM | Outgoing | 13177165682 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 | 05:08:18 AM | Incoming | 13177107604 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 | 07:08:28 AM | Incoming | 13177107604 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 | 07:09:00 AM | Outgoing | 13177107604 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 | 07:13:25 AM | Incoming | 13177107604 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 | 07:11:52 AM | Outgoing | 13177107604 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 | 07:10:07 AM | Outgoing | 13177107604 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 | 07:16:31 AM | Incoming | 13177107604 | NA | NA | NA |
| 13173311059 | 0 | MMS | 11/19/2013 | 07:16:53 AM | Incoming | 13177107604 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 | 09:12:58 AM | Incoming | 13176794411 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 | 09:12:59 AM | Incoming | 209 | NA | NA | NA |
| 13173311059 | 31026054837267 | MMS | 11/19/2013 | 09:13:09 AM | Incoming | +13176794411/T YPE=PLMN@icm ms1.sun5.lightsu rf.net | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 | 09:14:22 AM | Incoming | 13176794411 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 | 09:14:47 AM | Outgoing | 13176794411 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 | 09:14:49 AM | Incoming | 206 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 | 09:14:50 AM | Incoming | 206 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 | 10:02:06 AM | Incoming | 13177107604 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 | 10:02:47 AM | Outgoing | 13177107604 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 | 10:09:41 AM | Outgoing | 13177107604 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 | 10:41:18 AM | Incoming | 13177107604 | NA | NA | NA |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 13173311059 | 31026054837267 | SMS | 11/19/2013 10:42:28 AM | Outgoing | 13177107604 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 10:44:00 AM | Incoming | 13177107604 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 10:44:33 AM | Outgoing | 13177107604 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 10:45:59 AM | Incoming | 13177107604 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 10:48:10 AM | Incoming | 13177107604 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 10:56:16 AM | Outgoing | 13177107604 | NA | NA | NA |
| 0 | 31026054837267 | MMS | 11/19/2013 11:14:49 AM | Incoming | +13174137702/TYPE=PLMN@icmms1.sun5.lightsurf.net | NA | NA | NA |
| 13173311059 | 31026054837267 | MMS | 11/19/2013 11:16:11 AM | Incoming | +13174137702/TYPE=PLMN@icmms1.sun5.lightsurf.net 13173575791 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 12:44:10 PM | Outgoing | 13173575791 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 01:20:18 PM | Outgoing | 13176794411 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 01:22:45 PM | Incoming | 13176794411 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 01:23:11 PM | Incoming | 13176794411 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 01:37:00 PM | Outgoing | 13173575791 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 01:39:50 PM | Incoming | 13176794411 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 01:40:58 PM | Outgoing | 13176794411 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 01:43:43 PM | Incoming | 13176794411 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 01:59:25 PM | Outgoing | 13176794411 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 01:59:51 PM | Incoming | 13173575791 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 02:21:02 PM | Incoming | 13173575791 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 02:22:28 PM | Outgoing | 13173575791 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 02:22:46 PM | Incoming | 13173575791 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 02:40:23 PM | Incoming | 13173575791 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 02:41:16 PM | Incoming | 13173575791 | NA | NA | NA |
| 13173311059 | 31026054837267 | SMS | 11/19/2013 02:42:01 PM | Outgoing | 13173575791 | NA | NA | NA |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1317331059 | 31026054183726 | SMS | 11/19/2013 02:42:31 PM | Incoming | 13173575791 | NA | NA | NA |
| 1317331059 | 31026054183726 | SMS | 11/19/2013 02:51:42 PM | Incoming | 13173575791 | NA | NA | NA |
| 1317331059 | 31026054183726 | SMS | 11/19/2013 02:52:21 PM | Outgoing | 13173575791 | NA | NA | NA |
| 1317331059 | 31026054183726 | SMS | 11/19/2013 03:02:32 PM | Incoming | 13176794411 | NA | NA | NA |
| 1317331059 | 31026054183726 | MMS | 11/19/2013 03:03:52 PM | Incoming | 206 | NA | NA | NA |
| 1317331059 | 31026054183726 | SMS | 11/19/2013 03:03:53 PM | Incoming | 206 | NA | NA | NA |
| 1317331059 | 31026054183726 | SMS | 11/19/2013 03:05:49 PM | Outgoing | 13176794411 | NA | NA | NA |
| 1317331059 | 31026054183726 | SMS | 11/19/2013 03:07:34 PM | Incoming | 202 | NA | NA | NA |
| 1317331059 | 31026054183726 | SMS | 11/19/2013 03:07:35 PM | Incoming | 202 | NA | NA | NA |
| 1317331059 | 31026054183726 | SMS | 11/19/2013 03:10:26 PM | Outgoing | 13176794411 | NA | NA | NA |
| 1317331059 | 31026054183726 | SMS | 11/19/2013 03:10:57 PM | Incoming | 13176794411 | NA | NA | NA |
| 1317331059 | 31026054183726 | SMS | 11/19/2013 03:11:06 PM | Incoming | 13176794411 | NA | NA | NA |
| 1317331059 | 31026054183726 | SMS | 11/19/2013 03:11:19 PM | Outgoing | 13176794411 | NA | NA | NA |
| 1317331059 | 31026054183726 | SMS | 11/19/2013 03:12:00 PM | Incoming | 13176794411 | NA | NA | NA |
| 1317331059 | 31026054183726 | SMS | 11/19/2013 03:12:46 PM | Incoming | 13176794411 | NA | NA | NA |
| 1317331059 | 31026054183726 | SMS | 11/19/2013 03:13:25 PM | Outgoing | 13176794411 | NA | NA | NA |
| 1317331059 | 31026054183726 | SMS | 11/19/2013 03:13:47 PM | Incoming | +13176794411/T YPE=PLMN@icm ms1.sun5.lightsu rf.net | NA | NA | NA |
| 1317331059 | 0 | MMS | 11/19/2013 03:42:52 PM | Incoming | +13176794411/T YPE=PLMN@icm ms1.sun5.lightsu rf.net | NA | NA | NA |
| 1317331059 | 31026054183726 | SMS | 11/19/2013 03:42:52 PM | Incoming | 208 | NA | NA | NA |
| 1317331059 | 31026054183726 | SMS | 11/19/2013 03:42:53 PM | Incoming | 208 | NA | NA | NA |
| 1317331059 | 31026054183726 | MMS | 11/19/2013 03:42:57 PM | Incoming | +13176794411/T YPE=PLMN@icm ms1.sun5.lightsu rf.net | NA | NA | NA |
| 1317331059 | 31026054183726 | SMS | 11/19/2013 03:43:52 PM | Incoming | 202 | NA | NA | NA |
| 1317331059 | 31026054183726 | SMS | 11/19/2013 03:43:53 PM | Incoming | 202 | NA | NA | NA |

166

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 13173311059 | 310260541837267 | SMS | 11/19/2013 04:20:29 PM | Outgoing | 13176794411 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 11/19/2013 04:21:36 PM | Incoming | 13176794411 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 11/19/2013 04:22:20 PM | Outgoing | 13176794411 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 11/19/2013 04:22:41 PM | Incoming | 13176794411 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 11/19/2013 04:23:08 PM | Incoming | 13176794411 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 11/19/2013 04:23:22 PM | Outgoing | 13176794411 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 11/19/2013 04:24:11 PM | Incoming | 129 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 11/19/2013 04:24:24 PM | Outgoing | 13176794411 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 11/19/2013 04:25:12 PM | Incoming | 13176794411 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 11/19/2013 04:25:59 PM | Incoming | 13176794411 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 11/19/2013 04:26:00 PM | Incoming | 13176794411 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 11/19/2013 04:26:01 PM | Incoming | 13176794411 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 11/19/2013 04:26:02 PM | Incoming | 13176794411 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 11/19/2013 04:32:27 PM | Incoming | 13176794411 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 11/19/2013 04:32:48 PM | Outgoing | 13176794411 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 11/19/2013 04:49:13 PM | Incoming | 13176794411 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 11/19/2013 04:54:33 PM | Outgoing | 13176794411 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 11/19/2013 05:00:42 PM | Outgoing | 13176794411 | NA | NA | NA |
| 13173311059 | 0 | MMS | 11/19/2013 05:03:52 PM | Incoming | ms1.sun5.lightsurf.net +13176794411/TYPE=PLMN@icm ms1.sun5.lightsurf.net | NA | NA | NA |
| 13173311059 | 310260541837267 | MMS | 11/19/2013 05:04:01 PM | Incoming | +13176794411/TYPE=PLMN@icm ms1.sun5.lightsurf.net | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 11/19/2013 05:18:13 PM | Incoming | 13173575791 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 11/19/2013 05:19:03 PM | Incoming | 13173575791 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 11/19/2013 05:21:24 PM | Incoming | 13176794411 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 11/19/2013 05:22:30 PM | Outgoing | 13176794411 | NA | NA | NA |

| 13173311059 | 31026054183767267 | SMS | 11/19/2013 05:26:57 PM | Incoming | 13173575791 | NA | NA | NA |
|---|---|---|---|---|---|---|---|---|
| 13173311059 | 31026054183767267 | SMS | 11/19/2013 05:27:34 PM | Outgoing | 13173575791 | NA | NA | NA |
| 13173311059 | 31026054183767267 | SMS | 11/19/2013 05:43:36 PM | Incoming | 13173575791 | NA | NA | NA |
| 13173311059 | 31026054183767267 | SMS | 11/19/2013 05:43:54 PM | Outgoing | 13173575791 | NA | NA | NA |
| 13173311059 | 31026054183767267 | SMS | 11/19/2013 05:48:24 PM | Outgoing | 13173575791 | NA | NA | NA |
| 13173311059 | 31026054183767267 | SMS | 11/19/2013 05:52:25 PM | Outgoing | 13176794411 | NA | NA | NA |
| 13173311059 | 31026054183767267 | SMS | 11/19/2013 06:04:36 PM | Outgoing | 13176794411 | NA | NA | NA |
| 13173311059 | 31026054183767267 | SMS | 11/19/2013 06:07:34 PM | Incoming | 13176794411 | NA | NA | NA |
| 13173311059 | 0 | MMS | 11/19/2013 06:07:42 PM | Incoming | +13176794411/TYPE=PLMN@icmms1.sun5.lightsurf.net. | NA | NA | NA |
| 13173311059 | 31026054183767267 | SMS | 11/19/2013 06:08:59 PM | Incoming | 13176794411 | NA | NA | NA |
| 13173311059 | 31026054183767267 | SMS | 11/19/2013 06:29:41 PM | Incoming | 13177107604 | NA | NA | NA |
| 13173311059 | 31026054183767267 | SMS | 11/19/2013 06:39:52 PM | Outgoing | 13177107604 | NA | NA | NA |
| 13173311059 | 31026054183767267 | SMS | 11/19/2013 06:41:34 PM | Incoming | 13177107604 | NA | NA | NA |
| 13173311059 | 0 | MMS | 11/19/2013 06:43:52 PM | Incoming | +13176794411/TYPE=PLMN@icmms1.sun5.lightsurf.net. | NA | NA | NA |
| 13173311059 | 31026054183767267 | MMS | 11/19/2013 06:43:59 PM | Incoming | +13176794411/TYPE=PLMN@icmms1.sun5.lightsurf.net. | NA | NA | NA |
| 13173311059 | 31026054183767267 | SMS | 11/19/2013 06:56:40 PM | Outgoing | 13177107604 | NA | NA | NA |
| 13173311059 | 31026054183767267 | SMS | 11/19/2013 06:57:20 PM | Incoming | 13177107604 | NA | NA | NA |
| 13173311059 | 31026054183767267 | SMS | 11/19/2013 07:00:23 PM | Incoming | 13177107604 | NA | NA | NA |
| 13173311059 | 31026054183767267 | SMS | 11/19/2013 07:00:45 PM | Incoming | 13177107604 | NA | NA | NA |
| 13173311059 | 31026054183767267 | Voice | 11/19/2013 07:23:45 PM | Incoming | 13176794411 | 20498 | 60023 | 39.770536611 |
| 13173311059 | 31026054183767267 | Voice | 11/19/2013 07:23:48 PM | Outgoing | 13176794411 | 20498 | 60023 | 39.770536611 |
| 13173311059 | 31026054183767267 | Voice | 11/19/2013 07:23:55 PM | Outgoing | 18056377249 | 20498 | 60023 | 39.770536611 |

Case 1:16-cv-00103-WTL-MJD Document 48-1 Filed 01/23/17 Page 169 of 344 PageID #: 259

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 13173311059 | 310260541837267 | Voice | 11/19/2013 07:24:29 PM | Outgoing | 18056377243 | 20498 | 60023 | 39.77053611 |
| 13173311059 | 310260541837267 | Voice | 11/19/2013 07:25:34 PM | Incoming | 13176794411 | 20498 | 60023 | 39.77053611 |
| 13173311059 | 310260541837267 | Voice | 11/19/2013 07:32:04 PM | Incoming | 13176794411 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 11/19/2013 07:32:24 PM | Incoming | 13177107604 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 11/19/2013 07:32:33 PM | Incoming | 13177107604 | NA | NA | NA |
| 13173311059 | 310260541837267 | Voice | 11/19/2013 07:48:53 PM | Outgoing | 18056377243 | 20498 | NA | NA |
| 13173311059 | 310260541837267 | SMS | 11/19/2013 08:01:13 PM | Outgoing | 13173575791 | NA | 60023 | 39.77053611 |
| 13173311059 | 310260541837267 | Voice | 11/19/2013 08:08:00 PM | Incoming | 13176794411 | 20498 | NA | NA |
| 13173311059 | 310260541837267 | Voice | 11/19/2013 08:28:29 PM | Incoming | 13176794411 | 20498 | 60022 | 39.77053611 |
| 13173311059 | 310260541837267 | Voice | 11/19/2013 08:31:19 PM | Incoming | 13176794411 | 20498 | 20231 | 39.7703195 |
| 13173311059 | 310260541837267 | Voice | 11/19/2013 08:32:47 PM | Outgoing | 13176306100 | 20498 | 20231 | 39.7703195 |
| 13173311059 | 310260541837267 | Voice | 11/19/2013 08:34:04 PM | Outgoing | 13173575791 | 20498 | 11912 | 39.78364491 |
| 13173311059 | 310260541837267 | Voice | 11/19/2013 10:45:29 PM | Incoming | 13172237049 | 20498 | 11912 | 39.78364491 |
| 13173311059 | 310260541837267 | Voice | 11/19/2013 11:01:13 PM | Outgoing | 13176794411 | 20498 | 11912 | 39.78364491 |
| 13173311059 | 310260541837267 | Voice | 11/19/2013 11:52:23 PM | Incoming | 13177107604 | 20498 | 20231 | 39.7703195 |
| 13173311059 | 310260541837267 | SMS | 11/19/2013 11:52:25 PM | Outgoing | 13177107604 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 11/19/2013 11:53:11 PM | Outgoing | 13177107604 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 11/19/2013 11:54:29 PM | Outgoing | 13176794411 | NA | NA | NA |
| 13173311059 | 310260541837267 | Voice | 11/20/2013 02:54:51 AM | Incoming | 13173575791 | 20499 | 11792 | 39.80257465 |
| 13173311059 | 310260541837267 | SMS | 11/20/2013 03:50:33 AM | Incoming | 13176794411 | 20499 | 50303 | 39.794444 |
| 13173311059 | 310260541837267 | SMS | 11/20/2013 06:21:22 AM | Incoming | 207 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 11/20/2013 06:21:23 AM | Incoming | 207 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 11/20/2013 06:22:58 AM | Incoming | 13176794411 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 11/20/2013 06:24:55 AM | Outgoing | 13177107604 | NA | NA | NA |
| 13173311059 | 310260541837267 | SMS | 11/20/2013 06:25:27 AM | Outgoing | 13177107604 | NA | NA | NA |

Case 1:16-cv-00103-TWP-MJD   Document 38-1   Filed 11/28/17   Page 170 of 344 PageID #:
1762
Case 1:16-cv-00103-WTL-MJD   Document 43-19   Filed 01/13/17   Page 14 of 19   PageID 260

# ATTACHMENT B

| Target Number | Connected To | Direction | Type | Subscriber | Timestamp (All Times are in Eastern Time) | Duration Sec |
|---|---|---|---|---|---|---|
| 13173311059 | 13173757841 | Incoming | Voice | Ruth Rainsberger | 10/22/2013 8:11:03 AM | 71 |
| 13173311059 | 13173757841 | Incoming | SMS | Unknown 1 | 10/22/2013 8:42:01 AM | 0 |
| 13173311059 | 13177107604 | Outgoing | SMS | Unknown 1 | 10/22/2013 8:43:55 AM | 0 |
| 13173311059 | 13177107604 | Incoming | SMS | Unknown 1 | 10/22/2013 8:44:57 AM | 0 |
| 13173311059 | 13177107604 | Outgoing | SMS | Unknown 1 | 10/22/2013 8:45:25 AM | 0 |
| 13173311059 | 13177107604 | Incoming | SMS | Unknown 1 | 10/22/2013 8:56:45 AM | 0 |
| 13173311059 | 13177107604 | Outgoing | SMS | Unknown 1 | 10/22/2013 12:10:16 PM | 0 |
| 13173311059 | 13173757791 | Outgoing | SMS | Robert Rainsberger | 10/22/2013 12:10:51 PM | 0 |
| 13173311059 | 13173757841 | Incoming | Voice | Ruth Rainsberger | 10/22/2013 1:36:31 PM | 30 |
| 13173311059 | 13173757791 | Outgoing | SMS | Robert Rainsberger | 10/22/2013 1:26:53 PM | 0 |
| 13173311059 | 13173757791 | Incoming | SMS | Robert Rainsberger | 10/22/2013 4:33:33 PM | 0 |
| 13173311059 | 13177107604 | Incoming | SMS | Unknown 1 | 10/22/2013 4:41:59 PM | 0 |
| 13173311059 | 13177107604 | Outgoing | SMS | Unknown 1 | 10/22/2013 4:43:04 PM | 0 |
| 13173311059 | 13177107604 | Incoming | SMS | Unknown 1 | 10/22/2013 5:04:05 PM | 0 |
| 13173311059 | 13177107604 | Incoming | SMS | Unknown 1 | 10/22/2013 5:04:26 PM | 0 |
| 13173311059 | 13177107604 | Outgoing | SMS | Unknown 1 | 10/22/2013 10:55:36 PM | 0 |
| 13173311059 | 18056377243 | Outgoing | Voice | Robert Rainsberger | 10/22/2013 10:56:17 PM | 0 |
| 13173311059 | 129 | Incoming | Voice | Unknown 19 | 10/23/2013 12:00:37 AM | 14 |
| 13173311059 | 129 | Incoming | Voice | Unknown 16 | 10/23/2013 12:00:51 AM | 28 |
| 13173311059 | 18056377249 | Outgoing | Voice | Unknown 20 | 10/23/2013 12:14:24 AM | 0 |
| 13173311059 | 13177107604 | Incoming | SMS | Unknown 1 | 10/23/2013 8:14:52 AM | 0 |
| 13173311059 | 13177107604 | Incoming | SMS | Unknown 1 | 10/23/2013 8:15:34 AM | 0 |
| 13173311059 | 13177107604 | Outgoing | SMS | Unknown 1 | 10/23/2013 8:47:52 AM | 0 |
| 13173311059 | 13176582166 | Incoming | SMS | Unknown 15 | 10/23/2013 8:48:31 AM | 0 |
| 13173311059 | 13176582166 | Outgoing | SMS | Unknown 15 | 10/23/2013 8:49:14 AM | 0 |
| 13173311059 | 13176582166 | Outgoing | SMS | Unknown 15 | 10/23/2013 8:49:39 AM | 0 |
| 13173311059 | 13177107604 | Outgoing | SMS | Unknown 1 | 10/23/2013 9:02:25 AM | 0 |
| 13173311059 | 13173757791 | Incoming | SMS | Robert Rainsberger | 10/23/2013 9:04:50 AM | 0 |
| 13173311059 | 13173757791 | Outgoing | SMS | Robert Rainsberger | 10/23/2013 9:04:50 AM | 0 |
| 13173311059 | 13173757791 | Outgoing | SMS | Robert Rainsberger | 10/23/2013 9:18:23 AM | 0 |
| 13173311059 | 13176582166 | Incoming | SMS | Unknown 15 | 10/23/2013 9:19:38 AM | 0 |
| 13173311059 | 13176582166 | Outgoing | SMS | Unknown 15 | 10/23/2013 9:33:10 AM | 0 |
| 13173311059 | 13176582166 | Incoming | SMS | Unknown 15 | 10/23/2013 9:33:29 AM | 0 |
| 13173311059 | 13176582166 | Outgoing | SMS | Unknown 15 | 10/23/2013 9:33:38 AM | 0 |
| 13173311059 | 13176582166 | Incoming | SMS | Unknown 15 | 10/23/2013 9:34:42 AM | 0 |
| 13173311059 | 13176582166 | Outgoing | SMS | Unknown 15 | 10/23/2013 9:35:27 AM | 0 |
| 13173311059 | 13177107604 | Outgoing | SMS | Unknown 1 | 10/23/2013 9:48:05 AM | 0 |
| 13173311059 | 13173757791 | Outgoing | SMS | Robert Rainsberger | 10/23/2013 2:57:12 PM | 0 |
| 13173311059 | 13173757791 | Incoming | SMS | Robert Rainsberger | 10/23/2013 4:25:21 PM | 0 |

| 13173311059 | 13177107604 | Outgoing | SMS | Unknown 1 | 11/18/2013 6:23:13 PM | 0 |
|---|---|---|---|---|---|---|
| 13173311059 | 13177107604 | Incoming | SMS | Unknown 1 | 11/18/2013 6:23:51 PM | 0 |
| 13173311059 | 13177107604 | Incoming | SMS | Unknown 1 | 11/18/2013 9:44:30 PM | 0 |
| 13173311059 | 13177107604 | Outgoing | SMS | Unknown 1 | 11/18/2013 9:44:58 PM | 0 |
| 13173311059 | 13177107604 | Outgoing | SMS | Unknown 1 | 11/18/2013 9:49:00 PM | 0 |
| 13173311059 | 13177107604 | Incoming | SMS | Unknown 1 | 11/18/2013 9:49:49 PM | 0 |
| 13173311059 | 13177107604 | Outgoing | SMS | Unknown 1 | 11/18/2013 8:00:41 AM | 0 |
| 13173311059 | 13177107604 | Incoming | SMS | Unknown 1 | 11/18/2013 8:01:58 AM | 0 |
| 13173311059 | 13177165682 | Outgoing | SMS | Unknown 25 | 11/18/2013 8:08:18 AM | 0 |
| 13173311059 | 13177107604 | Incoming | SMS | Unknown 1 | 11/19/2013 10:08:28 AM | 0 |
| 13173311059 | 13177107604 | Outgoing | SMS | Unknown 1 | 11/19/2013 10:09:00 AM | 0 |
| 13173311059 | 13177107604 | Incoming | SMS | Unknown 1 | 11/19/2013 10:07:00 AM | 0 |
| 13173311059 | 13177107604 | Outgoing | SMS | Unknown 1 | 11/19/2013 10:11:52 AM | 0 |
| 13173311059 | 13177107604 | Incoming | SMS | Unknown 1 | 11/19/2013 10:13:25 AM | 0 |
| 13173311059 | 13177107604 | Incoming | SMS | Unknown 1 | 11/19/2013 10:16:31 AM | 0 |
| 13173311059 | 13177107604 | Outgoing | SMS | Unknown 1 | 11/19/2013 10:16:53 AM | 0 |
| 13173311059 | 13176794411 | Incoming | SMS | Rebecca Rainsberger | 11/19/2013 12:12:58 PM | 0 |
| 13173311059 | 209 | Incoming | SMS | Unknown 12 | 11/19/2013 12:12:58 PM | 0 |
| 13173311059 | 209 | Incoming | SMS | Unknown 12 | 11/19/2013 12:12:59 PM | 0 |
| 13173311059 | 206 | Incoming | SMS | Unknown 18 | 11/19/2013 12:13:09 PM | 0 |
| 13173311059 | 206 | Incoming | SMS | Unknown 18 | 11/19/2013 12:14:22 PM | 0 |
| 13173311059 | 13176794411 | Outgoing | SMS | Rebecca Rainsberger | 11/19/2013 12:14:47 PM | 0 |
| 13173311059 | 13177107604 | Incoming | SMS | Unknown 1 | 11/19/2013 12:14:49 PM | 0 |
| 13173311059 | 206 | Incoming | SMS | Unknown 18 | 11/19/2013 12:14:50 PM | 0 |
| 13173311059 | 13176794411 | Incoming | SMS | Rebecca Rainsberger | 11/19/2013 1:02:06 PM | 0 |
| 13173311059 | 13176794411 | Incoming | SMS | Rebecca Rainsberger | 11/19/2013 1:02:47 PM | 0 |
| 13173311059 | 13177107604 | Outgoing | SMS | Unknown 1 | 11/19/2013 1:09:41 PM | 0 |
| 13173311059 | 13177107604 | Incoming | SMS | Unknown 1 | 11/19/2013 1:41:18 PM | 0 |
| 13173311059 | 13177107604 | Incoming | SMS | Unknown 1 | 11/19/2013 1:42:28 PM | 0 |
| 13173311059 | 13177107604 | Outgoing | SMS | Unknown 1 | 11/19/2013 1:44:00 PM | 0 |
| 13173311059 | 13177107604 | Incoming | SMS | Unknown 1 | 11/19/2013 1:44:33 PM | 0 |
| 13173311059 | 13177107604 | Outgoing | SMS | Unknown 1 | 11/19/2013 1:45:59 PM | 0 |
| 13173311059 | 13176794411 | Outgoing | SMS | Rebecca Rainsberger | 11/19/2013 1:48:10 PM | 0 |
| 13173311059 | 13177107604 | Outgoing | SMS | Unknown 1 | 11/19/2013 1:56:16 PM | 0 |
| 13173311059 | 13177137702 | Incoming | MMS | Unknown 17 | 11/19/2013 2:14:49 PM | 0 |
| 13173311059 | 13174137702 | Incoming | MMS | Unknown 17 | 11/19/2013 2:16:11 PM | 0 |
| 13173311059 | 13177137702 | Outgoing | SMS | Unknown 1 | 11/19/2013 2:16:17 PM | 0 |
| 13173311059 | 13173757891 | Outgoing | MMS | Robert Rainsberger | 11/19/2013 3:44:10 PM | 0 |
| 13173311059 | 13176794411 | Outgoing | SMS | Rebecca Rainsberger | 11/19/2013 4:20:18 PM | 0 |
| 13173311059 | 13176794411 | Outgoing | SMS | Rebecca Rainsberger | 11/19/2013 4:20:18 PM | 0 |
| 13173311059 | 13176794411 | Incoming | SMS | Rebecca Rainsberger | 11/19/2013 4:22:45 PM | 0 |
| 13173311059 | 13176794411 | Outgoing | SMS | Rebecca Rainsberger | 11/19/2013 4:23:11 PM | 0 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 13173311059 | 13176794411 | Outgoing | SMS | Rebecca Rainsberger | 11/19/2013 4:37:00 PM | 0 |
| 13173311059 | 13176794411 | Incoming | SMS | Rebecca Rainsberger | 11/19/2013 4:39:50 PM | 0 |
| 13173311059 | 13176794411 | Outgoing | SMS | Rebecca Rainsberger | 11/19/2013 4:40:58 PM | 0 |
| 13173311059 | 13176794411 | Outgoing | SMS | Rebecca Rainsberger | 11/19/2013 4:43:43 PM | 0 |
| 13173311059 | 13173575791 | Outgoing | SMS | Robert Rainsberger | 11/19/2013 4:59:25 PM | 0 |
| 13173311059 | 13173575791 | Incoming | SMS | Robert Rainsberger | 11/19/2013 4:59:51 PM | 0 |
| 13173311059 | 13176794411 | Incoming | SMS | Rebecca Rainsberger | 11/19/2013 5:21:02 PM | 0 |
| 13173311059 | 13176794411 | Outgoing | SMS | Rebecca Rainsberger | 11/19/2013 5:22:28 PM | 0 |
| 13173311059 | 13176794411 | Incoming | SMS | Rebecca Rainsberger | 11/19/2013 5:22:46 PM | 0 |
| 13173311059 | 13176794411 | Outgoing | SMS | Rebecca Rainsberger | 11/19/2013 5:40:23 PM | 0 |
| 13173311059 | 13173575791 | Outgoing | SMS | Robert Rainsberger | 11/19/2013 5:41:16 PM | 0 |
| 13173311059 | 13173575791 | Incoming | SMS | Robert Rainsberger | 11/19/2013 5:42:01 PM | 0 |
| 13173311059 | 13173575791 | Outgoing | SMS | Robert Rainsberger | 11/19/2013 5:42:31 PM | 0 |
| 13173311059 | 13173575791 | Incoming | SMS | Robert Rainsberger | 11/19/2013 5:51:42 PM | 0 |
| 13173311059 | 13173575791 | Outgoing | SMS | Robert Rainsberger | 11/19/2013 5:52:21 PM | 0 |
| 13173311059 | 13176794411 | Outgoing | SMS | Rebecca Rainsberger | 11/19/2013 6:02:32 PM | 0 |
| 13173311059 | 13173575791 | Outgoing | SMS | Robert Rainsberger | 11/19/2013 6:03:52 PM | 0 |
| 13173311059 | 13176794411 | Outgoing | SMS | Rebecca Rainsberger | 11/19/2013 6:05:49 PM | 0 |
| 13173311059 | 206 | Outgoing | SMS | Unknown 18 | 11/19/2013 6:07:34 PM | 0 |
| 13173311059 | 202 | Incoming | SMS | Unknown 10 | 11/19/2013 6:07:35 PM | 0 |
| 13173311059 | 13176794411 | Outgoing | SMS | Rebecca Rainsberger | 11/19/2013 6:10:26 PM | 0 |
| 13173311059 | 13176794411 | Incoming | SMS | Rebecca Rainsberger | 11/19/2013 6:10:57 PM | 0 |
| 13173311059 | 13176794411 | Incoming | SMS | Rebecca Rainsberger | 11/19/2013 6:11:06 PM | 0 |
| 13173311059 | 13176794411 | Outgoing | SMS | Rebecca Rainsberger | 11/19/2013 6:11:19 PM | 0 |
| 13173311059 | 13173575791 | Incoming | SMS | Robert Rainsberger | 11/19/2013 6:11:50 PM | 0 |
| 13173311059 | 13173575791 | Outgoing | SMS | Robert Rainsberger | 11/19/2013 6:12:00 PM | 0 |
| 13173311059 | 13173575791 | Incoming | SMS | Robert Rainsberger | 11/19/2013 6:12:46 PM | 0 |
| 13173311059 | 13176794411 | Outgoing | MMS | Rebecca Rainsberger | 11/19/2013 6:13:25 PM | 0 |
| 13173311059 | 13176794411 | Incoming | SMS | Rebecca Rainsberger | 11/19/2013 6:13:47 PM | 0 |
| 13173311059 | 13176794411 | Outgoing | SMS | Rebecca Rainsberger | 11/19/2013 6:42:52 PM | 0 |
| 13173311059 | 13176794411 | Incoming | SMS | Rebecca Rainsberger | 11/19/2013 6:42:52 PM | 0 |
| 13173311059 | 13176794411 | Outgoing | SMS | Rebecca Rainsberger | 11/19/2013 6:42:53 PM | 0 |
| 13173311059 | 208 | Incoming | SMS | Unknown 11 | 11/19/2013 6:42:57 PM | 0 |
| 13173311059 | 208 | Incoming | MMS | Unknown 11 | 11/19/2013 6:43:52 PM | 0 |
| 13173311059 | 13176794411 | Outgoing | SMS | Rebecca Rainsberger | 11/19/2013 6:43:53 PM | 0 |
| 13173311059 | 202 | Incoming | SMS | Unknown 10 | 11/19/2013 7:20:29 PM | 0 |
| 13173311059 | 202 | Incoming | SMS | Unknown 10 | 11/19/2013 7:21:00 PM | 0 |
| 13173311059 | 13176794411 | Incoming | SMS | Rebecca Rainsberger | 11/19/2013 7:21:36 PM | 0 |
| 13173311059 | 13176794411 | Outgoing | SMS | Rebecca Rainsberger | 11/19/2013 7:22:20 PM | 0 |
| 13173311059 | 13176794411 | Incoming | SMS | Rebecca Rainsberger | 11/19/2013 7:22:41 PM | 0 |

| Number | Contact Number | Direction | Type | Name | Date/Time | Duration |
|---|---|---|---|---|---|---|
| 13173311059 | 13176794411 | Incoming | SMS | Rebecca Rainsberger | 11/19/2013 7:23:08 PM | 0 |
| 13173311059 | 13176794411 | Outgoing | SMS | Rebecca Rainsberger | 11/19/2013 7:23:22 PM | 0 |
| 13173311059 | 13176794411 | Outgoing | Voice | Rebecca Rainsberger | 11/19/2013 7:23:45 PM | 15 |
| 13173311059 | 13176794411 | Incoming | Voice | Rebecca Rainsberger | 11/19/2013 7:23:48 PM | 23 |
| 13173311059 | 18056377249 | Outgoing | Voice | Unknown 20 | 11/19/2013 7:23:55 PM | 16 |
| 13173311059 | 13176794411 | Incoming | SMS | Rebecca Rainsberger | 11/19/2013 7:24:11 PM | 0 |
| 13173311059 | 129 | Incoming | SMS | Unknown 16 | 11/19/2013 7:24:24 PM | 0 |
| 13173311059 | 13176794411 | Outgoing | SMS | Rebecca Rainsberger | 11/19/2013 7:24:29 PM | 21 |
| 13173311059 | 18056377243 | Outgoing | Voice | Unknown 19 | 11/19/2013 7:25:12 PM | 0 |
| 13173311059 | 13176794411 | Outgoing | SMS | Rebecca Rainsberger | 11/19/2013 7:25:34 PM | 410 |
| 13173311059 | 13176794411 | Incoming | SMS | Rebecca Rainsberger | 11/19/2013 7:25:59 PM | 0 |
| 13173311059 | 13176794411 | Incoming | SMS | Rebecca Rainsberger | 11/19/2013 7:26:00 PM | 0 |
| 13173311059 | 13176794411 | Outgoing | SMS | Rebecca Rainsberger | 11/19/2013 7:26:01 PM | 0 |
| 13173311059 | 13176794411 | Incoming | SMS | Rebecca Rainsberger | 11/19/2013 7:26:02 PM | 0 |
| 13173311059 | 13176794411 | Incoming | MMS | Rebecca Rainsberger | 11/19/2013 7:32:27 PM | 0 |
| 13173311059 | 13176794411 | Outgoing | SMS | Rebecca Rainsberger | 11/19/2013 7:32:48 PM | 0 |
| 13173311059 | 13173357791 | Outgoing | Voice | Robert Rainsberger | 11/19/2013 7:48:53 PM | 20 |
| 13173311059 | 13173357791 | Incoming | SMS | Robert Rainsberger | 11/19/2013 7:49:13 PM | 0 |
| 13173311059 | 13176794411 | Incoming | SMS | Rebecca Rainsberger | 11/19/2013 7:54:33 PM | 90 |
| 13173311059 | 13176794411 | Outgoing | SMS | Rebecca Rainsberger | 11/19/2013 8:00:42 PM | 0 |
| 13173311059 | 13173357791 | Outgoing | SMS | Robert Rainsberger | 11/19/2013 8:03:52 PM | 0 |
| 13173311059 | 13176794411 | Incoming | SMS | Rebecca Rainsberger | 11/19/2013 8:04:01 PM | 0 |
| 13173311059 | 13173357791 | Outgoing | MMS | Robert Rainsberger | 11/19/2013 8:08:00 PM | 0 |
| 13173311059 | 13176794411 | Incoming | Voice | Rebecca Rainsberger | 11/19/2013 8:18:13 PM | 0 |
| 13173311059 | 13173357791 | Incoming | SMS | Robert Rainsberger | 11/19/2013 8:19:03 PM | 0 |
| 13173311059 | 129 | Incoming | SMS | Unknown 19 | 11/19/2013 8:21:24 PM | 0 |
| 13173311059 | 13176794411 | Outgoing | SMS | Rebecca Rainsberger | 11/19/2013 8:22:30 PM | 0 |
| 13173311059 | 13176794411 | Incoming | SMS | Rebecca Rainsberger | 11/19/2013 8:26:57 PM | 0 |
| 13173311059 | 13173357791 | Incoming | SMS | Robert Rainsberger | 11/19/2013 8:27:34 PM | 0 |
| 13173311059 | 13176794411 | Incoming | Voice | Rebecca Rainsberger | 11/19/2013 8:28:29 PM | 81 |
| 13173311059 | 13176794411 | Outgoing | Voice | Rebecca Rainsberger | 11/19/2013 8:31:19 PM | 59 |
| 13173311059 | 13176794411 | Incoming | Voice | Rebecca Rainsberger | 11/19/2013 8:32:47 PM | 59 |
| 13173311059 | 13176794411 | Outgoing | Voice | Rebecca Rainsberger | 11/19/2013 8:34:04 PM | 84 |
| 13173311059 | 13173357791 | Outgoing | SMS | Robert Rainsberger | 11/19/2013 8:43:36 PM | 0 |
| 13173311059 | 13173357791 | Incoming | SMS | Robert Rainsberger | 11/19/2013 8:43:54 PM | 0 |
| 13173311059 | 13173357791 | Outgoing | SMS | Robert Rainsberger | 11/19/2013 8:48:24 PM | 0 |
| 13173311059 | 13176794411 | Outgoing | SMS | Rebecca Rainsberger | 11/19/2013 8:52:26 PM | 0 |
| 13173311059 | 13173357791 | Incoming | SMS | Robert Rainsberger | 11/19/2013 8:55:25 PM | 0 |
| 13173311059 | 13176794411 | Outgoing | SMS | Rebecca Rainsberger | 11/19/2013 9:04:36 PM | 0 |
| 13173311059 | 13176794411 | Incoming | SMS | Rebecca Rainsberger | 11/19/2013 9:07:24 PM | 0 |
| 13173311059 | 13176794411 | Incoming | MMS | Rebecca Rainsberger | 11/19/2013 9:07:34 PM | 0 |
| 13173311059 | 13176794411 | Incoming | MMS | Rebecca Rainsberger | 11/19/2013 9:07:42 PM | 0 |

| Account | Number | Direction | Type | Contact | Date/Time | Duration |
|---|---|---|---|---|---|---|
| 13173311059 | 13176794411 | Incoming | SMS | Rebecca Rainsberger | 11/19/2013 9:08:59 PM | 0 |
| 13173311059 | 13177107604 | Incoming | SMS | Unknown 1 | 11/19/2013 9:29:41 PM | 0 |
| 13173311059 | 13177107604 | Outgoing | SMS | Unknown 1 | 11/19/2013 9:39:52 PM | 0 |
| 13173311059 | 13177107604 | Incoming | SMS | Unknown 1 | 11/19/2013 9:41:34 PM | 0 |
| 13173311059 | 13176794411 | Incoming | MMS | Rebecca Rainsberger | 11/19/2013 9:43:52 PM | 0 |
| 13173311059 | 13176794411 | Incoming | SMS | Rebecca Rainsberger | 11/19/2013 9:43:59 PM | 0 |
| 13173311059 | 13177107604 | Outgoing | SMS | Unknown 1 | 11/19/2013 9:56:40 PM | 0 |
| 13173311059 | 13177107604 | Incoming | SMS | Unknown 1 | 11/19/2013 9:57:20 PM | 0 |
| 13173311059 | 13177107604 | Incoming | SMS | Unknown 1 | 11/19/2013 10:00:23 PM | 0 |
| 13173311059 | 13177107604 | Incoming | SMS | Unknown 1 | 11/19/2013 10:00:45 PM | 0 |
| 13173311059 | 13177107604 | Outgoing | SMS | Unknown 1 | 11/19/2013 10:32:04 PM | 0 |
| 13173311059 | 13177107604 | Outgoing | SMS | Unknown 1 | 11/19/2013 10:32:24 PM | 0 |
| 13173311059 | 13177107604 | Incoming | SMS | Unknown 4 | 11/19/2013 10:32:33 PM | 0 |
| 13173311059 | 13172237049 | Incoming | Voice | Unknown 4 | 11/19/2013 10:45:29 PM | 58 |
| 13173311059 | 13173575791 | Incoming | SMS | Robert Rainsberger | 11/19/2013 11:01:13 PM | 0 |
| 13173311059 | 13173575791 | Outgoing | Voice | Unknown 1 | 11/19/2013 11:01:13 PM | 410 |
| 13173311059 | 13176306100 | Incoming | Voice | Unknown 46 | 11/20/2013 2:48:06 AM | 80 |
| 13173311059 | 13173575791 | Incoming | SMS | Robert Rainsberger | 11/20/2013 2:52:23 AM | 0 |
| 13173311059 | 13176794411 | Outgoing | SMS | Rebecca Rainsberger | 11/20/2013 2:52:25 AM | 0 |
| 13173311059 | 13177107604 | Incoming | SMS | Unknown 1 | 11/20/2013 2:53:11 AM | 0 |
| 13173311059 | 13176794411 | Incoming | SMS | Rebecca Rainsberger | 11/20/2013 2:54:29 AM | 0 |
| 13173311059 | 13173575791 | Incoming | Voice | Robert Rainsberger | 11/20/2013 2:54:51 AM | 68 |
| 13173311059 | 13176794411 | Incoming | SMS | Rebecca Rainsberger | 11/20/2013 6:50:33 AM | 0 |
| 13173311059 | 13176794411 | Incoming | Voice | Rebecca Rainsberger | 11/20/2013 9:15:32 AM | 160 |
| 13173311059 | 13177107604 | Incoming | SMS | Unknown 1 | 11/20/2013 9:21:22 AM | 0 |
| 13173311059 | 207 | Incoming | SMS | Unknown 23 | 11/20/2013 9:21:23 AM | 0 |
| 13173311059 | 207 | Outgoing | SMS | Unknown 23 | 11/20/2013 9:22:58 AM | 0 |
| 13173311059 | 13176794411 | Outgoing | SMS | Rebecca Rainsberger | 11/20/2013 9:24:55 AM | 0 |
| 13173311059 | 13177107604 | Outgoing | SMS | Unknown 1 | 11/20/2013 9:25:27 AM | 0 |
| 13173311059 | 13177107604 | Incoming | SMS | Unknown 1 | 11/20/2013 9:25:53 AM | 0 |
| 13173311059 | 13177107604 | Outgoing | SMS | Unknown 1 | 11/20/2013 9:25:54 AM | 0 |
| 13173311059 | 13177107604 | Incoming | SMS | Unknown 1 | 11/20/2013 9:26:45 AM | 0 |
| 13173311059 | 13177107604 | Outgoing | SMS | Unknown 1 | 11/20/2013 9:27:35 AM | 0 |
| 13173311059 | 13177107604 | Outgoing | SMS | Unknown 1 | 11/20/2013 9:30:25 AM | 0 |
| 13173311059 | 13177107604 | Outgoing | SMS | Unknown 1 | 11/20/2013 9:30:51 AM | 0 |
| 13173311059 | 13177107604 | Incoming | SMS | Unknown 1 | 11/20/2013 9:33:44 AM | 0 |
| 13173311059 | 13177107604 | Incoming | SMS | Unknown 1 | 11/20/2013 9:33:50 AM | 0 |
| 13173311059 | 13174137702 | Incoming | Voice | Unknown 17 | 11/20/2013 10:18:16 AM | 141 |
| 13173311059 | 13174137702 | Outgoing | SMS | Unknown 17 | 11/20/2013 10:19:10 AM | 0 |
| 13173311059 | 13174137702 | Incoming | SMS | Unknown 17 | 11/20/2013 10:20:27 AM | 0 |

Case 1:16-cv-00103-TWP-MJD   Document 83-1   Filed 11/28/17   Page 176 of 344 PageID #:
Case 1:16-cv-00103-TWP-MJD   Document 43-20   Filed 02/13/17   Page 1 of 2   PageID #: 266
1768

# EXHIBIT 20

1440132.001
11/29/2013
SCAMP

Run Date:  11/29/2013
Run Time:  15:24:19
Landline Usage
For:  (317)375-7841

# LANDLINE USAGE

| Item | ConnDateTime | | Originating Number | Terminating Number | Elapsed Time | CIC | Call Code |
|---|---|---|---|---|---|---|---|
| 115 | 11/13/13 | 07:43:44P | 3173757841 | 3172145618 | 0:00 | 2 | 720 |
| 116 | 11/13/13 | 07:45:58P | 3173757841 | 3105212233 | 0:29 | 4441 | 110 |
| 117 | 11/13/13 | 07:48:19P | 3173757841 | 3173120500 | 0:23 | | 6 |
| 118 | 11/13/13 | 07:55:15P | 3173757841 | | 0:41 | | 196 |
| 119 | 11/13/13 | 07:56:57P | 3173757841 | | 0:27 | | 196 |
| 120 | 11/13/13 | 07:58:12P | 3173757841 | | 0:44 | | 196 |
| 121 | 11/13/13 | 07:59:55P | 3173757841 | | 0:54 | | 196 |
| 122 | 11/13/13 | 08:02:00P | 3173757841 | 3173311059 | 0:42 | | 6 |
| 123 | 11/13/13 | 08:04:18P | 3177280000 | 3173757841 | 0:00 | | 720 |
| 124 | 11/13/13 | 08:04:19P | 3177280000 | 3173757841 | 0:06 | 9 | 720 |
| 125 | 11/13/13 | 08:04:32P | 3173757841 | 3173311059 | 0:12 | 9 | 720 |
| 126 | 11/13/13 | 08:06:15P | 3177280000 | 3167944411 | 0:27 | | 6 |
| 127 | 11/13/13 | 08:17:15P | 3173757841 | 3173311059 | 0:31 | | 6 |
| 128 | 11/13/13 | 08:21:34P | 3173757841 | 3173757591 | 0:42 | | 6 |
| 129 | 11/13/13 | 08:22:15P | 765713000 | 3173757591 | 0:45 | 9 | 720 |
| 130 | 11/13/13 | 09:07:05P | 3173757841 | 3173311059 | 1:06 | | 6 |
| 131 | 11/14/13 | 10:18:50A | 3173757841 | 3172121546 | 0:38 | | 6 |
| 132 | 11/14/13 | 10:20:05A | 3173757841 | 3173311059 | 0:12 | | 6 |
| 133 | 11/14/13 | 10:51:05A | 3173757841 | 3173757841 | 0:09 | 9 | 6 |
| 134 | 11/14/13 | 12:58:48P | 3172129998 | 3173757841 | 0:34 | 50692 | 720 |
| 135 | 11/14/13 | 11:12:31A | 3177280000 | 3173757841 | 0:06 | 9 | 720 |
| 136 | 11/15/13 | 11:16:35A | 3173410000 | 3173757841 | 0:27 | | 6 |
| 137 | 11/15/13 | 11:51:59A | 8772370512 | 3173757841 | 0:59 | 2222 | 119 |
| 138 | 11/16/13 | 08:51:59A | 3792786673 | 3173757841 | 0:50 | 63302 | 119 |
| 139 | 11/16/13 | 07:42:50P | 3173757841 | 3173311059 | 0:33 | | 6 |
| 140 | 11/16/13 | 11:08:58A | 3173757841 | 3173311059 | 0:44 | | 6 |
| 141 | 11/16/13 | 07:54:48P | 3173757841 | 3173311059 | 1:23 | | 119 |
| 142 | 11/17/13 | 02:04:52A | 3173757841 | 3173311059 | 1:26 | | 6 |
| 143 | 11/17/13 | 07:58:12A | 3173757841 | 3173311059 | 1:23 | | 6 |
| 144 | 11/17/13 | 10:04:54A | 3167944411 | 3173757841 | 1:34 | | 119 |
| 145 | 11/17/13 | 05:12:14P | 3173757841 | 3173311059 | 4:58 | 90002 | 6 |
| 146 | 11/17/13 | 05:33:48P | 3173757841 | 3173311059 | 2:00 | | 6 |
| 147 | 11/17/13 | 05:57:22P | 3173757841 | 3173311059 | 1:05 | | 6 |
| 148 | 11/18/13 | 07:53:16A | 3173757841 | 3173311059 | 0:58 | | 6 |
| 149 | 11/18/13 | 05:41:45P | 3173757841 | 3173757841 | 0:26 | | 6 |
| 150 | 11/19/13 | 03:41:09P | 3173410000 | 3173575791 | 0:07 | | 6 |
| 149 | 11/19/13 | 10:29:50A | 3173757841 | 3173757841 | 0:00 | 9 | 720 |

EM

AT&T Proprietary

The information contained here is for use by authorized person only and is not for general distribution.



Page 4

Case 1:16-cv-00103-TWP-MJD   Document 88-1   Filed 11/28/17   Page 178 of 344 PageID #:
1770
Case 1:16-cv-00103-TWP-MJD   Document 43-21   Filed 02/13/17   Page 1 of 2   PageID 268

# EXHIBIT 21

**Box, Kathryn M.**

| | |
|---|---|
| **From:** | Bierce, Benjamin |
| **Sent:** | Monday, December 09, 2013 2:59 PM |
| **To:** | Benner, Charles |
| **Subject:** | DP13153344 317-357-5791 |
| **Attachments:** | DP13153344 317-357-5791 CDR Map 1.JPG; DP13153344 317-357-5791 CDR PT.xlsx; DP13153344 317-357-5791 CDR 4.xlsx |

Chuck,
Here are the files for Robert Rainsberger's phone. Let me know if you need anything else.
Thanks,
Ben

Detective Benjamin Bierce
Homicide Investigator
Indianapolis Metropolitan Police Department
Department of Public Safety
50 N. Alabama Room, E305
Indianapolis, IN 46204
Office: 317-327-3356
Fax: 317-327-3372
Pager: 317-639-8017
20088@indy.gov

Police - Fire - Homeland Security - Animal Care and Control- EMS - PSC

1

Case 1:16-cv-00103-TWP-MJD   Document 33-1   Filed 11/28/17   Page 180 of 344 PageID #:
Case 1:16-cv-00103-WTL-MJD   Document 43-22   Filed 02/13/17   Page 1 of 2   PageID #: 276
1772

# EXHIBIT 22

Case 1:16-cv-00103-TWP-MJD   Document 88-12   Filed 11/28/17   Page 181 of 344 PageID #:
1773
Case 1:16-cv-00103-TWP-MJD   Document 43-12   Filed 02/13/17   Page 21 of 24   PageID #:
481

**Box, Kathryn M.**

| | |
|---|---|
| **From:** | Bierce, Benjamin |
| **Sent:** | Wednesday, July 23, 2014 9:42 AM |
| **To:** | Benner, Charles |
| **Cc:** | Vincent, Marielle |
| **Subject:** | DP13153344 317-357-7590 |
| **Attachments:** | DP13153344 317-357-5791 CDR.xlsx |

Chuck,
Here are the results with the times converted to Eastern. This only applies to the Results tab.

Detective Benjamin Bierce
Homicide Investigator
Indianapolis Metropolitan Police Department
Department of Public Safety
50 N. Alabama Room, E305
Indianapolis, IN 46204
Office:  317-327-2428
Fax:  317-327-3372
Pager:  317-639-8017
20088@indy.gov

Case 1:16-cv-00103-TWP-MJD   Document 88-1   Filed 11/28/17   Page 182 of 344 PageID #:
1774
Case 1:16-cv-00103-TWP-MJD   Document 43-23   Filed 02/15/17   Page 92 of 3   PageID 272

# EXHIBIT 23

Case 1:16-cv-00103-TWP-MJD    Document 88-13    Filed 11/28/17    Page 183 of 344 PageID #:
1775
Case 1:16-cv-00103-TWP-MJD    Document 88-13    Filed 02/13/17    Page 2 of 3    PageID #:

WILLIAM RAINSBERGER VS.
CHARLES BENNER

ROBERT RAINSBERGER
December 20, 2016

Page 22

1 A   No.
2 Q   Did you go inside your mom's house?
3 A   No.
4 Q   What was William's demeanor like?
5 A   He was in shock.
6 Q   And what was your understanding of your mom's
7      condition at that time?
8 A   At that time, I don't know.
9 Q   Okay.
10 A   She was wheeled out.
11 Q   And you never received any more information at
12      that time about your mom?
13 A   No.
14 Q   Did you at any point shortly after this incident
15      go inside your mom's house?
16 A   No.
17 Q   Did you ever find out if something was missing
18      from your mom's house?
19 A   I still don't know what happened to that purse.
20 Q   Okay.  And when did you find out that the purse
21      was missing?
22 A   I don't recall.
23 Q   Did you ever -- do you recall Detective Benner in
24      this case?
25 A   Yeah.

Page 23

1 Q   Yeah.  Did you ever speak with Detective Benner
2      about your mom's purse being missing?
3 A   No.
4 Q   Okay.  So after your mom was wheeled out, you
5      asked William what happened, he said he didn't
6      know.  What happened next?
7 A   First thing I know is the police came out and --
8      and separated us.
9 Q   Okay.  And how did they separate you?
10 A   Put us in the back of cruisers, separate
11      cruisers.
12 Q   Okay.  And how long were you in the cop car for?
13 A   I don't know.  We started going downtown.  At
14      least an hour, maybe an hour and a half.
15 Q   Okay.  Did you speak with any police officers on
16      scene?
17 A   The one that was baby-sitting me.
18 Q   In the vehicle?
19 A   Uh-huh.
20 Q   And what did you say to him?
21 A   I asked him what happened.
22 Q   And what did he say?
23 A   He said she was shot.
24 Q   Anything else that you guys talked about?
25 A   Well, no.

Page 24

1 Q   No?  Did you ask him any other questions?
2 A   When he said she was shot, I said -- it just
3      seemed like a surprise to me and then he said he
4      didn't know, maybe it was -- there's a lot of
5      cases like this or some nonsense, so.  That was
6      the extent of it.
7 Q   Okay.  So the next thing that happened, did you
8      go to the police station?
9 A   Downtown, yes.
10 Q   Okay.  And what happened when you got to the
11      police station?
12 A   They put me in an interrogation room.
13 Q   Did William go as well to the police station?
14 A   Yes.
15 Q   But he was in a separate cop car; is that
16      correct?
17 A   Correct.
18 Q   And how long do you think you were in the
19      interrogation room?
20 A   Oh, total, hour and a half, I guess.
21 Q   Did you give a statement to the police that
22      night?
23 A   Yes.
24 Q   Do you recall if that was given to Detective
25      Benner?

Page 25

1 A   Yes.
2 Q   And what happened after you gave your statement
3      to Detective Benner?
4 A   They let me go.
5 Q   And did you go home?  Did you go to the hospital?
6      What did you do?
7 A   Hospital.
8 Q   Did William go to the hospital with you?
9 A   Yes.
10 Q   When you got to the hospital, did you learn more
11      about your mom's condition?
12 A   Yes.
13 Q   What did you find out there?
14 A   That she had passed, they removed the tubes and
15      she came back.
16 Q   What do you mean, "she came back"?
17 A   She came back.
18 Q   Came back to life?
19 A   Yes.
20 Q   Did they have any answers for how she sustained
21      her injuries?
22 A   The ER doctor went into great detail about how
23      she was shot.
24 Q   Did the ER doctor tell you anything else?
25 A   That her condition -- I don't remember exactly.

WILLIAM RAINSBERGER VS.
CHARLES BENNER

ROBERT RAINSBERGER
December 20, 2016

Page 26

1    It revolved around life support and a decision we
2    had to make.
3 Q   Whether you were going to take her off of life
4    support or not?
5 A   (Affirmative nod).
6 Q   What was her prognosis? Or did the doctor give
7    you an expected outcome at that time?
8 A   What do you mean, expected outcome?
9 Q   Did he -- did he give you any chances of her
10   surviving?
11 A   Off life support?
12 Q   Yeah.
13 A   No, he -- he didn't -- well, he described the
14   injuries and what that part of the brain
15   controls, so obviously the outlook was grim.
16 Q   Okay. And did you guys make the decision to take
17   her off of life support?
18 A   Yes.
19 Q   And who made that decision?
20 A   We all did. That was her decision, but we all --
21 Q   Followed her directive?
22 A   Right.
23 Q   Okay. And that was you, William and Rebecca?
24 A   Yes.
25 Q   Did you guys make that decision that evening?

Page 27

1 A   Yes.
2 Q   How soon after you guys made that decision and
3    she was removed from life support did she pass
4    away?
5 A   I don't know exactly. It was after midnight.
6 Q   Okay. So sometime the next day?
7 A   Yeah.
8 Q   Were you at the hospital the whole time until she
9    passed away?
10 A   No.
11 Q   No? What time do you think you left the hospital
12   that evening?
13 A   I don't know.
14 Q   Did William leave the hospital with you at that
15   time?
16 A   Yes.
17 Q   And where did you guys go?
18 A   Home.
19 Q   Home? And when you got home, did you go straight
20   to sleep?
21 A   No, I didn't sleep.
22 Q   Didn't sleep. So what happened next that you
23   recall?
24 A   I went to work.
25 Q   What time did you go to work?

Page 28

1 A   I don't know. Whenever I --
2 Q   Okay. When did you find out that your mom had
3    passed away?
4 A   I don't know what time it was.
5 Q   Before you went to work or after you went to
6    work?
7 A   I was at work.
8 Q   Okay. And when you found out that she'd passed
9    away, did you stay at work or did you leave?
10 A   No, I stayed. I couldn't --
11 Q   Couldn't leave?
12 A   Right.
13 Q   And what happened next?
14 A   I don't know what you mean.
15 Q   Okay. Did you ever -- after you found out that
16   your mom passed away, did you talk to William
17   about it?
18 A   The next morning.
19 Q   The following day?
20 A   No, later in the morning.
21 Q   Okay. And did you guys talk on the phone?
22 A   I don't think so.
23 Q   Was it -- so you think you had --
24 A   Huh?
25 Q   Sorry. Do you think you had the conversation

Page 29

1    before you went to work, then?
2 A   No. I went to work after we got home middle of
3    the night. I remember the conversation later
4    that morning, there was a phone call, we need to
5    go downtown.
6 Q   Downtown to the police station?
7 A   Right.
8 Q   And do you know who -- who called you?
9 A   I don't know exactly, no.
10 Q   Okay. So did you go downtown to the police
11   station?
12 A   Yes.
13 Q   Do you recall what time you went downtown?
14 A   It was -- not exactly. It was around lunchtime.
15 Q   Okay. What was your understanding for why you
16   needed to go downtown to the police station?
17 A   To discuss a preliminary autopsy report.
18 Q   And what happened when you got to the police
19   station?
20 A   Well, Benner tried to talk us into taking
21   polygraphs instead.
22 Q   And how did you feel about being asked to do a
23   polygraph?
24 A   How did I feel about -- well, I didn't want to do
25   it.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

WILLIAM RAINSBERGER,                )
                                    )
        Plaintiff,                  )
                                    )
    v.                              )       Case No.: 1:16-cv-103-WTL-MJD
                                    )
CHARLES BENNER,                     )
                                    )
        Defendant.                  )

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

This case arises out of the death of eighty-eight-year-old Ruth Rainsberger. William Rainsberger testified that on November 19, 2013, he discovered his mother, Ruth, on the floor of her apartment breathing, but severely injured. Medics rushed Ruth to the hospital where she succumbed to her injuries the next day. The coroner determined that Ruth's cause of death was multiple blunt force trauma to the head and ruled it a homicide. Detective Charles Benner, a twenty-seven-year veteran of the Indianapolis Metropolitan Police Department, investigated Ruth's death. After a thorough investigation, Benner submitted an Affidavit for Probable Cause to the Marion Superior Court. The trial court found probable cause and issued a warrant for his arrest, although the charges against him were later dismissed.

William now sues Benner for false arrest, malicious prosecution, and for making false or misleading statements in a probable cause affidavit. These claims fail for four reasons. First, there was probable cause for William's arrest and prosecution. Second, Benner did not act with malicious intent, and even if he did, there is no constitutional right not to be prosecuted without probable cause. Third, there is no evidence that Benner knowingly made false or misleading statements, or withheld exculpatory evidence (and the allegedly false or misleading statements

1

were not material to the finding of probable cause in any event). And fourth, Benner has qualified immunity because he did not violate William's clearly established constitutional rights. Accordingly, Benner is entitled to summary judgment.

### I. Statement of Material Facts Not in Dispute

#### A. *William reports that he found his mother injured on the floor of her apartment.*

According to William, on November 19, 2013 shortly after 3:30 p.m., he went to his mother's apartment at 801 North Shortridge Road in Indianapolis. Dkt. 1, ¶ 8; Exhibit 1 – Affidavit for Probable Cause, pp. 1-2. He says he went to unlock the door with his key, but it was already unlocked. Ex. 1, p. 2; Exhibit 2 – Deposition of William Rainsberger, 54:23-55:3. William entered the apartment and noticed his mother lying face down on the floor with "a blanket covering much of her shoulders and head." Ex. 2, 56:5-6. Ruth was still breathing when William testified that he discovered her, but her breathing was labored. Ex. 2, 56:8-10. He knelt down beside her, put his hand on her knee, and yelled, "Mom, Mom." Ex. 2, 56:21-22. Ruth was unable to communicate, but her breathing changed and she moved her head and arm slightly. Ex. 2, 56:23-57:7. William sensed that she was responding to his touch or voice. Ex. 2, 57:16-19.

William knelt down beside his mother and noticed that there was a large circle of dried blood on the blanket covering her head. Ex. 2, 57:22-58:9. There was also a large pool of what appeared to him to be congealed blood on the floor. Ex. 2, 58:9-12. Despite being curious about the nature and extent of her injuries, William did not remove the blanket. Ex. 2, 59:25-60:2; 61:15-18. He also did not attempt to put pressure on her wound or provide first aid. Exhibit 8 – Deposition of Charles Benner, ¶ 6c. Instead, around 3:38 p.m., he used his mom's landline phone to call 911. Ex. 2, 59:3; 66:7-10; Exhibit 3 – 911 Audio. William told the 911 operator that "someone bashed her head in." Ex. 3, Track 4, 00:49-00:51.

2

Indianapolis Fire Department Paramedic Carl Wooldridge responded to William's 911 call.
Exhibit 4 – Affidavit of Carl Wooldridge, ¶ 4. William met Wooldridge outside the apartment and
stated that someone had "caved his mother's head in." Ex. 4, ¶ 5. Inside the apartment, Wooldridge
observed Ruth lying on the ground between a chair and the coffee table. Ex. 4, ¶ 6; Ex. 4,
Attachment A, p. 1. She was still breathing. Ex. 4, Attachment A, p. 1. There was a greenish
colored cloth with blood and a small hole covering Ruth's head. Ex. 4, ¶ 6; Ex. 4, Attachment A,
p. 1. The cloth appeared stuck to her head. Ex. 4, ¶ 6. Wooldridge removed the cloth and saw an
area on the back left side of Ruth's head, two to three inches in diameter, with brain matter
protruding. Ex. 4, ¶ 7; Ex. 4, Attachment A, p. 1. There was also what Wooldridge believed to be
a hole in the left side of her forehead. Ex. 4, ¶ 7; Ex. 4, Attachment A, p. 1.

Based on Ruth's injuries, Wooldridge's initial medical opinion was that Ruth sustained a
gunshot wound. Ex. 4, ¶ 8. Based on Ruth's presenting injuries, the emergency room doctor also
determined that she was shot. Exhibit 23 – Affidavit of Robert Rainsberger, 25:22-23. Wooldridge
thought it was strange that William said his mother's head had been caved in because he did not
remove the cloth to visualize her injuries and her injuries appeared consistent with a gunshot
wound. Ex. 4, ¶ 9.  In addition to Wooldridge, five or six other individuals from Engine 43 and the
ambulance crew arrived on scene to assist with Ruth's treatment. Ex. 4, ¶ 10; Ex. 4, Attachment
A, p. 2. They padded the wound with a towel and log rolled her onto a back board. Ex. 4,
Attachment A, p. 2. The ambulance transported Ruth to Wishard Hospital in critical condition. Ex.
4, Attachment A, p. 2; Exhibit 5 – Deposition of Charles Benner, 8:10-12.

### B. Benner investigates Ruth's death.

IMPD Detective, Roger Feuquay, also responded to the 911 call. Ex. 5, 8:4-7. Feuquay,
an aggravated assault detective, contacted homicide detective Benner when he learned that Ruth

Case 1:16-cv-00103-WTL-MJD Document 84 Filed 11/28/17 Page 188 of 344 PageID #:

was in critical condition. Ex. 5, 8:8-13. Benner arrived at the scene around 4:15 p.m. Ex. 5, 8:14-18. IMPD Homicide detective Tudor also arrived to assist Benner with the investigation. Ex. 5, 9:24-10:1.

### 1. *Benner performs an on-scene investigation.*

Benner began his investigation by speaking briefly with Feuquay and the reporting officer. Ex. 5, 8:14-23; 9:10-23. Feuquay relayed that William was the 911 caller, that Ruth was found covered with a blanket, and that she was transported to the hospital in critical condition. Ex. 5, 8:19-23. Benner learned from the reporting officer that William and his brother, Robert Rainsberger, were on scene and in separate vehicles. Ex. 5, 9:12-18. Tudor did an initial canvas of the building to identify potential witnesses. Ex. 5, 9:24-10:1. Benner gathered information about the medical personnel who treated Ruth then requested a crime scene specialist to collect evidence. Ex. 5, 10:2-6.

Around 4:21 p.m., Crime Scene Specialist, Jennifer Lane, arrived at 801 North Shortridge Road. Ex. 5, 10:5-6; Exhibit 6 – Deposition of Jennifer Lane, 3:14-16. Lane videotaped and photographed Ruth's apartment. Ex. 6, 16:7-10. She collected evidence, including fingerprints and DNA. Ex. 6, 3:21-32. Lane collected a skin cell sample from the outside back neck area and outside left sleeve of Ruth's jacket. Exhibit 7 – Laboratory Examination Report, p. 1. The Indianapolis-Marion County Forensic Services Agency analyzed the sample. Ex. 7. On April 23, 2014, the Forensics Services Agency issued a report indicating that "[t]he partial DNA profile of the minor contributor is from an unknown male individual A." Ex. 7, p. 2.

The skin cell DNA evidence recovered from Ruth's jacket was more than likely from one of the first responders who treated Ruth at the scene. Exhibit 8 – Affidavit of Charles Benner, ¶ 11. In Benner's experience, it is common for first responders who treat an injured victim to leave

touch DNA on the victim or victim's clothing. Ex. 8, ¶ 11. Here, the medical personnel who responded to the scene had to "log roll" Ruth onto a back board and transport her to the ambulance. Ex. 8, ¶ 11; Ex. 4, Attachment A, p. 2. To perform these tasks, the first responders would have had to touch Ruth. Ex. 8, ¶ 11. Because the DNA could most likely be attributed to a first responder, Benner did not find this evidence helpful to his investigation. Ex. 8, ¶ 11. He did not include this evidence in his probable cause affidavit. Ex. 1. Instead, Benner complied with his training and made the Marion County Prosecutor's Office aware of the skin cell DNA recovered from the scene. Ex. 8, ¶ 11.

Benner did a walkthrough of Ruth's apartment. Ex. 1, p. 1. The walkthrough revealed no signs of forced entry. Ex. 1, p. 1; Exhibit 9 – Photos, #1-3. He noticed some open dresser drawers in Ruth's bedroom, but the contents appeared undisturbed. Ex. 1, p. 1; Ex. 9, #5-10. The back room was cluttered with boxes and trash bags that seemed untouched. Ex. 1, p. 1; Ex. 9, #11-15. Benner found a lockbox on the open closet shelf in the back room which contained what looked to him like valuable financial documents. Ex. 5, 60:1-5; Ex. 9, #12, 15. He also found Ruth's checkbook, cash, and credit cards in the apartment. Ex. 5, 141:25; Ex. 6, 3:7-11, 6:7-9; Ex. 9, #17.

Benner does not recall whether the lockbox specifically contained "savings bonds." Ex. 1. Ex. 8, ¶ 8. He does recall that the documents looked like financial documents. Ex. 8, ¶ 8. The documents appeared valuable to Benner because they were stored in a lockbox and contained financial information. Ex. 8, ¶ 8. The documents also seemed undisturbed, which would indicate that robbery was not the motive for her death. Ex. 8, ¶ 8. He included this information in his probable cause affidavit to support the conclusion that Ruth's apartment had not been burglarized. Ex. 8, ¶ 8.

During a search of the crime scene, Benner found a black handbag that seemed to match the description of Ruth's purse given to him by William and Robert. Ex. 8, ¶ 7; Ex. 9, #16. He also located a brown coin purse. Ex. 8, ¶ 7; Ex. 9, #6-7, 9. He noted several medications on the kitchen counter that appeared undisturbed. Ex. 9, #4. Based on all the evidence, Benner determined that robbery did not appear to be the motive for Ruth's death. Ex. 8, ¶ 7.

### 2. *Benner interviews William, Robert, and Rebecca.*

That same evening, Benner asked William and Robert to give a statement. Ex. 5, 11:17-21. They both consented and were transported to IMPD Headquarters. Ex. 5, 11:17-12:2. On the drive downtown, William told IMPD Officer Michael Price that he did not know whether what happened to his mother was a good thing or bad or a bad thing. Exhibit 10- Deposition of Michael Price, 14:3-9.

William told Benner during his interview that he had been taking care of Ruth daily for the past few years. Ex. 1, p. 2. He also handled all of her bills and finances. Ex. 1, p. 2. Ruth had approximately $80,000 to $100,000 in savings that was to be distributed to her three children after her death. Ex. 1, p. 2. In addition to Ruth, the only individuals with a key to her apartment were William, Robert, and their sister Rebecca. Ex. 8, ¶ 6a. The apartment complex where Ruth lived also had a key to her apartment; however, Benner confirmed that the key had not been moved and was in its normal location at all relevant times. Ex. 8, ¶ 6a.

William said he last saw his mother the previous night around 6:00 p.m. After visiting with her, William drove to Plainfield to spend the evening with his wife. Ex. 1, p. 2. Around 9:00 the next morning, he returned to his house at 7345 East 13th Street in Indianapolis. Ex. 1, p. 2. He stayed home until about 3:30 p.m. then went to Kroger on 10th Street in Indianapolis and bought a tea. Ex. 1, p. 2. William then drove the short distance to Ruth's apartment. Ex. 1, p. 2.

When he arrived at Ruth's apartment, he says he noticed that the door was already unlocked. Ex. 1, p. 2; Ex. 2, 54:23-55:3. He went inside and saw her lying on the floor with a blanket over her head. Ex. 1, p. 2. Based on Benner's training and experience, when an attacker covers his or her victim's head or face, it often indicates that the attacker had a personal relationship with the victim. Ex. 8, ¶ 6d. William also noticed some blood and that his mother was still breathing. Ex. 1, p. 2. When asked why he did not remove the blanket, William said that in his opinion removing the blanket would do more damage. Ex. 1, p. 2. He checked the apartment to confirm that no one was there and then called 911. Ex. 1, p. 2; Ex. 3. After calling 911, William went outside to wait for the ambulance. Ex. 1, p. 2.

William also informed Benner that the only prescription medication that Ruth took was Aricept to treat her dementia. Ex. 8, ¶ 7. Based on Benner's training and experience, Aricept is not a drug worth stealing because it has no value on the street. Ex. 8, ¶ 7. He does not recall whether William said that some of his mother's jewelry was missing. Ex. 8, ¶ 7. However, William did state that Ruth did not own any expensive jewelry. Ex. 8, ¶ 7. William admitted in his deposition that he cannot say with certainty that any jewelry was missing from the apartment. Ex. 2, 121:10-17.

William never asked Benner about his mother's condition or if he could go to the hospital to be with her. Ex. 2, 131:2-7.

During his interview, Robert stated that he had not seen Ruth for a few days. Ex. 1, p. 2. In August 2013, Robert moved in with William after the bank foreclosed on his house. Ex. 1, p. 2. Robert was at William's house on November 19, 2013 when William called and told him to come to Ruth's house immediately. Ex. 1, p. 2. When he got to Ruth's apartment, Robert was stopped

7

by police and put in a police car. Ex. 1, p. 2. He advised Benner that an ambulance took his mother away. Ex. 1, p. 2.

Robert, likewise, did not ask Benner about Ruth's condition or whether he could go to the hospital to be with her. Ex. 1, p. 2.

The next day, Benner spoke with Rebecca Rainsberger. Ex. 1, p. 2. Rebecca stated that she typically checks on her mother once a week. Ex. 1, p. 2. She was last at Ruth's during the day on Monday, November 18, 2013. Ex.1, p. 2. Rebecca was not at the apartment on the day of the incident. Ex. 1, p. 2.

### 3. *Ruth passes away.*

On November 20, 2013, Ruth died from her injuries. Ex. 2, 24:7-11. Benner attended Ruth's autopsy performed by Dr. Tashjian. Ex. 1, p. 2. He determined that Ruth's cause of death was multiple blunt force trauma to the head. Ex. 1, p. 2. According to Dr. Tashjian, Ruth's wounds were possibly caused by a hammer or similar object. Ex. 1, p. 3. He ruled her death a homicide. Ex. 1, p. 3.

### 4. *Benner asks William and Robert to take a polygraph test.*

Following Ruth's autopsy, Benner again spoke with William and Robert at IMPD Headquarters. Ex. 1, p. 3. Benner asked William and Robert to take a polygraph test to eliminate them as suspects. Ex. 1, p. 3. William got upset and began yelling. Ex. 2, 95:16-96:3. He adamantly refused to take a polygraph. Ex. 1, p. 3; Ex. 2, 94:14-15.

### 5. *Benner obtains William's and Robert's fingerprints and DNA.*

Benner obtained a limited search warrant for William and Robert's fingerprints and DNA. Ex. 1, p. 3. On December 4, 2013, Benner collected fingerprints and DNA buccal swabs from William and Robert. Ex. 1, p. 3.

8

### 6. *Benner recovers video of William from the Kroger on 10th Street.*

Two days later, Benner collected video from the Kroger store located on 10th Street. Ex. 1, p. 3. Phil Thompson, an off-duty IMPD officer, had previously asked Pam Pulliam, a Loss Prevention Specialist for Kroger, if there was any video of William from November 19, 2013. Exhibit 11 – Deposition of Pam Pulliam, 2:22-3:5. Pulliam identified video of William making a purchase from the self-checkout lane. Ex. 11, 3:7-13. Kroger had eighty-one working cameras that day. Ex. 11, 3:18-21.

Four of them showed William. Ex. 11, 5:21-6:9. Camera 30, located in the front entry way, shows William at about 3:29 p.m. pull a "straight object" from his right side or right pocket and dispose of it in the trash. Exhibit 12- Camera 30 Footage, 3:28:55-3:28:59; Exhibit 13 – Still Photos of Camera 30 Footage. After dropping the object in the trashcan, William then pushes some buttons on the Redbox video-rental box next to the trashcan. Ex. 12, 3:28:59-3:29:26. As he pushes buttons, he turns to his side and looks around. Ex. 12, 3:29:03-3:29:04. He then enters the store. Ex. 12, 3:29:30. Camera 7, located in the self-checkout area, shows William purchasing a tea. Exhibit 14 - Camera 7, 3:31:14-3:32:01; Exhibit 15 - Receipt. He appears to let a female at the adjacent checkout kiosk use his Kroger Plus Card, but he does not use the card for his purchase. Ex. 14, 3:31:18-3:31:25; Exhibit 16 - Kroger Plus Card Records. Camera 29, located near the exit, shows William leaving the store. Exhibit 17 - Camera 29 Footage, 3:32:26-3:32:34. Camera 44, located in the parking lot, shows William walking towards a row of parked vehicles. Exhibit 18 - Camera 44 Footage, 3:32:50-3:32:55. He stops in the middle of the road, does a complete turn, throws up his hand, and then walks to a vehicle that is directly in front of him. Ex. 18, 3:32:55-3:33:14. William then gets in a vehicle and drives away. Ex. 18, 3:33:14-3:33:49.

Pulliam contacted Benner and invited him to the store to view the video footage. Ex. 11, 7:11-17. In addition to the video described above, Benner recalls seeing footage of William driving onto the Kroger parking lot, exiting his vehicle, and walking toward the entrance. Ex. 8, ¶ 10; Ex. 11, 7:7-8, 16-24. This video did not show William carrying trash or anything relevant to Benner's investigation. Ex. 8, ¶ 10. Benner asked Pulliam to provide him with all of the video depicting William. Ex. 8, ¶ 10. Pulliam gave Benner four disks labeled: "Camera 44 Lot," "Camera 29 Exit," "Camera 7 Uscan," and "Camera 30 Redbox." Ex. 8, ¶ 10; Ex. 11, 5:21-6:5.

### 7. *Benner subpoenas Kroger's records.*

Benner subpoenaed the Kroger Plus Card records for card number XXXXXXXX9558, which belongs to William. Ex. 16. The records show that on November 19, 2013, he made a $48.16 purchase at the Fuel Center at 9:20 a.m. and a $14.10 purchase at the Uscan self-checkout at 3:32 p.m. Ex. 16. Benner also obtained a receipt for William's purchase at the Uscan kiosk shown on Camera 7. Ex. 15. The receipt indicates that he paid $1.06 for an Arizona Green Tea at 3:34 p.m. Ex. 15. After purchasing the tea, William goes to Ruth's apartment and finds her injured on the floor. Ex. 1, p. 2.

### 8. *IMPD Detective Bierce provides Benner with phone records.*

IMPD Detective Benjamin Bierce subpoenaed phone records for William, Robert, Rebecca, and Ruth. Ex. 8, ¶ 9. Rebecca's cell phone records confirmed that she was not in the vicinity of Ruth's apartment on November 19, 2013. Ex. 1, p. 2. William's phone records, including cell tower site locations for November 19, 2013, show that he was in the vicinity of Shortridge Road and 10th Street during the relevant time period. Ex. 1, p. 4. Ruth's phone records show a phone call to Robert's cell phone number, 317-357-5791, at 3:40 p.m. on November 19, 2013. Ex. 2, 20:16-17; Exhibit 19 – Affidavit of Benjamin Bierce, ¶ 7; Exhibit 20 – Phone Records

10

Case 1:16-cv-00103-TWP-MJD   Document 84-1   Filed 11/28/17   Page 195 of 344 PageID #:
Case 1:16-cv-00103-TWP-MJD   Document 84-1   Filed 01/13/17   Page 11 of 98   PageID #:
1787

for Ruth Rainsberger. Bierce determined that Robert's phone records show that he received two

phone calls from Ruth's landline number, 317-375-7841. Ex. 19, ¶¶ 8, 9; Ex. 19, Attachment A.

The first phone call was at 2:40 p.m. and the second phone call was at 3:40 p.m. Ex. 19, ¶ 8; Ex.

19, Attachment A. Bierce provided these records to Benner during the winter of 2013-2014. Ex.

19, ¶ 10; Ex. 19, Attachment A; Exhibit 21 – December 9, 2013 Email.

During the summer of 2014, while collecting phone records for another case, Bierce

learned that Sprint was doing construction on some of their cell phone towers in Indianapolis. Ex.

19, ¶ 11. Due to the construction, some calls were being routed through cell towers in Chicago,

Illinois. Ex. 19, ¶ 11. Calls that were routed through Chicago were recorded in Central standard

time. Ex. 19, ¶ 12. On Sprint phone records, calls routed through Chicago are indicated with a

Network Element ID of 420. Ex. 19, ¶ 13. After learning this new information, Bierce reviewed

the cell phone records he had obtained for several open investigations, including Robert's records.

Ex. 19, ¶¶ 14, 15. Bierce noticed that some of the calls on Robert's records had been routed through

Chicago. Ex. 19, ¶ 15. Accordingly, he created a spreadsheet titled "Results" that converted the

calls on Robert's phone records that had been routed through Chicago to Eastern standard time.

Ex. 19, ¶ 16; Ex. 19, Attachment B. The Results spreadsheet shows that the two calls to Robert's

cell phone from Ruth's landline were made on November 19, 2013 at 3:40:38 p.m. and 3:40:51

p.m. Ex. 19, ¶ 18; Ex. 19, Attachment B. Bierce created the Results spreadsheet in July 2014 and

provided it to Benner. Ex. 19, ¶ 19; Ex. 19, Attachment B; Exhibit 22 – July 23, 2014 Email.

### 9. *Benner interviews Pickens.*

On January 13, 2014, Benner spoke with Delbert Pickens. Ex. 1, p. 2. Pickens is a delivery

driver for Meals on Wheels. Ex. 1, p. 2. He delivers meals to Ruth Monday through Friday around

10:30 a.m. Ex. 1, p. 2. On November 19, 2013, Pickens arrived at Ruth's apartment around the

11

usual time. Ex. 1, p. 2. He knocked on Ruth's door, but she did not answer. Ex. 1, p. 2. He called her phone, but Ruth did not pick up. Ex. 1, p. 2. Pickens could hear Ruth's phone ringing inside her apartment. Ex. 1, p. 2. There were no signs that Ruth was in her apartment, so Pickens left without delivering the meal. Ex. 1, p. 2.

### 10. Benner subpoenas Ruth's financial records.

Benner subpoenaed Ruth's financial records from Financial Federal Credit Union located at 7101 East 56th Street in Indianapolis. Ex. 1, p. 4. The records show that at the time of her death Ruth had a checking account balance of $15,098.90, a savings account balance of $4,605.65, and certificate balances totaling $79,058.15. Ex. 1, p. 4. Benner obtained a beneficiary form from Ruth's apartment showing that William, Robert, and Rebecca were the beneficiaries for all of her assets. Ex. 1, p. 4.

### C.  The Prosecutor's Office charges William with the murder of Ruth.

Based on all the evidence that Benner obtained during his investigation, he concluded that William likely murdered Ruth because he: 1) had the opportunity; 2) had the financial motive; 3) knew specific details about Ruth's injuries unknown to medical personnel, despite testifying that he did not remove the blanket covering her head; and 4) acted suspiciously following the incident. Ex. 8, ¶ 8. On May 22, 2014, Benner and the Deputy Prosecuting Attorney signed a probable cause affidavit outlining the results of Benner's investigation. Ex. 1. They also signed a Charging Information that states that on or about November 19, 2013 William knowingly or intentionally caused Ruth's death in violation of Indiana law. Dkt. 1, ¶ 14. The Marion Superior Court determined that the murder charge against William was supported by probable cause and issued a warrant for his arrest. Ex. 8, ¶ 5. William was arrested and charged with murder on May 27, 2014.

Dkt. 1, ¶ 28. On July 7, 2015, the Prosecutor's Office dismissed the case against William. Dkt. 1, ¶ 32.

## II.     Standard of Review

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Springer v. Durflinger*, 518 F.3d 479, 483 (7th Cir. 2008). The party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## III.    Argument

Benner is entitled to summary judgment because there is no genuine issue of material fact, and William's claims fail as a matter of law. The designated evidence shows that there was probable cause to arrest and prosecute William for Ruth's murder. There is no evidence that Benner acted with malicious intent, and even if he did, there is no constitutional right not to be prosecuted without probable cause. Nor is there any evidence that Benner made knowingly false or misleading statements or withheld exculpatory evidence in his probable cause affidavit. Lastly, Benner is immune from suit under the doctrine of qualified immunity because he did not violate Rainsberger's clearly established constitutional rights.

Case 1:16-cv-00103-TWP-MJD   Document 84-1   Filed 11/28/17   Page 198 of 344 PageID #:
1790
Case 1:16-cv-00103-WTL-MJD   Document 44-1   Filed 04/13/17   Page 14 of 98   PageID #: 288

**A.  William's false arrest claim fails as a matter of law because there was probable cause for his arrest.**

If probable cause existed for an arrest, no Fourth Amendment violation occurred. *See Fleming v. Livingston Cnty., Ill.*, 674 F.3d 874, 878 (7th Cir. 2012) ("Indeed, if [the Sheriff Deputy] actually did have probable cause to arrest [the plaintiff], 'then a Fourth Amendment claim for false arrest is foreclosed.'") (quoting *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 679-80 (7th Cir. 2007)). "Probable cause exists if 'at the time of the arrest, the facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Williams v. City of Chicago*, 733 F.3d 749, 756 (7th Cir. 2013) (quoting *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009)). According to the Seventh Circuit, "it does not take much to establish probable cause." *Fox v. Hayes*, 600 F.3d 819, 833 (7th Cir. 2010) (citing *Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000)). While "[t]he officers must have more than a bare suspicion that they have the right guy, [] they need not have enough evidence to support a conviction or even to show that their belief is more likely true than false." *Id.*

In determining whether probable cause exists, courts must look at the facts from the perspective of the arresting officer, and not as an omniscient observer. *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1245 (7th Cir. 1994); *Kelley v. Miller,* 149 F.3d 641, 646 (7th Cir. 1998); *see also Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."). Probable cause may be determined as a matter of law when the material facts are undisputed. *Penn v. Harris*, 296 F.3d 573, 577 (7th Cir. 2002). Further, when determining whether a police officer had probable cause, the court must view each situation in light of the totality of the

14

circumstances. *Simkunas v. Tardi*, 720 F.Supp. 687, 692 (N.D. Ill. 1989). ". . . [T]he relevant inquiry is not whether the particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 243-44 (1983)).

At the time Benner filed his probable cause affidavit, the evidence against William could be summarized as follows:

- There were no signs of forced entry at Ruth's apartment. Ex. 8, ¶ 6a; Ex. 9, #1-3. William, Robert, and Rebecca were the only individuals who had keys to Ruth's apartment. Ex. 2, 32:21-25; Ex. 8, ¶ 6a. The apartment complex also had a key, but that key had not been moved and was found in its normal location. Ex. 8, ¶ 6a. Phone records indicated that Rebecca was not near Ruth's apartment at the time of her death. Ex. 1, p. 2; Ex. 8, ¶ 6a.

- William was Ruth's primary caregiver. Ex. 2, 27:11-12; Ex. 8, ¶ 6b.  To the best of Benner's knowledge, William was the last person to see her prior to the incident. Ex. 8, ¶ 6b. He admits that he was in her house the night before and he was the one who reported her condition to police. Ex. 2, 39:7-13; Ex. 8, ¶ 6b.

- Ruth was still breathing when William arrived at her apartment. Ex. 2, 56:8-10; Ex. 8, ¶ 6c. Although it was possible that his mother was still bleeding, he did not put pressure on her wound or attempt to render first aid. Ex. 2, 61:25-62:17; Ex. 8, ¶ 6c. And even though William sensed that his mother had responded to his voice or touch, he did not stay with her to comfort her. Ex. 2, 57:14-19, 68:15-24; Ex. 8, ¶ 6c. Instead, William called 911 and left the apartment. Ex. 2, 57:14-19, 68:15-24; Ex. 3; Ex. 8, ¶ 6c.

- There was a blanket covering Ruth's head/face and injuries. Ex. 2, 56:5-6; Ex. 4, ¶ 6; Ex. 8, ¶ 6d. William did not remove the blanket to determine the nature and extent of Ruth's

15

Case 1:16-cv-00103-TWP-MJD   Document 84-1   Filed 11/28/17   Page 200 of 344 PageID #:
Case 1:16-cv-00103-TWP-MJD   Document 84-1   Filed 11/13/17   Page 16 of 98   PageID #:
1792

injuries. Ex. 2, 59:25-60:2, 61:15-18; Ex. 4, ¶ 6; Ex. 8, ¶ 6d. Based on Benner's training

and experience, when an attacker covers his or her victim's head/face, it often indicates

that the attacker had a personal relationship with the victim. Ex. 8, ¶ 6d.

- William told the 911 operator that "someone had bashed her head in." Ex. 3, Track 4,

  00:49-00:51; Ex. 8, ¶ 6e. He also told Wooldridge that someone had caved his mother's

  head in. Ex. 4, ¶ 5; Ex. 8, ¶ 6e. However, William never removed the blanket to visualize

  Ruth's injuries. Ex. 2, 59:25-60:2, 61:15-18; Ex. 4, ¶ 6; Ex. 8, ¶ 6e. And, even had he

  looked under the blanket, her wounds were such that medical personnel on scene and at the

  hospital believed that she had been shot. Ex. 4, ¶ 8; Ex. 8, ¶ 6e; Ex. 23, 25:22-23. The

  autopsy determined that Ruth's cause of death was multiple blunt force trauma injuries to

  the head, possibly caused by a hammer-like object. Ex. 1, pp. 2-3; Ex. 8, ¶ 6e.

- Robbery did not appear to be the motive for Ruth's attack. Ex. 8, ¶ 6f. There were no signs

  of forced entry. Ex. 8, ¶ 6f; Ex. 9, #1-3. Ruth's cash, checks, and credit cards were found

  at the scene. Ex. 5, 60:1-5; Ex. 6, 3:7-11; Ex. 8, ¶ 6f; Ex. 9, #17. The drawers in Ruth's

  bedroom were open, but appeared undisturbed. Ex. 8, ¶ 6f; Ex. 9, #5-10. The back room of

  Ruth's apartment was cluttered with boxes and trash bags, but they also appeared

  undisturbed. Ex. 8, ¶ 6f; Ex. 9, #11-15. There was a lockbox in the back room of Ruth's

  apartment that contained what appeared to Benner to be financial documents. Ex. 5, 60:1-

  5; Ex. 8, ¶ 6f; Ex. 9, #12, 15. There were several pill bottles that appeared undisturbed on

  Ruth's kitchen counter. Ex. 8, ¶ 7; Ex. 9, #4. And Benner found a coin purse and black

  handbag in Ruth's bedroom. Ex. 8, ¶ 7; Ex. 9, #6-7, 9, 16.

16

- When Officer Price transported William to IMPD Headquarters, William said that he did not know whether what happened to his mother was a good thing or a bad thing. Ex. 8, ¶ 6g; Ex. 10, 14:3-9.

- Ruth did not answer the door when Pickens, a Meals-On-Wheels delivery driver, knocked around 10:30 a.m. Ex. 1, p. 2; Ex. 8, ¶ 6h. Pickens called Ruth's landline when she did not respond. Ex. 1, p. 2; Ex. 8, ¶ 6h; Ex. 20. Pickens could hear the phone ringing inside Ruth's apartment, but Ruth did not pick up the phone. Ex. 1, p. 2; Ex. 8, ¶ 6h. There was dried blood on the blanket covering Ruth's head. Ex. 2, 57:22-58:9; Ex. 4, ¶ 6; Ex. 8, ¶ 6h. Based on this evidence and Benner's training and experience, it is likely that Ruth was attacked prior to 10:30 a.m. Ex. 8, ¶ 6h. Kroger surveillance video shows William throwing away a straight object around 3:29 p.m. while looking around and seeming to fiddle with a Redbox. Ex. 8, ¶ 6h; Ex. 12, 3:28:55-3:39:30; Ex. 13.

- William's phone records, including cell tower site locations, indicate that he was in the vicinity of Shortridge Road and 10th Street on November 19, 2013 during the relevant time. Ex. 1, p. 4; Ex. 8, ¶ 6i.

- Benner interviewed William on the evening of November 19, 2013. Ex. 1, p. 2; Ex. 8, ¶ 6j. During that interview, William did not ask Benner how his mother was doing or if he could go to the hospital to be with her. Ex. 2, 131:2-7; Ex. 8, ¶ 6j.

- Ruth had $98,762.70 in assets at the time of her death. Ex. 1, p. 4; Ex. 2, 33:6-8; Ex. 8, ¶ 6k. William, Robert, and Rebecca were the beneficiaries of Ruth's assets. Ex. 1, p. 4; Ex. 8, ¶ 6k.

17

- Benner asked William to take a polygraph test. Ex. 2, 95:16-96:3; Ex. 8, ¶ 6l. William adamantly refused to take a polygraph test. Ex. 2, 94:14-15; Ex. 8, ¶ 6l. He became upset at Benner's request and began yelling. Ex. 2, 95:16-96:3; Ex. 8, ¶ 6l.

In light of the totality of the circumstances, Benner had probable cause to arrest William. The information available to Benner on May 22, 2014 indicated that: 1) William had the opportunity to murder Ruth; 2) William had the financial motive to murder Ruth; 3) William knew specific details about Ruth's injuries, which were unknown to medical personnel, despite testifying that he never looked under the blanket covering her head; and 4) William's behavior following Ruth's attack was highly suspicious. Ex. 8, ¶ 12. Because the above evidence is sufficient to establish probable cause, William's claim of false arrest fails as a matter of law.

### B. William's malicious prosecution claim fails as a matter of law.

The Seventh Circuit held in *Julian v. Hanna*, 732 F.3d 842 (7th Cir. 2013), that individuals may bring federal malicious prosecution claims against Indiana law enforcement officers and agencies under § 1983, because Indiana had failed to provide an adequate remedy for these claims. Accordingly, "[t]o state a claim for malicious prosecution under § 1983, a plaintiff must demonstrate that: (1) he has satisfied the requirements of a state law cause of action for malicious prosecution; (2) the malicious prosecution was committed by state actors; and (3) he was deprived of liberty." *Washington v. Summerville*, 127 F.3d 552, 558-59 (7th Cir. 1997) (citations omitted). In Indiana, "[t]he elements of a malicious prosecution are: (1) the defendant instituted or caused to be instituted an action against the plaintiff; (2) the defendant acted maliciously in so doing; (3) the defendant had no probable cause to institute the action; and (4) the original action was terminated in the plaintiff's favor." *Crosson v. Berry*, 829 N.E.2d 184, 189 (Ind. App. 2005) (citations omitted).

18

Case 1:16-cv-00103-TWP-MJD   Document 84-1   Filed 11/28/17   Page 203 of 344 PageID #:
1795
Case 1:16-cv-00103-WFL-MJD   Document 44-1   Filed 01/13/17   Page 19 of 38   PageID 293

### 1.  *Benner had probable cause to institute an action against William.*

Probable cause to commence criminal proceedings in the context of malicious prosecution exists when a reasonable inquiry would induce a reasonably intelligent and prudent person to believe that the accused committed the crime charged. *Owens v. Downey*, 150 F.Supp.3d 1008, 1018 (S.D. Ind. 2015). Indiana courts have held that a judicial determination of probable cause in a criminal proceeding constitutes prima facie evidence of probable cause in a subsequent civil lawsuit alleging malicious prosecution. *Id*. The plaintiff may rebut such a prima facie case of probable cause by introducing evidence that shows the finding of probable cause was induced by false testimony, fraud, or other improper means such as the defendant withholding material facts at the hearing. *Id*.

Here, the trial court found probable cause and issued a warrant for William's arrest. Ex. 8, ¶ 5. Accordingly, William bears the burden of rebutting this prima facie evidence of probable cause. Although William alleges that Benner made false or misleading statements in his probable cause affidavit, there is no evidence to support this allegation. *See infra*, Section III(C)(1). And, there was probable cause for William's arrest and prosecution even without the allegedly false or misleading statements. *See infra*, Section III(C)(2). Based on all the evidence outlined above, Benner had probable cause to institute an action against William for his mother's murder. *See supra*, Section III(A). Accordingly, William's malicious prosecution claim fails as a matter of law.

### 2.  *There is no evidence that Benner acted with malicious intent.*

Malice may be shown "by evidence of personal animosity or inferred from a complete lack of probable cause or a failure to conduct an adequate investigation under the circumstances." *Welton v. Anderson*, 770 F.3d 670, 674 (7th Cir. 2014).

19

There is no evidence that Benner had any personal animosity toward William. Further, as outlined above, Benner performed a thorough investigation. Ex. 1; Ex. 8, ¶ 5. Benner did not knowingly make false or misleading statements or withhold exculpatory evidence in his probable cause affidavit that was material to the finding of probable cause. *See infra*, Section III(C). Lastly, there was adequate probable cause to support William's arrest and prosecution. *See supra*, Section III(A).

### 3. *There is no constitutional right not to be prosecuted without probable cause.*

Even if probable cause did not exist for William's arrest and prosecution, and it did, Benner is still entitled to summary judgment because William does not have a constitutional right not to be prosecuted without probable cause. *Tully v. Barada*, 599 F.3d 591, 594-95 (7th Cir. 2010). An individual asserting a § 1983 malicious prosecution claim must allege that he or she was deprived of a specific constitutional right. *Id*.

The Seventh Circuit has made clear that "[f]ederal courts are rarely the appropriate forum for malicious prosecution claims." *Ray v. City of Chicago*, 629 F.3d 660, 664 (7th Cir. 2011). This is because individuals do not have a "federal right not to be summoned into court and prosecuted without probable cause, under either the Fourth Amendment or the Fourteenth Amendment's Procedural Due Process Clause." *Tully*, 599 F.3d at 594; *see Penn v. Harris*, 296 F.3d 573, 576 (7th Cir. 2002) ("[T]here is no constitutional right not to be prosecuted without probable cause") (internal citations and quotation marks omitted). Moreover, the Seventh Circuit has held that "a plaintiff could not state a [§]1983 claim simply by showing that he was wrongly prosecuted but rather must establish that he was deprived of a specific constitutional right, such as the right to a fair trial." *Holmes,* 511 F.3d at 683.

20

Case 1:16-cv-00103-TWP-MJD   Document 84-1   Filed 11/28/17   Page 205 of 344 PageID #:
1797
Case 1:16-cv-00103-TWP-MJD   Document 84-1   Filed 11/28/17   Page 21 of 38   PageID #:295

In the present case, William's malicious prosecution claim is entirely based on Benner's alleged violation of the Fourth and Fourteenth Amendments due to a lack of probable cause for his arrest. Dkt. 1. He does not allege that some other constitutional violation occurred in relation to his malicious prosecution claim. Dkt. 1. Because the Fourth and Fourteenth Amendments do not protect these interests, William's § 1983 claim fails as a matter of law. Accordingly, Benner is entitled to summary judgment on William's malicious prosecution claim.

### C.   There is no evidence that Benner knowingly made false statements that were material to the finding of probable cause.

"It is well-established that '[a] warrant request violates the Fourth Amendment if the requesting officer knowingly, intentionally, or with reckless disregard for the truth, makes false statements in requesting the warrant and the false statements were necessary to the determination that a warrant should issue.'" *Starks v. Moore*, 51 F.Supp.3d 782, 792 (S.D. Ind. 2014) (quoting *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012). "[A] reckless disregard for the truth can be shown by demonstrating that the officer entertained serious doubts as to the truth of the statements, had obvious reasons to doubt their accuracy, or failed to disclose facts that he or she knew would negate probable cause." *Id*. (internal quotation marks omitted).

#### 1.   Benner did not make knowingly false or misleading statements, or withhold exculpatory evidence in his probable cause affidavit.

William claims that several statements in Benner's probable cause affidavit were knowingly false or misleading. However, several of his allegations misstate Benner's probable cause affidavit. Regardless of William's misstatements, there is no evidence that Benner had any doubts about the facts in his affidavit. And, the designated evidence shows, that Benner did not recklessly omit facts.

Case 1:16-cv-00103-TWP-MJD   Document 84-1   Filed 11/28/17   Page 206 of 344 PageID #:
1798
Case 1:16-cv-00103-TWP-MJD   Document 84-1   Filed 11/13/17   Page 22 of 98   PageID #206

First, William alleges that "[i]n his probable cause affidavit, [] Benner misrepresented that [] William was in his mother's apartment during the time period she was attacked and well before he telephoned 911 to report her injuries." Dkt. 1, ¶ 18. This allegation refers to the following statement in Benner's probable cause affidavit: "[o]n November 19, 2013 at 2:40 p.m., Robert [] received a call from Ruth's [] landline to his cell of 317-357-5791." Ex. 1, p. 3. Benner goes on to explain that this phone call presumably occurred after Ruth was attacked based on his evidentiary-based assumption that Ruth was attacked prior to 10:30 a.m. Ex. 1, p. 3. Benner does not say that William made this call. Ex. 1, p. 3. And, based on Benner's information at the time, this statement was accurate. Ex. 19, ¶ 8; Ex. 21. As of May 22, 2014, Bierce had determined that there was a phone call from Ruth's landline to Robert's cellphone at 2:40 p.m. Ex. 19, Attachment A; Ex. 21. It was not until July 2014, several weeks after Benner filed his probable cause affidavit, that Bierce discovered that this phone call actually occurred at 3:40 p.m. Ex. 1; Ex. 19, ¶¶ 18, 19; Ex. 22.

Second, William alleges that "… Benner misrepresents that nothing of value was stolen from the apartment, in an apparent attempt to eliminate robbery as a motive for the attack, when in truth prescription drugs, a purse and jewelry were stolen." Dkt. 1, ¶ 19. In his affidavit, Benner does not make this statement. Ex. 1. Instead, Benner lays out several facts that, in his opinion, support the conclusion that Ruth's attack was not the result of a robbery. Ex. 1, p. 1; Ex. 8, ¶ 6f.

William claims that prescription drugs, a purse, and jewelry were stolen from Ruth's apartment; however, the evidence at the scene supported the opposite conclusion. Benner found a black handbag in the apartment that appeared to match the description of Ruth's purse given to him by William and Robert. Ex. 8, ¶ 7; Ex. 9, #16. Benner also found a brown coin purse in Ruth's bedroom. Ex. 8, ¶ 7; Ex. 9, #6-7, 9. He also noted that there were several pill bottles on the kitchen counter that appeared untouched. Ex. 9, #4. And, the only prescription medication that Ruth took

22

Case 1:16-cv-00103-WFL-MJD   Document 41   Filed 01/13/17   Page 23 of 38   PageID 297

was Aricept for her dementia, which is not a drug worth stealing. Ex. 2: 109:17-20; Ex. 8, ¶ 7.

During his interview on November 19, 2013, William told Benner that his mother did not own any

expensive jewelry. Ex. 8, ¶ 7. Even William himself admitted in his deposition that he cannot say

with certainty that any jewelry was stolen from the apartment. Ex. 2, 121:10-17. In short, there

was no evidence that would definitively indicate to Benner that Ruth's apartment was burglarized,

and there is no evidence that Benner's statements were false.

Third, William alleges that "[] Benner falsely stated in his probable cause affidavit that

there were savings bonds in [Ruth's] open lockbox in plain view in the apartment…" Dkt. 1, ¶ 20.

According to William, the lockbox was not in plain view and did not contain savings bonds. Dkt.

1, ¶ 21. Whether the lockbox was in plain view is a matter of interpretation. The photos of the

scene indicate that the lockbox was located on the shelf of an open closet. Ex. 5, 60:1-5; Ex. 8, ¶

8; Ex. 9, #12, 15. In Benner's opinion, the lockbox was in plain view. Ex. 8, ¶ 8. Benner cannot

recall whether the lockbox specifically contained "savings bonds," as he indicated in the probable

cause affidavit. Ex. 1, p. 1; Ex. 8, ¶ 8. He does remember that the documents looked like financial

documents. Ex. 8, ¶8. William confirmed that the lockbox contained financial documents during

his deposition. Ex. 2, 123:5-7. Regardless of whether the documents were specifically "savings

bonds," Benner's reason for including this information was to show that Ruth's apartment had not

been burglarized because valuable documents had not been disturbed. Ex. 8, ¶ 8. It is reasonable

to assume that documents stored in a lockbox that appear financial are just as valuable as "savings

bonds." So, William's allegation is a distinction without meaning. Based on the evidence, robbery

did not appear to be the motive for Ruth's death, which is what Benner indicated truthfully in his

probable cause affidavit. Ex. 1; Ex. 8, ¶ 8.

Case 1:16-cv-00103-TWP-MJD   Document 86-1   Filed 11/28/17   Page 208 of 344 PageID #:
1800
Case 1:16-cv-00103-TWP-MJD   Document 84-1   Filed 11/13/17   Page 24 of 33   PageID #: 208

Fourth, William alleges that "… Benner misrepresents that after the attack on his mother, a video from a surveillance camera in a Kroger grocery store located near his mother's apartment, showed [William] disposing of a 'straight object' 'pulled from his person' while he 'looked around for cameras.'" Dkt. 1, ¶ 22. William claims that the Kroger video is *before* he went to Ruth's apartment and shows him throwing away trash and not looking for cameras. Dkt. 1, ¶ 23. With respect to William's allegation regarding the timeline, Benner affirmatively states in his probable cause affidavit that William disposes of an object in the Kroger trash "[] then goes to his mother's apartment and calls the police." Ex. 1, p. 4. Benner does not represent that William was at Ruth's apartment prior to going to Kroger. Ex. 1, p. 3. Instead, Benner states that Robert received a phone call from Ruth's landline before William is on the Kroger video. Ex. 1, p. 3. Again, he does not state that William made this phone call. Ex. 1, p. 3.

Benner was operating on the presumption that Ruth was attacked sometime prior to 10:30 a.m. because she did not respond to Pickens at that time and because dried blood was found at the scene. Ex. 1, p. 3; Ex. 8, ¶ 6h. The facts, as known to Benner, support this reasonable presumption. Ex. 1, p. 2; Ex. 2, 57:22-58:9; Ex. 4, ¶ 6; Ex. 8; ¶ 6h. And, based on this reasonable presumption, Benner accurately states that the phone call at 2:40 p.m. occurred after Ruth was attacked. Ex. 1, p. 3. Further, the Kroger video shows William pull a "straight object" from his side or pocket and dispose of it in the Kroger trash. Ex. 12, 3:28:55-3:28:59; Ex. 13. William then pushes some buttons on the Redbox and turns to his side and looks around. Ex. 12, 3:28:59-3:29:26. It is possible that the straight object was trash, but it is not clear from the video. Ex. 12, 3:28:55-3:28:59; Ex. 13. And, most importantly, Benner does not state in his affidavit that the object was not trash. Ex. 1, p. 3. Instead, Benner accurately described the object as it appeared on the video. Ex. 1, p. 3; Ex. 12, 3:28:55-3:28:59; Ex. 13.

24

Case 1:16-cv-00103-TWP-MJD   Document 86-1   Filed 11/28/17   Page 209 of 344 PageID #:
Case 1:16-cv-00103-TWP-MJD   Document 84-1   Filed 11/13/17   Page 25 of 98   PageID #:
1801

Fifth, William alleges that "[] Benner viewed but failed to secure additional video surveillance from the Kroger parking lot camera which demonstrated that [William] was carrying trash, not a weapon." Dkt. 1, ¶ 24. Presumably what William is referring to is Benner's statement that "[t]he video showed William [] *drive onto the Kroger lot on November 19, 2013 at approximately 3:32 p.m. [William] got out of the car* and approached a garbage can located near the Red Box video dispenser." Ex. 1, p. 3. Benner recalls seeing video of William driving onto the Kroger parking lot and exiting his vehicle. Ex. 8, ¶ 10. Benner asked Pulliam to burn all of the video depicting William, including the referenced video. Ex. 8, ¶ 10.

The Kroger parking lot camera is Camera 44. Ex. 18. Pulliam provided Benner with a disk containing video footage from Camera 44. Ex. 8, ¶ 10; Ex. 11, 5:21-6:5; Ex. 18. However, this disk only contains footage of William walking to his vehicle and driving out of the parking lot. Ex. 18. Accordingly, it appears that Pulliam inadvertently failed to rewind the video far enough before burning the disk to capture William driving onto the lot and exiting his vehicle. Ex. 18. Kroger only maintains video for six weeks, so the video is no longer available. Ex. 11, 12:1-2. Benner recalls that the footage in question did not show William carrying trash or anything relevant to the case. Ex. 8, ¶ 10. Based on the location and distance of Camera 44, it is highly unlikely that it would show anything on William's right side or enough detail to identify the object as trash, as William alleges. Ex. 18.

"A police officer's duty to preserve evidence applies when the officer either knows the evidence is exculpatory or destroys the evidence in bad faith." *Hart v. Mannina*, 798 F.3d 578, 589 (7th Cir. 2015). Here, there is no evidence that the video in question was exculpatory. In fact, the undisputed evidence indicates that the video was irrelevant to the investigation. Ex. 8, ¶ 10.

Further, there is no evidence that Benner destroyed this video or acted in bad faith. Instead, the evidence shows that Benner attempted to preserve the video. Ex. 8, ¶ 10.

Sixth, William alleges that "… Benner failed to disclose that DNA evidence taken from [Ruth's] jacket was from an unidentified male []" and "... excluded the DNA as coming from [William]." Dkt. 1, ¶¶ 25-26. The DNA evidence that William is referring to is touch DNA from the neck and sleeve of Ruth's jacket. Ex. 7, p. 1. The Forensic Services Agency concluded that the DNA profile was made up of major and minor contributors. Ex. 7, p. 2. The major contributor was Ruth and the minor contributor was "an unknown male individual A." Ex. 7, p. 2. Benner did not include this information in his affidavit because it is touch DNA collected from areas where Ruth was likely touched by the medical personnel who treated her. Ex. 8, ¶ 11. In addition to Wooldridge, there were five or six other individuals on scene who assisted with treating Ruth. Ex. 4, ¶ 10. While treating Ruth, he medical personnel had to "log role" her onto a backboard and transport her to the ambulance, both of which would have required touching. Ex. 4, Attachment 1, p. 2; Ex. 8, ¶ 10. Accordingly, it is highly likely that the DNA evidence at issue is from one of the first responders. Ex. 8, ¶ 10. Benner was trained to turn this kind of DNA evidence over to the Prosecutor's Office, which he did, but not to include it in his probable cause affidavit. Ex. 8, ¶ 10.

The touch DNA evidence that Benner omitted from his probable cause affidavit was not material to the finding of probable cause. "The materiality of an omitted . . . fact depends on its relative importance to the evaluation of probable cause; an omitted fact is material if its inclusion would have negated probable cause. *Hart*, 798 F.3d at 592. "If the omitted fact would not have negated probable cause, its omission was immaterial and there was no Fourth Amendment violation." *Id.* To assess materiality a court must determine "whether a hypothetical affidavit that included the omitted material would still establish probable cause." *Id.* at 593. Here, a

"hypothetical affidavit" that contained the DNA evidence would still establish probable cause based on William's knowledge of his mother's injuries, his suspicious behavior, his access to Ruth, and his financial motive to commit the crime. Ex. 1; Ex. 8.

Lastly, William claims that "… Benner falsely stated that [William] showed no signs of concern for [his] mother's health while she was at the hospital before she died." Dkt. 1, ¶ 27. Again, this allegation misstates Benner's affidavit. Ex. 1, p. 2. Benner actually stated that "[a]t no time did Robert or his brother, William, ever ask me how their mom was doing or if they could get to the hospital to see her." Ex. 1, p. 2. William admitted in his deposition that he never asked Benner if he could go to the hospital. Ex. 2, 131:2-4; Ex. 8, ¶ 6j. Likewise, William admitted that he never asked Benner about his mother's condition. Ex. 2, 131:5-7; Ex. 8, ¶ 6j. Accordingly, Benner's statement was entirely accurate. Ex. 1, p. 2.

In sum, there is no evidence that Benner knowingly, intentionally, or recklessly made false or misleading statements, or withheld exculpatory evidence in his probable cause affidavit, and William cannot carry his burden to prove otherwise.

### 2. Benner's alleged false or misleading statements, or allegedly withheld exculpatory evidence was not material to the finding of probable cause.

William must prove that Benner "knowingly and deliberately, or with reckless disregard for the truth, made false statements or omissions in [his] affidavit of probable cause; and the false statements or omissions were material, or necessary, to the finding of probable cause." *Franks*, 438 U.S. at 155-56. Even if Benner made false or misleading statements in his probable cause affidavit, the allegedly false statements were not material to the finding of probable cause.

Leaving out the portions that William challenges, the probable cause affidavit cites evidence indicating that William had the opportunity and financial motive to murder Ruth, knew specific details about her injuries unknown to medical personnel until her autopsy, and acted

suspiciously following her attack. Ex. 8, ¶ 12. A reasonable person in Benner's position would find this evidence sufficient to establish probable cause for William's arrest and prosecution. Accordingly, Benner's alleged false or misleading statements were not material to the finding of probable cause.

### D. Benner is entitled to qualified immunity.

The doctrine of qualified immunity shields a public official from civil liability when an official is performing a discretionary function that the reasonable official would have believed was within the bounds of the law at the time he acted. *Belcher v. Norton*, 497 F.3d 742, 749 (7th Cir. 2007). The doctrine provides an immunity from suit rather than a mere defense to liability, and the defense is lost if a case is erroneously permitted to go to trial. *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985). Here, William cannot show that Benner violated a clearly established constitutional right or acted so outside the bounds of the law that he should have known his conduct violated the constitution. Accordingly, Benner is entitled to qualified immunity.

The question of whether the doctrine provides immunity from suit is a question of law for a court to decide. *Hughes v. Meyer*, 880 F.2d 967, 969 (7th Cir. 1989). The doctrine provides immunity to those public officers who reasonably act in a way they believe to be lawful. *Anderson v. Creighton,* 483 U.S. 635, 641 (1987). The doctrine provides "ample room for mistaken judgments" and protects "all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991). Although qualified immunity is an affirmative defense, once raised, the immunity becomes the plaintiff's burden to defeat. *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008).

The Supreme Court has established a two-part analysis to determine when the doctrine applies. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). A court should determine: (1) whether the facts,

taken in a light most favorable to the plaintiff, show that the defendants violated a constitutional

right; and (2) whether that constitutional right was clearly established at the time of the alleged

violation. *Saucier*, 533 U.S. at 201. This Court need not follow the two-part *Saucier* test. *Pearson*

*v. Callahan*, 129 S. Ct. 808, 811-12 (2009).

Benner has invoked qualified immunity, so William bears the burden of defeating it by

showing that Benner violated his constitutional rights and that his rights were clearly established

at the time of the violation. *Jewett*, 521 F.3d at 823. He cannot.

### 1. Benner complied with the U.S. Constitution.

As set forth above, Benner did not violate William's Fourth or Fourteenth Amendment

rights. There is no evidence that Benner knowingly made false or misleading statements or omit

exculpatory evidence in his probable cause affidavit that were material to the finding of probable

cause. *See supra*, Section III(C). And, the designated evidence establishes that there was probable

cause for William's arrest and prosecution. *See supra*, Section III(A).

Even if the Court finds that Benner lacked probable cause, there was at least "arguable

probable cause" for William's arrest and prosecution. This Circuit has recognized that "[t]he

probable-cause standard inherently allows room for reasonable mistakes, but qualified immunity

affords an added layer of protection by shielding officers from 'suit for damages if a reasonable

officer could have believed [the arrest] to be lawful, in light of clearly established law and the

information the [arresting] officers possessed.'" *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 714 (7th

Cir. 2013). "Often termed 'arguable probable cause,' qualified immunity in this context protects

officers who reasonably but mistakenly believe that probable cause exists." *Id*. at 714-15. In other

words, Benner is entitled to qualified immunity if he reasonably believed that probable cause

existed for William's arrest. William's post-incident behavior, access to Ruth, financial motive,

and inexplicable knowledge of Ruth's injuries support the reasonable that probable cause existed for William's arrest and prosecution.

### 2. *Benner did not violate William's clearly established rights.*

In addition to the above, William also cannot identify a closely analogous case establishing a right to be free from the alleged conduct, nor can he establish that Benner's conduct was so egregious that a reasonable person would know that his actions violated the constitution without guidance from the courts. *Chelios v. Heavener*, 520 F.3d 678, 691 (7th Cir. 2008). Because William cannot prove a clearly established right to defeat immunity, summary judgment is appropriate.

A plaintiff bears the burden to prove a clearly established constitutional right. *Rakovich v. Wade*, 850 F.2d 1180, 1209 (7th Cir. 1988). When defining a right in a claim of qualified immunity, courts should be wary of defining the right at issue too broadly, as the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. To defeat a claim of immunity, plaintiff must prove that a constitutional right is clearly established either by showing (1) "a clearly analogous case establishing a right to be free from the specific conduct at issue" or that (2) the "conduct is so egregious that no reasonable person could have believed that it would not violate clearly established rights." *See Chelios*, 520 F.3d at 691 (citing *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001)).

William cannot provide a clearly analogous case to the facts of this matter. A clearly analogous case is one decided before an officer acted. *Rice v. Burks*, 999 F.2d 1172, 1174 (7th Cir. 1993). A clearly analogous case must also establish a right sufficiently particularized to put the officer on notice that his or her conduct is unlawful. *Id.* The words "clearly established" should

not be used to read the defense of immunity out of federal law by stating the right in its most general terms. *Id*.

William must provide a case that establishes that Benner did not have probable cause to arrest him, even though he had the opportunity and motive to kill Ruth, inexplicably knew specific details about her injuries, and acted suspiciously following her death. Ex. 8, ¶ 12. William cannot provide a closely analogous case sufficient to establish a clearly established constitutional right on the facts of this case. Moreover, Rainsberger cannot prove that Benner's conduct was so plainly egregious that an officer would be on notice that his conduct violated the Fourth Amendment. *See Estate of Bryant v. Buchanan*, 883 F.Supp. 1222, 1227 (S.D. Ind. 1995).

Benner maintains that he did not knowingly make false or misleading statements or omit exculpatory evidence in his probable cause affidavit, but if the Court disagrees, Benner is still entitled to qualified immunity. "An officer who knowingly or recklessly submitted an affidavit containing false statements may still get qualified immunity if he can establish that he had an objectively reasonable basis for believing the facts in the affidavit were sufficient to establish probable cause." *Betker*, 692 F.3d at 860. Qualified immunity does not apply "where an officer knowingly or recklessly made false statements and 'no accurate information sufficient to constitute probable cause attended the false statements.'" *Id*. (quoting *Lawson v. Veruchi*, 637, F.3d 699, 705 (7th Cir. 2011). Benner's probable cause affidavit contained accurate information that William's behavior was suspicious following Ruth's death, he had knowledge of specific details of her death, and he had the opportunity and motive to commit the crime. Based on this evidence, it was objectively reasonably for Benner to conclude that there was probable cause for William's arrest and prosecution.

Benner is therefore entitled to qualified immunity.

Case 1:16-cv-00103-TWP-MJD   Document 84-1   Filed 11/28/17   Page 216 of 344 PageID #:
Case 1:16-cv-00103-WTL-MJD   Document 44   Filed 01/13/17   Page 32 of 33   PageID #: 906
1808

## IV.    Conclusion

William cannot point to any evidence suggesting that Benner violated his rights. Benner

therefore respectfully requests that the Court grant him summary judgment on William's claims.


Respectfully submitted,


 */s/ Kathryn M. Box*
Kathryn M. Box (31233-49)
Assistant Corporation Counsel
Office of Corporation Counsel
200 East Washington Street, Room 1601
Indianapolis, Indiana 46204
Telephone: (317) 327-4055
Fax: (317) 327-3968
E-Mail: kathryn.box@indy.gov

## CERTIFICATE OF SERVICE

I hereby certify that on January 13, 2017, a copy of the foregoing was served by electronic filing. Notice of this filing will be sent to all ECF-registered parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Kathryn M. Box*
Kathryn M. Box (31233-49)
Assistant Corporation Counsel


OFFICE OF CORPORATION COUNSEL
200 East Washington Street, Room 1601
Indianapolis, Indiana 46204
Telephone: (317) 327-4055
Fax: (317) 327-3968

Rainsberger v. Benner



Exhibit 3

Rainsberger v. Benner
Exhibit 1
Photos
#s 1-17



Exhibit 9

Rainsberger v. Benner



Exhibit 12

Rainsberger v. Benner



Exhibit 14





Case 1:16-cv-00103-TWP-MJD   Document 89-1   Filed 02/28/17   Page 221 of 344 PageID #:
Case 1:16-cv-00103-WTL-MJD   Document 49-1   Filed 02/13/17   Page 1 of 30   PageID #:
1813

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | |
|---|---|
| **WILLIAM RAINSBERGER,** | ) |
| **PLAINTIFF,** | ) **CAUSE NO. 1:16-cv-103-WTL-MJD** |
| **v.** | ) |
| **CHARLES BENNER,** | ) |
| **DEFENDANT.** | ) |

[i]t is well-established that '[a]warrant request violates the Fourth Amendment if the requesting officer knowingly, intentionally, or with reckless disregard for the truth, makes false statements in requesting the warrant and the false statements were necessary to the determination that a warrant should issue.'"

> *Starks v. Moore*, Case 1:12-cv-01008-WTL-DML (SJ Entry at 14)
> (Doc. 163, 09/02/14)

## PLAINTIFF'S MEMORANDUM IN RESPONSE
## TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

William Rainsberger was falsely accused of killing his own mother, arrested, kept in jail for two months, and had criminal charges of murder lodged against him for over a year before they were dismissed for "evidentiary problems." He suffered loss of liberty, public embarrassment and humiliation, physical discomfort, emotional distress, damage to his good name and reputation, loss of economic opportunities, and over $60,000 in criminal defense attorney fees and costs.

Based upon the summary judgment record, a reasonable jury could conclude that Detective Charles Benner intentionally, knowingly or recklessly included false and misleading information in his probable cause affidavit, causing Mr. Rainsberger to be falsely arrested and maliciously prosecuted. Accordingly, defendant's motion for summary judgment should be denied.

### Plaintiff's Statement of Material Facts with Disputes Noted

1.  Ruth Rainsberger was 88 years old, suffering from dementia, and lived alone. W. Rainsberger Aff. ¶ 2. W. Rainsberger Depo. 24-25; Reb. Rainsberger Stmt, p. 2, Nov. 2013.

2.  Ruth had three adult children; Rebecca, William, and Robert. W. Rainsberger Aff. ¶ 3.

3.  William lived close by his mother and was her primary care giver. W. Rainsberger Depo. 27; Robt. Rainsberger Stmt, p. 3, Nov. 19, 2013; Reb. Rainsberger Stmt, p. 1-2, Nov. 20, 2013.

4.  William saw his mother most every day, did her grocery shopping, and kept her mentally engaged. W. Rainsberger Depo. 27-28; Robt. Rainsberger Stmt, p. 3, Nov. 19, 2013; Rebecca Rainsberger Stmt, p. 1-2, Nov. 20, 2013.

5.  Rebecca lived further away, saw her mother once a week, and did her laundry. Rebecca Rainsberger Stmt, p. 1-3, Nov. 20, 2013; W. Rainsberger Depo. 27-28.

6.  Robert saw his mother less frequently, and had recently lost his job and his home had been foreclosed on. R. Rainsberger Stmt, p. 1, 3, Nov. 19, 2013; Benner Civil Depo. 88.

7.  On either the evening of Nov. 18 or the morning of Nov. 19, 2013 Ruth was attacked in her home and suffered blunt force trauma to her head. Benner Civ. Depo 89-90.

8.  William reported finding his injured mother at her home when he called 911 from her apartment at 3:37 p.m. on Nov. 19, 2013. W. Rainsberger Stmt, Nov. 19, 2013, p. 1-2.

9.  Ruth died the next day, Nov. 20, 2013. W. Rainsberger Depo. 24.

10. William cooperated with the police, gave two statements–one the evening of Nov. 19, and the second the following day, Nov. 20, 2013. W. Rainsberger Stmt, Nov. 19, 2013; W. Rainsberger Stmt, Nov. 20, 2013.

11. Six months later, on May 27, 2014, William Rainsberger was arrested and charged with the murder of his mother, Ruth Rainsberger. W. Rainsberger Aff. ¶ 4.

12. William's arrest and the murder charge were based upon a probable cause affidavit written and signed under oath on May 22, 2014, by Det. Charles Benner. Benner Civil Depo. 49-50

2

(Q: Okay. And without your probable cause affidavit, the prosecutor – and without you signing this information, the prosecutor wouldn't have filed charges against William Rainsberger? A: Correct"); Hennessy Aff. ¶6.

13. Det. Benner swore in the charging information that on November 19, 2013, William Rainsberger "did knowingly kill another human being, namely: Ruth Rainsberger, by inflicting blunt force injuries with a hammer or similar object, at or against the person of Ruth Rainsberger[.]" Information, 5/22/2014.

14. Based upon Det. Benner's PCA, Mr. Rainsberger was arrested (Benner Civil Depo. 49-50) and jailed for two months. W. Rainsberger Aff. ¶ 6.

15. Detective Benner never had a murder weapon, confession, eyewitness, nor direct evidence that William killed his mother. Hennessy Aff, ¶ 8; Rossmo Report 11,-12, 28-30-33.

16. Detective Benner's evidence against William was all circumstantial. Benner Civil Depo. 22 ("I mean, it's a circumstantial case so, like I said, it's not my decision whether or not probable cause is established."); *id*. at 67 ("everything was circumstantial for the most part"); Hennessy Aff. ¶ 9; Rossmo Report 11,-12, 28-30-33.

17. The parties dispute whether many of the circumstances set forth in Det. Benner's probable cause affidavit meant to implicate William in his mother's murder were false or misleading. Plaintiff's evidence that these circumstances were false and misleading include:

   a. The representation that cell phone tower records showed William in the area of the murder during the relevant time was false. *Infra* ¶ ¶ 18-19.

   b. The inclusion of a 2:40 p.m. telephone call from William in his mother's apartment with her critically injured and an hour before he reported finding her and telephoning

Case 1:16-cv-00103-TWP-MJD   Document 89-1   Filed 02/23/17   Page 224 of 344 PageID #:
Case 1:16-cv-00103-WTL-MJD   Document 49-1   Filed 02/13/17   Page 4 of 39   PageID #:
1816

911 was false. *Infra* ¶ ¶ 20-28.

c.   The representations that after this 2:40 p.m. telephone call, William went to a nearby
Kroger grocery store, pulled what Det. Benner implied was a murder weapon from
his person, looked around for cameras, and threw it away in the trash, was a mixture
of misrepresented facts and falsehoods. *Infra* ¶ ¶ 29-35.

d.   The representations that there were no signs of forced entry and that nothing was
stolen from Ruth Rainsberger's apartment was a mixture of misrepresented facts and
falsehoods. *Infra* ¶ ¶ 36, 43-50.

e.   The representation that savings bonds were present in plain view in the apartment but
left undisturbed was false. *Infra* ¶ ¶ 52-53.

f.   The representations that medics and hospital personnel thought Mrs. Rainsberger
suffered a gunshot wound while William thought it was blunt force trauma was a
mixture of misrepresented facts and falsehoods. *Infra* ¶ ¶ 54-69.

g.   The representations that William was uncaring and unconcerned about his mother's
condition was a mixture of misrepresented facts and falsehoods.  *Infra* ¶ ¶ 70-73.

**Cell Phone Tower Records do not Show William in the Area of the Murder**

18.   Detective Benner mislead the court in his affidavit by stating that cell phone tower location
records "do not show William Rainsberger outside the area of Shortridge and 10th St. during
the relevant time period." PCA, p. 5, ¶ 2.

19.   Cell phone records do not show William *in* this area anytime from 5:41 p.m. on Nov. 18,
2013 to 7:23 p.m. on Nov. 19, 2013, because there is no location information from cell phone

4

data for his telephone during that period. Cell Phone Tower Records; Hennessy Aff. ¶ 23; W. Rainsberger Aff. ¶ 13 (explaining Cell Tower Spreadsheets); Rossmo Report 13-14.

**There Was No Telephone Call From Ruth Rainsberger's Apartment at 2:40 p.m.**

20.    Detective Benner included a key false time in his probable cause affidavit by stating that a telephone call was made from Ruth Rainsberger's landline telephone at 2:40 p.m. on Nov. 19, 2013 to Robert Rainsberger's cell phone. PCA, p. 3, ¶ 6.

21.    Robert Rainsberger was William's brother, and both William and Robert had informed Det. Benner about this call, but said that it was made at 3:40 p.m., after William found their injured mother, rather than at 2:40 p.m. R. Rainsberger Stmt, p. 1, Nov. 19, 2013 ("My brother called me about, it was like twenty until 4:00. He said, 'Get over here, quick.'"); W. Rainsberger Stmt, p. 2-3, Nov. 20, 2013 (call made after he found mother after 3:30 p.m.); W. Rainsberger Aff. 11; Rossmo Report 16.

22.    Detective Benner's affidavit, stating this call occurred at 2:40 p.m. rather than 3:40 p.m., was particularly incriminating of William Rainsberger, as it placed William in his mother's apartment, with her critically injured, a full hour before he telephoned 911 and a full hour before he said he discovered her. Benner Civil Depo 24-25 (included this in affidavit because it was "significant" and "very inculpatory" towards William Rainsberger); Hennessy Aff. ¶ 14; Rossmo Report 14-16; W. Rainsberger Aff. ¶ 11.

23.    The 2:40 p.m. time was not the time that call was made. Benner Bail Testimony 46, July 17, 2014 (Hennessy: "So its not true that there was a call from inside the apartment at 2:40." Benner: "Correct.").

24.    While an entry from Robert Rainsberger's cell phone records showed a call at 2:40 p.m., it

5

Case 1:16-cv-00103-TWP-MJD Document 89-1 Filed 02/28/17 Page 226 of 344 PageID #:
1818
Case 1:16-cv-00103-WTL-MJD Document 49-1 Filed 02/13/17 Page 6 of 39 PageID #: 323

also showed a second entry for the same call at 3:40 p.m. R. Rainsberger Cell Phone

Records; W. Rainsberger Aff. ¶ 11; Rossmo Report 14-16; Hennessy Aff. ¶ 15.

25.     The 2:40 p.m. entry was due to the 3:40 p.m. call being routed through Chicago, which is one

hour earlier than Indianapolis time. This was apparent from the records, which contained the

Chicago area code 773 for the 2:40 p.m. call entry. Robt. Rainsberger Cell Phone Records;

Hennessy Aff. ¶ 15; Rossmo Report 14-16; W. Rainsberger Aff. ¶ 11.

26.     Well before filing his PCA in court, Det. Benner had in his possession Ruth Rainsberger's

AT&T landline telephone records, which accurately showed this call was made from her

telephone at 3:40 p.m., and which showed no call made from that line at  2:40 p.m. Benner

Civil Depo. 43-44:

> "Waples:        But yet you didn't write in your report – in your affidavit of the probable
> cause that the AT&T records from Ruth's landline showed in Exhibit 3 that
> there was a call made at 3:40, not 2:40 and that the results of Officer Bierce's
> analysis of Robert's cell phone records showed those two calls being both at
> 3:40?
> Benner:         I'm sorry. What was the question? Did I have this?
> Waples:         You had it and you didn't put that in your affidavit of probable cause.
> Benner:         That's correct."
> Waples:         Instead you reported it as 2:40?
> Benner:         Yes.
>
> Benner civil deposition, September 27, 2016, at 43-44.

27.     Also, well before filing his PCA in court, Det. Benner knew that both Robert and William

had voluntarily told him about this call, and both reported the call as occurring <u>after</u> the 3:30

p.m. time that William reported finding his mother, which matched the AT&T landline

records of a call from Ruth Rainsberger's landline to Robert Rainsberger's cell phone at 3:40

p.m. Robt. Rainsberger Stmt, p. 1, Nov. 19, 2013 ("My brother called me about, it was like

6

twenty until 4:00. He said, 'Get over here, quick.''); Benner Civil Depo. 24-25; Ruth Rainsberger's AT&T Records; Hennessy Aff. ¶ 13; W. Rainsberger Aff. ¶ 11; W. Rainsberger Stmt, p. 2-3, Nov. 20, 2013; Rossmo Report 16.

28. Detective Benner has also testified that he had the records from IMPD telephone expert Bierce, which showed that the correct time of the call was 3:40 and not 2:40 p.m., before he signed his probable cause affidavit on May 22, 2014, but that he still included the 2:40 p.m. time. Benner Civil Depo. 42, line 3 to p. 44, line 16.

**The Kroger Video Does Not Depict William Pulling Anything from His Person, Looking Around for Cameras, or Throwing Away a Weapon**

29. Detective Benner lied in his probable cause affidavit by stating that at approximately 3:32 p.m., while at the Kroger store nearby to his mother's apartment, video shows William pulling a "straight object from his person," and "looking around for cameras" when he threw this item away in a trash can at the front of the store. PCA, p. 3, ¶ 5; Hennessy Aff. ¶ 20, 21; W. Rainsberger Aff. ¶ 12; Rossmo Report 16-19.

30. Detective Benner included this allegation in his affidavit implying that it was circumstantial evidence of William disposing of the murder weapon. Benner Civil Depo. 79-80 ("it could have been the murder weapon, yes. That's why I put it in there.").

31. Later, Det. Benner admitted that contrary to his PCA affirmation, the video does not depict William pulling anything "from his person." Benner Civil Depo. 146 ("that's correct.").

32. Indeed, the Kroger video does not depict William pulling anything from his person nor looking around for cameras. It instead shows him throwing away a piece of trash and after doing so looking behind him to the parking lot at a woman who was walking up behind him.

7

Hennessy Aff. ¶ 21; W. Rainsberger Aff. ¶ 11-12 (piece of trash, can't remember what it was); Rossmo Report 16-19; Kroger video still frames replicated in Rossmo Report, 18, 19.

33. While the piece of trash William was throwing away appears "straight" and thin in some still frames of the video, the object appears rectangular in other still frames of the video. Rossmo Report 17-19.

34. The item "does not look thick enough to be a hammer, pipe or pry bar. There is no way to determine the object's composition, and certainly no indication that it is metal, as it is never in focus and can't be clearly seen." Rossmo Report 17; See also Benner Bail Testimony 18 (admitting that object "didn't look like a hammer to me").

35. By falsely stating the time of the telephone call from Ruth Rainsberger's apartment at 2:40 p.m., and then implying that William left the apartment and went to the Kroger store to dispose of a weapon, and by misconstruing what the Kroger video depicted, Det. Benner misled the court into thinking that William was disposing of the murder weapon. Hennessy Aff. ¶ 21; Rossmo Report 16-19; W. Rainsberger Aff. ¶ 11-12.

**Mrs. Rainsberger Lived in a High Crime Area, There Was Evidence of Ongoing Drug Trafficking in Her Apartment Building, and Her Door Was Unlocked**

36. Det. Benner stated that there was no sign of forced entry into Mrs. Rainsberger's apartment (PCA, p. 1, ¶ 3) and that nothing was stolen from the apartment, which he contends makes it more likely that the attack was not associated with a robbery or burglary but done by someone who knew her. Benner Civil Depo 19-20.

37. Det. Benner did not mention in his affidavit that Mrs. Rainsberger lived in a high crime area and that there was evidence of an active drug trade in her apartment building. Benner Crim.

8

Depo. 71 (10.5 police runs per month at apartment complex);  Benner Bail Testimony 37-38

(high traffic in apartment building tenant associated with drugs); Benner Crim. Depo. 4

(same); M. Bilger Depo. 20-21 (Mrs. Rainsberger lived in high crime area, aware of one

woman attacked and another raped); W. Rainsberger Stmt. Nov. 19, 2013 ("the corner of 10th

and Shadeland is not a good place to be in the middle of the night. And I worry about that.").

38. In fact, Det. Benner was aware that on Oct. 7, 2013, just the month before Mrs. Rainsberger

was attacked, another woman was attacked, hit in the head, and had her purse taken in the

parking lot right outside Mrs. Rainsberger's apartment. The unknown male assailant was

never found. Benner Bail Testimony 36-37; Benner Crim. Depo. 23.

39. Det. Benner never interviewed the victim of the Oct. 7th attack. Benner Crim Depo. 23.

40. Mrs. Rainsberger's door was unlocked when William arrived on Nov. 19, 2013. W.

Rainsberger Stmt, Nov. 19, 2013, p. 1.

41. Mrs. Rainsberger was not physically able to look through the peephole to see who was at her

door and would sometimes open the door to strangers. W. Rainsberger Stmt, Nov. 19, p. 5;

Robt. Rainsberger Stmt, Nov. 19, p. 7; Mari Bilger Depo. 13.

42. In fact, in the past, other tenants in the apartment building had reported seeing Mrs.

Rainsberger, who suffered from dementia, just sitting in her apartment watching tv seemingly

oblivious to the fact that her apartment door was wide open. Rossmo Report 31.

**A Purse and Prescription Medicine were Stolen from Ruth Rainsberger's Apartment**

43. Detective Benner lied in his probable cause affidavit by representing that nothing was stolen

from Ruth Rainsberger's apartment. PCA, p. 1, ¶ 2; Hennessy Aff. ¶ 24; W. Rainsberger Aff.

¶ 14; Rossmo Report 20-21.

Case 1:16-cv-00103-TWP-MJD Document 86-1 Filed 11/28/17 Page 230 of 344 PageID #:
Case 1:16-cv-00103-WTL-MJD Document 89-1 Filed 02/13/17 Page 10 of 99 PageID #:
1822

44.     Detective Benner knew that the Rainsberger children had described their mother's purse and prescription medication, both of which were missing and never recovered. Hennessy Aff. ¶ 25; W. Rainsberger Aff. ¶ 14; Rossmo Report 20-21; Lane Depo. 13.-14, 17-18; Rebecca Rainsberger Stmt, p. 2, Nov. 20, 2013.

45.     IMPD Forensic Services, which inventoried the scene, noted in a report, which Det. Benner had prior to the submission of his affidavit, that "no prescriptions found, purse is missing." Forensic Services Agency Note, Nov. 19, 2013; Lane Depo. 13-14; Hennessy Aff. ¶ 25; W. Rainsberger Aff. ¶ 14; Rossmo Report 20-21.

46.     IMPD Forensic Services Crime Scene Specialist Jennifer Lane had searched for prescription medications, found none, and told this to Det. Benner. Lane Depo. 13.

47.     Detective Benner also had this information about the missing purse, but did not include it in his probable cause affidavit:

> Hennessy:    Uh in your notes you indicate purse is missing. Where did you get that information?
> Lane:    Uh also from the family members we've been told that she carried a black purse um and we had searched, both myself and Det. Tudor had searched um all the drawers, the closets, under the beds um in both bedrooms, closets and the other bedroom as well um pantry, kitchen cabinets and we did not locate a black purse.
> Hennessy:    And so Benner and Tudor had the same information about the missing purse?
> Lane:    That is correct.
>
> Lane Depo. 14 (Sept. 8, 2014).

48.     Forensic Services Crime Scene Specialist Lane did find a new purse in Mrs. Rainsberger's bedroom dresser drawer which was empty, unused and which still had the store tag on it. It was apparent to Lane that this was not the purse described by the family. Det. Benner was with Lane during this search. Lane Depo. 17-18.

10

Case 1:16-cv-00103-TWP-MJD   Document 86-1   Filed 11/28/17   Page 231 of 344 PageID #:
Case 1:16-cv-00103-TWP-MJD   Document 89-1   Filed 02/13/17   Page 12 of 39   PageID #:
1823

49. Det. Benner knew the family described their mother's purse as black and shiny and patten leather, and this new unused purse did not fit this description. Benner Crim. Depo. 6.

50. The new purse with the store tag on it still had the paper stuffing in it, and was not the one described by the Rainsberger children as the one their mother used every day. W. Rainsberger Aff. ¶ 14; Rebecca Rainsberger Stmt, p. 5, Nov. 20, 2013; Lane Depo. 17-18; Benner Crim Depo. 6.

51. A checkbook, a small amount of cash, and credit cards were located inside a translucent plastic Tupperware container which was underneath a stack of papers on one of Mrs. Rainsberger's tables, items which would not have been readily apparent to a stranger. Benner Bail Testimony 59; W. Rainsberger Aff. ¶ 14.

**There were no Savings Bonds in Plain View or Otherwise**

52. Det. Benner falsely stated in his probable cause affidavit that: "There was a lockbox in the back room in plain view that contained savings bonds belonging to the victim." PCA, p. 2, ¶ 3; Hennessy Aff. ¶ ¶ 24, 25; W. Rainsberger Aff. ¶ 14.

53. In truth, the lock box was in a back bedroom closet, and never contained savings bonds. Benner Civil Depo. 59-60 (admitting lockbox was in a cluttered bedroom closet and contained no savings bonds; contesting whether box was in plain view and asserting that documents "were something like savings bonds" "I'm not sure what they were"); Hennessy Aff. ¶ ¶ 24, 25; W. Rainsberger Aff. ¶ 14 (never any savings bonds or anything "remotely resembling savings bonds, nor anything else of monetary value"in lockbox); Rossmo Report 20-21.

11

Case 1:16-cv-00103-TWP-MJD Document 86-1 Filed 11/28/17 Page 232 of 344 PageID #:
Case 1:16-cv-00103-WTL-MJD Document 89 Filed 02/13/17 Page 12 of 39 PageID #:
1824

**William Rationally Thought the Wound on Top of His Mother's Head Was from a Blow; the One Firefighter Who Thought it Was a Gunshot Wound Based His Conclusion on What He Thought Were Bullet Entrance and Exit Wounds Not Visible to William**

54. Detective Benner stated in his probable cause affidavit that because William reported that his mother had been hit in the head though "fire and ambulance personnel thought" that Ruth Rainsberger had been shot, this indicated that William knew "how she sustained the injury," thus implicating him in the attack. PCA, p. 1, ¶ 1.

55. William did not know how his mother had been attacked, and told Det. Benner that at first he thought she had fallen and hit her head, but when he got closer and saw all the blood that had congealed on the blanket wrapped around the top of her head, he "didn't know what had happened," but thought that maybe she had been struck on the top of the head. Rainsberger Stmt, p. 6-7, Nov. 20, 2013; W. Rainsberger Aff. ¶ 15; W. Rainsberger Depo. 57-59.

56. As William explains:

> While it definitely appeared to me that my mother was struck on the head, I was not certain how my mother was injured. What I saw was a blanket soaked with partially-dried blood stuck to the top of my mother's head as she lay on the floor, and on the same blanket but on the floor right next to my mother's head, a pool of congealed blood, approximately one cup. This indicated to me an extremely serious injury that produced substantial blood loss, which had occurred long enough before my arrival that the blood was not fresh but partially dried and solidified. I did not remove the bloody blanket stuck to the top of her head because I believed it was acting as a bandage, and I did not want to pull it away from the wound and cause it to start bleeding again.
>
> W. Rainsberger Aff. ¶ 15a.

57. William did not see any hole in the blanket surrounding his mother's head, and, having not removed it, could not see her forehead. W. Rainsberger Aff. ¶ 15 f; W. Rainsberger Stmt, Nov. 20, 2013, p. 3.

Case 1:16-cv-00103-TWP-MJD  Document 86-1  Filed 11/28/17  Page 233 of 344 PageID #:
Case 1:16-cv-00103-TWP-MJD  Document 49-1  Filed 02/13/17  Page 13 of 99  PageID #:
1825

58.  William does not normally associate wounds to the top of the head as gunshot wounds, which is probably typical of most people's reactions. W. Rainsberger Depo. 72 ("I have no idea except I don't know how many people get shot on top of the head."); W. Rainsberger Aff. ¶ 15 d; Rossmo Report 21-22.

59.  There was no blood splatter, no odor of gun powder, nor any spent gun cartridges in Ruth Rainsberger's apartment, all of which would be associated with a gunshot.  Benner Civil Depo. 51-52; Hennessy Aff. ¶ 29; W. Rainsberger Aff. ¶ 15 e; Rossmo Report 21.

60.  The incorrect "gunshot wound" conclusion was started by Firefighter Carl Wooldridge, one of the first responders, who removed the blood soaked blanket which had dried upon Mrs. Rainsberger's head and observed a hole in the blanket covered with wet and dried blood where the wound was, which he thought was perhaps made by a bullet, and a mark on Ruth's now exposed forehead, which he mistakenly thought was a bullet entrance wound. Wooldridge Depo. 8 (cloth had "somewhat of a hole in it right where the wound was" and there "was a mark ... on her forehead [visible only after peeling cloth off] that I believed to be an entrance wound."); Hennessy Aff. ¶ 30; Rossmo Report 21-23.

61.  Detective Benner wrote in his probable cause affidavit that "it should be noted that during the initial investigation, both medic and hospital personnel believed that the victim may have sustained a gunshot wound."PCA, p. 2, ¶ 1.

62.  However, this was not true, as only Firefighter Wooldridge expressed this opinion, and Det. Benner never spoke to any of the medics or hospital personnel to get their opinions. Benner Civil Depo. 52-53, 55.

63.  Firefighter Wooldridge had only responded to three previous incidents where there was a

13

Case 1:16-cv-00103-TWP-MJD   Document 86-1   Filed 11/28/17   Page 234 of 344 PageID #:
Case 1:16-cv-00103-WTL-MJD   Document 49-1   Filed 02/13/17   Page 14 of 39   PageID #:
1826

gunshot victim. Wooldridge Depo. 9; Rossmo Report 21.

64. While medical personnel at Eskenazi Hospital were initially told the victim may have
suffered a gunshot wound, upon examining Mrs. Rainsberger, they determined the wound
was from blunt force trauma. Dr. Streib Depo. 3-4 (ambulance notified them on route that
Mrs. Rainsberger "had a wound that might be a gunshot wound ... upon our further
evaluation we determined in fact that this was not due to a gunshot wound but probably due
to a blunt force injury").

65. William told Det. Benner that he did not remove the blanket from his mother's head because
there was a mixture of congealed and dried blood sticking it to his mother's wound and he
did not want to pull it off and risk causing more bleeding. Benner Civil Depo. 12-18 ("That's
what he told me, yes."); W. Rainsberger Stmt, Nov. 20, 2013, p. 4-5.

66. Having not disturbed the blanket, William was unable to see any hole in it or any mark on
his mother's forehead underneath the blanket.  W. Rainsberger Stmt, Nov. 20, 2013, p. 3 ("I
couldn't see much of her face or shoulders because there was that blanket thing over her.");
W. Rainsberger Aff. ¶ 15 f.

67. Detective Benner ignored the fact that Mr. Wooldridge based his assumption on an incorrect
diagnosis of gunshot entrance and exit wounds, which were not even visible to William, and
used William's speculation about how his mother had been injured as evidence that he had
killed her. PCA, p. 1, ¶ 1; Hennessy Aff. ¶ 31; Rossmo Report 21-23.

68. William's  speculation about the nature of his mother's injures was rational based on his
observation of a wound on top of her head, the fact that there were no shells, bullets, blood
splatter, or odor of gunpowder, and he was not able to see any supposed bullet exit hole in

14

Case 1:16-cv-00103-TWP-MJD Document 86-1 Filed 11/28/17 Page 235 of 344 PageID #:
Case 1:16-cv-00103-TWP-MJD Document 89-1 Filed 02/13/17 Page 15 of 35 PageID #:
1827

the blanket and no supposed bullet entrance wound on his mother's forehead. W. Rainsberger

Aff. ¶ 15 a, c, d, e, f; Hennessy Aff. ¶ ¶ 28-31; Rossmo Report 21-23.

69.    William's decision not to remove the blanket stuck to his mother's wound because it

appeared to act as a bandage but rather to call for immediate emergency medical assistance

was rational and not indicative of having caused the injury. W. Rainsberger Depo. 60-62 ("I

was more interested that my mom receive proper medical care, and knowing that there was

a fire station half a mile away, I didn't think that it would take that long, that I could

potentially do more damage. There's nothing I could have done for her because she was not

bleeding anymore."); Hennessy Aff. ¶ 30 ("Benner made it seem incriminating that William

had not removed the blanket but William had told him he did not for fear of making the

bleeding worse."); Rossmo Report 23 ("Detective Benner characterized William

Rainsberger's actions after discovering his mother to be callous and suspicious. In fact,

William did exactly what he should have done in such a situation-he checked for

responsiveness, determined his mother was still breathing, and established her bleeding had

stopped (American Red Cross, 2011; Mayo Clinic, 2017; U.S. Department of Health and

Human Services, 2016). He decided not to remove the blanket stuck to the top of her head

for fear of further damage and concluded that prompt emergency medical help was

immediately needed.").

**Det. Benner Misrepresented William's Reactions and Concerns for his Mother**

70.    After discovering his injured mother, William telephoned 911, quickly checked the

apartment to see if any intruders were still present, and then ran out the front door of the

apartment building to flag down the ambulance. William told Det. Benner he did this because

Case 1:16-cv-00103-TWP-MJD   Document 86-1   Filed 11/29/17   Page 236 of 344 PageID #:
Case 1:16-cv-00103-WFL-MJD   Document 49-1   Filed 02/13/17   Page 16 of 39   PageID 933
1828

the apartment complex is complicated and the buildings poorly marked, and he wanted to get emergency medical help for his mother as soon as possible. Detective Benner omitted all the reasons William told him he went outside, and simply put in his affidavit that after calling 911 William "went outside to wait for the ambulance" (PCA, p. 2, ¶ 1) and that "William left his mother unattended until the police arrived" (PCA, p. 4, ¶ 1). W. Rainsberger Aff. ¶ 16 a; Rossmo Report 23; Hennessy Aff. ¶ 32 a;  Rainsberger Stmt, p. 2-3, Nov. 20, 2013 ("H 11 [mother's apartment number] doesn't really tell you much. So I jumped up and down and waved at them. And then they came ..."); see also W. Rainsberger Depo. 68 (Q: And then what did you do after you hung up [from 911]? A: I looked at my mom for a little bit more, and I think I started crying. And then I realized I should run out and flag down the ambulance[.]"); Benner Bail Test. 35-36 (admitting apartment layout confusing).

71.    Defendant asserts that "On the drive downtown, William told IMPD Officer Michael Price that he did not know whether what happened to his mother was a good thing or bad or a bad thing." Def's SJ Memo 6 (citing Exhibit 10- Price Depo 14:3-9). William did not say he didn't know if what happened to his mother was good or bad, but, rather, given what happened, and that she appeared to be dying, that he didn't know if it was good or bad for her to survive in a severely damaged state or in a coma, or to pass away. W. Rainsberger Aff. ¶ 18. In his deposition, Officer Price did not directly quote William, and acknowledged that William was referencing whether Mrs. Rainsberger was going to live or die, not whether it was good or bad that she had been attacked. Price Depo. 14-15.

72.    Detective Benner swore in his Probable Cause Affidavit that while William was detained for questioning downtown at police headquarters during the evening of Nov. 19, 2013, that he

16

did not ask the detective how his mother was doing and never asked to be taken to the hospital. PCA p. 2, ¶ 3.

73.    While this was technically true, as William did not used these words, it was extremely misleading, as Det. Benner knew that while William was detained he was in frequent contact with his sister Rebecca, who was at the hospital with their mother, and that she was keeping William informed of their mother's condition. William actually read one of Rebecca's texts to him to Detective Benner during his interrogation (W. Rainsberger Stmt, Nov. 19, 2013 Transcript at 13) in which Rebecca advised William of their mother's condition and instructed him which entrance he should enter at Eskenazi Hospital. Detective Benner said "we'll get you there" which he never did. W. Rainsberger Aff. ¶ 16 b; Hennessy Aff. ¶ 32 b.

**Detective Benner's Account of William's Refusal to Take a Polygraph Was Not Evidence of a Crime and Contained a Mixture of Misrepresented Facts and Falsehoods**

74.    On November 20, 2013, the day his mother died, Detective Benner called William and told him he wanted him, his sister, and his brother, to come downtown so that the detective could share with them the results of their mother's autopsy. Benner Bail Hearing Testimony, July 17, 2014, p. 33; Robt. Rainsberger Depo. 29.

75.    The real reason Detective Benner asked them to come downtown was not to share the autopsy results with them, but to get them to submit to additional questioning and polygraph examinations. Benner Bail Hearing Testimony, July 17, 2014, p. 33 ("If I told them I wanted to come down for them to give a polygraph, they probably wouldn't have showed up, so I can say what I want to have them come down there.").

76.    Instead of sharing the autopsy results with the family, Det. Benner and his partner Tom

17

Tudor, took statements from Rebecca and William, confronted William and Robert with requests to take polygraphs, and accused William and Robert of killing their mother for money. W. Rainsberger Depo. 94-96; Hennessy Aff. ¶ 33.

77. The police in general and Det. Benner in particular were overbearing and treated the Rainsbergers callously and with disrespect. The night before, William had been detained at the scene for over an hour in the back of a locked police car, and had to relieve himself under guard on the side of the apartment building. W. Rainsberger Depo 86-88. At police headquarters the next day, Det. Benner continued this abusive treatment:

> Q   Okay. And what did Benner do? Or how could you tell that he was pissed?
> A    They spoke to Bill first, then me, and he just had -- well, when we first got there, he talked to my sister like she was a petulant little seven-year-old, and he wanted to talk to her first since he didn't talk to her the night before. And he was just angry. He was angry as soon as we got there. Becky didn't stand up as soon as he told her to come with him, so he yelled at her. Then he talked to Bill. Apparently he didn't like what Bill had to say, because by the time got to me, he was fit to be tied.
>
> Robt. Rainsberger Depo 30-31.

78. Detective Benner omitted from his probable cause affidavit that he had lied to the family to get them to come downtown, instead writing that on November 20, 2013, "I asked them [William and Robert] if they would submit to a polygraph so that I could eliminate them as suspects and they adamantly said no, they would not take a polygraph. All three siblings stormed out and I have not heard from them since." PCA, p. 3, ¶ 2.

79. William refused the polygraph because he was upset and suspicious of the police, as they had detained him the night before, both at the scene and downtown where he gave his statement, keeping him from the hospital and his dying mother; lied to about the reason for him to come to police headquarters; subjected to interrogation again on Nov. 20, 2013, the day their

18

Case 1:16-cv-00103-TWP-MJD Document 86-1 Filed 11/28/17 Page 239 of 344 PageID #:
Case 1:16-cv-00103-WPL-MJD Document 49-1 Filed 02/13/17 Page 19 of 39 PageID #:
1831

mother died; not provided with the autopsy results, the ostensive reason they were given as the purpose of the meeting, and treated like suspects rather than the grieving family of the victim of a violent homicide. William also did not believe that polygraphs were reliable, and he believed the police, especially Det. Benner, were already prejudiced against him. W. Rainsberger Aff. ¶ 17; W. Rainsberger Depo. 94-96; Rossmo Report 24-27; Hennessy Aff. ¶ 33; Benner Civil Depo. 68 (William accused Benner of lying to him "[b]ecause, like I said, he probably thought he was just coming down to get results of what happened to his mother and he didn't know he was going to be confronted to see if he would take a polygraph.").

80. The refusal to take a polygraph exam is not evidence of guilt. Rossmo Report 25.

81. As Professor Rossmo states: " William Rainsberger had a right to refuse a polygraph test and such a refusal should never have been used as an element in a probable cause affidavit. He also had other reasons to be concerned about a polygraph. First, his treatment by police generally, and Detective Benner's polygraph deception specifically, raised legitimate concerns over investigative bias." Rossmo Report 26.

**Detective Benner's PCA Assertion that the Rainsberger Family "Stormed Out" of Police Headquarters on Nov. 20, 2013, was False**

82. Detective Benner lied to the court in his affidavit when he stated that William and his siblings "stormed out" of police headquarters on Nov. 20, 2013, after refusing to take a polygraph . PCA, p. 3, ¶ 2.

83. Instead, Detective Benner and his partner Tom Tudor left the room before the three Rainsberger children. W. Rainsberger Depo. 94-96; W. Rainsberger Aff. ¶ 17; Hennessy Aff. ¶ 33.

19

Case 1:16-cv-00103-TWP-MJD  Document 86-1  Filed 11/28/17  Page 240 of 344 PageID #:
Case 1:16-cv-00103-WTL-MJD  Document 49-1  Filed 02/13/17  Page 20 of 39  PageID #:
1832

As Detective Benner explained it:

Q      You and Tudor accused -- Tudor accuses them of killing their mother for
       money and you and Tudor walk off from where you're all together and you
       guys --
A      We went back to our office.
Q      You go back to your office and the three children were there together still?
A      Yes.
Q      And then they leave?
A      Yes.

Benner Civil Depo. 70.

84.   The three Rainsberger siblings did not storm out of police headquarters, but rather left after

      detectives Benner and Tudor left, ending their meeting. W. Rainsberger Depo. 70, 96; W.

      Rainsberger Aff. ¶ 17.

**Detective Benner's PCA Assertion that the Rainsberger Family Did not Contact Him
after Nov. 20, 2013, was False**

85.   Detective Benner lied to the court in his affidavit when he said that after this confrontation

      on Nov. 20, 2013, that "I have not heard from them [the three Rainsberger children] since."

      PCA, p. 3, ¶ 2.

86.   Detective Benner admits that Rebecca Rainsberger telephoned him twice after this time and

      left messages wanting to check in on the case and asking him to return her calls, and he

      refused to return either call. Benner Bail Testimony 30; Benner Civil Depo 73-74; Hennessy

      Aff. ¶ 32 c; Rossmo Report, p. 27; W. Rainsberger Aff. ¶ 16 c.

**William Had No Financial Motive to Murder His Mother**

87.   Detective Benner also mislead the court in his probable cause affidavit by suggesting that

      William had a financial motive for killing his mother because he along with his siblings was

      a beneficiary of his mother's estate. PCA, p. 4, ¶ 3.

20

Case 1:16-cv-00103-TWP-MJD Document 86-1 Filed 11/29/17 Page 241 of 344 PageID #:
Case 1:16-cv-00103-WTL-MJD Document 89-1 Filed 02/13/17 Page 21 of 35 PageID #:
1833

88. While Det. Benner noted that William's inheritance of his mother's estate was approximately $33,000 (PCA, p. 4, ¶ 3), he omitted the fact that William was comfortably retired and owned his house free and clear of any mortgage. W. Rainsberger Nov. 19, 2013 Stmt. 15; W. Rainsberger Aff. ¶ 19.

89. "Being the beneficiary of someone's estate is not evidence of murder, it is not even a motive absent the establishment of some financial need" of which there was none here, Rossmo Report at 12.

90. Detective Benner understood that William Rainsberger had access to all of his mother's finances before her death. Benner Bail Testimony 63.

91. William handled all his mother's finances, and had a power of attorney which enabled him to conduct all her financial affairs. W. Rainsberger Depo. 30, 33-34.

92. If William was dishonest and had wanted his mother's money, he could have just taken it without harming her. W. Rainsberger Aff. ¶ 19.

**Detective Benner Failed to Include Exculpatory DNA Evidence in his PCA**

93. DNA is often important evidence which can be either compelling evidence of guilt or exculpatory evidence of innocence. Hennessy Aff. ¶ 36.

94. Detective Benner had the Marion County Forensic Services Agency collect DNA samples from Ruth Rainsberger's clothing. Benner Civil Depo. 37, 108-109.

95. The purpose of testing for DNA is twofold: one, to identify a perpetrator; two, to possibly eliminate an innocent suspect. Benner Civil Depo. 109-110.

96. Detective Benner obtained a search warrant to collect DNA samples from William and Robert Rainsberger. Hennessy Aff. ¶ 38; Benner Civil Depo. 110; Rossmo Report 37.

21

Case 1:16-cv-00103-TWP-MJD   Document 86-1   Filed 11/28/17   Page 242 of 344 PageID #:
Case 1:16-cv-00103-WFL-MJD   Document 89-1   Filed 02/13/17   Page 22 of 39   PageID 935
1834

97.   Illustrating the importance of DNA evidence to this wholly circumstantial case, on March
      20, 2014, Det. Benner wrote an email to the Indiana Criminal Justice Institute, which was
      considering a victim's compensation request filed by Rebecca Rainsberger, informing the
      Institute that he could not make any arrests in the Ruth Rainsberger murder investigation
      until after he received DNA test results. Email from Benner to Amelia Basham, March 20,
      2014 ("The victim's sons are the suspects in the case and I am waiting for DNA results
      before any arrest can be made. I just do not want to compensate anyone who may have killed
      the victim.") (under-lineation supplied).

98.   A month later, on April 23, 2014, the Marion County Forensic Services Agency reported to
      Detective Benner (a month before he signed the probable cause affidavit) that Ruth
      Rainsberger's clothing tested positive for DNA from two unknown male subjects. DNA
      Report, p. 2; Rossmo Report 37-38; Hennessy Aff. ¶ 39.

99.   In that same report, the Marion County Forensic Services Agency reported to Detective
      Benner that William Rainsberger was excluded as having contributed the male DNA
      evidence found on Ruth Rainsberger's clothing. DNA Report, p. 2; Benner Civil Depo. 111;
      Rossmo Report 37-38; Hennessy Aff. ¶ 40.

100.  Detective Benner omitted this exculpatory evidence from his May 22, 2014, probable cause
      affidavit he filed against William Rainsberger. Hennessy Aff. ¶ 42; Benner Depo. 112;
      Rossmo Report 37-38.

101.  Detective Benner now contends he did not include the DNA positive test results for two
      unknown males and the exclusion of William Rainsberger because, he speculates, the DNA
      may have come from one of the first responders. Benner SJ Aff. ¶ 10-11.

Case 1:16-cv-00103-TWP-MJD   Document 86-1   Filed 11/28/17   Page 243 of 344 PageID #:
Case 1:16-cv-00103-WTL-MJD   Document 49-1   Filed 02/13/17   Page 23 of 39   PageID #:
1835

102.    However, there was blood on the scene and on Mrs. Rainsberger, and first responders

normally take precautions against becoming infected by such bodily fluids by wearing latex

gloves, and thus it is unlikely they would have been the source of the DNA from two

unknown males discovered on Mrs. Rainsberger. Rossmo Report 37-38.

**Det. Benner First Probable Cause Affidavit was Rejected**

103.    Detective Benner prepared and signed two probable cause affidavits in this case, one on

December 6, 2013, just weeks after Ruth Rainsberger's murder; the other on May 22, 2014,

leading to William's arrest. PCA, Dec. 6, 2013; PCA, May 22, 2014; Benner Civil Depo 31.

104.    The two affidavits are virtually identical, with the addition of two substantive allegations to

the second affidavit, (1) the false information about the 2:40 p.m. phone call; and, (2) the

false allegation of cell tower data placing William in the area of Shadeland and 10th Street

during the time of the murder. Compare PCA Dec. 6, 2013 with PCA, May 22, 2014.[1]

105.    Detective Benner initially presented the Dec. 6, 2013, version of the PCA to the Marion

County Prosecutor's Office, which declined to file charges against William Rainsberger.

Benner Civil Depo. 31-32.

106.    Rather than include the DNA test results in the second affidavit, Det. Benner included the

two additional allegations about the cell phone tower location data and the 2:40 p.m.

telephone call, presented it again to the prosecutor's office, which then filed charges against

William Rainsberger. Benner Civil Depo. 49-50.

---

[1] The only other substantive difference between the two documents is the concluding paragraph of the latter May 22, 2014 affidavit, concerning Ruth's financial records showing that she had approximately $99,000 in assets. This information simply confirmed what William had told Det. Benner on Nov. 19, 2013, which Det. Benner had included as the last sentence on the first paragraph of page 2 of the earlier affidavit.

Case 1:16-cv-00103-TWP-MJD   Document 86-1   Filed 11/28/17   Page 244 of 344 PageID #:
1836
Case 1:16-cv-00103-WTL-MJD   Document 49-1   Filed 02/13/17   Page 24 of 39   PageID #: 941

**Summary of Argument**

Jurors could reasonably conclude that in his probable cause affidavit Detective Benner intentionally, knowingly, or recklessly included false and misleading statements, and omitted important exculpatory information, which caused William Rainsberger to be falsely arrested and prosecuted. The rights violated here were clearly established, thus qualified immunity is not available. Detective Benner's motion for summary judgment should be denied.

**ARGUMENT**

**Reasonable Jurors Could Conclude
Detective Benner Intentionally, Knowingly or Recklessly
Made False and Misleading Statements in his Probable Cause Affidavit
and that William Rainsberger was Wrongly Arrested and Maliciously Prosecuted**

**A.      Reasonable Jurors Could Conclude That Detective Benner Made False and
         Misleading Statements in His Probable Cause Affidavit**

It is axiomatic that police officers cannot lie and mislead courts in their probable cause affidavits and that if they do they can be liable for the resulting damages.

As this Court recently recognized in a similar case against one of Det. Benner's colleagues, "[i]t is well-established that '[a] warrant request violates the Fourth Amendment if the requesting officer knowingly, intentionally, or with reckless disregard for the truth, makes false statements in requesting the warrant and the false statements were necessary to the determination that a warrant should issue.'" *Starks v. Moore*, Case 1:12-cv-01008-WTL-DML, SJ Entry at 14 (Doc. 163, 09/02/14) (quoting *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012) (quoting *Knox v. Smith*, 342 F.3d 651, 658 (7th Cir. 2003)).

Officers who lie or mislead in order to obtain a warrant will be liable under § 1983 for a subsequent false arrest. *Olson v. Tyler*, 771 F.2d 277 (7th Cir. 1985); see also *Hampton v. Hanrahan*,

24

Case 1:16-cv-00103-TWP-MJD   Document 86-1   Filed 11/28/17   Page 245 of 344 PageID #:
Case 1:16-cv-00103-TWP-MJD   Document 80-1   Filed 02/13/17   Page 25 of 30   PageID #:
1837

600 F.2d 600, 635-38 (7th Cir. 1979).

As this Court stated, in *Starks*, the Seventh Circuit recognizes that "a reckless disregard for the truth can be shown by demonstrating that the officer entertained serious doubts as to the truth of the statements, had obvious reasons to doubt their accuracy, or failed to disclose facts that he or she knew would negate probable cause."*Starks*, Doc. 163 SJ Entry at 14.

As set forth in detail in the fact section above, Detective Benner's repeated decisions to ignore correct information and instead use false and misleading statements in his probable cause affidavit provides a sufficient basis for a reasonable trier of fact to determine that he intentionally, knowingly, or recklessly ignored the truth in his pursuit of having William Rainsberger arrested and prosecuted.

This was a circumstantial case, as admitted to by Det. Benner. Detective Benner did not have a murder weapon, an eyewitness, a confession, or any direct evidence that William Rainsberger killed his mother. He did not have DNA evidence, which he previously acknowledged was necessary in order to make an arrest. When that evidence did not pan out, but rather pointed towards others, Det. Benner failed to mention it in his affidavit and instead inserted the false cell tower location and 2:40 p.m. phone call. Without the false and misleading statements in Det. Benner's probable cause affidavit, he didn't have anything approaching probable cause for William's arrest. Rossmo Report 28-29; Hennessy Aff. ¶ 11, 42.

Detective Benner suspected William Rainsberger right away, and focused his investigation solely upon him. As Attorney Hennessy states:

> Detective Benner rushed to judgment, declaring William his prime suspect within 24 hours of the attack. Det. Benner admitted that William became his only suspect after William declined to take a polygraph test because he knew they were considered unreliable. All further investigation was limited to attempts to confirm Det. Benner's unfounded belief. When the evidence did not support his suspicions, Det. Benner misconstrued facts against William, distorted other evidence, and ignored exculpatory evidence in William's favor.

25

Hennessy Aff. ¶ 12.

Plaintiff has employed Kim Rossmo to review Det. Benner's investigation and probable cause affidavit. Dr. Rossmo is a former law enforcement detective and currently the University Endowed Chair in Criminology and the Director of the Center for Geospatial Intelligence and Investigation in the Department of Criminal Justice at Texas State University. Dr. Rossmo has prepared an extensive expert disclosure report. Rossmo Report. In his 46 page report, Dr. Rossmo reviews Det. Benner's investigation and affidavit of probable cause in detail; he summarizes the failings in Det. Benner's probable cause affidavit as follows:

> Detective Benner failed to perform a thorough investigation and his affidavit for probable cause contained a number of false and misleading statements.
>
> 1. Of the eight allegations in the probable cause, only five were actually items of evidence. One of these was false, and the remaining four contained a mix of facts and falsehoods. Some evidence was misinterpreted and taken out of context.
>
> 2. Detective Benner's rationale for concluding William Rainsberger murdered his mother is based on unreasonable and logically flawed conclusions.
>
> When asserting that probable cause exists, police officers must be reasonable, cautious, and prudent, and must consider all the trustworthy facts and the overall circumstances.
>
> 1. Detective Benner was not cautious and prudent. He was haphazard and careless. He rushed to judgment and his investigation then suffered from tunnel vision and confirmation bias.
>
> 2. Several mistakes and omissions occurred in the police investigation. Some of Detective Benner's facts were not trustworthy and he often failed to consider overall circumstances.
>
> 3. These mistakes were unreasonable because Detective Benner failed to verify his information, check assumptions, remain objective, and consider the probability of his investigative theory.

Rossmo Report 3.

There is just too much wrong in this probable cause affidavit to say that a rational jury could

not find intentional, knowing, or reckless conduct in its compilation. There is no excuse for Det. Benner falsely stating that cell phone tower records show William in the area of the murder during the relevant time when those records do not show this at all. Det. Benner had the information on the correct time of the 3:40 p.m. call William made to his brother from his mother's apartment; he simply chose to ignore it and include the obviously incorrect time, which was highly incriminating to William. These two incriminating "facts," the cell phone tower location  records and the non-existent 2:40 p.m. call, were critical to the probable cause determination, as the prosecutor's office had declined to file charges previously on the same affidavit sans these two canards.

Similarly, Det. Benner did not have a basis to say that all the medics and hospital personnel thought Mrs. Rainsberger's injuries were due to a gunshot, when he only received this information from a single firefighter who observed a suspected bullet hole in the blanket and an "entrance" wound on Mrs. Rainsberger's forehead, neither of which were visible to William. Det. Benner was wrong to exclude burglary or a robbery as a possible motive when he knew that Mrs. Rainsberger's door was unlocked, she would open the door because she could not see through the peephole, and there was evidence of an active drug trade in her apartment building in this high crime area. Detective Benner also knew the family reported and forensic services confirmed that prescription medication and a purse were missing and never recovered. Along this same line, Detective Benner was simply wrong to state in the affidavit that there were savings bonds in plain sight that were not taken when there were never any savings bonds and the papers he was referencing were in a lock box in a cluttered back bedroom closet. Detective Benner was wrong to characterize the Kroger video as depicting William pulling a straight object from his person and looking around for cameras prior to throwing it away, when the video neither shows him pulling any object from his person nor him

looking around for cameras and only throwing away a small, unidentifiable piece of trash. It was simply false for Det. Benner to say that the Rainsberger siblings stormed out of his office on Nov. 20, 2013, and never tried to contact him afterwards.

In his memorandum in support of summary judgment at 12, Det. Benner makes four arguments for finding probable cause against William Rainsberger:

1. He had the opportunity.
2. He had a financial motive.
3. He knew specific details about the victim's injuries.
4. His behavior following the incident was suspicious and uncommon.

But, as set forth in the fact section above and in Professor Rossmo's report at 28-29, William had no more opportunity to commit this crime than thousands of other people. He had little need for money as he was comfortably retired and his home was paid for; moreover, if he wanted his mother's money, as her power of attorney with complete access to her finances, he could have simply taken it without killing her. Moreover, he did not benefit financially to any greater extent than his siblings from his mother's death. His brother was the one who was in serious financial straits, not William.

Based on what William saw at the crime scene, especially a wound on the top of his mother's head, he reasonably concluded that someone had hit his mother in the head.

Finally, Det. Benner mischaracterized William's behavior and misrepresented his actions following the discovery of his mother's body. William behaved reasonably, normally, and logically given the totality of the circumstances. See Rossmo Report 29.

Dr. Rossmo extensively discussed the failings of the eight specific assertions in Det. Benner's probable cause affidavit. Rossmo Report 12-30. He explains how "being the beneficiary of someone's estate is not evidence of murder, it is not even a motive absent the establishment of some financial need" of which there was none here, *id.* at 12; how Det. Benner's assertion was false that

cell phone tower records place William in the area at the time of his mother's attack, *id*. at 13-14; how Detective Benner's ignored overwhelming evidence that his assertion was false that there was a call made from Ruth Rainsberger's landline phone an hour before William claimed to have discovered his mother; *id*. at 14-15; how Det. Benner's depiction of the Kroger video was false in that it did not show William pulling anything from his person or looking around for cameras, or throwing anything that could be a murder weapon in the trash, *id*. at 16-19; how Det. Benner's assertion was false that there was no evidence of a burglary at Ruth Rainsberger's apartment, *id*. at 20-21; how William's assumption of how his mother sustained her injury was reasonable and not indicative of guilt, especially in light of the  diagnosis of a gunshot entrance and exit wounds that firefighter Wooldridge incorrectly relied upon for his contrary conclusion were not visible to William *id*. at 21-23; how Det. Benner unfairly lied, omitted facts, and misconstrued other facts, in depicting William as unconcerned and uncaring for his mother's well-being, *id*. at 23-24; and, how William's refusal to take a polygraph was not evidence of guilt but rather a rational reaction to the abusive and biased treatment he had already been subjected to by Det. Benner. *Id*. at 24-27.

Based on the number and centrality of these falsehoods and misrepresentations, reasonable jurors could easily reach the conclusion that Det. Benner intentionally, knowingly or recklessly included false and misleading statements in his probable cause affidavit. Accordingly, Defendant's motion for summary judgment on the Fourth Amendment warrant claim should be denied.

### B. Reasonable Jurors Could Conclude That William Rainsberger Was Arrested Without Probable Cause

As this Court recognized in *Starks*, if false or misleading statements or omitted exculpatory information leads to the probable cause finding, the offending officer will be liable for the subsequent false arrest on the ensuing warrant. *Starks,* Doc. 162, SJ Entry at 14.

Case 1:16-cv-00103-TWP-MJD   Document 86-1   Filed 11/28/17   Page 250 of 344 PageID #:
Case 1:16-cv-00103-TWP-MJD   Document 89-1   Filed 02/13/17   Page 36 of 39   PageID #:
1842

While Det. Benner suspected William of the murder, and there is no problem with him investigating William, a reasonable jury could easily conclude that the evidence supporting such a suspicion was thin and nothing more than conjecture, and that without the false and misleading statements made by Det. Benner that probable cause did not exist for the issuance of the warrant.

Detective Benner rushed to judgment, suspecting William as his prime suspect within 24 hours of the attack. When the evidence did not support his suspicions, Det. Benner made up evidence against William, distorted other evidence, and ignored exculpatory evidence in William's favor.

The case against William was weak even if all the things alleged in Detective Benner's probable cause affidavit were true. When those false and misleading statements are stripped away from Detective Benner's probable cause affidavit, and the omitted evidence is included, it is apparent that William Rainsberger should never have been arrested or charged with Ruth Rainsberger's murder.

Detective Benner prepared a probable cause affidavit on December 6, 2013, just a few weeks after Ruth's murder and presented it to the prosecutor's officer, which rejected filing any charges against William Rainsberger.

Indeed, four months after the murder, Det. Benner admitted to others that without hard evidence such as DNA, there was no basis to make an arrest. When that DNA evidence came back and excluded William and pointed towards others, Det. Benner failed to mention it in his affidavit. Instead, he included the two false facts of the cell phone tower location of William Rainsberger and the 2:40 p.m. phone call. Not only were these two new "facts" incorrect, much of the remainder of the affidavit was also comprised of false and misleading statements. The prosecutor then filed charges, which ultimately were dismissed because of evidentiary problems.

Dr. Rossmo prepared a detailed analysis of what is left of Det. Benner's probable cause affidavit

30

stripped of its false and misleading statements. On pages 28-29 of his report, he replicates the affidavit, color-coding the false and misleading information. This presentation illustrates the scant and non-incriminating nature of the information remaining. *Id*.

As defense attorney David Hennessy observes, "When those inaccurate and misleading statements are stripped away from Detective Benner's probable cause affidavit, and the omitted evidence is included, it is apparent that William Rainsberger should never have been arrested or charged with Ruth Rainsberger's murder." Hennessy Aff. ¶ 11.

The only factually true circumstantial information regarding William Rainsberger in Det. Benner's affidavit is that William said someone had struck his mother in the head, he did not remove the blanket from his mother's head, a firefighter thought Ruth may had been shot, a few dresser drawers in Ruth's bedroom were pulled out partway, boxes in the backroom bedroom appeared untouched, and William threw some type of object in a trash can in front of a Kroger store. It is apparent that these circumstances would not lead a reasonable and prudent person to believe that William Rainsberger murdered his mother.

While William correctly speculated that someone had struck his mother in the head rather than shot her, his speculation was based upon objective facts he observed at the scene, including a wound on top of her head, no blood splatter, no shell casings, and no odor of gunpowder. Mr. Wooldridge's contrary gunshot conclusion was based upon his observation of hole under the blood on the cloth covering Ruth's wound which he mistook for a bullet hole, and a mark on Ruth's forehead, which Wooldridge mistook for a bullet entrance wound, neither of which were visible to William.

William's decision not to pull the blanket off his mother's head was rationally based on his concern that doing so would disturb the dried blood and thus reopen the wound, causing further

31

bleeding. He took the most appropriate actions by quickly calling for close-by emergency medical services, checking for intruders, and going outside to direct the medical personnel to his mother.

A reasonable jury could credit William for correctly assessing the situation and taking the most appropriate actions to assist his mother, rather than find in those actions some nefarious knowledge of how she was injured or lack of concern for her health and welfare.

The fact that dresser drawers were pulled out but appeared untouched indicates a possible burglary, in which the thieves either were interrupted or thought the contents not worth taking. It does not point to William as the assailant.

William's throwing away a piece of trash at a Kroger store which even Det. Benner admits does not appear to be a hammer or similar type instrument the autopsy identified as the murder weapon, does nothing to implicate William in his mother's murder. The whole theory is preposterous, that William struck his mother with a weapon in the morning, left her apartment, did not dispose of the murder weapon, returns to his mother's apartment where she is injured but not dead, calls his brother, goes to Kroger, then disposes of the alleged murder weapon in front of the busy store, then goes back to the apartment where his injured mother is still not dead, and, instead of finishing her off, he calls emergency medical assistance for her, despite the fact that she could identify him as her attacker if she is revived. This "theory" makes absolutely no sense, is riddled with falsehoods and misconstrued facts, is not supported by the objective true facts of what happened, and is rank speculation rather than probable cause for William's arrest for the murder of his mother. See *United States v. Cellitti*, 387 F.3d 618, 624 (7th Cir. 2004) (noting that officer speculation is insufficient to establish probable cause); *Sherouse v. Ratchner*, 573 F.3d 1055, 1062 (10th Cir. 2009) ("Where an officer observes inherently innocuous behavior that has plausible innocent explanations, it takes

more than speculation or mere possibility to give rise to probable cause to arrest.").

Detective Benner realized he did not have probable cause in March of 2014 when he wrote the Criminal Justice Institute. He was hoping DNA evidence would provide that probable cause. The April DNA tests excluded William and pointed towards others. Detective Benner excluded these results from his affidavit and instead added the two false allegations of cell tower location data and the 2:40 p.m. phone call. Hence, by his own representation, Det. Benner admitted his earlier affidavit was insufficient to establish probable cause. Reasonable jurors could reach the same conclusion.

A reasonable jury could conclude that absent the false and misleading statements contained in Det. Benner's probable cause affidavit, there was no probable cause for William Rainsberger's arrest. Accordingly, defendant's motion for summary judgment on the Fourth Amendment unreasonable seizure *i.e.* false arrest claim, should be denied.

### C. Detective Benner is not Entitled to Qualified Immunity for Making False and Misleading Statements in his Probable Cause Affidavit and Causing William Rainsberger to be Arrested without Probable Cause

The parties agree the law is clearly established that an officer who intentionally, knowingly or recklessly submits an affidavit containing false or misleading statements is not entitled to qualified immunity unless "accurate information sufficient to constitute probable cause attended the false statements." See *Malley v. Briggs*, 475 U.S. 335, 344 (1986); *Lawson v. Veruchi*, 637 F.3d 699, 705 (7th Cir. 2011); *Juriss v. McGowan*, 957 F.2d 345, 349-50 (7th Cir. 1992) (officer not entitled to qualified immunity where only his false and misleading statements provided probable cause); *Starks*, Doc, 163, SJ Entry at 16-17 (denying qualified immunity).

The parties disagree about whether Det. Benner included false and misleading statements in his probable cause affidavit, and, if he did, whether the remainder of his affidavit established probable

33

Case 1:16-cv-00103-TWP-MJD   Document 86-1   Filed 11/28/17   Page 254 of 344 PageID #:
1846
Case 1:16-cv-00103-TWP-MJD   Document 49   Filed 02/13/17   Page 34 of 39   PageID 951

cause for William Rainsberger's arrest. The parties' disagreements on both of these questions are the same as in the preceding two sections. Without repeating but incorporating those same arguments, plaintiff submits that when the summary judgment evidence is viewed in the light most favorably to William Rainsberger, the resolution of those questions is clear and precludes a defense of qualified immunity at this stage.

A reasonable jury could conclude based upon this evidence that Det. Benner's affidavit of probable cause was riddled with false and misleading statements, and that without those statements that there was no probable cause for William Rainsberger's arrest. Accordingly, Defendant Benner is not entitled to qualified immunity.

### D. Reasonable Jurors Could Conclude that William Rainsberger was Maliciously Prosecuted

Defendant acknowledges that the Seventh Circuit has held that Indiana plaintiffs may bring malicious prosecution claims under 42 U.S.C. §1983 because Indiana does not provide an adequate remedy for such claims. Def's SJ Memo at 18 (citing *Julian v. Hanna*, 732 F.3d 842 (7th Cir. 2013). Defendant argues that the evidence here does not support such a claim, and that such claims cannot be based solely upon the Fourth Amendment. *Id*. at 18, 20-21.

The first argument is incorrect; the second argument is presently valid under existing Seventh Circuit precedent, which as explained below, is likely to change before the trial in this case.

Defendant's first evidentiary argument is that there was probable cause to institute the action. This inquiry is the same as in above sections, which plaintiff incorporates rather than repeats here. A reasonable jury could conclude an absence of probable cause.

Defendant's second evidentiary argument is that there is no evidence that Det. Benner acted with malicious intent. Defendant fails to examine the relevant law on malice, which as applied to

34

Case 1:16-cv-00103-TWP-MJD   Document 86-1   Filed 11/28/17   Page 255 of 344 PageID #:
Case 1:16-cv-00103-WFL-MJD   Document 49-1   Filed 02/13/17   Page 35 of 39   PageID #:
1847

the evidence in this case, would permit a reasonable jury to infer malice here.

Plaintiff's evidence that Detective Benner falsified his affidavit is sufficient for a jury to determine malice. See *Kalina v. Fletcher*, 522 U.S. 118, 133 (1997) (Scalia, J., concurring) ("false statements" may serve as "evidence of malice or initiation in the malicious prosecution suit"); *Peoples Bank & Trust Co. v. Stock*, 403 N.E.2d 1077, 1084 (Ind. 1980) ("any wrongful act done willfully and purposely and without just cause or excuse, to the injury of another is as against that person malicious.").

In Indiana, only "legal malice," as opposed to "actual malice," is needed to prove malicious prosecution. *Pontius v. Kimble*, 104 N.E. 981, 982 (Ind. App. 1914) (rejecting the argument that actual, or express, malice is necessary to prove malicious prosecution. Legal malice, "'malice in law,' or 'implied malice' means wrongful act done intentionally, without just cause or excuse." *United States Fire Ins. Co. v. Beltmann Northern American Co.*, 883 F.2d 564, 566 (7th Cir. 1989) (citing Black's Law Dictionary (5th ed. 1979)).

"Legal malice" is distinguished from "actual malice," the latter of which requires proof of "spite, hatred, ill will, or vindictive motives." See *Boyd v. Tornier, Inc.*, 656 F.3d 487, 497 (7th Cir. 2011) (discussing the difference between actual and legal malice under federal law). Actual malice has a substantially higher proof threshold. For example, proof of actual malice is required to establish liability for libel against public officials. See *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-280 (1964).

Because the Indiana Supreme Court has held that "any wrongful act done willfully and purposely and without just cause or excuse, to the injury of another is as against that person malicious" (*Peoples Bank & Trust Co.*, 403 N.E.2d at 1084), evidence of Detective Benner' false

Case 1:16-cv-00103-TWP-MJD  Document 86-1  Filed 11/28/17  Page 256 of 344 PageID #:
Case 1:16-cv-00103-WFL-MJD  Document 49-1  Filed 02/13/17  Page 36 of 39  PageID #:
1848

and misleading presentation of evidence is sufficient to support an inference of legal malice.

Malicious intent can also be inferred from the complete lack of probable cause, *Welton v. Anderson*, 770 F.3d 670, 674 (7th Cir. 2014). As explained above, absent the false and misleading material there was no probable cause here, and hence malice can be inferred.

Finally, malicious intent can be inferred from an officer's failure to conduct an adequate investigation. *Welton*, 770 F.3d at 674. Here, Det. Benner latched onto Mr. Rainsberger as his only suspect within 24 hours and failed to conduct an adequate investigation.

Professor Rossmo extensively examined Det. Benner's investigation and found it biased and woefully lacking in thoroughness and objectivity. Rossmo Report 30-46.  Without repeating his extensive findings set forth in those 17 pages of his report, suffice it to say that his critique would provide an adequate basis for a reasonable jury to conclude that the investigation was inadequate and to infer legal malice.

Defendant's legal argument against Mr. Rainsberger's malicious prosecution claims based solely upon a Fourth Amendment lack of probable cause are not permitted in the Seventh Circuit. Def's SJ Memo 20 (citing *Ray v. City of Chicago*, 629 F.3d 660, 664 (7th Cir. 2011) and *Tully v. Barada*, 599 F.3d 591, 594-95 (7th Cir. 2010)).

Defendant correctly relies upon this Seventh Circuit precedent for this proposition. However, the Seventh Circuit is out of step with the other circuits on this issue, and the issue is presently under consideration by the U.S. Supreme Court, which likely will soon align our circuit with the others.

On January 15, 2016, the Court granted certiorari on the following question presented in *Manuel v. City of Joliet,* 590 F. App'x 641 (7th Cir. 2015), cert. granted 136 S. Ct. 890 (Jan. 15, 2016):

The question presented is whether an individual's Fourth Amendment right to be free from unreasonable seizure continues beyond legal process so as to allow a malicious prosecution

36

Case 1:16-cv-00103-TWP-MJD   Document 86-1   Filed 11/28/17   Page 257 of 344 PageID #:
1849
Case 1:16-cv-00103-TWP-MJD   Document 86-1   Filed 11/28/17   Page 37 of 99   PageID #:

claim based upon the Fourth Amendment. This question was raised, but left unanswered,
by this Court in *Albright v. Oliver*, 510 U.S. 266 (1994). Since then, the First, Second,
Third, Fourth, Fifth, Sixth, Ninth, Tenth, Eleventh, and D.C. Circuits have all held that a
Fourth Amendment malicious prosecution claim is cognizable through 42 U.S.C. § 1983
("Section 1983"). Only the Seventh Circuit holds that a Fourth Amendment Section 1983
malicious prosecution claim is not cognizable.
http://www.supremecourt.gov/qp/14-09496qp.pdf (Last accessed 2-10-17).

The Supreme Court heard oral argument on this issue at the beginning of this term, on Oct. 5,

2016. A transcript of that argument is submitted by plaintiff. Manuel Oral Arg Transcript.

While it is always risky to forecast what the Supreme Court will do, it is not unreasonable to

expect it to bring the Seventh Circuit in line with the other circuits on this issue, especially in light

of the Court's previous assumption that such claims are viable under the Fourth Amendment.

In *Wallace v. Kato*, 594 U.S. 384 (2007), the Supreme Court, citing *Albright*, explained that

it: has "never explored the contours of a Fourth Amendment malicious-prosecution suit under

Section 1983;" recognized a "range of approaches" on such a claim in the lower courts; and, did not

foreclose such claims, but rather "assumed, without deciding," that such claims were cognizable

under §1983. *Wallace*, 594 U.S. at 390 n.2. *See also Albright v. Oliver*, 510 U.S. at 271 ("Most of

the lower courts recognize some form of malicious prosecution action under § 1983.").

As the First Circuit has observed: "there is now broad consensus among the circuits that the

Fourth Amendment right to be free from seizure but upon probable cause extends through the pretrial

period." *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 98-99 (1st Cir. 2013).

To this point, in the *Manuel* oral argument, the respondents concede a Fourth Amendment

claim which extends beyond arrest for false statements by officers which lead to continued pretrial

seizures. Manuel Oral Arg. Transcript at 51 ("You would have a Fourth Amendment claim for

misstatements at a Gerstein hearing that then led to ongoing pretrial seizure. And the damages from

37

that claim would run throughout the period of pretrial seizure.").

One would assume a decision in *Manuel* would be handed down prior to the conclusion of the Court's current term in late June or early July and prior to the September 11, 2017 trial in this case.

Plaintiff submits that the most judicious manner to address the issue is to take defendant's motion on this claim under advisement and address the issue after the Supreme Court hands down *Manuel* and prior to the September 11, 2017 trial.

Accordingly, for the above reasons, Defendant's motion for summary judgment on Mr. Rainsberger's malicious prosecution claim should be denied on all arguments asserted by defendant with the exception of the issue to be decided by *Manuel*, and, with respect to that issue, taken under consideration pending the outcome in *Manuel*.

### Conclusion

Detective Benner has failed to show that the material facts are undisputed and that he is entitled to judgment as a matter of law. Based upon the summary judgment record, reasonable jurors could conclude that Det. Benner intentionally, knowingly, or recklessly made false and misleading statements and omitted relevant exculpatory information from his probable cause affidavit, and that without that unfair presentation, probable cause did not exist for William Rainsberger's arrest or prosecution. The rights here were clearly established at the time of the events, and qualified immunity does not apply. Accordingly, the motion for summary judgment should be denied as to the first two claims, and taken under advisement on plaintiff's malicious prosecution claim on the issue pending before the Supreme Court in *Manuel*.

Dated: February 13, 2017

Respectfully submitted,

*/s/ Richard A. Waples*
Richard A. Waples
Attorney for Plaintiff

38

Case 1:16-cv-00103-TWP-MJD   Document 86-1   Filed 11/28/17   Page 259 of 344 PageID #:
Case 1:16-cv-00103-TWP-MJD   Document 49   Filed 02/13/17   Page 39 of 39   PageID #:
1851

**WAPLES & HANGER**
410 N. Audubon Road
Indianapolis, Indiana 46219
TEL: (317) 357-0903
FAX: (317) 357-0275
EMAIL: rwaples@wapleshanger.com

**CERTIFICATE OF SERVICE**

The undersigned certifies that on February 13, 2017, a copy of this document was filed

electronically. Notice of this filing will be sent to counsel of record by operation of the Court's

electronic filing system. Parties may access this filing through the Court's system:

Kathryn Box at Kathryn.Box@indy.gov
Lynne D. Hammer at Lynne.Hammer@indy.gov
Benjamin J. Church at Benjamin.Church@indy.gov

Office of Corporation Counsel
200 East Washington Street, Room 1601
Indianapolis, Indiana 46204

*/s/ Richard A. Waples*
Richard A. Waples

**WAPLES & HANGER**
410 N. Audubon Road
Indianapolis, IN 46219
TEL: (317) 357-0903
FAX: (317) 357-0275
EMAIL: rwaples@wapleshanger.com

Case 1:16-cv-00103-TWP-MJD   Document 88-1   Filed 11/29/17   Page 260 of 344 PageID #:
Case 1:16-cv-00103-WTL-MJD   Document 86-1   Filed 02/27/17   Page 1 of 21   PageID #:
1852

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

WILLIAM RAINSBERGER,       )
                                      )
     Plaintiff,              )
                                      )
    v.                        )    Case No.:  1:16-cv-103-WTL-MJD
                                      )
CHARLES BENNER,           )
                                      )
     Defendant.             )

## REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Rainsberger's oversized brief and hundreds of pages of exhibits appear designed to make the Court think the record is just too sprawling or complex to resolve this case on summary judgment. The Court should not be fooled.

Rainsberger's attempts to muddy and mischaracterize the record, his claim that he did not commit the crime, and his expert's Monday-morning quarterbacking are immaterial to the pending motion.[1] When focusing on the facts and arguments that actually are material, the resolution of that motion is straightforward. If Detective Benner had probable cause (or at least arguable probable cause) to seek a warrant for Rainsberger's arrest and prosecution, this litigation must end. The Court need not—and should not—go any further. But even if it does, nothing in the record negates probable cause or establishes malice.

---

[1] Rainsberger's response to Benner's summary-judgment motion is full of immaterial arguments, inadmissible evidence, and misrepresentations of the record. Responding to them is complicated by his failure to assign any exhibit numbers (which in turn is complicated by his designation of evidence's failure to list any of his thirty-four exhibits in the order in which he actually filed them). Nevertheless, Benner has attempted to address many of those issues in this reply. Addressing them all would far exceed the permitted page allotment only to divert the Court's attention to immaterial issues. For instance, Rainsberger claims the prosecutor's office "rejected" Benner's first probable-cause affidavit. He fails to mention that the prosecutor never said the initial affidavit did not establish probable cause and simply asked Benner to confirm the victim's financial information—information nobody disputes in this lawsuit. *See* Dkt. 50-3 at 46-47; Dkt. 50-9 at 13-14. Such claims are misleading but ultimately are immaterial to the issues the Court must decide. As the Court knows, misrepresentations of the record, inadmissible evidence, and disputes over *immaterial* facts cannot defeat a summary-judgment motion.

1

I.      **As long as Benner had arguable probable cause, Rainsberger's claims are legally barred (and this Court's analysis must end).**

Rainsberger's response goes to great lengths trying to explain away the undisputed evidence that provided Benner probable cause to believe he committed murder. But this is not a murder trial. Although Rainsberger's post-hoc rationalizations might create reasonable doubt, they do not negate the undisputed facts establishing that Benner had at least arguable probable cause to seek a warrant for Rainsberger's arrest and prosecution. Although Benner goes on to address various mischaracterizations and admissibility issues in later sections of this brief—so the Court is not left with a false view of the record—the issue addressed in this first section is dispositive. Because the undisputed facts easily meet the threshold for arguable probable cause, the Court need not proceed beyond Section I of this brief.

A.      **Binding precedent consistently cautions that probable cause is not a high bar, and the existence of at least arguable probable cause is an absolute defense to Rainsberger's claims.**

Probable cause is an "absolute defense" to false arrest and malicious prosecution claims under Section 1983. *Hart v. Mannina*, 798 F.3d 578, 587 (7th Cir. 2015). And for good reason. There is no constitutional right to be arrested and prosecuted only when the government has proof of guilt beyond a reasonable doubt. All that is required for either is probable cause. Our system leaves the determination of guilt or innocence to fellow citizens—not the government.

The Supreme Court has often cautioned that probable cause has a low threshold. *Kaley v. United States*, 134 S. Ct. 1090, 1103 (2014) ("Probable cause, we have often told litigants, is not a high bar. It requires only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." (quotation marks and alteration marks omitted)). Our own circuit echoes the Supreme Court's reminder. *E.g.*, *Fox v. Hayes*, 600 F.3d 819, 833 (7th Cir. 2010) ("it does not take much to establish probable cause"); *Hart*, 798 F.3d at 587 (calling probable cause a

2

Case 1:16-cv-00103-TWP-MJD   Document 88-1   Filed 11/29/17   Page 262 of 344 PageID #:
1854
Case 1:16-cv-00103-TWP-MJD   Document 86   Filed 02/27/17   Page 3 of 21   PageID #: 1854

"fluid concept" resting on "common-sense judgments" given the totality of circumstances). Accordingly, a police officer may have probable cause even if his evidence would not support a conviction. In fact, probable cause does not even require an officer to show that his belief is more likely correct than incorrect. *Fox*, 600 F.3d at 833. The officer need only have "more than a bare suspicion" that he has the right guy—even if he is more likely wrong than right. *Id.* ("The officers must have more than a bare suspicion that they have the right guy, but they need not have enough evidence to support a conviction or even to show that their belief is more likely true than false.").

Courts evaluating whether probable cause existed must consider the defendant officer's perspective, not that of an omniscient observer. *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1245 (7th Cir. 1994). And because police officers are entitled to rely on their experience, their probable-cause judgments "deserve deference." *United States v. Breit*, 429 F.3d 725, 728 (7th Cir. 2005). Here, where Benner has asserted a qualified-immunity defense, he must establish only that he had arguable probable cause. In other words, even if he was mistaken that probable cause existed, he is immune as long as that mistake was reasonable. *See* Dkt. 44 at 29 (citing *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 714-15 (7th Cir. 2013)).

### B. Even if the Court were to credit Rainsberger's inadmissible evidence and mischaracterizations, the remaining undisputed facts still satisfy the threshold for probable cause.

Notwithstanding Rainsberger's attempts to muddy the record, the resolution of this case is not complicated. As explained in Sections II and V of this reply, the Court should not credit Rainsberger's inadmissible evidence and mischaracterizations of the record. But even if it does, the undisputed facts still easily meet the threshold for probable cause (and the lower threshold for arguable probable cause), entitling Benner to summary judgment:

- Rainsberger was the last known person to see his mother alive. *See* Dkt. 50-24 at 2. He is also the one who reported her injuries in the 911 call. Dkt. 50-18 at 56. No evidence

Case 1:16-cv-00103-TWP-MJD Document 88-1 Filed 11/28/17 Page 263 of 344 PageID #:
1855
Case 1:16-cv-00103-TWP-MJD Document 86-1 Filed 11/27/17 Page 4 of 21 PageID #: 1855

confirms that anyone else was in his mother's apartment between the time Rainsberger acknowledges last being there and the time he called 911 to report her injuries.

- Although his mother was still breathing, Rainsberger did not attempt to provide any aid even after dispatchers instructed him to put pressure on her wound. Dkt. 50-10 at 6; *see also* Dkt. 50-18 at 65 (calling it "moronic" that dispatchers kept asking him if she was breathing normally). Rainsberger now offers various post-hoc explanations for why he refused to follow the dispatcher's instructions. But it is undisputed that he provided no aid and that Benner found that fact to be suspicious. *See* Dkt. 50-9 at 11.

- A bloodied blanket covered his mother's head. *Id.* at 58. Detective Benner's training and experience taught him that an attacker who covers his victim's head often has a personal relationship with the victim.[2] Dkt. 43-8 at 3.

- Rainsberger never looked under the blanket to see what had happened to his mother or to assess her injuries. *See* Dkt. 50-18 at 64 (testifying that removing the blanket to see what had happened was "the most idiotic suggestion anyone could have made"). But despite never looking under the blanket to see what happened, Rainsberger appeared to know right away how his mother had been attacked. He told the 911 operator that someone "bashed" her head in. *Id.* at 71. Likewise, he told a medic that someone had "caved" her head in. Dkt. 50-7 at 5.

- That medic, Carl Wooldridge, reported to Benner that he thought it strange when Rainsberger reported that someone had caved his mother's head in given that Rainsberger

---

[2] Rainsberger's expert report—which is largely inadmissible or immaterial as noted below in Section V—questions whether empirical research supports that training (despite acknowledging a manual from the FBI's National Center for the Analysis of Violent Crime that does). But whatever the literature surveyed in an expert report prepared in 2017 may show, it is undisputed that Benner's training and experience taught him that covering a victim's face suggests a personal relationship between the victim and her attacker. *Cf. Sheik-Abdi*, 37 F.3d at 1245 (noting the officer's perspective at the time is what matters).

4

Case 1:16-cv-00103-TWP-MJD   Document 88-1   Filed 12/29/17   Page 264 of 344 PageID #:
1856
Case 1:16-cv-00103-TWP-MJD   Document 86-1   Filed 12/27/17   Page 5 of 21   PageID #:
1856

had not removed the blanket to see what happened. Dkt. 43-4 at 3, 10. Indeed, Wooldridge initially thought she had been shot. *Id.* at 7. And Rainsberger's own evidence shows that at least one other medic, a female, and an ER doctor also reported an initial belief that she had been shot. *See* Dkt. 50-2 at 2-3; Dkt. 50-11 at 8; Dkt. 50-13 at 7. Yet Rainsberger somehow appeared to know right away how the attack had actually happened. Although he now says he was actually unsure and offers various post-hoc explanations for his statements to the dispatcher and the medic, those statements are undisputed and were unequivocal. It is also undisputed that both Benner and Wooldridge found it suspicious that Rainsberger appeared to know how the attack happened well before medical personnel were able to figure it out.[3] Dkt. 43-1 at 2; Dkt. 43-4 at 3, 10.

- Wooldridge also reported to Benner that he thought William's lack of emotion on the scene "didn't seem right." Dkt. 43-4 at 10. No evidence anywhere in the record suggests Benner had any reason to doubt Wooldridge's credibility.

- It appeared to Benner that there had been no forced entry to the mother's apartment (something Rainsberger agreed with). Dkt. 43-1 at 2; Dkt. 50-24 at 20. Rainsberger also told Benner his mother would have been unlikely to open the door for a stranger. Dkt. 50-18 at 30; Dkt. 50-24 at 24. Rainsberger was one of a very small universe of people with a key to his mother's apartment. Dkt. 50-18 at 32.

- Credit cards, cash, and a checkbook were found in a container sitting on the dining room table. Dkt. 43-1 at 2; Dkt. 50-28 at 5-6. A lockbox was left undisturbed on a shelf in the spare bedroom's open closet. Dkt. 43-1 at 2; Dkt. 43-9 (photo 12); Dkt. 50-18 at 123.

---

[3] Rainsberger now criticizes first responders for thinking his mother had been shot, pointing to things like the absence of any gunpowder odor in the apartment. His response omits the forensic specialist's testimony that she has never *in her entire career* been able to smell gunpowder at a shooting scene. Dkt. 43-6 at 3.

Case 1:16-cv-00103-TWP-MJD Document 88-1 Filed 11/28/17 Page 265 of 344 PageID #:
1857
Case 1:16-cv-00103-TWP-MJD Document 86 Filed 02/27/17 Page 6 of 21 PageID #: 265

- Rainsberger told the police officer transporting him from the scene either (a) that he did
  not know if it was a good thing or a bad thing that happened to his mother or (b) that he
  did not know if it was a good thing or a bad thing if his mother died. Dkt. 50-2 at 14.
  Rainsberger has since attempted to explain what he meant. *See* Dkt. 50-18 at 89 (calling
  one possible explanation "just a comment on the fragility of life and the senselessness of
  the crime" and another that "if she was going to die anyway, she might as well die"). But
  regardless of any post-hoc rationalizations for it, it is undisputed that Benner found that
  statement to be suspicious. Dkt. 43-8 at 3-4.

- Rainsberger's mother had approximately $100,000 in assets, and Rainsberger was one of
  her beneficiaries. Dkt. 43-1 at 5; Dkt. 50-18 at 38. Had she lived longer, those assets would
  have been spent down quickly on the cost of assisted living. Dkt. 50-24 at 7.

- Rainsberger became angry when Benner asked him to take a polygraph, refused to take it,
  and shouted down to the waiting room to tell his brother Robert that he was not taking a
  polygraph either. Dkt. 50-18 at 93-97. Although he has since attempted to explain why he
  refused, it is undisputed that polygraphs are a tool Benner often use to eliminate family
  members as suspects early in an investigation, that in Benner's experience family members
  typically are eager to cooperate and take a polygraph so police can move on to other
  potential suspects, and that Rainsberger's angry refusal aroused both Benner's suspicions
  and Detective Tom Tudor's suspicions. Dkt. 50-9 at 39-40, 80-81.

Even if the Court credits everything in Rainsberger's response, these facts remain
undisputed. They provided Benner with "more than a bare suspicion" that Rainsberger had
committed murder. He appeared to have the most opportunity to commit the crime. He appeared
to know how the attack had happened long before anyone else had figured it out. His behavior

6

Case 1:16-cv-00103-TWP-MJD Document 88-1 Filed 11/28/17 Page 266 of 344 PageID #:
1858
Case 1:16-cv-00103-TWP-MJD Document 86-1 Filed 11/21/17 Page 7 of 21 PageID #:
1858

after the crime seemed suspicious both to a first responder and to two experienced homicide detectives. And he stood to gain financially from his mother's death. Under binding Seventh Circuit precedent, Benner is therefore entitled to summary judgment *even if he was more likely wrong than right*. *Supra* at 2. And even if those facts did not justify more than a bare suspicion— and they do—Benner would still be entitled to qualified immunity because they at least provided him with arguable probable cause.

That is the end of the inquiry. Probable cause, or at least arguable probable cause, is an absolute bar to both of Rainsberger's claims. *See Hart*, 798 F.3d at 587; *Abbott*, 705 F.3d at 714. The Court need not—and should not—go any further to resolve this case.

## II.    Although the Court need not reach them, Rainsberger's scattershot arguments repeatedly misstate the record and are immaterial in any event.

Rainsberger tries to defeat summary judgment by arguing that Benner should have pursued other leads, drawn different inferences from the facts, or included different facts in his probable-cause affidavit. Those arguments are immaterial. As noted in Section I, the existence of probable cause is an absolute bar to Rainsberger's claims (so the Court need not address anything else). And notwithstanding the response's second-guessing of Benner's decision to focus on Rainsberger as a suspect, the Seventh Circuit has "consistently" held that officers with probable cause "have no constitutional obligation to conduct any further investigation in the hopes of uncovering potentially exculpatory evidence." *E.g.*, *Forman v. Richmond Police Dep't*, 104 F.3d 950, 962 (7th Cir. 1997).

And even if Rainsberger's arguments were material, the record does not support them. His response constructs a fictional probable-cause affidavit and then argues that the fictional affidavit was false or misleading. Those mischaracterizations should not distract the Court from the straightforward inquiry before it—whether Benner had probable cause to believe Rainsberger had killed his mother. And to the extent Benner made any mistakes in the actual probable-cause

affidavit at issue here, they are immaterial to the outcome because they do not negate the probable cause (or, at a minimum, arguable probable cause) established in Section I.

Lest those mischaracterizations go unanswered—however immaterial they may be—this reply addresses them briefly in turn.

1.     Rainsberger claims the probable-cause affidavit was misleading because cellphone records to not show him in the area of his mother's apartment during the relevant time period. There are two problems with that claim. First, Benner's probable-cause affidavit never says records show him inside the area. It simply says no records are able to confirm he was *outside* the area during the relevant time.[4] Dkt. 43-1 at 5. That statement is indisputably true. Second, Rainsberger's claim that this true statement somehow misled the criminal-court judge into thinking Rainsberger was in the area is preposterous. His own testimony places him either at his house two or three blocks away from his mother's apartment or at the Kroger across the street from her apartment for virtually the entire day leading up to his 911 call. Dkt. 50-4 at 14; Dkt. 50-18 at 43-48. And even though no cellphone location data confirmed it, Benner included in his affidavit Rainsberger's version of events—that he went to Plainfield the evening before and stayed there through the early morning hours before returning home. Dkt. 43-1 at 3. So Benner's actual statement about cellphone location records was indisputably accurate, and it could not possibly have misled a judge into believing that which Rainsberger himself has testified to.

2.     Rainsberger claims Benner falsely stated that cellphone records showed a call from the mother's landline phone to Rainsberger's brother at 2:40 p.m. *See* Dkt. 43-1 at 4. It is undisputed that Rainsberger's brother's cellphone records do, in fact, show that 2:40 p.m. call. At

---

[4] Benner testified in the criminal matter that he considered the relevant time to be from the morning of November 19, 2013 until the time when Rainsberger called 911 that afternoon. Dkt. 50-4 at 66.

8

Case 1:16-cv-00103-TWP-MJD   Document 88-1   Filed 11/28/17   Page 268 of 344 PageID #:
Case 1:16-cv-00103-TWP-MJD   Document 86-1   Filed 02/27/17   Page 9 of 21   PageID #:
1860

some point, Benner received a spreadsheet prepared by another officer comparing various phone records and suggesting that the 2:40 p.m. call was actually a 3:40 p.m. call routed through a Chicago network. Even assuming Benner had that spreadsheet when he completed his affidavit, there is no evidence that he had any understanding that the two calls were the same call until months later.[5] To the contrary, more than two years later Benner still was not convinced they were the same call because—even accepting the time zone discrepancy for a call routed through Chicago—the two calls show up on the brother's cellphone records as having two different durations. Dkt. 50-9 at 16, 22.

Even Rainsberger testified that he has no evidence proving that there was only one call. Dkt. 50-18 at 105 ("Q: But you have no evidence to prove that. A: No, but I'm confident."). He simply argues that Benner should have known to treat the mother's landline phone records—which show a 3:41 p.m. call but not a 2:40 p.m. call—as the inviolably accurate ones. But those records do not even show the 3:38 p.m. 911 call that everyone agrees was made from the mother's landline phone. Dkt. 50-18 at 8; Dkt. 50-25. Although police may not ignore "conclusively established evidence" that defeats probable cause, the phone call discrepancy is not even conclusively established today. *Cf. McBride v. Grice*, 576 F.3d 703, 707-08 (7th Cir. 2009). And even if it were, that fact would not negate probable cause. *See* Section I, *supra*.

3.     Rainsberger calls Benner a liar and criticizes him for purportedly saying that surveillance video from a Kroger shows Rainsberger throwing away a weapon and looking around for cameras. The most fundamental problem with that farce is that Benner's probable-cause

---

[5] Two-and-a-half years after the fact, Benner testified that he believed he had the comparison spreadsheet in his file when he prepared the probable-cause affidavit but was not aware of the discrepancy at that time. Dkt. 50-9 at 50. The evidence actually confirms that Officer Bierce did not even create the comparison spreadsheet until well *after* Benner submitted his probable-cause affidavit in May 2014. Dkt. 43-19 at 3-4 (Bierce testifying that he did not create the comparison spreadsheet until July 2014); Dkt. 43-22 at 2 (Bierce emailing Benner the comparison spreadsheet in late July 2014).

affidavit says nothing about Rainsberger throwing away a weapon, a hammer, or a pry bar. *Cf.* Dkt. 49 at 8. It says that Rainsberger appeared to take a "straight object" from his person and place in a garbage can. Dkt. 43-1 at 4. That statement is indisputably true. *See* Dkt. 50-18 at 130 (Rainsberger testifying that he took the object from his pocket and threw it away); Dkt. 50-31 at 18 (showing that it was some sort of straight object). Rainsberger also takes issue with Benner stating that he "appeared to look around for cameras," saying he was just turning to look at a woman. Dkt. 49 at 7. Regardless of what Rainsberger now claims he was looking at back in November 2013, there is no evidence suggesting Benner knowingly made a false statement when he said it looked to him like Rainsberger was looking around for cameras. Nor could that discrepancy negate probable cause.

4.      Rainsberger criticizes Benner for stating that a lockbox in plain view in the back room contained "savings bonds." It is undisputed that the lockbox was visible on a shelf in an open closet in that back room. Dkt. 43-9 (photo 12); Dkt. 50-9 at 35. And, though everyone now agrees the financial documents in the lockbox were certificates of deposit instead of savings bonds, it is hard to fathom how that fact could possibly be material. *See* Dkt. 50-18 at 123. They were financial documents that someone thought important enough to keep in a lockbox, and they were undisturbed. Moreover, even though Benner's statement later proved to be mistaken, Rainsberger's own designated evidence shows that Benner relied on a representation from crime lab personnel who indicated they were savings bonds. Dkt. 50-4 at 47.

5.      Rainsberger says Benner lied in his probable-cause affidavit by saying nothing had been stolen from the mother's apartment. Dkt. 49 at 9-11. Rainsberger is yet again attacking a fictional probable-cause affidavit. Dkt. 43-1. The one at issue here never says that nothing was stolen. It says there were no visible signs of forced entry, something Rainsberger himself agrees

with. *Id.*; Dkt. 50-18 at 123. It recounts that some drawers were pulled out but did not appear to have been rifled through. Dkt. 43-1 at 2. And it notes various seemingly valuable items that were left undisturbed, including cash, checks, and credit cards. *Id.* Those facts are undisputed.

Rainsberger argues that Benner should have known some items were stolen because Rainsberger had reported that his mother owned certain items that purportedly were not recovered—a purse, jewelry, and a dementia medication. But the evidence does not support that argument. It shows that Rainsberger's mother had a shiny black purse that she rarely if ever used. Dkt. 50-11 at 6; Dkt. 50-18 at 113. Benner recovered a purse matching that description. Dkt. 43-8 at 4; Dkt. 43-9 (photo 16); Dkt. 50-9 at 9. And while Rainsberger now argues that Benner should have known the recovered purse did not fit the description of his mother's purse, that argument squarely contradicts his own sworn testimony that it was "extremely similar" to the one he remembers his mother having.[6] *Compare* Dkt. 49 at 11, *with* Dkt. 50-18 at 113; *see also* Dkt. 43-9 (showing in photo 16 the shiny black purse police recovered from the apartment). Regarding Rainsberger's claim that Benner should have known his mother's jewelry was stolen, that too contradicts his own testimony. Rainsberger testified under oath that he cannot say for sure whether any jewelry was stolen and that, in fact, her jewelry was sufficiently valueless that "we didn't really track it." Dkt. 50-18 at 121. In fact, he explicitly told Benner that his mother had no valuable jewelry in the apartment (or any other valuable possessions for that matter). Dkt. 50-24 at 9 ("[B]ut she doesn't own a car or real estate or stocks or valuable jewelry or, or anything."). And with respect to the allegedly missing dementia prescription, Benner testified that he noticed some pill bottles on the kitchen counter but did not pay attention to whether they were over-the-counter or the dementia prescription. Dkt. 50-4 at 58-59. In any event, it is undisputed that Benner's training

---

[6] Rainsberger appears to make up out of thin air a claim that the recovered purse still had paper stuffing in it from the store. *See* Dkt. 49 at 11. He cites four possible sources for that claim, none of which support it.

and experience taught him that Aricept is not commonly stolen and has no street value. Dkt. 43-8 at 4.

In sum, Benner never said in his probable-cause affidavit that nothing was stolen. And while Rainsberger now suggests the evidence does not conclusively establish that all of his mother's belongings were recovered and inventoried by police, there is no evidence that Benner knowingly ignored conclusively established evidence that anything was missing—much less evidence sufficient to negate probable cause. *Cf. McBride*, 576 F.3d at 707-08.

6.      Rainsberger accuses Benner of misrepresenting Rainsberger's degree of concern for his mother. Here, yet again, the actual probable-cause affidavit never says Rainsberger was not concerned. And the statements it does make—that he left the apartment to wait for the ambulance after calling 911, that he did not remove the blanket from her head to see what happened to her, and that he never asked Benner about his mom's condition or asked to go see her during his interview—are undisputed. *See* 43-1 at 2-3; *see also* Dkt. 50-18 at 131 ("Q: My question is: Did you ever ask Detective Benner if you could go to the hospital? A: I did not. Q: Did you ever ask Detective Benner what your mother's condition was? A: No.").

7.      Rainsberger accuses Benner of misrepresenting his refusal to take a polygraph and lying about whether the family stormed out afterward. Dkt. 49 at 17-20. But all the probable-cause affidavit says about the exchange is that Rainsberger and his brother "adamantly said no" and that afterward the family stormed out. Dkt. 43-1 at 4. Rainsberger's own testimony confirms this account. He says he refused to take it and then started "yelling back and forth" with Benner and Tudor about it. Dkt. 50-18 at 94-96. He also says that, while he is "not sure exactly how it played out," he then left the interview room yelling at his brother down in the waiting room that "we are not taking a polygraph test." Dkt. 50-18 at 97. His brother, Robert, testified that yelling and cussing

12

continued in the lobby and that the detectives and the Rainsbergers then parted ways from the lobby. Dkt. 50-13 at 9. Nit picking whether "stormed out" or some other phrase best describes that heated exchange cannot possibly be material to this motion.

8.      Rainsberger claims that Benner lied in his probable-cause affidavit when he said he had not heard from the Rainsbergers after the polygraph confrontation. Dkt. 49 at 20. Benner later acknowledged in testimony during the criminal proceeding that, while he had not spoken with her, he had received two voicemails from Rainsberger's sister, Rebecca. Dkt. 50-4 at 30. He has also testified that the sentence noting that he had not heard from any of the siblings was in his initial draft probable-cause affidavit prepared months earlier and that he did not catch it and remove it when finalizing the May 2014 affidavit. Dkt. 50-9 at 44. He noted that whether Rebecca left him any voicemails was irrelevant to probable cause, though. Neither of the brothers—and particularly his suspect, William Rainsberger—ever contacted him. *Id.* That is indisputably right. Whether Rebecca left Benner a voicemail does not negate probable cause.

9.      Rainsberger faults Benner for not including in his probable-cause affidavit that a touch DNA sample from the shoulder of his mother's sweater showed DNA from an unidentified male. Dkt. 49 at 21-23. Undisputed evidence shows that Benner told prosecutors about the sample but did not include it in his affidavit just as he was trained to do. Dkt. 43-8 at 6. Based on his training and experience, he understood that sample likely was attributable to medical personnel who treated Ruth Rainsberger at the scene and transported her to the hospital. *Id.* at 5-6; Dkt. 50-9 at 79. Prosecutors told Benner they agreed and also noted that doctors and nurses at the hospital could be responsible for the sample. *See* Dkt. 50-9 at 66. In short, Benner followed his training and his experience. And while the DNA evidence might be important to a reasonable-doubt

13

defense in a murder trial, it does not change the fact that Benner had "more than a bare suspicion" that Rainsberger committed murder.

10.     Rainsberger says Benner misled the criminal court by "suggesting" in his probable-cause affidavit that he had a financial motive to kill his mother. There are several problems with that argument. First, again, he is attacking a fictitious affidavit. The one Benner prepared never says Rainsberger had a financial motive. It simply reports what the mother's assets were and that Rainsberger was one of her beneficiaries. Dkt. 43-1 at 5. Those facts indisputably are true. What Rainsberger and his purported expert evidence complain about are the inferences someone might draw from those accurate factual statements. But that complaint is not with Benner. He simply provided accurate facts about the mother's assets.

Moreover, the bald claim in Rainsberger's expert report that a suspect cannot have a financial motive unless he is in dire financial straits is wholly unsupported. Rossmo's unsourced assertion that only poor folks could ever have a motive to kill for money is facially absurd. It defies both common sense and long-established law in this circuit recognizing "[p]ersonal advancement and financial gain" as "two well recognized motives for much of human conduct." *United States v. Snow*, 670 F.2d 749, 7545 n.9 (7th Cir. 1982). In short, the actual probable-cause affidavit in this case does not say Rainsberger had a financial motive. But even if it did, he indisputably stood to (and did) gain financially from his mother's death. Dkt. 50-18 at 38-39; *see also* Dkt. 50-24 at 7 (Rainsberger noting that, although his mother was "fairly well off" before her death, he was looking at moving her into assisted living "but it costs so much that it was going to eat through everything" before Medicaid kicked in).

*   *   *   *   *

14

Although Rainsberger's response might be relevant to the beyond-a-reasonable-doubt inquiry in a murder trial, this is not a murder trial. The relevant question here is whether Benner had probable cause to seek the arrest warrant. Because the undisputed facts confirm that he did, everything else is immaterial. *See* Section I, *supra*.

## III.    Rainsberger failed to point to a single analogous case and has therefore failed to meet his burden of overcoming qualified immunity.

Rainsberger points to general principles that police officers are not entitled to qualified immunity if their probable-cause affidavits include false or misleading statements. Dkt. 49 at 33. As an initial matter, he misstates the law. If probable cause or arguable probable cause existed, Benner has an absolute defense to his claims regardless of what the probable-cause affidavit may or may not have included. Moreover, Rainsberger points to no analogous case suggesting that probable cause could be negated by, for instance, mixing up whether documents in a murder victim's lockbox were certificates of deposit or savings bonds or by characterizing a shouting match in a police station's lobby as someone storming out. Harping on those sorts of immaterial disputes may be a useful strategy for defending a murder charge under the beyond-a-reasonable-doubt standard, but Rainsberger points to no analogous case clearly establishing that such peripheral issues could negate probable cause. It was his burden to overcome qualified immunity, and he failed to meet it.

## IV.    Even if probable cause were not an absolute bar to both of Rainsberger's claims, his malicious prosecution claim would still fail.

Rainsberger notes that he cannot prevail on a malicious prosecution claim without establishing that Benner committed a "wrongful act done willfully and purposely and without just cause or excuse." Dkt. 49 at 35 (citing *Peoples Bank & Trust Co. v. Stock*, 403 N.E.2d 1077, 1084 (Ind. 1980)). Here, Rainsberger cannot point to any evidence that any purported mistakes or omissions were purposeful or without excuse. The argument he emphasizes most is Benner's

15

failure to include DNA results in his probable-cause affidavit. But that argument cannot support a malicious prosecution claim because it is undisputed that Benner made the authority that eventually initiated the prosecution aware of those results—meaning any omission from the affidavit could not possibly be responsible for the prosecutor filing a criminal information against Rainsberger. Dkt. 43-8 at 6; Dkt. 50-9 at 66; *see also Alexander v. United States*, 721 F.3d 418, 422 (7th Cir. 2013) (noting that one of the elements of malicious prosecution in Indiana is causing an action to be instituted against the plaintiff). Moreover, it is undisputed that he was following his training by turning those results over to prosecutors but not including them in his affidavit. *Id.*

Likewise, Rainsberger concedes that current Seventh Circuit law bars his malicious prosecution claim because it is premised solely on the Fourth Amendment. Dkt. 49 at 36.

## V.      Much of the sprawling evidence filed with Rainsberger's response is inadmissible and immaterial (although probable cause exists even if it is considered).

As noted in Section I, summary judgment is proper even if the Court considers all of Rainsberger's evidence. But much that that evidence is inadmissible in any event.

### A.      Most of the Rainsberger and Hennessy affidavits are inadmissible.

A plaintiff's self-serving affidavit may be considered only if it is supported by record evidence and if it satisfies relevant evidentiary requirements—including requirements that affidavits be based on personal knowledge and set out facts that would be admissible. *See Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 504 (7th Cir. 2004). After a few unobjectionable introductory paragraphs, Rainsberger's sprawling and argumentative affidavit is inadmissible. It is replete with assumptions and arguments for which he has established no foundation of personal knowledge. *See* Dkt. 50-15. It is also full of speculation, legal arguments, hearsay, and violations of the best evidence rule. *See id.* Under the guise of stating "facts," it also repeatedly misstates what the evidence in the record actually shows in much the same way the arguments in his brief did.

16

*Compare* Dkt. 50-15, *with* Section II, *supra*. The facts in the record are the facts in the record. Rainsberger's arguments about those facts—whether in his response or in his purported affidavit—are not evidence.

Rainsberger also submits an affidavit from his criminal defense lawyer. *See* Dkt. 50-29. Like Rainsberger's own affidavit, his lawyer's affidavit provides a few unobjectionable introductory facts and then launches into dozens more paragraphs of what amounts to legal argument. It is replete with assumptions and argumentative conclusions for which there is no foundation of personal knowledge, speculation, legal arguments, hearsay, and violations of the best evidence rule. *See* Dkt. 50-29. And like Rainsberger's affidavit, it repeatedly mischaracterizes the record. *Compare* Dkt. 50-29, *with* Section II, *supra*. It is not evidence.

For those reasons, the Court should strike each paragraph following paragraph nine in Rainsberger's affidavit and each paragraph following paragraph seven in his Hennessy's affidavit. Arguments regarding how the Court should characterize the evidence are not evidence.

### B. Much of Dr. Rossmo's report is inadmissible, and the admissible portions are immaterial.

Qualified expert witnesses may provide opinion testimony if their specialized knowledge will help determine a fact in issue, but only if that testimony is based on sufficient facts or data. Fed. R. Evid. 702. It is well-settled that expert witnesses may not opine whether undisputed facts are sufficient to establish probable cause. That is a question of law for the Court. *Mason v. City of Indianapolis*, No. 1:06-cv-258-RLY-TAB, 2007 WL 2700193, at *1 (S.D. Ind. Sept. 11, 2007) (citing *Smith v. Lamz*, 321 F.3d 680, 684 (7th Cir. 2003)). Hence, experts may not testify about whether a given police investigation was sufficient to justify probable cause, as an expert is no better suited than a jury to make that determination. *United States v. Diekhoff*, 535 F.3d 611, 619 (7th Cir. 2008) (noting that so-called "fact-law conclusions" in which experts purport to apply the

facts of a case to the governing legal standard are inadmissible); *Wells v. City of Chicago*, No. 09 C 1198, 2012 WL 116040, at *14 (N.D. Ill. Jan. 16, 2102) (excluding expert testimony purporting to claim that plaintiff's detention was not justified by the investigation police performed because an expert is "no more qualified than a jury to determine whether probable cause existed").

Rainsberger offers an expert report from Dr. Kim Rossmo, an apparent expert on the use of geographic profiling in criminal investigations (something nobody contends to be relevant to this case). His conclusions are either inadmissible, irrelevant, or squarely contradicted by binding Seventh Circuit law.

First, Rossmo opines that Rainsberger was wrongfully arrested. Dkt. 50-31 at 44. That opinion is inadmissible under well-established Seventh Circuit law. *Diekhoff*, 535 F.3d at 619.

Second, Rossmo concludes that Benner rushed to judgment, suffered from common cognitive errors like tunnel vision and confirmation bias, and failed to investigate alternate theories. Dkt. 50-31 at 44. Even if credited, that conclusion is immaterial. Seventh Circuit precedent is clear. Once Benner had probable cause to believe Rainsberger committed the crime, he had no constitutional obligation to investigate alternate theories or search for exculpatory evidence. *Forman*, 104 F.3d at 962. Moreover, that Rossmo in hindsight thinks Benner's investigation could have been influenced by what he himself calls "common" cognitive or thinking errors that "frequently" impact real-world decision-making is immaterial. If anything, the report shows that these sorts of cognitive errors are as inevitable and unintentional for police officers as they are for any other humans. *See id.* at 5-10 (noting that "the possibility of mistakes and human error always exists," "[t]he reality is the system makes mistakes," and that "[l]ike all humans, police investigators, prosecutors, and forensic scientists can fall prey to cognitive biases"). That Rossmo thinks inevitable cognitive errors affected an investigation might be relevant if this were

a murder trial tasked with determining whether Rainsberger committed murder under the beyond-a-reasonable-doubt standard. But it provides no support for the allegations in this case that Benner lacked probable cause or knowingly made false or misleading statements. If anything, it suggests just the opposite.

Third, Rossmo claims that Benner's probable-cause affidavit contained false or misleading statements and attempts to explain away some of the facts that helped establish probable cause. Dkt. 50-31 at 45. As described in Sections I and II, those conclusions largely derive from Rossmo's mischaracterizations of the record. Regardless, they do not negate probable cause. *See* Section I, *supra*.

Finally, Rossmo offers his opinion as to the standard of care an officer must follow to establish probable cause. That opinion is inconsistent with the law, and it is inadmissible. The standard for evaluating whether probable cause existed is an issue of law decided in binding cases like *Kaley*, *Hart*, *Fox*, and *Forman*—not something for an expert witness to decree.

## Conclusion

Rainsberger goes to great lengths to make a straightforward case seem complicated. But the Court need not untangle his web of misstated facts and immaterial or inadmissible evidence. Even if the Court credits those arguments, it is left with undisputed facts that still easily clear the threshold for establishing probable cause (and the even lower bar for arguable probable cause). Because probable cause is an absolute defense to both claims in this lawsuit, the Court should go no further. Benner is entitled to summary judgment.

And even if probable cause did not exist, Benner would be entitled to qualified immunity on both claims. Rainsberger failed to come forward with a single analogous case establishing that the sorts of alleged mistakes at issue here would be sufficient to negate probable cause. The

malicious prosecution claim fails other reasons too—both because Seventh Circuit law precludes it and because Benner has failed to show malice.

For all those reasons, Detective Benner is entitled to summary judgment.

Respectfully submitted,

_/s/ Donald E. Morgan_____
Donald E. Morgan, No. 30776-49
OFFICE OF CORPORATION COUNSEL
200 East Washington Street, Suite 1601
Indianapolis, IN 46204
Telephone: (317) 327-4055
Fax: (317) 327-3968
E-mail: donald.morgan@indy.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing reply was filed electronically on this 27th day of February, 2017. This filing will be served on the following by operation of the Court's electronic case filing system, and parties may access this filing through the Court's system.

Richard A. Waples
WAPLES & HANER
410 N. Audubon Road
Indianapolis, IN  46219
rwaples@wapleshanger.com


_/s/ Donald E. Morgan_____
Donald E. Morgan
Chief Litigation Counsel

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

WILLIAM RAINSBERGER,          )
                              )
          PLAINTIFF,          )          CAUSE NO. 1:16-cv-103-WTL-MJD
                              )
v.                            )
                              )
CHARLES BENNER,               )
                              )
          DEFENDANT.          )


**PLAINTIFF'S SUBMISSION OF SUBSEQUENT AUTHORITY**

Plaintiff, by counsel, submits as supplemental authority on the pending motion for

summary judgment the recent U. S. Supreme Court decision in *Manuel v. City of Joliet*, 2017

U.S. LEXIS 2021 (U.S. Mar. 21, 2017). The Seventh Circuit's decision in this case was

discussed by the parties in their summary judgment submissions, as well as the fact that the

Supreme Court had granted certiorari of the case. In *Manuel*, the Court held:

> Nothing in the nature of the legal proceeding establishing probable cause makes a
> difference for purposes of the Fourth Amendment: Whatever its precise form, if
> the proceeding is tainted—as here, by fabricated evidence—and the result is that
> probable cause is lacking, then the ensuing pretrial detention violates the confined
> person's Fourth Amendment rights, for all the reasons we have stated.

*Manuel*, 2017 U.S. LEXIS 2021 at *15. Accordingly, "For that reason, and contrary to the

Seventh Circuit's view, Manuel stated a Fourth Amendment claim when he sought relief not

merely for his (pre-legal-process) arrest, but also for his (post-legal-process) pretrial detention. *Id*

at *14.

The decision is attached.

Respectfully submitted,

Dated: March 27, 2017

*/s/  Richard A. Waples*
Richard A. Waples
Attorney for Plaintiff

**WAPLES & HANGER**
410 N. Audubon Road
Indianapolis, Indiana 46219
TEL: (317) 357-0903
FAX: (317) 357-0275
EMAIL: rwaples@wapleshanger.com

## CERTIFICATE OF SERVICE

The undersigned certifies that on March 27, 2017 this document was filed electronically and the following counsel of record will have access to the document pursuant to the Court's electronic fling system:

Donald Morgan      donald.morgan@indy.gov

Pamela Schneeman      Pamela.Schneeman@indy.gov

Office of Corporation Counsel
200 East Washington Street, Room 1601
Indianapolis, Indiana 46204

*/s/  Richard A.Waples*
Richard A. Waples
Attorney for Plaintiff

**WAPLES & HANGER**
410 N. Audubon Road
Indianapolis, IN 46219
TEL: (317) 357-0903
FAX: (317) 357-0275
EMAIL: rwaples@wapleshanger.com

-2-

2017 U.S. LEXIS 2021, *

**ELIJAH MANUEL, PETITIONER v. CITY OF JOLIET, ILLINOIS, ET AL.**

**No. 14-9496.**

**SUPREME COURT OF THE UNITED STATES**

*2017 U.S. LEXIS 2021*

**October 5, 2016, Argued**
**March 21, 2017, Decided**

**NOTICE:**

The LEXIS pagination of this document is subject to change pending release of the final published version.

**PRIOR HISTORY:**     **[\*1]** ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT
*Manuel v. City of Joliet, 590 Fed. Appx. 641, 2015 U.S. App. LEXIS 1346 (7th Cir. Ill., 2015)*

**DISPOSITION:**     *590 Fed. Appx. 641*, reversed and remanded.

**SYLLABUS**

During a traffic stop, police officers in Joliet, Illinois, searched petitioner Elijah Manuel and found a vitamin bottle containing pills. Suspecting the pills to be illegal drugs, the officers conducted a field test, which came back negative for any controlled substance. Still, they arrested Manuel and took him to the police station. There, an evidence technician tested the pills and got the same negative result, but claimed in his report that one of the pills tested "positive for the probable presence of ecstasy." App. 92. An arresting officer also reported that, based on his "training and experience," he "knew the pills to be ecstasy." *Id.*, at 91. On the basis of those false statements, another officer filed a sworn complaint charging Manuel with unlawful possession of a controlled substance. Relying exclusively on that complaint, a county court judge found probable cause to detain Manuel pending trial.

While Manuel was in jail, the Illinois police laboratory tested the seized pills and reported that they contained no controlled substances. But Manuel remained in custody, spending a total **[\*2]** of 48 days in pretrial detention. More than two years after his arrest, but less than two years after his criminal case was dismissed, Manuel filed a *42 U. S. C. §1983* lawsuit against Joliet and several of its police officers (collectively, the City), alleging that his arrest and detention violated the *Fourth Amendment*. The District Court dismissed Manuel's suit, holding, first, that the applicable two-year statute of limitations barred his

unlawful arrest claim, and, second, that under binding Circuit precedent, pretrial detention following the start of legal process (here, the judge's probable-cause determination) could not give rise to a *Fourth Amendment* claim. Manuel appealed the dismissal of his unlawful detention claim; the Seventh Circuit affirmed.

*Held*:

1. Manuel may challenge his pretrial detention on *Fourth Amendment* grounds. This conclusion follows from the Court's settled precedent. In *Gerstein v. Pugh, 420 U. S. 103, 95 S. Ct. 854, 43 L. Ed. 2d 54*, the Court decided that a pretrial detention challenge was governed by the *Fourth Amendment*, noting that the *Fourth Amendment* establishes the minimum constitutional "standards and procedures" not just for arrest but also for "detention," *id.*, at 111, 95 S. Ct. 854, 43 L. Ed. 2d 54, and "always has been thought to define" the appropriate process "for seizures of person[s] . . . in criminal cases, including the detention of suspects **[\*3]**  pending trial," *id.*, at 125, n. 27, 95 S. Ct. 854, 43 L. Ed. 2d 54. And in *Albright v. Oliver, 510 U. S. 266, 114 S. Ct. 807, 127 L. Ed. 2d 114*, a majority of the Court again looked to the *Fourth Amendment* to assess pretrial restraints on liberty. Relying on *Gerstein*, the plurality reiterated that the *Fourth Amendment* is the "relevan[t]" constitutional provision to assess the "deprivations of liberty that go hand in hand with criminal prosecutions." *Id., at 274, 114 S. Ct. 807, 127 L. Ed. 2d 114*; see *id., at 290, 114 S. Ct. 807, 127 L. Ed. 2d 114* (Souter, J., concurring in judgment) ("[R]ules of recovery for such harms have naturally coalesced under the *Fourth Amendment*"). That the pretrial restraints in *Albright* arose pursuant to legal process made no difference, given that they were allegedly unsupported by probable cause.

As reflected in those cases, pretrial detention can violate the *Fourth Amendment* not only when it precedes, but also when it follows, the start of legal process. The *Fourth Amendment* prohibits government officials from detaining a person absent probable cause. And where legal process has gone forward, but has done nothing to satisfy the probable-cause requirement, it cannot extinguish a detainee's *Fourth Amendment* claim. That was the case here: Because the judge's determination of probable cause was based solely on fabricated evidence,

it did not expunge Manuel's *Fourth Amendment* claim. For that reason, Manuel stated a *Fourth Amendment* claim when he sought relief not merely for his arrest, but also **[*4]** for his pretrial detention. Pp. 6-10.

2. On remand, the Seventh Circuit should determine the claim's accrual date, unless it finds that the City has previously waived its timeliness argument. In doing so, the court should look to the common law of torts for guidance, *Carey v. Piphus, 435 U. S. 247, 257-258, 98 S. Ct. 1042, 55 L. Ed. 2d 252*, while also closely attending to the values and purposes of the constitutional right at issue. The court may also consider any other still-live issues relating to the elements of and rules applicable to Manuel's *Fourth Amendment* claim. Pp. 11-15.

*590 Fed. Appx. 641*, reversed and remanded.

**COUNSEL: Stanley B. Eisenhammer** argued the cause for petitioner.

**Michael A. Scodro** argued the cause for respondents.

**Ilana H. Eisenstein** argued the cause for the United States as amicus curiae.

**JUDGES:** Kagan, J., delivered the opinion of the Court, in which Roberts, C. J., and Kennedy, Ginsburg, Breyer, and Sotomayor, JJ., joined. Thomas, J., filed a dissenting opinion. Alito, J., filed a dissenting opinion, in which Thomas, J., joined.

**OPINION BY:** KAGAN

**OPINION**

Justice Kagan delivered the opinion of the Court.

Petitioner Elijah Manuel was held in jail for some seven weeks after a judge relied on allegedly fabricated evidence to find probable cause that he had committed a crime. The primary question in this case is whether Manuel may bring a claim based on the *Fourth Amendment* to contest the legality of his pretrial confinement. Our answer follows from settled precedent. The *Fourth Amendment*, this Court has recognized, establishes **[*5]** "the standards and procedures" governing pretrial detention. See, *e.g.*, *Gerstein v. Pugh, 420 U. S. 103, 111, 95 S. Ct. 854, 43 L. Ed. 2d 54 (1975)*. And those constitutional protections apply even after the start of "legal process" in a criminal case--here, that is, after the judge's determination of probable cause. See *Albright v. Oliver, 510 U. S. 266, 274, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994)* (plurality opinion); *id., at 290, 114 S. Ct. 807, 127 L. Ed. 2d 114* (Souter, J., concurring in judgment). Accordingly, we hold today that Manuel may challenge his pretrial detention on the ground that it violated the *Fourth Amendment* (while we leave all other issues, including one about that claim's timeliness, to the

court below).

I

Shortly after midnight on March 18, 2011, Manuel was riding through Joliet, Illinois, in the passenger seat of a Dodge Charger, with his brother at the wheel. A pair of Joliet police officers pulled the car over when the driver failed to signal a turn. See App. 90. According to the complaint in this case, one of the officers dragged Manuel from the car, called him a racial slur, and kicked and punched him as he lay on the ground. See *id.,* at 31-32, 63. [1] The policeman then searched Manuel and found a vitamin bottle containing pills. See *id.*, at 64. Suspecting that the pills were actually illegal drugs, the officers conducted a field test of the bottle's contents. The test came back negative for any **[*6]** controlled substance, leaving the officers with no evidence that Manuel had committed a crime. See *id.,* at 69. Still, the officers arrested Manuel and took him to the Joliet police station. See *id.*, at 70.

> 1  Because we here review an order dismissing Manuel's suit, we accept as true all the factual allegations in his complaint. See, *e.g.*, *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U. S. 163, 164, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993)*.

There, an evidence technician tested the pills once again, and got the same (negative) result. See *ibid.* But the technician lied in his report, claiming that one of the pills was "found to be . . . positive for the probable presence of ecstasy." *Id.,* at 92. Similarly, one of the arresting officers wrote in his report that "[f ]rom [ his] training and experience, [ he] knew the pills to be ecstasy." *Id.,* at 91. On the basis of those statements, another officer swore out a criminal complaint against Manuel, charging him with unlawful possession of a controlled substance. See *id.,* at 52-53.

Manuel was brought before a county court judge later that day for a determination of whether there was probable cause for the charge, as necessary for further detention. See *Gerstein, 420 U. S., at 114, 95 S. Ct. 854, 43 L. Ed. 2d 54* (requiring a judicial finding of probable cause following a warrantless arrest to impose any significant pretrial restraint on liberty); *Ill. Comp. Stat., ch. 725, §5/109-1 (West 2010)* (implementing that constitutional rule). The judge relied exclusively on the criminal complaint--which **[*7]** in turn relied exclusively on the police department's fabrications--to support a finding of probable cause. Based on that determination, he sent Manuel to the county jail to await trial. In the somewhat obscure legal lingo of this case, Manuel's subsequent detention was thus pursuant to "legal process"--because it followed from, and was authorized

2017 U.S. LEXIS 2021, *

by, the judge's probable-cause determination. [2]

> 2   Although not addressed in Manuel's complaint, the police department's alleged fabrications did not stop at this initial hearing on probable cause. About two weeks later, on March 30, a grand jury indicted Manuel based on similar false evidence: testimony from one of the arresting officers that "[t]he pills field tested positive" for ecstasy. App. 96 (grand jury minutes).

While Manuel sat in jail, the Illinois police laboratory reexamined the seized pills, and on April 1, it issued a report concluding (just as the prior two tests had) that they contained no controlled substances. See App. 51. But for unknown reasons, the prosecution--and, critically for this case, Manuel's detention--continued for more than another month. Only on May 4 did an Assistant State's Attorney seek dismissal of the drug charge. See *id.*, at 48, 101. The County Court immediately granted the request, and Manuel was released the next day. In all, he had spent 48 days in pretrial detention.

On April 22, 2013, Manuel brought this lawsuit under *42 U. S. C. §1983* against the City of Joliet and several of its police officers (collectively, the City). *Section 1983* creates a "species of tort liability," *Imbler v. Pachtman, 424 U. S. 409, 417, 96 S. Ct. 984, 47 L. Ed. 2d 128 (1976)*, for "the deprivation of any rights, privileges, **[*8]** or immunities secured by the Constitution," *§1983*. Manuel's complaint alleged that the City violated his *Fourth Amendment* rights in two ways-- first by arresting him at the roadside without any reason, and next by "detaining him in police custody" for almost seven weeks based entirely on made-up evidence. See App. 79-80. [3]

> 3   Manuel's allegation of unlawful detention concerns only the period after the onset of legal process--here meaning, again, after the County Court found probable cause that he had committed a crime. See *supra*, at 3. The police also held Manuel in custody for several hours between his warrantless arrest and his first appearance in court. But throughout this litigation, Manuel has treated that short period as part and parcel of the initial unlawful arrest. See, *e.g.*, Reply Brief 1.

The District Court dismissed Manuel's suit. See 2014 WL 551626 (ND Ill., Feb. 12, 2014). The court first held that the applicable two-year statute of limitations barred Manuel's claim for unlawful arrest, because more than two years had elapsed between the date of his arrest (March 18, 2011) and the filing of his complaint (April 22, 2013). But the court relied on another basis in

rejecting Manuel's challenge to his subsequent detention (which stretched from March 18 to May 5, 2011). Binding Circuit precedent, the District Court explained, made clear that pretrial detention following the start of legal process could not give rise to a *Fourth Amendment* claim. See *id.*, at *1 (citing, *e.g.*, *Newsome v. McCabe, 256 F. 3d 747, 750 (CA7 2001)*). According to that line of decisions, a *§1983* plaintiff challenging such detention must allege a breach of the *Due Process Clause*--and must show, to recover on that theory, that state law fails to provide an adequate remedy. See 2014 WL 551626, at *1-*2. Because Manuel's complaint rested solely on the *Fourth Amendment*--and because, **[*9]** in any event, Illinois's remedies were robust enough to preclude the due process avenue--the District Court found that Manuel had no way to proceed. See *ibid.*

The Court of Appeals for the Seventh Circuit affirmed the dismissal of Manuel's claim for unlawful detention (the only part of the District Court's decision Manuel appealed). See *590 Fed. Appx. 641 (2015)*. Invoking its prior caselaw, the Court of Appeals reiterated that such claims could not be brought under the *Fourth Amendment*. Once a person is detained pursuant to legal process, the court stated, "the *Fourth Amendment* falls out of the picture and the detainee's claim that the detention is improper becomes [one of] due process." *Id., at 643-644* (quoting *Llovet v. Chicago, 761 F. 3d 759, 763 (CA7 2014)*). And again: "When, after the arrest[,] a person is not let go when he should be, the *Fourth Amendment* gives way to the *due process clause* as a basis for challenging his detention." *590 Fed. Appx., at 643590 Fed. Appx., at 643* (quoting *Llovet, 761 F. 3d, at 764*). So the Seventh Circuit held that Manuel's complaint, in alleging only a *Fourth Amendment* violation, rested on the wrong part of the Constitution: A person detained following the onset of legal process could at most (although, the court agreed, *not* in Illinois) challenge his pretrial confinement via the *Due Process Clause*. See *590 Fed. Appx., at 643-644.*

The Seventh Circuit recognized that its position makes it an outlier among the Courts of Appeals, **[*10]** with ten others taking the opposite view. See *id., at 643*; *Hernandez-Cuevas v. Taylor, 723 F. 3d 91, 99 (CA1 2013)* ("[T]here is now broad consensus among the circuits that the *Fourth Amendment* right to be free from seizure but upon probable cause extends through the pretrial period"). [4] Still, the court decided, Manuel had failed to offer a sufficient reason for overturning settled Circuit precedent; his argument, albeit "strong," was "better left for the Supreme Court." *590 Fed. Appx., at 643.*

> 4   See also *Singer v. Fulton County Sheriff, 63 F. 3d 110, 114-118 (CA2 1995)*; *McKenna v. Philadelphia, 582 F. 3d 447, 461 (CA3 2009)*; *Lambert v. Williams, 223 F. 3d 257, 260-262*

2017 U.S. LEXIS 2021, *

*(CA4 2000)*; *Castellano v. Fragozo, 352 F. 3d 939, 953-954, 959-960 (CA5 2003)* (en banc); *Sykes v. Anderson, 625 F. 3d 294, 308-309 (CA6 2010)*; *Galbraith v. County of Santa Clara, 307 F. 3d 1119, 1126-1127 (CA9 2002)*; *Wilkins v. DeReyes, 528 F. 3d 790, 797-799 (CA10 2008)*; *Whiting v. Traylor, 85 F. 3d 581, 584-586 (CA11 1996)*; *Pitt v. District of Columbia, 491 F. 3d 494, 510-511, 377 U.S. App. D.C. 103 (CADC 2007)*.

On cue, we granted certiorari. *577 U. S. ___, 136 S. Ct. 890, 193 L. Ed. 2d 783 (2016)*.

II

The *Fourth Amendment* protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures." Manuel's complaint seeks just that protection. Government officials, it recounts, detained--which is to say, "seiz[ed]"--Manuel for 48 days following his arrest. See App. 79-80; *Brendlin v. California, 551 U. S. 249, 254, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007)* ("A person is seized" whenever officials "restrain[ ] his freedom of movement" such that he is "not free to leave"). And that detention was "unreason-able," the complaint continues, because it was based solely on false evidence, rather than supported by probable cause. See App. 79-80; *Bailey v. United States, 568 U. S. 186, 192, 133 S. Ct. 1031, 185 L. Ed. 2d 19 (2013)* ("[T]he general rule [is] that *Fourth Amendment* seizures are 'reasonable' only if based on probable cause to believe that the individual has committed a crime"). By their respective terms, then, Manuel's claim fits the *Fourth Amendment*, and the *Fourth Amendment* fits **[*11]** Manuel's claim, as hand in glove.

This Court decided some four decades ago that a claim challenging pretrial detention fell within the scope of the *Fourth Amendment*. In *Gerstein*, two persons arrested without a warrant brought a *§1983* suit complaining that they had been held in custody for "a substantial period solely on the decision of a prosecutor." *420 U. S., at 106, 95 S. Ct. 854, 43 L. Ed. 2d 54*. The Court looked to the *Fourth Amendment* to analyze--and uphold--their claim that such a pretrial restraint on liberty is unlawful unless a judge (or grand jury) first makes a reliable finding of probable cause. See *id., at 114, 117, n. 19, 95 S. Ct. 854, 43 L. Ed. 2d 54*. The *Fourth Amendment*, we began, establishes the minimum constitutional "standards and procedures" not just for arrest but also for ensuing "detention." *Id., at 111, 95 S. Ct. 854, 43 L. Ed. 2d 54*. In choosing that Amendment "as the rationale for decision," the Court responded to a concurring Justice's view that the *Due Process Clause* offered the better framework: The *Fourth Amendment*, the majority countered, was "tailored explicitly for the criminal justice system, and it[ ] always has been thought

to define" the appropriate process "for seizures of person[s] . . . in criminal cases, including the detention of suspects pending trial." *Id., at 125, n. 27, 95 S. Ct. 854, 43 L. Ed. 2d 54*. That Amendment, standing alone, guaranteed "a fair and reliable determination of probable cause as a condition for any significant **[*12]** pretrial restraint." *Id., at 125, 95 S. Ct. 854, 43 L. Ed. 2d 54*. Accordingly, those detained prior to trial without such a finding could appeal to "the *Fourth Amendment*'s protection against unfounded invasions of liberty." *Id., at 112, 95 S. Ct. 854, 43 L. Ed. 2d 54*; see *id., at 114, 95 S. Ct. 854, 43 L. Ed. 2d 54*. [5]

5   The Court repeated the same idea in a follow-on decision to *Gerstein*. In *County of Riverside v. McLaughlin, 500 U. S. 44, 47, 111 S. Ct. 1661, 114 L. Ed. 2d 49 (1991)*, we considered how quickly a jurisdiction must provide the probable-cause determination that *Gerstein* demanded "as a prerequisite to an extended pretrial detention." In holding that the decision should occur within 48 hours of an arrest, the majority understood its "task [as] articulat[ing] more clearly the boundaries of what is permissible under the *Fourth Amendment*." *500 U. S., at 56, 111 S. Ct. 1661, 114 L. Ed. 2d 49*. In arguing for still greater speed, the principal dissent invoked the original meaning of "the *Fourth Amendment*'s prohibition of 'unreasonable seizures,' insofar as it applies to seizure of the person." *Id., at 60, 111 S. Ct. 1661, 114 L. Ed. 2d 49* (Scalia, J., dissenting). The difference between the two opinions was significant, but the commonality still more so: All Justices agreed that the *Fourth Amendment* provides the appropriate lens through which to view a claim involving pretrial detention.

And so too, a later decision indicates, those objecting to a pretrial deprivation of liberty may invoke the *Fourth Amendment* when (as here) that deprivation occurs after legal process commences. The *§1983* plaintiff in *Albright* complained of various pretrial restraints imposed after a court found probable cause to issue an arrest warrant, and then bind him over for trial, based on a policeman's unfounded charges. See *510 U. S., at 268-269, 114 S. Ct. 807, 127 L. Ed. 2d 114* (plurality opinion). For uncertain reasons, Albright ignored the *Fourth Amendment* in drafting his complaint; instead, he alleged that the defendant officer had infringed his substantive due process rights. This Court rejected that claim, with five Justices in two opinions remitting Albright to the *Fourth Amendment*. See *id., at 271, 114 S. Ct. 807, 127 L. Ed. 2d 114* (plurality opinion) ("We hold that it is the *Fourth Amendment* . . . under which [ his] claim must be judged"); *id., at 290, 114 S. Ct. 807, 127 L. Ed. 2d 114* (Souter, J., concurring in judgment) ("[I]njuries like those [ he] alleges are

cognizable in *§1983* claims founded upon . . . the *Fourth Amendment*"). "The Framers," the plurality wrote, "considered the matter of pretrial deprivations **[*13]** of liberty and drafted the *Fourth Amendment* to address it." *Id., at 274, 114 S. Ct. 807, 127 L. Ed. 2d 114*. That the deprivations at issue were pursuant to legal process made no difference, given that they were (allegedly) unsupported by probable cause; indeed, neither of the two opinions so much as mentioned that procedural circumstance. Relying on *Gerstein*, the plurality stated that the *Fourth Amendment* remained the "relevan[t] constitutional provision to assess the "deprivations of liberty"--most notably, pretrial detention--"that go hand in hand with criminal prosecutions." *510 U. S., at 274, 114 S. Ct. 807, 127 L. Ed. 2d 114*; see *id., at 290, 114 S. Ct. 807, 127 L. Ed. 2d 114* (Souter, J., concurring in judgment) ("[R]ules of recovery for such harms have naturally coalesced under the *Fourth Amendment*").

As reflected in *Albright*'s tracking of *Gerstein*'s analysis, pretrial detention can violate the *Fourth Amendment* not only when it precedes, but also when it follows, the start of legal process in a criminal case. The *Fourth Amendment* prohibits government officials from detaining a person in the absence of probable cause. See *supra*, at 6. That can happen when the police hold someone without any reason before the formal onset of a criminal proceeding. But it also can occur when legal process itself goes wrong--when, for example, a judge's probable-cause determination is predicated solely on a police officer's false statements. **[*14]** Then, too, a person is confined without constitutionally adequate justification. Legal process has gone forward, but it has done nothing to satisfy the *Fourth Amendment*'s probable-cause requirement. And for that reason, it cannot extinguish the detainee's *Fourth Amendment* claim--or somehow, as the Seventh Circuit has held, convert that claim into one founded on the *Due Process Clause*. See *590 Fed. Appx., at 643-644*. If the complaint is that a form of legal process resulted in pretrial detention unsupported by probable cause, then the right allegedly infringed lies in the *Fourth Amendment*. [6]

6  The opposite view would suggest an untenable result: that a person arrested pursuant to a warrant could not bring a *Fourth Amendment* claim challenging the reasonableness of even his arrest, let alone any subsequent detention. An arrest warrant, after all, is a way of initiating legal process, in which a magistrate finds probable cause that a person committed a crime. See *Wallace v. Kato, 549 U. S. 384, 389, 127 S. Ct. 1091, 166 L. Ed. 2d 973 (2007)* (explaining that the seizure of a person was "without legal process" because police officers "did not have a warrant for his arrest"); W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts §119, pp. 871, 886 (5th ed. 1984) (similar). If legal process is the cut-off point for the *Fourth Amendment*, then someone arrested (as well as later held) under a warrant procured through false testimony would have to look to the *Due Process Clause* for relief. But that runs counter to our caselaw. See, *e.g., Whiteley v. Warden, Wyo. State Penitentiary, 401 U. S. 560, 568-569, 91 S. Ct. 1031, 28 L. Ed. 2d 306 (1971)* (holding that an arrest violated the *Fourth Amendment* because a magistrate's warrant was not backed by probable cause). And if the Seventh Circuit would reply that arrest warrants are somehow different--that there is legal process and then again there is *legal process*--the next (and in our view unanswerable) question would be why.

For that reason, and contrary to the Seventh Circuit's view, Manuel stated a *Fourth Amendment* claim when he sought relief not merely for his (pre-legal-process) arrest, but also for his (post-legal-process) pretrial detention. [7] Consider again the facts alleged in this case. Police officers initially arrested Manuel without probable cause, based solely on his possession of pills that had field tested negative for an illegal substance. So (putting timeliness issues aside) Manuel could bring a claim for wrongful arrest under the *Fourth Amendment*. And the same is true (again, disregarding timeliness) as to a claim for wrongful detention--because Manuel's subsequent weeks in custody were *also* unsupported by **[*15]** probable cause, and so *also* constitutionally unreasonable. No evidence of Manuel's criminality had come to light in between the roadside arrest and the County Court proceeding initiating legal process; to the contrary, yet another test of Manuel's pills had come back negative in that period. All that the judge had before him were police fabrications about the pills' content. The judge's order holding Manuel for trial therefore lacked any proper basis. And that means Manuel's ensuing pretrial detention, no less than his original arrest, violated his *Fourth Amendment* rights. Or put just a bit differently: Legal process did not expunge Manuel's *Fourth Amendment* claim because the process he received failed to establish what that Amendment makes essential for pretrial detention--probable cause to believe he committed a crime. [8]

7  Even the City no longer appears to contest that conclusion. On multiple occasions during oral argument in this Court, the City agreed that "a *Fourth Amendment* right . . . survive[d] the initiation of process" at the hearing in which the county judge found probable cause and ordered detention. Tr. of Oral Arg. 31; see *id.*, at 33 (concurring with the statement that "once [an] individual is brought . . . before a magistrate, and

the magistrate using the same bad evidence says, stay here in jail . . . until we get to trial, that that period is a violation of the *Fourth Amendment*"); *id.,* at 51 (stating that a detainee has "a *Fourth Amendment* claim" if "misstatements at [such a probable-cause hearing] led to ongoing pretrial seizure").

8   The dissent goes some way toward claiming that a different kind of pretrial legal process--a grand jury indictment or preliminary examination--does expunge such a *Fourth Amendment* claim. See *post,* at 9, n. 4 (opinion of Alito, J.) (raising but "not decid[ing] that question"); *post,* at 10 (suggesting an answer nonetheless). The effect of that view would be to cut off Manuel's claim on the date of his grand jury indictment (March 30)--even though that indictment (like the County Court's probable-cause proceeding) was entirely based on false testimony and even though Manuel remained in detention for 36 days longer. See n. 2, *supra.* Or said otherwise--even though the legal process he received failed to establish the probable cause necessary for his continued confinement. We can see no principled reason to draw that line. Nothing in the nature of the legal proceeding establishing probable cause makes a difference for purposes of the *Fourth Amendment*: Whatever its precise form, if the proceeding is tainted--as here, by fabricated evidence--and the result is that probable cause is lacking, and then the ensuing pretrial detention violates the confined person's *Fourth Amendment* rights, for all the reasons we have stated. By contrast (and contrary to the dissent's suggestion, see *post,* at 9, n. 3), once a trial has occurred, the *Fourth Amendment* drops out: A person challenging the sufficiency of the evidence to support both a conviction and any ensuing incarceration does so under the *Due Process Clause of the Fourteenth Amendment.* See *Jackson v. Virginia, 443 U. S. 307, 318, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)* (invalidating a conviction under the *Due Process Clause* when "the record evidence could [not] reasonably support a finding of guilt beyond a reasonable doubt"); *Thompson v. Louisville, 362 U. S. 199, 204, 80 S. Ct. 624, 4 L. Ed. 2d 654 (1960)* (striking a conviction under the same provision when "the record [wa]s entirely lacking in evidence" of guilt--such that it could not even establish probable cause). *Gerstein* and *Albright,* as already suggested, both reflected and recognized that constitutional division of labor. See *supra,* at 6-8. In their words, the Framers "drafted the *Fourth Amendment*" to address "the matter of *pretrial* deprivations of liberty,"

*Albright, 510 U. S., at 274, 114 S. Ct. 807, 127 L. Ed. 2d 114* (emphasis added), and the Amendment thus provides "standards and procedures" for "the detention of suspects *pending trial,*" *Gerstein, 420 U. S., at 125, n. 27, 95 S. Ct. 854, 43 L. Ed. 2d 54* (emphasis added).

III

Our holding--that the *Fourth Amendment* governs a claim for unlawful pretrial detention even beyond the start of legal process--does not exhaust the disputed legal issues in this case. It addresses only the threshold inquiry in a *§1983* suit, which requires courts to "identify the specific constitutional right" at issue. *Albright, 510 U. S., at 271, 114 S. Ct. 807, 127 L. Ed. 2d 114.* After pinpointing that right, courts **[*16]** still must determine the elements of, and rules associated with, an action seeking damages for its violation. See, *e.g., Carey v. Piphus, 435 U. S. 247, 257-258, 98 S. Ct. 1042, 55 L. Ed. 2d 252 (1978).* Here, the parties particularly disagree over the accrual date of Manuel's *Fourth Amendment* claim--that is, the date on which the applicable two-year statute of limitations began to run. The timeliness of Manuel's suit hinges on the choice between their proposed dates. But with the following brief comments, we remand that issue to the court below.

In defining the contours and prerequisites of a *§1983* claim, including its rule of accrual, courts are to look first to the common law of torts. See *ibid.* (explaining that tort principles "provide the appropriate starting point" in specifying the conditions for recovery under *§1983*); *Wallace v. Kato, 549 U. S. 384, 388-390, 127 S. Ct. 1091, 166 L. Ed. 2d 973 (2007)* (same for accrual dates in particular). Sometimes, that review of common law will lead a court to adopt wholesale the rules that would apply in a suit involving the most analogous tort. See *id., at 388-390, 127 S. Ct. 1091, 166 L. Ed. 2d 973*; *Heck v. Humphrey, 512 U. S. 477, 483-487, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994).* But not always. Common-law principles are meant to guide rather than to control the definition of *§1983* claims, serving "more as a source of inspired examples than of prefabricated components." *Hartman v. Moore, 547 U. S. 250, 258, 126 S. Ct. 1695, 164 L. Ed. 2d 441 (2006)*; see *Rehberg v. Paulk, 566 U. S. 356, 366, 132 S. Ct. 1497, 182 L. Ed. 2d 593 (2012)* (noting that "*§1983* is [not] simply a federalized amalgamation of pre-existing common-law **[*17]** claims"). In applying, selecting among, or adjusting common-law approaches, courts must closely attend to the values and purposes of the constitutional right at issue.

With these precepts as backdrop, Manuel and the City offer competing views about what accrual rule should govern a *§1983* suit challenging post-legal-process pretrial detention. According to Manuel, that

2017 U.S. LEXIS 2021, *

*Fourth Amendment* claim accrues only upon the dismissal of criminal charges--here, on May 4, 2011, less than two years before he brought his suit. See Reply Brief 2; Brief for United States as *Amicus Curiae* 24-25, n. 16 (taking the same position). Relying on this Court's caselaw, Manuel analogizes his claim to the common-law tort of malicious prosecution. See Reply Brief 9; *Wallace, 549 U. S., at 389-390, 127 S. Ct. 1091, 166 L. Ed. 2d 973.* An element of that tort is the "termination of the . . . proceeding in favor of the accused"; and accordingly, the statute of limitations does not start to run until that termination takes place. *Heck, 512 U. S., at 484, 489, 114 S. Ct. 2364, 129 L. Ed. 2d 383.* Manuel argues that following the same rule in suits like his will avoid "conflicting resolutions" in *§1983* litigation and criminal proceedings by "preclud[ing] the possibility of the claimant succeeding in the tort action after having been convicted in the underlying criminal prosecution." **[*18]** *Id., at 484, 486, 114 S. Ct. 2364, 129 L. Ed. 2d 383*; see Reply Brief 10-11; Brief for United States as *Amicus Curiae* 24-25, n. 16. In support of Manuel's position, all but two of the ten Courts of Appeals that have recognized a *Fourth Amendment* claim like his have incorporated a "favorable termination" element and so pegged the statute of limitations to the dismissal of the criminal case. See n. 4, *supra*. [9] That means in the great majority of Circuits, Manuel's claim would be timely.

9     The two exceptions--the Ninth and D. C. Circuits--have not yet weighed in on whether a *Fourth Amendment* claim like Manuel's includes a "favorable termination" element.

The City, however, contends that any such *Fourth Amendment* claim accrues (and the limitations period starts to run) on the date of the initiation of legal process--here, on March 18, 2011, *more* than two years before Manuel filed suit. See Brief for Respondents 33. According to the City, the most analogous tort to Manuel's constitutional claim is not malicious prosecution but false arrest, which accrues when legal process commences. See Tr. of Oral Arg. 47; *Wallace, 549 U. S., at 389, 127 S. Ct. 1091, 166 L. Ed. 2d 973* (noting accrual rule for false arrest suits). And even if malicious prosecution were the better comparison, the City continues, a court should decline to adopt that tort's favorable-termination element and associated accrual rule in adjudicating a *§1983* claim involving pretrial detention. That element, the City argues, "make[s] little sense" **[*19]** in this context because "the *Fourth Amendment* is concerned not with the outcome of a prosecution, but with the legality of searches and seizures." Brief for Respondents 16. And finally, the City contends that Manuel forfeited an alternative theory for treating his date of release as the date of accrual: to wit, that his pretrial detention "constitute[d] a continuing *Fourth Amendment* violation," each day of which

triggered the statute of limitations anew. *Id.,* at 29, and n. 6; see Tr. of Oral Arg. 36; see also *Albright, 510 U. S., at 280, 114 S. Ct. 807, 127 L. Ed. 2d 114* (Ginsburg, J., concurring) (propounding a similar view). So Manuel, the City concludes, lost the opportunity to recover for his pretrial detention by waiting too long to file suit.

We leave consideration of this dispute to the Court of Appeals. "[W]e are a court of review, not of first view." *Cutter v. Wilkinson, 544 U. S. 709, 718, n. 7, 125 S. Ct. 2113, 161 L. Ed. 2d 1020 (2005).* Because the Seventh Circuit wrongly held that Manuel lacked any *Fourth Amendment* claim once legal process began, the court never addressed the elements of, or rules applicable to, such a claim. And in particular, the court never confronted the accrual issue that the parties contest here. [10] On remand, the Court of Appeals should decide that question, unless it finds that the City has previously waived its timeliness argument. See Reply to Brief in Opposition 1-2 **[*20]** (addressing the possibility of waiver); Tr. of Oral Arg. 40-44 (same). And so too, the court may consider any other still-live issues relating to the contours of Manuel's *Fourth Amendment* claim for unlawful pretrial detention.

10     The dissent would have us address these questions anyway, on the ground that "the conflict on the malicious prosecution question was the centerpiece of Manuel's argument in favor of certiorari." *Post,* at 2. But the decision below did not implicate a "conflict on the malicious prosecution question"--because the Seventh Circuit, in holding that detainees like Manuel could not bring a *Fourth Amendment* claim at all, never considered whether (and, if so, how) that claim could resemble the malicious prosecution tort. Nor did Manuel's petition for certiorari suggest otherwise. The principal part of his question presented--mirroring the one and only Circuit split involving the decision below--reads as follows: "[W]hether an individual's *Fourth Amendment* right to be free from unreasonable seizure continues beyond legal process." Pet. for Cert. i. That is exactly the issue we have resolved. The rest of Manuel's question did indeed express a view as to what would follow from an affirmative answer ("so as to allow a malicious prosecution claim"). *Ibid.* (And as the dissent notes, the Seventh Circuit recounted that he made the same argument in that court. See *post,* at 2, n. 1.) But as to that secondary issue, we think (for all the reasons just stated) that Manuel jumped the gun. See *supra,* at 11-14. And contra the dissent, his doing so provides no warrant for our doing so too.

***

For the reasons stated, we reverse the judgment of the Seventh Circuit and remand the case for further proceedings consistent with this opinion.

It is so ordered.

**DISSENT BY:** THOMAS; ALITO

**DISSENT**

Justice Thomas, dissenting.

I join Justice Alito's opinion in full but write separately regarding the accrual date for a *Fourth Amendment* unreasonable-seizure claim. Justice Alito suggests that a claim for unreasonable seizure based on a warrantless arrest might not accrue until the "first appearance" under Illinois law (or the "initial appearance" under federal law)--which ordinarily represents the first judicial determination of probable cause for that kind of arrest--rather than at the time of the arrest. See *post,* at 1, 9 (dissenting opinion); see also *Wallace v. Kato, 549 U. S. 384, 127 S. Ct. 1091, 166 L. Ed. 2d 973 (2007)* (taking a similar approach). Which of those events is the correct one for purposes of accrual makes no difference in this case, because both the arrest and the first appearance occurred more than two years before petitioner filed suit. See *ante,* at 4; see also [*21] *Wallace, supra, at 387, 27 S. Ct. 1091, 166 L. Ed. 2d 973* (petitioner's claim was untimely regardless of whether it accrued on day of arrest or first appearance).

I would leave for another case (one where the question is dispositive) whether an unreasonable-seizure claim would accrue on the date of the first appearance if that appearance occurred on some day after the arrest. I think the answer to that question might turn on the meaning of "seizure," rather than on the presence or absence of any form of legal process. See *post,* at 7-8 (describing the ordinary meaning of "seizure").

Justice Alito, with whom Justice Thomas joins, dissenting.

I agree with the Court's holding up to a point: The protection provided by the *Fourth Amendment* continues to apply after "the start of legal process," *ante,* at 1, if legal process is understood to mean the issuance of an arrest warrant or what is called a "first appearance" under Illinois law and an "initial appearance" under federal law. *Ill. Comp. Stat., ch. 725, §§5/109-1(a),* (e) (West Supp. 2015); *Fed. Rule Crim. Proc. 5.* But if the Court means more--specifically, that new *Fourth Amendment* claims continue to accrue as long as pretrial detention lasts--the Court stretches the concept of a seizure much too far.

What is perhaps most remarkable about the [*22] Court's approach is that it entirely ignores the question that we agreed to decide, *i.e.,* whether a claim of malicious prosecution may be brought under the *Fourth Amendment.* I would decide that question and hold that the *Fourth Amendment* cannot house any such claim. If a malicious prosecution claim may be brought under the Constitution, it must find some other home, presumably the *Due Process Clause.*

I

The question that was set out in Manuel's petition for a writ of certiorari and that we agreed to decide is as follows:

"[W]hether an individual's *Fourth Amendment* right to be free from unreasonable seizure continues beyond legal process *so as to allow a malicious prosecution claim based upon the Fourth Amendment.* This question was raised, but left unanswered, by this Court in *Albright v. Oliver, 510 U. S. 266, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994).* Since then, the First, Second, Third, Fourth, Fifth, Sixth, Ninth, Tenth, Eleventh, and D. C. Circuits have all held that a *Fourth Amendment* malicious prosecution claim is cognizable through *42 U. S. C. §1983* ("*Section 1983*"). Only the Seventh Circuit holds that a *Fourth Amendment Section 1983* malicious prosecution claim is not cognizable." Pet. for Cert. i (emphasis added).

The question's reference to "a malicious prosecution claim" was surely no accident. First, the conflict on the malicious prosecution question was the centerpiece of Manuel's argument in favor of certiorari. [*23] [1] Second, unless Manuel is given the benefit of the unique accrual rule for malicious prosecution claims, his claim is untimely, and he is not entitled to relief.

1 The Court defends this evasion on the ground that it is resolving "the one and only Circuit split involving the decision below." *Ante,* at 15, n. 10. That is flatly wrong. As the Seventh Circuit acknowledged, its decision in this case and an earlier case on which the decision here relied, *Newsome v. McCabe, 256 F. 3d 747 (2001),* conflict with decisions of other circuits holding that a malicious prosecution claim maybe brought under the *Fourth Amendment.* The decision below states: "Manuel argues that we should reconsider our holding in *Newsome* and recognize a federal claim for malicious prosecution under the *Fourth Amendment* regardless of the available state remedy. By his count, 10 other Circuits have

recognized federal malicious-prosecution claims under the *Fourth Amendment*." *590 Fed. Appx. 641, 643 (2015)*. The court refused to overrule *Newsome* and said that "Manuel's argument is better left for the Supreme Court." *Ibid.*

Manuel's petition for a writ of certiorari repeatedly made the same point. See Pet. for Cert. 2 ("The Seventh Circuit stands alone among circuits in not allowing a federal malicious prosecution claim grounded on the *Fourth Amendment*"); *id.*, at 10 ("Ten Federal Circuits Correctly Hold That Malicious Prosecution is Actionable as a *Fourth Amendment, Section 1983* Claim"); *ibid.* ("[E]ight circuits have held that malicious prosecution is cognizable through a *Section 1983 Fourth Amendment* claim"). All of the decisions that are cited as being in conflict with the decision below involved malicious prosecution claims and are described as such. See *id.*, at 10-11.

It is certainly true that the question whether a malicious prosecution claim may be brought under the *Fourth Amendment* subsumes the question whether a *Fourth Amendment* seizure continues past a first or initial appearance, but answering the latter question does not by any means resolve the Circuit split that Manuel cited and that we took this case to resolve. Suppose that the Seventh Circuit were to hold on remand that a *Fourth Amendment* seizure may continue up to the date when trial begins but no further. Such a holding would be consistent with the Court's holding in this case, but there would still be a conflict between Seventh Circuit case law and the decisions of other Circuits (on which Manuel relied, see *ibid.*), holding that a standard malicious prosecution claim (which requires a termination favorable to the defendant) may be brought under the *Fourth Amendment.* See, e.g., *Hernandez-Cuevas v. Taylor, 723 F. 3d 91, 99 (CA1 2013)*; *Manganiello v. New York, 612 F. 3d 149, 160-161 (CA2 2010)*; *McKenna v. Philadelphia, 582 F. 3d 447, 461 (CA3 2009)*; *Evans v. Chalmers, 703 F. 3d 636, 647 (CA4 2012)*; *Sykes v. Anderson, 625 F. 3d 294, 308 (CA6 2010)*; *Grider v. Auburn, 618 F. 3d 1240, 1256 (CA11 2010)*.

A

I would first consider what I take to be the core of the question presented--whether a "malicious prosecution claim may be brought under the *Fourth Amendment*." See *ibid.* Manuel asked us to decide that question because it may be critical to his ultimate success in this lawsuit. Why is that so?

The statute of limitations for Manuel's claim is Illinois's general statute of limitations for personal-injury torts, see *Wallace v. Kato, 549 U. S. 384, 387, 127 S. Ct. 1091, 166 L. Ed. 2d 973 (2007)*, which requires suit to be brought within two years of the accrual of the claim, see *Ill. Comp. Stat., ch. 735, §5/13-202* (West 2010). Here is the chronology of relevant events in this case:

March 18, 2011: Manuel is arrested and brought before a county court judge, who makes the required probable-cause finding because Manuel was arrested without a warrant.

March 31, 2011: Manuel is indicted by a grand jury.

April 8, 2011: Manuel is arraigned.

May 4, 2011: An assistant state's attorney moves to dismiss the charges, and the motion is granted.

May 5, 2011: Manuel is released from jail.

April 22, 2013: Manuel **[*24]** files his complaint.

Since the statute of limitations requires the commencement of suit within two years of accrual, Manuel's claim is untimely unless it accrued on or after April 22, 2011. And the only events in the above chronology that occurred within that time frame are the dismissal of the charge against him and his release from custody. A claim of malicious prosecution "does not accrue until the criminal proceedings have terminated in the plaintiff's favor." *Heck v. Humphrey, 512 U. S. 477, 489, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994)*; see 3 *Restatement (Second) of Torts §653* (1976). None of the other common-law torts to which Manuel's claim might be compared--such as false arrest or false imprisonment--has such an accrual date. See *Wallace, supra, at 397, 127 S. Ct. 1091, 166 L. Ed. 2d 973* (holding that a claim for false imprisonment under the *Fourth Amendment* accrues when "the claimant becomes detained pursuant to legal process"). Therefore, if Manuel's case is to go forward, it is essential that his claim be treated like a malicious prosecution claim.

B

Although the Court refuses to decide whether Manuel's claim should be so treated, the answer to that question--the one that the Court actually agreed to review--is straightforward: A malicious prosecution claim cannot be based on the *Fourth Amendment.*

"The first inquiry in any *§1983* suit," the Court has

Case 1:16-cv-00103-TWP-MJD Document 78-1 Filed 11/28/17 Page 292 of 344 PageID #: 1884
Case 1:16-cv-00103-TWP-MJD Document 78-1 Filed 03/27/17 Page 10 of 15 PageID #: 431

Page 10

2017 U.S. LEXIS 2021, *

explained, is "to [*25] isolate the precise constitutional violation with which [the defendant] is charged." *Baker v. McCollan, 443 U. S. 137, 140, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979)*. In this case, Manuel charges that he was seized without probable cause in violation of the *Fourth Amendment*. In order to flesh out the elements of this constitutional tort, we must look for "tort analogies." *Wilson v. Garcia, 471 U. S. 261, 277, 105 S. Ct. 1938, 85 L. Ed. 2d 254 (1985)*. Manuel says that the appropriate analog is the tort of malicious prosecution, so we should look to the elements of that tort.

To make out a claim for malicious prosecution, a plaintiff generally must show three things: (1) "that the criminal proceeding was initiated or continued *by the defendant* without 'probable cause,'" W. Keeton, D. Dobbs, P. Keeton, & D. Owen, Prosser and Keeton on Law of *Torts 876 (5th ed. 1984)* (Prosser and Keeton) (emphasis added), (2) "that the defendant instituted the proceeding 'maliciously,'" *id.*, at 882, and (3) that "the proceedings have terminated in favor of the accused," 3 *Restatement (Second) of Torts §653(b)*; see also *Heck, supra, at 489*.

There is a severe mismatch between these elements and the *Fourth Amendment*. First, the defendants typically named in *Fourth Amendment* seizure cases--namely, law enforcement officers--lack the authority to initiate or dismiss a prosecution. See Prosser and Keeton 876. That authority lies in the hands of prosecutors. A law enforcement [*26] officer, including the officer responsible for the defendant's arrest, may testify before a grand jury, at a preliminary examination, see l*ll. Comp. Stat., ch. 725, §§5/109-3(b), 5/109-3.1(b)* (West 2010), or hearing, see *Fed. Rule Crim. Proc. 5.1*, and at trial. But when that occurs, the officer is simply a witness and is not responsible for "the decision to press criminal charges." *Rehberg v. Paulk, 566 U. S. 356, 371, 132 S. Ct. 1497, 182 L. Ed. 2d 593 (2012)*.

Second, while subjective bad faith, *i.e.*, malice, is the core element of a malicious prosecution claim, it is firmly established that the *Fourth Amendment* standard of reasonableness is fundamentally objective. See *Ashcroft* v. *al-Kidd, 563 U. S. 731, 736, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)*. These two standards--one subjective and the other objective--cannot co-exist. In some instances, importing a malice requirement into the *Fourth Amendment* would leave culpable conduct unpunished. An officer could act unreasonably, thereby violating the *Fourth Amendment*, without even a hint of bad faith. In other cases, the malice requirement would cast too wide a net. An officer could harbor intense personal ill will toward an arrestee but still act in an objectively reasonable manner in carrying out an arrest.

Finally, malicious prosecution's favorable-termination element makes no sense when the claim is that a seizure violated the *Fourth Amendment*. The *Fourth Amendment*, after all, prohibits [*27] *all* unreasonable seizures--regardless of whether a prosecution is ever brought or how a prosecution ends. A "*Fourth Amendment* wrong" "is fully accomplished," *United States v. Calandra, 414 U. S. 338, 354, 94 S. Ct. 613, 38 L. Ed. 2d 561 (1974)*, when an impermissible seizure occurs. The Amendment is violated and the injury is inflicted no matter what happens in any later proceedings.

Our cases concerning *Fourth Amendment* claims brought under *42 U. S. C. §1983* prove the point. For example, we have recognized that there is no favorable-termination element for a *Fourth Amendment* false imprisonment claim. See *Wallace, 549 U. S., at 389-392, 127 S. Ct. 1091, 166 L. Ed. 2d 973*. [2] An arrestee can file such a claim while his prosecution is pending--and, in at least some situations--will need to do so to ensure that the claim is not time barred. See *id., at 392-395, 127 S. Ct. 1091, 166 L. Ed. 2d 973*. By the same token, an individual may seek damages for pretrial *Fourth Amendment* violations *even after a valid conviction*. For example, in *Haring v. Prosise, 462 U. S. 306, 308, 103 S. Ct. 2368, 76 L. Ed. 2d 595 (1983)*, the respondent pleaded guilty to a drug crime without raising any *Fourth Amendment* issues. He then brought a *§1983* suit, challenging the constitutionality of the search that led to the discovery of the drugs on which his criminal charge was based. The Court held that respondent's suit could proceed--despite his valid conviction. *Id., at 323, 103 S. Ct. 2368, 76 L. Ed. 2d 595*; see also *Heck, 512 U. S., at 487, n. 7, 114 S. Ct. 2364, 129 L. Ed. 2d 383* ("[A] suit for damages attributable to an allegedly unreasonable search may lie even if the challenged search produced evidence that [*28] was introduced in a state criminal trial resulting in the *§1983* plaintiff's still-outstanding conviction").

> 2 In *Wallace*, the Court noted that "[f]alse arrest and false imprisonment overlap" and decided to "refer to the two torts together as false imprisonment." *549 U. S., at 388-389, 127 S. Ct. 1091, 166 L. Ed. 2d 973*.

The favorable-termination element is similarly irrelevant to claims like Manuel's. Manuel alleges that he was arrested and held based entirely on falsified evidence. In such a case, it makes no difference whether the prosecution was eventually able to gather and introduce legitimate evidence and to obtain a conviction at trial. The unlawful arrest and detention would still provide grounds for recovery. Accordingly, there is no good reason why the accrual of a claim like Manuel's should have to await a favorable termination of the prosecution.

For all these reasons, malicious prosecution is a strikingly inapt "tort analog[y]," *Wilson, 471 U. S., at*

*277, 105 S. Ct. 1938, 85 L. Ed. 2d 254*, for *Fourth Amendment* violations. So the answer to the question presented in Manuel's certiorari petition is that the *Fourth Amendment* does *not* give rise to a malicious prosecution claim, and this means that Manuel's suit is untimely. I would affirm the Seventh Circuit on that basis.

## II

Instead of deciding the question on which we granted review, the Court ventures in a different direction. The Court purports to refrain from deciding any issue of timeliness, see *ante*, at 10, but the Court's opinion **[*29]** is certain to be read by some to mean that every moment of pretrial confinement without probable cause constitutes a violation of the *Fourth Amendment*. And if that is so, it would seem to follow that new *Fourth Amendment* claims continue to accrue as long as the pretrial detention lasts.

### A

That proposition--that every moment in pretrial detention constitutes a "seizure"--is hard to square with the ordinary meaning of the term. The term "seizure" applies most directly to the act of taking a person into custody or otherwise depriving the person of liberty. It is not generally used to refer to a prolonged detention. Dictionary definitions from around the time of the adoption of the *Fourth Amendment* define the term "seizure" as a single event--and not a continuing condition. See, *e.g.*, 2 N. Webster, An American Dictionary of the English Language 67 (1828) (Webster) (defining "seizure" as "the act of laying hold on suddenly"); 1 S. Johnson, A Dictionary of the English Language (6th ed. 1785) (defining "seizure" as "the act of taking forcible possession"); 1 T. Dyche & W. Pardon, A New General English Dictionary (14th ed. 1771) (defining "seize" as "to lay or take hold of violently or at unawares, wrongfully, or by force"). As the Court has **[*30]** explained before, "[f]rom the time of the founding to the present, the word 'seizure' has meant a 'taking possession.'" *California v. Hodari D., 499 U. S. 621, 624, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991)* (quoting 2 Webster 67). And we have cautioned against "stretch[ing] the *Fourth Amendment* beyond its words and beyond the meaning of arrest." *499 U. S., at 627, 111 S. Ct. 1547, 113 L. Ed. 2d 690*. The Members of Congress who proposed the *Fourth Amendment* and the State legislatures that ratified the Amendment would have expected to see a more expansive term, such as "detention" or "confinement," if a *Fourth Amendment* seizure could be a long event that continued throughout the entirety of the pretrial period.

In my view, a period of detention spanning weeks or months cannot be viewed as one long, continuing

seizure, and a pretrial detainee is not "seized" over and over again as long as he remains in custody. [3] Of course, the damages resulting from an unlawful seizure may continue to mount during the period of confinement caused by the seizure, but no new *Fourth Amendment* seizure claims accrue after that date. [4] Thus, any possible *Fourth Amendment* claim that Manuel could bring is time barred.

3   By the Court's logic, there is no apparent reason why even a judgment of conviction should cut off the accrual of new *Fourth Amendment* claims based on the use of fabricated evidence. The Court writes that "[n]othing in the nature of the legal proceeding establishing probable cause makes a difference for purposes of the *Fourth Amendment*." *Ante*, at 11, n. 8. "[I]f the proceeding is tainted--as here, by fabricated evidence--and the result is that probable cause is lacking," the Court continues, "then the ensuing pretrial detention violates the confined person's *Fourth Amendment* rights, for all the reasons we have stated." *Ibid*. Although the Court inserts the word "pretrial" in this sentence, its logic provides no reason for that limitation. If a *Fourth Amendment* seizure continues as long as a person is detained, there is no reason why incarceration after conviction cannot be regarded as a continuing seizure. The Court asserts that the *Fourth Amendment* "drops out of the picture" after trial, *ibid*., but it does not explain why this is so. There are facilities that house both pretrial detainees and prisoners serving sentences. If a detainee is transferred following conviction from the section for detainees to the section for prisoners, does the transfer render this person "unseized"?

4   There is authority for the proposition that a grand jury indictment or a determination of probable cause after an adversary proceeding may be an intervening cause that cuts off liability for an unlawful arrest. See *Wallace v. Kato, 549 U. S. 384, 390, 127 S. Ct. 1091, 166 L. Ed. 2d 973 (2007)*; Prosser and Keeton 885. I would not decide that question here.

### B

The Court is mistaken in saying that its decision "follows from settled precedent." *Ante*, at 1. The Court reads *Albright v. Oliver, 510 U. S. 266, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994)*, and *Gerstein v. Pugh, 420 U. S. 103, 95 S. Ct. 854, 43 L. Ed. 2d 54 (1975)*, to mean that the *Fourth Amendment* can be violated "when legal process itself goes wrong," *ante*, at 9, but the accuracy **[*31]** of that interpretation depends on the meaning of

Case 1:16-cv-00103-TWP-MJD Document 78-1 Filed 11/28/17 Page 294 of 344 PageID #: 1886
Case 1:16-cv-00103-WTL-MJD Document 78-1 Filed 03/27/17 Page 12 of 13 PageID #: 453

Page 12

2017 U.S. LEXIS 2021, *

"legal process." The Court's reading is correct if by "legal process" the Court means a determination of probable cause at a first or initial appearance. See *Ill. Comp. Stat., ch. 725, §5/109-1* (West Supp. 2015); *Fed. Rule Crim. Proc. 5(b)*. When an arrest warrant is obtained, the probable-cause determination is made at that time, and there is thus no need for a repeat determination at the first or initial appearance. But when an arrest is made without a warrant, the arrestee, generally within 48 hours, must be brought before a judicial officer, *County of Riverside v. McLaughlin, 500 U. S. 44, 56, 111 S. Ct. 1661, 114 L. Ed. 2d 49 (1991)*, who then completes the arrest process by making the same determination that would have been made as part of the warrant application process. See *Ill. Comp. Stat., ch. 725, §§5/109-1(a), (b); Fed. Rule Crim. Proc. 4(a), 5(b)*. Thus, this appearance is an integral part of the process of taking the arrestee into custody and easily falls within the meaning of the term "seizure." But other forms of "legal process," for example, a grand jury indictment or a determination of probable cause at a preliminary examination or hearing, do not fit within the concept of a "seizure," and the cases cited by the Court do not suggest otherwise.

Take *Albright* first. A detective **[*32]** named Oliver procured a warrant for the arrest of Albright for distributing a "look-alike" substance. See *Albright v. Oliver, 975 F. 2d 343, 344 (CA7 1992)*. The warrant was based on information given to Oliver by the purchaser of the substance. *Ibid*. After learning of the warrant, Albright turned himself in, was booked, and was released on bond. *Ibid*. Oliver testified at what Illinois calls a preliminary examination and apparently related the information provided by the alleged purchaser. *Ibid*. The judge found probable cause, but the charges were later dismissed. *Ibid*. According to the Seventh Circuit, probable cause was sorely lacking, *id., at 345*, and Albright sued Oliver under *42 U. S. C. §1983*, claiming that Oliver had violated his substantive due process right not to be prosecuted without probable cause. All that this Court held was that Albright's claim had to be analyzed under the *Fourth Amendment*, not substantive due process.

The Court now reads *Albright* to mean that a *Fourth Amendment* seizure continues "after the start of 'legal process,'" but three forms of what might be termed "legal process" were issued in *Albright*: the arrest warrant, the order releasing him on bond after his first appearance, and the order holding him over for trial after the preliminary examination. I agree **[*33]** that Albright's seizure did not end with the issuance of the warrant (that would be ridiculous since he had not even been arrested at that point) or the first appearance, see *ante*, at 8-9, and n. 6, but it is impossible to read anything more into the holding in *Albright*. The terse plurality opinion joined by four Justices said no more; the opinion of Justice Scalia, who joined the plurality opinion, referred only to

Albright's "arrest," *510 U. S., at 275, 114 S. Ct. 807, 127 L. Ed. 2d 114* (concurring opinion); and Justices KENNEDY and THOMAS, who concurred in the judgment, did so only because Albright's "allegation of arrest without probable cause must be analyzed under the *Fourth Amendment*." *Id., at 281, 114 S. Ct. 807, 127 L. Ed. 2d 114* (Kennedy, J., concurring in the judgment). To read anything more into *Albright* is to adopt the position taken by just one Member of the plurality, see *id., at 279, 114 S. Ct. 807, 127 L. Ed. 2d 114* (Ginsburg, J., concurring) (seizure continues throughout the period of pretrial detention), and the two Justices in dissent, see *id., at 307, 114 S. Ct. 807, 127 L. Ed. 2d 114* (Stevens, J., dissenting) (same).

The other precedent on which the Court relies, *Gerstein*, goes no further than *Albright*. All that the Court held in *Gerstein* was that *if* there is no probable-cause finding by a neutral magistrate *before* an arrest, there must be one *after* the arrest. **[*34]** *420 U. S., at 111-116, 95 S. Ct. 854, 43 L. Ed. 2d 54* . The Court reasoned that "the *Fourth Amendment* requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest." *Id., at 114, 95 S. Ct. 854, 43 L. Ed. 2d 54* . The Court said nothing about whether a claim for a seizure in violation of the *Fourth Amendment* could accrue after an initial appearance.

The Court thus is forced to rely on dicta--taken out of context--from *Gerstein*. For example, the Court cites *Gerstein's* statement that "[t]he *Fourth Amendment* was tailored explicitly for the criminal justice system," and that it "always has been thought to define the 'process that is due' for seizures of person[s] . . . in criminal cases, including the detention of suspects pending trial." *Id., at 125, n. 27, 95 S. Ct. 854, 43 L. Ed. 2d 54* . This statement hardly shows that a *Fourth Amendment* seizure continues throughout a period of pretrial detention, and the Court does not mention the very next sentence in *Gerstein*-- which suggests that the *Fourth Amendment* might govern "only the first stage" of a prosecution, eventually giving way to other protections that are also part of our "elaborate system, unique in jurisprudence, designed to safeguard the rights of those accused of criminal conduct." *Ibid*. (emphasis deleted). In the end, *Gerstein* stands for the proposition that the *Fourth Amendment* requires a post-arrest probable cause finding **[*35]** by a neutral magistrate; it says nothing about whether the *Fourth Amendment* extends beyond that or any other "legal process."

\*\*\*

A well-known medical maxim--"first, do no harm"-- is a good rule of thumb for courts as well. The Court's decision today violates that rule by avoiding the question presented in order to reach an unnecessary and tricky issue. The resulting opinion will, I fear, inject much

Case 1:16-cv-00103-TWP-MJD Document 98-1 Filed 11/28/17 Page 295 of 344 PageID #: 1887
Case 1:16-cv-00103-WTL-MJD Document 72-1 Filed 03/27/17 Page 13 of 15 PageID #: 454

Page 13

2017 U.S. LEXIS 2021, *

confusion into *Fourth Amendment* law. And it has the potential to do much harm--by dramatically expanding *Fourth Amendment* liability under *§1983* in a way that does violence to the text of the *Fourth Amendment*. I respectfully dissent.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| WILLIAM RAINSBERGER, | ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | **Cause No. 1:16-cv-103-WTL-MJD** |
| CHARLES BENNER, | ) ) | |
| Defendant. | ) ) | |

## ENTRY ON MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on the Defendant's motion for summary judgment (Dkt. No. 41). The motion is fully briefed and the Court, being duly advised, **DENIES** the motion for the reasons set forth below.

## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed, and all reasonable inferences must be drawn in the non-movant's favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, a party who bears the burden of proof on a particular issue may not rest on its pleadings, but must show what evidence it has that there is a genuine issue of material fact that requires trial. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in

Case 1:16-cv-00103-TWP-MJD  Document 88-1  Filed 11/28/17  Page 297 of 344 PageID #:
Case 1:16-cv-00103-TWP-MJD  Document 88-1  Filed 11/28/17  Page 2 of 30  PageID #: 1436
1889

search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d
713, 723 (7th Cir. 2001).

## II. <u>BACKGROUND</u>

The facts set forth below consist of facts supported by evidence of record, viewed in the
light most favorable to the Plaintiff, as the non-moving party.[1]  Additional facts are included in
the Discussion section as relevant.

### A. The Events of November 19, 2013

In November 2013, Ruth Rainsberger was 88 years old and suffering from dementia.  She
lived alone in an apartment in Indianapolis.  Her son, Plaintiff William Rainsberger, lived close
by and was her primary caregiver.  He saw Ruth almost every day, did her grocery shopping, and
kept her mentally engaged.  Ruth had two other children: Rebecca, who lived farther away, saw
her once a week, and did her laundry; and Robert, who saw his mother less frequently.  Robert
had recently lost his job and his home to foreclosure and had moved in with William.

On November 19, 2013, shortly after 3:30 p.m., William went to Ruth's apartment and
found the door unlocked.  He entered the apartment and noticed his mother lying face down on
the floor with a blanket covering much of her shoulders and head.  She was still breathing, but
her breathing was labored.  He knelt down beside her, put his hand on her knee, and yelled,
"Mom, Mom."  There was a large circle of dried blood on the blanket covering her head.  There
was also a large pool of what appeared to him to be congealed blood on the floor.  William did
not remove the blanket because it was stuck to the wound and he believed it was acting as a
bandage, so removing it would cause more bleeding to occur.

---

[1]Many of these facts are disputed by Benner.

Case 1:16-cv-00103-TWP-MJD   Document 88-1   Filed 11/28/17   Page 298 of 344 PageID #:
Case 1:16-cv-00103-WL-MJD   Document 88-1   Filed 11/28/17   Page 3 of 80   PageID #:
1890

Around 3:37 p.m., William used his mother's landline phone to call 911.  William told the 911 operator that someone had attacked his mother and, later in the call, that "someone bashed her head in."

Indianapolis Fire Department Paramedic Carl Wooldridge responded to William's 911 call.  William, who had gone outside to direct the ambulance to the correct apartment, met Wooldridge outside and told him that someone had "caved his mother's head in."

Inside the apartment, Wooldridge observed Ruth lying on the ground between a chair and the coffee table.  She was still breathing.  There was a cloth with blood covering Ruth's head that appeared to be stuck to a wound on her head.  The cloth had "somewhat of a hole in it right where the wound was," and when Wooldridge "peeled it off there was a mark at that time on her forehead that I believed to be an entrance wound."  Dkt. No. 50-7 at 8.  Based on these observations, Woolridge thought that Ruth had been shot and reported that belief to the paramedics who transported Ruth to the hospital.  Wooldridge later reported to Benner that he thought it was "odd" that William said his mother's head had been caved in because he had not removed the cloth to look at her injuries.

Defendant Charles Benner, a homicide detective with the Indianapolis Metropolitan Police Department ("IMPD"), arrived at the scene around 4:15 p.m. along with fellow homicide detective Tom Tudor.  Benner learned from the other officers on the scene that William and his brother Robert were both at the scene and had arrived in separate vehicles, that William had called 911, that Ruth had been found covered with a blanket, and that she had been transported to the hospital in critical condition.  Tudor did an initial canvas of the building to identify potential witnesses while Benner gathered information about the medical personnel who treated Ruth.

Case 1:16-cv-00103-TWP-MJD   Document 88-1   Filed 11/28/17   Page 299 of 344 PageID #:
1891
Case 1:16-cv-00103-WFL-MJD   Document 88-1   Filed 07/18/17   Page 4 of 30   PageID #:

Benner then did a walkthrough of Ruth's apartment. The walkthrough revealed no signs of forced entry. Benner noticed some open dresser drawers in Ruth's bedroom, but the contents appeared undisturbed. The back room was cluttered with boxes and trash bags that seemed untouched. Benner found a lockbox on a closet shelf in the back room that contained what looked to him like financial documents. He also found Ruth's checkbook, cash, and credit cards in the apartment. Ruth's children reported that she used a black purse and took prescription medication for dementia. Neither was found in the apartment. Based on his observations, Benner determined that robbery did not appear to be the motive for the attack.

On November 20, 2013, Ruth died from her injuries. An autopsy was performed and the cause of death was determined to be multiple blunt force trauma to the head, possibly caused by a hammer or similar object. Not surprisingly, her death was ruled a homicide.

### B. Statements by William, Robert, and Rebecca

On the evening of the attack, Benner asked William and Robert to give statements. They both consented and were transported to IMPD Headquarters.

During his interview, William told Benner that he had been taking care of Ruth daily for the past few years. He also handled all of her bills and finances. Ruth had approximately $80,000 to $100,000 in savings that was to be distributed to her three children after her death. In addition to Ruth, the only individuals with a key to her apartment were William, Robert, and their sister Rebecca. The staff of the apartment complex where Ruth lived also had a key to her apartment; however, Benner confirmed that the key had not been moved and was in its normal location at all relevant times.

William reported to Benner that he had last seen his mother the previous night around 6:00 p.m. After visiting with her, William drove to Plainfield to spend the evening with his wife.

Case 1:16-cv-00103-TWP-MJD   Document 88-1   Filed 11/28/17   Page 300 of 344 PageID #:
Case 1:16-cv-00103-WFL-MJD   Document 88-1   Filed 11/28/17   Page 5 of 30   PageID #:
1892

Around 9:00 the next morning, he returned to his house at 7345 East 13th Street in Indianapolis.
He stayed home until about 3:30 p.m., then went to Kroger on 10th Street in Indianapolis and
bought a tea.  William then drove the short distance to Ruth's apartment.

When he arrived at Ruth's apartment, William noticed that the door was already
unlocked.  He went inside and saw Ruth lying on the floor with a blanket over her head.  Based
on Benner's training and experience, when an attacker covers his or her victim's head or face, it
often indicates that the attacker had a personal relationship with the victim.  William also noticed
a great deal of blood and that his mother was still breathing.  When asked why he did not remove
the blanket, William said that in his opinion removing the blanket would do more damage
because it was stuck to the wound and he believed it was acting as a bandage and preventing
more bleeding.  He checked the apartment to confirm that no one was there and then called 911.
After calling 911, William went outside to wait for the ambulance so he could direct it to the
correct apartment, as his mother's apartment can be difficult to locate.

During his interview, Robert stated that he had not seen Ruth for a few days.  In August
2013, Robert moved in with William after the bank foreclosed on his house.  Robert was at
William's house on November 19, 2013, when William called and told him to come to Ruth's
house immediately.  When he got to Ruth's apartment, Robert was stopped by police and put in a
police car.

The following day, Benner spoke with Rebecca Rainsberger, Ruth's other child.  Rebecca
stated that she typically checked on her mother once a week and had last been at Ruth's during
the day on the day before the attack.

At some point that day, Benner asked Rebecca, William, and Robert to come to IMPD
Headquarters, ostensibly to review the results of Ruth's autopsy.  Benner accused William and

Robert of murdering Ruth for money and asked them to take a polygraph test.  Upset at being

brought to the station under false pretenses and being accused of his mother's murder, and

because he considered polygraphs unreliable, William adamantly refused to take a polygraph.

### C.  The Investigation

Crime scene specialist Jennifer Lane collected potential evidence at the scene.  She

videotaped and photographed Ruth's apartment and collected fingerprints and DNA.  A report

dated April 23, 2014, stated that two DNA contributors were found on the outside back neck area

and outside left sleeve of Ruth's jacket.  The major contributor was Ruth; the "partial DNA

profile of the minor contributor [was] from an unknown male" (i.e., not William or Robert).

Dkt. No. 50-33 at 2.   In addition, the DNA of another unknown male was found on the blanket

that was covering Ruth's head and two stains on Ruth's sweatshirt.  Benner believed that the

unknown DNA was likely from the first responders who treated Ruth at the scene.

On December 6, 2013, Benner collected video from the Kroger grocery store located on

10th Street.  The store had eighty-one working cameras that day, four of which showed William.

 Camera 30, located in the front entry way, shows William dispose of an item in the trash.  After

dropping the object in the trashcan, William then pushes some buttons on the Redbox video-

rental box next to the trashcan.  At one point while looking at the Redbox machine, he turns to

look behind him.  He then enters the store.

Camera 7, located in the self-checkout area, shows William purchasing a tea.  He appears

to let a customer at the adjacent checkout kiosk use his Kroger Plus Card, but he does not use the

card for his own purchase.  He then exits the store, locates his car, and drives away.

Benner obtained Ruth's financial records from her bank, which showed that at the time of

her death she had a checking account balance of $15,098.90, a savings account balance of

Case 1:16-cv-00103-TWP-MJD Document 88-1 Filed 11/28/17 Page 302 of 344 PageID #:
1894
Case 1:16-cv-00103-TWP-MJD Document 88-1 Filed 07/18/17 Page 7 of 30 PageID #: 1411

$4,605.65, and certificate balances totaling $79,058.15. Benner obtained a beneficiary form from Ruth's apartment showing that William, Robert, and Rebecca were the beneficiaries for all of her assets.

### D. Phone Records

IMPD detective Benjamin Bierce obtained phone records for William, Robert, Rebecca, and Ruth. Rebecca's cell phone records confirmed that she was not in the vicinity of Ruth's apartment on the day her mother was attacked. Ruth's landline phone records show a phone call to Robert's cell phone number at 3:40 p.m. Robert's cell phone records show that he received two phone calls from Ruth's landline number, one at 2:40 p.m. and the other at 3:40 p.m. Bierce provided the phone records to Benner during the winter of 2013-2014.

During the summer of 2014, while collecting phone records for another case, Bierce learned that due to cell tower construction, some calls made in Indianapolis were being routed through cell towers in Chicago, Illinois. Calls that were routed through Chicago were recorded in Central standard time. After learning this new information, Bierce reviewed the cell phone records he had obtained for several open investigations, including Robert's records. Bierce found that some of the calls on Robert's records had been routed through Chicago. Accordingly, he created a spreadsheet titled "Results" that converted the calls on Robert's phone records that had been routed through Chicago to Eastern standard time (Indianapolis time). The Results spreadsheet shows that the two calls to Robert's cell phone from Ruth's landline were made on November 19, 2013 at 3:40:38 p.m. and 3:40:51 p.m. Bierce created the Results spreadsheet in July 2014 and provided it to Benner.

7

Case 1:16-cv-00103-TWP-MJD   Document 88-1   Filed 11/28/17   Page 303 of 344 PageID #:
Case 1:16-cv-00103-WFL-MJD   Document 88-1   Filed 07/18/17   Page 8 of 30   PageID #:
1895

### E.  The Probable Cause Affidavit

On May 22, 2014, Benner executed a probable cause affidavit that contained the
following statements:

- On November 19, 2013 at approximately 3:38 pm IMPD 911 dispatch received a call
from the address of 801 N. Shortridge Rd, Apartment H 11. The caller said that someone
had "bashed" his mother's head in.  Officer Lewis arrived on scene along with IFD.
Officer Lewis said that the victim's head was covered with a blanket when they arrived
on scene. The victim, identified as Ruth Rainsberger, was transported to Wishard hospital
in critical condition. The caller, identified as William Rainsberger, and his brother,
Robert Rainsberger, were transported to Police Headquarters to give a statement. It
should be noted that during the initial investigation, both medic and hospital personnel
believed that the victim may have sustained a gunshot wound. The fact that the 911 caller
said his mother's head was bashed in without actually seeing her head is indicative to the
affiant that he may have knowledge of how she sustained the injury.

- On December 4, 2013 I took a statement from Firefighter Carl Wooldridge. Wooldridge
said he was the first to have contact with the caller who was standing outside of the
apartment building when fire arrived on scene. The white male on scene told Wooldridge
that someone had "caved his mother's head in."  Wooldridge went to the apartment door
and noticed it was slightly ajar.  The victim was lying on the floor between a chair and a
coffee table.  Wooldridge said it was immediately apparent to him that the victim was
breathing even though she had a blanket covering her head.  He said the blanket appeared
to cover the entire head and not just one side.  The blanket was soaked in blood and was
stuck to the victim's head.  Wooldridge thought it was strange that the caller said her

8

Case 1:16-cv-00103-TWP-MJD   Document 88-1   Filed 11/28/17   Page 304 of 344 PageID #:
Case 1:16-cv-00103-WFL-MJD   Document 88-1   Filed 07/18/17   Page 9 of 30   PageID #1413
1896

head was caved in when it was obvious that he had not removed the blanket to check on

his mother. Fire and ambulance personnel thought the victim may have been shot and

thought it was not normal that there was not any blood spatter on the walls or ceiling.

Wooldridge said the apartment seemed to be in orderly condition. The caller was

identified as William Rainsberger.

- I requested crime lab to the scene and 4439 CSS Lane responded to the scene. A

walkthrough of the apartment revealed that there were no signs of forced entry.  There

were a few drawers in the victim's bedroom that were pulled out halfway with no sign of

anyone rifling through the contents.  There were a large amount of boxes in a back room

that were untouched.  There was a lockbox in the back room in plain view that contained

savings bonds belonging to the victim.  The victim's checkbook, some cash and credit

cards were still present inside the apartment.  The only blood found on the scene was on

the blanket and on the floor where the victim was found.

- On November 19, 2013 I conducted an interview of William Rainsberger at Police

Headquarters.  William said he has been taking care of his mother on a daily basis for the

past few years.  He pays all of her bills and has power of attorney responsibility over her

finances.  He said he last saw his mother on Monday night around 6:00 pm. He left her

apartment and went to Plainfield to spend the night with his wife.  He returned home to

13th Street around 9:00 am on Tuesday morning and just hung out at home all day.  He

said that around 3:30 pm he went to the Kroger on 10th St and bought an iced tea.  He

then drove across the street to check on his mother.  He said he checked her mailbox and

went out to his car before going to her door. He said when he used his key to open the

door if appeared that the door was already unlocked.  He opened the door and saw his

9

mom lying on the floor with a blanket over her head.  He walked around a coffee table and put his tea down on the table.  He saw some blood on the floor and on the blanket so he called 911.  He said his mom was breathing loudly as if she was snoring.  I asked why he didn't take the blanket off to check his mom and he said he thought he would do more damage by touching her.  He called 911, left the apartment after closing the door, and went outside to wait for the ambulance.  He also said he had walked through the residence to check for anyone inside before he called 911.  I asked William about his mother's finances and learned that she has approximately eighty to one hundred thousand dollars in savings and bonds that will be distributed to her three children if she were to die.

- On November 19, 2013 I spoke to Robert Rainsberger who said he had not seen his mother for a few days.  He recently had his home foreclosed upon and moved in with William this past August.  He said he was hanging out at home on Tuesday when William called and told him to get over to his mom's apartment immediately.  Robert drove his vehicle to Shortridge and was stopped by police when he arrived.  He said his mother was taken away in an ambulance and he waited in a police car until I transported him downtown to give a statement.  I drove Robert to headquarters and he did not say one word on the way unless I asked him a question.  At no time did Robert or his brother, William, ever ask me how their mom was doing or if they could get to the hospital to see her.

- On November 20, 2013 I spoke to Rebecca Rainsberger.  She said she usually checks on her mother once a week and had last been to her apartment on Monday, November 8th.  I asked her if she was at the apartment at all on Tuesday and she said no.  Phone records

10

confirmed that her cell phone was not near Ruth Rainsberger's apartment when the incident occurred.

- On 1-13-14 I spoke to Delbert Pickens who delivers meals on a daily basis to Ruth's apartment. Mr. Pickens said he delivers a meal to Ruth Monday through Friday and almost always arrives around 10:30 am. On 11-19-13 Delbert said he arrived at Ruth's address around 10:30 am. He knocked on the door and she did not answer. He called her phone and could hear it ringing inside the apartment. He did not hear any signs that anyone may be inside the apartment so he left.

- On November 20, 2013 I attended the autopsy of Ruth Rainsberger which was performed by Dr. Tashjian. He determined that the cause of death was due to multiple blunt force trauma injuries to the head and the manner was ruled a Homicide. The wounds were possibly inflicted with a hammer or similar type weapon.

- On November 20, 2013 I spoke to William and Robert Rainsberger once again at Police Headquarters. I asked them if they would submit to a polygraph so that I could eliminate them as suspects and they adamantly said no, they would not take a polygraph. All three siblings stormed out and I have not heard from them since.

- I have not at any time during this investigation, been asked by any of the victim's children if I have any suspects or any other information in reference to this case.

- On November 27, 2013 I received a call from Attorney Brad Keffer, who said he is now representing William Rainsberger. I advised him I would be requesting a limited search warrant for William to obtain a buccal swab and major case prints. I also received a call from Attorney John Christ, who said he is now representing Robert Rainsberger. I made arrangements for William and Robert to come to Police Headquarters on December 4,

11

2013 so that I could serve the limited search warrants for prints and a DNA buccal swab. Both subjects did show up on December 4, 2013 with their attorneys and I obtained prints and buccal swabs from both.

- On November 22, 2013 Detective Tudor and I recovered a video from the Kroger store located at 7101 E 10th St.  The video showed William Rainsberger drive onto the Kroger lot on November 19, 2013 at approximately 3:32 pm. Mr. Rainsberger got out of the car and approached a garbage can located near the Red Box video dispenser.  Rainsberger appeared to pull out a straight object from his person which he placed in the garbage can. As he placed the item in the trash he appeared to look around for cameras.  He then stepped over to the Red Box and punched some buttons.  He looked around again before he entered the store.  He entered the store and bought an iced tea which he paid for with cash.  He appeared to let someone in line use his Kroger plus card but did not use the card for his purchase. William exited the store and looked around several times before returning to his vehicle.  He left the lot and drove to his mother's apartment where he found her down and called 911.

- I received cell phone records for the Rainsberger family and obtained the following information.  On November 19, 2013 at 2:40 pm, Robert Rainsberger received a call from Ruth Rainsberger's landline to his cell -----. This is hours after it is presumed that Ruth Rainsberger received her injuries.  This presumption is based upon the fact that a delivery person knocked on her door at 10:30 am and attempted to call her but did not get an answer and also based upon the fact that the blanket contained dried blood which caused the blanket to stick to the victim's head which, in the affiant's experience, would indicate the victim was not recently attacked (prior to the 911 call).  Within an hour of this phone

12

call, William Rainsberger is on video across the street at the Kroger.  He throws an object away in the trash before entering the store to buy an ice tea.  He then goes to his mother's apartment and calls the police.  William then stood outside and left his mother unattended until the police arrived.

- Cell phone records were obtained for William Rainsberger, including cell tower site locations for the day of November 19, 2013.  Those records do not show William Rainsberger outside of the area of Shortridge and 10th St. during the relevant time period.

- On 1-13-14 I received the financial records for Ruth Rainsberger, from the Financial Federal Credit Union located at 701 E 56th St.  The records show the following balances existed at the time of Ruth's death.  There was a checking account balance of $15,098.90, savings account balance of $4,605.65 and certificate balances of $79,058.15.  I recovered a beneficiary form from Ruth's apartment shortly after she was discovered which revealed that William, Robert and Rebecca Rainsberger are the beneficiaries for all of her assets.

Dkt. No. 50-6.  Benner and a deputy prosecutor also executed an Information charging William with Ruth's murder.

Based on Benner's probable cause affidavit, a court found probable cause to arrest William for murder.  A few days later, William was arrested for the murder of his mother.  He was held in jail for two months after his arrest before being released on bail.  On July 7, 2015, the Prosecutor's Office dismissed the case against William.

## III. DISCUSSION

The Court notes as an initial matter that Benner raises several evidentiary issues in his reply brief.  He argues that many statements in affidavits relied upon by William (his own and

that of David Hennessy) are inadmissible and that the expert report submitted by William is largely inadmissible and/or immaterial. The Court has not relied on either affidavit or the expert report in making this ruling and, therefore, need not address Benner's arguments. Because the issue may arise again at trial, however, the Court notes that many of Benner's arguments regarding the opinions in the expert report appear to be well-taken, and William should carefully review the applicable law when deciding whether to offer the expert's testimony at trial.

Turning to the merits, William asserts claims against Benner pursuant to 42 U.S.C. § 1983 for violation of the fourth amendment. Specifically, William alleges that Benner intentionally, knowingly, or recklessly made false and misleading statements in his probable cause affidavit that led to William being wrongfully arrested and maliciously prosecuted.

The applicable law is not in dispute. "[P]robable cause is an absolute defense to false arrest claims in . . . the § 1983 context." *Jones v. City of Elkhart, Ind.*, 737 F.3d 1107, 1114 (7th Cir. 2013). Thus,

> [a] warrant request violates the Fourth Amendment if the requesting officer knowingly, intentionally, or with reckless disregard for the truth, makes false statements in requesting the warrant and the false statements were necessary to the determination that a warrant should issue. A reckless disregard for the truth can be shown by demonstrating that the officer entertained serious doubts as to the truth of the statements, had obvious reasons to doubt their accuracy, or failed to disclose facts that he or she knew would negate probable cause.

*Hart v. Mannina*, 798 F.3d 578, 591 (7th Cir. 2015) (internal citations and quotation marks omitted).

## A. Allegedly False or Misleading Statements

William argues that a reasonable jury could find that Benner knowingly or with reckless disregard for the truth made false or misleading statements in the probable cause affidavit. Each of the statements William objects to is examined, in turn, below.

14

### 1.  Cell phone tower records

Benner stated in the probable cause affidavit that cell phone tower location records "do not show William Rainsberger outside the area of Shortridge and 10th St. during the relevant time period."  William argues that this statement was misleading because the records "do not show William *in* this area anytime from 5:41 p.m. on Nov. 18, 2013 to 7:23 p.m. on Nov. 19, 2013, because there is no location information from cell phone data for his telephone during that period."  Dkt. No. 49 at 4-5.  The Court disagrees that a reasonable jury could find that this statement was misleading.  The statement is true, and can reasonably be read only to indicate that there is no exculpatory cell phone evidence.  No reasonable judicial officer would read that statement as implying that there were cell phone records that affirmatively suggested that William (or at least his cell phone) was present in the relevant area at the relevant time; if such evidence existed, Benner certainly would have included it.[2]

### 2.  The 2:40 p.m. telephone call

Benner stated in the probable cause affidavit that a call was made from Ruth's landline to Robert at 2:40 p.m., which is hours after the time the evidence indicates Ruth was attacked.  This information was intended to suggest that William could have been in Ruth's apartment an hour before he called 911.  The Court agrees with William that a reasonable jury could find from the evidence of record that that call was actually made by William at 3:40 p.m., after he discovered his mother and called 911, and that the 2:40 p.m. time on the phone records occurred because the

---

[2]Unfortunately, in his brief in support of the instant motion, Benner—or, more accurately, his counsel—mischaracterizes the statement in the probable cause affidavit as showing that "William's phone records, including cell tower site locations for November 19, 2013, show that he was in the vicinity of Shortridge Road and 10th Street during the relevant time period."  Dkt. No. 44 at 17.  Counsel is admonished to be more careful in characterizing the evidence of record.

call was routed through a tower in Chicago, where the time is one hour earlier than the time in Indianapolis.  Further, Benner himself testified in his deposition that he had the report from IMPD phone records expert Bierce that showed the time discrepancy before he executed his probable cause affidavit.[3]  Given this testimony, and viewing the evidence in the light most favorable to William, the Court finds that a reasonable jury could determine from the evidence of record that Benner included the statement about the 2:40 p.m. call with reckless disregard for whether it was accurate because, given the totality of the information about the telephone records that he testified that he had, a reasonable jury could find that he had obvious reasons to doubt its accuracy.

### 3. The Kroger video

In the probable cause affidavit, Benner stated that the video from the Kroger store shows that William "appeared to pull out a straight object from his person which he placed in the garbage can."  William argues that the video "does not depict William pulling anything from his person," but rather shows him throwing away a piece of trash, and that Benner admitted in his deposition that "the video does not depict William pulling anything 'from his person.'"  Dkt. No. 49 at 7 (emphasis in original) (citing Benner Civil Depo. at 146).  The deposition testimony in question reads as follows:

Q:    You're not able to really see if he – when he gets the object in his hands or not, are you?

A:    I don't think so, no, just that it's there.

---

[3] That testimony is belied by Bierce's own affidavit in which he states that he created the report on or about July 2014, well after William's arrest, and by Benner's own testimony that he learned of the theory when it was raised by William's criminal defense lawyer.  However, the Court must view the evidence in the light most favorable to William.

16

Q:     So you don't know whether he pulled it out of his pocket or a waistband or—

A:     Doesn't matter, but, no, I don't know.

Q:     Or whether it was in his hand before and you just didn't see it?

A:     That's correct.

Dkt. No. 50-9 at 85-86.

This testimony does not, in fact, elucidate what Benner meant by "pull[ed] . . . from his person" or whether he in fact agrees with William's assessment that the camera does not show him "pull[ing the object] from his person."  He was not asked that question.  That said, the Court has watched the video, and agrees with William that a reasonable juror could find the statement's wording to be intentionally misleading.[4]  There is simply nothing on the video that shows William "pulling" the object from anywhere.  Given what is shown on the video, it is equally possible that he walked from his vehicle to the trash can carrying the object in plain view.

Next, William argues that the statement is misleading because it is meant to imply that the object in question was the murder weapon.  It does not state that it was the murder weapon, however, and the statement, as worded, makes it clear that one cannot tell from the video what the object was, only that it was a "straight object."  That statement is not false or misleading.  Any judicial officer reviewing the affidavit would understand that if Benner believed anything else about the object could be identified on the video, he would have included that information.

---

[4]While the standard quoted above speaks of "false statements," the Seventh Circuit also has recognized that misleading statements in a probable cause affidavit can lead to a Fourth Amendment violation.  *See, e.g.*, *Betker v. Gomez*, 692 F.3d 854, 861-62 (7th Cir. 2012) ("A reasonable jury could find that Officer Gomez knowingly or with reckless disregard for the truth made false or misleading statements. So we must decide whether probable cause would have existed for the no-knock search warrant absent those disputed statements.").

17

The affidavit essentially says that William threw away something that could have been the murder weapon, and that is, in fact, true.

Finally, the affidavit also states that "[a]s he placed the item in the trash he appeared to look around for cameras." The Court agrees with William that a reasonable jury watching the video could find that that statement was false and that Benner knew it to be so.

### 4. No signs of a burglary

The probable cause affidavit states the following:

> A walkthrough of the apartment revealed that there were no signs of forced entry. There were a few drawers in the victim's bedroom that were pulled out halfway with no sign of anyone rifling through the contents. There were a large amount of boxes in a back room that were untouched. There was a lockbox in the back room in plain view that contained savings bonds belonging to the victim. The victim's checkbook, some cash and credit cards were still present inside the apartment.

William suggests that this paragraph—which implies that it is more likely that Ruth's attacker was not someone seeking to steal from her, but rather someone she knew—is misleading because Benner omitted the fact that Ruth's purse and her prescription medication were missing from the apartment. Viewing the evidence of record in the light most favorable to William, the Court agrees. While the affidavit does not state that nothing appeared to be taken from the apartment, that is clearly the message that paragraph is intended to convey. A reasonable jury could determine that Benner knew a purse and prescription medication were missing and that the failure to include that information was intentionally misleading.

In addition, the evidence viewed in the light most favorable to William indicates that the lockbox found in Ruth's apartment was not reasonably described as "in plain view," and that it did not contain savings bonds. Again, a reasonably jury could find that Benner included those statements with knowledge of, or reckless disregard for, their falsity.

18

*5. William knew the nature of Ruth's injuries*

The probable cause affidavit makes it clear that Benner believed it to be suspicious that William told the 911 operator that his mother's head had been "bashed in," and also told Wooldridge that her head had been "caved in," even though Ruth's head was covered by a blanket.  The Court finds nothing false or misleading about Benner's statements that "[t]he fact that the 911 caller said his mother's head was bashed in without actually seeing her head is indicative to the affiant that he may have knowledge of how she sustained the injury" and "Wooldridge thought it was strange that the caller said her head was caved in when it was obvious that he had not removed the blanket to check on his mother."  William provides wholly reasonable explanations for how he surmised that his mother had been hit in the head without looking under the blanket, but those explanations do not change the fact that Benner's statements in the affidavit were true and not misleading.

What William really takes issue with are Benner's representations that others who saw Ruth initially believed that she may have been shot; in other words, they did not immediately conclude that she had suffered blunt force trauma to the head like William did.  Dkt. No. 50-6 at 2 ("It should be noted that during the initial investigation, both medic and hospital personnel believed that the victim may have sustained a gunshot wound."; "Fire and ambulance personnel thought the victim may have been shot and thought it was not normal that there was not any blood spatter on the walls or ceiling.").  William has pointed to no evidence of record that shows that Benner knew these statements were not true or had reason to doubt that they were.  There is no dispute that Woolridge, who as an EMT would fall under the category of "medic personnel," believed that she may have been shot and that ambulance personnel reported to the hospital that Ruth's wound might be a gunshot wound.  Benner also testified that a deputy coroner told him

19

that hospital personnel believed she had been shot and, in fact, wrote "possible gunshot wound" on the tag that was placed on Ruth's body. While William makes a convincing argument as to why it was not suspicious that his initial belief was that his mother had been hit in the head, there was nothing false or misleading about Benner's statements that others believed otherwise.

### 6. *William's lack of concern for his mother*

William argues that several statements in the probable cause affidavit that were meant to convey his lack of concern for his mother are false or misleading. The Court agrees.

First, Benner notes in the affidavit that after calling 911 William "went outside to wait for the ambulance" and "left his mother unattended until the police arrived." Benner fails to note William's explanation for doing so—that he wanted to direct the ambulance because his mother's apartment was hard to find based solely on the address. In addition, Benner states that while William was being questioned on November 19, 2013, "[a]t no time did Robert or his brother, William, ever ask me how their mom was doing or if they could get to the hospital to see her." This statement is misleading, because Benner knew that William was receiving texts from his sister, who was at the hospital, about Ruth's condition, and also knew that he expressed concern about how he would get to the hospital. These omissions were misleading, and a reasonable jury could find them to be intentionally so.

### 7. *Refusal to take a polygraph*

William takes issue with the inclusion in the probable cause affidavit of the fact that he and his brother adamantly refused to take a polygraph, then they and their sister "stormed out" and Benner did not hear from them again. William does not deny that he adamantly refused to take a polygraph, but rather offers reasons for his refusal and suggests that Benner should have included the fact that he lied to the Rainsbergers in order to get them to come to the police

20

station, at which time he asked the brothers to submit to polygraphs.  William does not suggest that his reaction would have been any different if Benner had simply asked him to come in to take a polygraph, nor does he provide any evidence that Benner knew William's reasons for refusing.  However, William has presented evidence from which a reasonable jury could find that Benner's statements that the siblings "stormed out," and that he did not hear from them again after that, were false and that Benner knew them to be so.

### 8.  *Suggestion of financial motive*

William next argues that "Detective Benner also mislead the court in his probable cause affidavit by suggesting that William had a financial motive for killing his mother because he along with his siblings was a beneficiary of his mother's estate."  Dkt. No. 49 at 20.  There was nothing false or misleading about the financial information Benner included in the affidavit. Benner did not in any way suggest that William was having financial problems himself, and therefore did not mislead the court reviewing the affidavit into believing that to be the case.

### B.  Was There Probable Cause Without the False or Misleading Statements?

William argues that "[t]here is just too much wrong in this probable cause affidavit to say that a rational jury could not find intentional, knowing, or reckless conduct in its compilation." Dkt. No. 49 at 27.  As explained above, viewing the evidence in the light most favorable to William, the Court agrees.  However, as both parties acknowledge, such a finding would not be sufficient to support a jury verdict in William's favor.  Rather, despite the presence of false and misleading statements in the probable cause affidavit, William's Fourth Amendment rights were not violated unless the false and misleading statements were "necessary to the determination that a warrant should issue."  *Hart*, 798 F.3d at 591.  Accordingly, the Court must examine the remaining statements in the probable cause affidavit, along with the omitted information that

made some of the statements misleading, in order to determine whether the resulting probable

cause affidavit, free from false and misleading statements, would have been sufficient to

establish probable cause to arrest William for murder.  *See Betker v. Gomez*, 692 F.3d 854, 862

(7th Cir. 2012) ("Our analysis is fairly straightforward.  We eliminate the alleged false

statements, incorporate any allegedly omitted facts, and then evaluate whether the resulting

'hypothetical' affidavit would establish probable cause.") (citations omitted) (applying analysis

to search warrant).

The "hypothetical affidavit" that eliminates those statements that a reasonable jury,

viewing the facts of record in the light most favorable to William, could find to be false, and

adds information necessary to rectify what a reasonable jury could find to be misleading

statements,[5] includes the following statements:

- On November 19, 2013 at approximately 3:38 pm IMPD 911 dispatch received a call

  from the address of 801 N. Shortridge Rd, Apartment H 11. The caller said that someone

  had "bashed" his mother's head in.  Officer Lewis arrived on scene along with IFD.

  Officer Lewis said that the victim's head was covered with a blanket when they arrived

  on scene. The victim, identified as Ruth Rainsberger, was transported to Wishard hospital

  in critical condition. The caller, identified as William Rainsberger, and his brother,

  Robert Rainsberger, were transported to Police Headquarters to give a statement. It

  should be noted that during the initial investigation, both medic and hospital personnel

  believed that the victim may have sustained a gunshot wound. The fact that the 911 caller

---

[5]The information that has been added by the Court is in bold type.

said his mother's head was bashed in without actually seeing her head is indicative to the affiant that he may have knowledge of how she sustained the injury.

- On December 4, 2013 I took a statement from Firefighter Carl Wooldridge. Wooldridge said he was the first to have contact with the caller who was standing outside of the apartment building when fire arrived on scene. The white male on scene told Wooldridge that someone had "caved his mother's head in."  Wooldridge went to the apartment door and noticed it was slightly ajar.  The victim was lying on the floor between a chair and a coffee table.  Wooldridge said it was immediately apparent to him that the victim was breathing even though she had a blanket covering her head.  He said the blanket appeared to cover the entire head and not just one side.  The blanket was soaked in blood and was stuck to the victim's head.  Wooldridge thought it was strange that the caller said her head was caved in when it was obvious that he had not removed the blanket to check on his mother. Fire and ambulance personnel thought the victim may have been shot and thought it was not normal that there was not any blood spatter on the walls or ceiling. Wooldridge said the apartment seemed to be in orderly condition. The caller was identified as William Rainsberger.

- I requested crime lab to the scene and 4439 CSS Lane responded to the scene. A walkthrough of the apartment revealed that there were no signs of forced entry.  There were a few drawers in the victim's bedroom that were pulled out halfway with no sign of anyone rifling through the contents.  There were a large amount of boxes in a back room that were untouched.  The victim's checkbook, some cash and credit cards were still present inside the apartment.  **The victim's purse and a bottle of prescription**

23

**medication were not found in the apartment.**  The only blood found on the scene was on the blanket and on the floor where the victim was found.

- On November 19, 2013 I conducted an interview of William Rainsberger at Police Headquarters.  William said he has been taking care of his mother on a daily basis for the past few years.  He pays all of her bills and has power of attorney responsibility over her finances.  He said he last saw his mother on Monday night around 6:00 pm. He left her apartment and went to Plainfield to spend the night with his wife.  He returned home to 13th Street around 9:00 am on Tuesday morning and just hung out at home all day.  He said that around 3:30 pm he went to the Kroger on 10th St and bought an iced tea.  He then drove across the street to check on his mother.  He said he checked her mailbox and went out to his car before going to her door. He said when he used his key to open the door if appeared that the door was already unlocked.  He opened the door and saw his mom lying on the floor with a blanket over her head.  He walked around a coffee table and put his tea down on the table.  He saw some blood on the floor and on the blanket so he called 911.  He said his mom was breathing loudly as if she was snoring.  I asked why he didn't take the blanket off to check his mom and he said he thought he would do more damage by touching her.  He called 911, left the apartment after closing the door, and went outside **so that he could direct the ambulance to his mother's apartment, as it can be difficult to locate**.  He also said he had walked through the residence to check for anyone inside before he called 911.  I asked William about his mother's finances and learned that she has approximately eighty to one hundred thousand dollars in savings and bonds that will be distributed to her three children if she were to die.

24

- On November 19, 2013 I spoke to Robert Rainsberger who said he had not seen his mother for a few days. He recently had his home foreclosed upon and moved in with William this past August. He said he was hanging out at home on Tuesday when William called and told him to get over to his mom's apartment immediately. Robert drove his vehicle to Shortridge and was stopped by police when he arrived. He said his mother was taken away in an ambulance and he waited in a police car until I transported him downtown to give a statement. I drove Robert to headquarters and he did not say one word on the way unless I asked him a question.

- On November 20, 2013 I spoke to Rebecca Rainsberger. She said she usually checks on her mother once a week and had last been to her apartment on Monday, November 8th. I asked her if she was at the apartment at all on Tuesday and she said no. Phone records confirmed that her cell phone was not near Ruth Rainsberger's apartment when the incident occurred.

- On 1-13-14 I spoke to Delbert Pickens who delivers meals on a daily basis to Ruth's apartment. Mr. Pickens said he delivers a meal to Ruth Monday through Friday and almost always arrives around 10:30 am. On 11-19-13 Delbert said he arrived at Ruth's address around 10:30 am. He knocked on the door and she did not answer. He called her phone and could hear it ringing inside the apartment. He did not hear any signs that anyone may be inside the apartment so he left.

- On November 20, 2013 I attended the autopsy of Ruth Rainsberger which was performed by Dr. Tashjian. He determined that the cause of death was due to multiple blunt force trauma injuries to the head and the manner was ruled a Homicide. The wounds were possibly inflicted with a hammer or similar type weapon.

25

- On November 20, 2013 I spoke to William and Robert Rainsberger once again at Police Headquarters. I asked them if they would submit to a polygraph so that I could eliminate them as suspects and they adamantly said no, they would not take a polygraph.

- On November 27, 2013 I received a call from Attorney Brad Keffer, who said he is now representing William Rainsberger. I advised him I would be requesting a limited search warrant for William to obtain a buccal swab and major case prints. I also received a call from Attorney John Christ, who said he is now representing Robert Rainsberger. I made arrangements for William and Robert to come to Police Headquarters on December 4, 2013 so that I could serve the limited search warrants for prints and a DNA buccal swab. Both subjects did show up on December 4, 2013 with their attorneys and I obtained prints and buccal swabs from both.

- On November 22, 2013 Detective Tudor and I recovered a video from the Kroger store located at 7101 E 10th St. The video showed William Rainsberger drive onto the Kroger lot on November 19, 2013 at approximately 3:32 pm. Mr. Rainsberger got out of the car and approached a garbage can located near the Red Box video dispenser. Rainsberger placed what appeared to be a straight object in the garbage can.  He then stepped over to the Red Box and punched some buttons. He entered the store and bought an iced tea which he paid for with cash. He appeared to let someone in line use his Kroger plus card but did not use the card for his purchase. William exited the store and drove to his mother's apartment where he found her down and called 911.

- Cell phone records were obtained for William Rainsberger, including cell tower site locations for the day of November 19, 2013. Those records do not show William Rainsberger outside of the area of Shortridge and 10th St. during the relevant time period.

26

- On 1-13-14 I received the financial records for Ruth Rainsberger, from the Financial
  Federal Credit Union located at 701 E 56th St.  The records show the following balances
  existed at the time of Ruth's death. There was a checking account balance of $15,098.90,
  savings account balance of $4,605.65 and certificate balances of $79,058.15. I recovered
  a beneficiary form from Ruth's apartment shortly after she was discovered which
  revealed that William, Robert and Rebecca Rainsberger are the beneficiaries for all of her
  assets.

Dkt. No. 50-6.

The Court finds that this hypothetical affidavit does not establish probable cause to arrest
William for the murder of his mother.  Probable cause "is a common-sense inquiry requiring
only a probability of criminal activity; it exists whenever an officer or a court has enough
information to warrant a prudent person to believe criminal conduct has occurred."
*Leaver v. Shortess*, 844 F.3d 665, 669 (7th Cir. 2016), *cert. denied,* 137 S. Ct. 2127 (2017).  "[I]t
does not take much to establish probable cause. The officers must have more than a bare
suspicion that they have the right guy, but they need not have enough evidence to support a
conviction or even to show that their belief is more likely true than false." *Fox v. Hayes,* 600
F.3d 819, 833 (7th Cir. 2010).  Even given this fairly low bar, the Court finds that there are

27

simply not enough facts in the hypothetical affidavit[6] to support a finding of probable cause.

Accordingly, Benner is not entitled to summary judgment on William's claim for false arrest.[7]

## C. Qualified Immunity

Benner argues that even if probable cause was lacking, he is entitled to qualified immunity if there was "arguable probable cause" for William's arrest. This argument is off base. Benner cites cases that discuss qualified immunity in cases in which an officer decides that he has probable cause to arrest someone on the spot. Those cases and the "arguable probable cause" standard applied therein are irrelevant to the instant case. Rather, the applicable law is clear: "A police officer is not entitled to qualified immunity for submitting an affidavit that contained statements he knew to be false or would have known were false had he not recklessly disregarded the truth and no accurate information sufficient to constitute probable cause attended the false statements." *Olson v. Champaign County, Ill.*, 784 F.3d 1093, 1100 (7th Cir. 2015)

---

[6]In his reply brief, Benner points to additional facts that he argues help to establish probable cause; for example, the fact that William did not attempt any first aid while waiting for the ambulance, and the fact that his training indicated that an attacker who covers his victim's head often has a personal relationship with the victim. These facts were not included in the probable cause affidavit, however, and therefore are irrelevant to the question of whether the probable cause affidavit, as written, but omitting any statements a reasonable jury could find to be false and misleading, would have been sufficient to constitute probable cause to arrest William.

[7]William also argues that the probable cause affidavit improperly omits the fact that Ruth's apartment complex was a high crime area and another woman had been hit in the head and robbed about a month earlier in the parking lot outside of Ruth's apartment, as well as omitting what he deems to be exculpatory DNA evidence. An officer does not have to include every fact, only those facts that are material. "'The materiality of an omitted . . . fact depends on its relative importance to the evaluation of probable cause; an omitted fact is material if its inclusion would have negated probable cause.' If the omitted fact would not have negated probable cause, its omission was immaterial and there was no Fourth Amendment violation.'" *Hart*, 798 F.3d at 593 (quoting *Whitlock v. Brown,* 596 F.3d 406, 411 (7th Cir. 2010)). Because the Court finds probable cause lacking even without consider this omitted information, the Court need not determine whether it was material.

(citations omitted); *see also Betker v. Gomez*, 692 F.3d 854 (7th Cir. 2012) (finding law clearly established).  If Benner ultimately is liable to William in this case, he will not be liable for determining that probable cause existed to arrest William.  As he stated in his deposition, that was not his call to make under the circumstances of this case; a judicial officer made that determination.  Rather, any liability in this case will be based upon the jury determining that Benner intentionally or recklessly included false and/or misleading statements in his probable cause affidavit that caused the judicial officer to find probable cause when, in the absence of those statements, it would not have been appropriate to do so.  Because, considering the facts of record in the light most favorable to William, a reasonable jury could so find, Benner is not entitled to qualified immunity.

### D.  Malicious Prosecution

In addition to his false arrest claim, William also asserts a claim for malicious prosecution under the Fourth Amendment.  Benner in essence argues that this claim fails for the same reasons as he argues the false arrest claim fails.[8]  Accordingly, the Court finds summary judgment is not appropriate on that claim as well.  However, it is unclear to the Court how, under the facts of this case, a malicious prosecution claim adds anything to the false arrest claim.  It appears to the Court that if William cannot be successful on the former and not also be successful on the latter, and any damages he could receive for malicious prosecution would also be available for false arrest.  Accordingly, William should carefully consider whether it is

---

[8]In addition, consistent with the law in this circuit at the time, Benner argued in his summary judgment briefing that William's malicious prosecution claim could not be brought under the Fourth Amendment.  William wisely conceded the point, but noted that the Supreme Court had before it a case that could change the law.  That case has since been decided, and William's claim for malicious prosecution under the Fourth Amendment is, indeed, now viable. *See Manuel v. City of Joliet*, 137 S. Ct. 911 (2017).

advisable to proceed with both claims at trial, or whether doing so will only unnecessarily complicate the jury instructions in this case.

## IV. **CONCLUSION**

For the reasons set forth below, Benner's motion for summary judgment is **DENIED**. This cause remains set for trial on September 11, 2017.  The final pretrial conference will be held on August 10, 2017.  The parties are reminded of their pretrial filing obligations set forth in section VIII of the case management plan (Dkt. No. 12).  In addition, the parties shall confer and file a joint issue instruction at least one week prior to the final pretrial conference.  The issue instruction serves as the Court's brief introduction of the case to the jury; it is read to the jury during *voir dire* and is included in the Court's preliminary instructions.  It needs to inform the jury who the parties are and what the case is about.  It is the Court's practice to require the parties to agree to a joint issue instruction; it is not acceptable for each side to propose one.

SO ORDERED:  7/18/2017

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification

30

Case 1:16-cv-00103-TWP-MJD Document 86-1 Filed 07/28/17 Page 326 of 344 PageID #:
1918
Case 1:16-cv-00103-WTL-MJD Document 76 Filed 07/26/17 Page 1 of 2 PageID #:1472

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

WILLIAM RAINSBERGER,               )
                                   )
    Plaintiff,                     )
                                   )
v.                                 )     Case No.:  1:16-cv-103-WTL-MJD
                                   )
CHARLES BENNER,                    )
                                   )
    Defendant.                     )

## DEFENDANT'S NOTICE OF APPEAL

    Notice is hereby given that Defendant Charles Benner appeals to the United States Court

of Appeals for the Seventh Circuit from the order denying him qualified immunity entered on July

18, 2017 at Docket Number 73.


                       Respectfully Submitted,


                        /s/ *Pamela G. Schneeman*
                        Pamela G. Schneeman, (18142-53)
                        Deputy Chief Litigation Counsel
                        Office of Corporation Counsel
                        200 East Washington Street, Room 1601
                        Indianapolis, Indiana  46204
                        Telephone: (317) 327-4055
                        Fax: (317) 327-3968
                        E-Mail: Pamela.Schneeman@indy.gov

Case 1:16-cv-00103-TWP-MJD   Document 86-1   Filed 07/28/17   Page 327 of 344 PageID #:
1919
Case 1:16-cv-00103-WTL-MJD   Document 76   Filed 07/26/17   Page 2 of 2 PageID #473

## CERTIFICATE OF SERVICE

I hereby certify that on July 26, 2017, a copy of the foregoing DEFENDANT'S NOTICE

OF APPEAL was filed electronically. Service of this filing will be made on all ECF-registered

counsel by operation of the Court's electronic filing system.  Parties may access this filing through

the Court's system.

Richard A. Waples
WAPLES & HANGER
410 N. Audubon Rd.
Indianapolis, IN  46219
rwaples@wapleshanger.com


_/s/ *Pamela G. Schneeman*
Pamela G. Schneeman, (18142-53)
Deputy Chief Litigation Counsel



OFFICE OF CORPORATION COUNSEL
200 East Washington Street, Room 1601
Indianapolis, Indiana 46204
Telephone: (317) 327-4055
Fax: (317) 327-3968

Case 1:16-cv-00103-TWP-MJD Document 88-1 Filed 07/28/17 Page 328 of 344 PageID #:
Case 1:16-cv-00103-WTL-MJD Document 80 Filed 07/26/17 Page 1 of 3 PageID #:
1920

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

WILLIAM RAINSBERGER,           )
                               )
        Plaintiff,             )
                               )
        v.                     )    Case No.: 1:16-cv-103-WTL-MJD
                               )
CHARLES BENNER,                )
                               )
        Defendant.             )

## APPELLANT CHARLES BENNER'S DOCKETING STATEMENT

Detective Charles Benner submits this docketing statement under Federal Rule of Appellate

Procedure 3 and Seventh Circuit Rule 3(c).

1.      **Statement of District Court Jurisdiction.** William Rainsberger brings his claims

against Detective Benner under 42 U.S.C. § 1983, alleging a violation of his Fourth and Fourteenth

Amendment rights. Accordingly, the District Court has federal question jurisdiction under 28

U.S.C. § 1331.

2.      **Statement of Appellate Jurisdiction.** The District Court denied summary

judgment on Detective Benner's request for qualified immunity in an order dated July 18, 2017.

Dkt. 73. No motions that would toll the time for appealing that order have been filed, and Detective

Benner filed his notice of appeal and paid the required filing fees on July 26, 2017. The Seventh

Circuit Court of Appeals has jurisdiction over Detective Benner's immediate appeal under 28

U.S.C. § 1291 and the collateral order doctrine because (a) the District Court's summary-judgment

order denied qualified immunity, (b) that qualified immunity determination conclusively decided

a disputed question that is separate from the merits, (c) the qualified immunity denial is effectively

unreviewable on appeal from the final judgment, and (d) Detective Benner's appeal will accept

those facts assumed by the district court, supplemented as appropriate only by undisputed facts

presented to the District Court. *Cf. Mitchell v. Forsyth*, 472 U.S. 511, 525-30 (1985); *Washington*

*v. Haupert*, 481 F.3d 543, 549 n.2 (7th Cir. 2007).

       3.      **Prior or Related Appellate Proceedings.** There have been no prior or related

appellate proceedings in this case.

       4.      **Official Capacity Claims.** Rainsberger is not pursuing any official capacity claims.

                            Respectfully Submitted,

                            */s/ Donald E. Morgan*
                            Donald E. Morgan
                            Chief Litigation Counsel
                            Office of Corporation Counsel
                            200 East Washington Street, Room 1601
                            Indianapolis, Indiana  46204
                            Telephone: (317) 327-4055
                            Fax: (317) 327-3968
                            E-Mail: donald.morgan@indy.gov

## CERTIFICATE OF SERVICE

I hereby certify that on July 26, 2017, a copy of the foregoing DOCKETING STATEMENT was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Richard A. Waples
WAPLES & HANGER
410 N. Audubon Rd.
Indianapolis, IN  46219
rwaples@wapleshanger.com

_/s/ Donald E. Morgan_
Donald E. Morgan
Chief Litigation Counsel

OFFICE OF CORPORATION COUNSEL
200 East Washington Street, Room 1601
Indianapolis, Indiana 46204
Telephone: (317) 327-4055
Fax: (317) 327-3968

3

Case 1:16-cv-00103-TWP-MJD   Document 88-1   Filed 11/28/17   Page 331 of 344 PageID #:
Case 1:16-cv-00103-WTL-MJD   Document 84   Filed 08/08/17   Page 1 of 12   PageID #:
1923

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

WILLIAM RAINSBERGER,           )
                               )
        Plaintiff,             )
                               )
        v.                     )   Case No.:  1:16-cv-103-WTL-MJD
                               )
CHARLES BENNER,                )
                               )
        Defendant.             )

### JOINT DESIGNATION OF RECORD FOR USE ON APPEAL

Under Southern District of Indiana Local Rule 76-1 and Seventh Circuit Rule 10, William Rainsberger and Detective Charles Benner jointly designate the items highlighted in Exhibit A to be included in the record for use in the appeal docketed as *William Rainsberger v. Charles Benner*, No. 17-2521. Where manually filed exhibits are highlighted, the parties respectfully request that the manually filed exhibits be provided to the Court of Appeals.

Respectfully submitted,

*/s/ Richard A. Waples (with permission)*          */s/ Donald E. Morgan*
Richard A. Waples                               Donald E. Morgan
WAPLES & HANGER                                 OFFICE OF CORPORATION COUNSEL
410 North Audubon Road                          200 East Washington Street, Room 1601
Indianapolis, IN 46219                          Indianapolis, IN  46204
rwaples@wapleshanger.com                        Telephone: (317) 327-4055
Telephone: (317) 357-0903                       Fax:  (317) 327-3968
Fax: (317) 357-0275                             donald.morgan@indy.gov

# Exhibit A

CM/ECF LIVE                                                                      Page 1 of 9
Case 1:16-cv-00103-TWP-MJD Document 84-1 Filed 11/28/17 Page 333 of 344 PageID #: 1925
Case 1:16-cv-00103-WTL-MJD Document 78-1 Filed 09/26/17 Page 3 of 121 PageID #: 1918

# *** PUBLIC DOCKET ***

APPEAL,CMP

**U.S. District Court**
**Southern District of Indiana (Indianapolis)**
**CIVIL DOCKET FOR CASE #: 1:16-cv-00103-WTL-MJD**

| | |
|---|---|
| RAINSBERGER v. BENNER | Date Filed: 01/12/2016 |
| Assigned to: Judge William T. Lawrence | Jury Demand: Plaintiff |
| Referred to: Magistrate Judge Mark J. Dinsmore | Nature of Suit: 440 Civil Rights: Other |
| Cause: 28:1331 Federal Question: Other Civil Rights | Jurisdiction: Federal Question |

**Plaintiff**

**WILLIAM RAINSBERGER**          represented by   **Richard A. Waples**
                                                 WAPLES & HANGER
                                                 410 N. Audubon Road
                                                 Indianapolis, IN 46219
                                                 (317)357-0903
                                                 Fax: (317)357-0275
                                                 Email: rwaples@wapleshanger.com
                                                 *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**CHARLES BENNER**          represented by   **Donald Eugene Morgan**
                                             OFFICE OF CORPORATION
                                             COUNSEL
                                             CITY OF INDIANAPOLIS
                                             200 E. Washington Street
                                             Suite 1601
                                             Indianapolis, IN 46204
                                             317-327-4081
                                             Fax: 317-237-3968
                                             Email: donald.morgan@indy.gov
                                             *ATTORNEY TO BE NOTICED*

                                             **Pamela G. Schneeman**
                                             OFFICE OF CORPORATION
                                             COUNSEL
                                             CITY OF INDIANAPOLIS
                                             200 E. Washington Street
                                             Suite 1601
                                             Indianapolis, IN 46204

CM/ECF LIVE
Page 2 of 9

Case 1:16-cv-00103-TWP-MJD Document 84-1 Filed 12/28/17 Page 334 of 344 PageID #: 1926
Case 1:16-cv-00103-WTL-MJD Document 74-1 Filed 08/28/17 Page 2 of 9 PageID #: 1926

(317) 327-4055
Fax: (317) 327-3968
Email: pamela.schneeman@indy.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/12/2016 | 1 | COMPLAINT *against CHARLES BENNER* against WILLIAM RAINSBERGER, filed by WILLIAM RAINSBERGER. (Filing fee $400, receipt number 0756-3736498) (Attachments: # 1 Civil Cover Sheet, # 2 appearance, # 3 Proposed Summons)(Waples, Richard) (Entered: 01/12/2016) |
| 01/13/2016 | 2 | Summons Issued as to CHARLES BENNER. (MEH) (Entered: 01/13/2016) |
| 01/13/2016 | 3 | MAGISTRATE JUDGE's NOTICE of Availability to Exercise Jurisdiction issued. (MEH) (Entered: 01/13/2016) |
| 01/23/2016 | 4 | RETURN of Service by CMRRR, filed by WILLIAM RAINSBERGER. CHARLES BENNER served on 1/19/2016. (Attachments: # 1 Receipt Cert Mail Card, Return Receipt)(Waples, Richard) (Entered: 01/23/2016) |
| 02/04/2016 | 5 | NOTICE of Appearance by Benjamin J. Church on behalf of Defendant CHARLES BENNER. (Church, Benjamin) (Entered: 02/04/2016) |
| 02/04/2016 | 6 | NOTICE of Parties' First Extension of Time, filed by Defendant CHARLES BENNER. (Church, Benjamin) (Entered: 02/04/2016) |
| 02/05/2016 | 7 | SCHEDULING ORDER: Initial Pretrial Conference set for 3/15/2016 01:50 PM in room #257, United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana before Magistrate Judge Mark J. Dinsmore. The parties shall file a proposed Case Management Plan ("CMP") no fewer than seven days before the pretrial conference (see Order for additional information). Signed by Magistrate Judge Mark J. Dinsmore on 2/5/2016.(SWM) (Entered: 02/08/2016) |
| 02/08/2016 | 8 | NOTICE of Appearance by Lynne Denise Hammer on behalf of Defendant CHARLES BENNER. (Hammer, Lynne) (Entered: 02/08/2016) |
| 03/07/2016 | 9 | CASE MANAGEMENT PLAN TENDERED, filed by Plaintiff WILLIAM RAINSBERGER . (Waples, Richard) (Entered: 03/07/2016) |
| 03/08/2016 | 10 | ANSWER to 1 Complaint *AND AFFIRMATIVE DEFENSES*, filed by CHARLES BENNER.(Hammer, Lynne) (Entered: 03/08/2016) |
| 03/15/2016 | 11 | MINUTE ORDER for proceedings held before Magistrate Judge Mark J. Dinsmore: Initial Pretrial Conference held on 3/15/2016. The Court will approve the Case Management Plan, by separate order, with the changes to which the parties have agreed. Settlement Conference set for 9/27/2016 at 09:00 AM in room #257, United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana before Magistrate Judge Mark J. Dinsmore. Status |

CM/ECF LIVE
Page 3 of 9
Case 1:16-cv-00103-TWP-MJD Document 84-1 Filed 12/28/17 Page 335 of 344 PageID #:
Case 1:16-cv-00103-WTL-MJD Document 78-1 Filed 08/28/17 Page 3 of 9 PageID #: 1580
1927

| | | Conference set for 5/13/2016 at 10:30 AM in Telephonic before Magistrate Judge Mark J. Dinsmore. *see order for additional information* Signed by Magistrate Judge Mark J. Dinsmore. (NLR) (Entered: 03/15/2016) |
|---|---|---|
| 03/15/2016 | 12 | ORDER: CASE MANAGEMENT PLAN APPROVED AS AMENDED. Dispositive Motions due by 12/23/2016. Discovery due by 11/23/2016. Signed by Magistrate Judge Mark J. Dinsmore on 3/15/2016.(SWM) (Entered: 03/15/2016) |
| 03/21/2016 | 13 | SCHEDULING ORDER: Jury Trial set for 9/11/2017 at 9:00 AM in room #202, United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana before Judge William T. Lawrence. Final Pretrial Conference set for 8/10/2017 at 10:00 AM in room #202, United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana before Judge William T. Lawrence. (DW) (Entered: 03/21/2016) |
| 03/21/2016 | 14 | TRIAL PROCEDURES AND PRACTICES before Judge William T. Lawrence. (DW) (Entered: 03/21/2016) |
| 04/12/2016 | 15 | NOTICE of Service of Initial Disclosures , filed by Defendant CHARLES BENNER. (Hammer, Lynne) (Entered: 04/12/2016) |
| 04/12/2016 | 16 | NOTICE of Service of Initial Disclosures , filed by Plaintiff WILLIAM RAINSBERGER. (Waples, Richard) (Entered: 04/12/2016) |
| 04/12/2016 | 17 | Witness List *Preliminary*, filed by Plaintiff WILLIAM RAINSBERGER. (Waples, Richard) (Entered: 04/12/2016) |
| 04/12/2016 | 18 | Exhibit List *Preliminary*, filed by Plaintiff WILLIAM RAINSBERGER. (Waples, Richard) (Entered: 04/12/2016) |
| 04/22/2016 | 19 | Witness List *Preliminary*, filed by Defendant CHARLES BENNER, Exhibit List *Preliminary*, filed by Defendant CHARLES BENNER. (Hammer, Lynne) (Entered: 04/22/2016) |
| 04/22/2016 | 20 | Witness List *Preliminary*, filed by Defendant CHARLES BENNER. (Hammer, Lynne) (Entered: 04/22/2016) |
| 05/13/2016 | 22 | MINUTE ORDER for proceedings held before Magistrate Judge Mark J. Dinsmore: Telephonic Status Conference held on 5/13/2016. The parties discussed the status of and future plans for discovery. Telephonic Status Conference set for 7/7/2016 at 1:00 PM (Eastern Time) before Magistrate Judge Mark J. Dinsmore. *See order for additional information.* Signed by Magistrate Judge Mark J. Dinsmore. (GD) (Entered: 05/13/2016) |
| 07/06/2016 | 24 | NOTICE of Appearance by Kathryn M. Box on behalf of Defendant CHARLES BENNER. (Box, Kathryn) (Entered: 07/06/2016) |
| 07/12/2016 | 25 | MINUTE ORDER for proceedings held before Magistrate Judge Mark J. Dinsmore: Telephonic Status Conference held on 7/7/2016. The parties discussed the status of and future plans for discovery. Telephonic Status Conference set for 8/26/2016 at 3:40 PM (Eastern Time) before Magistrate Judge Mark J. Dinsmore. In addition, the September 27, 2016 Settlement |

| | | Conference is hereby CONTINUED 10/7/2016 at 1:00 PM (Eastern Time). All other requirements of the Court's March 15, 2016 order scheduling the settlement conference [Dkt. 11 at 1-5] remain in effect. *See order for additional information.* Signed by Magistrate Judge Mark J. Dinsmore. (GD) (Entered: 07/13/2016) |
|---|---|---|
| 08/26/2016 | 27 | MINUTE ORDER for proceedings held before Magistrate Judge Mark J. Dinsmore: Telephonic Status Conference held on 8/26/2016. The parties discussed the status of and future plans for discovery. The parties confirmed they will be ready for the upcoming settlement conference. The conference was concluded without further order. Signed by Magistrate Judge Mark J. Dinsmore. (GD) (Entered: 08/29/2016) |
| 09/01/2016 | 28 | Unopposed MOTION *to Excuse Defendant Charles Benner from Attending the Settlement Conference*, filed by Defendant CHARLES BENNER. (Attachments: # 1 Text of Proposed Order)(Box, Kathryn) (Entered: 09/01/2016) |
| 09/02/2016 | 29 | ORDER granting 28 Motion to excuse Defendant Benner from attending the settlement conference. Signed by Magistrate Judge Mark J. Dinsmore on 9/2/2016. (CBU) (Entered: 09/06/2016) |
| 10/07/2016 | 30 | NOTICE of Appearance by Daniel Bowman on behalf of Defendant CHARLES BENNER. (Bowman, Daniel) (Entered: 10/07/2016) |
| 10/07/2016 | 31 | MINUTE ORDER for proceedings held before Magistrate Judge Mark J. Dinsmore: Settlement Conference held on 10/7/2016. Settlement was not achieved. Telephonic Status Conference set for 3/10/2017 at 1:30 PM (Eastern Time) before Magistrate Judge Mark J. Dinsmore. *See order for additional information.* Signed by Magistrate Judge Mark J. Dinsmore. (GD) (Entered: 10/07/2016) |
| 11/18/2016 | 32 | Unopposed MOTION for Extension of Time to , filed by Defendant CHARLES BENNER. (Attachments: # 1 Text of Proposed Order)(Box, Kathryn) (Entered: 11/18/2016) |
| 11/22/2016 | 33 | SCHEDULING ORDER: Telephonic Status Conference set for 11/23/2016 at 9:30 AM (Eastern Time) to discuss Defendant's Unopposed Motion seeking a 30-day extension of the dispositive motion, liability discovery, and expert disclosure deadlines. [Dkt. 32 .] Counsel shall attend the conference by calling the designated telephone number, to be provided by the Court via email generated by the Court's ECF system. Signed by Magistrate Judge Mark J. Dinsmore on 11/22/2016.(GD) (Entered: 11/22/2016) |
| 11/22/2016 | 35 | NOTICE of Withdrawal of Appearance by *Daniel Bowman* on behalf of CHARLES BENNER (Bowman, Daniel) (Entered: 11/22/2016) |
| 11/23/2016 | 36 | MINUTE ORDER for proceedings held before Magistrate Judge Mark J. Dinsmore: Telephonic Status Conference held on 11/23/2016. Defendant's motion 32 to enlarge certain deadlines GRANTED IN PART and DENIED IN PART. The approved Case Management Plan 12 amended as follows: II. |

|            |    | Jurisdiction and Statement of Claims C. On or before 12/23/2016, and consistent with the certification provisions of Fed. R. Civ. P. 11(b), the party with the burden of proof shall file a statement of the claims or defenses it intends to prove at trial, stating specifically the legal theories upon which the claims or defenses are based. IV. Discovery and Dispositive Motions B. Dispositive Motions due by 1/6/2017. Discovery due by 12/21/2016. All other requirements of the approved Case Management Plan 12 remain in effect. Telephonic Status Conference on 3/10/2017 31 remains on calendar as scheduled. *See order for additional deadlines and information.* Signed by Magistrate Judge Mark J. Dinsmore. (GD) (Entered: 11/28/2016) |
|------------|----|---|
| 12/22/2016 | 37 | Statement *of Defenses* by CHARLES BENNER. (Box, Kathryn) (Entered: 12/22/2016) |
| 12/23/2016 | 38 | Statement *of Claims for Trial* by WILLIAM RAINSBERGER. (Waples, Richard) (Entered: 12/23/2016) |
| 01/03/2017 | 39 | MOTION for Extension of Time to January 13, 2017 *to File a Dispositive Motion*, filed by Defendant CHARLES BENNER. (Attachments: # 1 Text of Proposed Order)(Box, Kathryn) (Entered: 01/03/2017) |
| 01/04/2017 | 40 | ORDER granting Defendant's 39 Motion to enlarge dispositive motion deadline. Dispositive motions due by 1/13/2017. Signed by Magistrate Judge Mark J. Dinsmore on 1/4/2017.(SWM) (Entered: 01/04/2017) |
| 01/13/2017 | 41 | MOTION for Summary Judgment , filed by Defendant CHARLES BENNER. (Box, Kathryn) (Entered: 01/13/2017) |
| 01/13/2017 | 42 | NOTICE *of Manual Filing*, filed by Defendant CHARLES BENNER (Box, Kathryn) (Entered: 01/13/2017) |
| 01/13/2017 | 43 | Designation of Evidence re 41 MOTION for Summary Judgment , filed by Defendant CHARLES BENNER. (Attachments: # 1 Exhibit 1- Affidavit for Probable Cause, # 2 Exhibit 2- William Rainsberger Deposition Excerpts, # 3 Exhibit 3- Manually filed, # 4 Exhibit 4- Affidavit of Carl Wooldridge, # 5 Exhibit 5- Deposition of Charles Benner, # 6 Exhibit 6- Tape Deposition of Jennifer Lane, # 7 Exhibit 7- Laboratory Examination Report, # 8 Exhibit 8- Affidavit of Charles Benner, # 9 Exhibit 9- Manually Filed, # 10 Exhibit 10- Interview, # 11 Exhibit 11- Taped Deposition of Pamela Pullium, # 12 Exhibit 12- Manually Filed, # 13 Exhibit 13- Photographs, # 14 Exhibit 14- Manually Filed, # 15 Exhibit 15- Electronic Journal File, # 16 Exhibit 16- Transaction Journal, # 17 Exhibit 17- Manually Filed, # 18 Exhibit 18- Manually Filed, # 19 Exhibit 19- Affidavit of Benjamin Bierce, # 20 Exhibit 20- Landline Usage, # 21 Exhibit 21-Email, # 22 Exhibit 22- Email, # 23 Exhibit 23- Robert Rainsberger Deposition excerpt)(Box, Kathryn) (Entered: 01/13/2017) |
| 01/13/2017 | 44 | BRIEF/MEMORANDUM in Support re 41 MOTION for Summary Judgment , filed by Defendant CHARLES BENNER. (Box, Kathryn) (Entered: 01/13/2017) |
|            |    | |

| | | |
|---|---|---|
| 01/17/2017 | 45 | Receipt of Six CDs re 42 NOTICE *of Manual Filing*, filed by Defendant CHARLES BENNER (Box, Kathryn) (BRR) (Entered: 01/17/2017) |
| 02/07/2017 | 46 | MOTION for Extension of Time to File Response to February 13, 2017 re 41 MOTION for Summary Judgment , filed by Plaintiff WILLIAM RAINSBERGER. (Attachments: # 1 Text of Proposed Order)(Waples, Richard) (Entered: 02/07/2017) |
| 02/09/2017 | 47 | ORDER granting Plaintiff's 46 Motion for Extension of Time to File Response to 2/13/2017 re 41 MOTION for Summary Judgment . Signed by Magistrate Judge Mark J. Dinsmore on 2/9/2017. (SWM) (Entered: 02/10/2017) |
| 02/13/2017 | 48 | MOTION for Leave to File *over-sized summary judgment response brief*, filed by Plaintiff WILLIAM RAINSBERGER. (Attachments: # 1 Text of Proposed Order)(Waples, Richard) (Entered: 02/13/2017) |
| 02/13/2017 | 49 | RESPONSE in Opposition re 41 MOTION for Summary Judgment *Memorandum*, filed by Plaintiff WILLIAM RAINSBERGER. (Waples, Richard) (Entered: 02/13/2017) |
| 02/13/2017 | 50 | Designation of Evidence re 44 Brief/Memorandum in Support *of Plaintiff's Response to Defendant's Motion for Summary Judgment*, filed by Plaintiff WILLIAM RAINSBERGER. (Attachments: # 1 Exhibit Email from Charles Benner to Amelia Basham, March 20, 2014, # 2 Exhibit Deposition of Michael Price, Sept. 8, 2014, # 3 Exhibit Criminal Deposition of Charles Benner, Nov. 25, 2014, # 4 Exhibit Bail Testimony of Charles Benner, July 17, 2014, # 5 Exhibit Information for Murder Charge, May 22, 2014, # 6 Exhibit Affidavit of Probable Cause, May 22, 2014, # 7 Exhibit Deposition of Carl Wooldridge, Sept. 8, 2014, # 8 Exhibit Affidavit of Probable Cause, Dec. 6, 2013, # 9 Exhibit Civil Deposition of Charles Benner, September 27, 2016, # 10 Exhibit William Rainsberger Statement, Nov. 20, 2013, # 11 Exhibit Robert Rainsberger Statement, Nov. 19, 2013, # 12 Exhibit Mari Bilger Deposition, Dec. 20, 2016, # 13 Exhibit Robert Rainsberger Deposition, Dec. 20, 2016, # 14 Exhibit Criminal Case Dismissal Motion and Order, July 7, 2015, # 15 Exhibit William Rainsberger Affidavit, # 16 Exhibit Deposition of Dr. Eric Streib, March 27, 2015, # 17 Exhibit William Rainsberger Deposition Errata, # 18 Exhibit William Rainsberger Deposition, # 19 Exhibit Robert Rainsbergers Processed Cell Phone Records Map, # 20 Exhibit Robert Rainsbergers Processed Cell Phone Records, # 21 Exhibit William Rainsbergers Processed Cell Phone Records Map, # 22 Exhibit William Rainsbergers Processed Cell Phone Records, # 23 Exhibit Manuel v. City of Joliet, Transcript of Oral Arg., # 24 Exhibit William Rainsberger Statement, Nov. 19, 2013, # 25 Exhibit Ruth Rainsbergers AT&T Land line Records, # 26 Exhibit Forensic Services Agency Note, 11-19-2013, # 27 Exhibit Rebecca Rainsberger Statement, Nov. 20, 2013., # 28 Exhibit Deposition of Jennifer Lane, Sept. 8, 2014, # 29 Exhibit Affidavit of David Hennessy, # 30 Exhibit Affirmation of Kim Rossmo, # 31 Exhibit Expert Disclosure of Kim Rossmo (Rossmo Report), # 32 Exhibit CV of Kim Rossmo, # 33 Exhibit Lab Exam Report, DNA Report (highlighted) |

CM/ECF LIVE                                                    Page 7 of 9
Case 1:16-cv-00103-TWP-MJD Document 84-1 Filed 11/08/17 Page 339 of 344 PageID #
Case 1:16-cv-00103-WTL-MJD Document 78-1 Filed 08/22/17 Page 339 of 121 PageID #
1931

| | | |
|---|---|---|
| | | (Indianapolis-Marion County Forensic Services Agency Laboratory Examination Report), # 34 Exhibit Lab Exam Report, DNA Report (Indianapolis-Marion County Forensic Services Agency Laboratory Examination Report))(Waples, Richard) (Entered: 02/13/2017) |
| 02/14/2017 | 51 | ORDER - granting 48 Motion for Leave to File. Plaintiff may file an oversized summary judgment response brief up to 39 pages. Signed by Judge William T. Lawrence on 2/14/2017. (BRR) (Entered: 02/14/2017) |
| 02/17/2017 | 52 | Unopposed MOTION for Extension of Time to April 3, 2017 *to Serve Expert Disclosures*, filed by Defendant CHARLES BENNER. (Attachments: # 1 Text of Proposed Order)(Box, Kathryn) (Entered: 02/17/2017) |
| 02/17/2017 | 53 | MOTION to Withdraw Attorney Appearance *of Kathryn M. Box*, filed by Defendant CHARLES BENNER. (Box, Kathryn) (Entered: 02/17/2017) |
| 02/21/2017 | 54 | NOTICE of Appearance by Pamela G. Schneeman on behalf of Defendant CHARLES BENNER. (Schneeman, Pamela) (Entered: 02/21/2017) |
| 02/21/2017 | 55 | MOTION to Withdraw Attorney Appearance *of Lynne D. Hammer and Benjamin J. Church*, filed by Defendant CHARLES BENNER. (Attachments: # 1 Text of Proposed Order)(Schneeman, Pamela) (Entered: 02/21/2017) |
| 02/21/2017 | 56 | Submission of Proposed Order , re 53 MOTION to Withdraw Attorney Appearance *of Kathryn M. Box*, filed by Defendant CHARLES BENNER. (Box, Kathryn) (Entered: 02/21/2017) |
| 02/21/2017 | 57 | Joint MOTION for Extension of Time to February 27, 2017 *to File Final Witness and Exhibit List*, filed by Defendant CHARLES BENNER. (Attachments: # 1 Text of Proposed Order)(Schneeman, Pamela) (Entered: 02/21/2017) |
| 02/22/2017 | 58 | ORDER granting 53 Motion to Withdraw Attorney Appearance. Attorney Kathryn M. Box withdrawn. Signed by Magistrate Judge Mark J. Dinsmore on 2/22/2017. (SWM) (Entered: 02/22/2017) |
| 02/22/2017 | 59 | ORDER granting 55 Motion to Withdraw Attorney Appearance. Attorney Benjamin J. Church and Lynne Denise Hammer withdrawn. Signed by Magistrate Judge Mark J. Dinsmore on 2/22/2017. (SWM) (Entered: 02/22/2017) |
| 02/22/2017 | 60 | SCHEDULING ORDER: This matter comes before the Court on Defendant's Unopposed Motion to Extend the Expert Disclosure Deadline [Dkt. 52] and the parties' Joint Motion for Extension of Time to File Final Witness and Exhibit Lists [Dkt. 57]. Those motions are set for a telephonic hearing before the Magistrate Judge at 8:30 a.m. (Eastern) on Friday, February 24, 2017. Counsel shall attend the hearing by calling the designated telephone number, to be provided by the Court via email generated by the Court's ECF system. Signed by Magistrate Judge Mark J. Dinsmore on 2/22/2017.(SWM) (Entered: 02/22/2017) |

CM/ECF LIVE                                                    Page 8 of 9
Case 1:16-cv-00103-TWP-MJD   Document 88-1   Filed 11/28/17   Page 340 of 344   PageID #:
Case 1:16-cv-00103-WML-MJD   Document 84-1   Filed 08/28/17   Page 98 of 121   PageID #:
1932

| 02/23/2017 | 62 | NOTICE of Appearance by Donald Eugene Morgan on behalf of Defendant CHARLES BENNER. (Morgan, Donald) (Entered: 02/23/2017) |
| 02/24/2017 | 63 | MINUTE ORDER for proceedings held before Magistrate Judge Mark J. Dinsmore: This matter came before the Court for a hearing on Defendant's motion to enlarge the Defendant's expert disclosure deadline [Dkt. 52 ] and the parties' joint motion to enlarge the deadline to file their final witness and exhibit lists [Dkt. 57 ]. The Court heard argument from the parties with regard to the motions and hereby orders as follows: Defendant's motion to enlarge the Defendant's expert disclosure deadline [Dkt. 52 ] is hereby GRANTED IN PART and DENIED IN PART. The parties' joint motion to enlarge the deadline to file their final witness and exhibit lists [Dkt. 57 ] is hereby GRANTED. All parties shall file and serve their final witness and exhibit lists on or before February 27, 2017. (See Entry.) Signed by Magistrate Judge Mark J. Dinsmore. (BRR) (Entered: 02/24/2017) |
| 02/27/2017 | 64 | Witness List *Final*, filed by Plaintiff WILLIAM RAINSBERGER. (Waples, Richard) (Entered: 02/27/2017) |
| 02/27/2017 | 65 | Exhibit List *Final*, filed by Plaintiff WILLIAM RAINSBERGER. (Waples, Richard) (Entered: 02/27/2017) |
| 02/27/2017 | 66 | REPLY in Support of Motion re 41 MOTION for Summary Judgment , filed by Defendant CHARLES BENNER. (Morgan, Donald) (Entered: 02/27/2017) |
| 02/27/2017 | 67 | Exhibit List *Final*, filed by Defendant CHARLES BENNER, Witness List *Final*, filed by Defendant CHARLES BENNER. (Morgan, Donald) (Entered: 02/27/2017) |
| 03/10/2017 | 69 | MINUTE ORDER for proceedings held before Magistrate Judge Mark J. Dinsmore: Telephonic Status Conference held on 3/10/2017. The parties discussed the status of and future plans for discovery. The conference was concluded without further order. Signed by Magistrate Judge Mark J. Dinsmore. (GD) (Entered: 03/10/2017) |
| 03/24/2017 | 70 | Exhibit List *Final*, filed by Defendant CHARLES BENNER, Witness List *Amended Final*, filed by Defendant CHARLES BENNER. (Schneeman, Pamela) (Entered: 03/24/2017) |
| 03/24/2017 | 71 | NOTICE *of Service of Expert Disclosure*, filed by Defendant CHARLES BENNER (Schneeman, Pamela) (Entered: 03/24/2017) |
| 03/27/2017 | 72 | Submission *of Supplemental Authority on Summary Judgment Motion*, filed by Plaintiff WILLIAM RAINSBERGER. (Attachments: # 1 Exhibit Manuel v. City of Joliet)(Waples, Richard) (Entered: 03/27/2017) |
| 07/18/2017 | 73 | ORDER denying 41 Motion for Summary Judgment. This cause remains set for trial on September 11, 2017. The final pretrial conference will be held on August 10, 2017. The parties are reminded of their pretrial filing obligations set forth in section VIII of the case management plan Dkt. No. 12 . In addition, the parties shall confer and file a joint issue instruction at least one |

CM/ECF LIVE                                                                          Page 9 of 9
Case 1:16-cv-00103-TWP-MJD   Document 88-1   Filed 11/28/17   Page 341 of 344 PageID #:
Case 1:16-cv-00103-WTL-MJD   Document 84   Filed 08/28/17   Page 91 of 91 PageID #:
1933

| | | |
|---|---|---|
| | | week prior to the final pretrial conference. The issue instruction serves as the Court's brief introduction of the case to the jury; it is read to the jury during voir dire and is included in the Court's preliminary instructions. It needs to inform the jury who the parties are and what the case is about. It is the Court's practice to require the parties to agree to a joint issue instruction; it is not acceptable for each side to propose one. Signed by Judge William T. Lawrence on 7/18/2017. (JDC) (Entered: 07/18/2017) |
| 07/21/2017 | 74 | SCHEDULING ORDER: Settlement Conference set for 7/28/2017 01:00 PM (Eastern Time) in room #257, United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana before Magistrate Judge Mark J. Dinsmore. On or before July 26, 2017, the parties may, but need not, submit (not file) supplemental confidential settlement statements if they wish to do so; any such statements should be submitted via email to MJDinsmore@insd.uscourts.gov. See Order for additional information. Signed by Magistrate Judge Mark J. Dinsmore on 7/21/2017.(SWM) (Entered: 07/21/2017) |
| 07/24/2017 | 75 | MOTION to Vacate *July 28 Settlement Conference*, filed by Defendant CHARLES BENNER. (Attachments: # 1 Text of Proposed Order) (Schneeman, Pamela) (Entered: 07/24/2017) |
| 07/26/2017 | 76 | NOTICE OF APPEAL as to 73 Order on Motion for Summary Judgment, filed by Defendant CHARLES BENNER. (Filing fee $505, receipt number 0756-4462073) (Schneeman, Pamela) (Entered: 07/26/2017) |
| 07/26/2017 | 77 | MOTION to Stay *Case Pending Appeal*, filed by Defendant CHARLES BENNER. (Attachments: # 1 Text of Proposed Order)(Schneeman, Pamela) (Entered: 07/26/2017) |

**Case #: 1:16-cv-00103-WTL-MJD**

## CERTIFICATE OF SERVICE

I hereby certify that on August 8, 2017, a copy of the foregoing designation was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Richard A. Waples
WAPLES & HANER
410 N. Audubon Road
Indianapolis, IN  46219
rwaples@wapleshanger.com

/s/ Donald E. Morgan
Donald E. Morgan
Chief Litigation Counsel

OFFICE OF CORPORATION COUNSEL
200 East Washington Street, Room 1601
Indianapolis, Indiana  46204
Telephone: (317) 327-4055
Fax:  (317) 327-3968

3

## SEVENTH CIRCUIT TRANSCRIPT INFORMATION SHEET

PART I – Must be completed by party or party's attorney pursuant to Rule 10(b) of the Federal Rules of Appellate Procedure and Rule 11(a) of the Circuit Rules. The appellant must file this form with the court reporter within 14 days of filing the notice of appeal, whether transcript is being ordered or not. (FRAP 10(b)(1)) Satisfactory arrangements with the court reporter for payment of the costs of the transcripts must also be made at that time. (FRAP 10(b)(4)) (Note: Appellees as well as appellants are expected to use this form when ordering transcripts.)

| Short Title<br>Rainsberger v. Benner | District<br>S.D. Ind. | D.C. Docket No.<br>1:16-cv-103-WTL-MJD |
|---|---|---|
| | District Judge<br>Lawrence | Court Reporter |

| | |
|---|---|
| ☐ I am ordering transcript.<br>☑ I am not ordering transcript because: No transcript relevant to issues on appeal<br>☐ The transcript has been prepared. | Sign below and return original and one copy to court reporter. Distribute remaining copies to the Clerk of the District Court and opposing party, retaining one copy for yourself. |

Indicate proceedings for which transcript is required. Dates must be provided:                    Date(s)

☐ Pretrial proceedings. Specify: _____    _____

☐ Voir Dire                                                                          _____

Trial or Hearing. Specify: _____          _____

☐ Opening statement                                                               _____

☐ Instruction conference                                                          _____

☐ Closing statements                                                              _____

☐ Court instructions                                                              _____

☐ Post-trial proceedings. Specify: _____            _____

☐ Sentencing                                                                      _____

☐ Other proceedings. Specify: _____                 _____

| Method of Payment: | ☐ Cash | ☐ Check or Money Order | ☐ C.J.A. Voucher |
|---|---|---|---|
| Status of Payment: | ☐ Full Payment | ☐ Partial Payment | ☐ No Payment Yet |

Signature:    s/ Donald E. Morgan                                    Telephone No. 317-327-4055
Address:      200 East Washington Street, Suite 1601
              Indianapolis, IN 46204                                 Date: 8/21/2017

PART II – Must be completed by Court Reporter pursuant to Rule 11(b) of the Federal Rules of Appellate Procedure. By signing this Part II, the Court Reporter certifies that *satisfactory arrangements for payment have been made.*

| U.S.C.A. Docket No. | Date Order Received | Estimated Completion Date | Estimated Length |
|---|---|---|---|
| | | | |

Signature of Court Reporter:    s/ _____    Date: _____

NOTICE: The Judicial Conference of the United States, by its resolution of March 11, 1982, has provided that a penalty of 10 percent must apply, unless a waiver is granted by the Court of Appeals' Clerk, when a "transcript of a case on appeal is not delivered within 30 days of the date ordered and payment received therefor." The penalty is 20 percent for transcript not delivered within 60 days.

Original to Court Reporter. Copies to: ● U.S.C.A. Clerk ● Service Copy ● District Court Clerk and to ● Party / Counsel Ordering Transcript.

Case 1:16-cv-00103-TWP-MJD Document 88-1 Filed 11/28/17 Page 344 of 344 PageID #:
1936
Case 1:16-cv-00103-WTL-MJD Document 85 Filed 08/21/17 Page 2 of 2 PageID #: 507

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 21, 2017, a copy of the foregoing was filed electronically.

Service of this filing will be made on all ECF-registered counsel by operation of the Court's

electronic filing system. Parties may access this filing through the Court's system.

Richard A. Waples
WAPLES & HANGER
410 N. Audubon Rd.
Indianapolis, IN 46219
rwaples@wapleshanger.com


                                        /s/ *Donald E. Morgan*
                                        Donald E. Morgan
                                        Chief Litigation Counsel


OFFICE OF CORPORATION COUNSEL
200 East Washington Street, Room 1601
Indianapolis, Indiana 46204
Telephone: (317) 327-4055
Fax: (317) 327-3968