# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| **WILLIAM RAINSBERGER,** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | **CAUSE NO. 1:16-cv-103-WTL-MJD** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CHARLES BENNER,** | ) | |
| | ) | |
| **DEFENDANT.** | ) | |


## PLAINTIFF'S DESIGNATION OF EVIDENCE
## IN RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, by counsel, designates the following evidence in support of his response to defendant's motion for summary judgment:

Affidavit of Probable Cause, Dec. 6, 2013

Affidavit of Probable Cause, May 22, 2014

Information for Murder Charge, May 22, 2014

Criminal Case Dismissal Motion and Order, July 7, 2015

William Rainsberger Statement, Nov. 19, 2013

William Rainsberger Statement, Nov. 20, 2013

William Rainsberger Affidavit

William Rainsberger Deposition and Errata

Robert Rainsberger Statement, Nov. 19, 2013

Robert Rainsberger Deposition, Dec. 20, 2016

Rebecca Rainsberger Statement, Nov. 20, 2013.

Mari Bilger Deposition, Dec. 20, 2016

Civil Deposition of Charles Benner, September 27, 2016

Criminal Deposition of Charles Benner, Nov. 25, 2014

Bail Testimony of Charles Benner, July 17, 2014

Deposition of Jennifer Lane, Sept. 8, 2014

Deposition of Michael Price, Sept. 8, 2014

Affidavit of David Hennessy

Deposition of Dr. Eric Streib, March 27, 2015

Deposition of Carl Wooldridge, Sept. 8, 2014

Expert Disclosure of Kim Rossmo (Rossmo Report)

CV of Kim Rossmo

Affirmation of Kim Rossmo

Ruth Rainsberger's AT&T Land line Records

William Rainsberger's Processed Cell Phone Records

William Rainsberger's Processed Cell Phone Records Map

Robert Rainsberger's Processed Cell Phone Records

Robert Rainsberger Processed Cell Phone Records Map

Email from Charles Benner to Amelia Basham, March 20, 2014

Forensic Services Agency Note, 11-19-2013

Lab Exam Report, DNA Report (Indianapolis-Marion County Forensic Services Agency
    Laboratory Examination Report)

Lab Exam Report, DNA Report (highlighted) (Indianapolis-Marion County Forensic
    Services Agency Laboratory Examination Report)

*Manuel v. City of Joliet,* Transcript of Oral Arg.

Plaintiff also relies upon the Defendant's submission of summary judgment materials.

Respectfully submitted,

Dated: February 13, 2017                    */s/ Richard A. Waples*
                                            Richard A. Waples
                                            Attorney for Plaintiff

**WAPLES & HANGER**
410 N. Audubon Road
Indianapolis, Indiana 46219
TEL: (317) 357-0903
FAX: (317) 357-0275
EMAIL: rwaples@wapleshanger.com

## CERTIFICATE OF SERVICE

The undersigned certifies that on February 13, 2017 this document was filed electronically

and the following counsel of record will have access to the document pursuant to the Court's

electronic fling system:

> Kathryn Box at Kathryn.Box@indy.gov
> Lynne D. Hammer at Lynne.Hammer@indy.gov
> Benjamin J. Church at Benjamin.Church@indy.gov
>
> Office of Corporation Counsel
> 200 East Washington Street, Room 1601
> Indianapolis, Indiana 46204
>
>                    */s/ Richard A.Waples*
>                    Richard A. Waples
>                    Attorney for Plaintiff

**WAPLES & HANGER**
410 N. Audubon Road
Indianapolis, IN 46219
TEL: (317) 357-0903
FAX: (317) 357-0275
EMAIL: rwaples@wapleshanger.com

Thank you.

Thanks~

Amelia Basham
Indiana Criminal Justice Institute
101 West Washington Street~ Suite 1170E
Indianapolis, Indiana 46204
(p) 317-232-0157 ~(toll free) 1-800-353-1484~(f) 317-233-3912
(e) abasham@cji.in.gov<mailto:abasham@cji.in.gov>
Website: www.in.gov/cji<http://www.in.gov/cji>

From: Benner, Charles [mailto:Charles.Benner@indy.gov]
Sent: Thursday, March 20, 2014 10:23 PM
To: Basham, Amelia
Subject: RE: URGENT V13-1098- Victim: Ruth Rainsberger - Homicide


OK, I'll fill it out when I get back to work Saturday.


-----Original Message-----
From: Basham, Amelia [mailto:ABasham@cji.IN.gov]
Sent: Thu 3/20/2014 4:18 PM
To: Benner, Charles
Subject: RE: URGENT V13-1098- Victim: Ruth Rainsberger - Homicide

Rebecca Rainsberger filed as the claimant on this case.  She is seeking victim compensation to help by for the funeral expenses.

Thanks~

Amelia Basham
Indiana Criminal Justice Institute
101 West Washington Street~ Suite 1170E
Indianapolis, Indiana 46204
(p) 317-232-0157 ~(toll free) 1-800-353-1484~(f) 317-233-3912
(e) abasham@cji.in.gov<mailto:abasham@cji.in.gov>
Website: www.in.gov/cji<http://www.in.gov/cji>

From: Benner, Charles [mailto:Charles.Benner@indy.gov]
Sent: Thursday, March 20, 2014 4:15 PM
To: Basham, Amelia
Subject: RE: URGENT V13-1098- Victim: Ruth Rainsberger - Homicide


I'm sorry I have not responded to this request but I am not sure who filed for the compensation. The victim's sons are the suspects in this case and I am waiting for DNA results before any arrest may be made. I just do not want to compensate anyone who may have killed the victim. Thanks


-----Original Message-----
From: Basham, Amelia [mailto:ABasham@cji.IN.gov]
Sent: Thu 3/20/2014 12:40 PM
To: Benner, Charles
Subject: FW: URGENT V13-1098- Victim: Ruth Rainsberger - Homicide

Please see chain below.

Thanks~

Amelia Basham

| STATE OF INDIANA | ) | IN THE MARION SUPERIOR COURT |
| | ) SS: | CRIMINAL DIVISION 1 |
| COUNTY OF MARION | ) | CAUSE NO. 49G01-1405-MR-026747 |

| STATE OF INDIANA, | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| | ) |
| WILLIAM RAINSBERGER, | ) |
| Defendant. | ) |

## TAPED DEPOSITION OF OFFICER MICHAEL PRICE

Q   David R. Hennessy
A   Officer Michael Price
Pros   Marielle Vincent

1   Q   This is September 8, 2014 depositions on William Rainsberger.  Marielle Vincent for the

2       State and myself for the defense.  Our next deponent is Officer Price. Do you want to pull

3       up just a little bit and do you solemnly swear to tell the truth?

4   A   Yes I do.

5   Q   His hand went up everybody.  State your name.

6   A   Officer Michael Price.

7   Q   November 19, 2013 what was your district and shift assignment?

8   A   Uh middle shift, east (inaudible)

9   Q   And how long have you worked that area?

10  A   Um 5 years.

11  Q   And what do you know about the Jeffersonian in general?

12  A   Uh a lot of time a lot of just miscellaneous medical runs and things usually when we go

13      there typically.

14  Q   What about assaults, burglary and stuff like that?

15  A   No not really too much.  Not that I've been on.

1

| | | |
|---|---|---|
| 1 | Q | Do you know if there's anything else that 801 Jefferson I mean 801 North Shortridge? |
| 2 | A | As far as? |
| 3 | Q | Well when I run that address through the uh IMPD |
| 4 | A | Uh huh. |
| 5 | Q | Um well I don't want to tell Marielle yet so never mind I'm not even going to go there |
| 6 | | with you, okay. So on November 19, 2013 you end up going to building H? |
| 7 | A | Right. |
| 8 | Q | Why? |
| 9 | A | Uh we got a run there and it was uh basically like a head injury for somebody. I think it |
| 10 | | was head injured but it didn't sound real critical at the time the run came out. It didn't |
| 11 | | sound like an emergency. I mean, you know what I mean, like a real high alert type of |
| 12 | | thing. |
| 13 | Q | Not that you need to be looking for a few people as you arrive, not that sense of urgency. |
| 14 | A | Right, of course you never know what you're go into but. |
| 15 | Q | Right, when you show up what do you see? |
| 16 | A | Well I had an officer buddy that was running the same zone, he had gotten there like a |
| 17 | | minute before me so he was there. |
| 18 | Q | Who was |
| 19 | A | Officer Lewis. |
| 20 | Q | Lewis? |
| 21 | A | But I ended up pretty much cause it's my zone most of the time he had been filling in |
| 22 | | kind of thing and so I took over once I got there pretty much. The medics had come up to |
| 23 | | me pretty much right away cause like I said I thought it was just based on the run uh and |
| 24 | | the information it was going to be like a head injury or something fairly minor but then |

2

1  the medics were also on scene and uh I remember the one medic, the lady, sorry I forget

2  her name, she came up to me and she immediately said that something about a gunshot

3  wound, or she believed it might be.  So that obviously instantly made it go up, it

4  escalated a little bit in my mind.

5  Q  When you get there, there's a fire truck there, right?

6  A  Yeah I believe so.

7  Q  Lewis is close in time?

8  A  Right.

9  Q  Even right before or about the same time, right?

10  A  Uh huh.

11  Q  Is that a yes?  They have to type this up so is that a yes?

12  A  Oh yes, yes.

13  Q  And is the ambulance there?

14  A  Yes.

15  Q  Okay so when you arrive are they wheeling the lady out?

16  A  No.

17  Q  Uh have they came out at all yet?

18  A  They had, they met me outside right behind the ambulance.

19  Q  So she's already

20  A  That's where I pulled up.

21  Q  So she's already loaded, the victim?

22  A  No.

23  Q  Okay, well do you see her come out?

3

| 1  | A | Uh not right then I mean cause obviously once they believe that it was something further |
| 2  |   | than maybe a possible gunshot, homicide type stuff they I believe they instantly backed |
| 3  |   | out of it because their protocol is usually you know let a police come and check it out and |
| 4  |   | deal with it first. |
| 5  | Q | Okay, there's a paramedic on the fire truck and there's an ambulance there and you say |
| 6  |   | you recognized the one paramedic, right? Is that a yes. |
| 7  | A | Yes. |
| 8  | Q | Do you recognize her as being connected to the ambulance? |
| 9  | A | Yes she's usually on the ambulance most from my experiences with her in the past. |
| 10 | Q | Okay and that was a female? |
| 11 | A | Yes. |
| 12 | Q | Any idea who she is? |
| 13 | A | I do but I just drew a blank but I see her regularly, I seen her again the other day. |
| 14 | Q | But I mean you can't tell us a name or anything? |
| 15 | A | It's one of those as soon as you say it, it's on the tip of my tongue. |
| 16 | Q | And I'm trying to picture it, you're outside. |
| 17 | A | Uh huh. |
| 18 | Q | Had you seen the two civilian people yet? |
| 19 | A | The I mean my first instinct when I pull up the first thing I know I make eye contact with |
| 20 |   | is the medic and she informs me of what could it could possibly be compared to what we |
| 21 |   | originally had thought it was. |
| 22 | Q | How many civilians do you think there in the area when you get there? |
| 23 | A | Uh not very many there's not a lot of people out at that time so it's just the paramedics |
| 24 |   | and firemen like that. |

| 1 | Q | You end up taking one guy downtown? |
|---|---|---|
| 2 | A | Yes. |
| 3 | Q | Do you remember where and when you first saw him? |
| 4 | A | Yes so as soon as I was you know alerted and they backed out and they tell me what's |
| 5 | | going on uh he was sitting in the front of the apartment, in front of the building.  There's |
| 6 | | like a brick wall that you kind of have to walk around to go to the main door to get into |
| 7 | | the building and he was sitting on that ledge in front of the building, in front of this, her |
| 8 | | apartment. |
| 9 | Q | What was he doing? |
| 10 | A | Uh he was just looking down and had his head down and just kind of looking at the |
| 11 | | ground, not making eye contact or anything. |
| 12 | Q | So he's sitting there, the medical people are inside, the one lady comes out and tells you |
| 13 | | hey it's a gunshot. |
| 14 | A | Well I believe they all came out at that time. |
| 15 | Q | Okay, I'm trying to picture if they haven't brought her out yet when do you see that |
| 16 | | happen? |
| 17 | A | Uh well that's after I actually went in and got you know, because they didn't want to |
| 18 | | move her or anything if she's dead obviously.  Um so once I'm alerted that it could be |
| 19 | | something else I need to check and see what's going on. |
| 20 | Q | So you went in the apartment? |
| 21 | A | I made eye contact with the guys not even sure really who they are yet and I want to go in |
| 22 | | and find out what I'm dealing with cause you have to secure the scene. |
| 23 | Q | So you actually went into the apartment? |
| 24 | A | Yes. |

1    Q    Are you the only officer that went in?

2    A    At that time yes.

3    Q    Then when you go in do you see the fire people there?

4    A    I'm trying to remember that cause I know it was one time they were in there but I think

5         they I think I believe that they were, but I'm not 100% on that as right now, my mind's

6         just didn't and I remember passing them because I wanted to secure the apartment and

7         make sure nobody was hiding or anything like that.  I didn't want to get snuck up on.

8    Q    Is uh did you see the lady laying on the ground when you go in?

9    A    In my, yes.

10   Q    Is the blanket still on her head?

11   A    Yes.

12   Q    And can you describe that.

13   A    Well no I take that back I think it was, my picture in my mind says it was still on her head

14        but I know that the fire fighters would have moved it to try to save her if they had a

15        chance, I know that but I can't tell you definitively.

16   Q    Do you just go through all the rooms and open closet doors and stuff like that?

17   A    Um yeah try not to disturb as much as possible but I obviously I've got to open the door.

18        I don't go through drawers or anything like that but

19   Q    Right.

20   A    But open where a person could be.

21   Q    And uh so you're saying the ambulance people had backed out until you cleared?

22   A    Right.

23   Q    And confirmed it safe.

24   A    Right.

6

| 1  | Q | And then are you inside then when they come back in and put her on the stretcher? |
|----|---|---|
| 2  | A | Um yes I was in there once that happened. I'm not sure of the timeline exactly uh but I |
| 3  |   | would say once we confirm or you know DOA or whatever that's at that point, you know, |
| 4  |   | contact the detectives and all of that before we just remove but I don't remember the time |
| 5  |   | frame on that. |
| 6  | Q | Well she was not DOA. |
| 7  | A | Yeah but that's what my point so I don't remember the timeline like if we sat back and, |
| 8  |   | I'm not sure how that went down in the beginning. |
| 9  | Q | A lady says gunshot wound. Did she say anything to you about why or anything giving |
| 10 |   | you some idea why she thought that? |
| 11 | A | Uh no I mean other than I think she had said something about the um no not real I mean I |
| 12 |   | can't, not exactly sure what she said. |
| 13 | Q | Well you go in, do you smell gun powder or any other evidence of a gunshot? |
| 14 | A | No. |
| 15 | Q | No shell casings or anything? |
| 16 | A | Not at the time no. |
| 17 | Q | Have you responded to shootings in confined area and do you note the residual odor of |
| 18 |   | gunpowder from gunshots? |
| 19 | A | I mean there could be yes. I would say the main thing would be shell casings usually you |
| 20 |   | find some you know, there's usually something pretty close. |
| 21 | Q | Well I have a fellow that had an accidental discharge in his um living room and he said |
| 22 |   | the gunpowder lingered for a day. |
| 23 | A | Right. |

7

| | | |
|---|---|---|
| 1 | Q | I wonder if you have shared this experience when you show up where there has been a |
| 2 | | gun discharges. |
| 3 | A | I was just on one yesterday and they had 9 or 15 rounds loaded in and I didn't smell it. |
| 4 | Q | Is that in a |
| 5 | A | Yeah it was right in the entry way. I don't know if it was cause my senses was going to |
| 6 | | the scene and figuring everything out and shut the nose down or. |
| 7 | Q | Okay uh so do you see her then get loaded on the ambulance and leave? |
| 8 | A | Yes. |
| 9 | Q | And then what's your next contact with the man you ended up taking? |
| 10 | A | Well obviously I found out he was family members so that's going to be my next of kin |
| 11 | | and try to you know talk to them, who are they, what the whole story and it was William |
| 12 | | that I spoke with. I noticed both of them like I said. |
| 13 | Q | How were they identified to you as family? |
| 14 | A | Um I believe the medic had just pointed out that's some that's family or of some sort. I |
| 15 | | don't know how she said it but I think that's what drew my attention and I went up and |
| 16 | | just you know introduced myself and talked to them. |
| 17 | Q | And tell me how that went. |
| 18 | A | Um like I said when I first went up before I was even talking to them I see him sitting on |
| 19 | | the stoop or on the brick wall. He's looking down not really wanting to make eye contact |
| 20 | | as I'm walking normally I'm right there you know. The other brother I'm not sure of the |
| 21 | | name I'm talking about William, that's the one i ended up transporting downtown, that's |
| 22 | | the one I kind of know. Um the other brother was pacing swiftly and was very angry. He |
| 23 | | said he didn't want to talk at all he was avoiding me so I walked up to William to say hey |
| 24 | | who are you guys and what's going on? |

8

1    Q    What did William say?

2    A    Um he had mentioned something about well the story what he told me was he comes over

3         regularly to check on his mother.

4    Q    Uh huh.

5    A    Um I think cause he lives fairly close or something so he was the one that did it out of the

6         family and um he tells me that he, today that day, when he got there he went to his

7         mother's apartment and he noticed the door was unlocked and when he went in obviously

8         his mother, well he says his mother is right there laying at the door and um with a blanket

9         over her.  He said he could, she was breathing heavily I believe is what he said or she

10        wasn't breathing he said and that he reached down and poked her in the leg.  And then my

11        next question was just I just asked him did you remove the blanket to look at her you

12        know since she's breathing and he, he jumped at that question I noticed and he was very

13        adamant that he said no I didn't touch anything.

14   Q    You said he jumped at that question, what do you mean?

15   A    I just mean that he got um like it was just a normal question from my stand point at that

16        point, I wasn't really thinking, you know as far as anything bad per say or whatever I'm

17        still thinking he just walked in on this mother and I just thought it a normal question you

18        know if I see my mom laying there breathing I'm going to instantly pull the blanket back

19        and check her out to see if you know what I mean, mother you know type of thing but I

20        noticed he, you know when I asked if he removed the blanket to do that it was like

21        defense mode.  I mean it was obvious defensive mode it wasn't a normal reaction in my

22        estimation.

23   Q    Well did you see the blanket and how it was crusted to the wound?

| 1 | A | I can't I can see the blanket and I can see it all but I can't vividly see it into the wound like |
| 2 | | that. |
| 3 | Q | See we keep going back and forth on that and quite frankly I would do exactly what he |
| 4 | | did because I've had wounds and if I take the bandage off after it's crusted to it it's going |
| 5 | | to start bleeding again. |
| 6 | A | Uh huh. |
| 7 | Q | Do you see that? |
| 8 | A | No I know I would have had to look. I know if my mother is laying there and I know |
| 9 | | she's breathing and she's been assaulted somehow I'd instantly yanking that blanket off so |
| 10 | | she could breath, talk to me whatever as I call 911. That would be my reaction. |
| 11 | Q | You wouldn't think about making things worse and |
| 12 | A | No I wouldn't. I wouldn't worry about evidence when my mother's still laying there |
| 13 | | breathing. |
| 14 | Q | Oh I'm not talking about evidence I'm talking about worrying about making the situation |
| 15 | | worse. |
| 16 | A | No not at all cause I can always, if it's a gushing wound I can always pad it back up real |
| 17 | | quick as soon as I know but if I don't know I want to know. I want to know. |
| 18 | Q | So your thought is if its crusted to and I rip the blanket off so now I've ripped the only |
| 19 | | thing stopping the bleeding. |
| 20 | A | If that's what you're saying yes. |
| 21 | Q | You'd be able to stop it again. |
| 22 | A | Well I would attempt to as I call 911 but I would still look. I'm not just going to oh this is |
| 23 | | bad and back out. I mean not with my mother I wouldn't. |
| 24 | Q | Why is that? |

10

| 1 | A | I mean it's your mother, usually that's your close, you know what I mean that's your |
| 2 | | family.  You know what I mean I'd do it for any family or any. |
| 3 | Q | Have you cared for an elderly person with dementia like 88 or so? |
| 4 | A | Like 88? |
| 5 | Q | Yeah. |
| 6 | A | Any care for them? |
| 7 | Q | Yeah have you had any contact with close family relationship with dementia Alzheimer's |
| 8 | | people. |
| 9 | A | Alzheimer's we've had some Alzheimer's in our family yeah. |
| 10 | Q | Were you the primary care giver |
| 11 | A | No. |
| 12 | Q | Or and um how long have you been a police officer? |
| 13 | A | 5 years. |
| 14 | Q | And have you received, do you get any medical training or? |
| 15 | A | We get limited, yeah, |
| 16 | Q | Just the |
| 17 | A | But I'd also been a certified EMT before so. |
| 18 | Q | Oh where was that? |
| 19 | A | Um through Warren Township Buck Creek. |
| 20 | Q | And so you're saying  defensive mode because you're thinking, you're thinking evidence |
| 21 | | and he's adamant that he didn't touch anything? |
| 22 | A | I wasn't thinking of evidence I was just asking the normal question. |
| 23 | Q | Well you're thinking that he's thinking evidence. |

1    A    Well I mean the way I wasn't even thinking anything until he jumped the way he did at

2         the question. I mean it was straight no way in heck you know type of thing I didn't touch

3         anything on the scene was the reaction. I mean of uh other than yeah up until that point I

4         really wasn't feeling any uh you know wasn't feeling anything toward him as far as

5    Q    Suspicious?

6    A    Yeah really until that moment.

7    Q    So how did that conversation keep going then?

8    A    Um really I don't know if I got, I don't know if we talked a whole lot more because

9         obviously I want uh to call a detective and get them involved and kind of go down the

10        right, you know, set the way or however they wanted to handle everything.

11    Q    Did you call for homicide then?

12    A    I did at some point I believe.

13    Q    Can you testify to anything else that he said there at the scene?

14    A    Are you talking, William?

15    Q    Yes.

16    A    Um not that I recall while we were still on scene no.

17    Q    Did you get the other fellows identification?

18    A    I did not by then I had a partner.

19    Q    And did he?

20    A    Yeah I'm sure I know he sat in his car. We ended up separating them each in each car.

21    Q    Which officer was that?

22    A    I want to say that was officer I want to say it was Officer Staton that pulled up.

23    Q    Did anybody go around and get the identification of all civilians at the scene?

24    A    Are you talking paramedics and everything or just

1   Q   Yeah.

2   A   No, no.

3   Q   How about all civilians that were not related to the emergency response?

4   A   Well I spoke to the two guys that were standing right there and I even spoke to a neighbor

5       and was kind of seeing if they, I got his ID and everything.

6   Q   Who was that?

7   A   I think it was the neighbor that lived I think he lived right upstairs but I put him in the run

8       he was the guy I just ran and to see you know just anybody that I spoke to.

9   Q   You don't remember the name at all?

10  A   Uh not off hand.

11  Q   And uh

12  A   I put him in the report.

13  Q   Uh anybody else that you remember that you talked to or got the identity of?

14  A   No just them the two brothers and him.

15  Q   And the neighbor can you remember anything he said?

16  A   Yeah he just said he worked uh late shift I believe gets home around 3:00 a.m. and that

17      basically he hadn't heard anything.

18  Q   Uh so what happens next?

19  A   Well detective comes to the scene, Det. Benner, and basically he takes over  I kind of just

20      let him know what I've found so far and he takes over and I know we have the brothers

21      separated and at some point he wants us to transport them downtown to talk with him.

22  Q   So you take uh William?

23  A   Right.

24  Q   And you have some conversation?

13

| 1 | A | Well he was talking.  I wasn't asking him any questions or anything. |

1  A    Well he was talking.  I wasn't asking him any questions or anything.

2  Q    What did he say?

3  A    He just kind of randomly um well out of the blue he was just he said um out of the blue

4     he had said he didn't know if it was a good thing or a bad thing that this had happened.

5  Q    Do you remember how he says that?

6  A    Um something to the effect like you know as he's contemplating it I'm not sure if this is

7     good or bad.  I asked him what he was talking about.  He said his mother dying and

8     because of the dementia she was already had set in and everything.  She was already,

9     basically she was already getting toward later stage in life basically.

10  Q    So yeah (inaudible) well earlier you said you know I don't know if it's a good thing or a

11     bad thing this had happened and I'm thinking in the reports I don't know if it's a good

12     thing or a bad thing if my mother dies but it was in reflecting that's the jest of it is that

13     whether she survived, right?

14  A    Yes

15  Q    He wasn't acting like she was dead or anything, was he?

16  A    Yeah he uh actually he was because he was, he just, you know he just kept saying I can't

17     believe it, can't believe it and he was saying that you know that's pretty understandable

18     hearing somebody say that so I didn't you know I just let him talk, you know I'm driving

19     so.

20  Q    Sure.

21  A    And then he kind of went into that don't know if it's a good thing or not.

22  Q    He was just in disbelief, mostly.

23  A    Yeah I mean that was his demeanor.

14

1    Q    And then he said I can't I'm not sure if that would be a good thing or a bad thing if she

2         dies?  That's the version I've got.

3    A    I can't testify that he said yeah if she dies or that she's going to die or anything but it was

4         to that, that's what he was talking about.

5    Q    Well did he say or do anything that made you think he thought she was already dead?

6    A    Just other than that I mean not really other than he kept saying he can't believe it, he can't

7         believe it but that could have been just over anything I'm not positive.

8    Q    Anything else he said that you recall?

9    A    Right now I can't remember.

10   Q    Well do you have any notes or anything you could look at to refresh your recollection?

11   A    Not really I mean other than what I wrote in the narrative and I reread that but.

12   Q    So you had prepared for today?

13   A    Yeah I read it.

14   Q    You read your report?

15   A    Yes.

16   Q    And the part that was in the report?

17   A    Yeah I read that.

18   Q    Here's the thing, I get a lot of guys that will say not that I can remember right now and

19        then you know then I got to bring them back once a week before trial.

20   A    Uh huh.

21   Q    Have you remembered anything yet?  I like to try to avoid that.

22   A    Right.

23   Q    By trying to find out (a) they are fully prepared and you feel that you are?

24   A    Yes.

| 1 | Q | And that they've looked at everything that's available to them to refresh their recollection |
| 2 | | you have, right? |
| 3 | A | I looked at my stuff, yes. |
| 4 | Q | Uh well how about this, if you come up with something new or you recall something |
| 5 | | different will you let me know? |
| 6 | A | Yes. |
| 7 | Q | Alright.  Now I want to interrupt for just one minute because I want to try to find the |
| 8 | | CAD or the report to get this identification. --- Okay we're back on.  The good Officer |
| 9 | | Price is gonna actually going to look on his laptop and then come back and tell me the |
| 10 | | name.  We're not going to turn this back on for that.  Uh you put it in your report, do you |
| 11 | | remember if you've given it to Benner there at the scene? |
| 12 | A | Uh not positive of it. |
| 13 | Q | It would be available to him because it's in your reports. |
| 14 | A | Yes, yes. |
| 15 | Q | And you don't recall, did you do any other canvassing, knocking on doors, talking to |
| 16 | | people? |
| 17 | A | Not talking or anything no. |
| 18 | Q | And you didn't have enough sufficient contact with any other people in the area that you |
| 19 | | got their identification but for the one person you put in your report? |
| 20 | A | Other than the two brothers. |
| 21 | Q | And the two brothers.  Uh do you have any conversation with Robert, the other brother? |
| 22 | A | If I did it was very limited because he, he didn't he was very angry. |
| 23 | Q | Did you ever see him smoking a cigarette? |
| 24 | A | I can't recall the cigarette. |

16

1   Q     Okay.

2   A     I know he was pacing you know when I first walked up and.

3   Q     So he was like uh okay thank you that's all that I have.

4   Pros   No questions asked

        END OF TAPED DEPOSITION OF OFFICER MICHAEL PRICE.


        AND FURTHER AFFIANT SAYETH NAUGHT.


        _____         _____
        Officer Michael Price            Date
        IMPD  (31326)

STATE OF INDIANA          )     IN THE MARION SUPERIOR COURT
                          ) SS:  CRIMINAL DIVISION 1
COUNTY OF MARION          )     CAUSE NO. 49G01-1405-MR-026747

STATE OF INDIANA,         )
            Plaintiff,    )
    v.                    )
                          )
                          )
WILLIAM RAINSBERGER,      )
            Defendant.    )

TAPED DEPOSITION OF DET. CHARLES BENNER

| | | |
|---|---|---|
| Q | | David R. Hennessy |
| A | | Det. Charles Benner (B4219) |
| Pros | | Marielle Riedle |

1   Q   We're here it's November 25, 2014 on Rainsberger taking the deposition of

2       Det. Benner, Marielle Riedle for the prosecutor.  If you would raise your

3       right hand please.  Do you solemnly swear to tell the truth, the whole truth

4       and nothing but the truth so help you God?

5   A   Yes I do.

6   Q   And state your name.

7   A   Charles Benner  B-E-N-N-E-R.

8   Q   In my experience homicide detectives take detailed notes of their

9       investigation is that something that is required by the department or just

10      something.

11  A   We just we take the notes we feel are necessary for the case.

12  Q   I mean but like robbery detectives in my experience don't I'm wondering is

13      that just something they teach you when you go to homicide or is it

14      something converse requires or I've always wondered?

1

| 1 | A | There's no requirement on how many notes we take. |
| 2 | Q | Okay, on this case out on at uh 801 Sherman |
| 3 | Pros | Shortridge. |
| 4 | Q | Shortridge um aggravated assault went out first, right? |
| 5 | A | Correct. |
| 6 | Q | And who was that detective? |
| 7 | A | Feuquay. |
| 8 | Q | So when you arrive describe for me what you first see, is the fire rescue still |
| 9 | | there, how many police, who's where and what? |
| 10 | A | Feuquay's still there, the ambulance had already taken off when I got there |
| 11 | | um William Rainsberger's there, there were a couple of uniforms there. |
| 12 | | Shortly after Robert Rainsberger shows up in his vehicle. |
| 13 | Q | Was Wool is it Woodridge or Woolridge? |
| 14 | A | Woolridge, Carl Woolridge, I did not talk to him that day. |
| 15 | Q | Was he still there if you remember? |
| 16 | A | I don't believe so. |
| 17 | Q | Okay. |
| 18 | A | I'm not positive on that. |
| 19 | Q | But where do you first see William? |
| 20 | A | He was standing outside when I got there or he was with the police, may |
| 21 | | have been in a police car already. |
| 22 | Q | And but you see Robert then arrive in a car? |

2

| 1 | A | I don't know if I actually see him arrive but he did arrive in a Lincoln, black |
| 2 | | Lincoln. |
| 3 | Q | Are you sure he's not there when you get there? |
| 4 | A | Um I'm not positive if he was there or not when I got there.  I just remember |
| 5 | | seeing him in the car. |
| 6 | Q | Did you see anybody like hanging out smoking a cigarette, either of the |
| 7 | | Rainsberger's? |
| 8 | A | No. |
| 9 | Q | So that's something that was reported to you later? |
| 10 | A | Yes. |
| 11 | Q | So you get there um has uh crime lab shown up yet? |
| 12 | A | No. |
| 13 | Q· | So what happens next, crime lab shows up? |
| 14 | A | Um Jenny Lane I believe was crime lab, shows up.  We start, I do a walk |
| 15 | | through the scene and then she processes it uh take the two brothers back to |
| 16 | | headquarters for statements. After we do uh as they signed a consent to |
| 17 | | searches for their vehicles at the scene. |
| 18 | Q | So Lane did still photos and a video? |
| 19 | A | Yes. |
| 20 | Q | And in doing a walk through uh you made some notes, right? |
| 21 | A | Uh |
| 22 | Q | And your notes begin with a note uh I'm sorry.  The copy of the notes I have |
| 23 | | begins with apartment H 7 traffic, is that where you begin or am I missing? |

3

1  A  No the first page is it just has the case number and Ruth Rainsberger,

2      reporting officer.

3  Q  Oh may I see that? Okay uh hold on to that I'd like to copy just so I have a

4      complete set. So then what my page one is, is your page 2 and the first entry

5      is apartment H 7 traffic?

6  A  Yes.

7  Q  Where did you get that?

8  A  That came from uh talking to apartment number 8, Kevin Walker said that

9      he thought there was a lot of traffic going in and out of that apartment, but

10     nobody ever answered it, H 7.

11 Q  Did anybody else out there like the maintenance men or uh another

12     neighbor, Maria also describe a lot of traffic in and out of the H building?

13 A  Um that Maria girl um she may have said there's people in and out of there,

14     I talked to her on the phone.

15 Q  Do you remember a guy named Loney or Looney?

16 A  No I believe Tudor talked to him, to Looney, is he the maintenance guy?

17 Q  Yeah one of them.

18 A  I talked to Sean, yeah I talked to Sean.

19 Q  And you talked to Sean.

20 A  Several times on the phone.

21 Q  What's his last name if you remember.

22 A  I'm not sure, it's in here we'll probably get to it.

4

| | | |
|---|---|---|
| 1 | Q | Yeah we'll come across is.  Did Sean ever tell you about a lot of traffic in |
| 2 | | and out of H 7? |
| 3 | A | I don't believe so, no. |
| 4 | Q | Did you figure out or identify who lived in H 7 that day? |
| 5 | A | No. |
| 6 | Q | For H 8 you've got Kevin Walker and Damon Thomas? |
| 7 | A | Yes. |
| 8 | Q | Is Kevin Walker the older guy? |
| 9 | A | I believe so, his roommate was Damon Thomas. |
| 10 | Q | Was that a roommate or a son? |
| 11 | A | I was under the impression that they lived together like uh lived together |
| 12 | | lived together. |
| 13 | Q | Was Mr. Walker, had he been drinking when you saw him that day? |
| 14 | A | Not that I know of, no. |
| 15 | Q | Uh and then down here I can't read what's below the line.  What's that say, I |
| 16 | | spoke oh I spoke with William. |
| 17 | A | I spoke to William about medication says she took Aricept for dementia. |
| 18 | Q | And below that is blue? |
| 19 | A | Black shiny purse. |
| 20 | Q | Black shiny purse. |
| 21 | A | Patent leather. |
| 22 | Q | And what is that notation? |

| | | |
|---|---|---|
| 1 | A | That's what he was saying that might have been in the living room, a black |
| 2 | | shiny purse. |
| 3 | Q | Is that the purse the family identified as missing but that you believe was |
| 4 | | later found? |
| 5 | A | There was a purse in the uh dresser drawers in there along there was also a |
| 6 | | little coin purse that matched the description of the one he gave, a little tan |
| 7 | | coin purse. |
| 8 | Q | Did you find a purse that matched that description, black and shinny, patent |
| 9 | | leather? |
| 10 | A | It was different colors I believe, not just black. |
| 11 | Q | And what's that next entry? |
| 12 | A | Last night 6:30 p.m. is the last time he saw his mom. |
| 13 | Q | And then Meals on Wheels William |
| 14 | A | With ice tea on the coffee table. |
| 15 | Q | And then |
| 16 | A | Blanket over victim's head. |
| 17 | Q | Well who did oh did you get that from William? |
| 18 | A | Yes. |
| 19 | Q | And then uh consent to search for Robert's vehicle? |
| 20 | A | Yes. |
| 21 | Q | And who did that search? |
| 22 | A | Officer Price and I was standing right there also. |
| 23 | Q | Did he there's a notation of finding a legal pad with some writings. |

6

| 1  | A | Yes. |
|----|---|------|
| 2  | Q | To be kind and uh any notation of anything else in that vehicle? |
| 3  | A | No. |
| 4  | Q | And then at 1749 what's that say? |
| 5  | A | Arrived at HQ. |
| 6  | Q | And then Robert was on the phone with the doctor? |
| 7  | A | He was on the phone with Dr. Stride. I was listening to him. |
| 8  | Q | Was it on speaker? |
| 9  | A | No. |
| 10 | Q | You were just listening |
| 11 | A | I was just listening to Robert talk. |
| 12 | Q | Okay so you're at headquarters and you've got Robert there. Did Officer |
| 13 |   | Price transport him? |
| 14 | A | No I transported him. I was listening to him in the car right outside police |
| 15 |   | headquarters. |
| 16 | Q | So Robert's still in the car when he's talking to the doctor on the phone? |
| 17 | A | Yes. |
| 18 | Q | And then uh Price transports William? |
| 19 | A | Correct. |
| 20 | Q | So you take taped statement of William? |
| 21 | A | Yeah. |
| 22 | Q | What does that say, returned? |
| 23 | A | Retired, Franciscan Alliance, that's where he use to work. |

7

1   Q   Uh what's that next entry something

2   A   T Kroger - 10th Street that's where he got the ice tea.

3   Q   But that next part.

4   A   Something hanging on the door said it was renewing her lease.  He went

5       back to the car with a bank statement before he went in.

6   Q   Um maintenance Moody, John is that what that says?

7   A   It says Monday.

8   Q   Monday, John.  What's that about?

9   A   I think that's what I got from uh all of this came from William so he said

10      there's somebody named John that was a maintenance.

11  Q   So you're basically at that time finding out who was in and out at different

12      times?

13  A   Yes and the next thing I asked him about finances.  It's $1300.00 a month.

14  Q   In SSI?

15  A   SSI.

16  Q   What's that say above SSI?

17  A   Pension.

18  Q   Pension.  Lease at what?

19  A   At the end of the year.

20  Q   And then go into assisted living?

21  A   Yes had $89,000.00 in the bank.

22  Q   And what was uh you take Robert down and is William up at homicide

23      when you get there?

1    A    Yes.

2    Q    So are William and Robert then together like waiting outside the homicide

3         office?

4    A    No they're put into rooms separately.

5    Q    Back on the other side of the interview rooms?

6    A    Yes.

7    Q    And then you go in to interview um William?

8    A    Yes.

9    Q    Is anyone with you?

10   A    I believe Tudor was with me.

11   Q    And how would you describe his demeanor?

12   A    Who William?

13   Q    Yeah.

14   A    Um how would I describe his demeanor, he was just the same that I'd

15        always known it to be and just the way I saw him at the let the bail hearing

16        just answering questions.

17   Q    But would you describe it as unemotional I mean was anything suspicious

18        about it in your mind or?

19   A    He wasn't emotional but I was not uh at that time I wasn't treating him like a

20        suspect if that's what you're asking.  I uh was just trying to get background

21        to um when the last time he saw her was.

9

| | | |
|---|---|---|
| 1 | Q | He clearly became a suspect I'm just wondering any observations from that |
| 2 | | first interview that started leading you in that direction that you can put your |
| 3 | | finger on or describe for me. |
| 4 | A | Only when you when everything else got put together like when I went to |
| 5 | | the autopsy and found out that she had been struck and he made mention in |
| 6 | | a statement that somebody might have hit her with a lead pipe. I didn't think |
| 7 | | anything about that you know necessarily at the time cause at that time we |
| 8 | | were assuming that she had been shot so. |
| 9 | Q | So still at that time your people are thinking a gunshot? |
| 10 | A | Yes. |
| 11 | Q | Had there been any calls from neighbors about hearing shots? |
| 12 | A | No. |
| 13 | Q | I mean if there were gunshots in apartments there's normally several calls to |
| 14 | | uh the 911 center reporting gunshots. |
| 15 | A | I can't say if that's true or not. |
| 16 | Q | Cause it's just like a one or two inside maybe. But anyway you had no |
| 17 | | independent evidence of a gunshot you just had peoples, uh I'm sorry was |
| 18 | | that a no? |
| 19 | A | No. |
| 20 | Q | Just people expressing their opinions? |
| 21 | A | The medics uh yes. |
| 22 | Q | Okay uh under Rebecca was that an interview with her or just her |
| 23 | A | No that's him telling me who his sister is. |

10

| 1 | Q | And the beige what? Down here  sorry. |
| 2 | A | Beige carrier inside purse that the one described it.  Was in the bedroom in |
| 3 |   | one of the drawers it looked like where he said she kept her credit cards and |
| 4 |   | stuff that I found later. |
| 5 | Q | So you found  this beige carrier in a drawer in the apartment? |
| 6 | A | Well I don't know if it is the one he was talking about but there was a there |
| 7 |   | was a beige little coin purse type thing in there. |
| 8 | Q | Do you remember when you found that? |
| 9 | A | It was sometime during the walk through with the crime lab.  We were |
| 10 |   | processing |
| 11 | Q | Was it recovered that day if you recall? |
| 12 | A | I don't think so I just |
| 13 | Q | Was it photographed if you recall? |
| 14 | A | I believe everything should have been photographed in there. |
| 15 | Q | And then who gave the information about Meals on Wheels? |
| 16 | A | This is all from William's |
| 17 | Q | Still from William? |
| 18 | A | I guess she got meals Monday through Friday. It's always the same guy. |
| 19 | Q | When Feuquay brings you a property from Wishard what does he give you? |
| 20 | A | Whatever she had on at the uh hospital. |
| 21 | Q | Her personal clothing? |
| 22 | A | Yes. |

11

1   Q   Did he bring the blanket if you know? That was probably still back at the

2        apartment?

3   A   Yeah that was collected by crime lab that didn't go to the hospital.

4   Q   It did not?

5   A   No.

6   Q   So someone did remove it there in the uh

7   A   Jennifer Lane would have recovered it.

8   Q   What does that say about Det. Breedlove?

9   A   I was doing interviews so I gave the items to Det. Breedlove to give to

10       Jennifer Lane when she showed up.

11   Q   What's it say, oh give what to

12   A   J. Lane

13   Q   Gave property what?

14   A   Victims clothing

15   Q   Oh.

16   A   To Det. Breedlove.

17   Q   And he gave to J. Lane?

18   A   Yes.

19   Q   Alright and uh do we have a list of everything that's in the property room on

20       this case and how would that appear?

21   A   Uh crime lab makes uh send out reports, you should have a crime lab report

22       that shows everything that was recovered, whatever she recovered should be

23       in the, either at the property room or at the lab.

1    Q    Yeah I got this evidence submissions from crime lab. Um but I'm more

2         interested in like what's in the property room. We'll just have to schedule

3         for me to go look at it but sometimes I get property room receipts that list

4         everything in the property room and do they exist on this case?

5    A    Well the crime lab puts all this stuff in the property room so I'm sure they

6         keep records of what they put in there.

7    Q    Well I'm thinking sometimes the police officer does it and there's like white,

8         pink

9    A    Well I don't put anything from the scene in there. That's the crime lab

10        anything they recover they put in there.

11   Q    Okay uh you gave the clothes to Breedlove, he gave them to Lane. Did you

12        personally put anything in the property room ever on this case?

13   A    Uh yes I put the uh probably put some receipts and checkbook and Visa

14        cards and all of that stuff. Probably the stuff that was taken during the

15        search warrant at William's house out there on 13th Street like the firebox

16        and uh just stuff related to that search warrant. Some of that is still at the uh

17        cyber crimes office, the computers and stuff.

18   Q    And then back to your notes uh do you is this you begin to interview Robert

19        or is that just getting Robert's information from William?

20   A    Uh that's beginning to talk to Robert, that's when I took his statement 8:02 to

21        8:15.

22   Q    And then at 2230 hours you sent the statements to be typed?

13

1   A   Yeah before that I typed up my own department reference to the case and

2       then I submitted those statements to be typed.

3   Q   On the 20th the coroner is that a name after coroner?

4   A   Heather Tate, she left me a message stating that the, that Ruth had died at

5       4:15.

6   Q   And then you gave yourself a little to do list?

7   A   Yes.

8   Q   911 call apartment office, what's that say?

9   A   Tenants.

10  Q   And what's that say after that?

11  A   Maintenance.

12  Q   John, did you get a list of tenants?

13  A   No, well I don't believe I did no.  Just some I just wrote down who was in

14      her building.

15  Q   So are these notes then to you from prior information or is the maintenance

16      man John telling you again about the traffic in at apartment H 7?

17  A   I don't know who John is.  I never talked to, Sean probably he probably said

18      it wrong cause I never there were two maintenance men and I never talked

19      to anyone named John I talked to Sean.  William said his name was John so

20      I wrote John down.  He might have meant Sean.

21  Q   Um apartment H 7 traffic it appears again, what's that?

22  A   That just means I'm going to go back there and knock on the doors and see if

23      and I could never get in contact with anybody at that apartment.

14

| | | |
|---|---|---|
| 1 | Q | How many times did you go? |
| 2 | A | Well probably within the first couple of days I was there every day so |
| 3 | | probably 3 or 4 times initially and then later I went back a few times. |
| 4 | Q | Did you ever get a well we'll come to that.  Uh what's that next thing? |
| 5 | | Financial crimes Sgt. Eads? |
| 6 | A | Yes. |
| 7 | Q | Banks, cell records, warrant. |
| 8 | A | Kroger video. |
| 9 | Q | Victim's siblings? |
| 10 | A | Out of State. |
| 11 | Q | Crime stoppers? |
| 12 | A | Crime stoppers and media. |
| 13 | Q | And did you do a crime stoppers that day? |
| 14 | A | No the media did some kind of crime stoppers thing.  That's probably why I |
| 15 | | wrote it down there cause I was going to look it up and see what they did. |
| 16 | | They put something out there. |
| 17 | Q | Um the next day or maybe later the same day, message sent to David who? |
| 18 | | Or is that David? |
| 19 | A | O'Grannon he's a contact we have that checks on life insurance of victims |
| 20 | | might have. |
| 21 | Q | Is he with um the Indiana Department of Insurance? |
| 22 | A | I believe so, he use to be an officer I believe and he's just a contact or has |
| 23 | | some kind of connection to the police department. |

15

| 1 | Q | And then you attended the autopsy? |
|---|---|---|
| 2 | A | Yes. |
| 3 | Q | And then I have this which was not in my original copies. I see, this is on |
| 4 | | the back of your sheet. |
| 5 | A | Okay, yeah. |
| 6 | Q | Right? |
| 7 | A | Yeah. |
| 8 | Q | Okay uh |
| 9 | A | That's Kevin Walker again from H 8 and I got that number 7. I got that |
| 10 | | name from Tracy, the manager at the uh apartments. |
| 11 | Q | And then uh what's below that? |
| 12 | A | Maria crazy lady. |
| 13 | Q | And uh did you get any contact information for Anita? |
| 14 | A | No she didn't have any just her address. |
| 15 | Q | And she gave you Batiff B-A-T-I-F-F? |
| 16 | A | Yes. |
| 17 | Q | And you know that now to be wrong? |
| 18 | A | Yeah I don't know who I don't know if she gave the right name or what. |
| 19 | | Those people aren't there anymore as far as I know, they all moved out. |
| 20 | Q | Call Meals on Wheels and what's that say? |
| 21 | A | Negative on 2 5 that is a wrong number. He was actually connected to a |
| 22 | | different part of it's called nutrition. I got transferred to Phyllis Mills, gave |

16

1       me the direct number for where he worked 803-6016 then I talked to uh

2       Delbert on the phone, Delbert Pickens who is the Meals on Wheels driver.

3   Q   And then notes from the autopsy?

4   A   Yes.

5   Q   Conversations with uh the forensic pathologist?

6   A   Yes.

7   Q   And you talked to Delbert again?

8   A   Yes.

9   Q   Does this say and he rang her phone or he heard it ringing?

10  A   That he rang the phone.

11  Q   And I think then he ended up telling you he could hear it.

12  A   Yes.

13  Q   What's that maintenance?

14  A   Maintenance cleaning up the laundry room when he was there.

15  Q   Did you ever find out who that maintenance person was that was cleaning

16      the laundry room?

17  A   As far as I know it was Sean.  He said he didn't really see anything.

18  Q   Which, I'm sorry, you never talked to uh maintenance man Looney

19  A   No.

20  Q   That's still there.  You talked to Sean that's now gone?

21  A   I didn't know he was gone but he's not working there anymore?

22  Q   No.

23  A   Yeah I talked to Sean.

1    Q    So Sean's the one that tells you she saw the Mini Cooper there that day?

2    A    That he thought he might have saw it there that day yes.

3    Q    Who tells you that the daughter would be, what's that say?

4    A    Would be there sometime this is all from Delbert Pickens.

5    Q    About once a week?

6    A    Yeah.

7    Q    And then what's that say below that?

8    A    Cause of death, blunt force trauma to the head.

9    Q    Delbert Pickens told you that?

10    A    No, I don't know why I wrote that right there.

11    Q    Do you find that suspicious that Delbert Pickens could be the cause of death

12       (laughter). It's about time I got something in this case. Um at then what,

13       interview um with Rebecca?

14    A    Yeah Rebecca downtown.

15    Q    What's that say under 1303?

16    A    Locked or unlocked, Meals on Wheels.

17    Q    What's that about?

18    A    Asking uh Delbert if he knew if the door was locked or unlocked. He said

19       he didn't test the door so he doesn't know if it was locked or not.

20    Q    Oh that's Delbert's still.

21    A    Yeah I went back to Delbert, he's the Meals on Wheels guy, that was just

22       something I needed to ask him again.

23    Q    Okay are we at the part uh this polygraph on the next sheet?

| | | |
|---|---|---|
| 1 | A | Yeah. |
| 2 | Q | Okay um so you interviewed William and you interviewed Robert the day |
| 3 | | of? |
| 4 | A | Yes. |
| 5 | Q | The first day, right? |
| 6 | A | Yes. |
| 7 | Q | And then did you interview Rebecca before they all come back for the |
| 8 | | polygraph? |
| 9 | A | This was the same day they all came in that next day at noon. They were all |
| 10 | | three in there. |
| 11 | Q | And tell me what happens? This is the day you called them and tell them to |
| 12 | | come in and discuss the autopsy? |
| 13 | A | Correct. |
| 14 | Q | So they all three come? |
| 15 | A | Yes. |
| 16 | Q | And where are they? |
| 17 | A | They're sitting in the conference room. I take William back first. I take a |
| 18 | | statement from him and then after the statement I tell him that in cases like |
| 19 | | these where family members are involved it is important for me to eliminate |
| 20 | | them as suspects so I asked him if he would take a polygraph. |
| 21 | Q | Is that first request made well first of all you ended up you did get a taped |
| 22 | | statement from Rebecca right? |
| 23 | A | Yes. |

19

1    Q    Did that happen before this or does she give you one afterwards?

2    A    I talked to her first.

3    Q    But that same day when they're all down there?

4    A    Yes.

5    Q    And so you get a taped statement from Rebecca and then you do William.

6    A.   Yes.

7    Q    You've not re-interviewed Robert yet.

8    A    No.

9    Q    Then you raise the uh concept of a polygraph?

10   A    Yes.

11   Q    And when you first raise that are you back in the conference with in front of

12        all three of them?

13   A    No we're in the interview room still.

14   Q    Just you and William?

15   A    And Tudor.

16   Q    And Tudor, and so what happens then?

17   A    Then he starts yelling that he's not taking a polygraph, he doesn't trust

18        polygraphs. We're all liars and we brought them down here for a different

19        reason and now we want to polygraph them and so we walked back down

20        the hall and we're going to bring Robert back and ask him the same thing

21        but he starts yelling at Robert that they're going to ask you to take a

22        polygraph, we're not taking any polygraphs so we take Robert back anyway

23        and ask him and he says no he won't take one either.

1   Q   Um you and Tudor and Robert then are separate from the others?

2   A   Yes when we take him back there.

3   Q   And how does Robert express his, him declining a polygraph?

4   A   He's just Robert's always been matter of fact just he doesn't say, he just says

5       I'm not taking a polygraphs that's all he said.  He wasn't yelling or screaming

6       anything.

7   Q   When William was yelling and screaming um did anybody yell back?

8   A   Um probably when we went back out there, there was some yelling back

9       and forth.

10  Q   Were you yelling?

11  A   I might have been, raised my voice a little bit.

12  Q   Well do you remember

13  A   I wasn't screaming.

14  Q   Do you remember what you were saying?

15  A   I told them that the uh all the assets for his mom were going to be frozen at

16      this time until the investigation was complete.

17  Q   Did Tudor do some yelling?

18  A   Yeah I imagine he probably did.

19  Q   Do you remember what he yelled?

20  A   Um I think something along the lines of you know we don't normally get

21      this kind of reactions from family members that don't have anything

22      involved usually they just say yes I'll take the polygraph and we clear them

23      and they're gone.  That's pretty must the jest of the conversation.

1    Q    Do you remember if anyone yelled at William that he killed his mother for

2         twenty-five thousand dollars?

3    A    No.

4    Q    Not at that time?

5    A    Not at any time.

6    Q    Ever, never?

7    A    No.

8    Q    Tudor never said that to him?

9    A    Not that I know of, you can ask Tudor.

10   Q    Sounds kind of like something.

11   A    Yeah.

12   Q    Tudor would say, I can say that.  Uh so then did Rebecca say anything?

13   A    No she was quiet through the whole thing too.  She wasn't upset.

14   Q    And does anybody then ask you about the autopsy that day?

15   A    No.

16   Q    Did anybody say hey you told, does anyone confront you about bringing

17        them down there for that reason but then going in a different direction?

18   A    I think William might have thrown that in when he was yelling about that

19        we were liars and we brought them down for one reason and

20   Q    You don't remember Rebecca saying much at all that day?

21   A    Not really no.

22   Q    And then uh so then in fact you do try to freeze all of her assets?

Case 1:16-cv-00103-WTL-MJD   Document 88-2   Filed 02/13/17   Page 23 of 49   PageID #: 1980

| | | |
|---|---|---|
| 1 | A | Well I mean I get search warrants and get the uh I give that to Sgt. Eads but |
| 2 | | I don't think um we really frozen anything.  But later on they called and |
| 3 | | asked if uh anybody else besides William had been charged in the case and I |
| 4 | | said no so I'm not sure if they released any money to them or not. |
| 5 | Q | At uh the next entry in your notes does that say switch cases? |
| 6 | A | Yes one of my suspects on another case got picked up so I had to interview |
| 7 | | him. |
| 8 | Q | And then what's that say immediately  below that something? |
| 9 | A | Enroute back to 801 N. Shortridge at 4:30 p.m. that day. |
| 10 | Q | And what's that D? |
| 11 | A | That's the D. Keppler, Dan Keppler's phone number. |
| 12 | Q | Who is that? |
| 13 | A | That's Det. Keppler in homicide day shift.  I think he was telling me about |
| 14 | | this report that I'd already researched but it was where Karen Pitman was |
| 15 | | attacked out there, had her purse taken I think on October 7th. |
| 16 | Q | Uh did you ever find where that happened? |
| 17 | A | It happened right out there on side the side of her building. |
| 18 | Q | Well I think she's in D.  Did they ever describe it happening under this |
| 19 | | carport right outside building H? |
| 20 | A | I didn't investigate the case so I'm not, I don't know exactly where it |
| 21 | | happened you'll have to ask the robbery detective that went out there. |
| 22 | Q | Did you ever interview Kenneth Stanley or Karen Pitman? |
| 23 | A | No. |

1   Q   I did.

2   A   That's great.

3   Q   That's what they told me.  Um what's this next H 8 we're back with Kevin

4       Walker.

5   A   Yep he said he has seen a Mini Cooper before, may have seen it yesterday.

6   Q   Was he drinking that day?

7   A   Not that I saw him I never noticed that he had been drinking or anything.

8   Q   Whenever you had contact with Kevin Walker you didn't.  And then Tracy's

9       the manager?  She called there's a John again.

10  A   That was a friend of William Rainsberger that called her and said that he

11      received a text.  It was dated October or something and the text came in to

12      him this morning I don't know if she was just telling me that.  John hadn't

13      heard from me for a long time so he thought it was weird when he found out

14      this stuff that, he never, I talked to him on the phone and he just said that he

15      hadn't heard from William in awhile and he got a text about so he just

16      thought it was weird when he found out his mom was, you know if he was

17      just distraught beforehand or what I don't know.

18  Q   Who is this John?

19  A   Some friend of William's.

20  Q   Not the maintenance man?

21  A   No there is no maintenance man named John that I know of.

22  Q   Received a text from William Rainsberger what's that say?

23  A   Left in mid October.  Unless he use to be a maintenance man I'm not sure.

24

1    Q    Text came

2    A    To him this morning.

3    Q    To him this morning.

4    A    So he must have left in mid October maybe that's the John he was talking

5       about that doesn't even live there anymore or work there anymore. So that's

6       the guy who he had contact with he sent him and told him about his mom or

7       something he thought it weird.

8    Q    Well I'm wondering how John is telling Tracy this.

9    A    How, he called her and told her.

10   Q    I think it might be John Looney. But you think John called Tracy to tell her

11      about a text that he got from William?

12   A    Yes.

13   Q    And uh actually John Looney is the one that's a maintenance man that left.

14      But you think that this John, do you have a last name for him?

15   A    I don't.

16   Q    Called Tracy to tell her about a text from William.

17   A    Yes.

18   Q    What's her relationship with John?

19   A    Either he lived out there or something says he left in mid October.

20   Q    Any idea why he would be calling?

21   A    She just said that he had heard that something happened to William's mom

22      and that she thought it weird that he just got a text about it because he hadn't

23      heard from him in a long time.

25

| | | |
|---|---|---|
| 1 | Q | So you think this left in mid October is this John guy either moving out or |
| 2 | | something. |
| 3 | A | Yes that's the way I would take it and I'm not sure. |
| 4 | Q | I mean I read it like maybe the text got left in mid October.  Nope text came |
| 5 | | to him this morning. |
| 6 | A | To him this morning. |
| 7 | Q | So then what's this about J Lane again?   Oh is this when you recovered |
| 8 | | hammers? |
| 9 | A | Yes we went and took the hammers and the paperwork that was on the door. |
| 10 | Q | So that stuff was still there? |
| 11 | A | No, yeah it was in the house.  When we left the crime scene tape up so no |
| 12 | | one would enter. |
| 13 | Q | The paperwork from the door? |
| 14 | A | Was on the coffee table inside. |
| 15 | Q | That was a bag that was hanging on the door knob supposedly? |
| 16 | A | Yes. |
| 17 | Q | And had that lease renewal stuff in it? |
| 18 | A | Yes. |
| 19 | Q | Was there also like a door hang tag, flat cardboard like thing? |
| 20 | A | Yes. |
| 21 | Q | But all that then had been left on the table? |
| 22 | A | Yes. |
| 23 | Q | In the apartment? |

1   A    Yes.

2   Q    So you're at the scene for an hour and fifteen minutes?

3   A    That day yes.

4   Q    Um would you have listed everything that was collected that day or would

5        you just maybe list these 3 things and then Lane would do it more.

6   A    She would, everything she collected she would make a note of. I just wrote

7        down what I was really there to get the hammers because of the autopsy.

8   Q    Did the doctor tell you it was a hammer?

9   A    No he said it was something consistent with a hammer it could be anything.

10  Q    So I can't remember, did you say previously at the hearing that William

11        became your primary suspect after he got upset over being offered a

12        polygraph?

13  A    And after I started getting statements from everybody else about the uh we

14        listened to the 911 call and when he said that her head was caved in and his

15        reaction to the polygraph kind of.

16  Q    You said within a day or two and I can't remember which, did he become a

17        suspect within a day within two days if you remember?

18  A    Well I mean from that point on where I considered him a suspect at that

19        point I also continued to uh to investigate the area around the ports and see

20        if there were any other things going on um that would fit this type of crime I

21        mean this type of crime just didn't make sense to me so nothing I found

22        could compare to it to make me think that somebody else might have been

23        involved.

1    Q    What's that 11/21/13?

2    A    1230 hours on duty HQ.

3    Q    Okay and then okay this is on back of previous I'm getting it now.   Uh

4         Sean's the maintenance man?

5    A    Yes.

6    Q    And Hornsby is a policeman isn't he?  Who's Hornsby?

7    A    No he's a maintenance guy.

8    Q    Oh Sean, Hornsby is Sean's last name?

9    A    Yes.

10   Q    What's that say Tuesday?

11   A    It's Tuesday 11:40 to noon at the apartments said he thought it was the

12        daughter's car.

13   Q    Okay this is on the back of a sheet.  Oh you're at headquarters do you think

14        he called you or you called him?  It seems like a random note where it's

15        placed.

16   A    Yeah I received that from um Tudor.  Tudor told me that and I wrote it

17        down that's why it's there out of place.

18   Q    So you're you come on duty and

19   A    Talk to him about the case, right.

20   Q    And then um Eads calls back tells you what?

21   A    He says that he put a block on the accounts.

22   Q    Was that at the finance center?

23   A    Credit union.

28

| 1  | Q | Credit union |
|----|---|--------------|
| 2  | A | (Inaudible) Det. Steve Buchanan faxed 911 request to communications |
| 3  | Q | And she emailed you the 911 calls? |
| 4  | A | Yes. |
| 5  | Q | And then you |
| 6  | A | And I got a copy too off the disc. |
| 7  | Q | Um who's Sherry Taylor, is a different dispatch lady? |
| 8  | A | Yes. |
| 9  | Q | And at the very bottom you sent the probable cause and cell numbers or |
| 10 |   | what's that say? |
| 11 | A | Yeah I sent them to Det. Berris who was doing the search warrant on the |
| 12 |   | phone records. |
| 13 | Q | What's the PC, that might not |
| 14 | A | Probable cause. |
| 15 | Q | Well yeah you probably didn't do a probable cause yet did you? |
| 16 | A | Well I had to do one for the, just a brief one, to get the search warrant for |
| 17 |   | the cell numbers. |
| 18 | Q | Ah probable cause for search warrant gotcha. |
| 19 | A | Yeah, yeah. |
| 20 | Q | William's wife what's that say?  Crime lab, cards, blanket?  What is this? |
| 21 | A | It's just a list of things I'm going to do. |
| 22 | Q | What's that under, before search warrants? |

| 1 | A | Limited search warrants with the buccal swabs and prints from William and |
| 2 | | Robert. |
| 3 | Q | And what's that does that say cable company? |
| 4 | A | Cable company phone calls. There was a mention that uh they heard Ruth |
| 5 | | speaking to someone named Michael on the phone and on her television set |
| 6 | | there was a cable contact that she had with directions on how to work her |
| 7 | | email said Michael, Michael, Michael, Michael, Michael and the other step |
| 8 | | is she needed to fix her television when she needed to fix it. |
| 9 | Q | Explain that to me again. |
| 10 | A | Michael is the person, basically the contact that she calls for when her |
| 11 | | cable's messed up. |
| 12 | Q | Is he with the cable company or with the apartment complex? |
| 13 | A | Probably the cable company I don't know why someone from the complex |
| 14 | | would type out directions on how to fix her television. |
| 15 | Q | I'm not getting it you said there was a list of things and it said Michael next |
| 16 | | to each one? |
| 17 | A | Uh huh like he typed it out. |
| 18 | Q | And what did this list say? |
| 19 | A | It's in evidence somewhere. |
| 20 | Q | Oh it is. |
| 21 | A | How to the steps to take to turn the television on and get it to where it's |
| 22 | | suppose to be because her cable, she keeps pushing buttons and messing it |
| 23 | | up so. |

1  Q    Did we talk to Michael? Where did this come from?

2  A    No I couldn't tell if it came from the cable company. What do you mean
3       where did this come from?

4  Q    Well this note I mean it just kind of a list of William's, you know a list of
5       things and it just kind of, cable company phone calls, Michael.

6  A    Oh because Kevin Walker I think is his name said that he had heard her
7       talking on the phone to somebody named Michael like a few days earlier or
8       something so I found that thing on the television to show that that's more
9       than likely Michael and had certain calls to the cable company but there
10      hadn't been any for a few days. So he actually sent her something where she
11      could help fix the, William said most of his calls were about the television
12      from her and how to fix the television. She had dementia so she was kind of

13  Q    I have one of those, he's 89. I get all kind of calls somebody was after him
14      yesterday and I told him it was just the people coming to take him to dinner
15      and he should go with them quietly. 18 - 15 hours what's that say?

16  A    Printed reports from the area of 801 N. Shortridge.

17  Q    And those are the five reports that we've discussed that have been provided
18      to me?

19  A    Yes.

20  Q    Typed what? Case management.

21  A    Typed and updated case management.

22  Q    And this is a list of what, stuff collected or stuff that you were going to do,
23      oh I'm sorry these are, you listened to his statement and made notes.

1   A   And made notes.

2   Q   Okay.

3   A   Made notes, yes from Rainsberger.

4   Q   And then the next page is that also just you making notes from

5   A   Yes, continue research at the bottom.

6   Q   Blanket was over her, came from the chair?

7   A   Yes.

8   Q   Breathing

9   A   Rasperly did not touch the blanket, nudged her on the leg, thought she had

10      fallen, went around to the coffee table to the phone, saw the blood, called

11      911 didn't know what happened, thought she had a stroke or broke her hip,

12      blood coming through the blanket, small pool of blood, didn't move blanket,

13      thought maybe it was scabbed over and the blanket was keeping her from

14      bleeding that's why he didn't move the blanket.  Was telling me he didn't

15      touch anything in the apartment, called the ambulance, went through the

16      apartment, went to the front door, closed the apartment door.  My mother

17      has been attacked, someone might have hit her with a lead pipe.  Any tools

18      in the house, pliers, screwdriver, sister was there Monday morning and

19      continued research.

20   Q   Comcast phone number is I don't remember, did we, was her phone with

21      Comcast or did we think that and found out later it wasn't?

22   A   That was just for uh for the television.

23   Q   Okay.

1   A   I'm just looking to see what the numbers were so when I could see when she

2       might have been talking to somebody named Michael at Comcast.  So that's

3       a number that'll show up on her phone records this 1-800-266-2278.

4   Q   Internet research, apartment, Michael Comcast, what's that numbers for

5       siblings?

6   A   Yes trying to get the numbers for uh

7   Q   Oh okay.

8   A   The siblings out of State.  Set meeting with Denise for 9:30 on Monday.

9   Q   And this is when you went back and collected credit cards and paperwork?

10  A   Yes.

11  A   Receipts and stuff.

12  Q   Did Lane go with you?

13  A   Yes.

14  Q   Uh do you know if photographs were taken prior to collection on that day?

15  A   They should have been, yes.

16  Q   Um 2:00 o'clock.

17  A   Kroger video.

18  Q   You're waiting for crime lab to return what?  Is this, what's that?  Yeah

19      waiting for crime lab to return

20  A   I went over to uh Kroger to speak with uh security while I was waiting for

21      Lane to get back.

22  Q   Do you believe you sat and watched video this day?

23  A   Yes.

1  Q  Because I'm not trying to

2  A  I just kind of got to where we were seeing what time he came in so that she

3     could make the tapes for me.

4  Q  Because I think later you actually meet with Pullium but we'll come to that.

5     But you do recall watching on the Kroger video I swear originally I saw a

6     video of him walking across the parking lot before you even get within

7     range of the camera that shows the Red Box and the trash can.

8  A  On the way in?

9  Q  Do you remember seeing that?

10 A  I thought I did yes, I might not have gotten everything that I was suppose to

11    get.

12 Q  And the one I seem like, if I've seen it you would have had it but now I don't

13    know where I've come up with this.

14 A  Are you talking about the one that when he has the possible thing in his

15    hand or something different?

16 Q  No that one's from, that has the Red Box

17 A  Right.

18 Q  It just may be 12 foot

19 A  Right.

20 Q  Of sidewalk that it shows. No this is out it's got the shopping cart places

21    and all the cars and it's clearly the parking lot and it's only as he's walking

22    up to the building from his left and since whatever he's throwing away is in

23    his right hand I was trying to find out if we had anything from the right.

1        Pullium tells me there is a camera and we've seen it, it's over there by the

2        pharmacy but I don't ever remember seeing that and then when I go back I

3        can't find him walking across the parking lot.

4  A   Right, after I got these tapes she said she couldn't go back. I even tried to

5        get the uh cause I wanted the uh 9:30 that morning I wanted the one from

6        the gas pumps too and she sent me the she had video of inside the storage

7        area instead of pumps that I asked for. So when I said you gave me the

8        wrong ones she said well they're all gone now I can't get back in there so

9        whatever.

10  Q   But when you're sitting and watching you do remember seeing him go

11       across the parking lot?

12  A   I do.

13  Q   Do you remember seeing the angle um looking at him from towards his right

14       side to try to better see what was in his hand that he's throwing away?

15  A   I do not. I don't remember seeing anything in his hand from any other

16       angle.

17  Q   And the Kroger plus cards I can't figure those out, what can you tell me

18       about that?

19       Turned tape over

20  Q   Okay what can you tell me about Kroger plus cards?

21  A   Well the Kroger card was basically you could type in the code off the card

22       and tell what time that person was there which helped her find what time

23       she'd be looking for on video.

1    Q    But in some of the uh Ruth had one, William had one and I don't know

2        what, what do you what importance do you see in the uh Kroger plus cards?

3    A    The only thing I mean it was just to help show what time he was in there,

4        show that he bought ice tea and that was basically it. Just to show what time

5        he entered the store and left the store.

6    Q    Did you look for any patterns of purchases or times and use of Ruth's card

7        verses William's card?

8    A    I don't think Ruth's card had been used it was all and it was mostly yogurt

9        and stuff the day before. He bought some yogurt and stuff but yeah there's I

10       mean there's a print out of when the card was used and what it was used for.

11       It was basically just to find uh cause when he bought the ice tea he didn't

12       actually use his card he let somebody behind him use it. Had he not I might

13       not have, it would have been a lot harder to find the time he was in there,

14       had he not let that lady use it, cause he didn't use it when he bought his own

15       ice tea.

16    Q    But he called 911 and told you that very day, told you he had gone to the

17       Kroger and gotten ice tea.

18    A    Right, I'm not saying, I didn't say there was anything suspicious about it I

19       just said I wouldn't have known that he was there at that exact time unless

20       he would have unless he wouldn't have used his card we would have had to

21       look harder for it.

22    Q    Well just I'd have gotten the time the 911 call and backed up 10 minutes and

23       watched, it wouldn't seem so difficult to me.  Uh what's the William

| 1  |   | Rainsberger entry on your next page?  Or is this the next page?  I left off |
|----|---|---|
| 2  |   | after the bottom of called Comcast request call back. Am I missing a page? |
| 3  | A | Ah there's a page before that.  The last four numbers of the Kroger cards |
| 4  |   | right there.  That's this one. |
| 5  | Q | Okay and then on to the next page.  William Rainsberger what's that, what's |
| 6  |   | going on there? |
| 7  | A | With William Rainsberger? |
| 8  | Q | Yeah. |
| 9  | A | Um I was talking to Comcast and uh I believe that was the old uh that was |
| 10 |   | the address he had for Comcast at one time was 997 E. County Line Rd and |
| 11 |   | I was calling about his mom's Comcast. |
| 12 | Q | So you found a Comcast account under William at that address? |
| 13 | A | At 997 E. County Line Rd. that's the one that they have. |
| 14 | Q | And they said they would need a subpoena, did you ever |
| 15 | A | Well they wanted a subpoena if I wanted them to tell me who Mike was so I, |
| 16 |   | she said yeah there's Mike's that works here but I can't give any names |
| 17 |   | without a subpoena so. |
| 18 | Q | Did you use a subpoena? |
| 19 | A | No. |
| 20 | Q | Uh what's below the crime stopper story? |
| 21 | A | Crime stopper story, 1200 hours Kroger limited search warrant. |
| 22 | Q | Okay.  Who's Jeff Taylor oh Fire Communications? |
| 23 | A | Yes trying to set up that meeting with Carl Woolridge. |

1   Q   And James Barker did he talk to you and tell you anything?

2   A   No he's just somebody from the department that's retired that works at

3       Comcast.

4   Q   It says detective who?

5   A   Uh Craig Hill he had a new case so I had to go help him on a canvas.

6       Update case management.

7   Q   On November 26th you left a message for William to call you.

8   A   Yes.

9   Q   Why?

10   A   Cause I'm getting ready to set up the limited search warrant summons to see

11       if he will come in to do limited.

12   Q   And you left the message on what?

13   A   On his cell phone  331-1059 I believe.

14   Q   And did he call you back?

15   A   No.

16   Q   What did you say in your message?

17   A   Just asked him to call me.

18   Q   So you said hey it's Det. Benner.

19   A   You need to contact me, yes.

20   Q   He didn't like you after well

21   A   Probably not.

22   Q   Maybe, maybe not.  Down below oh crime lab cards something search

23       warrant for William Rainsberger, what's that say?

1   A   Typed.

2   Q   Was that to get a buccal?

3   A   Yes and fingerprints.

4   Q   Then you called Kroger.  What's this Amber after 6:00 p.m.?

5   A   She was an employee there.

6   Q   Why are you calling Kroger now?

7   A   Cause I'm going to pick up I still haven't served the search warrant and I

8       think to get the rest of the stuff from the Kroger plus card information and

9       all that stuff they're printing out for me.

10  Q   Did you ever check with a tool mark expert?

11  A   No.

12  Q   When you made that note were you thinking of what, showing him photos

13      from autopsy?

14  A   Yeah just to see if there were, what other uh weapons could have been used

15      besides a hammer.

16  Q   Anything else you think that you could show a tool mark expert to be of

17      assistance on that?

18  A   You mean beside the autopsy?

19  Q   Yeah just thinking you got photos uh

20  A   I mean there's photos of the skull and everything the damage that was done

21      to the skull and got shaved down so you can see all the damage.

22  Q   Um Tudor spoke to Tracy.  William was there and I can't read the rest.

23  A   Told her not to tell the police he was there.

1 Q     That's Tracy at the office?

2 A     She called Tudor and said that Rainsberger was in there and told her not to

3         tell the police that he came in there.

4 Q     Do we know what he went there?

5 A     I think that's when he probably gave her the note that we went back and

6         picked up.

7 Q     Did Tracy tell you what uh he wanted or what he said other than don't tell

8         the police I was here.

9 A     No just that note that he gave her.

10 Q     Then at Kroger again you met with Amber and you ran the that's when you

11        ran the plus cards?

12 A     Yes.

13 Q     Is that Ruth's or Robert's Kroger plus card?

14 A     Ruth's.

15 Q     Then I can't read anything below that. I was

16 A     I was sitting outside of Ruth's apartment William came out and saw me and

17        went back inside.

18 Q     And that was on November 27th at 4:15 p.m.?

19 A     Yes.

20 Q     Why were you outside Ruth's apartment?

21 A     Just looking around. I went back out there all the time and walked around

22        just to see if anything else popped up.

23 Q     What, were you in a plain clothed car?

1   A   Yes at that time I was in a Crown Vic.

2   Q   So he would just have recognized you by your appearance you didn't have

3       the police garb on did you?

4   A   I was dressed like I am now.

5   Q   You always in a shirt and tie?

6   A   When I'm working I am.

7   Q   Uh I can't read what's at the top of your next page 18.

8   A   Worked on limited search warrant for Robert Rainsberger.

9   Q   Research or what?

10  A   Research mobile roll call which is an app that we have on our computer.

11      Typed in 801 N. Shortridge

12  Q   And then what's that mean?

13  A   Just to check to see what else that's another place where reports can pop up

14      from people that have been stopped over there.

15  Q   So who's Brandy Gaston and

16  A   Just people that came up when I ran that.

17  Q   How's that work?  They would come up because they had been stopped?

18  A   Or they made a report or some kind of contact with the police dispatch typed

19      them in the run.

20  Q   Does that, what's that say before Leonard

21  A   Danard.

22  Q   Danard Leonard what's

23  A   Pickett

41

| 1 | Q | Pickett.  Did uh these five people did you talk to any of them or learn |
| 2 | | anything about them? |
| 3 | A | No. |
| 4 | Q | Can you tell me any details about why they popped up, what their particular |
| 5 | | contact would have been with the police? |
| 6 | A | No nothing that caught my attention or I would have wrote it down. |
| 7 | Q | Eastgate Terrace Apartments. |
| 8 | A | Do the same thing, research.   10th and uh Shadeland there's some |
| 9 | | apartments over there just to see if anything. |
| 10 | Q | Then below that |
| 11 | A | Abbey Meadows Apartments. |
| 12 | Q | And below that? |
| 13 | A | Check the area near the crime scene.  I walked around again.  I checked the |
| 14 | | buildings that were attached to Kroger over there. |
| 15 | Q | What's it say below that? |
| 16 | A | Meeting set for December 4th at 1:40 for statement from fireman.   1400 |
| 17 | | hours I'm sorry. |
| 18 | Q | Okay here's Pam Pullium. |
| 19 | A | Yeah. |
| 20 | Q | And this is November 29th and she says you need a search warrant? |
| 21 | A | Yes. |
| 22 | Q | But that's for the Kroger plus cards right? |
| 23 | A | Yes. |

1    Q    And then what's this did William use a different Kroger plus card when he

2        bought the

3    A    Ice tea.

4    Q    Ice tea. Is that a question to yourself?

5    A    Yes, yes.

6    Q    Did that get answered that day?

7    A    Yes he used I already told you he used it or he let the lady behind him use it

8        when he bought the ice tea.

9    Q    How come uh Pam Pullium has, gets three stars?

10    A    Oh uh just because she's the contact for the video and I don't know.

11    Q    Do you think that contacts the video or just the Kroger plus cards?

12    A    It says just the Kroger plus cards.

13    Q    And then what's that say next?

14    A    Finished limited search warrants for Robert and Rebecca Rainsberger. Need

15        search warrant for Kroger plus cards. Limited search warrants need signed,

16        orders by Denise Robinson and met with Judge Harvath at APC referenced

17        limited warrants.

18    Q    And then you're going to meet uh Pam on Wednesday.

19    A    At 9:00 a.m.

20    Q    And was that to look at video again and get the actual copies or what?

21    A    Yes.

22    Q    Cause we go back then to 12/4 it looks like you're back out at Kroger and

23        you serve the search warrant on Kroger Pam Pullium.

1  A  Received video.

2  Q  And you received the video that day. Pam describes sitting with you

3     watching it and you identifying for her what you want. Was that this day do

4     you think or was it that previous entry in your notes?

5  A  This was the day where I told her everything I needed.

6  Q  But I mean do you remember sitting there watching with her and saying I

7     want that?

8  A  This day?

9  Q  Any day.

10 A  Yes I mean I told her I wanted everything basically that she could find.

11 Q  But you remember sitting and watching video with her?

12 A  The first day we did just to see what time it was but this time I don't know if

13    I actually watched it all with her that day or not. I just told her what I

14    wanted, everything she could find.

15 Q  Um oh I'm sorry I kind of want to make sure I have everything cause there's

16    a difference between my first set and my second set. Is your next page at

17    the very bottom does that, do you uh print statement from Robert?

18 A  Yes.

19 Q  And then uh the next page the very last thing is the taped statement of Carl

20    Woolridge?

21 A  Yes.

22 Q  And what's that last line say, green?

23 A  Green cloth over her head.

44

1  Q  And

2  A  Glasses in hand.

3  Q  And 14

4  A  41 end statement.

5  Q  Did you take um on these statements William, Robert, Carl do you take

6     notes before hand, do you do a pre interview?

7  A  No.

8  Q  You just go straight to recording and take your notes during the recording?

9  A  During these ones I did. Sometimes I do it before but no I didn't for these.

10 Q  And then next uh 11/19/13 phone records.

11 A  Yes.

12 Q  Cause Robert's phone then William's what's that say?

13 A  William's cell calls Robert again at 14:44.

14 Q  Is this the entry, where did you get this information?

15 A  From the phone records.

16 Q  Remember there was 375-7841 I think is Ruth's landline is that right?

17 A  Yes.

18 Q  And someone originally was thought of this at one time but it's an often

19     (inaudible) because it got routed through Chicago.

20 A  Yes.

21 Q  I think in your testimony you said that Berris came up with that so are these

22     notes what Berris is telling you or is it you, is this note you looking at phone

23     records?

45

1   A   This is what I wrote down after looking at the phone records.

2   Q   And what day was this?

3   A   Um 12/4.

4   Q   Okay and you meet with Denise and does she do you talk about charging or

5       not charging?

6   A   Yes on December 4th I got a new case too that's why there's a gap there. I

7       got a new case on December 4th so I left this for a minute on the 26th I sent

8       a rough PC to Denise and then ended up, meet with her on New Year's Eve

9       which is 10:00 a.m. on Tuesday.

10  Q   And on the 27th uh is this an email to Pulliam?

11  A   Yes.

12  Q   And what did you want?

13  A   Sent message reference receipt.

14  Q   What's that about?

15  A   It's just the receipt that for the ice tea.

16  Q   To get it or?

17  A   Just to make sure yeah that I got a copy of it and any receipts that she had.

18  Q   Would you have a copy of that email to Pam Pulliam on that day?

19  A   Uh I don't know I could check to see if I still have my sent items I don't

20      know if I would have erased that yet or not.

21  Q   Do you sometimes copy it for the file?

22  A   Sometimes but.

23  Q   So you meet with Denise?

46

1    A    Yes.

2    Q    And how did that go?

3    A    Um it uh she gave me she wanted me to seek financial info for Ruth before

4        she made any decision.

5    Q    Maybe you can tell me now uh I've got stacks and stacks of sacks of bank

6        records and uh what do you find in them, anything suspicious?

7    A    What do you mean by suspicious? I mean I, she supposedly had like

8        $89,000.00 in assets or whatever. I don't know what's suspicious about it.

9    Q    The uh so you've got, okay on Ruth's finances you have uh $89,000.00 in

10       bank accounts and then the life insurance policy? Right?

11    A    I'm not completely clear on what kind of financial I just knew that the

12       whatever I put in the probable cause was the amount of money that she had

13       in assets whatever they may be.

14    Q    And you got that information from whom?

15    A    Well I did a search warrant on the financial credit union.

16    Q    Have you ever looked at the uh estate documents in probate court?

17    A    No.

18    Q    Have you ever contacted the lawyer that processed the estate?

19    A    No.

20    Q    And handled all the legal action with regard to inheritances and distribution

21       of money?

22    A    No.

1   Q   So when this uh cousin calls you and says Blanche, William got Blanche to

2       sign over $10,000.00 did you do anything, any investigation to find out if

3       that was true other than talking to Blanche and the caregiver and the cousin?

4   A   No.

5   Q   And so do you know the lawyer had any involvement in that or the estate

6       reports any of that or what the actual amount was?

7   A   No.

8   Q   The youst tells you the caregiver that there's another caregiver, did you ever

9       interview the other caregiver?

10   A   No.

11   Q   Did you ever find out who the other caregiver is?

12   A   No.

13   Q   And then uh back then on the 31st, New Year's Eve, you're meeting with

14       Denise Robinson and she gives you a to do list.

15   A   Just basically to seek the financial info.

16   Q   Uh search warrants for uh financial records, right?

17   A   Yes.

18   Q   And then we got Delbert Pickens?

19   A   Yes.

20   Q   You seek some financial records, right?

21   A   Yes.

22   Q   Oh that's a post it, what's this post it all about?

| | | |
|---|---|---|
| 1 | A | The uh Dallas Cowboys hoodie that was turned in that was found in the |
| 2 | | laundry room. |
| 3 | Q | Okay at 800 Shortridge. |
| 4 | A | Yes. |
| 5 | Q | And on January 26th this Tracy, is that the manager? |
| 6 | A | Yes. |
| 7 | Q | And why does, why do you have an entry with her? |
| 8 | A | I just probably checked in with her to see what's going on. |
| 9 | Q | Is this when you get the call about a bloody sweatshirt behind the washer |
| 10 | | and dryer? |
| 11 | A | That was February 5th when they called in and said they found the uh. |
| 12 | Q | So this post it goes to. |
| 13 | A | Something I left out. |
| 14 | Q | The February 5th? |
| 15 | A | Yes. |
| 16 | Q | Okay on January 26th any idea what you talked to Tracy about? |
| 17 | A | Just to see if she probably heard anything else about what's going on.  Did |
| 18 | | anybody talk to her? |
| 19 | Q | What's blacked out, oh was that her phone number? |
| 20 | Pros | Yeah it's a phone number. |
| 21 | Q | Do you know if that's a personal phone number, or a work phone number? |
| 22 | A | Um I think it was work. |
| 23 | Q | Can I have it? |

| | | |
|---|---|---|
| 1 | Pros | I'd have to double check that it's not her personal.  I care about people. |
| 2 | Q | Yeah, yeah oh I'm a real threat to Tracy. |
| 3 | Pros | If you'll remind me I'll double check that. |
| 4 | Q | This is the blood sweatshirt I got excited about that I thought was in the |
| 5 | | laundry room of building H |
| 6 | Pros | Yep. |
| 7 | Q | And then you very scornfully corrected me and embarrassed me in public, is |
| 8 | | that the one? |
| 9 | A | About what that you thought it was in the same building? |
| 10 | Q | The sweatshirt yeah. |
| 11 | A | Okay it was in K building. |
| 12 | Q | February 5th what's that say? |
| 13 | A | Enroute to scene at the laundry room 801 N. Shortridge building K.  Called |
| 14 | | Jennifer Lane back out there. |
| 15 | Q | Building K, building laundry room K, is that a K? |
| 16 | A | Yes. |
| 17 | Q | Okay and they arrive both crime lab.  What's that I can't read it? |
| 18 | A | 1630 hours. |
| 19 | Q | Okay then right below crime lab? |
| 20 | A | Sweatshirt, photographed and recovered. |
| 21 | Q | And that was Jackie Goldstein and she found it and then here I've got |
| 22 | | something that was not in my original production. |

50

1  A  223 I went and got her buccal swab just so I could eliminate her from

2     finding the sweatshirt.

3  Q  No I've got that on the back. This is on back of previous. Where'd we get

4     this and what's this about?

5  A  Um this is uh H 10 and H 9.

6  Q  Victoria who?

7  A  It says Victoria and boyfriend that's who lived in H 10. Somebody named

8     Alfred in H 9 I believe he's the one that's drunk all the time that I talk to on

9     the phone once in awhile.

10  Q  Ah okay.

11  A  You know him? You want to talk about it?

12  Q  How did this show up here?

13  A  It's probably, I probably got that from Tracy?

14  Q  Yep the drunk guy the mother of his child that has to bring the child for

15     visitation, she's more helpful than the drunk guy because she's not a drunk

16     and she doesn't like the drunk guy and so she tells you a lot about him. Uh

17     and where did you get these?

18  A  From Tracy.

19  Q  And on what day? See it's kind of random it's on the back.

20  A  Yeah I probably wrote it on a piece of paper when I was talking to uh Tracy

21     the night I wrote that.

22  Q  So that maybe came from the 26th or is it maybe from 5/1 did we really

23     jump from February 23rd to May 1st?

51

1    A    Yes, I wrote it somewhere on my desk or my notebook got messed up  I just

2         opened it up kept it open wrote that   down.

3    Q    So do you remember when you would have gotten this?

4    A    I don't know exactly.

5    Q    Occupancy for H 10 and H 9?

6    A    I don't know.

7    Q    Do you think it's around this time?

8    A    It's sometime during my investigation, yes.  Sometime from Tracy because

9         that's the only person cause that's the only person I probably would have got

10         that from.

11    Q    Did you talk to Victoria and boyfriend?

12    A    No nobody, every time I went out there I couldn't get anybody except Kevin

13         upstairs that's the only one I could really get in contact with.

14    Q    And did Alfred ever tell you anything?

15    A    Alfred told me to get lost he wasn't talking to the police.

16    Q    And then uh Maria called you on May 1st?

17    A    She said she heard the office manager talking about the case.  She said she

18         heard Tracy talking saying all kinds of stuff about the case, so I called Tracy

19         and she said that wasn't true.

20    Q    And did Maria tell you that you needed to speak with Sean?

21    A    Yeah I talked with Sean several times.  He said he didn't see anything

22         significant.

1   Q   So what happens between February 23rd when you got the illumination

2       sample from Jackie to May 1st on this case, anything?

3   A   Um no not if there's nothing in there.

4   Q   And Denise.

5   A   On December 4th I got that case and then on January 2nd I got a new case

6       and on January 28th I got a double so I was working on those cases in the

7       interim and got back to this one when I could.

8   Q   And Denise wasn't bothering you during this time checking on that to do list

9       she gave you on New Year's Eve?

10  A   No she was pretty busy.

11  Q   And uh May 22nd how do you decide to meet with Denise and file the case

12      and get a warrant for William Rainsberger on that day?

13  A   That's just uh the date we picked to get together.

14  Q   Do you know when that date got picked?

15  A   Probably the day before or a couple of days before I'm not sure.

16  Q   That's the same day he calls and leaves a message, right?

17  A   I mean, yes.

18  Q   And you're saying you do not speak to him before

19  A   No.

20  Q   Filing it.  It's kind of a coincidental I mean nothing happened on the case

21      from May 1st to May 22nd happened to be the same day that he calls and so

22      I'm curious how that date got set up between you and Denise to do that.

23  A   Just when we both had a free moment that's all that is.

53

| 1 | Q | And then uh listened to some jail calls, listened to some more jail calls and |
|---|---|---|
| 2 | | you met with uh the prosecutors, is this all in order? |
| 3 | A | Yes. |
| 4 | Q | Some more bank stuff. |
| 5 | A | Well we did the search warrant in there somewhere too. |
| 6 | Q | The search warrant at his house? |
| 7 | A | Yeah do you have those notes?  That page got ripped out too. |
| 8 | Q | I'm wondering what this is.  I haven't ran across it yet.  I don't have any |
| 9 | | Tudor notes. |
| 10 | A | That's not my writing I don't know who that is.  Yeah I don't have any Tudor |
| 11 | | notes either. |
| 12 | Q | But I got |
| 13 | A | I mean these are notes from my search warrant that came out of this |
| 14 | | notebook. |
| 15 | Q | Okay so you have notes from them.  Okay I'll get |
| 16 | Pros | May I ask, did you ask Tudor for notes? |
| 17 | A | Yes. |
| 18 | Pros | And he said he didn't have any. |
| 19 | A | Yes. |
| 20 | Pros | Okay. |
| 21 | Q | Could you tell him I'm very disappointed with him. |
| 22 | A | I'm sure he'll be happy to hear that.  Do you want these? |
| 23 | Q | Can I? |

54

1    A      Yeah.

2    Pros   Can I see them just to make sure they're

3    A      This is what I did at search.

4    Q      Searching my client's home.

5    Pros   I just want to make sure, thank you I appreciate it.

6    Q      It's the same office that blacks out my client's dates of birth on my materials

7           like I shouldn't know when my client was born.  June 9th okay so set that

8           aside we got to get the first page and those two pages we can put those in

9           order.

10   Pros   You going to put them under or do you want to discuss these real quick?

11   Q      Yeah I better read them let's see.  Oh good God.

12   A      I got another case on June 5th that's why I had to wait until June 9th to do

13          the search warrant on his house.  We were suppose to find the firebox right

14          is that what you're talking about?

15   Q      Okay I'm going to start with these and then go we'll go back, take a break

16          and I'm gonna copy them so I can ask questions so I can write because I

17          can't read them.  What's this Frank is that the next thing?

18   A      Uh what's it lead off?

19   Q      I don't know.  Okay uh June 16th you met with the prosecutor how did that

20          go?

21   A      Oh Marielle Vincent?

22   Q      Was I on the case yet?

23   Pros   No I don't believe so.

1    Q    Were you guys meeting because holy cow look who's on the case now, is

2          that what happened?

3    Pros   Sure.

4    A    Yeah candles and birthday cake.

5    Q    At 4:05 you did what?

6    A    Place papers in the property room as evidence.

7    Q    What papers?

8    A    That was taken from the search warrant, that search warrant.

9    Q    Gotcha and still need Facebook.

10    A    Firebox just need to put that in there.

11    Q    Okay, Kim Godfrey calls what's she tell you?

12    A    She received claims from William, Robert and Rebecca.  She asked if the

13          other siblings were at all suspects I told her it was still an ongoing

14          investigation.

15    Q    What's this July 11th meeting with prosecutor, news video PIO?

16    A    There was some news video that was out.

17    Q    What does PIO mean?

18    A    Public Information Officer.

19    Q    Why do you go.

20    A    Some kind of statement about it.  I didn't do it that was just notifying that

21          they had done it. I didn't talk to anybody.

22    Q    Why do you go back out to Jeffersonian Apartments on July 12th?

1    A    Um it looks like I went to try to locate Tracy and she had moved to a

2         different uh different apartment complex.

3    Q    Okay what's is the next the Anita upstairs?

4    A    Yes.

5    Q    What's that about?

6    A    This is stuff once again I found out I got a hold of Tracy and she told me

7         about these people again.  Just confirm that's who they were, Maria she says

8         is a crazy person.

9    Q    Who's Donna?

10   A    Ask about H 8 I never figured out who Donna was.

11   Q    Well what's that note, Donna ask about H 8 black male.

12   A    Ask about that's Kevin Walker that lives in H 8.  I don't know she must have

13        known him or something.

14   Q    Did we ever find Donna?

15   A    No.

16   Q    Did we ever know what Donna

17   A    Never talked to anybody but Kevin.

18   Q    Do you know what Donna would have told us about anybody in the H

19        building?

20   A    Uh I don't know but they make a lot of noise at night or something maybe, I

21        don't know.

22   Q    What about black male in H 10 what's that about?

23   A    That not H 10 that number 10.

57

| 1 | Q | Oh well I was going to say number 10 but then it looked to me like maybe |
| 2 | | you were trying to turn it back into an H.  But I'll go with number 10 what's |
| 3 | | it about? |
| 4 | A | That's just something from Tracy saying that there might have been a black |
| 5 | | male that lived in 10 and stayed in H 10. |
| 6 | Q | Did you ever find this person? |
| 7 | A | No unless it's the drunk that I ran into out front. |
| 8 | Q | Could be a relative? |
| 9 | A | Alfred, I doubt it. |
| 10 | Q | Oh what's this I spoke to Frank what's that say? |
| 11 | A | Uh I spoke to a female. |
| 12 | Q | Oh. |
| 13 | A | Just one of the numbers off of Ruth's phone that I was trying to call and see |
| 14 | | who it might be.  Somebody that she didn't know she said she didn't know |
| 15 | | who it was. |
| 16 | Q | What's the rest of this say? |
| 17 | A | Doctor numbers, cyber crimes she never called that number.  She called |
| 18 | | AT&T and confirmed it. |
| 19 | Q | What's that about? |
| 20 | A | That's the person that owns that number that says she called AT&T and |
| 21 | | Ruth's number never showed up on there so she doesn't know what I'm |
| 22 | | talking about. |
| 23 | Q | So that's a phone number? |

58

| 1 | A | Yeah 341-0000. |
|---|---|---|
| 2 | Q | Maybe you're suppose to ask permission before you gave me that. |
| 3 | A | That is a cell phone so you can't have it. |
| 4 | Q | 341-4 zeros?  What's this here what are these initials? |
| 5 | A | She called AT&T and confirmed it, I don't know what that is.  It doesn't |
| 6 | | look like anything to me. |
| 7 | Q | And then what's July 18th went to bail hearing what's that, oh hearing |
| 8 | | begins, what's that say? |
| 9 | A | Copies of the stuff that you wanted car title, passport, notes Pullium, I went |
| 10 | | to the property room found the registration gave it to Marielle Vincent. |
| 11 | Q | And then there's the whole Pamela Hogan thing? |
| 12 | A | Yes. |
| 13 | Q | Did you, have you ever met with her personally? |
| 14 | A | No just on the phone. |
| 15 | Q | Uh Blanche moved to North Canton, Ohio. |
| 16 | A | Yes. |
| 17 | Q | Ruth had three siblings, 2 sisters, I brother? |
| 18 | A | Yeah. |
| 19 | Q | Paul Miller? |
| 20 | A | Yes. |
| 21 | Q | Who's that? |
| 22 | A | I'm sorry, Blanche's husband. |
| 23 | Q | And below that what's that? |

59

| 1 | A | Parkinson's. |
|---|---|---|
| 2 | Q | Did Blanche have that or did Paul have that? |
| 3 | A | Blanche. |
| 4 | Q | What's this Roxie? |
| 5 | A | Uh Pam's mom that lives in Florida. |
| 6 | Q | Did you ever talk to her? |
| 7 | A | No. |
| 8 | Q | What's that last name? |
| 9 | A | Finnegan. |
| 10 | Q | Finnegan? |
| 11 | A | Finnegan. |
| 12 | Q | Blanche has money she has (inaudible) Pam just found out. |
| 13 | A | There was a murder. |
| 14 | Q | Who told you that, oh Pam? |
| 15 | A | Yes. |
| 16 | Q | Were those, was that her direct words, I just found out it was a murder. |
| 17 | A | Uh huh saw it on Facebook.  When he got out of prison or jail he put it on |
| 18 |  | there. |
| 19 | Q | I'm sorry William put something on Facebook about being out of jail? |
| 20 | A | Yes. |
| 21 | Q | Have you seen anything, have you seen that? |
| 22 | A | No that's just what they said.  That sounds |
| 23 | Q | Just shortly after the murder Rainsberger |

| 1 | A | Contacted Blanche. |
|---|---|---|
| 2 | Q | And this is from Hogan? |
| 3 | A | Yes. |
| 4 | Q | And then what's that say Pam called William? |
| 5 | A | Yeah Pam called William spoke about the death. He told her he didn't want |
| 6 | | to talk. Last saw mom the day before, next day found her on the floor like |
| 7 | | she just hit her head on something, she was just dead. Also said I have a |
| 8 | | great sense of loss which he'd said that same line later on the news exactly |
| 9 | | when they spoke to him. Or that was before cause when he, when they were |
| 10 | | walking him down the hall when he's |
| 11 | Q | You find that notable why? |
| 12 | A | It's very interesting because I have a great sense of loss doesn't really sound |
| 13 | | normal to me as somebody that's in grief. But that has nothing to do with |
| 14 | | the case. |
| 15 | Q | Well I don't know it might have something to do with my belief that you are |
| 16 | | overly suspicious. |
| 17 | A | It doesn't matter what I believe anyway. |
| 18 | Q | What's that also? |
| 19 | A | Also said I have a great sense of loss and also said this on the news. |
| 20 | Q | Oh okay. William calls Blanche, I'm going to |
| 21 | A | See you soon. |
| 22 | Q | And then please continue. |

61

1   A   After getting on, out on bond possible 7/27/14 now he tells Blanche it was a

2       murder.

3   Q   I'm sorry William told Blanche it was a murder?

4   A   That's what this says yeah.

5   Q   And below do you know who, did that come from Pam?

6   A   Yeah this is all Pam's stuff here.

7   Q   And below that Marsha.

8   A   And Blanche talk, William had gone to see Blanche.

9   Q   Who is Marsha?

10   A   The caregiver.

11   Q   Okay 4/17

12   A   Pam talked to William two to three weeks later William visited Blanche.

13       Blanche signed over $10,000.00 check to William.  William wanted to see

14       Blanche's will.  Blanche hasn't spoken to Robert or Rebecca.

15   Q   So you never confirmed this alleged $10,000.00?

16   A   Blanche said that she signed it over to him I mean I confirmed it through

17       her.

18   Q   Blanche said $10,000.00?

19   A   Yes I believe she said that or just she, I don't know if she gave the exact

20       amount or not but she said she signed her part of the check over to him.

21   Q   Do you have any idea how the will read with regard to Blanche what she

22       was suppose to get?

23   A   No.

1    Q    And what she relinquished?

2    A    I do not.

3    Q    Any idea why she would, why she relinquished it?

4    A    That doesn't matter to me.

5    Q    Call us, what's that say?

6    A    If contacted by Hennessy.

7    Q    Who's suppose to call you if I contact them?

8    A    Pam and those guys.

9    Q    Oh have they called yet?

10    A    Um

11    Q    To let you know we've been hanging out.

12    A    Naw I don't think so.

13    Q    Pam's Verizon records?

14    A    Yep.

15    Q    What's why do you have the my case little thing there?

16    A    Um I don't know it's just a search engine for something on the internet.

17    Q    What's that next entry?

18    A    Pamela Hogan's phone statement.  I took a phone statement from her, taped.

19    Q    Oh okay and what's that say, 18?

20    A    18 months to 2 years contact with William.

21    Q    Did you get that she had not had contact with William for that period of

22       time?

23    A    Yes.

| 1 | Q | And then she calls William about Ruth's death? |
|---|---|---|
| 2 | A | Yes. |
| 3 | Q | And she tells you that she called on November 21st? |
| 4 | A | Yes. |
| 5 | Q | Anything confirming that any records? |
| 6 | A | No. |
| 7 | Q` | July 25th 11 Facebook what's that say? |
| 8 | A | William got out on bail. |
| 9 | Q | How did, how did Pam know then? |
| 10 | A | His face (inaudible) was on Facebook.  She found out about the murder |
| 11 | | charges when he got out said he just got out on bond. |
| 12 | Q | And on July 27th texted William? |
| 13 | A | Yes. |
| 14 | Q | Blanche said Rainsberger had called and then April 22nd and 23rd what's |
| 15 | | that? |
| 16 | A | Text to William was there to see Blanche.  He was nasty to her $10,000.00 |
| 17 | | will money left for Blanche, William had her sign it over to him. |
| 18 | Q | Do you know if any of that's true or just what they said? |
| 19 | A | That's just what they said, I don't know. |
| 20 | Q | Um but this is from who on the 22nd and 23rd? |
| 21 | A | Still from Pam |
| 22 | Q | That's still her |
| 23 | A | Still her statement. |

64

1    Q    Okay and below that?

2    A    Tracy I talked to Tracy again.

3    Q    Oh.

4    A    Got some further names of people who might have lived there.

5    Q    Did Tracy ever tell you how you could get an entire complete list of people

6         that lived there and when and where through like corporate headquarters?

7    A    No I never really needed the list.

8    Q    Did you, why not?

9    A    Cause I was knocking on their doors.  If they don't answer I mean

10   Q    Well you're getting

11   A    What information do I need from them?

12   Q    You're getting it from her right so you must have wanted it, I'm just saying

13        did you get it?

14   A    Well because by this point most of them are already gone so I was trying to

15        see what she remembered about who was there.

16   Q    8/7 a lot of traffic in and out.  You have Anita Battiff uh assigned to that per

17        Tracy correct?

18   A    Yes.

19   Q    Any idea how many other people lived there?

20   A    No.

21   Q    Okay then on the next page August 13th what's that say?

| 1 | A | Talked to Marsha caregiver for Blanche agreed to meet her in North Canton |
| 2 | | on Monday at 1300 hours. Blanche's address on 8/18 at 6:30 in the morning |
| 3 | | I'm on my way to North Canton, Ohio. |
| 4 | Q | You arrived at Wendy's? |
| 5 | A | Yes that's where I met Marsha. |
| 6 | Q | Located at oh to meet with Marsha interrogate her, Marsha yeah, took a |
| 7 | | statement, right? |
| 8 | A | Yes. |
| 9 | Q | Blanche's will, Bill wanted to read the will. |
| 10 | A | Yes. |
| 11 | Q | Then you went to Blanche's residence? |
| 12 | A | Yes. |
| 13 | Q | And then mine ends how about yours? |
| 14 | A | Yep. |
| 15 | Q | Okay and has anything been done since then that you can tell me about? |
| 16 | A | Nope |
| 17 | Q | Okay. |
| 18 | A | If I did something it would be in here. |
| 19 | Pros | Do you want (inaudible) |
| 20 | Q | I'm sorry. Hey look we're going off the record for a minute. Okay we went |
| 21 | | uh over the uh search warrant notes uh June 9th uh Robert tells you that |
| 22 | | Mary had taken some computer equipment. |
| 23 | A | Yes. |

66

| | | |
|---|---|---|
| 1 | Q | Did you ever follow up with her to find out what that was or get it? |
| 2 | A | I tried to call her one time and she said she wasn't she was told by her |
| 3 | | attorney not to talk to me so I never contacted her again. |
| 4 | Q | Uh who told you don't do that? |
| 5 | A | Mary, she said that her lawyer told her not to talk to me so I never called her |
| 6 | | back. |
| 7 | Q | Did you ever know who her lawyers was? |
| 8 | A | I imagine she meant William's lawyer. |
| 9 | Q | Not suppose to imagine.  Uh this is a list and I'm wondering where it came |
| 10 | | from. |
| 11 | A | I wrote this uh as a guide when I was typing my probable cause. |
| 12 | Q | And when by this uh it's a list with numbers looks to be done on a legal pad |
| 13 | | number 1 is no forced entry and then uh runs through number 22. |
| 14 | A | Yes. |
| 15 | Q | Uh I'm going to go off record again.  We're back on we're going to pick up |
| 16 | | on number 12 Uh refrigerator 2 wood boxes containing old sterling |
| 17 | | silverware. |
| 18 | A | Yes. |
| 19 | Q | How's that related to the refrigerator was it on it or in it? |
| 20 | A | It was on top of the refrigerator. |
| 21 | Q | And then number 15 interviews. |
| 22 | A | No emotion never asked about mom's condition. |
| 23 | Q | 16? |

67

| | | |
|---|---|---|
| 1 | A | Officer Price, William said on the ride down I don't know if it's a good thing |
| 2 | | or a bad thing if she dies. |
| 3 | Q | 17? |
| 4 | A | Siblings looking to place mom in assisted living. |
| 5 | Q | Mom has 80 to 100,000 in savings and bonds, beneficiary is the 3 kids, |
| 6 | | right? |
| 7 | A | Yes. |
| 8 | Q | Uh number 20 she said she was |
| 9 | A | Last there on Monday. |
| 10 | Q | Okay. I called William's wife and asked her to |
| 11 | A | Come in. |
| 12 | Q | She said. |
| 13 | A | She would call back and has not done so. |
| 14 | Q | On the back of it what's that? |
| 15 | A | That's just uh stuff that I needed to get to the prosecutor. |
| 16 | Q | That's a list of stuff the prosecutor wanted. |
| 17 | A | Yes. |
| 18 | Q | Was that Denise before filing or Marielle after filing? |
| 19 | A | Um probably after cause I'm thinking I already had the Kroger plus card |
| 20 | | stuff with purchases. |
| 21 | Q | What is the very last thing, media's message? |
| 22 | A | Medic, medics message. |
| 23 | Q | What's that about? |

| 1 | A | Just left a message for them to uh |
|---|---|---|
| 2 | Q | Okay um you had a search warrant for William's house but anything for |
| 3 | | bloody hammers or potential murder weapons or bloody clothes? |
| 4 | A | Uh search warrant to see what was listed that we were looking for. It was |
| 5 | | the search warrant was based on the phone calls from jail so we were |
| 6 | | looking for the firebox. |
| 7 | Q | Uh you indicated in watching the video that you believed he threw |
| 8 | | something away that was metallic, how do you come up with that? |
| 9 | A | I don't know if I said metallic, I don't |
| 10 | Q | Well you said metal object. |
| 11 | A | Well I said it just appeared to it just appeared to me to be a metal object. |
| 12 | Q | Now I'm wondering what about it made you think metal? |
| 13 | A | It didn't look like a straw or anything like that so I just figured it was metal. |
| 14 | | I said it appeared so I mean just what it appears to be to me. |
| 15 | Q | And uh you still have not identified anything that was stolen from her |
| 16 | | apartment? |
| 17 | A | No. |
| 18 | Q | Now uh the first interview with William uh he was taken down in a patrol |
| 19 | | car by a patrolman, no you took William? |
| 20 | A | I took Robert. |
| 21 | Q | You took Robert so William was taken in |
| 22 | | Turned tape over. |
| 23 | Q | Uh okay the tape ran out and what was I asking you does anyone remember? |

| 1 | Pros | Going through the next set of questions I think. |
| 2 | Q | Oh um police car, uniformed policeman brings William down for his first |
| 3 | | interview, correct? |
| 4 | A | Yes. |
| 5 | Q | Uh was he ever told that he could leave? |
| 6 | A | No. |
| 7 | Q | You had no intention at that time of keeping him so you did not Mirandize |
| 8 | | him? |
| 9 | A | Correct. |
| 10 | Q | Uh was he, I'm sorry, did you tell him he was free to leave? |
| 11 | A | He never asked if he could leave, no I didn't just come out and say you can |
| 12 | | go ahead and take off if you want. |
| 13 | Q | And how was the second interview arranged, that was the hey come down |
| 14 | | and talk about the autopsy? |
| 15 | A | Yes. |
| 16 | Q | And when he left but was he told he was free to leave prior to that |
| 17 | | statement? |
| 18 | A | No I didn't tell him he could leave.  I figured if he wanted to leave he |
| 19 | | wouldn't have came. |
| 20 | Q | There you go figuring again. |
| 21 | A | Uh huh. |
| 22 | Q | Is figuring a lot like assuming? |
| 23 | Pros | It's more like imagining. |

| | | |
|---|---|---|
| 1 | Q | Imagining that's kind of (inaudible) um do you know what a CAD/dispatch |
| 2 | | search is? |
| 3 | A | Yes. |
| 4 | Q | Did you do that in this case? |
| 5 | A | That's just like pick up the run, run history? |
| 6 | Q | Yes. |
| 7 | A | Yes. |
| 8 | Q | Well how many did you get? |
| 9 | A | You mean how many dispatches out there? |
| 10 | Q | Yeah. |
| 11 | A | One CAD should have just been uh the initial scene. |
| 12 | Q | Well no I got a list from uh |
| 13 | A | From the search warrants and everything too? |
| 14 | Q | I don't know, everything and there's 10 1/2 runs per month at 801 |
| 15 | | Shortridge. |
| 16 | A | Oh you're talking about running an address, I thought you were talking |
| 17 | | about running a report for that incident. |
| 18 | Q | Okay no this would be just for 801 Shortridge through CAD/dispatch. |
| 19 | A | Okay, yes I didn't uh |
| 20 | Q | Did you do that? |
| 21 | A | I checked for reports, I didn't check for all dispatch runs. |
| 22 | Q | Do you have, do they still for crime lab have, how do you make a request |
| 23 | | for analysis, is that all computerized now? |

71

1   A   You can but I type, I write the cards out by hand still.

2   Q   And do you have copies then of your cards?

3   A   Yes.

4   Q   Uh evidence submission item number 22 the uh 22 is identified as the

5       doorknob hanging bag with H 11 written in marker and it was on the coffee

6       table.

7   A   Yes.

8   Q   Okay and then in that was there a can cooler?

9   A   Yes.

10  Q   A yellow smiley face, do you remember that being inside it?

11  A   Yes.

12  Q   And then a white envelope from the Financial Center Credit Union was that

13      inside it, this says in a group with item 22.

14  A   Right and that's stuff that was on the table there was probably an envelope

15      outside the bag.  The bag was just what the apartment complex left there.

16  Q   Okay, so 22 is basically everything that was on the coffee table?

17  A   Yes.

18  Q   Um okay.  Tudor had no notes?

19  A   He told me he didn't.

20  Q   Well do you believe him?

21  A   He retired so I know he had some probably at the time I don't know I'll ask

22      him again.

72

| 1 | Q | Well that is all that I have at this oh wait. Um at the time, in the transcript |
| 2 | | from the bail hearing you had indicated that even the doctor thought it was a |
| 3 | | gunshot wound where did you get that information? |
| 4 | A | Um where was that at? |
| 5 | Q | Uh at the bail hearing. |
| 6 | A | Uh oh okay. |
| 7 | Q | There might be I don't know if you got it from medical records or if |
| 8 | | someone told you |
| 9 | A | I have my copy of the medical records yeah but people that had been to the |
| 10 | | hospital stated that the doctors were assuming, I know you shouldn't |
| 11 | | assume, but they were treating they couldn't treat her completely, they didn't |
| 12 | | want to move her to check out the wounds closely but they were they |
| 13 | | thought it was a gunshot wound. |
| 14 | Q | And |
| 15 | A | They were trying to stabilize her before they went in and |
| 16 | Q | Do you know who told you that? |
| 17 | A | It would have been the officer that went to uh, Feuquay, the one that went |
| 18 | | down to get the clothes at the hospital. |
| 19 | Q | And at the time you indicated that William had used his Kroger plus card at |
| 20 | | 9:20 a.m. was that on the day of? |
| 21 | A | Yes the 19th. |
| 22 | Q | And was that then at the 10th Street Kroger? |
| 23 | A | At the gas pumps there yes. |

| 1 | Q | Oh at the gas pumps. |
| 2 | A | Yes. |
| 3 | Q | Okay, that's all that I have.  You got anything to tell me that I haven't asked |
| 4 | | you about? |
| 5 | A | No not at this time. |
| 6 | Q | Relevant to this case? |
| 7 | A | Not right now. |
| 8 | Q | Have you done anything lately?  Have you done anything since your trip to |
| 9 | | Ohio? |
| 10 | A | On this case? |
| 11 | Q | Yes sir. |
| 12 | A | No. |
| 13 | Q | Oaky doky.  Do you have any questions Marielle? |
| 14 | Pros | No. |
| 15 | | End of taped deposition of Det. Charles Benner. |

AND FURTHER AFFIANT SAYETH NAUGHT.

_____          _____
Det. Charles Benner (IMPD B4219)          Date

Case 1:16-cv-00103-TWP-MJD   Document 86-2   Filed 11/28/17   Page 96 of 495 PageID #:
2032
Case 1:16-cv-00103-WTL-MJD   Document 30-2   Filed 02/23/17   Page 1 of 495 PageID 452

```
 1    STATE OF INDIANA      )
                            )   SS:
 2    COUNTY OF MARION      )

 3

 4
                    IN THE MARION SUPERIOR COURT
 5                     CRIMINAL DIVISION ONE
                   HONORABLE KURT EISGRUBER, JUDGE
 6

 7

 8    STATE OF INDIANA        )
                              )
 9                            )
      VS                      )   CAUSE NO. 49G01-1405-MR-026747
10                            )
                              )
11    WILLIAM RAINSBERGER     )

12

13         * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

14            TESTIMONY OF DET. CHARLES BENNER
                      July 17, 2014
15         * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

16
      A P P E A R A N C E S :
17

18    For the State of Indiana:      Marielle Vincent

19

20    For the Defendant:            David Hennessy

21

22

23

24              Carla Villalta, Court Reporter
                   Marion Superior Court
25                 Criminal Division One
```

1

1          BE IT REMEMBERED, that on July 17, 2014 in the

2     Superior Court, Criminal Division One, Room 202,

3     City-County Building, Indianapolis, Marion County,

4     Indiana, before the Honorable Kurt Eisgruber, Judge,

5     the following proceedings were had:

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          The State, in order to maintain the issues in its

 2          behalf, offered and introduced the following into

 3          evidence, to-wit:

 4          D E T.   C H A R L E S    B E N N E R,

 5          a witness, called on behalf of the State, who,

 6          after first being sworn to testify the truth,

 7          testified as follows, to-wit:

 8

 9     QUESTIONS BY THE COURT:

10     Q    And if you would, please, state your name.

11     A    Charles Benner, B-E-N-N-E-R.

12     Q    All right.  Thank you very much.

13          THE COURT:  And Ms. Vincent?

14          MS. VINCENT:  Thank you, Judge.

15     DIRECT EXAMINATION,

16     QUESTIONS BY MS. VINCENT:

17     Q    Detective, you're currently with IMPD; is that

18          correct?

19     A    Yes, ma'am.

20     Q    With the role of homicide detective; is that

21          correct?

22     A    Yes.

23     Q    How long have you been so employed?

24     A    Nine years in homicide and 25 years on the

25          department.
```

```
 1   Q   All right.  Did you become involved with the case

 2       involving the murder of Ruth Rainsberger on November

 3       19, 2013?

 4   A   Yes, I did.

 5   Q   All right.  And when did you specifically become

 6       involved with that case, please?

 7   A   The case, the run came out about 3:38 PM that day, in

 8       which Detective Feuquay originally responded as an

 9       aggravated assault detective.

10       Based upon her condition later, homicide was

11       requested, and I got there about 4:15 PM.

12   Q   All right.  I'd like to briefly review some things

13       from the day of the murder, specifically, November

14       19th of 2013.  Where did Ruth Rainsberger live,

15       please?

16   A   801 North Shortridge, Apartment H-11.

17   Q   And who did she live there with, please?

18   A   She lived alone.

19   Q   Was there anyone who tried to make contact with her

20       earlier that morning, if you know?

21   A   Yes.  There was a food delivery person named Delbert

22       Pickens that said he was there around 10:30 that

23       morning.

24   Q   Okay.  And did he make attempts to contact her to

25       deliver that food?
```

4

1  A   He said he knocked on the door, receive no answer, so

2      he called her landline, listened to it ring outside

3      and received no answer.

4  Q   All right.  So he was able to hear her phone ringing

5      inside but did not hear an answer?

6  A   Yes.

7  Q   And this was at approximately 10:30 AM, you said?

8  A   Yes.

9  Q   Did you, in fact, get the phone records of Ruth

10     Rainsberger, Detective?

11 A   Yes.

12 Q   And is her call log consistent with a call coming

13     into her landline at approximately 10:30 that day?

14 A   Yes.

15 Q   What's the next bit of information that you learned

16     about Ruth Rainsberger from that day, please?  Is it

17     a 911 call?

18 A   Yes.

19 Q   Okay.  And approximately what time was that call

20     made, please?

21 A   It was 3:38 or 3:39, somewhere --

22 Q   In the afternoon?

23 A   Yes.

24 Q   Thank you.  And who made that 911 call, please?

25 A   William Rainsberger.

5

```
 1   Q   The Defendant?

 2   A   Yes.

 3   Q   And is he, in fact, one of Ruth Rainsberger's sons?

 4   A   Yes.

 5   Q   And the other two children are Rebecca Rainsberger

 6       and Robert Rainsberger, correct?

 7   A   Yes.

 8   Q   And what of note does he say in the call, please?

 9   A   He tells the 911 operator that his mother's head was

10       bashed in.

11   Q   Specifically, he says that the head has been "bashed

12       in"; is that correct?

13   A   Yes.

14   Q   All right.

15         MS. VINCENT:   Judge, I would move to admit State's

16       Exhibit 1, which I have provided to Mr. Hennessy, the

17       calls -- they are in two parts -- that the Defendant

18       makes that evening that reflect what the detective

19       has said.

20         MR. HENNESSY:   No objection for purposes of the

21       hearing.

22         THE COURT:   State's 1 admitted, no objection.

23   Q   Was this description that the Defendant made in the

24       911 call of note to you, sir?

25   A   Yes.
```

1   MR. HENNESSY:  I'm sorry, I couldn't understand the

2   question.

3  Q   Was the description that the Defendant gave regarding

4      his mother of note to you with this investigation,

5      Detective?

6  A   Yes.

7  Q   And we'll go into why a bit later, but to go on for a

8      bit here, who was the first police or medical

9      personnel to arrive, Detective?

10  A   I believe it was Officer Price, and Carl Wooldridge

11     was the fire personnel that arrived on the scene.

12  Q   Let's go into what -- Mr. Wooldridge for a moment.

13     What did he observe when he arrived, please?

14  A   He stated that Mr. Rainsberger was standing outside

15     smoking a cigarette when he arrived.

16  Q   Did Mr. Wooldridge have an opportunity to go inside

17     the apartment?

18  A   Yes.

19  Q   All right.  And did -- at the time that Mr.

20     Wooldridge arrived with the Defendant standing

21     outside smoking a cigarette, did the Defendant say

22     anything to Mr. Wooldridge about what happened?

23  A   Yes.  He told the fireman also that her head had been

24     caved in, bashed in.

25  Q   Okay.  What did the firefighter see when he went

```
 1          inside the apartment, please?
 2     A    He stated that the door to the apartment was slightly
 3          ajar.  He stepped inside the apartment.  He saw the
 4          victim, Ruth Rainsberger, lying on the floor between,
 5          like, a chair and a coffee table.  He noticed that
 6          she had a blanket completely covering her head on
 7          both sides.  She was laying down on the floor.
 8     Q    Did he notice anything about whether or not she was
 9          breathing at that time?
10     A    Yes.  He said it was evident as soon as he walked
11          into the apartment that she was breathing.
12     Q    And you mentioned that the blanket was covering her
13          head.  Was there -- was it entirely covering her head
14          or simply one side?
15     A    Completely --
16     Q    Okay.  Was there --
17     A    -- covering her head.
18     Q    I'm sorry, I didn't mean to interrupt.  Was there any
19          blood on that blanket?
20     A    Yes.
21     Q    Okay.  And, in fact, was the blanket soaked with
22          blood and stuck to the victim's head?
23     A    Yes.
24     Q    Was it evident by the amount of blood there and the
25          drying nature, dried nature of some of it that it had
```

```
 1      been there for quite some time?

 2  A   Yes.

 3  Q   All right.  And why was all of this of note to you

 4      considering, again, this investigation involving --

 5      or ultimately this investigation involving the

 6      Defendant?

 7  A   It became important because the knowledge, advising

 8      911 callers and the firemen on the scene that the

 9      victim's head was bashed in.  Without the blanket

10      being removed from the victim's head to actually see

11      her head, I mean, there was no way to tell that she

12      was bashed over the head or her head was caved in.

13          MR. HENNESSY:  I'm going to object to his opinion.

14      Preliminary question, please.

15          THE COURT:  You may.

16  PRELIMINARY QUESTIONS BY MR. HENNESSY:

17  Q   Are there any photographs of Ms. Rainsberger with the

18      blanket on her head?

19  A   No.  She was transported --

20  Q   Did you see it yourself?

21  A   No.

22  Q   So you're just -- and Wooldridge did.

23          MR. HENNESSY:  So I object to his opinion as to

24      what you could or could not determine from looking,

25      because he didn't look and he's already testified as
```

9

1   to Wooldridge's hearsay.

2      MS. VINCENT:  And, Judge, hearsay is admissible in

3   these hearings.  I would -- I can ask the detective,

4   but I know the answer is that other people told him

5   that this was -- other.  And, obviously, hearsay is

6   admissible at these hearings.

7      THE COURT:  No, and I'm fine with hearsay.  I do

8   think Mr. Hennessy's objection as to how it occurred

9   concerning a towel is objectionable and I'll sustain

10  that.

11  Q  Detective, what did the fire and ambulance personnel

12     think the nature of the injury of Ms. Rainsberger was

13     that day when they arrived?

14  A  That she was shot.

15  Q  Other than -- excuse me.  Once the Defendant was seen

16     outside smoking the cigarette when the firefighter

17     arrived, was he allowed back in the home at all that

18     day that you know of?

19  A  I don't believe -- he was in a police car when I

20     arrived on the scene.

21  Q  Okay.  And, in fact, ambulance personnel transported

22     Ms. Rainsberger out of the home and to the hospital

23     that day; is that correct?

24  A  Yes.

25  Q  All right.  In addition to believing that Ms.

10

1    Rainsberger's injury was a gunshot, were there, in

2    fact, any actions taken based on that belief,

3    Detective?

4  A   Yes.  I, obviously, had crime lab check the apartment

5    to see if there was any blood spatter or anything

6    that would be indicative of a gunshot wound.  And we

7    even used the Bluestar, Luminol for the walls to see

8    if any had been cleaned up, and the ceiling.

9  Q   And that was while you were on the scene; is that

10    correct, Detective?

11  A   Yes.

12  Q   So everyone was -- all of the personnel present were

13    operating under the assumption from what they had

14    seen that it had been a gunshot wound, correct?

15  A   Yes.

16  Q   Okay.  Other than the blood on the body, blanket, and

17    floor around the body, did you find any other blood

18    in the apartment that day, sir?

19  A   No.

20  Q   Were there any statements made by the Defendant that

21    evening to someone other than you, other than the

22    generalities that we've been discussing here,

23    specifically, to Mr. Price?

24  A   Yes.  I was advised by Officer Price of a statement

25    that he made on his way downtown.

11

```
 1   Q   Okay.  And what was that statement, please?

 2   A   He told Officer Price that he wasn't sure if it was a

 3       good or bad thing if his mother died.

 4   Q   Was there anything of note about the apartment

 5       itself, Detective?  Any signs of forced entry?

 6   A   There were no signs of forced entry.  The apartment

 7       was clean.  I mean, the bedroom, the closet was still

 8       closed.  The bed, the blanket on the bed was just

 9       pulled back as if she had gotten out of bed that

10       morning.  Some of the drawers were pulled out

11       slightly, but it did not appear as if anybody had

12       rifled through any of the drawers.

13   Q   Was there a lockbox present in the home, Detective?

14   A   There was a lockbox in the spare room, along with a

15       lot of boxes filled with items.

16   Q   Would that have included items such as savings bonds

17       belonging to the victim?

18   A   Yes.

19   Q   Okay.  And was that in plain view from when you

20       walked into the home, the back room?

21   A   Yes.

22   Q   Were you able to locate the victim's checkbook and

23       credit cards that day?

24   A   Yes.

25   Q   And, in fact, you were able to collect the checkbook,
```

```
 1        credit cards, and even cash present inside the

 2        apartment, correct?

 3    A   I collected the checkbook and the cards.  I had left

 4        the cash there.  There was $70 there.  I left it in

 5        the plastic container.

 6    Q   And was --

 7            MR. HENNESSY:  I'm sorry, I couldn't hear that

 8        answer.  It was too softly spoken.

 9    A   I collected the checkbook, Visa cards, and I did not

10        collect -- $70 in cash was photographed and left

11        there in the plastic container in the living room

12        where Ruth was found.

13    Q   So those items that we've just discussed were, in

14        fact, found in the same room where Ruth Rainsberger's

15        body was, correct?

16    A   Yes.

17    Q   Were there any electronics within the home?

18    A   There was a television just inside the front door

19        also.

20    Q   And that was still there that day, correct?

21    A   Yes.

22    Q   Did you conduct a statement with the Defendant on

23        that same day of November 19, 2013, sir?

24    A   Yes.

25    Q   And what did you learn, if anything, about the
```

```
 1        mother's finances in relation to the Defendant?
 2   A    I learned that William said that he has power of
 3        attorney over his mother's finances and pays all her
 4        bills and everything for her.
 5   Q    And the Defendant actually lives approximately two to
 6        three blocks from his mother's home; is that
 7        correct?
 8   A    Yes.
 9   Q    All right.  Did he make any statements about whether
10        or not he had noticed that the mother had been
11        breathing?
12   A    Yes.  He stated that she was kind of snoring loudly,
13        breathing when he first entered the apartment.
14   Q    Did he also admit that he did not make any attempts
15        to take the blanket off to check on her?
16   A    Yes.
17   Q    All right.  Did you also learn of any possible
18        financial motivation regarding inheritance?
19   A    I learned that Ruth Rainsberger had approximately
20        $100,000 worth of savings and bonds, of which the
21        three children were beneficiaries of.
22   Q    Eventually, Ms. Rainsberger passed away and an
23        autopsy was done; is that correct?
24   A    Yes.
25   Q    From the autopsy -- do you know what day that was
```

```
 1        conducted, please?

 2   A    The next day, 11-20.

 3   Q    So this was after all of the statements that we've

 4        just discussed that the Defendant made, correct?

 5   A    The second statement, I talked to him after the

 6        autopsy, but the autopsy was not discussed.

 7   Q    Okay.  Did you learn what type of object likely

 8        inflicted the deadly injuries on Ms. Rainsberger from

 9        the doctor of the autopsy, the pathologist?

10   A    Yes.  It was Dr. Tashjian, and he stated that it was

11        a hammer-like object, steel, whatever.

12   Q    But again, prior to the conclusion at the autopsy,

13        all the police and first responding personnel thought

14        it had been a gunshot wound, correct?

15   A    Yes.

16   Q    And, in fact, what did the toe tag on Ruth

17        Rainsberger's body read?

18   A    Possible gunshot wound.

19   Q    In fact, "POSS GSW," is that correct?

20   A    Yes.

21   Q    During your statement with the Defendant, did he make

22        any indication as to what he thought his mother had

23        been attacked with?

24   A    When I talked to him the second time on 11-20, he

25        made reference to the fact that she may have been hit
```

15

```
 1         with a lead pipe.

 2    Q    And that would have been consistent with the

 3         conclusion by the doctor that none of the personnel

 4         present at the scene had been able to conclude; is

 5         that correct?

 6    A    Yes.

 7            MR. HENNESSY:  I'm sorry, hit with a what?

 8            DET. BENNER:  A lead pipe.

 9    Q    In that statement, including to the -- scratch that.

10         Sorry.

11            Okay, I'd like to now talk about the video

12         footage that was collected from the Kroger across the

13         street from Ms. Rainsberger's apartment.  Are you

14         aware of that?

15    A    Yes.

16    Q    All right.  Do we see the Defendant in that footage?

17    A    Yes.

18    Q    And that's on November 19th.  Approximately what time

19         is it?

20    A    About 3:38 --

21    Q    2:28?

22    A    -- (inaudible.)  Yes.

23    Q    So a little bit before the 911 call; is that correct?

24    A    Yes, ten minutes or so.

25    Q    And can you describe for the Judge what you see in
```

16

```
 1        the video of him outside of the Kroger front door?
 2   A    Mr. Rainsberger exits his vehicle and walks towards
 3        the store.  He looks around.  He walks up to -- he
 4        pulls something out -- I don't know if it's from his
 5        waistband or his pocket.  It looks like some type of
 6        object, metal object.  He walks straight forward to
 7        the trash can, places it in the trash can --
 8             MR. HENNESSY:  Judge, I would ask the Court to
 9        review the video himself because Detective Benner --
10        I've watched it three or four times, and quite
11        frankly, Detective Benner's description in his
12        probable cause is just simply false and misleading,
13        especially when he wants to describe it as looking
14        around for cameras.
15             At the Redbox he's pushing buttons, and then he
16        looks off to his right one time.  There's no --
17        there's no audio.  I think that you need to see it
18        and make your own determination, because Detective
19        Benner is not looking at it objectively.
20             MS. VINCENT:  And, Judge, we will be submitting it
21        after the detective gives his description, yes.
22             THE COURT:  Okay.
23             MS. VINCENT:  Along with photo stills.
24             THE COURT:  Considering that I will review it, I'll
25        allow the State to continue --
```

```
 1          MS. VINCENT:  Thank you, Judge.

 2          THE COURT:  -- with this question.

 3    Q     And, I'm sorry, he takes an object -- did you say a

 4          long, narrow object?

 5    A     Yes.

 6    Q     Okay.  And he puts it in the trash can, correct?

 7    A     Yes.

 8    Q     All right.  And in your opinion, Detective, is it

 9          consistent with something like the shape of a metal

10          pipe or a hammer handle?

11    A     It could be a pipe or a pry bar of some kind.  It

12          didn't look like a hammer to me, but...

13    Q     What day did you collect the video, Detective?

14    A     The 22nd.

15    Q     Is that November 22nd?

16    A     Yes.

17    Q     All right.  So this is three days after the murder;

18          is that correct?

19    A     Yes.

20    Q     All right.  So by that time would it be fair to say

21          that the Kroger trash can that that object had been

22          thrown into, you weren't able to check the trash can,

23          correct?

24    A     I asked them, and they said they empty them daily.

25    Q     Okay.  And again, looking at that long, thin object,
```

18

1        which I'm about to submit to the Court, what was the

2        Defendant's speculation again about how the crime

3        occurred during your interview of him that everyone

4        else thought was a gunshot wound?

5    A   He had mentioned a lead pipe.

6            MS. VINCENT:  All right.  I'd move to admit State's

7        Exhibit 2, which is the camera at the Kroger Redbox,

8        and also corresponding to that, State's 3 through 10

9        of those photo cells, all of which again I have

10       provided to Mr. Hennessy previously.

11           MR. HENNESSY:  No objection for purposes of this

12       hearing.  And is it -- there was two --

13           MS. VINCENT:  This is the one in front of the

14       store.  It's the first one --

15           MR. HENNESSY:  Yeah, there's -- there was two,

16       camera --

17           MS. VINCENT:  The one that you showed --

18           MR. HENNESSY:  Cameras 29 and 30.

19           MS. VINCENT:  There are other videos, Judge -- if I

20       may, Mr. Hennessy?

21           MR. HENNESSY:  Right.

22           MS. VINCENT:  There are other videos that includes

23       the inside of the store of him buying his iced tea,

24       the parking lot.  This is the only video of the

25       outside when he's putting an object in the trash can

1      looking at the Redbox, so that's why I'm submitting

2      this.

3         MR. HENNESSY:  Right.  I'm just -- camera 29 and

4      camera 30 both show the same thing, and to me it

5      would be better -- I don't have a copy.  This is --

6      she's offering the 30, and I don't have a duplicate

7      of 29 but would like it to be admitted as well.

8         MS. VINCENT:  I have no objection if he wants to

9      supplement the Court with that after the hearing.

10        THE COURT:  Okay.

11        MS. VINCENT:  So no objection to 2 through 10?

12        MR. HENNESSY:  Not for purposes of this hearing.

13        MS. VINCENT:  Thank you.

14        THE COURT:  Two through 10 are admitted.

15        MS. VINCENT:  Yes, Judge, thank you.

16        THE COURT:  No objection for purposes of this

17     hearing.

18        MR. HENNESSY:  You don't happen to have a spare

19     copy of --

20        MS. VINCENT:  I don't, not on me, no.

21        MR. HENNESSY:  -- 29?  How about Benner?  You got

22     one?

23        DET. BENNER:  I might.

24        MS. VINCENT:  Is it your only copy though?

25        DET. BENNER:  Yeah.

1    MS. VINCENT:  It would be his only copy, Mr.

2    Hennessy, so he -- Mr. Hennessy, that's his only copy

3    so --

4    MR. HENNESSY:  Okay.

5    MS. VINCENT:  -- if you can just make a copy, we'd

6    prefer that.  Thank you.

7    MR. HENNESSY:  Well, I'll have to find someone that

8    knows how to do that.

9    MS. VINCENT:  Thank you.

10   THE COURT:  All right.  So should we expect 29 or

11   no?  Angle 29?

12   MR. HENNESSY:  Yes, please, we'd like to -- we'll

13   submit camera 29 and ask the Court to view camera 29

14   in conjunction with camera 30.

15   THE COURT:  Okay.  Will I get that -- when do you

16   think I'll get that?

17   MR. HENNESSY:  Well, you can have it now if there

18   would be no objection to me withdrawing it to make a

19   copy later next week or something.

20   THE COURT:  Okay.  So if I -- well, you have

21   copies.  If I screw this one up, they still have

22   copies.

23   MS. VINCENT:  Correct.

24   THE COURT:  All right.

25   MR. HENNESSY:  Do you want me to mark that?  We

21

1    probably should.

2        THE COURT:  Yeah, Defense A.  We'll get it marked

3    here.

4        MR. HENNESSY:  Defense C.  I've got an A and a B.

5        THE COURT:  Oh, Defense C, and it's camera angle

6    29.  All right, State's 2 through 10, they're

7    admitted.

8        MS. VINCENT:  Thank you, Judge.

9    DIRECT EXAMINATION RESUMED,

10   QUESTIONS BY MS. VINCENT:

11   Q   Detective, we talked previously about that you

12       learned that Ruth Rainsberger had nearly $100,000 in

13       accounts and other policies.  Did you also learn that

14       there's a life insurance policy for her?

15   A   Yes.

16   Q   And was that in the amount of approximately $60,000

17       payable to her three children?

18   A   I believe so.

19   Q   Okay.  Detective, have you also had an opportunity to

20       listen to some jail calls relating to this case?

21   A   Yes.

22   Q   Were there any of note made specifically on

23       5-31-2014, all of which have been discovered to the

24       defense attorney?

25   A   Yes.  I listened to probably three calls that day,

```
 1        one of which William's speaking about the finances of
 2        his mother, whether or not -- go ahead.
 3   Q    Specifically, is he trying to get the life insurance
 4        policy distributed to himself and his two siblings?
 5   A    Yes.
 6   Q    Okay.  I'd like to make -- refer your attention to
 7        another call where he's speaking to someone by the
 8        name of Brad.  Can you tell the Court what he
 9        discusses in that call, please?
10   A    He speaks about some celebratory thing or something
11        that he needs to get to his brother, Robert, that he
12        has in a drawer somewhere.
13   Q    Does he, in fact, refer to it as a house warming
14        gift?
15   A    Yes.
16   Q    And he refers to it as a bottle; is that correct?
17   A    Yes.
18   Q    Does he make any indication as to anyone that his
19        brother, William, should -- or excuse me, his
20        brother, Robert, should share it with?
21   A    His sister.
22   Q    Okay.  And does he indicate to his brother, Robert,
23        where that item is in the home?
24   A    I think it's in his drawer.
25   Q    Okay.  Does he also discuss anything else
```

1      specifically about this case in that phone call?

2   A  He kind of speaks in a coded -- I don't know what

3      he's doing, but he gives, like, a list of 11 or 12

4      things and says that it's mnemonics for the case

5      that's going on.

6   Q  He specifically tells the gentleman he's talking to

7      it's a mnemonic device for him and about the case; is

8      that correct?

9   A  Yes, and to email it to somebody.

10  Q  Okay.  That same day, does the Defendant follow up

11     with a call to his brother, Robert, as well?

12  A  Yes.

13  Q  Does he confirm that Robert has picked up the item in

14     his drawer?

15  A  Yes.

16  Q  All right.  Does he also give any other instructions

17     to his brother?

18  A  He says that there's a file on his computer that he

19     wants to be deleted.

20  Q  In fact, does he say permanently deleted from his

21     file?

22  A  Yes, immediately and permanently deleted.

23  Q  All right.

24        MS. VINCENT:  I'm going to move to admit, again

25     it's already been discovered to defense counsel,

```
 1        those three jail calls that we just referenced,
 2        State's 11, into evidence (inaudible).
 3          MR. HENNESSY:  No objection.
 4          MS. VINCENT:  Thank you.
 5          THE COURT:  State's 11 entered, no objection.
 6          MS. VINCENT:  Thank you.
 7   Q    And, Detective, have you, in fact, executed a search
 8        warrant on the Defendant's home since those calls
 9        were made in order to obtain his computer and other
10        papers in their house for the case?
11   A    Yes.
12   Q    And are we still waiting on -- back from cyber crimes
13        for a search of that computer?
14   A    Yes, we are.
15   Q    Okay.  And, Detective, were there, in fact, other
16        jail calls where the Defendant discusses trying to
17        get his life insurance policy money?
18   A    Yes.
19   Q    And again, these were discovered to the defense
20        counsel.  Can you give us a brief description as to
21        the gist of these conversations about the life
22        insurance policy?
23   A    I know he just speaks about how it's going to be
24        distributed, I believe, and --
25   Q    Do they -- I'm sorry.  Do people indicate to him that
```

```
 1          there's any trouble in the distribution of the life

 2          insurance policy?

 3    A     Yes.  They are -- I think they're requesting police

 4          reports and stuff pertaining to this case before they

 5          decide whether or not that money will be distributed.

 6    Q     And what is the Defendant's response to that?

 7    A     He said that he didn't think they really needed those

 8          reports.  They shouldn't distribute it anyway.

 9    Q     Okay.  And, Detective, we are also still waiting back

10          on account information from both the victim and the

11          Defendant's on this case via a third party request;

12          is that correct?

13    A     Yes.

14    Q     I'd like to take a moment and also -- in the probable

15          cause, I'm sure Mr. Hennessy will be discussing this

16          with you, there was a note that you believed that at

17          approximately 2:40 PM there was a call made from Ruth

18          Rainsberger's landline to the Defendant's brother,

19          Robert Rainsberger; is that correct?

20    A     Yes.

21    Q     And, in fact, in discussions with both myself via

22          Detective Bierce, did you learn anything about that

23          phone call?

24    A     I learned that the 2:40 phone call was a different

25          time zone, so it would have kicked it up to savings
```

```
 1        -- daylight savings time, which would have made it

 2        3:40 --

 3   Q    All right.  So --

 4   A    -- instead of 2:40.

 5   Q    At this time your understanding, and you have no

 6        reason to dispute it at this time, that when put in

 7        Indiana's time zone, that that call was likely made

 8        at approximately 3:40 PM; is that correct?

 9   A    Yes.

10   Q    Okay.  Did you attempt to obtain a polygraph from the

11        Defendant in this case?

12   A    Yes.

13        MR. HENNESSY:  Objection.  That's not relevant, not

14        even at this.

15        THE COURT:  Uh...

16        MR. HENNESSY:  It's just not.

17        THE COURT:  Well, it is not, and I cannot consider

18        that, so I don't know what relevance it would have.

19        MS. VINCENT:  I can move on.

20        THE COURT:  I mean, I can view it that way or I can

21        view it I'm not going to give it any weight, but you

22        --

23        MR. VINCENT:  I can move on.

24        THE COURT:  -- might as well skip it, yeah.

25   Q    Detective, this case was not filed immediately after
```

```
 1          the death of Ms. Rainsberger; is that correct?
 2    A     Yes.
 3    Q     In fact, there were a few months that lapsed before
 4          it was filed?
 5    A     Yes.
 6    Q     And a lot of that had to do with other investigations
 7          that were ongoing; is that correct?
 8    A     Yes.
 9    Q     During those several months, other than the
10          conversations, the two conversations that you had
11          with the Defendant that you've discussed with us, did
12          the Defendant make any inquiries as to the
13          investigation with you?
14    A     The only call I received from him was, I believe, on
15          May 22nd, the day that I went and got the warrant.
16          He was asking me if he could get his handgun back.
17          That's the only time I spoke with him.
18    Q     And that's -- you're talking about the initial
19          warrant in this case, not the search warrant
20          subsequent?
21    A     Right, I was talking about the arrest warrant.
22    Q     Okay.
23            MS. VINCENT:  One moment, please, Judge.  No
24          further questions at this time.  Thank you.
25    CROSS-EXAMINATION,
```

1    QUESTIONS BY MR. HENNESSY:

2    Q   The May 22nd (inaudible) he tried to get his handgun

3        back, was that before you went to get the warrant?

4    A   No, it was -- well, I don't know what time he left

5        the message, but I didn't get the message until I got

6        back after the warrant.

7    Q   And can you explain why you never returned the

8        voicemails from Becky Rainsberger through January and

9        February, trying to ask you questions about the case?

10       MS. VINCENT:   Judge, I would object as to relevance

11       for this defendant's culpability.

12       MR. HENNESSY:   Well, they brought it out that, gee,

13       no one's bothered to ask him about the case, does he

14       have any suspects, highly suspicious.   They have

15       Becky Rainsberger's phone records.

16       THE COURT:   I'll allow it.

17       MR. HENNESSY:   She called him repeatedly.   She left

18       messages.   He never called her back.   And he and

19       Tudor both yelled at the three of them.   So it's

20       relevant.

21       THE COURT:   Well, I don't know that I needed that

22       dialogue.   I'll consider them relevant because it is

23       in the window in which there were no files charged,

24       so I think it is an appropriate question.

25   Q   Did you get voicemail --

```
 1   A    I spoke to Becky the day after the autopsy, and I

 2        think I made it pretty clear at that point that

 3        William was a suspect in the case.  She did not --

 4        she left two voicemails, I believe, one in February

 5        or March and one late -- I don't know when they were,

 6        but there were two voicemails asking me basically,

 7        just called to check in or whatever.

 8             But it was very clear to the family that William

 9        was a suspect in the case, so I saw no need to call

10        her and tell her that at that point.

11   Q    So you never returned her calls?

12   A    I did not, no.

13   Q    Tell me the date then you made it accurately clear

14        that William was your suspect, and rather than do an

15        independent investigation, you were simply building a

16        case against him?

17   A    Well, basically I started out, you know, it's kind of

18        a touchy situation when a family member may be

19        involved in a case, so I did not treat him like a

20        suspect --

21   Q    No, sir, you just said --

22   A    -- initially.

23   Q    -- that you made it clear to the family --

24   A    I'm answering your question.

25   Q    No, you're not.  My question is, what day -- you said
```

```
 1            --

 2    A    I'm getting to that.

 3    Q    Well, just give me the day.  It's my question so --

 4    A    It's the day when --

 5    Q    -- answer my question.  She can ask you more

 6         questions.

 7    A    I'm answering your question.

 8    Q    The day?

 9         MS. VINCENT:  If I can just have a moment, Judge.

10    A    When I decided that he was a true suspect in the case

11         was when he came in the day after the autopsy and he

12         gave me a statement, and I was asking him about his

13         brother.  I told him that in these kind of cases,

14         it's important for me to eliminate family members as

15         suspects before I move on to the outside world.

16         I asked him if he would take a polygraph and he

17         exploded and went crazy.  They ran out and they

18         contacted their lawyers and I never talked to him

19         again.  At that point he became my main suspect.

20         From there --

21    Q    What day?

22    A    -- I started to --

23    Q    What day was that?

24    A    I just told you, the day of -- the day of the

25         autopsy, the day after the case --
```

31

```
 1    Q    Well, no, you haven't given me a date.  I'd like to
 2         know the --
 3              MS. VINCENT:   Judge --
 4    A    11-20 --
 5    Q    I'm sorry?
 6    A    -- 2013.
 7    Q    What?  And then, in fact, did you ask all three of
 8         them to give a polygraph?
 9    A    I asked Robert and William and they said no.
10    Q    Did they both decline?
11    A    Yes.
12    Q    And who left the room first, you and Tudor or the
13         family?
14    A    Who left what room first?
15    Q    The last room you were in with the three children?
16    A    I think we pretty much went our separate ways at the
17         same time.
18    Q    Well, I thought you said they just stormed out, they
19         got upset and stormed out?
20    A    They stormed out of the interview room, but we came
21         up by the conference room where Becky was still
22         sitting.  He came in and yelled at Robert, "They want
23         us to take a polygraph.  Let's get out of here."
24              So Robert came back for a second and then he
25         refused his, so we came back to where they were
```

32

```
 1        sitting and then they --

 2   Q    How did you get them down there that day?

 3   A    They showed up.

 4   Q    Yeah, but didn't you schedule it?  Didn't you tell

 5        them to come down to discuss the autopsy report?

 6   A    Maybe.  Yes.

 7   Q    So you tell them, "We want you all to come down and

 8        talk about and review the autopsy report," right?

 9   A    If I told them I them wanted to come down for them to

10        give a polygraph, they probably wouldn't have showed

11        up, so I can say what I want to have them come down

12        there.

13   Q    Okay.  So you lied to them to get them down there,

14        and then they're upset when they find out you lied to

15        them.

16        MS. VINCENT:  Judge, objection.  At this point --

17   Q    Is that what happened?

18        MS. VINCENT:  -- he's just making argument. I would

19        ask that he just ask questions of the detective.

20        THE COURT:  That is your theory of the case.  And

21        you can conclude that and that can be your argument,

22        but I don't know that's it's appropriate.  You can

23        ask him the questions --

24        THE COURT:  -- and he'll answer them to the best of

25        his ability.
```

```
 1   Q   You didn't tell them the truth to get them to come

 2       down, correct?

 3   A   If they would have said, "Yeah, I'll take a polygraph

 4       --

 5   Q   Did you tell them what --

 6   A   -- everything's fine," I would have given him -- I

 7       would have given them the autopsy results, but at

 8       that point I had to hold it back because they became

 9       suspects.

10   Q   Detective Benner, if you could please focus on my

11       questions and answer only my questions.  You've had

12       your opportunity to show your case to the Judge.

13   A   Ask the question.

14   Q   My question was, did you lie to them to get them down

15       there?  That's a "yes" or a "no."

16   A   Not necessarily, no, because I had every intent of

17       telling them about the autopsy results until that

18       happened.  I'm not going to give them the gist of my

19       case.

20   Q   Well, why didn't you do that first then?

21   A   I'm sorry?

22   Q   Why didn't you do that first then?

23       MS. VINCENT:  Judge --

24   A   What do you mean?

25       MS. VINCENT:  -- at this point, I mean, I think
```

```
 1       we're --

 2    Q  Well, if you scheduled a meeting --

 3         MS. VINCENT:  He's made his point as to how --

 4         THE COURT:  And I think -- I think you're arguing

 5       with the witness and I don't know that that's

 6       productive.  You can ask the question --

 7         MR. HENNESSY:  Well, but I'm only having to argue

 8       with him because he won't answer the questions.

 9         THE COURT:  No, he's answering the questions and

10       let's move forward.  I get the gist of how this

11       meeting took place.

12    Q  Okay.  So they left upset and then you made it clear

13       to the sister that William's your suspect and then

14       they don't bother to call you to find out if you're

15       actually developing any other suspects?

16    A  Correct.

17    Q  Okay.  In terms of other suspects, did you have

18       information from witnesses -- first of all, these

19       apartments at 801 Shortridge are the Jeffersonian,

20       correct?

21    A  Yes.

22    Q  And they have buildings that look alike, correct?

23    A  Yes.

24    Q  And there's multiple entrances and exits to the

25       apartment complex, right?
```

```
 1   A   Yes.

 2   Q   And you found it suspicious that he waits outside for

 3       the ambulance after he called 911, correct?

 4   A   Yes.

 5   Q   You can't see Building H until you drive past it.

 6       The only markings are on the front of the buildings.

 7       You have to actually drive through to find Building H

 8       or Building J or Building I, correct?

 9   A   Yes.

10   Q   All right.  And now, Building H, you had information

11       when you filed your probable cause affidavit that

12       there had been a mugging and a physical attack of a

13       woman under the carport right outside Building H,

14       correct?

15   A   Yes.

16   Q   And then to the east of Building H is Holy Spirit

17       Church, correct?

18   A   Yeah, I guess.  I don't know.

19   Q   Do you know where the dumpster is for the

20       Jeffersonian?

21   A   Oh, yes, through the fence there.  Yes, I know what

22       you're talking about now.

23   Q   Well, no, do you know where the --

24   A   The church to the east, right?

25   Q   There's a gate to Holy Spirit to the east --
```

36

```
 1    A    Yes, I know what you're talking about, yeah.

 2    Q    And do you know where the dumpster is for the

 3         Jeffersonian?

 4    A    I didn't pay any attention to the dumpster, but I'd

 5         imagine there's one out there.

 6    Q    And then there's foliage and brush and ivy along that

 7         fenceline to the east, correct?

 8    A    Yes.

 9    Q    Did anybody ever search for a weapon through there?

10    A    Yes.

11    Q    And who did that and when?

12    A    I did.

13    Q    When?

14    A    Every day.

15    Q    You went and searched --

16    A    Those three days.  Yes, I walked that fenceline many

17         times.

18    Q    Every day?  Did you ever make notes --

19    A    For the first three days or so.

20    Q    Did you ever put it in your notes?

21    A    No.  It didn't produce anything.

22    Q    Well, did you ever -- well, you put a lot of stuff in

23         your notes that didn't produce anything.  Did you put

24         in your notes the witness that told you about all the

25         high traffic in and out of Building H?
```

```
 1   A    I believe so.

 2   Q    So you had that information?

 3   A    Yes.

 4   Q    And she suspected it was drug dealers or --

 5   A    I don't know about all that.

 6   Q    -- drug buyers?  What?

 7   A    I don't know about all that.

 8   Q    Well, did you ask her?

 9   A    She can't say whether or not it was drug dealers or

10        not.

11   Q    But she could certainly form an opinion based upon

12        it.

13           MS. VINCENT:  Judge, may I ask a preliminary --

14   Q    Police do it all the time.

15           MS. VINCENT:  -- question?

16           THE COURT:  You may.

17   PRELIMINARY QUESTIONS BY MS. VINCENT:

18   Q    Did this woman give any indication that she had

19        observed anything about this crime or any statement

20        that she had observed people coming to or from the

21        area prior to Ruth Rainsberger's murder?

22   A    No.

23           MS. VINCENT:  No further questions.

24   CROSS-EXAMINATION RESUMED,

25   QUESTIONS BY MR. HENNESSY:
```

```
 1  Q   And then sometime afterwards you found a bloody
 2      sweatshirt behind the dryer in the laundry room,
 3      which is right outside Ruth Rainsberger's apartment?
 4  A   It's down at the total other end of the complex.
 5      That was on February 5th, and I had that tested and
 6      it had nothing to do at all with this case.
 7  Q   That sweatshirt didn't come out of the laundry room
 8      in Building H?
 9  A   No.
10  Q   Are you sure?
11  A   Positive.
12  Q   But it is a sign and evidence of other violent acts
13      within the Jeffersonian Apartments?
14          MS. VINCENT:  Judge, objection.  It's calling for a
15      conclusion.
16          THE COURT:  Well --
17          MS. VINCENT:  It's irrelevant to this cause.
18          THE COURT:  It does.  I think the evidence speaks
19      for itself.  I don't know that -- so it is calling
20      for speculation, so I'll sustain it.
21          MS. VINCENT:  Thank you.
22  Q   Did any witness give you information about a
23      potential suspect or suspects?
24  A   No.
25  Q   And your belief then was that Delbert Pickens was the
```

```
 1          last person to have contact with the Ruth Rainsberger

 2          apartment before William made the 911 call?

 3   A      Yes.

 4   Q      Do you remember talking to the groundskeeper?

 5   A      Yes.

 6   Q      Did he tell you that Becky Rainsberger's Mini Cooper

 7          was there around 11:30 to noon?

 8   A      He was mistaken.  That was the day before.

 9   Q      Did he tell you that?

10   A      Yeah, he did, and I investigated and decided that it

11          was not true.

12   Q      Based on what?  Becky?  Becky told you it was the day

13          before so you believed her?

14   A      Well, Robert and William both said that she goes

15          there every Monday, and this happened on a Tuesday,

16          so they also confirmed that she was there on Monday.

17          And plus the phone records and everything did not put

18          her in that location.

19   Q      Well, it didn't put her phone there, right?

20   A      Correct.

21   Q      But William's phone does put him there in the area,

22          correct?

23   A      He lives in the area, so that would be --

24   Q      Okay.  So you have an independent witness not tied to

25          the family that puts Becky's car there between 11:30
```

40

```
 1        and noon the day Ruth Rainsberger --
 2    A   Well, he said he thought.
 3    Q   -- was attacked --
 4    A   He wasn't sure.
 5    Q   I'm sorry, could I finish my questions and then you
 6        could answer?  Did you have that information?
 7    A   Yes.
 8    Q   Had you investigated or do you know William
 9        Rainsberger's financial situation?
10          MS. VINCENT:  Do you mean Robert?
11          MR. HENNESSY:  Excuse me?
12          MS. VINCENT:  Did you mean William Rainsberger?
13          MR. HENNESSY:  I meant exactly what I said.
14    A   I believe there's orders in to get his financial
15        information.
16    Q   So you haven't reviewed it yet?
17    A   No.
18    Q   So do you have any -- well, you seem to think that
19        this one-third of 150,000 or 120,00 is motive.  Is
20        that where you're going with that?
21    A   Well, I mean, it's a possible motive.  I'm not sure
22        what was --
23    Q   Okay.
24    A   -- going through everybody's head when they do things
25        like this.  He might have just been mad at her.
```

```
1   Q   Do you even -- do you know Robert's financial

2       situation as it compared to William's?

3   A   I don't know about William's, so I can't compare the

4       two, but Robert said that he had lost his house and

5       moved in with William.

6   Q   Okay.  But he needed money?

7   A   I don't know if he needed money or not.  He just

8       moved in with William.  William was taking care of

9       him.

10  Q   Well, you seem to make a lot of conclusions and

11      suspicions --

12          MS. VINCENT:  Judge, I think --

13  Q   -- but you cannot figure out that if someone lost

14      their house and moved in with someone, you can't

15      envision that they need money?

16          MS. VINCENT:  Judge, that's argumentative.  He's

17      made -- he's asked his question and the detective has

18      answered it.

19          MR. HENNESSY:  Well, I'm pointing out this

20      detective's bias.  He makes all these leaping

21      conclusions --

22          THE COURT:  I understand that.

23          MR. HENNESSY:  -- and it's important that you see

24      it.  I mean, he just -- it --

25          THE COURT:  Well --
```

```
 1        MR. HENNESSY:  He has had one suspect from November

 2     20th --

 3        THE COURT:  I understand --

 4        MR. HENNESSY:  -- and he's never investigated the

 5     case.

 6        THE COURT:  -- but you can argue it, Mr. Hennessy.

 7        MR. HENNESSY:  What?

 8        THE COURT:  You can argue it.

 9        MR. HENNESSY:  Okay.

10        THE COURT:  But I don't know that it helps --

11        MR. HENNESSY:  Well, I think it's important that

12     you see it --

13        THE COURT:  -- to argue with him on the question.

14        MR. HENNESSY:  -- from his demeanor and the fact

15     that he -- something that is reasonable and

16     objective, he acts like he can't make that

17     conclusion.

18        THE COURT:  I understand.

19        MR. HENNESSY:  And I think it's important for you

20     to see it.

21  Q  Now, the day that you did -- I'm sorry, did you want

22     to say something?

23  A  I was talking to my prosecutor here.  Go ahead.

24  Q  The day that you prepared the affidavit, did you have

25     the landline records from AT&T from Ruth Rainsberger?
```

```
 1   A   Yes.

 2   Q   And did you have William -- I mean, Robert

 3       Rainsberger's cellular phone records?

 4   A   Yes.

 5   Q   And if you look at those documents, in about ten

 6       minutes you can see that the 2:40 call was routed

 7       through the 773 area code and that the landline did

 8       not have a 2:40 call, correct?

 9   A   Ben Bierce gave me that information, so you're going

10       to have to ask him that question.  He does the phone

11       records.

12   Q   Well, I'm just -- you had the documents.

13   A   The information I had was that the call was made at

14       2:40 and that's what I put in the probable cause.

15   Q   What information?  Where did you get that

16       information?

17   A   From Bierce.

18   Q   Okay.  I'm asking if you had the documents, because

19       see, I looked at the same documents and it took me

20       ten minutes to figure out that the call got routed

21       through area code 773.  I Google'd 773 and found out

22       it was Chicago.

23   A   Good job.

24   Q   So I want to know what work you did as a detective

25       before you put a false --
```

44

```
 1        MS. VINCENT:  Judge --

 2   Q    -- fact in the probable cause affidavit?

 3        MS. VINCENT:  Judge, again at this point, I mean,

 4   what we're here for is a let to bail.  He can ask the

 5   questions that he's asking about the -- that go

 6   towards the presumption and evidence in this case,

 7   and I think that -- I mean, a lot of it has become

 8   argumentative, Judge, and I would just ask that --

 9        THE COURT:  Well, I think he is entitled to probe

10   this area, a routing through 773.

11        MS. VINCENT:  Which has already --

12        THE COURT:  Just curious.

13        MS. VINCENT:  Which we have addressed in direct,

14   that it, in fact, was 3:40.  We're not suggesting

15   otherwise, but --

16        THE COURT:  No, I don't --

17        MR. HENNESSY:  No, he swore to it, and he had

18   documents.  If you look at them, it takes you ten

19   minutes to figure out it's not true.

20        THE COURT:  All right.  I'm not exactly sure what's

21   not true other than a routing through a different

22   area code.

23        MR. HENNESSY:  With the time.

24        THE COURT:  Oh, the time.  Okay, just merely the

25   time.  All right.
```

```
 1        MR. HENNESSY:  In the affidavit he puts in 2:40 --
 2        THE COURT:  Right.
 3        MR. HENNESSY:  -- because the 911 call is at 3:38,
 4    3:39.  He thinks that's important because it puts, by
 5    his speculation, William in the apartment at 2:40
 6    calling Robert.  That was a big fact for him in the
 7    probable cause.  It's false.
 8        THE COURT:  Okay.
 9        MR. HENNESSY:  And I would ask you to review the
10    probable cause, now knowing that part of the
11    affidavit was false.
12        THE COURT:  And I think it's appropriate for you to
13    attack.
14        MR. HENNESSY:  And what I'm trying to do is point
15    out for the Court that if you had been objective and
16    simply look at the documents that he now admits that
17    he had before he wrote that false statement, it goes
18    beyond negligent.  I mean, it just was clear.  I saw
19    it within ten minutes and it turned out to be
20    correct.
21        THE COURT:  Okay.
22        MR. HENNESSY:  So it's not true that there was a
23    call from inside the apartment at 2:40.
24  A   Correct.
25  Q   And then you mentioned savings bonds.  Do you have
```

```
 1       any savings bonds that came out of a lockbox?
 2   A   I don't recall if they were in the -- they're in the
 3       property room, whatever was in the box.
 4   Q   Okay.  Well, where do you get the idea there were
 5       savings bonds?
 6   A   That's what the crime lab person said that was in
 7       there when she checked the box.
 8   Q   Okay.  So that just came from the crime scene
 9       specialist that --
10   A   I was there with her, yes.
11   Q   Okay.  Well, did you see them?
12   A   I didn't pay a whole lot of attention to them.  It
13       didn't really make that much difference at the time.
14   Q   Well, you want to go with money for motive.  I just
15       want to know how sure you are that there were savings
16       bonds in that apartment.
17   A   There was at least -- there was paperwork showing
18       that they were beneficiaries to savings bonds and all
19       that stuff.  I do know that.  I don't know if the
20       actual bonds were there.  I don't know.
21   Q   Well, you swore to it but now you don't know?
22   A   There was evidence that they had bonds that they were
23       beneficiaries for.
24   Q   Now, the inside, right inside the door was a pen on
25       the floor.  Do you remember that?
```

```
 1   A    Yes.

 2   Q    Has that been processed --

 3   A    Yes.

 4   Q    -- for fingerprints or DNA?

 5   A    Both.

 6   Q    Do you know what the results were on the pen?

 7        Because I have not seen that.

 8   A    You'd have to ask the DNA people.  I don't have the

 9        results on that either.

10   Q    But what are you saying, that you put in a request

11        for the pen?

12   A    Yes, yes.

13   Q    Okay.  And then how about the bag -- tell us about

14        the bag that was a door hanger or something.

15   A    That was left on the door by the maintenance person

16        and William took it inside.

17   Q    And how do you know it was left by the maintenance

18        person?

19   A    By talking to the maintenance person.

20   Q    Which one?

21   A    Sean.

22   Q    Did you also talk to Mr. Loney?

23   A    Mr. Loney?

24   Q    Yeah, the other maintenance man.

25   A    Not that I recall.
```

```
 1   Q   And then in terms of -- well, Ruth Rainsberger went

 2       to the hospital and then you got her clothing from

 3       the hospital through Detective Breedlove; is that

 4       correct?

 5   A   Feuquay.

 6   Q   Well, does that say from Breedlove?

 7   A   Does what say from Breedlove?  Oh, yes.  Feuquay gave

 8       it to me and I gave it to Breedlove because I was

 9       interviewing, so I gave it to Breedlove to give to

10       crime lab.

11   Q   Okay.  But that was Ruth Rainsberger's jacket?

12   A   Yes.

13   Q   And then have you seen the DNA report from the

14       jacket?

15   A   Yes.

16   Q   So do you know that there was a mixture, a major and

17       minor contributor, and the minor contributor was

18       again a profile of an unknown male?

19   A   Yes.

20   Q   And that would exclude William Rainsberger because

21       they had his buccal swab, correct?

22   A   That -- on the sweatshirt, yes.

23   Q   On Ruth Rainsberger's jacket, not the sweatshirt.

24   A   Yes, jacket, sweatshirt, whatever.

25           MR. HENNESSY:  I'd move to admit A and B.
```

49

```
 1         MS. VINCENT:  For purposes of this hearing, Judge,
 2    no objection.
 3         THE COURT:  Defendant's A and B are admitted.
 4  Q  Now, do you have any idea what -- Wooldridge's
 5    expertise with regard to spatter or identifying
 6    gunshot wounds?
 7  A  No.
 8  Q  Do you suspect it's based on experience from being a
 9    fire fellow?
10         MS. VINCENT:  Judge, objection.  He just said he
11    didn't know.
12         THE COURT:  I didn't hear the follow up, to be
13    honest with you.
14         MS. VINCENT:  He said, "Do you suspect that it's
15    based on being a firefighter?"  He just said he
16    doesn't know.
17         THE COURT:  Okay.  He can answer that.  If he
18    knows, he knows; if he doesn't, he doesn't.
19  A  What was the question?
20  Q  Wooldridge, why do you find it important that he
21    thought it was a gunshot wound?  What's his
22    expertise?
23  A  Even the doctor at the hospital thought it was a
24    gunshot wound, so Wooldridge, that's just their first
25    impression at the scene.
```

50

```
 1   Q   Right.  And I'm wondering what expertise he has?  Had
 2       he been to more scenes like that?
 3   A   You'd have to ask him, but I would imagine a fireman
 4       has been to many scenes like that.
 5   Q   Okay.  Well, I'm asking you why you put it in here
 6       and thought it was important.  Because you thought he
 7       had more experience than William?
 8           MS. VINCENT:  Again, he's answered his limited
 9       knowledge as to what Mr. Wooldridge's experience is
10       and that he doesn't have any.  He's already answered
11       it.
12           THE COURT:  Well, I think he's just exploring --
13           MS. VINCENT:  And he's answered why he --
14           THE COURT:  -- the answer and I think he's fine, so
15       he can answer it to the extent he can.
16   A   I think what -- if I have to say, what I think
17       Wooldridge was saying is that there's no -- I mean,
18       anybody could see blood spatter on the wall or on the
19       ceiling.  You don't have to be an expert to know if
20       there was blood sprayed on the walls.  He said that
21       it didn't look like there was any blood anywhere
22       else.  I mean, that's not being --
23   Q   Are you saying there was?
24   A   -- that's not being a blood spatter expert where you
25       actually decide the angles and how it happened and
```

```
 1     where the person was standing.  He was just saying
 2     that there was -- didn't appear to be any more blood
 3     except for what was right there underneath the body,
 4     and that's what everybody saw.
 5   Q Right.  And the way this reads if it would have been
 6     a gun -- that they thought it was a gunshot but it
 7     was not normal that there wasn't any blood spatter.
 8          That tells me that Wooldridge would have
 9     expected blood spatter if it had been a gunshot.
10   A That's probably -- yes.
11   Q But there wasn't blood spatter?
12   A Right.  And they thought it was strange --
13   Q So that contradicts --
14   A -- but that did not say that they didn't think it was
15     a gunshot.  They said it was weird that there wasn't.
16   Q So it contradicts his belief of a gunshot, correct?
17   A No.  You'd have to ask him that question.  I don't
18     know.
19   Q Do you have any pictures of Ruth Rainsberger as she
20     appeared on the floor with a blanket around her head?
21       MS. VINCENT:  Judge, that's been asked and
22     answered.
23       THE COURT:  I think he asked that at his
24     preliminary questions.  He can ask.  That's fine.
25   A The medical personnel treated her, so they took it
```

```
 1         off and transported her.  There were no pictures

 2         taken.  There was nobody there yet but them.

 3    Q    And then you fault William for not moving the blanket

 4         but the blanket was crusted, and at one point in your

 5         affidavit you describe the blanket as being somewhat

 6         crusted and stuck to the wound?

 7    A    Yes.

 8    Q    So if someone pulls that off, would it be reasonable

 9         to think that the bleeding might begin again?

10         MS. VINCENT:  Judge, objection.  That goes towards

11         speculation about what someone may or may not have

12         been thinking.

13         MR. HENNESSY:  He's willing to speculate one way.

14         I'm just trying to get him to be objective and

15         reasonable.  Look, if you have a wound --

16         THE COURT:  He can answer the question.

17         MR. HENNESSY:  -- and a bandage on it and you rip

18         it off, it's going to start bleeding again.

19         THE COURT:  I don't know.  Maybe it will, maybe it

20         won't.

21         MR. HENNESSY:  Your Scouting experience would tell

22         you all that.

23         THE COURT:  Well, it may.  It depends on how long

24         it's been there and --

25         MR. HENNESSY:  That's right.  It's reasonable to
```

```
 1        think --
 2          MS. VINCENT:  Judge, I would just ask --
 3          THE COURT:  It is reasonable but it's not
 4      unreasonable to think it won't, but you may answer
 5      the question.
 6    A   I think it's unreasonable that he wouldn't check on
 7        his mother's condition when she's laying there
 8        breathing and bloody with a blanket over her head.
 9        Any normal person would have pulled the blanket off
10        of her head to check and ask her what's going on.
11        They wouldn't have went outside and waited for
12        somebody.
13    Q   That's your belief of what a normal person would do.
14    A   You asked me what my belief was, and that's my
15        belief.
16    Q   What's your definition of a "normal person"?
17          MS. VINCENT:  Judge, objection.  He's answering the
18        questions.
19          MR. HENNESSY:  No, he introduced it.
20    Q   What's a "normal person" to you?
21          MS. VINCENT:  Judge, at this point we're getting
22        argumentative.  He's answered the question.
23          THE COURT:  You can answer the question.
24    A   In this case a normal person would have checked on
25        his mother.  She's laying there half dead and he
```

```
1        didn't even do anything to attempt to help her.

2   Q    Well, that's not true.  He told you exactly what he

3        did.

4   A    He called 911 and went outside.

5   Q    And he looked.  I wonder what you think a normal

6        person is, because in the same -- do you think I'm a

7        normal person?

8        MS. VINCENT:  Judge, objection.  I'm going to move

9        to strike that from the record.  Can you please stick

10       to this case?

11       MR. HENNESSY:  I'm trying to.  He introduced

12       "normal person."  And I'm telling you, I got an

13       88-year-old father that I care for.  I know exactly

14       what I would do if go in and I see the exact same

15       thing.  I'm not going to move the blanket, because

16       you pull it off -- if it sealed the wound and you

17       pull it off, that wound is going to start bleeding

18       again.

19       MS. VINCENT:  Judge, I appreciate Mr. Hennessy's

20       continuous arguments throughout these questions, but

21       if we can just stick to questions --

22       MR. HENNESSY:  Well, if you appreciate them, don't

23       object to them.

24       MS. VINCENT:  Judge, Judge --

25       THE COURT:  No.  The question was asked --
```

55

```
1        MS. VINCENT:  In all seriousness.  Thank you.

2        THE COURT:  -- what do you consider a normal

3    person? and Detective Benner can answer that

4    question.

5        MS. VINCENT:  Thank you.

6  A  I already did answer it.

7        MR. HENNESSY:  Well, I want to know what he thinks

8    a normal person is.

9        THE COURT:  If you have an opinion?

10 A  And I said a normal person to me in that situation

11   would have checked on his mother and try to find if

12   she was --

13       MR. HENNESSY:  He keeps telling me what he thinks a

14   normal person would do.  I want to know what he

15   thinks a normal person is, because I go over it with

16   five people that I consider extremely normal, and

17   they all -- their perception is exactly like mine.

18       MS. VINCENT:  Judge, Mr. Hennessy --

19       MR. HENNESSY:  I'm not trained to treat the woman.

20   If it's crusted and sealed to the wound, don't pull

21   it off.  And that's normal people, so I want to know,

22   you know...

23       THE COURT:  Well, I understand that what Detective

24   Benner represents is what he feels a normal person

25   would have done.  I understand that that doesn't
```

56

```
 1        necessarily qualify in every instance.
 2            MR. HENNESSY:  Well, that's why I'm trying to find
 3        out what his definition of a "normal person" is.
 4            MS. VINCENT:  Judge, he's made his point five-fold.
 5        If we can please move forward.  He's answered the
 6        question.  The detective has answered Mr. Hennessy's
 7        question about what he believes a normal person is.
 8        He's answered it three times.
 9            Just because Mr. Hennessy is not getting the
10        answer that he's desiring -- it has no relevance to
11        what we're here for, which is the let to bail.  He's
12        made his point about that five times.
13            THE COURT:  I think he has made his point.  I don't
14        think the question has been answered, but I don't
15        know that it plays much relevance as far as how I
16        view the case, so let's do move on, Mr. Hennessy.
17            MS. VINCENT:  Thank you.
18    Q   Did crime lab look for blood on the walls and the
19        ceiling?
20    A   Yes.
21    Q   Did they find some?
22    A   No.
23    Q   You've not seen a report about a positive reaction on
24        the ceiling?
25    A   No.  I mean, they took a test of the ceiling, but
```

```
 1        there was no positive reaction.  It was not blood.

 2   Q    Do you know what medication Ruth Rainsberger was on?

 3   A    No.

 4   Q    Did you find any medication in the apartment?

 5   A    I don't -- there may have been some pill bottles in

 6        the kitchen.  I didn't pay any attention to them.

 7   Q    Or they could have been stolen by the person that

 8        attacked her, since you don't have any?  Can you tell

 9        us if you found any?

10   A    Can I tell what?

11   Q    Can you tell us if you found any of her medicine in

12        her apartment?

13   A    There were pill bottles in the kitchen.

14   Q    Do you have pictures of that?

15   A    We'd have to check.  I'm not sure.

16   Q    What did you do with the pill bottles that were in

17        the kitchen?

18   A    Nothing.

19   Q    So you're just going off raw memory?

20   A    Yes.

21   Q    How about her purse?

22   A    There was a change purse described by William that

23        was in a drawer in the bedroom, and I don't know --

24        there was no purse.

25   Q    So the purse was missing?
```

```
 1   A   I never -- I don't know if she had a purse.

 2   Q   Well, did you ever ask the three family members, or

 3       since you made William a suspect --

 4   A   William said she may have had a purse.

 5   Q   Okay.

 6   A   But her checkbook and her Visa cards and her cash

 7       were there, so I don't know what she would be keeping

 8       in a purse.

 9   Q   Where was the checkbook?

10   A   Right in the plastic container, right ten feet from

11       her body.

12   Q   Right.  Purse is gone.  Pills are gone.

13   A   There's no purse and pills gone that I know of.

14   Q   Did you investigate?  Did you try to find out?

15   A   I had no reason to believe there were any pills

16       taken.  William told me that one medication she was

17       taking for dementia.  I don't think people are going

18       to steal dementia pills.

19   Q   So you just assumed it wouldn't be stolen?

20   A   I had no evidence to suggest that there were any

21       pills stolen.  There was nothing --

22   Q   Did ask --

23   A   The house was not ransacked.  There was nothing taken

24       that I know of from that apartment.

25   Q   Did you ever ask Becky Rainsberger what was
```

```
 1        missing?

 2   A    I don't know how she would know.

 3   Q    Well, you just said that you had information she was

 4        there every Monday.

 5   A    So she wasn't there Tuesday.

 6   Q    Right.  And so sometime --

 7   A    How would she know if anything was taken if she

 8        wasn't in the place when it happened?

 9   Q    Well, you can ask.  That's how you might find those

10        things out, if you were to ask and do an

11        investigation rather --

12   A    I took a statement from her.  I don't know if --

13   Q    -- than just focus on --

14   A    -- I asked her --

15   Q    I'm not finished.

16   A    -- if anything was taken or not.

17   Q    Rather than just focus on William Rainsberger, if you

18        do an objective investigation.  So did you ask Becky

19        Rainsberger what, if anything, was missing from Ruth

20        Rainsberger's apartment?

21   A    I don't recall if I did or not --

22   Q    Did you ask --

23   A    -- but she wouldn't have --

24   Q    -- Robert Rainsberger what, if anything, was missing

25        from Ruth Rainsberger's apartment?
```

```
 1   A   They did not have access to the apartment --

 2   Q   Did you ask --

 3   A   -- so they wouldn't know.

 4   Q   -- Robert Rainsberger --

 5   A   I don't know if --

 6   Q   -- what, if anything --

 7   A   I don't think I did because --

 8   Q   -- was missing from the apartment?

 9   A   -- he wasn't -- he wasn't there.

10   Q   You don't know if he was there after?

11   A   After my investigation was complete.

12   Q   Did you ask him?

13   A   I don't recall if I asked him if anything was --

14   Q   You think Robert might know what --

15   A   -- missing or not.

16       MS. VINCENT:  Judge, I believe -- if he --

17   Q   -- belongings his mother had?

18       MS. VINCENT:  If Mr. Hennessy can just wait for Mr.

19       Benner to also answer his statements --

20       THE COURT:  Yeah, and --

21       MS. VINCENT:  -- so people aren't talking over.

22       THE COURT:  -- Detective Benner has answered he

23       does not recall asking that question.

24   Q   Do you think the three children might know what

25       belongings she had, just from being there
```

```
 1        periodically?

 2     A  There was nothing moved.  There was nothing taken.

 3        The only reference to --

 4     Q  You don't know it --

 5     A  -- anything being taken -- they would have told me.

 6     Q  What?  What did you just say?

 7     A  Why wouldn't they tell me?

 8     Q  Because you didn't ask.

 9     A  Oh, I'm sure.  Your mom gets killed and you're not

10        going to offer anything?

11     Q  Because on November 20th you told them we're going

12        after William Rainsberger; isn't that right?  You

13        just swore here today on November 20, 2013, the day

14        after Ruth Rainsberger was discovered and the day she

15        died, you made it clear to the family that William

16        Rainsberger was your suspect, right?

17          MS. VINCENT:  I believe he stated the day after,

18        after they stormed out of the office.

19          MR. HENNESSY:  I asked him the date, and I finally

20        got November 20th out of him.

21          MS. VINCENT:  Which is the day after.

22     A  That's the day after then.

23     Q  She died 11 hours after she went to the hospital.

24        It's the day she died.  She was discovered on the

25        19th.  Am I right about that?  Can you add 11 hours
```

```
 1        to three o'clock?
 2            MS. VINCENT:  Judge --
 3            MR. HENNESSY:  Well, it's just what he -- it's what
 4        he's done throughout this case, Judge.
 5            THE COURT:  No, I understand --
 6            MR. HENNESSY:  And you need to see it.
 7            THE COURT:  -- your theory of the case, but we both
 8        need to have clear cut questions but clear cut
 9        answers as well.  Respond to the questions and let's
10        keep moving forward here.
11    Q   Did William Rainsberger have sole access to all of
12        Ruth Rainsberger's finances?
13    A   As far as I know, yes.
14    Q   Have you obtained copies of text messages from the
15        cellular phones of William, Robert, and Becky
16        Rainsberger?
17    A   I think I -- we received some from Becky's, but a lot
18        of phones you can't get text messages.
19    Q   You put in your probable cause affidavit that you
20        found it suspicious that Robert and William weren't
21        asking about their mother's status while at the
22        hospital.  Did you put that in there?
23    A   Yes.
24    Q   Why?
25    A   Because it thought it was suspicious that they
```

63

```
 1            weren't asking about her condition.  Is that what it
 2            says?
 3       Q    Have you seen the communications between them and
 4            their sister who was at the hospital?
 5       A    Rebecca?
 6       Q    Yeah.  Do you know if they were learning the status
 7            of their mother without having to ask you?
 8       A    Not while I was speaking with them, they weren't.
 9            Maybe after.
10       Q    Or before -- and before and after?  But they just
11            didn't ask you, right?
12       A    I am the detective, yes.  They didn't ask me.
13       Q    The Redbox that William approached after throwing
14            some trash away, have you looked at that Redbox?
15       A    Yes.
16       Q    Do you know if it's a touch screen or has buttons?
17       A    I don't know.
18       Q    In the video you see that he's punching the Redbox
19            with his finger --
20       A    Yeah, aimlessly.
21       Q    -- several times?
22       A    Aimlessly, yes, in my opinion.
23       Q    Well, yeah, that's what I -- I knew you would say
24            that because you're such a suspicious fellow, which
25            is why I want to know, did you go to that Redbox and
```

```
 1        see how it works?

 2   A    I know how Redbox's work, yes.

 3   Q    Well, how do they work?

 4        MS. VINCENT:  Can you be more specific with your

 5        question, please, Mr. Hennessy?

 6   A    I've never used one myself.  But, I mean, you look

 7        for what movie you want, you order it, and you get

 8        it.  Correct?

 9   Q    And on that Redbox, did you go and see what you punch

10        and how it works so you could somehow understand more

11        objectively the video when Robert -- I mean, William

12        is standing at the Redbox?

13   A    I looked at it, but I don't -- I don't understand the

14        question.

15   Q    See, I've never used a Redbox either myself and so I

16        went and did that and it made a lot of sense to me

17        then, the video did.  I just wonder if you bothered

18        to do the same thing.

19   A    Yes, I looked at it.

20   Q    Is that a "no"?

21        MS. VINCENT:  He just said yes, he looked at it,

22        Judge.

23   Q    Now you're saying you did look at the Redbox?

24   A    I told you earlier I looked at the Redbox.  I just

25        didn't touch buttons and do all that stuff.
```

65

```
 1   Q   In your probable cause affidavit you swore that
 2       records didn't show William Rainsberger outside the
 3       area of Shortridge and 10th Street during the
 4       relevant time period?
 5         MS. VINCENT:  I'm sorry, did not show?
 6         MR. HENNESSY:  Yeah.
 7         MS. VINCENT:  Thank you.
 8   Q   William Rainsberger's records did not show him
 9       outside of the area of 10th and Shortridge --
10   A   Correct.
11   Q   -- during the relevant time period.  I'm wondering,
12       in your mind, what was the relevant time period?
13   A   The morning of the 19th and up until she was found.
14   Q   So from when to when?
15         MS. VINCENT:  Do you remember an approximate time,
16       Detective?
17         MR. HENNESSY:  I'm sorry --
18         MS. VINCENT:  I asked if he remembers an
19       approximate time.
20   A   Well, I know that William used his Kroger plus card
21       about 9:20 AM across the street at the Kroger, so we
22       can say between 9:00 and 3:30 then, if you want.
23   Q   Kroger plus card at 9:20 AM on the 19th?
24   A   Yes.
25   Q   And then we know that he called 911 at 3:38,
```

66

```
 1        correct?

 2   A    Yes.

 3   Q    And he lived in that same area?

 4   A    Yes.

 5   Q    What records do you rely on for that statement?

 6        MS. VINCENT:  For which statement?

 7        MR. HENNESSY:  That -- the one I read to him,

 8   quoted from the probable cause:  "Those records do

 9   not show William Rainsberger outside of the area of

10   Shortridge and 10th Street during the relevant time

11   period."  I'm wondering what records you're

12   referencing.

13   A    I just told you I referenced the Kroger plus card at

14        9:20.

15   Q    No, no, cell phone records and cell tower locations,

16        because I don't have any cell tower location

17        information.

18        MS. VINCENT:  They were discovered to you, sir.

19        MR. HENNESSY:  Well --

20        MS. VINCENT:  Just for the record, they were

21   discovered to you.

22        MR. HENNESSY:  I don't have cell tower locations.

23        MS. VINCENT:  They were discovered.

24        MR. HENNESSY:  Can I just ask the --

25        MS. VINCENT:  Yes.
```

1   MR. HENNESSY:  -- witness questions or -- I mean, I

2   know you want to --

3   MS. VINCENT:  Mr. Hennessy, I was simply saying

4   that -- you said that you don't have them and I was

5   clarifying that, in fact, that was discovered to you.

6    That was all I was doing, Judge.

7   THE COURT:  All right.  But he's quizzing the

8   detective.

9   MS. VINCENT:  Sure.

10 Q So what cell phone records, including cell tower, how

11   did you do this?  Did you have someone do it for you?

12 A Benjamin Bierce does that, a detective.  He handles

13   the cell phone information.

14 Q So he reviewed William Rainsberger's cellular

15   telephone records and told you that the phone was not

16   outside the area of 10th and Shortridge between --

17 A It did not show that it was.

18 Q That came from Bierce?

19 A Yes.

20   MR. HENNESSY:  That's all I have.

21   THE COURT:  Okay.  State?

22 REDIRECT EXAMINATION,

23 QUESTIONS BY MS. VINCENT:

24 Q Detective, just very briefly, we did discuss, through

25   Mr. Hennessy and you, some other investigations of

68

1   other possible suspects.  Did you eliminate any other

2   possible suspects in your investigation?  Can you

3   tell us a little bit about that, please?

4   A   I ran police reports, starting probably on the 21st

5   of November and on through for the next couple months

6   in between cases, and I found there was a rape at 801

7   North Shortridge.

8       I investigated that person and found that in

9   March of 2013, he was sentenced for 100 years for

10  that rape, so he was in jail when this occurred.

11      There were some other batteries and stuff in the

12  area, and I could not place any of those individuals

13  in the area.

14      I do have probably five or six reports from 801

15  North Shortridge, so I did run that area to see if

16  any other -- you know, I was working on as possible

17  suspects just to see if my direction would go

18  elsewhere.

19  Q   And you are in the process of getting me copies of

20  that so that I can discover that to Mr. Hennessy,

21  correct?

22  A   Yes.

23  Q   Additionally, we spoke briefly, I just wanted to make

24  clear that the woman who said that she may or may not

25  have seen -- that made this speculation that Mr.

```
 1      Hennessy spoke about, she did not give any indication

 2      about seeing anything related to the crime.  It was

 3      simply a speculation that she made on her own based

 4      on nothing to your knowledge, correct?

 5   A  Yes.

 6   Q  You mentioned that you made some efforts to verify

 7      that led you to reach your conclusion that Rebecca

 8      Rainsberger's vehicle was, in fact, present the day

 9      before, on Monday.  You were cut off a little bit.

10      Can you please describe to the Court what efforts you

11      made?

12   A  I spoke to Sean again to see if it was possible it

13      could have been the day before, and based upon -- I

14      believe the phone records even showed that she always

15      called on Monday, so it seemed to me like she always

16      appeared on Monday, which was the day before, which

17      was a likely possible mistake that the maintenance

18      man could have made.

19          I mean, it's a Mini Cooper vehicle.  He said he

20      thought he saw it that day, but the fact that it was

21      probably there the day before wasn't that big of a

22      jump.

23   Q  You also talked about a sweatshirt that was found.

24      What day was that incident?

25   A  That was found on, I believe, like, February 5th.
```

1       There was somebody doing laundry on the other end of

2       the complex.  She dropped something behind the

3       dryer/washer.  She went back there and picked up the

4       hose and there was a bloody sweatshirt underneath, or

5       what appeared to be blood.

6    Q  And you did test and that sweatshirt was in no way

7       connected with Ruth Rainsberger, correct?

8    A  Correct.

9    Q  Okay.  No further questions at this time, but he may

10      have some more for you.

11   CROSS-EXAMINATION,

12   QUESTIONS BY MR. HENNESSY:

13   Q  The police report regarding the mugging and the

14      carport right outside Building H, did they ever make

15      an arrest?

16   A  I don't believe so, no.

17   Q  So that would be an unknown suspect out there that

18      had attacked someone in the exact same area where

19      Ruth Rainsberger was attacked?

20   A  Yes.

21   Q  And you said you had five or six batteries at the

22      Jeffersonian?

23   A  Well, five or six reports.  Not all necessarily

24      batteries.  One of them was a rape and maybe a

25      robbery -- it was a purse grab.  The one you're

```
 1        talking about, I believe, was a purse grab.
 2   Q    Did all of those reports result in arrests?
 3   A    On some -- a couple of them.  One of them was
 4        exceptionally cleared, which means that there was not
 5        an actual arrest made but a suspect was identified.
 6   Q    Who was that suspect and how were you able to clear
 7        him on this one?
 8   A    He lives on the south side of Indianapolis.  His name
 9        was Thomas -- I can supply the reports to you.  I
10        can't recall his last name right now, but he was not
11        connected really to that area.  He was placed on
12        Community Corrections, I believe, in March of 2013
13        until February '14, so he was under the watchful eye
14        of somebody.
15   Q    On some of those reports, were arrests not made?
16   A    I already answered that question.  Yes.
17   Q    Well, you answered about the mugging.  When I asked
18        you about the other five or six, you went straight
19        around one was somehow cleared with a suspect without
20        an arrest and you didn't ever really answer about the
21        others.
22   A    I did say yes, there were some that were not arrests.
23        I did say that.
24   Q    What did you say?
25   A    There are cases out there that did not result in
```

```
 1       arrests.  I did make that --

 2   Q   So those are suspects of violent acts at the

 3       Jeffersonian that you could not rule out because you

 4       don't know who they are?

 5   A   Well, I mean, I've ruled them out of this case,

 6       yes.

 7   Q   Well, because you liked William the day after, right?

 8       You --

 9   A   Is that a question?

10   Q   -- couldn't exclude them because you didn't know who

11       they were, right?  You can't exclude an unknown

12       suspect, can you?

13   A   Do you -- parts of those crimes did not match up to

14       this one.  Some of those had forced entry.

15   Q   I understand.  You just brought it up, you know,

16       because you want to say, hey, you've ruled all these

17       people out, and I'm trying --

18   A   Well, I didn't.  I ruled them --

19   Q   -- again show the whole truth, because you guys just

20       don't want to share, and so I have to do this.  So I

21       want it to be clear that you had some reports, had

22       suspects in a violent crime that was not arrested so

23       you could not rule that person out.  Is that true or

24       not?

25   A   The ones that arrests were not made, I don't know if
```

```
 1        those are violent acts or not.  You'll have to look
 2        at the reports yourself.  But the two that I know
 3        that were violent I've already discussed with you.
 4        One was in prison and the other one's on Community
 5        Corrections.  Those are the two violent ones that I
 6        know of.
 7   Q    How about the mugging where they punched the woman in
 8        the head --
 9   A    We already covered that too --
10   Q    -- and took her property?
11   A    -- and I told you --
12   Q    That's no -- there's no arrests?
13   A    I already said that.  I already answered that
14        question.
15        MS. VINCENT:  I believe that has --
16   Q    That's just now when you wanted to make it look more
17        favorable to yourself.
18        MR. HENNESSY:  Judge, I have no further questions,
19        but I'd like an order from this court that those
20        reports be given to me unredacted... (hearing
21        continues and concludes.)
22
23        END OF TESTIMONY OF DET. CHARLES BENNER
24
25
```

```
 1    STATE OF INDIANA        )

 2                            )    SS:

 3    COUNTY OF MARION        )

 4

 5

 6         I, Carla Villalta, a duly appointed and sworn

 7    Official Reporter for the Marion Superior Court,

 8    Criminal Division One, State of Indiana, do hereby

 9    certify that the foregoing is a true, full and

10    complete transcript of the Testimony of Det. Charles

11    Benner, held on July 17, 2014, in Cause Number

12    49G01-1405-MR-026747, wherein the State of Indiana

13    was the Plaintiff and William Rainsberger was the

14    Defendant.

15         IN WITNESS WHEREOF, I hereunto set my hand and

16    seal this ____ day of August, 2014.

17

18

19                              _____
                                Carla Villalta
20                              Official Reporter
                                Marion Superior Court
21                              Criminal Division One

22

23

24

25
```

75

STATE OF INDIANA          IN THE MARION SUPERIOR COURT
MARION COUNTY, ss:           CRIMINAL DIVISION


THE STATE OF INDIANA      )    **INFORMATION**
                    )    COUNT I
      vs.               )    MURDER, I.C. 35-42-1-1(1)
                    )

William Rainsberger
W/M   DOB:  ▓▓▓▓▓/1957
CAUSE NO. 49G011405MR026747
(AS TO COUNT(S) I)



     On this date, Detective Charles Benner came before the
Prosecuting Attorney of the Nineteenth Judicial Circuit and,
being duly sworn (or having affirmed), stated that in Marion
County, Indiana


COUNT I

     William Rainsberger, on or about November 19, 2013, did

knowingly kill another human being, namely: Ruth Rainsberger,

by inflicting blunt force injuries with a hammer or similar

object, at and against the person of Ruth Rainsberger, thereby

inflicting mortal injuries upon Ruth Rainsberger, causing Ruth

Rainsberger to die;

     all of which is contrary to statute and against the peace
and dignity of the State of Indiana.

     I swear or affirm under penalty of perjury as specified by
I.C. 35-44-2-1 that the foregoing representations are true.



_____      5/22/2014
Affiant                     Date

PLAINTIFF'S
EXHIBIT
5
PENGAD 800-631-6989

239

**TERRY R. CURRY**
Marion County Prosecutor
19th Judicial Circuit

_____
Deputy Prosecuting Attorney

State's Witnesses:
Det. Charles Benner, IMPD, B4219
Officer M. Price, IMPD, 31326
Jennifer Lane, MCCL
Melissa Wilson, MCCL
Dr. Randy Tashjian, MCCO
Delbert Pickens
Carl Wooldridge
Pam Pulliam

240

# AFFIDAVIT
## FOR PROBABLE CAUSE

**STATE OF INDIANA, COUNTY OF MARION, SS:**

Detective Charles Benner swears (affirms) that:

On November 19, 2013 at approximately 3:38 pm IMPD 911 dispatch received a call from the address of 801 N. Shortridge Rd, Apartment H11. The caller said that someone had "bashed" his mother's head in. Officer Lewis arrived on scene along with IFD. Officer Lewis stated that the victim's head was covered with a blanket when they arrived on scene. The victim, identified as Ruth Rainsberger, was transported to Wishard hospital in critical condition. The caller, identified as William Rainsberger, and his brother, Robert Rainsberger, were transported to Police Headquarters to give a statement. It should be noted that during the initial investigation, both medic and hospital personnel believed that the victim may have sustained a gunshot wound. The fact that the 911 caller said his mother's head was bashed in without actually seeing her head is indicative to the affiant that he may have knowledge of how she sustained the injury.

On December 4, 2013 I took a statement from Firefighter Carl Wooldridge. Wooldridge said he was the first to have contact with the caller who was standing outside of the apartment building when fire arrived on scene. The white male on scene told Wooldridge that someone had "caved his mother's head in." Wooldridge went to the apartment door and noticed it was slightly ajar. The victim was lying on the floor between a chair and a coffee table. Wooldridge said it was immediately apparent to him that the victim was breathing even though she had a blanket covering her head. He said the blanket appeared to cover the entire head and not just one side. The blanket was soaked in blood and was stuck to the victim's head. Wooldridge thought it was strange that the caller said her head was caved in when it was obvious that he had not removed the blanket to check on his mother. Fire and ambulance personnel thought the victim may have been shot and thought it was not normal that there was not any blood spatter on the walls or ceiling. Wooldridge said the apartment seemed to be in orderly condition. The caller was identified as William Rainsberger.

I requested crime lab to the scene and 4439 CSS Lane responded to the scene. A walkthrough of the apartment revealed that there were no signs of forced entry. There were a few drawers in the victim's bedroom that were pulled out halfway with no sign of anyone rifling through the contents. There were a large amount of boxes in a back room that were untouched. There was a lockbox in the back room in plain view that contained savings bonds belonging to the victim. The victim's checkbook, some cash and credit cards were still present inside the apartment. The only blood found on the scene was on the blanket and on the floor where the victim was found.

I swear (affirm), under penalty of perjury as specified by IC 35-44-2-1, that the foregoing representations are true.

_____
AFFIANT

DATED:  May 22, 2014
_____

_____                    _____
DEPUTY PROSECUTING ATTORNEY                          JUDGE
NINETEENTH JUDICIAL CIRCUIT

PLAINTIFF'S EXHIBIT
PENGAD 800-631-6989
2

## Affidavit for Probable Cause

**From:** Detective Charles Benner

On November 19, 2013 I conducted an interview of William Rainsberger at Police Headquarters. William said he has been taking care of his mother on a daily basis for the past few years. He pays all of her bills and has power of attorney responsibility over her finances. He said he last saw his mother on Monday night around 6:00 pm. He left her apartment and went to Plainfield to spend the night with his wife. He returned home to 13th Street around 9:00 am on Tuesday morning and just hung out at home all day. He said that around 3:30 pm he went to the Kroger on 10th St and bought an iced tea. He then drove across the street to check on his mother. He said he checked her mailbox and went out to his car before going to her door. He said when he used his key to open the door it appeared that the door was already unlocked. He opened the door and saw his mom lying on the floor with a blanket over her head. He walked around a coffee table and put his tea down on the table. He saw some blood on the floor and on the blanket so he called 911. He said his mom was breathing loudly as if she was snoring. I asked why he didn't take the blanket off to check his mom and he said he thought he would do more damage by touching her. He called 911, left the apartment after closing the door, and went outside to wait for the ambulance. He also said he had walked through the residence to check for anyone inside before he called 911. I asked William about his mother's finances and learned that she has approximately eighty to one hundred thousand dollars in savings and bonds that will be distributed to her three children if she were to die.

On November 19, 2013 I spoke to Robert Rainsberger who said he had not seen his mother for a few days. He recently had his home foreclosed upon and moved in with William this past August. He said he was hanging out at home on Tuesday when William called and told him to get over to his mom's apartment immediately. Robert drove his vehicle to Shortridge and was stopped by police when he arrived. He said his mother was taken away in an ambulance and he waited in a police car until I transported him downtown to give a statement. I drove Robert to headquarters and he did not say one word on the way unless I asked him a question. At no time did Robert or his brother, William, ever ask me how their mom was doing or if they could get to the hospital to see her.

On November 20, 2013 I spoke to Rebecca Rainsberger. She said she usually checks on her mother once a week and had last been to her apartment on Monday, November 18th. I asked her if she was at the apartment at all on Tuesday and she said no. Phone records confirmed that her cell phone was not near Ruth Rainsberger's apartment when the incident occurred.

On 1-13-14 I spoke to Delbert Pickens who delivers meals on a daily basis to Ruth's apartment. Mr. Pickens said he delivers a meal to Ruth Monday through Friday and almost always arrives around 10:30 am. On 11-19-13 Delbert said he arrived at Ruth's address around 10:30 am. He knocked on the door and she did not answer. He called her phone and could hear it ringing inside the apartment. He did not hear any signs that anyone may be inside the apartment so he left.

On November 20, 2013 I attended the autopsy of Ruth Rainsberger which was performed by Dr. Tashjian. He determined that the cause of death was due to multiple blunt force trauma injuries to the head and the

I swear (affirm), under penalty of perjury as specified by IC 35-44-2-1, that the foregoing representations are true.

AFFIANT

DATED: May 22, 2014

DEPUTY PROSECUTING ATTORNEY
NINETEENTH JUDICIAL CIRCUIT

JUDGE

242

(Page 2)

## Affidavit for Probable Cause

**From:** Detective Charles Benner

manner was ruled a Homicide. The wounds were possibly inflicted with a hammer or similar type weapon.

On November 20, 2013 I spoke to William and Robert Rainsberger once again at Police Headquarters. I asked them if they would submit to a polygraph so that I could eliminate them as suspects and they adamantly said no, they would not take a polygraph. All three siblings stormed out and I have not heard from them since.

I have not at any time during this investigation, been asked by any of the victim's children if I have any suspects or any other information in reference to this case.

On November 27, 2013 I received a call from Attorney Brad Keffer, who said he is now representing William Rainsberger. I advised him I would be requesting a limited search warrant for William to obtain a buccal swab and major case prints. I also received a call from Attorney John Christ, who said he is now representing Robert Rainsberger. I made arrangements for William and Robert to come to Police Headquarters on December 4, 2013 so that I could serve the limited search warrants for prints and a DNA buccal swab. Both subjects did show up on December 4, 2013 with their attorneys and I obtained prints and buccal swabs from both.

On November 22, 2013 Detective Tudor and I recovered a video from the Kroger store located at 7101 E 10th St. The video showed William Rainsberger drive onto the Kroger lot on November 19, 2013 at approximately 3:32 pm. Mr. Rainsberger got out of the car and approached a garbage can located near the Red Box video dispenser. Rainsberger appeared to pull out a straight object from his person which he placed in the garbage can. As he placed the item in the trash he appeared to look around for cameras. He then stepped over to the Red Box and punched some buttons. He looked around again before he entered the store. He entered the store and bought an iced tea which he paid for with cash. He appeared to let someone in line use his Kroger plus card but did not use the card for his purchase. William exited the store and looked around several times before returning to his vehicle. He left the lot and drove to his mother's apartment where he found her down and called 911.

I received cell phone records for the Rainsberger family and obtained the following information. On November 19, 2013 at 2:40 pm, Robert Rainsberger received a call from Ruth Rainsberger's landline to his cell of ████████. This is hours after it is presumed that Ruth Rainsberger received her injuries. This presumption is based upon the fact that a delivery person knocked on her door at 10:30 am and attempted to call her but did not get an answer and also based upon the fact that the blanket contained dried blood which caused the blanket to stick to the victim's head which, in the affiant's experience, would indicate the victim was not recently attacked (prior to the 911 call). Within an hour of this phone call, William Rainsberger is on video across the street at the Kroger. He throws an object away in the

I swear (affirm), under penalty of perjury as specified by IC 35-44-2-1, that the foregoing representations are true.

_____
AFFIANT

DATED:  May 22, 2014

_____
DEPUTY PROSECUTING ATTORNEY
NINETEENTH JUDICIAL CIRCUIT

_____
JUDGE

### Affidavit for Probable Cause

**From:** Detective Charles Benner

trash before entering the store to buy an ice tea. He then goes to his mother's apartment and calls the police. William then stood outside and left his mother unattended until the police arrived.

Cell phone records were obtained for William Rainsberger, including cell tower site locations for the day of November 19, 2013. Those records do not show William Rainsberger outside of the area of Shortridge and 10th St. during the relevant time period.

On 1-13-14 I received the financial records for Ruth Rainsberger, from the Financial Federal Credit Union located at 7101 E 56th St. The records show the following balances existed at the time of Ruth's death. There was a checking account balance of $15,098.90, savings account balance of $4,605.65 and certificate balances of $79,058.15. I recovered a beneficiary form from Ruth's apartment shortly after she was discovered which revealed that William, Robert and Rebecca Rainsberger are the beneficiaries for all of her assets.

All of these events occurred in Marion County, Indiana.

I swear (affirm), under penalty of perjury as specified by IC 35-44-2-1, that the foregoing representations are true.

_____
AFFIANT

DATED: May 22, 2014

_____
DEPUTY PROSECUTING ATTORNEY
NINETEENTH JUDICIAL CIRCUIT

_____
JUDGE

STATE OF INDIANA          )          IN THE MARION SUPERIOR COURT
                         ) SS:      CRIMINAL DIVISION 1
COUNTY OF MARION          )          CAUSE NO. 49G01-1405-MR-026747

STATE OF INDIANA,                    )
        Plaintiff,                )
  v.                                )
                                     )
                                     )
WILLIAM RAINSBERGER,                 )
        Defendant.                )

### TAPED DEPOSITION OF CARL WOOLRIDGE

Q     David R. Hennessy
A     Carl Woolridge
Pros  Marielle Vincent

1  Q    This is September 8, 2014 depositions on William Rainsberger. Marielle Vincent for the

2       State and myself for the defense. For Fireman Woolridge he have Kenneth Bacon with

3       IFD accompanying him and he's present in the room for the record. And if you would

4       raise your right hand. Do you solemnly swear to tell the truth?

5  A    I do.

6  Q    And state your name.

7  A    Carl Wooldridge.

8  Q    Where do you work?

9  A    Indianapolis Fire Department Station 43.

10  Q    How long?

11  A    I've been a fireman 17 years.

12  Q    And um on November 19 of 2013 what was your shift and assignment?

13  A    Um I was engineer paramedic on engine 43.

14  Q    And how long have you been a paramedic?

15  A    12 years.

1   Q   Do you know Teresa Hall?

2   A   I don't think so.

3   Q   Former paramedic now prosecutor.  Um you brought something with you, what all you

4       got in there?

5   A   It's just the paperwork, a copy of my run, narrative that I did that day and a copy of a

6       statement that I give um an officer shortly after the incident.

7   Q   And you've reviewed that then just to prepare for today?

8   A   Yes I have.

9   Q   Have you don't anything else to prepare for today?

10  A   Not really.

11  Q   Um you indicated you met with the prosecutor, was that on this case?

12  A   Yes it was.

13  Q   And when was that?   Day, week?  Was that to prepare for this or just to meet and greet?

14  A   To meet and greet and go over the statement that I made to the original officer and.

15  Q   How did that run come out if you recall?

16  A   Come in as an assault trauma.

17  Q   And um so you ride on the fire truck?

18  A   I drive the engine.

19  Q   You drive it?

20  A   Yes.

21  Q   A paramedic drives?

22  A   Yep.

23  Q   And what entrance do you go in?

24  A   It's the center entrance into that complex.

2

| 1 | Q | Were you familiar with that apartment complex before you went there that day? |
|---|---|---|
| 2 | A | Yes. |
| 3 | Q | From prior runs and whatnot? |
| 4 | A | Yes. |
| 5 | Q | Did you know where Building H was? |
| 6 | A | The apartment the 801 H Building I was familiar with because we went to a run on a |
| 7 | | regular basis on that back side of that same building. |
| 8 | Q | And what was that about? |
| 9 | A | The other run that we went to? |
| 10 | Q | On a regular basis. |
| 11 | A | It was a medical run. |
| 12 | Q | I mean did someone live there that was in poor health or? |
| 13 | A | They had an issue, it was a medical run. |
| 14 | Q | What are you telling me, they were hypochondriacs? |
| 15 | A | Uh due to HIPPA laws I can't tell you nothing about it. |
| 16 | Q | Oh well I suppose that might be correct.  Huh, it would be interesting now you got me, |
| 17 | | I'll have to work harder to figure that out.  So anyway you knew where the building was? |
| 18 | A | Yes. |
| 19 | Q | So you were able to pull in and drive right there? |
| 20 | A | Yes. |
| 21 | Q | When you pull in what's the first thing you see? |
| 22 | A | We pull in, we pulled down the end of the building there was a man standing there |
| 23 | | somewhat flagging us down to stop. |
| 24 | Q | And can you describe that man for me? |

3

| | | |
|---|---|---|
| 1 | A | To me he was just a common person, I mean I don't, I don't look specifically to pick out |
| 2 | | and try to remember people on runs. |
| 3 | Q | Any remarkable, length of hair, type of clothing? |
| 4 | A | Mid length hair just dressed common, I would call them worker casual clothes. |
| 5 | Q | Was he smoking a cigarette? |
| 6 | A | At the time we pulled up I could not say one way or another. |
| 7 | Q | In your statement you talk about a brother, right? |
| 8 | A | Yes. |
| 9 | Q | And can you describe him? |
| 10 | A | He was standing off to the side back to the east towards a parking lean to thing.  He was |
| 11 | | standing there smoking a cigarette and I really didn't give him much attention and I was |
| 12 | | told that it was his brother as I came back out after we had done some other stuff. |
| 13 | Q | To distinguish him would you say he had shorter hair?  I mean is there a way you can |
| 14 | | distinguish by description so we know who you are talking about? |
| 15 | A | No. |
| 16 | Q | Who told you that was the first guy's brother? |
| 17 | A | I believe it was the guys on my crew. |
| 18 | Q | Okay, any idea where they got that? |
| 19 | A | No. |
| 20 | Q | In your statement he's the one that was smoking the cigarette? |
| 21 | A | Yes. |
| 22 | Q | Okay, so you see the guy waving you to let you know where the thing is, do you have any |
| 23 | | young load and do you have any conversation with him at that point? |

4

| 1 | A | I came off the truck, I walked up to the man and said and it's my standard statement, |
| 2 | | what's going on today?  I mean that's the way I enter basically all runs when we show up |
| 3 | | that way they tell me you were called for whatever reason. |
| 4 | Q | So what did he say? |
| 5 | A | He said that somebody had caved his mom's head in. |
| 6 | Q | So anything else? |
| 7 | A | I asked where she was, which apartment she was at?  He directed me it was the |
| 8 | | downstairs apartment to the left. |
| 9 | Q | Did he follow you in? |
| 10 | A | No he didn't I had the officer of the truck that day stay with him and keep him outside. |
| 11 | Q | Um because you don't need family? |
| 12 | A | I don't need family in there. |
| 13 | Q | They generally aren't medically trained. |
| 14 | A | That and they just kind of disrupts the scene when you're trying to treat people. |
| 15 | Q | And uh are you first in then? |
| 16 | A | Yes. |
| 17 | Q | Anybody with you? |
| 18 | A | We had um two back steppers with us that day, Landon Collin would have been one of |
| 19 | | them and John Denvry would have been the other one. |
| 20 | Q | Do you call them back steppers because |
| 21 | A | They ride backwards in the engine. |
| 22 | Q | Well I thought maybe they got to stand out on the bumper. |
| 23 | A | Not anymore but that's where that name come from. |
| 24 | Q | Does anybody get to stand out there and hold on? |

| 1 | A | Not anymore, not in front of a chief officer anyhow. |
| 2 | Q | Is that OSHA or HIPPA that got you. |
| 3 | A | The would be OSHA. |
| 4 | Q | Some acronym anyway.  Acronym we're with the government we're here to help.  But |
| 5 | | anyway um they went in with you? |
| 6 | A | Yes. |
| 7 | Q | Alright then tell me what you see. |
| 8 | A | As we approached the apartment the door was partially opened.  I open up I see this lady |
| 9 | | laying between a couch, like a loveseat large chair and a coffee table. |
| 10 | Q | And there's a blanket over her head. |
| 11 | A | A small piece of cloth of some sort. |
| 12 | Q | And do uh appear at some point to be stuck to the wound? |
| 13 | A | Yes it was. |
| 14 | Q | And what was did it appear to have both dried and moist blood? |
| 15 | A | Yes there was dry and moist blood both there. |
| 16 | Q | And the part that appeared to be stuck how would you describe that? |
| 17 | A | It was stuck right to the wound area and to the hair to the left side of her head. |
| 18 | Q | And from your first looking at it where, before taking the blanket off or anything where |
| 19 | | do you think the wound was? |
| 20 | A | To the left rear corner of her head. |
| 21 | Q | More up towards the top, or? |
| 22 | A | Well I call it your bump right here. |
| 23 | Q | What do you call it? |

6

| | | |
|---|---|---|
| 1 | A | Some of us word where the sutures in your head are you kind of form little knots |
| 2 | | everybody's head is not perfectly round so it would be right in here. |
| 3 | Q | Do you are you a part time methodologist? |
| 4 | A | Nope. |
| 5 | Q | Do you know what they are? |
| 6 | A | Nope. |
| 7 | Q | They read bumps on your head and tell you your future, a good line of work. Well that's |
| 8 | | not helpful to me thought but you uh left top corner? |
| 9 | A | Yeah, left rear corner. |
| 10 | Q | Left rear corner. But now you're talking about a bump. About how far above the ear? |
| 11 | A | 2 to 3 inches. |
| 12 | Q | Alright, so what do you do? |
| 13 | A | At this point it's determined that the patient is still alive at that point I could hear her |
| 14 | | breathing. It was kind of an agonal respiration but she was still breathing. |
| 15 | Q | Agonal? |
| 16 | A | Agonal. |
| 17 | Q | What's that mean? |
| 18 | A | It's a short gasping breath normally seen in people that are not going to be with us much |
| 19 | | longer. |
| 20 | Q | Okay what so what do you do? |
| 21 | A | At that point I really thought it was a gunshot wound just because of the way it looked on |
| 22 | | the back of that. Took a quick glance up to see if there was splatter because we have had |
| 23 | | training do not disturb the crime scene any worse than you absolutely have to, to treat the |
| 24 | | patient. We moved the chair or couch turned it at an angle, the coffee table at an angle so |

7

1    we could make better access to the patient to treat her and at that point is when I went and

2    pealed the cloth off her head.

3    Q    I'm sorry you looked where for splatter?

4    A    She was there, just looked, scanned the area, it was right where we were at.

5    Q    Um I'm sorry I forget how long have you been a paramedic?

6    A    12 years.

7    Q    Oh the whole time you're with the fire department?

8    A    Uh the biggest part of it.

9    Q    Where were you what did you do before that?

10   A    I was an EMT firefighter.

11   Q    Where?

12   A    The Lawrence Township.

13   Q    Oh that's where I live.  Um so that's a big deal they all think it's highly suspicious that my

14        guys thinks that her head's caved in and you think it's a gunshot wound.  So uh tell me

15        everything that made you think it was a gunshot.

16   A    Just by the way the cloth was and the cloth had somewhat of a hole in it right where the

17        wound was and then when I pealed it off there was a mark at that time on her forehead

18        that I believed to be an entrance wound.  At looking at it typically on a head wound we

19        do not you don't put your hands on it anymore than you have too to disturb any type of

20        bone or anything on a head wound.

21   Q    Well before you take it off though, do you smell any gun powder?

22   A    No I can't say as I did.

8

| 1 | Q | Have you every responded to a gunshot scene in a confined area such as that apartment |
| 2 | | and uh you're the first responder you'd there would be gun powder odor lingering in |
| 3 | | there? |
| 4 | A | The only gunshot wounds that I've responded on I cannot say I smelled gun powder on |
| 5 | | any of them. |
| 6 | Q | And uh you see any shell casings or anything? |
| 7 | A | No I did not. |
| 8 | Q | What kind of things would you typically note at a gunshot scene? |
| 9 | A | The ones I've been on is uh normally a bullet hole in the body somewhere that we seen |
| 10 | | that we end up treating and the only other one was on a I believe it was an officer that we |
| 11 | | went on it was self inflicted and the gun was still present at the time. |
| 12 | Q | So really you've only been on two gunshot runs? |
| 13 | A | I've been on uh 3 gunshot wounds. |
| 14 | Q | Well the self inflicted and the other two were there shell casings or other |
| 15 | A | The one person that was shot wasn't even in the same area that she got shot at and the |
| 16 | | other one we picked the person up outside of a uh apartment complex and it was a little |
| 17 | | chaotic. I knew it was a gunshot wound going in cause we were told that it was a gunshot |
| 18 | | wound over dispatch. |
| 19 | Q | You didn't know where that one was shot either? |
| 20 | A | No. |
| 21 | Q | Well I mean not like where on their body but where in the world. |
| 22 | A | Yeah, I don't know where they were at when they got shot on any of it. |
| 23 | Q | And um so before you take the thing off it's only, I'm wondering why you go straight to |
| 24 | | gunshot, just because it looking like the hole in the blanket? |

9

| 1  | A | Yes. |
| 2  | Q | And that's about it? |
| 3  | A | Yes. |
| 4  | Q | Can you point to anything else? |
| 5  | A | After I pulled the cloth off |
| 6  | Q | That uh |
| 7  | A | The spot that on her forehead that I thought would have been an entrance would at that |
| 8  |   | point. |
| 9  | Q | Okay what, did you do anything else then in there in the apartment? |
| 10 | A | Um after we moved that back, got that peeled off cut the sleeve on her robe and her shirt |
| 11 |   | to try to make access to get a set of vitals on her arm. |
| 12 | Q | Um they recovered slippers at the, do you remember if her slippers stayed on her all the |
| 13 |   | way to the hospital? |
| 14 | A | I do not recall. |
| 15 | Q | Do you remember her having slippers on? |
| 16 | A | I don't really recall that neither. |
| 17 | Q | Do you remember anything about eye glasses? |
| 18 | A | She had her glasses in her left hand. |
| 19 | Q | And who removed those? |
| 20 | A | I don't recall that.  I remember that she had them clutched in her left hand. |
| 21 | Q | So it's you and the two uh back steppers and uh what do they do, anything? |
| 22 | A | One of them helped move the couch back.  Basically the back steppers carry in all the |
| 23 |   | EMS equipment uh. |

10

1  Q  Did anyone treat this woman there before she leaves besides you and the paramedic or

2     medical aspect?

3  A  Other than assisting the uh getting the lady on the backboard and stuff they did not do

4     anything to the lady.

5  Q  Then an ambulance is showing up before she's transport, correct?

6  A  Yes.

7  Q  Did the paramedics on the ambulance do anything in terms of treatment inside the

8     apartment?

9  A  No there was nothing done inside the apartment.

10 Q  And where do they first have contact with this lady?

11 A  They came into the apartment.  They brought in the backboard with c collar um I don't

12    recall the c collar we use towel rolls and roll the lady over and put her on the backboard

13    to do C spine and lumbar precautions on her.

14 Q  And then they took her out to the ambulance?

15 A  Yes we did.

16 Q  And then you were done?

17 A  I was done.

18 Q  Any discussions with them about gunshot?

19 A  I told em that I believed it was a gunshot wound when they came in cause that's

20    customary to pass off as much as you know to uh next facility of equal of higher rank

21    that's going to be taking care of that patient.

22 Q  Did they say anything in response?

23 A  No.

24 Q  And then uh do you see them do any care, do they start a line or anything?

11

| | | |
|---|---|---|
| 1 | A | That was in the ambulance and I did not ride in the ambulance so I don't know what took |
| 2 | | place there. |
| 3 | Q | So backboard, roller thing, she goes to the ambulance and you're done. |
| 4 | A | Yes. |
| 5 | Q | Um did you have any other contact then with either of the two gentlemen outside? |
| 6 | A | No, I talked to an officer who was with the gentleman that stopped us when we first came |
| 7 | | in. |
| 8 | Q | What did he say? |
| 9 | A | I asked him if there was any reason for us to stay for anything further and he said no. |
| 10 | Q | Did you hear any other statements from either of the gentlemen that was there when you |
| 11 | | were first there? |
| 12 | A | No. |
| 13 | Q | Did you meet the police there? |
| 14 | A | Yes we did. |
| 15 | Q | That happens a lot doesn't it? |
| 16 | A | Typically on a trauma assault we wait for them to get there. |
| 17 | Q | And you did not for a particular reason in this case? |
| 18 | A | Yes there was on the MBT which is the computer in our truck that gives us the dispatch |
| 19 | | locations, times and it also had a note on it that this particular building had an autistic |
| 20 | | child that had ran off and we were not to wait on the police, come to find out that child |
| 21 | | has moved out of that building and it still pops up on the MBT. |
| 22 | Q | Yeah it shows up on the CAD too. But that's why you didn't wait. |
| 23 | A | Yes, uh we thought we were going on something totally different. |

12

| | | |
|---|---|---|
| 1 | Q | Uh alright, have you responded to any other assaults or what turned out to be criminal |
| 2 | | actions in building H? |
| 3 | A | No I haven't. |
| 4 | Q | How about the Jeffersonian Apartments? |
| 5 | A | I don't believe I know that name. |
| 6 | Q | Anything about that fellow that you saw that was waving you down that looked |
| 7 | | suspicious? |
| 8 | A | He just looked like a common person to me. |
| 9 | Q | Well did |
| 10 | A | I mean nothing, nothing like he had a big wart stuck out on his head or purple hair. |
| 11 | Q | Some fellows are saying that he should've been angry over the thing.  Was that you, did |
| 12 | | you say that?  I forget. |
| 13 | A | His general demeanor, everybody responds to stress differently. |
| 14 | Q | Right. |
| 15 | A | I will say that.  His general demeanor he seemed a little distraught, upset when we |
| 16 | | showed up, if it had been my mother I think I would have been a lot more upset, |
| 17 | | concerned however you want to put it but that's just my demeanor on how I would |
| 18 | | respond to it. |
| 19 | Q | Were you the one that said if it had of been your mom you'd be angry about it? |
| 20 | A | I'd been angry, I'd want to know who did it and how she was.  If she was going to make |
| 21 | | it. |
| 22 | Q | But uh |

13

1  A   And I typically I had asked them questions just on a sick person, are they going to be

2      alright and I realize he was talking to a police officer but I was never questioned when I

3      came out the door.

4  Q   But he was talking to a policeman when you came out the door?

5  A   Yes he was.

6  Q   Okay and so you never after the initial contact you don't ever really have any contact with

7      him?

8  A   No.

9  Q   Um anything else that I've forgotten to ask you from your statement or anything that they

10     thought was important?

11 A   Not that I know of.

12 Q   Okay, you don't know who did it do you?

13 A   No I don't.

14 Q   Well why did this fellow come with you, this Bacon guy?

15 A   It's our general way the fire department operates.  We bring management with us when

16     we go to do these things I guess and I've been instructed that this is the way it worked and

17     this is the first time I've ever had to do it.

18 Q   Is he a fair guy?

19     TAPE ENDED

20     END OF TAPED DEPOSITION OF CARL WOOLRIDGE.

14

# AFFIDAVIT
## FOR PROBABLE CAUSE

**STATE OF INDIANA, COUNTY OF MARION, SS:**

Detective Charles Benner swears (affirms) that:

On 11-19-13 at approximately 3:38 pm IMPD 911 dispatch received a call from the address of 801 N. Shortridge Rd, apartment H11. The caller said that someone had bashed his Mother's head in. Officer Lewis arrived on scene along with IFD. Officer Lewis said that the victim's head was covered with a blanket when they arrived on scene. The victim, identified as Ruth Rainsberger, was transported to Wishard hospital in critical condition. The caller, identified as William Rainsberger, and his brother Robert Rainsberger were transported to Police headquarters to give a statement. It should be noted that during the initial investigation, both medic and hospital personnel believed that the victim may have sustained a gunshot wound. The fact that the 911 caller said his Mother's head was bashed in without actually seeing her head is indicative that he may have knowledge of how she sustained the injury.

On 12-4-13 I took a statement from Firefighter Carl Wooldridge. Carl said he was the first to have contact with the caller who was standing outside of the apartment building when Fire arrived on scene. The W/M on scene told Carl Wooldridge that someone had "caved his Mother's head in." Carl went to the apartment door and noticed it was slightly ajar. The victim was lying on the floor between a chair and a coffee table. Carl said it was immediately apparent to him that the victim was breathing even though she had a blanket covering her head. He said the blanket appeared to cover the entire head and not just one side. The blanket was soaked in blood and was stuck to the victim's head. Carl thought it was strange that the caller said her head was caved in when it was obvious that he had not removed the blanket to check on his Mother. Fire and ambulance personnel thought the victim may have been shot and thought it was not normal that there was not any blood spatter on the walls or ceiling. Carl said the apartment seemed to be in orderly condition.

I requested crime lab to the scene and 4439 CSI Lane responded to the scene. A walkthrough of the apartment revealed that there were no signs of forced entry. There were a few drawers in the victim's bedroom that were pulled out halfway with no sign of anyone rifling through the contents. There were a large amount of boxes in a back room that were untouched. There was a lockbox in the back room in plain view that contained savings bonds belonging to the victim. The victim's checkbook , some cash and credit cards were still present inside the apartment. The only blood found on the scene was on the blanket, and on the floor where the victim was found.

On 11-19-13 I conducted an interview of William Rainsberger at Police Headquarters. William said he has been taking care of his Mother on a daily basis for the past few years. He pays all of her bills and has

I swear (affirm), under penalty of perjury as specified by IC 35-44-2-1, that the foregoing representations are true.

AFFIANT _____

PLAINTIFF'S EXHIBIT

PENGAD 800-631-6989

DATED: _December 6, 2013_____

_____     JUDGE _____
DEPUTY PROSECUTING ATTORNEY
NINETEENTH JUDICIAL CIRCUIT

# Affidavit for Probable Cause

From:  Detective Charles Benner

power of attorney responsibility over her finances. He said he last saw his Mother on Monday night around 6:00 pm. He left her apartment and went to Plainfield to spend the night with his wife. He returned home to 13th Street around 9:00 am on Tuesday morning and just hung out at home all day. He said that around 3:30 pm he went to the Kroger on 10th St and bought an iced tea. He then drove across the street to check on his Mother. He said he checked her mailbox and went out to his car before going to her door. He said when he used his key to open the door it appeared that the door was already unlocked. He opened the door and saw his Mom lying on the floor with a blanket over her head. He walked around a coffee table and put his tea down on the table. He saw some blood on the floor and on the blanket so he called 911. He said his Mom was breathing loudly as if she was snoring. I asked why he didn't take the blanket off to check his Mom and he said he thought he would do more damage by touching her. He called 911, left the apartment after closing the door, and went outside to wait for the ambulance. He also said he had walked through the residence to check for anyone inside before he called 911. I asked William about his Mother's finances and learned that she has approximately eighty to one hundred thousand dollars in savings and bonds that will be distributed to her three children if she were to die.

On 11-19-13 I spoke to Robert Rainsberger who said he had not seen his Mother for a few days. He recently had his home foreclosed upon and moved in with William this past August. He said he was hanging out at home on Tuesday when William called and told him to get over to his Mom's apartment immediately. Robert drove his vehicle to Shortridge and was stopped by police when he arrived. He said his Mother was taken away in an ambulance and he waited in a police car until I transported him downtown to give a statement. I drove Robert to headquarters and he did not say one word on the way unless I asked him a question. At no time did he or his brother ever ask me how their Mom was doing or if they could get to the hospital to see her.

On November 20, 2013 I spoke to Rebecca Rainsberger. She said she usually checks on her Mother once a week and had last been to her apartment on Monday, November 18th. I asked her if she was at the apartment at all on Tuesday and she said no. Detective Tudor spoke to Sean Hornsby who is a maintenance employee at the apartments where the victim resides. Mr. Hornsby said he is positive that he saw Rebecca's vehicle parked outside her Mom's apartment on Tuesday around 11:40 am. I had recently spoken with a meal delivery driver who tried to deliver a meal to the victim on Tuesday at 10:35 am. He knocked on the door and called her number and did not receive an answer.

On 11-20-13 I attended the autopsy of Ruth Rainsberger which was performed by Dr. Tashjian. He determined that the cause of death is multiple blunt force trauma injuries to the head and the manner is Homicide. The wounds were possibly inflicted with a hammer or similar type weapon.

On 11-20-13 I spoke to William and Robert Rainsberger once again at Police Headquarters. I asked them if they would submit to a polygraph so that I could eliminate them as suspects and they adamantly said no, they will not take a polygraph. All three siblings stormed out and I have not heard from them since.

I swear (affirm), under penalty of perjury as specified by IC 35-44-2-1, that the foregoing representations are true.

_____
AFFIANT

DATED:  December 6, 2013 _____

_____          _____
DEPUTY PROSECUTING ATTORNEY                JUDGE
NINETEENTH JUDICIAL CIRCUIT

550

## Affidavit for Probable Cause

**From:** Detective Charles Benner

I have not at any time during this investigation, been asked by any of the victim's children if I have any suspects or any other information in reference to this case.

On 11-27-13 I received a call from Attorney Brad Keffer, who said he is now representing William Rainsberger. I advised him I will be requesting a limited search warrant for William to obtain a buccal swab and major case prints. I also received a call from Attorney John Christ, who said he is now representing Robert Rainsberger. I made arrangements for William and Robert to come to Police Headquarters on 12-4-13 so that I can serve the limited search warrants for prints and a DNA buccal swab. Both subjects did show up on 12-4-13 with their attorneys and I obtained prints and Buccal swabs from both.

On 11-22-13 Detective Tudor and I recovered a video from the Kroger store located at 7101 E 10th St. The video showed William Rainsberger drive onto the Kroger lot on 11-19-13 at approximately 3:32 pm. Mr. Rainsberger gets out of the car and approaches a garbage can located near the Red Box video dispenser. Rainsberger appears to pull out a straight object from his person which he places in the garbage can. As he places the item in the trash he appears to look around for cameras. He then steps over to the Red Box and punches some buttons. He looks around again before he enters the store. He enters the store and buys an iced tea which pays for with cash. He appears to let someone in line use his Kroger plus card but does not use the card for his purchase. William exits the store and looks around several times before returning to his vehicle. He leaves the lot and drives to his Mother's apartment where he finds her down and calls 911.

I swear (affirm), under penalty of perjury as specified by IC 35-44-2-1, that the foregoing representations are true.

_____
AFFIANT

DATED:  December 6, 2013  _____

_____       _____
DEPUTY PROSECUTING ATTORNEY              JUDGE
NINETEENTH JUDICIAL CIRCUIT

551

1             UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF INDIANA
2              INDIANAPOLIS DIVISION
3      Civil Action No. 1:16-CV-103-WTL-MJD
4

WILLIAM RAINSBERGER,       )
5                      )
               Plaintiff,  )
6                      )
      -vs-               )
7                      )
CHARLES BENNER,          )
8                      )
              Defendant.  )
9
10

          DEPOSITION OF CHARLES BENNER
11
12

       The deposition upon oral examination of
13  CHARLES BENNER, a witness produced and sworn before
    me, Kelly S. Horsley, RPR, CSR 98-R-3004, a Notary
14  Public in and for the County of Hendricks, State of
    Indiana, taken on behalf of the Plaintiff at the
15  offices of Connor Reporting, 111 Monument Circle,
    Suite 4350, Indianapolis, Marion County, Indiana,
16  on the 27th day of September, 2016, commencing at
    the hour of 9:31 A.M., pursuant to the Federal
17  Rules of Civil Procedure with written notice as to
    the time and place thereof having been given.
18
19
20
21
22
23
24
25

2
1                 APPEARANCES
2  FOR THE PLAINTIFF:
3        Mr. Richard A. Waples
         WAPLES & HANGER
4        410 N. Audobon Road
         Indianapolis, IN  46219

```
 5               317.357.0903
                 rwaples@wapleshanger.com
 6
 7   FOR THE DEFENDANT:
 8               Ms. Kathryn Box
                 Ms. Lynne D. Hammer
 9               OFFICE OF CORPORATION COUNSEL
                 200 East Washington Street
10               Room 1601
                 Indianapolis, IN  46204
11               317.327.4055
                 kathryn.box@indy.gov
12               lynne.hammer@indy.gov
13
14   ALSO PRESENT:
15               Mr. William Rainsberger
16
17
                      INDEX OF EXAMINATION
18                                              PAGE
```

```
19   DIRECT EXAMINATION ............................4
     Questions by Mr. Richard A. Waples
20   CROSS-EXAMINATION ...........................127
     Questions by Ms. Kathryn Box
21   CROSS-EXAMINATION ...........................143
     Questions by Mr. Richard A. Waples
22
23
24
25
```

```
 3
 1                    INDEX OF EXHIBITS
                                                PAGE
 2   Plaintiff Exhibit:
```

```
 3   Exhibit 1 -  Affidavit for Probable Cause ......20
                  dated 12/6/13, Bates Nos. 549
 4                through 551
     Exhibit 2 -  Affidavit for Probable Cause ......20
 5                dated 5/22/14, Bates Nos. 241
                  through 244
 6   Exhibit 3 -  Landline usage spreadsheet ........41
                  dated 11/29/13, Bates No. 385
 7   Exhibit 4 -  Microsoft Excel spreadsheet .......42
     Exhibit 5 -  Charging information in State .....48
 8                of Indiana -v- William
```

|   |   | Rainsberger, Bates Nos. 239 and |   |
|---|---|---|---|
| 9 |   | 240 |   |
|   | Exhibit 6 - | Request for Analysis dated | .......107 |
| 10 |   | 11/26/13, Bates Nos. 586 through |   |
|   |   | 590 |   |
| 11 | Exhibit 7 - | Request for Analysis | ............110 |
|   | Exhibit 8 - | IMPD Property Room Voucher | .......110 |
| 12 |   | dated 12/4/13, Bates No. 585 |   |
|   | Exhibit 9 - | Laboratory Examination Report | ....113 |
| 13 |   | dated 4/23/14,Bates Nos. 593 |   |
|   |   | through 595 |   |
| 14 | Exhibit 10 - | Laboratory Examination | ..........115 |
|   |   | Report dated 2/10/14, Bates |   |
| 15 |   | Nos. 556 through 555 |   |
|   | Exhibit 11 - | Defendant's Preliminary | ..........116 |
| 16 |   | Witness List |   |
|   | Exhibit 12 - | Physical Evidence List Lab | .......120 |
| 17 |   | Case No. LAB13-07692, Bates |   |
|   |   | Nos. 787 through 789 |   |

18
19
20
21
22
23
24
25
4

 1                 CHARLES BENNER,
 2  having been first duly sworn to tell the truth, the
 3                 whole truth and nothing but the truth
 4                 relating to said matter, was examined
 5                 and testified as follows:
 6
 7  DIRECT EXAMINATION,
 8      QUESTIONS BY MR. RICHARD A. WAPLES:
 9  Q   Would you please state your name?
10  A   Charles Benner, B-e-n-n-e-r.
11  Q   And what do you do, Mr. Benner?
12  A   Detective for the Indianapolis Metropolitan
13      Police Department.
14  Q   How long have you been so employed?
15  A   I've been in the department for 27 years.
16  Q   Okay.  Give me a little background about
17      yourself, education, where you grew up and

```
18        different jobs you have had.
19   A    I grew up in Ohio, born in Cleveland, went to
20        Wooster High School.  I was a military policeman
21        in the Army for three years.  I have a
22        bachelor's degree in criminal justice from Kent
23        State University.
24   Q    What year was that?
25   A    I graduated in '89.  And that's when I started
5
 1        on the department here also.
 2   Q    With the --
 3   A    I graduated in August of '89 from Kent State and
 4        started here in October.
 5   Q    Did you start with the City or the sheriff's
 6        department?
 7   A    The City.
 8   Q    So you worked for IPD --
 9   A    IPD.
10   Q    -- and now IMPD your whole career?
11   A    Yes.
12   Q    And what different positions have you held with
13        the I -- with the City's police department?
14   A    The only two positions I've had was working
15        south district on the street and homicide.
16   Q    And -- and homicide as an investigator?
17   A    Yes.
18   Q    What -- and you've gone back and forth, haven't
19        you, a few times?
20   A    Yes.
21   Q    Why is that?
22   A    Just -- I was there, like, four and a half years
23        the first time.  My son was young, I wanted to
24        spend more time at home so that's why I left the
25        first time.  The second time I was there -- I
6
 1        don't know -- two and a half years maybe, same
 2        reason, I mean, coaching, wanting to be home
 3        more, stress of the job, no sleep.
 4   Q    A little longer hours?
 5   A    It wears on you.
 6   Q    Less regular hours when you're a detective with
 7        the homicide?
 8   A    Correct.  It can go on for days without, you
 9        know, I mean you can't make any plans, you know,
10        that sort of thing.  My son's a teenager, a
```

```
11        junior in high school now, so he's more
12        understanding of me not being there when I can't
13        be.  And I've over the years got used to the
14        job, learned to handle it better, you know,
15        learn to occupy your time better, ration your
16        time better.
17   Q    It's always a struggle to juggle, isn't it?
18   A    Yes.
19   Q    What have you done to prepare for the
20        deposition?
21   A    Basically just went over my file again, read my
22        notebook, read the probable cause, met with my
23        attorneys, Kathryn and Lynne.
24   Q    And when you say your file, the documents that
25        comprise the homicide file in the case?
7
 1   A    Yes, just basically who I spoke to and items of
 2        evidence collected, looking at the crime scene
 3        photos, that sort of thing.
 4   Q    Did you learn anything from going back over
 5        those, that file, that you hadn't seen before or
 6        hadn't thought about back at the time that you
 7        were working the case?
 8   A    No, not really.
 9   Q    Okay.  Is it an active case?
10   A    It's not closed, so it's still open.
11   Q    Is it assigned to you still or --
12   A    Yes.
13   Q    When was the last time you had done anything to
14        investigate the case?
15   A    It's been probably since he was released and the
16        case was dismissed.  I haven't really -- I've
17        had probably 15 cases since then so I don't have
18        time to go back to it right now.  There hasn't
19        been any new information.  The case hasn't led
20        me in any other direction.
21   Q    So since that time you haven't done any further
22        investigation or --
23   A    No.
24   Q    -- uncovered any other evidence?
25   A    No.  There's no new evidence.
8
 1   Q    Okay.  Tell me when you first learned about the
 2        case.  What -- who called you and what did they
 3        tell you and what did you do?
```

```
 4   A    I was contacted, I believe, Detective Feuquay
 5        responded to the scene.  It was initially an
 6        aggravated assault because the victim, Ruth, was
 7        still breathing and had some vital signs.
 8             So Detective Feuquay is an aggravated
 9        assault detective and he was the only one on the
10        scene.  He contacted me when he found from the
11        medics that she was in critical condition at
12        that point, unresponsive.  They were unable to
13        get her to speak or come to in any way.
14             So I came to the scene.  The run came out
15        probably about 3:39 P.M.  I got there probably
16        about 4:15 or so, made contact with
17        Detective Feuquay and he just let me know
18        basically what he had.
19   Q    What did he tell you he had?
20   A    The only information he had really was that the
21        son had called 911, that the victim was found
22        covered with a blanket, and she was transported
23        by medics in critical condition.
24   Q    She was already gone by the time you got there?
25   A    Yes.
 9
 1   Q    Were there any photographs taken of the scene
 2        before she was -- she left?
 3   A    I don't believe so, no.  She was still alive so
 4        the medics won't leave her there.  They'll take
 5        her immediately.
 6   Q    Okay.  Tell me a little bit -- kind of back off
 7        a little bit.  What's your process when you do
 8        an investigation like this?  What do you try to
 9        do in general?
10   A    Basically my job as a lead investigator is to be
11        the manager of the scene, get there, make sure
12        everything's been secured, made contact with the
13        reporting officer also, which was Officer Price,
14        see what information he might have.  He let me
15        know that William was on scene and Robert, the
16        other brother, had showed up on scene in a
17        vehicle.  They were separated and still at the
18        scene.
19             I basically do a quick walk-through of the
20        scene to see, just to get a general impression
21        of what's going on in there, what items I'm
22        going to need collected when I call the crime
```

```
23          lab.
24                  Detective Tudor did an initial canvas of
25          the building there to talk to people that may
10
 1          have seen or heard anything.
 2                  I receive all the information I can about
 3          the medics and people that transported the
 4          victim to the hospital.  And basically I called
 5          for crime scene.  At that point Jennifer Lane
 6          responded to the scene.
 7     Q    What is her position and what is her role?  What
 8          does she do?
 9     A    She was the crime scene CSS.  They call them
10          "crime scene specialist."  She is the one that
11          will videotape, take photographs, do a crime
12          scene sketch, collect any evidence, and then
13          testify later about the cases.  She'll also
14          process the items that are collected like prints
15          and DNA, take the swabs; but she doesn't
16          actually process them after that point.
17     Q    Somebody else does the DNA analysis?
18     A    Yes.
19     Q    But she collects the swabs?
20     A    Yes.
21     Q    Okay.  What did -- you said you separated the
22          brothers, William and Robert?
23     A    Yes.
24     Q    Where did you put them or where did you have
25          them?
11
 1     A    They were by police cars or in police cars there
 2          around the parking lot.
 3     Q    What did you tell them when -- or did you talk
 4          to them initially at the scene?
 5     A    I initially -- I didn't tell them anything
 6          per se.  In a case -- I knew that this was a
 7          mother/son -- the son reporting a mother that
 8          was found in this condition so protocol or
 9          whatever, in my opinion or what I've been
10          taught, was that I wanted to ask them if they
11          would, just to cover all my bases, if they would
12          submit to a consent to search of their vehicles
13          just to make sure that they weren't involved in
14          any way and see if there was anything that would
15          connect them to the apartment during the time of
```

```
16            the incident.
17                 They both consented to that.  And I
18            basically told them I was going to have to take
19            them downtown and take statements from them,
20            which they said that was fine.  So they were
21            later transported.
22   Q    Did you transport either one of them?
23   A    I transported Robert.
24   Q    Okay.
25   A    Officer Price, I believe, transported William.
12
 1   Q    And then you went down to IMPD headquarters?
 2   A    Yes.
 3   Q    Did -- now, they were transported in marked
 4        police cars or unmarked or --
 5   A    Officer Price had a marked car, but I had an
 6        unmarked car.
 7   Q    The -- were they free to go at that point?
 8        Could they have just said, "No, we don't want to
 9        talk to you"?
10   A    Yes.
11   Q    But they voluntarily agreed to go downtown?
12   A    Yes.
13   Q    And they voluntarily agreed to have search of
14        the cars?
15   A    Yes.  They signed a consent to search.
16   Q    Did the search of the cars reveal any evidence?
17   A    No.
18   Q    They went downtown.  Where did you put them?
19   A    In interview rooms in the back.
20   Q    Separate interview rooms?
21   A    Yes.
22   Q    And what did you learn from -- did you interview
23        both of them?
24   A    Yes.
25   Q    Okay.  About how long did those interviews last?
13
 1   A    I'm not totally positive.  Probably about an
 2        hour for William and probably not quite as long
 3        for Robert.
 4   Q    Okay.  What did you learn from them, those
 5        interviews?
 6   A    From William I learned that he said that he
 7        spent the night in Plainfield playing poker the
 8        night before, that he had seen his mother
```

```
 9         probably between 6:00 and 6:30 P.M. before he
10         went out there.  He returned back to the east
11         side around 9:00 in the morning, went to his
12         house, Robert was there.  They spent the day
13         there doing laundry, watching TV, that sort of
14         thing.
15             He said that around 3:00 or so he went over
16         and said -- told Robert he was going to go check
17         on his mother.  He said he went over to the
18         Kroger, bought an ice tea, went to her
19         apartment.  There was a bag on the door that
20         contained some items.  He took the bag off the
21         door, returned to his car.  He was going to go
22         home and look over those items, but decided
23         instead to go over them with her.  He said --
24         went back to the door, used his key to get in,
25         said he thought that maybe the door was
14
 1    unlocked, wasn't sure, went inside, saw his
 2    mother lying on the ground covered in a blanket.
 3         He walked around the other side to the
 4    coffee table, put down his ice tea, said he
 5    could see some blood that seemed be to be
 6    coagulating through the blanket.
 7         He said he called 911.  He said at first he
 8    wasn't sure if she had fallen and hit her head
 9    or if she had been attacked.  He eventually made
10    reference to the fact that he thought that she
11    was hit with a lead pipe, could have been hit
12    with a lead pipe.  I asked him about items that
13    might have been -- if she had a purse or
14    anything like that.  And he described a black,
15    shiny purse that I believe we photographed in
16    the back bedroom that was still on the scene
17    along with a beige coin purse that was also in a
18    drawer in the bedroom, said that she never
19    really carried any money.  She hadn't been out
20    of the house but a couple times in a whole year.
21         Never mentioned -- oh, I asked him about
22    medication.  He said most of her medication was
23    over-the-counter.  Over-the-counter drugs were
24    still on the counter when we were there.  He
25    said she may have some type of dementia
15
 1         medication.  I'm not sure what the name of that
```

```
 2        might be.
 3             As far as items missing --
 4    Q   Was that ever uncovered, was there ever any
 5        prescription medication recovered from the
 6        scene?
 7    A   No.  There was a little pill dispenser.  I'm not
 8        sure what was in there, but there was a lot
 9        of -- there's pictures.  I'm not sure if they
10        would show if there's any prescription
11        medication there; but there was a large number
12        of over-the-counter drugs that were still there.
13    Q   But you didn't find any prescription medication
14        in a bottle?
15    A   I didn't see any.
16    Q   Did you follow up with any pharmacy to determine
17        whether she had been prescribed any prescription
18        medication?
19    A   No.  No, Bill said that she was -- if she was
20        prescribed any, it was just for dementia so it
21        didn't seem like it had anything to do with the
22        case really.
23    Q   Did any of the children tell you that it had
24        come up missing, that she had a pill bottle
25        there?
16
 1    A   No.
 2    Q   Okay.  Anything else you learned from those
 3        interviews?
 4    A   Just from that interview, I believe that was
 5        most of what basically that lead pipe thing was
 6        significant to me that time.
 7    Q   Why was that?
 8    A   Because the medics and people at the hospital,
 9        we all thought that she suffered a gunshot
10        wound.  So we -- I wasn't even thinking that
11        there was blunt force trauma at that time.  It
12        didn't really mean anything at that point until
13        I found out that she actually was.
14    Q   Suffered blunt force trauma?
15    A   Right.  And then it kind of jumped out at me
16        that somebody would say in a 911 call, said
17        that -- or told the fireman that somebody bashed
18        his mom's head in.  So I don't know how he would
19        know that if she is covered with a blanket.
20             The other thing from that interview was
```

```
21        that she was covered with a blanket.  She was
22        breathing loudly.  He didn't attempt to pull the
23        blanket off, didn't, you know, try to pull it
24        off, ask her what happened, see if he could
25        render any first aid.
17
 1             The dispatcher actually directed him to put
 2        pressure on the wound, and he said he wasn't
 3        going to do that.  It just seemed unnatural to
 4        me that somebody would see their mother lying on
 5        the floor and not respond by pulling the blanket
 6        off and asking her, "What happened?  Did you
 7        fall?  Did somebody hit you?  Is there anything
 8        I can do?"
 9    Q   Did he tell you -- did you ask him if he had
10        called out his mother's name and tried to talk
11        to her?
12    A   Yeah.  He said, "Mom, mom."  He did say that.
13    Q   And did she respond?
14    A   No.  She was just breathing loudly.
15    Q   Okay.  So he couldn't get her to respond to him?
16    A   No.
17    Q   Did he tell you that it appeared that the
18        blanket was stuck to her head?
19    A   Yes.
20    Q   And that he was afraid if he pulled it off, that
21        it might break that --
22    A   Right, that's what --
23    Q   -- barrier, that --
24    A   Yes.
25    Q   -- connection of the blanket to the wound?
18
 1    A   That's what he told me, yes.
 2    Q   And that might cause further bleeding?
 3    A   Yes.
 4    Q   It seems like a reasonable thing to assume for
 5        somebody, doesn't it?
 6    A   I mean, everybody could have their own opinion
 7        on that.  My opinion, I probably wouldn't have
 8        walked around to the other side.  I would have
 9        immediately grabbed the blanket off to see what
10        was wrong with her.  I wouldn't survey the whole
11        situation, make the decision that the blood is
12        sticking to her, the blanket is sticking to her
13        head so I don't want to find out what happened
```

```
14          because I might make her start bleeding again.
15          I mean, it just -- that would be for somebody
16          beyond me to decide.
17              I mean, I had my own opinions.  I just
18          wrote down the facts as I saw them.
19     Q    But that's what he told you, that he was afraid
20          of opening up that wound and her bleeding out?
21     A    Yes, right.
22     Q    And the other things you said you thought
23          sounded not natural was the fact that he
24          reported that he thought that his mother had
25          suffered a blunt force trauma rather than a
19
1           gunshot wound?
2      A    Right.
3      Q    Those were the two big things there that kind of
4           stuck out from your initial investigation and
5           the interviews with him?
6      A    Yes, and the not -- there's no forced entry. I
7           mean, nothing taken that I can tell.  Nothing
8           rifled through.  The totality of the
9           circumstances in the residence when I went in --
10          I've been in plenty of apartments that had been
11          burglarized.  Whether or not there's an actual
12          assault at the time or not, they rifle through
13          everything.
14              To kill somebody without forced entry and
15          then leave with nothing just didn't make any
16          sense to me.  It's been my experience that
17          little old ladies, so to speak, keep a lot of
18          cash in their house, usually in the closet,
19          under the bed.  None of that stuff was checked,
20          gone through.
21              Not to mention the fact that we basically
22          learn in homicides schools and training that
23          signs of personal attachment to the victim is
24          cover up their face so they can't see you during
25          the crime.  Her head was completely covered with
20
1           the a blanket, so it looked like it was
2           personal.
3               All those things together, you could say,
4           seemed suspicious to me at the time.
5      Q    Seemed suspicious and warranted further
6           investigation, you would say?
```

```
 7   A   Yes.
 8   Q   At this point, you're not ready to arrest him
 9       and charge him with murder, are you?
10   A   Well, I typed up what I had and sent it off to
11       the prosecutor and let them make -- I don't make
12       the decisions on whether or not he's going to
13       get charged.
14   Q   Right.  We've got a couple versions of your
15       probable cause affidavit and I want to mark
16       them.
17           (Plaintiff Exhibits 1 and 2 marked for
18       identification.)
19   Q   Can you identify what Exhibit 1 is?
20   A   It's an affidavit of probable cause that's dated
21       December 6th, 2013.
22   Q   Okay.  Is that kind of a work in progress?
23   A   Yes.
24   Q   Okay.  And then Exhibit 2 is what?
25   A   This is the one that was actually -- that she
21
 1       filed the warrant on.
 2   Q   So is No. 1 -- that's the extent of your
 3       investigation up to -- up to December 6th, 2013?
 4   A   Yes.
 5   Q   And did you actually send this to the
 6       prosecutor?
 7   A   I just emailed it to her just as an update type
 8       of thing, let her know where the case is at at
 9       that time.
10   Q   And who was the prosecutor?
11   A   Denise Robinson.
12   Q   Okay.  Did she communicate back to you at that
13       time?
14   A   Yes, probably.  She would have contacted me.
15   Q   And what did she say?
16   A   I don't recall what she said.  I mean, we didn't
17       make a meeting at that time.  The first time I
18       met with her was the end of December.
19   Q   And what did she tell you when you met with her?
20   A   She wanted to -- wanted me to get the financial
21       records for Ruth Rainsberger, so I got a warrant
22       for the financial records from Federal Credit
23       Union.
24   Q   Did she tell you at this time she wasn't ready
25       to file the case because she didn't believe that
```

22
```
1        the -- your affidavit established probable cause
2        yet?
3    A   No, she didn't say that.
4    Q   At this point on December 6th, at least your
5        affidavit, did you believe that it established
6        probable cause?
7    A   I mean, it's a circumstantial case so, like I
8        said, it's not my decision whether or not
9        probable cause is established.  In my mind it
10       was a circumstantial case, so if you wanted to
11       give it to the jury and let them decide, I mean,
12       that is what the prosecutor's office decides. I
13       do not, so I --
14   Q   At this point she is not ready to do that?
15   A   At this point she did not do that.
16   Q   She said get the additional --
17   A   Yes, she requested that I get the financial
18       records.
19   Q   And looks like on Exhibit 2, the last page, you
20       have the financial records?
21   A   Yes.
22   Q   And you have a paragraph about that?
23   A   Yes.
24   Q   And then you also have a paragraph about the
25       phone records that is different -- it wasn't in
```
23
```
1        the earlier --
2    A   You mean on the first page?
3    Q   No.  On the last page of Exhibit 2, which is the
4        May 22nd affidavit, you've got a paragraph about
5        the cell phone records; correct?
6    A   Yes.
7    Q   And also the -- on page 3 the bottom paragraph,
8        there's a paragraph about the cell phone records
9        as well that show this call from Ruth
10       Rainsberger's landline at 2:40 P.M.
11   A   Yes.
12   Q   Correct?
13   A   Yes.
14   Q   You think that that was a significant factor
15       that helped establish probable cause against
16       William Rainsberger?
17   A   Yes.  I mean, it's part of the whole
18       circumstance; but, yeah, it combined with the
```

```
19        other things was important.
20   Q    Well, until you had that, didn't you -- you had
21        suspicions that he had committed this crime but
22        there wasn't any directly contradictory
23        information he had provided or any really
24        incriminating information that you had uncovered
25        against him?
24
 1   A    It was -- it was a circumstantial case, but I
 2        mean, these phone records I had from the
 3        beginning.  It just wasn't in the first draft.
 4        That's all.  I already had.  Those records were
 5        already available to me.
 6   Q    But didn't you find it significant and very
 7        inculpatory towards Mr. Rainsberger that he said
 8        he didn't get to the apartment until 3:30 when
 9        he found his mother but then you find a phone
10        record where he had called from her landline to
11        his brother's number at 2:40?
12   A    Right.
13             MS. BOX:  I'm going to object just because
14        it mischaracterizes the PC.  It says that Robert
15        received a call from the landline.  It doesn't
16        say that William made that call.
17   Q    All right.  But William had admitted he made a
18        call to his brother right after he called 911?
19   A    Correct.
20   Q    And he called from his mother's landline?
21   A    And that call was there also, yes.
22   Q    Right.  And so I think you put it in there that
23        given the fact that he was there apparently an
24        hour before he made the 911 call and his mother
25        had apparently already been injured --
25
 1   A    Correct.
 2   Q    -- well before then, because she had dried blood
 3        on her head --
 4   A    Yes.
 5   Q    -- that that established that he was there when
 6        she was injured at least well before he had
 7        called 911?
 8   A    If he was the one that made the call, then, yes,
 9        he was there.
10   Q    And he is the only one that said he made a call
11        from his mother's landline to his brother's cell
```

```
12          phone; correct?
13   A      Correct.
14   Q      But later you determined that that was
15          inaccurate; correct?
16   A      No, I didn't think it was inaccurate.  And I
17          still don't.  Attorney Hennessy had some records
18          that seemed to show that one of the calls were
19          not on that -- on the records but
20          Robert Rainsberger's phone records do show that
21          there were two calls made from inside the
22          apartment on November 19th, one at 2:40 and one
23          at 3:40.
24               They lasted two different times.  One
25          lasted for 25 seconds.  One lasted for 15
26
1           seconds, I believe.
2                Right after the 2:40 phone call, William
3           then texts Robert and then Robert and his sister
4           start texting back and forth.  So it started a
5           chain reaction an hour before 911 was called
6           that the siblings were all talking to each other
7           on their phones, either by text or by voice.
8    Q      So do you still contend that that phone call was
9           made at 2:40 rather than 3:40?
10   A      I have records that show from
11          Robert Rainsberger's phone that there were two
12          calls made on November 19th.  Now, there are
13          landline records that may not show that call.
14          And William's records may not show that call,
15          but Robert's do show that call.
16               Now, the discrepancy between the cell
17          companies, I don't know what it is.  I don't
18          know if AT&T with the landline keeps track of
19          every call, whether it's completed or not.
20          Maybe somebody didn't answer.  I don't know if
21          that's why it was excluded.  But I do know that
22          Robert Rainsberger's phone records show both
23          those calls were made.  One lasted 15 seconds
24          and the other one, I believe, 25 seconds.
25   Q      Did you consult with anybody about those calls
27
1           and how to interpret them and the information
2           regarding them?
3    A      Detective Bierce at that time, back in 2013, his
4           only job was to do phone records and warrants
```

```
 5        for phone records.  On all of our cases we would
 6        send information to him and he would do the
 7        search warrants on the phones and send us the
 8        information.
 9            He alerted me to those calls, and then I
10        looked at the phone records.  And I could see
11        those calls.  I mean, there was really no reason
12        to interpret.  The one thing he did interpret
13        for me, I do believe, is that when it said
14        "routed call," he believed that that was --
15        meant somebody didn't pick up, that voice
16        message may have been left.
17            And like I said, Defense Attorney Hennessy
18        had the other phone records that didn't show
19        that call and tried to tell me that the
20        discrepancy was because central time was used
21        and eastern time was used here and central time,
22        and it didn't make any sense to me.
23            By looking at the phone records that he was
24        showing me, I could see that that call wasn't
25        there, so I said, well, I guess maybe that's
28
 1        possible.  Maybe I did make a mistake, but I
 2        looked at Robert's phone records again.  I
 3        looked at them several times; and those calls
 4        are on there, two different lengths.  They lead
 5        to the texting between the siblings an hour
 6        before 911 was called, so it seems to me that
 7        they knew something was going on.
 8   Q    Did you -- did you consult with Bierce about the
 9        discrepancy and whether or not the call was --
10        the call was routed to central time to a Chicago
11        area code --
12   A    No.
13   Q    Let me finish my question -- to a Chicago area
14        phone in question and that's perhaps the reason
15        why it's listed at 2:40 rather than 3:40?
16   A    No, because they're listed at both times on
17        those phones records.  So I didn't have to ask
18        him.
19            On the other records, I mean, I didn't ask
20        them about that.  It wasn't -- well, I'm not
21        sure exactly whether he left but he retired and
22        went to private business so he's not even around
23        anymore.
```

24   Q   So you never consulted with him about this
25       discrepancy?
29
 1   A   On the other records, no, I did not.
 2   Q   Did you consult with Denise Robinson about the
 3       discrepancy?
 4   A   I don't know if we spoke about the other records
 5       because the only records that I made -- I mean,
 6       she has all the records, of course.  When I give
 7       her my file, she has everything that I have.
 8       But the only one that she would have actually
 9       taken notice of is what I put in the probable
10       cause, which is in here so ...
11            And that came out later during a deposition
12       with Hennessy that was long after the case was
13       already filed, so anybody that I would talk to
14       about that would have been Mariel Vincent who
15       was then assigned the case.  Detective -- or
16       Denise Robinson didn't have anything further to
17       do with it.
18   Q   Did you talk to Mariel about it?
19   A   We talked about -- yeah, we talked about
20       everything.
21   Q   What did she say about it?
22   A   She was unsure about it, why the discrepancy. I
23       don't know that she actually realized that
24       Robert Rainsberger's cell records actually did
25       show both calls because now she was focused upon
30
 1       what Hennessy brought to light, the smoke that
 2       he threw about --
 3   Q   The prosecutor's office ultimately moved to
 4       dismiss the charges against Robert?
 5   A   Yes.
 6   Q   Citing evidentiary problems; correct?
 7   A   That's what they said, yes.
 8   Q   What did -- was that -- did you talk to Mariel
 9       about that?
10   A   Just briefly.
11   Q   What did she tell you?
12   A   Well, we had a -- we had bail hearings and we
13       had a motion to suppress.  There was a cartoon
14       and stuff like that that ended up being
15       suppressed from a search warrant that she felt
16       was important to the case.  And we had two

```
17        witnesses that were starting to, after a visit
18        from certain -- from attorneys, they decided
19        that they might not want to prosecute any longer
20        and come to court.
21            So she felt at that time -- I don't know
22        that she was going to dismiss it with
23        evidentiary problems.  I didn't know how exactly
24        she was going to dismiss it, but we felt that
25        there may be more investigating that could be
31
 1        done.  Rather than try a case and take the
 2        chance of not winning it, we dismissed it or she
 3        dismissed it and wait and see if any more
 4        evidence came up and make the arrest again at a
 5        later date if we needed to.
 6   Q    What other investigation did she say she needed
 7        to have you to do?
 8   A    I mean, she didn't mention anything specific.  I
 9        mean, anything could come up.  Anybody could
10        call in.  These cases never go away.  I'm going
11        to be assigned this case until I'm not around
12        anymore, so it's my case.  Anybody calls,
13        they'll contact me.
14   Q    You say that the records -- well, the probable
15        cause affidavit you sent to Denise Robinson you
16        said you sent that in email to her?
17   A    Yes.
18            MS. BOX:  Which one are you referring to?
19            MR. WAPLES:  The Exhibit 1?
20   A    The first one, yes.
21   Q    And Exhibit 2?
22   A    I usually send it to her also ahead of our
23        meeting, but then we meet in person.
24   Q    And that's by email?
25   A    Yes.
32
 1   Q    And Denise Robinson is the one that's making the
 2        charging decision whether or not to go forward
 3        or not --
 4   A    Yes.
 5   Q    -- for the prosecutor's office?
 6   A    Well, I believe they met, Denise Hollingsworth
 7        and Jeremy Teipen, I think they all three met on
 8        this one and decided that they wouldn't file.
 9   Q    They are also deputy prosecutors?
```

```
10   A    Yes.
11   Q    The -- when you -- you say you emailed it to her
12        and then you met with her and then met with all
13        three of them?
14   A    I met with Denise.  Yeah, they are in and out,
15        you know, asking questions and taking part; but
16        she -- I met with her directly just meeting
17        between her and I.
18   Q    And where did you meet?
19   A    In her office, the prosecutor's office.
20   Q    And when you met with her, what did you have
21        with you --
22   A    My file.
23   Q    -- if anything?
24   A    I had my file, and I gave her a copy.  She had a
25        copy of the file also.  We make a prosecutor
33
 1        file and keep a copy of our own.
 2   Q    Did she look through your file or did you just
 3        talk to her about it?
 4   A    She did not -- I mean, she looks over it before
 5        she makes the decision.  She had this case for a
 6        long time, had this PC for a long time.  I
 7        talked to her numerous times during -- during
 8        this period.  I was investigating probably five
 9        other homicides between November 19th and
10        May 22nd when the charges were filed, so
11        sometimes we could meet, sometimes I didn't have
12        time to meet.  Sometimes I was working on other
13        cases and would meet with her about those.
14             So eventually when things slowed down, she
15        got back to this case, said they were going to
16        meet about it, let me know.  They didn't make a
17        decision to charge and I went over and met with
18        her.  I'm sure they all went through my file.
19   Q    But you don't have personal knowledge of that,
20        though.  You weren't there.
21   A    I mean, I didn't see them, no; but I would
22        imagine the charging prosecutor would look
23        through the file and read the -- I mean, they
24        read the probable cause obviously; but I don't
25        know if they simply just go on that.  I imagine
34
 1        they look at the file, look at the statements,
 2        read the statements I provided them.
```

```
 3   Q   The witness statements?
 4   A   Yes, sir.
 5   Q   Now, there was -- you said there was this
 6       discrepancy that came up later that Attorney
 7       Hennessy found with the cell phone records and
 8       suggested that they showed that Robert's cell
 9       phone records suggested that they routed through
10       a central time area code.
11   A   He wasn't talking about Robert's.  He was
12       talking about William's and the landline.  I
13       don't think he specifically spoke about Robert's
14       because they show both phone calls.  He didn't
15       show me the one that showed both phone calls.
16       He showed me the ones that did not.
17   Q   But this phone call came from Ruth's landline?
18   A   Yes.
19   Q   That's how you knew that it was -- that it
20       placed William in Ruth's apartment at 2:40?
21           MS. BOX:  He didn't testify to that and
22       that's not what the probable cause says.
23   A   That's what can be implied probably.  That's
24       circumstantial also.
25   Q   But that was your conclusion given that --
35
 1   A   Correct.  I mean --
 2   Q   -- William said he made the call and the records
 3       show that there was a call from Ruth's landline?
 4   A   There was two calls, yes.  He said he made the
 5       one at 3:40.  He didn't say anything about the
 6       one at 2:40, 2:41.
 7   Q   Was there -- did Ruth's landline records
 8       indicate a call at 2:40 or 3:40?
 9   A   No.  They showed the one at 3:40 but not the
10       other one.
11   Q   So Ruth's landline records that you had back in
12       December of 2013 showed one call coming from
13       Ruth's landline at 3:40?
14   A   Yes.
15   Q   And no call coming from Ruth's landline at 2:40?
16   A   Correct.
17   Q   But you didn't put that in your affidavit?
18   A   No.
19   Q   Okay.  The -- did -- and Mariel, what's her last
20       name?
21   A   Reidle I think now.  She got married.
```

```
22  Q   What was it before?
23  A   Vincent.
24  Q   Vincent.  Did she tell you that this issue of
25      this phone call was at least part of the reason
36
 1      why they were deciding to dismiss the case?
 2  A   She didn't come right out and say that, but I'm
 3      sure it probably played a part.
 4  Q   It was a big issue, wasn't it, the discrepancy?
 5  A   You would really have to ask her.  I don't know
 6      if it was a big issue for her.  It wasn't for
 7      me, but it may have been for her.  I don't know.
 8  Q   It wasn't a big issue for you even though Ruth's
 9      landline records only showed a call at 3:40,
10      which was consistent with William's testimony
11      that he made that call after he came in a little
12      after 3:30 and called his brother to tell him to
13      come over there?
14  A   I mean, like I said, again, the only -- Robert's
15      phone showed that both calls were made so, I
16      mean, that's not my job to give him the benefit
17      of the doubt.  I had information from his call
18      from his phone records that two calls were made
19      at two different lengths.  So, I mean, they're
20      not the same call.
21          If they were both 25 seconds and they were
22      exact same time like one's at 2:40 and one's at
23      3:41 and couple seconds, if they were the exact
24      same time, exact seconds, and the exact duration
25      then I might have said, well, maybe there's
37
 1      something wrong here.  But to me, it looked like
 2      there was two calls made.
 3          And whether or not -- like I said, AT&T, I
 4      don't know how accurate they are.  I mean, who
 5      has a landline anymore?  Who knows how important
 6      they take their records of calls made or whether
 7      or not they acknowledge the ones that aren't
 8      actually connected.  There's just a voice mail,
 9      which is the routing thing that sends it to the
10      voice mail.  Maybe when that happens they don't
11      pop up.  I did not check that.
12  Q   Seems like an important question if you want to
13      charge somebody with murder and you want to use
14      circumstantial evidence that they're in
```

```
15        somebody's apartment who has been murdered at a
16        time an hour before they said they're there.
17        And --
18   A    Well, I mean --
19   Q    -- you've got a landline record that shows a
20        call at 3:40, which is consistent with the
21        person's story that they got there at 3:30 and
22        found the mother, called 911, and then used the
23        landline to call the brother.  And yet you're
24        saying, well, we got these cell phone records
25        from Robert that say that there is two calls an
38
 1        hour before but not at 3:40; correct?
 2   A    Correct.
 3   Q    Seems like you would want to do a little more
 4        investigation to determine whether or not
 5        which -- especially when there's a question
 6        raised about maybe there's a routing issue and
 7        it went to central time and that's why it's
 8        listed at 2:40 or 2:41 rather than go forward
 9        without mentioning that Ruth's AT&T records only
10        show one call at the 3:40 and 3:41, not at 2:40
11        and without checking with AT&T whether that
12        record accurately depicts whether there was a
13        call made at 2:40 or not?
14             MS. BOX:  What's your question?
15   Q    That's my question.  Wouldn't you want to check
16        because you just said you hadn't checked that
17        out and you didn't know.
18   A    The fact that I looked at Robert Rainsberger's
19        phone records.  I could tell that they weren't
20        in central time because it would have been an
21        hour earlier or an hour later.  And for it to be
22        an hour later, it would have been made at 4:40
23        which I had control of the residence at that
24        point.  There was nobody using the phone at that
25        point, so it told me that those records were
39
 1        accurate at 2:40 and 3:40.
 2             If you push the times forward and it's just
 3        3:40, there's still the next one that would be
 4        4:40 when there's nobody in the apartment but me
 5        and the crime lab and nobody would be using that
 6        phone.
 7             Now --
```

```
 8   Q   How does that follow?  I'm sorry.  I'm lost at
 9       this 4:40 call.  There's a 4:40 call?
10   A   No.  I'm saying if you're saying that those
11       calls were central time and they were an hour
12       off and there's two calls, then it would push
13       the other one forward to 4:40 instead of 3:40
14       he's talking about, which wouldn't make sense.
15   Q   "Push the other one"?  What's "the other one"?
16   A   There's a call made at 2:40 and 3:40 from the
17       landline.
18   Q   Ruth's AT&T records show two calls, one at 2:40
19       and one as --
20   A   I'm talking about Robert's cell phone records.
21   Q   Okay.
22   A   So they show -- you're saying that those
23       couldn't possibly be within central time.  But
24       if they were, then both of those calls would
25       have been possible.
40
 1           Central time is an hour behind eastern time
 2       or we just changed time so it'd probably be
 3       about the same time.  We change our clocks back
 4       around the end of the October, so I don't know
 5       whether central or eastern time would make any
 6       difference.  It would be the exact -- the right
 7       time.  Wouldn't it?
 8   Q   So you're saying in November, November 27th
 9       eastern and standard time would be the same
10       time?
11   A   Eastern and central?
12   Q   Eastern and central, yeah.
13   A   I'm not sure.
14   Q   You don't know?
15   A   Either way, I mean, there's two calls.  You want
16       to take it back?  You want to take it forward?
17       It doesn't matter.  It's a discrepancy.  There's
18       two calls made.
19           If I'm not mistaken central time is an hour
20       behind eastern time, so when we turn our time
21       back, we should be the same time during the
22       winter time because we used to be central time.
23       We fall back.
24   Q   In 2013 were we central time or eastern time or
25       do you know?
41
```

```
 1              MS. BOX:  I think he's testified that he
 2         doesn't know central time and eastern time and
 3         when we fall back and spring forward.
 4              (Plaintiff Exhibit 3 marked for
 5         identification.)
 6    Q    Here's Exhibit 3, which is Bates stamped
 7         production 385.  Are those -- is that a page of
 8         Ruth's landline --
 9    A    Yes.
10    Q    -- calls?  Does that just show one call at 3:41?
11    A    Yes.
12    Q    Does that show a call to Robert's landline or
13         Robert's cell phone?
14    A    No.
15    Q    What's it show a call to?
16    A    Oh, which call?  3:41?
17    Q    Yes.
18    A    Yeah, it shows a call to Robert.
19    Q    Okay.  From Ruth's landline?
20    A    Yes.
21    Q    And it doesn't show another call from -- to
22         Robert at that time or at 2:40?
23    A    Not on these records, no.  I already told you
24         they didn't.
25    Q    Okay.  And then you received some records from
42
 1         Bierce, did you say?
 2    A    Yes.
 3    Q    With respect to Robert's cell phone records?
 4    A    Yes.
 5              (Plaintiff Exhibit 4 marked for
 6         identification.)
 7    Q    Okay.  I hand you Exhibit 4.  Now, there's two
 8         pages here taken from an Excel spreadsheet of
 9         Robert's cell phone records that were produced
10         to us in a disk.  The second page circled down
11         at the bottom "original CDR."  The first page
12         says "results."  So those are different pages of
13         the Excel spreadsheet.  Do you recognize this as
14         part of your homicide investigation file?
15    A    Yes.
16    Q    Okay.  And the second page on the original CD,
17         does it show two calls basically line 486 and
18         line 493?
19    A    Yes.
```

```
20   Q   And are those the calls to -- from Ruth's
21       landline to Robert's cell phone?
22   A   Yes.
23   Q   And those are the ones that are at time is, at
24       least on there, is 11:19 and 14:40 and 15:40?
25   A   Yes.
43
 1   Q   Which would be 2:40 and/or 3:40?
 2   A   Yes.
 3   Q   And on page 1, which shows results -- and are
 4       these the results of Officer Bierce's
 5       investigation of what Robert's cell phone
 6       records show?
 7   A   These are the results.  He's showing contact
 8       between William, Ruth, and Robert, yes, and
 9       Rebecca.
10   Q   All right.  Well, this is showing, isn't it,
11       Robert Rainsberger's Sprint records?
12   A   That's what it says on here, yes.
13   Q   And on lines 486 and 487, there are two calls
14       there to Ruth Rainsberger -- or from
15       Ruth Rainsberger's landline to Robert's cell
16       phone?
17   A   Yes.
18   Q   And do the results of Officer Bierce's analysis
19       of these show that both of those calls were made
20       at 3:40, one at 3:40:38, one at 3:40:51 P.M.?
21   A   That's what it says here, yes.
22   Q   All right.  And you had this record back in
23       December of 2013 and in May of 2013 [sic] when
24       you prepared your affidavit of probable cause;
25       correct?
44
 1   A   Yes.
 2   Q   But yet you didn't write in your report -- in
 3       your affidavit of the probable cause that the
 4       AT&T records from Ruth's landline showed in
 5       Exhibit 3 that there was a call made at 3:40,
 6       not 2:40 and that the results of
 7       Officer Bierce's analysis of Robert's cell phone
 8       records showed those two calls being both at
 9       3:40?
10   A   I'm sorry.  What was the question?  Did I have
11       this?
12   Q   You had it and you didn't put that in your
```

```
13        affidavit of probable cause.
14   A    That's correct.
15   Q    Instead you reported it as 2:40?
16   A    Yes.
17   Q    Okay.  You said there were a couple of witnesses
18        that made -- that you had interviewed that later
19        the prosecutor or you had determined were --
20        didn't want to become involved or changed their
21        stories or something like that?
22   A    They didn't change their stories.  They were
23        just more reluctant to come to court,
24        Damon Thomas and Kevin Walker.
25   Q    And are those the two individuals that lived
45
 1        upstairs?
 2   A    Yes.
 3   Q    And you didn't put anything in your affidavit of
 4        probable cause about anything they reported to
 5        you, did you?
 6   A    No.
 7   Q    And why is that?
 8   A    Because I hadn't spoken to them yet.  They
 9        hadn't given those statements yet.
10   Q    They hadn't given any statements by
11        December 6th, which is your first version of
12        your affidavit of probable cause?
13   A    No.  They -- they gave those statements in March
14        of 2015.
15   Q    Much later after the --
16   A    Yes.
17   Q    But they had been interviewed the day of --
18   A    Yes.
19   Q    -- the homicide; correct?
20   A    Yes.
21   Q    And they both reported that they didn't hear or
22        see anything unusual at that time?
23   A    Yes.
24   Q    It was only a year and a half later after
25        William had been arrested that they said that
46
 1        they had heard something unusual or strange?
 2   A    What they said was they didn't think that it was
 3        weird or strange that the son was there because
 4        he came there every day.  So when they said that
 5        they saw him there that day, it was nothing out
```

```
 6        of the ordinary.  That's what they said.
 7   Q    But they had been asked whether they had seen
 8        him there that day and they didn't report that
 9        they had.
10   A    I don't know if they were asked if they saw
11        William there.  They were just asked if they saw
12        anything suspicious.  I mean, at that point he
13        wasn't a suspect.  We wouldn't know to ask him,
14        "Hey, was William here this morning?"  At the
15        initial scene, he was not a suspect.
16   Q    Well, wouldn't they ask, "Did you see in the
17        apartment?"
18   A    See anything suspicious or -- I mean ...
19   Q    You're a homicide investigator.  You're not just
20        going to say, "Did you see anything suspicious."
21        Aren't you going to say, "Did you see anybody at
22        Ruth's house?"
23   A    I don't remember the exact wording that we used;
24        but at that point when we talked to them, they
25        didn't say anything about the son being there.
47
 1   Q    Right.  Later they did?
 2   A    Yes.
 3   Q    After he had been arrested a year and a half
 4        later?
 5   A    Yes.
 6   Q    And then later they didn't want to come to court
 7        and say that?
 8   A    Well, they were just reluctant.  They said they
 9        were going to, but they were getting harder to
10        get in touch with.  But as time goes by, we lose
11        witnesses, lose, you know, the motivation.  They
12        don't want to be part of a court case.  It
13        happens in all of our cases, most of our cases.
14   Q    You didn't consider them very reliable, did you?
15   A    It's not for me to decide.  I wrote down what
16        they told me in their statements and passed it
17        on to the prosecutor.
18   Q    Yeah.  But you had an opinion, didn't you?
19           MS. BOX:  Object.  Asked and answered.
20   Q    You had an opinion?
21           MS. BOX:  You can answer.
22   A    Oh, okay.  I had an opinion?  My opinion at that
23        point, because they had no reason to lie, I
24        mean, I don't know what their motivation would
```

```
25        be to come forward and tell me that they saw the
48
 1        son there that day.  They had nothing to gain
 2        from that.  I don't understand why they would
 3        make something like that up.  It doesn't make
 4        any sense.
 5   Q    Did you check into their background, their
 6        reliability, whether they had any criminal
 7        records, whether they seemed reliable?
 8   A    As far as I know, they both had jobs.  They're
 9        an alternative lifestyle couple.  I know that.
10        I don't think they had any criminal history.
11        One of them might have something like driving
12        while suspended or theft or something like that.
13        I'm not sure, but it was nothing that would give
14        you reason to believe that they're going to make
15        something up in a homicide investigation.
16   Q    But they didn't want to become involved?
17   A    I said they were becoming more reluctant.  They
18        still said that they would show up to court if
19        it went to trial.
20             It kept getting harder.  I had to keep
21        going out to their house.  They wouldn't answer
22        phone calls anymore.  It just seemed like they
23        were getting tired of the whole process.  That's
24        all.
25             (Plaintiff Exhibit 5 marked for
49
 1        identification.)
 2   Q    Here's Exhibit 5.  Can you tell me what that is?
 3   A    This is a charging affidavit that was created by
 4        Denise Robinson.
 5   Q    Is this the information for murder --
 6   A    Yes.
 7   Q    -- charging William Rainsberger with knowingly
 8        killing Ruth Rainsberger by inflicting blunt
 9        force injuries with a hammer or similar object?
10   A    Yes.
11   Q    Is this an affidavit that you signed?
12   A    Yes.
13   Q    Under penalties of perjury?
14   A    Yes.
15   Q    And you swore that that statement was true?
16   A    Yes.
17   Q    Okay.  And you signed that on what date?
```

```
18   A   May 22, 2014.
19   Q   Is that the same date as your probable cause
20       affidavit, the second version was signed --
21   A   Yes.
22   Q   -- which is Exhibit 2?
23   A   Yes.
24   Q   Okay.  And without your probable cause
25       affidavit, the prosecutor -- and without you
50
 1       signing this information, the prosecutor
 2       wouldn't have filed charges against
 3       William Rainsberger?
 4   A   Correct.
 5   Q   I'm going to go over the affidavit, the May 22nd
 6       one, if you can pull that out, Exhibit 2.
 7   A   (Witness complies.)
 8   Q   Okay.  This contained, at the time, May 22nd,
 9       2014, the information you believed constituted
10       probable cause for the charges that you signed
11       the homicide against William Rainsberger, which
12       is Exhibit 5; correct?
13   A   That's what the prosecutor believed I had
14       probable cause, yes.  This is what I submitted
15       to her.
16   Q   Okay.  And the first paragraph you say that on
17       November 19, 2013, William Rainsberger reported
18       that someone had bashed his mother's head in,
19       but "both medic and hospital personnel believe
20       that the victim may have sustained a gunshot
21       wound."
22   A   Yes.
23   Q   All right.  The -- was the -- in a gunshot
24       wound, is there usually blood splatter?
25   A   There can be.
51
 1   Q   Is it -- is that usual?
 2   A   I don't know.
 3           MS. BOX:  He said there can be, Rich.
 4   A   There can or can't be.  If somebody's covered
 5       with a blanket, there may not be because it
 6       would hold it in.
 7   Q   There was no blood splatter here, though;
 8       correct?
 9   A   No, I didn't see any.
10   Q   Okay.  And if there's a firearm used, are there
```

```
11        usually shell casings that may be ejected?
12   A    There may or may not be.  Sometimes they use a
13        revolver.
14   Q    Were there shell casings here?
15   A    No.
16   Q    In a gunshot wound are there usually -- usually
17        bullets are found?
18   A    There may or may not be bullets found.  If you
19        shoot somebody in the head, they may be inside
20        the head.
21   Q    Were there any bullets found here?
22   A    No.
23   Q    And if there's a gunshot in an enclosed space
24        like an apartment is there usually the smell of
25        gun powder that lingers for a while?
52
1    A    There could be when it first happens.
2    Q    And it could linger for quite awhile, can't it?
3    A    I'm not sure how long it would linger.  I have
4         no idea.
5    Q    Was there any gunshot residue smelled or any
6         gunshot smell?
7    A    Not that I recall, no.
8    Q    So objectively those things would point less
9         towards a firearm being used and more towards a
10        blunt force trauma, wouldn't it?
11   A    It wasn't for me to decide what caused the
12        wounds.  She was gone when I got there so the
13        medics believed that she was shot.  The doctors
14        believed that she was probably shot.  That's all
15        I had to go on at that time.
16   Q    Well --
17   A    When I got there I didn't see any --
18   Q    Well, when you said the medics believe that she
19        was shot, was there more medics than this
20        Wooldridge, Carl Wooldridge, that actually
21        believed that or reported that?
22   A    Yes.  I mean, they were all there together.  He
23        is from the fire department so he was with the
24        medics.
25   Q    But he's the one that reported that he thought
53
1         it was a gunshot?
2    A    He's the one that gave the statement, yes.
3    Q    But none of the other medics reported to you
```

```
 4        that they believed that there was a gunshot?
 5    A   I didn't talk to them.  I didn't reach out to
 6        the others.  This is the only one I made contact
 7        with.
 8    Q   Right.  And the hospital personnel would have
 9        been going off of what was reported to them by
10        the fire department and medics; correct?
11    A   Possibly.  And the doctor could make his own
12        decision.
13    Q   Well, and they made their own decision that it
14        was blunt force trauma?
15    A   I don't believe they ever made that decision.
16        The autopsy showed it was blunt force trauma. I
17        never heard anybody at the hospital say it was
18        blunt force trauma.
19    Q   Did you interview any of the medical personnel
20        at the hospital --
21    A   No.
22    Q   -- that said that they believed that it was a
23        gunshot wound rather than blunt force trauma?
24    A   No.  The coroner spoke to them and Heather Tait,
25        and she said that that's what they believed.
54
 1        And I'm pretty sure she didn't put on the toe
 2        tag that it was a possible gunshot wound.
 3    Q   But you didn't talk to any hospital personnel
 4        that believed it was a --
 5    A   I did not know.
 6    Q   And you don't know whether any hospital
 7        personnel actually believed that or it was just
 8        passing on what Wooldridge had reported?
 9    A   The coroner talked to the medical personnel.
10        They're not going to give somebody else's
11        opinion.  They'll give their own opinion.
12    Q   Did the coroner say that some medical doctor
13        said that it was a gunshot wound?
14    A   She said personnel.  She didn't -- she didn't
15        specifically say "doctor."  But she called me,
16        like, 4:15 in the morning so I don't remember
17        the call, everything she said.
18    Q   So.  Can you swear here today that she told you
19        that medical personnel at the hospital told her
20        that they thought it was a gunshot wound?
21    A   I believe so, yes.
22    Q   Okay.  And what was her name?
```

```
23  A   Heather Tait, T-a-i-t.  I don't know if she
24      works there anymore either.  I haven't seen her
25      since then.
55
 1  Q   And was she a deputy coroner?
 2  A   Yes.
 3  Q   Okay.  Second paragraph, you say that this
 4      Carl Wooldridge reported that the blanket was
 5      stuck to the victim's head.
 6  A   Yes.
 7  Q   Again, you repeat that fire and ambulance
 8      personnel felt the victim may have been shot.
 9  A   Yes.
10  Q   Is that what Wooldridge had told you or did you
11      have any ambulance personnel that told you that
12      they believed that the victim was shot?
13  A   Wooldridge is the only one I had direct
14      communication with.
15  Q   But even they thought it was not normal that
16      there wasn't any blood splatter on the walls if
17      it was a gunshot wound?
18  A   That's what he said, yes.
19  Q   You report that Wooldridge said the apartment
20      seemed to be in orderly condition.  Did
21      Wooldridge go through the apartment?
22  A   He was in the main room.  You can see everything
23      but Ruth's bedroom pretty much from just inside
24      the door.
25  Q   Was the back room in an orderly condition, the
56
 1      second bedroom?
 2  A   Are you asking my opinion of the bedroom?
 3  Q   I'm asking you objectively was it in orderly
 4      condition or was it in a fairly chaotic
 5      condition?
 6          MS. BOX:  Objection.  That calls for
 7      speculation.  You can answer as to your opinion.
 8  A   It did not appear as if anything was gone
 9      through.  There were bags and boxes all stacked
10      in there, so that's the basically the way it
11      looked to me.
12  Q   It looked to you to be in orderly condition, the
13      back room?
14  A   I mean, it was cluttered.  It was cluttered. I
15      mean, it wasn't -- by "orderly," to me means
```

```
16        that things weren't rifled through and thrown
17        all over the place like somebody was looking for
18        something.
19   Q    Sometimes when an intruder goes through a
20        residence and they start rifling through things,
21        they tear everything apart and make a mess of
22        everything; correct?
23   A    Yes.
24   Q    Sometimes an intruder gets spooked for whatever
25        reason, interrupted in what they do, may have
57
 1        been at the beginning and they flee without
 2        causing any disturbance; correct?
 3   A    Maybe.
 4   Q    You don't know any of the circumstances exactly
 5        whether -- which one of those circumstances may
 6        have happened in this case, do you?
 7   A    No.
 8   Q    Do you even know what time it was that Ruth
 9        sustained her injuries?
10   A    I don't have an exact time, no.
11   Q    You believed it was before 10:30 in the morning;
12        correct?
13   A    Yes.
14   Q    Because Delbert Pickens and Meals on Wheels both
15        knocked on her door and called her phone?
16   A    Yes.
17   Q    And Ruth's cell phone records that we saw show a
18        call from Delbert Pickens at about 10:29 A.M.
19        that morning; right?
20   A    They show a call at that time, yes.
21   Q    To Ruth's landline?
22   A    Yes.
23   Q    I guess that tells us a couple of things. I
24        mean, one, you took it that that means that she
25        was probably injured because she didn't respond
58
 1        to the door before 10:30 in the morning?
 2   A    Yes.
 3   Q    It also tells us that AT&T reports on their
 4        landline records that calls that are even made
 5        to that landline that aren't -- aren't picked up
 6        on; correct?
 7   A    Possibly, yes.
 8   Q    Well --
```

```
 9   A   Doesn't mean they record all of them.
10   Q   Yeah.  And you don't know whether they do or
11       not?
12   A   I don't know what they did.
13   Q   And you didn't check with them to see if they
14       did or not?
15   A   No.
16   Q   Correct?
17   A   Correct.
18   Q   Okay.  The -- and you know William had said he
19       had been over there maybe 5:30, 6:00 the night
20       before?
21   A   Yes.
22   Q   You didn't have anybody's -- information from
23       anybody that showed that the injury occurred
24       sometime after that time the night before of the
25       18th or early in the morning of the 19th?
59
 1   A   We can't specify what time it happened.
 2   Q   Okay.  You say in that third paragraph there in
 3       the bottom that "There was a lockbox in the back
 4       room in plain view that contained savings bonds
 5       belonging to the victim."  Did -- where exactly
 6       was the lockbox?
 7   A   It was in the closet in the room right there
 8       with the clutter, the boxes and the bags.
 9   Q   So that's not -- and it's in a lockbox itself?
10   A   Yes.
11   Q   In a closet in a cluttered room?
12   A   Yes.
13   Q   And that's what you're stating is in plain view?
14   A   If you walk into the room, it's in -- I mean,
15       you could see it just by looking in the closet.
16       The closet door was open.
17   Q   You can see a lot of things, though, because
18       it's cluttered, a lot of boxes, a lot of the
19       different things in that room; correct?
20   A   Yes.  I pointed that out just because that's an
21       area that I believed if somebody was looking for
22       valuables they would check a lockbox that's
23       sitting there in plain view is probably what
24       somebody would be looking for if they were going
25       to burglarize an apartment.
60
 1   Q   And you said that the lockbox contained savings
```

```
 2        bonds?
 3   A    That's what it says here, but I heard they might
 4        be certificates of deposit or whatever, some
 5        kind of financial documents.
 6   Q    They weren't savings bonds?
 7   A    I'm not sure what they were, but that's what I
 8        put in here.  They were something like savings
 9        bonds, certificates of deposit.  The point was I
10        was just showing there was something with
11        possible value in that box that wasn't looked
12        through.
13   Q    On the second page of this, you report what you
14        found -- what William had told you.
15   A    Yes.
16   Q    Second paragraph, that's on the evening of
17        November 19th when they voluntarily cooperated
18        with you and went to the police headquarters and
19        gave a recorded statement?
20   A    Yes.
21   Q    Without even a lawyer present; correct?
22   A    Yes.
23   Q    Same thing on the second paragraph.  You report
24        what Robert told you in that interview on
25        November 19th at police headquarters?
61
 1   A    Yes.
 2   Q    And that last sentence in that paragraph you say
 3        "At no time did Robert or brother, William, ever
 4        ask me how mom was doing or if they could get to
 5        the hospital to see her."
 6   A    Right.
 7   Q    Was that true?
 8   A    Yes.
 9   Q    That seems to indicate that they were uncaring
10        or unconcerned about their mother, doesn't it?
11   A    Seemed to be, yes.
12   Q    Okay.  Why would they ask you how their mom was
13        doing?
14   A    Why would they ask me?
15   Q    Yeah.  You were at police headquarters with
16        them.  Why would they ask you?
17   A    Well, because I could check for them.  I mean,
18        everybody asks -- not everybody but a lot of
19        people ask after their loves ones.  They want to
20        get out of there as quick as they can to get to
```

```
21          the hospital.
22   Q   Well, did they indicate they wanted to be there
23          at police headquarters or were they there
24          because you told them you needed them to go
25          downtown and give a statement?
62
 1   A   They came down because I asked them to.  I mean,
 2          this -- this statement is basically not even
 3          about just that night.  It's just following
 4          that.  I mean, nobody ever called later in the
 5          evening.  They never called about the suspects,
 6          never called to check in on the case.
 7   Q   You have another statement about that and we'll
 8          get to that.  But with respect to that night you
 9          say at no time did they ask you about their
10          mom's condition when they're there under
11          interrogation by you.  But you weren't at the
12          hospital so you didn't know what their mom's
13          condition was.
14   A   No, but I can call the hospital and find out.
15   Q   Well, wasn't --
16   A   I mean, the main reason why I came up with that
17          was because on the way downtown William told the
18          officer, "I don't know if it's a good thing or a
19          bad thing if my mom dies."
20              From that point, there was really no sign
21          of emotion.  He talked to me like nothing was
22          even happening during his statement.  So that --
23          when you make a statement like that, it makes me
24          think that you're not really concerned whether
25          she dies or not if you don't know if it's a good
63
 1          thing a bad thing.
 2   Q   You reported that but you also reported that he
 3          didn't ask you how his mom's condition is when
 4          he's there being interrogated by you at the
 5          police headquarters.
 6   A   Right.  He didn't ask if he could leave to go
 7          see her.  That's correct.
 8   Q   Wasn't his sister at the hospital with his
 9          mother?
10   A   Probably.
11   Q   And didn't William have his cell phone with him?
12   A   If he was making communications -- I didn't say
13          in here that maybe he was talking to his sister
```

```
14        about it.  But the truth of the matter is I put
15        in there he didn't ask me about it.  That's all
16        it says.  He didn't ask me about it.  Maybe he
17        asked his sister.  He didn't say anything to me
18        about it.
19   Q    Well, didn't he receive a call from his sister?
20   A    I don't know.
21   Q    Didn't he talk to his sister while you were
22        interviewing him asking him about his mother?
23   A    Not that I remember.
24   Q    But if he did, you didn't put that in the
25        report?
64
 1   A    I don't remember him talking -- he wasn't
 2        talking on the phone when I'm interviewing him.
 3        He was back there with the cell phone by himself
 4        for a while, so he may have had contact with her
 5        at that point.
 6   Q    Right.  But if you knew he had been talking to
 7        his sister about his mother and how she's doing,
 8        that would create a very contradictory inference
 9        from the one you're trying to draw here that he
10        is uncaring and unconcerned because he's not
11        asking you about his mother?
12   A    He didn't ask.  I just said he didn't ask to go
13        to the hospital to see her.
14   Q    You told him you needed him there; right?
15   A    And I already covered that.  Most people will
16        say, "I need to hurry up.  Can we hurry this up.
17        I need to go see my mother."  That's what I'm
18        getting at.  And that's why I put that in there.
19   Q    Were you dragging it out?  I mean, how long did
20        this take?
21   A    I don't remember how long it took.  Probably
22        about an hour or so.
23   Q    Do you know what they did when they left, Robert
24        and William?
25   A    They probably went to the hospital.
65
 1   Q    Okay.  You didn't put that in the report that
 2        they went to the hospital as soon as they got
 3        out of the interview.
 4   A    No.
 5   Q    That last paragraph on page 2 of your report
 6        what the doctor that had done the autopsy
```

```
 7        reported to you?
 8   A    Yes.
 9   Q    Multiple blunt force trauma to Ruth's head and
10        that the wounds were possibly inflicted with a
11        hammer or similar-type weapon?
12   A    Yes.
13   Q    The next paragraph on page 3 first full
14        paragraph "On November 20th" -- now this is
15        after Ruth had died; correct?
16   A    Yes.
17   Q    And you said you spoke to William and Robert
18        once again at police headquarters.  Was their
19        sister there too?
20   A    Yes, yes.
21   Q    And did you call them and ask them to come down?
22   A    Yes.
23   Q    And did you tell them why you wanted them to
24        come down?
25   A    To talk about the case.
66
 1   Q    Did you tell them you wanted to report to them
 2        the results of the autopsy?
 3   A    I may have.  I'm not sure if I said anything
 4        about the autopsy or not.
 5   Q    When they got there, did you tell them about the
 6        results of the autopsy?
 7   A    I'm not sure if they asked me when they came
 8        down or not.  I don't remember talking about the
 9        autopsy.  Once we got to the polygraph part,
10        everything blew up at that point and it was
11        over.  We never got that far.
12   Q    You say "All three siblings stormed out and I
13        have not heard from them since."
14   A    Yes.
15   Q    When you asked them to take -- is a polygraph
16        reliable?
17            MS. BOX:  Objection.  Calls for
18        speculation.  You can answer to your experience.
19   A    I mean, it's -- it's a tool that we use.  It's
20        not reliable in court.  It's not accepted in
21        court.  But in a case -- when there's a case,
22        like I said, between family members, it's
23        customary that we have to eliminate family
24        members first before we move on to somebody
25        else.
```

67
1          So myself and Detective Tudor spoke to
2     William.  Since it's not admissible, we turned
3     off the recorder.  I told him I'm not accusing
4     you of anything; but in cases like this, we need
5     to eliminate the family members.  And I asked --
6     requested that they take a polygraph.
7          Now, reliable or not, it's still -- the
8     reaction I got was very negative, screaming and
9     yelling that they were not taking polygraphs,
10    which at that point was basically when I started
11    treating them like a suspect at that point.
12         Still up to this point everything was
13    circumstantial for the most part; but, I mean,
14    we used that polygraph as a tool to gauge where
15    people are coming from.  A lot of family
16    members, not all, would say "Yes, hurry up.
17    Give me a polygraph.  Clear me.  I want you to
18    find out who killed my mother."  They wouldn't
19    be yelling and screaming and say, "No way."
20         His reaction was out of control, so it made
21    Detective Tudor and I both believe that, yes, we
22    are on the right track.
23  Q  You say he yelled and screamed?
24  A  Yes.
25  Q  What did he yell and what did he scream?
68
1   A  That he's not taking a polygraph, that we're a
2     bunch of liars and we're just trying to jam him
3     up in the case and get him for something he
4     didn't do and we lied to get him down there.
5   Q  Why did he accuse you of lying to get him down
6     there?
7   A  Because, like I said, he probably thought he was
8     just coming down to get results of what happened
9     to his mother and he didn't know he was going to
10    be confronted to see if he would take a
11    polygraph.
12  Q  His mother just died that day; right?
13  A  Yes.
14  Q  And you call him and tell him you want him to
15    come down to tell him about the results of the
16    autopsy.  They do and you don't tell them about
17    the results of the autopsy.  Instead you treat
18    them like suspects and say, "We want you to take

```
19          a polygraph"?
20    A     We never got that far.  And I wasn't treating
21          him like a suspect until after his reaction to
22          the polygraph.  I did not once treat him like a
23          suspect.  I never yelled at him, never got out
24          of line with him, asked him simple questions
25          about the events of the night before.
69
 1                That was just our gauge to ask him, "Will
 2          you take a polygraph?" to see how he would
 3          react.  And he reacted very negatively.
 4    Q     What about William?
 5    A     He came running down the hall and started
 6          yelling and screaming that "We're not taking any
 7          polygraph.  Robert, you're not taking any
 8          polygraph."  So Robert refused us also.
 9    Q     Did you or Tudor accuse William or Robert of
10          killing the mother at that time?
11    A     There were some words exchanged between
12          Detective Tudor I believe about the fact that
13          the money that she had.
14    Q     What did he say?
15    A     And that if you killed your mom for money,
16          that's ridiculous or something like that.
17    Q     He accused them?
18    A     There was a lot of emotions going back and forth
19          because they were yelling at us calling us
20          liars.  I mean, he didn't accuse.  He said, "If
21          you kill your mother for money, that's
22          sickening" or "ridiculous," something like that.
23    Q     Did he use the word "if" or did he actually say,
24          "You killed your mother for money"?
25    A     I don't know if he actually said it like that or
70
 1          not.  It wasn't recorded so I'm not sure.  I
 2          know it was heated back and forth.
 3    Q     But you had turned off the recorder?
 4    A     We were already out in the lobby of our office
 5          at that point when that was going on right
 6          before they left.
 7    Q     And you two had left, right, and gone into
 8          another room before the three sibling left?
 9    A     I don't understand the question, who had gone
10          into another room.
11    Q     You and Tudor accused -- Tudor accuses them of
```

```
12        killing their mother for money and you and Tudor
13        walk off from where you're all together and you
14        guys --
15   A    We went back to our office.
16   Q    You go back to your office and the three
17        children were there together still?
18   A    Yes.
19   Q    And then they leave?
20   A    Yes.
21   Q    But you put in here that they stormed out.  "All
22        three siblings stormed out."  That's really not
23        true, is it?
24   A    Yes.
25   Q    They left after you left.
71
1    A    Well, they left at the same time.  We're all in
2         this little room together smaller than this
3         room, about a quarter of the size from me to you
4         to the wall.  They went that way; we went this
5         way.
6    Q    So --
7    A    So they did storm out.  I mean, you can use any
8         words that you want.  I don't know if they
9         stormed or left angrily, left yelling and
10        screaming; but they left upset, stormed out.
11        That's just the word that I chose to put in
12        there.
13   Q    And you said "and I have not heard from them
14        since."  Was that true?
15   A    I tried to contact William.  Yes.  I had talked
16        to William or Robert until the lawyers came with
17        the -- to do the limited search warrants. I
18        talked to the lawyers.
19   Q    Did you try to talk to William again?
20   A    I tried to call William a couple times, yes.
21   Q    What about?
22   A    To see if he would come in and do the limited
23        search warrant so I could get prints and DNA.
24   Q    Well, and he did that; right?
25   A    He contacted a lawyer and the lawyer contacted
72
1         me to do it.
2    Q    And he came in and gave prints and --
3    A    Yes.
4    Q    -- a DNA swab?
```

```
 5   A   Yes.
 6   Q   Okay.  You said "All three siblings stormed out
 7       and I have not heard from them since."  Did you
 8       expect William to call you or Robert to call you
 9       after Tudor had told them -- told them that they
10       accused him of killing his mother?
11           MS. BOX:  Again, you're mischaracterizing
12       his testimony.  He didn't testify that Tudor
13       accused them.  He said "if."
14           MR. WAPLES:  He said he can't remember
15       which one it was, whether he used "if" or
16       whether he just accused them.
17   Q   But regardless, after Tudor had said either "If
18       you killed your mother for money that's
19       ridiculous," or "that's sickening" or "You
20       killed your mother for money.  That's sickening"
21       or "that's ridiculous," and then they leave and
22       you thought it was strange that William or
23       Robert didn't call you after that time?
24   A   If they wanted find out who killed their mother,
25       they'd call somebody.  If they didn't want to
73
 1       talk to me, the could have called the
 2       supervisor.  Whether I expected them to or not,
 3       they didn't.  And that's what I put in here.
 4   Q   But didn't their sister Rebecca call you several
 5       times afterwards?
 6   A   She called me once in February just to see what
 7       was going on.  And I said, "The same suspects
 8       are being investigated."
 9   Q   And who were those?
10   A   William at that point.  He was the only one that
11       was a suspect.
12   Q   So you talked to Rebecca in -- in February?
13   A   I think it was February.  I can't be positive,
14       February or March, sometime she called the
15       office.
16   Q   Did you make a notation of that call?
17   A   I'm not sure if I did or not.  I do remember it,
18       though.
19   Q   I didn't see anything in your file.  I didn't
20       see any record of it in your file.
21   A   Maybe I just remember it, but I do remember her
22       calling.  And I think it was February.
23   Q   Of her calling you?
```

```
24  A    Yes.
25  Q    So the statement's not true that you have not
74
 1       heard from them since.  You say "All three
 2       siblings stormed out and I have not heard from
 3       them since."  So you had heard -- and you signed
 4       this on May 22nd of 2014.  So you had heard from
 5       Rebecca since.
 6  A    From Rebecca; right.  So that's -- yeah, that
 7       doesn't mean much to the probable cause.  But I
 8       mean, William is the suspect.  And Robert was
 9       with him.  They didn't contact me.
10           I didn't go back through and take that out.
11       I didn't catch that part of it, so I could have
12       added "except Rebecca called me and asked me
13       what was going on."  I don't know whether that
14       would have changed in the probable cause but ...
15  Q    Now, wasn't Robert a suspect at this point?
16  A    We asked him to take a polygraph also.  I mean,
17       William was the main suspect because he is the
18       primary caregiver.  He goes there every day.
19           It seemed like everything -- his comments
20       he made.  It was all circumstantial in the
21       beginning.  Mostly circumstantial probably when
22       she filed the case, but that's the decision that
23       the prosecutor made.
24           I had no reason to believe that Robert was
25       over there.  He said he hardly went over there.
75
 1       William was the main caregiver, went there every
 2       day, paid for her groceries, paid her bills,
 3       took care of her.
 4           The comments that he made about her head
 5       being bashed in and possibly using a lead pipe,
 6       I mean, all that stuff was contradictory with
 7       what we believed at first.  So ...
 8  Q    "What we believed at first"?
 9  A    If I said "we," maybe me and Detective Tudor.  I
10       don't know.  It's my probable causes, so that's
11       what I believed, that we had circumstantial
12       evidence.
13           What I do is I type everything up that I
14       put in here and I send it to the prosecutor's
15       office and they decide whether or not the
16       evidence warrants a charge.  That's what
```

```
17          happened.
18    Q     But as of December 6th of 2013, there wasn't
19          that in this Exhibit 1, that version of the
20          affidavit.  There's not yet sufficient evidence
21          at least for the prosecutor to go forward?
22    A     Well, she just -- I don't know if she would have
23          filed at that point or not if there was nothing
24          else, but I kept working on the case at that
25          point.  I don't know if she felt there was
76
 1          circumstantial evidence at that point or not.
 2          You would have to ask her.
 3    Q     On page 3 of that probable cause you've got the
 4          fourth full paragraph begins "On November 22,
 5          2013," about the videos at Kroger.
 6    A     Yes.
 7    Q     You said "The video showed the William
 8          Rainsberger drove onto the Kroger lot on
 9          November 19 ... at approximately 3:32 P.M.
10          Mr. Rainsberger got out of the car and
11          approached a garbage can located near the Red
12          Box.  I have -- as you know, you produced your
13          file to me, including any videos you got from
14          Kroger.  And I've looked through those videos,
15          and there's not a video that shows
16          William Rainsberger driving onto the Kroger lot
17          and getting out of his car.  Do you know why
18          that is, why there isn't a video that you
19          recovered from Kroger that would show what you
20          put in your probable cause affidavit?
21    A     It shows him walking across the lot with the
22          item in his hand, walking from his car towards
23          the --
24    Q     Do you believe that your homicide file that
25          contain videos from Kroger has a video of Robert
77
 1          [sic] that you say you recovered from Kroger --
 2          means you obtained it; right?  When you say you
 3          recovered?
 4    A     Yes.
 5    Q     A video that you recovered you obtained from
 6          Kroger that says that shows William drive onto
 7          the Kroger lot at approximately 3:32?
 8    A     Yes.  I believe I saw a video to that effect.
 9          Whether or not they actually gave me that part
```

```
10          of it or not, I do not know.  I don't remember
11          if I saw that part on video or not.  I know that
12          they transcribed the video and still photos of
13          him walking across the lot with the item in his
14          hand, so they got that from the video.
15     Q    Well, there's a video showing him approaching
16          the trashcan and the Red Box close to the Kroger
17          entrance where he's either on a sidewalk or a
18          step or two off the sidewalk walking up to that
19          area; right?
20     A    I'm not sure how far it is; but, yeah, there's
21          some photographs of him walking across the lot,
22          walking towards the Red Box and the trashcan.
23     Q    Are there photographs of him pulling onto the
24          Kroger lot and getting out of his car?
25     A    I thought there were.  I mean, if you're saying
78
 1          that there's not, maybe there's not.  I know
 2          that he had to pull in the lot because he pulled
 3          off the lot.  His car is on the lot.  And I'm
 4          pretty sure that when we went to the end, we
 5          backed it up and got to the point where he
 6          pulled out of the lot also.
 7     Q    All right.  Well, you put this in your probable
 8          cause affidavit so -- and you say you recovered
 9          the video, so there should be a video in your
10          file that shows what you put in your probable
11          cause affidavit; correct?
12     A    I got a search warrant, and I watched the video,
13          and I recovered the video.  So hopefully
14          everything is in there that I saw.
15     Q    And you say you saw Mr. Rainsberger getting out
16          of his car and approaching a garbage can.  You
17          say that's what the video shows?
18     A    Yes.  That's what I saw on the video.
19     Q    And you say Rainsberger appeared to pull out a
20          straight object from his person which he placed
21          in the garbage can?
22     A    Yes.
23     Q    And this is at 3:32 P.M.?
24     A    Yes.
25     Q    What did that straight object look like?
79
 1     A    Straight object.  I couldn't tell you what it
 2          was.
```

```
 3   Q   How big was it?
 4   A   I couldn't tell.  It was kind of hidden next to
 5       his body.  Looked like maybe 4 inches or so was
 6       sticking out.  There is still photos of it.  You
 7       can look at them and see.
 8   Q   You couldn't tell how long it was or what it was
 9       made out of?
10   A   It was next to his body.  No, I couldn't.
11   Q   And you say "As he placed the item in the trash
12       he appeared to look around for cameras."  So the
13       video should show that as well; correct?
14   A   Yes.
15   Q   If it doesn't show that, then you've
16       misrepresented what he -- what happened;
17       correct?
18          MS. BOX:  Objection.  Calls for
19       speculation.
20   A   That's my opinion.  I'm sorry.  That's my
21       opinion of what I saw when I watched the video.
22   Q   Are you speculating that was a murder weapon?
23   A   Am I speculating?  I just wrote in there that he
24       threw away a straight object.  Once again,
25       that's part of the circumstantial case, so I'm
80
 1       sure the prosecutor's office and I both believed
 2       that it could have been a weapon, yes.  That's
 3       why I put it in there.
 4   Q   Could have been, but it's just speculation
 5       because you don't know how big it was, what it
 6       was made out of, whether it was metal, or
 7       whether it was just a piece of trash?
 8   A   It was a straight object so, I mean, I put it in
 9       there as part of the entire case, as another
10       piece of circumstantial evidence, yes.
11   Q   Okay.  Would your theory of the case be that he
12       used that object to strike his mother in the
13       head at some point before 10:30 when
14       Delbert Pickens got there?
15   A   It's possible.
16   Q   And then keep that on his person --
17   A   It's possible.
18   Q   -- the rest of the day, not dispose of it, and
19       then go to his mom's house at 2:40 or sometime
20       before that and be there with his mother again
21       and then take that object and instead of
```

```
22        throwing it away in a secretive place, go to a
23        public place where there's a lot of people
24        around and throw that out in front of a lot of
25        people in a trashcan where most people would
81
 1        understand that there's security cameras?  You
 2        think that sounds like a reasonable thing that
 3        happened?
 4   A    It's possible.  Every case is different, and
 5        people that commit these crimes aren't acting
 6        reasonably.  So I can't say where somebody would
 7        throw away something that they hit their mother
 8        with.  It's -- stranger things have happened.
 9        Could have been put -- could have still had it
10        in the trunk when we got there.  We just don't
11        know.  Every case is different.
12            Some people stand outside of a crime scene
13        with the murder weapon in their hand.  Maybe he
14        forgot about it.
15   Q    But you don't know whether that was a murder
16        weapon or not?
17   A    I don't.  And I never said in my PC that it was
18        a murder weapon.  It's just open for
19        speculation, something for a jury to decide at
20        that point.
21   Q    Did you attempt to recover the trash from
22        Kroger?
23   A    It had already been dumped.  I checked.  They
24        don't keep it for more -- it was, like, four
25        days later when the video was watched.
82
 1   Q    Was the -- who did you speak to about the trash
 2        dumping from Kroger?
 3   A    The security, the Pam Pulliam, individual that
 4        got me the video.
 5   Q    Did you ask her when the trashcan from the front
 6        of the Kroger store where you saw
 7        Mr. Rainsberger throw away that trash or object
 8        was, where that would be dumped?
 9   A    No.  I mean, it's hard to tell which landfill
10        they would go to.
11   Q    No, no.  I'm not asking about a landfill.
12   A    You mean a dumpster?
13   Q    What do they do with that trashcan's contents?
14        What does Kroger do with that trashcan's
```

```
15        contents?
16    A   They put them in a dumpster to be picked up.
17    Q   And did you determine when the dumpster got
18        dumped?
19    A   I'm not sure what day it was, but she said that
20        the dumpster was already cleared.  They were
21        empty from that day.  And this was, like, four
22        days later after the 19th.
23    Q   Did she tell you that they were -- that the
24        dumpster got dumped on a routine basis on a
25        particular day?
83
 1    A   I don't remember all that.  I don't know if I
 2        got that specific about it or not, just to know
 3        that it was no longer there.
 4    Q   Did you ask her what company would pick up the
 5        dumpster?
 6    A   I believe it's Ray's that covers that
 7        neighborhood.
 8    Q   Well, did you ask her?
 9    A   I don't recall if I asked her or not.
10    Q   Did you attempt to contact Ray's and determine
11        what they might have done with the contents of
12        the dumpster?
13    A   No.
14    Q   Why not?
15    A   Because it would be like looking for a needle in
16        a haystack.  It was gone at that point.  There
17        was no way I was going to recover  -- I can't go
18        through a landfill looking for a lead pipe or
19        anything else that matches that type of blunt
20        object.
21    Q   Well, you don't know whether it was in a
22        landfill or not, do you?
23    A   That's usually where they dump the dumpsters.
24    Q   So the answer to my question is correct.  You
25        don't know what they did with the dumpster and
84
 1        its contents?
 2    A   I don't have any idea what happened to that
 3        dumpster.
 4    Q   The last full paragraph there on page 3, we've
 5        already covered that, haven't we, when we talked
 6        about the cell phone records?
 7    A   Yes.
```

```
 8   Q   And the landline records?
 9   A   Yes.
10   Q   And, again, you didn't report in there what
11       Ruth's landline showed calls or what the results
12       were from Biers analysis of Robert's cell phone
13       records; correct?
14   A   I did not.  I wasn't aware.
15   Q   Well, you had those documents.
16   A   I believe I had them, yes.  I didn't realize
17       they were a bit different.
18   Q   That paragraph continues in page 4.  It ends
19       with the sentence that says "William then stood
20       outside" -- this is after he had gone back to
21       his mother's after your scenario of him being
22       there at 2:40 making a call but then going to
23       Kroger at 3:30 and then coming back to his
24       mother's some time right after 3:30 and
25       discovering her, calling 911.  Then you said
85
 1       "William then stood outside and left his mother
 2       unattended until the police arrived."  That's
 3       after he calls the police; correct?
 4   A   Yes.
 5   Q   And that is consistent with your statements
 6       earlier that made the children -- or at least
 7       William -- look uncaring or unconcerned about
 8       his mother; right?  Callous?
 9   A   Yes.
10   Q   It created the impression that he didn't care
11       about his mother or what was happening to her?
12   A   Yes.
13   Q   But didn't William tell you that he had -- he
14       was afraid to pull the blanket off because it
15       would open up the dried up scabby wound on her
16       head, that he called 911 and he knew the fire
17       department was very close by -- there's a fire
18       station close by -- and that he ran outside to
19       flag down the fire department and the ambulance,
20       whichever got there first because it was
21       difficult to see which building was Building L
22       in that apartment complex?
23   A   That's what he said, yes.
24   Q   Okay.  And did you -- but that seems much
25       different than just William making a call and
86
```

```
 1        then William standing outside and left his
 2        mother unattended until the police arrived,
 3        doesn't it?
 4     A  It was -- I mean, it follows the line of
 5        thinking that he didn't check on her and that he
 6        pulls the door shut and goes outside.
 7     Q  Well, he did check on her, didn't he?
 8     A  We covered that earlier.
 9     Q  We did.
10     A  But he didn't pull the blanket off and ask his
11        mother, "What's wrong?"
12     Q  Well, he couldn't get his mother to respond at
13        all.  He was calling her name right?  "Mom?
14        Mom?  Mom?"
15     A  We already covered all that, yes; but, I mean,
16        my line of thinking at that point looking at the
17        totality of this case was that it wasn't
18        reasonable to me that you would leave your mom
19        laying there as soon as you walk through the
20        door, pulling that blanket off, and asking her
21        what's going on, what happened.
22           You wouldn't calmly walk around, place your
23        ice tea on the coffee table and think, well,
24        maybe I better not pull the blanket off because
25        it's like a bandaid or a scab on her head, so it
87
 1        just didn't make any sense to me.
 2           So when he left her unattended it just
 3        didn't -- I don't know that I would -- I would
 4        still be trying to find out what was wrong with
 5        my mom.  But, I mean, I'm not part of this case.
 6        That's just my own opinion.
 7     Q  Well, wouldn't it be more reasonable to want to
 8        make sure you get prompt expert medical
 9        attention to her as fast --
10     A  I mean --
11     Q  Let me finish my question -- to get prompt
12        expert medical attention to her as fast as you
13        can?
14     A  The police were probably there.  I mean,
15        somebody will guide the ambulance and they know.
16        They've probably been to that complex numerous
17        times.  They knew their way around.
18     Q  You're just speculating about that, aren't you?
19     A  And you are too.
```

```
20   Q   I'm not.  I'm not at all.
21   A   You're saying that he cared about her.  And I'm
22       just saying in my opinion, with the totality of
23       the circumstances, it seemed that he didn't.
24   Q   Wasn't it --
25   A   And that was circumstantial evidence for the
88
 1       prosecutor to file the charges.  That's all I'm
 2       saying.
 3   Q   Right.  The picture that you painted in the
 4       probable cause affidavit were the reason why the
 5       prosecutor filed the charges; correct?
 6           MS. BOX:  Objection.  Calls for
 7       speculation.
 8   A   I don't understand.
 9   Q   Well, we've already covered this.  The
10       prosecutor relied upon your affidavit of
11       probable cause in order to say "go forward" and
12       then draft up the charges that you signed, which
13       are the information for murder accusing William
14       of killing his mother.
15   A   Yes.
16   Q   All right.  This next paragraph on page 4 of
17       Exhibit 2, your affidavit of probable cause, you
18       say you obtained William's cell phone records
19       "including cell tower site locations for the day
20       of November 19, 2013.  Those records do not show
21       William Rainsberger outside of the area of
22       Shortridge and 10th Street during the relevant
23       time period."  Correct?  Is that what you put?
24   A   That's what it says, yes.
25   Q   I have looked at those records, and I want to
89
 1       know what you determined was the relevant time
 2       period.
 3   A   Between the morning and when he called 911, his
 4       Kroger card showed that he was across the street
 5       at the Kroger gas station around 9:00 in the
 6       morning too.  So, I mean, the relevant time
 7       period is the morning hours leading up to when
 8       she was found.  I mean, we've got the 10:30 time
 9       that the Meals on Wheels person was there, so
10       sometime before that up until the time she was
11       found.
12   Q   All through the night before?
```

```
13   A   Well, we didn't -- yeah, I suppose you can say
14       through the night before.
15   Q   Well, I think you said that right.  You didn't
16       know when the attack occurred on the mother.
17   A   I don't have a definite time, no, but --
18   Q   Your best guess is it happened before 10:30
19       because what's when Delbert Pickens tried to
20       contact her?
21   A   Yes.
22   Q   But don't know whether it happened an hour
23       before 10:30 or at midnight or the night before;
24       correct?
25   A   We don't -- we didn't pinpoint the time, no.
90
 1   Q   Right.  So a relevant period for the attack on
 2       the mother includes the night before; right?
 3   A   Well, my relevant time period was in the morning
 4       because I -- it appears to me that he was there
 5       over night.  She wouldn't have survived that
 6       long.
 7   Q   You didn't see her.  You weren't there.
 8   A   No, but I know the wounds that she sustained
 9       were pretty serious.  And they totally
10       immobilized her and put her out.  She was barely
11       hanging on at 3:00.
12   Q   Do you have any medical training?
13   A   No.
14   Q   Are you --
15   A   I talked to the pathologist, though.
16   Q   Are you making a medical judgment, though, when
17       the attack would have occurred because based on
18       how long she would survive with that wound?
19   A   That was just going by the seriousness that the
20       pathologist said the wounds were.
21   Q   Serious and it caused her death?
22   A   Yes.
23   Q   And she was -- we know at least that she was
24       unconscious or unresponsive when -- when William
25       found her and called 911 and the ambulance and
91
 1       fire people came at 3:30 that afternoon;
 2       correct?
 3   A   Yes.
 4   Q   And we assume she was in a similar sort of
 5       condition, unresponsive, unable to make any
```

```
 6        noise, or come to the door or answer the phone
 7        when Dilbert Pickens was there at 10:30 that
 8        morning; correct?
 9   A    Yes.
10   Q    And how long she had been in that condition? I
11        think we established that you don't know.  It
12        could have been any time that morning or the
13        night before; correct?
14   A    I suppose it could have been the night before;
15        but, I mean, there was still blood that wasn't
16        coagulated.  There was still blood that was wet.
17        I mean, it surely would have been dried if she
18        was there all night.
19            So the relevant time period, to me, was --
20        I mean, you can say it was all night; but when I
21        wrote this, the relevant time period is leading
22        up to the time when he called 911.  He was there
23        in that area, like he said he was.  I know that
24        he was there from at least 9:00 A.M. until he
25        called the 911.
92
 1   Q    Well you know he was there from 9:00 A.M.
 2        because he bought gas at Kroger?
 3   A    Yes.
 4   Q    My specific question in this record, this
 5        affidavit of probable cause, you said that the
 6        cell phone tower location data showed that he
 7        was in the relevant -- in the area during the
 8        relevant time period.  I'm trying to figure
 9        out -- I'm asking you, one, what's the relevant
10        time period?  You're telling me it's at least
11        that morning is your thought.
12   A    My relevant time period was --
13   Q    And my question is:  Do your records in your
14        file contain cell phone tower site locations for
15        that day that show where William's phone was on
16        that day morning to that afternoon.
17   A    Yes.  The tower locations will show that he was
18        in the area and his house is in this area also.
19        So it's not out of the ordinary that he's still
20        there all day.  He lives on 13th street, so I
21        said that they showed him not outside the area
22        so he was in the area.
23   Q    Okay.  So you're including when he's at his
24        house?
```

```
25    A    Yes, the area -- yeah, that's what I'm saying.
93
 1         I'm not saying right at the apartment.  That's
 2         not what that means.  It just means outside the
 3         area.
 4    Q    Well, when the --
 5    A    Which is the cell tower.  In that area, so he's
 6         close to that cell tower and his house is in
 7         that area.  So that's all that means, that he
 8         wasn't in Plainfield at that time.  He wasn't in
 9         Morgan County at that time.  He was in that area
10         around Shortridge and 10th Street.  That's all
11         that means, which his house is in that area.
12    Q    Well, but you put Shortridge and 10th because
13         that was close to the mother's house rather than
14         his house.
15    A    Because it's in the area.  It's in the same area
16         as 13th Street.  It's just right across the
17         street, really, a couple blocks away.
18    Q    But you didn't put the records show that he was
19         at his house or by his house the relevant time
20         period.  You put he was at Shortridge and 10th
21         which was closer to his mom's apartment where
22         the attack occurred; correct?
23    A    Yes.  That's the way I put it in there.
24    Q    Okay.  The next full paragraph, the last full
25         paragraph you say you obtained financial records
94
 1         in January for Ruth Rainsberger that showed
 2         William, Robert, and Rebecca were the
 3         beneficiary of her assets; correct?
 4    A    Yes.
 5    Q    Did you -- and so you think that -- well, tell
 6         me.  Are you saying that you think William
 7         killed his mother for one-third of her assets?
 8    A    I'm not saying that.  It's just part of the
 9         case.  That's how much money she had in case
10         there's a motive.  That could be a motive.
11         People kill each other for $20 anymore but --
12    Q    Did you check William's assets, his own assets?
13    A    No.
14    Q    So you didn't know how much money he had?
15    A    No.
16    Q    You didn't know he owned his house free and
17         clear?
```

```
18   A   It didn't have anything to do with my case.
19   Q   Did you check Robert's financial situation?
20   A   I knew that he had been recently foreclosed
21       upon.  I got that from William and Robert, so he
22       was staying with William because he was locked
23       out on his lot.
24   Q   So he was more in financial straits than William
25       was?
95
 1   A   Yes.
 2   Q   But you really didn't look into William's
 3       financial situation?
 4   A   No.
 5           MR. WAPLES:  Okay.  Let's take a break.
 6           (A recess was taken between 11:17 A.M. and
 7       11:32 A.M.)
 8           MR. WAPLES:  Back on the record.
 9   Q   Detective, you said that there was no sign of
10       forced entry; correct?
11   A   Yes.
12   Q   Did you ask Robert or William about their
13       mother's normal behavior if somebody came to the
14       door, how she would respond if somebody came to
15       the door and knocked?
16   A   I talked to William about that.
17   Q   What did he tell you about that?
18   A   He said that she would look through -- try to
19       look through the peephole, and she wouldn't let
20       anybody in that she didn't know basically.
21   Q   Okay.  He didn't tell you that she couldn't
22       reach the peephole and that she would open the
23       door without being able to see through the
24       peephole?
25   A   I don't think he told me she would open the door
96
 1       to anybody to see if anybody was out there.
 2   Q   Well, did he tell you that she couldn't see
 3       through the peephole?
 4   A   I just remember him saying she tried to look
 5       through the peephole.  I don't know if she
 6       couldn't reach it or not.
 7   Q   Okay.
 8   A   She could probably yell through the door.
 9   Q   Did he tell you that he thought that the door
10       was unlocked even though he used his key to open
```

```
11          it, it moved like it had not been locked or it
12          didn't make that unlocking noise or mechanism
13          that --
14     A    Yes, that's what he said.
15     Q    And that would be strange to him, that he would
16          have thought it would have been locked; correct?
17     A    Would it be strange that he thought it was
18          locked?
19     Q    Well, didn't he tell you his mother normally
20          would keep her door locked?
21     A    That she would keep it locked, yes.
22     Q    She would keep it locked.  So being unlocked, to
23          him, would be unusual?
24     A    If it was unlocked, yes.
25     Q    Yeah.  You said that it didn't appear that
97
 1          anybody had gone through anything, but weren't
 2          there drawers pulled out in his mother's
 3          bedroom?
 4     A    They were pulled out a little bit.
 5     Q    And were the contents all jumbled up?
 6     A    No, not at all.
 7     Q    Did any of the children tell you that she was on
 8          a prescription medication that was missing?
 9     A    No.
10     Q    Okay.  Did any of the children tell you that she
11          had a purse similar to the black purse that was
12          found but different and that it contained --
13          that she would keep money in there or a credit
14          card or whatever?
15     A    No.  William told me that she didn't carry any
16          money and that he only described the purse,
17          which is the one we found.  Never said there was
18          a --
19     Q    Did any of the children tell you that there was
20          a second purse that --
21     A    I didn't talk to any of them about it.
22     Q    Any of the children tell you that there was
23          jewelry missing?
24     A    Not that either, no.
25     Q    If they did, you wouldn't -- you didn't put that
98
 1          in your probable cause affidavit?
 2     A    I don't recall any jewelry being mentioned.
 3     Q    If they had told you that jewelry was missing or
```

```
 4        a black purse was missing or a prescription was
 5        missing, you would have put that in your
 6        probable cause affidavit?
 7    A   Yes.
 8    Q   Because that would indicate that --
 9    A   Well, I would have let the prosecutor know.
10        That they said it was missing doesn't
11        necessarily mean -- I would have let the
12        prosecutor know.
13    Q   But you didn't put that in your probable cause
14        affidavit and you didn't let the prosecutor know
15        that?
16    A   I didn't believe anything was taken, no.
17    Q   So you didn't report to the prosecutor any of
18        those things; correct?
19    A   I let -- I mean, they obviously knew that he
20        said that she had a purse that was described
21        that we found in the house and that she didn't
22        carry any money.  I let them know that there was
23        money and her credit cards and checks were in
24        the apartment, so those weren't taken.
25            I didn't know about any prescription
99
 1        medication that was gone.  He said that she used
 2        mostly over-the-counter medication that was
 3        still on the counter.  I'm not sure what the
 4        mentioned medication is, but I don't think it's
 5        popular in the street that anybody would want to
 6        take it.
 7            And that's about it.  I mean, the
 8        prosecutor knew everything that he said. I
 9        mean, she had the statements so he mentioned
10        that stuff in the statements.
11    Q   But you never reported to the prosecutor
12        yourself that the children were telling you that
13        there was a purse missing, prescription
14        medication missing, or this -- or jewelry?
15            MS. BOX:  Objection.  Asked and answered.
16        You can answer.
17    A   They never told me that those things were
18        missing.
19    Q   And so you never reported that to the
20        prosecutor?
21    A   Only what William said, that she had a purse
22        that could be missing; but we found, like, that
```

```
23        with the change purse and the credit cards and
24        the check and the money were there, so it
25        obviously wasn't missing.  But she knew that
100
 1        William brought up the purse.
 2             I asked William about it.  He didn't bring
 3        it up.  I asked him if she had a purse or
 4        anything, and that's what he described.
 5    Q   If the facts were that it was -- the drawers
 6        were pulled out, the contents were jumbled, that
 7        there was a purse that was missing, that there
 8        was prescription medication that was missing,
 9        that there was jewelry that was taken and
10        missing, that would be more indicative that
11        there was some kind of intruder and robbery
12        motive; correct?
13    A   It could be possible or could be staged, either
14        one.
15    Q   You never did find the murder weapon; correct?
16    A   No, no.
17    Q   Whatever William appeared to be throwing away at
18        Kroger didn't appear to be a hammer?
19    A   It didn't really look like a hammer to me, like
20        a hammer-like object.
21    Q   When the prosecutor dismissed the charges for
22        evidentiary reasons, you said you had a
23        conversation, not with Denise but with the other
24        deputy prosecutor.
25    A   Yes, sir.
101
 1    Q   Was that the only conversation you had with the
 2        prosecutor's office about that?
 3    A   Yes.
 4    Q   And was that an in-person conversation?
 5    A   We talked on the phone and in person probably.
 6    Q   Were there any emails exchanged between you and
 7        the deputy prosecutor about that decision?
 8    A   There was lots of emails between us, but I don't
 9        know that she mentioned that in an email.  I'm
10        not sure if she mentioned that.
11    Q   In your emails, the lot of them -- who was the
12        deputy prosecutor again?
13    A   Mariel Reidle, R-e-i-d-l-e.
14    Q   And if I was to look for those emails, where
15        would I find them, between you and Mariel?  Are
```

```
16        they in Outlook?  Are they --
17   A    Yeah, they're in Outlook.  Yeah, that's what we
18        use.  I don't think I deleted any of them.
19   Q    Can you go back and --
20            MR. WAPLES:  Can I ask you, Kathryn, to
21        produce the emails between -- any emails from
22        the detective on these regarding
23        William Rainsberger and this case to the
24        prosecutor's or anybody else?
25            MS. BOX:  We --
102
1            MR. WAPLES:  Between Officer Benner,
2        Officer Tudor, Denise Robinson, and
3        Mariel Reidle?
4            MS. BOX:  Those four.  And what time period
5        are you looking at?
6            MR. WAPLES:  Really from the date of the
7        incident, November 19th of 2013, ongoing.
8            MS. BOX:  Tudor, Reidle, Robinson, and
9        Detective Benner?
10            MR. WAPLES:  Yeah.  They don't all have to
11        be in there, but any of them with respect to the
12        Rainsberger death investigation.
13            MS. BOX:  We can do a search.  ISA can do a
14        search, but I'm guessing there's going to be a
15        lot that comes back so it will take a while to
16        go through the privilege review, but we can get
17        them.
18   Q    How many emails do you think there might be that
19        comprise that universe of emails between you and
20        the deputy prosecutor and --
21   A    Probably not a lot between me and
22        Denise Robinson but Mariel sent and her
23        paralegal -- they sent stuff like what I needed
24        to do.
25   Q    What was her paralegal's name?
103
1    A    Angie Mahone.  She's not there anymore.  She
2        works for Voyles.  She works in Voyles' office
3        now.
4    Q    M-a-h-o-n-e?
5    A    Yes.
6    Q    Mahone?
7    A    Yes, sir.
8    Q    Anybody else in the prosecutor's office?
```

```
 9    A    That should be it.
10    Q    Anybody else in the police department or --
11    A    Shouldn't be, no.
12    Q    What about anybody else you might have
13         communicated with in email regarding the
14         Rainsberger case?
15    A    I get the crime lab Jenny Lane probably sent me
16         a list of stuff she recovered and stuff like
17         that.
18    Q    Jenny Lane --
19    A    She works for.
20    Q    -- and Angie Mahone?  She works where?
21    A    She works for the Carmel Police Department.
22    Q    But back then she was with the crime lab with
23         the City?
24    A    Yes.
25    Q    When was the last time you talked to Jenny?
104
 1    A    It's been a while.  She left probably six months
 2         ago or so at least.
 3    Q    When was the last time you talked to Mariel?
 4    A    About this case?
 5    Q    No, about anything.
 6    A    I don't really talk to her anymore unless I just
 7         pass her in the hall or something, just say
 8         "Hi."  That's all.
 9    Q    She's with the prosecutor's office?
10    A    Yes.
11    Q    When was the last time you talked to her about
12         the case?
13    A    Probably when it got dismissed.  I haven't
14         really talked to her since.
15    Q    Have you -- did you take any report to your
16         superior, Captain Converse, about the dismissal
17         of the case?
18    A    Yes, they all know about it.
19    Q    Did you make those in writing or orally or both?
20    A    I don't know that I -- probably just orally.
21         They all know what's going on with the case,
22         though.  I don't know that I'm -- I didn't give
23         them an inter-department or anything about it.
24    Q    Would there be any emails between you and
25         Captain Converse about the case?
105
 1    A    I don't think so.
```

```
 2   Q   And tell me again to the best of your
 3       recollection the prosecutor decision to dismiss
 4       the charges, what did they communicate to you,
 5       Mariel communicate to you?
 6   A   I -- I already answered that a little while ago;
 7       but I'll do it again, I guess.  What did she
 8       communicate to me?  After the bail hearing and
 9       after the suppression when the cartoon that
10       William drew got thrown out and the two
11       witnesses were acting a little reluctant about
12       wanting to continue on with the investigation,
13       she wasn't sure that we would be able to win the
14       court -- win the trial or not.
15           So rather than try it and lose it and not
16       be able to try it again, we figured we'll wait
17       and see.  Dismiss it and see if any new evidence
18       would come up that could strengthen the case
19       more.  Basically that's the reason that I'm
20       aware of.
21   Q   In your interviews with William and -- and
22       Robert, his brother, you asked him about a
23       person named Michael a couple of times.  Who is
24       Michael?
25   A   That name came up when I spoke to Damon Thomas
106
 1       and Kevin Walker.  They said that they thought
 2       they had heard Ruth about a week earlier or so
 3       talking to somebody on the phone named Michael,
 4       and it turns out that there was a piece of
 5       paper -- William said that his mom had troubles
 6       with the TV all the time.  There was a piece of
 7       paper up by the television that had Comcast
 8       contact on there, and it had questions that she
 9       was supposed to ask, and it had Michael in
10       parentheses at the beginning of each one.
11           So Michael appears to be the Comcast person
12       she would call when she had problems with her
13       television set.  She'd often call William to
14       come over and help her with the television also.
15   Q   Did you try to contact Comcast and find out who
16       this Michael is?
17   A   I called them, but they said -- I mean, they
18       have got a lot of Michaels that worked there.
19       And they don't know that they track the phone
20       calls that well to see who it was that would
```

```
21        answer questions like that, so I didn't pursue
22        it any further.
23   Q    Did the two witnesses, Damon Walker -- or
24        Kevin Walker and Damon Thomas, did they say that
25        they had seen a Mike, this person named Michael
107
 1        there?
 2   A    No, they said it seemed like she was talking on
 3        the phone.
 4   Q    To a Michael?
 5   A    Yes.  She said his name.
 6   Q    On the day of the incident?
 7   A    No, about a week before they said.
 8   Q    About a week before.  And then that name was
 9        written -- she had written it somewhere in
10        her --
11   A    It was typed and it said "Michael."  I don't
12        know if William typed it for her or something,
13        but it was a sheet on here that had Michael in
14        parentheses by every question, like "Do I have
15        it on the right channel?" or whatever questions
16        that she had on there.  But she had "Michael"
17        written down there at least ten times.  And
18        there was a landline call on November 12th, I
19        think it was, where she did call Comcast.
20   Q    Okay.
21             (Plaintiff Exhibit 6 marked for
22        identification.)
23   Q    You said you collected a bunch of evidence in
24        the case to have the crime lab look at, examine;
25        right?
108
 1   A    Yes.
 2   Q    Handing you Exhibit 6, which is a multiple-page
 3        document starting with Bates stamp 586, can you
 4        tell me what that is, please.
 5   A    This is a crime lab card that I submitted to
 6        Jennifer Lane in reference to the green blanket
 7        that was recovered from the victim's body, check
 8        for touch DNA, check for hair foreign to the
 9        victim, check for prints, touch DNA off the
10        eyeglasses recovered near her body.
11   Q    And it's a multiple-page document that goes on
12        to the next page.
13   A    Yes.
```

```
14   Q   You also checked the victim's gray jacket and
15       sleeves for touch DNA?
16   A   Yes.  And then the underwear from the victim,
17       check for any signs of semen, gray pants
18       recovered from the victim, check pant legs for
19       touch DNA.
20           And then the third card was from the
21       autopsy, victim fingernail scraping.  I had them
22       check for foreign DNA.  And I also did a rape
23       kit on her for oral, anal, and vaginal swabs to
24       check for any semen.
25   Q   And the fourth page?
109
 1   A   Want me to continue to read them?
 2   Q   Yeah.  The fourth page you had a Stanley hammer
 3       and a helping hand hammer checked for DNA, touch
 4       DNA?  It's on Bates stamp 589.
 5   A   Oh, yes.
 6   Q   Items 24 and 25?
 7   A   Yes.  Stanley brand hammer, check for human
 8       blood, touch DNA, and another helping hand
 9       hammer check for human blood and touch DNA.  And
10       the last one is a pink pen that was by the front
11       door or by the coffee table, glass dish
12       recovered from the scene.  That's the end of
13       that.
14   Q   All right.  And you submitted this to the crime
15       lab on November 26 of '13?
16   A   Yes.
17   Q   Okay.  Why would it be important to look for
18       that kind of DNA and that kind of evidence?
19   A   Checking to see if there was anybody foreign
20       inside the apartment that might have had contact
21       with any of her property or her person.
22   Q   Might help identify who would have done this to
23       Ruth; correct?
24   A   Possibly, yes.
25   Q   Or it might eliminate people who might have done
110
 1       this to Ruth?
 2   A   Possibly.  Not necessarily.
 3           (Plaintiff Exhibit 7 marked for
 4       identification.)
 5   Q   Exhibit 7 is Bates stamped 582 from your file.
 6       Is this the -- well, tell me what this is.
```

```
 7   A   This is the buccal swab I took from
 8       William Rainsberger to compare to any DNA
 9       recovered from the seen.
10   Q   So this is the swab you -- was it from his
11       mouth?
12   A   Yes.
13   Q   And that's how you collect DNA for the lab to
14       then compare that to the DNA that might be found
15       on the items that you were listed in the Exhibit
16       6; correct?
17   A   Yes.
18   Q   Okay.
19           (Plaintiff Exhibit 8 marked for
20       identification.)
21   Q   What is 8, Exhibit 8?
22   A   This is the property room voucher showing that I
23       took the swab down to the property room and
24       submitted it as evidence.
25   Q   The swab from William?
111
 1   A   Yes.
 2   Q   Okay.  Put those over here.
 3   A   (Witness complies.)
 4   Q   Now, did those -- you had the -- was it both on
 5       the blanket that was around her head, did -- and
 6       you had that checked for DNA?
 7   A   Yes.
 8   Q   And her jacket she had on?
 9   A   Yes.
10   Q   And compared to see whether there was any DNA on
11       there from William?
12   A   Yes, from anybody.
13   Q   Did it show that William -- was there any DNA
14       from any male on either one of those items?
15   A   There was a DNA swab from the sweatshirt that
16       was -- didn't come back to anybody.
17   Q   Did it come back as DNA from an unidentified
18       male?
19   A   Yes.
20   Q   And did it exclude William as being the --
21   A   Yes.
22   Q   -- contributor of that DNA?
23   A   Yes.
24   Q   And did you attempt to match that DNA with --
25       through any kind of databank of DNA?
```

112
```
 1   A   Yes, the unknown samples get put in CODIS and
 2       then checked every week against known samples in
 3       their database.
 4   Q   And at least up to that time it hadn't come back
 5       with anybody else that might have --
 6   A   Right, up to this time.
 7   Q   But at least it was an unidentified male had
 8       some kind of touch DNA on her jacket?
 9   A   Yes.
10   Q   And you had it recovered from the back of her
11       neck of her jack and the sleeve?  Is that where
12       you did?
13   A   Probably the shoulder, yes.  I mean, they do the
14       swabs.  I mean, they get an area that they deem
15       necessary.
16   Q   Well, why would they -- would those be places
17       where maybe an attacker might grab her?  Is that
18       why you're looking for touch DNA at those places
19       more likely that somebody would grab her there?
20   A   It's possible, yes.
21   Q   Okay.  Did you include the results of that DNA
22       in your probable cause affidavit that showed
23       that there had been some unidentified male that
24       had touched her jacket?
25   A   No.
```
113
```
 1   Q   And had excluded William as that person?
 2   A   No.
 3   Q   Okay.  Why not?
 4   A   I let the prosecutor know that there was a
 5       sample and based upon the fact that she was
 6       covered up with the blanket and that she was
 7       transported by the medics and everybody, she
 8       felt -- and the other prosecutors felt that it
 9       could be explained by possible medics, doctors,
10       nurses, somebody that took -- touched her shirt
11       during her care at the hospital or at the scene.
12           So it's not something that I put in the
13       probable cause.  It's something I let the
14       prosecutor know and if there are any charges
15       filed, that they then forward it on to any
16       defense attorney that might take the case.
17   Q   But you knew at that time that when the results
18       came back that it had excluded William as the
```

```
19        contributor to that DNA?
20   A    I'm not sure exactly when the results came back;
21        but, yes, I was aware of it and the prosecutor
22        was aware of it.
23            (Plaintiff Exhibit 9 marked for
24        identification.)
25   Q    Exhibit 9, is this one of the -- is this a
114
 1        laboratory report from the crime lab on that
 2        DNA?
 3   A    Yes, yes.
 4   Q    But that showed what they -- the items that she
 5        examined and what they found?
 6   A    And there's another case number on here also
 7        from a different case of the DP14012605 doesn't
 8        have anything to do with this case.  This was a
 9        sweatshirt that was recovered on February 5th of
10        2014 from a couple buildings over that was
11        hidden behind a washer.  It had possible human
12        blood on it so it was collected and sent in and
13        did not come back connected to this case in any
14        way.
15   Q    Okay.  But the rest of them above that --
16   A    All the ones that have the DP13153344 are
17        related to this case.
18   Q    Gotcha.  And item -- the one, two, three, four,
19        five -- the sixth item down is the
20        Item 006.001.01 is a possible skin cell sample
21        from the outside back neck and outside left
22        sleeve of jacket?
23   A    Yes, sir.
24   Q    And does that show that there were, on the
25        second page under Conclusions, down at the --
115
 1   A    It's in the second paragraph at the top.
 2   Q    Second paragraph at the top?
 3   A    Yes.
 4   Q    Okay.  Show that that was from --
 5   A    Yes.
 6   Q    It was an unknown male individual on that?
 7   A    Yes.
 8   Q    But it not William Rainsberger?
 9   A    Correct.
10   Q    Okay.
11            (Plaintiff Exhibit 10 marked for
```

Case 1:16-cv-00103-TWP-MJD  Document 86-2  Filed 01/28/17  Page 361 of 495 PageID #:
Case 1:16-cv-00103-TWP-MJD  Document 56-2  Filed 01/23/17  Page 65 of 94  PageID #:
2197

```
12        identification.)
13   Q    Exhibit 10, is that another laboratory result?
14   A    Yes.
15   Q    A little earlier than the other one; right?
16   A    February 10th, 2014.
17   Q    And that is submitting the blanket and the
18        jacket and the underwear and those other items?
19   A    Yes.
20   Q    And you're going to do basically the same thing
21        you were talking about us doing blood and DNA
22        exams on these items?
23   A    Yes.
24   Q    And actually there's the same report looks like
25        you maybe looked at before that shows the
116
 1        results, last three pages; is that correct?
 2   A    Yes.
 3   Q    All right.
 4            (Plaintiff Exhibit 11 marked for
 5        identification.)
 6   Q    Here is defendant's preliminary witness list.
 7        And I want to ask you about those people.  What
 8        is Detective Tudor have to -- what will he
 9        testify to other than what you've already stated
10        his involvement was?
11   A    The only -- he was at the initial scene, helped
12        with the initial canvas.  He was there when I
13        spoke to Kevin Walker and Damon Thomas.
14   Q    On the day of?
15   A    Yes.  And then he was with me when I spoke to
16        William.
17   Q    So you both were talking to Damon Thomas and
18        Kevin Walker?
19   A    Yes.  He talked to them initially.  Then I went
20        up there later and talked with them also.
21   Q    Okay.  So you talked to them at separate times
22        and then he together with you?
23   A    Yes.
24   Q    And then he was -- took one of the statements of
25        the brothers at headquarters?
117
 1   A    I took all the statements, but he was with me.
 2   Q    He was with you for both of those?
 3   A    He was with me for William.  I'm not sure.  He
 4        may have been there with Robert also.
```

```
 5   Q   Okay.  What else did he do in the case?
 6   A   He went -- when I went back the next day and
 7       recovered some of the other stuff, he was there
 8       also.  I think the only other thing he probably
 9       did was recovered a note from Tracy, the
10       apartment manager there, that William had
11       brought to her; and we just recovered it.  Gave
12       it to Jenny Lane.  And that was the last
13       participation I think Tudor had in the case.
14   Q   From then on it was pretty much you?
15   A   Yes.
16   Q   What about Officer Jordan Lewis?  What did he
17       do?
18   A   I'm not sure if I remember -- I don't remember
19       what he did.  I'm not sure why he's on here.
20   Q   And Carl Wooldridge?
21   A   He's the fireman at the scene.  And then he gave
22       a statement about William's comments at the
23       scene.
24   Q   And that's contained in your file.  We have
25       that; right?
118
 1   A   Yes.
 2   Q   Did he do anything else with respect to the
 3       case?
 4   A   No.
 5   Q   And Jennifer Lane was the crime scene analysis
 6       person?
 7   A   Yes, sir.
 8   Q   Did you say she's now up -- she is still with
 9       IMPD or --
10   A   Carmel.
11   Q   She went to Carmel?
12   A   Yes.
13   Q   And Delbert Pickens, we pretty much covered what
14       he said and he gave a statement?
15   A   Yes.
16   Q   Pam Pulliam, what does she have to say?
17   A   She was the security at the Kroger that got the
18       video and I spoke to.
19   Q   Did you just speak to her the one time?
20   A   No, I saw her a few different times.  I went and
21       spoke to her about the video.  Then I got a
22       search warrant for the video.  Then I watched
23       the video.  Then she recorded or put the video
```

```
24        on CDs and gave them to me, so I talked to her
25        quite a few times.
119
 1    Q   Did she tell you anything other than what's on
 2        the video?
 3    A   No, she didn't have any knowledge of anything,
 4        personal knowledge, of what happened.
 5    Q   Did she tell you any impressions she had from
 6        looking at the video?
 7    A   No.
 8    Q   Do you know of any other witnesses in this case
 9        that would have anything to say with respect to
10        your defense?
11    A   No.  That's pretty much the only other people
12        that I talked to outside of this would have been
13        Robert's -- or William's relatives that live in
14        Ohio.
15    Q   Did they --
16    A   I say Aunt Blanche, I think.  And they didn't --
17        I mean, she just had basic knowledge of what
18        William told them.  That's all.  They don't have
19        anything to do with the case really.  Those are
20        the only other people I believe I spoke with.
21    Q   They weren't really going to be witnesses in the
22        criminal case?
23    A   No.
24    Q   Wouldn't be witnesses in this case?
25    A   No.
120
 1    Q   Okay.
 2            (Plaintiff Exhibit 12 marked for
 3        identification.)
 4    Q   Exhibit 12, can you tell me what this is?
 5    A   This is a physical evidence list typed up by the
 6        crime lab.
 7    Q   And does it show the items of evidence in the
 8        case and who submitted it to them and the date
 9        that they submitted them?
10    A   Yes.
11    Q   Is there any other evidence that you were aware
12        of, physical evidence, that existed in the case?
13    A   I don't believe so, no.
14    Q   Okay.  Okay.  Did you ever try to confiscate the
15        clothing Bill had on him that day?
16    A   No.
```

```
17  Q  Did you learn that Bill had full access to his
18     mother's accounts?
19  A  Yes.
20  Q  He could have taken the money without killing
21     his mother if he wanted to, couldn't he?
22  A  I suppose so.
23  Q  Did you look up Bill's criminal background?
24  A  He did not have one.
25  Q  Did you put either one of those items in the
121
1      affidavit of probable cause, that he had no
2      criminal background and that he could have taken
3      the money without killing his mother?
4   A  No.
5   Q  So you interviewed his Aunt Blanche?
6   A  Yes.
7   Q  Did she tell you about Bill telling her about
8      her sister's death -- his mother's death?
9   A  I spoke to Marcia, her caregiver, I spoke to her
10     first.  And then she did mention that she
11     eventually found out that she had been -- that
12     she had been killed.  But they initially thought
13     that she had just fallen and hit her head or
14     something is what Marcia and those guys thought
15     at first.  They found out a couple month later.
16  Q  Did Aunt Blanche tell you that when Bill was
17     telling her about his mother's death, that she
18     could barely understand him because he was
19     crying so much?
20  A  No, I don't remember that.
21  Q  What evidence do you have other than what we've
22     gone over today that would be incriminatory
23     towards Bill Rainsberger, if there is any?
24  A  Stuff on the probable cause is what the case was
25     based upon, what the arrest was made upon.
122
1         From the search warrant there was a cartoon
2      that he drew that seemed it depicted the crime
3      scene and the actual act of his mom being
4      killed.  And that was thrown out during the
5      motion to suppress.  That would have been
6      entered into evidence.
7   Q  Why did the court throw that out?
8   A  Because it wasn't listed.  The search warrant
9      was basically to recover -- based upon jail
```

```
10        calls William was making, he was requesting that
11        some files be deleted from a computer.
12            So the warrant was to recover any hard
13        drives or -- he said they were in a fire box of
14        some type that we were looking for, recovering
15        any thumb drives, anything that could contain
16        possible files that could be deleted because we
17        didn't know what they were.
18            During that search, in a drawer I found
19        notebook paper that was folded.  And it was
20        about three or four pages of a cartoon with
21        square -- just like you'd see a regular cartoon
22        in the newspaper.  And the last screen of it was
23        somebody laying down with a blanket covering
24        them and it just seemed apparent to me that was
25        a depiction of the crime scene, so I recovered
123
1         it.  It's not something that we go into a crime
2         scene looking for, so it wasn't covered in the
3         search warrant, so the judge felt that it would
4         not be admissible.  So he suppressed it.
5    Q    Didn't really tend to incriminate Bill.  He was
6         there at the crime scene.  He saw his mother
7         right?  And he didn't have a blanket wrapped
8         around her head did it?
9    A    What didn't?  The cartoon?
10   Q    Yeah.
11   A    It had it laying over her.  I don't remember
12        exactly what it looked like, but there was a
13        blanket.  I mean, like once again, it wasn't up
14        to me to decide if it was incriminating or not.
15        Just something that the prosecutor was made
16        aware of that would have been used as evidence
17        to see what the jury thought about it.  It was
18        their decision, not mine.
19   Q    What is -- is there any other evidence that you
20        have that would help defend yourself in this
21        civil case that you're aware of?
22   A    I don't know what you mean by evidence to defend
23        myself.  I mean, all I have --
24   Q    Facts or any physical evidence or anything you
25        think would assist in a jury determining that
124
1         you're not responsible for any kind of arrest
2         without probable cause or misleading the court
```

```
 3        or not fully putting all the facts in the
 4        affidavit that would inform the court about the
 5        results of your investigation of
 6        William Rainsberger in this case?
 7   A    Everything I've done in the case is either in my
 8        file or in the probable cause or the prosecutor
 9        is aware of, so I don't have anything to hide
10        anywhere.  No, I don't have anything to add.
11   Q    You agree with these rules.  I mean, I'm going
12        to throw out three or four or five:  That police
13        officers have to have probable cause for arrest?
14             MS. BOX:  Objection.  He's not here as a
15        30(B)(6) witness.  He's just a fact witness so
16        he cannot testify for all police officers.  He
17        can only testify for himself.
18   Q    I'm asking you for yourself.  I mean, is that a
19        rule that you normally would think that applies
20        that there has to be probable causes for arrest?
21   A    Yes.
22   Q    Okay.  Do you agree with the rule that the facts
23        stated in a probable cause affidavit have to be
24        true?
25             MS. BOX:  Same objection.
125
 1   A    Yes.
 2   Q    Okay.  Do you agree with the rule that police
 3        officers cannot misrepresent facts in probable
 4        cause affidavits?
 5             MS. BOX:  Same objection.
 6   A    Yes.
 7   Q    Okay.  Do you agree with the rule that police
 8        officers can't mislead the court or the
 9        prosecutor in a probable case affidavit?
10             MS. BOX:  Same objection.
11   A    Yes.
12   Q    Do you agree that police officers cannot leave
13        out important facts in a probable cause
14        affidavit that would tend to show that the
15        defendant or the person that's identified in the
16        probable cause affidavit didn't commit the
17        crime?
18             MS. BOX:  Same objection.
19   A    That's usually a determination made between the
20        officer and the prosecutor.  I mean, there are
21        times when stuff is left out but made aware in
```

```
22        discovery.
23   Q    In this case --
24   A    Everything doesn't have to be in the probable
25        cause.
126
 1   Q    In this case you're the one that created the
 2        probable cause affidavit; correct?
 3   A    Yes.
 4   Q    The prosecutor didn't write this probable cause
 5        affidavit?
 6   A    No.
 7   Q    Correct?
 8   A    Yes.
 9   Q    Okay.  Do you agree that any reasonably trained
10        officer would know these rules that we just
11        covered?
12   A    Yes.
13   Q    And that they were well established at the time
14        of the events in this case?
15   A    Yes.
16   Q    Okay.  Okay let's take a short break.
17             (A recess was taken between 12:15 P.M. and
18        12:26 P.M.)
19   BY MR. WAPLES:
20   Q    Detective Benner, were there -- did you talk to
21        everybody that lived in that apartment building,
22        H?
23   A    We made brief contact with the people that lived
24        upstairs.  I don't know that I talked to
25        everybody.  A lot of people weren't home and
127
 1        ended up moving away or whatever; but the 7, 8,
 2        9, 10 upstairs is where I made contact.
 3   Q    Nobody reported anything like a shot being heard
 4        or anything; correct?
 5   A    No.
 6   Q    Did you come across any information from anybody
 7        that indicated that there was an active drug
 8        trade going on out of that building from any of
 9        the apartments?
10   A    No.
11   Q    If there had been an active drug trade going
12        from and out of those apartments, that building,
13        would that give you cause for concern that maybe
14        there was people in that building that shouldn't
```

```
15        be there and are up to no good and might be
16        possible suspects in this case?
17   A    Possibly.  I mean, anything is possible.
18            MR. WAPLES:  I don't have any further
19        questions.
20            MS. BOX:  Okay.  Just gather my thoughts
21        here real quick.
22   CROSS-EXAMINATION,
23        QUESTIONS BY MS. KATHRYN BOX:
24   Q    Okay.  Detective Benner, I have just a few
25        questions for you.  We've been going for a while
128
1         here, so I'm going to do my best to make it
2         quick.
3             I'm going to go back to Exhibit 4. I
4         believe that this was -- it's in two pages,
5         first page is the results page of Robert's --
6         Robert Rainsberger's phone records.  The second
7         page is the original CDR for Robert Rainsberger
8         phone records; is that correct?
9    A    Yes.
10   Q    To the best of your understanding?
11   A    Yes.
12   Q    Okay.  Now, we have already established that on
13        the first page, which is the results page, shows
14        a phone call at I believe 4:38 P.M. and then
15        another one at 4:51 P.M.  Where were those phone
16        calls from and to?
17            MR. WAPLES:  I'm sorry.  What line?
18            MS. BOX:  Sorry.  Okay.  3:40:38, it's line
19        486 and line 487, 3:40:51.  Okay?
20            MR. WAPLES:  You just misspoke and said
21        4:30 instead of 3:40.
22            MS. BOX:  Sorry.  Thank you.
23            MR. WAPLES:  That's okay.
24   A    The calls are involved between Ruth Rainsberger
25        and Robert, I believe.
129
1    Q    And can you tell who's initiating the call?
2    A    The landline.
3    Q    Okay.  Which is Ruth Rainsberger?
4    A    Yes.
5    Q    To Robert.  Is that his cell phone do you know?
6    A    Yes.
7    Q    Okay.  Now, the first phone call at 3:40:38 says
```

```
 8        it lasts for how many seconds?
 9   A    Twenty-five.
10   Q    Okay.  And if that phone call which lasts for
11        25 seconds, with have -- wouldn't it conflict
12        with the second phone call?
13   A    It appears as if it would, yes.
14   Q    So the amount of time between the two phone
15        calls -- 3:40:37 and 3:40:51 -- is roughly
16        13 seconds; correct?
17   A    Yes.
18   Q    So there couldn't have been a 25 second phone
19        call placed at 3:40:48 then a second phone all
20        placed at 3:40:51; is that correct?
21   A    I would think not, yes.
22   Q    Okay.  And do you know who created this
23        document?
24   A    Detective Bierce.
25   Q    Detective Bierce.  And was it typed in or was it
130
 1        compiled, like, copy and pasted or --
 2   A    He does everything on the computer.  Back then
 3        he did warrants for everybody, and we don't do
 4        that anymore.  Now we all do our own warrants,
 5        so we can be more familiar with what's going on
 6        and get all the records back and take care of
 7        everything.  So he did everything on the
 8        computer.
 9            He must have compiled certain numbers and
10        put them all together to come up with results
11        like that.
12   Q    Okay.
13   A    And then printed it off the computer.
14   Q    So it's possible that could be a typo?
15   A    Yes.
16   Q    Now, the second page of that Exhibit 4, which
17        is, again, Robert Rainsberger's phone records,
18        but the original CDR page of the Excel
19        spreadsheet does show two phone calls; correct?
20   A    Yes.
21   Q    One, it's line 486 at 14:40:51, which is roughly
22        2:40:51; correct?
23   A    Yes.
24   Q    And then another one, line 493 at 3:40:38 or
25        15:40:38; correct.
131
```

```
 1   A   Yes.
 2   Q   Okay.  And when you reviewed Robert
 3       Rainsberger's phone records in preparing your
 4       probable cause affidavit, were those the two
 5       records that you saw?
 6   A   Yes.
 7   Q   Okay.  I don't think we have Ruth Rainsberger's
 8       landline records as an exhibit.  But if we take
 9       the first page --
10           MR. WAPLES:  I thought we did?
11           MS. BOX:  Do we?  I didn't see it.
12           MR. WAPLES:  It's Exhibit 3.
13   Q   All right.  Now, on Exhibit 3, this is
14       Ruth Rainsberger's landline.  We're comparing
15       that to page 1 of Exhibit 4.  Do both of the
16       phone calls that we're referencing, the one at
17       3:40:38 and 3:40:51 show up on her landline?
18   A   No, just the one.
19   Q   And what is the one phone call that shows up on
20       her landline records?
21   A   It says 3:41:09.
22   Q   So the phone call that shows up on her landline
23       really doesn't match either of the phone calls
24       on the first page of Exhibit 4; is that correct?
25   A   Correct.
132
 1   Q   Okay.  I'll give you that back, then I wanted to
 2       talk a little bit about the Kroger video.  As
 3       you sit here today do you recall seeing or can
 4       you say for sure that you saw video of William
 5       parking his vehicle and then walking into the
 6       store?
 7   A   I believe that when I was there in person with
 8       Pam Pulliam, I had her back up the video to the
 9       point where he pulled in.  I did see him get
10       out.
11   Q   And can you explain that?  You said "in person."
12       Did you go to Kroger?
13   A   Yes, I was sitting next to her.  And we were
14       looking at it on her monitors.  She pulled up
15       the video for me.
16   Q   And then based on what you looked at with her,
17       do you then determine that you want her to burn
18       to a disk?
19   A   Yes.
```

```
20   Q   Okay.  And did the video of him parking his
21       vehicle and then walking to the store that
22       wasn't covered by the entryway camera, did it
23       have any relevance to your probable -- creating
24       your probable cause affidavit?
25   A   No.
133
 1   Q   Did it show anything inculpatory or exculpatory
 2       about William?
 3   A   No.
 4   Q   So it's possible that you saw that video and it
 5       didn't get burned to a disk?
 6   A   Correct.
 7   Q   But, again, it wouldn't have relevance to your
 8       probable cause?
 9   A   No.
10   Q   And you recall seeing him walk to a trash can
11       and throw what looked like a straight object
12       away?
13   A   You can see that he walks to the trash can, yes.
14       It's right next to the box.  And he comes back
15       to the box without the item in his hands.  So I
16       don't know if I actually see it go into the
17       trash can, but it was inferred that he went to
18       the trash can and doesn't have the item anymore
19       that he was putting in the trash can.
20   Q   Okay.  And you saw a video of him leaving
21       Kroger; right?
22   A   Yes.
23   Q   Was he in the parking lot walking to his car?
24   A   Yes.
25   Q   So if he was walking to a vehicle, pretty safe
134
 1       to assume that he drove to Kroger?
 2   A   Yes.
 3   Q   And than walked from his vehicle into the store?
 4   A   Yes.
 5   Q   Okay.  And then with respect to the DNA and then
 6       we talked about that there was some DNA on I
 7       believe it was Ruth's jacket maybe in the upper
 8       shoulder area from an unidentified male; is that
 9       correct?
10   A   Yes.
11   Q   Okay.  And it's your understanding -- well, let
12       me back up.  Sorry.  Was Ruth already gone by
```

```
13        the time you arrived on scene?
14   A    Yes.
15   Q    Okay.  But it's your understanding that EMTs
16        from either the fire department or EMS arrived
17        on scene to care for her?
18   A    Yes.
19   Q    Okay.  And then they transported her to the
20        hospital?
21   A    Yes.
22   Q    So presumably they had to pick her up, put her
23        on a backboard?
24   A    Yes.
25   Q    Carry her to the ambulance?
135
 1   A    Yes.
 2   Q    And then once at the hospital, she would have,
 3        based on your experience, would have undergone
 4        some sort of examination?
 5   A    Yes.  They would have transferred her to a
 6        hospital bed, taken her clothes off and placed
 7        them in a paper bag for us to collect later.
 8   Q    Okay.  And presumably that would involve some
 9        touching --
10   A    Yes.
11   Q    -- as well?  So it's possible that the
12        unidentified DNA could be from any one of these
13        individuals that touched her?
14   A    Yes.
15   Q    Okay.  And then the shoulder location where the
16        DNA was found is a typical place where someone
17        would touch if you were transporting them or
18        lifting them?
19   A    Yes, it's consistent with somebody picking them
20        up putting them on a backboard.
21   Q    Okay.  And have you come across this type of DNA
22        evidence before --
23   A    Yes.
24   Q    -- in your experience?  Would this be something
25        you'd typically put in your probable cause
136
 1        affidavit given all the other factors?
 2   A    No.  It was just something that I would give the
 3        results to the prosecutor so they were aware of
 4        it.
 5   Q    Okay.
```

```
 6   A   Just part of the investigation that would be
 7       passed on in discovery.
 8   Q   Okay.  And you made the prosecutor aware in this
 9       case; correct?
10   A   Yes.
11   Q   So with respect to Ruth Rainsberger's injuries,
12       it was your understanding until the autopsy that
13       she had suffered a gunshot wound; is that
14       correct?
15   A   Yes.
16   Q   And you didn't have any reason to believe
17       otherwise?
18   A   No.  I'd wait until William collected the .357
19       in his house that he signed a consent form.
20   Q   And how long have you been a detective for?
21   A   Probably 12 years.
22   Q   Twelve years?
23   A   Out of 27.
24   Q   I know it was split up some there.
25   A   Yes.
137
 1   Q   So you've done a fair number of investigations?
 2   A   I've been lead detective on 69 homicide cases.
 3   Q   Okay.  And you've interviewed a number of
 4       witnesses and potential suspects?
 5   A   Yes.
 6   Q   Okay.  Was William Rainsberger's behavior with
 7       regards to the polygraph, how he got upset,
 8       "stormed out" were your words, typical of
 9       someone who had nothing to hide; right?
10           MR. WAPLES:  Objection.  Calls for
11       speculation.
12           MS. BOX:  I'm just asking upon his
13       experience.
14           MR. WAPLES:  It's speculation.  You can
15       answer if you can.
16   A   Based on my personal opinion that it was
17       overboard the way he reacted to the polygraph.
18       I've had people that acted softer than that when
19       they're really being interrogated as a suspect,
20       you know, they acted calmer than he did when I
21       wasn't even treating him as a suspect at that
22       point, so I was caught off guard by it.
23           And so was Tudor and that's why our
24       emotions get elevated there when we all came
```

```
25        back together because we were really shocked by
138
 1        it.  We thought he was going to say, "Yeah, you
 2        need to find who killed my mother, do it now,
 3        right now and get it over with, so I'm not a
 4        suspect and move on to who did this."  That was
 5        my opinion at the time.
 6   Q    Okay.  And what is your opinion on
 7        William Rainsberger's demeanor and actions
 8        following his mother's death attack and death?
 9        Was it typical of someone who had lost his mom?
10   A    I'm trying -- I mean, a loved one in general,
11        normally people are crazy crying falling down
12        screaming, yelling, wanting to know what
13        happened, rushing -- I mean, it would be
14        pandemonium in a lot of cases where, not
15        necessarily mother/son, but that doesn't happen
16        very often in my -- I haven't had many cases
17        like that, just a few.  But my opinion was
18        formulated based upon everything at the time.
19            When I investigate a case, I remember
20        everything, how people act, how they talk, how
21        they give statements.  And then once information
22        starts coming in, I kind of backtrack.  Was he
23        acting normal?  And I -- the way -- the thing
24        that really bothered me the most, if I haven't
25        talked about it already -- I think I have -- was
139
 1        that he couldn't he didn't check her, didn't
 2        grab her and check her and grab that blanket
 3        off, which I think a normal human being seeing
 4        their mother in that condition would do.
 5            So it was kind of weird to me right from
 6        the start; but like I said, I did not treat him
 7        like a suspect.  I treated him with respect
 8        until the polygraph; and that's when he became
 9        an actual suspect in my mind.
10   Q    Okay.  And just in general, you don't make the
11        determination of whether there's probable cause
12        to charge someone for an arrest; correct?
13   A    No, I don't.
14   Q    Who makes that call?
15   A    The deputy prosecutor.
16   Q    Okay.  And your job with respect to the probable
17        cause is just to lay out the facts as you have
```

```
18        investigated them?
19   A    Yes.
20   Q    In your probable cause -- or in your experience
21        as an investigator, is it possible to chase down
22        every single lead --
23   A    No.
24   Q    -- in a case?
25   A    No.
140
 1   Q    Okay.  And is it possible to put everything that
 2        you develop from an investigation into a
 3        probable cause affidavit?
 4   A    No.
 5   Q    Okay.  How do you decide what facts are
 6        important or warrant putting in the probable
 7        cause?
 8   A    Basically what you have at the time that points
 9        to -- I mean, we're looking for probable cause
10        for an arrest at this point so we don't
11        necessarily have to put everything in there,
12        even if it's negative towards the defendant, we
13        don't have to put everything in there.
14            The way we handle our probable causes is we
15        email them to deputy prosecutor and they look at
16        them and they give input.  If they want
17        something changed, they'll tell us you need to
18        add something.  Is there any more?  This doesn't
19        look right.  You know what I'm saying?
20   Q    Right.
21   A    So there's a give and take at that point; but,
22        everything to do with an investigation, then
23        there's always stuff that comes up after you
24        file the probable cause that adds to it or, I
25        mean, it's possible that something could come up
141
 1        that would clear the person also, you know, so
 2        but as far as the probable cause, this is a
 3        probable cause for arrest; so the prosecutor
 4        makes the decision whether or not what she reads
 5        there gives her probable cause to request a
 6        warrant with the judge.
 7   Q    All right.  And the judge granted a warrant in
 8        this case; correct?
 9   A    Yes.
10   Q    With respect to some of the stolen items from
```

```
11        the apartment, from Ruth's apartment, were you
12        ever told by either Rebecca, William, or Robert
13        that anything was missing from the apartment?
14    A   The only one I really talked to about that was
15        William because he was the only one that was in
16        the apartment.  The other two hadn't entered
17        during the investigation.
18            For the next two or three days I went back
19        to the apartment and they hadn't been in there
20        because the crime scene tape was left up to keep
21        people out.  So he was the only one that gave me
22        an indication of what could have been, like I
23        said, the descriptions of the items that he, we
24        found them, I believe, inside the residence.
25        And there was money, credit cards, checkbooks.
142
1             Nothing rifled through, closets unchecked,
2         lockboxes not rifled through either.  So in my
3         opinion, it didn't appear as if anything had
4         been taken.
5             The over-the-counter drugs that he said
6         were on the counter were all still there.  So,
7         yeah, but he would be the only one that would
8         have been able to tell me.  He was the only one
9         in the apartment at the time when this was
10        happening.
11    Q   Okay.  And you've never -- prior this incident,
12        you never met Ruth Rainsberger before; correct?
13    A   No.
14    Q   Never been inside her apartment?
15    A   No, I never been there.
16    Q   So is it safe to say you wouldn't know if
17        anything was missing unless you were told that
18        something was missing?
19    A   Correct.
20    Q   Do you recall in his statement
21        Mr. Rainsberger -- William, excuse me -- telling
22        you that his mom didn't have anything of value
23        in the apartment?
24    A   Yes.
25    Q   Okay.  Okay.  Just finishing up here, did you
143
1         knowingly or intentionally lie in your probable
2         cause affidavit?
3     A   No, I did not.
```

```
 4    Q    Did you knowingly or intentionally try to
 5         mislead the court in the probable cause
 6         affidavit or the prosecutor?
 7    A    No, I did not.
 8    Q    How about did you knowingly or intentionally
 9         include what you thought was incorrect
10         information in your probable cause affidavit?
11    A    No.
12              MS. BOX:  No further questions.
13   CROSS-EXAMINATION,
14         QUESTIONS BY MR. RICHARD A. WAPLES:
15    Q    The prosecutor relies upon your characterization
16         of the evidence in the probable cause affidavit,
17         don't they?
18    A    They read the probable causes, yes, and make
19         their decision based upon that.
20    Q    Yeah.  The prosecutor in this case didn't ask
21         you to change anything in the affidavit, did
22         they?
23    A    No.
24    Q    Didn't suggest you put anything else in the
25         affidavit that wasn't already there?
144
 1    A    The only thing, like we covered earlier, from
 2         December to May was she asked to get the
 3         financial records, she asked to include that
 4         when I got them.
 5    Q    Okay.  But she relied upon your characterization
 6         of the financial records as well; correct?
 7    A    Yes.
 8    Q    And you know that's how it works and your
 9         interaction with the prosecutor is that they
10         rely upon you as the homicide investigator to
11         present to them all of the facts in the case;
12         correct?
13    A    Yes.
14    Q    And relies upon you to objectively put forth
15         those facts in a probable cause affidavit that
16         would tend to show whether the person did it or
17         not?
18    A    Yes.
19    Q    Okay.  You said the Kroger video that you saw at
20         the scene of William getting out of the car,
21         didn't contain any incriminating evidence or any
22         exculpatory evidence; is that what you said?
```

```
23   A   Yes.
24   Q   Okay.  Did it show anything in his hands getting
25       out of the car?
145
 1   A   The only time I could see -- it looked like he
 2       pulled out from somewhere.  I think that's what
 3       I said when I saw the video, so it was on his --
 4       kind of hidden by his body, so I don't know if
 5       it was in his pocket, waistband.  I'm not sure.
 6       I didn't see it when he first got out of the
 7       car.
 8   Q   Well, that would be important evidence to see
 9       for a defense lawyer, wouldn't it, to see what
10       that video that shows him getting out of his
11       car, whether it shows anything in his hand or
12       not?
13   A   I requested all the video be recovered.  If it's
14       not in there, then it's not part of the video
15       that she downloaded for me.
16   Q   Well, you said you recovered it.
17   A   Well ...
18   Q   You wrote that in the probable cause affidavit.
19       You wrote that you recovered the video that
20       showed him getting out -- pulling into the lot
21       and getting out of his car.
22           MS. BOX:  Objection.  He did not write in
23       his probable call affidavit that he recovered
24       that video.
25           MR. WAPLES:  We don't need to quibble,
146
 1       because the language you used was "recovered."
 2   Q   So it would be important, would it not, to view
 3       it to see whether Robert [sic] had anything in
 4       his hand and what that might look like when he's
 5       getting out of the car in the parking lot.
 6   A   And it was requested.  If everything didn't make
 7       it to the video, then Pam Pullium didn't get it
 8       all on there; but when I was in there in person,
 9       she backed all the way up to where I could see
10       him pulling in.
11           I mean, when you get out, the left side is
12       exposed to the camera.  And you don't see it
13       until he starts walking towards where the camera
14       picks up.  That's why they have the still photos
15       from that point on.
```

```
16   Q   You're not able to really see if he -- when he
17       gets the object in his hands or not, are you?
18   A   I don't think so, no, just that it's there.
19   Q   So you don't know whether he pulled it out of
20       his pocket or a waistband or --
21   A   Doesn't matter, but, no, I don't know.
22   Q   Or whether it was in his hand before and you
23       just didn't see it?
24   A   That's correct.
25   Q   And you say you requested that video and in your
147
 1       probable cause affidavit you said you recovered
 2       the video and if the video is not in your file,
 3       that means you didn't recover the video?
 4   A   I recovered video of the incident which covers
 5       all the videos I recovered.  There's probably
 6       five or six CD, DVDs.
 7   Q   Did you look at the videos after you got them
 8       from Pam?
 9   A   The best I could.  I mean, I didn't -- the
10       prosecutor looked at all of them.  I was working
11       on probably other cases between six cases
12       between November 19th and when he was arrested
13       so I was -- I didn't have the time to keep going
14       back to this case like that.
15   Q   So did you look at the videos after you got them
16       from Pam and see a video of him getting out of
17       his car?
18   A   I don't recall if I saw him getting out of the
19       car, no.  I'd have to look at them again.  I
20       know that I saw it initially.
21   Q   With respect to the DNA of the unidentified male
22       on Ruth's jacket, it's not in your probable
23       cause affidavit anything about what the DNA
24       showed or didn't show?
25   A   No.
148
 1   Q   And you didn't include that it eliminated
 2       William as the contributor of that DNA that was
 3       found; correct?
 4   A   The prosecutor's made aware; but, no, I did not
 5       put that in the probable cause.
 6   Q   When you say the prosecutor was made aware of
 7       it, did you actually tell the prosecutor orally
 8       or did you write it in the memo?
```

```
 9   A   No.  I mean, she gets all the results.  When I
10       get them, I give them to them, so they were
11       aware.  Something we discuss.
12   Q   With respect to Exhibits 3 and 4, you obtained
13       these from Bierce, you said; right?
14   A   Yes.
15   Q   Did you ever ask Bierce about the discrepancy
16       between one call at 3:41 on Ruth's landline and
17       these entries for what appears to be two calls
18       on page 2 of Exhibit 4 of Robert's cell phone
19       records?
20   A   I don't believe I did, no.
21   Q   Did you ask him what it meant to have the
22       773 number in between his call on line 486,
23       page 2 of Exhibit 4?
24   A   Yeah.  I thought he told me that it was a routed
25       call meant that it was going to voice mail.
149
 1   Q   Did he tell you that because it was routed
 2       there's actually two entries for that call and
 3       it's only one call?
 4   A   No, he didn't tell me that.
 5   Q   Didn't tell you that.  Did you ask him about the
 6       discrepancy between the calls listed on
 7       line 1 -- or Exhibit 4, lines 486 and 487, the
 8       overlapping times?
 9   A   No.
10   Q   And whether that indicated there was really only
11       one call rather than two?
12   A   I don't believe I did, no.
13   Q   In the results page of that spreadsheet which
14       Bierce gave you, do show both calls, if there
15       were two calls, both at the 3:41 time and
16       3:40 time, not 2:40; correct?
17   A   Yes.
18   Q   And you didn't ask him about that?
19   A   No.
20   Q   Instead you put in the affidavit that the call
21       occurred at 2:40?
22   A   I put that in there based upon the records that
23       I saw from William Rainsberger's phone.
24   Q   And you never altered that probable cause
25       affidavit or withdrew it or changed it with
150
 1       respect to the calls?
```

```
 2    A    No.
 3              MR. WAPLES:  Okay.  I don't have any
 4         further questions.
 5              MS. BOX:  No questions.
 6
 7              (Time noted:  12:53 P.M.)
 8              AND FURTHER THE DEPONENT SAITH NOT.
 9
10                   _____
11                        CHARLES BENNER
12
13
14
15
16
17
18
19
20
21
22
23
24
25
151
 1    STATE OF INDIANA           )
                                 )  SS:
 2    COUNTY OF MARION           )
 3         I, Kelly S. Horsley, RPR, CSR No. 98-R-3004, a
 4    Notary Public in and for the County of Hendricks,
 5    State of Indiana at large, do hereby certify that
 6    the deponent herein, CHARLES BENNER, was by me
 7    first duly sworn to tell the truth, the whole
 8    truth, and nothing but the truth in the
 9    aforementioned matter;
10         That the foregoing deposition was taken on
11    behalf of the Plaintiff at the offices of Connor
12    Reporting, 111 Monument Circle, Suite 4350,
13    Indianapolis, Marion County, Indiana, on the 27th
14    day of September, 2016, commencing at the hour of
15    9:31 A.M., pursuant to the Federal Rules of Civil
16    Procedure;
17         That said deposition was taken down in
18    stenograph notes and afterwards reduced to English
19    under my direction, and that transcript is a true
```

20    record of the testimony given by the said deponent;
21    and that the signature of said deponent to his
22    deposition was requested;
23          That the parties were represented by their
24    counsel as aforementioned.
25          I do further certify that I am a disinterested

152

 1    person in this cause of action; that I am not a
 2    relative or attorney of either party, or otherwise
 3    interested in the event of this action, and am not
 4    in the employ of the attorneys for either party.
 5          IN WITNESS WHEREOF, I have hereunto set my
 6    hand and affixed my notarial seal this _____ day
 7    of _____, 2016.
 8
 9                    _____
10                      N O T A R Y   P U B L I C
11
12    My Commission Expires:
      October 11, 2023
13
14    County of Residence:
      Hendricks
15
16
17
18
19
20
21
22
23
24
25

Case 1:16-cv-00103-WTL-MJD   Document 50-2   Filed 02/23/17   Page 90 of 94   PageID 639

Q: This is a statement being given by William Rainsberger. The date is 11/20/2013. The time is 1334 hours. This statement is being given to Detective Charles Benner and Detective Tom Tudor, 3rd floor homicide interview room in reference to case number DP13153344, which occurred 11/19/2013 at 1539 hours. Sir, could state your name, age and date of birth, please?

A: Uh; my name is William T. Rainsberger, age is 56 and my birthday is June 8, 1957.

Q: And address and telephone number?

A: Uh; 7345 East 13th Street, Indianapolis, 46219. Phone number is 317-331-1059.

Q: Alright, and you're not employed at this time, right?

A: No, I'm retired.

Q: Okay. Alright, uh; we went over a lot of things last night. I took a pretty long statement from you. And, uh; some of the things I didn't ask you about were, about your brother, uh; Robert, right? That's your brother?

A: Robert, yeah.

Q: Yeah.

A: Bob.

Q: Uh; you said you spent the night at your girlfriend's house on Monday night, is that right? Or your, or your wife? I'm sorry. In Plainfield?

A: Yes.

Q: And you got home probably some time in the morning?

A: Yeah, I'm not sure what time, 9:-, 9:30.

Q: Was your brother home at that time when you got home?

A: Yeah.

Q: Alright, he, does he work at all right now. Has he been working?

A: Yeah, he, he works, uh; two nights a week. He works at Speedway.

Q: Uh-huh.

A:   I don't remember which store, he does there around, stocking inventory and stuff, 'cause the trucks come in all, at midnight. And then his main job is house painting, interior and exterior house painting.

Q:   But he hasn't been doing much of that lately?

A:   Well he was until maybe two weeks ago.

Q:   Okay. So…

A:   Because it was…

Q:   … when you, when you got home was he home? Was he up, was he in bed or what was he doing?

A:   Good grief, uh… I'm not sure I remember. Uh; honestly it was just…

Q:   Do you remember seeing him that day when you got home?

A:   I'm pretty sure, yeah. I think he was just hanging out in his room on Facebook or something.

Q:   This would have been yesterday, right?

A:   Yeah.

Q:   Okay.

A:   Yesterday morning. 'Cause I spent the night, well, I play poker, we play poker every Monday night. I went out there. Poker starts at 7:00. I spent the night at my wife's house and then I got home, I think at my place like 9:30. I'm not real sh-…

Q:   Alright, and what, what did you do the rest of the day then?

A:   Not a lot. Uh; I started reading a book, uh; I think I did laundry, uh…

Q:   And did you see your brother during all this time during the day or…?

A:   Yeah, he was there.

Q:   Was he there the whole time, even when you had left to go check on your mom or…

A:   Yeah, 'cause when I left I said, 'I'm going to check on mom.' And he said, "Okay." I think he was watching TV.

Q:   Alright. And then you went over and checked on your mother and then you called him and told him what had happened?

Statement of William Rainsberger, #2        DP130153344        Page 2 of 13

A:      Yeah, I was trying to, I was telling my wife about it and I can't remember if
        I texted him or I called him or both.

Q:      Okay. When you…

A:      I'm not, I'm not sure who I texted and who I, uh; I got there and then I was
        there for a little bit and then I texted him. I said get over here now.

Q:      Okay.

A:      And…

Q:      Let's just go over real quick, again what happened when you first got
        there. Did you check the mail and get the mail and go out to your car
        before you went into your mom's apartment?

A:      I got the mail, she had a bank statement and I got, uh; there was
        something on her; hanging on her door. It was a plastic bag with a, a
        cozy, a phone drink holder; uh; with a piece of paper in it. And I thought it
        was like an ad for a bar or a Chinese restaurant. They get, uh; uh; they get
        flyers in their doors and tact up inside for, uh; Chinese delivery and pizza
        and daycare and fast food stuff. So I had the, a bank statement and my
        ice tea and this thing in the bag. And I went out to my car and I was just
        going to leave the stuff there. And I thought, well, I'll just, I'll just show her,
        you know, try and show her things to keep her mind engaged. Like I
        showed her Facebook. You know, my phone just showed her that this is
        what this is. Anyway, and I thought well, I'll just, I'll show her the bank
        statement and, to make sure she knows, you know, good it's there and I'll
        show her what the numbers say. And on the back and the, uh; door was
        unlocked and we went ahead and she was laying there.

Q:      And what did she look like when she was laying there? Could you see her
        face or…

A:      Her, there was… she was laying on her left side. And I couldn't see much
        of her face or shoulders because there was that blanket thing over her.

Q:      Okay. What color was the blanket? Do you remember? Or do you know
        where she kept that blanket?

A:      The blanket was, uh; usually on a chair. She had a…

Q:·     The one she was sitting on, that she usually sat on?

A:      It was a gigantic chair.

Q:      Uh-huh.

A:   And she has this blanket. I think it's, she got it for donating the World
     Wildlife Federation or something's got panda bears on it, if it's the one…
     that's the one I always thought it was. And it's, it's a… I can't remember if
     it's blue on one side and green on the other or if I had a similar one that I
     got from work.

Q:   Okay. So she was covered up so you couldn't really, was she breathing
     could you tell?

A:   Yeah.

Q:   Okay.

A:   She was breathing, uh; rasp, rasp-idly… (making rasp sound)… or like
     that.

Q:   Did you try to take the blanket off of her to look at or ask her if everything
     was alright or…

A:   I nudged her and I said, 'Mom! Mom!' And then I realized that I, I thought
     she had fallen or when I, I realized she was unconscious. And then I went
     around to the, there was a coffee table and she was here. And I went
     around where the phone was and set my stuff down. And then I noticed
     all the blood. And then I started freaking out kind of. And I called 911.
     And, uh; I didn't know what on here that happened. It looked, at first I
     thought she either fell or had a stroke or broke her hip or it's something
     like that. It's like why, why would she be laying there unconscious. It'
     sounds like a stroke. And she broke her hip. She wouldn't lose
     consciousness. If she's fallen and hit her head it seems like there would
     have been blood or something on the table. Or I didn't know. It just
     seemed like a lot of blood for hit, for you hitting your head on the table, but
     I, I don't know.

Q:   So even with the blanket over her head you could see blood?

A:   Well, there was blood coming through the blanket. There was blood, uh;
     like a small pool of congealed blood. Uh…

Q:   So you could see all that when you got to the other side of her?

A:   Yeah, then I started, I think her heart rate went to about 200. Then I called
     911.

Q:   Did you try to take the blanket off to look at her then or…

A:   No, because the ambulance dispatch kept asking me if she was breathing.
     And I said, mentioned this before it's like, you know, if you got blood
     coming out of your head and you're breathing you're probably breathing

okay. That's as good as you can do.  Okay.  They said get a cloth and put it on your head and I thought, I'm not touching this, because I don't know if the blanket that's there, I don't know.  I thought, well, maybe it's scabbed over.  Maybe that's the only thing like keeping the blood from starting again.  So I didn't' touch, other than to poke her leg, I didn't touch her or the blanket or, or anything.  I'm not sure I touched anything at all other than I sat my stuff down and set the letter down.  And the, the cozy thing. I touched her to see if she was around.  And I touched, I opened the front door obviously.  I'm pretty sure I didn't touch anything else in the apartment because…

Q:     Did you use your cell phone or the, or her phone to call?

A:     I used a land line.  My cell phone has been.  I don't know what's going on. I used the cell, the land line, 'cause I figured that would be quicker.  It's a real land line.  And I…

Q:     Saying there's something wrong with your cell phone?

A:     It's been rebooting lately.  So, and I don't know if it works the same, like, if you call 911 from the cell phone I don't know if it knows where I am really. So if that, what's she got a land line; I'll just use the land line.  So that just see (Inaudible)…

Q:     What did you do before that when you were waiting for the ambulance, what were you doing after you made the call?

A:     I called them and, uh; I, I looked at her and I went kind of here and there's a little hallway and I went, I wanted to look around to see, if, you know, I know if there's a broken window or I don't know what I was looking for.  I mean, I was just looking around to see what the hell was going on.  I went to the door of her bedroom and looked in and saw the, the dresser.  The drawers were open.  And then I looked, I don't know.  I'm not sure I remember where it, well, well, I left.  Actually, I went to the front door.  Uh; pulled it behind me.  I don't think I latched it.  And…

Q:     So you closed the door?

A:     I, I closed the door of, yeah, from the outside.  I pulled it and I don't remember if I pulled it shut or if I…

Q:     Was her mouth still breathing at that point?

A:     Yeah, she was, it was very loud.  It sounded like, uh; almost like snoring. It was like… (making snoring sound)…kind of labored and, and raspy. And I went out and I pulled the door behind me just in case somebody was doing their laundry or whatever.  And I went out and, uh; went out the front door of the building and I stood in front, by that time, I could hear the

Q:    sirens of the fire department. And then I saw them pull in off of Shortridge and they kind of stopped at Shortridge and the, the apartment drive and, uh; we jumped up and down and waved at them, 'cause, you know, H11 doesn't really tell you much. So I jumped up and down and waved at them. And then they came and…

Q:    When you dialed 911 what's the first thing you said? What did, what did you tell them was going on there?

A:    I called 911 and I said, I'm not real sure what I said. I was pretty agitated. I said my mother's been attacked in her apartment and I need an ambulance. And the first time we called them, the person kept asking me if there was, if there was new triggers still there. And I kept saying no. And they, I, I don't know. I don't, you know. I know you guys got this on tape. I'm not sure what I said.

Q:    Right.

A:    It seemed like the first person was like really intended on knowing whether there was an intruder there.

Q:    Right.

A:    And I kept saying no. And I went, what the…?

Q:    So when did you jump from she might have fell and hurt herself to somebody attacked her?

A:    When I went around to the other side to call 911 to get an ambulance I saw the blood and then I figured you, you don't have that much blood just from falling and hitting your head. You don't, well, you know, it looked like a cup of blood congealed next to the blanket. And the whole, the blanket was on the top of her head. This whole area was bloody. I mean, it was just massive blood loss. So I, I mean, I see people fall and hit their head. I've never seen anything like that. So then the next 911 dispatch I called I said, again, 'My mom's, my mom's been attacked. She's in the apartment, blah-blah-blah.' And then they put me through to ambulance dispatch. They were the ones that kept asking me if she's breathing normally. Which I thought was the stupidest question I ever heard, because I don't know what's normal for head trauma or whatever. I didn't know what had happened. And so I said, 'Yeah, she's breathing normally.' And then that's the ones that said, "Well, get a clean cloth and put it on the wound and hold it in place." And that's when I decided that I might be doing more harm than good. I didn't want to move the blanket. I didn't want to put a cloth over her head. I didn't want to touch her, you know. I watch CSI, well, I watch cop shows. You're not supposed to touch anything unless there's a reason. So, uh; I left her because at that point the blood, I could tell, the blood had congealed. There's blood on the blanket. There's

blood here. It's congealed. It looked like, I don't know, but it was gross. And I didn't want to move the blanket or touch her or move her head or anything, 'cause I didn't know what was going on. It just looked to me like somebody bashed her head in or something, hit her with a lead pipe. I don't know. So at that point...

Q:     Did your mom keep anything like that in her apartment?

A:     Not that I...

Q:     Nothing like a lead pipe or anything?

A:     I don't even know if they make lead pipes anymore.

Q:     (Inaudible) ... tools? Tools?

A:     I don't think so. I think she has a pair of pliers.

Q1:    Okay.

A:     She had, uh; maybe a screwdriver. I use, I know I used the pliers a couple weeks ago to change the cable box out, but she didn't keep, uh; I don't, I don't know if she had any, anything else. I know she has a pair of pliers, 'cause we used a pair of pliers. I don't know if she had anything else.

Q1:    Okay.

A:     I, she had a lot of stuff. She had a lot of books a lot of clothes, a lot of knick knacks and lamps and stuff.

Q1:    When's, when's the last time your, your sister saw her, you know?

A:     I think she was there Monday morning.

Q1:    Monday morning?

A:     My sister comes over every Monday and brings her laundry, takes away the laundry that needs to be washed, uh; changes the bedding and just, you know, look around and takes the trash out if you need to; whatever. So she comes every Monday pretty, pretty regularly. 'Cause I don't want to do, I don't want to do my mom's laundry, really.

Q1:    Right.

A:     And I, I do the bedding or, you know, do anything else, but I, I don't...

Q1:    Well, I understand.

Statement of William Rainsberger, #2      DP130153344          Page 7 of 13

A:      Yeah.

Q1:     Yeah.

A:      So, so she would have; I don't know what time she would have left.

Q1:     Alright.

A:      I, I don't know.  She usually comes late morning.

Q1:     Okay.  Nothing else.

Q:      Nothing else you can think of?

Q1:     Huh-uh.

Q:      Anything else you can think of that I, came to mind overnight or that I
        haven't asked you or...

A:      Uh; no, I've been, I've been...

Q:      ... you may, might want to talk about anything else or...?

A:      No, he's, no.  He said, uh; I talked a lot.

Q:      Huh?

A:      He said I talk a lot, 'cause he was waiting.  He was like...

Q:      Oh, yeah.

A:      ... how long... is he going to, how long... you know.

Q:      Oh.

A:      What's he going to say?

Q:      And did he say anything about what happened last night or anything?  Tell
        me what happened to your mom; did he talk to you about that at all?

A:      Well, we talked about, we went down to Wishard and then, and... it's
        actually the wife of one of his close friends; happen to be a nurse.  So now,
        you know, and, uh; so we talked some there and then (Sighs) we got
        home.  I took him to the apartment to get his car.

Q:      Right.

Statement of William Rainsberger, #2     DP130153344          Page 8 of 13

A:   'Cause it was still there. And he had taken me to; anyway, uh; and then we went home and I, I don't know we chatted about something, like nothing real meaningful and then I went to bed. I was beat.

Q:   Okay. Can you take a look at this and see if you noticed whose writing that is?

A:   (Inaudible) last night?

Q:   Yeah, really.

A:   That's my brother's writing.

Q:   Yeah, have you ever seen that notebook before?

A:   No.

Q:   Can you read a little bit of it and tell me what he might be writing about if you have any idea?

A:   Exoneration for forbearance release. Find away to forgive without giving up her principles as often (Inaudible) can. Exoneration wiping the slate entirely clean of destroying a relationship to the full state of innocence. It had before the harmful action took place. Action, genuine accident, child and loving, feels didn't truly understand person is truly sorry. Take full responsibility no excuses. That's forgiveness. All for if offender makes it says exoneration offender. I trust God of course, but I want to understand and I trust Pops to make everything right with the family car. (Inaudible) And I was there; what's that? (Inaudible) you was at work. Robert, you think too much. What main course takes the longest prep time? Different forms of exoneration forbearance release. I'm looking at release consider all the options. It's the least of the options not (Inaudible). It's because of declaring all the trust, not just in God, but in the other parties, we'll have to drop things right where they are. Walk away; there are times when things get so antagonistic. I don't... you want me to keep reading?

Q:   No. I mean, does that sound like something he'd write before or you ever seen anything like this or...

A:   I accidentally saw one of his notebooks. I don't pry into his stuff. He's, uh... I'm questioning that things got done. And we trusted pops to make things right with the family car. So...

Q1:   What does, what does that mean to you? Trusting Pops to make things right with the family car, what does that mean?

A:     The family car?  Still want to know what he did with that… well, there's a couple of things this could mean.  Uh; he could be working on a story, uh; he usually writes poetry and he's, he's the writer in the family.

Q1:    Pops, have you ever heard him use that expression

A:     We called our father dad.

Q1:    Hum?

A:     I've never heard the expression Pops.  And I'm not sure what making things right with the family car means.  That doesn't.  I know there's, he had a… my dad was a dick.  I believe there's no other way to put it.  He was not a pleasant person.  Uh; and they got divorced probably when my brother was 5 or 6.  I'm not sure what he means by making things right with the family car.

Q1:    What do you think he means by this, 'the action and the person'?  What do you, what do you think he meaning by that?  I mean none of it makes any sense really.

A:     Exoneration wiping the slate clean and restoring the relationship to the full state of innocence.  It had to be for a horrible action.  Genuine accident, child and loving feels to truly understand.  Person is truly sorry takes full responsibility.  No excuses, ask forgiveness.  This is probably this.

Q1:    Right.

A:     And then…

Q:     But why is he talking…

Q1:    But why is he talking about that, in this why?

A:     Why is he talk… why is he writing this stuff?

Q1:    Yeah.

A:     He writes in his notebooks all the time.  He's got other; I think he's got other notebooks.  I've seen him writing in notebooks so that…

Q1:    But that's…

A:     I accidentally saw them.

Q:     Yeah, just reading this.

A:     Yeah.

Q1:     It's here, it's there, it's... there's nothing that's fluid. There's no story to that. I, it's just you got this then you jump over here to the back and...

A:      He...

Q1:     I'm just asking you your interpretation. He's your brother. I don't know.

A:      He's the religious one in the family, the moral religious. I'm, I'm, I'm Christian and I don't go to church. He doesn't go to church either...

Q1:     Okay.

A:      ... but he's a little more... like he'll put something on Facebook, like a bible verse (Inaudible).

Q1:     Okay.

A:      Uh; I have notebooks about political stuff that wa-, is jumbled. Actually, probably more jumbled. What he's talking about is Christ redemption in light of something that may have happened in the family.

Q1:     Okay.

A:      Uh; religion requires forgiveness. I think he's trying to come to grips with the fact that he was essentially by our father. My dad was... (Sighs)... I'm not sure what all happened. My sister could explain where I've heard that he cheated on my mom. He didn't give her any money to take care of the household. He was only home one day a week.

Q1:     Okay.

A:      And when he was, when my brother was 6 years old my dad moved to Florida. So my brother spent, he's probably spent as much time in the City-County building as he spent quality time with my dad. And, and my dad didn't do much of quality time. He'd come home on Saturday afternoon or evening. We'd have dinner. We go to church the next morning. And we'd have dinner. And he would take off for Illinois or Chicago or some place on his job.

Q1:     Okay. So his...

A:      Between, between that, that mess, which has been a problem, you know. And then getting foreclosed on...

Q1:     Okay.

A:      ... I think he's just going through a bunch of crap. He's been writing a lot.

Q:      Did he get along alright with your mom?

A:      Oh, yeah.

Q:      They got a long good?

A:      Yeah. My brother is, I don't want to put words in your mouth. My brother's a very peaceful person. He got attacked a couple of months ago at Speedway station where he works. Some guy clocked him just cold cocked him, just, not cold cock. He sucker punched him.

Q:      Uh-huh.

A:      Because that guy and his girlfriend were walking out of the Speedway. My brother looked at his girlfriend. And he said was quite beautiful. And this guy comes out of the Speedway and just sucker punches him right there.

Q:      Hum.

A:      In fact he may still have the scar right there.

Q:      Has your brother been having troubles with an old girlfriend too, like uh; last summer?

A:      Yeah, and I'm not sure what happened. He got a restraining order; as I'm sure you are aware of. Uh; he's kind of... I haven't asked him really about that. I know he got, she got a restraining order against him. Uh; I think he was, uh; what little I understood was he was being kind of a clingy, annoying guy. And then the restraining order was... here's how much faith I put in him. She didn't show up for the court date.

Q:      Okay. Alright.

A:      So, if my brother, my brother ever hurt a person or ends a life, I'd be shocked.

Q1:     Okay.

Q:      Is there anything else you can think of about what we've been talking about?

A:      No, I, I; in fact I just went through and explained to, to my wife what that little, left the blood out and all that stuff and I, it just still seems like such a bunch of... I have...the only thing I can think of that would be of any help is that there are people around there who go through there, walk through there. There were people in that neighborhood who are of less means than the rest of us, who are into drugs. I don't think it's, I wouldn't say it's well known, but it was, it's unusual for s-, for a little old lady who lived by herself on the end unit in the basement and maybe they thought she was an easy target. I don't know. That doesn't make any sense to me.

There's, I think about God in terms of what has happened; I'm not getting the full picture of what God's intent is. So that's the (Inaudible).

Q:     Okay.  Alright.  This is the end of the statement being given by William Rainsberger. The time is now 1402 hours.

END OF STATEMENT

air
IMPD
02/04/2014

Q:   This is a witness statement being given by Robert Rainsberger. The date is 11/19/2013. The time is 2002 hours. This statement is being given to Detective Charles Benner at police headquarters 3rd floor interview room. It's being given in reference to case number DP13153344, which occurred on today's date, 11/19/13, approximately 1539 hours at 801 North Shortridge Road, Apartment H11. Sir, can you state your name, age and date of birth, please?

A:   Robert Rainsberger, 51, 1/12/62.

Q:   And what's your address and telephone number?

A:   ███████████████████████████

Q:   Is that a cell phone?

A:   Yes.

Q:   Okay. Did you guys have a home phone on?

A:   (Nonverbal response)

Q:   Okay.

A:   No.

Q:   Are, are you employed, sir?

A:   Uh; off and on, yeah.

Q:   Okay, you're not employed at the moment?

A:   No.

Q:   Okay. So you didn't work today?

A:   Huh-uh.

Q:   Okay. Alright, alright, Mr. Rainsberger the, an incident occurred today when we went to your mother's house there at 801 North Shortridge. Can you tell me in your own words how you became aware of the incident?

A:   I was at home. My brother called me about, it was like twenty until 4:00. He said, "Get over here, quick!" And so I got over there. There was already a fire truck. I think the ambulance pulled up right after me, but I don't, other than that I don't know anything other than hearsay from what you guys mentioned, you know, after being in there.

Q:   Okay.

Statement of Robert Rainsberger        DP130153344        Page 1 of 8

A:      I wasn't never in the apartment so.

Q:      You never went in there today?

A:      No.

Q:      When was the last time you saw your mom in person?

A:      Uh; it was a weekend.  Saturday, maybe Friday.  Saturday, I think it was Saturday.  I think it was Saturday.

Q:      Okay.  Do you know about what time it was?

A:      No, it was... I know she was having problems with the TV again.

Q:      Okay.

A:      I think it would have been in the morning, late morning maybe.  (Inaudible)

Q:      Okay. When you, when you go over there did she let you in or do you use a key to get in?

A:      I use a key.

Q:      Okay.  What, what's she doing when you get there?  Does she just sit in the front room there or...?

A:      Yeah, sitting in her chair usually or laying in bed.

Q:      Okay.

A:      So.

Q:      Does she watch TV in both places?

A:      No, she just has the TV in the one room.

Q:      In the living room, in the front by the door?

A:      Yeah.

Q:      Okay.  Has she ever mentioned any problems she had been having with anybody lately to you?

A:      No.  No, any of the things she's men-, she was suffering from dementia.  So the stuff she had mentioned was related to that.  And it wasn't anything real, of this world type stuff, but, uh; no, she hadn't said anything like that.

Statement of Robert Rainsberger        DP130153344        Page 2 of 8

Q:    Okay.  So there wasn't anything out of the ordinary when you went over
      there over the weekend?

A:    Huh-uh.  No.

Q:    Okay.

A:    Just...

Q:    How often would you see your mom?

A:    Uh; not real often, every week at least, but not as often.  Not like my
      brother, he's over there every day.

Q:    Okay.  So your brother William's the one that takes care of her day to day?

A:    Uh-huh.  Well, yeah, she, uh; he checks on her.  She's got meals, she's
      got meals on wheels, but other than that, uh; my sister would go do
      laundry and dishes, but, you know, yeah, he was the main one.

Q:    Okay.  And did your brother say anything when he called you about what
      was going on over there or...

A:    No, when he called, it was, it was like ten seconds.  "Get over here now!"
      And that was it.  And I got over there and he was just, he just told me what
      he told you.  He just, the door was unlocked.  He saw her laying there and
      after that he's gradually in and out and I, didn't catch much of anything.

Q:    When you got there were the police already there?

A:    The fire truck was there.  I don't know.  I, I don't think there was any cop
      cars there.  I don't know.  The fire truck was there.  And an ambulance, an
      ambulance came up right after I did.  I can't remember if there were any
      police cars there or not.

Q:    Okay.  Where was your brother at when you got there? Was he outside?

A:    He was, yeah, he was right on that front step.  Sitting on that little brick
      wall.

Q:    Okay.  So do you have any idea just sitting right here, right now what
      could have happened to your mother today?

A:    I have no idea.  I don't know who would want to do this.  I never wanted
      anybody to; why would they want to cut up my mother, but now, I, I don't
      know.  I have no idea.

Q:    Do you know of any problems that were going on in her building or
      anything?

Statement of Robert Rainsberger        DP130153344            Page 3 of 8

A:   In her building, most of it was about maintenance and flooding, but as far as people no. I think, I don't know. I, I wasn't over there not enough, enough to see any trouble. Most things weird down with the, you know, maintenance or flooding and management type stuff.

Q:   Okay. Did you mom have anything of value in the apartment that somebody would want to take?

A:   I don't think so. She may have had some jewelry, but, yeah, most of the stuff was just run of the mill.

Q:   She didn't keep any cash or anything in the apartment?

A:   I don't think so. That don't and that's not like her.

Q:   Okay. Uh; and you said you recently started to live with your brother?

A:   (Nonverbal response)

Q:   When did that occur?

A:   August.

Q:   Just a couple of months ago?

A:   (Nonverbal response)

Q:   And what brought that about?

A:   Uh; I got foreclosed on.

Q:   Okay. Was it because of lack of work or what happened? Were you…

A:   Yeah, I was just, I got behind. I got behind. I got caught up, got behind again and just, you know, couldn't make it go.

Q:   Okay. And you were just living by yourself at the time?

A:   Uh-huh.

Q:   You never, have you ever been married?

A:   Huh-uh.

Q:   Okay. No relationship going on right now?

A:   Huh-uh.

Q:   Okay. And you've been staying with your brother for a couple of months?

Statement of Robert Rainsberger        DP130153344        Page 4 of 8

A:     Yeah.

Q:     Is your, is your brother, your brother's married though, right?

A:     Uh-huh.

Q:     Okay, but she lives at a separate house?

A:     Uh-huh.

Q:     Is that right?

A:     Yeah.

Q:     Okay. And the question I have to ask you is do you think anybody in your family would be involved in something like this, some, whatever happened to your mother?

A:     No.

Q:     Is it just you three siblings?

A:     Right.

Q:     So nobody?

A:     There's nobody else in town.

Q:     Alright.  And you wouldn't think anybody else in your family...

A:     No.

Q:     ... would have anything to do with something like this?

A:     No.

Q:     And do you have any idea what could have happened, who could have got into her apartment?

A:     (Nonverbal response)

Q:     Does anybody else have a key?

A:     No, just, us three. Uh; and she's got a key, but I have no idea.

Q:     Do you know if she had any kind of purse or anything that she kept near her?

A:     She, oh, I don't know about near her.

Statement of Robert Rainsberger          DP130153344                    Page 5 of 8

Q:     Or somewhere in the apartment?

A:     She had to put it over... it should be something in the apartment, but, uh;
       she didn't get out much at all unless it's like a doctor's appointment or
       something, so. I didn't see her with a purse. I haven't seen her with a
       purse for, you know, I don't know how long.

Q:     Do you have any idea what her purse looked like the last time you saw her
       with one?

A:     Uh; no, not off hand. She had a black one that was kind of bulky, but then
       she had a smaller one like, and here was a dark color.

Q:     Okay. So she didn't really leave the apartment much. So she didn't
       actually...

A:     Huh-uh.

Q:     ... carry a purse or anything, right?

A:     No.

Q:     Did she have any credit cards or anything that you know of?

A:     No, like I, I know she got a debit card. I just can't remember the code to it.
       I don't know if she's got a credit card or not. She always used to, but, uh;
       uh; my brother was handling, you know, checking mail and checking her
       bills and stuff. So he, he'd know, he knew more about that stuff than I did.

Q:     Okay.

A:     So.

Q:     Alright. So the only, the only way that you found out about what happened
       was your brother texting and just saying get over there right away?

A:     Yeah, he called. It was like 20 to 4:00 or something. He said, "Get over
       here."

Q:     Did he say what had happened to her or anything?

A:     Nope.

Q:     Was...

A:     He just said get over here. And he doesn't do that, he usually doesn't even
       call me. He'll text me, but, uh; uh; he called and said get over here. I
       knew something was wrong. So I didn't know this... I figured it was an
       accident or a health issue, but nothing like this.

Statement of Robert Rainsberger        DP130153344              Page 6 of 8

Q:   Okay.  Do you, uh; do you or your brother have any guns in the
     residence?

A:   I don't.  I don't know if he does or not.

Q:   You don't know if he has a gun in the house or not?

A:   I don't, I don't think so.  I we never talked about anything like that.

Q:   Alright.  Uh; you don't know if your mom had any maintenance or anything
     set up?  Was there anybody out of the ordinary coming to work on her
     house or... she ever spoke of anybody going door to door trying to get
     work or anything or any stranger...

A:   No, like I said, no, she, she really, really wasn't lucid enough to handle her
     affairs like that; as far as maintenance and stuff.  My brother did that.  Uh;
     whether she would answer the door for somebody, I don't know.

Q:   Okay.

A:   Like, I could see her doing that, yeah, but I don't know.

Q:   You...

A:   I just, like I said, usually I just, you know, knock once and use my key,
     but...

Q:   Do, do you know somebody name Michael that she might know?  She
     know anybody named Michael that you know of?

A:   Michael?  Huh-uh.

Q:   No?

A:   No.

Q:   Okay.  And once you got there and spoke to your brother when the fire
     truck and everything was there with your mom did you ask what was
     wrong with her?  Did you ask if she had an injuries or did he say anything
     about what injuries she...

A:   Oh, he said he, he told me what happened while the door was open.  She
     was on the ground.  At that point I just, I, I didn't know if it was again, I still
     didn't know anything really.  How bad she was or whether it was an
     accident or what, but, and then they wheeled her out on the gurney.  I said
     (Inaudible)...

Q:   What did he say happened, though?  Did he say...

Statement of Robert Rainsberger          DP130153344          Page 7 of 8

A:     He said he didn't know. He just saw his, she was on the ground. She was bloody. And, uh; yeah, she was struggling to breathe apparently, but he didn't know the cause And actually...

Q:     Okay. And that's all he told you?

A:     When they wheeled her out I asked what happened. He said, "I don't know!" So.

Q:     Okay. Alright. Is there...

A:     We, we didn't even know...I didn't know it was a gunshot until the doctor called so.

Q:     Okay. Alright. Is there anything else you can think of about what happened that I haven't asked you?

A:     I don't know. I was, I was in the dark on this thing. I don't know, uh; I don't know anything really.

Q:     So you don't have anything else to add to your statement at this time?

A:     No.

Q:     Alright. This is the end of the statement being given by Robert Rainsberger. The time is now 2015 hours.

END OF STATEMENT

alr
IMPD
01/14/2014

Statement of Robert Rainsberger          DP130153344          Page 8 of 8

Q:   This is a witness statement being given by Robert Rainsberger. The date is 11/19/2013. The time is 2002 hours. This statement is being given to Detective Charles Benner at police headquarters 3rd floor interview room. It's being given in reference to case number DP13153344, which occurred on today's date, 11/19/13, approximately 1539 hours at 801 North Shortridge Road, Apartment H11. Sir, can you state your name, age and date of birth, please?

A:   Robert Rainsberger, 51, 1/12/62.

Q:   And what's your address and telephone number?

A:   ██████████████████████████████

Q:   Is that a cell phone?

A:   Yes.

Q:   Okay. Did you guys have a home phone on?

A:   (Nonverbal response)

Q:   Okay.

A:   No.

Q:   Are, are you employed, sir?

A:   Uh; off and on, yeah.

Q:   Okay, you're not employed at the moment?

A:   No.

Q:   Okay. So you didn't work today?

A:   Huh-uh.

Q:   Okay. Alright, alright, Mr. Rainsberger the, an incident occurred today when we went to your mother's house there at 801 North Shortridge. Can you tell me in your own words how you became aware of the incident?

A:   I was at home. My brother called me about, it was like twenty until 4:00. He said, "Get over here, quick!" And so I got over there. There was already a fire truck. I think the ambulance pulled up right after me, but I don't, other than that I don't know anything other than hearsay from what you guys mentioned, you know, after being in there.

Q:   Okay.

Statement of Robert Rainsberger          DP130153344          Page 1 of 8

1

```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF INDIANA
                       INDIANAPOLIS DIVISION
                    CASE NO. 1:16-cv-00103-WTL-MJD


WILLIAM RAINSBERGER,          )
                              )
                 Plaintiff,   )
                              )
         -vs-                 )
                              )
CHARLES BENNER,               )
                              )
                 Defendant.   )
```

        The deposition upon oral examination of

MARI BILGER, a witness produced and sworn before me,

Dianne Lockhart, RMR, CRR, CSR, a Notary Public in and

for the County of Marion, State of Indiana, taken on

behalf of the Defendant at the offices of Circle City

Reporting, 135 North Pennsylvania Street, Suite 1720,

Indianapolis, Marion County, Indiana, on the 20th day

of December, 2016, commencing at 8:32 a.m. pursuant to

the Federal Rules of Civil Procedure.

```
                    CIRCLE CITY REPORTING
                    135 North Pennsylvania
                          Suite 1720
                    Indianapolis, IN  46204
                       (317) 635-7857
```

WILLIAM RAINSBERGER VS.
CHARLES BENNER

MARI BILGER
December 20, 2016

---

Page 2

A P P E A R A N C E S

FOR THE PLAINTIFF:     Richard A. Waples
                       WAPLES & HANGER
                       410 North Audubon Road
                       Indianapolis, IN 46219

FOR THE DEFENDANT:     Kathryn M. Box
                       OFFICE OF CORPORATION COUNSEL
                       200 East Washington Street
                       Room 1601
                       Indianapolis, IN 46204

ALSO PRESENT:          William Rainsberger

I N D E X   O F   E X A M I N A T I O N
                                                PAGE
DIRECT EXAMINATION .............................. 3
     Questions by Kathryn M. Box

---

Page 3

1   M A R I   B I L G E R, having been first duly sworn
2      to tell the truth, the whole truth and nothing
3      but the truth relating to said matter, was
4      examined and testified as follows:
5   DIRECT EXAMINATION,
6      QUESTIONS BY KATHRYN M. BOX:
7   Q   Good morning, Ms. Bilger. Thank you for being
8      here today. My name is Kathryn Box, and I
9      represent the City of Indianapolis in this case.
10      Have you ever given a deposition before?
11  A   No.
12  Q   Okay. There's just a few sort of ground rules
13      that will help us get a clear record of what's
14      being said today. The first one is as you
15      noticed, you were sworn in to tell the truth, so
16      you have to make sure at all times today you tell
17      the truth.
18      The second answer is if you answer a -- or
19      the second rule is if you answer a question, I'm
20      going to assume that you heard my question and
21      that you understood it. If at any time you don't
22      understand it or you don't hear it, feel free to
23      ask me to repeat it or rephrase it, anything like
24      that.
25  A   Okay.

---

Page 4

1   Q   You got to make sure you answer out loud so she
2      can take down an answer. Sort of head nods and
3      head shakes, while us talking together here like
4      this totally understand each other, makes it
5      difficult for someone trying to read a transcript
6      later.
7      And along the same lines, let's make sure
8      that we don't talk over each other as well, so
9      I'll try to let you finish your answer before I
10      start my next question and vice versa; okay?
11  A   Okay.
12  Q   And then I don't think we'll take very long
13      today, I know you have to get to work, but if at
14      any time you need a break, just let me know, you
15      can grab some coffee, use the bathroom, whatever.
16      The only thing I ask is that you answer the
17      pending question first; okay?
18  A   Okay.
19  Q   Did you take any medication this morning?
20  A   Yes.
21  Q   Okay. Anything -- I don't need to know about
22      your medical history, but anything that would
23      make you not be able to understand or hear my
24      questions today?
25  A   No.

---

Page 5

1   Q   Are you on any drugs besides -- illegal drugs?
2   A   No.
3   Q   No. Okay. On any alcohol?
4   A   No.
5   Q   Do you use any hearing aids?
6   A   No.
7   Q   Okay. Any eyeglasses?
8   A   No.
9   Q   What did you do to prepare for the deposition
10      today?
11  A   Nothing.
12  Q   Nothing. Did you review any documents?
13  A   No.
14  Q   Okay. What's your date of birth?
15  A   2-12-71.
16  Q   And that makes you how old today?
17  A   45.
18  Q   And if you recall, how old were you on
19      November 19, 2013, when Ruth died?
20  A   43.
21  Q   Okay. And what's your current address?
22  A   221 South Vine Street, Plainfield, Indiana.
23  Q   Is that the same address you were at in November
24      of 2013?
25  A   Yes.

---

WILLIAM RAINSBERGER VS.
CHARLES BENNER

MARI BILGER
December 20, 2016

---

Page 6

1 Q   Okay.  And who lives there with you at that
2     address?
3 A   I live alone.
4 Q   Live alone, okay.  And what was your cell phone
5     number on November 19, 2013?
6 A   710 -- I'm sorry.  317-710-7604.
7 Q   Okay.  I'm going to go through just a couple
8     quick questions about your background.  Where did
9     you go to high school?
10 A   Fowlerville, Michigan.
11 Q   Did you attend college?
12 A   Yes.
13 Q   Where did you go?
14 A   Indiana Wesleyan University.
15 Q   And what was your degree in?
16 A   Information technology.
17 Q   Do you have any other post college or technical
18     training certificates, any other education?
19 A   No.
20 Q   And how are you employed?
21 A   I work for KAR Information Services.
22 Q   How long have you been employed there?
23 A   Two months.
24 Q   Okay.  Where were you employed in November of
25     2013?

---

Page 7

1 A   Citizens Energy Group.
2 Q   Okay.  And when you were at Citizens, were you a
3     sort of 8 to 5?  What were your hours?
4 A   Yes.
5 Q   And what were your general duties at Citizens?
6 A   Technical support.
7 Q   Have you ever been arrested?
8 A   No.
9 Q   Okay.  Have you ever been a party to a lawsuit?
10 A   No.  Oh, I apologize.  Yes.
11 Q   Okay.  Can you briefly just explain that?
12 A   Yes.  A person scratched my car and I sued them.
13 Q   And it's my understanding that you and William
14     were married at one time; is that correct?
15 A   That is correct.
16 Q   Okay.  When did you guys get married?
17 A   2011.
18 Q   Okay.  So you'd been married for a couple years
19     when this incident occurred?
20 A   That is correct.
21 Q   When did you guys get divorced?
22 A   2014.
23 Q   It doesn't have to be --
24 A   I believe.
25 Q   Okay.

---

Page 8

1 A   It might have been 2015.
2 Q   Okay.
3 A   Yes.
4 Q   No problem.  It doesn't have to be exact.
5     And did William live with you at your house
6     in Plainfield at that time?
7 A   No.
8 Q   Where did William live at that time?
9 A   He lived on East 10th Street.
10 Q   And then was there any specific reason you guys
11     lived apart?
12 A   No.
13 Q   Just had two different houses?
14 A   We had two houses when we were married and we
15     both had cats.
16 Q   Cats.  Okay.  How often would William spend the
17     night at your house?
18 A   Two to three nights a week.
19 Q   How often would you spend the night at his house?
20 A   Rarely.  Maybe once a month.
21 Q   And did you guys have any kids?
22 A   No.
23 Q   I'm going to ask you a few questions about
24     William, about what you know.  If you don't know,
25     that's totally fine.

---

Page 9

1     Are you aware, does he have any chronic
2     illnesses?
3 A   Does depression count?
4 Q   That's fine.  Any hospitalizations that you know
5     of?
6 A   No.
7 Q   Any medications that he takes regularly -- he
8     took regularly at that time?
9 A   I believe he was on depression.
10 Q   What about drugs, did you ever see him use any
11     drugs?
12 A   No.
13 Q   Okay.  What about alcohol?
14 A   Yes.
15 Q   How frequently, would you say?
16 A   When he came over, we drank a glass of wine with
17     dinner.
18 Q   Okay.  And what -- what was William's income, if
19     any, back in November of 2013?
20 A   He was retired, but he did receive a retirement
21     from the Sisters of St. Francis.
22 Q   And you already said he owned a house?
23 A   Yes.
24 Q   Any other assets that you know of?
25 A   He had substantial savings.

---

Case 1:16-cv-00103-TWP-MJD   Document 86-2   Filed 12/28/17   Page 309 of 495 PageID #:
Case 1:16-cv-00103-TWP-MJD   Document 56-12   Filed 02/28/17   Page 3 of 12   PageID #:
2245

WILLIAM RAINSBERGER VS.                                                    MARI BILGER
CHARLES BENNER                                                         December 20, 2016

---

Page 10

1  Q   Okay.  Any debt that you're aware of?
2  A   No.
3  Q   How would you describe William's relationship
4      with his mom?
5  A   Very close.
6  Q   Close, okay.  How often would he see her?
7  A   Daily.
8  Q   What things would he do for her?
9  A   Make sure she ate, make sure she had her
10     medications, make sure she had her clothes
11     washed, hung up, general housekeeping, and then
12     he would just sit and visit.
13 Q   Did he do any financial stuff for her, are you
14     aware?
15 A   I believe he paid her bills.
16 Q   Did you ever hear Robert complain about his
17     work -- or helping with his mom?
18 A   Robert?
19 Q   Yeah -- or, sorry --
20 A   The brother?
21 Q   Sorry, William complain about --
22 A   No.
23 Q   Did he ever complain about Rebecca or Robert not
24     helping out as much as he was?
25 A   He thought his sister could have investigated a

---

Page 11

1      nursing home a little bit better.
2  Q   Okay.
3  A   But nothing continual, regular basis.  There was
4      occasional mention of it.
5  Q   Right.  Did you have any conversations with
6      William about putting his mom in a nursing home?
7  A   For -- she needed more constant supervision.  She
8      was at a point where stairs and things like -- of
9      that nature were becoming an issue for her.
10 Q   So a nursing home was something -- a discussion
11     of that was in the works?
12 A   Yes.
13 Q   Okay.  And did William have a key to her
14     apartment?
15 A   Yes.
16 Q   Did you have a key to the apartment?
17 A   No.
18 Q   How would you describe your relationship with
19     Ruth?
20 A   I loved Ruth.
21 Q   I'm sorry.
22 A   I didn't see her but maybe twice a month.
23 Q   I'm sorry, do you want to take a break or
24     anything?
25 A   No.

---

Page 12

1  Q   Okay.  You said you saw her about twice a month.
2      When you would see Ruth, would you go over to her
3      house?
4  A   Yes.
5  Q   And what would you do when you were over there?
6  A   Just visit and make sure everything was in order.
7  Q   How would you describe Ruth's medical condition
8      around this time?
9  A   She was losing -- she couldn't remember as much.
10     She remembered things from the past, but things
11     recent --
12 Q   So it seemed like better long-term memory?
13 A   Yes.
14 Q   Okay.  So if you could estimate, how many times
15     do you think you were over at Ruth's house, in
16     general?
17 A   Well, a lot of times when we saw her, it was out
18     to dinner or on an occasion, so I was probably
19     there a dozen times.
20 Q   When you were there, do you recall seeing
21     anything of like substantial value?
22 A   No.
23 Q   Okay.  Did she have any expensive jewelry that
24     you knew of?
25 A   No.

---

Page 13

1  Q   Did you know her to carry a lot of cash?
2  A   No.
3  Q   Did you ever see her carry a purse?
4  A   Yes.
5  Q   And can you describe that purse for me?
6  A   I couldn't tell you.
7  Q   Okay.  No problem.  Okay, now I'm going to go to
8      the incident in question.
9  A   Okay.
10 Q   Do you recall when the last time you saw Ruth was
11     prior to her death?
12 A   I can't remember exactly.
13 Q   Okay.  No problem.  This is kind of jumping back
14     a little bit, but from what you know of Ruth,
15     would you have expected her to open the door for
16     someone she didn't know?
17 A   Yes.
18 Q   Yes.  Okay.  Okay.  Then I'm going to talk about
19     Monday, November 18th.  That's the day before
20     Ruth passed away.
21 A   Uh-huh.
22 Q   Did you see William that day?
23 A   I can't remember, but it was our habit for Monday
24     nights for him to come over.
25 Q   Okay.  Can you explain your kind of normal Monday

---

---

Page 14

1    routine for me?
2 A  He would come over and we would play poker at a
3    local bar. And if he was there, he would have
4    signed his name on the roster.
5 Q  And what roster is that? At the bar?
6 A  Who played poker that night.
7 Q  Okay. And what time does poker start?
8 A  Seven, I believe. Might have been eight at the
9    time, but I think it was seven.
10 Q  Okay. Where would you guys play poker?
11 A  Firehouse.
12 Q  But you don't recall if William was with you
13    playing poker that night or not?
14 A  I believe he was, but I'm not a hundred percent.
15 Q  Okay. And on a normal Monday after you guys
16    played poker, would William spend the night at
17    your house?
18 A  Yes.
19 Q  What time would you guys usually leave the bar at
20    or when would poker end?
21 A  Maybe ten o'clock.
22 Q  Okay.
23 A  I had to work the next morning.
24 Q  Right. So did you guys usually just head
25    straight home, then, after that?

---

Page 15

1 A  Yes. It was four blocks.
2 Q  So do you recall if William spent the night at
3    your house that evening?
4 A  If we played cards, then, yes, but I'm not a
5    hundred percent.
6 Q  And do you know what time you would have woken up
7    the next morning?
8 A  Him or I?
9 Q  You.
10 A  7 a.m.
11 Q  Seven, okay. What time would William leave?
12 A  He'd generally sleep in and leave ten to noon.
13 Q  Okay. What time did you leave for work?
14 A  7:30.
15 Q  When William would spend the night at your house,
16    would you guys stay in the same room?
17 A  Yes.
18 Q  And you said William would usually leave the
19    house between ten and noon?
20 A  Yes. Sometimes later; just depend.
21 Q  Okay. And can you just briefly describe your
22    house for me?
23 A  It's a three bedroom house. It's -- it was built
24    in 1886, so it has very high ceilings.
25 Q  Is it a ranch or a multi-level?

---

Page 16

1 A  Sorry, ranch.
2 Q  Would you and William ever text while you were in
3    the house together?
4 A  Yes.
5 Q  Okay. Would you say that's fairly common?
6 A  Yes.
7 Q  Okay. Any reason for that other than --
8 A  Silly things.
9 Q  Okay. Do you have any idea where William went
10    when he left your house that day?
11 A  He generally goes home.
12 Q  Home, okay. So what was -- what's the next thing
13    that you remember happening about November 19,
14    2013?
15 A  I received a call from a mutual friend that Bill
16    was in jail. Oh, I apologize. Bill called me
17    and said his mother was in the hospital.
18 Q  Do you know about what time that phone call was?
19 A  It was late in the evening.
20 Q  Okay. Were you at home?
21 A  Yes.
22 Q  Okay. So that's the first call you received?
23 A  Yes.
24 Q  And what did you do when you received that phone
25    call? Did you do anything?

---

Page 17

1 A  I asked if I should come down to the hospital.
2 Q  And did you go to the hospital?
3 A  I did not.
4 Q  Okay. And then you received a call from a mutual
5    friend?
6 A  After she passed away.
7 Q  Okay. Was it that same evening?
8 A  Yes.
9 Q  And who was your friend who called you?
10 A  Nadine Murphy.
11 Q  N-A-D-I-N-E?
12 A  Uh-huh.
13 Q  And she told you that William was in jail?
14 A  Yes.
15 Q  What else did she tell you?
16 A  That was it.
17 Q  Did she tell you why he was in jail?
18 A  No.
19 Q  What was your first thought when you heard that
20    he was in jail?
21 A  Why.
22 Q  And what did you do when you found out that
23    William was in jail?
24 A  I asked what I needed to do and if I could see
25    him.

---

WILLIAM RAINSBERGER VS.
CHARLES BENNER

MARI BILGER
December 20, 2016

---

Page 18

1  Q   Were you able to see him?

2  A   No.

3  Q   When was the next time you did see William?

4  A   After he was released.

5  Q   Okay.  And do you know, was that the next day?

6  A   No.

7  Q   Okay.  How much longer do you think that was?

8  A   I saw him at court --

9  Q   Okay.

10 A   -- twice, and I believe it was almost six months
11     that he was incarcerated.

12 Q   When William called you and said his mom was in
13     the hospital, what was his demeanor like?

14 A   He was crying.

15 Q   Crying.  What was your understanding of Ruth's
16     condition at that time?

17 A   They didn't think she would last the evening.

18 Q   Did you get any specifics about what happened to
19     her?

20 A   Bill said that he thought she had been beaten,
21     but wouldn't know if she had been shot because
22     her head was misshapen when he walked in.

23 Q   Sorry, I know this is difficult for you.

24        Did you go to the hospital at any time to
25     see Ruth?

---

Page 19

1  A   I did not.

2  Q   Okay.  When did you find out that Ruth passed
3     away?

4  A   That evening, I believe.

5  Q   And you don't think you saw William again until
6     he was released from prison?

7  A   At the court.

8  Q   Court and then released.  Okay.

9  A   My memory is not good.

10 Q   That's okay.  I know it's been a while, so don't
11     worry.  Just trying to get a sense --

12 A   I think he was questioned.

13 Q   Questioned by the police?

14 A   Yes, that night, and then -- yes, he was
15     questioned that night and then it was several
16     months that we didn't hear anything and then he
17     was questioned again and then he was put in jail,
18     okay.  I'm sorry.  It's been a while.

19 Q   It's okay.  Did you stay in touch with him while
20     he was in jail?

21 A   Yes.

22 Q   Would you usually just speak on the phone?

23 A   Yes.

24 Q   Okay.  Did you ever go visit him?

25 A   No.

---

Page 20

1  Q   Okay.  When he got out, what happened?

2  A   What do you mean?

3  Q   Did you guys go back to your relationship?

4  A   Yes.

5  Q   Did you ever have to give a statement to the
6     police?

7  A   No.

8  Q   How did William react to being charged with his
9     mother's death?

10 A   He was very upset and surprised and a little bit
11     angry.

12 Q   Do you know if William was ever asked to give a
13     polygraph to the police?

14 A   I believe so, yes.

15 Q   And do you know if he did?

16 A   He did not.

17 Q   Okay.  Do you know how he reacted to being asked
18     to give a polygraph?

19 A   He was angry a little bit.

20 Q   Do you know if Ruth had any trouble with people
21     at her apartment complex?

22 A   Not directly, no.

23 Q   What do you -- indirectly would she have issues?

24 A   I knew the apartment to be in a bad area because
25     a co-worker had a niece attacked there.

---

Page 21

1  Q   So when you say bad area, do you mean crime, lots
2     of crime?

3  A   Yes.

4  Q   Do you know what types of crime?

5  A   Somebody was hit on the head and their purse was
6     taken and somebody was raped.

7  Q   Okay.  Would you ever have thought that William
8     was capable of hurting his mom?

9  A   No.

10 Q   Do you know if William received any money from
11     his mom's estate after her death?

12 A   I know she had a little bit of money because
13     that's what she lived off of, and a retirement,
14     but nothing of substance.

15 Q   Okay.  I just have a few questions about sort
16     of -- that would go to William's damages, sort of
17     how you saw this impact William --

18 A   Okay.

19 Q   -- if that makes sense.  Can you explain some of
20     the emotional injuries that he may have had, if
21     any, related to this injury -- or related to this
22     incident?

23 A   His depression got worse.  He became more
24     withdrawn.  He didn't come over.

25 Q   Did this incident and William being charged

---

| Page 22 | Page 24 |
|---|---|

**Page 22**

1  affect your guys' relationship?

2  A   Yes.

3  Q   Any other injuries, physical, emotional, mental,

4      that you think that William experienced as part

5      of this incident?

6  A   I believe he became more cut off socially.

7  Q   Is there anything else about this incident that

8      you recall that we haven't talked about today?

9  A   I know he suffered severe financial loss because

10     of the lawyers and the bail and all of the other

11     legal things.

12 Q   Anything else you can remember about specifics

13     about the incident and what you recall or about

14     William and his injuries?

15 A   Nothing that I can think of.

16 Q   Okay.  Is there anything else that you think

17     would be important for me to know today?

18 A   No.

19     MS. BOX: That's all the questions I have.

20     MR. WAPLES: Okay.  I don't have any

21 questions.

22     THE REPORTER: Signature?

23     MR. WAPLES: You have the opportunity to

24 read the transcript, if you want, and then sign

25 it, or you can waive signature.

**Page 23**

1      THE WITNESS: I waive.

2  AND FURTHER THE DEPONENT SAITH NOT.

3

       (Signature Waived)

4      _____

       MARI BILGER

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 24**

1  STATE OF INDIANA      )
                          ) SS:

2  COUNTY OF MARION       )

3      I, Dianne Lockhart, RMR, CRR, CSR, a Notary

4  Public in and for the County of Marion, State of

5  Indiana at large, do hereby certify that MARI BILGER,

6  the deponent herein, was by me first duly sworn to

7  tell the truth, the whole truth, and nothing but the

8  truth in the above-captioned cause.

9      That the foregoing deposition was taken on

10 behalf of the Defendant at the offices of Circle City

11 Reporting, 135 North Pennsylvania Street, Suite 1720,

12 Indianapolis, Marion County, Indiana, on the 20th day

13 of December, 2016, pursuant to the Applicable Rules.

14     That said deposition was taken down in

15 stenograph notes and afterwards reduced to typewriting

16 under my direction, and that the typewritten

17 transcript is a true record of the testimony given by

18 said deponent; and that signature of said deponent to

19 their deposition was waived by the deponent and all

20 parties present, the deposition to be read with the

21 same force and effect as if signed by them;

22     That the parties were represented by their

23 aforementioned counsel;

24     I do further certify that I am a disinterested

25 person in this cause of action; that I am not a

**Page 25**

1  relative or attorney of either party, or otherwise

2  interested in the event of this action, and am not in

3  the employ of the attorneys for either party.

4      IN WITNESS WHEREOF, I have hereunto set my hand

5  and affixed my notarial seal this _____ day of

6  _____, 2017.

7

8      _____

9      Dianne Lockhart, RMR, CRR, CSR
           Notary Public
           CSR #93-R-1012

10

11  My Commission Expires:

12 June 4, 2023

13 County of Residence:
   Marion

14

15

16

17

18

19

20

21

22

23

24

25

**WILLIAM RAINSBERGER VS.**
**CHARLES BENNER**

**MARI BILGER**
**December 20, 2016**

---

**#**

**#93-R-1012 (1)**
25:9.5

**A**

**able (2)**
4:23;18:1
**above-captioned (1)**
24:8
**action (2)**
24:25;25:2
**address (3)**
5:21,23;6:2
**affect (1)**
22:1
**affixed (1)**
25:5
**aforementioned (1)**
24:23
**afterwards (1)**
24:15
**again (2)**
19:5,17
**aids (1)**
5:5
**alcohol (2)**
5:3;9:13
**almost (1)**
18:10
**alone (2)**
6:3,4
**along (1)**
4:7
**angry (2)**
20:11,19
**apart (1)**
8:11
**apartment (4)**
11:14,16;20:21,24
**apologize (2)**
7:10;16:16
**Applicable (1)**
24:13
**area (2)**
20:24;21:1
**around (1)**
12:8
**arrested (1)**
7:7
**assets (1)**
9:24
**assume (1)**
3:20
**ate (1)**
10:9
**attacked (1)**
20:25
**attend (1)**
6:11
**attorney (1)**

25:1
**attorneys (1)**
25:3
**aware (3)**
9:1;10:1,14
**away (1)**
13:20;17:6;19:3

**B**

**back (3)**
9:19;13:13;20:3
**background (1)**
6:8
**bad (2)**
20:24;21:1
**bail (1)**
22:10
**bar (3)**
14:3,5,19
**basis (1)**
11:3
**bathroom (1)**
4:15
**beaten (1)**
18:20
**became (2)**
21:23;22:6
**becoming (1)**
11:9
**bedroom (1)**
15:23
**behalf (1)**
24:10
**besides (1)**
5:1
**better (2)**
11:1;12:12
**Bilger (3)**
3:7;23:4.5;24:5
**Bill (3)**
16:15,16;18:20
**bills (1)**
10:15
**birth (1)**
5:14
**bit (5)**
11:1;13:14;20:10,
19;21:12
**blocks (1)**
15:1
**both (1)**
8:15
**BOX (3)**
3:6,8;22:19
**break (2)**
4:14;11:23
**briefly (2)**
7:11;15:21
**brother (1)**
10:20
**built (1)**
15:23

**C**

**call (5)**
16:15,18,22,25;
17:4
**called (3)**
16:16;17:9;18:12
**came (1)**
9:16
**can (10)**
4:2,15;7:11;13:5,
25;15:21;21:19;
22:12,15,25
**capable (1)**
21:8
**car (1)**
7:12
**cards (1)**
15:4
**carry (2)**
13:1,3
**case (1)**
3:9
**cash (1)**
13:1
**cats (2)**
8:15,16
**cause (2)**
24:8,25
**ceilings (1)**
15:24
**cell (1)**
6:4
**certificates (1)**
6:18
**certify (2)**
24:5,24
**charged (2)**
20:8;21:25
**chronic (1)**
9:1
**Circle (1)**
24:10
**Citizens (3)**
7:1,2,5
**City (2)**
3:9;24:10
**clear (1)**
3:13
**close (2)**
10:5,6
**clothes (1)**
10:10
**coffee (1)**
4:15
**college (2)**
6:11,17
**Commission (1)**
25:11.5
**common (1)**
16:5
**complain (3)**

10:16,21,23
**complex (1)**
20:21
**condition (2)**
12:7;18:16
**constant (1)**
11:7
**continual (1)**
11:3
**conversations (1)**
11:5
**counsel (1)**
24:23
**count (1)**
9:3
**COUNTY (4)**
24:2,4,12;25:13
**couple (2)**
6:7;7:18
**court (3)**
18:8;19:7,8
**co-worker (1)**
20:25
**crime (3)**
21:1,2,4
**CRR (2)**
24:3;25:8.5
**crying (2)**
18:14,15
**CSR (3)**
24:3;25:8.5,9.5
**current (1)**
5:21
**cut (1)**
22:6

**D**

**Daily (1)**
10:7
**damages (1)**
21:16
**date (1)**
5:14
**day (6)**
13:19,22;16:10;
18:5;24:12;25:5
**death (3)**
13:11;20:9;21:11
**debt (1)**
10:1
**December (1)**
24:13
**Defendant (1)**
24:10
**degree (1)**
6:15
**demeanor (1)**
18:13
**depend (1)**
15:20
**DEPONENT (5)**
23:2;24:6,18,18,19

**deposition (6)**
3:10;5:9;24:9,14,
19,20
**depression (3)**
9:3,9;21:23
**describe (5)**
10:3;11:18;12:7;
13:5;15:21
**Dianne (3)**
24:3;25:8.5
**died (1)**
5:19
**different (1)**
8:13
**difficult (2)**
4:5;18:23
**dinner (2)**
9:17;12:18
**DIRECT (1)**
3:5
**direction (1)**
24:16
**directly (1)**
20:22
**discussion (1)**
11:10
**disinterested (1)**
24:24
**divorced (1)**
7:21
**documents (1)**
5:12
**door (1)**
13:15
**down (3)**
4:2;17:1;24:14
**dozen (1)**
12:19
**drank (1)**
9:16
**drugs (4)**
5:1,1;9:10,11
**duly (2)**
3:1;24:6
**duties (1)**
7:5

**E**

**East (1)**
8:9
**education (1)**
6:18
**effect (1)**
24:21
**eight (1)**
14:8
**either (2)**
25:1,3
**else (4)**
17:15;22:7,12,16
**emotional (1)**
21:20;22:3

---

**Circle City Reporting**
**317-635-7857**

Case 1:16-cv-00103-TWP-MJD   Document 86-2   Filed 12/28/17   Page 314 of 495 PageID #:
2250
WILLIAM RAINSBERGER VS.
CHARLES BENNER
MARI BILGER
December 20, 2016

**employ (1)**
25:3
**employed (3)**
6:20,22,24
**end (1)**
14:20
**Energy (1)**
7:1
**estate (1)**
21:11
**estimate (1)**
12:14
**evening (5)**
15:3;16:19;17:7;
18:17;19:4
**event (1)**
25:1
**exact (1)**
8:4
**exactly (1)**
13:12
**EXAMINATION (1)**
3:5
**examined (1)**
3:4
**expected (1)**
13:15
**expensive (1)**
12:23
**experienced (1)**
22:4
**Expires (1)**
25:11.5
**explain (3)**
7:11;13:25;21:19
**eyeglasses (1)**
5:7

**F**

**fairly (1)**
16:5
**feel (1)**
3:22
**few (3)**
3:12;8:23;21:15
**financial (2)**
10:13;22:9
**find (1)**
19:2
**fine (2)**
8:25;9:4
**finish (1)**
4:9
**Firehouse (1)**
14:11
**first (6)**
3:1,14;4:17;16:22;
17:19;24:6
**follows (1)**
3:4
**force (1)**
24:21

**foregoing (1)**
24:9
**found (1)**
17:22
**four (1)**
15:1
**Fowlerville (1)**
6:10
**Francis (1)**
9:21
**free (1)**
3:22
**frequently (1)**
9:15
**friend (3)**
16:15;17:5,9
**FURTHER (2)**
23:2;24:24

**G**

**general (3)**
7:5;10:11;12:16
**generally (2)**
15:12;16:11
**given (2)**
3:10;24:17
**glass (1)**
9:16
**goes (1)**
16:11
**Good (2)**
3:7;19:9
**grab (1)**
4:15
**ground (1)**
3:12
**Group (1)**
7:1
**guys (10)**
7:16,21;8:10,21;
14:10,15,19,24;
15:16;20:3
**guys' (1)**
22:1

**H**

**habit (1)**
13:23
**hand (1)**
25:4
**happened (2)**
18:18;20:1
**happening (1)**
16:13
**head (5)**
4:2,3;14:24;18:22;
21:5
**hear (4)**
3:22;4:23;10:16;
19:16
**heard (2)**

**3:20;17:19**
**hearing (1)**
5:5
**help (1)**
3:13
**helping (2)**
10:17,24
**hereby (1)**
24:5
**herein (1)**
24:6
**hereunto (1)**
25:4
**high (2)**
6:9;15:24
**history (1)**
4:22
**hit (1)**
21:5
**home (7)**
11:1,6,10;14:25;
16:11,12,20
**hospital (5)**
16:17;17:1,2;
18:13,24
**hospitalizations (1)**
9:4
**hours (1)**
7:3
**house (14)**
8:5,17,19;9:22;
12:3,15;14:17;15:3,
15,19,22,23;16:3,10
**housekeeping (1)**
10:11
**houses (2)**
8:13,14
**hundred (2)**
14:14;15:5
**hung (1)**
10:11
**hurting (1)**
21:8

**I**

**idea (1)**
16:9
**illegal (1)**
5:1
**illnesses (1)**
9:2
**impact (1)**
21:17
**important (1)**
22:17
**incarcerated (1)**
18:11
**incident (7)**
7:19;13:8;21:22,
25;22:5,7,13
**income (1)**
9:18

**Indiana (5)**
5:22;6:14;24:1,5,
12
**Indianapolis (2)**
3:9;24:12
**indirectly (1)**
20:23
**Information (2)**
6:16,21
**injuries (3)**
21:20;22:3,14
**injury (1)**
21:21
**interested (1)**
25:2
**investigated (1)**
10:25
**issue (1)**
11:9
**issues (1)**
20:23

**J**

**jail (7)**
16:16;17:13,17,20,
23;19:17,20
**jewelry (1)**
12:23
**jumping (1)**
13:13
**June (1)**
25:12

**K**

**KAR (1)**
6:21
**KATHRYN (2)**
3:6,8
**key (1)**
11:13,16
**kids (1)**
8:21
**kind (2)**
13:13,25
**knew (2)**
12:24;20:24

**L**

**large (1)**
24:5
**last (2)**
13:10;18:17
**late (1)**
16:19
**later (2)**
4:6;15:20
**lawsuit (1)**
7:9
**lawyers (1)**
22:10

**leave (1)**
14:19;15:11,12,13,
18
**left (1)**
16:10
**legal (1)**
22:11
**lines (1)**
4:7
**little (5)**
11:1;13:14;20:10,
19;21:12
**live (4)**
6:3,4;8:5,8
**lived (3)**
8:9,11;21:13
**lives (1)**
6:1
**local (1)**
14:3
**Lockhart (2)**
24:3;25:8.5
**long (2)**
4:12;6:22
**longer (1)**
18:7
**long-term (1)**
12:12
**losing (1)**
12:9
**loss (1)**
22:9
**lot (2)**
12:17;13:1
**lots (1)**
21:1
**loud (1)**
4:1
**loved (1)**
11:20

**M**

**makes (3)**
4:4;5:16;21:19
**many (1)**
12:14
**MARI (2)**
23:4.5;24:5
**MARION (4)**
24:2,4,12;25:13.5
**married (4)**
7:14,16,18;8:14
**matter (1)**
3:3
**may (1)**
21:20
**Maybe (3)**
8:20;11:22;14:21
**mean (2)**
20:2;21:1
**medical (2)**
4:22;12:7

Case 1:16-cv-00103-TWP-MJD Document 58-2 Filed 11/28/17 Page 315 of 495 PageID #:
2251
WILLIAM RAINSBERGER VS.
CHARLES BENNER
MARI BILGER
December 20, 2016

**medication (1)**
4:19
**medications (2)**
9:7;10:10
**memory (2)**
12:12;19:9
**mental (1)**
22:3
**mention (1)**
11:4
**Michigan (1)**
6:10
**might (2)**
8:1;14:8
**misshapen (1)**
18:22
**mom (5)**
10:4,17;11:6;
18:12;21:8
**mom's (1)**
21:11
**Monday (4)**
13:19,23,25;14:15
**money (2)**
21:10,12
**month (3)**
8:20;11:22;12:1
**months (3)**
6:23;18:10;19:16
**more (3)**
11:7;21:23;22:6
**morning (4)**
3:7;4:19;14:23;
15:7
**mother (1)**
16:17
**mother's (1)**
20:9
**much (3)**
10:24;12:9;18:7
**multi-level (1)**
15:25
**Murphy (1)**
17:10
**mutual (2)**
16:15;17:4

**N**

**Nadine (1)**
17:10
**N-A-D-I-N-E (1)**
17:11
**name (2)**
3:8;14:4
**nature (1)**
11:9
**need (2)**
4:14,21
**needed (2)**
11:7;17:24
**next (6)**
4:10;14:23;15:7;

16:12;18:3,5
**niece (1)**
20:25
**night (9)**
8:17,19;14:6,13,
16;15:2,15;19:14,15
**nights (2)**
8:18;13:24
**nods (1)**
4:2
**noon (2)**
15:12,19
**normal (2)**
13:25;14:15
**North (1)**
24:11
**notarial (1)**
25:5
**Notary (2)**
24:3;25:9
**notes (1)**
24:15
**noticed (1)**
3:15
**November (7)**
5:19,23;6:5,24;
9:19;13:19;16:13
**number (1)**
6:5
**nursing (3)**
11:1,6,10

**O**

**occasion (1)**
12:18
**occasional (1)**
11:4
**occurred (1)**
7:19
**o'clock (1)**
14:21
**off (2)**
21:13;22:6
**offices (1)**
24:10
**often (3)**
8:16,19;10:6
**old (2)**
5:16,18
**once (1)**
8:20
**one (2)**
3:14;7:14
**only (1)**
4:16
**open (1)**
13:15
**opportunity (1)**
22:23
**order (1)**
12:6
**otherwise (1)**

25:1
**out (6)**
4:1;10:24;12:17;
17:22;19:2;20:1
**over (8)**
4:8;9:16;12:2,5,15;
13:24;14:2;21:24
**owned (1)**
9:22

**P**

**paid (1)**
10:15
**part (1)**
22:4
**parties (2)**
24:20,22
**party (3)**
7:9;25:1,3
**passed (3)**
13:20;17:6;19:2
**past (1)**
12:10
**pending (1)**
4:17
**Pennsylvania (1)**
24:11
**people (1)**
20:20
**percent (2)**
14:14;15:5
**person (2)**
7:12;24:25
**phone (4)**
6:4;16:18,24;19:22
**physical (1)**
22:3
**Plainfield (2)**
5:22;8:6
**play (2)**
14:2,10
**played (3)**
14:6,16;15:4
**playing (1)**
14:13
**point (1)**
11:8
**poker (7)**
14:2,6,7,10,13,16,
20
**police (3)**
19:13;20:6,13
**polygraph (2)**
20:13,18
**post (1)**
6:17
**prepare (1)**
5:9
**present (1)**
24:20
**prior (1)**
13:11

**prison (1)**
19:6
**probably (1)**
12:18
**problem (3)**
8:4;13:7,13
**Public (2)**
24:4;25:9
**purse (1)**
13:3,5;21:5
**pursuant (1)**
24:13
**put (1)**
19:17
**putting (1)**
11:6

**Q**

**quick (1)**
6:8

**R**

**ranch (2)**
15:25;16:1
**raped (1)**
21:6
**Rarely (1)**
8:20
**react (1)**
20:8
**reacted (1)**
20:17
**read (3)**
4:5;22:24;24:20
**reason (2)**
8:10;16:7
**Rebecca (1)**
10:23
**recall (7)**
5:18;12:20;13:10;
14:12;15:2;22:8,13
**receive (1)**
9:20
**received (5)**
16:15,22,24;17:4;
21:10
**recent (1)**
12:11
**record (2)**
3:13;24:17
**reduced (1)**
24:15
**regular (1)**
11:3
**regularly (2)**
9:7,8
**related (2)**
21:21,21
**relating (1)**
3:3
**relationship (4)**

10:3;11:18;20:3;
22:1
**relative (1)**
25:1
**released (3)**
18:4;19:6,8
**remember (5)**
12:9;13:12,23;
16:13;22:12
**remembered (1)**
12:10
**repeat (1)**
3:23
**rephrase (1)**
3:23
**REPORTER (1)**
22:22
**Reporting (1)**
24:11
**represent (1)**
3:9
**represented (1)**
24:22
**Residence (1)**
25:13
**retired (1)**
9:20
**retirement (2)**
9:20;21:13
**review (1)**
5:12
**Right (2)**
11:5;14:24
**RMR (2)**
24:3;25:8.5
**Robert (3)**
10:16,18,23
**room (1)**
15:16
**roster (2)**
14:4,5
**routine (1)**
14:1
**rule (1)**
3:19
**rules (2)**
3:12;24:13
**Ruth (10)**
5:19;11:19,20;
12:2;13:10,14,20;
18:25;19:2;20:20
**Ruth's (3)**
12:7,15;18:15

**S**

**SAITH (1)**
23:2
**same (5)**
4:7;5:23;15:16;
17:7;24:21
**savings (1)**
9:25

saw (6)
 12:1,17;13:10;
 18:8;19:5;21:17
school (1)
 6:9
scratched (1)
 7:12
seal (1)
 25:5
second (2)
 3:18,19
seeing (1)
 12:20
seemed (1)
 12:12
sense (2)
 19:11;21:19
Services (1)
 6:21
set (1)
 25:4
Seven (3)
 14:8,9;15:11
several (1)
 19:15
severe (1)
 22:9
shakes (1)
 4:3
shot (1)
 18:21
sign (1)
 22:24
Signature (4)
 22:22,25;23:3.5;
 24:18
signed (2)
 14:4;24:21
Silly (1)
 16:8
sister (1)
 10:25
Sisters (1)
 9:21
sit (1)
 10:12
six (1)
 18:10
sleep (1)
 15:12
socially (1)
 22:6
Somebody (2)
 21:5,6
someone (2)
 4:5;13:16
Sometimes (1)
 15:20
sorry (8)
 6:6;10:19,21;
 11:21,23;16:1;18:23;
 19:18
sort (5)

 3:12;4:2;7:3;21:15,
 16
South (1)
 5:22
speak (1)
 19:22
specific (1)
 8:10
specifics (2)
 18:18;22:12
spend (4)
 8:16,19;14:16;
 15:15
spent (1)
 15:2
SS (1)
 24:1.5
St (1)
 9:21
stairs (1)
 11:8
start (2)
 4:10;14:7
STATE (2)
 24:1,4
statement (1)
 20:5
stay (2)
 15:16;19:19
stenograph (1)
 24:15
straight (1)
 14:25
Street (3)
 5:22;8:9;24:11
stuff (1)
 10:13
substance (1)
 21:14
substantial (2)
 9:25;12:21
sued (1)
 7:12
suffered (1)
 22:9
Suite (1)
 24:11
supervision (1)
 11:7
support (1)
 7:6
sure (7)
 3:16;4:1,7;10:9,9,
 10;12:6
surprised (1)
 20:10
sworn (3)
 3:1,15;24:6

**T**

talk (2)
 4:8;13:18

talked (1)
 22:8
talking (1)
 4:3
technical (2)
 6:17;7:6
technology (1)
 6:16
ten (3)
 14:21;15:12,19
testified (1)
 3:4
testimony (1)
 24:17
thought (4)
 10:25;17:19;18:20;
 21:7
three (2)
 8:18;15:23
times (4)
 3:16;12:14,17,19
today (9)
 3:8,14,16;4:13,24;
 5:10,16;22:8,17
together (2)
 4:3;16:3
told (1)
 17:13
took (1)
 9:8
totally (2)
 4:4;8:25
touch (1)
 19:19
training (1)
 6:18
transcript (3)
 4:5;22:24;24:17
trouble (1)
 20:20
true (1)
 24:17
truth (8)
 3:2,2,3,15,17;24:7,
 7,8
try (1)
 4:9
trying (2)
 4:5;19:11
twice (3)
 11:22;12:1;18:10
Two (4)
 6:23;8:13,14,18
types (1)
 21:4
typewriting (1)
 24:15
typewritten (1)
 24:16

**U**

under (1)

 24:16
understood (1)
 3:21
University (1)
 6:14
up (2)
 10:11;15:6
upset (1)
 20:10
use (3)
 4:15;5:5;9:10
usually (4)
 14:19,24;15:18;
 19:22

**V**

value (1)
 12:21
versa (1)
 4:10
vice (1)
 4:10
Vine (1)
 5:22
visit (3)
 10:12;12:6;19:24

**W**

waive (2)
 22:25;23:1
Waived (2)
 23:3.5;24:19
walked (1)
 18:22
WAPLES (2)
 22:20,23
washed (1)
 10:11
week (1)
 8:18
Wesleyan (1)
 6:14
what's (4)
 3:13;5:14,21;16:12
WHEREOF (1)
 25:4
whole (2)
 3:2;24:7
William (30)
 7:13;8:5,8,16,24;
 10:21;11:6,13;13:22;
 14:12,16;15:2,11,15,
 18;16:2,9;17:13,23;
 18:3,12;19:5;20:8,
 12;21:7,10,17,25;
 22:4,14
William's (3)
 9:18;10:3;21:16
wine (1)
 9:16
withdrawn (1)

 24:16
WITNESS (2)
 23:1;25:4
woken (1)
 15:6
work (5)
 4:13;6:21;10:17;
 14:23;15:13
works (1)
 11:11
worry (1)
 19:11
worse (1)
 21:23

21:24

**Y**

years (1)
 7:18

**1**

10th (1)
 8:9
135 (1)
 24:11
1720 (1)
 24:11
1886 (1)
 15:24
18th (1)
 13:19
19 (3)
 5:19;6:5;16:13

**2**

2011 (1)
 7:17
2013 (6)
 5:19,24;6:5,25;
 9:19;16:14
2014 (1)
 7:22
2015 (1)
 8:1
2016 (1)
 24:13
2017 (1)
 25:6
2023 (1)
 25:12
20th (1)
 24:12
2-12-71 (1)
 5:15
221 (1)
 5:22

**3**

317-710-7604 (1)
 6:6

**WILLIAM RAINSBERGER VS.**
**CHARLES BENNER**

**MARI BILGER**
**December 20, 2016**

| 4 |
| --- |

**4 (1)**
   25:12
**43 (1)**
   5:20
**45 (1)**
   5:17

| 5 |
| --- |

**5 (1)**
   7:3

| 7 |
| --- |

**7 (1)**
   15:10
**7:30 (1)**
   15:14
**710 (1)**
   6:6

| 8 |
| --- |

**8 (1)**
   7:3

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION
CASE NO. 1:16-cv-00103-WTL-MJD

WILLIAM RAINSBERGER,        )
                            )
              Plaintiff,    )
                            )
      -vs-                  )
                            )
CHARLES BENNER,             )
                            )
              Defendant.    )


     The deposition upon oral examination of

ROBERT RAINSBERGER, a witness produced and sworn

before me, Dianne Lockhart, RMR, CRR, CSR, a Notary

Public in and for the County of Marion, State of

Indiana, taken on behalf of the Defendant at the

offices of Circle City Reporting, 135 North

Pennsylvania Street, Suite 1720, Indianapolis, Marion

County, Indiana, on the 20th day of December, 2016,

commencing at 9:02 a.m. pursuant to the Federal Rules

of Civil Procedure.




CIRCLE CITY REPORTING
135 North Pennsylvania
Suite 1720
Indianapolis, IN  46204
(317) 635-7857

WILLIAM RAINSBERGER VS.
CHARLES BENNER

ROBERT RAINSBERGER
December 20, 2016

---

Page 2

```
 1              A P P E A R A N C E S
 2   FOR THE PLAINTIFF:    Richard A. Waples
                           WAPLES & HANGER
 3                         410 North Audubon Road
                           Indianapolis, IN  46219
 4
 5
 6   FOR THE DEFENDANT:    Kathryn M. Box
                           OFFICE OF CORPORATION COUNSEL
                           200 East Washington Street
 7                         Room 1601
                           Indianapolis, IN  46204
 8
 9
10   ALSO PRESENT:         William Rainsberger
11
12
13
14
15
16
17
18
19
20      I N D E X   O F   E X A M I N A T I O N
                                            PAGE
21   DIRECT EXAMINATION ........................ 3
         Questions by Kathryn M. Box
22
23
24
25
```

---

Page 3

1  R O B E R T   R A I N S B E R G E R, having been
2    first duly sworn to tell the truth, the whole
3    truth and nothing but the truth relating to said
4    matter, was examined and testified as follows:
5  DIRECT EXAMINATION,
6    QUESTIONS BY KATHRYN M. BOX:
7  Q   Good morning, Mr. Rainsberger. Thank you for
8    being here today.
9  A   Good morning.
10 Q   My name's Kathryn Box. I represent the City of
11    Indianapolis in this case.
12    Have you ever given a deposition before?
13 A   No.
14 Q   Okay. There's just a few kind of simple ground
15    rules that'll help us get a clear transcript
16    today. You met our court reporter. She's taking
17    down everything that we say, so it's very
18    important that when you answer my questions, you
19    answer out loud instead of doing head shakes and
20    nods and that kind of thing, because while we
21    understand each other, it's hard when someone
22    tries to read it later to understand.
23 A   Right.
24 Q   Also, at the same time, make sure that we don't
25    talk over each other. I'll do my best to let you

---

Page 4

1    finish answering the question before I start my
2    next question and vice versa.
3    If you answer a question, I'm going to
4    assume that you heard me and that you understood
5    the question, but if at any time I mumble or my
6    question's not clear, please ask me to rephrase
7    it or restate the question; okay?
8  A   (Affirmative nod).
9  Q   Can you -- is that okay?
10 A   Yes.
11 Q   Sorry. I may remind you every once in a while.
12    MR. WAPLES: He could just go like this
13    (indicating).
14 Q   And you did -- you were sworn in today.
15 A   Yes.
16 Q   So the most important thing is that you tell the
17    truth. If there's -- I know this was back in
18    2013, so if there's things you don't remember,
19    that's fine as well. I don't think we'll go very
20    long today. I don't have a ton of questions, but
21    if at any time you need a break, just ask me and
22    you can get coffee, use the restroom, anything
23    like that. I'd just ask that you answer the
24    pending question first; okay?
25 A   (Affirmative nod).

---

Page 5

1  Q   All right.
2  A   Yes.
3  Q   Thank you. Did you take any medication this
4    morning?
5  A   No.
6  Q   Okay. When was the last time you used any
7    alcohol?
8  A   Alcohol?
9  Q   Yeah.
10 A   Saturday.
11 Q   Okay. How about any illegal drugs?
12 A   Years.
13 Q   Okay. Do you use hearing aids?
14 A   No.
15 Q   Or eyeglasses?
16 A   Reading glasses.
17 Q   Reading glasses, okay. Is there any reason that
18    you wouldn't be able to understand my questions
19    today?
20 A   Perhaps grammatically, but other than that, I
21    understand the language pretty well.
22 Q   Okay. Good. What did you do to prepare for your
23    deposition today?
24 A   I met with Mr. Waples just to go over. This is
25    the first time, so kind of --

---

WILLIAM RAINSBERGER VS.
CHARLES BENNER

ROBERT RAINSBERGER
December 20, 2016

Page 6

1 Q   Did you -- sorry, go ahead.
2 A   No.  It's just basic stuff.
3 Q   Did you review any documents?
4 A   My testimony -- or my -- the questioning the
5     night of the incident.
6 Q   Your statement to the police?
7 A   Right.
8 Q   Okay.  Any other documents that you reviewed?
9 A   Uh-uh, no.
10 Q   And what's your birthday?
11 A   1-12-62.
12 Q   And that makes you how old today?
13 A   54.
14 Q   And how old were you on November 19th of 2013?
15 A   2013, I'd be 51.
16 Q   Okay.  And what is your current address?
17 A   7155 East 21st Street, Apartment 5.
18 Q   And that's in Indianapolis?
19 A   Yes.
20 Q   What was your address on November 19th of 2013?
21 A   7345 East 13th Street.
22 Q   And was that William's address as well?
23 A   Yes.
24 Q   Okay.  Was there anyone else who lived there with
25     you and William?

Page 7

1 A   No.
2 Q   Can you describe William's house for me briefly.
3 A   It's a one floor ranch.
4 Q   How many bedrooms?
5 A   Oh, no, it does have a bedroom upstairs.  One,
6     two, three bedrooms.
7 Q   Okay.  And what was your cell phone number in
8     November of 2013?
9 A   317-357-5791.
10 Q   Okay.  Thank you.  And where did you attend high
11     school?
12 A   Arlington High School.
13 Q   Did you attend college?
14 A   A little bit.
15 Q   A little bit.  Where did you go?
16 A   I had a year at Butler, a year at IUPUI.
17 Q   Did you graduate?
18 A   No.
19 Q   No, okay.  Did you do any other types of
20     technical training, certificates, post high
21     school studies?
22 A   I did aeronautical school, but that was -- there
23     was no graduation.
24 Q   Okay.  And how were you employed in November of
25     2013?

Page 8

1 A   2013.  I was -- I was painting.
2 Q   Painting, okay.  And that's what you're doing
3     today as well?
4 A   Yeah.
5 Q   Okay.  Do you own your own business or do you
6     work for --
7 A   I do sub work and I do some of my own.
8 Q   Okay.  What are your general hours or schedule
9     for painting?
10 A   Generally 8 to 5.
11 Q   Okay.  Does it vary with seasons or times of
12     year?
13 A   Yes.
14 Q   Okay.  And is that less work in the winter?
15 A   Yes.
16 Q   And why were you living with William in November
17     of 2013?
18 A   I lost my house.
19 Q   Was that financial reasons?
20 A   Foreclosure.
21 Q   And how long had you been living with William
22     when your mom passed away?
23 A   A couple of months.
24 Q   Couple of months.  Have you ever been arrested?
25 A   Yes.

Page 9

1 Q   How many times?
2 A   Twice.
3 Q   Twice.  Can you just briefly describe what those
4     arrests were for?
5 A   DUI.
6 Q   Both of them?
7 A   Yes.
8 Q   Have you ever been a party to a lawsuit?
9 A   No.
10 Q   Do you own a firearm?
11 A   No.
12 Q   Did you own one in 2013?
13 A   No.
14 Q   Are you married?
15 A   No.
16 Q   Have you ever been married?
17 A   No.
18 Q   Okay.  Do you have any kids?
19 A   No.
20 Q   Okay.  And can you name your siblings for me,
21     please.
22 A   William T. Rainsberger and Rebecca Sue
23     Rainsberger.
24 Q   And where does Rebecca live?
25 A   South Carolina.

WILLIAM RAINSBERGER VS.
CHARLES BENNER

ROBERT RAINSBERGER
December 20, 2016

---

Page 10

1 Q   How often do you see Rebecca?
2 A   Not very.  I've seen her once since she moved
3     down there.
4 Q   When did she move, do you recall?
5 A   Was that 2014?  Spring or summer of 2014.
6 Q   Okay.  How would you describe your relationship
7     with William in November of 2013?
8 A   Pretty tight.  Not any different than before.
9 Q   Okay.  How often did you visit your mother?
10 A   Once every week or two.
11 Q   Okay.  And when you would visit her, would you go
12     over to her house?
13 A   Yes.
14 Q   And can you describe her house or apartment for
15     me?
16 A   It was a one bedroom on the basement level.
17 Q   How far was her apartment from William and yours
18     house?
19 A   Five or six blocks.
20 Q   Okay.  Do you recall how long your mom had been
21     there?
22 A   No, not exactly.
23 Q   Okay.  That's fine.  And did she live alone?
24 A   Yes.
25 Q   Did she have a cell phone?

---

Page 11

1 A   I believe so, yes.
2 Q   Do you know the number for the cell phone by
3     chance?
4 A   No.
5 Q   And did she have a land line?
6 A   Yes.
7 Q   And do you know that number?
8 A   Not offhand, no.
9 Q   Okay.  How would you describe your mom's physical
10     condition at the time?
11 A   A little hard getting around, but she did.
12 Q   Was she able to care for herself?
13 A   What do you mean, care?
14 Q   Well, I can be more specific.  Did she have to --
15     was she mobile?  Did she have to walk with a
16     wheelchair -- or did she have to have a
17     wheelchair?
18 A   No, she didn't need a wheelchair.
19 Q   What about a walker?
20 A   No.
21 Q   Okay.  Was she able to bathe herself?
22 A   I believe so, yes.
23 Q   Okay.  What about cook for herself?
24 A   No.
25 Q   Okay.  What about clean?

---

Page 12

1 A   She could, but my sister helped with that.
2 Q   Okay.  And what about laundry?
3 A   My sister did that.
4 Q   Okay.  Do you know if she had someone delivering
5     meals to her?
6 A   Meals on Wheels.
7 Q   Meals on Wheels.  How often would she get meals?
8 A   Every day I think.
9 Q   When you would visit your mom, what kind of
10     things would you do?
11 A   Well, she was usually watching TV, so we would
12     watch TV.
13 Q   Okay.  How often would your mom get out of the
14     house?
15 A   I don't know.
16 Q   Okay.  Was she able to drive herself?
17 A   No.
18 Q   So if she left the house, would it always be with
19     you, William or Rebecca?
20 A   Yes.
21 Q   Do you know if she would ever answer the door for
22     someone she didn't know?
23 A   Do I know for a fact, no.
24 Q   Would you have suspected her to personality-wise?
25 A   Yes.

---

Page 13

1 Q   Okay.  How would you describe her mental
2     condition?
3 A   She was suffering from dementia.
4 Q   Dementia, okay.  What kind of side effects would
5     she show -- or symptoms, I guess?
6 A   Well, she wasn't always sure what -- what year it
7     was.  She used to see a small tiger or something
8     at the doctor's office.
9 Q   A small tiger, is that what you said?
10 A   Yes.  Just forgetting names and basic -- what
11     should be basic facts.
12 Q   Okay.  Was she able to handle her own finances?
13 A   No.
14 Q   Would William do those for her?
15 A   Yes.
16 Q   Other than dementia, did she have any other types
17     of chronic illnesses?
18 A   Chronic.  I don't think so.
19 Q   Okay.  Do you know what, if any, medications she
20     was on?
21 A   I don't know.  Well, there was one for dementia
22     that I know, but other than that, I don't know.
23 Q   Do you know the name of that one?
24 A   No.
25 Q   And you said you'd see your mom once every week

---

WILLIAM RAINSBERGER VS.
CHARLES BENNER

ROBERT RAINSBERGER
December 20, 2016

---

**Page 14**

1  or so; is that correct?
2  A   Yes.
3  Q   And you would go to her house most of the time?
4  A   Always, yes.
5  Q   Always.  Sorry.  And you guys would watch TV.
6      Would you do any other, I don't know, chores,
7      stuff for her?
8  A   I'd fix her a meal if it was that time of day.
9      You know, I've washed dishes or picked up a
10     little bit, but.
11 Q   Okay.  How often would William see your mom?
12 A   Almost every day.
13 Q   How would you describe William's relationship
14     with your mom?
15 A   Pretty tight.  He was -- he was making sure
16     everything was right.
17 Q   Do you know how often Rebecca would see your mom?
18 A   Every week I think.
19 Q   Would she have a certain day that she would go on
20     or would it just vary?
21 A   I think it was the same day.
22 Q   Do you know what day that was, by chance?
23 A   Not offhand.
24 Q   And I know you said Rebecca would do some
25     cleaning and some laundry for her; is that

---

**Page 15**

1  correct?
2  A   Yes.
3  Q   Anything else that you know of that Rebecca would
4      do for her?
5  A   Not that I know of.
6  Q   Did you have a key to your mom's apartment?
7  A   Yes.
8  Q   Do you know who else had a key to your mom's
9      apartment?
10 A   My brother and sister.
11 Q   Anybody else that you know of?
12 A   Not that I know of other than apartment
13     management.
14 Q   Okay.  What were your mom's finances like in
15     November of 2013?
16 A   She was doing okay, I guess.
17 Q   Okay.  Did she have any assets that you were
18     aware of?
19 A   Like property?
20 Q   Right, property, house.
21 A   No.
22 Q   What about any savings?
23 A   She had some.
24 Q   Do you know if she was collecting any sort of
25     retirement income?

---

**Page 16**

1  A   Yes.
2  Q   Social Security, do you know, or just --
3  A   I don't know the source.
4  Q   Okay.  Was there any discussions about your mom
5      going into a nursing home?
6  A   Yes.
7  Q   And did you guys come to a decision about that?
8  A   Yes.
9  Q   What was the decision?
10 A   We would, because she needed help, more help than
11     we could give her.
12 Q   Did your mom have expensive things at her
13     apartment?
14 A   No.
15 Q   Did she have any expensive jewelry that you knew
16     of?
17 A   No.
18 Q   Did your mom carry a purse?
19 A   Yes.
20 Q   Can you describe the purse.
21 A   Well, the main one was the black and tan leather.
22 Q   Okay.  Was there another one?
23 A   There was a smaller one, but.  Yeah, the main one
24     was the black and tan leather.
25 Q   Okay.  Do you know if she had a lot of cash on

---

**Page 17**

1  her?
2  A   No, she wouldn't.
3  Q   And you said you guys had made a decision to put
4      your mom in a nursing home.  Why hadn't she been
5      moved to a nursing home yet in November of 2013?
6  A   We had just -- that was about the time we'd made
7      the decision.
8  Q   Okay.  Do you know if your mom had a will?
9  A   I don't know.
10 Q   Do you know -- can you recall the last time you
11     saw your mom prior to this incident, prior to her
12     death?
13 A   It was, I don't know, a few days before.
14 Q   Okay.  Do you know what time you were there?
15 A   I don't recall.
16 Q   Okay.  And why did you go over there?
17 A   To check in on her.
18 Q   And what did you guys do?
19 A   Watched TV.
20 Q   Okay.  Did you use your key to get in?
21 A   Yes.
22 Q   Do you know about how long you stayed?
23 A   No.
24 Q   And do you recall what your mom's condition was
25     when you left?

---

Circle City Reporting
317-635-7857

Page 18

1  A    Yeah, she didn't seem to with it.  She didn't
2       know -- I don't know.  Again, she had trouble
3       with time.
4  Q    Okay.  Did you see William the night before your
5       mom's death on Monday, November 18, 2013?
6  A    I don't know.  I don't remember the night before.
7  Q    Okay.  Do you know if he spent the night at the
8       house that evening?
9  A    I don't know.  He wasn't there the morning of.
10 Q    On Tuesday, the 19th?
11 A    Right.
12 Q    What time did he get home on Tuesday, the 19th?
13 A    If I recall, it was before lunch.
14 Q    Before lunch, okay.  And how long did he stay at
15      the house?
16 A    I don't know because I left.
17 Q    Oh, okay.  Where did you go?
18 A    I ran errands.
19 Q    Do you know what time you left?
20 A    What time I left?
21 Q    What time you left, sorry.
22 A    I left about -- probably be around lunchtime.
23 Q    How long after William got home do you think you
24      left?
25 A    I can't say for sure.

Page 19

1  Q    And how long were you out running errands?
2  A    A few hours.
3  Q    Okay.  Do you know about what time you got home?
4  A    No.
5  Q    No.  Was William home when you got back?
6  A    I don't recall.
7  Q    So do you have any idea what time William left
8       the house that day?
9  A    In the afternoon?
10 Q    Uh-huh.
11 A    I don't.
12 Q    Okay.  But you do know that he left the house
13      sometime to go visit your mom; is that correct?
14 A    Yes.
15 Q    Did you and William ever text in the house
16      together?
17 A    In the house?
18 Q    Yeah.
19 A    No, not that I recall.
20 Q    Okay.  Do you recall any conversations that you
21      had with William before -- when you may have seen
22      him before you left to go do errands?
23 A    Oh, that day?
24 Q    Yeah.
25 A    Could you repeat that?

Page 20

1  Q    Yeah.  Sorry.  So William came home and you left
2       maybe shortly thereafter to go run errands.  Do
3       you recall any conversation that you had in that
4       time?
5  A    While we were both in the house?
6  Q    While you guys were both home together.
7  A    I don't recall, no, unless it's just -- I don't
8       recall.
9  Q    Okay.  What's the next thing that you recall
10      happening that day?
11 A    He called me from my mother's phone.
12 Q    Okay.  Do you know about what time that was?
13 A    It was going on four.
14 Q    Going on four.  And what did William tell you?
15 A    He said, "Get over here now."
16 Q    And you understood that to mean get over to your
17      mom's house?
18 A    Yeah.  The number came up on caller ID.
19 Q    Got you.  Okay.  So what did you do?
20 A    I went over there.
21 Q    Okay.  Did you go immediately?
22 A    Uh-huh, yes.
23 Q    Did you have any other calls from your mom's land
24      line earlier in the day?
25 A    No.

Page 21

1  Q    Okay.  Do you know any reason why your phone
2       records would show a call from your mom
3       earlier -- mom's land line earlier that day?
4  A    Do I know?  No.
5  Q    Okay.  What's the first thing you recall seeing
6       when you arrived at your mom's house?
7  A    He was standing outside the front entrance to the
8       building.
9  Q    We're talking about William; correct?
10 A    Right.  I think fire rescue was already there,
11      and that's -- that's it.
12 Q    Okay.  And what did you do when you got there?
13 A    I walked up to him, I asked him what happened.
14 Q    What did William say?
15 A    He didn't know.
16 Q    Did he give you any other specifics?
17 A    I don't recall.
18 Q    Did he talk to you about your mom's condition?
19 A    He wasn't -- no, I -- no.
20 Q    Okay.
21 A    The only thing I remember was when they wheeled
22      her out, I asked him what happened and he said,
23      "I don't know."
24 Q    Did you speak to any of the fire rescue people or
25      ambulance people there?

WILLIAM RAINSBERGER VS.
CHARLES BENNER

ROBERT RAINSBERGER
December 20, 2016

---

Page 22

1  A    No.
2  Q    Did you go inside your mom's house?
3  A    No.
4  Q    What was William's demeanor like?
5  A    He was in shock.
6  Q    And what was your understanding of your mom's
7       condition at that time?
8  A    At that time, I don't know.
9  Q    Okay.
10 A    She was wheeled out.
11 Q    And you never received any more information at
12      that time about your mom?
13 A    No.
14 Q    Did you at any point shortly after this incident
15      go inside your mom's house?
16 A    No.
17 Q    Did you ever find out if something was missing
18      from your mom's house?
19 A    I still don't know what happened to that purse.
20 Q    Okay.  And when did you find out that the purse
21      was missing?
22 A    I don't recall.
23 Q    Did you ever -- do you recall Detective Benner in
24      this case?
25 A    Yeah.

---

Page 23

1  Q    Yeah.  Did you ever speak with Detective Benner
2       about your mom's purse being missing?
3  A    No.
4  Q    Okay.  So after your mom was wheeled out, you
5       asked William what happened, he said he didn't
6       know.  What happened next?
7  A    First thing I know is the police came out and --
8       and separated us.
9  Q    Okay.  And how did they separate you?
10 A    Put us in the back of cruisers, separate
11      cruisers.
12 Q    Okay.  And how long were you in the cop car for?
13 A    I don't know.  We started going downtown.  At
14      least an hour, maybe an hour and a half.
15 Q    Okay.  Did you speak with any police officers on
16      scene?
17 A    The one that was baby-sitting me.
18 Q    In the vehicle?
19 A    Uh-huh.
20 Q    And what did you say to him?
21 A    I asked him what happened.
22 Q    And what did he say?
23 A    He said she was shot.
24 Q    Anything else that you guys talked about?
25 A    Well, no.

---

Page 24

1  Q    No?  Did you ask him any other questions?
2  A    When he said she was shot, I said -- it just
3       seemed like a surprise to me and then he said he
4       didn't know, maybe it was -- there's a lot of
5       cases like this or some nonsense, so.  That was
6       the extent of it.
7  Q    Okay.  So the next thing that happened, did you
8       go to the police station?
9  A    Downtown, yes.
10 Q    Okay.  And what happened when you got to the
11      police station?
12 A    They put me in an interrogation room.
13 Q    Did William go as well to the police station?
14 A    Yes.
15 Q    But he was in a separate cop car; is that
16      correct?
17 A    Correct.
18 Q    And how long do you think you were in the
19      interrogation room?
20 A    Oh, total, hour and a half, I guess.
21 Q    Did you give a statement to the police that
22      night?
23 A    Yes.
24 Q    Do you recall if that was given to Detective
25      Benner?

---

Page 25

1  A    Yes.
2  Q    And what happened after you gave your statement
3       to Detective Benner?
4  A    They let me go.
5  Q    And did you go home?  Did you go to the hospital?
6       What did you do?
7  A    Hospital.
8  Q    Did William go to the hospital with you?
9  A    Yes.
10 Q    When you got to the hospital, did you learn more
11      about your mom's condition?
12 A    Yes.
13 Q    What did you find out there?
14 A    That she had passed, they removed the tubes and
15      she came back.
16 Q    What do you mean, "she came back"?
17 A    She came back.
18 Q    Came back to life?
19 A    Yes.
20 Q    Did they have any answers for how she sustained
21      her injuries?
22 A    The ER doctor went into great detail about how
23      she was shot.
24 Q    Did the ER doctor tell you anything else?
25 A    That her condition -- I don't remember exactly.

---

WILLIAM RAINSBERGER VS.
CHARLES BENNER

ROBERT RAINSBERGER
December 20, 2016

---

Page 26

```
 1      It revolved around life support and a decision we
 2      had to make.
 3  Q   Whether you were going to take her off of life
 4      support or not?
 5  A   (Affirmative nod).
 6  Q   What was her prognosis?  Or did the doctor give
 7      you an expected outcome at that time?
 8  A   What do you mean, expected outcome?
 9  Q   Did he -- did he give you any chances of her
10      surviving?
11  A   Off life support?
12  Q   Yeah.
13  A   No, he -- he didn't -- well, he described the
14      injuries and what that part of the brain
15      controls, so obviously the outlook was grim.
16  Q   Okay.  And did you guys make the decision to take
17      her off of life support?
18  A   Yes.
19  Q   And who made that decision?
20  A   We all did.  That was her decision, but we all --
21  Q   Followed her directive?
22  A   Right.
23  Q   Okay.  And that was you, William and Rebecca?
24  A   Yes.
25  Q   Did you guys make that decision that evening?
```

---

Page 27

```
 1  A   Yes.
 2  Q   How soon after you guys made that decision and
 3      she was removed from life support did she pass
 4      away?
 5  A   I don't know exactly.  It was after midnight.
 6  Q   Okay.  So sometime the next day?
 7  A   Yeah.
 8  Q   Were you at the hospital the whole time until she
 9      passed away?
10  A   No.
11  Q   No?  What time do you think you left the hospital
12      that evening?
13  A   I don't know.
14  Q   Did William leave the hospital with you at that
15      time?
16  A   Yes.
17  Q   And where did you guys go?
18  A   Home.
19  Q   Home?  And when you got home, did you go straight
20      to sleep?
21  A   No, I didn't sleep.
22  Q   Didn't sleep.  So what happened next that you
23      recall?
24  A   I went to work.
25  Q   What time did you go to work?
```

---

Page 28

```
 1  A   I don't know.  Whenever I --
 2  Q   Okay.  When did you find out that your mom had
 3      passed away?
 4  A   I don't know what time it was.
 5  Q   Before you went to work or after you went to
 6      work?
 7  A   I was at work.
 8  Q   Okay.  And when you found out that she'd passed
 9      away, did you stay at work or did you leave?
10  A   No, I stayed.  I couldn't --
11  Q   Couldn't leave?
12  A   Right.
13  Q   And what happened next?
14  A   I don't know what you mean.
15  Q   Okay.  Did you ever -- after you found out that
16      your mom passed away, did you talk to William
17      about it?
18  A   The next morning.
19  Q   The following day?
20  A   No, later in the morning.
21  Q   Okay.  And did you guys talk on the phone?
22  A   I don't think so.
23  Q   Was it -- so you think you had --
24  A   Huh?
25  Q   Sorry.  Do you think you had the conversation
```

---

Page 29

```
 1      before you went to work, then?
 2  A   No.  I went to work after we got home middle of
 3      the night.  I remember the conversation later
 4      that morning, there was a phone call, we need to
 5      go downtown.
 6  Q   Downtown to the police station?
 7  A   Right.
 8  Q   And do you know who -- who called you?
 9  A   I don't know exactly, no.
10  Q   Okay.  So did you go downtown to the police
11      station?
12  A   Yes.
13  Q   Do you recall what time you went downtown?
14  A   It was -- not exactly.  It was around lunchtime.
15  Q   Okay.  What was your understanding for why you
16      needed to go downtown to the police station?
17  A   To discuss a preliminary autopsy report.
18  Q   And what happened when you got to the police
19      station?
20  A   Well, Benner tried to talk us into taking
21      polygraphs instead.
22  Q   And how did you feel about being asked to do a
23      polygraph?
24  A   How did I feel about -- well, I didn't want to do
25      it.
```

---

WILLIAM RAINSBERGER VS.
CHARLES BENNER

ROBERT RAINSBERGER
December 20, 2016

Page 30

1 Q   Okay. And why didn't you want to do a polygraph?
2 A   It's unreliable information.
3 Q   Okay. Do you know if William was asked to do a
4      polygraph?
5 A   He was asked.
6 Q   And how did he react to that?
7 A   He refused.
8 Q   Do you know how he felt about that?
9 A   He -- same thing.
10 Q  So after you were asked to do a polygraph and you
11     refused, what happened?
12 A  Benner was pissed.
13 Q  Okay.
14 A  He was -- he was angry the whole time we were
15     there, but that pissed him off more than
16     anything.
17 Q  Okay. And what did Benner do? Or how could you
18     tell that he was pissed?
19 A  They spoke to Bill first, then me, and he just
20     had -- well, when we first got there, he talked
21     to my sister like she was a petulant little
22     seven-year-old, and he wanted to talk to her
23     first since he didn't talk to her the night
24     before. And he was just angry. He was angry as
25     soon as we got there. Becky didn't stand up as

Page 31

1      soon as he told her to come with him, so he
2      yelled at her. Then he talked to Bill.
3      Apparently he didn't like what Bill had to say,
4      because by the time got to me, he was fit to be
5      tied. He asked me -- he asked me, "So I suppose
6      you don't want to take a polygraph either." I
7      said, "No." And then he started yelling and he
8      started bringing out statistics about whatever
9      and there was a whole lot of cussing between he
10     and I, a whole lot of yelling, and I -- to
11     Tudor's credit, he broke it up, so.
12 Q  Did you leave the police station after that?
13 A  We were in that main lobby and I finally asked
14     him how she died.
15 Q  And what did he say?
16 A  She was beaten, so. Then we left.
17 Q  Anything else you guys spoke about with
18     Detective Benner at that time?
19 A  No.
20 Q  When did you first hear that William had been
21     arrested for your mom's death?
22 A  There was a private message on Facebook that I
23     didn't understand at first.
24 Q  And who was the message from?
25 A  I don't remember.

Page 32

1 Q   Okay. And after you understood what it said,
2      what did it mean?
3 A   After I understood the context behind it, I went
4      to my brother's house and saw his wallet and
5      phone on the washer, so.
6 Q   Saw his phone on the washer?
7 A   Uh-huh.
8 Q   Okay. And were you looking for his phone?
9 A   No. I just went into the house to see what was
10     going on, and when I saw his phone sitting there
11     and he wasn't there, I -- that was confirmation.
12 Q   So did the message tell you that he had been
13     arrested?
14 A   No.
15 Q   Okay.
16 A   No, it was just apologies kind of thing.
17 Q   The message was?
18 A   Yeah.
19 Q   And you don't recall who that was from?
20 A   No.
21 Q   Okay. Did you suspect that he had been arrested,
22     though?
23 A   No. I had -- when I first read it, I had no
24     clue.
25 Q   Okay. And what did you do after you knew for

Page 33

1      sure that he was arrested?
2 A   There wasn't anything I could do.
3 Q   Okay. What was your first thoughts about hearing
4      that he had been arrested for your mom's death?
5 A   I was pissed. It was just more of the same
6      nonsense that we'd been going through the whole
7      time, so.
8 Q   Okay. Did you ever think that William could have
9      been involved in this, in your mom's death?
10 A   No. No.
11 Q   And were you pissed at Benner, pissed at the
12     police in general?
13 A   Well, Benner mostly, but.
14 Q   And why were you most upset with Benner?
15 A   He was the lead detective. He was the angry one.
16     He was the one that targeted us with really
17     nothing to go on. He's the one that -- from my
18     understanding, he's the one that sat around for
19     months before bothering to do anything, so, yeah.
20 Q   Okay.
21 A   He put in no effort, had us pinned from the
22     beginning, so.
23 Q   Do you know if your mom had any trouble with
24     people at her apartment?
25 A   I can't imagine. She -- she was always inside,

Page 34

1    so.
2  Q  Okay.  Anyone that you could think of that would
3    want to hurt your mom for any reason?
4  A  No.
5  Q  Did you ever receive any money from your mom's
6    estate after she passed away?
7  A  Yes.
8  Q  Did William receive money?
9  A  Some, yes.
10  Q  Okay.  Any other thing that you -- or any other
11    specifics about the incident or William's arrest
12    that we haven't talked about today?
13  A  I can't think of anything, no.
14  Q  Okay.  I'm going to just ask you a few questions
15    about how William's arrest and this incident
16    affected him, if you know.
17        So what kind of injuries or damage do you
18    think William sustained as a result of this
19    incident?
20  A  It's going to stick with him -- I mean this is
21    permanent.  He's -- you know, he wouldn't hurt a
22    fly and all the sudden he's in jail for killing
23    his mother.  That's got to burn.
24  Q  Do you know if he had any physical or emotional
25    injuries related to this incident?

Page 35

1  A  Physical?
2  Q  Yes.
3  A  I don't think so.  Emotional, sure.  Anybody
4    would.
5  Q  Okay.  And could you give me any specifics about
6    his symptoms of that or how those injuries
7    manifested?
8  A  Anger, lots of anger, trying to get his -- like
9    me, except for he -- he was pinned for it.
10    Trying to get your head around things and you
11    can't.  None of it makes sense.  And it never
12    will because it's over now.  But there's always
13    going to be anger about what the police did and
14    what they didn't do, and that's never going to go
15    away.
16  Q  When William was finally released from prison,
17    were you still living at his house at that time?
18  A  Yes.
19  Q  Okay.  And what --
20  A  No.  When he was released?
21  Q  Yeah.
22  A  That was -- I got my timeline mixed up.  I don't
23    remember when that was.
24  Q  Okay.  I believe he was arrested in May of 2014
25    and then he was released in June or July.

Page 36

1  A  Oh, okay.  Okay.
2  Q  Does that make sense?
3  A  Yes.  Yes.
4  Q  Were you still living at his house at that time?
5  A  Uh-huh.
6  Q  And when he came home, what was his demeanor
7    like?
8  A  Well, that day he was pretty damn happy to be
9    out.
10  Q  I can imagine.
11  A  But after that, it's -- you know, still those
12    things in the back of your head, you know, the
13    process isn't over, and, so he kept to himself a
14    lot.  Sometimes we'd be talking and there'd be
15    outbursts, just enough to show it's -- it's all
16    still raised in there under the surface.
17  Q  Okay.  Anything else about how this affected
18    William that we haven't talked about here?
19  A  I don't know.
20  Q  Anything else important that you think I should
21    know about this incident or about William?
22  A  I don't -- I can't think of anything.
23        MS. BOX: Okay.  No further questions.
24        MR. WAPLES: I don't have any questions.
25        THE REPORTER: Signature?

Page 37

1        MR. WAPLES: Robert, you got the right, if
2  you want to, after the deposition is transcribed
3  to read it, make sure it's accurate and then sign
4  it, or you can waive signature.
5        THE WITNESS: All right.
6        MR. WAPLES: So either read and sign or say
7  waive.
8        THE WITNESS: I'll waive.
9   AND FURTHER THE DEPONENT SAITH NOT.
10
11        (Signature Waived)

        _____
        ROBERT RAINSBERGER

Page 38

```
1   STATE OF INDIANA        )
                            ) SS:
2   COUNTY OF MARION        )
3       I, Dianne Lockhart, RMR, CRR, CSR, a Notary
4   Public in and for the County of Marion, State of
5   Indiana at large, do hereby certify that
6   ROBERT RAINSBERGER, the deponent herein, was by me
7   first duly sworn to tell the truth, the whole truth,
8   and nothing but the truth in the above-captioned
9   cause.
10       That the foregoing deposition was taken on
11  behalf of the Defendant at the offices of Circle City
12  Reporting, 135 North Pennsylvania Street, Suite 1720,
13  Indianapolis, Marion County, Indiana, on the 20th day
14  of December, 2016, pursuant to the Applicable Rules.
15       That said deposition was taken down in
16  stenograph notes and afterwards reduced to typewriting
17  under my direction, and that the typewritten
18  transcript is a true record of the testimony given by
19  said deponent; and that signature of said deponent to
20  their deposition was waived by the deponent and all
21  parties present, the deposition to be read with the
22  same force and effect as if signed by them;
23       That the parties were represented by their
24  aforementioned counsel;
25       I do further certify that I am a disinterested
```

Page 39

```
1   person in this cause of action; that I am not a
2   relative or attorney of either party, or otherwise
3   interested in the event of this action, and am not in
4   the employ of the attorneys for either party.
5       IN WITNESS WHEREOF, I have hereunto set my hand
6   and affixed my notarial seal this _____ day of
7   _____, 2017.
8
9       _____
        Dianne Lockhart, RMR, CRR, CSR
10              Notary Public
                CSR #93-R-1012
11
12
    My Commission Expires:
13  June 4, 2023
14  County of Residence:
    Marion
15
16
17
18
19
20
21
22
23
24
25
```

Case 1:16-cv-00103-TWP-MJD   Document 58-3   Filed 11/28/17   Page 329 of 495 PageID #:
2265
Case 1:16-cv-00103-TWP-MJD   Document 50-13   Filed 02/13/17   Page 129 of 166 PageID #:
2265

WILLIAM RAINSBERGER VS.
CHARLES BENNER

ROBERT RAINSBERGER
December 20, 2016

---

## #

**#93-R-1012 (1)**
39:10.5

---

## A

**able (5)**
5:18;11:12,21;
12:16;13:12
**above-captioned (1)**
38:8
**accurate (1)**
37:3
**action (2)**
39:1,3
**address (3)**
6:16,20,22
**aeronautical (1)**
7:22
**affected (2)**
34:16;36:17
**Affirmative (3)**
4:8,25;26:5
**affixed (1)**
39:6
**aforementioned (1)**
38:24
**afternoon (1)**
19:9
**afterwards (1)**
38:16
**Again (1)**
18:2
**ahead (1)**
6:1
**aids (1)**
5:13
**alcohol (2)**
5:7,8
**Almost (1)**
14:12
**alone (1)**
10:23
**always (6)**
12:18;13:6;14:4,5;
33:25;35:12
**ambulance (1)**
21:25
**anger (3)**
35:8,8,13
**angry (4)**
30:14,24,24;33:15
**Apartment (8)**
6:17;10:14,17;
15:6,9,12;16:13;
33:24
**apologies (1)**
32:16
**Apparently (1)**
31:3
**Applicable (1)**

38:14
**Arlington (1)**
7:12
**around (6)**
11:11;18:22;26:1;
29:14;33:18;35:10
**arrest (2)**
34:11,15
**arrested (7)**
8:24;31:21;32:13,
21;33:1,4;35:24
**arrests (1)**
9:4
**arrived (1)**
21:6
**assets (1)**
15:17
**assume (1)**
4:4
**attend (2)**
7:10,13
**attorney (1)**
39:2
**attorneys (1)**
39:4
**autopsy (1)**
29:17
**aware (1)**
15:18
**away (8)**
8:22;27:4,9;28:3,9,
16;34:6;35:15

---

## B

**baby-sitting (1)**
23:17
**back (8)**
4:17;19:5;23:10;
25:15,16,17,18;36:12
**basement (1)**
10:16
**basic (3)**
6:2;13:10,11
**bathe (1)**
11:21
**beaten (1)**
31:16
**Becky (1)**
30:25
**bedroom (2)**
7:5;10:16
**bedrooms (2)**
7:4,6
**beginning (1)**
33:22
**behalf (1)**
38:11
**behind (1)**
32:3
**Benner (11)**
22:23;23:1;24:25;
25:3;29:20;30:12,17;

31:18;33:11,13,14
**best (1)**
3:25
**Bill (3)**
30:19;31:2,3
**birthday (1)**
6:10
**bit (3)**
7:14,15;14:10
**black (2)**
16:21,24
**blocks (1)**
10:19
**Both (3)**
9:6;20:5,6
**bothering (1)**
33:19
**BOX (3)**
3:6,10;36:23
**brain (1)**
26:14
**break (1)**
4:21
**briefly (1)**
7:2;9:3
**bringing (1)**
31:8
**broke (1)**
31:11
**brother (1)**
15:10
**brother's (1)**
32:4
**building (1)**
21:8
**burn (1)**
34:23
**business (1)**
8:5
**Butler (1)**
7:16

---

## C

**call (2)**
21:2;29:4
**called (2)**
20:11;29:8
**caller (1)**
20:18
**calls (1)**
20:23
**came (8)**
20:1,18;23:7;
25:15,16,17,18;36:6
**Can (11)**
4:9,22;7:2;9:3,20;
10:14;11:14;16:20;
17:10;36:10;37:4
**car (2)**
23:12;24:15
**care (1)**
11:12,13

**Carolina (1)**
9:25
**carry (1)**
16:18
**case (2)**
3:11;22:24
**cases (1)**
24:5
**cash (1)**
16:25
**cause (2)**
38:9;39:1
**cell (3)**
7:7;10:25;11:2
**certain (1)**
14:19
**certificates (1)**
7:20
**certify (2)**
38:5,25
**chance (2)**
11:3;14:22
**chances (1)**
26:9
**check (1)**
17:17
**chores (1)**
14:6
**chronic (2)**
13:17,18
**Circle (1)**
38:11
**City (2)**
3:10;38:11
**clean (1)**
11:25
**cleaning (1)**
14:25
**clear (2)**
3:15;4:6
**clue (1)**
32:24
**coffee (1)**
4:22
**collecting (1)**
15:24
**college (1)**
7:13
**Commission (1)**
39:12.5
**condition (7)**
11:10;13:2;17:24;
21:18;22:7;25:11,25
**confirmation (1)**
32:11
**context (1)**
32:3
**controls (1)**
26:15
**conversation (3)**
20:3;28:25;29:3
**conversations (1)**
19:20

**cook (1)**
11:23
**cop (2)**
23:12;24:15
**counsel (1)**
38:24
**COUNTY (4)**
38:2,4,13;39:14
**couple (2)**
8:23,24
**court (1)**
3:16
**credit (1)**
31:11
**CRR (2)**
38:3;39:9.5
**cruisers (2)**
23:10,11
**CSR (3)**
38:3;39:9.5,10.5
**current (1)**
6:16
**cussing (1)**
31:9

---

## D

**damage (1)**
34:17
**damn (1)**
36:8
**day (16)**
12:8;14:8,12,19,21,
22;19:8,23;20:10,24;
21:3;27:6;28:19;
36:8;38:13;39:6
**days (1)**
17:13
**death (5)**
17:12;18:5;31:21;
33:4,9
**December (1)**
38:14
**decision (10)**
16:7,9;17:3,7;26:1,
16,19,20,25;27:2
**Defendant (1)**
38:11
**delivering (1)**
12:4
**demeanor (2)**
22:4;36:6
**dementia (4)**
13:3,4,16,21
**DEPONENT (5)**
37:9;38:6,19,19,20
**deposition (7)**
3:12;5:23;37:2;
38:10,15,20,21
**describe (8)**
7:2;9:3;10:6,14;
11:9;13:1;14:13;
16:20

**Circle City Reporting**
**317-635-7857**

**described (1)**
26:13
**detail (1)**
25:22
**Detective (6)**
22:23;23:1;24:24;
25:3;31:18;33:15
**Dianne (2)**
38:3;39:9.5
**died (1)**
31:14
**different (1)**
10:8
**DIRECT (1)**
3:5
**direction (1)**
38:17
**directive (1)**
26:21
**discuss (1)**
29:17
**discussions (1)**
16:4
**dishes (1)**
14:9
**disinterested (1)**
38:25
**doctor (3)**
25:22,24;26:6
**doctor's (1)**
13:8
**documents (2)**
6:3,8
**door (1)**
12:21
**down (3)**
3:17;10:3;38:15
**downtown (7)**
23:13;24:9;29:5,6,
10,13,16
**drive (1)**
12:16
**drugs (1)**
5:11
**DUI (1)**
9:5
**duly (2)**
3:2;38:7

**E**

**earlier (3)**
20:24;21:3,3
**East (2)**
6:17,21
**effect (1)**
38:22
**effects (1)**
13:4
**effort (1)**
33:21
**either (4)**
31:6;37:6;39:2,4

**else (9)**
6:24;15:3,8,11;
23:24;25:24;31:17;
36:17,20
**emotional (2)**
34:24;35:3
**employ (1)**
39:4
**employed (1)**
7:24
**enough (1)**
36:15
**entrance (1)**
21:7
**ER (2)**
25:22,24
**errands (4)**
18:18;19:1,22;20:2
**estate (1)**
34:6
**evening (3)**
18:8;26:25;27:12
**event (1)**
39:3
**exactly (5)**
10:22;25:25;27:5;
29:9,14
**EXAMINATION (1)**
3:5
**examined (1)**
3:4
**except (1)**
35:9
**expected (2)**
26:7,8
**expensive (2)**
16:12,15
**Expires (1)**
39:12.5
**extent (1)**
24:6
**eyeglasses (1)**
5:15

**F**

**Facebook (1)**
31:22
**fact (1)**
12:23
**facts (1)**
13:11
**far (1)**
10:17
**feel (2)**
29:22,24
**felt (1)**
30:8
**few (4)**
3:14;17:13;19:2;
34:14
**finally (2)**
31:13;35:16

**finances (2)**
13:12;15:14
**financial (1)**
8:19
**find (4)**
22:17,20;25:13;
28:2
**fine (2)**
4:19;10:23
**finish (1)**
4:1
**fire (2)**
21:10,24
**firearm (1)**
9:10
**first (13)**
3:2;4:24;5:25;
21:5;23:7;30:19,20,
23;31:20,23;32:23;
33:3;38:7
**fit (1)**
31:4
**Five (1)**
10:19
**fix (1)**
14:8
**floor (1)**
7:3
**fly (1)**
34:22
**Followed (1)**
26:21
**following (1)**
28:19
**follows (1)**
3:4
**force (1)**
38:22
**Foreclosure (1)**
8:20
**foregoing (1)**
38:10
**forgetting (1)**
13:10
**found (2)**
28:8,15
**four (2)**
20:13,14
**front (1)**
21:7
**further (1)**
36:23;37:9;38:25

**G**

**gave (1)**
25:2
**general (2)**
8:8;33:12
**Generally (1)**
8:10
**given (3)**
3:12;24:24;38:18

**glasses (2)**
5:16,17
**Good (3)**
3:7,9;5:22
**graduate (1)**
7:17
**graduation (1)**
7:23
**grammatically (1)**
5:20
**great (1)**
25:22
**grim (1)**
26:15
**ground (1)**
3:14
**guess (3)**
13:5;15:16;24:20
**guys (12)**
14:5;16:7;17:3,18;
20:6;23:24;26:16,25;
27:2,17;28:21;31:17

**H**

**half (2)**
23:14;24:20
**hand (1)**
39:5
**handle (1)**
13:12
**happened (13)**
21:13,22;22:19;
23:5,6,21;24:7,10;
25:2;27:22;28:13;
29:18;30:11
**happening (1)**
20:10
**happy (1)**
36:8
**hard (2)**
3:21;11:11
**head (3)**
3:19;35:10;36:12
**hear (1)**
31:20
**heard (1)**
4:4
**hearing (2)**
5:13;33:3
**help (3)**
3:15;16:10,10
**helped (1)**
12:1
**hereby (1)**
38:5
**herein (1)**
38:6
**hereunto (1)**
39:5
**herself (4)**
11:12,21,23;12:16
**high (3)**

7:10,12,20
**himself (1)**
36:13
**home (15)**
16:5;17:4,5;18:12,
23;19:3,5;20:1,6;
25:5;27:18,19,19;
29:2;36:6
**hospital (7)**
25:5,7,8,10;27:8,
11,14
**hour (3)**
23:14,14;24:20
**hours (2)**
8:8;19:2
**house (25)**
7:2,8;18;10:12,14,
18;12:14,18;14:3;
15:20;18:8,15;19:8,
12,15,17;20:5,17;
21:6;22:2,15,18;32:4,
9;35:17;36:4
**Huh (1)**
28:24
**hurt (2)**
34:3,21

**I**

**ID (1)**
20:18
**idea (1)**
19:7
**illegal (1)**
5:11
**illnesses (1)**
13:17
**imagine (2)**
33:25;36:10
**immediately (1)**
20:21
**important (3)**
3:18;4:16;36:20
**incident (8)**
6:5;17:11;22:14;
34:11,15,19,25;36:21
**income (1)**
15:25
**INDIANA (3)**
38:1,5,13
**Indianapolis (3)**
3:11;6:18;38:13
**indicating (1)**
4:13
**information (2)**
22:11;30:2
**injuries (5)**
25:21;26:14;34:17,
25;35:6
**inside (3)**
22:2,15;33:25
**instead (1)**
3:19;29:21

**interested (1)**
39:3
**interrogation (2)**
24:12,19
**into (4)**
16:5;25:22;29:20;
32:9
**involved (1)**
33:9
**IUPUI (1)**
7:16

## J

**jail (1)**
34:22
**jewelry (1)**
16:15
**July (1)**
35:25
**June (2)**
35:25;39:13

## K

**KATHRYN (2)**
3:6,10
**kept (1)**
36:13
**key (3)**
15:6,8;17:20
**kids (1)**
9:18
**killing (1)**
34:22
**kind (7)**
3:14,20;5:25;12:9;
13:4;32:16;34:17
**knew (2)**
16:15;32:25

## L

**land (3)**
11:5;20:23;21:3
**language (1)**
5:21
**large (1)**
38:5
**last (2)**
5:6;17:10
**later (3)**
3:22;28:20;29:3
**laundry (2)**
12:2;14:25
**lawsuit (1)**
9:8
**lead (1)**
33:15
**learn (1)**
25:10
**least (1)**
23:14

**leather (2)**
16:21,24
**leave (4)**
27:14;28:9,11;
31:12
**left (14)**
12:18;17:25;18:16,
19,20,21,22,24;19:7,
12,22;20:1;27:11;
31:16
**less (1)**
8:14
**level (1)**
10:16
**life (6)**
25:18;26:1,3,11,
17;27:3
**line (3)**
11:5;20:24;21:3
**little (5)**
7:14,15;11:11;
14:10;30:21
**live (2)**
9:24;10:23
**lived (1)**
6:24
**living (4)**
8:16,21;35:17;36:4
**lobby (1)**
31:13
**Lockhart (2)**
38:3;39:9.5
**long (9)**
4:20;8:21;10:20;
17:22;18:14,23;19:1;
23:12;24:18
**looking (1)**
32:8
**lost (1)**
8:18
**lot (5)**
16:25;24:4;31:9,
10;36:14
**lots (1)**
35:8
**loud (1)**
3:19
**lunch (2)**
18:13,14
**lunchtime (2)**
18:22;29:14

## M

**main (3)**
16:21,23;31:13
**makes (2)**
6:12;35:11
**making (1)**
14:15
**management (1)**
15:13
**manifested (1)**

35:7
**many (2)**
7:4;9:1
**MARION (4)**
38:2,4,13;39:14.5
**married (2)**
9:14,16
**matter (1)**
3:4
**may (3)**
4:11;19:21;35:24
**maybe (3)**
20:2;23:14;24:4
**meal (1)**
14:8
**meals (4)**
12:5,6,7,7
**mean (7)**
11:13;20:16;25:16;
26:8;28:14;32:2;
34:20
**medication (1)**
5:3
**medications (1)**
13:19
**mental (1)**
13:1
**message (4)**
31:22,24;32:12,17
**met (2)**
3:16;5:24
**middle (1)**
29:2
**midnight (1)**
27:5
**missing (3)**
22:17,21;23:2
**mixed (1)**
35:22
**mobile (1)**
11:15
**mom (22)**
8:22;10:20;12:9,
13;13:25;14:11,14,
17;16:4,12,18;17:4,8,
11;19:13;21:2;22:12;
23:4;28:2,16;33:23;
34:3
**mom's (21)**
11:9;15:6,8,14;
17:24;18:5;20:17,23;
21:3,6,18;22:2,6,15,
18;23:2;25:11;31:21;
33:4,9;34:5
**Monday (1)**
18:5
**money (2)**
34:5,8
**months (3)**
8:23,24;33:19
**more (6)**
11:14;16:10;22:11;
25:10;30:15;33:5

**morning (7)**
3:7,9;5:4;18:9;
28:18,20;29:4
**most (3)**
4:16;14:3;33:14
**mostly (1)**
33:13
**mother (2)**
10:9;34:23
**mother's (1)**
20:11
**move (1)**
10:4
**moved (2)**
10:2;17:5
**mumble (1)**
4:5

## N

**name (2)**
9:20;13:23
**names (1)**
13:10
**name's (1)**
3:10
**need (3)**
4:21;11:18;29:4
**needed (2)**
16:10;29:16
**next (8)**
4:2;20:9;23:6;
24:7;27:6,22;28:13,
18
**night (7)**
6:5;18:4,6,7;24:22;
29:3;30:23
**nod (3)**
4:8,25;26:5
**nods (1)**
3:20
**None (1)**
35:11
**nonsense (2)**
24:5;33:6
**North (1)**
38:12
**notarial (1)**
39:6
**Notary (2)**
38:3;39:10
**notes (1)**
38:16
**November (9)**
6:14,20;7:8,24;
8:16;10:7;15:15;
17:5;18:5
**number (4)**
7:7;11:2,7;20:18
**nursing (3)**
16:5;17:4,5

## O

**obviously (1)**
26:15
**off (4)**
26:3,11,17;30:15
**offhand (2)**
11:8;14:23
**office (1)**
13:8
**officers (1)**
23:15
**offices (1)**
38:11
**often (6)**
10:1,9;12:7,13;
14:11,17
**old (2)**
6:12,14
**once (4)**
4:11;10:2,10;13:25
**one (15)**
7:3,5;9:12;10:16;
13:21,23;16:21,22,
23,23;23:17;33:15,
16,17,18
**only (1)**
21:21
**otherwise (1)**
39:2
**out (15)**
3:19;12:13;19:1;
21:22;22:10,17,20;
23:4,7;25:13;28:2,8,
15;31:8;36:9
**outbursts (1)**
36:15
**outcome (2)**
26:7,8
**outlook (1)**
26:15
**outside (1)**
21:7
**over (9)**
3:25;5:24;10:12;
17:16;20:15,16,20;
35:12;36:13
**own (6)**
8:5,5,7;9:10,12;
13:12

## P

**painting (3)**
8:1,2,9
**part (1)**
26:14
**parties (2)**
38:21,23
**party (3)**
9:8;39:2,4
**pass (1)**

27:3
**passed (7)**
8:22;25:14;27:9;
28:3,8,16;34:6
**pending (1)**
4:24
**Pennsylvania (1)**
38:12
**people (3)**
21:24,25;33:24
**Perhaps (1)**
5:20
**permanent (1)**
34:21
**person (1)**
39:1
**personality-wise (1)**
12:24
**petulant (1)**
30:21
**phone (11)**
7:7;10:25;11:2;
20:11;21:1;28:21;
29:4;32:5,6,8,10
**physical (3)**
11:9;34:24;35:1
**picked (1)**
14:9
**pinned (2)**
33:21;35:9
**pissed (6)**
30:12,15,18;33:5,
11,11
**please (2)**
4:6;9:21
**point (1)**
22:14
**police (14)**
6:6;23:7,15;24:8,
11,13,21;29:6,10,16,
18;31:12;33:12;
35:13
**polygraph (5)**
29:23;30:1,4,10;
31:6
**polygraphs (1)**
29:21
**post (1)**
7:20
**preliminary (1)**
29:17
**prepare (1)**
5:22
**present (1)**
38:21
**pretty (4)**
5:21;10:8;14:15;
36:8
**prior (2)**
17:11,11
**prison (1)**
35:16
**private (1)**

31:22
**probably (1)**
18:22
**process (1)**
36:13
**prognosis (1)**
26:6
**property (2)**
15:19,20
**Public (2)**
38:4;39:10
**purse (5)**
16:18,20;22:19,20;
23:2
**pursuant (1)**
38:14
**put (4)**
17:3;23:10;24:12;
33:21

**Q**

**question's (1)**
4:6

**R**

**Rainsberger (5)**
3:7;9:22,23;
37:11.5;38:6
**raised (1)**
36:16
**ran (1)**
18:18
**ranch (1)**
7:3
**react (1)**
30:6
**read (5)**
3:22;32:23;37:3,6;
38:21
**Reading (2)**
5:16,17
**really (1)**
33:16
**reason (3)**
5:17;21:1;34:3
**reasons (1)**
8:19
**Rebecca (8)**
9:22,24;10:1;
12:19;14:17,24;15:3;
26:23
**recall (21)**
10:4,20;17:10,15,
24;18:13;19:6,19,20;
20:3,7,8,9;21:5,17;
22:22,23;24:24;
27:23;29:13;32:19
**receive (2)**
34:5,8
**received (1)**
22:11

**record (1)**
38:18
**records (1)**
21:2
**reduced (1)**
38:16
**refused (2)**
30:7,11
**related (1)**
34:25
**relating (1)**
3:3
**relationship (2)**
10:6;14:13
**relative (1)**
39:2
**released (3)**
35:16,20,25
**remember (7)**
4:18;18:6;21:21;
25:25;29:3;31:25;
35:23
**remind (1)**
4:11
**removed (2)**
25:14;27:3
**repeat (1)**
19:25
**rephrase (1)**
4:6
**report (1)**
29:17
**reporter (2)**
3:16;36:25
**Reporting (1)**
38:12
**represent (1)**
3:10
**represented (1)**
38:23
**rescue (2)**
21:10,24
**Residence (1)**
39:14
**restate (1)**
4:7
**restroom (1)**
4:22
**result (1)**
34:18
**retirement (1)**
15:25
**review (1)**
6:3
**reviewed (1)**
6:8
**revolved (1)**
26:1
**Right (12)**
3:23;5:1;6:7;
14:16;15:20;18:11;
21:10;26:22;28:12;
29:7;37:1,5

**RMR (2)**
38:3;39:9.5
**Robert (3)**
37:1,11.5;38:6
**room (2)**
24:12,19
**rules (2)**
3:15;38:14
**run (1)**
20:2
**running (1)**
19:1

**S**

**SAITH (1)**
37:9
**same (5)**
3:24;14:21;30:9;
33:5;38:22
**sat (1)**
33:18
**Saturday (1)**
5:10
**savings (1)**
15:22
**saw (4)**
17:11;32:4,6,10
**scene (1)**
23:16
**schedule (1)**
8:8
**school (4)**
7:11,12,21,22
**seal (1)**
39:6
**seasons (1)**
8:11
**Security (1)**
16:2
**seeing (1)**
21:5
**seem (1)**
18:1
**seemed (1)**
24:3
**sense (2)**
35:11;36:2
**separate (3)**
23:9,10;24:15
**separated (1)**
23:8
**set (1)**
39:5
**seven-year-old (1)**
30:22
**shakes (1)**
3:19
**shock (1)**
22:5
**shortly (2)**
20:2;22:14
**shot (3)**

23:23;24:2;25:23
**show (3)**
13:5;21:2;36:15
**siblings (1)**
9:20
**side (1)**
13:4
**sign (2)**
37:3,6
**Signature (4)**
36:25;37:4,10.5;
38:19
**signed (1)**
38:22
**simple (1)**
3:14
**sister (4)**
12:1,3;15:10;30:21
**sitting (1)**
32:10
**six (1)**
10:19
**sleep (3)**
27:20,21,22
**small (2)**
13:7,9
**smaller (1)**
16:23
**Social (1)**
16:2
**someone (3)**
3:21;12:4,22
**sometime (2)**
19:13;27:6
**Sometimes (1)**
36:14
**soon (3)**
27:2;30:25;31:1
**Sorry (6)**
4:11;6:1;14:5;
18:21;20:1;28:25
**sort (1)**
15:24
**source (1)**
16:3
**South (1)**
9:25
**speak (3)**
21:24;23:1,15
**specific (1)**
11:14
**specifics (3)**
21:16;34:11;35:5
**spent (1)**
18:7
**spoke (2)**
30:19;31:17
**Spring (1)**
10:5
**SS (1)**
38:1.5
**stand (1)**
30:25

**WILLIAM RAINSBERGER VS.**
**CHARLES BENNER**

**ROBERT RAINSBERGER**
December 20, 2016

**standing (1)**
  21:7
**start (1)**
  4:1
**started (3)**
  23:13;31:7,8
**STATE (2)**
  38:1,4
**statement (3)**
  6:6;24:21;25:2
**station (8)**
  24:8,11,13;29:6,11,
  16,19;31:12
**statistics (1)**
  31:8
**stay (2)**
  18:14;28:9
**stayed (2)**
  17:22;28:10
**stenograph (1)**
  38:16
**stick (1)**
  34:20
**still (5)**
  22:19;35:17;36:4,
  11,16
**straight (1)**
  27:19
**Street (3)**
  6:17,21;38:12
**studies (1)**
  7:21
**stuff (2)**
  6:2;14:7
**sub (1)**
  8:7
**sudden (1)**
  34:22
**Sue (1)**
  9:22
**suffering (1)**
  13:3
**Suite (1)**
  38:12
**summer (1)**
  10:5
**support (5)**
  26:1,4,11,17;27:3
**suppose (1)**
  31:5
**sure (7)**
  3:24;13:6;14:15;
  18:25;33:1;35:3;37:3
**surface (1)**
  36:16
**surprise (1)**
  24:3
**surviving (1)**
  26:10
**suspect (1)**
  32:21
**suspected (1)**
  12:24

**sustained (2)**
  25:20;34:18
**sworn (1)**
  3:2;4:14;38:7
**symptoms (2)**
  13:5;35:6

**T**

**talk (7)**
  3:25;21:18;28:16,
  21;29:20;30:22,23
**talked (5)**
  23:24;30:20;31:2;
  34:12;36:18
**talking (2)**
  21:9;36:14
**tan (2)**
  16:21,24
**targeted (1)**
  33:16
**technical (1)**
  7:20
**testified (1)**
  3:4
**testimony (2)**
  6:4;38:18
**that'll (1)**
  3:15
**thereafter (1)**
  20:2
**there'd (1)**
  36:14
**though (1)**
  32:22
**thoughts (1)**
  33:3
**three (1)**
  7:6
**tied (1)**
  31:5
**tiger (2)**
  13:7,9
**tight (2)**
  10:8;14:15
**timeline (1)**
  35:22
**times (2)**
  8:11;9:1
**today (9)**
  3:8,16;4:14,20;
  5:19,23;6:12;8:3;
  34:12
**together (2)**
  19:16;20:6
**told (1)**
  31:1
**ton (1)**
  4:20
**total (1)**
  14:20
**training (1)**
  7:20

**transcribed (1)**
  37:2
**transcript (2)**
  3:15;38:18
**tried (1)**
  29:20
**tries (1)**
  3:22
**trouble (2)**
  18:2;33:23
**true (1)**
  38:18
**truth (7)**
  3:2,3,3;4:17;38:7,
  7,8
**trying (2)**
  35:8,10
**tubes (1)**
  25:14
**Tudor's (1)**
  31:11
**Tuesday (2)**
  18:10,12
**TV (4)**
  12:11,12;14:5;
  17:19
**Twice (2)**
  9:2,3
**two (2)**
  7:6;10:10
**types (2)**
  7:19;13:16
**typewriting (1)**
  38:16
**typewritten (1)**
  38:17

**U**

**Uh-uh (1)**
  6:9
**under (2)**
  36:16;38:17
**understood (4)**
  4:4;20:16;32:1,3
**unless (1)**
  20:7
**unreliable (1)**
  30:2
**up (6)**
  14:9;20:18;21:13;
  30:25;31:11;35:22
**upset (1)**
  33:14
**upstairs (1)**
  7:5
**use (3)**
  4:22;5:13;17:20
**used (2)**
  5:6;13:7
**usually (1)**
  12:11

**V**

**vary (2)**
  8:11;14:20
**vehicle (1)**
  23:18
**versa (1)**
  4:2
**vice (1)**
  4:2
**visit (4)**
  10:9,11;12:9;19:13

**W**

**waive (3)**
  37:4,7,8
**Waived (3)**
  37:10.5;38:20
**walk (1)**
  11:15
**walked (1)**
  21:13
**walker (1)**
  11:19
**wallet (1)**
  32:4
**WAPLES (5)**
  4:12;5:24;36:24;
  37:1,6
**washed (1)**
  14:9
**washer (2)**
  32:5,6
**watch (2)**
  12:12;14:5
**Watched (1)**
  17:19
**watching (1)**
  12:11
**week (3)**
  10:10;13:25;14:18
**what's (3)**
  6:10;20:9;21:5
**wheelchair (3)**
  11:16,17,18
**wheeled (3)**
  21:21;22:10;23:4
**Wheels (2)**
  12:6,7
**Whenever (1)**
  28:1
**WHEREOF (1)**
  39:5
**whole (7)**
  3:2;27:8;30:14;
  31:9,10;33:6;38:7
**William (33)**
  6:25;8:16,21;9:22;
  10:7,17;12:19;13:14;
  14:11;18:4,23;19:5,7,
  15,21;20:1,14;21:9,

  14;23:5;24:13;25:8;
  26:23;27:14;28:16;
  30:3;31:20;33:8;
  34:8,18;35:16;36:18,
  21
**William's (6)**
  6:22;7:2;14:13;
  22:4;34:11,15
**winter (1)**
  8:14
**WITNESS (3)**
  37:5,8;39:5
**work (11)**
  8:6,7,14;27:24,25;
  28:5,6,7,9;29:1,2

**Y**

**year (4)**
  7:16,16;8:12;13:6
**Years (1)**
  5:12
**yelled (1)**
  31:2
**yelling (2)**
  31:7,10

**1**

**1-12-62 (1)**
  6:11
**135 (1)**
  38:12
**13th (1)**
  6:21
**1720 (1)**
  38:12
**18 (1)**
  18:5
**19th (4)**
  6:14,20;18:10,12

**2**

**2013 (13)**
  4:18;6:14,15,20;
  7:8,25;8:1,17;9:12;
  10:7;15:15;17:5;18:5
**2014 (3)**
  10:5,5;35:24
**2016 (1)**
  38:14
**2017 (1)**
  39:7
**2023 (1)**
  39:13
**20th (1)**
  38:13
**21st (1)**
  6:17

**3**

Case 1:16-cv-00103-TWP-MJD Document 58-3 Filed 11/28/17 Page 334 of 495 PageID #:
2270
Case 1:16-cv-00103-TWP-MJD Document 50-13 Filed 02/13/17 Page 174 of 495 PageID #:
1640

**317-357-5791 (1)**
  7:9

## 4

**4 (1)**
  39:13

## 5

**5 (2)**
  6:17;8:10
**51 (1)**
  6:15
**54 (1)**
  6:13

## 7

**7155 (1)**
  6:17
**7345 (1)**
  6:21

## 8

**8 (1)**
  8:10

STATE OF INDIANA          )
                          )SS:
COUNTY OF MARION          )
                          )
STATE OF INDIANA          )
                          )
        VS                )

William Rainsberger

IN THE MARION SUPERIOR
COURT CRIMINAL DIVISION
ROOM _____ 1

CAUSE # 14D26747

## MOTION TO DISMISS

The State of Indiana moves the Court

To dismiss all counts in the above captioned case:

To dismiss the following counts in the above captioned case:

| Count | 1 | Murder / MR. |
|-------|---|--------------|
| Count | ____ | _____ |
| Count | ____ | _____ |
| Count | ____ | _____ |
| Count | ____ | _____ |
| Count | ____ | _____ |

**FILED**

(38)  JUL 07 2015  MF

Myla A. Eldridge
CLERK OF THE MARION CIRCUIT COURT

For the following reason(s):

| CODE | LITERAL |
|------|---------|
| 01 | Evidentiary Problems |
| 02 | Essential Police Witness Not Present |
| 03 | Essential Civilian Witness Not Present |
| 04 | Plea Agreement |
| 05 | Diversion |
| 06 | State Declines Prosecution |
| 07 | Restitution Made to Victim |
| 10 | Lack of Corroborative Evidence |
| 52 | Mental Treatment |
| 65 | Defendant Deceased |
| 67 | Victim Recants |
|    | Other: |

DATE: _7/7/15_

_____
DEPUTY PROSECUTING ATTORNEY
19TH JUDICIAL CIRCUIT

The Court having examined said Motion to Dismiss and being duly advised in the premises now sustains said motion.

DATE: _7/7/15_

_____
JUDGE, MARION SUPERIOR COURT
CRIMINAL DIVISION ROOM _____

## Affidavit of William Rainsberger

1.   I am 59 years old, of sound mind, and make this affidavit based upon my own personal knowledge.

2.   My mother was Ruth Rainsberger, who died on November 20, 2013 at the age of 88.

3.   My brother is Robert Rainsberger. My sister is Rebecca Rainsberger. At the time of my mother's death, I was married to Mari Bilger.

4.   On May 27, 2014, I was arrested and charged with Murder, for allegedly murdering my mother.

5.   I did not murder my mother.

6.   I spent 58 days in the Marion County Jail on this false charge. On July 22, 2014, the court ordered me released from jail on $100,000 bond.

7.   Over a year after my arrest, on July 7, 2015, the prosecutor, citing "evidentiary problems", moved to dismiss the murder charge against me. The court granted this motion the same day.

8.   My arrest and the murder charge were based upon a probable cause affidavit written by Detective Charles Benner of the Indianapolis Metropolitan Police Department (IMPD).

9.   Detective Benner swore in the charging information against me that on November 19, 2013, I "did knowingly kill another human being, namely: Ruth Rainsberger, by inflicting blunt force injuries with a hammer or similar object, at or against the person of Ruth Rainsberger[.]" (Information, 5/22/2014.)

10.  Detective Benner lied in this Information and lied and misled the court in his Probable Cause Affidavit.

1

11.    Detective Benner lied in his probable cause affidavit by stating that a call was made to my brother's cell phone from my mom's landline telephone at 2:40 pm (PCA, p. 3, para. 6) which was well after my mother had been attacked, and an hour before I called 911 for help for my mother from that same phone. In the same paragraph of his PCA, Detective Benner then depicted me as the one who made a call at 2:40 pm, by noting my presence at a nearby grocery shortly after this time. But the 2:40 pm time was not the time that call was made; while the raw data from my brother's cell phone company shows an entry at 2:40 pm, it also shows a second entry for the same call at 3:40 pm The 2:40 pm entry was due to the call being routed through Chicago, which was one hour behind Indianapolis time.  Detective Benner also had in his possession, in 2013, my mother's AT&T landline telephone records which accurately showed this call was made at 3:40 pm, which matched what both my brother Robert and I had reported to him as when this call occurred. The AT&T records also show that no call whatsoever was made from my mother's landline at 2:40 pm. Detective Benner chose to completely ignore this information, and instead used the false call time of 2:40 pm in his PCA. This lie was particularly incriminating of me, especially in connection with the false portrayal of me throwing away trash at Kroger (see para. 12 below) between this false 2:40 time and the time I called 911 shortly after I found my mother a little after 3:30 pm. This lie was fabricated by Detective Benner in order to place me in my mother's apartment, with her critically injured, a full hour before I telephoned 911 and a full hour before I said I discovered her, thus misleading the court.

12.    Detective Benner lied in his probable cause affidavit by stating that at the Kroger store

2

across the street from my mother's apartment I pulled a "straight object" "from my person," and that I was "looking around for cameras" when I then threw it away in a trash bin at the front of the store. (PCA, p. 3, para. 5.) In the Kroger security video referenced by Detective Benner, I did not look around for cameras, nor did I pull any item from my person. I had a piece of trash in my hand, I threw it away, and I do not recall what it was. By making up these lies and including them in his PCA, Detective Benner sought to mislead the court into thinking I disposed of the murder weapon in a Kroger trash bin, at the front of a busy Kroger, during daytime hours.

13.   Detective Benner lied in his Probable Cause Affidavit by stating that cell phone tower site location records "do not show William Rainsberger outside the area of Shortridge and 10th St. during the relevant time period." (PCA, p. 5, para. 2) This is an astounding lie. Cell phone tower records do not show me in this area anytime from 5:41 pm on Nov. 18, 2013 to 7:23 pm on Nov. 19, 2013, but that is because there is absolutely no location information from cell phone data for my phone during that period. Detective Benner may as well have said that cell phone records do not show me outside Mongolia during this time. Detective Benner absolutely knew this well in advance of filing his PCA because the IMPD phone records expert told him so in a report spreadsheet. Yet Detective Benner chose to ignore the IMPD expert, and insert into his PCA a well-crafted lie to give the court the impression that I was in the vicinity of my mother's apartment during what might have been the time of her attack.

a.   The following explains the cell phone records submitted on summary judgment and how they do not show location data for my cell phone from 11/18/2013 at

3

5:41:14 p.m. to 11/19/2013 at 7:23:45 p.m.

The PDF "William Rainsberger Processed Cell Phone Records.pdf"
represents the "Results" worksheet from the Microsoft Excel spreadsheet of the
police analysis of my cell phone data for the period October 22 - November 22,
2013. That spreadsheet was created by Detective Bierce of IMPD on November
25 2013, and produced in discovery.  The PDF shows a combination of my cell
phone activity and my phone provider's (T-Mobile) cell tower information. It is
Detective Bierce's summary and cross-reference of all my available phone
information into one useful view.

In the PDF a row may represent a text message or a voice call. Columns
A-F contain descriptive data for voice calls and text messages, with  Column D
indicating whether the entry is for a text ("SMS", "MMS") or a voice call
("Voice"). For reasons unknown, T-Mobile reports voice call timestamps (Column
F) accurately, but reports text message timestamps as occurring three hours early.
The remaining columns (G - U) represent cell tower information, which T-Mobile
only provides for voice calls. Note that for text messages, there is nothing (N/A)
in columns G - U.

To narrow down the time range to that in question, please note there is a
voice call on row 1041 (11/18/2013  5:41:14 p.m.), then not another voice call
until row 1159 (11/19/2013  7:23:45 p.m.). Because both those rows represent
voice calls, they have cell tower information in columns G - U. Row 1041 shows
that my mother called me at 11/18/2013 at 5:41:14 p.m. and my phone was

4

connected to a tower at 7701 East 21st Street in Indianapolis. Row 1159 shows

that I called my sister at 7:23 p.m., and my phone was connected to a tower at 225

N. New Jersey in Indianapolis.

       In between those two calls, the only events are texts, so there is no cell

tower data recorded. In other words, the rows between 1041 and 1159 are all text

messages, therefore they have no cell tower location information. This means that

the location of my phone could not possibly be determined from T-Mobile records

between 11/18/2013 at 5:41:14 p.m. and 11/19/2013 at 7:23:45 p.m.

       Thus Detective Benner's statement that my phone records show my phone

was not outside a specific area during that timeframe is not true at all. Those

phone records do not show anything about location, period.

14.    Detective Benner lied in his probable cause affidavit by stating that nothing was stolen

from my mother's apartment. I described my mother's purse and my mother's one

prescription medication to Detective Benner shortly after his arrival at the crime scene on

November 19, 2013, and he wrote that in his notes. My siblings told Detective Benner of

my mother's purse, a small coin purse where she kept credit and debit cards, and her

prescription medication, all of which were missing and never recovered. IMPD Forensic

Services which inventoried the scene also noted in one of their reports which Det. Benner

had, that "no prescriptions found, purse is missing." Detective Benner simply ignored all

this information to make it look like robbery could not have been a motive in the attack

on my mother, so as to make it look to the court that my mother's attack was an inside

job. Detectives did find my mom's checkbook and a small amount of cash and a couple of

credit cards in her apartment, but these items would not have been readily apparent to an intruder as she kept them inside a translucent plastic Tupperware container which was underneath a stack of papers on one of her tables. Also, Det. Benner falsely stated in the probable cause affidavit that: "There was a lockbox in the back room in plain view that contained savings bonds belonging to the victim." The lock box was in a closet, not in plain view. Not only were there no savings bonds inside, there were no documents remotely resembling savings bonds, nor anything else of monetary value.

15.   Detective Benner was misleading in his probable cause affidavit by stating that because I reported that my mother had been hit in the head though "fire and ambulance personnel thought" that my mother had been shot,  this indicated that I knew "how she sustained the injury." (PCA, p. 1, para. 1)

     a.      While it definitely appeared to me that my mother was struck on the head, I was not certain how my mother was injured.  What I saw was a blanket soaked with partially-dried blood stuck to the top of my mother's head as she lay on the floor, and on the same blanket but on the floor right next to my mother's head, a pool of congealed blood, approximately one cup. This indicated to me an extremely serious injury that produced substantial blood loss, which had occurred long enough before my arrival because the blood was not fresh but partially dried and solidified. I did not remove the bloody blanket stuck to the top of her head because I believed it was acting as a bandage, and I did not want to pull it away from the wound and cause it to start bleeding again.

     b.      Detective Benner knew that when my brother arrived at the scene and asked me

what had happened to our mother I told him I did not know.

c.     When Det. Benner interrogated me on Nov. 19, I told him I initially thought my

mother had fallen and hit her head, but upon seeing the blanket wrapped her head

and the amount of blood loss apparently coming from on top of her head, I

thought she must have been hit on top of the head.

d.     I do not associate gunshot wounds to an injury on the top of a head.

e.     Also, I did not see any blood splatter, sense an odor of gun powder, or see any

spent gun cartridges in my mother's apartment, any of which might indicate that

my mom was shot.

f.     I did not see any hole in the blanket surrounding my mother's head, and, having

not removed it, could not see her forehead.

g.     Based upon the witness statements provided to my criminal defense lawyers and

my civil lawyers, which I have reviewed, it was Firefighter Carl Wooldridge, one

of the first responders and the first among fire and ambulance personnel to see my

mother, who determined that my mother had been shot, and he simply passed this

incorrect conclusion on to the other medical personnel.

h.     Mr. Wooldridge based his assessment on more information than I had: he

removed the blanket from my mother's head, noticed a hole in the blanket which I

had not seen, observed a mark on my mother's now exposed forehead, which I

had not seen, and mistakenly concluded that it was a gunshot entrance wound. Mr.

Wooldridge did not have the medical or forensic training to make a determination

on the nature of the attack on my mother. Mr. Wooldridge's act of removing the

7

bloody blanket stuck to my mother's head was in my opinion irresponsible and

unnecessary because once EMS arrived, they re-bandaged my mother's head,

which I saw as they took her to the ambulance.

i.      It should have been apparent to Detective that Mr. Wooldridge and myself simply

saw different things and arrived at different conclusions based upon this differing

information. As documented in my mother's autopsy, Mr. Wooldridge was

absolutely mistaken in his description of a gunshot entrance wound on my

mother's forehead

j.      Detective Benner did not include in his probable cause affidavit that I told him I

initially thought my mother had fallen and struck her head but rather unfairly used

my speculation about how my mother was injured to suggest that I had killed her.

16.   Detective Benner misleadingly suggested to the court in his PCA that I was uncaring and

unconcerned for my mother's health, making it appear more likely that I would have

carried out the attack on her. He did this in a number of ways, including:

a.      After I discovered my injured mother I called 911, quickly checked the apartment

for intruders, and ran out the front door of the apartment building to flag down the

ambulance. I went outside because I knew the fire department was close and the

apartment complex is complicated and the buildings poorly marked. I wanted to

get emergency medical help for my mother as soon as possible, so I wanted to

direct the ambulance people to my mother's apartment. I told this to Detective

Benner during his interview of me on Nov. 19. However, in his PCA, Detective

Benner omitted all the reasons I told him I went outside, and simply put in his

8

PCA that after calling 911 I "went outside to wait for the ambulance" (PCA, p. 2, para. 1) and that "William left his mother unattended until the police arrived" (PCA, p. 4, para. 1) in order to make me seem uncaring to the court.

b.      Detective Benner put in his Probable Cause Affidavit that while I was detained for questioning downtown at police headquarters during the evening of Nov. 19, 2013, that I did not ask him how my mother was doing and that I never asked him to take me to the hospital to see her. (PCA p. 2, para. 3) This was false and misleading, as Detective Benner knew I was in constant contact with my sister who was at the hospital with our mother during my detention and interrogation, and that she was keeping me informed of my mother's condition. I actually read one of my sister's many texts to me to Detective Benner during his interrogation of me (Nov. 19, 2013 Transcript at 13) which was advising me of my mother's condition, and instructing me which entrance I should enter at Eskenazi Hospital. Detective Benner said "we'll get you there" which he never did. Thus there was no need for me to ask Detective Benner how my mother was doing or for a ride to the hospital. Detective Benner's portrayal of this exchange was simply dishonest and misleading and obviously meant to prejudice me.

c.      Detective Benner lied to the court in his probable cause affidavit when he said that after Nov. 20, 2013, that "I have not heard from them [my brother, sister, and myself] since." (PCA, p. 3, para. 2.) My sister telephoned Detective Benner twice after this time and left messages for him to return her call, and he chose to not return either call. Again, this lie was designed to make it appear that we were

9

uncaring and culpable in our mother's death.

17. Detective Benner lied to the court in his PCA when he stated that I "stormed out" of

police headquarters on Nov. 20, 2013, after refusing to take a polygraph (PCA, p. 3, para.

2.). Detective Benner and his partner Tom Tudor left the room before my brother, sister

and I did. Additionally, Detective Benner did not reveal in his PCA that he lied to us to

get us to come downtown on the day our mother died, by telling us he had the results of

the autopsy that he wanted to discuss with us. Nor did Detective Benner notify anyone in

my family about the time and date of the autopsy. Instead of sharing autopsy results with

our family, he treated us as guilty parties, falsely accused me and my brother of killing

our mother for money, and confronted us out of the blue with his polygraph request. I did

not consent to the polygraph because I consider them unreliable and I considered

Detective Benner to already be prejudiced against me because of his uncaring attitude the

night before, his deception and aggressive and hostile attitude on Nov. 20, 2013.

18. Detective Benner also has unfairly portrayed what I said on the way to police

headquarters on Nov. 19, 2013, in an apparent attempt to unfairly prejudice me and make

me seem callous and uncaring. He asserts in his summary judgment memo at p. 6 that

"On the drive downtown, William told IMPD Officer Michael Price that he did not know

whether what happened to his mother was a good thing or bad thing." (citing Exhibit 10-

Price Depo 14:3-9). I did not say I did not know if what happened to his mother was good

or bad, but, rather, given what happened, and that my mother appeared to be dying, that I

didn't know if it was good or bad for her to survive in a severely damaged state or in a

coma, or to pass away. Officer Price was not quoting me, and confirmed in his deposition

10

that I was speaking about whether my mother survived.

19.     Detective Benner in his PCA noted that my mother's assets totaled approximately

$99,000. He intentionally omitted my financial status so as to mislead the court into

believing I had a financial motive for murdering my own mother. I did not. I told Det.

Benner that I was retired and "fairly well set" financially. County records showed I owed

my house free and clear. Additionally, I was my mother's power of attorney and handled

all of her financial affairs in her best interests. I resent Det. Benner suggesting that I

would kill my mother and that I had a financial motive to do so. If I was dishonest, which

I am not, and if I had wanted my mother's money, which I did not, I could have simply

taken it without harming her.

20.     As a direct result of Detective Benner's intentionally false and misleading statements I

was: falsely accused of  murdering my own mother; kept in the Marion County jail for

almost two months, with 23 hours per day of that time confined in an 8x5 cell; was

threatened twice with murder and once with rape while in jail; was physically attacked in

jail by having cleaning fluid sprayed in my eyes and items thrown at me; threatened with

bodily harm multiple times by strangers on Facebook; tethered to an ankle bracelet for

nearly three months; was not allowed to leave Indiana for almost a year; was not allowed

to communicate with my beloved aunt, Blanche Miller, my mother's sister, for over nine

months; had criminal charges of murder lodged against me for over a year; suffered

substantial physical discomfort, emotional distress, public humiliation and

embarrassment, damage to my good name and reputation; and, spent over $60,000 in

criminal defense attorney fees and associated expenses.

I affirm under the penalties for perjury that the above statements are true.


February 13, 2017                    */s/ William T. Rainsberger*
                                     William T. Rainsberger

STATE OF INDIANA          )          IN THE MARION SUPERIOR COURT
                          ) SS:      CRIMINAL DIVISION 1
COUNTY OF MARION          )          CAUSE NO. 49G01-1405-MR-026747

STATE OF INDIANA,                    )
              Plaintiff,             )          ORIGINAL
       v.                            )
                                     )
                                     )
WILLIAM RAINSBERGER,                 )
              Defendant.             )

                    TELEPHONIC TAPED DEPOSITION OF
                              DR. STREIB
                           March, 27, 2015

       Q      David R. Hennessy
       A      Dr. Streib
       Pros   Marielle Riedel

1    Q    I've started the recording and I just want to make sure of one thing.  I appreciate your

2         time but I regrettably I can't pay you for your time. It's my understanding that you are

3         waiving any fees for this telephonic statement.

4    A    Yes that's fine.

5    Q    Oh you're wonderful, thank you.  Uh if you would just do you swear to tell the truth?

6    A    Yes.

7    Q    Okay thank you.  Did you get my fax?

8    A    Yes I did.

9    Q    Okay. Um that's great.  Now um have you spoken with any police officers before today?

10   A    Um not since the time of the patient being in the hospital.

11   Q    And back at that time do you remember which officer you spoke with?

12   A    No.

13   Q    Do you have any idea, do you remember what the conversation was about?

1

| 1 | A | Um at the time I had spoken with the officer that was at the hospital about uh in |
| | | describing in general because I don't remember specifically, but about the nature of her |
| 3 | | injuries and then uh the officer also identified that they had a family member at the scene |
| 4 | | and that uh I was able to speak to the person they had identified as a son, um on the |
| 5 | | telephone um after discussing with law enforcement that this is the person they had |
| 6 | | identified as her son, to describe the condition of the patient. |
| 7 | Q | And tell me about your conversation with the son. |
| 8 | A | Um at that point I uh described that she had a uh very uh severe traumatic brain injury |
| 9 | | and that based on our evaluation that there was no treatment available to improve her |
| 10 | | outcome and that we anticipated that this was a non survivable injury and we spoke about |
| 11 | | um setting some limits on her treatment but we did not uh withdraw any care at that |
| 12 | | point.  We made a decision to uh limit escalation of treatment until the family could |
| 13 | | arrive as a group at the hospital and discuss it further. |
| 14 | Q | Is that what led to the do not resuscitate order? |
| 15 | A | Yes. |
| 16 | Q | In looking at the records it appears that that came pretty far in or pretty, sometime after |
| 17 | | her arrival.  Do you recall any idea how long after her arrival? |
| 18 | A | Um, um I made a note that I had spoken to him and um I entered that note at 6:15 p.m. so |
| 19 | | that decision was made uh sometime prior to that so probably a few minutes prior to that. |
| 20 | Q | Okay great and in talking to him did he seem um, how did he seem? |
| 21 | A | Um I, I don't recall the detail of the conversation um he seemed uh upset and concerned |
| 22 | | about her condition. |
| 23 | Q | And did he seem to be reflective with that decision, whether to do the DNR or not? |

2

1   A   Um I mean he seemed that uh he was able to uh consider what I had told him about her

2       and that um issues with the need to not go any heroic treatments that did not have a

3       reasonable chance of improving her outcome.

4   Q   In reviewing the records it looked to me almost like Dr. Guzman had done that but you

5       personally had that conversation?

6   A   Yes.

7   Q   Um and then have you spoken with any prosecutors prior to today about your testimony

8       as opposed as to just scheduling discussions?

9   A   Um I have um spoken with the with Miss um Riedle um and uh reviewed with her kind of

10      the time course of the events in the hospital and uh answered some questions she had

11      about uh the nature of the injures and what occurred at the hospital.

12  Q   And from those conversations uh do you have um some idea why you're being called as a

13      witness what your expected testimony will be?

14  A   Um I expect to testify to uh the facts of the case um the medical facts as documented in

15      our records and then the events that occurred at the hospital.

16  Q   And in what manner I mean what, what did you learn would be important for them?

17  A   My understanding is that uh it's important for me to describe to the court the nature of

18      Mrs. Rainsberger's injuries and uh the um care that was provided and uh and ultimately

19      uh that she had died as a result of this injury.

20  Q   Okay uh did you independently uh determine a suspected gunshot wound or is that just

21      how she came in?

22  A   Um she uh was brought by uh the ambulance service and um they notify us um while

23      they are enroute to the hospital and they had um notified us that she had a wound that

3

1  might be a gunshot wound um in their interpretation um meaning that she had an open

2  wound that appeared to penetrate into the skull um upon our further evaluation we

3  determined in fact that this was not due to a gunshot wound but probably uh due to a

4  blunt force injury uh that created um a depressed skull fracture in a fairly focused area of

5  the back of her head that again has the appearance of a penetrating injury similar to a

6  gunshot wound or some other high energy mechanism.

7  Q   Right so all the references to the gunshot wound came from either a medic or fire

8      personnel on the scene?

9  A   Yeah there's a few references to it because uh I mean any penetrating injury um know um

10     it's basically a small penetration could be um um due to something like a gunshot wound

11     which we unfortunately see commonly or could be due to a direct blow on a very small

12     area.

13  Q   And then uh you said the back of the head from the autopsy schematics and photographs

14     it appears to be more to the left and more to the top would you agree?

15  A   Yes.

16  Q   And uh do you are you an emergency room physician?

17  A   I am a surgeon uh so I am what most people would refer to as a trauma surgeon so my

18     scope of practice involves trauma care, intensive care, uh and general surgery.

19  Q   Okay based on your experience, training and education, anything do you ever get in the

20     area of the mechanics of an injury?

21  A   Um I am not a forensic expert uh we leave the determinations of uh the forensics aspects

22     of the mechanism of an injury to the coroner's office uh because they have expertise in

23     this area however, I do have experience uh taking care of a lot of patients with traumatic

4

1   brain injuries and uh so I have a practicing familiarity with uh a variety of types of

2   injuries.

3   Q   I suspected as much.  The uh it is clearly a blow to the head, anything beyond that that

4   you picked up?

5   A   Um I mean my impression of this is that there was a high energy fairly focused uh blow

6   to the skull uh was capable of creating a fracture that uh penetrated deeply into the brain

7   um there's actually a secondary of, of fracture uh a little bit more to the right uh that does

8   not uh penetrate through the skull and the scalp uh but the um um clearly the area on the

9   left side of the back of the head is what caused your damage to the brain.

10  Q   Um and then do you have an opinion or can you anything about uh if the blow, handiness

11  left hand, right handed if she was struck by someone?

12  A   No I did not know um anything about uh what occurred at the scene uh as the cause of

13  this injury so I, I don't think I could speculate as to that.

14  Q   Okay and then um you um how about whether it was from the front or from behind?

15  A   Um this is a uh this would have been a blow from uh uh behind uh in the location that we

16  previously discussed um and uh it appears that uh again that the energy of this blow uh

17  was sufficient to penetrate towards the center of her uh her head.  Um about 6 centimeters

18  or so it was pretty significant force.

19  Q   And then um I asked about handiness and whether this blow came from the right or the

20  left or directly behind?

21  A   Um again I think that would uh depend on a lot of factors that I don't know the position

22  of the patient at the time of the injury and uh uh uh what she was struck with uh I, I think

5

1   it would be hard to describe that without information that law enforcement or the coroner

2   may be able to provide.

3   Q   Sure, um some of this I kind of suspect but I just need to pin it down um the um with the

4       injuries that you observed on Ruth Rainsberger if um there's a perpetrator and they leave

5       her, how long, do you know how long she could be breathing laying unattended?

6   A   Um that um is something that we don't know for certain um we were informed that she

7       was found uh at home by her son and um it's unclear uh how much time there was uh

8       between the time of her injury and she was discovered or uh the 911 call that was made.

9       Uh with an injury like this a person may be able to maintain uh their vital functions uh for

10      a period of time in fact it could be a period of minutes or hours depending on uh their a

11      number of factors of mostly having to do with is there any obstruction of the airway due

12      to the unconscious or um the progression of the injury itself.

13  Q   When you say hours could it be as many as four or five?

14  A   Uh it could be.

15  Q   And has anyone provided you information to help you provide testimony as to that time

16      frame in this case?

17  A   No but I would base that assessment on the fact that at the time that care was withdrawn

18      uh several hours did go by until she ultimately died from this injury um so clearly there

19      was, she did have the ability as vital functions of breathing for a period of time after that

20      care was withdrawn and uh essentially the natural course of the injury was allowed to

21      happen.

22  Q   Uh was she intubated by ambulance personnel or hospital personnel?

| | | |
|---|---|---|
| 1 | A | Uh let me just review the notes for a second.  Um she was intubated shortly after arrival |
| 2 | | to the emergency room. |
| 3 | Q | And so then she would have had assistance in breathing either by a hand pump or other |
| 4 | | machine? |
| 5 | A | Um yes. |
| 6 | Q | And that would have continued until the withdrawal of care? |
| 7 | A | That's correct. |
| 8 | Q | So I'm sure that people talked to you to try uh because what they really want to do is to |
| 9 | | try to get this blow to the head within minutes of the son discovering her so where are |
| 10 | | you with that? |
| 11 | A | Um I do not have an opinion on that.  I don't have information to make a judgment on |
| 12 | | that. |
| 13 | Q | So it would be equally reasonable to say she'd been struck four hours before the son |
| 14 | | discovered her as to saying she was struck ten minutes before the son discovered her, |
| 15 | | correct? |
| 16 | A | Um all I can say is I do not know the time that occurred between the time of her injury |
| 17 | | and the time she was discovered. |
| 18 | Q | Right but I need, could it have been four hours as well as 10 minutes? |
| 19 | A | Um that is possible. |
| 20 | Q | Is one more likely than another? |
| 21 | A | I don't know. |
| 22 | Q | Okay and then just very quickly I want to go through the records and you have them |
| 23 | | they're numbered in the upper right hand corner. |

| 1  | A | Yes. |
|----|---|------|
| 2  | Q | Okay on page 1 what's a code 77? |
| 3  | A | That is a term we use uh at the hospital for our highest level of trauma activation so when |
| 4  |   | the emergency medical services uh notify the hospital that they are bringing a patient that |
| 5  |   | meets certain criteria uh certain types of injuries uh we have different levels of activation |
| 6  |   | that code 77 is our highest level of activation which results in an immediate response of |
| 7  |   | our entire trauma team and emergency medical staff to the uh receiving area of the |
| 8  |   | emergency department commonly referred to as the shock room and the patient is |
| 9  |   | evaluated there by um a trauma surgeon, emergency medical physician um a variety of |
| 10 |   | other resident doctors and uh hospital staff. |
| 11 | Q | And then down at the bottom of that page there's typewriting that says comment 11/23 |
| 12 |   | 2013 do you see that? |
| 13 | A | Yeah |
| 14 | Q | I can't read the rest of that, any idea what that is? |
| 15 | A | Um |
| 16 | Q | Could that be… |
| 17 | A | I believe that is sort of a time stamp from our um it says coding complete which I believe |
| 18 |   | would refer to a review of the chart for um chart entry and so forth. |
| 19 | Q | Was Wishard on Epic or any other health data system at that time? |
| 20 | A | Um we have a medical records system uh which is an order entry and uh documentation |
| 21 |   | system we refer to it as a G3 which is uh a system that was developed here locally um the |
| 22 |   | medical record itself consists of some um handwritten or paper documentation that's |

1   generated in the emergency department and then also some electronic medical records

2   that are generated after the um patient is admitted to the hospital.  So

3   Q   Yeah.

4   A   So it's a combination of handwritten and electronic documents.

5   Q   So certainly care would have been completed on November 23rd, I'm thinking that

6   coding complete means all of that process had been done I guess the.

7   A   Yeah, so the, you know the charts get reviewed from an administrative stand point and

8   then they get scanned into a medical records archive which is what generates the images

9   that you have here.  Um so I believe that uh that statement has something to do with

10   either that the chart has been scanned or that the administrative functions that are based

11   on this record were completed at that time.

12   Q   Okay page 2, resident was Noland so he's a doctor right?

13   A   Yes.

14   Q   Says staff is LeFlore, would that be a nurse?

15   A   Uh that is uh one of the emergency medicine uh so Dr. LeFlore is an emergency medicine

16   attending physician and Dr. Noland would be the emergency medicine resident on duty at

17   that time.

18   Q   And it's signed by a Jill Glasser, what's her function?

19   A   Um

20   Q   Down at the very bottom left.

21   A   Um that's on page 2 um that would be um the emergency department nurse.

22   Q   Okay. Would any of those people have had contact with family members outside of your

23   presence to your knowledge?

9

| | | |
|---|---|---|
| 1 | A | Um possible, I don't know. |
| 2 | Q | And then on page 3 the historical notations "found slumped over in apartment by friend" |
| 3 | | do you know where that, the source of that? |
| 4 | A | Um that would be based on the um the paramedics report um so they give us a verbal |
| 5 | | report on arrival and since she was unconscious that would have been the only history |
| 6 | | that we had available is what the paramedics told us. |
| 7 | Q | Do you know who would have made that entry? |
| 8 | A | Um that is by Dr. Noland. |
| 9 | Q | And then on page 3 I have a hard time reading some of this. Um eyes open, something |
| 10 | | spontaneous what? |
| 11 | A | Um it says LUE which is left upper extremity spontaneous movement um protruding |
| 12 | | tissue and depressed skull fracture, sonorous respiration. |
| 13 | Q | And uh it says something at bedside. |
| 14 | A | Um |
| 15 | Q | Oh I'm sorry in the 3rd paragraph 3rd line. |
| 16 | A | Okay. |
| 17 | Q | MDM elderly lady with head trauma. |
| 18 | A | Okay um elderly lady with head trauma seems to be only injury, intubated on arrival, To |
| 19 | | CT emergently. NUS which is the abbreviation for neurosurgery. |
| 20 | Q | Okay. |
| 21 | A | Uh trauma is our trauma team um surgery team at the bedside um critically ill, tube |
| 22 | | placement confirmed on chest x-ray CXR. |
| 23 | Q | Do you know who made those entries in that hand writing? |

| | | |
|---|---|---|
| 1 | A | Um that appears to be Dr. Noland's handwriting and then there is a uh cursive |
| 2 | | handwriting note that says the teaching staff MD that would be Dr. LeFlore. |
| 3 | Q | And can you read that? |
| 4 | A | Um says uh patient seen and examined um.  (long pause) |
| 5 | Q | I'm glad to know you have some difficulty yourself. |
| 6 | A | Yeah this is unfortunately the problem with the hand written documentation and why we |
| 7 | | then subsequently dictate a full ____ *history and physical* because we are aware that our handwritten notes uh |
| 8 | | we do them immediately to have some documentation at the time. |
| 9 | Q | Well and it's not your primary focus at the time I mean you're giving care so. |
| 10 | A | Yeah so it says that he's discussed with the resident uh I mean generally that appears to |
| 11 | | be a statement that, he saw and examined the patient with the resident, discussed the care |
| 12 | | and agreed. |
| 13 | Q | Yeah it's under teaching staff MD so it may be just |
| 14 | A | Yeah. |
| 15 | Q | Kind of a memorialize it for those purposes. |
| 16 | A | It's a bit of a formality that says he agrees with what Dr. Noland had documented. |
| 17 | Q | Anything from those entries that affects your belief or opinion about the timing of the |
| 18 | | trauma? |
| 19 | A | No. |
| 20 | Q | And then page 5 uh notified 15:58 I'm not, I have separate notes that's up at the top. |
| 21 | | Notified 15:58 arrived 16:04 and notification would have been by radio from the EMS |
| 22 | | saying we're on our way or what? |

11

| | | |
|---|---|---|
| 1 | A | So that would be the time that we received the page uh that says code 77 you know, |
| 2 | | patient has arrived with a brief description of the problem at the time of arrival. So that's |
| 3 | | when we received that page uh and then when we were present uh I mean our team uh at |
| 4 | | 16:01 then the patient arrived at 16:04. |
| 5 | Q | Um so it would be internal of the hospital so someone at the hospital gets something from |
| 6 | | the EMS ambulance personnel and then they that is when they notify the who they need |
| 7 | | for their code 77? |
| 8 | A | Yes so that's the time the code 77 page was received by our team. |
| 9 | Q | And then on page 6 on the secondary survey something bilateral non reactive. |
| 10 | A | Um the pupil size 2 mm, bilateral, nonreactive. |
| 11 | Q | Okay, anything on those notes that helps you try to figure out the timing of the trauma? |
| 12 | A | Um no I mean these notes and then again our subsequent dictated version of it basically |
| 13 | | describe the findings at the time of arrival. |
| 14 | Q | Page 8 we have a Dr. Simons. |
| 15 | A | Yes. |
| 16 | Q | Who's that? |
| 17 | A | Um he is one of my partners um so he was on duty at the time of her arrival to the |
| 18 | | emergency department um and then the uh then the uh then have an on call staff that |
| 19 | | takes over at 5:00 p.m. so I was next on call so um I took over the care from Dr. Simons |
| 20 | | shortly after the patient arrives. |
| 21 | Q | And then on page 10 um we've got references to Dr. Guzman and Dr. Gayed. Can you |
| 22 | | tell me who they are and their participation? |

| | | |
|---|---|---|
| 1 | A | They are two of our surgical residents that are part of the um trauma surgery team at uh |
| 2 | | that evaluated her and cared for her. |
| 3 | Q | And then the narrative that appears on that page do you know its source. |
| 4 | A | Are you on page 10? |
| 5 | Q | Yes sir uh where briefly brought in, an unidentified |
| 6 | A | Yes. |
| 7 | Q | Is that just |
| 8 | A | That's a note by Dr. Guzman who uh would have been our senior resident on duty um and |
| 9 | | uh so he's uh summarizing the uh the nature of uh what happened and the uh plan. |
| 10 | Q | So that could have been different sources some EMS, some nurses, some personal |
| 11 | | observations? |
| 12 | A | Yes. |
| 13 | Q | Thank you. Um page 11 were you present for the discussions no wait, page 11 is the |
| 14 | | DNR uh and it says after discussions with the family that was just the son, correct? |
| 15 | A | Um that is page 11 is actually somewhat out of time sequence but it's uh a note um that |
| 16 | | was entered after the time of her death sort of summarizing the hospital course uh that |
| 17 | | evening. |
| 18 | Q | Did Dr. Guzman make that entry or? |
| 19 | A | Yes. |
| 20 | Q | And then um do you see the part after the discussions with the family she was made |
| 21 | | DNR? |
| 22 | A | Yes. |
| 23 | Q | Um to your knowledge that was just the son? |

13

| | | |
|---|---|---|
| 1 | A | Um the um the additional conversation was with the son by telephone and um it |
| 2 | | sometime thereafter a her daughter arrived at the hospital and uh discussions were um |
| 3 | | held throughout the evening with her family members uh about her condition and there |
| 4 | | was an agreement amongst the family uh to make that decision. |
| 5 | Q | Were you present when it talks about the immediate family, were you present for that the |
| 6 | | discussions about withdrawing care? |
| 7 | A | Yes. |
| 8 | Q | And so how many was it if you recall? |
| 9 | A | Um there were three children that had arrived at the bedside and we spoke with them in |
| 10 | | the intensive care unit. |
| 11 | Q | Anything about the demeanor of any of them that you found odd? |
| 12 | A | Um no, not given the circumstances. |
| 13 | Q | Were they, so they all seemed to be reacting appropriately given the circumstances? |
| 14 | A | Yes. |
| 15 | Q | Anything about the discussions that I don't know is out of sync with your experience? |
| 16 | A | Um no I discussed um the nature of her injuries and the devastating traumatic brain injury |
| 17 | | and uh her condition at the time and that it was the opinion of the neurosurgeons and of |
| 18 | | our team caring for her that there was no treatment that would repair her injuries that |
| 19 | | would lead to a good recovery and then they agreed that she would not want prolonged |
| 20 | | life support in that situation and uh at that point the decision was made to withdraw care |
| 21 | | except for uh pain medication and comfort measures.  Uh and I made a note to that effect |
| 22 | | in the record which is not included in the um documents that you have but um was a note |
| 23 | | that I entered in the medical record at 22:11. |

14

| 1 | Q | I'm sorry just the note that they had decided to withdraw care? |
|---|---|---|
| 2 | A | Yes. |
| 3 | Q | Okay in um given those communications can you remember any specific statements or |
| 4 |   | concerns expressed by any particular one of the three children? |
| 5 | A | No. |
| 6 | Q | Uh page 12 it's simply the radiology report. |
| 7 | A | Yes. |
| 8 | Q | Anything about that that would help someone determine the timing of the trauma? |
| 9 | A | Um, um it demonstrates that this is an acute or a recent injury but the uh the exact timing |
| 10 |   | would not be uh uh determined to the point of whether it was minutes or hours. |
| 11 | Q | Yeah recent in medical terminology could be up to 20 hours, right? |
| 12 | A | Um, um it was definitely evidence of an acute injury with a recent hemorrhage uh I can't |
| 13 |   | speculate on the duration of time. |
| 14 | Q | Okay well but when you use the word recent how, what, what amount of time could that |
| 15 |   | involve? |
| 16 | A | Um minutes or hours. |
| 17 | Q | And how many hours? |
| 18 | A | I don't know. |
| 19 | Q | And if you reference recent to the hemorrhaging, hemorrhaging would be ongoing, |
| 20 |   | correct? |
| 21 | A | Uh yes. |
| 22 | Q | Um |

| | | |
|---|---|---|
| 1 | A | So, so blood has a certain appearance on a CT scan and uh over time that appearance |
| 2 | | changes um um I am not a radiologist so I could not quote you a specific time frame but |
| 3 | | in my experience this is indicative of an acute injury um as I mentioned uh within |
| 4 | | minutes or a few hours. |
| 5 | Q | Okay well now a few hours could that be four or five? |
| 6 | A | It could be. |
| 7 | Q | Okay is there anyway, we keep going minutes or a few hours, is there any way to uh to |
| 8 | | elevate or give more credence to one or the other? |
| 9 | A | Um, not in my experience. |
| 10 | Q | On page |
| 11 | A | I don't think that the test is able to be that precise in terms of timing. |
| 12 | Q | So I suspect that's why they want you to come in is to say that the kid, the kid had to have |
| 13 | | done it because it was so recent.  Are you going to say anything like that? |
| 14 | A | Uh I can't speculate about who caused this injury.  I can just describe the injury uh. |
| 15 | Q | Right but I'm saying I'm not talking about describing who did it.  It's going to be their |
| 16 | | theory and I think they want you to help them I mean are you going to come in and say |
| 17 | | whoever found this person probably did it because it's so recent, anything like that? |
| 18 | A | Um I can say that it was a recent injury I can't speculate as to whether or not the person |
| 19 | | who found her was involved or just happened to find her I don't know. |
| 20 | Q | Okay and again recent could have been four or five hours? |
| 21 | A | Um it, it could have been but I think it was probably relatively soon after the injury. |
| 22 | Q | Okay why do you say that?  Why did it take me so long to get that answer? |

16

| | | |
|---|---|---|
| 1 | A | Um well, I mean I'm saying, I'm saying it would be uh more likely, more likely a matter |
| 2 | | of minutes than hours. |
| 3 | Q | I think I'm pretty sure I asked that directly about 20 minutes ago but why are you saying |
| 4 | | that now? |
| 5 | A | Because you continue to ask me could it have been this and could have it been that and I |
| 6 | | cannot say with absolute certainty so I would say in my opinion this was more likely uh a |
| 7 | | matter of minutes rather than several hours because I don't think she would have survived |
| 8 | | without life support for a long period of time. |
| 9 | Q | Okay well how long? |
| 10 | A | Uh I'd give it the same answer I gave you before. A matter of minutes or hours. |
| 11 | Q | Okay so but now you're saying more likely minutes because she wouldn't have survived. |
| 12 | | So how do you get there?  I mean you know three times I've asked the question, you go |
| 13 | | minutes or hours.  I even said is one more likely than the other early on and you said no |
| 14 | | and now it's your opinion it's more likely minutes than hours and I'd like you to explain |
| 15 | | that to me please. |
| 16 | A | Because when a person has a severe traumatic brain injury and they are unconscious um |
| 17 | | there are effects on the patency of the airway, the patient's ability to breath and there's |
| 18 | | ongoing bleeding and these injuries evolve over time as a patient's condition tends to get |
| 19 | | worse um over a relatively short period of time an that period of time in the absence of |
| 20 | | medical treatment in my opinion, would be more likely to be measured in minutes than |
| 21 | | multiple hours. |

17

| 1 | Q | And um I'm sorry so, great now I'm really have to, you just extended this a few, quite a |
| 2 | | bit. Uh have you reviewed any documentation, photographs or videos of the scene to see |
| 3 | | what kind of blood loss was there? |
| 4 | A | No. |
| 5 | Q | Would that affect your opinion? |
| 6 | A | No. |
| 7 | Q | Well if blood loss is something that goes over time if there's a little of it that would mean |
| 8 | | it was a shorter time versus if there's a lot of it, correct? |
| 9 | A | Um I base my assessment on our evaluation of the patient uh the amount of bleeding she |
| 10 | | had that we observed and the laboratory and other tests that we obtained at the hospital. |
| 11 | Q | Okay well tell me what laboratory results affect that opinion? |
| 12 | A | Um she had a blood cell count um a hemoglobin level that it was an impression of uh the |
| 13 | | amount of blood loss uh and I would use that as, you know my assessment as to how |
| 14 | | much bleeding there has been. Uh it is very difficult to estimate the quantity of blood |
| 15 | | loss based on observation of a patient of the scene or the patient's clothing uh that is |
| 16 | | something that's fairly well known. You just pour a quantity of liquid on the floor it's |
| 17 | | very difficult to estimate the exact volume of that. |
| 18 | Q | Well you could certainly tell the difference between a 50 cent drop and a 1 foot puddle |
| 19 | | couldn't you? |
| 20 | A | Um yes. |
| 21 | Q | Wouldn't you say a 50 cent drop would be less liquid than a 1 foot puddle? |
| 22 | A | Yes. |

| | | |
|---|---|---|
| 1 | Q | So then on the lab reports tell me what uh you've told me how the hemoglobin count so |
| 2 | | what does that tell you then about how long she'd been bleeding? |
| 3 | A | Uh she had a hemoglobin level of 9.9 normal range is 12 to 15 so she had lost you would |
| 4 | | estimate approximately uh what we would describe as 2 units of blood or the amount of |
| 5 | | transfusion that would be required to replace that blood loss to get her back to a normal |
| 6 | | value would be about 2 units of stored blood.  So that's how I make that estimation. |
| 7 | Q | So how long would it take to lose 2 units of blood? |
| 8 | A | That depends on how fast someone's bleeding. |
| 9 | Q | So how does that help you decide minutes rather than hours? |
| 10 | A | It doesn't. It just helps me decide how much blood was lost. |
| 11 | Q | Well did she get any blood? |
| 12 | A | No, I don't think so. |
| 13 | Q | So what else uh supports your preference for minutes versus hours? |
| 14 | A | Uh that's my judgment and professional experience. |
| 15 | Q | No, no, I want to know what you're basing it on.  You said the blood count and you said |
| 16 | | something else and then we started talking about the blood count so. |
| 17 | A | I would use the blood count to estimate how much blood she had lost not the time period |
| 18 | | over which she lost it. |
| 19 | Q | Okay. |
| 20 | A | Uh I would use my experience based on her condition when she arrived, the nature of her |
| 21 | | injuries, uh is that this was an acute injury, that um that without medical treatment she |
| 22 | | would not survive um more than some number of minutes or a few hours. |
| 23 | Q | Alright. |

1   A   I am not going to be more specific than that because I cannot be.

2   Q   Well you've gone back and forth on it.  You'll be able to read this.

3   A   No I have consistently said a period of time between minutes or several hours.

4   Q   I won't argue with you, I'll wait and let you read it.

5   A   On that question.

6   Q   I'll wait and let you read it and then you can make changes if you wish.

7   A   So.

8   Q   Are you a neurologist or a neurosurgeon?

9   A   I am a general surgeon with _____ qualifications in surgical critical care.

10  Q   Any board certifications?

11  A   Yes.

12  Q   What are they?

13  A   Surgery and surgical critical care.

14  Q   And uh any board certifications in neurology or brain functions?

15  A   No.

16  Q   Uh back to the record page 13 who is Dr. Tarver?

17  A   He is a radiologist.

18  Q   And then page 14 uh do you know who um made the entry for the history of present
19      illness?

20  A   Um that was entered by Benjamin Gayed who I, I mentioned as one of our surgery
21      residents, trauma team.

22  Q   Do you know where he got that information?

| | | |
|---|---|---|
| 1 | A | Um based on the history provided by the paramedics and of his assessment of the patient |
| 2 | | on arrival. |
| 3 | Q | The only new entry on that narrative is that no weapon was found any idea where he got |
| 4 | | that information? |
| 5 | A | It would have been what came from the same paramedics. |
| 6 | Q | And then page 15 assessment and plan would that still be Dr. Gayed or Dr. Simons? |
| 7 | A | It would be Dr. Gayed and then um again Dr. Simons is the attending so he was uh uh |
| 8 | | still sign as the attending physician of record. |
| 9 | Q | When he said a neurosurgeon was consulted who was that? |
| 10 | A | Um that was uh Dr. Todd Vogel, he was one of the neurosurgery residents at the time and |
| 11 | | his attending was Dr. Shapiro. |
| 12 | Q | I'm sorry could you spell Dr. Todd's last name? |
| 13 | A | It's Todd Vogel V as in Victor-O-G-E-L. |
| 14 | Q | And his uh he was a resident? |
| 15 | A | Yes. |
| 16 | Q | And so who was the supervising doctor? |
| 17 | A | Scott Shaprio S-H-A-P-I-R-O. |
| 18 | Q | Have they prepared any reports to your knowledge? |
| 19 | A | Uh yes. |
| 20 | Q | And do you have any idea where those are? |
| 21 | A | Um |
| 22 | Q | I'm sorry hold on a minute (turned tape over) Okay where would those reports be? |

| | | |
|---|---|---|
| 1 | A | Um there is um a note in our electronic medical records um that um that was entered |
| 2 | | November 19, 2013 at 16:56. |
| 3 | Q | Do you have access to that? |
| 4 | A | Yes. |
| 5 | Q | Is it lengthy? |
| 6 | A | No. |
| 7 | Q | Can you read it? |
| 8 | A | Um it says neurosurgery consult note.  Unidentified female uh reported born in 1925 uh |
| 9 | | 88 years old found down at home with GSW to left parietal occipital region unknown |
| 10 | | circumstances.  No family available for questioning.  Patient had eyes open, squeezing |
| 11 | | left hand intermittently, non verbal during transportation for a GSC of 9 E4 G1 M4 on |
| 12 | | arrival.  Intubated with rapid intubation sequence on arrival.  Large left occipital lesions. |
| 13 | | Uh that's how I read past medical history, past surgical history, medication, socialistic |
| 14 | | family history, review systems are unable to be  obtained.  Uh there's a listing of the vital |
| 15 | | signs on arrival.  Uh says GCS 3T at time of my exam but patient recently paralyzed, |
| 16 | | pupils 2 non reactive, no gag, large left occipital lesion palpated. Head CT demonstrates |
| 17 | | left parietal occipital comminuted bone fracture driven deep into the brain with |
| 18 | | intraventrical hemorrhage. 5 millimeter midline shift left to right.   Assessment plan |
| 19 | | gunshot wound to head.  Non operative based on imaging.  Patient will likely die from |
| 20 | | her injury we're happy to counsel family but no neurosurgical intervention given severity |
| 21 | | of her injury.  It says staff is Shapiro and then there's an addendum by Dr. Shapiro that |
| 22 | | says patient seen and examined and resident supervisor agree with plan. |
| 23 | Q | So that entry would have been made by Dr. Vogel? |

1   A   Yes.

2   Q   And uh any idea why I don't have that?  Do you know if it was given to the prosecutor?

3   A   Um I don't know, it is uh in our electronic medical records and should be available upon

4       request.

5   Q   Well so I'm identifying now that you have one note that you identified not in the packet

6       that I sent you which is all that I was given and now we have this.  Do you know of any

7       other missing documents or documents that I don't have?  I don't mean to say missing

8       documents.

9   A   Um I mean what you have is a, are excerpts from the medical records um medical records

10      now a days are sort of a complex data base that I think are sometimes difficult to depict

11      completely in a printed form however, uh it should certainly be possible to retrieve all of

12      the progress notes and have those available to you.  Uh upon request from our medical

13      records department.

14  Q   Yeah I don't know how they requested it but I can do a non party.

15  A   So what, I mean what is in this packet is incomplete version of the medical record.

16  Q   Gotcha.

17  Pros  So I may just, how many additional pages does it look because this is all that the State

18       was provided upon request.  About how many other documents are we talking about Dr.

19       Streib if you had to guess?

20  A   Um if I pull up the list of available documents um

21  Pros  Or maybe a better way if we re-request it how should we word it to ensure we get all the

22       documents?

23

| 1  | A    | Um you would want to make sure that you have all of documents including the history |
|----|------|------|
| 2  |      | and physical, progress notes, um radiology reports and discharge summary that would |
| 3  |      | give you all of the physician documentation. |
| 4  | Pros | Okay and I'm sorry I only got um the radiology report and discharge summary what did |
| 5  |      | you say prior to that please? |
| 6  | A    | I would say the admitting history and physical. |
| 7  | Pros | Okay thank you. |
| 8  | A    | And progress notes. |
| 9  | Pros | Okay thank you, sorry go ahead. |
| 10 | Q    | You might include consultation and referral notes.  Um |
| 11 | Pros | Would that also be necessary to include, doctor? |
| 12 | A    | Um you could certainly, yeah you could list that. |
| 13 | Pros | Okay. |
| 14 | Q    | Uh from your discussion with uh the prosecutor and all and expectation of testimony |
| 15 |      | have I missed anything? |
| 16 | A    | Um |
| 17 | Q    | See here's the thing, I hate surprises when I'm in court and hear stuff for the first time so I |
| 18 |      | like to try to make sure I've heard everything from a prospective witness that they know |
| 19 |      | or expect will be covered in their testimony. |
| 20 | A    | Uh huh.  Um I uh like I said if called to testify I would be able to uh testify to the facts of |
| 21 |      | the documented medical records, uh my opinion based upon those which I think I have |
| 22 |      | described to you uh and I could uh describe the discussion I had with the patient's family |
| 23 |      | and the decisions that were made based upon those discussions um I would not be able to |

24

1      provide any detailed forensic testimony about the mechanism of injury or the timing of

2      injury any more specifically than we've discussed because I just that's not in my area of

3      expertise. It is possible that the coroner or medical examiner may have more specific

4      information or uh details regarding those questions.

5  Q    And then uh anything about your interactions with the family that we haven't covered?

6  A    No, I don't think so.

7  Q    When you referenced minutes versus hours like minutes was that are you talking 10, 15

8      or up to 59?

9  A    Um I mean just based on the nature of pre-hospital care um and um I don't have the EMS

10     record um but there would be information regarding the timing of the call, usually uh the

11     pre-hospital time would be at least 20 to 30 minutes um so I would say that you're

12     probably from the you know the time of an injury is found and the time the patient gets to

13     the hospital it could be in the 30 to 60 minutes time frame.

14  Q   Oh no I'm talking about when you uh uh your opinion as to when the trauma was suffered

15  A   Yeah.

16  Q   You know you said it could be minutes it could be hours and you're saying in your

17     opinion it was more likely minutes.

18  A   Yeah.

19  Q   Can you give me your parameters of that word.  When you say minutes are you talking 5-

20     10.

21  A   I think clearly it happened before the 911 call.  Uh so uh um whatever that time period is

22     a minimum number uh and then uh I think that uh in um um you know if it was probably

23     somewhere between half an hour uh upwards but again I can't I don't have any really way

1    of being any more specific on that.  Like I said I think that just on the nature of the pre-

2    hospital timing uh that it happened obviously before that.

3  Q    Right but when you're saying minutes I mean could it be up to 50-59 before you switch

4       over to saying hours, I mean just in general?

5  A    Yes.

6  Q    Okay well thank you very much.  I'm going to turn the tape.  I'm sorry do you have any

7       questions?

8  Pros   No

9  Q    I'm going to turn the tape off.

10      End of taped deposition of Dr. Streib.


AND FURTHER AFFIANT SAYETH NAUGHT.


_____                    04/03/2015
Dr. Streib                                          Date


26

STATE OF INDIANA     )         IN THE MARION SUPERIOR COURT
                          )SS:   CRIMINAL DIVISION 1
COUNTY OF MARION    )         CAUSE NO. 49G01-1405-MR-026747

STATE OF INDIANA,           )
          Plaintiff,       )
                          )
     vs.                  )
                          )
WILLIAM RAINSBERGER,   )
          Defendant.     )

"I hereby certify that the foregoing is a true and accurate transcript of the taped deposition testimony given by Dr. Erik Streib. The transcript was prepared and completed by me on the 30th day of March, 2015".


*Patricia A. Cardinal*

Patricia A. Cardinal


PATRICIA A CARDINAL
Notary Public- Seal
State of Indiana
My Commission Expires Aug 28, 2019

Case 1:16-cv-02022-TWP-MJD Document 98-2 Filed 11/28/17 Page 375 of 495 PageID 731
Case 1:16-cv-02022-TWP-MJD Document 66-2 Filed 04/13/17 Page 283 of 275 PageID 731
2311

ERRATA TO DEPOSITION TRANSCRIPT OF _____ JUDGE: KURT EISGRUBER

CAUSE NUMBER: 49G01-1405-MR-026747

I make the following corrections

- Page __5__ Section __Line 7_____ reads,

___... there's actually a secondary of, of fracture..._____

Should read,

_____there's actually a second area of, of fracture..._____

- Page __11__ Section __line 7_____ reads,

then subsequently dictate a full ___ because we are aware
that our handwritten notes
Should read,

then subsequently dictate a full history and physical because...

- Page __20__ Section __Line 9_____ reads,

___I am a general surgeon with _____ qualifications in
Surgical critical care
Should read,

___I am a general surgeon with added qualifications in
Surgical critical care.

- Page _____ Section _____ reads,

_____

_____

Should read,

_____

_____

_____

DATE: __04/03/2015_____     AFFIANT: _Erik Streib_ Erik Streib



111 Monument Circle    Suite 4350    Indianapolis, IN  46204
317+236+6022       800+554+3376    317+236+6015(f)

November 8, 2016

Kathryn Box
OFFICE OF CORPORATE COUNSEL
1601 City-County Building
200 E. Washington Street
Indianapolis, IN  46204

Re:    Deposition of **William Rainsberger**
       09/27/2016
       William Rainsberger vs. Charles Benner

Dear Ms. Box:

The witness did not waive the right to read and sign his/her deposition in the above referenced matter.  Enclosed is the signed original transcript with errata sheet(s).  It has been sealed for submission to the Court.  Should you have any questions, please don't hesitate to call.

Sincerely,

Zachary J. McClure
Connor Reporting

No. 44245
Enclosures

 cc:   Richard A. Waples

148

name."

Q   Do you know what specialty he was, by chance?

A   I think we spoke to the neuro guy.

Q   Neuro guy, okay.

    MS. BOX:  I don't have any further questions.

    THE WITNESS:  Oh, okay.

    MR. WAPLES:  Let's take a short break.

    (A recess was taken between 5:19 p.m. and 5:23 p.m.)

    MR. WAPLES:  We don't have any questions. We'll read and sign.

    THE REPORTER:  Copies?

    MR. WAPLES:  E-tran.

    MS. BOX:  E-tran condensed, please.

    (Time noted:  5:23 p.m.)

    AND FURTHER THE DEPONENT SAITH NOT.


            WILLIAM TERRY RAINSBERGER

EXHIBITS



Case 1:16-cv-00103-TWP-MJD   Document 88-17  Filed 11/28/17   Page 378 of 495 PageID #:
2314
Case 1:16-cv-00103-TWP-MJD   Document 90-17   Filed 02/13/17   Page 38 of 45 PageID #: 734



**CONNOR REPORTING**
SETTING THE RECORD STRAIGHT

111 Monument Circle, Suite 4350  •  Indianapolis, IN 46204
317.236.6022   800.554.3376   317.236.6015•F

RE: Indiana Rules of Procedure, Trial Rule 30 (E) and/or Federal Rules of Civil Procedure.

*PAGE _62_ LINE # _24_
CHANGE_ breathing

TO_ bleeding

REASON FOR CHANGE _I said "bleeding"_

*PAGE _67_ LINE # _4_
CHANGE_ "I have them straight..."

TO_ "I don't have them straight..."

REASON FOR CHANGE _what I meant to say_

*PAGE _112_ LINE # _19-21_
CHANGE_ "I don't know if I told Benner or Tudor or who, but I told them stuff was taken, and it didn't seem to register."

TO_ "I told Benner about a purse and prescription that were later shown by the crime scene records to be missing."

REASON FOR CHANGE _What I meant to say_

1/3



**CONNOR REPORTING**
SETTING THE RECORD STRAIGHT

111 Monument Circle, Suite 4350 • Indianapolis, IN 46204
317.236.6022    800.554.3376    317.236.6016•F

RE: Indiana Rules of Procedure, Trial Rule 30 (E) and/or Federal Rules of Civil Procedure.

\*PAGE 112 LINE # 23
CHANGE "I don't remember."

TO "November 19th and 20th, 2013."

REASON FOR CHANGE What I meant to say

\*PAGE 112 LINE # 25
CHANGE "I believe it was Benner, but I don't remember."

TO "Detective Benner"

REASON FOR CHANGE What I meant to say

\*PAGE 113 LINE # 4-7
CHANGE "I believe I told Benner; if not, I told one of the other police officers that a purse, jewelry, and my mom's Aricept were missing."
TO "I told Benner about a purse and prescription that were later shown by the crime scene records to be missing, and told him the drawers, where my mother's jewelry was kept, were opened."
REASON FOR CHANGE What I meant to say

2/3



**CONNOR REPORTING**
SETTING THE RECORD STRAIGHT

111 Monument Circle, Suite 4350 • Indianapolis, IN 46204
317.236.6022    800.554.3376    317.236.6015•F

RE: Indiana Rules of Procedure, Trial Rule 30 (E) and/or Federal Rules of Civil Procedure.

*PAGE _122_ LINE # _11_

CHANGE _"Yeah."_

TO _"I told Benner about a purse and prescription that were later shown by the crime scene records to be missing, and told him the drawers, where my mother's jewelry was kept, were opened."_

REASON FOR CHANGE _What I meant to say_

*PAGE _122_ LINE # _13_

CHANGE _"I do not"_

TO _"November 19th and 20th, 2013."_

REASON FOR CHANGE _what I meant to say._

*PAGE _____ LINE # _____

CHANGE _____

TO _____

REASON FOR CHANGE _____

3/3

```
1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF INDIANA
2                INDIANAPOLIS DIVISION
3          CIVIL ACTION NO. 1:16-cv-103-WTL-MJD
4    WILLIAM RAINSBERGER,              )
                                       )
5            Plaintiff,                )
                                       )
6             -vs-                     )
                                       )
7    CHARLES BENNER,                   )
                                       )
8            Defendant.                )
9
10       DEPOSITION OF WILLIAM TERRY RAINSBERGER
11
12       The deposition upon oral examination of
     WILLIAM TERRY RAINSBERGER, a witness produced and
13   sworn before me, Susan Wollenweber Dezelan, RDR,
     CRR, CRC, Notary Public in and for the County of
14   Marion, State of Indiana, taken on behalf of the
     Defendant, at the offices of Connor Reporting, 111
15   Monument Circle, Suite 4350, Indianapolis, Marion
     County, Indiana, on the 27th day of September,
16   2016, at 1:58 p.m., pursuant to the Federal Rules
     of Civil Procedure with written notice as to time
17   and place thereof.
18
19
20
21
22
23
24
25
```

Case 1:16-cv-00103-TWP-MJD Document 58-2 Filed 11/28/17 Page 382 of 495 PageID #: 2318
Case 1:16-cv-00103-TWP-MJD Document 50-18 Filed 02/13/17 Page 2 of 250 PageID #: 738

2

```
 1                    APPEARANCES
 2    FOR THE PLAINTIFF:
 3            Richard A. Waples
              WAPLES & HANGER
 4            410 North Audubon Road
              Indianapolis, IN  46219
 5            317.357.0903
              rwaples@wapleshanger.com
 6
 7
      FOR THE DEFENDANT:
 8
              Kathryn M. Box
 9            Lynne D. Hammer
              CITY OF INDIANAPOLIS
10            OFFICE OF CORPORATION COUNSEL
              200 East Washington Street, #1601
11            Indianapolis, IN  46204
              317.327.4055
12            kathryn.box@indy.gov
              lynne.hammer@indy.gov
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Case 1:16-cv-00103-TWP-MJD Document 58-2 Filed 11/28/17 Page 383 of 495 PageID #: 2319
Case 1:16-cv-00103-TWP-MJD Document 50-13 Filed 02/13/17 Page 3 of 50 PageID #: 739

3

```
 1                    INDEX OF EXAMINATION
 2                                           Page
 3    DIRECT EXAMINATION  . . . . . . . . . . . . .5
            Questions by Kathryn M. Box
 4
 5                    INDEX OF EXHIBITS
 6                                           Page
 7    Exhibit No.:
 8    Exhibit 13  - Robert Rainsberger's Cell . . . . 75
                    Phone Records
 9    Exhibit 14  - Gas Receipt from Kroger . . . . . 43
      Exhibit 15  - Kroger Receipt for Iced Tea . . . 49
10    Exhibit 16  - Kroger Plus Card Records  . . . . 50
      Exhibit 17  - Text Message Records from . . . . 80
11                  Rebecca Ferguson's Phone Number
      Exhibit 18  - Audio Records Request for 911 . . 82
12                  Call
      Exhibit 19  - Complaint . . . . . . . . . . . . 99
13    Exhibit 20  - Photograph Depicting Items on . .110
                    Counter
14    Exhibit 21  - Photograph Depicting a Box in . .110
                    a Drawer
15    Exhibit 22  - Photo Depicting a Black Purse . .114
                    in a Drawer
16    Exhibit 23  - Statement of William  . . . . . .115
                    Rainsberger
17    Exhibit 24  - Photo Depicting Small Purse in  .117
                    a Drawer
18    Exhibit 25  - Photograph Depicting Bedroom  . .119
      Exhibit 26  - Photograph Depicting Lockbox  . .122
19    Exhibit 27A - Photograph Depicting  . . . . . .128
                    Rainsberger at Kroger
20    Exhibit 27B - Photograph Depicting  . . . . . .128
                    Rainsberger at Kroger
21    Exhibit 27C - Photograph Depicting  . . . . . .128
                    Rainsberger at Kroger
22    Exhibit 27D - Photograph Depicting  . . . . . .128
                    Rainsberger at Kroger
23    Exhibit 28  - Selected W. Rainsberger Phone . .131
                    Records
24    Exhibit 29  - Storyboard for Video  . . . . . .135
      Exhibit 30  - 06-04-14 E-mail Exchange from . .137
25                  Vincent and Benner
```

Case 1:16-cv-00103-TWP-MJD Document 88-2 Filed 11/28/17 Page 384 of 495 PageID #740
Case 1:16-cv-00103-WTL-MJD Document 58-18 Filed 02/13/17 Page 4 of 250 PageID #:
2320

4

```
1                    INDEX OF EXHIBITS

2                                                Page

     Exhibit No.:

3    (Previously marked)

4    Exhibit 2   - Benner's Affidavit for Probable .100

                   Cause

5    Exhibit 3   - R. Rainsberger's Land Line  . . . 83

                   Telephone Records

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 1:16-cv-00103-TWP-MJD Document 58-2 Filed 11/28/17 Page 385 of 495 PageID #:
2321
Case 1:16-cv-00103-WTL-MJD Document 50-18 Filed 02/13/17 Page 3 of 250 PageID #: 741

5

```
 1                WILLIAM TERRY RAINSBERGER,

 2      having been duly sworn to tell the truth, the whole

 3      truth, and nothing but the truth relating to said

 4      matter, was examined and testified as follows:

 5

 6      DIRECT EXAMINATION,

 7        QUESTIONS BY KATHRYN M. BOX:

 8   Q    Good morning, Mr. Rainsberger.

 9   A    Good afternoon.

10   Q    Good afternoon, sorry about that, it's been a

11        long day already.  My name is Kathryn Box, and I

12        represent Detective Benner in this case.  This

13        is my colleague, Lynne Hammer.  She also will

14        help me with representing Detective Benner here

15        today.

16             For ease of reference, do you mind if I

17        call you William or Bill?

18   A    Bill is fine.

19   Q    Bill.  Okay, thank you.  You can call me Kathryn

20        at any time.  Will you just start by stating

21        your full name for the record and spelling your

22        last name?

23   A    Yeah.  My name is William Terry Rainsberger,

24        R-A-I-N-S-B-E-R-G-E-R.

25   Q    Thank you.  Have you ever given a deposition
```

Case 1:16-cv-00103-TWP-MJD   Document 58-2   Filed 11/28/17   Page 386 of 495 PageID #:
2322
Case 1:16-cv-00103-WTL-MJD   Document 50-18   Filed 02/13/17   Page 6 of 25 PageID #: 742

6

1       before?

2    A   No.

3    Q   No?

4    A   No.

5    Q   So I'm going to go over a few rules real quick,

6        they're pretty simple.  The first rule is you

7        have to tell the truth to the best of your

8        ability.  She swore you in today, it's similar

9        as if you were in front of a Court or in front

10       of a jury.

11           Sometimes I will ask bad questions, it's

12       going to happen, you're not going to understand

13       what I say, you're not going to be able to hear

14       what I say, or when I get nervous sometimes I

15       start speaking fast.  So if for any reason you

16       don't understand my question or you don't hear

17       it, just let me know and I'll be happy to

18       restate it or rephrase it for you.

19   A   Okay.

20   Q   If you answer the question, I'm going to assume

21       that you heard it and that you understood it;

22       fair enough?

23   A   Yes.

24   Q   Great.  Our court reporter -- I know you kind of

25       already went through this this morning, but our

Case 1:16-cv-00103-TWP-MJD   Document 58-2   Filed 11/28/17   Page 387 of 495 PageID #: 2323
Case 1:16-cv-00103-WTL-MJD   Document 50-18   Filed 02/13/17   Page 7 of 250   PageID #: 743

7

```
 1            court reporter is taking down everything that

 2            you and I say, and for her ease of typing, what

 3            we're going to try to make sure we do is not

 4            talk over each other; let me finish my question,

 5            and I'll let you finish your answer.  And make

 6            sure we answer out loud, so no nods of the heads

 7            or head shakes, yes and nos.  And I will try to

 8            remind you as we go throughout the deposition if

 9            you answer any by shaking your head or nodding,

10            okay?

11    A    Okay.

12    Q    Last, I don't know how long I'll take today, but

13            I don't anticipate it will be too long, but if

14            you need a break at any time, just like we did

15            this morning, just let me know.  We can take a

16            break, you can use the bathroom, get some food.

17            The only thing I ask is that you answer the

18            pending question before we break.

19    A    Yes.

20    Q    Great, thanks.

21            THE WITNESS:  Is this -- is there a

22            microphone, or are you just transcribing?

23            MS. BOX:  I don't know, I'm not sure how it

24            works, sorry.  I believe there is a microphone

25            as well.
```

Case 1:16-cv-00103-TWP-MJD   Document 58-2   Filed 11/28/17   Page 388 of 495 PageID #:
2324
Case 1:16-cv-00103-WTL-MJD   Document 50-18   Filed 02/13/17   Page 8 of 150   PageID #: 744

8

```
 1              THE WITNESS:  Okay.

 2    BY MS. BOX:

 3    Q    Are you on any medication today?

 4    A    Yes.

 5    Q    What medication are you on?

 6    A    I take paroxetine, 10 milligram, once a day, and

 7         I take -- what's it called? -- generic Adderall.

 8         I can't remember the generic name.

 9    Q    And that's fine.  I don't --

10    A    And I take multiple hay fever over-the-counter

11         medications.

12    Q    Do any of those medications affect your ability

13         to understand questions?

14    A    No.

15    Q    Affect your ability to answer questions today?

16    A    No.

17    Q    Are you under the influence of any alcohol?

18    A    No.

19    Q    Sorry, I have to ask.

20    A    That's okay.

21    Q    Are you under the influence of any illegal

22         drugs?

23    A    No.

24    Q    And I see that you have eyeglasses.  Do you need

25         those to see any of the exhibits that I show you
```

```
 1         today?

 2   A     I just wear them to read --

 3   Q     Okay.

 4   A     -- so as that applies, I'll have to wear them.

 5   Q     The only thing I ask is if you need them to see

 6         something clearly, please do so.

 7   A     Right.

 8   Q     Thanks.  And do you wear hearing aids?

 9   A     No.

10   Q     Other than speaking with your attorney, what did

11         you do to prepare for your deposition today?

12   A     I just read through the affidavit and the

13         statements that I had -- or the -- my responses

14         to the questions that the police, the IMPD in

15         November of 2013.

16   Q     Was that your statement that you gave to

17         Detective Benner?

18   A     Yeah.  I read the question-and-answer with

19         Benner from the two instances in November 2013.

20   Q     Okay, right.  And there are two statements, just

21         so we're clear, right, one on the 19th?

22   A     The 19th.

23   Q     And then one on the next day, on the 20th; is

24         that correct?

25   A     Correct.
```

```
 1    Q   Of November, 2013.

 2            Did you talk to anyone else besides your

 3        attorney about your deposition today?

 4    A   No.

 5    Q   And I mean about the substance.

 6    A   No.

 7    Q   And I'm just going to ask a few background

 8        questions just to understand you, really.

 9        What's your date of birth?

10    A   June 8, 1957.

11    Q   And how old are you?

12    A   59.

13    Q   How old were you on November 19th of 2013?

14        I'm not good at math, that's why I asked.

15    A   56.

16    Q   And where do you currently live?

17    A   You want the address?

18    Q   Please.

19    A   7345 East 13th Street.

20    Q   And that's the same address you lived at in

21        November of 2013; correct?

22    A   Correct.

23    Q   And what is your cell phone number?

24    A   (317)331-1059.

25    Q   Is that the same number as --
```

Case 1:16-cv-00103-TWR-MJD Document 88-2 Filed 12/28/17 Page 391 of 495 PageID #: 747
Case 1:16-cv-00103-WTL-MJD Document 50-13 Filed 02/23/17 Page 13 of 150 PageID #:
2327

11

```
 1    A    Yes, ma'am.

 2    Q    -- November 2013?  And who is your carrier?

 3    A    T-Mobile.

 4    Q    T-Mobile.  All right.

 5              Where were you born, the city?

 6    A    Canton, Ohio.

 7    Q    Canton, Ohio, okay.  And where did you go to

 8         high school?

 9    A    Arlington, here.

10    Q    Here in Indianapolis.  Did you go to college?

11    A    Yes.

12    Q    And where did you go to college?

13    A    For three years I went to IUPUI, and then I

14         finished, did two more years at Butler.

15    Q    And did you get a degree?

16    A    Yes.

17    Q    And what degree was that?

18    A    I have a bachelor of science.

19    Q    In what area of study?

20    A    I have a dual major in math and computer

21         science.

22    Q    That explains the Windows 10 stuff you were

23         explaining to us.  You know your computers.

24              Do you have any other post-high school

25         education?
```

Case 1:16-cv-00103-TWP-MJD Document 88-2 Filed 01/28/17 Page 392 of 495 PageID #:
Case 1:16-cv-00103-WTL-MJD Document 50-13 Filed 02/23/17 Page 12 of 150 PageID #: 748
2328

12

```
 1   A   I'm not sure I understand the question.

 2   Q   Sorry.  Like any technical training or

 3       certificates.

 4   A   I have a limited amount of technical training

 5       that was done in relation to my work.

 6   Q   Okay.  Can you explain that a little bit

 7       further, please?

 8   A   I took several classes back in the '80s about

 9       IBM mainframes.

10   Q   Okay.

11   A   I took a class in the '90s about Novell, which

12       is a network operating system, and I took a

13       class in 1999 on firewalls.

14   Q   So all computer-related stuff?

15   A   Yes.

16   Q   And are you currently employed?

17   A   No, ma'am.

18   Q   Were you employed on November 19th of 2013?

19   A   No, ma'am.

20   Q   How long had you -- so you were retired?

21   A   Yes.

22   Q   And where were you retired from?

23   A   From Franciscan Alliance.

24   Q   How long did you work for Franciscan Alliance?

25   A   30 years, not all in a row.
```

Case 1:16-cv-00103-TWP-MJD Document 88-2 Filed 01/28/17 Page 393 of 495 PageID #:
2329
Case 1:16-cv-00103-WTL-MJD Document 50-13 Filed 02/23/17 Page 13 of 150 PageID #49

13

1    Q    And what year did you retire?

2    A    January 2012 or early 2012.

3    Q    And what would a primary day, like, after

4         retirement be for you?  Did you -- what,

5         hobbies, activities, how did you stay busy?

6    A    Oh.  I read a lot.  I hang out with friends.

7         Work on the house.  I guess that's it.

8    Q    So you were retired in November of 2013.  Did

9         you have some sort of retirement pension, or

10        what was your source of income at that time?

11   A    A pension.

12   Q    A pension?  Okay.  Did you own any property in

13        November of 2013?

14   A    Yes.

15   Q    And is that the house --

16   A    Yes.

17   Q    -- that we're speaking about?  And that's at

18        7135 East 13th Street?

19   A    Yes.

20   Q    Can you describe the house for me?

21   A    It's a long ranch house, brick, on about

22        two-thirds of an acre.

23   Q    And is it -- that's in Indianapolis; correct?

24   A    Yes.

25   Q    What side of town is that on?

Case 1:16-cv-00103-TWP-MJD Document 88-2 Filed 01/28/17 Page 394 of 495 PageID #: 2330
Case 1:16-cv-00103-WTL-MJD Document 50-13 Filed 02/23/17 Page 14 of 150 PageID 750

14

```
 1    A    It's on the east side, near 10th and

 2         Shadeland.

 3    Q    And did you own a vehicle at that time?

 4    A    Yes, ma'am.

 5    Q    Just one?

 6    A    Yes.

 7    Q    And what type of vehicle was that?

 8    A    It's a Honda Accord.

 9    Q    Did you have any other source of income at that

10         time besides your pension?

11    A    The answer doesn't fit the question.  I had

12         other assets.

13    Q    Okay.

14    A    So I don't know how to answer the question,

15         actually.

16    Q    No, no problem.  Can you describe your other

17         assets for me?

18    A    I have a IRA that I -- you know, IRA.  And

19         savings.

20    Q    And I just want to talk briefly about your

21         medical history.  Do you have a primary care

22         provider, doctor that you see regularly?

23    A    Yes, yes.

24    Q    What's his or her name?

25    A    William Kleckner.  K --
```

Case 1:16-cv-00193-TWR-MJD  Document 88-2  Filed 11/28/17  Page 395 of 495 PageID #:
2331
Case 1:16-cv-00193-WTL-MJD  Document 50-13  Filed 02/23/17  Page 15 of 150  PageID #: 751
15

```
 1    Q   Can you spell --

 2    A   K-L-E-C-K-N-E-R.

 3    Q   And what hospital is he affiliated with?

 4    A   He's independent.

 5    Q   Independent, no hospital, okay.

 6            Do you have any chronic illnesses?

 7    A   No.

 8    Q   And we already talked briefly about your

 9        prescription medication.  Would the paroxetine,

10        the generic Adderall, and maybe some

11        over-the-counter allergy medicine be similar

12        medications that you were taking back in

13        November of 2013?

14    A   Paroxetine, yes.  Yes to all three, yes.

15    Q   Have you had any recent hospitalizations?

16    A   No.

17    Q   And I apologize, I'm not prying, I just have to

18        ask:  Have you ever been treated for a mental

19        health issue?

20    A   The paroxetine --

21    Q   Yeah.

22    A   -- if you want to categorize it that way, is for

23        low-level depression and anxiety.

24    Q   And how would you characterize it?  Is that how

25        you would characterize it as --
```

Case 1:16-cv-00193-TWP-MJD Document 88-2 Filed 11/28/17 Page 396 of 495 PageID #: 2332
Case 1:16-cv-00193-WTL-MJD Document 50-13 Filed 02/23/17 Page 18 of 150 PageID 752

16

```
 1    A    Low-level depression and anxiety.

 2    Q    Okay, just wanted to make sure.

 3    A    Yes.

 4    Q    And is Dr. Kleckner your prescriber for the

 5         paroxetine?

 6    A    Yes, ma'am.

 7    Q    Have you ever had any inpatient treatment for a

 8         mental health issue?

 9    A    No.

10    Q    Have you ever been treated for drug or alcohol

11         addiction?

12    A    No.

13    Q    Prior to this incident, had you ever been

14         arrested before?

15    A    No.

16    Q    Had you ever been a party to any sort of civil

17         lawsuit prior to this incident?

18    A    Two divorces.

19    Q    That counts.

20             Have you ever sued the City of Indianapolis

21         before or one of its employees?

22    A    No, ma'am.

23    Q    In November of 2013, did you own a firearm?

24    A    Yes, ma'am.

25    Q    And what kind of gun was that?
```

```
 1    A    It's a revolver.

 2    Q    Okay.  And do you still have that gun?

 3    A    Yes, ma'am.

 4    Q    How long have you had the gun for,

 5         approximately?

 6    A    Do you mean when did I buy it?

 7    Q    Yes, that works.

 8    A    Oh, wow.  20 years ago.

 9    Q    And do you have a permit for it, or does it just

10         stay inside your house?

11    A    It just stays inside my house.

12    Q    What's the primary purpose of the weapon?

13    A    Personal protection.

14    Q    Personal protection, okay.

15             And are you -- I don't know how to put

16         this -- a gun guy, a gun aficionado, do you

17         enjoy guns?

18    A    No, ma'am.

19    Q    Do you smoke?

20    A    Can you define "smoke"?

21    Q    Cigarettes.

22    A    Occasionally, yeah.  Rarely.

23    Q    Do you smoke any sort of recreational drugs?

24    A    I have, but I do not.

25    Q    How often would you say you've smoked a
```

```
 1          recreational drug in the last year, if at all?

 2    A     Once or twice.

 3    Q     And are we talking about weed?

 4    A     We are talking about weed.

 5    Q     Okay.  Just wanted to make sure we're on the

 6          same page.

 7              Now I'm going to ask you a few questions

 8          about your family.  Are you married?

 9    A     No, ma'am.

10    Q     Were you married in November 2013?

11    A     Yes.

12    Q     And what was your wife's name?

13    A     Mari, M-A-R-I, Bilger, B-I-L-G-E-R.

14    Q     And do you know her date of birth?

15    A     February 12, 1971.

16    Q     And where did she live in November of 2013?

17    A     At her house in Plainfield, Indiana.

18    Q     And can you give me that address, if you recall?

19    A     221 South Vine Street in Plainfield.

20    Q     So you guys were married but each owned separate

21          houses?

22    A     Correct.

23    Q     How much time would you spend at her house,

24          would you estimate, maybe in a week?

25    A     One or two evenings a week, at most.
```

Case 1:16-cv-00103-TWR-MJD   Document 88-2   Filed 01/28/17   Page 399 of 495 PageID #:
2335
Case 1:16-cv-00103-WTL-MJD   Document 50-13   Filed 02/23/17   Page 19 of 150   PageID 755

19

```
 1    Q    At her house?  Would she come and stay with you?

 2    A    Rarely.

 3    Q    And what does she do for a living?

 4    A    I'm sorry.

 5    Q    You're fine.

 6    A    She is -- she works in the computer field.

 7    Q    Do you have any children?

 8    A    No, ma'am.

 9    Q    And do you have any siblings?

10    A    Yes, ma'am.

11    Q    And what are their names?

12    A    My sister's name is Rebecca, same last name.  My

13         brother's name is Robert.

14    Q    Is that all your siblings?

15    A    Yes, ma'am.

16    Q    And who's the oldest, or can you give me oldest

17         to youngest?

18    A    My sister is the oldest, I'm middle, my brother

19         is the youngest.

20    Q    I'm going to talk about Robert for just a

21         second, okay?

22    A    Uh-huh.

23    Q    Do you know Robert's date of birth?

24    A    January 12, 1962.

25    Q    Is Robert married?
```

Case 1:16-cv-00103-TWR-MJD Document 88-2 Filed 01/28/17 Page 400 of 495 PageID #: 2336
Case 1:16-cv-00103-WTL-MJD Document 56-13 Filed 02/23/17 Page 20 of 150 PageID 756

20

```
 1    A    No.

 2    Q    Does he have a girlfriend or significant other,

 3         that you know of?

 4    A    I do not know.

 5    Q    And I know in November of 2013, he was living

 6         with you for a little bit; is that correct?

 7    A    Correct.

 8    Q    Is he still living with you?

 9    A    No, ma'am.

10    Q    What's his current address?

11    A    7155 East 21st Street, Apartment 5.

12    Q    And that's in Indianapolis?

13    A    Yes, ma'am.

14    Q    Okay.  And what does Robert do for a living?

15    A    He's a house painter.

16    Q    And what's Robert's cell phone number?

17    A    (317)357-5791.

18    Q    How often do you see Robert?

19    A    Every few weeks.

20    Q    Every few weeks.

21         Would you characterize your relationship as

22         close?

23    A    Yes.

24    Q    And I know we touched on Robert was living with

25         you in November of 2013.  And why was he living
```

Case 1:16-cv-00103-TWR-MJD   Document 88-2   Filed 11/28/17   Page 401 of 495 PageID #: 2337
Case 1:16-cv-00103-WTL-MJD   Document 50-13   Filed 02/23/17   Page 21 of 150 PageID 757

21

```
 1        with you?

 2   A    His house had been foreclosed on.  He was in a

 3        financial muddle.

 4   Q    Okay.

 5   A    So...

 6   Q    And when did he start living with you?

 7   A    The summer of 2013, I think.

 8   Q    Okay.  So he had been with you for three, four

 9        months, something like that --

10   A    Yeah, I can't remember exactly.

11   Q    -- at the time of the -- and then Rebecca, do

12        you know her date of birth?

13   A    September 21, 1951.

14   Q    And is Rebecca married?

15   A    Yes.

16   Q    What's her husband's name?

17   A    Larry Ferguson.

18   Q    Do they have any kids?

19   A    You mean between them?

20   Q    Yes.

21   A    No.

22   Q    Do they have kids separately?

23   A    My sister has a daughter.

24   Q    A daughter?  And how old is her daughter?

25   A    Mid-40s.
```

Case 1:16-cv-00103-TWR-MJD Document 88-3 Filed 01/28/17 Page 402 of 495 PageID #:
2338
Case 1:16-cv-00103-WTL-MJD Document 50-13 Filed 02/23/17 Page 22 of 130 PageID 758

22

1    Q    Mid-40s, okay.  So that's your niece; correct?

2    A    Correct.

3    Q    And what's her name?

4    A    Amber Hulse, H-U-L-S-E.

5    Q    And does she live in Indianapolis?

6    A    Amber lives in the county seat of Hendricks

7         County.  Danville.

8    Q    How often do you see Amber?

9    A    Once a month.

10   Q    Does Rebecca live with Larry?

11   A    Yes.

12   Q    And where do they live at?

13   A    They live in Greenville, South Carolina.

14   Q    Okay.  Now, she lived in Indianapolis in

15        November of 2013; correct?

16   A    Yes, ma'am.

17   Q    And what was her address?

18   A    In November of 2013?

19   Q    Correct.

20   A    12957 Tarkington Common, Carmel.

21   Q    What does Rebecca do for a living?

22   A    Rebecca is retired.

23   Q    Retired now.  What did she do before she

24        retired?

25   A    She was a CPA.

Case 1:16-cv-00103-WTL-MJD   Document 50-13   Filed 02/23/17   Page 29 of 150   PageID 759

```
 1    Q    How often do you see Rebecca?  I know she lives

 2         far away.

 3    A    Once a year.

 4    Q    Once a year.  Did you see her more frequently

 5         when she lived in Carmel?

 6    A    Yes.

 7    Q    How often did you see her?

 8    A    Once -- once a month.

 9    Q    Once a month.  Do you recall the last time you

10         saw her before the incident on the 19th,

11         November 19th?

12    A    No, not -- not with any accuracy.

13    Q    And what is your father's name?

14    A    His name was Ralph, R-A-L-P-H, Rainsberger.

15    Q    And he passed away?

16    A    Yes.

17    Q    I'm sorry about that.  When did he pass away?

18         Has it been a while?

19    A    '83?

20    Q    Were he and your mom married at that time --

21    A    No.

22    Q    -- when he passed away?

23    A    No.

24    Q    And did he live in Indianapolis at that time?

25    A    No.
```

```
 1    Q   Did you have much of a relationship after he and

 2        your mom got divorced?

 3    A   No.

 4    Q   And your mother's name was Ruth Rainsberger;

 5        correct?

 6    A   Yes, ma'am.

 7    Q   And she was attacked and killed on

 8        November 19, 2013?

 9    A   She was attacked on November 19th.

10    Q   And she died the next day; is that correct?

11    A   Yes.

12    Q   I'm going to talk about your mom a little bit,

13        and I'm sorry for your loss.  I know this is --

14    A   That's okay.

15    Q   I'm sure it's tough to talk about; if you ever

16        need a break just let me know, okay?

17            Do you know your mom's date of birth?

18    A   June 10, 1925.

19    Q   And how old was she when she died?

20    A   8- -- 88.

21    Q   And where did she live?

22    A   801 North Shortridge, Apartment H-11,

23        Indianapolis.

24    Q   And that's an apartment complex?

25    A   Yes.  It's called Jeffersonian.
```

```
 1   Q   And can you describe her apartment for me,

 2       briefly?

 3   A   She had a two-bedroom, one-bath apartment that

 4       was in the -- like, half in the basement.  Very

 5       generic apartment.

 6   Q   And did she live there by herself?

 7   A   Yes, ma'am.

 8   Q   How long had she lived there for?

 9   A   At the time she passed away, it had been almost

10       two years.

11   Q   Did she have a cell phone at that time?

12   A   Think of an answer that works correctly.  She

13       had a cell phone but never used it and did not

14       know how to operate it.

15   Q   I understand that.  Did she have a land line?

16   A   Yes, ma'am.

17   Q   And what was that number?

18   A   I don't remember.  It's in the --

19   Q   It's in the records?

20   A   Yeah.

21   Q   I'll find it real quick.

22   A   375-7841.

23   Q   7841?  375-7841?

24   A   Yes.

25   Q   What was your mom's physical condition like at
```

Case 1:16-cv-00193-TWR-MJD Document 88-2 Filed 01/28/17 Page 406 of 495 PageID #:
2342
Case 1:16-cv-00193-WTL-MJD Document 50-13 Filed 02/23/17 Page 26 of 150 PageID #: 762

26

```
 1          the time of her death?  Was she mobile, could

 2          she walk?

 3     A    Yes.

 4     Q    Did she need any assistance from a walker or a

 5          wheelchair or anything like that?

 6     A    No.

 7     Q    Was she able to care for herself?

 8     A    No.

 9     Q    No, okay.  Could she bathe herself?

10     A    I don't mean to be this -- this guy.

11     Q    You're fine.

12     A    She was -- she would have been physically strong

13          enough and adept enough to bathe herself, but

14          her dementia prevented her from performing

15          routine tasks.

16     Q    Describe her dementia for me a little bit.

17          Would you characterize it as severe or bad?

18     A    No.

19     Q    No, okay.  How often in a day would she forget

20          something, or what were -- let me back up.

21              What were her symptoms?

22     A    She -- there was a couple things.  One was

23          forgetfulness and the other is loss of executive

24          function.

25     Q    What do you mean by that?
```

Case 1:16-cv-00193-TWR-MJD   Document 88-2   Filed 01/28/17   Page 407 of 495 PageID #:
2343
Case 1:16-cv-00193-WTL-MJD   Document 50-13   Filed 01/23/17   Page 27 of 150   PageID #: 763

27

```
 1    A   She was not able to perform tasks that required

 2        more than one or two steps.

 3    Q   Okay.

 4    A   So, for example, to make toast would be -- it's

 5        kind of haphazard.

 6    Q   Okay.

 7    A   She had Lewy body dementia, the same thing Robin

 8        Williams had.

 9    Q   Oh, okay.

10    A   She was under treatment for that.

11    Q   Were you her primary caregiver at the time?

12    A   Yes.

13    Q   Who else helped with taking care of your mom?

14    A   My sister.

15    Q   What would you do for your mom, general tasks?

16    A   I went to the store, did her dishes, and put

17        things away.  The main thing I did was just to

18        be a companion.

19    Q   And what would Rebecca do for your mom?

20    A   Mainly laundry.

21    Q   How often --

22    A   She would -- she would also -- I'm sorry, I'm

23        not really here or there.  She would also bathe

24        her.

25    Q   And how often would you see her?
```

Case 1:16-cv-00103-TWR-MJD   Document 88-2   Filed 11/28/17   Page 408 of 495 PageID #:
2344
Case 1:16-cv-00103-WTL-MJD   Document 50-13   Filed 02/23/17   Page 20 of 150   PageID #: 764

28

```
 1    A    My mother?

 2    Q    Yes, your mother, sorry.

 3    A    Every day.

 4    Q    How often would Rebecca see her?

 5    A    Once a week.

 6    Q    And did your mom have food delivered to her?

 7    A    Yes, ma'am.

 8    Q    And how often did those food deliveries come?

 9    A    Monday through Friday.

10    Q    Did they come at the same time every day?

11    A    Approximately, yes.

12    Q    Approximately.  And what time was that?

13    A    10:30 or 11:00.

14    Q    Do you know if it was the same individual who

15         dropped the food off each day?

16    A    Yes.

17    Q    Did your mom understand that she was having food

18         delivered --

19    A    Yes.

20    Q    -- pretty much every day around 10:30?

21    A    Yes.

22    Q    So she would have been expecting a delivery?

23    A    Yes.

24    Q    How often would your mom get out of the house?

25    A    Rarely.
```

Case 1:16-cv-00103-TWR-MJD Document 88-2 Filed 01/28/17 Page 409 of 495 PageID #:
Case 1:16-cv-00103-WTL-MJD Document 50-13 Filed 02/23/17 Page 29 of 150 PageID 765
2345

29

1    Q   Would she ever go out by herself?

2    A   No.

3    Q   And I believe you talked a little bit about, in

4        your statement, that she was either skeptical --

5        or I think "leery" was the word you used -- of

6        people at her door.  Is that correct?

7    A   Yes.  She was kind of skeptical of everyone, but

8        she would answer the door sometimes, against my

9        urging.

10   Q   And do you know specific times that she would

11       answer the door for people she didn't know?

12   A   The only time that I know that she did that she

13       told me about was when the two guys that lived

14       upstairs, who we referred to this morning --

15   Q   Right.

16   A   -- their names escape me --

17   Q   I don't know off the top of my head.

18   A   -- when they moved -- when they moved in, they

19       came down and introduced themselves, which my

20       mother thought was kind of funny or odd, but...

21   Q   But would you say it would be rare for her to

22       open the door for a stranger?

23   A   I don't have enough data points to know because

24       she didn't really tell me, and people didn't

25       generally knock on her door except the food guy.

Case 1:16-cv-00193-TWR-MJD Document 88-2 Filed 11/28/17 Page 410 of 495 PageID #:
Case 1:16-cv-00193-WTL-MJD Document 50-12 Filed 02/23/17 Page 30 of 150 PageID 766
2346

30

```
 1    Q    Do you remember making statements to Detective
 2         Benner about how you thought it would be
 3         unlikely that she would answer the door for a
 4         stranger?
 5    A    Yes.
 6    Q    And with your mom's dementia issues, was she
 7         able to handle her own finances?
 8    A    No.
 9    Q    Did you handle those for her?
10    A    Yes.
11    Q    What did you do, generally, for her financially?
12    A    The utilities were in my name and, of course, I
13         paid for groceries when I went to the grocery,
14         so I paid her bills, prepared checks for her to
15         sign.
16    Q    So she was able to still sign her checks,
17         though?
18    A    Yes.
19    Q    And did she reimburse you for the groceries that
20         you bought for her?
21    A    Yes.
22    Q    Did your mom have any other illnesses besides
23         her dementia?
24    A    I believe the only other medical condition she
25         had was scoliosis.
```

Case 1:16-cv-00103-TWR-MSD Document 88-2 Filed 01/28/17 Page 411 of 495 PageID #: 767
Case 1:16-cv-00103-WTL-MJD Document 80-13 Filed 02/23/17 Page 31 of 150 PageID #: 2347

31

```
 1    Q    Did she have to take medication for her

 2         scoliosis?

 3    A    No.

 4    Q    What, if any, side effects would she have from

 5         her scoliosis?

 6    A    It was difficult for her to walk and get around.

 7    Q    And what medication or medications was your mom

 8         on for her dementia?

 9    A    Aricept, A-R-I-C-E-P-T.

10    Q    Do you know what dosage?

11    A    No.

12    Q    Okay.

13    A    And that's for hallucinations.

14    Q    It's for hallucinations?

15    A    Aricept is for hallucinations.

16    Q    And the hallucinations were a side effect of her

17         dementia, to your understanding?

18    A    Correct, correct.

19    Q    And did you fill her prescriptions for her?

20    A    Yes.

21    Q    Aricept, what was the packaging?  What did it

22         look like?

23    A    Just a pill bottle.

24    Q    Just a pill bottle?

25    A    Uh-huh.
```

Case 1:16-cv-00193-TWR-MJD   Document 88-2   Filed 11/28/17   Page 412 of 495 PageID #:
2348
Case 1:16-cv-00193-WTL-MJD   Document 50-13   Filed 02/23/17   Page 32 of 150   PageID 768

32

```
 1    Q    Did your mom have any hospitalizations close to

 2         the time of her death?

 3    A    No.

 4    Q    Would you also make sure that she took her

 5         medication daily?

 6    A    Yes.

 7    Q    Did Robert help much with caring for your mom?

 8    A    No.

 9    Q    And why was that?

10    A    I took it on because he worked, and I was

11         retired, and I enjoyed doing it, so I didn't

12         think anything of it.

13    Q    Was Robert still pretty close with your mom?

14    A    Oh, yeah.

15    Q    How often would he see her?

16    A    Every few months.

17    Q    Every few months.

18              Do you know when the last time Robert saw

19         your mom before this incident was?

20    A    I do not.

21    Q    Did you have a key to your mom's apartment?

22    A    Yes, ma'am.

23    Q    Who else had keys to the apartment?

24    A    My brother and my sister.  And my mother, of

25         course.
```

```
 1   Q   What was your mother's source of income in

 2       November of 2013?

 3   A   She had the savings that were mentioned in the

 4       affidavit; she had a pension; and she had social

 5       security.

 6   Q   About how much did she have in savings?

 7   A   Just under $100,000.  That's savings and CDs and

 8       a checking and money market, whatever.

 9   Q   Gotcha.  And do you know how much she got for

10       her pension?

11   A   1100 something, maybe 1200.

12   Q   Do you know how much she got for social

13       security?

14   A   Very little, probably 150 or 200 due to the

15       civil service offset.

16   Q   Is that the pension offset that you're referring

17       to?

18   A   Yes.  If you have a civil service pension, they

19       subtract from your social security.

20   Q   And you managed all her finances; correct?

21   A   I did not do her taxes, but I did everything

22       else.

23   Q   And did you have a power of attorney for her?

24   A   Yes, ma'am.

25   Q   What did that power of attorney cover?
```

1    A    I don't recall offhand, it was just the routine.

2    Q    Did it encompass medical decisions?

3    A    There was a medical power of attorney.

4    Q    Okay.  But that's something different than --

5    A    It was two different documents, yeah.

6    Q    And who had the medical power of attorney?

7    A    I think myself and my sister.  I do not recall

8         clearly, so don't --

9    Q    Did your mom own any property in November of

10        2013?

11   A    No, ma'am.

12   Q    Did she own a vehicle?

13   A    No.

14   Q    Did she have any debt that you were aware of?

15   A    No.

16   Q    Any other assets that we haven't spoken about?

17   A    I'm trying to think.  She had very little in the

18        way of earthly possessions that were of any

19        value.  No.

20   Q    How much was the apartment complex a month,

21        where she was living?

22   A    650, 680?

23   Q    Did she have any other bills at that time?

24        Obviously groceries, but --

25   A    She had groceries, utilities, that's it.

Case 1:16-cv-00193-TWR-MJD   Document 88-2   Filed 11/28/17   Page 415 of 495 PageID #71
Case 1:16-cv-00193-WTL-MJD   Document 50-13   Filed 02/23/17   Page 35 of 150   PageID #:
2351

35

```
 1    Q   About, altogether, how much do you think she
 2        spent a month?
 3    A   Maybe 1100.
 4    Q   1100.  So her pension and social security pretty
 5        much covered all her expenses for a month?
 6    A   Uh-huh, correct.
 7    Q   Given your mom's medical condition, was there
 8        any discussion about putting her in a nursing
 9        home?
10    A   Yes.
11    Q   And when did this discussion occur prior to
12        November of 2013, how long before?
13    A   I think it was the summer of 2013 that the kids
14        discussed it, and my sister was very much
15        wanting to find a place for her.
16    Q   And what was the reason that you ended up not
17        putting her in a nursing home at that time?
18    A   We were waiting for an opening so she would
19        have -- you didn't ask this, but she would have
20        been in a nursing home probably by February of
21        2014 -- I'm sorry, not nursing home, assisted
22        living.
23    Q   Assisted living, okay.  So is there, like, a
24        long waiting list for assisted living places or
25        only certain places?
```

```
 1    A    The -- I hate to elaborate too much, but the
 2         place that -- we wanted to get her in a place
 3         that had a continuum of care and that would take
 4         Medicaid once her money ran out, and there is a
 5         waiting list for such places, yes, especially
 6         Medicaid assisted living, which is very rare.
 7    Q    Would Medicaid pay the full cost of her nursing
 8         home once her assets ran out?
 9    A    Correct.  It would make up the difference, I
10         should say.
11    Q    And about how much -- a nursing home that's not
12         one of these ones that would accept Medicaid,
13         about how much would that cost a month?
14    A    Nursing home or assisted living?
15    Q    Assisted living, excuse me.
16    A    We looked at Crestwood Village, and it was
17         between 2500 and 3,000.
18    Q    Wow.  So quite a bit more expensive than her
19         current expenses --
20    A    Correct.
21    Q    -- in the apartment?
22    A    Correct.
23    Q    So you decided financially it made more sense
24         for you to just keep taking care of her and
25         Rebecca helping out until there was a spot open
```

Case 1:16-cv-00103-TWR-MSD Document 88-2 Filed 01/28/17 Page 417 of 495 PageID #73
Case 1:16-cv-00103-WTL-MJD Document 50-13 Filed 02/23/17 Page 37 of 150 PageID #
2353
37

```
 1         at a Medicaid assisted living facility?

 2    A    Correct, because there was a spot coming open,

 3         so she would have slid in before too long.

 4    Q    So you guys were aware that there was a spot

 5         opening up soon?

 6    A    Yes.  And there was a specific place by Fort

 7         Harrison, the name of which I can't recall, that

 8         she would have gone into.

 9    Q    GreenTree?

10    A    No.  It was some real pompous-sounding name I

11         can't remember.  It's a brand-new place almost.

12    Q    So 2500.  How much would the Medicaid facility

13         that she was on the waiting list for cost a

14         month?

15    A    3,000.

16    Q    3,000.

17    A    Thereabouts.

18    Q    So still expensive.

19    A    Very.

20    Q    So that would run through her savings pretty

21         quickly.

22    A    Yes.  Within -- I can't remember how long, it's

23         a few years that it would burn through her

24         savings.  And then she would transfer to

25         Medicaid.
```

Case 1:16-cv-00103-TWR-MJD Document 88-2 Filed 01/28/17 Page 418 of 495 PageID #74
Case 1:16-cv-00103-WTL-MJD Document 50-13 Filed 02/23/17 Page 30 of 150 PageID 2354

38

1  Q  Did your mom have a will?

2  A  Yes.

3  Q  And who were the beneficiaries of that will?

4  A  There were four beneficiaries: the three

5     siblings, and her sister, my Aunt Blanche, not

6     in equal parts.

7  Q  And that was my next question, what are the --

8     what's the divide?

9  A  Of the assets of my mother's estate that were

10    not awarded via beneficiaries, named

11    beneficiaries, my aunt would get 10 percent or

12    10,000, whichever was less, and the three

13    children would divide the rest per stirpes.

14 Q  Stirpes?

15 A  Stirpes.  Is that it?  I don't know, stripes?

16 Q  It's been a while since my family law clinic,

17    trust -- trusts and estates class.

18       Okay, so a third, a third, a third for you

19    and your siblings?

20 A  Correct, roughly.

21 Q  Roughly.  After this incident, did you make a

22    claim on your mom's assets?

23 A  I don't know what you mean by "claim."

24 Q  Did you make a claim to have her assets

25    distributed per the will?

Case 1:16-cv-00103-TWP-MJD Document 88-2 Filed 11/28/17 Page 419 of 495 PageID #75
Case 1:16-cv-00103-WTL-MJD Document 50-13 Filed 02/23/17 Page 39 of 150 PageID #
2355

39

```
 1   A   I was the administrator.  I met with her

 2       attorney and followed his instructions as far as

 3       getting her assets identified and start, over

 4       time, distributing what was supposed to be

 5       distributed, et cetera.  I administered the will

 6       in accordance with her wishes.

 7   Q   When was the last time you saw your mom prior to

 8       this incident?

 9   A   November 18th, in the evening.

10   Q   That was the day before; correct?

11   A   Correct.

12   Q   And about what time was that?

13   A   Around 6:00.

14   Q   And why did you go over there?

15   A   I went over there every evening to fix her

16       something to eat and to spend time talking with

17       her.  Get her ma- -- get her her mail,

18       et cetera.

19   Q   The general duties of taking care of her.

20   A   Correct.

21   Q   How long did you stay?

22   A   I can't speak with any certainty.  Probably half

23       an hour.

24   Q   And what was your mom doing when you left?

25   A   Watching TV.
```

Case 1:16-cv-00103-TWR-MJD Document 88-2 Filed 01/28/17 Page 420 of 495 PageID #76
Case 1:16-cv-00103-WTL-MJD Document 50-13 Filed 02/23/17 Page 40 of 130 PageID #
2356
40

 1   Q   What was her condition?

 2   A   I'm not sure I understand.

 3   Q   How was she mentally?

 4           Let me rephrase.  Anything out of the

 5       ordinary?

 6   A   Nope.  Just watching TV.  That's what she did.

 7   Q   And when you left, did you lock the door?

 8   A   Yes.

 9   Q   So you didn't see her again in person until the

10       incident.

11           Did you speak to her at all later the

12       evening of the 18th or the morning of the

13       19th?

14   A   I don't believe so.

15   Q   Where did you go after you left your mom's

16       house?

17   A   I went to Plainfield to see my wife.

18   Q   Do you know what time you got to Plainfield?

19   A   I want to say it was 7:15 or 7:30.  Poker starts

20       at 7:00; I was too late for poker.

21   Q   Where do you play poker at?

22   A   There's a bar in Plainfield that has a free

23       poker game.

24   Q   Okay, cool.  Did you take your wife to poker

25       with you -- or you didn't get to play, but to

Case 1:16-cv-00103-TWR-MJD  Document 88-2  Filed 01/28/17  Page 421 of 495 PageID #77
Case 1:16-cv-00103-WTL-MJD  Document 50-13  Filed 02/23/17  Page 42 of 150  PageID #
2357

41

```
 1          the bar with you?

 2     A    My -- my wife was already at poker.

 3     Q    Okay.

 4     A    So actually didn't -- I don't think I went over

 5          there because I was too late, so I just stayed

 6          at her house.

 7     Q    So you don't think you actually went to the bar?

 8     A    I don't believe so.

 9     Q    Okay.  So you just went to your wife's house,

10          then?

11     A    Correct.

12     Q    And you think you got there about 7:15 or 7:30?

13     A    I believe so, yes.

14     Q    Did your wife come home soon after?

15     A    She came home after poker, which would have

16          been, I don't know, 9:30 or 10:00.

17     Q    Were you still awake?

18     A    Yes.

19     Q    What else did you do that evening?

20     A    Not a lot.  I mean -- do you mean at my wife's

21          house?

22     Q    Yes.

23     A    Watched TV.

24     Q    Anything stand out?

25     A    No.
```

```
 1    Q    What time did you go to bed?

 2    A    11:00, maybe.  I don't know.  I'm going to say I

 3         don't know.

 4    Q    Do you know what time you woke up the next

 5         morning?

 6    A    No.

 7    Q    No?  Do you have a typical time you wake up at?

 8    A    Not really, no.

 9    Q    It just varies?

10    A    Yeah.

11    Q    And what time did you leave Plainfield that

12         morning?  The morning of the 19th, excuse me.

13    A    I think it was 8:00-something.

14    Q    Was your wife with you in the morning?

15    A    Briefly.

16    Q    Briefly?  Okay.  What time did she leave?

17    A    Earlier than I did.

18    Q    Okay.

19    A    7:15.

20    Q    And where did you go when you left Plainfield?

21    A    I headed back home, but I stopped at, I think,

22         two Kmarts on the way.

23    Q    Just running errands?

24    A    I was looking for rabbit ears.

25    Q    Like for a TV?
```

Case 1:16-cv-00193-TWR-MJD Document 88-2 Filed 01/28/17 Page 423 of 495 PageID #79
Case 1:16-cv-00193-WTL-MJD Document 50-13 Filed 01/23/17 Page 43 of 150 PageID # 2359

43

```
 1   A   Yes.

 2   Q   Did you make any other stops on the way home?

 3   A   I don't know if I did or not.  I know I got -- I

 4       got gas, whenever I got gas, I don't know if I

 5       went home first or not, I can't remember.

 6   Q   Do you recall what time you got gas at?

 7   A   Not off the top of my head.

 8   Q   What time do you think you got home at?

 9   A   9:30, 10:00.

10   Q   Was Robert there when you got home?

11   A   Yes, ma'am.

12   Q   And what was he doing?

13   A   Goofing around on the Internet, I believe.

14   Q   Okay.

15           (Exhibit 14 was marked for identification.)

16   Q   Bill, I'm going to show you what's been marked

17       as Exhibit 14.  I'm going to represent to you

18       that that's a receipt from when you got gas at

19       Kroger.

20   A   Okay.

21   Q   Does that look to be an accurate copy of the

22       receipt?

23   A   I guess so.

24   Q   Any reason to dispute that it would be the

25       receipt from when you got gas that morning?
```

Case 1:16-cv-00193-TWR-MJD   Document 88-2   Filed 01/28/17   Page 424 of 495 PageID #:
2360
Case 1:16-cv-00193-WTL-MJD   Document 50-13   Filed 02/23/17   Page 44 of 150   PageID #:780

44

1    A    No.

2    Q    Up in the right-hand corner, not the very top

3         but the basically third line down, there's a

4         date and a time.  Can you please read that for

5         me?

6    A    11/19/13 09:20.  9:20.

7    Q    Do you think that means that you got gas on the

8         19th at 9:20 a.m.?

9    A    I don't know if I did or not, but it sure looks

10        like I did, yes.

11   Q    And then it looks like, down in the left-hand

12        column, that the total amount for the gas was

13        $48.16.  Do you see that?

14   A    Yes.

15   Q    And then one more thing I wanted to look at, on

16        the right-hand column where it says "Summary

17        Journal," about the third line down, it says

18        "Kroger Plus Customer."  Did you have a Kroger

19        Plus card at this time?

20   A    Yes, ma'am.

21   Q    And do you know your Kroger Plus number off the

22        top of your head?

23   A    No, I don't.

24   Q    Any reason to dispute that those are the last

25        four numbers of your Kroger Plus card, the 9558?

Case 1:16-cv-00103-TWP-MJD   Document 88-2   Filed 01/28/17   Page 425 of 495 PageID #:
2361
Case 1:16-cv-00103-WTL-MJD   Document 80-13   Filed 02/23/17   Page 43 of 150   PageID #:781

45

 1   A   Knowing where you got this, I have no reason to

 2       dispute it.

 3   Q   Okay.  That's why I was asking.

 4           And can you describe to me what a Kroger

 5       Plus card is?

 6   A   Well, it's a discount card.  If you swipe it or

 7       whatever when you purchase something at Kroger,

 8       you accumulate points which eventually give you

 9       a discount on gasoline.

10   Q   And, actually, I was going to -- one more thing

11       on Exhibit 14, in the top left corner, there's

12       "Store:  100."

13   A   Uh-huh.

14   Q   Do you know what location is Store 100 for

15       Kroger?

16   A   7101 East 10th Street.

17   Q   East 10th Street.  And is this the same -- I

18       know I'm jumping ahead a little bit -- but the

19       same Kroger you go to later in the afternoon --

20   A   Yes, ma'am.

21   Q   -- on the 19th?

22           And that Kroger, Store 100, how far is that

23       from your house, driving minutes, approximately?

24   A   Two minutes.

25   Q   Two minutes, okay.

Case 1:16-cv-00103-TWP-MJD Document 88-2 Filed 01/28/17 Page 426 of 495 PageID #: 2362
Case 1:16-cv-00103-WTL-MJD Document 50-13 Filed 02/23/17 Page 46 of 50 PageID #: 782

46

```
 1               And how far from your mom's house?

 2    A    It's directly west across Shortridge Road, so

 3         2-, 300 yards if you go building to building, I

 4         guess.  Extremely close.

 5    Q    And why didn't you go check on your mom, visit

 6         your mom at that time, do your daily --

 7    A    Did you say why did I or why didn't --

 8    Q    Why didn't you?

 9    A    The setup that we had was that I would go in the

10         evening and that the Meals on Wheels guy would

11         act as her, kind of, like, mental stimulus or --

12         or universal reminder of where she is in the

13         morning.

14    Q    Would she interact much with the Meals on Wheels

15         guy?

16    A    Not really.

17    Q    Okay.

18    A    Not -- not -- excuse me.  Pleasantries, that's

19         all.

20    Q    Did you ever go to your mom's house in the

21         morning?

22    A    If -- if needed.

23    Q    Okay.

24    A    If, like, her TV was messed up or -- which it

25         often was, yes.  It wasn't normal, but it wasn't
```

Case 1:16-cv-00103-WTL-MJD Document 50-13 Filed 02/23/17 Page 47 of 150 PageID #: 783

```
 1            unusual to go twice in one day.

 2     Q     So no reason you couldn't have gone and checked

 3            on your mom at that time; right?

 4     A     No.  I could've, but I was -- I did dinner.

 5     Q     You did dinner?

 6     A     The Meals on Wheels guy took -- brought her

 7            lunch, I did her dinner, or made sure she had

 8            something hot or nourishing to eat at -- in late

 9            evening, early evening.

10     Q     So that just wasn't the schedule.

11     A     Correct.

12     Q     And we don't know if you got gas before or after

13            you went home the first time, but what did you

14            do after you got gas?

15     A     Do you mean after I went back home?

16     Q     Well, you testified that you couldn't remember

17            if you went home first and then went back out to

18            get gas or if you got gas on your way home from

19            Plainfield and then went home.

20     A     I have no idea.

21     Q     But what did you do after you got gas?

22     A     I believe I went home.

23     Q     Went home, okay.

24            And how long were you at home for?

25     A     Well, from when I got gas until 3:15 or 3:30,
```

```
 1           when I went to my mom's, so that -- I -- I
 2           believe that after I went home, I stayed there
 3           until that afternoon.
 4      Q    So until you went to check on your mom --
 5      A    Correct.
 6      Q    -- at 3:00 or 3:15.
 7      A    Correct.
 8      Q    And was Robert with you the whole time?
 9      A    I can't say for sure.  I don't know if he ran
10           out or not.
11      Q    Do you remember telling Detective Benner in your
12           statement that Robert was with you the whole
13           day?
14      A    I don't remember.  I believe he was with me all
15           day, but I guess that's that.  I don't know
16           absolutely for sure if he was there the whole
17           time, but I believe he was.
18      Q    And you recall telling Detective Benner that he
19           was there with you that day?
20      A    Uh-huh, yes.
21      Q    You left for your mom's at 3:00 or 3:15,
22           correct, in the afternoon, on the 19th?
23      A    Yeah.  It might -- I'm not sure of the exact
24           time.  It was around 3:15, 3:20, I -- I'm not
25           sure.
```

```
 1    Q    And did you go straight to your mom's house?

 2    A    No, I went to Kroger.

 3    Q    The same Kroger we've already talked about?

 4    A    Of course.

 5    Q    And what did you do at Kroger?

 6    A    I bought an iced tea because it was on sale and

 7         I wanted one.

 8    Q    Seems like a good reason.

 9              Do you remember about how much that iced

10         tea cost?

11    A    About a dollar.

12    Q    A dollar, okay.

13              (Exhibit 15 was marked for identification.)

14    Q    I'm showing you Exhibit 15, which I'm going to

15         represent to you is a receipt for the iced tea

16         you purchased --

17    A    Oh.

18    Q    -- on 11-19-2013.

19    A    Okay.

20    Q    And do you see under "Total Number of Items

21         Sold," there's a date and a time there?

22    A    Yes.

23    Q    And can you read that off for me, please?

24    A    11-19-13 at 3:31 p.m.

25    Q    Okay.
```

Case 1:16-cv-00103-TWR-MJD Document 88-2 Filed 01/28/17 Page 430 of 495 PageID #6
Case 1:16-cv-00103-WTL-MJD Document 60-13 Filed 02/23/17 Page 50 of 150 PageID #:
2366
50

```
 1              (Exhibit 16 was marked for identification.)

 2   Q    Now I'm showing you what has been marked as

 3        Exhibit 16, and I'm going to represent to you

 4        that these are your Kroger Plus card records,

 5        the records for the Kroger Plus card ending in

 6        9558.  Do you have any reason to dispute that?

 7              MR. WAPLES:  Do you have a copy?

 8              MS. BOX:  Yes.  Sorry, gave it to Lynne

 9        instead.

10              MR. WAPLES:  And this is 15?

11              MS. BOX:  This is 16.

12              MR. WAPLES:  This is 16?

13              MS. BOX:  Yes.

14   A    Not without analyzing it for some weirdness,

15        but, no, I don't see anything unusual about it.

16   BY MS. BOX:

17   Q    The fifth line down, there's a record that says

18        "Spirit Terminal 11-19-2013" at 9:20 a.m., it

19        looks like, for 48.16.

20   A    Yes.

21   Q    And would that match up with the receipt for the

22        gas that we talked about earlier in Exhibit 13?

23   A    It sure looks like it.

24   Q    Now, I also see a record for 11-19, it's just

25        one up from that, four down, and it looks like
```

Case 1:16-cv-00103-TWR-MSD Document 88-2 Filed 01/28/17 Page 431 of 495 PageID #: 737
Case 1:16-cv-00103-WTL-MJD Document 50-13 Filed 02/23/17 Page 51 of 150 PageID #: 2367

51

```
 1          it's at 3:32, but it's for $14.10.  Do you see
 2          that?
 3     A    Uh-huh, yes, I do.
 4     Q    But that would not be the Kroger Plus card for
 5          your tea, correct, because your tea only cost
 6          $0.99?
 7     A    Correct.
 8     Q    Did you use your Kroger Plus card when you
 9          purchased your tea?
10     A    No.
11     Q    So did you make this $14.10 purchase?
12     A    No.
13     Q    Did you let someone else use your Kroger Plus
14          card?
15     A    Yes, to get their points.
16     Q    Why would you let someone else use your Kroger
17          Plus card but then not use it for your own
18          transaction?
19     A    I don't think it works unless your pretax total
20          is a dollar or more, so I didn't even bother.
21     Q    And that's something you know for sure?
22     A    No.  It's something I believe, but I don't know
23          for sure.  That was my experience, so I thought,
24          well, whatever.
25     Q    And you told me earlier that the iced tea was on
```

```
 1          sale; is that correct?

 2      A   I think it was.

 3      Q   Would you have had to use your Kroger Plus card

 4          to get that discounted price?

 5      A   I don't remember.  I don't believe so.

 6      Q   Okay.

 7      A   And that may not actually -- I hate to ramble --

 8          that may not be the sale price, it may have gone

 9          off sale, because 99 cents is the normal price,

10          I believe, for Arizona tea, so I may have

11          thought I was going to save a dime that day and

12          I didn't.

13      Q   Didn't break the bank, though, did it?

14      A   Close.

15      Q   You bought a tea at Kroger, and did you go to

16          your mom's house after that?

17      A   Yes, ma'am.

18      Q   Did you have any reason for going over to your

19          mom's house that day other than just to cook her

20          dinner, your daily general tasks that you do

21          with her?

22      A   The general checking in to make sure she had

23          something that she wanted to eat, that she would

24          eat.

25      Q   Do you recall what time you got to your mom's
```

Case 1:16-cv-00103-TWR-MJD Document 88-2 Filed 01/28/17 Page 433 of 495 PageID #:
2369
Case 1:16-cv-00103-WTL-MJD Document 56-13 Filed 02/23/17 Page 53 of 150 PageID #:789

53

| | | |
|---|---|---|
| 1 | | house? |
| 2 | A | Well, it was right after that, so 3:30, 3:35, |
| 3 | | somewhere in there. |
| 4 | Q | Because, again, the Kroger is very close to your |
| 5 | | mom's house; right? |
| 6 | A | Correct.  It's one minute, two minutes. |
| 7 | Q | What was the first thing you did when you got to |
| 8 | | your mom's apartment? |
| 9 | A | I got out of the car, and I went up to the door, |
| 10 | | and she had something, there was something |
| 11 | | hanging on her door, and I can't remember if it |
| 12 | | was a sales flyer or something about her lease |
| 13 | | renewal.  It was something -- it might have been |
| 14 | | the lease renewal, I honestly can't remember, |
| 15 | | but there was a -- some kind of paper. |
| 16 | Q | Okay.  So did you collect that or take it off |
| 17 | | the door handle? |
| 18 | A | I took it off the door handle. |
| 19 | Q | Okay.  And then what did you do? |
| 20 | A | I went -- I believe I went back to my car and I |
| 21 | | was going to put it in my car. |
| 22 | Q | Did you put it in your car? |
| 23 | A | No.  I believe I decided to show it to my mother |
| 24 | | to try to engage her mentally, which was kind of |
| 25 | | an ongoing thing. |

Case 1:16-cv-00103-TWR-MJD Document 88-2 Filed 01/28/17 Page 434 of 495 PageID #: 2370
Case 1:16-cv-00103-WTL-MJD Document 50-13 Filed 02/23/17 Page 54 of 150 PageID #: 790

54

1    Q    After you went back to your car, what did you

2         do?

3    A    Oh, I went back to my mother's apartment.

4    Q    Okay.

5    A    Well, I went back in the building.

6    Q    Went back in the building.

7    A    So I parked right outside the building, went

8         back in the building.

9    Q    And did you enter your mother's apartment at

10        that time?

11   A    Yes.

12   Q    When you went to open the door, did you use your

13        key?

14   A    I used my key on -- you can use the key on

15        deadbolt and doorknob.  I used my key, yes,

16        sorry.

17   Q    Is it the same key for the deadbolt and the

18        doorknob?

19   A    I don't remember.

20   Q    Is there an outside door to the apartment

21        complex that needed a key?

22   A    No.

23   Q    And when you went to unlock the door, did it

24        feel like the door had been locked?

25   A    The door was unlocked.

Case 1:16-cv-00103-TWR-MJD Document 88-2 Filed 01/28/17 Page 435 of 495 PageID #:
2371
Case 1:16-cv-00103-WTL-MJD Document 50-13 Filed 02/23/17 Page 55 of 150 PageID 791

55

1    Q    Okay.

2    A    There was no resistance when I turned the key on

3         the deadbolt.

4    Q    Did you notice any damage to either the door

5         frame or the door right around where the lock

6         would be?

7    A    No.

8    Q    What was the first thing you saw when you got

9         inside?

10   A    I saw my mother laying on the living room floor.

11   Q    I know this is kind of tough, but can you

12        describe the scene for me, please?

13   A    As you walk into my mother's apartment, you step

14        into the living room.  There is a chair, a TV,

15        coffee table, and she was laying sort of next to

16        the chair, on her stomach.

17   Q    On her stomach.  What part of her body was

18        facing you?  Was it her legs, her head, her

19        side?

20   A    Oh, her -- she -- her feet were towards the

21        door.

22   Q    Her feet were towards the door, okay.

23             And what else did you notice?

24   A    Do you mean right then?

25   Q    Yes.

Case 1:16-cv-00193-TWR-MJD Document 88-2 Filed 01/28/17 Page 436 of 495 PageID #: 2372
Case 1:16-cv-00193-WTL-MJD Document 50-13 Filed 02/23/17 Page 56 of 150 PageID #: 792

56

```
 1    A    Nothing else.  I didn't notice anything else

 2         except my mother laying there.

 3    Q    And how did your mother appear?

 4    A    She -- well, I mean, she simply appeared like

 5         she was laying on the floor with a blanket

 6         covering much of her shoulders and head, the

 7         blanket she always had with her and always had

 8         over her.  And you said "appear," but her -- her

 9         breathing was very forced, so that's more of a

10         sound than an appear thing.

11    Q    Did you hear anything else?

12    A    No.

13    Q    Smell anything?

14    A    No.

15    Q    What were your initial thoughts right then, when

16         you saw your mom on the floor with the blanket

17         covering her head?

18    A    I thought she'd had a heart attack or a stroke.

19    Q    What did you do?

20    A    This is a little hazy because I was in shock,

21         but I -- I reached out and kneeled down and

22         grabbed her leg and yelled, "Mom, Mom."

23    Q    And did she respond to you in any way?

24    A    Her breathing changed a little, and she moved

25         her head a little, but she did not -- well, of
```

Case 1:16-cv-00103-TWR-MJD Document 88-2 Filed 01/28/17 Page 437 of 495 PageID #: 2373
Case 1:16-cv-00103-WTL-MJD Document 50-13 Filed 02/23/17 Page 57 of 130 PageID #: 793

57

```
 1          course, in hindsight, she was not able to

 2          communicate, did not say anything.  She moved --

 3          she was laying -- well, it doesn't translate.

 4          She was laying on her stomach but with her head

 5          on -- somewhat on its left side, and she moved

 6          slightly and moved her arm slightly, and then

 7          stopped moving after that.

 8     Q    Okay.  You said her breathing changed, and she

 9          moved a little bit.  Do you think that she

10          recognized that someone was there?

11     A    I don't know.

12     Q    Okay.

13     A    I -- I -- I don't know.

14     Q    Do you think she could have been responding to

15          your touch?

16     A    My sense was, without knowing for sure, is that

17          she responded either to my voice or to my touch,

18          because mine is the voice she's most familiar

19          with.  It could have been unrelated.

20     Q    Right.  Okay.  When she didn't really respond to

21          you, what did you do next?

22     A    Well, I was kind of freaking out, and I went

23          around to see what -- to look at her condition,

24          and I got down on my knees and was trying to

25          understand this scene of having all this blood.
```

|   |   |   |
|---|---|---|
| 1 |   | She had these -- this blanket thing, it's about |
| 2 |   | four-by-four, kind of a shawl or a small |
| 3 |   | blanket, I guess, over her head, so I reached |
| 4 |   | down, and I was trying -- I examined the -- |
| 5 |   | the -- there was a -- a circle of -- a large |
| 6 |   | circle of blood stuck to her head, and I reached |
| 7 |   | down, and I looked very closely to examine that, |
| 8 |   | and there was -- because that was on the top of |
| 9 |   | her head.  And then on the floor, as it -- as it |
| 10 |   | had oozed out, I guess, there was a -- not huge, |
| 11 |   | but shockingly large pool of blood that had |
| 12 |   | congealed. |
| 13 | Q | Okay. |
| 14 | A | And I examined -- I did not try to remove the |
| 15 |   | blanket.  I did kind of barely touch where it |
| 16 |   | had scabbed on.  And I touched the congealed |
| 17 |   | blood just barely to see what -- at that time I |
| 18 |   | didn't know if she had -- I was still operating |
| 19 |   | under the assumption that she had fallen and hit |
| 20 |   | her head on the coffee table corner or |
| 21 |   | something, but it was -- in looking at it and |
| 22 |   | getting down and looking closely, it was such a |
| 23 |   | enormous amount of dried blood on the top of her |
| 24 |   | head that I thought, Well, this, you know, |
| 25 |   | there's no blood on the coffee table.  So I |

```
 1          just -- I froze, I think, for a few seconds and
 2          then called out again, and it was, like, just in
 3          shock, and then I called 911.
 4    Q     And so when you -- you said you were on your
 5          knees; is that correct?
 6    A     Yeah.  When I was trying to -- I was trying to
 7          figure out what was going on with all the blood.
 8    Q     You got down --
 9    A     Yeah.
10    Q     You got down on your knees, okay.
11                And where are you with respect to her body?
12          Are you up by her head, on either one of her
13          sides?
14    A     I'm up -- I'm up -- it's hard to explain without
15          a diagram, but I'm up by her head.  Up -- as
16          you're walking in the apartment, you come to my
17          mother, and her feet are by the door, her head
18          is angled away from the door, about a 45-degree
19          angle, I am at her head, so I could see the top
20          of her head and see the blood.  Not -- I wasn't
21          beside her, I was at the top of her head,
22          because that's where -- I was just in shock and
23          trying to figure out what on earth was
24          happening.
25    Q     And you didn't remove the blanket; that's
```

Case 1:16-cv-00103-TWR-MJD Document 88-2 Filed 01/28/17 Page 440 of 495 PageID #
Case 1:16-cv-00103-WTL-MJD Document 88-13 Filed 02/23/17 Page 60 of 150 PageID 796
2376

60

```
 1        correct?

 2    A   Correct.

 3    Q   And why didn't you remove the blanket?

 4    A   It had -- there was a circle of blood the size

 5        of a softball at least which had congealed on

 6        the outer ring of it.  The outer inch or so

 7        was -- was almost completely dry, and the blood

 8        on the floor had congealed, it was the

 9        consistency of pudding, more or less, it

10        wasn't -- you know, and there was probably half

11        a cup or a cup of blood in this pool on the

12        floor, but there was no fresh blood.  There was

13        just this darker colored blood.

14            And my sense was that it was stuck to her

15        head and that it made more sense to leave it

16        stuck to her head than to pry it off, because

17        whatever made that much blood come out must be

18        pretty serious, and it appeared she had stopped

19        bleeding, so I just left well enough alone.

20    Q   So you were under the understanding that -- or

21        you thought that it had stopped bleeding at that

22        point?

23    A   It may -- it -- it appeared that the blood that

24        was there, the blood that was -- made up the

25        round part stuck to the top of her head, and the
```

1   blood that had formed a small pool on the floor,

2   on the blanket on the floor, it all appeared

3   like that bleeding had taken place, I don't

4   know, well before I had gotten there, and that

5   it was -- the blood on the top of her head had

6   started drying and did not appear to be "wet"

7   wet, so I didn't think she was bleeding.

8     I thought it was -- it's a banal

9   comparison, but when you -- if I nick myself

10   shaving and put a piece of toilet paper on there

11   and wet it and then it dries, that's what it

12   looked like to me, and I was not going to pull

13   that off.  I thought it would be stupid to pull

14   it off, so that's why I didn't.

15 Q You weren't curious to know what actually

16   happened to your mom or to figure out the extent

17   of her injuries?

18 A My -- I was curious, of course, but I was more

19   interested that my mom receive proper medical

20   care, and knowing that there was a fire station

21   half a mile away, I didn't think that it would

22   take that long, that I could potentially do more

23   damage.  There's nothing I could have done for

24   her because she was not bleeding anymore.

25 Q Do you know for sure she wasn't bleeding

Case 1:16-cv-00103-TWR-MJD Document 88-2 Filed 01/28/17 Page 442 of 495 PageID #: 2378
Case 1:16-cv-00103-WTL-MJD Document 50-13 Filed 02/23/17 Page 62 of 150 PageID 798

62

1        anymore?

2    A   I do not know for sure.  It did not appear that

3        there was bright red blood on the blanket, on

4        the floor, on my mother, anywhere.

5    Q   And if she had been bleeding, you could have put

6        pressure on the wound to help with that?

7    A   Yes.  If the -- if it had appeared that the --

8        if the blood on the blanket was wet and red,

9        that would, to me, indicate that she was

10       bleeding, and at that point I would get -- use

11       the blanket or get a towel and put pressure on

12       it.

13           But I was afraid that by putting pressure

14       on it, I might break the bond between the

15       blanket and her head and start the bleeding

16       again, so I chose to defer to the ambulance or

17       fire for their help.

18   Q   Didn't the 911 operator instruct you to put a

19       cloth on your mom's head, hold a cloth to her

20       head?

21   A   There were -- I don't remember precisely what

22       they said, but when they said put a cloth to her

23       head, I thought that was absolutely idiotic

24       because she wasn't breathing.  I know what a

25       pressure bandage is, but she wasn't bleeding, or

Case 1:16-cv-00193-TWR-MJD Document 88-2 Filed 01/28/17 Page 443 of 495 PageID #99
Case 1:16-cv-00193-WTL-MJD Document 50-13 Filed 02/23/17 Page 63 of 150 PageID #99
2379

63

```
 1          did not appear to be bleeding, and I didn't want

 2          to screw up what was already there.  Idea behind

 3          a pressure bandage is you put it on there till

 4          the bleeding stops through the force of

 5          compression, and it didn't look like there was

 6          any -- it looked like she had stopped bleeding

 7          quite awhile before that, so I thought that was

 8          among various unhelpful things 911 said.

 9    Q     And you don't have any medical training?

10    A     I took a first aid course at some point, but,

11          no, I do not.

12    Q     Any, like, first-responder EMT-type training?

13    A     Nope, nothing.

14    Q     And you testified that it was your opinion that

15          you should defer to the fire department.

16    A     When I saw my mother in the condition she was

17          in, with the loss of blood but nonactive

18          bleeding, getting fire or medical or somebody

19          there as quickly as possible seemed like the

20          most logical thing to do, so that's what I did.

21    Q     Well, if you're deferring to medical, and people

22          with medical training and experience are telling

23          you to put a cloth on your mom's head, why

24          wouldn't you follow their instructions?

25              MR. WAPLES:  Objection.  States facts not
```

Case 1:16-cv-00103-TWP-MJD Document 88-2 Filed 01/28/17 Page 444 of 495 PageID #:
2380
Case 1:16-cv-00103-WTL-MJD Document 50-13 Filed 02/23/17 Page 64 of 150 PageID 800

64

 1          in evidence, and it's been asked and answered.

 2     Q    You can answer.

 3     A    They -- they did not understand the scene at all

 4          and that putting a cloth on a scab is kind of

 5          silly.

 6     Q    Okay.

 7     A    They did not even understand the scene.  They

 8          didn't ask me if she was actively bleeding, they

 9          didn't know anything, really, what was going on.

10          So their advice is just a stock advice, which

11          didn't make any sense given the circumstances.

12     Q    Do you believe that you fully understood the

13          scene?

14     A    As well as -- as well as a layperson can.  I

15          don't know what you mean by the question.

16     Q    Couldn't you have understood the scene more by

17          removing the blanket, being able to give the 911

18          responder a description of her injuries?

19     A    Based on the amount of blood, I felt that the

20          injuries must be quite severe and that removing

21          the blanket would be -- it's been brought up a

22          number of times.  I still think that is the most

23          idiotic suggestion anyone could have made.

24     Q    Do you think it would be important for the EMT

25          or first responders to have as much information

```
 1          about your mom's condition as possible?

 2     A    Not having the ability to assess the situation

 3          beyond the fact that my mother had some sort of

 4          head wound would not have helped them in any way

 5          versus them just showing up and doing it

 6          themselves.

 7     Q    Did the 911 operator ask anything else about

 8          your mom's condition when you were speaking to

 9          her on the phone?

10     A    I can't remember which one it was, but one of

11          them asked if she was breathing regularly and

12          kept asking me that, and I thought that was also

13          moronic.

14     Q    Okay.

15     A    'Cause I said she was breathing, I said she was

16          breathing, she was breathing, like (making

17          breathing noise) like really loud and raspy.  So

18          I don't know what -- I mean, if somebody's not

19          breathing, you can do CPR; if they are

20          breathing, there's not a lot you can do.

21               So I don't even understand what the

22          question was, but I think that puts the 911

23          operator not even understanding what the

24          situation was, blood around the head, the scab

25          on the head, or whatever you want to call that,
```

```
 1            and her labored breathing.

 2    Q       We're going to back up a little bit.  We talked

 3            a lot about your thought process and why you

 4            chose to call 911, take the path that you did.

 5                    So walk me through, you are now on your

 6            knees, kind of up by your mom's head examining

 7            the scene, and you decide the best course of

 8            action is to call 911.  Did you use the land

 9            line or did you use your cell phone?

10    A       I used the land line.

11    Q       And is it a cordless phone?

12    A       No.  It's an old-fashioned cord phone.

13    Q       So did you have to go get up and go to another

14            room in the house to use the phone?

15    A       No.  The phone was on the coffee table, right

16            there where my mother was laying.

17    Q       And so you stood by your mom while you made the

18            call to 911?

19    A       I either sat on the floor or sat on the other

20            chair, I can't remember.

21    Q       And I think --

22    A       The phone was a few feet from my mother's head,

23            so...

24    Q       I think there's been some reference to a couple

25            of 911 calls.  How many 911 calls did you make?
```

Case 1:16-cv-00193-TWR-MSD Document 88-2 Filed 01/28/17 Page 447 of 495 PageID #:
Case 9:14-cv-00109-WTL-MJD Document 50-12 Filed 02/23/17 Page 67 of 150 PageID 803
2383

67

 1   A   Two.

 2   Q   Two, okay.  And briefly explain to me the

 3       first -- summarize the first 911 call for me.

 4   A   I have them straight because I'm not that

 5       familiar, but I called 911, and I said, "My

 6       mother's been attacked."  And what I wanted to

 7       do is give them the address and get an ambulance

 8       en route, and I think that was the 911 operator

 9       who kept asking me about her breathing.  "Is she

10       breathing?  Is she breathing regularly," or

11       normally or something.  And I'm, like, it seemed

12       beyond nonhelpful, so I hung up and I called 911

13       back.

14   Q   Did you call up immediately right after you hung

15       up?

16   A   Yep.

17   Q   Okay.

18   A   Called 911 back, and I said, "My mother's been

19       attacked."  And I don't know if that was the one

20       that said put something on her head or not, but

21       I finally understood that somebody was on the

22       way anyway.  That's the advantage -- that's why

23       I used the land line.  Land lines have

24       geographical references so they can -- as soon

25       as you say "ambulance," they know your address,

Case 1:16-cv-00103-TWR-MJD Document 88-2 Filed 11/28/17 Page 448 of 495 PageID #: 2384
Case 1:16-cv-00103-WTL-MJD Document 50-13 Filed 02/23/17 Page 66 of 150 PageID 804

68

```
 1              they know to dispatch an ambulance; my cell

 2              doesn't have that.

 3        Q     Oh, like a caller ID or something like that?  I

 4              get what you're saying --

 5        A     Yes, kind of, yeah.

 6        Q     I get what you're saying.  They know exactly

 7              where the --

 8        A     They know where you're coming from --

 9        Q     -- where you're calling from --

10        A     -- unlike the cell.  Yeah.

11        Q     Even without giving them the address, okay.

12                  And did you stay on the phone with 911 or

13              did you hang up?

14        A     No.  I hung up.

15        Q     And then what did you do after you hung up?

16        A     I looked at my mom for a little bit more, and I

17              think I started crying.  And then I realized I

18              should run out and flag down the ambulance

19              because the -- so I ran out, left her apartment,

20              I don't know if I closed it or left it ajar,

21              went outside, went into the parking lot where

22              you drive, not just the parking area, and

23              started looking towards the main entrance for an

24              ambulance.

25        Q     Why didn't you stay with your mom at that time?
```

Case 1:16-cv-00193-TWR-MJD Document 88-2 Filed 12/28/17 Page 449 of 495 PageID #:
2385
Case 1:16-cv-00193-WTL-MJD Document 56-13 Filed 02/23/17 Page 69 of 150 PageID 805

69

```
 1   A   Because the most logical thing to do was to get

 2       medical care to her as quickly as possible.

 3       There was nothing I felt that I could do for

 4       somebody with an enormous head wound that has

 5       already stopped bleeding, in my opinion, and the

 6       apartment complex is kind of confusing, it's not

 7       well marked or anything, so in order to

 8       facilitate them getting to my mother as quickly

 9       as possible, I went out to flag them down.

10   Q   Could you have comforted your mother with either

11       your voice or your touch?

12   A   I don't know if she would have responded or

13       understood any of that, and I don't know if that

14       would have helped heal her wounds.

15   Q   Well, you testified earlier that you believe she

16       responded to your voice or your touch.

17   A   I said she may have; it may have been an

18       involuntary thing that's a coincidence.  But

19       that would not heal -- whatever.

20   Q   I understand.  I'm not talking about healing her

21       wounds.

22   A   Okay.

23   Q   I'm talking about being with her during a

24       traumatic incident.

25   A   If there was nothing else to do, I would have
```

Case 1:16-cv-00103-TWR-MJD Document 88-2 Filed 12/28/17 Page 450 of 495 PageID #:
Case 1:16-cv-00103-WTL-MJD Document 30-12 Filed 02/23/17 Page 450 of 495 PageID 806
2386

70

```
 1        been with her.  But there was something to do:

 2        Make sure the ambulance finds my mother's

 3        apartment as fast as possible.

 4     Q  You don't think the ambulance had been to this

 5        apartment complex before?

 6     A  I have no idea.

 7     Q  You said it was close by.  Correct?

 8     A  The fire's close by.  I don't know where

 9        ambulance came from.  The fire showed up first.

10     Q  And you don't believe the ambulances are usually

11        at the fire department?

12     A  I don't believe at that one they are.

13     Q  How quickly did the fire department show up?

14     A  Two or three minutes.

15     Q  What did you do after you waved them down?

16     A  I just -- I pointed -- one of them got out of

17        the truck, and I motioned and pointed where to

18        go.

19     Q  Did you follow them inside?

20     A  I think I did 'cause I showed -- I -- led them

21        to the apartment and opened the door, said, you

22        know, "Here's my mom," and said, "She's got a

23        bleeding head wound and she's nonresponding."

24        Her head wound had been bleeding; I guess it

25        wasn't bleeding, really.  She had a massive
```

Case 1:16-cv-00103-TWR-MJD Document 88-2 Filed 01/28/17 Page 451 of 495 PageID #: 2387
Case 1:16-cv-00103-WTL-MJD Document 50-13 Filed 02/23/17 Page 75 of 150 PageID 807

71

1          freaking head wound and blood on the blanket,

2          blood on the blanket on the floor.  So I -- I

3          was kind of in shock at that point, so -- and

4          then they told me to go back out and wait, so I

5          went back out and waited.

6     Q    Did you tell them anything else about her wound?

7     A    No.  I just said she had -- I just -- I mean, it

8          was painfully obvious.  I pointed it out and

9          said she -- somebody hit her over the head, it

10         looks like, and I don't really know anything

11         else I could contribute, and they wanted me out

12         of there so they could work with her, so they

13         sent me back out.

14    Q    So you recall telling one of the firefighters

15         that you think someone smashed your mom's head

16         in?

17    A    I believe I told 911 and the firefighter that

18         somebody had bashed my mother over the head.

19    Q    And why did you feel at that time that she had

20         been bashed over the head?

21    A    She had -- she had a bloody piece of cloth stuck

22         to the top of her head, right here (indicating),

23         and it looked like that's what had happened.  I

24         don't -- I didn't really think through it or

25         think gunshot or not.  It looked like somebody

Case 1:16-cv-00103-TWR-MJD Document 88-2 Filed 01/28/17 Page 452 of 495 PageID #:
Case 1:16-cv-00103-WTL-MJD Document 80-13 Filed 02/23/17 Page 72 of 150 PageID 808
2388

72

```
 1        had taken a pickax or something and just bashed

 2        her head in.

 3    Q   But there were other -- other ways that someone

 4        could sustain that type of injury; correct?

 5    A   I have no idea.

 6    Q   Would you assume that a gunshot wound would

 7        cause that type of bleeding to the head?

 8    A   I have no idea except I don't how many people

 9        get shot on the top of their head.

10    Q   What about -- you already stated that you

11        thought she may have fallen and hit her head.

12    A   Yeah.  But she was -- she was like a foot away

13        from the edge of the coffee table still, her

14        head was, and there was no blood on the coffee

15        table.  And I've fallen and hit my head on the

16        coffee table, I -- it doesn't produce massive

17        amounts of blood, so I kind of just dismissed

18        that out of hand.

19    Q   So you pretty much knew right away that it was

20        some sort of blunt force trauma?

21            MR. WAPLES:  Objection, misstates his

22        testimony.

23    A   I believed that it was.

24    Q   Okay.  As opposed to some sort of other injury?

25    A   As opposed to what?
```

Case 1:16-cv-00103-TWR-MJD Document 88-2 Filed 01/28/17 Page 453 of 495 PageID #:
Case 1:16-cv-00103-WTL-MJD Document 50-13 Filed 02/23/17 Page 73 of 150 PageID 809
2389

73

1    Q    Some sort of other injury, cause of injury.

2    A    Yeah, correct.

3    Q    Did you consider any other causes of injury?

4    A    Not having seen her, no.  Having seen her, I

5         would argue that any rational person would say

6         she got hit over the head.

7    Q    Did you know that the medical responders on

8         scene and the police officers and the hospital

9         staff were under the impression that she

10        suffered a gunshot wound?

11   A    I'm not entirely clear who thought what, so I

12        understand that theory is out there, but I don't

13        know factually who actually said what.

14   Q    Okay.  But you know that someone was under the

15        impression that your mom suffered a gunshot

16        wound?

17   A    I think the -- I think someone did.  I believe

18        Wooldridge, the fireman, did, but I don't know

19        if anybody from the ambulance or the other three

20        people on the fire truck or anybody at the

21        hospital ever stated one way or the other.  So

22        I -- I technically don't know.

23   Q    Okay.  You went back outside after instructed to

24        do so by the firefighters.

25   A    Yes, ma'am.

Case 1:16-cv-00103-TWR-MJD Document 88-2 Filed 01/28/17 Page 454 of 495 PageID #:
Case 1:16-cv-00103-WM-MJD Document 50-13 Filed 02/23/17 Page 45 of 150 PageID 810
2390

74

1   Q   What did you do when you were outside?

2   A   I sat on the bricks on the edge of the porch and

3       cried and was freaking out.  At some point I

4       contacted my brother.

5   Q   So you contacted Robert.  Did you use your cell

6       phone?

7   A   No.  I think I had -- oh, God, it's such a blur.

8       I may have called him from her phone after I

9       called 911.

10  Q   From the land line, maybe?

11  A   I-- I -- I do not remember which phone, but I

12      contacted him.  Once I stopped freaking out for

13      a second, I realized I needed to notify people,

14      and so, my brother being so close, I called him.

15  Q   So did you go back inside the house to call him,

16      then?

17  A   I honestly don't remember.

18  Q   Do you know if you made your call to Robert

19      before or after they moved your mom or

20      transported her to the hospital?

21  A   Way before.  It took them quite awhile --

22  Q   To transport her?

23  A   -- to get her on the board, or what seemed like

24      quite awhile.

25  Q   Any idea how long that took?

```
 1    A    10 minutes.  I mean, it seemed like forever, but

 2         I -- honestly, I would guess that it was 10

 3         minutes or something perfectly reasonable.

 4    Q    What did you tell Robert when you called him?

 5    A    Told him to come over here now.  I did not tell

 6         him anything else.

 7    Q    No other details?

 8    A    Well, I think he surmised something was

 9         seriously wrong by the, "Come over here to Mom's

10         now," or something like that.

11    Q    Do you think -- did he head over there?

12    A    He was there almost instantaneously.

13              (A discussion was held off the record.)

14              (Exhibit 13 was marked for identification.)

15    Q    I'm going to hand you what's been marked as

16         Exhibit 13, and we went a little bit out of

17         order here.

18              I'm going to represent to you that these

19         are phone records for your brother Robert's cell

20         phone number.

21    A    Right.

22    Q    That number at the top, (317)357-5791, is that

23         your brother's cell phone number?

24    A    Yes.

25    Q    And I would like you to look at the blue
```

Case 1:16-cv-00193-TWR-MJD Document 88-2 Filed 01/28/17 Page 456 of 495 PageID #:
Case 1:16-cv-00193-WTL-MJD Document 50-13 Filed 01/23/17 Page 456 of 495 PageID #:
2392

76

```
 1            highlighted number -- or record, excuse me.

 2    A     Okay.

 3    Q     And can you tell me what number was being called

 4            from?  I believe it's the first column.

 5    A     It's my mother's phone number, 375-7841.

 6    Q     And then the third column over, the number that

 7            is being called?

 8    A     357-5791.

 9    Q     And that's your brother's number; correct?

10    A     Correct.

11    Q     And then over to the fifth column, "Start Date,"

12            it looks like there's a time and a date.  Can

13            you read that for me, please?

14    A     November 19, 2013, at 15:40 and 38 seconds.

15    Q     And 15:40 is 3:40 --

16    A     3:40 -- 3:40 p.m.

17    Q     -- 3:40 p.m.; correct.

18            Do you think that this is the phone call

19            you made to Robert telling him to come over to

20            your mom's house?

21    A     Yes.

22    Q     We'll come back to that exhibit.

23            How long did it take for Robert to arrive?

24    A     I don't know exactly.  If I had to guess, I

25            would say it was no more than five minutes.
```

Case 1:16-cv-00103-TWR-MSD   Document 88-2   Filed 02/28/17   Page 457 of 495 PageID #:
Case 1:16-cv-00103-WTL-MJD   Document 88-2   Filed 02/23/17   Page 77 of 150 PageID #:
2393

77

```
 1    Q    No more than five minutes?  Okay.

 2              When did the police arrive?

 3    A    Wow.  I'm not sure who arrived in what order.

 4         The police -- I believe the police squad car was

 5         the first emergency responder to arrive.

 6    Q    Even before the firefighters?

 7    A    I'm not sure.  I'm going to say I don't know.

 8    Q    Do you think the police --

 9    A    Sorry.

10    Q    -- arrived before Robert got there?

11    A    I don't know.

12    Q    So the first police vehicle to arrive, was it a

13         marked police car?

14    A    Yes.

15    Q    And what did that officer do when he arrived on

16         scene?

17    A    Not much, really.  Asked what had happened and

18         just looked at what was going on.

19    Q    Okay.

20    A    I don't think he really did anything.

21    Q    Did you speak with him for very long?

22    A    No.  I don't think so.

23    Q    Did you tell them what had happened to your mom?

24    A    Yes.  But we didn't talk about anything about --

25         other than the most immediate -- or the most
```

Case 1:16-cv-00103-TWR-MSD Document 88-3 Filed 01/28/17 Page 458 of 495 PageID #:
Case 1:16-cv-00103-WTL-MJD Document 50-13 Filed 02/23/17 Page 459 of 505 PageID #:14
2394

78

```
 1          high-level aspect of what was occurring.

 2    Q     Did Robert arrive before or after they

 3          transported your mom to the hospital?

 4    A     I believe it was before.

 5    Q     Okay.  So Robert arrives on scene.  And what do

 6          you and Robert do?

 7    A     I talked to him and explained what had happened

 8          to Mom, and he was -- we were both just in

 9          shock.  We didn't really talk that much.  I

10          asked him for a cigarette.  And we were both

11          stand -- all we could do is stand around outside

12          and wait for the gurney to come out.

13    Q     What did you tell him happened to your mom?

14    A     I told him it looked like somebody bashed her

15          over the head, and that she was -- I described

16          the -- the nature of her condition.

17    Q     What happened next?

18    A     I'm not sure where we are exactly or who's

19          there, who gets there, so by "next," you mean --

20          my mother was taken, in ambulance, to the

21          hospital.

22    Q     Is that the next event that you remember

23          chronologically?

24    A     Yes.

25    Q     Okay.  Did you follow the ambulance to the
```

1    hospital?

2  A  No.

3  Q  And why not?

4  A  I think at that point either myself or my

5     brother were already talking to my sister.

6     However that worked out, whether we were or

7     whether that came just after my sister -- I sent

8     a text, my sister voted to go to the hospital.

9     And that may or may not have been during the

10    time that we were, quote, unquote, held by the

11    police.

12 Q  And when you say "held by the police," are you

13    referring to the patrol officer that arrived?

14 A  No.  The -- the patrol officer didn't really do

15    anything except just keep an eye on things.

16    And, again, my -- my timing and my understanding

17    of who arrived when and whatnot is kind of

18    vague, but other patrol cars showed up, and I

19    don't know which detective showed up or when

20    they showed up.

21 Q  Okay.

22        MS. BOX:  So did we decide we were on 16 or

23    17?

24        THE WITNESS:  We've used 16.

25        MR. WAPLES:  We used 16.

Case 1:16-cv-00103-TWP-MJD Document 88-2 Filed 01/23/17 Page 460 of 495 PageID #:
Case 1:16-cv-00103-TWP-MJD Document 50-13 Filed 02/23/17 Page 80 of 150 PageID #:
2396
80

```
 1              MS. BOX:  17.  Okay.

 2              (Exhibit 17 was marked for identification.)

 3     BY MS. BOX:

 4     Q   I'm going to show you what's been marked as

 5         Exhibit 17, and I'm going to represent to you

 6         that these are text messages from your sister,

 7         Rebecca Rainsberger's, phone number.  Let me

 8         draw your attention to the third kind of full

 9         box down.

10     A   Uh-huh.

11     Q   You see in the middle, on the left-hand side,

12         there's a record that reads "Originating DN."

13         And then across from that, there looks like to

14         be a phone number.

15     A   Yes.

16     Q   Can you read that phone number for me, please?

17     A   "(317)331-1059."

18     Q   And do you recognize that phone number?

19     A   That's mine.

20     Q   And that's your cell phone; correct?

21     A   Correct.

22     Q   And then there's a terminating DN?

23     A   Yes.

24     Q   And a number following that.  Can you read that

25         number for me?
```

Case 1:16-cv-00193-TWR-MJD   Document 88-2   Filed 11/28/17   Page 461 of 495 PageID #:
Case 1:16-cv-00193-WTL-MJD   Document 80-13   Filed 02/23/17   Page 81 of 150 PageID #:
2397

81

 1    A    "(317)679-4411."

 2    Q    Do you recognize that number?

 3    A    That's my sister.

 4    Q    And then at the bottom of that box, it shows the

 5         message text?

 6    A    Yes.

 7    Q    Can you read that for me, please?

 8    A    "Come down to Mom's now."

 9    Q    Do you think that's the text message you sent to

10         your sister notifying her of your mom's

11         incident?

12    A    Yeah.

13    Q    And then back up at the top, it looks like

14         there's a message over on the left-hand side,

15         "Message Arrival," and then there's a date and a

16         time.  Can you read that for me, please?

17    A    November 19, 2013, at 15:20:18, or at 3:20 p.m.

18         and 18 seconds.

19    Q    So 3:20 p.m., you texted your sister and told

20         her to come down to your mom's?

21    A    No.  The information here says 3:20, but that is

22         not when I texted her.  I would guess that this

23         is off by an hour.

24    Q    Why do you believe that it's off by an hour?

25    A    Well, at 3:20 p.m., I'm not sure I'd gotten to

Case 1:16-cv-00103-TWR-MJD Document 88-2 Filed 01/28/17 Page 462 of 495 PageID #18
Case 1:16-cv-00103-WTL-MJD Document 50-13 Filed 02/23/17 Page 32 of 150 PageID #:
2398

82

1      my mother's.

2    Q  Okay.

3    A  Had I?  No, I was on my way to Kroger.

4    Q  Okay.  What evidence do you have that this

5      record is incorrect?

6    A  The fact that it refers to an event or an

7      emergency of which I am not yet aware.

8    Q  So just your testimony?

9    A  Yeah.  I'm not a phone expert.  But there was no

10     reason for me to text my sister at 3:20 and tell

11     her to come to Mom's.

12   Q  Unless you had gone to your mom's house before

13     you went to Kroger.

14   A  I guess we can deal in hypotheticals, but I

15     didn't.

16   Q  And if that time was actually correct, that text

17     would have occurred before your 911 call; is

18     that correct?

19   A  Again, if you want to deal with hypotheticals,

20     yeah, it would've.  But I didn't make that text

21     at that time.

22   Q  Well, I'm not dealing with hypotheticals, I'm

23     dealing with the records.

24       (Exhibit 18 was marked for identification.)

25   Q  I'm going to hand you what's been marked as

Case 1:16-cv-00103-TWR-MJD Document 88-2 Filed 01/28/17 Page 463 of 495 PageID #:
2399
Case 1:16-cv-00103-WTL-MJD Document 50-13 Filed 02/23/17 Page 83 of 150 PageID #: 19

83

```
 1        Exhibit 18.  It says "Plaintiff's Exhibit,"

 2        but -- it's a copy of the audio records request

 3        for when you made the 911 call.  Right under the

 4        boxes, though, it looks like sort of Excel

 5        boxes.  There's a "Date of Incident" and a "Time

 6        of Incident."  Can you read that for me, please?

 7    A   November 19, 2013.  Time is 1538 hours.

 8    Q   Okay.  So this is the record of your 911 call.

 9        It looks like you made the 911 call at 3:38 p.m.

10    A   According to this, yes.

11    Q   And you said you called 911 from your mom's

12        phone.  Is that correct?

13    A   Yes.

14    Q   Okay.

15    A   Twice.

16    Q   I'm going to show you -- I'm going to go back to

17        what was Exhibit 3 that we entered this morning.

18    A   Oh.

19    Q   I think it might be in here, the official one.

20        Here you go.  This was previously admitted.

21        This was your mom's land line records.

22    A   Right.

23    Q   Do you see -- okay.  The call -- the very last

24        call, line number 150, what time was that call

25        made at?
```

Case 1:16-cv-00103-TWR-MJD Document 88-2 Filed 01/28/17 Page 464 of 495 PageID #:
2400
Case 1:16-cv-00103-WTL-MJD Document 50-13 Filed 02/23/17 Page 84 of 150 PageID #:
84

```
 1    A    November 19, 2013, at 3:41:09.

 2    Q    And the call right -- that call, the terminating

 3         number, 357-5791, that's your brother, Robert's,

 4         phone number; correct?

 5    A    Correct.

 6    Q    And you think that's the phone call you made to

 7         your brother telling him to come to Mom's?

 8    A    Correct.

 9    Q    The phone call made right before that, the last

10         phone call to your mom's land line, can you tell

11         me what time that was made at?

12    A    Line 149?

13    Q    149, yes.

14    A    November 19, 2013, at 10:29:50 a.m.

15    Q    So there's no phone call from your mom's land

16         line at 3:38; is that correct?

17    A    There is no --

18    Q    On this record.

19    A    There is no entry on this record for a 911 call

20         at 3:38, correct.

21    Q    But you believe you used your mom's land line to

22         call 911?

23    A    Correct.

24    Q    Where was Rebecca when you texted her, do you

25         know?
```

Case 1:16-cv-00103-TWP-MJD Document 88-2 Filed 11/28/17 Page 465 of 495 PageID #:
2401
Case 1:16-cv-00103-WTL-MJD Document 50-13 Filed 02/23/17 Page 85 of 150 PageID #:821

85

```
 1    A    I don't know.

 2    Q    And did you guys continue to text back and

 3         forth?

 4    A    Yes.

 5    Q    About your mother?

 6    A    Yes.

 7    Q    And at some point, the decision was made that

 8         she would go to the hospital?

 9    A    Yes.  And I don't know when that decision was

10         made, but it was -- she did not come to the

11         apartment.

12    Q    And then, at some point in time, some IMPD

13         detectives showed up at the scene; is that

14         correct?

15    A    Yes, ma'am.

16    Q    And what did those detectives say to you when

17         they got on the scene?  Or was -- was there one

18         detective, two detectives?

19    A    I'm not clear.

20    Q    Okay.

21    A    There was at least one, and I don't remember who

22         got there first.

23    Q    Okay.  You know Detective Benner --

24    A    Yes, ma'am.

25    Q    -- you just met him this morning.  Do you recall
```

Case 1:16-cv-00103-TWR-MJD   Document 88-3   Filed 01/28/17   Page 466 of 495 PageID #:
Case 1:16-cv-00103-WTL-MJD   Document 50-13   Filed 02/23/17   Page 86 of 150 PageID #:
2402

86

```
 1        seeing him at the scene?

 2   A    Yes.

 3   Q    And did you speak with him at the scene?

 4   A    I don't remember.

 5   Q    Okay.  Did you speak with another detective at

 6        the scene?

 7   A    I believe I spoke to either him or Tudor, but I

 8        cannot say for sure.  I should say I think I

 9        spoke to him or Tudor, but I cannot say for

10        sure.  I don't believe.

11   Q    And why didn't you go to the hospital at that

12        time?

13   A    Because my sister was going to the hospital and

14        I was being held by the police.

15   Q    Can you explain "being held"?

16   A    I was put in the back of a squad car and not

17        allowed to leave.

18   Q    Did you ask to leave?

19   A    Nope.

20   Q    How do you know you weren't allowed to leave?

21   A    Because I couldn't get out of the squad car.

22   Q    Was the door locked?

23   A    Uh-huh.

24   Q    Did you try it?

25   A    Uh-huh.
```

Case 1:16-cv-00103-TWR-MJD Document 88-2 Filed 01/28/17 Page 467 of 495 PageID #:
Case 1:16-cv-00103-WTL-MJD Document 50-13 Filed 02/23/17 Page 67 of 150 PageID #:
2403

87

```
 1    Q   How many times?

 2    A   I would say once.

 3    Q   But you didn't ask anyone to leave?

 4    A   I'm sorry?

 5    Q   You didn't ask anyone to leave?

 6    A   No, ma'am, I did not.

 7    Q   Didn't ask anyone to go with your mom to the

 8        hospital?

 9    A   No, I did not.

10    Q   All right.  What happened after you were placed

11        in the squad car?

12    A   I think crime scene showed up, and there was a

13        lot of people coming and going.

14    Q   How do you know they were crime scene?

15    A   Different jackets or markings, and they had what

16        appeared to be equipment.

17    Q   How long did you stay in the back of the squad

18        car, do you believe?

19    A   May have been as long as an hour.  It was quite

20        awhile.

21    Q   Okay.

22    A   I had to go to the bathroom at one point.  I was

23        allowed to do that.

24    Q   So you asked someone if you could go to the

25        bathroom?
```

```
 1    A    And they let me, but they had to watch me.

 2    Q    Where did you use the restroom at?

 3    A    I went outside, on the wall in between my

 4         mother's apartment and the church next door.

 5    Q    So where did you go next?

 6    A    You mean after the squad car --

 7    Q    Yes.

 8    A    -- time?

 9    Q    Yes.

10    A    I believe that squad car took me downtown to

11         IMPD.

12    Q    Okay.  And once you got downtown, where did you

13         go?

14    A    I was brought up to -- I don't know where it is,

15         somewhere in IMPD, in the City-County Building.

16    Q    Okay.

17    A    And placed in a -- like a conference room.

18    Q    Okay.  Did Robert go downtown with you as well?

19    A    Robert went downtown separately.

20    Q    Okay.  So he was in another vehicle?

21    A    Yes.

22    Q    Do you recall who drove you downtown?

23    A    I cannot -- I cannot remember the guy's name.

24         It was a patrolman.

25    Q    Okay.  Was he an IMPD officer?
```

 1    A    Yes.

 2    Q    Was he wearing a uniform?

 3    A    Uniformed --

 4    Q    Did you guys --

 5    A    -- in a squad car.

 6    Q    I'm sorry.  Did you guys talk about anything?

 7    A    Very little.

 8    Q    Did you say something to the effect of, "I don't

 9         know if it would be better or worse if my mom

10         died"?

11    A    I said something around that, although I'm not

12         sure -- I cannot remember what I said clearly.

13    Q    Do you know what you meant by that?

14    A    I was referring to the -- well, I didn't --

15         it -- it could have been a couple things.  One

16         was just a comment on the fragility of life and

17         the senselessness of the crime, and the other

18         was if my mom was going to be -- if she was

19         going to die anyway, she might as well die,

20         as -- as harsh as that sounds, I didn't want --

21         it was paramount for me that having my mother

22         having gone through this, that she not suffer.

23    Q    And you're downtown in an interview room.  Did

24         you give a statement at that time to the police?

25    A    I don't know if -- I was questioned and I

Case 1:16-cv-00103-TWR-MJD   Document 88-2   Filed 01/28/17   Page 470 of 495 PageID #:
2406
Case 1:16-cv-00103-WTL-MJD   Document 50-13   Filed 02/23/17   Page 90 of 150   PageID #:
90

```
 1        answered questions.

 2    Q   And who was in the room with you when you

 3        answered questions?

 4    A   I'm not sure, but I think it was just Benner.

 5    Q   Okay.  Do you recall about how long that lasted?

 6    A   In between 30 minutes and an hour.

 7    Q   Okay.

 8    A   It's hard to remember because it seemed like a

 9        long time.

10    Q   Did Robert answer questions at that point, too?

11    A   Yes, ma'am.

12    Q   So what happened after you and Robert were done

13        giving --

14    A   I'm sorry, you said at that time?  He -- one of

15        us was questioned first, one of us was

16        questioned second.  I don't know who went -- I

17        can't remember who went first and second.

18    Q   While Robert was being questioned, whether it

19        was before you or after you, were you still in

20        the interview room?

21    A   Yes, ma'am.

22    Q   So were you both basically let out of the

23        interview room at the same time?

24    A   I don't know that I know exactly when he got

25        out.  We were in different rooms, and the door
```

Case 1:16-cv-00103-TWP-MJD Document 88-2 Filed 01/28/17 Page 471 of 495 PageID #: 2407
Case 1:16-cv-00103-WTL-MJD Document 50-13 Filed 02/23/17 Page 41 of 150 PageID #: 27

91

```
 1          was kept shut.

 2   Q    Did you guys leave together?

 3   A    No, ma'am.

 4   Q    Where did you go after you left downtown?

 5   A    If I'm remembering correctly, Detective Tudor,

 6          he had me sign a thing consenting to a search

 7          and obtainment, or whatever you want to call it,

 8          for my gun, which was at my house.  And I didn't

 9          see my brother, but I -- I left with Detective

10          Tudor when he drove me to my house and took my

11          gun.

12   Q    After you got to your house, did you go to the

13          hospital?

14   A    Yes.

15   Q    Okay.  Did you go with Robert?

16   A    Yes.  I picked him up.

17   Q    Did you pick him up from downtown?

18   A    I picked him up from the City-County Building.

19   Q    Where you guys were being interviewed?

20   A    Correct.

21   Q    And you met up with your sister at the hospital;

22          is that correct?

23   A    Yes, ma'am.

24   Q    Did you talk to any medical personnel, a doctor,

25          a nurse, when you got to the hospital?
```

```
 1    A    The nurse there, coincidentally, was my

 2         brother's best friend's wife, so we talked to

 3         her, and we talked to another nurse, and we

 4         talked to -- took him a while to get there, but

 5         we talked to the doctor on charge of that area

 6         or whatever.

 7    Q    And what were you basically told about your

 8         mom's condition?

 9    A    That it was irreversible, she would not recover,

10         she wasn't in any pain, but the prognosis was

11         zero.

12    Q    Did you guys make a decision at that time to

13         remove her from life support?

14    A    Yes.  We talked about it briefly, and it was my

15         mother's wish that, when the time came, that she

16         be removed from life support, and there was

17         no -- we would have made that decision anyway

18         because there was no hope.

19    Q    Did she have a DNR, a do not resuscitate order?

20    A    No.  I don't think she had a DNR.  She had a

21         medical power of attorney, but I -- I -- I'm

22         going to say I don't recall ever seeing a DNR.

23    Q    And you know that that was her wish from

24         previous conversations you had with her?

25    A    Correct.
```

Case 1:16-cv-00103-TWR-MJD Document 88-2 Filed 01/28/17 Page 473 of 495 PageID #:
Case 1:16-cv-00103-WTL-MJD Document 50-13 Filed 02/23/17 Page 93 of 150 PageID #:
2409
93

 1   Q   But she never memorialized anything in writing?

 2   A   It may be in the medical power of attorney, but

 3       I cannot remember because that document wasn't

 4       invoked.

 5   Q   And when did your mother pass away?

 6   A   2:30 to 3:00 the following morning.

 7   Q   On November 20th?

 8   A   November 20th.

 9   Q   Were you, again, asked some questions by

10       Detective Benner on the 20th?

11   A   Yes, ma'am.

12   Q   About how long did that question-and-answer

13       session last?

14   A   I think it was half an hour, I'm not quite

15       clear.

16   Q   And was that at the City-County Building again?

17   A   Yes, ma'am.  It was up in homicide or whatever

18       area, interrogation room.

19   Q   And do you recall about what time of the day

20       that was at on the 20th?

21   A   Early afternoon.

22   Q   At some point did Detective Benner ask you to do

23       a polygraph exam?

24   A   Yes.  They both were -- yes.

25   Q   "They both"; are you referring to Detective

```
 1          Tudor as well?

 2     A    Yes, Tudor was there with Benner.

 3     Q    Okay.  And do you recall what month this was in

 4          or how close it was, what day it was --

 5     A    I don't understand the question.

 6     Q    -- that you had this conversation?  How soon

 7          after your mom's death did you have this

 8          conversation?

 9     A    Regarding the polygraph?

10     Q    Yes.

11     A    Well, that was on the day of my mother's death.

12     Q    The same day?

13     A    Yes.

14     Q    And did you consent to do a polygraph?

15     A    I did not.

16     Q    And why not?

17     A    Because, one, I think we'd already been through

18          enough, and, two, I think polygraphs are BS.

19     Q    Why do you think a polygraph's BS?

20     A    They're not even admissible in court, and after

21          having been lied to about the reason to come

22          down and having been questioned like some kind

23          of fiend, I didn't have any faith in the process

24          anymore and didn't want to partake in what I

25          considered to be a -- a silly exercise that --
```

Case 1:16-cv-00103-TWR-MJD Document 88-2 Filed 01/28/17 Page 475 of 495 PageID #:
2411
Case 1:16-cv-00103-WTL-MJD Document 50-13 Filed 02/23/17 Page 95 of 150 PageID 831

95

 1         that I would not have considered to be unbiased.

 2    Q    So you consented to a search of your gun;

 3         correct?

 4    A    Yes.  The retrieval --

 5    Q    The retrieval of your gun --

 6    A    -- of my gun.

 7    Q    Yes.  I don't know what all they do to test it,

 8         but --

 9    A    Technically, it's a search warrant, you're

10         right.

11    Q    And to a search of your car, is that correct, as

12         well?

13    A    Correct.

14    Q    But you wouldn't consent to the polygraph?

15    A    No.

16    Q    Did you get upset when Detective Benner asked

17         you to consent to a polygraph?

18    A    Yes.

19    Q    What did you do?

20    A    We were yelling back and forth about the

21         efficacy of such a test and might -- their need

22         for me to do it and my anger at them for leading

23         me on and lying about why we were there.  And I

24         said something about it not being admissible in

25         court, and I'm not taking it.  And that did not

Case 1:16-cv-00103-TWR-MJD Document 88-2 Filed 11/28/17 Page 476 of 495 PageID #:
2412
Case 1:16-cv-00103-WM-MJD Document 50-13 Filed 02/23/17 Page 96 of 150 PageID 832

96

 1       sit well.

 2   Q   Did you yell?

 3   A   No more than they did.

 4   Q   Did you storm out?

 5   A   No.  In fact, it's impossible to storm out of an

 6       investigation room with a detective sitting on

 7       either side of the table.  They're in the way.

 8   Q   You couldn't get around them?

 9   A   No.  The room's not big enough.  And I certainly

10       would not storm past a detective, you know, I

11       have more respect for the law than that.

12   Q   So you know that a polygraph test is not

13       admissible in court, but you still didn't want

14       to consent to it?

15   A   Correct.

16   Q   Do you think there was any usefulness that could

17       have been gained from a polygraph test of you,

18       Robert, or Rebecca?

19   A   No.

20   Q   You're absolutely sure neither Robert or Rebecca

21       had anything to do with your mom's death?

22   A   As sure as I can be of anything, yes; they're

23       not involved, I'm not involved.

24   Q   If they had been, would you have wanted them to

25       consent to a polygraph to find out?

```
 1    A    I had -- no, because I have -- I don't have any

 2         faith in the process.

 3    Q    So I know you couldn't go around the detectives,

 4         but the detectives leave the room; did you then

 5         leave quickly thereafter?

 6    A    They made room for me to go out and go get my

 7         brother and said, "Go get your brother."  And

 8         I'm not sure exactly how it played out, but I

 9         was supposed to go get him, and then he would be

10         questioned, and I yelled at my brother, "We are

11         not taking a polygraph test," or something like

12         that.

13              MS. HAMMER:  Note for the record that

14         Mr. Rainsberger raised his voice to show the

15         inflection.

16              THE WITNESS:  Right.

17    A    I was distant from my brother, too, because he

18         was in the waiting room, and he was probably

19         25 feet away, so the only way to communicate

20         with him -- there was probably a better way to

21         communicate that, but I wanted him to know what

22         was going on.

23    BY MS. BOX:

24    Q    So did you demand to leave?

25    A    No.
```

Case 1:16-cv-00103-TWR-MJD   Document 88-2   Filed 11/28/17   Page 478 of 495 PageID #:
Case 1:16-cv-00103-WTL-MJD   Document 50-13   Filed 02/23/17   Page 96 of 150   PageID 834
2414

98

```
 1    Q    You didn't demand the officers move so you could

 2         get out of the room?

 3    A    Oh, I'm sorry, this is before that.  They --

 4         it's like they stood up and said -- one of them

 5         stood up, Tudor, I think, and said, "Go get your

 6         brother and have him come back here."

 7    Q    You were under the impression that you were

 8         there that day to go over the autopsy results;

 9         right?

10    A    Yes.  But Benner contacted my sister, she

11         contacted us, that autopsy results, be there at

12         1:00, so that's what my -- that's what we were

13         told.

14    Q    Did you go over the autopsy results with

15         Detective Benner?

16    A    No.

17    Q    So you left before he could go over the autopsy

18         results with you?

19              MR. WAPLES:  Objection, misstates facts in

20         evidence and it's argumentative.

21              You can answer.

22    A    They left us waiting in the entryway without

23         talking about the autopsy, so I don't know how

24         to answer that exactly.

25              MS. BOX:  Do you want to take a break or do
```

Case 1:16-cv-00103-TWR-MJD Document 88-2 Filed 12/28/17 Page 479 of 495 PageID #:
Case 1:16-cv-00103-WTL-MJD Document 50-13 Filed 02/23/17 Page 99 of 150 PageID 835
2415
99

```
 1          you want to keep going?

 2               THE WITNESS:  I'm okay.  I don't --

 3               MR. WAPLES:  I'm okay.  It's up to you.

 4               MS. HAMMER:  I'm okay.

 5               (Exhibit 19 was marked for identification.)

 6     BY MS. BOX:

 7     Q   I'm going to show you what's been marked as

 8          Exhibit 19.  And this is the Complaint that was

 9          filed in this case against Charles Benner,

10          Detective Benner.  The document reference number

11          is Document 1, it was filed on January 12th of

12          2016, and the Case No. is 1:16-cv-00103-WTL-MJD.

13               Do you recognize this document,

14          Mr. Rainsberger?

15     A   Yes, ma'am.

16     Q   When was the last time you saw this document?

17     A   I've read it recently.  I don't know exactly

18          when.

19     Q   Did you help in the preparation of this

20          document?

21     A   Yes, ma'am.

22     Q   Now, I know you're not a lawyer, but what is

23          your understanding, just in general terms, of

24          the claims that you're bringing against

25          Detective Benner?
```

```
 1              MR. WAPLES:  Objection, calls for a legal
 2         conclusion, but he can answer to the extent that
 3         he knows.
 4    A    I know that it's a Section 1983 lawsuit against
 5         a police person acting under the color of
 6         authority violating my constitutional rights.
 7    Q    And what rights do you feel were violated?
 8    A    The right not to be arrested and charged with
 9         something out of thin air.  I don't know.
10    Q    I'd like you to turn to page 3, it's
11         Paragraph 18, it reads, "In his probable cause
12         affidavit, Detective Benner misrepresented that
13         Mr. Rainsberger was in his mother's apartment
14         during the time period she was attacked and well
15         before he telephoned 911 to report her
16         injuries."
17              Do you see that?
18    A    Yes, ma'am.
19    Q    Okay.  And then Exhibit 2, which is Detective
20         Benner's affidavit for probable cause.  Here you
21         go.  It's on page 3.
22    A    Okay.
23    Q    The very last paragraph, Detective Benner
24         writes, "I received cell phone records for the
25         Rainsberger family and obtained the following
```

Case 1:16-cv-00103-TWP-MJD   Document 86-2   Filed 11/28/17   Page 481 of 495 PageID #: 2417
Case 1:16-cv-00103-TWP-MJD   Document 90-18   Filed 02/28/17   Page 101 of 150   PageID #: 937

101

```
 1          information:  On November 19, 2013, at

 2          2:40 p.m., Robert Rainsberger received a call

 3          from Ruth Rainsberger's land line to his cell

 4          of," and it's blacked out.

 5    A     Uh-huh.

 6    Q     Is that the statement you're referring to in

 7          Paragraph 18, the misrepresentation?

 8    A     Yes.

 9    Q     So but in the probable cause affidavit,

10          Detective Benner doesn't actually say that you

11          made the call at 2:40; correct?

12    A     No, he does not.

13    Q     I'd like to go back to Exhibit 13.  It looks

14          like this.

15    A     Okay.

16    Q     And now let's talk about the yellow highlighted

17          record.

18    A     Okay.

19    Q     Again, Exhibit 13 is Robert Rainsberger's phone

20          records.  The yellow highlighted line, which is

21          the -- 1, 2, 3, 4 -- fifth line down from the

22          top.

23    A     Yes.

24    Q     Can you please read for me the number that was

25          called?
```

```
 1   A   357-5791.

 2   Q   And that's your brother, Robert's, phone number;

 3       correct?

 4   A   Correct.

 5   Q   And the number that was being called from?

 6   A   375-7841, my mother.

 7   Q   Your mother's phone number, okay.

 8       And then over to "Start Date," the time and

 9       date, please?

10   A   Start date is November 19, 2013, 14:40:51.

11   Q   So according to this record, it appears that

12       Detective Benner's statement in the probable

13       cause affidavit is correct?

14   A   No, it does not.  It does not appear that way.

15   Q   How does it not appear that way?

16   A   According to Exhibit 13, at 15:40:38, somebody

17       called from my mother's land line to a 773

18       number, and that is nonsensical.  The same 773

19       number on the 14th put a call under "Dialed

20       Digits."

21   Q   Looks like the called number, though, is

22       317-357-5791?

23   A   No, that's dialed digits.  The called number in

24       blue is (773)960-9972.

25   Q   We're referring to the yellow highlighted one.
```

```
 1    A    Blue.

 2    Q    No.  We're referring to yellow, though, the

 3         phone call at 2:41.

 4    A    I'm sorry.  Let me -- let me recap what I just

 5         probably said badly.  There is a record with a

 6         start date -- a start time of 14:40:51 showing

 7         my mother's land line number called my brother's

 8         cell number, that's the first two columns.  At

 9         15:40:38, there is another line that shows my

10         mother's land line phone calling a 773 number,

11         that's the blue line.

12    Q    But so, again, there's a phone call from your

13         mom's land line to Robert Rainsberger at 2:40,

14         at least it appears from these records.

15    A    If -- if you don't understand this record, there

16         is a line there that does say something occurred

17         at a time stamp of 2:40:51, yes.

18    Q    What do you mean if I don't understand this

19         record?  How am I misunderstanding it?

20    A    These two lines are the same thing, they're two

21         halves of the phone call.  The 773 number is a

22         bridging number in Chicago for AT&T to connect

23         its network to Sprint.

24    Q    And how do you know that?

25    A    I don't, but it's the only thing that makes any
```

```
 1          sense.

 2    Q     You stated earlier you're not a phone record

 3          expert; correct?

 4    A     Well, the alternative is that at 15:41:03,

 5          somebody from my mother's land line called a 773

 6          number, which did not happen.

 7    Q     Has an expert in phone records told you that

 8          that's what's happening here?

 9    A     No, but I'm very confident.

10    Q     How so?

11    A     I'm very confident that an expert that would

12          look at this would go, Oh, that's the same call.

13    Q     Have you spoken to any expert?

14    A     No.  But at least Beers (phonetic) corrected the

15          time on this, on the 1440 call.

16    Q     Well, there's multiple issues with Beers's

17          records.

18    A     Only if you don't understand the phone records,

19          and I'm very confident that what I've stated and

20          testified to will be borne out.

21    Q     The --

22    A     That I made a phone call at 15:40 to my brother

23          from my mother's land line.

24    Q     Tell me the times of both those phone calls, the

25          duration.
```

```
 1   A   The duration, as listed, the first one at 14- --

 2       with the time stamp of 14:40 is 15 seconds.

 3   Q   And the second one?

 4   A   25 seconds.

 5   Q   So they're not even the same length of phone

 6       calls.  How could it be the same phone call?

 7   A   The 15-second phone call is encapsulated into

 8       the 25-second phone call.  The 25 seconds is the

 9       phone call, the actual time on the phone plus

10       the switching plus the front and back end

11       handoffs and everything.

12   Q   But you have no evidence to prove that.

13   A   No, but I'm confident.

14   Q   But your own speculation?

15   A   I've never been more confident in anything.

16   Q   Do you recognize that Chicago number, 773

17       number?

18   A   Only because I looked it up after the fact and

19       found it was some weird number that appears in

20       other things.  It's not a person.  It is part of

21       the network switching for the phone companies.

22   Q   But your testimony today is you were not at your

23       mom's house at 2:40 p.m.; is that correct?

24   A   Absolutely not.

25   Q   And Robert was at home with you at that time;
```

 1      correct?

 2   A   Correct.  I had not yet left.

 3   Q   And where was Rebecca, do you know?

 4   A   I have no idea.

 5   Q   You three were the only individuals with keys

 6      besides your mom; correct?

 7   A   To be accurate, maintenance would have had keys.

 8   Q   So who could have made this call?

 9   A   I don't know what call you're referring to.

10   Q   The call at 2:40 p.m.

11   A   There is no call at 2:40 p.m.  Those are --

12      those are two lines that represent one call, and

13      it's shown in the rest of the records it kind of

14      works that way, but not being a phone expert, I

15      can't really explain it adequately, I guess,

16      so...

17   Q   Since you're not a phone expert, let's assume

18      there was a call at 2:41, because we have no

19      evidence --

20      MR. WAPLES:  Objection, assumes facts not

21      in evidence, it's contrary to the record.

22   A   The AT&T records show --

23      (Simultaneous colloquy interrupted by the

24      court reporter.)

25      MR. WAPLES:  And I object to that.  It

```
 1          assumes facts not in evidence and is contrary to

 2          the records.

 3     Q    So who could have made that call?

 4               MR. WAPLES:  And it calls for speculation.

 5          Somebody made a call that didn't exist at that

 6          time, it didn't happen.

 7               MS. BOX:  We have Exhibit 13 that says that

 8          there's a call.  We have no evidence to prove

 9          otherwise.

10               MR. WAPLES:  We don't even know --

11               (Simultaneous colloquy.)

12               MS. BOX:  I even made it clear on the

13          record that I would assume -- make an assumption

14          that a call occurred.  I just want to know who

15          could have made the call if it did occur.

16               MR. WAPLES:  You're asking him to testify

17          about a call that occurred at a time he said it

18          didn't occur.  It occurred at 3:40, not --

19               MS. BOX:  He also told me he wasn't at his

20          mom's house at 2:40, so how would he have known

21          if the call occurred not?  He's not Robert, he's

22          not the person on the other line making a call.

23     A    Because the AT&T phone records don't show a call

24          at 2:40.

25
```

```
 1   BY MS. BOX:

 2   Q   The AT&T records also don't show your 911 call

 3       at 3:38.  How do you explain that?  Or your two

 4       911 calls at 3:38.  There are multiple issues

 5       with your mom's land line records.

 6           MR. WAPLES:  Objection, argumentative.

 7   Q   So who could have made a call at 2:40 p.m. from

 8       your mom's land line?

 9   A   I can't answer that.  That's a nonsensical

10       question.

11   Q   Well, it could have been Robert, you said it

12       wasn't you, and you don't know where Rebecca

13       was.  I guess the maintenance man could have

14       made the call, but the maintenance man wouldn't

15       have Robert's cell phone number; correct?

16   A   I can't speculate.

17           MR. WAPLES:  Objection.  Kathryn, you're

18       speculating and you're arguing with the witness

19       who's already told you what his answer is about

20       any call at 2:40 --

21           MS. BOX:  He didn't answer the question,

22       Rich.  And I'm not --

23           MR. WAPLES:  He's not going to answer that

24       somebody made a call when he doesn't believe a

25       call was made.
```

```
1                MS. BOX:  I'm not asking him to answer that
2           someone made a call.  I'm asking him:  If the
3           call was made, who could have done it?
4                THE WITNESS:  I have no idea.
5      BY MS. BOX:
6      Q    Going back to Exhibit 19, this is the Complaint.
7           Page 3, Paragraph 19 states, "In his probable
8           cause affidavit, Detective Benner misrepresents
9           that nothing of value was stolen from the
10          apartment, in an apparent attempt to eliminate a
11          robbery as a motive for the attack, when in
12          truth prescription drugs, a purse and jewelry
13          were stolen."
14               Do you see that paragraph that I'm
15          referring to?
16     A    Yes, ma'am.
17     Q    What drugs were stolen from the apartment?
18     A    Aricept.  I don't know if any over-the-counter
19          drugs were taken or not, but the Aricept was
20          missing.
21     Q    What did you do to find out that the Aricept was
22          missing?
23     A    I looked at the place that it was always sitting
24          on the counter and saw that there was no Aricept
25          there.
```

```
 1    Q    At what time?

 2    A    Oh, what time?

 3    Q    Yes.

 4    A    I'm not even sure what day.  I don't know if I

 5         looked that closely on the 19th.  I did look

 6         around the apartment, but I don't know if I

 7         noticed it for sure that day or not, I can't

 8         remember.

 9    Q    Okay.  Where did your mom usually keep her

10         Aricept medication?

11    A    It's sitting on the kitchen across from the

12         refrigerator, to the right of the sink, where

13         all that stuff is.

14         (Exhibit 20 was marked for identification.)

15    Q    Here's Exhibit 20.  Do you recognize what that

16         photo is depicting?

17    A    I believe this is the kitchen counter to the

18         right of the sink.

19    Q    And is that where she would usually keep her

20         Aricept?

21    A    Yes, ma'am.

22         (Exhibit 21 was marked for identification.)

23    Q    All right.  Now I'm handing you Exhibit 21.  Do

24         you recognize what's in that box in the drawer

25         or do you know what that is?
```

```
 1   A    It's some other medication.  That could be --

 2        oh, she'd been on something for something else

 3        in the past and I -- I do not remember what that

 4        is.

 5   Q    Okay.  But that's not Aricept; is that your

 6        testimony today?

 7   A    Aricept -- correct.  Aricept comes in a bottle.

 8   Q    Well, do you see the bottle up to the right-hand

 9        side of the box?

10   A    Yes, ma'am.

11   Q    And could that have been her Aricept?

12   A    No, ma'am, that -- that bottle appears to be too

13        big.

14   Q    Can you think of any reason that someone would

15        want to take Aricept?

16   A    To be succinct, I -- I believe someone who would

17        do such a thing would just grab whatever

18        prescription drugs existed without thinking

19        about it.

20   Q    Why wouldn't they take any of the other drugs

21        depicted in these two exhibits?

22   A    Well, the -- the items on the counter are

23        over-the-counter medications that are not

24        particularly valuable to a drug addict, and the

25        4-milligram card I didn't even realize was a
```

Case 1:16-cv-00103-TWP-MJD   Document 90-18   Filed 02/18/17   Page 112 of 150   PageID

```
 1          drug at first, I thought that was a pamphlet, so
 2          they may not have recognized that.
 3     Q    What about that bottle?
 4     A    Oh, I don't know.  I have no idea.
 5     Q    Do you think if someone was going to rob the
 6          place, they would pick and choose between
 7          different medications or just grab everything
 8          that they could see?
 9              MR. WAPLES:  Objection, calls for
10          speculation.
11     A    I believe the easiest and quickest and surest
12          they could take would be the bottle of
13          medication sitting out on the kitchen counter,
14          so not something that doesn't look like
15          medication, and I have no explanation for the
16          other bottle except maybe they didn't see it.
17     Q    Did you ever tell Detective Benner that Aricept
18          was taken?
19     A    I don't know if I told Benner or Tudor or who,
20          but I told them that stuff was taken, and it
21          didn't seem to register.
22     Q    So when did this conversation take place?
23     A    I don't remember.
24     Q    Do you know who you were speaking to?
25     A    I believe it was Benner, but I don't remember.
```

```
 1    Q    So you heard Detective Benner testify this
 2         morning that you never told him that anything
 3         was taken.
 4    A    I believe I told Benner; if not, I told one of
 5         the other police officers or I told Tudor that a
 6         purse, jewelry, and my mom's Aricept were
 7         missing.
 8    Q    Okay.  You told them about all three at the same
 9         time?
10    A    I don't remember.
11    Q    But you only brought this lawsuit against
12         Detective Benner; correct?
13    A    That's the way it works.
14    Q    I'm just asking.
15    A    Correct.
16    Q    Can you please describe the purse that was
17         stolen?
18    A    It was a black leather purse, approximately the
19         size of a loaf of bread, with handles.
20         Extremely similar to the other purse that was
21         left on the scene.
22    Q    Did you indicate to Detective Benner that there
23         were two purses, that your mom had two purses?
24    A    Yeah.
25    Q    And when did you do that?
```

1   A   I don't remember.

2   Q   I'm handing you what's been marked as

3       Exhibit 22.  Do you recognize that?

4   A   That is my mother's new purse that she does not

5       use and keeps in a drawer.

6           (Exhibit 22 was marked for identification.)

7           THE WITNESS:  Can we take a break?

8           MS. BOX:  Sure.

9           (A recess was taken between 4:19 p.m. and

10      4:29 p.m.)

11  BY MS. BOX:

12  Q   We were talking about the purse that was

13      allegedly stolen from your mom's house.  Do you

14      recall -- we already talked about you gave a

15      statement to Detective Benner on the 19th, the

16      evening of the 19th, and he asked you about

17      some things that could have been stolen from the

18      house.  Do you recall giving him a description

19      of your mom's purse?

20  A   Not off the top of my head, no.  I could

21      describe the purse, but I don't recall that

22      instance.

23  Q   Then I'm going to show you what's been marked as

24      Plaintiff's Exhibit 23, and I have it open to

25      page 21 just for ease.

```
 1                    (Exhibit 23 was marked for identification.)

 2        Q    And it's the very top paragraph.  Can you read

 3             that paragraph for me?

 4        A    Let's see.  "Yeah, she had a, uh; purses, black,

 5             patent leather, oh, not patent leather, shiny

 6             black leather with like, uh; stitching in it,

 7             like, I don't know how to, anyway it was about

 8             that big, about that big, and, uh; it's got,

 9             like, stitching in it to make it look kind of

10             alligator-y.  It's black, shiny leather.  It's

11             crammed full most of the time.  And as far as I

12             know, it should be in her ... she kept it in

13             her, uh; clothes closet on the floor..."

14        Q    Okay, thank you.  And the purse in Exhibit

15             No. 22, the one right before this, you would

16             agree that that matches the description that you

17             gave Detective Benner; correct?

18        A    No.  This purse does not have stitching in order

19             to emulate alligator appearance.

20        Q    What is the white stitching pattern?

21        A    That's stitching, but that does not emulate an

22             alligator-type appearance.

23        Q    That looks like a black patent leather purse to

24             me, though.  Correct?

25        A    She had two of them.
```