# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



| | |
|---|---|
| Everett McKinley Dirksen United States Courthouse<br>Room 2722 - 219 S. Dearborn Street<br>Chicago, Illinois 60604 | Office of the Clerk<br>Phone: (312) 435-5850<br>www.ca7.uscourts.gov |

## NOTICE OF ISSUANCE OF MANDATE

February 6, 2019

To:   Laura A. Briggs
UNITED STATES DISTRICT COURT
Southern District of Indiana
United States Courthouse
Indianapolis , IN 46204-0000

| | |
|---|---|
| No. 17-2521 | WILLIAM RAINSBERGER,<br>Plaintiff - Appellee<br><br>v.<br><br>CHARLES BENNER,<br>Defendant - Appellant |

| **Originating Case Information:** |
|---|
| District Court No: 1:16-cv-00103-WTL-MJD<br>Southern District of Indiana, Indianapolis Division<br>District Judge William T. Lawrence |

Herewith is the mandate of this court in this appeal, along with the Bill of Costs, if any. A certified copy of the opinion/order of the court and judgment, if any, and any direction as to costs shall constitute the mandate.

PARTIAL RECORD RETURN          Record to be returned later

Other to be returned later (specify items):     6 CDs

**NOTE TO COUNSEL:**

If any physical and large documentary exhibits have been filed in the above-entitled cause, they are to be withdrawn ten (10) days from the date of this notice. Exhibits not withdrawn during this period will be disposed of.

Please acknowledge receipt of these documents on the enclosed copy of this notice.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Received above mandate and record, if any, from the Clerk, U.S. Court of Appeals for the Seventh Circuit.

**Date:**                                     **Received by:**

2/7/2019
_____

_____
Deputy Clerk/ U.S.District Court

form name: **c7_Mandate**(form ID: **135**)

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## FINAL JUDGMENT



**CERTIFIED COPY**

A True Copy
Teste:

_____
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

January 15, 2019

Before:

**DIANE P. WOOD**, *Chief Circuit Judge*

**DAVID F. HAMILTON**, *Circuit Judge*

**AMY C. BARRETT**, *Circuit Judge*

| | |
|---|---|
| No. 17-2521 | WILLIAM RAINSBERGER,<br>Plaintiff - Appellee<br><br>v.<br><br>CHARLES BENNER,<br>Defendant - Appellant |

**Originating Case Information:**

District Court No: 1:16-cv-00103-WTL-MJD
Southern District of Indiana, Indianapolis Division
District Judge William T. Lawrence

    The judgment of the District Court is **AFFIRMED**, with costs, in accordance with the decision of this court entered on this date.

In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 17-2521

WILLIAM RAINSBERGER,

*Plaintiff-Appellee,*

*v.*

CHARLES BENNER,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:16-cv-00103-WTL-MJD — **William T. Lawrence**, *Judge*.

———————————

ARGUED JANUARY 4, 2018 — DECIDED JANUARY 15, 2019

———————————

Before WOOD, *Chief Judge*, and HAMILTON and BARRETT,
*Circuit Judges*.

BARRETT, *Circuit Judge*. William Rainsberger was charged
with murdering his elderly mother. But the detective who
built the case against him, Charles Benner, may have been dis-
honest. According to Rainsberger, Benner submitted a proba-
ble cause affidavit that was riddled with lies and undercut by
the omission of exculpatory evidence. Based on that affidavit,
Rainsberger was arrested, charged, and imprisoned for two

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

months. When the prosecutor dismissed the case because of evidentiary problems, Rainsberger sued Benner under 42 U.S.C. § 1983 for violating his Fourth Amendment rights. Benner moved for summary judgment, arguing that he was entitled to qualified immunity. The district court denied his motion, and he now asks us to reverse the district court.

We decline to do so. Benner concedes for purposes of this appeal that he knowingly or recklessly made false statements in the probable cause affidavit. He emphasizes, however, that knowingly or recklessly misleading the magistrate in a probable cause affidavit—whether by omissions or outright lies—only violates the Fourth Amendment if the omissions and lies were material to probable cause. He claims that his weren't, but we disagree. Materiality depends on whether the affidavit demonstrates probable cause when the lies are taken out and the exculpatory evidence is added in. And when that is done here, Benner's affidavit fails to establish probable cause to believe that Rainsberger murdered his mother. Because it is clearly established that it violates the Fourth Amendment "to use deliberately falsified allegations to demonstrate probable cause," *Franks v. Delaware*, 438 U.S. 154, 168 (1978), Benner is not entitled to qualified immunity.

I.

