UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

WILLIAM RAINSBERGER,              )
                                  )
          Plaintiff,              )
                                  )
VS.                               )   CIVIL ACTION NUMBER:
                                  )   1:16-CV-00103-WTL-MJD
CHARLES BENNER,                   )
                                  )
          Defendant.              )


     *************************************************

          ORAL|VIDEO CONFERENCE DEPOSITION OF

                   DR. KIM ROSSMO

                   APRIL 13, 2017


     *************************************************

     ORAL DEPOSITION OF DR. KIM ROSSMO, produced as a

witness at the instance of the Defendant, was duly

sworn, was taken in the above-styled and numbered cause

on the APRIL 13, 2017, from 2:14 p.m. to 4:32 p.m.,

before Chris Carpenter, CSR, in and for the State of

Texas, reported by machine shorthand, at the offices of

Kim Tindall & Associates, 2550 South Interstate 35,

Suite 110, Austin, TX, pursuant to the Federal Rules of

Civil Procedure and the provisions stated on the record

or attached hereto.

```
 1

 2                          A P P E A R A N C E S

 3    FOR THE PLAINTIFF:

 4          Richard A. Waples (by video conference)
            WAPLES & HANGER
 5          410 North Audubon Road
            Indianapolis, IN 46219
 6          (317) 357-0903
            rwaples@wapleshanger.com
 7
      FOR THE DEFENDANT:
 8
            Pamela G. Schneeman (by video conference)
 9          Deputy Chief Litigation Counsel
            Office of Corporation Counsel
10          200 East Washington Street
            Room 1601
11          Indianapolis, IN 46204
            (317) 327-3968
12          Pamela.Schneeman@indy.gov

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              INDEX

2    Appearances.......................................2

3    DR. KIM ROSSMO

4            Examination by Ms. Schneeman..............4
             Examination by Mr. Waples.................80
5
     Signature and Changes............................86
6
     Reporter's Certificate...........................88
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      THE REPORTER:  This is Chris Carpenter,

2  the court reporter.  Do you both want copies of the

3  deposition?

4      MS. SCHNEEMAN:  Can you send me -- this is

5  Pam Schneeman.  Can you send me an electronic copy, but

6  I -- I do like the condensed version with the index and

7  the exhibit.  Can it be sent that way?

8      THE REPORTER:  Yes, it can be sent

9  electronically with the exhibits attached.

10     MS. SCHNEEMAN:  Okay.

11     MR. WAPLES:  And this is Rich Waples, and

12  we probably will not order one right away, but if we

13  have your contact information, we will probably order

14  one before trial.  So, I think the doctor will read and

15  sign the deposition, so you can send the copy for that

16  directly to him for signature.

17     THE REPORTER:  Okay.

18          DR. KIM ROSSMO,

19  having been first duly sworn to testify the truth, the

20  whole truth, and nothing but the truth, testified as

21  follows:

22          EXAMINATION

23  BY MS. SCHNEEMAN:

24     Q.   Good afternoon, Doctor.  My name is Pam

25  Schneeman.  I'm an attorney for the City of

1    Indianapolis, and I'm representing Detective Charles

2    Benner in this lawsuit.  We've invited you to come today

3    to answer some questions we have about your expert

4    report, because we understand that you're going to be

5    serving as an expert for the plaintiff in the case.

6         A.   Good afternoon.

7         Q.   Just so we have it for the record, would you

8    please state and spell your name for the record?

9         A.   My name is Kim Rossmo, K-I-M  R-O-S-S-M-O.

10        Q.   Okay.  And were you ever contacted by an

11   attorney, David Hennessey, to assist with William

12   Rainsberger's underlying criminal case?

13        A.   No.

14        Q.   Okay.  When were you first contacted to assist

15   Plaintiff William Rainsberger in this civil litigation?

16        A.   I couldn't tell you the exact date, but it was

17   sometime in 2016.

18        Q.   Okay.  Do you know if it was spring, fall, the

19   season of the year?

20        A.   I have a record of it, but I don't have that

21   record with me, so I wouldn't want to guess.

22        Q.   Okay, that's fine.  And who first contacted you

23   about possibly being an expert in this case?

24        A.   Mr. Richard Waples.

25        Q.   And what did he tell you at that time?

1    A.    He indicated that he was representing William

2  Rainsberger in a civil matter regarding a wrongful

3  arrest for the murder of Ruth Rainsberger, William's

4  mother, and that the charges had been dropped against

5  him and that they were pursuing a civil case.

6    Q.    Okay.  And did he ask you to do anything at

7  that time?

8    A.    I think he wanted to discuss with me the

9  possibility of retaining me, so I had a short discussion

10  with him about how, you know, I approach that type of

11  thing and then we proceeded from there.

12    Q.    Okay.  And how -- how do you approach that type

13  of thing, that being deciding whether you will take on a

14  case as an expert?

15    A.    I should say that I take very few of these

16  cases.  Most of them either I choose not to be involved

17  with or the conditions under which I operate are not

18  satisfactory to the lawyer and so we don't proceed any

19  further.  I make it clear that I don't really engage in

20  cases where their only job is to attack or find

21  weaknesses in the investigation.  I'm only really

22  interested in working those cases where, I guess these

23  are the operative words, the client is factually

24  innocent.

25    Q.    Okay.  And so as part of deciding to take on

1    this case as an expert, did you make some kind of

2    determination that you thought Mr. Rainsberger was

3    factually innocent?

4        A.   What I normally would do, and I'll use the word

5    normally in parentheses because, as I say, many cases

6    don't even get to the next step, but what I would

7    normally do and what I believe I did in this case is I

8    asked for some basic information, and I tell the lawyer

9    that I'll take a look at this and spend maybe a day of

10   my time and then I'll let you know what I think I can --

11   I can do for you.

12            And in that case, Mr. -- in this case,

13   Mr. Waples wanted to proceed, so he sent me -- I believe

14   some of the first documents were some legal documents,

15   and I then asked for more information, and after -- at

16   some point within a few days, I said that I would be

17   willing to work on the case.

18       Q.   Okay.  Let me circle back to the question that

19   I asked earlier.  If I'm remembering your testimony, you

20   said that you wouldn't take a case unless you thought

21   the plaintiff was innocent.  And so my question was:

22   Did you make some kind of determination that William

23   Rainsberger was factually innocent?

24       A.   Yes.

25       Q.   Okay.  And --

1    A.    Or at least he appeared to be based on the

2  information that I was provided at that time.  You can't

3  make -- your evaluation will change as you look at more

4  information and more evidence.

5    Q.    Okay.  So if I understand your testimony,

6  you're telling me that you at least initially agreed to

7  take the case because you thought Mr. Rainsberger was

8  innocent?

9    A.    Correct.

10    Q.    And what -- what information did you consider

11  that caused you to believe that?

12    A.    That I saw no evidence that suggested he was

13  guilty.  Moreover, there were a number of problems in

14  the initial police investigation.

15    Q.    Okay.  It's my understanding from the

16  information you provided in your expert report that you

17  charge $400 an hour; is that correct?

18    A.    That's correct.

19    Q.    And has that been your fee arrangement with

20  Mr. Waples and Mr. Rainsberger throughout this entire

21  case?

22    A.    Correct.

23    Q.    Okay.  I was just curious if you had raised

24  your fees at any time or something like that.

25    A.    No.

1      Q.    And who is paying you for your time today?

2      A.    Well, I believe I'm being paid by Mr. Waples'

3   law firm.

4      Q.    What did you do to prepare for your deposition

5   today?

6      A.    I read over my report.

7      Q.    Okay.  Anything else?

8      A.    No, that's all.

9      Q.    Okay.  Are you aware that Mr. Waples deposed

10  Detective Sergeant Leslie Van Buskirk earlier today?

11     A.    No, I'm not aware of that.

12     Q.    Okay.  Have you had any conversations with

13  Mr. Waples or Mr. Rainsberger about a deposition of

14  Leslie Van Buskirk?

15     A.    I've had no conversations with Mr. Rainsberger

16  at all on any matter.  Regarding Mr. Waples, I knew that

17  there had been a report prepared by the defendants

18  regarding the use of her as some sort of expert rebuttal

19  witness and I -- I saw that document.  I didn't know

20  that -- if or when she was going to be deposed.

21     Q.    Okay.  So I was just curious if you considered

22  any of her testimony in formulating any further opinions

23  that you might have had in this matter?

24     A.    As I said, I read that document, which was not

25  really -- it was not her report.  I don't know if her

1  report informed that legal document.  But I didn't see

2  anything in that report that was particularly material,

3  and I -- I've not changed my opinion regarding anything.

4      Q.   Okay.  Thank you.  And I understand from our

5  conversation before we went on the record that you did

6  bring a copy of your expert report with you today.

7      A.   Yes.

8           MS. SCHNEEMAN:  Okay.  And we've agreed,

9  so I'll say it for the record, that we will be e-mailing

10  a copy of the report as it was already filed with the

11  court at docket number -- I believe it was 50-31.  So

12  we'll be making that an exhibit to this

13  deposition.  Agreed?  [emailing report?]

14           MR. WAPLES:  Yes.  And we're pretty sure

15  that's the right docket number.  If it's not, we'll get

16  the right docket number.  But that's our information

17  that that's the docket number.

18           MS. SCHNEEMAN:  Right.  Right.

19      Q.   (By Ms. Schneeman) Okay.  I just wanted to make

20  sure that you had a copy of your expert witness report

21  in case you wanted to refer to it.  I -- just to kind of

22  let you know where we're going with this, I have some

23  questions that I first want to start off asking you

24  about your CV, which is at the end of that document.  I

25  noticed at the top of your CV, it would be page 1 of 36,

1    and it's titled Texas State (indiscernible) Vitae.

2                    THE REPORTER:  You're breaking out.  Wait

3    a minute.  You broke out.  You said it's titled Texas

4    State?

5                    MS. SCHNEEMAN:  University Vitae,

6    V-I-T-A-E.

7        Q.    (By Ms. Schneeman) And there's what appears to

8    be a document number at the top right-hand corner.  It

9    reads PPS 8.10, Form 1A.  Do you see that?

10       A.    Yes, I do.

11       Q.    Does that have any meaning to you?

12       A.    The PPS is -- I think it stands for policy and

13   procedure statement or something similar.  They're just

14   forms and procedures -- sorry, procedures, policies, and

15   then in some cases associated forms that Texas State

16   University uses for various things.  I would suspect

17   that PPS 8.10 was about the format that we're supposed

18   to follow when we prepare our professional vitae for the

19   university.

20       Q.    Okay.  Thank you.  And that brings me to my

21   next question.  How long have you been with Texas State?

22       A.    It will be 14 years in August of this year.

23       Q.    Okay.  And you're a full tenured professor?

24       A.    Yes, I am.

25       Q.    Okay.  And how long have you been a full

1   tenured professor there?

2        A.    I think it will be ten years this September.

3        Q.    Okay.  I want to ask you some questions about

4   the courses that you've taught, and they're listed on

5   Page 2 of that vitae.

6        A.    Okay.

7        Q.    What is that first course, Environmental

8   Criminology?  Can you kind of briefly summarize that?

9        A.    Environmental criminology is concerned with the

10  influence of the built environment on crime patterns,

11  how, where and when they occur.  So, for example, the

12  street layout, the positions of rapid transit or bus

13  lines, where people live, zoning, where liquor

14  establishments and bars and nightclubs are located.  So

15  rather than like much of criminology, focusing on why

16  does someone decide to offend, it takes that as a given

17  and looks at the influence of the environmental on the

18  patterning of their crimes, particularly where and when.

19       Q.    Okay.  And the next class, Investigations, what

20  -- briefly summarize what was taught in that class.

21       A.    It's a class that I co-taught with Dr. Peter

22  Blair, and my particular portion of the class was on the

23  logic and rationale of investigative thinking, how to

24  understand and analyze evidence, and some of the

25  cognitive biases that can occur in that criminal

1   investigation.

2      Q.   Okay.  What -- what kind of students did you

3   have in that class?  Are those students working towards

4   like a BA or a BS?  It said master's level, maybe

5   they're university level master students?

6      A.   Yes, they would all be master students.  Some

7   would be just working towards a masters.  Some would

8   maybe be hoping to become doctorate students later.  For

9   that particular class, we probably had a higher

10  proportion of criminal justice professionals, such as

11  police officers, than we might see in a general class.

12     Q.   There were law enforcement professionals such

13  as patrol officers, sergeants, detectives, that sort of

14  thing, they were in the class as well?

15     A.   Correct.

16     Q.   Okay.  And those persons, would they be working

17  towards a degree or would that just -- the class was

18  open to them because of their profession?

19     A.   No, they would be working towards a degree.

20     Q.   What did you teach about the logic and

21  rationale of investigative thinking in that class?

22          MR. WAPLES:  Objection, overbroad.  You

23  can answer.

24     A.   I'm not sure I can because I don't have the

25  course syllabus handy and the last time I taught it was

1    a few years ago.  What I can remember is we would often

2    introduce some part of a well-known crime and ask

3    students to consider various theories of how the crime

4    occurred.  And then we would go back later and say, did

5    you rationally follow the evidence or did you, for

6    example, jump to a conclusion, which was a common

7    failing in the classroom in those classroom exercises.

8              But I should maybe mention one thing just

9    for clarification, Ms. Schneeman, because I'm a research

10   professor, I don't normally have teaching duties, so

11   I've taught very few classes compared to a typical

12   professor.  I've taught some, either because I was

13   interested in or to help out.  But normally I do not

14   teach.  And the last time I taught was probably four

15   years ago.  Last time I did the investigations class may

16   have been five years ago.  So my main job is to do

17   research.

18        Q.   Okay.  What sort of research do you focus on?

19        A.   Currently I have two National Institute of

20   Justice grants.  The National Institute of Justice is

21   the research body within the Department of the Justice.

22   One of those projects is looking at offender

23   decision-making, and the other one is looking at

24   criminal investigative failures within the sentinel

25   events' perspective.

1    Q.   With respect to your current research on

2    criminal investigative failures, you said with respect

3    to sentinel incidents?

4    A.   Sentinel events.

5    Q.   Sentinel events.  Explain what that is that

6    you're researching there.

7    A.   A few years ago, partly as a result of some

8    efforts by a Boston defense lawyer by the name of Jim

9    Doyle, there began to be a recognition within the

10   National Institute of Justice and within a number of

11   police and university and criminal justice agencies that

12   whenever we have a failure, rather than try to -- let's

13   take an example of a shooting that maybe shouldn't have

14   occurred.  So the traditional approach has been very

15   punitive in which you do -- you may get some justice

16   that way, but you don't necessarily learn from the

17   tragedy.  So the sentinel events' approach is adopted

18   from the transportation industry and from the medical

19   field, so that when an error occurs, there's an effort

20   to understand how things went wrong, why they went

21   wrong, with the idea of coming up with initiatives to

22   try to prevent those failures in the future.

23           So an airplane crash is, there's a very

24   comprehensive investigation as to why that occurred.  If

25   there's an unnecessary death that happened in a

1    hospital, the same thing.  And the goal is to, first of

2    all, recognize is that most of these failures have

3    multiple causes, and the second part of it is to figure

4    out what can be done to change things from a system-wide

5    perspective to prevent something like that from

6    happening in the future.

7              And so my particular research project is

8    taking a look at this within the context of what we call

9    criminal investigative failures.  Most criminal

10   investigative failures are wrongful convictions, at

11   least the ones we know about.  Some are crimes that

12   should have been solved that weren't.  And others are

13   crimes that were just ignored by police when -- and no

14   response was given to them and then that led to other

15   tragedies.

16        Q.   Okay.  So I guess if I understand your

17   testimony, even though there's some courses taught

18   listed here on your CV, that teaching isn't really your

19   area of focus, it's more research; is that correct?

20        A.   That's correct.

21        Q.   Okay.  And you probably haven't taught a class

22   in the classroom in the last four or five years.  Am I

23   understanding that as well?

24        A.   I'm going to say at least four years, yes.

25        Q.   Okay.

1      A.    To be clear, though, I do a lot of teaching

2   through presentations, but in terms of a formal Texas

3   State class, not for four years.

4      Q.    Okay.  The teaching that you do, is it -- I

5   guess you mentioned the -- like not the course teaching

6   but I guess the periodic presentations, is that a good

7   way to put it?

8      A.    Seminars, presentations, talks, guest lectures.

9      Q.    Right.  What types of groups do you make those

10  presentations to?

11     A.    It's very varied.  Many are to police officers,

12  homicide detectives, forensic scientists, defense

13  lawyers, occasionally prosecutors, many universities.  I

14  just returned from a homicide conference in Wisconsin,

15  and that was a state-wide collection of people in police

16  and related fields like coroner's offices, and so that's

17  one example.  I gave one not too long ago to the Arizona

18  State Homicide Investigators Association.  I'm giving a

19  university talk, university-wide talk next week.  So I

20  would say probably roughly equally between academics and

21  professionals and then sometimes just other groups that

22  might be interested in something.

23     Q.    Right.  Now, when I looked through the

24  different -- if I'm reading your CV correctly, it looks

25  like you have done a lot of work in the subject of

 1 | geographic profiling; is that correct?

 2 |     A.    That is right.

 3 |     Q.    Yeah.   Is that your main area of expertise?

 4 |     A.    I would say that I have two main areas.   One of

 5 | them is the geography of crime, and the other is

 6 | criminal investigative failures.   They both intersect in

 7 | the area of criminal investigations.

 8 |     Q.    Okay.   Now, I understand that you -- you have

 9 | actually been a police officer yourself; is that

10 | correct?

11 |     A.    That's correct.

12 |     Q.    Okay.   And that was in Canada?

13 |     A.    That was Vancouver, British Columbia, Canada.

14 |     Q.    Okay.   And remind me, what years were you a

15 | police officer, from what year to what year?

16 |     A.    I started with the Vancouver police department

17 | in 1978 as civilian communications section.   In January

18 | 1980, I became a sworn officer, and I was with them

19 | until the end of December 2000.

20 |     Q.    Okay.   And during -- during that period of time

21 | that you were with that agency, did you have

22 | responsibility for investigating homicides?

23 |     A.    I was not a homicide detective, but for my last

24 | five years, I was detective inspector in charge of our

25 | geographic profiling section, and most of the cases that

1  we worked on were serial murder or serial rape cases.

2      Q.    I'm sorry, you said serial murder and serial

3  rape?

4      A.    Yes.

5      Q.    And what did your duties and responsibilities

6  include as the --

7              (Phone interruption.)

8              MS. SCHNEEMAN:   Sorry, we got a phone call

9  going here.

10     Q.    (By Ms. Schneeman) So you said that the last

11  five years you were with the department --

12     A.    The last five years I was the officer in charge

13  of a section within the Vancouver Police Department

14  called the Geographic Profiling Section.

15     Q.    Right.   Okay.   And so what were your duties and

16  responsibilities as the officer in charge of that

17  section?

18     A.    To prepare geographic profiles and give

19  investigative advice for appropriate cases for our

20  agency, for other Canadian police agencies and for other

21  agencies internationally.

22     Q.    And if I'm understanding from your earlier

23  testimony that geographic profiling, that has to do with

24  how the geography or the scene influences crime?

25     A.    Yes, specifically, geographic profiling is a

1   quantitative analysis of the crime locations of a

2   connected series, so we would analyze where the crimes

3   occurred, associated, say, with a particular serial

4   killer.   Through a computer program we would then do a

5   number of calculations that would produce maps that

6   would outline the most probable area where the offender

7   was based or where he resided.   This would then be used

8   by investigations for their strategies, for example,

9   prioritizing suspects.

10      Q.   So would that involve, once you've mapped a

11  particular area and you're looking for, I guess,

12  patterns of where crime occurs, then you look for

13  suspects within that area?

14      A.   Yes.   Think of it as working backwards.   One

15  kind of simplified example would be if you had one of

16  those old water sprinklers that went around in a circle

17  and then you took away the water sprinkler afterwards,

18  you could look at where the grass was wet and figure out

19  where the water sprinkler was.   I mean, that's -- that's

20  horribly simplified, but it's the idea.   The idea that

21  any given crime location doesn't tell you much, but if

22  you have a series of them, then you can produce

23  probability surfaces or maps that give you some idea of

24  where to try to find the needle in a haystack.   These

25  cases often involve hundreds or thousands of suspects so

1    where do you start?  And geography is one way of

2    prioritizing them.  Not the only way, by any means.

3        Q.   Okay.  Now, I know from your CV you provided

4    some testimony in the David Camm criminal case here in

5    Indiana; is that correct?

6        A.   That's correct.

7        Q.   And did you -- were you providing that

8    testimony for the prosecutor or the defense?

9        A.   For the defense.

10       Q.   Do you remember the attorneys that you worked

11   with?

12       A.   Stacy Uliana.

13       Q.   Do you remember how to the spell her last name?

14       A.   U-L-I-A-N-A.

15       Q.   And did you prepare a written report, maybe

16   something maybe not as long as the one you prepared in

17   this case, but did you prepare any kind of written

18   report in the David Camm case?

19       A.   Yes, I did.  Well, I had a report.  I don't

20   know if it was something that became evidence, but I

21   wrote a report for my purposes.

22       Q.   Okay.  And do you know how many times David

23   Camm went to trial?

24       A.   In this criminal matter, three times.

25       Q.   Yeah.  Were you employed for the third of the

1    three?

2        A.    Yes.

3        Q.    Okay.   And I wasn't sure from your CV whether

4    you gave trial testimony or deposition testimony.    Do

5    you recall?

6        A.    In the Camm matter?

7        Q.    Yes.

8        A.    I gave a deposition similar to this, but it was

9    just by telephone, and then I testified in the trial.

10       Q.    Okay.   So, actually, you did both?

11       A.    Yes.

12       Q.    Okay.   And it looks like from your CV, so

13   correct me if I'm wrong, and I know you did say earlier

14   that you don't take many expert witness cases, but so in

15   the last four years, other than the case that we're here

16   today and the and the David Camm case (sound fading out)

17   --

18           THE REPORTER:   Wait a minute.   When you're

19   doing that, that's cutting her out.

20           THE WITNESS:   Oh, sorry.   Okay.

21           THE REPORTER:   I'm sorry, we were touching

22   the microphone there and cutting you out, so.

23           THE WITNESS:   Moving papers around.   I'm

24   sorry.

25           THE REPORTER:   "Other than the case that

1  we're here for today and the David Camm case"?

2      A.    The David --

3      Q.    (By Ms. Schneeman) Yeah.

4      A.    The David Camm case is the only case in the

5  last -- I think, was it four years, that I gave

6  testimony for.

7      Q.    Okay.  If we go could go back another four

8  years, have you given -- been retained to provide any

9  kind of expert testimony in cases going back eight

10  years?

11      A.    I'm not quite sure how to answer that, again,

12  without checking dates, and depends how you define

13  expert testimony.  I've been retained to do expert work

14  but not testified.  I've testified at commissions of

15  inquiry because of my expertise but also because of my

16  involvement in some other cases.

17      Q.    Okay.  Well, let me ask you about that.

18  Commissions of inquiry, I have to say I don't do

19  criminal law so I -- it's not a term I'm familiar with

20  here in Indiana.  Is that something that they --

21  commissions of inquiry, is that something that they do

22  down in Texas?

23      A.    No, in Canada.

24      Q.    Oh, in Canada, okay.  And is that sort of -- is

25  that natural analogous like a grand jury in the States?

1    A.    No, I guess maybe the closest thing might be

2    like Senate hearings or investigations.  So they would

3    be commissioned by a federal or provincial government to

4    look at something that went wrong, with the idea being

5    to figure out what occurred and what should happen in

6    the future.

7    Q.    Okay.  So it's -- correct me if I'm wrong.  I'm

8    just trying to get an understanding.  It would be sort

9    of like an internal investigation almost where something

10   has gone wrong and they're trying to figure out how to

11   prevent it from happening in the future so this

12   commission of inquiry is established and they're sort of

13   kind of doing an internal investigation?

14   A.    Maybe I would say internal is not the best

15   word, because it would involve multiple agencies and

16   multiple people.  They have subpoena power and often

17   they go on for months, if not years.

18   Q.    Okay.  I think that gives me an idea of the

19   kind of work that you've done.

20         When is the last time that you were

21   involved in providing testimony for one of the

22   commissions of inquiry up in Canada?

23   A.    It would have been -- I probably could tell you

24   from my vitae, but it was the commission inquiry in to

25   the missing women case in Vancouver, which would have

1    been around 2010.  And it involved a matter of a number

2    of street sex trade workers who had gone missing.  Our

3    police department really ignored the problem or

4    underplayed it, coming to a conclusion that they had

5    just moved somewhere else.  And that resulted in several

6    more murders occurring.  They had actually been victims

7    of a serial killer known in the press as the pig farmer.

8    And he -- I think they found the DNA for 37 different

9    women, but he probably did about 49.  So it was a major

10   disaster, and the province had an inquiry in to what

11   went wrong.  And I was asked as to testify for that.  I

12   believe, yeah, 2012.  Missing -- I gave evidence as an

13   expert for the British Columbia missing women commission

14   of inquiry.

15       Q.   Okay.  And if I understand what you're telling

16   me, the situation that they were trying to address there

17   is why they couldn't find the suspect or the

18   perpetrator?

19       A.   They --

20       Q.   -- when they needed --

21       A.   They weren't even looking for him, which was

22   what the problem was, and when they did, they were

23   seriously underresourced.  They didn't take the problem

24   seriously enough.

25            Ma'am, if this is any help, on my full

1   vitae, the university vitae, at the bottom of page 25,

2   the top of 26, are a list of consultancies that I've

3   been involved in, and they include the commission

4   inquiries and some of the other case reviews that I've

5   done for different agencies that relate to such aspects

6   of wrongful convictions or failed investigations.

7       Q.   Okay.  Thank you.  I -- that is helpful because

8   I guess I didn't -- I didn't recognize what that was

9   exactly.

10          So on that Page 25 of 36, the report on

11  confirmation bias in the David Camm murder cases, that

12  was a consultancy.  What did that involve and who did

13  you report to?

14      A.   Sorry.  Do you mean my role during the criminal

15  trial of David Camm?

16      Q.   Well, you just referred me to Page 25 of 36 of

17  your Texas University CV and the section on

18  consultancies, and you have listed four down, if you're

19  there with me.

20      A.   Oh, oh, yes, okay.  Yes, that was what we were

21  talking about before.

22      Q.   Okay.  So it's kind of listed there on your

23  resumé twice, but it's the same thing.

24      A.   Where --

25      Q.   That wasn't -- that wasn't a separate

1  independent commission.  You provided the expert

2  services in connection with the criminal proceedings.

3  A.   Can I just --

4  Q.   Uh-huh.

5  A.   Sorry, can I -- you say it's listed twice, so

