# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| **WILLIAM RAINSBERGER,** | ) | |
| **PLAINTIFF,** | ) | **CAUSE NO. 1:16-cv-103-WTL-MJD** |
| **v.** | ) | |
| **CHARLES BENNER,** | ) | |
| **DEFENDANT.** | ) | |

## PLAINTIFF'S MEMORANDUM IN RESPONSE
## TO DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY

The opinion testimonies of Dr. Kim Rossmo and David Hennessy are relevant and meet the standards for expert testimony. Defendant's motion to exclude their testimony misconstrues both experts' credentials and projected testimonies and ignores the most recent and relevant Seventh Circuit case holding similar expert testimony admissible in a §1983 wrongful prosecution lawsuit. Defendant's motion should be granted in part and denied in part. The objection to expert testimony that probable cause did not exist, an assertion proffered by Mr. Hennessy but not by Dr. Rossmo, should be granted; the challenge to testimony from both experts explaining how Benner failed to follow reasonable police investigative practices and standards during his investigation and preparation of his probable cause affidavit should be denied.[1]

---

[1] Benner motion leads with a quote from Judge Lawrence's summary judgment decision commenting on the likely merits of defendant's objections to plaintiff's experts. To the extent this comment encompasses the opinion testimony of Mr. Hennessy on the lack of probable cause it was well-taken. Plaintiff notes this comment was made on the basis of defendant's objections to these experts contained in defendant's reply on summary judgment (Dkt. 66), arguments not briefed by the plaintiff. As explained within, Benner's argument there, repeated in the instant motion, fails to address the most relevant and recent authority on the admissibility of expert testimony on the failures of a particular police investigation leading to a wrongful prosecution. That opinion, *Jimenez v. City of Chi.*, 732 F.3d 710 (7th Cir. 2013), authored by Circuit Judge David Hamilton, has been widely followed in this circuit and others, and is controlling on defendant's motion.

**Standard of Review for a *Daubert* Motion**

Under Federal Rule of Evidence 702, trial courts must determine whether expert evidence rests on a reliable foundation and is relevant. *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013). "Expert testimony is admissible when the testimony is reliable and would assist the trier of fact to understand the evidence or determine a fact at issue in a case." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) (citing Fed. R. Evid. 702; *Daubert v. Merrell Down Pharmaceuticals, Inc.*, 509 U.S. 579, 589-91 (1993)). The party seeking to introduce expert testimony bears the burden of demonstrating that the proposed testimony satisfies this standard by a preponderance of the evidence. *Id.* The rule on expert testimony is liberal, and doubts about the usefulness of an expert's testimony are generally resolved in favor of admissibility. *Davis v. Duran*, 277 F.R.D. 362, 366 (N.D. Ill. 2011) (citing *Krist v. Eli Lilly & Co.*, 897 F.2d 293, 298 (7th Cir. 1990); *Vill of Sauk Vill. v. Roadway Express, Inc.*, No. 15-cv-9183, 2017 U.S. Dist. LEXIS 10478, at *4 (N.D. Ill. Jan. 25, 2017). This Court has recognized that where an expert's opinion is at least "minimally relevant," there is a "heavy presumption in favor of admissibility." *United States v. Lopez*, No. 1:15-cr-00069-TWP-DML, 2016 U.S. Dist. LEXIS 5239 (S.D. Ind. Jan. 15, 2016).

The text of Fed. R. Evid. 702 expressly contemplates that an expert may be qualified on the basis of experience. The Court in *Daubert* explained that the test of reliability for witnesses who are expert by way of experience does not "rely on anything like a scientific method." 509 U.S. at 593. In such instances, a district court's task in determining reliability focuses on how the witness's experience "leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts." *Daubert* at 593.

As the Committee Notes to Fed. R. Evid. 702 suggest, rejection of expert testimony is the exception rather than the rule. Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking contested but admissible evidence. *Daubert*, 509 U.S. at 595. Likewise, *Daubert* is not intended to provide an excuse for an automatic challenge to the testimony of every expert. See *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (noting that the trial judge has the discretion "to avoid unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted").

### Summary of Case and Expert Testimony

Ruth Rainsberger was murdered in her apartment. Detective Charles Benner investigated the murder, and within first 24 hours concluded that her son, William, had killed her. Within two weeks, Benner prepared a probable cause affidavit accusing William of the murder and presented it to the prosecutor's office, who rejected filing any charges against William.

Four months after the murder, Benner admitted to others that without hard evidence, such as DNA, there was no basis to make an arrest. When DNA evidence came back and excluded William and pointed towards others, Benner failed to mention it in his affidavit. Instead, he included the two new false facts, one asserting that cell phone tower location data placed William at or near the scene "at the relevant time," and two, an incorrect time of when William had made a telephone call from his mother's apartment, which, as explained below, placed William in his mother's apartment a full hour before he said he was there and at a time when all agree his mother lay dying on the floor. Not only were these two new "facts" incorrect, much of the remainder of the affidavit

3

was comprised of admittedly or demonstrably false and misleading statements. On the basis of the second affidavit, the prosecutor filed murder charges against William. William was arrested, kept in jail for two months, and had criminal charges of murder lodged against him for over a year before they were dismissed for "evidentiary problems."

