UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| WILLIAM RAINSBERGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 1:16-cv-103-WTL-MJD |
| | ) | |
| CHARLES BENNER, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S REPLY IN SUPPORT OF MOTION TO EXCLUDE**

When an expert offers an opinion relevant to applying a legal standard such as probable cause, the experts role is "limited to describing sound professional standards and identifying departures from them." *Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir 2013)(citing *West v. Waymire*, 114 F.3d 646, 652 (7th Cir 1997)). Here, Plaintiff's proffered experts fail to clear that basic hurdle.

Expert testimony is admissible if offered by a witness qualified as an expert by knowledge, skill, experience, training, or education, and this specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, and if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. *U.S. v. Conn*, 297 F.3d 548 (7th Cir. 2002)(citing Fed.R.Evid 702). Rule 703 requires the expert to rely on "facts or data" as opposed to subjective impressions. *Ford v. Marion County Sheriff's Dept.*, 2018 WL 1169216 (S.D. Ind. 2018).

Here, the proffered experts do not sufficiently articulate how their expertise leads to the conclusions drawn. *See Zenith Elecs. Corp. v. WH-TV Broad Corp.*, 395 F.3d 416, 419 (7th Cir.

1

2005)("a witness who invokes 'my expertise' rather than…explain how his conclusions met [Rule 702's] requirements…[is] not entitled to give expert testimony."); *see also* Fed. R. Evid. 702 Advisory Comm. Notes ("if the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."). Rule 702 requires an expert to "explain the 'methodologies and principles' that support his opinion; he cannot simply assert a 'bottom line.'" *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010). Problematically, the Plaintiff's proffered experts did not explain this. Their testimony would not assist the trier of fact.

### A. The case at bar is distinguishable from *Jimenez.*

In *Jimenez,* Victor Romo and another boy encountered Eric Morro on a street in Chicago. The boy with Victor Romo shot and killed Morro. Romo identified this boy, the shooter, as Juan Carlos Torres. A friend of Morro's, Larry Tueffel, was present at the shooting. Tina Elder and Phil Torres were close by. Detective Bogucki was the investigator of the homicide. He used coercive tactics to convince Tueffel and Torres to falsely identify Jimenez as the shooter. Bogucki also tainted the testimony of other witnesses. He arranged for Elder to see a picture of Morro's body next to a picture of Jimenez prior to viewing the lineup. Bogucki knew that Jimenez owned a blue and white Duke University jacket, so he planted the idea with the witnesses that the shooter was wearing that color and style of jacket.

The police practices expert was permitted to testify regarding the steps a reasonable police investigator would have taken to solve Morro's murder, as well as the information that a reasonable police investigator would have taken into account as the investigation progressed. *Id.* at 721. The expert, McCrary, did not try to resolve conflicts in the testimony of different witnesses. *Id.* He

pointed out ways in which evidence from other witnesses indicated that Bogucki and his colleagues departed from reasonable investigation methods. *Id.* McCrary did not offer any opinion at trial as to probable cause at any stage of the investigation or the prosecution. *Id.*

*Jimenez* dealt, in part, with the presentation of identifications to be made by witness(es). In *Jimenez,* the investigator coerced and manipulated to procure those identifications. There are procedures on how to conduct a photo array or physical lineup with a witness. Officers tend to do and say the same thing each time to promote consistency. With IMPD, as with many police departments, officers undergo training on the law surrounding identification so they know what not to do. The testimony of a police expert on procedure in a case such as *Jimenez* differs from testimony in the present case.

First, Rossmo does not have experience regarding how the Indianapolis Metropolitan Police Department conducts homicide investigations. Even assuming that Rossmo's experience elsewhere is applicable to this locality, Rossmo does not delineate how that is so. Second, the opinions of the proffered experts do not focus on reasonable investigative procedures, or how those procedures were deviated from (if at all). There is no "how to" on conducting a homicide investigation, and therefore it differs from procedures that are more clearly set forth such as *Miranda* waivers or presentation of photo arrays.