We start with an issue that affects both appellate jurisdiction and our rendition of the facts. This is an appeal from the district court's order denying Benner's motion for summary judgment on the ground of qualified immunity. In the normal course, we lack jurisdiction to review an order denying summary judgment because it is not a "final decision" under 28 U.S.C. § 1291. *See Gutierrez v. Kermon*, 722 F.3d 1003, 1009 (7th

No. 17-2521                                                    3

Cir. 2013). But because "qualified immunity is in part an entitlement not to be forced to litigate the consequences of official conduct," *Mitchell v. Forsyth*, 472 U.S. 511, 527 (1985), the denial of qualified immunity is an appealable interlocutory decision—at least insofar as it turns exclusively on a question of law, *id.* at 530. That qualification is significant: because our authority extends only to questions of law, an officer can obtain interlocutory review only if he refrains from contesting any fact that a reasonable jury could resolve against him. *See Jones v. Clark*, 630 F.3d 677, 680 (7th Cir.2011) ("In a collateralorder appeal …, where the defendants say that they accept the plaintiff's version of the facts, we will take them at their word and consider their legal arguments in that light. If, however, we detect a back-door effort to contest the facts, we will reject it and dismiss the appeal for want of jurisdiction."). Benner does so here. For purposes of this appeal, he accepts as true Rainsberger's version of all facts that are in material dispute—most significantly, that he knowingly or recklessly made false or misleading statements in the affidavit that secured Rainsberger's arrest. In what follows, then, we recount the facts that we must take as true, drawing all inferences in Rainsberger's favor. The legal question that we must decide is whether Benner is entitled to qualified immunity on these facts.

### A.

Rainsberger was the primary caregiver for his mother, Ruth, who was 88 years old and suffering from dementia.[1] Ruth lived alone in an apartment in a high-crime area; Rainsberger lived nearby. He checked on her daily, did her grocery

---

[1] We will refer to the other members of the Rainsberger family by their first names for the sake of clarity.

shopping, and handled her finances. His siblings Robert and Rebecca also helped care for Ruth, although they saw her less frequently.

At approximately 3:30 p.m. on November 19, 2013, Rainsberger went to Ruth's apartment and found the door unlocked. When he entered, he discovered Ruth lying facedown on the floor with a blanket covering her shoulders and head. She was breathing, but with difficulty. There was a large circle of dried blood on the blanket and a pool of congealed blood on the floor. Rainsberger did not remove the blanket because he believed that it was acting as a bandage, and he feared that the bleeding would increase if he pulled it off.

Rainsberger called 911 from his mother's landline at 3:37 p.m. He told the operator that someone had "bashed [his mother's] head in." He then called his brother Robert and told him to come to the apartment immediately. Rainsberger waited outside for the ambulance because Ruth's apartment was difficult to locate within the complex.

When paramedic Carl Wooldridge arrived, Rainsberger told him that someone had "caved his mother's head in." Wooldridge observed that the blanket covering Ruth's head appeared to be stuck to a wound. He noticed "somewhat of a hole in [the blanket] where the wound was," and when he peeled the blanket off, "there was a mark … on her forehead that [he] believed to be an entrance wound." Based on those observations, Wooldridge told fire and ambulance personnel that Ruth had been shot—a conclusion that the emergency personnel thought odd, given the lack of blood splatter on the walls or ceiling. As it turned out, Rainsberger, not Wooldridge, had it right: Ruth died of blunt force trauma to the head. Wooldridge later told Charles Benner, the detective

investigating the murder, that he found it suspicious that Rainsberger said that his mother's head had been caved in even though he had not removed the blanket to look at her injuries.

Benner came to Ruth's apartment roughly 40 minutes after Rainsberger placed the 911 call. There was no sign of forced entry, and while some dresser drawers in Ruth's bedroom were open, their contents were undisturbed. Ruth's checkbook, credit cards, and some cash were found in the apartment. Her purse and prescription medication were not.

Rainsberger and Robert, who had since arrived, voluntarily went to police headquarters to give statements to Benner. Rainsberger said that he had last seen his mother the previous evening. After visiting her, he drove to Plainfield, which is roughly 25 miles away, to spend the evening with his wife. He returned to his house the next morning, where he stayed until around 3:30 p.m. He then left home to check on his mother, stopping at Kroger on the way to buy an iced tea. He told Benner that Ruth's apartment was unlocked when he arrived and that he found her lying wounded on the floor. He checked the apartment for intruders and, finding none, called 911. Rainsberger informed Benner that his mother was not physically able to stand up and see through the peephole, so she typically had to open the door to see who was there. And Rainsberger said that Ruth had $80,000 to $100,000 in savings that would be distributed to her three children upon her death.

Robert told Benner that he had not seen Ruth for a few days. He said that he had been at Rainsberger's house when Rainsberger called to tell him to come to Ruth's apartment im-

mediately. He explained that he had been living with Rains-
berger for a few months because he had lost his own home to
foreclosure.

Benner talked to Rainsberger's sister Rebecca the next day.
Rebecca told Benner that she typically checked on her mother
once a week and had last seen her the day before the attack.
Sometime after his call with Rebecca, Benner asked the three
siblings to come to the station to review the results of Ruth's
autopsy. When they got there, however, Benner did not talk
about the autopsy. Instead, he accused Rainsberger and Rob-
ert of murdering their mother for her money and asked them
to take a polygraph. Upset at the accusation and at being
lured to the station under false pretenses, they refused and
left. Roughly a week later, after obtaining counsel to represent
them, both Rainsberger and Robert agreed to go to the station
to give fingerprints and submit to a DNA buccal swab.