6  just to double-check, can you tell me the other place

7  it's listed?

8  Q.   Sure.  This may not be on your actual CV, but

9  on Page 63 of your expert report, it says a list of all

10  other cases in which during the previous four years the

11  witness testified as an expert at trial or by

12  deposition, and it lists State of Indiana versus David

13  Camm.  And then you're calling that a consultancy on

14  your CV on Page 25, so that's the same thing?

15  A.   Yes.

16  Q.   Okay.  I got it.  What's the review of the

17  Stevens police investigation in Fredericksburg, Texas

18  about?

19  A.   It was -- I'm sorry, you have to excuse me

20  because I take a look at a lot of investigations over

21  the course of a year so I'm -- just don't want to mix

22  something up.  But it had to do with a sexual assault

23  allegation made by a student to a teacher in her school,

24  and the response by the police and the school to her

25  allegation was dismissive.  The teacher had a prior

1   history of having some sort of improper relationship

2   with a -- with a high school student, as well, and I was

3   asked to take a look at whether or not I thought there

4   were problems with how the police had investigate --

5   investigated the matter.

6       Q.    Okay.  So I think the -- the impression that

7   I'm getting of what you do is that you -- you look for

8   police failures, not only in what they actually did, but

9   in what they failed to do.  So when they don't

10  investigate something at all, you're also analyzing

11  those types of situations.

12      A.    Well, just to put this into context, I don't

13  look for anything.  I get approached.  I probably -- and

14  there's many police investigations that I get involved

15  with for the police that you don't see listed here

16  because my involvement is -- is -- if the investigation

17  is ongoing, then I'll typically not list it.  So we're

18  not looking at that part of it.  We're only looking at

19  the ones here that I've listed where there's some major

20  consultation that's not an ongoing operational police

21  matter.  So I just wanted to clear that up.  So most of

22  my -- my work of that nature is assisting the police in

23  an unsolved crime or investigation.  There will be other

24  times where things didn't go well, and I would be

25  approached to ask if I could provide some help.  And

1    that could be one of two forms.  It could be we're still

2    trying to catch the guy.  We made a mistake some years

3    ago, we screwed up.  Is there anything here we need to

4    think about or to reconsider.  Other times it will be

5    more operational or more administrative in nature.  So,

6    for example, I think one of the ones listed here is for

7    the case review of the John Jerome wrongful conviction,

8    so that was done for the Georgia bureau of

9    investigation, and they wanted to know where they erred,

10   what they might be able to do to prevent such errors

11   from occurring in the future.

12          You know, the one below is quite a typical

13   one.  It was the cold case review for an unsolved

14   homicide of, actually, someone that lived in San Marcos

15   many, many years ago, and they were looking for new

16   ideas.

17          In a case that's going to go to like a

18   civil matter or a wrongful conviction -- sorry, a

19   criminal trial where there may be a wrongful conviction

20   involved, I might get involved there if I think there

21   were problems in the investigation.  Maybe if I go to

22   your original question, the problem could be one or two

23   forms.  Something that was done that shouldn't have been

24   done and something that wasn't done that should have

25   been done.

1    Q.   Have you ever met Charles Benner, the defendant
2  in this lawsuit?
3    A.   No.
4    Q.   Other than reading his deposition transcript in
5  this case, you've not talked with him, have you?
6    A.   I've not talked with him, no.
7    Q.   Do you know anything about his work in other
8  cases, other investigations that he's handled?
9    A.   No.
10   Q.   On Page 4 of your expert report, you have
11 written that Benner decided (audio breaking out) --
12            THE REPORTER:   You're breaking out.
13 You'll have to start over on that question.
14   Q.   (By Ms. Schneeman) Doctor, on Page 4 of your
15 expert report, you wrote that in less than a day, Benner
16 determined that William Rainsberger was guilty.  Are you
17 with me there?
18   A.   So is it the section called Introduction?
19   Q.   Yes.
20   A.   Yes, okay, go ahead.
21   Q.   Okay.  Based on what fact do you draw the
22 conclusion that Benner decided that Rainsberger was
23 guilty within a day?
24   A.   Based on his actions and the depositions of
25 William Robert and Rebecca Rainsberger and of the

1    various depositions and testimonies of Detective Benner.

2       Q.    Okay.   What specifically about Benner's actions

3    caused you to draw the conclusion that Benner concluded

4    Rainsberger was guilty within a day?

5       A.    Well, the beginning, he is the son of a murder

6    victim, and the police lock him in a police car.   Don't

7    allow him to use a bathroom.   They then take him to the

8    police station and then bring him back the next day.

9    But this -- if you give me a moment, I can find specific

10   quotations from Detective Benner regarding --

11      Q.    Well, let's -- sure.   Let me follow-up on what

12   you said while you're looking there.   Why do you think

13   that the conclusion was made he was guilty because he

14   was Ruth Benner's son?   Let's break this down.

15      A.    Okay.   So you've asked me two things, so let me

16   first of all look for the first question, and then I'll

17   come back to the second question.

18      Q.    Right.   Well, my first question was within a

19   day, and I asked about the actions and you wanted to

20   turn to testimony and I want to focus on the actions

21   first, which is -- which is what I wanted to focus on.

22      A.    Maybe I don't understand.   Not being there, all

23   I can go on is the -- the testimony or the statements of

24   the people that were there.   So I didn't see anything

25   myself.   And so I'm just now trying to find those

1    quotations from Detective Benner where he indicated when
2    he came to that conclusion.
3        Q.    Okay.
4        A.    So he makes -- on Page 30, he has some quotes
5    about his -- a belief that he has, an erroneous belief,
6    but a belief that he has that he said learned in
7    homicide school that covering the victim's face shows a
8    personal attachment, so it indicates that as assuming as
9    he heard about that, he was starting to look at
10   something personal.  His concluding line is, "All these
11   things together, you could say seems suspicious to me at
12   the time," at the time being when he first arrived at
13   the crime site.  His conclusion that nothing had been
14   burglarized or nothing had been rifled through, there
15   was no forced entry.  So that's the first indication.
16   As the homicide detective at the scene, he's in charge
17   of it, and so he's in charge of how William Rainsberger
18   was treated, which certainly was not how would you treat
19   the victim of a homicide -- or sorry, a relative of a
20   homicide victim on the same day that she was discovered.
21   You know, basically locking somebody into the back of a
22   police car, whatever you may call it afterwards, is
23   confining him and placing him under some form of arrest.
24   And you -- that would indicate a lot about what he was
25   thinking about the -- about the suspicions of William

1    Rainsberger.  He makes other comments about how, by the

2    next day, during the -- his efforts to trick the family

3    to come down to police headquarters to do a polygraph

4    test, and then they became upset.  And this was all

5    within 24 hours of the phone call that at that point in

6    time, he had come to the conclusion that he was the

7    prime suspect.  Again, I'm just trying to find you the

8    exact quotation.

9        Q.    Direct me where in your expert report Benner

10   said within 24 hours he concluded Rainsberger was

11   guilty.  And that's Rainsberger, meaning, William.

12       A.    Okay.  So there's a number of pieces here.

13   I'll just sort of point them out as I go along.  Page

14   33, he tells Rebecca Rainsberger that his strategy is

15   every homicide investigation starts with the family.

16       Q.    Okay.  Where -- okay.  You say on Page 33 you

17   got a quote from Detective Benner where he told Rebecca?

18       A.    Yes.

19       Q.    Okay.

20       A.    He told Rebecca his -- right at the top, his

21   strategy was --

22       Q.    What Rebecca says, right, not what -- what

23   Benner said?

24       A.    What Rebecca said.

25       Q.    Right.  You're -- you're trusting that Rebecca

1    was telling you the truth about that?

2        A.    Well, like -- as I said, ma'am, I wasn't there

3    at the time, so I can only go on the statements, on the

4    testimony, the depositions of the people that were

5    there.  But if you give me a moment, I -- I will find

6    the part where Detective Benner basically comes to the

7    same conclusion, and I believe it's where he -- the part

8    where -- just give me a moment and I will find it,

9    rather than me trying to guess.

10                  The last paragraph, this is on Page 4:

11                  "I spoke to Becky the day after the

12   autopsy, and I think I made it pretty clear at that

13   point that William was a suspect in the case.  But it

14   was very clear to the family that William was a suspect

15   in the case, so I saw no need to call her.  I --

16   referring to call her back and tell her that at that

17   point."

18                  "So you never returned her calls?"

19                  "I did not, no."  And then there is --

20       Q.    Okay.  After the autopsy --

21       A.    Yeah.

22       Q.    -- in the middle of Page 24.

23       A.    Yeah.

24       Q.    Okay.  And do you know what day the autopsy was

25   done?

1    A.    She -- the day after she was found by her son,

2  and then I think it was done in the early morning hours

3  or something like that.

4    Q.    Well, let me ask you a question about that.

5  Determining that a person is a suspect is different than

6  determining that they're guilty, correct?

7    A.    That's correct.

8    Q.    Okay.  And guilt and probable cause are two

9  separate concepts, two different things, right?

10    A.    Correct.

11    Q.    And so are you telling us that it was

12  inappropriate for Detective Benner to identify William

13  Rainsberger as a possible suspect within a day of the

14  murder?

15    A.    There's an old saying in a homicide

16  investigation that everyone is a suspect.  It just comes

17  down to a matter of degree.  And his -- first of all,

18  his treatment of the Rainsbergers was premature and very

19  unprofessional.  And then the subsequent arrest of

20  William Rainsberger, based on the evidence outlined in

21  his initial probable cause, was -- was not reasonable or

22  justified.

23    Q.    Okay.  Well, I want to focus on -- I want to

24  focus on the statement that you've made about Benner

25  determining that Rainsberger was guilty.  What is your

1    understanding of the term guilt?

2         A.    My understanding of the term guilt?

3         Q.    Yes, as a legal concept.   You've used the word

4    in your report.

5         A.    Well, if you believe someone is guilty, then

6    you believe that they're the one responsible for the

7    crime within the legal definition.

8         Q.    Okay.   And why do you think that -- you read

9    for me your own report and Detective Benner's words that

10   he had identified Rainsberger as a suspect, but you're

11   saying in your report that Benner had concluded he was

12   guilty.   Why are you drawing that conclusion?   That

13   seems like your conclusion, not Benner's conclusion.

14        A.    Well, if he considered William to just be a

15   suspect, he would have expected him to explore all

16   viable options, including the other Rainsberger

17   children, including the -- the drug deal-burglary -- or

18   the drug matter-burglary gone wrong, any number of other

19   things.   And it was very clear that he became almost

20   completely focused on William Rainsberger, and the

21   efforts he made on those other matters were minimal to

22   nonexistent.

23              And the report outlines a number of those

24   examples.   For -- for instance, how -- the brother and

25   the sister of Bill Rainsberger were treated, even though

1  most of the elements in the probable cause also applied

2  to them.   Failure to obtain certain elements of physical

3  evidence.   And most problematic, I guess, would be his

4  failure to search around the apartment building to

5  identify the people in the apartment complex.

6      Q.   Okay.  Well, let me ask you this then:   How

7  many -- do you think that a detective investigating, I

8  suppose, any crime, but a homicide, in particular,

9  should wait a particular number of days or weeks or

10 months before identifying a suspect?

11     A.   Well, as I said before, you start off in --

12 there are multiple suspects.  If you jump to a

13 conclusion and say --

14     Q.   So are you -- is a -- is a detective required

15 to wait a certain number of days?  It seems that you're

16 putting emphasis in that William Rainsberger was

17 identified as a suspect within a day, and you're

18 suggesting that that's inappropriate.  So my question

19 is:   Is there a particular number of days that a

20 detective should wait?

21     A.   It has really nothing to do so much with the

22 time as it has to do with the evidence in the case.  So

23 at this point in time, the physical -- the laboratory

24 analysis of the physical evidence hadn't been --

25     Q.   I'm sorry, I didn't pick up a word.  The --

1    A.    The analysis of the physical evidence recovered

2    from the crime scene had not been completed.    The

3    neighborhood canvas had not been done.    The proper

4    analysis of the phone records had not been done.    All

5    the things that you would expect an investigation to do

6    in terms of establishing what are the reliable facts in

7    the case had not occurred.    What Bennet did was he

8    jumped to, "oh, a family member" and -- and he didn't

9    change his mind after that.

10    Q.    But you agree with me there's a difference

11    between identifying someone as a suspect and concluding

12    that they're guilty, correct?

13    A.    Yes, I agree with you.

14    Q.    Okay.    And you also agree that there's a

15    difference between probable cause for an arrest and

16    guilt.    Do you agree?

17    A.    Well, they're sort of different concepts.

18    Q.    Exactly.    And you've written down there that in

19    less than a day Benner concluded that Rainsberger was

20    guilty, not just that he was a suspect, not just there

21    might have been probable cause to further investigate,

22    that he was guilty.

23    A.    Well, there's -- I think we're mixing up some

24    things here.    So, first of all, is he a suspect?    Yes,

25    and so were hundreds of other potential people.    Anyone

1    with a prior criminal --

2        Q.    Let me ask you, what --

3        A.    Well, can I -- can I finish the question --

4        Q.    Well --

5        A.    -- answer the question?

6        Q.    Yes, go right ahead.

7        A.    Okay.  So the suspects would have included

8    individuals engaged in possible stranger crimes in that

9    area, should have been considered suspects.  The --

10   William, Robert and Rebecca Rainsberger would have all

11   been considered suspects.  Anyone else, there would have

12   been some association to the victim, could have been a

13   suspect as well.  So you -- you have all these suspects

14   and then you start -- you don't go out and arrest them

15   all.  You don't jump to a conclusion that that's the

16   person before you have your evidence and you've analyzed

17   your evidence and you've thought about your evidence.

18   And that's -- that's not what happened in this case.

19       Q.    Right.  William Rainsberger wasn't arrested

20   immediately though, correct?  (indiscernible) wasn't

21   filed for several months.

22       A.    Well, we can argue whether locking him in the

23   back of a police car is an arrest or not, but --

24       Q.    He wasn't taken into custody and charged for a

25   crime at that point, correct?

1           MR. WAPLES:  Objection, compound question.

2      Q.    (By Ms. Schneeman) You can go ahead.

3      A.    Yeah.  Well, I would say he was taken into

4  custody, so, you know.  Now, there was also some effort

5  earlier on to try to lay charges, though the prosecutor

6  felt more evidence was required.  So they -- I think

7  they recognized how weak the case was.  At the end of

8  the day, and, of course, the case was dropped, the

9  evidence was so bad.

10     Q.    Well, let me ask you this:  Are there certain

11  investigatory steps that you believe a detective must

12  perform before he or she can identify someone that is a

13  suspect?

14     A.    Yeah, they should collect the evidence and

15  analyze it.  They need to consider a theory that

16  explains the evidence.  They need to consider

17  alternative theories.  They don't walk into a crime

18  scene and go, hey, you know, I'm experienced, I'm good,

19  I know what happened here.

20     Q.    And you never talked with Detective Benner, and

21  you think he thought he thought that?

22          MR. WAPLES:  Objection, asked and

23  answered, argumentative.

24     Q.    (By Ms. Schneeman) You're -- you're thinking

25  that that had to be what was in Detective Benner's mind.

1    A.   I don't know what was in Detective Benner's

2    mind, but I know what he said in his testimony and his

3    depositions.

4    Q.   Is it your opinion that family members of a

5    murder victim should not be immediately interviewed?

6    A.   I think you need to balance the circumstances

7    and the tragedy, because in many cases, the family

8    member will not be responsible.  We're kind of --

9    Detective Benner does this:  He conflates the

10    probability of a murder created by someone in a

11    relationship with family generally.  And I think in the

12    report there's some specific statistics from the FBI

13    about how unlikely it is that a son will murder the

14    mother.  So we have to make sure that we separate out

15    the relationship probability in a family murder

16    situation with some other relationships such as being

17    the son of the murder victim.  That's not particularly

18    high.  In fact, it's much lower than the probability of

19    a stranger committing such a murder.

20    Q.   And in your conclusion, I know you said earlier

21    that you don't take a case unless you think the person

22    is innocent and you're -- you've come to the conclusion,

23    based on what you reviewed, that this was a stranger

24    break-in gone bad crime?

25    A.   I've -- I've come to no conclusion regarding

1   who did it.  I've come to the conclusion that this was a

2   flawed investigation.

3       Q.   Okay.  Well, that wasn't my question.  I --

4   your conclusion is that this was a burglary gone bad?

5       A.   No, I never said that, and I did answer your

6   question ma'am.  I said I have no conclusion about who

7   did this.  I was not asked to investigate this case.  I

8   could not investigate this case at this point in time

9   with the information that I have.  I can only analyze

10  the nature of the criminal investigations in the

11  presence of tunnel vision and confirmation bias.

12      Q.   Okay.  Well, let me refer you to Page 31 of

13  your expert report.  At the top you state, "Benner

14  failed to consider the very real possibility that the

15  murder was a burglary or robbery gone bad."  I'm getting

16  the impression that you think that that's what happened.

17  That's not the case?

18      A.   Well, what I said in the report, it's a very

19  real possibility.  One that should not be discounted,

20  one that needs to be investigated and explored.  But you

21  can't say that's my conclusion because I say it's a real

22  possibility.  And unfortunately, that investigation,

23  that aspect of the investigation did not occur.  We have

24  no list of all the tenants.  This really was one of the

25  worst neighborhood canvasses that I've -- I've reviewed.

1    People had the opportunity to move away before Detective

2    Benner went back there.  He didn't think it was

3    important to look in the -- the trash disposing unit for

4    the apartment building, even though the murder weapon

5    had not been found.

6              There's -- there's a half-life of

7    evidence.  So that means that physical evidence,

8    witnesses, witnesses' memories, all start to deteriorate

9    for one reason or another over time.  So you have to

10   respond quickly to get that information.  If you leave

11   it, then it becomes much more difficult.  And that's

12   what happened in this case.  There were -- there were

13   serious lags in the -- in the timeline involved here

14   because of the other cases Detective Benner was working

15   on.

16       Q.    Okay.  Well, what do you know about the other

17   cases he was working on?

18       A.    Just what he and Detective Tutor said, that

19   they had maybe five or six other cases they were

20   juggling and they couldn't keep coming back to this case

21   all the time.

22       Q.    How many cases do you think is appropriate for

23   a homicide detective in a city the size of Indianapolis

24   to have on a routine basis?

25       A.    Well, I don't know the size of the homicide

1   unit in Indianapolis, but I do know that you need enough

2   homicide detectives to properly investigate a case.

3   This case was not properly investigated.

4        Q.   Okay.  Well, do you think that one homicide

5   detective can handle five cases at one time?

6        A.   No, I don't think so.

7        Q.   And why?  What do you base that opinion on?

8        A.   Well, a typical response by the more

9   professional homicide teams are four detectives assigned

10  to a case with support from patrol officers.  The need

11  to do a physical -- careful physical search of the

12  entire area and identify all the tenants and visitors to

13  those tenants has to be done.

14       Q.   Right.  So how many detectives -- how many

15  cases do you think a -- one homicide detective can

16  handle at a time?  Not what was going on with this

17  particular case.  And your answer -- I don't think I got

18  an answer to my question.

19            MR. WAPLES:   I want to object because I

20  think he was answering your question until you cut him

21  off in his answer.

22            MS. SCHNEEMAN:   I think the witness is not

23  answering my questions and answering what he wants to

24  say.

25       Q.   (By Ms. Schneeman) My question to you, sir:

1    Because you said that the detectives were overworked and

2    couldn't handle the number of cases, you said -- and so

3    I want to know how many cases you think a homicide

4    detective can handle?

5        A.    Well, I can't answer that because it would

6    depend on the stage of the investigation.   Is the case

7    solved and you're putting evidence together for court?

8    Is it unsolved?   Are there any viable leads?   The

9    answer --

10       Q.    To do --

11       A.    -- is what it takes to do it properly.

12       Q.    Right.   What does it take -- can -- so is one

13   homicide case too much for one homicide detective?

14       A.    Well, it depends on the nature -- the nature of

15   the homicide.   In some cases, ten homicide detectives

16   will work on one case and that's all they'll do.

17       Q.    Right.   Okay.   Well, let me ask -- let me move

18   on to another question I have for you.

19            In -- on Page 5 of your report, in

20   Footnote 1, you say, "There are only three ways to solve

21   a crime; a witness, a confession or physical evidence."

22   Do you see where you've written that?

23       A.    Yeah.

24       Q.    Okay.   What are your thoughts on circumstantial

25   evidence?   Do you discount circumstantial evidence

1   entirely?

2       A.   Well, the circumstantial evidence has to be in

3   the nature of somebody confession to something, somebody

4   that saw something or something that's physical in

5   nature.

6       Q.   Okay.  So relationships between people are

7   irrelevant and being in the proximity of a crime is

8   irrelevant, is that what you're saying?  That type of

9   circumstantial evidence is irrelevant and shouldn't be

10  considered?

11      A.   No, it's not irrelevant, but how do you know

12  someone has a relationship?  How do you know someone was

13  in the area of a crime?  Usually, the fact that someone

14  is in the area of a crime would be the product of other,

15  some documentary evidence or maybe a cell phone record

16  or maybe a witness.  So that's what it ultimately comes

17  down to.  My point there is probably saying that you

18  find people -- determination of whether someone did a

19  crime or not is a function of the evidence, not of

20  theories or hypotheses or speculation.

21      Q.   Okay.  So also on Page 5 you use the term

22  "investigative theory."  And you mentioned to me earlier

23  today that you've got to test theories and, if your

24  theory doesn't work, come up with another theory.  So

25  explain to me the importance of having an investigative

1    theory.

2        A.    Well, as you're collecting your evidence, you

3    need to put it together in -- in some sort of narrative

4    that makes sense.   And you might, like, for example, in

5    this case, Detective Benner's theory was that Ruth had

6    been killed by William.   But alternative theories might

7    have been that she was killed by another child or that

8    she was killed in a robbery gone wrong.   And then, you

9    know, you would have a number of theories that you would

10   be considering and then you see how the evidence matches

11   those theories, but you don't wedge yourself to a theory

12   because then you'll start to get confirmation biases.

13   So at this stage, the early stage, your theories are

14   just all the possibilities that make sense, but those

15   have to be --

16       Q.    Okay.

17       A.    -- constantly adjusted and revaluated as -- as

18   your evidence comes in.   It may help guide you to

19   looking for future evidence.

20       Q.    Okay.   Let me -- so let me make sure I

21   understand that.   So when you teach or you advise folks

22   on how to conduct an investigation, do you -- do you

23   think it's important for them to brainstorm the various

24   investigative theories first and then pursue the

25   evidence to see if it matches up with any of those

1   theories?  Is that -- is that what you're telling us?

2       A.   The first step should be collecting and

3   analyzing the evidence.  So you're going to have crime

4   scene evidence.  You're going to have the autopsy.

5   You're going have the results of a neighborhood canvas.

6   Prior to at least those stages being completed, it's

7   premature to start theorizing, because there could be,

8   you know, ten different theories.  But what you find as

9   a result of that may point to the need to look somewhere

10  else for additional evidence.  But there's no, like,

11  magic line where you shift gears, but at some point

12  you're probably going to have all the information that

13  you're going to find with that initial search and then

14  at that point you need to think about it.

15      Q.   Okay.

16      A.   What do these pieces mean?  How do they fit

17  together?

18      Q.   So you -- theories come to detectives at

19  different times, right?  They might have one theory and

20  develop some evidence and get another theory but then

21  maybe develop some evidence and go back to the first

22  theory; is that correct?

23      A.   Well, I would argue that detectives that are

24  coming up with theories before they've collected and

25  analyzed the evidence are going to have a problem

1   because then they'll run the risk of suffering from

2   confirmation bias.

3       Q.   Right.  Well, that's what I'm trying to

4   understand because I -- I guess I need some help

5   understanding from you.  Because you talk about the

6   importance of having an investigative theory.  It could

7   have been William.  It could have been Robert.  It could

8   have been Rebecca.  It could have been a burglary gone

9   bad.  And that all of those various theories, at least

10  in your mind, existed.  It sounds to me like you're

11  starting with a theory and then looking for what

12  evidence fits into the theory.

13      A.   Could you -- first of all, so I understand

14  exactly what you're saying, could you tell me the point

15  in the report where I say that it's important to have a

16  theory so just so I'm understanding.

17           Also, ma'am, on Page 32, I found what I

18  was looking for.  During a civil deposition Detective

19  Benner said, "I was working on probably other cases,

20  between six cases between November 19th and when he was

21  arrested, so I was -- I didn't have the time to keep

22  going back to this case like that."  And then Detective

23  Tutor said he had something like five homicides.  So the

24  operative word, phrase here, is "I didn't have the time

25  to keep going back to this case like that."  That meant

1    that he --

2         Q.    Okay.

3         A.    -- was overworked.

4         Q.    But -- okay.  But my question to you was

5    talking about the investigative theory, because you've

6    talked earlier in your deposition today about the

7    importance of investigative theories and pursuing all

8    things.  And one of the things that you said is that you

9    don't think Benner properly pursued the theory that it

10   was a burglary gone bad.  And I know I pointed to your

11   earlier today in your deposition -- or I'm sorry, in

12   your expert report where you mentioned that you didn't

13   think that that theory was adequately explored.  Page 5,

14   you use the word "investigative theory" in the first

15   paragraph.  And then on Page 37, "intruder possibility."

16   37, "intruder theory."  So you -- you have this -- you

17   talk about these other theories that should have been

18   explored, so it seems to me that you're focusing on a

19   theory and driving the evidence.

20        A.    No, no.  I'm -- I'm saying the opposite, that

21   there could be multiple explanations for the crime or

22   theories, but you need to, first of all, establish what

23   your evidence is, and then what your evidence means, and

24   then that helps you assess the various theories out

25   there.

1           Some theories may be more obvious than

2     others at a particular point in time.  So, for example,

3     given this particular crime, the fact that it was a

4     revenge gang slaying is not a very good investigative