The evidentiary problems with Benner's probable cause affidavit were extensive and have been the subject of this Court's ruling denying Benner summary judgment (Dkt. 73, 07/18/17), and the Seventh Circuit's ruling rejecting his assertion of qualified immunity. *Rainsberger v. Benner*, 913 F.3d 640 (7th Cir. 2018). The failures of Defendant Benner's investigation and the probable cause affidavit included:

1.  The representation that cell phone tower records showed William in the area of the murder during the relevant time was false.

2.  The inclusion of a 2:40 p.m. telephone call from William in his mother's apartment with her critically injured and an hour before he reported finding her and telephoning 9-1-1 was false.

3.  The representations that after this 2:40 p.m. telephone call, William went to a nearby Kroger grocery store, pulled what Det. Benner implied was a murder weapon from his person, looked around for cameras, and threw it away in the trash, was a mixture of misrepresented facts and falsehoods.

4.  The representations that there were no signs of forced entry and nothing was stolen from Ruth Rainsberger's apartment was a mixture of misrepresented facts and falsehoods.

5.  The representation that savings bonds were present in plain view in the apartment, but left undisturbed, was false.

6.  The representations that medics and hospital personnel thought Mrs. Rainsberger suffered

a gunshot wound while William thought it was blunt force trauma was a mixture of misrepresented facts and falsehoods.

7.    The representations that William was uncaring and unconcerned about his mother's condition was a mixture of misrepresented facts and falsehoods.

Plaintiff's two experts, Dr. Kim Rossmo and Attorney David Hennessy, are qualified by training and experience in reasonable police investigation standards and techniques; common failures of such investigations; and, the preparation of probable cause affidavits.  Dr. Rossmo is a former police officer and investigator and has researched and lectured on criminal justice issues. Defendant complains Dr. Rossmo's speciality is in geographical profiling but admits that his other area of expertise is in "criminal investigative failures." Dkt. 116, Defendant's Memo at 3. The latter expertise is particularly relevant here. Indeed, Dr. Rossmo is one of the country's leading authorities on criminal investigation failures. Ex. 1 (Dr. Kim Rossmo's CV). Dr. Rossmo has authored books and numerous journal articles on the subject and has lectured widely and trained police officers across the country and around the world on criminal investigatory failures. Several of his recent presentations and training sessions to police, prosecutors, defense attorneys, and academics on criminal investigative failures include:

- *Criminal Investigative Failures*. European Crime Analysis Conference 2019 (Copenhagen, Denmark; March 2019).

- *Criminal investigative failures*. Maricopa County Attorney's Office (Phoenix, AZ; February 2018).

- *Evidence, logic, and bias in criminal investigations*. Paul Tappan Award Keynote Presentation, Western Society of Criminology (Honolulu, HI; February 2019).

5

- *Deconstructing criminal investigative failures.* Texas State University (San Marcos, TX; November 2018).

- *Deconstructing criminal investigative failures: Understanding how wrongful convictions occur.* Simon Fraser University/Ting Forum on Justice Policy (Vancouver, BC; October 2018).

- *Wrongful convictions: Thinking errors and logic problems.* Dallas County District Attorney's Office (Dallas, TX; May 2018).

- *Criminal Investigative Failures.* New Orleans Police Department Commanders' Symposium: Best Practices in Major Incident Investigation (New Orleans, LA; March 2018).

- Texas Criminal Defense Lawyers Association Annual Forensics Seminar (Houston, TX; October 2016).

In Indiana, Dr. Rossmo was an expert for the defense in the third and final trial of the high profile case of *State of Indiana v. David Camm*, See https://en.wikipedia.org/wiki/David_Camm. Dr. Rossmo examined a number of criminal investigatory errors (e.g. rush to judgment, tunnel vision, confirmation bias) committed by the Indiana State Police and the Floyd County Prosecutor's Office during their investigation of the murders of Camm's wife and two children. His testimony helped play a role in Camm being found not guilty and his wrongful conviction for these crimes overturned. *Id.*

Attorney Hennessy is an experienced criminal defense attorney who represented William in the criminal case, and who uncovered the failures of Benner's investigation and the inclusion of false information in his probable cause affidavit, findings which led to the dismissal of the criminal

charges. Mr. Hennessy has represented thousands of criminal defendants charged with major felonies and has carefully reviewed police investigations and probable cause affidavits in every case. He is widely-regarded in the community as one of the top criminal defense attorneys in Indiana.

Both experts thus have extensive experience in assessing the reasonableness of police investigations and have extensive experience with Defendant Benner's actual investigation and probable cause affidavit in this case. Both are qualified to offer their opinions on whether Detective Benner followed typical and reasonable police investigative practices in this case. Their proffered testimonies explain how Benner failed to follow reasonable police investigatory practices by jumping to the conclusion that William murdered his mother; failing to investigate other reasonable leads; engaging in tunnel vision and confirmation bias; including false information in his probable cause affidavit; and excluding from that affidavit exculpatory information.

Benner admits the relevancy and admissibility of expert testimony on these topic by proffering his own expert on reasonable police investigations and the training of investigators not to succumb to tunnel vision and confirmation bias and on the proper preparation of probable cause affidavits. See Ex. 2 Defendant's Expert Disclosure.