In *Jimenez*, the reasonableness of the police procedures could be quantified and examined against the practice of other officers. Coercing a witness is not a reasonable investigative procedure. Nor is an unduly suggestive photo being shown to the witness prior to an identification. Planting suggestions as to what the suspect was wearing are likewise not reasonable investigative procedure. While *Jimenez* allows for the testimony of police practices experts within certain guidelines, those guidelines have not been demonstrated in the case at bar. An examination of

Plaintiff's proffered expert's reports and affidavits quickly reveals why.

### 1. Rossmo's report does not describe sound professional standards and identify departures from them.

In the present case, Dr. Rossmo's analysis of Benner's probable cause affidavit focuses on eight different items, which are analyzed separately. Rossmo opines – as to each- that Benner's reliance is unreasonable. [Dkt 50-31, pgs 11-12.] These opinions are not general discussions of police procedure, but rather, a specific attack of the facts in this investigation. A discussion of these "core allegations" follows.

1. The victim's assets totaled almost $100,000 and William Rainsberger was, along with his brother and sister, a beneficiary of her will.

Rossmo's opinion states that "being the beneficiary of someone's estate is not evidence of murder, it is not even motive absent the establishment of some financial need." [Dkt 50-31, pgs 12-13]. Rossmo states that the focus made little sense, and cites that Robert's financial situation was more dire than William's. He then quotes from Benner's deposition in the civil case: "William was the main suspect because he is the primary caregiver. He goes there every day…I had no reason to believe that Robert was over there. He said he hardly went over there." However, the complete question and answer for this testimony is as follows:

> Q: Now, wasn't Robert a suspect at this point?
>
> A: We asked him to take a polygraph also. I mean, William was the main suspect because he is the primary caregiver. He goes there every day. It seemed like everything- his comments he made. It was all circumstantial in the beginning. Mostly circumstantial probably when she filed the case, but that is the decision the prosecutor made. I had no reason to believe that Robert was over there. He said he hardly went over there. William was the main caregiver, went over there every day,

>paid for her groceries, paid her bills, took care of her. The comments that he made about her head being bashed in and possibly using a lead pipe, I mean, all that stuff was contradictory with what we believed at first. [Dkt 50-9 pg 74-75].

Dr. Rossmo does not offer in his analysis what reasonable investigative procedures would have been in regards to this evidence. The selective quote is telling. Benner's full answer offers an explanation as to why Robert was not a suspect and William was. Benner's sole reason was not merely that William was a beneficiary of the estate. Rather, it was one fact which, coupled with other facts, he took into account. Namely, that William had far more opportunity to commit the offense given his access to the victim (every day) versus Robert (who hardly went over there). Additionally, William's comment about the victim's head being bashed in also factored into Benner's consideration. Rossmo's analysis does not state how Benner including this fact in his analysis deviated from reasonable investigative procedures.

2. Cell phone records show William Rainsberger was in the area of the murder during the relevant time period the murder was most likely committed.

Dr. Rossmo focuses on the "relevant time period." He states that the police never established a relevant time period for when the murder occurred. He points to the fact that Benner did not seek a time of death estimation from the pathologist or medical examiner, or seek medical or forensic opinions for the estimated time of the victim's wounds. [Dkt 50-31, pgs 13-14]. Rossmo accuses Benner of circular reasoning, stating that Benner believed the relevant time period was because William was not in Indianapolis the prior night. He then cites a portion of Benner's deposition wherein Benner states "well my relevant time period was the morning because I- it appears to me that he was there [Plainfield] overnight. She could not have survived that long." However, the deposition continues:

>Q: Do you have any medical training?

5

A: No.

Q: Are you-

A: I talked to the pathologist though.

Q: Are you making a medical judgment, though, when the attack would have occurred because based on how long she would survive with that wound?

A: That was just going by the seriousness that the pathologist said the wounds were.

[Dkt 50-9, pg 90-91]

The deposition continues:

Q: And how long had she been in that condition? I think we established that you don't know. It could have been that morning or the night before; correct?

A: I suppose it could have been the night before; but, I mean, there was still blood that wasn't coagulated. There was still blood that was wet. I mean, it surely would have been dried if she was there all night.

[Dkt 50-9, pg 91].