Benner did not wait for the results of the DNA tests before
seeking to have Rainsberger arrested and charged. In early
December 2013, Benner submitted a probable cause affidavit
to the Marion County prosecutor. But the prosecutor declined
to pursue it, and Benner went back to find more evidence.

Benner hoped that the results of the DNA tests would
make his case against Rainsberger. In March 2014, he noted in
an email to a colleague that "[t]he victim's sons are the sus-
pects in this case and I am waiting for DNA results before any
arrest may be made." But when the laboratory report came
out in April 2014, it did not implicate Rainsberger—the DNA
of two males was found on Ruth's blanket and clothing, but
neither Rainsberger nor Robert was a match. Benner took that
result in stride. Although the DNA test did not incriminate

Rainsberger, Benner did not think that it exonerated him ei-
ther. (The same, of course, was true of Robert, but Benner was
focused on Rainsberger.) Benner reasoned that the unknown
male DNA on Ruth's blanket and clothing might have been
left by emergency personnel rather than the killer.

In May 2014, Benner went to the prosecutor with a second
probable cause affidavit that was almost identical to the first.
The second affidavit did not disclose the results of the DNA
test. But it added two pieces of evidence that Benner had ac-
quired since he presented the prosecutor with the first affida-
vit. First, Benner used cell phone records to suggest that
Rainsberger had called Robert from Ruth's apartment at 2:40
p.m.—hours after Ruth was attacked and a little more than an
hour before Rainsberger called 911. Second, he stated that cell
phone tower location data could not place Rainsberger out-
side the area of his mother's apartment during the relevant
period. After receiving the second probable cause affidavit,
the prosecutor went to Marion County Court and obtained a
warrant for Rainsberger's arrest. Rainsberger was charged
with his mother's murder and spent two months in jail before
he was released on bail. The prosecutor dismissed the case a
year later because of evidentiary problems.

B.

After the charges were dropped, Rainsberger sued Benner
under 42 U.S.C. § 1983, alleging that Benner had violated his
Fourth Amendment rights. Benner moved for summary judg-
ment on the basis of qualified immunity, but the district court
denied the motion. It decided that a reasonable jury could find
that Benner knowingly or with reckless disregard for the truth
made false or misleading statements in the affidavit. Probable
cause did not exist without the false or misleading statements,

the district court said, and because an officer who submits a materially misleading probable cause affidavit violates clearly established Fourth Amendment law, it denied Benner qualified immunity. The district court's order turned on the following omissions and alleged lies.[2]

*The phone records.* The most damning addition to the second probable cause affidavit was the suggestion that Rainsberger called Robert's cell phone from Ruth's landline at 2:40 p.m. on November 19. This placed Rainsberger at Ruth's apartment after she was injured and almost an hour before he called 911 for help. But the time stamp was inaccurate—and for purposes of this appeal, we must assume that Benner knew it. A phone expert at the police department had analyzed the records and told Benner that the call had been routed through a cell tower in Chicago, where it was one hour earlier. Thus, despite the 2:40 p.m. time stamp, the call had been placed at 3:40 p.m. Indianapolis time. It was the call that Rainsberger had made to Robert just after he found Ruth and called 911. Benner chose to use the inaccurate and incriminating time in his affidavit.

*The Kroger video.* Rainsberger had stopped at Kroger to buy an iced tea before going to Ruth's apartment on the day of the

---

[2] Rainsberger complains about omissions in addition to those we detail here. For example, he faults Benner for failing to include the results of the DNA test, the fact that Ruth lived in a high-crime area, and the fact that she would often open the door to strangers because she couldn't see through the peephole. The district court chose not to determine whether this information was material because it found probable cause lacking even without it. Because we agree that the hypothetical affidavit fails to establish probable cause even without this evidence, we take the same approach as the district court.

murder. In the probable cause affidavit, Benner described sur-
veillance video from Kroger that showed Rainsberger making
a trip to a trash can. According to Benner, Rainsberger "ap-
peared to pull out a straight object from his person which he
placed in the garbage can." But the district court observed that
nothing on the video shows Rainsberger "'pulling' the object
from anywhere." Benner also claimed that "[a]s [Rainsberger]
placed the object in the trash he appeared to look around for
cameras." But as the district court said, a reasonable jury
could find that Benner deliberately mischaracterized Rains-
berger's behavior, which does not appear furtive on the video.
And after watching the video ourselves, we agree with Rains-
berger that a reasonable jury could find that Benner intention-
ally misled the prosecutor and magistrate in yet another re-
spect: by describing Rainsberger's trash as a "straight object."
That phrase was obviously designed to imply that Rains-
berger disposed of the murder weapon, but the object that
Rainsberger threw away looks far more like a soda can than a
"straight object."[3] Viewed in Rainsberger's favor, the video
depicts him carrying a small nondescript piece of trash
through a parking lot and throwing it away near the entrance
to the grocery store—in broad daylight and while other pa-
trons are walking by.