5     theory, absence some evidence that we don't know about.

6     But another victim found in another location under other

7     circumstances with a different cause of death, that

8     might be one of your possible viable theories.

9           So you need -- the problem is, is when you

10    lock down and focus prematurely on one theory, to the

11    exclusion of other theories, when you haven't looked at

12    the evidence and considered what their meanings are for

13    the various theories.

14       Q.   Now, you talk about tunnel vision and

15    confirmation bias, and you say on Page 7 of your report

16    that tunnel vision is insidious and common.  When you

17    assist with the investigation of homicide -- well, let

18    me back up.

19           So you've made the statement that tunnel

20    vision is insidious and also that tunnel vision is

21    common on Page 7 of your report.  If that's the case,

22    what do you recommend or what do you tell police

23    officers that you train or work with how to avoid those

24    pitfalls?

25       A.   One of the first things is to not to

1    prematurely come to a conclusion, to keep all viable

2    options open, particularly to the point of the

3    collection and the analysis of the evidence.

4            Now, a number of police agencies have

5    started -- or they have introduced discussion sessions

6    where people talk about their cases and then other

7    people in the group -- and there may be a designated

8    gadfly whose job is to try to poke holes in the theory.

9    And by formalizing the process like this and by

10   assigning that role to somebody, people are much more

11   willing to be critical.

12           Another is the option, which is a standard

13   procedure in the United Kingdom, where after certain

14   periods of time, I believe one month and then one year,

15   if the homicide is unsolved, the case goes to somebody

16   from a completely different agency, not your friend, not

17   somebody you drink with, somebody looking to find what

18   you've missed in your case, what needs to be done, what

19   errors you may have done in your thinking, and they

20   write a report which then goes back to the agency that

21   has the murder in the first case.

22           Now, maybe I'll point out, the United

23   Kingdom has a significantly higher homicide clearance

24   rate than the average police agency in the United States

25   has.  And I think some of the -- there's a number of

1    reasons for that, but errors in thinking about the case

2    and probably even more important than errors is the

3    initial resources to collect the evidence.  You have

4    something to think about are critical factors for

5    correctly solving a case.

6       Q.   Now, so tunnel vision and confirmation bias,

7    this isn't -- this isn't a phenomenon that just applies

8    to law enforcement officials.  This is a phenomenon that

9    applies in all sorts of scenarios and contexts?

10      A.   Yes.  A human phenomena.

11      Q.   A human phenomenon.

12           Did you develop tunnel vision or

13   confirmation bias in determining that Benner had jumped

14   to a conclusion?

15      A.   You know, the exact same question that I was

16   asked during my testimony for the David Camm case.  My

17   answer is I'd like to think no.  I've justified through

18   quotations and logic, I believe, the various stages.  I

19   have no horse in this race.  I don't -- it doesn't

20   really matter to me whether Detective Benner did his

21   job -- a good job or not a good job, but I would prefer

22   to seem he has done a good job.  But he didn't.  And

23   there's questions here absent an answer.  And -- and I

24   would have to say it's not an answer I could find in the

25   documents available to me that suggests that the

1    investigation was flawed and problematic.

2        Q.    Well, you do have a dog in the game because

3    you're being paid, correct?

4        A.    Well, like I said, I reject most of these, so

5    I'm really not interested in them for the money.   I

6    could have reviewed the report and come up with

7    different conclusions.   I still would have gotten paid.

8    Believe me, if I have any bias, ma'am, it's I would like

9    to see police do a good job.   I'm a retired police

10   officer and do a lot of work with policing, and I just

11   would like to see proper investigations and the right

12   people locked up.

13       Q.    Can you -- can you give me an example of a time

14   that you've fallen prey to tunnel vision and cognitive

15   bias?

16       A.    Not off the top of my head.

17       Q.    Do you think you have?

18       A.    Undoubtedly at some point in my life.   I'd like

19   to think since I became interested in the subject and

20   began examining them, that at least within the

21   context of -- context of criminal investigations, that

22   I'm careful and double-check and rethink things.   Well,

23   I -- I can give you an example.   Sometimes I like to do

24   puzzles.   And sometimes when I don't get to a solution

25   in the puzzle, it's because I'm suffering from tunnel

1    vision looking at it.

2        Q.    On Page 9 of your expert report, you talk there

3    at the bottom about how conclusions reached by

4    detectives should not depend on the particular sequence

5    in which the evidence is discovered.   If altering the

6    evidential order changes the case conclusions, then most

7    likely there's a problem with the investigative logic.

8    How do you -- what order do you think Detective Benner

9    should have considered the evidence in this case?

10       A.    In an investigation, the order in which

11   evidence is found and then maybe more critically when

12   lab results get returned can -- can vary, and sometimes

13   it can take weeks and even months for certain results.

14   But if you think about it, the -- at least the physical

15   evidence collected from a crime scene, all that happened

16   more or less at the same time.   So if you make up your

17   mind on a subset of the evidence and then later evidence

18   comes along that challenges your initial set of

19   assumptions or theory, then the human tendency is to

20   engage in confirmation bias.   At least there's a risk of

21   that, and you tend to denigrate that evidence.   You

22   don't give it the weight that it should.   You failed

23   maybe to follow-up further on the -- on the

24   evidence.   But if you were just -- like one of the

25   things I try to do is I just look at these things in a

1    different order and say, well, if those DNA results came

2    back day one, you know, what would have been the

3    thinking?  So --

4         Q.    Okay.  I -- I think I understand the theory of

5    what you're saying.  What I'm trying to understand is

6    you suggested that Benner should have looked at the

7    evidence in a different order, and I'm wanting to know

8    from you what order he should have looked at the

9    evidence in.

10                    MR. WAPLES:  Objection, misstates his

11   testimony in his report.

12                    MS. SCHNEEMAN:  Well, no.  This is -- this

13   the question that I have.

14        Q.    (By Ms. Schneeman) I understand what you had

15   just testified.

16        A.    Sure.  I'd like to -- I'll try to do a better

17   job of answering.

18                    He should have looked at it in multiple

19   orders.  So think of it as like, you know, cards in a

20   card deck and you keep shuffling them and looking at

21   them and say, "This has changed my mind, has this

22   changed my mind."

23                    So perhaps one of the more problematic

24   actions in this case had to do with the timing of the

25   telephone call from -- that was Detective Benner

1   initially stated in his probable cause that was made

2   from Ruth Rainsberger's land line to Robert Rainsberger

3   at an hour before William said he had discovered the --

4   the body.  Now, if that was the case, if that was a

5   factual occurrence, that's -- that's pretty powerful

6   evidence and calls into question William Rainsberger's

7   innocence.  It doesn't fit with his theory.  It -- it --

8   you know, it would be something that would make you

9   extremely suspicious.  However, the time was wrong

10  because it was based on Central standard time because of

11  the routing of the call through Chicago.  So there

12  you've got two pieces of evidence, the phone call time

13  and then the other evidence saying, well, no, this is

14  really what the phone call time was.  So the first one

15  was wrong.  And if you looked at those immediately, like

16  ten seconds apart, you would go, okay, yeah, well, this

17  fits with what William Rainsberger has said in his

18  statement.  So, more or less, it becomes nothing.  But

19  instead it becomes an integral part of his probable

20  cause and seems to have influenced his thinking after

21  that.

22       Q.   Okay, well, so I -- what I understand you

23  saying is there was an error in interpreting the phone

24  data, but I still don't know if that answers my question

25  because I'm -- what I'm trying to understand is if -- if

1    Charles Benner had looked at the evidence in a different

2    order, let's set aside the mistake in interpreting the

3    phone record, what other evidence or what order would

4    you have had him look at the evidence first and then a

5    different order that you would have had him look in the

6    -- at the evidence later to draw a different conclusion

7    than the one he did?

8           MR. WAPLES:  Objection, asked and

9    answered, but you can go ahead and answer it.

10        A.   So this is -- this is a very strong example of

11   this.  If he had -- rather than look at the -- only look

12   at the evidence as it came in to him, if he went back

13   and rethought things and said what if I had discovered

14   this error right away, what would that have meant for

15   how I saw things.  And according to the latest

16   depositions, it still seems that he's either holding on

17   to the fact that this was Detective Bierce's mistake and

18   not his, and, therefore, not his responsibility, or that

19   maybe the telephone company got it wrong.  There's just

20   no acknowledgement of -- of the error here, which is, by

21   the way, a very typical response to this.  We have -- we

22   have a saying that it's often not the initial mistake,

23   it's the fact that people won't admit their mistakes and

24   then just double-down, and that makes things ten times

25   worse.  And --

59

1      Q.    I guess -- I guess what I'm trying to
2  understand is you've told me multiple times, and -- and
3  I understand that there was an error in interpreting the
4  phone records.  But you're saying that the
5  Detective Benner needs to look at the evidence in
6  multiple ways, in multiple -- at multiple times, he
7  didn't look at it again, whatever it is.  And how do
8  you -- how do you know that?  How do you know that
9  Detective Benner didn't look at the evidence in multiple
10 ways on different occasions, and looked at the evidence
11 in a different order on multiple occasions, that he only
12 considered things as they came in one time, moved on,
13 and didn't give it any other consideration?
14     A.    Well, I'm not Detective Benner.  I can only
15 tell you what I've read that he had said that he has
16 done.  And he seemed to be very cavalier about this
17 error.  It would be -- if his testimony was, yes, we
18 discovered this mistake and we then looked at things
19 again.  But he doesn't say that.  He said either it's
20 not an error or it was Detective Bierce's fault, you
21 need to talk to him.  That is not someone who's going
22 back and rethinking their case when they find a problem
23 in the elements of the evidence that led up to their
24 probable cause determination.
25     Q.    Well, again, you haven't answered my question.

1    You're only talking about the phone record and the one

2    error with the phone record.  And so -- so is that the

3    only -- you're saying that's the only piece of evidence

4    that he failed to consider --

5         A.    No.

6         Q.    -- multiple times?

7         A.    No, I'm giving you an example.  I can go

8    through other examples.  So another one would be the --

9         Q.    Well, but, I guess, back to my -- back to my

10   original question.  You suggest that if he had

11   considered the evidence in a different order, that's

12   what Page 9 says, it's the altering the evidential order

13   changes the case conclusion.  And so I'm wanting to know

14   from you, what order do you think Detective Benner

15   should have considered the evidence?  What order do you

16   think he considered the evidence and then what order do

17   you think, if he had considered the evidence in a

18   different order, it would have changed his mind?

19              MR. WAPLES:  I'm going to object to the

20   form of the question because it misstates his testimony

21   it misstates his affidavit -- or his report, and it's

22   been asked and answered.

23        Q.    (By Ms. Schneeman) Okay.  Well --

24        A.    Ma'am, I think I did answer it in that he

25   should look at it in multiple different orders.

1    Q.    Okay.  What's makes you think -- what makes you

2    think --

3    A.    I can give you another example beyond the

4    telephone records if you would like.

5    Q.    I want to ask my question.  What makes you

6    think that Detective Benner did not do that?

7    A.    Again, I think I've answered that.  I'm not

8    Detective Benner, but judging what he has said in his

9    testimony and his depositions, there is absolutely no

10   indication that he ever did any such thing.  And, again,

11   to come back to the telephone record or to the injury on

12   Ruth Rainsberger's head, he seems to dismiss these

13   things and just move on.  There's no indication that he

14   said, "When we got that error, we realized we had made a

15   mistake and then we went back and looked at things."

16   There's none of that.  It's either it wasn't an error or

17   that is something you'll have to ask Detective Bierce.

18   Same thing with the injury to the top of the head.  He

19   -- he doesn't ask or explore what the different

20   perspectives were.  He just jumps to some assumptions.

21   He doesn't consider the -- he takes Fireman Woolridge's

22   statements at -- at face value without understanding

23   them, without exploring them.  He makes no effort then

24   to integrate the autopsy results or statements from

25   other people.  He just looks at something once and he

1    moves on because he's so busy.

2            You know, I don't have the evidence to do

3    this but --

4        Q.   Because --

5        A.   -- it's interesting to see what his notebook --

6            MR. WAPLES:  Well, let him finish his

7    answer.

8            MS. SCHNEEMAN:  Well, he's just speaking

9    in narrative without a question, but go ahead.

10       A.   Well, it relates to what we're talking about

11   it.  It will be interesting to see actual hours logged

12   on this case by Detective Benner and the other

13   detectives.  Because, you know, here's one of the

14   issues, ma'am:  To go back and rethink things takes time

15   and takes effort and energy.

16       Q.   (By Ms. Schneeman) Now, I want to ask another

17   question.  Let's see.  Do you think it's -- do you think

18   it's reasonable for investigators to draw inferences

19   from facts?

20       A.   At some point they will have to, but if you

21   start drawing inferences from one fact without

22   understanding or knowing what the other facts are, then

23   you're going to have a problem.

24       Q.   Okay.  So are you telling me that you think

25   Detective Benner drew an inference from just one fact?

1    A.   I think he drew inference from what he -- from

2  -- I think he drew a number of problematic inferences

3  from single facts without considering what they meant in

4  the total context.

5    Q.   And you're basing these conclusions without

6  ever having met Detective Benner, without ever having

7  worked with him, not knowing the man and not going the

8  quality of his work on any other case.

9    A.   Ma'am, I think you know the answer to that

10  question.   I'm not evaluating Detective Benner.   I'm

11  evaluating the investigation of the Ruth Rainsberger

12  murder.

13    Q.   You're aware that William Rainsberger has made

14  a statement early on to Detective Benner that he

15  believed his mother's head was bashed in, correct,

16  you're aware of that?

17    A.   I know that he made some similar statement on

18  -- during his 911 call and perhaps to Woolridge and then

19  -- and possibly Detective Benner.

20    Q.   Do you think that that statement should have

21  been ignored?

22    A.   No.

23    Q.   What relevance would that statement possibly

24  have to you?

25    A.   Well, the relevance will depend on the -- the

1      other facts in the case.

2          Q.    Okay.  So -- so you concede or you agree that

3      that's not a fact that should have been ignored?

4          A.    No, but I do think it should have been explored

5      further, and I think Detective Benner should have asked

6      him why do you think that.

7          Q.    Okay.  Now, do you think that the demeanor of a

8      victim or a criminal suspect should be ignored?

9          A.    I think you have to be incredibly careful when

10     you use demeanor evidence.  And police have learned the

11     hard way that people behave differently, individuals

12     behave differently depending on who they are, depending

13     on the circumstances.  There's the whole phenomenon of

14     rape trauma where detectives would not believe a rape

15     victim because she was not acting like someone they

16     thought should act if they had been raped.  There's a --

17     if you're involved with a violent crime, there's a

18     certain degree of post-traumatic stress disorder that

19     can occur.  Some people cry.  Some people yell.  Some

20     people become withdrawn.  And, frankly, any experienced

21     police officer, let alone detective, would know there's

22     this range of human activity.

23         Q.    Right.  But I think what you were -- I think if

24     -- if I understand your answer is that you do not ignore

25     it.  It's not something to be completely discarded.  It

1   can have some relevance, but you have to be considerate
2   and careful about the relevance.  Is that what you're
3   saying?
4       A.   Fair enough.  It really comes down to what is
5   the significance of any piece of evidence and whether or
6   not there are connections to other pieces of evidence.
7   I'm sure you're familiar with the infamous Amanda Knox
8   trial where the Italian police jumped to conclusions
9   based on her demeanor after the discovery of her
10   roommate's murder.  And, you know, now through DNA
11   analysis, they know who committed the murder, and the
12   Italian high court has been very critical of the
13   investigation.  So it's -- it's sometimes like we expect
14   people to behave like we see in a Hollywood movie or on
15   television, and in the real world, people behave in a
16   variety of different forms.  And any one piece of
17   evidence has to be considered in the context of all the
18   other evidence.  So would you ignore it?  No.  Would you
19   give it much weight?  Very little, especially absent
20   connections to something else.
21       Q.   Okay.  And you think in this case, it didn't
22   have any connection to anything else?
23       A.   Well, if it was connected to something else, I
24   haven't read about it.
25       Q.   Let me ask you a question about another thing

1   written in your report.  This is actually on Page 37.

2   Towards the bottom of that page is the last paragraph.

3      A.   Yes.

4      Q.   It says -- the key phrase in this statement is

5   "his" investigation, meaning, Detective Benner's efforts

6   to implicate William Rainsberger.  I'm getting the

7   impression that you think because Detective Benner

8   referred to the investigation as his investigation, the

9   word his meant that Detective Benner was trying to get

10   William Rainsberger.  I'm not understanding why you

11   italicized the word his?  Why did you think that that

12   statement meant that -- Detective Benner's

13   characterization of the investigation as his

14   investigation meant that he was trying to implicate

15   William Rainsberger?

16      A.   At this point in time, I think it's very clear

17   that he is focused solely on William Rainsberger.  Here

18   is DNA evidence that could possibly point towards the

19   real killer or at least viable suspects.  Now, Detective

20   Benner says maybe this was left by first responders.

21   You know, I'd be very surprised, given the blood at the

22   scene, that people there didn't wear gloves.  That's

23   standard procedure in most places.  Now, maybe he's

24   right.  Maybe he's wrong.  But you check it out.  You

25   get the analysis done.  You try to figure out what it

1   might tell you about what occurred at the crime scene.
2   But, in this case, it didn't fit with his theory and his
3   suspect, so he becomes uninterested in it.

4       Q.   Okay.  Well, but that's still not answering my
5   question.  The mere fact that Detective Benner referred
6   to the investigation as his investigation, you seem to
7   be suggesting that because it was his investigation, he
8   was out to get William Rainsberger.  We was assigned the
9   investigation, so, of course, it was his investigation.
10  Aren't you the one jumping to conclusions here?

11      A.   He's assigned this investigation to determine
12  what happened, not to get someone that annoyed him in
13  the early stages because he refused the polygraph test.
14  And that seems to be what happened here.

15      Q.   And you're basing that on William Rainsberger's
16  statements to you that -- that William thought Benner
17  was annoyed?

18      A.   And Robert Rainsberger and even the statements
19  of Detective Tutor and Detective Benner.

20      Q.   Detective Benner testified that he was annoyed
21  with William Rainsberger because he wouldn't take a
22  polygraph?

23      A.   He wasn't happy.  Again, if you want to wait, I
24  can try to find some of the -- his quotations.  Is that
25  --

1    Q.    Sure, go ahead.

2    A.    Okay.

3    Q.    Yeah, I want -- what it is about detective --

4  because it seems to me that you're placing greater

5  emphasis on certain people's testimony in this case and

6  discounting Benner's testimony.   And if you can point to

7  me where Detective Benner said that he was annoyed with

8  William Rainsberger for not giving or not consenting to

9  a polygraph, yeah, I'd like for you to point that out to

10  me.

11    A.    Well, he states that because of the refusal to

12  take the polygraph, this is Page 24.

13    Q.    Tell me what page you're on.

14    A.    Page 24.   Because he thought the reaction was

15  out of control, that they were on the right track, and

16  that the refusal to take the polygraph suggested they

17  were guilty.   In my experience, individuals who are not

18  involved in a crime are willing to take a polygraph to

19  prove their assistance.   But he also talks about if he

20  was honest about giving him the polygraph, they probably

21  wouldn't have shown up.   And then there was --

22    Q.    You're --

23    A.    -- some -- and I don't know if I have it in my

24  report, but there was some indication from Detective

25  Benner somewhere that he thought Detective Tutor had

1    yelled at the family.  And then there's indications --

2    again, some of this is stuff not in this report, but

3    it's -- but I'm still going through this.  And then

4    Robert Rainsberger talks about cussing, a whole lot of

5    yelling at how Tutor broke this up, which, I guess,

6    would be between William and Detective Benner.

7        Q.   Okay.  So you -- you can't point to any

8    testimony in your report that you relied on to -- for

9    the conclusion that you drew that Detective Benner was

10   annoyed with William Rainsberger and that's why he

11   pursued him throughout the rest of the investigation.

12       A.   There's something in -- and I don't believe

13   it's in my report, but there's something in one of the

14   depositions or testimonies about that Detective Benner

15   admitted that Detective Tutor might have lost his

16   temper.

17       Q.   Okay, well, that's Detective Tutor, not

18   Detective Benner.

19       A.   I know.

20       Q.   Okay.

21       A.   But it's Detective Benner's case, so if

22   Detective Tutor's getting angry and Detective Benner's

23   not, I take a look at what Robert Rainsberger said as

24   well.  And then I look at how Detective Benner proceeds

25   in the investigation after this point.  He doesn't

1    return calls --

2       Q.   You're drawing the conclusion that Benner was

3    annoyed, but you can't point to anything specifically

4    except to say that the fact that they asked Rainsberger

5    to come in for a polygraph and Rainsberger refused.

6       A.   I'm pretty sure that if I looked through all

7    the depositions again I could find those.  If -- if it's

8    your position that Detective Benner was not annoyed,

9    that would be very interesting, I think, at trial

10   because I think -- I think that's not the case.  And I

11   think that's the point -- he says that at that point he

12   became my suspect just because he was thwarted.

13      Q.   Well, do you -- can somebody be a suspect

14   without having a personal annoyance against them?

15      A.   Given the fact that there were, A, two other

16   viable suspects, Robert and Rebecca, particularly Robert

17   because of his financial problem, given the fact that

18   there was this concern about the possible drug sales in

19   the apartment right above Ruth's, and some other

20   concerns about high crime in the area, those were all

21   investigative theories that needed to be explored and

22   evidence gathered.  But that's not what happened.  I

23   mean, to me it's amazing that Detective Benner didn't

24   think it was necessary to look in the garbage can

25   outside the apartment when he didn't have the murder

1   weapon.  Why?  Well, he thinks he knows where the murder

2   weapon went.  It's this piece of trash that William

3   Rainsberger threw away in front of the Krogers.  So

4   that's, you know, a good example.  I've --

5        Q.   You think that --

6        A.   -- I know what's happened.

7        Q.   You think that that establishes annoyance on

8   the part of Detective Benner because they didn't look in

9   the trash for a weapon?

10       A.   Well, I say it establishes incompetence, and it

11  also establishes confirmation bias.  Why would you not

12  do that?  Well, the only thing I can say is he believes

13  he already knows what happened.

14       Q.   Well, you're speculating as to what Detective

15  Benner may have had in his mind, correct?

16       A.   I don't know what's in Detective Benner's mind,

17  ma'am.  I can only look at his actions or inactions.

18       Q.   Right.

19            MR. WAPLES:  I think now would be a good

20  time for a break.

21            MS. SCHNEEMAN:  Sure.  Would you like to

22  take a break?

23       A.   Sure.

24            (Recess taken from 3:57 to 4:07.)

25       Q.   (By Ms. Schneeman) Okay.  I want to circle back

1    and -- and follow-up on some questions that I asked

2    earlier in the deposition.  You told me that -- I know

3    you're serving as an expert in this case, and I know

4    you've served as an expert in the David Camm case.  I

5    think you told me that in the eight years prior, you had

6    offered your expertise in connection with some

7    commissions of inquiry.  But I guess what I want to

8    circle back is, other than this case and the David Camm

9    case, have you served as an expert witness in connection

10   with civil litigation?

11       A.   I just clarify:  I -- I wouldn't say I offered

12   it.  I -- I am asked to and --

13       Q.   Yeah, I get that.  Thanks.

14       A.   Civil litigation that actually went to trial

15   or?

16       Q.   Well, or a deposition like this.

17       A.   No.

18       Q.   Okay.

19       A.   To be clear, though, I have been involved in

20   some cases but never to the point of a deposition or a

21   trial, either because they settled or perhaps they

22   haven't progressed to that point, I don't know.

23       Q.   Sure, okay.  About how many cases then would

24   you say you've been a consulting expert for a civil

25   litigation like this one?

1     A.    Just a handful.

2     Q.    Okay.  Handful, meaning, five or six?

3     A.    Might be more accurate, I think, if I guessed

4 four.

5     Q.    Were those in Indiana or other jurisdictions?

6     A.    Well, there's the David Camm case.

7     Q.    Right.

8     A.    There was a case in Texas.  Sorry, let me just

9 check my consultancies list here because that may give

10 me an idea.

11     Q.    Sure.

12     A.    By the way, some of these overlap or merge, so,

13 for example, the British Columbia missing women

14 commission inquiry, I --

15     Q.    Can you remind me what page we're on?

16     A.    Oh, Page 25 and 26.

17     Q.    Okay, got it.

18     A.    Even though that was a provincial commission

19 inquiry, there were reporters representing various

20 interested parties of which some of them engaged in

21 civil litigation afterwards.  I believe I was cross-

22 examined by 18 lawyers in that particular matter.  So

23 these often, especially with a wrongful conviction, end

24 up in a civil matter where some of my stuff will be

25 used, but I never got to the point of a separate

74

1   deposition or a trial.

2       Q.   Okay.  And then correct me if I'm wrong.   I

3   know the transcript will speak for itself, but I'm

4   afraid if I didn't ask the question or if I thought I

5   asked the question and didn't, I'll get home and be

6   sorry so it -- I just want to ask it again if I did ask

7   it.  But if I understand, you have never been the lead

8   homicide investigator on any homicide case.  It's just

9   that you supervised a section of the Vancouver police

10  department that investigated homicides and then you've

11  assisted or consulted in both investigations and looking

12  at perhaps what went wrong after the fact.

13      A.   I don't think that's quite accurate.  So the

14  first part, I've never been a homicide detective,

15  per se, with that as my assigned function.  In the

16  geographic profiling section, we provided analytic

17  support for homicides, particularly serial homicides,

18  but not entirely.  And then I've also been asked to do

19  consulting or advice or guidance on cases that ended up

20  unsolved or with a wrongful conviction.  And I've been

21  asked to do that by police agencies, defense lawyers,

22  prosecutors, government agencies.

23      Q.   I got a question about something when you were

24  on Page 27 of your report.  You talked about the

25  indiscriminate use of the polygraph.