Defendant complains that plaintiff's experts' opinions are not subject to scientific testing. However, "*Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire*, 526 U.S. at 141; see also *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 835 (7th Cir. 2015) ("this list is neither exhaustive nor mandatory."). In other words, *Daubert's* four factors "may be applied in differing degrees when it comes to non-Newtonian science or 'other specialized knowledge.'" *Harris v. City of Chi.*, No. 14 C 4391, 2017 U.S. Dist. LEXIS 85548, at *18-19 (N.D. Ill. June 5, 2017) (quoting *Indianapolis Minority Contrs. Ass'n v. Wiley*, No.

94 C 1175, 1998 U.S. Dist. LEXIS 23349, 1998 WL 1988826, at *12 (S.D. Ind. May 13, 1998) (Tinder, J.) (quoting *United States v. Hall*, 974 F. Supp. 1198, 1202 (C.D. Ill. 1997)). Indeed, a "district court enjoys broad latitude both in deciding how to determine reliability and in making the ultimate reliability determination." *Higgins v. Koch Dev. Corp.*, 794 F.3d 697, 704 (7th Cir. 2015); see also *Kumho Tire*, 526 F.3d at 142 ("the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination.") (emphasis in original).

Both experts posses genuine expertise in how criminal investigations are conducted. Their testimonies are entirely based upon their experience and skills in that area and would assist the trier of fact in determining whether Benner followed or failed to adhere to reasonable police investigatory standards.

As former district and appellate judge Tinder recognized:

"Expert testimony proffered under FED. R. EVID. 104(a) for admission under Rule 702 . . . must be tested to be sure the person possesses genuine expertise in a field." *Id.* Under the *Daubert* methodology, the court must first consider whether the proffer of testimony demonstrates that the work the expert performed meets standards of intellectual rigor. In other words, the court "must rule out 'subjective belief or unsupported speculation.'" *Deimer v. Cincinnati Sub-Zero Products, Inc.*, 58 F.3d 341, 344 (7th Cir. 1995) (citing *Porter v. Whitehall Lab.*, 9 F.3d 607, 614 (7th Cir. 1993) (quoting *Daubert*, 509 U.S. at 590)). Second, the court must determine whether the testimony is actually based upon the expert's special skills. Finally, under Rule 702, the court must decide whether the testimony actually assists the trier of fact in understanding or determining a fact in issue. *Id*. This is the ultimate test of expert testimony. *United States v. Hall*, 93 F.3d 1337, 1342 (7th Cir. 1996).

*Indianapolis Minority Contractors Ass'n v. Wiley*, 1998 U.S. Dist. LEXIS 23349, at *36-37.

Using this methodology,  federal courts have rejected similar challenges to the qualifications of social science-type experts such as a police investigators solely because their expertise is based

on experience rather than hard science methodology or statistics. See, e.g., *United States v. Simmons*, 470 F.3d 1115, 1123 (5th Cir. 2006), quoted in *Smith v. Pfizer Inc.*, 714 F.Supp.2d 845, 856 (M.D. Tenn. 2010) ("social sciences … cannot have the exactness of hard science methodologies"); *U.S. v. Long*, 328 F.3d 655, 668 (D.C. Cir. 2003) (rejecting Rule 404 challenge to expert "in the field of sexual exploitation of children" despite expert's lack of hard data, "because expert testimony need not be based on statistical analysis in order to be probative"); *U.S. v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000) (admitting testimony of gang activity expert because "*Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it"); *Durmishi v. National Cas. Co.*, 720 F.Supp.2d 862, 881 (E.D. Mich. 2010) ("the four traditional *Daubert* factors for determining reliability    developed for scientific fields with publications and computed error rates, etc.    do not map easily onto the social-science context").

Additionally, a district court's evaluation of expert testimony under *Daubert* does not "take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012); see also *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013) ("the district court's role as gatekeeper does not render the district court the trier of all facts relating to expert testimony"). Once it is determined that "the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Lapsley*, 689 F.3d at 805 (quoting *Daubert*, 509 U.S. at 596).

A district court's inquiry under *Daubert* is a flexible one, and district courts have wide latitude in performing this gate-keeping function. See *Kumho Tire Co.*, 526 U.S. 137,  *Hartman v. EBSCO Indus., Inc.*, 758 F.3d 810, 818 (7th Cir. 2014) ("[T]he key to the gate is not the ultimate correctness of the expert's conclusions,"  rather, "it is the soundness  and care with which the expert arrived at her opinion[.]"); *Wood*, 807 F.3d at 834 (citation omitted); see also *Stuhlmacher v. Home Depot U.S.A., Inc.*, 774 F.3d 405, 410 (7th Cir. 2014) ("It is not the trial judge's job to determine whether the expert's opinion is correct."). *Harris v. City of Chi.*, No. 14 C 4391, 2017 U.S. Dist. LEXIS 85548, at *16-17 (N.D. Ill. June 5, 2017) (same).

As a threshold matter, this Court should find that Dr. Rossmo and Mr. Hennessy are well qualified to testify as experts  on generally-accepted and reasonable police investigatory practices and procedures, and on their opinions that Detective Benner's investigation and probable cause affidavit were fundamentally flawed when measured against those standards.


**The *Jimienez* Case is Controlling and Requires the Denial in Part of Defendant's Motion**

Benner ignores the most relevant and recent authority on the admissibility of expert testimony on the failures of a particular police investigation leading to a wrongful prosecution. That opinion, *Jimenez v. City of Chi.*, 732 F.3d 710 (7th Cir. 2013), was authored by Circuit Judge David Hamilton and has been widely followed in this circuit and others. Plaintiff quotes from that opinion below at length because it is on-point and controlling on defendant's motion.