Again, this is not a discussion of general police procedures. Rossmo faults Benner for not establishing the relevant time period. However, Benner did consult with the pathologist. This, coupled with his observations of the condition of the blood at the scene, helped form the basis for his determination of the time period. Rossmo does not demonstrate how this deviates from reasonable police procedures.

   3. Cell phone records show a call was made from the victim's landline to Robert, William Rainsberger's brother, an hour before William claimed to find his mother's body.

Rossmo concludes that police investigators were careless and misinterpreted telephone records, failing to recognize that the call to Robert's cell phone had been routed to a Chicago area code. [Dkt 50-31, pgs 14-15] There is no general discussion about police procedures regarding cell

6

phone records. Rather, the discussion is specific to this case and how the police were careless. Rossmo does not delineate what a reasonable investigative procedure would have been, and rather bemoans Benner's reliance upon Detective Ben Bierce. Rossmo does not state whether such a reliance deviates from sound professional standards or reasonable investigative procedures.

    4. In that intervening hour, William Rainsberger threw a "straight object" into a garbage can in front of the Kroger store located across the street from his mother's apartment. He looked around for cameras both before and after doing this.

Rossmo states that "Detective Benner's use of innuendo is more obvious here than anywhere else." [Dkt 50-31, pgs 16-17]. Rossmo then sets forth Benner's "perceptions and beliefs" about the object. Rossmo then engages in an analysis of the video frame by frame, complete with still images, discussing his perceptions and beliefs about the object. While this discussion certainly demonstrates why Rossmo's beliefs about the object differ from Benner's beliefs, there is no discussion regarding what sound professional standards would have been and how this allegedly deviated from them.

    5. There were no indications of a burglary or to the victim's apartment- no signs of forced entry (William Rainsberger had a key), no evidence of ransacking, and nothing stolen.

Rossmo states Benner ignored William's statement that he found the door to the apartment unlocked, and moreover, ignored the possibility of a burglary. [Dkt. 50-31, pgs 20-21]. Again, there is no discussion of sound professional standards, or how this perceived discounting of a burglary theory was a departure from such standards. Benner testified that the victim's checkbook, visa cards and cash were in the apartment. [Dkt 50-4, pg 59]. In regards to the "missing purse" discussed by Rossmo, Benner cited these items as being things he would normally expect in a purse, "so I don't know what she would be keeping in a purse." Rossmo points to the testimony of Crime Scene Specialist Jenny Lane, in which she stated that the top four drawers of a credenza and a nightstand were slightly opened. However, Ms. Lane also states that "it did not appear they

had actually been gone through at all." [Dkt 50-31, pg 20]. Rossmo does not describe sound professional standards or identify how Benner's discounting of a burglary theory is a departure from them.

> 6. Rainsberger told people his mother's head had been bashed in even though he had not seen the actual injury, suggesting he knew how the injury was inflicted.

Rossmo does not identify what sound professional standard would direct a police officer investigating a homicide to discount this sort of information. An individual seeming to know how a wound was inflicted when it was not obvious to at least one first responder how the injury occurred certainly seems worthy of an investigator's attention. Rather than a discussion of reasonable investigative practices, it is an *ex post facto* attack of the specific facts of the case in an effort to make William's statement reasonable. [Dkt 50-31, pg 21-22].

> 7. After calling 911, Rainsberger left his mother unattended in the apartment and sat outside until police arrived. He did not ask detectives how she was doing or if he could go to the hospital to see her. He did not show signs of grief or show interest in the progress of the investigation.

Rossmo does make a general statement that interpreting the demeanor of the victim of a crime can be problematic because people respond to things in different ways. [Dkt 50-31, pgs 23-24]. He does not, however, discuss what sound professional standards would be to assess an individual's demeanor. Instead, Rossmo justifies the actions William took as to why he went outside and left his mother unattended. Likewise, Rossmo justifies William's lack of communication with Benner as being due to Benner's suspicion of William as a suspect. While there was communication between William and Rebecca, who was at the hospital, that does not negate the remainder of the demeanor Benner was observing at the time. While there is much devoted to justifying William's actions and explaining his demeanor, there is not discussion of how this evaluation by Benner deviated from sound professional standards.