   *The evidence of burglary.* Benner believed that Ruth's at-
tacker was someone she knew rather than a thief. Consistent
with that theory, Benner swore in the affidavit that nothing

---

[3] The district court did not address the shape of the trash, and its hypo-
thetical affidavit left intact Benner's statement that "Rainsberger placed
what appeared to be a straight object in the garbage can." After viewing
the video in the light most favorable to Rainsberger, we refer to the waste
simply as "trash" in evaluating the affidavit.

had been taken from the apartment. He noted that there was no sign of forced entry; that cash, a checkbook, and credit cards were still in the apartment; and that things were undisturbed apart from a few open drawers. But the district court concluded that a jury could find that Benner intentionally misled the prosecutor and magistrate in two respects. First, he failed to tell them that Ruth's purse and prescription medication were missing. Second, he stated that a lockbox containing savings bonds was untouched and in plain view, even though the lockbox was neither in plain view nor a repository of savings bonds.

*Rainsberger's concern for his mother*. Benner described Rainsberger as lacking concern for his mother. He stated that after Rainsberger called 911, he "went outside to wait for the ambulance" and "left his mother unattended until the police arrived." Benner conspicuously omitted Rainsberger's explanation for doing so—that he wanted to direct the ambulance to Ruth's apartment, which was hard to find. And continuing with this "callous son" theme, Benner asserted that when they were questioned on the day of the attack, "[a]t no time did Robert or his brother, Rainsberger, ever ask me how their mom was doing or if they could get to the hospital to see her." Benner knew, however, that Rainsberger was receiving updates by text from his sister Rebecca, who was at the hospital, and that Rainsberger had expressed concern about how he would get to the hospital from the police station. The district court concluded that a reasonable jury could find that Benner intentionally misled the prosecutor and magistrate.

*The polygraph*. Benner claimed in the affidavit that the Rainsberger children "stormed out" of the police station after he asked Rainsberger and Robert to take a polygraph test and

that he did not hear from them again. According to the district court, a reasonable jury could agree with Rainsberger that Benner's description of the Rainsbergers' departure was a lie, as was his claim that he didn't hear from them again.

## II.

Before us, Benner insists that he is entitled to qualified immunity even if all of the disputed facts are true. Qualified immunity involves a two-pronged inquiry: (1) whether the facts, read in favor of the non-moving party, amount to a constitutional violation; and (2) whether the constitutional right was clearly established at the time of the alleged violation. *McComas v. Brickley*, 673 F.3d 722, 725 (7th Cir. 2012). The officer wins if the answer to either question is "no." *Jacobs v. City of Chicago*, 215 F.3d 758, 766 (7th Cir. 2000). Courts often start with the second question, because if the law was not clearly established, there is no need to tackle the (often harder) question whether the challenged conduct violated the Constitution. *See Pearson v. Callahan*, 555 U.S. 223, 236–42 (2009). This case requires us to confront both issues, however, so we begin by analyzing whether Benner's alleged conduct violated Rainsberger's Fourth Amendment rights.

## A.

An officer violates the Fourth Amendment if he intentionally or recklessly includes false statements in a warrant application and those false statements were material to a finding of probable cause. *Hart v. Mannina*, 798 F.3d 578, 591 (7th Cir. 2015). An officer similarly violates the Fourth Amendment if he intentionally or recklessly withholds material information from a probable cause affidavit. *Whitlock v. Brown*, 596 F.3d 406, 410–11 (7th Cir. 2010). We use a straightforward method

to determine whether the alleged lies or omissions are material: "We eliminate the alleged false statements, incorporate any allegedly omitted facts, and then evaluate whether the resulting 'hypothetical' affidavit would establish probable cause." *Betker v. Gomez*, 692 F.3d 854, 862 (7th Cir. 2012).

With the lies stripped and the omissions added, Benner's case for probable cause boils down to this: Ruth's murderer might have been someone she knew, because the attack was not necessarily connected to a burglary. Some drawers had been opened and her purse and medication were missing; at the same time, there was no sign of a forced entry, and Ruth's checkbook, credit cards, and some cash were still in the apartment. Rainsberger had a key to her apartment, and cell phone records did not rule out the possibility that he was in the vicinity of her apartment complex when the attack happened. Shortly before he found his mother and called 911, Rainsberger stopped at a Kroger across the street from his mother's apartment to buy an iced tea. He walked in plain view through the Kroger parking lot carrying a piece of trash, which he threw away in a receptacle by a Redbox machine on his way into the store. He correctly described Ruth's injury as a blow to the head, even though he had not removed the blanket to see the wound. In contrast, the first responder, who did remove the blanket, initially thought that Ruth had been shot. Rainsberger and his two siblings would inherit about $33,000 apiece if his mother died. When Benner brought the Rainsberger children to the police station under false pretenses, Rainsberger and his brother refused Benner's request that they take a polygraph test. A week later, they voluntarily gave fingerprints and submitted to a DNA buccal swab.