```
 1              MR. WAPLES:  Can you say where?

 2              MS. SCHNEEMAN:  Yeah, it's at the top of

 3     the page.

 4              MR. WAPLES:  First full paragraph?

 5              MS. SCHNEEMAN:  First full paragraph.

 6       Q.   (By Ms. Schneeman) Why do you characterize the

 7     act of William Rainsberger to take a polygraph as an

 8     indiscriminate use of it?

 9       A.   First of all, I think the timing was wrong.

10       Q.   Okay.  With what regard?

11       A.   Because this is within less than one day of

12     William finding his mother in a very traumatic

13     situation.  It just -- if you wanted cooperation from

14     William, this was not the time or certainly not the way

15     to do this.  And it made it very clear to him the

16     perspective I think of the detectives and he reacted

17     accordingly.  And that unfortunately hurt the

18     investigation because it shut off a line of further

19     exploration or inquiry.  I think the --

20       Q.   Well --

21       A.   -- the indiscriminate part also refers more to

22     it was -- the indications were the detectives were going

23     to polygraph all three people, and this is very

24     problematic.  It's going to -- it had a 50-50 percent

25     chance of leading to a false positive given the
```

1  reliability of polygraph tests.

2      Q.    Well, now, are you aware that polygraphs are

3  also used to exclude people as suspects?

4      A.    Yes.

5      Q.    And do you think it's important to exclude

6  people as suspects as early as possible?

7      A.    I would say at the right time.  Again, I think

8  that the evidence needs to be collected and analyzed and

9  then a process going from there.  But let's say this is

10  actually gone ahead as Detective Benner wanted.  And the

11  dice rolled such a way that one of the three of them

12  ended up showing deceptive, which could happen just by

13  chance given the false positive rates that have been

14  established exist for polygraphs, assuming you have a

15  professional unbiased and competent and trained

16  polygraph examiner.  Well, what's going to happen then?

17  That's leading -- that's an invitation to confirmation

18  bias.  It will focus the case --

19      Q.    Well --

20      A.    -- and -- and before they have the other

21  evidence.  So I think they did it prematurely.

22      Q.    Well, when people early on, why -- why is it

23  your conclusion that it wasn't -- why do you conclude

24  that this was an attempt to get evidence against William

25  early on as opposed to excluding him early on?

1    A.   Well, given his treatment of William and the
2    family up to that point, that -- it's clear that he
3    thought of him as a suspect.  When he refuses, he
4    doesn't -- Benner doesn't recognize that it might have
5    been because he deceived the family or they might be
6    emotionally upset.  His conclusion is, okay, well, this
7    is what guilty people do.
8        Q.   Okay.  So you're -- you're making a judgment
9    based on what you think Benner's reaction was at the
10   same time you're saying that Benner shouldn't make
11   judgments based on the family's reaction.  Isn't that
12   kind of inconsistent on your part?
13       A.   I'm saying that this was too early to ask for
14   the polygraph test, applying it to all the family
15   members led to a mathematical probability problem, and
16   that Benner should have collected other evidence first.
17   There is no time lag here with a polygraph.  You don't
18   want to do it a year later, but it certainly could have
19   been done a week later.  And it could have been done in
20   a very straightforward fashion that didn't alienate the
21   family.
22       Q.   Well, that wasn't my last question to you
23   though.  My last question to you was that you're
24   judging, you're judging Benner's reaction in the same
25   way that you say he shouldn't have judged the family's

1  reaction.

2      A.   Well, one, I'm not arresting Benner or locking

3  him up so let's, you know, put these in different

4  categories, ma'am.  I'm doing an evaluation of Benner's

5  investigation, so if you say that involves judgment,

6  expert judgment, then yes, that would be correct.  But

7  in my opinion, this -- I mean, this -- this was done too

8  early and it was problematic, because like I come back

9  to it, you just do enough people and you'll get false

10 positives.  So what if -- what do you know?  What have

11 you learned?  You haven't learned anything.  If you have

12 other evidence, maybe you could focus.  For example,

13 maybe further investigation showed the issue with the --

14 the money problem suffered by Robert, maybe that might

15 be the first person you want to do a polygraph on.  I

16 don't know.  But this -- this, to me, smacked of a quick

17 fix, just, okay, let's just polygraph them all, then we

18 can move on, because I got five other homicides, I can't

19 put a lot of time into this case.

20     Q.   But you don't -- you don't know that they

21 sought a polygraph to exclude -- well, anyway, never

22 mind.  That's a bad question.

23     A.   I guess it's worthwhile pointing out, too, that

24 if someone passes a polygraph test, a certain portion of

25 those will actually be lying and get away with it.  So