Benner's principal argument is that "Dr. Rossmo's report [and Hennessy's affidavit] discusses what Benner should have done," which defendant asserts is "inadmissible testimony." Defendants' Brief at 6. However, *Jimenez* holds just the opposite. Secondarily, Benner complains that both

10

experts opine on the credibility of other witnesses. However, neither witness does so. Rather, their opinions are based on an acceptance of one version of competing facts (or, in many instances, as explained below, admitted facts of false information in Benner's probable cause affidavit), something Federal Rule of Evidence 702 expressly authorizes, and which *Jimenez* and other cases deem appropriate. Finally, defendant complains that plaintiff's experts opine on probable cause. As shown below, defendant is correct on one opinion expressed by Mr. Hennessy. Defendant is incorrect with respect to the remainder of Mr. Hennessy's opinion testimony and inaccurate with respect to Dr. Rossmo's testimony. Moreover, *Jimenez* explains that experts in these types of cases may permissibly discuss the concept of probable cause, but may not opine on whether it existed at any particular stage of the underlying proceeding.

In *Jimenz*, the Seventh Circuit discussed when expert testimony related to the legal issue of probable cause in a wrongful prosecution case is permitted. The case involved the testimony of plaintiff's expert Gregg McCrary, a police practices expert, who testified "about reasonable practices for police investigations and how the investigation of the murder of Eric Morro departed from those practices. . . ." *Id.* at 719. The Court acknowledged the general rule that "an expert may not offer legal opinions," because "[i]t is the role of the judge, not an expert witness, to instruct the jury on the applicable principles of law, and it is the role of the jury to apply those principles of law to the facts in evidence." *Id.* at 721. Accordingly, McCrary was not permitted to testify as to the absence of probable cause. Instead, he was permitted to testify "about reasonable investigative procedures and ways in which evidence from other witnesses did or did not indicate departures from those reasonable procedures." *Id.* More specifically, McCrary testified about the steps a reasonable police investigator would have taken to solve the murder, as well as the information that a reasonable police

11

investigator would have taken into account as the investigation progressed. He was permitted to testify the ways in which evidence from other witnesses indicated that the homicide investigator departed from reasonable investigation methods. *Id.* at 722. This testimony was determined to be permissible, even though "McCrary's opinions had direct implications for applying legal standards such as probable cause . . . ." *Id*. at 721. That was because the effect "of [McCrary's] testimony depended on how the jury resolved conflicts among the testimony of other witnesses," and the testimony "would have helped the jury conclude that the departures from reasonable police practices were so important, severe, and numerous that they supported an inference that [the defendant investigator] acted deliberately to violate Jimenez's rights." *Jimenez*, 732 F.3d at 722.

Because the *Jimenez* case is so relevant and controlling of defendant's motion, plaintiff sets forth the applicable portion of that decision at length:

### V. Expert Testimony

Finally, we address the defendants' contention that the district court erred by permitting Jimenez to offer the testimony of Gregg McCrary, an expert on police practices. McCrary testified in some detail about reasonable practices for police investigations and how the investigation of the murder of Eric Morro departed from those practices, depending in large part on how the jury resolved conflicting evidence about the investigation. McCrary's testimony tended to show that the errors in defendants' handling of the investigation were so severe and numerous as to support an inference of deliberate wrongdoing in violation of the Constitution.

Defendants contend that McCrary's testimony regarding reasonable police investigatory practices amounted to legal conclusions that were not admissible under Federal Rule of Evidence 702. They also argue that McCrary's testimony impermissibly opined on the credibility of other witnesses. We find no reversible error.

A. Forfeiture [omitted]

### B. The Merits of Defendants' Challenges

Even if defendants had not forfeited these objections, though, defendants' arguments

against McCrary's testimony fail on the merits. When an objection is made properly, a district court's decision admitting evidence is reviewed for an abuse of discretion. *Griffin v. Foley*, 542 F.3d 209, 217 (7th Cir. 2008).

**1. Testimony Regarding "Reasonableness"**

Federal Rule of Evidence 702(a) permits a witness qualified as an expert to testify regarding his or her opinion if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." It is the role of the judge, not an expert witness, to instruct the jury on the applicable principles of law, and it is the role of the jury to apply those principles of law to the facts in evidence. As a general rule, accordingly, an expert may not offer legal opinions.

The defendants argue that McCrary's testimony regarding reasonable police practices was intertwined with probable cause, a legal standard, and thus McCrary should not have been permitted to testify on the subject. We disagree. McCrary did not offer any opinion at trial as to probable cause at any stage of the investigation of Morro's murder or the prosecution of Jiminez. He testified only about reasonable investigative procedures and ways in which evidence from other witnesses did or did not indicate departures from those reasonable procedures.

We recognize that McCrary's opinions had direct implications for applying legal standards such as probable cause and, even more to the point, whether Bogucki deliberately failed to comply with his obligations under *Brady v. Maryland* and the Due Process Clause of the Fourteenth Amendment. That's why his testimony was relevant.