       8.   Rainsberger refused to take a polygraph and became angry when asked to do so.

Just as in the preceding paragraph, there is no discussion of sound professional standards regarding the evaluation of a refusal to take a polygraph. There are justifications made as to why William didn't want to take the polygraph- officers had to watch him when he went to the restroom at the scene, he thought polygraphs were "BS", he was yelling no more than they [officers] did, he had a right to refuse- but there is no discussion regarding how Benner's consideration of William's behavior and demeanor in the refusal was a deviation from standard practices. [Dkt 50-31, pgs 24-27].

Rossmo's report does not set forth sound professional standards and identify deviations from them. (See *West,* supra). Unlike the testimony in *Jimenez,* there lacks a discussion of reasonable investigative procedures or a departure therefrom. It evaluates each "core allegation" separately, ignoring that an investigator is going to look at the totality of the case rather than piecemeal. A difference in the interpretation of evidence does not equate to a deviation from a sound professional standard or reasonable investigative procedure.

    **2.**   **There is no clear methodology to Rossmo's opinion and it is not reliable under Daubert or 703.**

Expert testimony is admissible at trial if the testimony is relevant to a fact at issue, is based on sufficient facts or data, and is the product of reliable scientific or other expert methods that are properly applied. *Sanders v. City of Chicago Heights*, 2016 WL 4417257 (N.D. IL 2016)(citing *Stulmacher v. Home Depot,* 774 F.3d 405 (7th Cir 2014). In determining reliability, a critical inquiry is whether there is a connection between the data employed and the opinion offered; it is the opinion connected to existing data 'only by the *ipse dixit* of the expert' that is properly excluded under 702. *Id.* (citing *Manpower Inc. v. Ins. Co. of Pennsylvania,* 732 F.3d 796 (7th Cir 2013)). In other words, "it is critical under Rule 702 that there be a link between the facts and data the expert

9

has worked with and the conclusion the expert's testimony is intended to support." *Id.* (quoting *United States v. Mamah,* 332 F.3d 475, 478 (7th Cir 2003).

It is unclear how Rossmo reached his conclusion that Benner was suffering from tunnel vision and confirmation bias. There is not a methodology set forth on how Rossmo made his conclusion. It appears to be a subjective analysis without the benefit of neutral factors or a clear method to gauge what is being evaluated. It lacks the reliability 703 demands.

3. **The Affidavit of David Hennessy does not discuss sound professional standards and departures therefrom**.

The Affidavit of David Hennessy [Dkt 50-29] does not discuss reasonable investigative procedures, or ways in which the investigation deviated from these procedures. There are factual assertions which do not need to be relayed by an attorney expert to be understood by the trier of fact, such as: the murder charge being dismissed, the charges being based on a probable cause affidavit Benner wrote, and the wording of the charging information. It also contains interpretation of evidence, such as the phone records and Kroger video. And it is replete with legal conclusions: William should never have been arrested or charged, Benner misled the court in his probable cause affidavit, William was falsely arrested and accused of murdering his mother, these charges were eventually dropped when Benner's probable cause fell apart and it became apparent the State had no case against William.

This affidavit and proffered testimony does not lend itself to fall into the category of specialized knowledge that will assist the trier of fact. It does not contain any description of sound

professional standards, or identify any deviation from those standards. In short, it fails to meet the standard for admissibility under Federal Rule of Evidence 702, 704 (b) or *Jimenez*.

## Conclusion

Neither the testimony of Dr. Rossmo nor David Hennessy meet the requirements for admissibility under Federal Rule of Evidence 702. Neither opinion sets forth sound professional standards or deviations from them. Neither discloses a methodology by which the conclusion and opinion may be judged, therefore making it unreliable. While *Jimenez* does allow for the testimony of police practices experts within certain guidelines, those guidelines have not been met here. For the reasons stated above, as well as those in the Defendant's Motion [Dkt. 115], Rossmo and Hennessy must be excluded from testifying in this case.

Respectfully submitted,

/s/ *Anne C. Harrigan*

Anne C. Harrigan (23601-64)
Chief Litigation Counsel
OFFICE OF CORPORATION COUNSEL
200 East Washington Street, Room 1601
Indianapolis, Indiana 46204
Telephone: (317) 327-4055
Fax: (317) 327-3968
E-Mail: anne.harrigan@indy.gov