As we have explained before, "probable cause is a common-sense inquiry requiring only a probability of criminal activity; it exists whenever an officer or a court has enough information to warrant a prudent person to believe criminal conduct has occurred." *Whitlock*, 596 F.3d at 411. It does not require proof of a crime; it is about "the degree of suspicion that attaches to particular types of non-criminal acts." *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983). Importantly, a probable cause inquiry does not take each fact in isolation; it depends on the totality of the circumstances. *District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018). Assessing the hypothetical affidavit therefore requires us to determine whether Rainsberger's behavior was suspicious enough that a prudent person aware of the full picture painted in the hypothetical affidavit could believe that Rainsberger murdered his mother.

A prudent person could not draw that conclusion on these facts. Many of them would be true of most children of aging parents: that Rainsberger had a key to her apartment, checked on her frequently, and stood (along with his siblings) to inherit whatever she left behind. These unremarkable facts would be reason to suspect Rainsberger only if other information cast them in a suspicious light. Benner sought that light with his theory that Ruth was murdered by someone she knew rather than a thief. Yet the evidence on that score was conflicting: while some valuables remained in the apartment, others were missing. Benner also suggested that Rainsberger's refusal to take a polygraph test reflected his consciousness of guilt. But that inference is weak, given that Benner had lured the Rainsberger children to the station with a lie and met them with a hostile demand for a polygraph test when they arrived. And the fact that Rainsberger tossed a

piece of trash into a garbage can in broad daylight on his way
into Kroger is neither here nor there. Without what a jury
could reasonably consider to be a grossly misleading descrip-
tion of the surveillance video, this trip to a trash can certainly
does not support the inference that Rainsberger disposed of
the murder weapon before going to Ruth's apartment.

Benner's best argument for turning this package of facts
into grounds for probable cause is that Rainsberger correctly
described his mother as having been hit in the head even
though he had not looked under the blanket. But this fact can-
not carry the weight Benner needs it to. Rainsberger's state-
ment was a reasonable inference from observable evidence;
he walked into his mother's house, saw her lying on the floor
and bleeding from her head, and concluded that someone had
hit her over the head. The cause of her injury was not so diffi-
cult to discern that knowing it suggested inside knowledge.
Indeed, the emergency personnel thought that the first re-
sponder's competing theory—that Ruth had been shot—was
counterintuitive, given the lack of telltale blood splatter on the
walls or ceiling.

The totality of these circumstances supports nothing more
than bare suspicion, and the Court has emphasized that prob-
able cause requires more than that. *See Brinegar v. United
States*, 338 U.S. 160, 175 (1949) (probable cause "mean[s] more
than bare suspicion"); *Henry v. United States*, 361 U.S. 98, 104
(1959) ("Under our system suspicion is not enough for an of-
ficer to lay hands on a citizen."); *see also Ebert v. Gaetz*, 610 F.3d
404, 413 (7th Cir. 2010) ("The officers must have more than a
bare suspicion that they have the right guy … ."); *Sherouse v.
Ratchner*, 573 F.3d 1055, 1062 (10th Cir. 2009) ("Where an of-

ficer observes inherently innocuous behavior that has plausible innocent explanations, it takes more than speculation or mere possibility to give rise to probable cause to arrest."). If probable cause exists here, then anyone who experiences the tragedy of discovering a murdered family member—and who correctly assesses the cause of the injury and recently threw something away in a public trash can—can be arrested for murder. Probable cause is a low bar, but this evidence does not clear it.

### B.

Benner tries to bolster the case for probable cause with inculpatory facts that he did not include in the affidavit. For example, he asserts that in his training and experience as a homicide detective, an attacker who covers his victim's head often has a personal relationship with the victim. He also says that in his experience, family members are typically eager to take polygraph tests so that the officer can get to work on finding the real culprit. According to Benner, this additional information can make up the difference if we think that the inculpatory evidence recited in the affidavit falls short.

Benner recognizes that we have never incorporated inculpatory evidence into a hypothetical affidavit in a civil suit like this.[4] But we have never expressly refused to do so either, and

---

[4] That said, he does stretch for some support from *Knox v. Smith*, 342 F.3d 651 (2003), which arose in the distinct context of a parole violation. In *Knox*, the plaintiff alleged that his parole officer lacked reasonable suspicion to believe that he had violated the conditions of his parole when she requested a warrant for his arrest on that ground. *Id.* at 656. He also alleged that at least one of the facts in the parole violation report prepared by the defendant and her supervisor was a lie. *Id.* at 658. According to Benner, *Knox* supports his "beyond the four corners" approach because

16                                    No. 17-2521

he argues that now is the time for us to embrace this approach. After all, he says, we go outside the four corners of the affidavit to consider omitted exculpatory evidence, so why not do the same for omitted inculpatory evidence? He emphasizes that officers do not have an obligation to include every inculpatory detail in a probable cause affidavit and warns that if we decline to consider omitted inculpatory facts, officers will feel forced to recite every detail in an affidavit to bolster any later claim of qualified immunity. He maintains that this would be inefficient and burdensome, particularly when the timeline is tight. And he contends that this rule might prompt officers to forgo warrants altogether, because if they are sued for making a warrantless arrest, they can defend by drawing on all available facts—not merely those they chose to include in an affidavit—to demonstrate that probable cause existed.