```
 1   it's not a panacea or magic bullet, but it might be
 2   helpful in the context of many other aspects of an
 3   investigation, other types of evidence.
 4       Q.    Do you have -- I know that you -- I know that
 5   you studied and you have a lot of expertise in
 6   criminology and criminal investigations.  What about
 7   psychology and human behavior, is that part of your
 8   expertise as well?
 9       A.    Psychology is a very broad field, but aspects
10   of psychology are of interest in criminology, which by
11   its nature is a multidisciplinary field.  So, for
12   example, forensic psychology or studies on rational
13   behavior and human judgment.
14       Q.    And so you think -- you think you've got
15   expertise in judging what is rational logical human
16   behavior and what is not?
17       A.    I think I have expertise in criminal
18   investigative failures.
19       Q.    Okay.  Well, that wasn't my question.
20       A.    Well, it overlaps.
21           MS. SCHNEEMAN:  Read back my question,
22   please.
23           (Requested portion read back by the court
24   reporter.)
25       A.    So, yet, I mean, that's a very big field, and I
```

1   would -- don't have expertise in that whole area, but to

2   the degree that it overlaps with detective cognition and

3   logical and rational analysis of evidence and how that

4   can lead to criminal investigative failures, so I'm

5   putting my hands up here to show that there's an overlap

6   there, that area, I feel comfortable.

7       Q.   (By Ms. Schneeman) So you feel that your

8   expertise allows you to judge that William Rainsberger's

9   behavior was rational, normal and logical under the

10  circumstances but Benner's was not.  Is that the

11  conclusion you draw?

12      A.   I've written in this report that William

13  Rainsberger's responses upon finding his mother seemed

14  to make sense and given the circumstances are logical

15  and rational.  And, obviously, that is at variance with

16  what Detective Benner says.  I believe Detective Benner

17  suffered from confirmation bias and tunnel vision.

18      Q.   Confirmation bias and tunnel vision, are they

19  two words pretty much the same term?

20      A.   There's some similarity, but I think they're

21  somewhat different.  Slightly different concepts.

22  Confirmation bias has some very -- the three specific

23  types of it, so it's a little easier to analyze.  Tunnel

24  vision tends to be focusing on one thing to the

25  exclusion of the others, while confirmation bias is more

1    a bias interpretation of information and evidence.  But

2    there's definitely overlap because confirmation --

3    tunnel vision often leads to confirmation bias.  And

4    aspects of confirmation bias could be categorized as

5    tunnel vision.

6            MS. SCHNEEMAN:  I think that's all I

7    have.  Mr. Rainsberger's counsel may have some follow-up

8    questions.

9            So I guess, Rich, do you want to get in

10   the picture?

11           MR. RICH:  No, I think I'm in there

12   enough.

13           MS. SCHNEEMAN:  Okay.

14                        EXAMINATION

15   BY MR. WAPLES:

16   Q.    I just have a couple of questions.  One is:

17   Counsel asked you about Detective Benner's demeanor and

18   reaction during the polygraph examination questioning,

19   if they would -- if the family would undertake those,

20   and you looked at a couple of things in your report.

21   You didn't turn to Page 27 in your report, and is that

22   additional information that explains what you saw from

23   the evidence of Defendant Benner's react -- Defendant

24   Benner's reaction to the polygraph episode in his

25   actions?

1        A.   Yes, this -- this was -- sorry, Catherine Box

2   is questioning Robert Rainsberger, and it starts out,

3   "So after you were asked to do a polygraph and you

4   refused, what happened?"

5                "Benner was pissed."

6                "Okay."

7                Rainsberger:  "He was, he was angry the

8   whole time we were there, but that pissed him off more

9   than anything."  And then he goes on, "They spoke to

10  Bill first, then me.  And he just had, well, when we

11  first got there, he talked to my sister like she was a

12  petulant little seven-year-old, and he wanted to talk to

13  her first since he didn't talk to her the night before.

14  And he was just angry.  He was angry as soon as we got

15  there.  Becky didn't stand up as soon as he told her to

16  come with him, so he yelled at her.  Then he talked to

17  Bill.  Apparently, he didn't like what Bill had to say

18  because by the time he got to me, he was fit to be tied.

19  He asked me -- he asked me, 'So I suppose you didn't

20  want -- you don't want to take a polygraph either?'  I

21  said no.  And then he started yelling, and he started

22  bringing out statistics about whatever.  And there was a

23  whole lot of cussing between he and I, a lot of yelling,

24  and I -- to Tutor's credit, he broke it up."

25                Then there was also something which may

1  not be in this report where when Benner was asked about

2  this yelling, and I think it was by David Hennessey, he

3  said something, well, Tutor might have yelled.  But I

4  don't necessarily -- I don't necessarily think that's in

5  this report, but I believe it was one of the depositions

6  Hennessey did or maybe the bail testimony.  I'm not

7  sure.  It would be easy enough to find.  Then there was

8  also Rebecca Rainsberger has some recollections about

9  that particular session that -- let's call it the

10  polygraph section -- session at the police department.

11     Q.    Okay.

12          MR. WAPLES:  Can we take a little break?

13          (Recess from 4:26 to 4:30 p.m.)

14          MR. WAPLES:  Dr. Rossmo, I don't have any

15  further questions.  I would note, Pam, that we might

16  have two exhibits here.  One is his report and the other

17  is the CV.  [Do you want to index report and CV  later

18  down they said they were combining into one exhibit]

19          MS. SCHNEEMAN:  Oh, okay.

20          MR. WAPLES:  And the CV, which you

21  referred to --

22          MS. SCHNEEMAN:  I thought it was part of

23  the report.

24          MR. WAPLES:  I think it's a separate

25  exhibit in the summary judgment thing, so we might have

1    a separate number for that.

2                 MS. SCHNEEMAN:  Oh, okay.

3                 MR. WAPLES:  But I don't care, we can put

4    it all together.  It doesn't matter.

5                 MS. SCHNEEMAN:  When I got the disclosure

6    of expert witness, it was all together so I assumed that

7    it was all part of one thing, but I think we'll -- we're

8    all in agreement what it is, so.

9                 MR. WAPLES:  Sure.  We'll combine it for

10   purposes of this.

11               But I don't have any further questions.

12               MS. SCHNEEMAN:  Okay.

13               THE WITNESS:  Can I just ask you,

14   regarding an exhibit question, in the report where it

15   asks what I might refer to during a trial, I referenced

16   the possibility of generating a Powerpoint presentation

17   from the report, which I don't know if that has to be

18   classified as an exhibit.  It's not prepared at this

19   time.  And I suspect you probably don't want it unless

20   this matter goes to trial, but I just wanted to remind

21   people about that.  And it would be just based on the

22   information in the report.

23               MR. WAPLES:  Sure.

24               MS. SCHNEEMAN:  Okay.

25               MR. WAPLES:  We understand.

1              THE WITNESS:  Okay.

2              MR. WAPLES:  Well, thank you very much,

3    Doctor.

4              MS. SCHNEEMAN:  Yeah.  Thank you very

5    much.  I appreciate your willingness to do the video

6    thing.  It makes it all, I think, easier for us and you,

7    and so, I do, I appreciate it.

8              THE WITNESS:  Okay.  Thank you.

9              MR. WAPLES:  Another thing I want to say

10   before we get off the record is actually the -- your

11   bill for this deposition, Doctor, you can send it to me,

12   but I will forward it to defendants for payment.  The

13   defendants have to pay experts that they depose of the

14   other side.

15             THE WITNESS:  Okay.  You want me to wait

16   until the end of the month or do it sooner rather than

17   later?

18             MR. WAPLES:  Any time you're ready, you

19   can send it when it's ready.

20             THE WITNESS:  Okay.  Because we don't have

21   anything else that we have to do in the next couple of

22   weeks?  I didn't think so, okay.

23             MR. WAPLES:  I don't believe so.

24             THE WITNESS:  Okay.

25             MR. WAPLES:  Thank you.

1          (Deposition concluded at 4:32 p.m.)

2

3          AND FURTHER THE DEPONENT SAITH NOT.

4

5

6                              _____

7                              DR. KIM ROSSMO

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        I, Chris Carpenter, Certified Shorthand Reporter in

2   and for the State of Texas, hereby certify to the

3   following:

4        That the witness, DR. KIM ROSSMO, was duly sworn by

5   the officer and that the transcript of the oral

6   deposition is a true record of the testimony given by

7   the witness;

8        That the amount of time used by each party at the

9   deposition is as follows:

10       Ms. Schneeman:  1 hour, 58 minutes

11       Mr. Waples:  4 minutes

12       I further certify that I am neither counsel for,

13   related to, nor employed by any of the parties or

14   attorneys in the action in which this proceeding was

15   taken, and further that I am not financially or

16   otherwise interested in the outcome of the action.

17       Certified to by me this 25th day of April, 2017.

18

19

20

21   _____
                CHRIS CARPENTER, CSR NO. 1151
22               Expiration Date 12/31/2018
                16414 San Pedro, Suite 900
23               San Antonio, TX  78232
                (210)697-3400
24

25   Firm Registration No. 631

WILLIAM RAINSBERGER VS.
CHARLES BENNER

DR. KIM ROSSMO
April 13, 2017

---

**$**

**$400 (1)**
8:17

**[**

**[Do (1)**
83:17
**[emailing (1)**
10:13

**A**

**able (1)**
29:10
**above (1)**
70:19
**absence (1)**
51:5
**absent (2)**
53:23;65:19
**absolutely (1)**
61:9
**academics (1)**
17:20
**according (1)**
58:15
**accordingly (1)**
75:17
**accurate (2)**
73:3;74:13
**acknowledgement (1)**
58:20
**act (2)**
64:16;75:7
**acting (1)**
64:15
**action (2)**
87:14,16
**actions (7)**
30:24;31:2,19,20;
56:24;71:17;81:25
**activity (1)**
64:22
**actual (2)**
27:8;62:11
**actually (10)**
18:9;22:10;25:6;
28:8;29:14;66:1;
72:14;76:10;78:25;
85:10
**additional (2)**
48:10;81:22
**address (1)**
25:16
**adequately (1)**
50:13
**adjusted (1)**
47:17
**administrative (1)**
29:5
**admit (1)**
58:23
**admitted (1)**
69:15
**adopted (1)**
15:17
**advice (2)**
19:19;74:19
**advise (1)**
47:21
**affidavit (1)**
60:21
**afraid (1)**
74:4
**afternoon (2)**
4:24;5:6
**afterwards (3)**
20:17;32:22;73:21
**again (12)**
23:11;33:7;59:7,
19,25;61:7,10;67:23;
69:2;70:7;74:6;76:7
**against (1)**
6:4;70:14;76:24
**agencies (8)**
15:11;19:20,21;
24:15;26:5;52:4;
74:21,22
**agency (5)**
18:21;19:20;52:16,
20,24
**ago (7)**
14:1,15,16;15:7;
17:17;29:3,15
**agree (5)**
38:10,13,14,16;
64:2
**agreed (3)**
8:6;10:8,13
**agreement (1)**
84:8
**ahead (7)**
30:20;39:6;40:2;
58:9;62:9;68:1;76:10
**airplane (1)**
15:23
**alienate (1)**
77:20
**allegation (2)**
27:23,25
**allow (1)**
31:7
**allows (1)**
80:8
**almost (2)**
24:9;36:19
**alone (1)**
64:21
**along (2)**
33:13;55:18
**altering (2)**
55:5;60:12
**alternative (2)**
40:17;47:6
**Amanda (1)**
65:7
**amazing (1)**
70:23
**amount (1)**
87:8
**analogous (1)**
23:25
**analysis (8)**
20:1;37:24;38:1,4;
52:3;65:11;66:25;
80:3
**analytic (1)**
74:16
**analyze (5)**
12:24;20:2;40:15;
42:9;80:23
**analyzed (3)**
39:16;48:25;76:8
**analyzing (2)**
28:10;48:3
**angry (4)**
69:22;82:7,14,14
**annoyance (2)**
70:14;71:7
**annoyed (7)**
67:12,17,20;68:7;
69:10;70:3,8
**answered (5)**
40:23;58:9;59:25;
60:22;61:7
**Antonio (1)**
87:23
**apart (1)**
57:16
**apartment (5)**
37:4,5;43:4;70:19,
25
**Apparently (1)**
82:17
**appeared (1)**
8:1
**appears (1)**
11:7
**applied (1)**
37:1
**applies (2)**
53:7,9
**applying (1)**
77:14
**appreciate (2)**
85:5,7
**approach (4)**
6:10,12;15:14,17
**approached (2)**
28:13,25
**appropriate (2)**
19:19;43:22
**April (1)**
87:17
**area (13)**
16:19;18:3,7;20:6,

11,13;39:9;44:12;
46:13,14;70:20;80:1,
6
**areas (1)**
18:4
**argue (2)**
39:22;48:23
**argumentative (1)**
40:23
**Arizona (1)**
17:17
**around (4)**
20:16;22:23;25:1;
37:4
**arrangement (1)**
8:19
**arrest (6)**
6:3;32:23;35:19;
38:15;39:14,23
**arrested (2)**
39:19;49:21
**arresting (1)**
78:2
**arrived (1)**
32:12
**aside (1)**
58:2
**aspect (1)**
42:23
**aspects (4)**
26:5;79:2,9;81:4
**assault (1)**
27:22
**assess (1)**
50:24
**assigned (4)**
44:9;67:8,11;74:15
**assigning (1)**
52:10
**assist (3)**
5:11,14;51:17
**assistance (1)**
68:19
**assisted (1)**
74:11
**assisting (1)**
28:22
**associated (2)**
11:15;20:3
**Association (2)**
17:18;39:12
**assumed (1)**
84:6
**assuming (2)**
32:8;76:14
**assumptions (2)**
55:19;61:20
**attached (1)**
4:9
**attachment (1)**
32:8
**attack (1)**
6:20
**attempt (1)**
76:24
**attorney (2)**
4:25;5:11
**attorneys (2)**
21:10;87:14
**audio (1)**
30:11
**August (1)**
11:22
**autopsy (5)**
34:12,20,24;48:4;
61:24
**available (1)**
53:25
**average (1)**
52:24
**avoid (1)**
51:23
**aware (5)**
9:9,11;63:13,16;
76:2
**away (6)**
4:12;20:17;43:1;
58:14;71:3;78:25

**B**

**BA (1)**
13:4
**back (29)**
7:18;14:4;23:7,9;
31:8,17;32:21;34:16;
39:23;43:2,20;48:21;
49:22,25;51:18;
52:20;56:2;58:12;
59:22;60:9,9;61:11,
15;62:14;71:25;72:8;
78:8;79:21,23
**backwards (1)**
20:14
**bad (7)**
40:9;41:24;42:4,
15;49:9;50:10;78:22
**bail (1)**
83:6
**balance (1)**
41:6
**bars (1)**
12:14
**base (1)**
44:7
**based (11)**
8:1;20:7;30:21,24;
35:20;41:23;57:10;
65:9;77:9,11;84:21
**bashed (1)**
63:15
**basic (1)**
7:8
**basically (2)**
32:21;34:6
**basing (2)**

Circle City Reporting
317-635-7857

63:5;67:15
**basis (1)**
43:24
**bathroom (1)**
31:7
**became (6)**
18:18;21:20;33:4;
36:19;54:19;70:12
**Becky (2)**
34:11;82:15
**become (2)**
13:8;64:20
**becomes (4)**
43:11;57:18,19;
67:3
**began (2)**
15:9;54:20
**beginning (1)**
31:5
**behave (4)**
64:11,12;65:14,15
**behavior (4)**
79:7,13,16;80:9
**belief (3)**
32:5,5,6
**believes (1)**
71:12
**below (1)**
29:12
**Benner (71)**
5:2;30:1,11,15,22;
31:1,3,10;32:1;33:9,
17,23;34:6;35:12,24;
36:11;38:19;40:20;
41:9;42:13;43:2,14;
49:19;50:9;53:13,20;
55:8;56:6,25;58:1;
59:5,9,14;60:14;61:6,
8;62:12,25;63:6,10,
14,19;64:5;66:7,9,20;
67:5,16,19,20;68:7,
25;69:6,9,14,18,24;
70:2,8,23;71:8,15;
76:10;77:4,10,16;
78:2;80:16,16;82:5;
83:1
**Benner's (20)**
31:2,14;36:9,13;
40:25;41:1;47:5;
66:5,12;68:6;69:21,
22;71:16;77:9,24;
78:4;80:10;81:17,23,
24
**Bennet (1)**
38:7
**best (1)**
24:14
**better (1)**
56:16
**beyond (1)**
61:3
**bias (18)**
26:11;42:11;49:2;

51:15;53:6,13;54:8,
15;55:20;71:11;
76:18;80:17,18,22,
25;81:1,3,4
**biases (2)**
12:25;47:12
**Bierce (1)**
61:17
**Bierce's (2)**
58:17;59:20
**big (1)**
79:25
**Bill (5)**
36:25;82:10,17,17;
85:11
**Blair (1)**
12:22
**blood (1)**
66:21
**body (2)**
14:21;57:4
**Boston (1)**
15:8
**both (4)**
4:2;18:6;22:10;
74:11
**bottom (3)**
26:1;55:3;66:2
**Box (1)**
82:1
**brainstorm (1)**
47:23
**break (4)**
31:14;71:20,22;
83:12
**break-in (1)**
41:24
**breaking (3)**
11:2;30:11,12
**briefly (2)**
12:8,20
**bring (2)**
10:6;31:8
**bringing (1)**
82:22
**brings (1)**
11:20
**British (3)**
18:13;25:13;73:13
**broad (1)**
79:9
**broke (3)**
11:3;69:5;82:24
**brother (1)**
36:24
**BS (1)**
13:4
**building (2)**
37:4;43:4
**built (1)**
12:10
**bullet (1)**
79:1

**bureau (1)**
29:8
**burglarized (1)**
32:14
**burglary (4)**
42:4,15;49:8;50:10
**bus (1)**
12:12
**Buskirk (2)**
9:10,14
**busy (1)**
62:1

## C

**calculations (1)**
20:5
**call (12)**
16:8;19:8;32:22;
33:5;34:15,16;56:25;
57:11,12,14;63:18;
83:9
**called (2)**
19:14;30:18
**calling (1)**
27:13
**calls (3)**
34:18;57:6;70:1
**came (4)**
32:2;56:1;58:12;
59:12
**Camm (14)**
21:4,18,23;22:6,
16;23:1,4;26:11,15;
27:13;53:16;72:4,8;
73:6
**Can (57)**
4:4,5,7,8,15;7:10,
11;12:8,25;13:23,24;
14:1;16:4;20:22;
27:3,5,6;31:9,23;
34:3;39:3,3,22;40:2,
12;42:9;44:5,15;
45:4,12;54:13,13,23;
55:12,12,13;58:9;
59:14;60:7;61:3;
64:19;65:1;67:24;
68:6;70:13,24;71:12,
17;73:15;71:7;78:18;
80:4;83:12;84:3,13;
85:11,19
**Canada (5)**
18:12,13;23:23,24;
24:22
**Canadian (1)**
19:20
**canvas (2)**
38:3;48:5
**canvasses (1)**
42:25
**car (3)**
31:6;32:22;39:23
**card (1)**

56:20
**cards (1)**
56:19
**care (1)**
84:3
**careful (4)**
44:11;54:22;64:9;
65:2
**Carpenter (2)**
4:1;87:1
**case (82)**
5:5,12,23;6:5,14;
7:1,7,12,12,17,20;
8:7,21;10:21;21:4,17,
18;22:15,16,25;23:1,
4,4;24:25;26:4;29:7,
13,17;30:5;34:13,15;
37:22;38:7;39:18;
40:7,8;41:21;42:7,8,
17;43:12,20;44:2,3,
10,17;45:6,13,16;
47:5;49:22,25;51:21;
52:15,18,21;53:1,5,
16;55:6,9;56:24;
57:4;59:22;60:13;
62:12;63:8;64:1;
65:21;67:2;68:5;
69:21;70:10;72:3,4,8,
9;73:6,8;74:8;76:18;
78:19
**cases (31)**
6:16,20,22;7:5;
11:15;18:25;19:1,19;
20:25;22:14;23:9,16;
26:11;27:10;30:8;
41:7;43:14,17,19,22;
44:5,15;45:2,3,15;
49:19,20;52:6;72:20,
23;74:19
**catch (1)**
29:2
**categories (1)**
78:4
**categorized (1)**
81:4
**Catherine (1)**
82:1
**cause (9)**
35:8,21;37:1;