When an expert offers an opinion relevant to applying a legal standard such as probable cause, the expert's role is "limited to describing sound professional standards and identifying departures from them." *West v. Waymire*, 114 F.3d 646, 652 (7th Cir. 1997); see also *Abdullahi v. City of Madison*, 423 F.3d 763, 772 (7th Cir. 2005) (commenting that expert's testimony could be relevant to jury in determining whether officers deviated from reasonable police practices). That's exactly what McCrary did here. The district court drew the line properly so that McCrary's testimony did not stray into impermissible territory.

In constitutional tort cases, expert testimony regarding sound professional standards governing a defendant's actions can be relevant and helpful. Liability for constitutional torts is more limited in scope than common law tort liability. Negligence is not sufficient. *Daniels v. Williams*, 474 U.S. 327, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986). Expert testimony regarding relevant professional standards can give a jury a baseline to help evaluate whether a defendant's deviations from those standards were merely

negligent or were so severe or persistent as to support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights. See, e.g., *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006) ("To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.""), citing *Estate of Cole v. Fromm*, 94 F.3d 254, 262 (7th Cir. 1996); *Collignon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998) ("A plaintiff can show that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances."). These cited cases dealt with medical treatment, but the same principle extends to police investigations.

McCrary testified about the steps a reasonable police investigator would have taken to solve the Morro murder, as well as the information that a reasonable police investigator would have taken into account as the investigation progressed. He did not try to resolve conflicts in the testimony of different witnesses. He also did not offer an opinion regarding whether the police had probable cause to arrest Jimenez. He did point out ways in which evidence from other witnesses indicated that Bogucki and his police colleagues departed from reasonable investigation methods. The effect of his testimony depended on how the jury resolved conflicts among the testimony of other witnesses. We must assume the jury resolved those conflicts in favor of plaintiff Jimenez, of course. McCrary's testimony thus would have helped the jury conclude that the departures from reasonable police practices were so important, severe, and numerous that they supported an inference that Bogucki acted deliberately to violate Jimenez's rights. Such use of McCrary's testimony would not transform it into an impermissible legal opinion. Thus, even if defendants had not forfeited their objections, we would find no error in admitting McCrary's testimony, much less plain error or an abuse of discretion.

## 2. Testimony Regarding Credibility

The defendants also contend that McCrary impermissibly testified regarding the credibility of the other trial witnesses. The defendants also forfeited this argument, as noted, but it too would fail on the merits. Whether expert testimony regarding witness perception, memory, reliability, and deception could assist a properly-instructed jury in its task of evaluating trial testimony is controversial. Compare, e.g., *United States v. Hall*, 165 F.3d 1095, 1107 (7th Cir. 1999) ("the credibility of eyewitness testimony is generally not an appropriate subject matter for expert testimony because it influences a critical function of the jury determining the credibility of witnesses."), with *Hall*, 165 F.3d at 1118 (Easterbrook, J., concurring in judgment) ("Jurors who think they understand how memory works may be mistaken, and if these mistakes influence their evaluation of testimony then they may convict innocent persons. ... That a subject is

14

within daily experience does not mean that jurors know it correctly.") (emphasis in original). As important as this controversy is, we need not address it here because McCrary simply did not testify regarding the credibility of other trial witnesses.

McCrary offered a few observations on credibility, but they were limited to proper discussions of the evidence that Bogucki received in the investigation. First, McCrary noted that one witness had given Bogucki two inconsistent versions of the events at two different times in the investigation. He explained that a reasonable officer would have realized that both of her stories "can't be true" and would have tried to resolve the conflicts. That point is hard to dispute and certainly did not invade the province of the jury.

McCrary also testified that a reasonable officer would have taken very seriously Victor Romo's statement that he was present when Morro was shot and that the shooter was Juan Carlos Torres, not Jimenez. McCrary explained that Romo's statement amounted to a voluntary confession that he was present at the scene of the murder with the person he said was the shooter, which would make Romo himself at least a suspect in the murder, at the very least as an accomplice. See Tr. 1627-28, 1630, 1635. McCrary did not testify that Romo had been telling the truth, but he explained that Romo's statement had strong indications of credibility so that a reasonable police investigator would have taken it seriously   it was a voluntary statement against Romo's own interests, for it implicated him in a very serious crime. We see nothing improper about that testimony. See *Nunez v. BNSF Railway Co.*, 730 F.3d 681, 684, 2013 U.S. App. LEXIS 18882, 2013 WL 4829259, at *3 (7th Cir. 2013) (expert could not testify as to whether another witness was telling the truth, but could testify about implications if he was).

McCrary did not tell the jury whether to believe what any witnesses had said during the civil trial. He told the jury what a reasonable police investigator should have done when presented with these conflicting and/or inculpatory statements during the murder investigation. This was within the bounds of proper testimony for a police practices expert. Thus, even if the argument had not been forfeited, we would find no error, let alone a plain error or an abuse of discretion.

*Jimenez v. City of Chi.*, 732 F.3d at 719-23.

This is exactly the type of testimony plaintiff has proffered for witnesses Rossmo and Hennessy. Dkt. 50-31 (Rossmo Report) and Dkt. 50-29 (Hennessy Aff.). Plaintiff will make sure both witnesses confine their opinions to the reasonableness of Detective Benner's investigation and techniques, and the failures of his investigation as measured against acceptable police standards,

rather than conclusions about whether probable cause existed at any particular time of the investigation. *Jimenez* holds the former type of testimony admissible and legal conclusions inadmissible.