Benner's argument is misguided. It assumes that this suit is about whether Benner violated the Fourth Amendment's prohibition on "unreasonable searches and seizures" by arresting Rainsberger without probable cause. But that is not the allegation here. Rainsberger has sued Benner for violating the Fourth Amendment's guarantee that "no Warrants shall

---

we relied on inculpatory information that was outside the parole violation report in concluding that the officer was entitled to qualified immunity. But the parole violation report in *Knox* was not the same thing as a probable cause affidavit; it was a document that the officer and her supervisor prepared the day after the warrant had issued. *Id.* at 655. Indeed, there was no affidavit in *Knox* that could have marked the boundaries of our inquiry, because the parole officer requested a warrant via a page sent to her supervisor. *Id.* And *Knox* contains no discussion of what the officer's supervisor knew when the officer requested the warrant, much less the "four corners" issue that Benner raises.

issue, but upon probable cause, supported by Oath or affirmation … ." U.S. CONST. amend. IV. The Warrant Clause is not merely a probable-cause guarantee. It is a guarantee that a warrant will not issue unless a neutral and disinterested magistrate independently decides that probable cause exists. *Franks v. Delaware*, 438 U.S. 154, 164 (1978) ("The bulwark of Fourth Amendment protection, of course, is the Warrant Clause, requiring that, absent certain exceptions, police obtain a warrant from a neutral and disinterested magistrate before embarking upon a search."); *Johnson v. United States*, 333 U.S. 10, 14 (1948) ("Its protection consists in requiring that [evidentiary] inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime."). A magistrate can assess only the information that she is given; therefore, in testing the validity of a warrant, we consider only evidence that the magistrate had.[5] And "[i]f an affidavit is the only matter presented to the issuing magistrate … the warrant must stand or fall solely on the contents of the affidavit." *United States v. Roth*, 391 F.2d 507, 509 (1967); *see also United States v. Orozco*, 576 F.3d 745, 748 (7th Cir. 2009) ("When, as here, an affidavit is the only evidence presented to a judge to support a search warrant, the 'validity of the warrant rests

---

[5] For the sake of clarity, we emphasize that inculpatory evidence not included in the affidavit may be admissible with respect to an issue other than whether the warrant demonstrates probable cause. For example, it might be evidence of whether an officer acted knowingly or recklessly when he prepared the affidavit. *See, e.g., United States v. Williams*, 718 F.3d 644, 650 (7th Cir. 2013) (noting that the officers' omission of additional inculpatory evidence provided "a reasonable basis to believe that the police did not intend to mislead").

solely on the strength of the affidavit.'" (citation omitted)). Extrinsic evidence of guilt "cannot be used … to augment an otherwise defective affidavit." *Roth*, 391 F.2d at 509; *see also United States v. Harris*, 464 F.3d 733, 739 (7th Cir. 2006) ("Considering new information … that supported a finding of probable cause was beyond the trial court's analytical reach. Rather, its consideration of new information omitted from the warrant affidavit should have been limited to facts that did not support a finding of probable cause.").

Benner argues that a different rule should apply in a civil case to give the police officer greater protection when his individual liability is on the line. But the first prong of the qualified immunity analysis is not the one designed to specially protect the officer—that comes at the second prong, which limits the officer's liability to violations of clearly established law. In the first inquiry, we analyze whether the facts before us "make out a violation of a constitutional right." *Pearson*, 555 U.S. at 232. And the Fourth Amendment is violated when the magistrate's probable-cause determination is made based on an affidavit that fails to establish probable cause, no matter what extra-affidavit information the officer had. *Roth*, 391 F.2d at 509; *see also Orozco*, 576 F.3d at 748. Moreover, while we have never addressed the issue that Benner raises, we have held that other aspects of *Franks* apply equally in civil and criminal cases. *See Perlman v. City of Chicago*, 801 F.2d 262, 264–65 (7th Cir. 1986) (holding that *Franks*'s requirement of a "substantial preliminary showing" that the officer deliberately misrepresented facts in a warrant affidavit applies in civil as well as criminal actions). There is no reason to follow a different course here. *See id.* (asserting that there is "no reason to apply a standard different than that established by *Franks* to a civil action for damages based on an allegation that

a police officer deliberately misrepresented facts in a warrant affidavit").