38:15,21;51:7;57:1,
20;59:24
**caused (2)**
8:11;31:3
**causes (1)**
16:3
**cavalier (1)**
59:16
**cell (1)**
46:15
**Central (1)**
57:10
**certain (8)**
37:2,15;40:10;

52:13;55:13;64:18;
68:5;78:24
**certainly (3)**
32:18;75:14;77:18
**Certified (2)**
87:1,17
**certify (2)**
87:2,12
**challenges (1)**
55:18
**chance (2)**
75:25;76:13
**change (3)**
8:3;16:4;38:9
**changed (4)**
10:3;56:21,22;
60:18
**changes (2)**
55:6;60:13
**characterization (1)**
66:13
**characterize (1)**
75:6
**charge (6)**
8:17;18:24;19:12,
16;32:16,17
**charged (1)**
39:24
**charges (2)**
6:4;40:5
**Charles (3)**
5:1;30:1;58:1
**check (2)**
66:24;73:9
**checking (1)**
23:12
**Chicago (1)**
57:11
**child (1)**
47:7
**children (1)**
36:17
**choose (1)**
6:16
**Chris (2)**
4:1;87:1
**circle (4)**
7:18;20:16;71:25;
72:8
**circumstances (5)**
41:6;51:7;64:13;
80:10,14
**circumstantial (4)**
45:24,25;46:2,9
**City (2)**
4:25;43:23
**civil (10)**
5:15;6:2,5;29:18;
49:18;72:10,14,24;
73:21,24
**civilian (1)**
18:17
**clarification (1)**
85:11

WILLIAM RAINSBERGER VS.
CHARLES BENNER

DR. KIM ROSSMO
April 13, 2017

14:9
**clarify (1)**
   72:11
**class (13)**
   12:19,20,21,22;
   13:3,9,11,14,17,21;
   14:15;16:21;17:3
**classes (1)**
   14:11
**classified (1)**
   84:18
**classroom (3)**
   14:7,7;16:22
**clear (10)**
   6:19;17:1;28:21;
   34:12,14;36:19;
   66:16;72:19;75:15;
   77:2
**clearance (1)**
   52:23
**client (1)**
   6:23
**closest (1)**
   24:1
**cognition (1)**
   80:2
**cognitive (2)**
   12:25;54:14
**cold (1)**
   29:13
**collect (2)**
   40:14;53:3
**collected (4)**
   48:24;55:15;76:8;
   77:16
**collecting (2)**
   47:2;48:2
**collection (2)**
   17:15;52:3
**Columbia (3)**
   18:13;25:13;73:13
**combine (1)**
   84:9
**combining (1)**
   83:18
**comfortable (1)**
   80:6
**coming (4)**
   15:21;25:4;43:20;
   48:24
**comments (1)**
   33:1
**commission (7)**
   24:12,24;25:13;
   26:3;27:1;73:14,18
**commissioned (1)**
   24:3
**commissions (5)**
   23:14,18,21;24:22;
   72:7
**committed (1)**
   65:11
**committing (1)**

41:19
**common (3)**
   14:6;51:16,21
**communications (1)**
   18:17
**company (1)**
   58:19
**compared (1)**
   14:11
**competent (1)**
   76:15
**completed (2)**
   38:2;48:6
**completely (3)**
   36:20;52:16;64:25
**complex (1)**
   37:5
**compound (1)**
   40:1
**comprehensive (1)**
   15:24
**computer (1)**
   20:4
**concede (1)**
   64:2
**concept (1)**
   36:3
**concepts (3)**
   35:9;38:17;80:21
**concern (1)**
   70:18
**concerned (1)**
   12:9
**concerns (1)**
   70:20
**conclude (1)**
   76:23
**concluded (5)**
   31:3;33:10;36:11;
   38:19;86:1
**concluding (2)**
   32:10;38:11
**conclusion (30)**
   14:6;25:4;30:22;
   31:3,13;32:2,13;
   33:6;34:7;36:12,13,
   13;37:13;39:15;
   41:20,22,25;42:1,4,6,
   21;52:1;53:14;58:6;
   60:13;69:9;70:2;
   76:23;77:6;80:11
**conclusions (6)**
   54:7;55:3,6;63:5;
   65:8;67:10
**condensed (1)**
   4:6
**conditions (1)**
   6:17
**conduct (1)**
   47:22
**conference (1)**
   17:14
**confession (2)**

45:21;46:3
**confining (1)**
   32:23
**confirmation (17)**
   26:11;42:11;47:12;
   49:2;51:15;53:6,13;
   55:20;71:11;76:17;
   80:17,18,22,25;81:2,
   3,4
**conflates (1)**
   41:9
**connected (2)**
   20:2;65:23
**connection (4)**
   27:2;65:22;72:6,9
**connections (2)**
   65:6,20
**consenting (1)**
   68:8
**consider (7)**
   8:10;14:3;40:15,
   16;42:14;60:4;61:21
**considerate (1)**
   65:1
**consideration (1)**
   59:13
**considered (13)**
   9:21;36:14;39:9,
   11;46:10;51:12;55:9;
   59:12;60:11,15,16,
   17;65:17
**considering (2)**
   47:10;63:3
**constantly (1)**
   47:17
**consultancies (3)**
   26:2,18;73:9
**consultancy (2)**
   26:12;27:13
**consultation (1)**
   28:20
**consulted (1)**
   74:11
**consulting (2)**
   72:24;74:19
**contact (1)**
   4:13
**contacted (3)**
   5:10,14,22
**context (7)**
   16:8;28:12;54:21,
   21;63:4;65:17;79:2
**contexts (1)**
   53:9
**control (1)**
   68:15
**conversation (1)**
   10:5
**conversations (2)**
   9:12,15
**conviction (5)**
   29:7,18,19;73:23;
   74:20

**convictions (2)**
   16:10;26:6
**cooperation (1)**
   75:13
**copies (1)**
   4:2
**copy (5)**
   4:5,15;10:6,10,20
**corner (1)**
   11:8
**coroner's (1)**
   17:16
**correctly (2)**
   17:24;53:5
**co-taught (1)**
   12:21
**counsel (3)**
   81:7,17;87:12
**couple (3)**
   81:16,20;85:21
**course (6)**
   12:7;13:25;17:5;
   27:21;40:8;67:9
**courses (2)**
   12:4;16:17
**court (5)**
   4:2;10:11;45:7;
   65:12;79:23
**covering (1)**
   32:7
**crash (1)**
   15:23
**created (1)**
   41:10
**credit (1)**
   82:24
**crime (29)**
   12:10;14:2,3;18:5;
   19:24;20:1,12,21;
   28:23;32:13;36:7;
   37:8;38:2;39:25;
   40:17;41:24;45:21;
   46:7,13,14,19;48:3;
   50:21;51:3;55:15;
   64:17;67:1;68:18;
   70:20
**crimes (5)**
   12:18;16:11,13;
   20:2;39:8
**criminal (23)**
   5:12;12:25;13:10;
   14:24;15:2,11;16:9,
   9;18:6,7;21:4,24;
   23:19;26:14;27:2;
   29:19;39:1;42:10;
   54:21;64:8;79:6,17;
   80:4
**Criminology (5)**
   12:8,9,15;79:6,10
**critical (3)**
   52:11;53:4;65:12
**critically (1)**
   55:11

**cross- (1)**
   73:21
**cry (1)**
   64:19
**curious (2)**
   8:23;9:21
**current (1)**
   15:1
**Currently (1)**
   14:19
**cussing (2)**
   69:4;82:23
**custody (2)**
   39:24;40:4
**cut (1)**
   44:20
**cutting (2)**
   22:19,22
**CV (13)**
   10:24,25;16:18;
   17:24;21:3;22:3,12;
   26:17;27:8,14;83:17,
   17,20

**D**

**data (1)**
   57:24
**date (2)**
   5:16;87:22
**dates (1)**
   23:12
**David (16)**
   5:11;21:4,18,22;
   22:16;23:1,2,4;26:11,
   15;27:12;53:16;72:4,
   8;73:6;83:2
**day (18)**
   7:9;30:15,23;31:4,
   8,19;32:20;33:2;
   34:11,24;35:1,13;
   37:17;38:19;40:8;
   56:2;75:11;87:17
**days (4)**
   7:16;37:9,15,19
**deal-burglary (1)**
   36:17
**death (2)**
   15:25;51:7
**deceived (1)**
   77:5
**December (1)**
   18:19
**deceptive (1)**
   76:12
**decide (1)**
   12:16
**decided (2)**
   30:11,22
**deciding (2)**
   6:13,25
**decision-making (1)**
   14:23

**deck (1)**
56:20
**defendant (3)**
30:1;81:23,23
**defendants (3)**
9:17;85:12,13
**defense (5)**
15:8;17:12;21:8,9;
74:21
**define (1)**
23:12
**definitely (1)**
81:2
**definition (1)**
36:7
**degree (5)**
13:17,19;35:17;
64:18;80:2
**demeanor (4)**
64:7,10;65:9;81:17
**denigrate (1)**
55:21
**Department (7)**
14:21;18:16;19:11,
13;25:3;74:10;83:10
**depend (3)**
45:6;55:4;63:25
**depending (2)**
64:12,12
**depends (2)**
23:12;45:14
**DEPONENT (1)**
86:3
**depose (1)**
85:13
**deposed (2)**
9:9,20
**deposition (20)**
4:3,15;9:4,13;
10:13;22:4,8;27:12;
30:4;49:18;50:6,11;
72:2,16,20;74:1;
85:11;86:1;87:6,9
**depositions (9)**
30:24;31:1;34:4;
41:3;58:16;61:9;
69:14;70:7;83:5
**designated (1)**
52:7
**Detective (85)**
5:1;9:10;18:23,24;
31:1,10;32:1,16;
33:17;34:6;35:12;
36:9;37:7,14,20;
40:11,20,25;41:1,9;
43:1,14,18,23;44:5,
15;45:4,13;47:5;
49:18,22;53:20;55:8;
56:25;58:17;59:5,9,
14,20;60:14;61:6,8,
17;62:12,25;63:6,10,
14,19;64:5,21;66:5,7,
9,12,19;67:5,19,19,

**deck (1)**
20;68:3,7,24,25;69:6,
9,14,15,17,18,21,22,
22,24;70:8,23;71:8,
14,16;74:14;76:10;
80:2,16,16;81:17
**detectives (14)**
13:13;17:12;44:2,
9,14;45:1,15;48:18,
23;55:4;62:13;64:14;
75:16,22
**deteriorate (1)**
43:8
**determination (4)**
7:2,22;46:18;59:24
**determine (1)**
67:11
**determined (1)**
30:16
**Determining (4)**
35:5,6,25;53:13
**develop (3)**
48:20,21;53:12
**dice (1)**
76:11
**difference (2)**
38:10,15
**different (26)**
17:24;25:8;26:5;
35:5,9;38:17;48:8,
19;51:7;52:16;54:7;
56:1,7;58:1,5,6;
59:10,11;60:11,18,
25;61:19;65:16;78:3;
80:21,21
**differently (2)**
64:11,12
**difficult (1)**
43:11
**Direct (1)**
33:9
**directly (1)**
4:16
**disaster (1)**
25:10
**discarded (1)**
64:25
**disclosure (1)**
84:5
**discount (1)**
45:25
**discounted (1)**
42:19
**discounting (1)**
68:6
**discovered (5)**
32:20;55:5;57:3;
58:13;59:18
**discovery (1)**
65:9
**discuss (1)**
6:8
**discussion (2)**
6:9;52:5

**dismiss (1)**
61:12
**dismissive (1)**
27:25
**disorder (1)**
64:18
**disposing (1)**
43:3
**DNA (4)**
25:8;56:1;65:10;
66:18
**docket (4)**
10:11,15,16,17
**doctor (5)**
4:14,24;30:14;
85:3,11
**doctorate (1)**
13:8
**document (5)**
9:19,24;10:1,24;
11:8
**documentary (1)**
46:15
**documents (3)**
7:14,14;53:25
**dog (1)**
54:2
**done (22)**
16:4;17:25;24:19;
26:5;29:8,23,24,24,
25;34:25;35:2;38:3,
4;44:13;52:18,19;
53:22;59:16;66:25;
77:19,19;78:7
**double-check (2)**
27:6;54:22
**double-down (1)**
58:24
**down (10)**
23:22;26:18;31:14;
33:3;35:17;38:18;
46:17;51:10;65:4;
83:18
**Doyle (1)**
15:9
**DR (5)**
4:18;12:21;83:14;
86:7;87:4
**draw (5)**
30:21;31:3;58:6;
62:18;80:11
**drawing (3)**
36:12;62:21;70:2
**drew (4)**
62:25;63:1,2;69:9
**drink (1)**
52:17
**driving (1)**
50:19
**dropped (2)**
6:4;40:8
**drug (3)**
36:17,18;70:18

**duly (2)**
4:19;87:4
**during (10)**
18:20,20;26:14;
27:10;33:2;49:18;
53:16;63:18;81:18;
84:15
**duties (3)**
14:10;19:5,15

**E**

**earlier (10)**
7:19;9:10;19:22;
22:13;40:5;41:20;
46:22;50:6,11;72:2
**early (10)**
35:2;47:13;63:14;
67:13;76:6,22,25,25;
77:13;78:8
**easier (1)**
80:23;85:6
**easy (1)**
83:7
**effort (4)**
15:19;40:4;61:23;
62:15
**efforts (4)**
15:8;33:2;36:21;
66:5
**eight (2)**
23:9;72:5
**either (6)**
6:16;14:12;58:16;
59:19;61:16;72:21
**either' (1)**
82:20
**electronic (1)**
4:5
**electronically (1)**
4:9
**elements (3)**
37:1,2;59:23
**else (8)**
9:7;25:5;39:11;
48:10;65:20,22,23;
85:21
**e-mailing (1)**
10:9
**emotionally (1)**
77:6
**emphasis (2)**
37:16;68:5
**employed (2)**
21:25;87:13
**end (5)**
10:24;18:19;40:7;
73:23;85:16
**ended (2)**
74:19;76:12
**energy (1)**
62:15
**enforcement (2)**

**13:12;53:8**
**engage (2)**
6:19;55:20
**engaged (2)**
39:8;73:20
**enough (6)**
25:24;44:1;65:4;
78:9;81:12;83:7
**entire (2)**
8:20;44:12
**entirely (2)**
46:1;74:18
**entry (1)**
32:15
**environment (1)**
12:10
**Environmental (3)**
12:7,9,17
**episode (1)**
81:24
**equally (1)**
17:20
**erred (1)**
29:9
**erroneous (1)**
32:5
**error (10)**
15:19;57:23;58:14,
20;59:3,17,20;60:2;
61:14,16
**errors (4)**
29:10;52:19;53:1,2
**especially (2)**
65:19;73:23
**establish (1)**
50:22
**established (2)**
24:12;76:14
**establishes (3)**
71:7,10,11
**establishing (1)**
38:6
**establishments (1)**
12:14
**evaluating (2)**
63:10,11
**evaluation (2)**
8:3;78:4
**even (9)**
7:6;16:17;25:21;
36:25;43:4;53:2;
55:13;67:18;73:18
**events (2)**
15:4,5
**events' (2)**
14:25;15:17
**everyone (1)**
35:16
**evidence (91)**
8:4,12;12:24;14:5;
21:20;25:12;35:20;
37:3,22,24;38:1;
39:16,17,17;40:6,9,

14,16;43:7.7;45:7,21,
25,25;46:2,9,15,19;
47:2,10,18,19,25;
48:3,4,10,20,21,25;
49:12;50:19,23,23;
51:5,12;52:3;53:3;
55:5,9,11,15,17,17,
21,24;56:7,9;57:6,12,
13;58:1,3,4,6,12;
59:5,9,10,23;60:3,11,
15,16,17;62:2;64:10;
65:5,6,17,18;66:18;
70:22;76:8,21,24;
77:16;78:12;79:3;
80:3;81:1,23

**evidential (2)**
55:6;60:12

**exact (3)**
5:16;33:8;53:15

**exactly (3)**
26:9;38:18;49:14

**EXAMINATION (3)**
4:22;81:14,18

**examined (1)**
73:22

**examiner (1)**
76:16

**examining (1)**
54:20

**example (18)**
12:11;14:6;15:13;
17:17;20:8,15;29:6;
47:4;51:2;54:13,23;
58:10;60:7;61:3;
71:4;73:13;78:12;
79:12

**examples (2)**
36:24;60:8

**except (1)**
70:4

**exclude (3)**
76:3,5;78:21

**excluding (1)**
76:25

**exclusion (2)**
51:11;80:25

**excuse (1)**
27:19

**exercises (1)**
14:7

**exhibit (5)**
4:7;10:12;83:25;
84:14,18

**exhibit] (1)**
83:18

**exhibits (2)**
4:9;83:16

**exist (1)**
76:14

**existed (1)**
49:10

**expect (2)**
38:5;65:13

**expected (1)**
36:15

**experience (1)**
68:17

**experienced (2)**
40:18;64:20

**expert (29)**
5:3,5,23;6:14;7:1;
8:16;9:18;10:6,20;
22:14;23:9,13,13;
25:13;27:1,9,11;
30:10,15;33:9;42:13;
50:12;55:2;72:3,4,9,
24;78:6;84:6

**expertise (9)**
18:3;23:15;72:6;
79:5,8,15,17;80:1,8

**experts (1)**
85:13

**Expiration (1)**
87:22

**Explain (2)**
15:5;46:25

**explains (2)**
40:16;81:22

**explanations (1)**
50:21

**exploration (1)**
75:19

**explore (2)**
36:15;61:19

**explored (5)**
42:20;50:13,18;
64:4;70:21

**exploring (1)**
61:23

**extremely (1)**
57:9

## F

**face (2)**
32:7;61:22

**fact (14)**
30:21;41:18;46:13;
51:3;58:17,23;62:21,
25;64:3;67:5;70:4,
15,17;74:12

**factors (1)**
53:4

**facts (5)**
38:6;62:19,22;
63:3;64:1

**factual (1)**
57:5

**factually (3)**
6:23;7:3,23

**fading (1)**
22:16

**failed (5)**
26:6;28:9;42:14;
55:22;60:4

**failing (1)**

14:7

**failure (3)**
15:12;37:2,4

**failures (10)**
14:24;15:2,22;
16:2,9,10;18:6;28:8;
79:18;80:4

**Fair (1)**
65:4

**fall (1)**
5:18

**fallen (1)**
54:14

**false (3)**
75:25;76:13;78:9

**familiar (2)**
23:19;65:7

**family (14)**
33:2,15;34:14;
38:8;41:4,7,11,15;
69:1;77:2,5,14,21;
81:19

**family's (2)**
77:11,25

**farmer (1)**
25:7

**fashion (1)**
77:20

**fault (1)**
59:20

**FBI (1)**
41:12

**federal (1)**
24:3

**fee (1)**
8:19

**feel (2)**
80:6,7

**fees (1)**
8:24

**felt (1)**
40:6

**few (5)**
6:15;7:16;14:1,11;
15:7

**field (4)**
15:19;79:9,11,25

**fields (1)**
17:16

**figure (5)**
16:3;20:18;24:5,
10;66:25

**filed (2)**
10:10;39:21

**financial (1)**
70:17

**financially (1)**
87:15

**find (17)**
6:20;20:24;25:17;
31:9,25;33:7;34:5,8;
46:18;48:8,13;52:17;
53:24;59:22;67:24;

70:7;83:7

**finding (2)**
75:12;80:13

**fine (1)**
5:22

**finish (2)**
39:3;62:6

**Fireman (1)**
61:21

**firm (2)**
9:3;87:25

**first (35)**
4:19;5:14,22;7:14;
10:23;12:7;16:1;
31:16,16,18,21;
32:12,15;35:17;
38:24;47:24;48:2,21;
49:13;50:14,22;
51:25;52:21;57:14;
58:4;66:20;74:14;
75:4,5,9;77:16;
78:15;82:10,11,13

**fit (4)**
48:16;57:7;67:2;
82:18

**fits (2)**
49:12;57:17

**five (10)**
14:16;16:22;18:24;
19:11,12;43:19;44:5;
49:23;73:2;78:18

**fix (1)**
78:17

**flawed (2)**
42:2;54:1

**focus (9)**
14:18;16:19;31:20,
21;35:23,24;51:10;
76:18;78:12

**focused (2)**
36:20;66:17

**focusing (3)**
12:15;50:18;80:24

**folks (1)**
47:21

**follow (2)**
11:18;14:5

**following (1)**
87:3

**follows (2)**
4:21;87:9

**follow-up (4)**
31:11;55:23;72:1;
81:7

**Footnote (1)**
45:20

**forced (1)**
32:15

**forensic (2)**
17:12;79:12

**Form (3)**
11:9;32:23;60:20

**formal (1)**

17:2

**formalizing (1)**
52:9

**format (1)**
11:17

**forms (5)**
11:14,15;29:1,23;
65:16

**formulating (1)**
9:22

**forward (1)**
85:12

**found (6)**
25:8;35:1;43:5;
49:17;51:6;55:11

**four (11)**
14:14;16:22,24;
17:3;22:15;23:5,7;
26:18;27:10;44:9;
73:4

**frankly (1)**
64:20

**Fredericksburg (1)**
27:17

**friend (1)**
52:16

**front (1)**
71:3

**full (5)**
11:23,25;25:25;
75:4,5

**function (2)**
46:19;74:15

**further (12)**
6:19;9:22;38:21;
55:23;64:5;75:18;
78:13;83:15;84:11;
86:3;87:12,15

**future (6)**
15:22;16:6;24:6,
11;29:11;47:19

## G

**gadfly (1)**
52:8

**game (1)**
54:2

**gang (1)**
51:4

**garbage (1)**
70:24

**gathered (1)**
70:22

**gave (5)**
17:17;22:4,8;23:5;
25:12

**gears (1)**
48:11

**general (1)**
13:11

**generally (1)**
41:11

generating (1)
84:16
geographic (7)
18:1,25;19:14,18,
23,25;74:16
geography (3)
18:5;19:24;21:1
Georgia (1)
29:8
given (13)
12:16;16:14;20:21;
23:8;51:3;66:21;
70:15,17;75:25;
76:13;77:1;80:14;
87:6
gives (1)
24:18
giving (4)
17:18;60:7;68:8,20
gloves (1)
66:22
goal (1)
16:1
goes (4)
52:15,20;82:9;
84:20
Good (11)
4:24;5:6;17:6;
40:18;51:4;53:21,21,
22;54:9;71:4,19
government (2)
24:3;74:22
grand (1)
23:25
grants (1)
14:20
grass (1)
20:18
greater (1)
68:4
group (1)
52:7
groups (2)
17:9,21
guess (18)
5:21;6:22;16:16;
17:5,6;20:11;24:1;
26:8;34:9;37:3;49:4;
59:1,1;60:9;69:5;
72:7;78:23;81:9
guessed (1)
73:3
guest (1)
17:8
guidance (1)
74:19
guide (1)
47:18
guilt (4)
35:8;36:1,2;38:16
guilty (15)
8:13;30:16,23;
31:4,13;33:11;35:6,

25;36:5,12;38:12,20,
22;68:17;77:7
guy (1)
29:2

## H

half-life (1)
43:6
handful (2)
73:1,2
handle (4)
44:5,16;45:2,4
handled (1)
30:8
hands (1)
80:5
handy (1)
13:25
happen (3)
24:5;76:12,16
happened (12)
15:25;39:18;40:19;
42:16;43:12;55:15;
67:12,14;70:22;71:6,
13;82:4
happening (2)
16:6;24:11
happy (1)
67:23
hard (1)
64:11
haystack (1)
20:24
head (4)
54:16;61:12,18;
63:15
headquarters (1)
33:3
heard (1)
32:9
hearings (1)
24:2
help (5)
14:13;25:25;28:25;
47:18;49:4
helpful (2)
26:7;79:2
helps (1)
50:24
Hennessey (3)
5:11;83:2,6
hereby (1)
87:2
here's (1)
62:13
hey (1)
40:18
high (4)
28:2;41:18;65:12;
70:20
higher (2)
13:9;52:23

history (1)
28:1
holding (1)
58:16
holes (1)
52:8
Hollywood (1)
65:14
home (1)
74:5
homicide (29)
17:12,14,18;18:23;
29:14;32:7,16,19,20;
33:15;35:15;37:8;
43:23,25;44:2,4,9,15;
45:3,13,13,15,15;
51:17;52:15,23;74:8,
8,14
homicides (6)
18:22;49:23;74:10,
17,17;78:18
honest (1)
68:20
hoping (1)
13:8
horribly (1)
20:20
horse (1)
53:19
hospital (1)
16:1
hour (3)
8:17;57:3;87:10
hours (4)
33:5,10;35:2;62:11
human (5)
53:10,11;55:19;
64:22;79:7,13,15
hundreds (2)
20:25;38:25
hurt (1)
75:17
hypotheses (1)
46:20

## I

idea (7)
15:21;20:20,20,23;
24:4,18;73:10
ideas (1)
29:16
identified (2)
36:10;37:17
identify (4)
35:12;37:5;40:12;
44:12
identifying (2)
37:10;38:11
ignore (2)
64:24;65:18
ignored (5)
16:13;25:3;63:21;

64:3,8
immediately (3)
39:20;41:5;57:15
implicate (2)
66:6,14
importance (3)
46:25;49:6;50:7
important (5)
43:3;47:23;49:15;
53:2;76:5
impression (3)
28:6;42:16;66:7
improper (1)
28:1
inactions (1)
71:17
inappropriate (2)
35:12;37:18
incidents (1)
15:3
include (2)
19:6;26:3
included (1)
39:7
including (2)
36:16,17
incompetence (1)
71:10
inconsistent (1)
77:12
incredibly (1)
64:9
independent (1)
27:1
index (2)
4:6;83:17
Indiana (4)
21:5;23:20;27:12;
73:5
Indianapolis (3)
5:1;43:23;44:1
indicate (1)
32:24
indicated (2)
6:1;32:1
indicates (1)
32:8
indication (4)
32:15;61:10,13;
68:24
indications (2)
69:1;75:22
indiscernible (2)
11:1;39:20
indiscriminate (3)
74:25;75:8,21
individuals (3)
39:8;64:11;68:17
industry (1)
15:18
infamous (1)
65:7
inference (2)

62:25;63:1