For example, similar to the admissibility of expert testimony in *Jimenez* on what a reasonable police investigator would have done with conflicting witness accounts, such testimony is admissible here on the conflicting evidence presented to Benner.

In this case Benner was presented with a record showing a telephone call received by William's brother, Robert Rainsberger, on his cell phone, coming from Ruth Rainsberger's landline telephone, an hour before William claimed to have found his injured mother in her apartment and made the call to his brother. This was highly incriminating evidence, as it placed William in his mother's apartment a full hour before he said he arrived and found her injured.

However, in addition to Robert's cell phone records of the telephone call, Benner was presented with Ruth Rainsberger's AT&T landline telephone records, showing that the call was made from her apartment telephone not at 2:40 p.m., as set forth in Robert's cell phone records, but an hour later, at 3:40 p.m., which was consistent with both Robert and William's accounts of the timing of the call. Rather than resolve this conflict by determining which record was correct, Benner included in his probable cause affidavit the assertion that the call had been made an hour earlier, directly contradicting William's account of his actions and implicating him in the attack on his mother. At the same time, Benner ignored the conflicting record of the timing of this call contained in Ruth's landline records and did not include this information in his probable cause affidavit. The Seventh Circuit recognized this was "the most damning" evidence against William, as it placed him in his mother's apartment a whole hour before he called for help, at a time when all agree his mother

16

lay dying on the floor. *Rainsberger*, 913 F.3d at 646.

It was plaintiff's expert David Hennessy who investigated these conflicting accounts of the timing of the telephone call, and who discovered that the call from Ruth's apartment to Robert's cell phone had been routed through Chicago, which is on Central Time. Thus, the telephone call had a time stamp of an hour earlier than the call actually occurred. Robert's telephone records of a 2:40 p.m. call time was incorrect, and Ruth's landline telephone records of when the call was made was accurate. This 3:40 p.m. time corresponded with William and Robert's account of the time of the call and was the correct one, not the Chicago-routed time stamp of the call on Robert's cell phone records.

Attorney Hennessy can certainly be called as a fact witness to his investigation of these charges and how he was able to resolve the conflict in these telephone records. That testimony is not at issue in defendant's motion. However, *Jimenez* provides that both he and Dr. Rossmo can opine that a reasonable police investigator would have attempted to resolve these conflicting telephone records of the timing of this call, rather than simply adopt the version which implicated William in his mother's murder and ignore the version which supported William's account of his innocence. Both Dr. Rossmo and Attorney Hennessy are qualified by training and experience on police investigatory techniques, and are qualified to explain to the jury their opinions that Benner's actions fell woefully short in this and many other aspects as set forth in their expert disclosures.

Benner's use of inaccurate cell phone records in his probable cause affidavit was similar to his admitted mischaracterization of the Kroger video (he admits the video does *not* show William pulling anything from his person); his denial of evidence of a burglary when all reports were that Ruth's purse and prescription medicine were missing; his misrepresentation of William's concern

for his mother; and the polygraph test incident, all detailed in the opinions of this Court and the Seventh Circuit. Pursuant to *Jimenez,* testimony regarding such gross departures from reasonable investigatory practices and probable cause affidavit preparation are certainly appropriate topics for expert opinion.

Just like Benner ignored the correct telephone record, his lawyers here ignore *Jimenez* and the growing consensus among federal courts approving police expert police pratice testimony evidence that police failed to follow reasonable police investigative training and techniques. See *Nnodimele v. Derienzo*, No. 13-CV-3461 (ARR)(RLM), 2016 U.S. Dist. LEXIS 83357, at *47 (E.D.N.Y. June 27, 2016) ("This court agrees and joins a growing number of courts holding that '[i]n constitutional tort cases, expert testimony regarding sound professional standards governing a defendant's actions can be relevant and helpful.'") (quoting *Jimenez v. City of Chicago*, 732 F.3d at 721); *Sanders v. City of Chi. Heights*, No. 13 C 0221, 2016 U.S. Dist. LEXIS 110551, at *17-18 (N.D. Ill. Aug. 19, 2016) ("As discussed in the Court's May 2, 2016 Daubert ruling, '[t]here is a difference between stating a legal conclusion and providing concrete information against which to measure abstract legal concepts.' *United States v. Blount*, 502 F.3d 674, 680 (7th Cir. 2007). In the context of constitutional tort claims, "[w]hen an expert offers an opinion relevant to applying a legal standard,' the 'expert's role is 'limited to describing sound professional standards and identifying departures from them.'" More specifically, '[e]xpert testimony regarding relevant professional standards can give a jury a baseline to help evaluate whether a defendant's deviations from those standards were merely negligent or were so severe or persistent as to support an inference of intensional or reckless conduct that violated a plaintiff's constitutional rights.') (quoting *Jimenez*, 732 F.3d at 721-22); *Hopkins v. City of Huntsville*, Civil Action No. CV-13-S-429-NE, 2014 U.S. Dist. LEXIS 153511, at *10-13

(N.D. Ala. Oct. 29, 2014) ("The Seventh Circuit recently discussed when expert testimony related to a legal issue should be permitted in a persuasive opinion reported as *Jimenez v. City of Chicago*, 732 F.3d 710 (7th Cir. 2013) (permitting expert testimony that investigators departed from reasonable police practices, while excluding conclusions regarding absence of probable cause) ("The expert opinion of Dr. Gaut on the issue of whether defendants' actions and policies were consistent with reasonable, typical police practices and procedures is admissible, however, and will be considered by this court."). See also *Kopf v. Skyrm*, 993 F.2d 374, 378 (4th Cir. 1993) (finding "abuse of discretion" where trial court excluded police experts who "would have testified that [officer]'s actions were unreasonable and violated accepted police practices" and "that the use of blackjacks or slapjacks by all three officers [was] brutal and excessive").