It bears emphasis that there is no lack of symmetry between our willingness to go beyond the affidavit to consider evidence of innocence while staying strictly within it for evidence of guilt. Both rules are designed to protect the integrity of the warrant process. Refusing to add inculpatory information to a hypothetical affidavit enforces the Warrant Clause's requirement that warrants issue based on the judgment of a neutral magistrate rather than that of an interested police officer. Adding exculpatory information to a hypothetical affidavit permits us to determine whether the officer distorted the magistrate's judgment by suppressing material evidence.[6] An affidavit that misleads by lies or omission undercuts the magistrate's ability to make an independent probable cause determination. *See Franks*, 438 U.S. at 165 ("Because it is the magistrate who must determine independently whether there is probable cause, it would be an unthinkable imposition upon his authority if a warrant affidavit, revealed after the fact to contain a deliberately or recklessly false statement, were to stand beyond impeachment." (citations omitted)). It also vitiates the Clause's requirement that probable cause be supported by "Oath or affirmation." As the Court has observed, this language demands a "truthful" showing "in the

---

[6] The same concern drives our practice of excluding false information from a hypothetical affidavit. An affidavit that contains material lies contaminates the magistrate's assessment of probable cause. If probable cause exists without the lies, then the warrant issued on the strength of the honestly sworn facts. It therefore satisfies the Fourth Amendment's requirement that a warrant issue only "upon probable cause" demonstrated by facts "supported by Oath or affirmation." U.S. CONST. amend. IV.

sense that the information put forth is believed or appropriately accepted by the affiant as true." *Id.* An officer who swears that presented facts support probable cause when he knows that suppressed facts destroy it does not act truthfully. He therefore violates the Warrant Clause, which "surely takes the affiant's good faith as its premise." *Id.* at 164.

In sum, Benner's argument that he could have obtained a valid warrant if he had proceeded differently is beside the point. A hypothetical affidavit is not designed to determine whether an officer *could have* satisfied the Warrant Clause; it is to determine whether he *actually* satisfied it. And Benner did not, at least if the disputed facts are resolved in Rainsberger's favor.

### III.

We now turn to the second prong of the qualified immunity analysis: whether it would have been "clear to a reasonable official that his or her conduct was unlawful in the situation." *Carvajal v. Dominguez*, 542 F.3d 561, 566 (7th Cir. 2008). Benner argues that even if he violated Rainsberger's Fourth Amendment rights, the district court still wrongfully denied him qualified immunity. He concedes—as he must—that it violates clearly established law "to use deliberately falsified allegations to demonstrate probable cause." *Franks*, 438 U.S. at 168. Even so, Benner says, he is entitled to qualified immunity if the facts of the hypothetical affidavit demonstrate "arguable probable cause"—in other words, if a competent officer faced with the facts in the hypothetical affidavit could reasonably if mistakenly believe that those facts were sufficient to establish probable cause. Benner's argument takes some untangling, but its logic is this: (1) only material lies and omissions violate the Fourth Amendment, so the materiality of those lies and

omissions must be clearly established; (2) the court evaluates materiality by determining whether a hypothetical affidavit would demonstrate probable cause; (3) if a competent officer reviewing the hypothetical affidavit could reasonably but mistakenly conclude that it established probable cause, then the materiality of the false or omitted information was not "clearly established."

We have never applied the test that Benner proposes. There is a reason: it doesn't make sense. To begin with, Benner's framing has the proverbial reasonable officer facing a situation different from the one Benner did. Qualified immunity depends on whether it would have been "clear to a reasonable officer that his conduct was unlawful *in the situation he confronted*." *Wesby*, 138 S. Ct. at 590 (emphasis added) (citation omitted). In other words, the court puts a competent officer in the defendant's shoes, facing the same choice that the defendant did. Benner did not face a choice about whether the facts in the hypothetical affidavit established probable cause. He faced a choice about whether to make false or misleading statements in the affidavit. (He has also been faulted for excluding exculpatory evidence, but that presents different issues that we'll get to below.) Thus, the relevant question is what a well-trained officer would have thought about the lawfulness of *that* action. What Benner is really arguing, then, is that he is entitled to qualified immunity if a well-trained officer could "reasonably but mistakenly conclude" that it was lawful to include an incriminating lie in an affidavit because the lie wasn't material to the probable cause determination. *See Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

Of course, a competent officer would not even entertain the question whether it was lawful for him to lie in a probable

cause affidavit. The hypothetical officer in the qualified immunity analysis is one who acts in *good faith*. That is what the standard of "objective reasonableness" is designed to capture. *See Harlow v. Fitzgerald*, 457 U.S. 800, 815–19 (1982); *Malley v. Briggs*, 475 U.S. 335, 345 (1986); *cf. United States v. Leon*, 468 U.S. 897, 922–23 (1984) (establishing the "good faith exception" to the exclusionary rule). Indeed, protecting officers who act in objective good faith is the justification for qualified immunity. *Harlow*, 457 U.S. at 815, 819 n.34 (explaining that qualified immunity applies to suits "arising from actions within the scope of an official's duties and in *objective good faith*" (emphasis added) (internal quotation omitted)). It would be flatly inconsistent with that justification to imagine a competent officer considering the question whether a lie helpful to demonstrating probable cause is so helpful that he should not tell it. That is neither a reasonable question to ask nor a reasonable mistake to make.