inferences (3)
62:18,21;63:2
influence (2)
12:10,17
influenced (1)
57:20
influences (1)
19:24
information (14)
4:13;7:8,15;8:2,4,
10,16;10:16;42:9;
43:10;48:12;81:1,22;
84:22
informed (1)
10:1
initial (6)
8:14;35:21;48:13;
53:3;55:18;58:22
initially (2)
8:6;57:1
initiatives (1)
15:21
injury (2)
61:11,18
innocence (1)
57:7
innocent (6)
6:24;7:3,21,23;8:8;
41:22
inquiries (1)
26:4
inquiry (12)
23:15,18,21;24:12,
22,24;25:10,14;72:7;
73:14,19;75:19
insidious (1)
51:16,20
inspector (1)
18:24
instance (1)
36:24
instead (1)
57:19
Institute (3)
14:19,20;15:10
integral (1)
57:19
integrate (1)
61:24
interest (1)
79:10
interested (7)
6:22;14:13;17:22;
54:5,19;73:20;87:16
interesting (3)
62:5,11;70:9
internal (3)
24:9,13,14
internationally (1)
19:21
interpretation (1)
81:1

**interpreting (3)**
57:23;58:2;59:3
**interruption (1)**
19:7
**intersect (1)**
18:6
**interviewed (1)**
41:5
**into (9)**
28:12;32:21;39:24;
40:3,17;49:12;57:6;
78:19;83:18
**introduce (1)**
14:2
**introduced (1)**
52:5
**Introduction (1)**
30:18
**intruder (2)**
50:15,16
**investigate (6)**
28:4,10;38:21;
42:7,8;44:2
**investigated (4)**
28:5;42:20;44:3;
74:10
**investigating (2)**
18:22;37:7
**investigation (41)**
6:21;8:14;13:1;
15:24;24:9,13;27:17;
28:16,23;29:9,21;
33:15;35:16;38:5;
42:2,22,23;45:6;
47:22;51:17;54:1;
55:10;63:11;65:13;
66:5,8,8,13,14;67:6,
6,7,9,9,11;69:11,25;
75:18;78:5,13;79:3
**Investigations (14)**
12:19;14:15;18:7;
20:8;24:2;26:6;
27:20;28:14;30:8;
42:10;54:11,21;
74:11;79:6
**investigative (20)**
12:23;13:21;14:24;
15:2;16:9,10;18:6;
19:19;46:22,25;
47:24;49:6;50:5,7,
14;51:4;55:7;70:21;
79:18;80:4
**investigator (1)**
74:8
**Investigators (2)**
17:18;62:18
**investigatory (1)**
40:11
**invitation (1)**
76:17
**invited (1)**
5:2
**involve (4)**

20:10,25;24:15;
26:12
**involved (11)**
6:16;24:21;25:1;
26:3;28:14;29:20,20;
43:13;64:17;68:18;
72:19
**involvement (2)**
23:16;28:16
**involves (1)**
78:5
**irrelevant (4)**
46:7,8,9,11
**issue (1)**
78:13
**issues (1)**
62:14
**Italian (2)**
65:8,12
**italicized (1)**
66:11

**J**

**January (1)**
18:17
**Jerome (1)**
29:7
**Jim (1)**
15:8
**job (9)**
6:20;14:16;52:8;
53:21,21,21,22;54:9;
56:17
**John (1)**
29:7
**judge (1)**
80:8
**judged (1)**
77:25
**judging (4)**
61:8;77:24,24;
79:15
**judgment (5)**
77:8;78:5,6;79:13;
83:25
**judgments (1)**
77:11
**juggling (1)**
43:20
**jump (3)**
14:6;37:12;39:15
**jumped (3)**
38:8;53:13;65:8
**jumping (1)**
67:10
**jumps (1)**
61:20
**jurisdictions (1)**
73:5
**jury (1)**
23:25
**justice (7)**

13:10;14:20,20,21;
15:10,11,15
**justified (2)**
35:22;53:17

**K**

**keep (5)**
43:20;49:21,25;
52:1;56:20
**key (1)**
66:4
**killed (3)**
47:6,7,8
**killer (3)**
20:4;25:7;66:19
**KIM (4)**
4:18;5:9;86:7;87:4
**K-I-M (1)**
5:9
**kind (13)**
7:1,22;10:21;12:8;
13:2;20:15;21:17;
23:9;24:13,19;26:22;
41:8;77:12
**Kingdom (1)**
52:13,23
**knew (1)**
9:16
**knowing (2)**
62:22;63:7
**known (1)**
25:7
**knows (2)**
71:1,13
**Knox (1)**
65:7
**Krogers (1)**
71:3

**L**

**lab (1)**
55:12
**laboratory (1)**
37:23
**lag (1)**
77:17
**lags (1)**
43:13
**land (1)**
57:2
**last (15)**
13:25;14:14,15;
16:22;18:23;19:10,
12;21:13;22:15;23:5;
24:20;34:10;66:2;
77:22,23
**later (8)**
13:8;14:4;55:17;
58:6;77:18,19;83:17;
85:17
**latest (1)**

58:15
**law (4)**
9:3;13:12;23:19;
53:8
**lawsuit (2)**
5:2;30:2
**lawyer (3)**
6:18;7:8;15:8
**lawyers (3)**
17:13;73:22;74:21
**lay (1)**
40:5
**layout (1)**
12:12
**lead (2)**
74:7;80:4
**leading (2)**
75:25;76:17
**leads (2)**
45:8;81:3
**learn (1)**
15:16
**learned (4)**
32:6;64:10;78:11,
11
**least (10)**
8:1,6;16:11,24;
48:6;49:9;54:20;
55:14,20;66:19
**leave (1)**
43:10
**lectures (1)**
17:8
**led (3)**
16:14;59:23;77:15
**left (1)**
66:20
**legal (4)**
7:14;10:1;36:3,7
**Leslie (2)**
9:10,14
**less (5)**
30:15;38:19;55:16;
57:18;75:11
**level (2)**
13:4,5
**life (1)**
54:18
**likely (1)**
55:7
**line (4)**
32:10;48:11;57:2;
75:18
**lines (1)**
12:13
**liquor (1)**
12:13
**list (5)**
26:2;27:9;28:17;
42:24;73:9
**listed (9)**
12:4;16:18;26:18,
22;27:5,7;28:15,19;

29:6
**lists (1)**
27:12
**litigation (5)**
5:15;72:10,14,25;
73:21
**little (4)**
65:19;80:23;82:12;
83:12
**live (1)**
12:13
**lived (1)**
29:14
**located (1)**
12:14
**location (2)**
20:21;51:6
**locations (1)**
20:1
**lock (2)**
31:6;51:10
**locked (1)**
54:12
**locking (3)**
32:21;39:22;78:2
**logged (1)**
62:11
**logic (4)**
12:23;13:20;53:18;
55:7
**logical (4)**
79:15;80:3,9,14
**long (4)**
11:21,25;17:17;
21:16
**look (28)**
7:9;8:3;16:8;20:12,
18;24:4;27:20;28:3,
7,13;31:16;32:9;
43:3;48:9;55:25;
58:4,5,11,11;59:5,7,
9;60:25;69:23,24;
70:24;71:8,17
**looked (12)**
17:23;51:11;56:6,
8,18;57:15;58:1;
59:10,18;61:15;70:6;
81:20
**looking (15)**
14:22,23;20:11;
25:21;28:18,18;
29:15;31:12;47:19;
49:11,18;52:17;55:1;
56:20;74:11
**looks (4)**
12:17;17:24;22:12;
61:25
**lost (1)**
69:15
**lot (10)**
17:1,25;27:20;
32:24;54:10;69:4;
78:19;79:5;82:23,23

**lower (1)**
41:18
**lying (1)**
78:25

## M

**Ma'am (10)**
25:25;34:2;42:6;
49:17;54:8;60:24;
62:14;63:9;71:17;
78:4
**magic (2)**
48:11;79:1
**main (3)**
14:16;18:3,4
**major (2)**
25:9;28:19
**makes (9)**
32:4;33:1;47:4;
58:24;61:1,1,5,23;
85:6
**making (2)**
10:12;77:8
**man (1)**
63:7
**many (16)**
7:5;17:11,13;
21:22;22:14;28:14;
29:15,15;37:7;41:7;
43:22;44:14,14;45:3;
72:23;79:2
**mapped (1)**
20:10
**maps (2)**
20:5,23
**Marcos (1)**
29:14
**master (2)**
13:5,6
**masters (1)**
13:7
**master's (1)**
13:4
**matches (2)**
47:10,25
**material (1)**
10:2
**mathematical (1)**
77:15
**matter (15)**
6:2;9:16,23;21:24;
22:6;25:1;28:5,21;
29:18;35:17;53:20;
73:22,24;84:4,20
**matter-burglary (1)**
36:18
**matters (1)**
36:21
**may (14)**
14:15;15:15;27:8;
29:19;32:22;47:18;
48:9;51:1;52:7,19;

71:15;73:9;81:7;
82:25
**maybe (26)**
7:9;13:4,8;14:8;
15:13;21:15,16;24:1,
14;29:21;31:22;
43:19;46:15,16;
48:21;52:22;55:11,
23;58:19;66:20,23,
24;78:12,13,14;83:6
**mean (6)**
20:19;26:14;48:16;
70:23;78:7;79:25
**meaning (4)**
11:11;33:11;66:5;
73:2
**meanings (1)**
51:12
**means (3)**
21:2;43:7;50:23
**meant (6)**
49:25;58:14;63:3;
66:9,12,14
**medical (1)**
15:18
**member (2)**
38:8;41:8
**members (2)**
41:4;77:15
**memories (1)**
43:8
**mention (1)**
14:8
**mentioned (3)**
17:5;46:22;50:12
**mere (1)**
67:5
**merge (1)**
73:12
**met (2)**
30:1;63:6
**microphone (1)**
22:22
**middle (1)**
34:22
**might (22)**
9:23;13:11;17:22;
24:1;29:10,20;38:21;
47:4,6;48:19;51:8;
67:1;69:15;73:3;
77:4,5;78:14;79:1;
83:3,15,25;84:15
**mind (11)**
38:9;40:25;41:2;
49:10;55:17;56:21,
22;60:18;71:15,16;
78:22
**minimal (1)**
36:21
**minute (2)**
11:3;22:18
**minutes (2)**
87:10,11

**missed (1)**
52:18
**missing (5)**
24:25;25:2,12,13;
73:13
**misstates (3)**
56:10;60:20,21
**mistake (6)**
29:2;58:2,17,22;
59:18;61:15
**mistakes (1)**
58:23
**mix (1)**
27:21
**mixing (1)**
38:23
**moment (3)**
31:9;34:5,8
**money (2)**
54:5;78:14
**month (2)**
52:14;85:16
**months (4)**
24:17;37:10;39:21;
55:13
**more (21)**
7:15;8:3,4;16:19;
25:6;29:5,5;40:6;
43:11;44:8;51:1;
52:10;53:2;55:11,16;
56:23;57:18;73:3;
75:21;80:25;82:8
**Moreover (1)**
8:13
**morning (1)**
35:2
**Most (11)**
6:16;16:2,9;18:25;
20:6;28:21;37:1,3;
54:4;55:6;66:23
**mother (4)**
6:4;41:14;75:12;
80:13
**mother's (1)**
63:15
**move (4)**
43:1;45:17;61:13;
78:18
**moved (2)**
25:5;59:12
**moves (1)**
62:1
**movie (1)**
65:14
**Moving (1)**
22:23
**much (11)**
12:15;20:21;37:21;
41:18;43:11;45:13;
52:10;65:19;80:19;
85:2,5
**multidisciplinary (1)**
79:11

**multiple (14)**
16:3;24:15,16;
37:12;50:21;56:18;
59:2,6,6,6,9,11;60:6,
25
**murder (20)**
6:3;19:1,2;26:11;
31:5;35:14;41:5,10,
13,15,17,19;42:15;
43:4;52:21;63:12;
65:10,11;70:25;71:1
**murders (1)**
25:6
**must (1)**
40:11
**myself (1)**
31:25

## N

**name (5)**
4:24;5:8,9;15:8;
21:13
**narrative (2)**
47:3;62:9
**National (3)**
14:19,20;15:10
**natural (1)**
23:25
**nature (8)**
28:22;29:5;42:10;
45:14,14;46:3,5;
79:11
**necessarily (3)**
15:16;83:4,4
**necessary (1)**
70:24
**need (14)**
29:3;34:15;40:15,
16;41:6;44:1,10;
47:3;48:9,14;49:4;
50:22;51:9;59:21
**needed (2)**
25:20;70:21
**needle (1)**
20:24
**needs (4)**
42:20;52:18;59:5;
76:8
**neighborhood (3)**
38:3;42:25;48:5
**neither (1)**
87:12
**new (1)**
29:15
**next (7)**
7:6;11:21;12:19;
17:19;31:8;33:2;
85:21
**night (1)**
82:13
**nightclubs (1)**
12:14

**none (1)**
61:16
**nonexistent (1)**
36:22
**nor (1)**
87:13
**normal (1)**
80:9
**normally (5)**
7:4,5,7;14:10,13
**note (1)**
83:15
**notebook (1)**
62:5
**noticed (1)**
10:25
**November (1)**
49:20
**number (21)**
8:13;10:11,15,16,
17;11:8;15:10;20:5;
25:1;33:12;36:18,23;
37:9,15,19;45:2;
47:9;52:4,25;63:2;
84:1

## O

**object (2)**
44:19;60:19
**Objection (5)**
13:22;40:1,22;
56:10;58:8
**obtain (1)**
37:2
**obvious (1)**
51:1
**obviously (1)**
80:15
**occasionally (1)**
17:13
**occasions (2)**
59:10,11
**occur (4)**
12:11,25;42:23;
64:19
**occurred (7)**
14:4;15:14,24;
20:3;24:5;38:7;67:1
**occurrence (1)**
57:5
**occurring (2)**
25:6;29:11
**occurs (2)**
15:19;20:12
**off (7)**
10:23;37:11;44:21;
54:16;75:18;82:8;
85:10
**offend (1)**
12:16
**offender (2)**
14:22;20:6

**offered (2)**
72:6,11
**officer (8)**
18:9,15,18;19:12,
16;54:10;64:21;87:5
**officers (5)**
13:11,13;17:11;
44:10;51:23
**offices (1)**
17:16
**officials (1)**
53:8
**often (6)**
14:1;20:25;24:16;
58:22;73:23;81:3
**old (2)**
20:16;35:15
**once (2)**
20:10;61:25
**one (60)**
4:12,14;14:8,22,
23;17:17,17;18:4;
20:14,15;21:1,16;
24:21;29:1,6,12,13,
22;36:6;42:19,20,24;
43:9;44:4,5,15;45:12,
13,16;48:19;50:8;
51:8,10,25;52:14,14;
55:24;56:2,23;57:14;
58:7;59:12;60:1,8;
62:13,21,25;65:16;
67:10;69:13;72:25;
75:11;76:11;78:2;
80:24;81:16;83:5,16,
18;84:7
**ones (3)**
16:11;28:19;29:6
**ongoing (2)**
28:17,20
**only (17)**
6:20,21;21:2;23:4;
28:8,18;34:3;42:9;
45:20;58:11;59:11,
14;60:1,3,3;71:12,17
**open (2)**
13:18;52:2
**operate (1)**
6:17
**operational (2)**
28:20;29:5
**operative (2)**
6:23;49:24
**opinion (4)**
10:3;41:4;44:7;
78:7
**opinions (1)**
9:22
**opportunity (1)**
43:1
**opposed (1)**
76:25
**opposite (1)**
50:20

**option (1)**
52:12
**options (2)**
36:16;52:2
**oral (1)**
87:5
**order (18)**
4:12,13;55:6,8,10;
56:1,7,8;58:2,3,5;
59:11;60:11,12,14,
15,16,18
**orders (2)**
56:19;60:25
**original (2)**
29:22;60:10
**others (3)**
16:12;51:2;80:25
**otherwise (1)**
87:16
**out (25)**
11:2,3;14:13;16:4;
20:18;22:16,19,22;
24:5,10;30:11,12;
33:13;39:14;41:14;
50:24;52:22;66:24,
25;67:8;68:9,15;
78:23;82:2,22
**outcome (1)**
87:16
**outline (1)**
20:6
**outlined (1)**
35:20
**outlines (1)**
36:23
**outside (1)**
70:25
**over (4)**
9:6;27:20;30:13;
43:9
**overbroad (1)**
13:22
**overlap (3)**
73:12;80:5;81:2
**overlaps (2)**
79:20;80:2
**overworked (2)**
45:1;50:3
**own (1)**
36:9

**P**

**page (34)**
10:25;12:5;26:1,
10,16;27:9,14;30:10,
14;32:4;33:13,16;
34:10,22;42:12;
45:19;46:21;49:17;
50:13,15;51:15,21;
55:2;60:12;66:1,2;
68:12,13,14;73:15,
16;74:24;75:3;81:21
**people's (1)**
68:5
**per (1)**
74:15
**percent (1)**
75:24
**perform (1)**

**paid (3)**
9:2;54:3,7
**Pam (3)**
4:5,24;83:15
**panacea (1)**
79:1
**papers (1)**
22:23
**paragraph (5)**
34:10;50:15;66:2;
75:4,5
**parentheses (1)**
7:5
**part (14)**
6:25;14:2;16:3;
28:18;34:6,7;57:19;
71:8;74:14;75:21;
77:12;79:7;83:22;
84:7
**particular (14)**
12:22;13:9;16:7;
20:3,11;37:8,9,19;
44:17;51:2,3;55:4;
73:22;83:9
**particularly (6)**
10:2;12:18;41:17;
52:2;70:16;74:17
**parties (2)**
73:20;87:13
**partly (1)**
15:7
**party (1)**
87:8
**passes (1)**
78:24
**patrol (2)**
13:13;44:10
**patterning (1)**
12:18
**patterns (2)**
12:10;20:12
**pay (1)**
85:13
**paying (1)**
9:1
**payment (1)**
85:12
**people (30)**
12:13;17:15;24:16;
31:24;34:4;37:5;
38:25;43:1;46:6,18;
52:6,7,10;54:12;
58:23;61:25;64:11,
19,19,20;65:14,15;
66:22;75:23;76:3,6,
22;77:7;78:9;84:21

**40:12**
**perhaps (4)**
56:23;63:18;72:21;
74:12
**period (1)**
18:20
**periodic (1)**
17:6
**periods (1)**
52:14
**perpetrator (1)**
25:18
**person (4)**
35:5;39:16;41:21;
78:15
**personal (3)**
32:8,10;70:14
**persons (1)**
13:16
**perspective (3)**
14:25;16:5;75:16
**perspectives (1)**
61:20
**Peter (1)**
12:21
**petulant (1)**
82:12
**phenomena (1)**
53:10
**phenomenon (4)**
53:7,8,11;64:13
**Phone (12)**
19:7,8;33:5;38:4;
46:15;57:12,14,23;
58:3;59:4;60:1,2
**phrase (2)**
49:24;66:4
**physical (10)**
37:2,23,24;38:1;
43:7;44:11,11;45:21;
46:4;55:14
**pick (1)**
37:25
**picture (1)**
81:10
**piece (4)**
60:3;65:5,16;71:2
**pieces (4)**
33:12;48:16;57:12;
65:6
**pig (1)**
25:7
**pissed (2)**
82:5,8
**pitfalls (1)**
51:24
**place (1)**
27:6
**places (2)**
66:23
**placing (2)**
32:23;68:4
**plaintiff (3)**

**5:5,15;7:21**
**please (2)**
5:8;79:22
**pm (2)**
83:13;86:1
**point (31)**
7:16;33:5,13;
34:13,17;37:23;
39:25;42:8;46:17;
48:9,11,14;49:14;
51:2;52:2,22;54:18;
62:20;66:16,18;68:6,
9;69:7,25;70:3,11,11;
72:20,22;73:25;77:2
**pointed (1)**
50:10
**pointing (1)**
78:23
**poke (1)**
52:8
**police (37)**
8:14;13:11;15:11;
16:13;17:11,15;18:9,
15,16;19:13,20;25:3;
27:17,24;28:4,8,14,
15,20,22;31:6,6,8;
32:22;33:3;39:23;
51:22;52:4,24;54:9,
9;64:10,21;65:8;
74:9,21;83:10
**policies (1)**
11:14
**policing (1)**
54:10
**policy (1)**
11:12
**polygraph (25)**
33:3;67:13,22;
68:9,12,16,18,20;
70:5;74:25;75:7,23;
76:1,16;77:14,17;
78:15,17,21,24;
81:18,24;82:3,20;
83:10
**polygraphs (2)**
76:2,14
**portion (3)**
12:22;78:24;79:23
**position (1)**
70:8
**positions (1)**
12:12
**positive (2)**
75:25;76:13
**positives (1)**
78:10
**possibilities (1)**
47:14
**possibility (6)**
6:9;42:14,19,22;
50:15;84:16
**possible (5)**
35:13;39:8;51:8;

70:18;76:6
**possibly (4)**
   5:23;63:19,23;
   66:18
**post-traumatic (1)**
   64:18
**potential (1)**
   38:25
**power (1)**
   24:16
**powerful (1)**
   57:5
**Powerpoint (1)**
   84:16
**PPS (3)**
   11:9,12,17
**prefer (1)**
   53:21
**premature (2)**
   35:18;48:7
**prematurely (3)**
   51:10;52:1;76:21
**prepare (5)**
   9:4;11:18;19:18;
   21:15,17
**prepared (3)**
   9:17;21:16;84:18
**presence (1)**
   42:11
**presentation (1)**
   84:16
**presentations (4)**
   17:2,6,8,10
**press (1)**
   25:7
**pretty (5)**
   10:14;34:12;57:5;
   70:6;80:19
**prevent (4)**
   15:22;16:5;24:11;
   29:10
**previous (1)**
   27:10
**prey (1)**
   54:14
**prime (1)**
   33:7
**prior (4)**
   27:25;39:1;48:6;
   72:5
**prioritizing (2)**
   20:9;21:2
**probability (5)**
   20:23;41:10,15,18;
   77:15
**probable (9)**
   20:6;35:8,21;37:1;
   38:15,21;57:1,19;
   59:24
**probably (15)**
   4:12,13;13:9;
   14:14;16:21;17:20;
   24:23;25:9;28:13;

46:17;48:12;49:19;
53:2;68:20;84:19
**problem (12)**
   25:3,22,23;29:22;
   48:25;51:9;55:7;
   59:22;62:23;70:17;
   77:15;78:14
**problematic (6)**
   37:3;54:1;56:23;
   63:2;75:24;78:8
**problems (3)**
   8:13;28:4;29:21
**procedure (3)**
   11:13;52:13;66:23
**procedures (2)**
   11:14,14
**proceed (2)**
   6:18;7:13
**proceeded (1)**
   6:11
**proceeding (1)**
   87:14
**proceedings (1)**
   27:2
**proceeds (1)**
   69:24
**process (2)**
   52:9;76:9
**produce (2)**
   20:5,22
**product (1)**
   46:14
**profession (1)**
   13:18
**professional (3)**
   11:18;44:9;76:15
**professionals (3)**
   13:10,12;17:21
**professor (4)**
   11:23;12:1;14:10,
   12
**profiles (1)**
   19:18
**profiling (6)**
   18:1,25;19:14,23,
   25;74:16
**program (1)**
   20:4
**progressed (1)**
   72:22
**project (1)**
   16:7
**projects (1)**
   14:22
**proper (2)**
   38:3;54:11
**properly (4)**
   44:2,3;45:11;50:9
**proportion (1)**
   13:10
**prosecutor (2)**
   21:8;40:5
**prosecutors (2)**

17:13;74:22
**prove (1)**
   68:19
**provide (2)**
   23:8;28:25
**provided (5)**
   8:2,16;21:3;27:1;
   74:16
**providing (2)**
   21:7;24:21
**province (1)**
   25:10
**provincial (2)**
   24:3;73:18
**proximity (1)**
   46:7
**psychology (4)**
   79:7,9,10,12
**punitive (1)**
   15:15
**purposes (2)**
   21:21;84:10
**pursue (1)**
   47:24
**pursued (2)**
   50:9;69:11
**pursuing (2)**
   6:5;50:7
**put (6)**
   17:7;28:12;47:3;
   78:3,19;84:3
**putting (3)**
   37:16;45:7;80:5
**puzzle (1)**
   54:25
**puzzles (1)**
   54:24

---

## Q

**quality (1)**
   63:8
**quantitative (1)**
   20:1
**quick (1)**
   78:16
**quickly (1)**
   43:10
**quite (3)**
   23:11;29:12;74:13
**quotation (1)**
   33:8
**quotations (4)**
   31:10;32:1;53:18;
   67:24
**quote (1)**
   33:17
**quotes (1)**
   32:4

---

## R

**race (1)**

53:19
**Rainsberger (51)**
   5:15;6:2,3;7:2,23;
   8:7,20;9:13,15;30:16,
   22,25;31:4;32:17;
   33:1,10,11,14;35:13,
   20,25;36:10,16,20,
   25;37:16;38:19;
   39:10,19;57:2,17;
   63:11,13;66:6,10,15,
   17;67:8,18,21;68:8;
   69:4,10,23;70:4,5;
   71:3;75:7;82:2,7;
   83:8
**Rainsbergers (1)**
   35:18
**Rainsberger's (8)**
   5:12;57:2,6;61:12;
   67:15;80:8,13;81:7
**raised (1)**
   8:23
**range (1)**
   64:22
**rape (4)**
   19:1,3;64:14,14
**raped (1)**
   64:16
**rapid (1)**
   12:12
**rate (1)**
   52:24
**rates (1)**
   76:13
**rather (5)**
   12:15;15:12;34:9;
   58:11;85:16
**rational (5)**
   79:12,15;80:3,9,15
**rationale (2)**
   12:23;13:21
**rationally (1)**
   14:5
**reached (1)**
   55:3
**react (1)**
   81:23
**reacted (1)**
   75:16
**reaction (7)**
   68:14;77:9,11,24;
   78:1;81:18,24
**read (8)**
   4:14;9:6,24;36:8;
   59:15;65:24;79:21,
   23
**reading (2)**
   17:24;30:4
**reads (1)**
   11:9
**ready (2)**
   85:18,19
**real (5)**
   42:14,19,21;65:15;

66:19
**realized (1)**
   61:14
**really (11)**
   6:19,21;9:25;
   16:18;25:3;37:21;
   42:24;53:20;54:5;
   57:14;65:4
**reason (1)**
   43:9
**reasonable (2)**
   35:21;62:18
**reasons (1)**
   53:1
**Rebecca (11)**
   30:25;33:14,17,20,
   22,24,25;39:10;49:8;
   70:16;83:8
**rebuttal (1)**
   9:18
**recall (1)**
   22:5
**Recess (2)**
   71:24;83:13
**recognition (1)**
   15:9
**recognize (3)**
   16:2;26:8;77:4