While ignoring *Jimenez* and its progeny, Benner instead selectively quotes Rossmo's deposition testimony out of context. For example, defendant complains that Rossmo's opinion is that "Rainsberger is innocent," an opinion, he contends, is "not based upon sufficient facts or data" and thus excludable under Rule 702. Dkt. 116,  Defendant's Brief at 5 (citing Rossmo Depo. 7). However, this is not an opinion contained in Rossmo's report of his testimony, but rather an answer to the deposition question posed by defense counsel of how Dr. Rossmo decides to become involved in any particular case, and why he decided to serve as an expert in this case. Dr. Rossmo explained that he receives many requests to serve as an expert witness on police investigatory failures, and he turns almost all away and only becomes involved in a case after he thoroughly reviews the facts and only then if he is convinced the person is actually innocent. *Id*., Rossmo Depo. 6-7 (" I make it clear that I don't really engage in cases where their only job is to attack or find weaknesses in the investigation. I'm only really interested in working those cases where, I guess these are the operative

19

words, the client is factually innocent. ... Q: ... you said that you wouldn't take a case unless you thought the plaintiff was innocent. And so my question was: Did you make some kind of determination that William Rainsberger was factually innocent?  A. Yes.").

Dr. Rossmo's decision to become involved in this case after he determined for himself that William was actually innocent does not disqualify him from serving as an expert, and defendant submits no authority for such a proposition.

In his motion Defendant Benner only quotes selective portions of Dr. Rossmo's deposition in which he responded to leading questions put forth by defense counsel, as above, to misconstrue the nature of his proffered testimony. Importantly, while defendant cited Dr. Rossmo's deposition, he never *once* quotes directly from Dr. Rossmo's actual expert disclosure report, which sets forth in detail Dr. Rossmo's intended testimony. Similarly, defendant did not quote Mr. Hennessy's affidavit of his projected testimony in his motion to exclude his testimony from trial. It is both unusual and telling for a defendant to seek an order from a court to exclude testimony it mischaracterizes rather than share with the court the actual intended testimony.

Dr. Rossmo's summary of his testimony, as set forth in his report, is as follows:

### Statement of Opinion

FRC Rule 26. (a) (2) (B) (i) a complete statement of all opinions the witness will express and the basis and reasons for them;

The police investigation of the Ruth Rainsberger murder suffered from tunnel vision and confirmation bias. Specifically:

1.    Detective Benner rushed to judgment and quickly decided William Rainsberger had killed his mother.

2.    Detective Benner suffered from tunnel vision and failed to properly investigate other viable theories for the murder.

20

3.      Detectives exhibited confirmation bias in their search, interpretation, and recall of evidence.

Detective Benner failed to perform a thorough investigation and his affidavit for probable cause contained a number of false and misleading statements.

1.      Of the eight allegations in the probable cause, only five were actually items of evidence. One of these was false, and the remaining four contained a mix of facts and falsehoods. Some evidence was misinterpreted and taken out of context.

2.      Detective Benner's rationale for concluding William Rainsberger murdered his mother is based on unreasonable and logically flawed conclusions.

When asserting that probable cause exists, police officers must be reasonable, cautious, and prudent, and must consider all the trustworthy facts and the overall circumstances.

1       Detective Benner was not cautious and prudent. He was haphazard and careless. He rushed to judgment and his investigation then suffered from tunnel vision and confirmation bias.

2.      Several mistakes and omissions occurred in the police investigation. Some of Detective Benner's facts were not trustworthy and he often failed to consider overall circumstances.

3.      These mistakes were unreasonable because Detective Benner failed to verify his information, check assumptions, remain objective, and consider the probability of his investigative theory.

Dkt. 50-31, Rossmo, *Tunnel Vision and Confirmation Bias in the Ruth Rainsberger Murder Investigation*, p. 3.

In his report, Dr. Rossmo explains at length the concepts of tunnel vision and confirmation bias, phenomenon which Benner agrees police investigators are trained to avoid (Ex. 2, Defendant's Expert Disclosure). Dr. Rossmo is widely published on these subjects, and his CV sets forth his extensive experience training police investigators on how to avoid these very types of investigatory errors Benner committed in his investigation of Ruth's murder. Ex. 1.

21

Dr. Rossmo's actual intended testimony tows the *Jimenez* line. While it discusses the evidence and probable cause, it focuses on the failures of Benner's investigation and how that investigation was unreasonable and contrary to standard police investigation training and standards. He never once opines on whether probable cause existed at any particular stage of the investigation. Benner's mischaracterization of Dr. Rossmo's opinions is similar to his earlier mischaracterization of William's actions and the evidence related to Ruth Rainsbergber's murder. Neither account is reliable.