Nonetheless, Benner maintains that we have previously embraced his approach. He seizes on a sentence in *Betker v. Gomez,* in which we asserted that "[a]n officer who knowingly or recklessly submitted an affidavit containing false statements may still get qualified immunity if he can establish that he had an objectively reasonable basis for believing the facts in the affidavit were sufficient to establish probable cause." *See* 692 F.3d at 860. Taken out of context, this sentence superficially supports Benner's position that he is entitled to qualified immunity if the hypothetical affidavit establishes "arguable probable cause." But his cherry-picking distorts what we actually said. In the very next sentence we explained: "But qualified immunity does not extend where an officer knowingly or recklessly made false statements and 'no accurate information sufficient to constitute probable cause attended the

No. 17-2521                                          23

false statements.'" *Id.* (quoting *Lawson v. Veruchi*, 637 F.3d 699, 705 (7th Cir. 2011)). Our analysis then proceeded as we do here: we constructed a hypothetical affidavit, determined whether it established actual probable cause, and denied qualified immunity because "immunity does not extend '[w]here the judicial finding of probable cause is based solely on information the officer knew to be false or would have known was false had he not recklessly disregarded the truth.'" *Id.* (alteration in original) (quoting *Olson v. Tyler*, 771 F.2d 277, 282 (7th Cir. 1985)). We never asked, much less analyzed, whether the officer in *Betker* had made a reasonable mistake about the materiality of his lies.

To summarize: if an officer knowingly or recklessly includes false information in an affidavit and that information is not material, he will not be liable in a § 1983 action because the plaintiff will not be able to prove a constitutional violation. But if that information is material, the officer is not entitled to qualified immunity. The unlawfulness of using deliberately falsified allegations to establish probable cause could not be clearer. *See, e.g.*, *Lawson*, 637 F.3d at 705 ("[I]t [i]s clearly established 'that a warrant request violates the Fourth Amendment if the requesting officer knowingly, intentionally, or with reckless disregard for the truth, makes false statements in requesting the warrant and the false statements were necessary to the determination that a warrant should issue.'" (citation omitted)); *Olson*, 771 F.2d at 281 ("If an officer submitted an affidavit that contained statements he knew to be false or would have known were false had he not recklessly disregarded the truth and no accurate information sufficient to constitute probable cause attended the false statements, not only is his conduct the active cause of the illegal arrest, but he

cannot be said to have acted in an objectively reasonable manner."). And the plaintiff need not show that the materiality of the lie would have been clear to a competent officer. The qualified immunity analysis uses the perspective of an officer acting in good faith, and an officer acting in good faith would not entertain that question.

An officer sued for failing to include materially exculpatory facts in a probable cause affidavit is differently situated. It violates clearly established law to "intentionally or recklessly withhold material information from a warrant application." *Whitlock*, 596 F.3d at 408. But while a competent officer would not ask whether the Fourth Amendment permits him to tell a particular lie, a competent officer would—indeed, must—consider whether the Fourth Amendment obligates him to disclose particular evidence. Because an officer acting in good faith could make a reasonable mistake about his disclosure obligation, the materiality of omitted facts, unlike the materiality of false statements, is properly part of the qualified-immunity analysis. We have repeatedly held, therefore, that an officer violates the Fourth Amendment by omission only if "it would have been clear to a reasonable officer that the omitted fact was material to the probable-cause determination." *See Leaver v. Shortess*, 844 F.3d 665, 669 (7th Cir. 2016); *see also Olson v. Tyler*, 825 F.2d 1116, 1121 (7th Cir. 1987) ("[O]nly where a reasonable officer can conclude that a withheld fact is irrelevant to probable cause should such an officer who withholds a known (or recklessly disregarded) fact be protected with qualified immunity.").

*Whitlock* provides an illustration. *See* 596 F.3d 406. There, campers picked up apparently abandoned bags in an Indiana

No. 17-2521                                                    25

state park, intending to turn them in to park authorities so that the property could be returned to its rightful owner. *Id.* at 408–09. But they forgot for several hours, the bags were reported stolen, and the campers were arrested for criminal conversion. *Id.* at 409. They sued the officer who obtained the warrant, alleging that he withheld a material fact by failing to include the campers' innocent explanation for taking the bags in his probable cause affidavit. *Id.* at 410. We held that the officer was entitled to qualified immunity. Because Indiana law on criminal conversion was undeveloped, a reasonable officer would not necessarily have known that the campers' explanation for taking the bags was material to the probable cause determination. *Id.* at 413. A well-trained officer could make a reasonable mistake about whether a given fact would negate probable cause.

Here, Benner has not argued that it would have been unclear to a reasonable officer that any of the information that he omitted was material to the probable cause determination. Thus, we need not address whether he made any reasonable mistakes in that regard.

\* \* \*

The district court correctly held that Benner is not entitled to qualified immunity, and its judgment is AFFIRMED.