**recognized (1)**
   40:7
**recollections (1)**
   83:8
**recommend (1)**
   51:22
**reconsider (1)**
   29:4
**record (13)**
   5:7,8,20,21;10:5,9;
   46:15;58:3;60:1,2;
   61:11;85:10;87:6
**records (3)**
   38:4;59:4;61:4
**recovered (1)**
   38:1
**refer (3)**
   10:21;42:12;84:15
**referenced (1)**
   84:15
**referred (4)**
   26:16;66:8;67:5;
   83:21
**referring (1)**
   34:16
**refers (1)**
   75:21
**refusal (2)**
   68:11,16
**refused (3)**
   67:13;70:5;82:4
**refuses (1)**
   77:3
**regard (1)**
   75:10

regarding (7)
  6:2;9:16,18;10:3;
  31:10;41:25;84:14
Registration (1)
  87:25
reject (1)
  54:4
relate (1)
  26:5
related (2)
  17:16;87:13
relates (1)
  62:10
relationship (4)
  28:1;41:11,15;
  46:12
relationships (2)
  41:16;46:6
relative (1)
  32:19
relevance (4)
  63:23,25;65:1,2
reliability (1)
  76:1
reliable (1)
  38:6
relied (1)
  69:8
remember (3)
  14:1;21:10,13
remembering (1)
  7:19
remind (3)
  18:14;73:15;84:20
report (54)
  5:4;8:16;9:6,17,25;
  10:1,2,6,10,20;21:15,
  18,19,21;26:10,13;
  27:9;30:10,15;33:9;
  36:4,9,11,23;41:12;
  42:13,18;45:19;
  49:15;50:12;51:15,
  21;52:20;54:6;55:2;
  56:11;60:21;66:1;
  68:24;69:2,8,13;
  74:24;80:12;81:20,
  21;83:1,5,16,17,23;
  84:14,17,22
report] (1)
  10:13
REPORTER (11)
  4:1,2,8,17;11:2;
  22:18,21,25;30:12;
  79:24;87:1
reporters (1)
  73:19
representing (3)
  5:1;6:1;73:19
Requested (1)
  79:23
required (2)
  37:14;40:6
research (7)

14:9,17,18,21;
  15:1;16:7,19
researching (1)
  15:6
resided (1)
  20:7
resources (1)
  53:3
respect (2)
  15:1,2
respond (1)
  43:10
responders (1)
  66:20
response (4)
  16:14;27:24;44:8;
  58:21
responses (1)
  80:13
responsibilities (2)
  19:5,16
responsibility (2)
  18:22;58:18
responsible (2)
  36:6;41:8
rest (1)
  69:11
result (2)
  15:7;48:9
resulted (1)
  25:5
results (5)
  48:5;55:12,13;
  56:1;61:24
resumé (1)
  26:23
retained (2)
  23:8,13
retaining (1)
  6:9
rethink (2)
  54:22;62:14
rethinking (1)
  59:22
rethought (1)
  58:13
retired (1)
  54:9
return (1)
  70:1
returned (3)
  17:14;34:18;55:12
revaluated (1)
  47:17
revenge (1)
  51:4
review (3)
  27:16;29:7,13
reviewed (3)
  41:23;42:25;54:6
reviews (1)
  26:4
Rich (3)

4:11;81:9,11
Richard (1)
  5:24
rifled (1)
  32:14
right (30)
  4:12;10:15,16,18,
  18;17:9,23;18:2;
  19:15;31:18;33:20,
  22,25;35:9;39:6,19;
  44:14;45:12,17;
  48:19;49:3;54:11;
  58:14;64:23;66:24;
  68:15;70:19;71:18;
  73:7;76:7
right-hand (1)
  11:8
risk (2)
  49:1;55:20
robbery (2)
  42:15;47:8
Robert (11)
  30:25;39:10;49:7;
  57:2;67:18;69:4,23;
  70:16,16;78:14;82:2
role (2)
  26:14;52:10
rolled (1)
  76:11
roommate's (1)
  65:10
ROSSMO (5)
  4:18;5:9;83:14;
  86:7;87:4
R-O-S-S-M-O (1)
  5:9
roughly (1)
  17:20
routine (1)
  43:24
routing (1)
  57:11
run (1)
  49:1
Ruth (6)
  6:3;31:14;47:5;
  57:2;61:12;63:11
Ruth's (1)
  70:19

**S**

SAITH (1)
  86:3
sales (1)
  70:18
same (11)
  16:1;26:23;27:14;
  32:20;34:7;53:15;
  55:16;61:18;77:10,
  24;80:19
San (2)
  29:14;87:23

satisfactory (1)
  6:18
saw (6)
  8:12;9:19;34:15;
  46:4;58:15;81:22
saying (15)
  35:15;36:11;46:8,
  17;49:14;50:20;56:5;
  57:13,23;58:22;59:4;
  60:3;65:3;77:10,13
scenarios (1)
  53:9
scene (8)
  19:24;32:16;38:2;
  40:18;48:4;55:15;
  66:22;67:1
SCHNEEMAN (41)
  4:4,5,10,23,25;
  10:8,18,19;11:5,7;
  14:9;19:8,10;23:3;
  30:14;40:2,24;44:22,
  25;56:12,14;60:23;
  62:8,16;71:21,25;
  75:2,5,6;79:21;80:7;
  81:6,13;83:19,22;
  84:2,5,12,24;85:4;
  87:10
school (4)
  27:23,24;28:2;32:7
scientists (1)
  17:12
screwed (1)
  29:3
se (1)
  74:15
search (3)
  37:4;44:11;48:13
season (1)
  5:19
second (2)
  16:3;31:17
seconds (1)
  57:16
section (10)
  18:17,25;19:13,14,
  17;26:17;30:18;74:9,
  16;83:10
seem (2)
  53:22;67:6
seemed (2)
  59:16;80:13
seems (9)
  32:11;36:13;37:15;
  50:18;57:20;58:16;
  61:12;67:14;68:4
Seminars (1)
  17:8
Senate (1)
  24:2
send (5)
  4:4,5,15;85:11,19
sense (3)
  47:4,14;80:14

sent (3)
  4:7,8;7:13
sentinel (5)
  14:24;15:3,4,5,17
separate (6)
  26:25;35:9;41:14;
  73:25;83:24;84:1
September (1)
  12:2
sequence (1)
  55:4
Sergeant (1)
  9:10
sergeants (1)
  13:13
serial (7)
  19:1,1,2,2;20:3;
  25:7;74:17
series (2)
  20:2,22
serious (1)
  43:13
seriously (2)
  25:23,24
served (2)
  72:4,9
services (1)
  27:2
serving (2)
  5:5;72:3
session (2)
  83:9,10
sessions (1)
  52:5
set (2)
  55:18;58:2
settled (1)
  72:21
seven-year-old (1)
  82:12
several (2)
  25:5;39:21
sex (1)
  25:2
sexual (1)
  27:22
shift (1)
  48:11
shooting (1)
  15:13
short (1)
  6:9
Shorthand (1)
  87:1
show (1)
  80:5
showed (1)
  78:13
showing (1)
  76:12
shown (1)
  68:21
shows (1)

WILLIAM RAINSBERGER VS.
CHARLES BENNER

DR. KIM ROSSMO
April 13, 2017

32:7
**shuffling (1)**
  56:20
**shut (1)**
  75:18
**side (1)**
  85:14
**sign (1)**
  4:15
**signature (1)**
  4:16
**significance (1)**
  65:5
**significantly (1)**
  52:23
**similar (3)**
  11:13;22:8;63:17
**similarity (1)**
  80:20
**simplified (2)**
  20:15,20
**single (1)**
  63:3
**sister (2)**
  36:25;82:11
**site (1)**
  32:13
**situation (3)**
  25:16;41:16;75:13
**situations (1)**
  28:11
**six (3)**
  43:19;49:20;73:2
**size (2)**
  43:23,25
**slaying (1)**
  51:4
**Slightly (1)**
  80:21
**smacked (1)**
  78:16
**solely (1)**
  66:17
**solution (1)**
  54:24
**solve (1)**
  45:20
**solved (2)**
  16:12;45:7
**solving (1)**
  53:5
**somebody (8)**
  32:21;46:3,3;
  52:10,15,17,17;70:13
**someone (14)**
  12:16;29:14;36:5;
  38:11;40:12;41:10;
  46:12,12,13,18;
  59:21;64:15;67:12;
  78:24
**sometime (1)**
  5:17
**sometimes (5)**

17:21;54:23,24;
  55:12;65:13
**somewhat (1)**
  80:21
**somewhere (3)**
  25:5;48:9;68:25
**son (5)**
  31:5,14;35:1;
  41:13,17
**soon (2)**
  82:14,15
**sooner (1)**
  85:16
**sorry (16)**
  11:14;19:2,8;
  22:20,21,24;26:14;
  27:5,19;29:18;32:19;
  37:25;50:11;73:8;
  74:6;82:1
**sort (10)**
  9:18;13:13;14:18;
  23:24;24:8,12;28:1;
  33:13;38:17;47:3
**sorts (1)**
  53:9
**sought (1)**
  78:21
**sound (1)**
  22:16
**sounds (1)**
  49:10
**speak (1)**
  74:3
**speaking (1)**
  62:8
**specific (3)**
  31:9;41:12;80:22
**specifically (3)**
  19:25;31:2;70:3
**speculating (1)**
  71:14
**speculation (1)**
  46:20
**spell (2)**
  5:8;21:13
**spend (1)**
  7:9
**spoke (2)**
  34:11;82:9
**spring (1)**
  5:18
**sprinkler (2)**
  20:17,19
**sprinklers (1)**
  20:16
**Stacy (1)**
  21:12
**stage (3)**
  45:6;47:13,13
**stages (3)**
  48:6;53:18;67:13
**stand (1)**
  82:15

**standard (3)**
  52:12;57:10;66:23
**stands (1)**
  11:12
**start (9)**
  10:23;21:1;30:13;
  37:11;39:14;43:8;
  47:12;48:7;62:21
**started (4)**
  18:16;52:5;82:21,
  21
**starting (2)**
  32:9;49:11
**starts (2)**
  33:15;82:2
**state (10)**
  5:8;11:1,4,15,21;
  17:3,18;27:12;42:13;
  87:2
**stated (1)**
  57:1
**statement (10)**
  11:13;35:24;51:19;
  57:18;63:14,17,20,
  23;66:4,12
**statements (6)**
  31:23;34:3;61:22,
  24;67:16,18
**States (3)**
  23:25;52:24;68:11
**state-wide (1)**
  17:15
**station (1)**
  31:8
**statistics (2)**
  41:12;82:22
**step (2)**
  7:6;48:2
**steps (1)**
  40:11
**Stevens (1)**
  27:17
**still (6)**
  29:1;54:7;57:24;
  58:16;67:4;69:3
**straightforward (1)**
  77:20
**stranger (3)**
  39:8;41:19,23
**strategies (1)**
  20:8
**strategy (2)**
  33:14,21
**street (2)**
  12:12;25:2
**stress (1)**
  64:18
**strong (1)**
  58:10
**student (2)**
  27:23;28:2
**students (6)**
  13:2,3,5,6,8;14:3

**studied (1)**
  79:5
**studies (1)**
  79:12
**stuff (2)**
  69:2;73:24
**subject (2)**
  17:25;54:19
**subpoena (1)**
  24:16
**subsequent (1)**
  35:19
**subset (1)**
  55:17
**suffered (2)**
  78:14;80:17
**suffering (2)**
  49:1;54:25
**suggest (1)**
  60:10
**suggested (3)**
  8:12;56:6;68:16
**suggesting (2)**
  37:18;67:7
**suggests (1)**
  53:25
**summarize (2)**
  12:8,20
**summary (1)**
  83:25
**supervised (1)**
  74:9
**support (2)**
  44:10;74:17
**suppose (2)**
  37:8;82:19
**supposed (1)**
  11:17
**sure (20)**
  10:14,20;13:24;
  22:3;23:11;27:8;
  31:11;41:14;47:20;
  56:16;65:7;68:1;
  70:6;71:21,23;72:23;
  73:11;83:7;84:9,23
**surfaces (1)**
  20:23
**surprised (1)**
  66:21
**suspect (23)**
  11:16;25:17;33:7;
  34:13,14;35:5,13,16;
  36:10,15;37:10,17;
  38:11,20,24;39:13;
  40:13;64:8;67:3;
  70:12,13;77:3;84:19
**suspects (12)**
  20:9,13,25;37:12;
  39:7,9,11,13;66:19;
  70:16;76:3,6
**suspicions (1)**
  32:25
**suspicious (2)**

**T**

**talk (10)**
  17:19,19;49:5;
  50:17;51:14;52:6;
  55:2;59:21;82:12,13
**talked (7)**
  30:5,6;40:20;50:6;
  74:24;82:11,16
**talking (4)**
  26:21;50:5;60:1;
  62:10
**talks (3)**
  17:8;68:19;69:4
**taught (8)**
  12:4,20;13:25;
  14:11,12,14;16:17,21
**teach (3)**
  13:20;14:14;47:21
**teacher (2)**
  27:23,25
**teaching (5)**
  14:10;16:18;17:1,
  4,5
**teams (1)**
  44:9
**telephone (5)**
  22:9;56:25;58:19;
  61:4,11
**television (1)**
  65:15
**telling (6)**
  8:6;25:15;34:1;
  35:11;48:1;62:24
**tells (1)**
  33:14
**temper (1)**
  69:16
**ten (5)**
  12:2;45:15;48:8;
  57:16;58:24
**tenants (3)**
  42:24;44:12,13
**tend (1)**
  55:21
**tendency (1)**
  55:19
**tends (1)**
  80:24
**tenured (2)**
  11:23;12:1
**term (5)**
  23:19;36:1,2;
  46:21;80:19
**terms (2)**

32:11;57:9
**sworn (3)**
  4:19;18:18;87:4
**syllabus (1)**
  13:25
**system-wide (1)**
  16:4

17:2;38:6
**test (5)**
  33:4;46:23;67:13;
  77:14;78:24
**testified (7)**
  4:20;22:9;23:14,
  14;27:11;56:15;
  67:20
**testify (2)**
  4:19;25:11
**testimonies (2)**
  31:1;69:14
**testimony (27)**
  7:19;8:5;9:22;
  16:17;19:23;21:4,8;
  22:4,4;23:6,9,13;
  24:21;31:20,23;34:4;
  41:2;53:16;56:11;
  59:17;60:20;61:9;
  68:5,6;69:8;83:6;
  87:6
**tests (1)**
  76:1
**Texas (10)**
  11:1,3,15,21;17:2;
  23:22;26:17;27:17;
  73:8;87:2
**Thanks (1)**
  72:13
**theories (23)**
  14:3;40:17;46:20,
  23;47:6,9,11,13,24;
  48:1,8,18,24;49:9;
  50:7,17,22,24;51:1,8,
  11,13;70:21
**theorizing (1)**
  48:7
**theory (27)**
  40:15;46:22,24,24;
  47:1,5,11;48:19,20,
  22;49:6,11,12,16;
  50:5,9,13,14,16,19;
  51:5,10;52:8;55:19;
  56:4;57:7;67:2
**therefore (1)**
  58:18
**thinking (8)**
  12:23;13:21;32:25;
  40:24;52:19;53:1;
  56:3;57:20
**third (1)**
  21:25
**though (9)**
  16:17;17:1;36:25;
  39:20;40:5;43:4;
  72:19;73:18;77:23
**thought (14)**
  7:2,20;8:7;28:3;
  39:17;40:21,21;
  64:16;67:16;68:14,
  25;74:4;77:3;83:22
**thoughts (1)**
  45:24

**thousands (1)**
  20:25
**three (6)**
  21:24;22:1;45:20;
  75:23;76:11;80:22
**threw (1)**
  71:3
**throughout (2)**
  8:20;69:11
**thwarted (1)**
  70:12
**tied (1)**
  82:18
**timeline (1)**
  43:13
**times (9)**
  21:22,24;28:24;
  29:4;48:19;58:24;
  59:2,6;60:6
**timing (2)**
  56:24;75:9
**titled (2)**
  11:1,3
**today (10)**
  5:2;9:1,5,10;10:6;
  22:16;23:1;46:23;
  50:6,11
**together (6)**
  32:11;45:7;47:3;
  48:17;84:4,6
**told (6)**
  33:17,20;59:2;
  72:2,5;82:15
**took (1)**
  20:17
**top (8)**
  10:25;11:8;26:2;
  33:20;42:13;54:16;
  61:18;75:2
**total (1)**
  63:4
**touching (1)**
  22:21
**towards (6)**
  13:3,7,17,19;66:2,
  18
**track (1)**
  68:15
**trade (1)**
  25:2
**traditional (1)**
  15:14
**tragedies (1)**
  16:15
**tragedy (2)**
  15:17;41:7
**train (1)**
  51:23
**trained (1)**
  76:15
**transcript (1)**
  30:4;74:3;87:5
**transit (1)**

12:12
**transportation (1)**
  15:18
**trash (3)**
  43:3;71:2,9
**trauma (1)**
  64:14
**traumatic (1)**
  75:12
**treat (1)**
  32:18
**treated (2)**
  32:18;36:25
**treatment (2)**
  35:18;77:1
**trial (14)**
  4:14;21:23;22:4,9;
  26:15;27:11;29:19;
  65:8;70:9;72:14,21;
  74:1;84:15,20
**trick (1)**
  33:2
**true (1)**
  87:6
**trusting (1)**
  33:25
**truth (4)**
  4:19,20,20;34:1
**try (9)**
  15:12,22;20:24;
  40:5;52:8;55:25;
  56:16;66:25;67:24
**trying (13)**
  24:8,10;25:16;
  29:2;31:25;33:7;
  34:9;49:3;56:5;
  57:25;59:1;66:9,14
**tunnel (14)**
  42:11;51:14,16,19,
  20;53:6,12;54:14,25;
  80:17,18,23;81:3,5
**turn (2)**
  31:20;81:21
**Tutor (8)**
  43:18;49:23;67:19;
  68:25;69:5,15,17;
  83:3
**Tutor's (2)**
  69:22;82:24
**twice (2)**
  26:23;27:5
**two (11)**
  14:19;18:4;29:1,
  22;31:15;35:8,9;
  57:12;70:15;80:19;
  83:16
**TX (1)**
  87:23
**type (3)**
  6:10,12;46:8
**types (4)**
  17:9;28:11;79:3;
  80:23

**typical (4)**
  14:11;29:12;44:8;
  58:21
**typically (1)**
  28:17

## U

**Uliana (1)**
  21:12
**U-L-I-A-N-A (1)**
  21:14
**ultimately (1)**
  46:16
**unbiased (1)**
  76:15
**under (4)**
  6:17;32:23;51:6;
  80:9
**underlying (1)**
  5:12
**underplayed (1)**
  25:4
**underresourced (1)**
  25:23
**undertake (1)**
  81:19
**Undoubtedly (1)**
  54:18
**unfortunately (2)**
  42:22;75:17
**uninterested (1)**
  67:3
**unit (2)**
  43:3;44:1
**United (3)**
  52:13,22,24
**universities (1)**
  17:13
**University (8)**
  11:5,16,19;13:5;
  15:11;17:19;26:1,17
**university-wide (1)**
  17:19
**unless (3)**
  7:20;41:21;84:19
**unlikely (1)**
  41:13
**unnecessary (1)**
  15:25
**unprofessional (1)**
  35:19
**unsolved (5)**
  28:23;29:13;45:8;
  52:15;74:20
**up (25)**
  15:21;24:22;27:22;
  28:21;29:3;37:25;
  38:23;46:24;47:25;
  48:24;51:18;54:6,12;
  55:16;59:23;68:21;
  69:5;73:24;74:19;
  76:12;77:2;78:3;

80:5;82:15,24
**upon (1)**
  80:13
**upset (2)**
  33:4;77:6
**use (8)**
  7:4;9:18;31:7;
  46:21;50:14;64:10;
  74:25;75:8
**used (5)**
  20:7;36:3;73:25;
  76:3;87:8
**uses (1)**
  11:16
**Usually (1)**
  46:13

## V

**value (1)**
  61:22
**Van (2)**
  9:10,14
**Vancouver (5)**
  18:13,16;19:13;
  24:25;74:9
**variance (1)**
  80:15
**varied (1)**
  17:11
**variety (1)**
  65:16
**various (9)**
  11:16;14:3;31:1;
  47:23;49:9;50:24;
  51:13;53:18;73:19
**vary (1)**
  55:12
**version (1)**
  4:6
**versus (1)**
  27:12
**viable (6)**
  36:16;45:8;51:8;
  52:1;66:19;70:16
**victim (9)**
  31:6;32:19,20;
  39:12;41:5,17;51:6;
  64:8,15
**victims (1)**
  25:6
**victim's (1)**
  32:7
**video (1)**
  85:5
**violent (1)**
  64:17
**vision (14)**
  42:11;51:14,16,20,
  20;53:6,12;54:14;
  55:1;80:17,18,24;
  81:3,5
**visitors (1)**

WILLIAM RAINSBERGER VS.
CHARLES BENNER

DR. KIM ROSSMO
April 13, 2017

44:12
**Vitae (7)**
 11:1,5,18;12:5;
 24:24;26:1,1
**V-I-T-A-E (1)**
 11:6

## W

**Wait (7)**
 11:2;22:18;37:9,
 15,20;67:23;85:15
**walk (1)**
 40:17
**wants (1)**
 44:23
**Waples (35)**
 4:11,11;5:24;7:13;
 8:20;9:9,13,16;
 10:14;13:22;40:1,22;
 44:19;56:10;58:8;
 60:19;62:6;71:19;
 75:1,4;81:15;83:12,
 14,20,24;84:3,9,23,
 25;85:2,9,18,23,25;
 87:11
**Waples' (1)**
 9:2
**water (3)**
 20:16,17,19
**way (11)**
 4:7;15:16;17:7;
 21:1,2;58:21;64:11;
 73:12;75:14;76:11;
 77:25
**ways (3)**
 45:20;59:6,10
**weak (1)**
 40:7
**weaknesses (1)**
 6:21
**weapon (4)**
 43:4;71:1,2,9
**wear (1)**
 66:22
**wedge (1)**
 47:11
**week (2)**
 17:19;77:19
**weeks (3)**
 37:9;55:13;85:22
**weight (2)**
 55:22;65:19
**well-known (1)**
 14:2
**weren't (2)**
 16:12;25:21
**wet (1)**
 20:18
**What's (5)**
 27:16;61:1;71:6,
 16;76:16
**whenever (1)**

15:12
**whole (6)**
 4:20;64:13;69:4;
 80:1;82:8,23
**who's (1)**
 59:21
**whose (1)**
 52:8
**William (43)**
 5:11,15;6:1;7:22;
 30:16,25;32:17,25;
 33:11;34:13,14;
 35:12,20;36:14,20;
 37:16;39:10,19;47:6;
 49:7;57:3,6,17;
 63:13;66:6,10,15,17;
 67:8,15,16,21;68:8;
 69:6,10;71:2;75:7,12,
 14;76:24;77:1;80:8,
 12
**William's (1)**
 6:3
**willing (3)**
 7:17;52:11;68:18
**willingness (1)**
 85:5
**Wisconsin (1)**
 17:14
**withdrawn (1)**
 64:20
**within (18)**
 7:16;14:21,24;
 15:9,10;16:8;19:13;
 20:13;30:23;31:4,18;
 33:5,10;35:13;36:7;
 37:17;54:20;75:11
**without (9)**
 23:12;61:22,23;
 62:9,21;63:3,5,6;
 70:14
**witness (19)**
 9:19;10:20;22:14,
 20,23;27:11;44:22;
 45:21;46:16;72:9;
 84:6,13;85:1,8,15,20,
 24;87:4,7
**witnesses (1)**
 43:8
**witnesses' (1)**
 43:8
**women (4)**
 24:25;25:9,13;
 73:13
**Woolridge (1)**
 63:18
**Woolridge's (1)**
 61:21
**word (8)**
 7:4;24:15;36:3;
 37:25;49:24;50:14;
 66:9,11
**words (3)**
 6:23;36:9;80:19

**work (11)**
 7:17;17:25;23:13;
 24:19;28:22;30:7;
 45:16;46:24;51:23;
 54:10;63:8
**worked (3)**
 19:1;21:10;63:7
**workers (1)**
 25:2
**working (9)**
 6:22;13:3,7,16,19;
 20:14;43:14,17;
 49:19
**world (1)**
 65:15
**worse (1)**
 58:25
**worst (1)**
 42:25
**worthwhile (1)**
 78:23
**write (1)**
 52:20
**written (7)**
 21:15,17;30:11;
 38:18;45:22;66:1;
 80:12
**wrong (16)**
 15:20,21;22:13;
 24:4,7,10;25:11;
 36:18;47:8;57:9,15;
 58:19;66:24;74:2,12;
 75:9
**wrongful (8)**
 6:2;16:10;26:6;
 29:7,18,19;73:23;
 74:20
**wrote (2)**
 21:21;30:15

## Y

**year (7)**
 5:19;11:22;18:15,
 15;27:21;52:14;
 77:18
**years (22)**
 11:22;12:2;14:1,
 15,16;15:7;16:22,24;
 17:3;18:14,24;19:11,
 12;22:15;23:5,8,10;
 24:17;27:10;29:2,15;
 72:5
**yell (1)**
 64:19
**yelled (3)**
 69:1;82:16;83:3
**yelling (4)**
 69:5;82:21,23;83:2

## Z

**zoning (1)**

12:13

| 1 |
|---|

**1 (3)**
 10:25;45:20;87:10
**12/31/2018 (1)**
 87:22
**14 (1)**
 11:22
**18 (1)**
 73:22
**1978 (1)**
 18:17
**1980 (1)**
 18:18
**19th (1)**
 49:20
**1A (1)**
 11:9

| 2 |
|---|

**2 (1)**
 12:5
**2000 (1)**
 18:19
**2010 (1)**
 25:1
**2012 (1)**
 25:12
**2016 (1)**
 5:17
**2017 (1)**
 87:17
**24 (5)**
 33:5,10;34:22;
 68:12,14
**25 (5)**
 26:1,10,16;27:14;
 73:16
**25th (1)**
 87:17
**26 (2)**
 26:2;73:16
**27 (2)**
 74:24;81:21

| 3 |
|---|

**3:57 (1)**
 71:24
**30 (1)**
 32:4
**31 (1)**
 42:12
**32 (1)**
 49:17
**33 (2)**
 33:14,16
**36 (3)**
 10:25;26:10,16
**37 (4)**

25:8;50:15,16;66:1

| 4 |
|---|

**4 (4)**
 30:10,14;34:10;
 87:11
**4:07 (1)**
 71:24
**4:26 (1)**
 83:13
**4:30 (1)**
 83:13
**4:32 (1)**
 86:1
**49 (1)**
 25:9

| 5 |
|---|

**5 (3)**
 45:19;46:21;50:13
**50-31 (1)**
 10:11
**50-50 (1)**
 75:24
**58 (1)**
 87:10

| 6 |
|---|

**63 (1)**
 27:9
**631 (1)**
 87:25

| 7 |
|---|

**7 (2)**
 51:15,21
**78232 (1)**
 87:23

| 8 |
|---|

**8.10 (2)**
 11:9,17

| 9 |
|---|

**9 (2)**
 55:2;60:12
**911 (1)**
 63:18