Benner also complains that plaintiff's experts make credibility determinations. This is not the case, as neither Dr. Rossmo nor Mr. Hennessy opine on which witness jurors should believe. As the Seventh Circuit explained above in *Jimenez*, experts are permitted to assume one version of competing facts and base their opinions on those facts, even where the other side disputes the facts. This is far different than telling jurors which witness to believe on a set of conflicting facts. These types of expert opinions are expressly authorized by Fed. R. Evid. 702, as explained recently by Judge St. Eve of the Northern District of Illinois:

> It is well-settled that determining the weight and credibility of witness testimony is the exclusive province of the jury and that experts are not permitted to offer opinions as to the believability or truthfulness of witness testimony. See *United States v. Hall*, 165 F.3d 1095, 1107 (7th Cir. 1999) ("[T]he credibility of eyewitness testimony is generally not an appropriate subject matter for expert testimony because it influences a critical function of the jury    determining the credibility of witnesses."). Nonetheless, experts can base their opinions on disputed facts because the "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Kawasaki Kisen Kaisha, Ltd. v. Plano Molding Co.*, 782 F.3d 353, 360 (7th Cir. 2015) (citation omitted). Indeed, the Advisory Committee's Notes to Rule 702 envision factual disputes in the context of expert opinions as follows: When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the [Rule] on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court

believes one version of the facts and not the other. Fed.R.Evid. 702, advisory committee's note (2000 amends.). "The Advisory Committee stressed that 'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system' or to allow the district court to preempt the jury by evaluating the correctness of the facts on which the expert relied." *Richman v. Sheahan*, 415 F. Supp. 2d 929, 943 (N.D. Ill. 2006) (citation omitted). Moreover, although an expert cannot rely on facts that are clearly contradicted by undisputed evidence, an expert may rely on his client's version of the facts when forming his opinions. See *Cage v. City of Chicago*, 979 F. Supp. 2d 787, 810 (N.D. Ill. 2013).

*Sanders v. City of Chi. Heights*, No. 13 C 0221, 2016 U.S. Dist. LEXIS 57704, at *17-18 (N.D. Ill. May 2, 2016).

Here, plaintiff's experts make no credibility calls. Moreover, Benner admits that many of the "facts" he included in his probable cause affidavit were incorrect. See e.g. Dkt. 50-4, Bail Testimony of Charles Benner, July 17, 2014, pg. 46 (Hennessy: "So its not true that there was a call from inside the apartment at 2:40." Benner: "Correct."); Dkt. 50-9, Civil Deposition of Charles Benner, September 27, 2016, 146 (admitting that contrary to his PCA affirmation, the Kroger video does not depict William pulling anything "from his person." A: "that's correct."); Dkt. 50-9, Benner Civil Depo. 59-60 (admitting that while his PCA stated "There was a lockbox in the back room in plain view that contained savings bonds belonging to the victim," but, in truth the lockbox was in bedroom closet, and never contained savings bonds.); Dkt. 50-6, (Benner affirmed in his PCA, dated May 22, 2014, that after his November 20, 2013, confrontation with the three Rainsberger children over the polygraph, that "I have not heard from them since;" However, Benner admits that Rebecca Rainsberger telephoned him twice after this time and left messages wanting to check in on the case and asking him to return her calls, and he failed to return either call. Dkt. 50-4, Benner Bail Testimony 30; Dkt. 50-9, Benner Civil Depo 73-74).

Benner's motion is correct that Mr. Hennessy's opinions that probable cause did not exist and William was "falsely arrested," opinions expressed in paragraphs 11 and 43 of his affidavit (Dkt. 50-29, Affidavit of David Hennessy) are impermissible legal conclusions and properly excludable from evidence at trial. The remainder of Mr. Hennessy's proffered testimony is admissible, most of which is entirely factual material about his uncovering of the incorrect matters set forth in Benner's probable cause affidavit rather than opinion testimony.

## Conclusion

Benner's motion to exclude from evidence the opinion testimony from plaintiff's experts Dr. Kim Rossmo and Mr. David Hennessy should be granted in part and denied in part. Both experts are qualified regarding proper police investigatory standards and the proper preparation of probable cause affidavits, and their opinions explaining how Benner failed to adhere to those standards are relevant and helpful to the jury in their resolution of whether Benner intentionally violated William's constitutional rights. Accordingly, their opinion testimony, sans Mr. Hennessy's assertions about the lack of probable cause and false arrest, are admissible.

Respectfully submitted,

Dated: July 22, 2019                    /s/ Richard A. Waples____
                                        Richard A. Waples
                                        Attorney for Plaintiff

**WAPLES & HANGER**
410 N. Audubon Road
Indianapolis, Indiana 46219
TEL: (317) 357-0903
FAX: (317) 357-0275
EMAIL: rwaples@wapleshanger.com

**CERTIFICATE OF SERVICE**

The undersigned certifies that on July 22, 2019, a copy of this document was filed electronically. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system:

Anne C. Harrigan: anne.harrigan@indy.gov
Traci Marie Cosby: traci.cosby@indy.gov

Office of Corporation Counsel
200 East Washington Street, Room 1601
Indianapolis, Indiana 46204

*/s/ Richard A. Waples*
Richard A. Waples

**WAPLES & HANGER**
410 N. Audubon Road
Indianapolis, IN 46219
TEL: (317) 357-0903
FAX: (317) 357-0275
EMAIL: rwaples@wapleshanger.com